```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

HOAI NGO,

                Plaintiff,

        v.                              17 CV 1727 (GHW)

OPPENHEIMER & CO., INC.,
                                        Conference
                Defendant.
------------------------------x
                                        New York, N.Y.
                                        May 9, 2017
                                        11:30 a.m.
Before:

        HON. GREGORY H. WOODS

                                        District Judge




            APPEARANCES


VLADECK RASKIN & CLARK P.C.
        Attorneys for Plaintiff
BY:     JEREMIAH IADEVAIA
        VALDI LICUL


SATTERLEE STEPHENS LLP
        Attorneys for Defendant
BY:     JOHN COSTER
        MICHAEL GIBSON
```

1         (Case called)
2         THE COURT:  Good morning.  We are here for an initial
3    pretrial conference for this case.  My agenda for this
4    conference follows.
5         First, I am going to give each of the parties an
6    opportunity to describe any legal or factual issues that you
7    would like to draw to my attention.  I have read all of the
8    documents that have been submitted on the docket to date.
9    Still, it can be helpful for me to hear how you characterize
10   those facts and issues.
11        Second, I hope to discuss the process that we will be
12   using to litigate the case going forward.  At the outset of
13   that, we'll discuss the premotion submissions by the parties
14   and the proposed motion to compel arbitration.  We will then
15   discuss the proposed case management plan that was presented by
16   the parties and the conduct of discovery in the case and what
17   the parties' expectations are with respect to that.
18        Last, I hope to take up the question of whether there
19   is anything I can do to help facilitate an amicable resolution
20   of the case.
21        Is there anything that any of you would like to add to
22   that agenda before we proceed?  Counsel for plaintiff?
23        MR. LICUL:  No, your Honor.
24        MR. GIBSON:  No, your Honor.
25        THE COURT:  Counsel for plaintiff.

1       MR. LICUL:  Your Honor, in a nutshell, it is an FMLA
2  and discrimination and retaliation claim.  Mr. Ngo started in
3  2009.  By late 2013 he worked his way up to being a co-head of
4  a fixed income group and was making more than others of his
5  peers, actually was on a fast track.
6       In the spring/summer of 2014, he announced that he and
7  his partner were having a child in California and requested
8  FMLA leave.  He took that leave in the spring and summer but
9  was not really granted it in the true sense, in the sense that
10 his managers basically told him that he should not take the
11 full leave, that while the company has a 12-week FMLA policy,
12 which is the law, they don't have a paternity leave policy.
13 There was an encouragement really to not take that leave.
14      Afraid for his job, he worked through some of it and
15 was prepared to return before the 12 weeks until he suffered a
16 brain aneurysm in August of 2014 and had to extend his leave by
17 an additional month or so.  Effectively, he was out from June
18 24, 2014, until November 3, 2014.  Part of that was FMLA leave
19 for the birth of his daughter.  The last month or so of that
20 was a request for an accommodation under the ADA and local laws
21 to extend that.
22      When he returned, he was basically demoted.  Certain
23 compliance functions were removed on the very first day that he
24 returned.  The next day, when he met with his supervisor, he
25 was told that he was no longer co-head of the group, which was

1  a practical demotion.  He then suffered two rounds of decreased
2  pay, $160,000 less in February of 2015.  In February of 2016
3  his pay did not decrease but it was less than when he was the
4  co-head of the group, if that makes sense.  Then he was fired
5  in June of 2016.
6        Our argument here, your Honor, is it's a violation of
7  the FMLA because he exercised his FMLA rights for the birth of
8  his daughter, after which he was demoted.  It's a violation of
9  the ADA and the local laws because the request for an extension
10 of leave is an accommodation under those laws and he was not
11 granted that accommodation.  He was allowed to take the leave
12 but then demoted, had his pay cut, and was fired.
13       It is also our position that this was a violation of
14 Title VII and local antidiscrimination laws based on sex
15 because the employer made clear throughout that while it
16 allowed 12 weeks of leave for women, it did not have a
17 paternity leave policy.  So it treated Mr. Ngo differently than
18 it did his female counterpoints.
19       That's it in a nutshell, your Honor.  If you would
20 like, I can address the issue of the arbitration or we can hear
21 from defense counsel, whichever the Court would like.
22       THE COURT:  Thank you.
23       We will hear from defense counsel first as a general
24 matter.  I will hear from them first with respect to the
25 proposed motion and give plaintiff the opportunity to respond.

1    Counsel, what would you like to tell me about the case?

2            MR. GIBSON:  Thank you, your Honor.  What I can tell

3    you about the case is that Oppenheimer denies that the

4    termination of Mr. Ngo was the result of any discriminatory

5    conduct.  Mr. Ngo was terminated as a result of legitimate,

6    nondiscriminatory reasons: specifically, restructuring within

7    that particular sector that he worked in.

8            Oppenheimer denies that there was any pressure or

9    admonition given to Mr. Ngo by Oppenheimer to not take his

10   leave or to work through his leave.  Mr. Ngo did continue to

11   provide some services to Oppenheimer during that leave period.

12   I believe there is some dispute is to whether those services

13   were actually being provided or not.

14           Counsel also mentioned that Mr. Ngo received a

15   reduction in pay shortly after his return.  A few points on

16   that.  First, my understanding is that the compensation that

17   counsel was referring to is a discretionary bonus.  Secondly,

18   one of the reasons that Mr. Ngo received a lower bonus upon his

19   return is because he was no longer providing supervisory

20   functions for the particular sector that he was an analyst in.

21           In a nutshell, your Honor, Oppenheimer denies all

22   claims of discrimination or retaliation in this case.  As

23   counsel mentioned, Oppenheimer takes the position that Mr. Ngo

24   agreed to arbitrate this dispute, and we will address that at

25   the appropriate time.

1    THE COURT:  Thank you.  Do you care to provide a
2  reaction to the plaintiff's argument regarding the failure to
3  accommodate with respect to the requested extension of time?
4    MR. GIBSON:  Yes, your Honor.  As with the allegation
5  that Mr. Ngo was pressured into not taking leave, Oppenheimer
6  also denies the allegation that any reasonable accommodation
7  that was requested by the plaintiff was denied.
8    THE COURT:  Thank you.
9    Counsel, let me turn to you.  I have seen defendant's
10  letter describing the basis for proposed motion to dismiss.
11  Let me ask you to please tell me the bases for the proposed
12  motion.
13    MR. GIBSON:  Yes, your Honor.  As part of his
14  employment with Oppenheimer, Mr. Ngo signed a written agreement
15  to arbitrate all disputes, including the specific
16  discrimination claims that he has alleged in this case before
17  FINRA.  That's a written agreement that was signed by Mr. Ngo
18  in 2009.
19    In counsel's letter to your Honor in response to our
20  pre-motion letter, counsel suggests that this arbitration
21  agreement that is in dispute here was somehow hidden in an
22  employee handbook that had some conditional language in it and
23  is therefore unenforceable.  I will submit, your Honor, that
24  that argument is incorrect, for a number of reasons.
25    First of all, the subject arbitration clause here was

1  not just hidden in some 25-page employment handbook.  It's a
2  separate, free-standing agreement that was executed by Mr. Ngo.
3  Many of the cases that are cited by counsel in his letter to
4  your Honor, which I will note are all from outside of this
5  circuit, stand for the proposition that in some cases, if an
6  arbitration clause is hidden inside of a large employee
7  handbook and that employee handbook has conditional language
8  saying that it does not constitute a contract for employment,
9  that arbitration provision is unenforceable.  That is not the
10 case here.
11        There is a separate written arbitration agreement
12 executed by Mr. Ngo.  That substantively identical arbitration
13 agreement has been enforced by this Court before, two years ago
14 by Judge McMahon and two years prior to that in this court.  As
15 a matter of fact, as opposed to the cases cited to by Mr. Ngo's
16 counsel, the courts of this circuit routinely hold that an
17 arbitration clause contained within an employee handbook, even
18 if it is not separately signed, like this one is, and even if
19 it does not have a conditional language that is not a contract
20 of employment, it is still entirely enforceable.
21        Thank you, your Honor.
22        THE COURT:  What case do you point me to for the last
23 assertion?
24        MR. GIBSON:  I would point you to the case of <u>Isaacs</u>
25 <u>v. OCE Business Services</u>.  It's 2013 CV 548, Judge Koeltl.  In

1  that case Judge Koeltl held, "An arbitration agreement,
2  including in an employee handbook with language providing that
3  the handbook does not constitute a contract of employment or
4  that the arbitration policy may be amended, is enforceable when
5  the language of the arbitration agreement is distinct and
6  mandatory and when the employee is advised of the policy and
7  that compliance with it is a condition of employment."  In that
8  decision there was a citation to Brown v. St. Paul Travelers,
9  which is a Western District of New York case from 2008, 559
10 F.Supp.2d 288, which was affirmed by the Second Circuit in
11 2009.
12          If your Honor wishes, the citation to the matter of
13 Rusciano v. Oppenheimer --
14          THE COURT:  That's in your letter.
15          MR. GIBSON:  Yes.  Thank you, your Honor.
16          THE COURT:  Thank you.  In your comments now, counsel,
17 you haven't placed much weight on the first of your two
18 proposed arguments: namely, that without need for a contract,
19 the FINRA rules obligate the plaintiff to arbitrate this
20 dispute.  Do you care to address that?
21          MR. GIBSON:  Yes, your Honor.  The intent of pointing
22 out the FINRA rule was to identify the fact that Mr. Ngo agreed
23 to arbitrate twice: by virtue of his registration and by virtue
24 of his separate written agreement to arbitrate.  I do concede
25 that counsel is correct that the FINRA rules say there is not

1  mandatory arbitration for discriminatory claims such as these
2  absent a separate written agreement, which we submit exists in
3  this case.
4          THE COURT:  Thank you.  I saw you referring to what
5  appears to be the arbitration agreement itself.  Would any of
6  the parties mind if I looked at the agreement while the
7  conference is proceeding?  Counsel for plaintiff?
8          MR. LICUL:  No problem.  Thank you, your Honor.
9          THE COURT:  Thank you.  Please send it forward.  Good.
10 Thank you.
11         Counsel for plaintiff, let me hear from you, please.
12         MR. LICUL:  First, the Rusciano matter, your Honor,
13 dealt with different challenges than we are dealing with here,
14 so it is not precedent for our claims.
15         I agree, your Honor, that there is no conflicting law
16 out there.  However, there is no doubt that this arbitration
17 provision is inside the handbook.  It is listed at page 24 of
18 24 of the handbook.  It is within that handbook.  It is not a
19 separate, free-standing agreement.  It is within that handbook.
20         On page one of that handbook is crystal clear language
21 which says that this is a general reference guide and not a
22 contract.  The state case law -- and I will explain to your
23 Honor why that is important -- is crystal clear from the New
24 York Court of Appeals that that disclaimer language prevents
25 the creation of a contract.

                    Why state law is important is because notwithstanding
the FAA's preference for arbitration and the FAA's application
when there exists an agreement to arbitrate and a thumb on the
scale of arbitration, the FAA's preference for arbitration does
not apply in determining whether there is a contract in the
first place.  That is a pure question of state law.

                    The New York State Court of Appeals has clearly held
that such disclaimer language prevents the creation of a
contract.  An agreement wrapped inside something else that says
it's not an agreement doesn't have the clarity to make it a
contract.  The cases, your Honor, are cited in our letter.

                    There are cases, Isaacs and some others, that say that
if you have the agreement inside a contract, the language
notwithstanding, it still is a contract.  We respectfully
disagree.  We don't think that in those cases the courts have
applied the law correctly.  The reason is because they ignore
state case law on how to form a contract to arbitrate.  They
use what we call the special circumstances doctrine.

                    The special circumstances doctrine applies under New
York State law to determine the circumstances under which
someone will be excused from performing under an already
existing contract, duress and things like that.  It does not
apply to the formation of the contract, which is the key thing
here.

                    I don't know, your Honor, for a fact that any of the

1  other cases, which largely rely on the Brown case, frankly --
2  they all stem from that Western District Brown case -- I'm not
3  sure that any of the courts had to deal with this specific
4  issue and with the application of Lobosco, which is the Court
5  of Appeals case which says that disclaimer language prevents
6  the creation of a contract.
7      THE COURT:  Thank you.  I have been handed a copy of
8  what defense counsel asserts is the arbitration agreement at
9  issue.  It is a one-page document, page 24 of 24.  At the top
10 of the page it begins in all caps the words "ARBITRATION
11 AGREEMENT."
12     Can I ask counsel for plaintiff, in the cases that you
13 point me to as support for your view regarding whether a
14 contract has been created here, consistent with the structure
15 that I see for this document as laid out in front of me -- this
16 appears to be an employment agreement, it is the last page of
17 it, and it starts off with a header that says "ARBITRATION
18 AGREEMENT" -- what is the basis for the conclusion that any
19 caveats that existed with respect to prior elements of the
20 employment manual also apply to this last page?
21     MR. LICUL:  Your Honor, the caveat that the disclaimer
22 language applies also to the last page of the agreement is that
23 the language says this is not a contract.  In other words, page
24 1 of the document that this page 24 is wrapped in says this is
25 not a contract.  This is just intended to be a general

1  reference guide.  It doesn't say this is not a contract except
2  for page 24.  It implies the entire contract.
3            If the plaintiff in this case would have said that
4  Oppenheimer breached the provision on page 15, for example, no
5  doubt Oppenheimer would have argued, and correctly, that the
6  disclaimer language prevents the creation of a contract based
7  upon clear New York State law.
8            Now, I understand, your Honor, that the disclaimer
9  language is in tension with the last page and the fact that it
10 contains what seems to be mandatory language and is signed.  I
11 agree, your Honor, that they seem to be saying two different
12 things.  One says this entire thing is not a contract.  The
13 last page seems to say this is a contract.  But under well-
14 settled New York law, that kind of ambiguity and that kind of
15 lack of clarity prevents the formation of a contract because it
16 could be both.
17           THE COURT:  On the precedent, did those cases present
18 the same situation as here?  In other words, is the provision
19 that purports to be an arbitration agreement set apart from the
20 remainder of the document, as appears to be the case here, or
21 is it I'll call it a subsection within a broader employment
22 guide?
23           MR. LICUL:  Your Honor, I believe, and my memory may
24 be failing me, that the one case out of Texas has pretty
25 identical facts.  I believe that to be the case.

1    THE COURT: Thank you. I have read the Texas case. It is not apparent from that case that is identical facts. In fact, if I recall the holding of the Texas court, to the extent that it has any persuasive effect here, the court distinguishes stand-alone arbitration agreements, an agreement that is independent from the handbook. The question there would be whether page 24 of 24 with the header "ARBITRATION AGREEMENT" is a stand-alone document that the court would consider differently.

MR. LICUL: I believe, your Honor, there is at least one case where the agreement both stands within the handbook and outside the handbook. I don't recall specifically whether the Texas case. I think it was the fact that the agreement also was signed independently outside the handbook that created the contract.

In any event, your Honor, we largely cited those cases as being persuasive. Obviously, they don't deal with New York State law. We do think that New York State law, the Lobosco case, is controlling on the point of the disclaimer language.

THE COURT: Good. Thank you very much. I appreciate the arguments on this point.

Let me turn to counsel for defendant. By when would you propose to file your motion to compel arbitration?

MR. GIBSON: Your Honor, if it is acceptable to the Court, I could have a motion filed within two weeks.

1    THE COURT:  Let me turn to counsel for plaintiff.
2  What is your view regarding that request?  As I understand it,
3  the proposal is that the motion to compel arbitration would be
4  filed by May 23rd.
5    MR. LICUL:  That's fine with us, your Honor.
6    THE COURT:  Good.  Thank you.  How much time would you
7  like to request, counsel for plaintiff, to file an opposition
8  to the proposed motion to compel arbitration?
9    MR. LICUL:  May we have two weeks also?
10   THE COURT:  Thank you.  I'd be happy to give you that
11 much time.
12   I expect, counsel for defendant, that you will be
13 submitting together with the motion both the arbitration
14 agreement and the employment handbook in which it is embedded.
15   MR. GIBSON:  Yes, your Honor.
16   THE COURT:  Good.  Thank you.  The briefing schedule
17 for the motion to compel arbitration follows.  The motion
18 itself will be due on May 23.  Any opposition to that motion
19 will be due no later than June 6th.  The reply, if any, will be
20 due no later than June 13, one week following service of the
21 opposition.
22   Good.  Thank you for that, counsel.  I look forward to
23 seeing your arguments with respect to this issue.
24   Let's talk about discovery and the process that we'll
25 be using with respect to litigation of the case generally going

1  forward.  I see that the parties anticipate that discovery will
2  functionally be stayed pending resolution of the motion to
3  compel arbitration.  That appears to be the premise with which
4  the parties approached the preparation of the case management
5  plan.  Is that accurate, counsel for plaintiff?
6          MR. LICUL:  Yes, your Honor, that is the way we
7  approached it.
8          THE COURT:  Thank you.
9          Counsel?
10         MR. GIBSON:  Yes, your Honor.
11         THE COURT:  Fine.  I understand that the parties have
12 effectively requested or are requesting that I stay discovery
13 in this case pending resolution of the motion to compel
14 arbitration, and I am willing to grant that request.  I think
15 that good cause exists.
16         The potential motion to compel arbitration raises
17 substantial questions of law that, if granted, would be
18 completely dispositive of the issues raised in this court, and
19 as a result the parties' position on that is reasonable.  I
20 will endorse it and separately enter an order staying
21 proceedings in this case pending resolution of the motion to
22 compel arbitration.
23         Nonetheless, since you are here, I would like to talk
24 about what you anticipate discovery will look like.  What I
25 expect to do if I deny the motion to compel arbitration is to

1    request that the parties submit a new case management plan with

2    dates that are triggered off of the new date.

3            In order to not require that you come back to talk

4    about discovery, I would like to take some time to hear what

5    you anticipate regarding discovery should you proceed in this

6    court to conduct discovery.  Counsel for plaintiff, what do you

7    anticipate that you would do in order to complete discovery in

8    this case should your claims proceed here?

9            MR. LICUL:  Your Honor, this is a single-plaintiff

10   case.  I anticipate that we could get discovery done in a

11   matter of three or four months.  I anticipate we would start

12   first with some type of initial disclosures, whether it is the

13   general initial disclosures or whether or not we are doing the

14   protocol discovery for employment cases, followed by paper

15   discovery, followed by depositions.  That's the typical course

16   that I often take.

17           THE COURT:  Thank you.  I understand the parties have

18   not yet completed your initial disclosures.  Do you have a

19   sense nonetheless, counsel, of how many depositions you might

20   be taking in the case?

21           MR. LICUL:  Your Honor, I envision probably five to

22   seven.  We don't know yet all of the folks involved.  Mr. Ngo's

23   two managers, I'm assuming there will likely be at least one or

24   two people from human resources, and there usually are a couple

25   of people that we can find that we want to hear from.  We are

1   certainly not waiving our right to take up to ten, but that's
2   what I anticipate.
3           THE COURT:  Thank you.  At this point do you
4   anticipate any third-party discovery?
5           MR. LICUL:  Your Honor, we don't intend to have an
6   expert.  I know that is a bit of a different question.  And I
7   don't see any third-party discovery at this time based upon the
8   information I have.
9           THE COURT:  Thank you.
10          Counsel, the same question for you.  Can you tell me
11  what it is?
12          MR. GIBSON:  Yes, your Honor.  I generally agree with
13  counsel.  I think three to four months, particularly if we are
14  talking about ten depositions, might be a little aggressive,
15  but I think that is in the time frame.  I also don't foresee an
16  expert witness in this case.
17          As far as third-party discovery, the only third-party
18  discovery that comes to mind now is if Mr. Ngo is currently
19  employed elsewhere, discovery regarding his earnings at his
20  current employer.  That is the only third-party discovery that
21  I can think of at this point.
22          THE COURT:  Good.  If I deny the anticipated motion to
23  compel arbitration and to dismiss the case, I will ask the
24  parties to submit a new case management plan, which I will then
25  order.  The information you have just given me is helpful and

1   hopefully will save time if that happens.  Is there anything I
2   can do help you resolve the case amicably now?
3           MR. LICUL:  I don't think so, your Honor.  We have had
4   discussions with both in-house and outside counsel, and we have
5   a good relationship.  We have made some efforts.  We are not
6   there.  Certainly, your Honor, if we believe that you could
7   help, we would not hesitate to reach out.
8           THE COURT:  Good.  Thank you.  Let me ask -- this goes
9   to the briefing schedule -- is there any reasonable possibility
10  that in the time between now and the time that defense counsel
11  has to submit their motion there will be enough movement to
12  make it reasonable for me to push back the deadline for
13  submission of defendant's motion?  What is your view?
14          MR. GIBSON:  Your Honor, I actually was not the
15  attorney who was involved in settlement discussions.  My firm
16  was just engaged.  Counsel had settlement discussions directly
17  with house counsel at Oppenheimer.  I'll be taking over that
18  now.  I'm certainly hopeful to continue discussions.
19          From my understanding of where the parties left off
20  before my engagement, I think it is unlikely that this case
21  will get resolved prior to disposition of this motion, but we
22  will certainly make every effort.  As counsel indicated, if we
23  feel the Court can be helpful, we will not be shy to ask.
24          THE COURT:  Good.  Please let me know if there is
25  anything I can do, particularly if it would be helpful to enter

1    a reference to the assigned magistrate judge or to the
2    mediation program.
3            Also, if you do discuss between now and the date that
4    the motion is to be filed the possibility of a settlement, if
5    you think it would be helpful for me to push back the deadline
6    for the motion to save money on the briefing process, let me
7    know.  Just send me a joint letter.  I'd be happy to entertain
8    that.  To the extent that lawyer money is money that can
9    instead be put into a settlement, I would be happy to help that
10   happen.
11           Is there anything else that we should discuss before
12   we adjourn?  Counsel?
13           MR. LICUL:  No, your Honor.
14           THE COURT:  Thank you.
15           Counsel?
16           MR. GIBSON:  No, your Honor.
17           THE COURT:  Good.  Thank you all.  This proceeding is
18   adjourned.
19           (Adjourned)
20
21
22
23
24
25