# EXHIBIT A

JAMS ARBITRATION
No. 1425025377

**HOAI NGO,**

  **Claimant,**

 and

**OPPENHEIMER & CO. INC.,**

  **Respondent.**

_____

FINAL AWARD

1. <u>Parties</u>: Hoai Ngo    (Claimant)

   Oppenheimer & Co. Inc. (Respondent)


2. <u>Attorneys</u>: Valdi Licul, Esq.   (Claimant)
     Jeremiah Iadevaia, Esq.
     Vladeck, Raskin & Clark, P.C.
     565 Fifth Avenue
     9th Floor
     New York, New York 10017
     Tel.: 212-403-7311
       212-403-7323

     Michael H. Gibson, Esq.  (Respondent)
     John J. Coster, Esq.
     Satterlee & Stephens LLP
     230 Park Avenue
     Suite 1130
     New York, New York 10169
     Tel.: 212-404-8726
       212-404-8712


3. <u>Arbitrator</u>: Michael H. Dolinger
     JAMS
     620 Eighth Avenue
     34th Floor
     New York, New York 10018

1

4. <u>Case Manager</u>:   Shavonne Applewhite
                         JAMS
                         620 Eighth Avenue
                         34th Floor
                         New York, New York 10018
                         Tel.: 212-607-2712
                         Fax: 212-751-4099

Findings and Conclusions

Hoia Ngo, formerly a high-yield research analyst at
respondent Oppenheimer & Company, initiated this arbitral
proceeding in 2018 against his former employer. His allegations
target a series of events spanning the period from May 2014 to
June 2016, when the firm terminated him. His complaints focus on
the firm's treatment of him starting when he assertedly sought to
take leave under the Family Medical Leave Act ("FMLA"), 29 U.S.C.
sec. 2601 <u>et seq</u>.. He alleges that this effort led to his
demotion, reduction in pay and eventual firing. These allegations
gave rise to claims for interference with FMLA rights,
retaliation for invocation of FMLA rights, discrimination on the
basis of gender, and retaliation for seeking a disability
accommodation.

Following the conclusion of discovery, we conducted an
arbitral hearing on March 4-7, 2019. With post-hearing briefing
completed, we now address the evidence and the claims and
defenses asserted in this case.

1. <u>The Pertinent History</u>

Mr. Ngo began employment in the financial industry in 1999,
starting with J.P. Morgan. (Tr. 19-20). After a brief stint and
layoff there, he worked at Bear, Stearns for five years and then
transferred to RBS Greenwich Capital, from which he was laid off,
followed by two years out of the business. (Tr. 21-31).

He then applied for a position at Oppenheimer, which hired
him in 2009 to serve as a senior research analyst in the firm's
taxable high-yield research group. (Tr. 38-40; Ex. 110). Those
researchers served the taxable high-yield sales and trading
staffs of Oppenheimer and thus focused on the debt instruments of
companies with weaker performance or poor credit histories. (Tr.
40-41, 46 (referring to distressed companies)). This part of the
firm's business had been acquired in 2008 from CIBC. (Tr. 732-33,
828-29). The role of the researchers was to provide market
analyses of business sectors and individual companies that might
be of interest to clients of the firm as well as to the

2

Oppenheimer high-yield traders, and to assist sales personnel by interacting with clients either at the sales person's request or by direct contact from the client. (Tr. 48-49, 56-57). The high-yield research staff was always quite small, never exceeding five or six during the relevant period and shrinking to only three for much of that time. (Tr. 53). Indeed, by the time of the hearing, the research team consisted of only two analysts, including the head of the team. (Tr. 794).

The researchers were paid a fixed salary and were eligible to receive an annual discretionary bonus. Mr. Ngo's starting salary was $100,000.00 and his first bonus (for a part-year performance) was $20,000.00. (Exs. 110, 11(B); Tr. 125-26).

At the time of Mr. Ngo's hiring, the research team was headed by Todd Morgan, who became Mr. Ngo's supervisor. Mr. Morgan in turn reported to Robert Lowenthal, who was the head of the taxable fixed-income department. The taxable high-yield sales group was led by Jane Ross, who had come over from CIBC in 2008, and she too reported to Mr. Lowenthal.

Mr. Ngo was ultimately assigned three sectors to cover. These involved paper and packaging, chemicals, and metals and mining. (Tr. 60-61). He apparently performed quite satisfactorily, and indeed received a very favorable evaluation in 2010 based on the comments of high-yield sales personnel. (Tr. 70-83; Ex. 34 at OPCO 1258).[1] Mr. Ngo was promoted twice, to senior director and managing director. (Tr. 85-86). In 2012 Mr. Ngo received a job offer from CIBC, and Mr. Lowenthal decided to offer him a raise in salary to match or exceed the CIBC offer. Thus, in 2013 his base pay was raised from $100,000.00 to $150,000.00. As for his discretionary bonus for that year, it was $270,000.00, which nearly equaled his bonus for the preceding year. (Tr. 101-02, 110-16; Exs. 11(C-F).[2]

In late 2013 Mr. Morgan left Oppenheimer for another firm. Based on his recommendation, Mr. Lowenthal appointed Mr. Ngo and one of his more senior colleagues -- Colleen Burns -- as co-heads of the research team. Both now reported to Mr. Lowenthal as their supervisor. In Mr. Ngo's capacity as co-head, he was expected to

---

[1] The firm did not do periodic formal reviews, and the 2010 assessment was apparently sui generis.

[2] Mr. Ngo's bonus in 2010 -- his first full year at Oppenheimer -- was $170,000.00. By 2012 it had reached $270,833.00. (Exs. 11(C), (E)).

3

continue to churn out his own research reports, but also was
responsible for issuance of the daily newsletter known as the
Morning Blast (although it consisted of a compilation of
observations by all of the research analysts, as well as
providing supervisory approval –- referred to as SAing -- for
other researchers' reports. (Tr. 55-59, 96-100) In addition, the
co-heads performed some limited liaison with the firm's
compliance personnel. (Tr. 89-90). Although both co-heads were
fully responsible for these tasks, it appears that in the months
following their joint appointment, Mr. Ngo was somewhat more
involved in the performance of these supervisory functions,
including being the one person in charge of the issuance of the
Morning Blast. (Tr. 94-95).

     In May 2014, Mr. Ngo and his partner were preparing to
welcome an as-yet unborn baby into their menage. The arrangements
involved a surrogate pregnancy in California, with an expected
birth date around July 4, when Mr. Ngo and his partner would take
custody of the child and return to New York. On about May 12, Mr.
Ngo informed Mr. Lowenthal of his sexual orientation and the
impending reception of a baby into his life, a development for
which Mr. Lowenthal expressed warmly supportive sentiments. (Tr.
137-40). In the course of the discussion, Mr. Ngo indicated that
he was unsure of the detailed logistics of his trip to California
to pick up the child (Tr. 140 (discussion was "exploratory")) and
asked about the firm's leave policies. Mr. Lowenthal was
uncertain as to those policies and told Mr. Ngo to speak with
Lenore Denys, the head of Human Resources. (Tr. 454-56). He also
told Mr. Ngo to speak with Ms. Ross and Ms. Burns about coverage
for any period when he was going to be in California after he
decided on his plans. (Tr.  837-38).

     That same day Mr. Ngo contacted Ms. Denys by e-mail, noting
that he was trying to "figure out leave" policies, and asked
whether Oppenheimer had a paternity leave policy. Ms. Denys
responded that the firm did not have such a policy, but that Mr.
Ngo might be eligible for FMLA leave, involving up to twelve
weeks of unpaid leave, and she referred him to page 17 of the
firm's employee Handbook for an explanation. (Exs. 48, 113).
According to Mr. Ngo, he consulted the pertinent pages (which ran
through page 19), and understood that FMLA leave was unpaid and
was for a maximum of twelve weeks. (Ex. 8 at 17) The Handbook
section on FMLA leave also stated that if an employee wanted to
arrange for such leave, he "should request FMLA leave by
submitting a written request for such leave to the Human
Resources Department." (Id. at 19). That provision largely
paralleled a statement on page 16 of the Handbook, dealing
generally with all requests for leaves of absences; on that page

the employees were instructed that "a prior written request is needed and must be submitted to the Human Resources Department." (Id. at 16). Apparently Mr. Ngo never reviewed page 16 of the Handbook.

At about the same time, Mr. Ngo conveyed the news to Ms. Burns and separately to Ms. Ross that he was expecting a child in California. Both of them offered apparently very sincere congratulations. (E.g., Tr. 134-35). During Mr. Ngo's conversation with Ms. Ross, he mentioned that he was entitled to up to twelve weeks of leave (Tr. 470-71), and he asked her about her experience with the birth of her two daughters, a question to which she responded that she had taken two months off for each. She went on to observe that, from her experience, the early period after childbirth was quite easy and that mothers would do better to save some of their child-care time for later years -- apparently during adolescence -- when dealing with children becomes more complicated. (Tr. 156-57, 1122-23). In the course of the conversation, Ms. Ross asked Mr. Ngo what line of work his partner was in, and claimant responded that he was in finance. (Tr. 159).

Mr. Ngo testified that during the conversation he asked Ms. Ross to approve an arrangement under which he would take two weeks "leave" after the birth and the decide how much longer to take -- a compromise on his part because he felt pressured by Ms. Ross, apparently based on his vague impression of her unspoken attitude to his taking a leave. (Tr. 155-68). He now contends that, acting for Oppenheimer, she approved his taking such an open-ended leave. (Tr. 161). In contrast, Ms. Ross credibly testified, in substance, that Mr. Ngo did not ask for permission to go on a leave of absence, that she had no authority to approve such a request, that he never mentioned not working while in California and leaving the Research group solely to Ms. Burns, and that she never sought to dissuade him from taking twelve weeks of leave if he wanted to do so. (Tr. 1118-23).

After Mr. Ngo's talk with Ms. Ross, he spoke again with Ms. Burns and mentioned that he thought that Ms. Ross's remark about her own experience indicated that she was not particularly supportive of his taking off significant time. Ms. Burns encouraged him to take off whatever time he needed. (Tr. 169-71).

According to Mr. Ngo, after speaking with Ms. Ross, he told Mr. Lowenthal that he had worked out a plan with Ms. Ross for a two-week hiatus after the birth, to be followed by his decision on how much longer a leave to take, and that Mr. Lowenthal indicated approval. (Tr. 170-73). Mr. Lowenthal provided a rather

5

different version of events, testifying -- consistent with the
accounts of Ms. Ross and Ms. Burns -- that Mr. Ngo estimated that
he would be in California for two to four weeks and would be
working or available for work during that time. (Tr. 844; Ex.
51). Further consistent with this version, Mr. Ngo never
contacted Human Resources or otherwise sought to document his
assertion intention to take a leave of absence.

    Mr. Ngo and his partner planned to leave for California on
June 20. In the interim Mr. Ngo apparently spoke one or several
times with Mr. Lowenthal, Ms. Ross and Ms. Burns about the
impending trip. According to these three individuals,  he
conveyed to them the expectation that he would remain in
California for approximately two to three or four weeks, and that
he intended to be available for work remotely, including checking
his e-mail regularly and pitching in as needed. (Tr.  743, 745-
46, 844-46, 1124-25).[3] Indeed, Mr. Lowenthal went so far as to
testify that Mr. Ngo specifically indicated that he did not want
to go on an unpaid leave. (Tr. 844). Consistent with Mr. Ngo's
intention to do some sort of work, Mr. Lowenthal authorized him
to take a company laptop with him to facilitate his work. (Tr.
845-46).

    In contrast to these witnesses, Mr. Ngo testified that he
had told all three that he planned to work only until the birth
of the child, that he then would take two weeks of leave -- the
specifics of which he did not specify -- and that he would then
decide how much additional time to take. (Tr. 166-67).

    Before departing, Mr. Ngo undertook some efforts to train a
junior colleague, John Daniels, to assist with the task -- if it
became necessary -- of preparing written responses to the
issuance of second-quarter corporate earnings reports. (Tr. 174,
195-97). This was a particularly important project that would
need to be addressed sometime in August, although it appears that
Mr. Ngo did not, at that stage, anticipate staying away from the
New York office for that length of time. Although he testified
that he had advised Ms. Burns and Ms. Ross that he was preparing
Mr. Daniels to assist on the earnings-report project (e.g., Tr.

-----

    [3] We note that at one point Mr. Ngo appeared to admit that he
had not told Mr. Lowenthal about his asserted arrangement with
Ms. Ross (that he would take a leave for two weeks post-birth and
then announce how much more time he would take) until a phone
call on July 16 -- just after he had announced to Ms. Ross and
Ms. Burns that he was extending his time away from the New York
office until August 25. (Tr. 532-33).

161), the record suggests that no senior person in the office was clear about the nature of Mr. Ngo's arrangement with Mr. Daniels for such coverage, and both Ms. Ross and Ms. Burns viewed him as unqualified to handle this task. (Tr. 762, 1127, 1133-36). Indeed, the assumption that Mr. Ngo would return before the end of July presumably discouraged any focus on this question.

Mr. Ngo and his partner arrived in California on June 20, but, contrary to expectations, the baby was born only four days later. (Tr. 178). Some time afterwards, he inquired of the doctor how soon he could take the child by plane back to New York, and was apparently surprised to learn that it was advisable to wait until the child had been vaccinated, a requirement that compelled a wait of up to six weeks. (Tr. 179). On July 13 Mr. Ngo sent an e-mail to Ms. Ross and Ms. Burns, stating that he would be required to remain in California another six weeks for this purpose, and that he would likely return to the office on August 25. He also stated that he would continue checking his email and was available to assist "if anyone needs anything." (Exs. 51, 114). In this e-mail he did not ask either of these women for permission to delay his return in this fashion or to be permitted FMLA leave or any other form of leave. He also did not send this e-mail to his supervisor, Mr. Lowenthal, or otherwise advise him of this change in his plans.

Ms. Ross and Ms. Burns noted that Mr. Ngo was not asking for permission to extend his absence from the New York office and were troubled by Mr. Ngo's failure to advise Mr. Lowenthal of what he was doing. (Tr. 756-57, 1127-28). Nonetheless, Ms. Ross sent Mr. Ngo an e-mail expressing good wishes on the birth and stating "See you in August", while also asking him how he "plan[ned] to handle second quarter earnings". (Exs. 51, 114). He sent a reply stating "We can see what John can do while I am away", and that he would "help out more" when he returned to New York. (Ex. 51). Ms. Ross was concerned by this response, which seemed dismissive of an important job responsibility. (Tr. 1132-33).

Mr. Ngo separately spoke to Ms. Burns, commenting that he thought Ms. Ross was unhappy about his taking time off, as judged by her reference to the second-quarter earnings reports. Ms. Burns responded that she would work with Mr. Daniels and "help to fill in and cover the desk as much as possible" (Tr. 761), a statement that suggests the improvisatory nature of the situation that she faced.

Both Ms. Ross and Ms. Burns subsequently spoke to Mr. Lowenthal about the latest development, and he told Ms. Burns to

request that Mr. Ngo call him directly. (Tr. 763-64, 1137-38). In
these interchanges it was apparent that Mr. Lowenthal was both
surprised and displeased by Mr. Ngo's handling of events.

Mr. Ngo spoke with Mr. Lowenthal on either July 16th or
17th. In the course of the conversation, according to Mr. Ngo,
Mr. Lowenthal seemed angry or disappointed -- we infer he noted
Mr. Ngo's failure to keep him apprised of his intentions -- and
that he was taking away Mr. Ngo's role with the Morning Blast, a
step that Mr. Ngo viewed as indicating to the financial world
that he was being displaced as a co-head of research. (Tr. 210-
12, 535).[4] According to Mr. Ngo, Mr. Lowenthal was unclear as to
whether he was in fact removing Mr. Ngo as co-head of Research,
but that he told claimant to "do whatever you have to do" with
regard to the needs of the child. (E.g., Tr. 531). In any event,
during the discussion Mr. Ngo apparently indicated his need for a
leave of absence and assured Mr. Lowenthal that he would "sign
whatever", an apparent reference to the requirement that
employees make a written request for leave to Human Resources.
(Tr. 532; Ex. 86(B) at 5).

Shortly after reviewing Mr. Ngo's July 13 e-mail, Mr.
Lowenthal informed Ms. Burns that he was appointing her sole head
of Research and that Mr. Ngo would remain as a research analyst,
although it appears that there was no written announcement of
this change communicated to the Research or Sales staffs. (Tr.
764; Ex. 86(B) at 8). In explaining that decision, he noted that
Mr. Ngo had apparently chosen to "unilaterally make plans" to
extend his time in California without notice to him or prior
permission, commenting that "I thought it showed poor judgment
and a lack of acknowledgment of the environment that we work in,
which is heavily regulated and requires the people you work for
be made aware and be part of a decision to just extend time
periods away from the office." (Tr. 850; see also Tr. 851-53
(referring to SEC and FINRA enforcement issues)).

As an apparent result of Mr. Ngo's e-mail, Mr. Lowenthal
also contacted Ms. Denys, who confirmed that "Hoai can apply for
unpaid leave under the FMLA" (Ex. 54), in substance confirming
that he had never done so. Mr. Lowenthal then sent an e-mailed
letter to Mr. Ngo on July 18 to follow up on their prior
conversation. (Ex. 45). In that letter, after warmly
congratulating Mr. Ngo on the birth, he stated, in pertinent

_____

[4] After the birth and until the phone call, the Morning Blast
was being reviewed by Ms. Burns but sent out under Mr. Ngo's
name. (Tr. 212).

8

part, the following:

I need to take this opportunity now to clarify the details regarding your leave from Oppenheimer and your return. When we discussed your time off, it was my understanding from you that you would need at least two weeks leave and with the possibility of extending that leave for an additional two weeks, depending on the health and needs of the baby. I believe that June 20th, 2014 is when your leave began. As you know, Oppenheimer does not have a paid paternity policy. I was willing to accommodate your initial request, permitted the flexibility with your return date and kept you on Oppenheimer's payroll.

The main catalyst for my sending this letter was that I was recently notified that your current intention is to remain out of the office through the end of August. Had you initially requested such an extended leave period, there would have been discussions on work coverage, particularly with respect to your supervisory responsibilities.  In your absence, I intend for Colleen Burns, as co-head of Fixed Income Research, to absorb all of the tasks associated with the supervisory elements of the Research Department. Had I known you would be absent over two months, I would also have expected you to communicate that to Oppenheimer's Human Resource Department at the time that I asked you to speak with them regarding the firm's policies on paternity leave.

I have now spoken with a Human Resource Representative and received the enclosed *Family Medical Leave Act* summary for your review and acknowledgment. Unfortunately, as discussed above, Oppenheimer does not offer paid family leave. You are, however, entitled to take unpaid leave time, over and above your allotted vacation. Questions concerning this should be addressed in the materials or can be addressed to the Benefits Department . . . .

(Ex. 45). Accompanying this letter were the FMLA explanatory materials and the form for requesting FMLA leave from Human Resources. (Id.).

Mr. Ngo never responded to this letter, nor did he fill out the FMLA form or otherwise request approval of FMLA leave or any other form of leave in connection with his California stay, whether from Human Resources or from anyone else at Oppenheimer. In explanation for his inactivity, he testified that in reviewing his e-mails he had overlooked this communication from Mr. Lowenthal and did not learn of it until his return to work on

9

November 3, 2014. (Tr. 244, 542).[5]

Mr. Ngo returned to New York on or about August 11. Prior to his return, he reports, he was checking his e-mail on a more or less daily basis and undertaking occasional minor work tasks, such as SAing one or several reports from other analysts. (Tr. 488-89, 493, 496, 502, 745-48; Ex. 125). He also offered to cover for Ms. Burns when she took her scheduled vacation in late July, although she deemed the offer unnecessary. (Ex. 128; Tr. 507-08, 751-52).

On August 16, Mr. Ngo suffered a brain aneurysm, which left him hospitalized for many weeks, followed by intensive physical therapy. (Tr. 221-28). His partner promptly contacted Oppenheimer to report this development and request a medical leave. On August 18 the firm's Human Resources Department registered him for a medical leave and terminated his pay as of that date, while he began a stay on disability. (Tr. 231-32; Ex. 112 at OPCO 0003). On or about October 9, 2019 he e-mailed Mr. Lowenthal to report on his progress and advised that he expected to be able to return to work by November 3. (Tr. 883-85; Ex. 72). And indeed he did return on that date.

On Mr. Ngo's first day back, he spoke with Mr. Lowenthal. According to Mr. Ngo, Mr. Lowenthal remarked that he had been gone too long and that in the interim changes had been made in the firm's business structure. In this respect, claimant says, Mr. Lowenthal mentioned that Mr. Ngo had been relieved of his "compliance" role or his "supervisory" role. (Tr. 232-35).[6] Mr. Ngo took that as an indication that he was no longer co-head of Research, but sought clarification, to which Mr. Lowenthal responded that he had explained it in his July 18 letter (which Mr. Ngo had apparently never seen), and that Mr. Ngo should just "get back to work". (Tr. 233-35). In contrast Mr. Lowenthal testified that he had made it plain that Ms. Burns was now the

_____

[5] In Mr. Ngo's testimony, at several points he asserted that he had not "received" the e-mail, but on further examination he conceded that it was on his laptop and that he had simply overlooked it. (Tr. 248-49).

[6] At one point Mr. Ngo testified that Mr. Lowenthal had referred only to eliminating his compliance role, leaving claimant confused about what he meant, but he seemed to contradict himself by also stating that Mr. Lowenthal had used the term "supervisory responsibilities". (Compare Tr. 732-33 with Tr. 734).

sole head of Fixed Income High Yield Research, a reiteration of his July statement to Mr Ngo. (Tr. 888-89).

The next day Mr. Ngo decided to resume his discussion with Mr. Lowenthal. On this occasion, he chose to secretly record the conversation, an act explicitly prohibited by the firm Handbook. (Tr. 253; Ex. 8 at 11; see Ex. 86(B)). As recorded in the transcript of that conversation, Mr. Ngo expressed remorse for any confusion and appeared at various points to agree with Mr. Lowenthal's assertions that his conduct was inconsistent with firm policies and had led to confusion and difficulties with arranging coverage. (Ex. 86(B) at 2, 3, 4). In the main, he sought to explain that he believed that by talking with Ms. Ross and Ms. Burns he had somehow obtained approval for a leave (id. at 2), though Mr. Lowenthal pointed out that they had no such authority and that Mr. Ngo had failed to deal with either Human Resources or himself on the specifics of any request for leave. (Id. at 3). He also reiterated the fact that Ms. Burns was now the sole head of Research. (Id. at 7). In Mr. Ngo's testimony, he sought to disavow his concessions from this discussion, observing that he feared for his job and was simply trying to pacify Mr. Lowenthal. (Tr. 258).

Mr. Ngo resumed his work as a research analyst, with an unchanged salary of $150,000.00. In early February 2015 Ms. Burns provided him notice of the amount of his annual discretionary bonus, which was set each year by Mr. Lowenthal. In this case he was paid $100,000.00 in bonus for his work in 2014, a figure that reflected a substantial reduction from the $270,000.00 that he had received for his performance in 2013. (Tr. 902-03).

Mr. Ngo continued to serve as a research analyst, covering the same sectors as before throughout 2015. In February 2016 Mr. Lowenthal awarded him a discretionary bonus of $175,000.00. (Tr. 908). Because of the limits of the bonus pool for that year, in order to allocate these funds to Mr. Ngo, Mr. Lowenthal found it necessary to reduce the bonus of Peter Albano, a senior Oppenheimer official, by $25,000.00.[7] (Tr. 911-13; Ex.116).

In the Spring of 2016, by which time the Research group had been reduced to three analysts, Oppenheimer hired a new analyst, Jiten Joshi, to replace Umesh Bhandari, who was leaving the firm. This hiring was intended to ensure continued coverage of the much vaunted technology, media and telecommunications ("TMT") sector,

_____

[7] Mr. Albano is now the head of the fixed income department. (Tr. 911).

previously covered by Mr. Morgan after the acquisition from CIBC, and then by Mr. Bhandari. (Tr. 931-32, 791-92).

On June 30, 2016 Ms. Burns and Human Resources notified Mr. Ngo that he was being terminated as part of a cost-cutting move by the firm, a decision made by Mr. Lowenthal. (Tr. 295, 786-87). As further explained at the hearing, Oppenheimer had been suffering a severe financial downturn in 2015 and 2016, leading to an increased number of layoffs across the firm. (Tr. 921, 1229-31; Ex. 90 at OPCO 491-92, Ex. 91 at OPCO 511; Ex. 36). In seeking to explain the basis for the decision at the hearing, Mr. Lowenthal noted that Mr. Ngo's three sectors were not covered on the equity side of the firm and did not have investment banker coverage, reflecting a faded interest by Oppenheimer in these sectors, which had been inherited from CIBC. (Tr. 899-900). He further observed that the financial arrangement between Oppenheimer and CIBC, reflected in the 2008 transaction between the two entities, had not worked out and had been discontinued. (Tr. 899). It was also noted that the Research group was a cost center and, unlike the Sales group, did not directly produce revenue. (Tr. 616). As for the hiring of Mr. Joshi, this was explained by the firm's continuing focus on the TMT sector, which it viewed as particularly promising in view of market conditions. (Tr. 931-32).

Subsequent to Mr. Ngo's termination, the firm did not replace him or reinstate coverage of his sectors. (Tr. 794-95, 932-33, 1045, 1150). Moreover, as of the time of the hearing, the research group had been reduced to only two analysts -- Ms. Burns and Mr. Joshi. (Tr. 737, 874).

Mr. Ngo subsequently sought alternative employment from a range of financial institutions. Finally, he was hired by Fitch & Company in June 2017. (Tr. 629; Ex. 104). He remained there for nearly one year, but was then terminated for sub-par performance. (Tr. 634-43; Ex. 124). In October 2018 he was hired by Bloomberg, where he remains to the present. In both of these two firms, he was paid a fixed salary substantially higher than his guaranteed pay at Oppenheimer, but his potential discretionary bonuses were capped at levels that are lower than what he had earned at Oppenheimer. (Tr. 646-47; Ex. 105).

<u>Assessment</u>

Claimant presses claims for interference with FMLA rights and FMLA retaliation, as well as discrimination on the basis of gender and disability. The interference and retaliation claims arise under the FMLA, the gender discrimination claims arise

12

under Title VII and the New York State and City Human Rights
Laws, and the disability discrimination claims (which in
substance are based on a retaliation theory) are asserted under
the Americans with Disabilities Act and the State and City Human
Rights Laws. We address these claims <u>seriatim</u>.

A. <u>Interference with FMLA Rights</u>

The FMLA grants to employees a right, on request, to unpaid
leave of as long as 12 weeks in any 12-month period for specified
reasons, including the birth of a child and a "serious heath
condition". 29 U.S.C. secs. 2612(a)(1)(A) & (D). At the
conclusion of the leave period, the employee must be reinstated
in the job position that he held at the beginning of the leave or
its equivaent, except in limited circumstances, notably if he is
unable to perform the functions of the position. <u>Id.</u> sec.
2614(a)(1); 29 C.F.R. sec. 825.214(b); <u>see</u>, <u>e.g.</u>, <u>Sarno v.
Douglas Elliman-Gibbons & Ives, Inc.</u>, 183 F.3d 155, 161-62 (2d
Cir. 1999).

The statute and accompanying regulations impose certain
obligations on both the employee and the employer. The employee
is required to advise the employer within a specified time period
(if foreseeable) of circumstances triggering a need for a leave.
29 U.S.C. sec. 2612(e)(1). That communication need not explicitly
invoke the FMLA but must be "sufficient to reasonably apprise
[the employer] of the employee's request to take time off for a"
covered reason. <u>McNamara v. Trinity</u>, 2013 WL 164221, *4 (D. Conn.
Jan. 15, 2013)(quoting <u>Darboe v. Staples, Inc.</u>, 243 F. Supp.2d 5,
17 (S.D.N.Y. 2003)). <u>Accord</u> <u>Brohm v. JH Props, Inc.</u>, 149 F.3d
517, 523 (6th Cir. 1998); <u>Dighello v. Thurston Foods, Inc.</u>, 307
F. Supp.3d 5, 14 (D. Conn. 2018)(citing cases); <u>Mann v. Mass.
Correa Elet., JV</u>, 2002 WL 88915, *7 (S.D.N.Y. Jan. 23, 2002). The
employee is also required to comply with the reasonable
requirements of the employer concerning the details of how to
request an FMLA leave, including communication of the reasons
for, expected duration and start date of the leave, as well to
whom such a request must be addressed. 29 C.F.R. sec.
825.302(d).[8] The employer is then required to determine whether

_____

[8] Section 825.302(d) states in pertinent part:

(d) Complying with employer policy. An employer may require
an employee to comply with the employer's usual and customary
notice and procedural requirements for requesting leave,
absent unusual circumstances. For example, an employer may
require that written notice set forth the reasons for the

such a leave may be eligible for treatment under the FMLA and advise the employee accordingly. E.g., Coutard v. Municipal Credit Union, 848 F.3d 102, 112 (22d Cir. 2017). Moreover, if the employee's communication does not provide sufficient information to make that determination of eligibility for FMLA coverage, the employer is obliged to request such further details as it deems necessary under the circumstances. 29 C.F.R. sec. 825.302(c). If the employer determines that the employee may be FMLA-eligible, it must notify the employee within five business days absent extenuating circumstances. 29 C.F.R. sec. 825.300(b)(1).

    The FMLA specifies that the employer may not "interfere with, restrain or deny the exercise of or the attempt to exercise any right" under the statute. 29 U.S.C. sec. 2615(a)(1). "[T]o prevail on a claim of interference with her FMLA rights, a plaintiff must establish: 1) that she is an eligible employee under the FMLA; 2) that the defendant is an employer as defined by the FMLA; 3) that she was entitled to take leave under the FMLA; 4) that she gave notice to the defendant of her intention to take leave; and 5) that she was denied benefits to which she was entitled under the FMLA." Coutard, 848 F.3d at 108; Graziadio v. Culinary Institute of Amercai, 817 F.3d 415, 424 (2d Cir. 2016). "Denial of FMLA benefits is interpreted flexibly; '[i]ntefering with' the exercise of an employee's rights would include, for example, not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." Hill v. City of New York, 136 F. Supp.3d 304, 342 (E.D.N.Y. 2015)(quoting 29 C.F.R. sec. 825.220(b)). Such discouragement may be demonstrated if the challenged conduct "would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." Santiago v. Dep't of Transp., 50 F. Supp.3d 136, 144 (D. Conn. 2014).

    Claimant first asserts that Oppenheimer engaged in discouragement, because of Ms. Ross's comments when Mr. Ngo asked about her experience with the birth of her children. Claimant's narrative is that Mr. Lowenthal referred him to Ms. Ross "to make leave arrangements" and that Ms. Ross "responded to Ngo's leave request by emphasizing that she did not take the full three

_____

    requested leave, the anticipated duration of the leave, and the anticipated start of the leave. An employee also may be required by an employer's policy to contact a specific individual. . . . Where an employee does not comply with the employer's usual notice and procedural requirements, and no unusual circumstances justify the failure to comply, FMLA-protected leave may be delayed or denied. . . .

months of leave when her daughters were born and that it was a 'mistake' for women to do so." (Cl. Post-Hearing Memo at 17). He further cites Ms. Ross's question as to his partner's work as hinting that Mr. Ngo "did not need his job at Oppenheimer." (Id. at 17-18). Supposedly these comments, "'taken in totality . . . were designed to coerce [Ngo] to leave h[is] employment or to discourage [Ngo] from using h[is] leave." (Id. at 18 (quoting Stoler v. Inst. for Integrative Nutrition, 2013 WL 6068598, *8 (S.D.N.Y. Nov. 18, 2013)). This argument is unconvincing.

First, the credible evidence demonstrates that Mr. Lowenthal did not direct Mr. Ngo to make his leave request to Ross. All he said regarding Ms. Ross (and Ms. Burns) was that if Mr. Ngo chose to take a leave -- the request for which the Handbook required be directed to Human Resources -- he should deal with Ms. Ross and Ms. Burns on coverage. Moreover, the credible testimony from Ms. Ross, and even Mr. Ngo's own testimony, does not suggest that he sought approval of a leave of absence (whether FMLA or not) from her. Indeed, what principally transpired at the time of their initial conversation was that Mr. Ngo noted his intention to pick up his soon-to-be-born baby and the potential of a leave of as long as twelve weeks, that he was considering his options about how to arrange that, and that he wanted to know about Ms. Ross's own experience with the birth of her children.

Second, Ms. Ross's answer to his question did not remotely amount to employer discouragement. She simply offered her experience in response to Mr. Ngo's request -- that she had taken two months, an amount of time that seemed sufficient for her purposes and (according to her) for mothers generally. She did not offer inaccurate information or make any remark that would deter or make it more difficult for a reasonable employee to opt for FMLA leave of whatever length he or she would be entitled to. Thus, Mr. Ngo claims discouragement based only on his vague impression of Ms. Ross's unexpressed thoughts.

Third, the record does not support the notion that claimant was deterred by her. As of the time of the initial conversation, Mr. Ngo had not yet decided how to proceed, and he was simply exploring what alternatives made sense for him. Ms. Ross did not try to discourage him from a choice he had not made,[9] and in any

---

[9] Claimant also cites what he describes as Ms. Ross's desire that he remain on the Morning Blast while away, for the sake of continuity. First, this is consistent with her understanding that he would be available for work while in California. Second, suggesting this arrangement -- which was followed in substance

event there is no persuasive evidence that he would have chosen a twelve-week FMLA leave but for these comments by Ms. Ross.[10]

Fourth, as for Ms. Ross's question about the work status of Mr. Ngo's partner, claimant's argument that this reflected a desire on her part to encourage him to leave his job with Oppenheimer or forego a leave is difficult to understand. There is no evidence whatsoever that Ms. Ross, or anyone else at Oppenheimer, desired to persuade Mr. Ngo to leave the firm at that stage nor any persuasive evidence that she desired to press him not to take a leave. Her question about his partner appears, in context, to have been engendered by perfectly understandable curiosity (since this was the first time that she had learned of Mr. Ngo's personal circumstances) and possibly a desire for context -- that is, to understand whether Mr. Ngo was financially able to withstand an unpaid leave of whatever length he chose. In any event, to the extent that the question triggered the answer that his partner was working in the financial world, that would seem to underscore that Mr. Ngo could afford a prolonged unpaid leave, thus -- if anything -- encouraging him to take such a leave.

Claimant next asserts that he was effectively demoted by virtue of his being stripped of the co-head role when he returned to work, a step that he characterizes as interference by Oppenheimer. He argues that this action by Mr. Lowenthal constitutes interference with his FMLA rights, since the statute requires that when the employee returns from an FMLA leave, the employer must restore him to the position that he held at the time he departed for his leave or to "an equivalent position with

_____

since his name remained on the Morning Blast until the July 13 e-mail (a period when Mr. Ngo claims to have been on leave of absence) even though Ms. Burns SAed it -- can scarcely demonstrate an effort by Ms. Ross to discourage Mr. Ngo from taking real leave.

[10] We note that Mr. Ngo reported to Ms. Burns that Ms. Ross seemed unsupportive of a three-month leave. We assume that this was his perception, but the credible testimony as to what transpired during the discussion with Ms. Ross suggests that this was a substantial overreaction by Mr. Ngo, possibly as a result of his experience with several earlier layoffs, as well as his perception -- seemingly accurate -- that employment in the financial industry tends to be volatile. Nonetheless, this state of mind does not convert innocuous remarks even by a senior work colleague into impermissible discouragement.

equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. sec. 2614(a)(1)(B). The term "equivalent position" refers to "one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status." 29 C.F.R. sec. 825.215(a).

Although respondent has implied that Mr. Ngo did not undergo a demotion or failure to be restored to his earlier position -- supposedly because "co-head" was not a "corporate title" and the supervisory work of the head of Research did not involve much labor or time -- that assertion is not tenable. The role of the "head" of such a group -- whether of Research or Sales -- involved a distinct set of responsibilities over and above the functions of the rank-and-file of each group, and the firm treated the term as a descriptor of that unique role. Moreover, Ms. Ross confirmed that for her the role of "Head of Sales" was a significant function, that the title itself had independent importance and, indeed, that she was unwilling to have her role and title altered to "co-head" when asked by the firm to do so. (Tr. 1159-65). Thus, the change in Mr. Ngo's role did not involve only "de minimis, intangible or unmeasurable aspects of the job." 29 C.F.R. sec. 825.215(f).

The more difficult question is whether the removal of Mr. Ngo's role as "co-head" was connected to his being on, or returning from, an FMLA leave. We conclude that it was not.

Mr. Ngo asserts that he requested a leave of absence from Ms. Ross before going to California. Alternatively, he seems to imply that he belatedly sought such a leave from Ms. Ross (and perhaps Ms. Burns) by virtue of his July 13 e-mail announcing that he was being delayed by the immunization requirement for his baby. And in still another version he seems to be suggesting that he requested a leave from Mr. Lowenthal in their telephone conversation on July 16 or 17 and that this sufficed to protect him. The weight of the evidence, however, does not support the notion that he ever pursued such a request in a manner consistent with the firm's reasonable requirements or indeed ever made his request clearly known to the appropriate decision-makers.

Mr. Ngo testified that at some point he had communicated to Ms. Ross and Ms. Burns before his departure that he was going to work from California until the birth of the child, that he would then take two weeks off, and at that point he would decide how much more time he needed before returning. The implication of this version of events was that he had made plain to them that he would work only until the birth and then would be on an unpaid

17

leave until his return. The further implication of his testimony was that his statements to them constituted a request for FMLA leave, thus triggering his entitlement to it.[11] Ms. Ross and Ms. Burns both testified to the contrary, that they each had understood from Mr. Ngo that he would be working while in California until his return. They also each confirmed that they did not understand Mr. Ngo to be asking for leave and that neither had the authority to approve such a request had one been made.[12] As for Mr. Lowenthal, he also testified that Mr. Ngo indicated a intention to be available for work throughout his stay in California, which was to be fairly brief -- a matter of perhaps three or four weeks -- and that he therefore left Mr. Ngo on the payroll, in lieu of a FMLA leave, for which claimant never applied. (E.g., Ex. 45).[13]

The problems with Mr. Ngo's position on this point are clear. First, the persuasive evidence reflects a failure by Mr. Ngo to actually request a leave of absence from anyone before

---

[11] There is no disagreement that the birth of a child -- a circumstance communicated to Ms. Ross and Ms. Burns as well as to Mr. Lowenthal -- constituted a valid basis for FMLA leave.

[12] Ms. Ross further noted that if Mr. Ngo had requested a leave of absence from her, she would have directed him to make that request to Human Resources. This point was also echoed by Mr. Lowenthal and reflected in his July 18 letter.

[13] We note that certain wording in Mr. Lowenthal's July 18 letter could be read to suggest that Mr. Ngo might not be working after the birth (see Ex. 51), but the letter is otherwise consistent with Mr. Lowenthal's hearing testimony that Mr. Ngo did not seek an unpaid leave and had not communicated a desire for such a formal leave. Rather, the loose terminology regarding "leave" and "time off" may be read as reflecting, as Mr. Lowenthal testified concerning his use of the term "leave", that Mr. Ngo would be out of the office for a limited period during late June and July (a time period that Ms. Ross described as usually very quiet (Tr. 1184)), and that he would be available to assist with work as needed -- an arrangement that is also reflected in Mr. Ngo's statements from California assuring Ms. Ross and Burns (even as late as the July 13 e-mail and his late July offer to cover for Ms. Burns) that he was available to assist as required, and his testimony that he was regularly checking his e-mails as well as periodically telephoning Ms. Burns.

departing for California -- whether Mr. Lowenthal[14], Ms. Ross,
Ms. Burns[15] or Human Resources. Rather, it seems to indicate an
informal understanding with Mr. Lowenthal -- reflected in his
July 18 letter -- that Mr. Ngo would spend a limited time in
California and would remain available to help out as needed,
while he remained on payroll. Moreover, the credible testimony of
Ms. Ross and Ms. Burns indicates that Mr. Ngo left both of them
with the understanding that he would be working or available for
work throughout, which implied that he would remain on the
payroll, an understanding shared as well by Mr. Lowenthal from
his talks with claimant.

Second, as the Labor Department ("DOL") regulations permit,
Oppenheimer had establish a specific and straightforward
procedure for seeking and obtaining FMLA leave. Thus the Handbook
specified that the process required a written application to
Human Resources, the office fully knowledgeable about the
criteria for various forms of leave, and the relevant form
required that the applicant identify not only the circumstances
triggering the leave application, but also the start date and, if
available, the end date. (Ex. 8 at 16, 19; Ex. 45 (attaching
Human Resources request form and instructions)). Moreover, Mr.
Ngo is presumed to have been knowledgeable about these
requirements since they are laid out in the Oppenheimer Handbook,
with which he was expected to be familiar, and indeed, at the
very outset, Human Resources directed him to the pages
specifically dealing with FMLA leaves. Consistent with 29 C.F.R.
sec. 825.302(d), Mr. Ngo was required to comply with these
written instructions, and Oppenheimer was entitled to rely on the
assumption that he would comply, so as to avoid precisely the
sort of confusion and misunderstandings that arose from Mr. Ngo's
non-compliance.

In seeking to avoid the thrust of this point, Mr. Ngo
appeared to suggest that compliance with the Handbook
instructions was purely optional. Thus he noted that the wording
found on page 19 of the Handbook says that the employee "should"
make a written application to Human Resources, and he seems to
argue -- lawyer-like -- that he interpreted this wording to mean
that it was only a suggestion. Complementing this assertion, he
reported having spoken with two employees from the Sales group --
Ms. Lynn Johnson and Ms. Bridget Donnelly -- while he was

---

[14] See n. 13, supra.

[15] We do not understand claimant to be asserting that Ms.
Burns had the authority to approve a leave request.

considering his options, and he reports that they told him that he could negotiate leave terms with his manager. (Tr. 147-53).[16]

This mode of argument falls of its own weight. It bears noting, initially, that on page 16 of the Handbook, in a section governing all leaves of absence, the firm states that employees "must" make written application to Human Resources. Although, when contacted by Mr. Ngo, Human Resources referred him only to page 17 -- the first page of the section specific to FMLA leaves -- we assume that Mr. Ngo, as a well-paid and sophisticated employee whose job entails exquisite attention to detail and who was also equipped with a law degree, would have familiarized himself with the full contents of the Handbook (at least as relevant to leaves). In any event, the wording of the page that he concededly read (page 19) does not remotely suggest that its stated requirements of (1) a written application (2) directed to Human Resources are optional and could simply be ignored.

As for Mr. Ngo's "water cooler" discussions with Ms. Johnson and Ms. Donnelly, we have two observations. The comments that he paraphrases -- notably by Ms. Johnson -- have to do with an employee seeking a special arrangement in connection with a leave request. That does not speak to whether an employee can simply casually mention to a manager that he will be attending to a birth at a future date and will consider later on what arrangement he wishes to make, and that he can then assume that he has satisfied the statutory requirement and firm requirements of adequate notice of a leave request. In any event, to the extent that these two Sales employees could be interpreted as saying that he could ignore the requirements of an actual application and that it be directed to Human Resources, such a statement obviously could not bind the firm.[17]

---

[16] One specific detail focused on by claimant concerning Ms. Johnson was that she had taken FMLA leave for a birth, and obtained the approval of Ms. Ross for an arrangement that she had worked out with the Sales person who was to cover her desk in her absence, to split the commissions on sales made to her pre-existing list of customers during her leave. (Tr. 1152-55).

[17] The record reflects that Ms. Johnson filed an FMLA application with Human Resources some weeks after the commencement of her leave, and that this was treated as effectively a nunc pro tunc request. (Tr. 969-71). Although she had gotten approval from her supervisor, Ms. Ross, for the fee-share arrangement, the record is silent as to the circumstances of her dealings with Human Resources beyond the fact that she

Third, the evidence makes plain that Mr. Ngo's July 13 e-mail to Ms. Ross and Ms. Burns did not request FMLA leave or any other leave. In that e-mail, claimant made no request at all and did not refer to a leave, but rather advised that he would be delaying his return to New York -- earlier estimated as occurring within a few weeks of the birth -- and that he would likely return to the New York office on August 25. That is not a request for leave, much less one directed to anyone with authority to approve it.

Fourth, the July 13 e-mail and its disclosure to Mr. Lowenthal led to the telephone discussion between Mr. Ngo and his supervisor on July 16 or 17. Although the statements made by these two gentlemen on that call are described only in fairly general terms, it appears that at that stage Mr. Ngo indicated that he was seeking (or perhaps thought he was already on) an approved leave of absence. We infer as well that both he and Mr. Lowenthal understood that, given the circumstances, the applicable leave, if any, would be under the FMLA. Mr. Ngo also reported that during the conversation he had assured Mr. Lowenthal that he would be willing "to sign whatever". (Ex. 86(B) at 4). In the wake of this conversation, Mr. Lowenthal promptly obtained the necessary FMLA materials from Human Resources, in the process confirming that claimant had never requested a leave from that office, and he sent them to Mr. Ngo, along with an explanation of the fact that he was not then on an unpaid leave, based on his earlier estimate that he would need to remain in California for only a few weeks after the birth, and that for an extended formal leave he needed to fill out the appropriate enclosed form. Had Mr. Ngo returned the necessary form to Human Resources, presumably he would have been deemed to be on an FMLA leave as of July 18 (see Tr. 1224-25; Ex. 60), but he never did so. In short, up to the time that Mr. Ngo suffered an aneurysm, he remained on a paid status and not yet covered by the FMLA. (Tr. 1215-17; Ex. 112 at OPCO 0004).[18]

---

eventually filed the necessary paperwork. In any event, Mr. Ngo never filed an application with Human Resources or with anyone else.

[18] We note that Mr. Ngo explained his failure to submit an application to the firm as attributable to his overlooking Mr. Lowenthal's e-mail in a blizzard of other e-mails on his computer. Whatever the explanation, Mr. Ngo never filed a request for a leave of absence until his aneurysm, and the firm is not responsible for his inaction.

In reaching these conclusions, we recognize that Mr. Ngo offered a somewhat different narrative concerning the clarity of his communications with the firm's hierarchy, although not with Human Resources. Indeed, he never contacted Human Resources after his May 12 communication with Ms. Denys. We do not suggest that he is knowingly seeing to mislead. Rather, we suspect that what occurred was a result of his apparent initial expectation that he would be staying in California only for a short period -- perhaps three or four weeks -- after the birth. That assumption may have lessened the perceived need to clarify his plans and may have led to a belief by Mr. Ngo that it would all work out somehow. With that in mind, it is entirely plausible that Mr. Ngo believed in retrospect that he had been clearer about his plans and had communicated them with more specificity than was the case.[19] In any event, however, we conclude that he did not do so -- much less comply with the requirements of the firm Handbook -- and that his course of conduct led to substantial confusion as to his plans and his status, an impact magnified by the fact that he was unavoidably detained in California until well into August, a key period for dealing with second-quarter financial reports. That being the case, he failed to trigger FMLA protections, since the firm is not required to be "clairvoyant". <u>See</u>, <u>e.g</u>, <u>Dighello</u>, 307 F. Supp.3d at 14 (quoting cases).

The conclusion that Mr. Ngo was not covered by the FMLA until August 18 then poses a question as to the viability of his claim that his demotion violated his FMLA right to be restored to his position as of the time that he went on leave. He appears to take the position that he was not demoted until his return on November 3, following the end of his medical leave, and that therefore -- even if his FMLA coverage did not start until mid-August -- the demotion violated section 2614(a)(1)(B). Oppenheimer argues, to the contrary that the demotion (if such it be) took place in July, prior to his FMLA leave. Although the evidence on timing is somewhat mixed, we concur with respondent on this point.

Mr. Lowenthal testified that he had decided to remove Mr. Ngo as co-head once he learned of claimant's July 13 e-mail and

_____

[19] We note also that the evidence of Mr. Ngo's interchanges with Mr. Lowenthal reflect a seeming hesitancy to clarify matters, including his understanding of past events. This tendency to vagueness is reflected both in his testimony about their November 3 discussion and the transcript of his recorded conversation from the next day (Ex. 86(B)), as well as in his testimony concerning their earlier conversation from July.

of the fact that Mr. Ngo was avoiding communicating to him about his status and that he had never cleared whatever leave he wanted with Human Resources. Ms. Burns confirmed that Mr. Lowenthal had informed her before July 18 that from then on she was to be the sole head of Research.[20] The only potential complication in reaching this conclusion is that in Mr. Lowenthal's July 18 letter he used somewhat ambiguous language, stating that "In your absence I intend for Colleen Burns . . . to absorb all of the tasks associated with the supervisory elements of the Research Department" (Ex. 45) -- language that could be read as saying that he was being relieved only for the period while he remained in California.[21]  Despite the ambiguity, I credit the testimony of both Mr. Lowenthal and Ms. Burns that the decision was made and conveyed shortly after the receipt of Mr. Ngo's July 13 e-mail.

Given this timing, the decision to demote Mr. Ngo was made before he was placed on an FMLA leave, which occurred on August 18. Accordingly, that decision by Mr. Lowenthal cannot amount to interference with claimant's FMLA rights.[22]

Apart from the interference claim premised on the demotion, claimant argues that his diminished bonus in February 2015

---

[20] Mr. Lowenthal also sent Ms. Burns a July 21 e-mail (Ex. 56), appointing her the sole head of Research. The e-mail stated that Mr. Lowenthal was "suspending" Mr. Ngo's supervisory role "pending further discussions."

[21] Another point that might be pressed to suggest that the demotion was not decided upon until later is the evidence that no written announcement of the change was issued at the time and that at least one person in the Sales department was unaware of the change until Mr. Ngo returned in November (see Ex. 86(B)), although Ms. Ross indicated that she had advised her Department at a much earlier date.

[22] The other difficulty with claimant's demotion claim is that if, as he insists, he was on FMLA leave since the birth of his child, his twelve weeks of leave expired in September, well before he returned to work. Given that gap, he would no longer have been job-protected. He also cannot rely on a theory of estoppel -- asserting reliance on Oppenheimer's approval of FMLA leave till November (see Cl. Memo at 40-41) -- since there could not have been any reliance by Mr. Ngo, as he was plainly unable to return to work in September if Oppenheimer had not approved the medical leave.

23

constituted an impermissible change in his work status following
an FMLA leave, and thus a violation of section 2615(a)(1). This
assertion cannot be sustained.

The bonus in question was discretionary and the amount to be
awarded rested on a variety of considerations, including the
performance of the firm and of the fixed-income units, as well as
the performance of the employee. The mere fact that an employee
opts at some point for an FMLA leave does not entitle him to
receive the same bonus as for the prior year, a protection that
employees who did not take a leave would not enjoy. Such a result
is precluded by the FMLA, which states that restored employees
are not entitled to "the accrual of any seniority or employment
benefits during any period of leave[,] or any right, benefit, or
position of employment other than any right, benefit or position
to which the employee would have been entitled had the employee
not taken the leave." 29 U.S.C. sec. 2614(a)(3)(A), (B).

As for the calculation of the amount of a bonus, if the
bonus is based in whole or in part on performance by the
employee, it appears that the employer may take into
consideration the effect on performance of the time that the
employee was on leave and not contributing to production. See,
e.g., Clemens v. Moody's Analytics, Inc., __ Fed. Appx. __, 2019
WL 1977323, *2 (2d Cir. May 3, 2019), aff'g 2018 WL 1750586, *7
(S.D.N.Y. April 9, 2019); Sommer v. Vanguard Group, 461 F.3d 397,
400-01 (3d Cir. 2006)(quoting Department of Labor opinion letters
distinguishing production bonuses from "absence of occurrence"
bonuses).

In resisting this conclusion, claimant reads 29 C.F.R. sec.
825.215(c)(2), as well as Sommer and Clemens, as allowing the
employer to take account of an employee's time off in setting
bonuses only if the bonus plan specifies a formula for precisely
prorating the bonus based on hours worked or sets a specific
production quota. (Cl. Memo at 41-42). That does not appear to be
the case. First, the cited regulation "is concerned solely with
the question of qualification and consideration for bonuses, not
their calculation or proration." Sommer, 461 F.3d at 405. Second,
the bonus plans in Clemens and Sommer -- in which the courts
allowed reductions of bonuses -- required consideration of
several factors in setting the amounts of the bonus,[23] as was

---

[23] In Sommer these included the "Vanguard's operating
performance, its competitors' operating performance, the
performance of the securities markets, the investment performance
of the Vanguard funds, and company earnings." Id. at 402. In

apparently the case at Oppenheimer, although the <u>Sommer</u> and <u>Clemens</u> plans incorporated specific goals for performance. In neither case, however, nor in the DOL opinion letters cited in <u>Sommer</u> did the courts or DOL say that an employer may not take into consideration the employee's level of participation when the bonus plan looks to employee performance as one among multiple criteria, "as distinguished from a bonus that merely rewards an employee for 'compliance with the rules'". <u>Sommer</u>, 461 F.3d at 404 (quoting 1994 DOL Opinion Letter)). For example, in one of the opinion letters quoted in <u>Sommer</u> the DOL noted that "in the case of a monthly 'perfect' attendance bonus that tracks absences rather than performance, an employee who had not missed any time before taking unpaid FMLA leave would continue to be eligible for the bonus on returning from FMLA leave", but "[w]here the amount of the bonus is calculated from hours worked, the FMLA leave taker would naturally receive a lesser amount than an employee who had not been on leave." <u>Id.</u> at 401 (quoting 2000 DOL Opinion Letter).[24]

The Oppenheimer plan did not feature quotas, but did rely on an assessment of performance by the employee. Moreover, it did not disqualify the employee from a bonus based on a leave taken. It thus appears to have resembled a plan in which the employee was expected to make affirmative work contributions (whether measured by hours worked or units manufactured or other less specific criteria) rather than a plan that awarded employees for avoiding undesirable acts, such as absenteeism. Accordingly, to the extent that Mr. Lowenthal was relying in part on the fact that claimant was not at the New York office for more than four months and was doing minimal or no work during much of that period, his decision was defensible under even the authority cited by claimant.[25]

---

<u>Clemens</u> the bonus depended on the production both of the employee and of his "Stress Testing Team". 2018 WL 1750586, at *7.

[24] The same opinion letter went on to state: "[S]ince bonuses may be pro-rated based upon hours worked, it would not be a violation under FMLA to determine the bonus percentage based only upon the actual hours of work during the monthly rating period." <u>Id.</u> at 401.

[25] Of course, apart from time spent out of the office, Oppenheimer was free to consider other factors pertinent to the quality of performance, including an assessment of Mr. Ngo's conduct in handling the leave question, his manifested attitude towards his job responsibilities throughout that time and his

Moreover, even if that were not the case, the claim based on
the 2014 bonus would fail as time-barred. This is so because the
assumption by Oppenheimer that it could treat Mr. Ngo's extended
absence as relevant to performance was a reasonable view of the
law -- judged by the legal authorities cited by the parties[26] --
and hence should not be viewed as a willful violation of the
statute.[27] See Porter v. NYU School of Law, 392 F.3d 530, 531 (2d
Cir. 2004)(quoting McLaughlin v. Richland Shoe Co., 486 U.S. 128,
133 (1988)& citing Hillstrom v. Best Western TLC Hotal, 354 F.3d
27, 33-34 (1st Cir. 2003)). Accordingly, the applicable statute
of limitations is two years, 29 U.S.C. sec. 2617(c)(1), and the
first assertion by claimant of this claim was made by filing suit
in March 2017, more than two years after the award of the bonus
for 2014.

In short, the fact that Mr. Ngo received a reduced bonus in
February 2015 for his work in 2014 as compared with the prior
year does not constitute interference with, or a violation of,
FMLA rights, and the claim is in any event time-barred. The
payment of the lower bonus may, of course, constitute
impermissible retaliation for assertion of FMLA rights, a theory
to which we next turn.[28]

———————————————

actual work in the period after he returned to Oppenheimer. The
combination of all of these factors may justify the employer in
drastically reducing the bonus from the prior year.

[26] The only other decision invoked by claimant is Caldwell v.
Bldg. Plastics, Inc., 2009 WL 2749964 (W.D. Tenn Aug. 26, 2009),
which does not speak directly to this issue, referring to the
potential impropriety of a supervisor threatening an employee
that his paid leave could result in a reduction of his bonus,
which the court describes as "attendance based" rather than
"performance based". See id. at *5 & n.22 (citing inter alia
Cornelius v. CMM of Ky., Inc., 2006 WL 517594, *3 (W.D. Ky. March
1, 2006)(finding bonus at issue was performance-based). Caldwell
does not address the DOL view that a bonus requirement based on
hours of attendance is, in effect, performance-based.

[27] An "FMLA violation is willful if an employer knew or
recklessly disregarded whether its conduct violated the FMLA".
Smith v. Westchester County, 769 F. Supp. 448, 463 (S.D.N.Y.
2011).

[28] If the bonus decision reflected actual retaliatory intent,
it would presumably be willful, see, e.g., Offor v. Mercy Med.
Center, 676 Fed. Appx. 51, 55 (2d Cir. 2017), in which case the

26

B. <u>FMLA Retaliation</u>

Claimant next asserts that his demotion, reduced bonuses for 2014 and 2015, and termination in 2016 all constituted impermissible retaliation for his taking FMLA leave. Respondent resists this conclusion.

To sustain an FMLA retaliation claim the plaintiff must demonstrate that he invoked his rights under the FMLA, that he was subjected to an adverse employment action and that his assertion of FMLA rights was a motivating factor in the adverse action. <u>See</u>, <u>e.g.</u>, <u>Woods v. Start Treatment & Recovery Centers, Inc.</u>, 864 F.3d 158, 168-69 (2d Cir. 2017)(approving "motivating factor" test); <u>see also</u> <u>Potenza v. City of New York</u>, 365 F.3d 165, 168 (2d Cir. 2004)(applying <u>McDonnell Douglas</u> test to FMLA retaliation claims).[29]

_____

claim would survive under a three-year statute of limitations. 29 U.S.C. sec. 2617(c)(2).

[29] We use the term "adverse employment action" because the Second Circuit currently uses that formulation. We note that an argument could be made that the test for a retaliation claim under the FMLA should require only proof of an "adverse action" -- that is, an action that might not amount to a change in the terms and conditions of employment -- since that more liberal formula has been applied to retaliation claims under Title VII. <u>See</u>, <u>e.g.</u>, <u>Burlington Northern & Santa Fe R. Co. V. White</u>, 548 U.S. 53, 68 (2006). Under that standard, the question is whether "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might well have "dissuaded a reasonable worker from making or supporting a charge of discrimination"'", <u>id.</u> (quoting <u>Rochon v. Gonzales</u>, 438 F.3d 1211, 1219 (D.C. Cir. 2006); <u>Washington v. Illinois Dep't of Revenue</u>, 420 F.3d 658 662 (7th Cir. 2005)), or engaging in other protected activity. Indeed, while still referring to "an adverse employment action", the Second Circuit has adopted the less stringent test for adversity in an FMLA retaliation context. <u>See</u> <u>Millea v. Metro-North R.R. Co.</u>, 658 F.3d 154, 164 (2d Cir. 2011). <u>But see</u> <u>Vega v. Hempstead Union Free School Dist.</u>, 801 F.3d 72, 85 (2d Cir. 2015). In any event, we view the challenged actions by Oppenheimer  -- demotion, reduction in bonuses and termination -- as sufficient to trigger FMLA scrutiny. <u>See</u>, <u>e.g.</u>, <u>Davis v. New York City Dep't of Educ.</u>, 804 F.3d 231, 235-36 (2d Cir. 2015)(discretionary bonus decision may constitute adverse employment action).

We have concluded that the stripping of co-head status from Mr. Ngo occurred before he was on FMLA leave. By the time that Mr. Lowenthal made that decision, following his review of Mr. Ngo's July 13 e-mail and his discussions with Ms. Ross and Ms. Burns, he may have sensed that Mr. Ngo was assuming that he was already on an FMLA leave or was at least attempting to attain that status. Had his demotion decision been predicated on unhappiness that Mr. Ngo was seeking FMLA status and for a substantial length of time, an argument could be fashioned that his decision to assign all supervisory duties to Ms. Burns was retaliatory. That said, we are persuaded that this was not his motivation.

As described, Mr. Ngo was on notice of the simple procedure for requesting FMLA leave, and he failed to follow it. Moreover, he apparently had reached some understanding with Mr. Lowenthal -- reflected in the July 18 letter, as well as the testimony of Mr. Lowenthal, Ms. Ross and Ms. Burns -- that he would remain in California for a limited time after the baby's birth and would be available to assist the office during that time, as a result of which he remained on the payroll. It was also apparently Mr. Lowenthal's understanding that these informal arrangements were in lieu of a formal FMLA leave, thus leaving Mr. Ngo on a pay status. These circumstances, as well as the blithe statements in Mr. Ngo's July communications with Ms. Ross -- in which he did not include Mr. Lowenthal and did not bother to ask for a new arrangement and also did not refer, except in passing, to the need for coverage in August[30] -- seemed to form the predicate for Mr. Lowenthal's decision to remove his supervisory role.[31] As further context, Mr. Lowenthal noted that at the time Oppenheimer was under SEC and FINRA investigations that concerned, at least in part, the quality of supervision at the firm, a circumstance that further heightened his sensitivity to what he viewed as irresponsible behavior by a supervisor under his command. (Tr. 851-52).

---

[30] When asked by Ms. Ross on July 14 how he intended to handle the second-quarter earnings statements -- a query that confirms that she understood that Mr. Ngo was not on a no-work leave -- he simply said, in seemingly very blase fashion, "We can see what John can do while I am away. I can help out more when I am back in New York as the logistics will be better." (Ex. 51).

[31] Mr. Lowenthal also testified that he had come to realize that there was no benefit from a co-head arrangement, although we are skeptical that this epiphany would have triggered a change if Mr. Ngo had properly requested an FMLA leave.

Whether Mr. Lowenthal's decision-making was fully justified by these circumstances is not the issue. All we conclude is that his decision was motivated by these facts and not by the newly expressed desire of Mr. Ngo for an FMLA leave.

Mr. Ngo next invokes a claim of FMLA retaliation based on the decision by Mr. Lowenthal in early 2015 to award him a bonus of $100,000.00 for 2014. This compares with his prior two awards, for 2012 and 2013, of $270,833.00 and $270,000.00, respectively. It also bears mention that Mr. Lowenthal originally intended to award Mr. Ngo only $40,000.000 for the year, but was persuaded by Ms. Burns to increase the amount by $60,000.00. The explanation offered by Mr. Lowenthal for this drastic decrease -- which amounted to the smallest bonus given to any of the research analysts (the next lowest being $135,000.00 for Sean Sneeden) -- is that it reflected his assessment of Mr. Ngo's contributions to the firm in 2014. In contrast, Ms. Burns received a bonus of $235,000.00 for 2014 (Ex. 12(D)), a modest reduction from her 2013 bonus of $250,000.00. (Ex. 12(C)).

The dramatic reduction for Mr. Ngo and the still deeper cut originally contemplated at least raise a question about the decisional motivation of Mr. Lowenthal. There appear to be at least several facially legitimate considerations at play in his inclination to steeply cut the bonus. One is that Mr. Ngo was simply not at work for the period starting in June and ending in November (although he apparently did perform some minor tasks remotely through July). Another was Mr. Ngo's failure, in Mr. Lowenthal's view, to handle the leave question in a professional manner, a matter that went well beyond bureaucratic nit-picking, leaving open questions about his professional commitment and managerial competence. Finally, it appears that following his return on November 3, he was perceived as fairly inactive. (E.g., Tr. 901; see also Tr. 1144-46, 1195-96).

The question to be faced is whether, notwithstanding these concerns, animus to Mr. Ngo for invoking his FMLA rights was one motivating factor -- that is, whether it played some role, among other considerations -- in the bonus decision. Although the question is a close call, I conclude that the amount ultimately awarded is not so disproportionate, given the legitimate factors, as to demonstrate that mixed in with those permissible concerns was an impermissible intent to punish claimant for the proper assertion of his FMLA rights.[32]

_____

[32] Had Mr. Lowenthal followed his initial intent to award only $40,000.00, the analysis might have been different.

Claimant appears also to challenge, as retaliatory, the award to him the next year of a bonus of $175,000.00. In assessing this decision, several factors bear noting. First, the decision on the amount of bonuses is made with the constraint that each business area is initially assigned a total sum for division among its employees, and that figure may effectively limit the decision-maker's ability to pay each individual what he might wish. (E.g., Tr. 908-09). Second, Oppenheimer suffered financial reversals in 2015 as well as the following year, thus apparently constraining the amount of bonus money that Mr. Lowenthal had to work with. (E.g., Tr. 920-24; Exs. 90 & 91). Third, Mr. Lowenthal went out of his way to increase the bonus awarded to Mr. Ngo by transferring $25,000.00 from the bonus originally destined for Mr. Albano to increase Mr. Ngo's bonus from $150,000.00 to $175,000.00. (Tr. 911-13; Ex. 116). Fourth, if the payment of the $100,000.00 bonus for 2014 was not retaliatory, the payment a year later of $175,000.00 was surely not either. Fifth, although the record is slim on the matter of performance, Ms. Ross testified that she had fielded some complaints by Sales personnel that Mr. Ngo was not producing substantial reports during 2015, and thereafter, reflecting a disappointing level of engagement in his job. (Tr. 1144-46).

In sum, the claim of retaliation based on the 2015 bonus is meritless.

The final piece of claimant's FMLA retaliation challenges concerns his termination on June 30, 2016. As noted, the stated reason for the decision by Mr. Lowenthal was the perceived need for cost-cutting -- reflected more broadly in the increasing number of cost-related layoffs at Oppenheimer (Tr. 1227-31; Ex. 36) -- combined with the business decision that the sectors covered by Mr. Ngo were no longer a priority, as well as an apparently decreasing commitment to a robust research analyst staff. The bona fides of these explanations are supported by (1) financial data for the firm for 2015 and 2016 (Exs. 90 & 91), (2) the fact that Mr. Ngo's position was not filled after his departure, (3) the absence of any reassignment of the remaining analysts to his sectors, (4) the shrinkage of size of the research staff to only two analysts, one of whom (Mr. Joshi) was covering the long-prized TMT sector (Tr. 791-94), (5) the reduction in the bonus of Ms. Burns, as head of Research, to $200,000.00 for 2016 and later to $170,000.00 and $165,000.00 for 2017 and 2018, respectively. (Tr. 782-85; Exs. 12(F), 137), and (6) the fact that the termination took place approximately two years after Mr. Ngo's travails with the Oppenheimer leave policies.

30

In resisting respondent's showing, Mr. Ngo focuses on what he views as weaknesses in the specific explanations provided to him on June 30, 2016 by Ms. Burns, who mentioned the lack of equity coverage and investment-banker involvement in his sectors, even though Oppenheimer had not had such coverage for a number of years before his firing. Claimant also reported, on rebuttal, that he had done a quick survey the prior night to determine the amount of market cap shares held on June 30, 2016 by his sectors, and he calculated that collectively they represented ten percent of the market cap, far more than the sector -- retail and consumer -- handled by Ms. Burns. (Tr. 1245-55). He also cites the fact that Oppenheimer had hired Mr. Joshi only a few months before his termination, and he says that although Mr. Joshi was employed to continue TMT sector coverage, the firm could have asked him to switch sectors. Based on these asserted anomalies, he argues that cost-cutting was a pretext for firing him and that the real reason was to retaliate for his having claimed and taken FMLA leave in 2014.

We find no persuasive basis on which to attribute the termination of Mr. Ngo, either in whole or in part, to retaliatory animus. There is no question that Oppenheimer was enduring significant financial difficulties in 2015 and 2016 and that it was engaged in increased cost-cutting by way of layoffs. Claimant also has conceded that this firm was known for that approach even before this period of time. The pattern of actions by the firm specifically with respect to the Research group is also consistent with the rationale that respondent presents for claimant's termination. Unlike the Sales group, which is a revenue-earning center, the Research group was a cost center and thus looked upon as an area in which pruning was more readily viewed as desirable. Thus the Research group -- never a large staff -- has been allowed to shrink over time from a height of perhaps six analysts to only two, inclusive of Mr. Joshi, is publishing relatively few reports, and no longer publishes the Morning Blast.

Moreover, judged by discretionary payments to Ms. Burns, still the head of this small shop, cost-cutting is still underway there. In addition, although Mr. Ngo suggests that cutting his sectors out of Research was unjustified, that is what the firm has done, by virtue of not assigning anyone to cover those sectors after his departure. (Tr. 794-95). Furthermore, although there is no dispute that Oppenheimer had given up equity and investment banking coverage of his sectors some years before his termination, there is no compelling reason to assume that the consequences of the lapse of such coverage would be bureaucratically imposed promptly on Research, particularly in

31

years when the firm was more flush than proved to be the case by 2016. As for the hiring of Mr. Joshi, it was said to be done specifically to keep Oppenheimer fully engaged in the TMT sector, which appears to have been a firm favorite, and there is no reason to question the credibility of that assertion. While it is also true that Oppenheimer could have asked Mr. Ngo to switch to the TMT sector, the choice by the firm to hire someone already immersed in that area was neither irrational nor so suspect as to suggest that the intent was to squeeze Mr. Ngo out for malign reasons.

As for Mr. Ngo's calculation of market cap shares, it is unclear how significant that should have been for Oppenheimer business decisions, especially since the key for the firm to be interested in a sector was volatility (Tr. 63, 904-05), and the market cap data does not reflect that. (Tr. 1251 (no data on volume of trading)). In any case, Oppenheimer had clearly made a business judgment that research on Mr. Ngo's sectors was of diminished utility. Finally, we note the passage of nearly two years between Mr. Ngo's contretemps with Mr. Lowenthal and the termination decision. Had Mr. Lowenthal harbored such animus as to contemplate firing Mr. Ngo as a result of his asserted invocation of the FMLA, we would expect that step to have been carried out long before June 2016.[33]

In sum, we reject the assertion by claimant that his termination was caused in whole or in part by retaliatory animus.

C. <u>Gender Discrimination</u>

Claimant next asserts that the steps taken by Oppenheimer that were adverse to him amounted to gender discrimination, in violation of Title VII, the New York State Human Rights Law and the City Human Rights Law. These claims are groundless.

To establish a claim under Title VII or the State law, the plaintiff must demonstrate that he was subjected to an adverse employment action and that his gender was a motivating factor in

---

[33] Even assuming that Mr. Lowenthal's conceded displeasure with Mr. Ngo's actions in 2014 had amounted to a desire to punish him for a proper invocation of FMLA rights -- a characterization that we have already declined to adopt -- his effort in early 2016 to increase claimant's bonus in the face of fiscal constraints would strongly suggest that such animus had long since dissipated.

that action. <u>See</u>, <u>e.g.</u>, <u>Vega</u>, 801 F.3d at 86; <u>Melman v. Montefiore Medical Center</u>, 98 A.D.3d 107, 127, 946 N.Y.S.2d 27 (1ˢᵗ Dep't 2012). Under the City law too, the plaintiff need show only that discriminatory animus played some role in the challenged decision. "[T]he plaintiff is not required to show that the employer's proffered reasons were false or played no part in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the motivating factors." <u>Id.</u> (quoting <u>Mihalik v. Credit Agricole Cheuvreux, N.A., Inc</u>., 715 F.3d 102, 110 n.8 (2d Cir. 2013). To satisfy either test, however, discriminatory animus must presumably still affect to some degree the complained-of conduct of the employer. <u>See</u>, <u>e.g.</u>, <u>Mihalik v. Credit Agricole Cheuvreux, N.A., Inc</u>, 715 F.3d at 117.

Mr. Ngo's argument on this point boils down to the contention that Ms. Johnson was treated better than him, since she was allowed to have a full twelve weeks of leave and even more, she was allowed to start her leave before filing her Human Resources papers, and she was permitted to receive some compensation while on leave. He also asserts that Ms. Donnelly was treated better because she received a full twelve-week leave. (Cl. Memo at 45-46 & n.32). The attempt to rest on these circumstances is entirely unpersuasive.

First, Mr. Ngo was not prevented from taking a twelve-week leave for the birth of his child. He never requested it, and there is no meaningful evidence that if he had done so, he would have been denied it or suffered any adverse consequences. For reasons likely relating to his insecurity about his job status, he chose to avoid what he apparently viewed as a career risk, and chose a different path -- an informal arrangement with Mr. Lowenthal under which he would not take formal leave, but would be away for a limited number of weeks while being available for work assignments as needed and would remain on payroll. Then, when the time limitation that he expected would be feasible proved not to be, he avoided directly requesting a different arrangement (notably FMLA leave), and announced that he was going to be away for at least another six weeks, but avoided telling his supervisor or asking for permission. Even so, he was provided with explicit instructions by Mr. Lowenthal as to how to proceed to get an FMLA leave of absence and was given the necessary forms to do so. Had he signed the application and sent it in, he would then have been given a twelve-week leave, possibly even retroactively to July 18 -- indeed, a Human Resources representative (Ms. Jamie Bridges) initially assumed that this would be the case (Ex. 60) -- but he never did so. These are not

Ms. Johnson's circumstances.[34]

Second, as for pay, as a Sales person Ms. Johnson was compensated solely by commission, and when she went on leave she arranged with a fellow Sales person to cover her clients, and to share the resulting commissions, an arrangement that Ms. Ross approved. That is not the circumstance that Mr. Ngo faced. He was on salary, and no revenue was coming in on his account during his absence, and no commissions were payable to any personnel in Research for doing his work. In short, in Ms. Johnson's case Oppenheimer was going to pay the commissions whenever sales were made, even if she was on leave, and the only question was whether she and her replacement wanted to engage in a sharing arrangement. In contrast, if Mr. Ngo were paid while on leave, it would require disbursements by Oppenheimer that it was not otherwise required to make when an employee is on FMLA leave. In any event, in making his original arrangement with Mr. Lowenthal, Mr. Ngo was allowed to continue to be paid in deference to the relative shortness of his projected California stay and apparently his willingness to be available for some remote work if needed.[35]

There is no other evidence to suggest any pattern of Oppenheimer treating men less favorably than women with regard to leaves or in any other respect. Claimant simply fails to carry his burden on this claim, whether under federal, State or City law.

D. Disability Discrimination

Claimant's remaining theory of liability is based on the fact that he suffered an aneurysm in August 2014, and that he was thereafter demoted, given a reduced bonus on two occasions and finally terminated. He asserts that these actions constituted retaliation for his having requested an accommodation for a disability -- specifically, his medical leave from August 18 to November 3, 2014. He seems to asserts his disability claims under

_____

[34] Ms. Johnson filed her papers some weeks after her leave had begun. (Tr. 969-71). As noted, Mr. Ngo never did so.

[35] Claimant mentions Ms. Donnely because she took a twelve-week leave. (Tr. 1530. Again, Mr. Ngo was free to do so as well, but chose not to. He also referred at one point in testimony to Ms. Donnelly having been paid while on leave (Tr. 153), but she was apparently receiving ony disability payments. (Tr. 153-54). Mr. Ngo was also on disability. (Tr. 881, 884, 1216).

both the ADA and the New York State and New York City Human
Rights Laws. (See Cl. Memo at 46-47).

An employer is barred from retaliating for an employee's
request for a disability accommodation. E.g., Wexelberg v.
Project Brokers LLC, 2014 WL 2624761, *9 (S.D.N.Y. April 28,
2014). The plaintiff has the burden of showing that he is under a
disability and sought an accommodation, and that retaliatory
animus was either a "but for" cause of an adverse action (under
federal and State law, see, e.g., Gross v. FBL Fin. Servs., 557
U.S. 167, 177-78 (2009)) or played any role in the decision. See
Bennett v. Health Management Sys., Inc., 92 A.D.3d 29, 40, 936
N.Y.S.2d 112, 120 (1st Dep't 2011).

Putting to one side whether Mr. Ngo suffered from a
cognizable disability under federal, State or City law,[36] we see
no evidence that the adverse actions undertaken by Oppenheimer
were attributable in any way to his request for FMLA medical
leave, which was of course granted. As noted, the demotion
occurred in July, a month before claimant suffered the aneurysm,
and in any event there is no meaningful evidence that whatever
actions Mr. Lowenthal took in November, which involved merely
confirming the change in Mr. Ngo's status, had anything to do
with his having gone on medical leave. The record is equally bare
of animus-based causal relationship between the medical leave and
Mr. Lowenthal's subsequent decisions in 2015 and 2016 concerning
the amount of claimant's bonuses and his eventual termination.

## CONCLUSION

For the reasons stated, we conclude that claimant has failed
to sustain his claims. Accordingly, the case is dismissed.

Dated: May 20, 2019

Michael H. Dolinger
Arbitrator

---

[36] The parties dispute that question. (Compare Cl. Reply Memo
at 17-18 with Resp. Memo at 57).

35

## SERVICE LIST

**Case Name:** Ngo, Hoai vs. Oppenheimer & Co., Inc.   **Hear Type:** Arbitration

**Reference #:** 1425025377   **Case Type:** Employment

**Panelist:** Dolinger, Michael H.,

---

### Michael H. Gibson

Satterlee Stephens Burke & Burke

Michael H. Gibson          Respondent
230 Park Avenue            Phone: 212-818-9200
New York, NY  10169-0079   Fax: 212-818-9607
mgibson@ssbb.com

**Party Represented:**
 Oppenheimer & Co. Inc.

### Jeremiah Iadevaia

Vladeck, Raskin & Clark, P.C.

Jeremiah Iadevaia          Claimant
565 Fifth Avenue, 9th Floor Phone: 212-403-7300
New York, NY  10017        Fax: 212-221-3172
jiadevaia@vladeck.com

**Party Represented:**
 Hoai Ngo

### Valdi Licul

Vladeck, Raskin & Clark, P.C.

Valdi Licul                Claimant
565 Fifth Avenue, 9th Floor Phone: 212-403-7300
New York, NY  10017        Fax: 212-221-3172
vlicul@vladeck.com

**Party Represented:**
 Hoai Ngo

## PROOF OF SERVICE BY EMAIL & U.S. MAIL

Re: Ngo, Hoai vs. Oppenheimer & Co., Inc.
Reference No. 1425025377

I, Vickie Johnston, not a party to the within action, hereby declare that on  June 20, 2019, I served

the attached Final Award on the parties in the within action by Email and by depositing true copies thereof

enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at New York, NEW

YORK, addressed as follows:

Valdi Licul Esq.
Jeremiah Iadevaia Esq.
Vladeck, Raskin & Clark, P.C.
565 Fifth Avenue, 9th Floor
New York, NY   10017
Phone: 212-403-7300
vlicul@vladeck.com
jiadevaia@vladeck.com
   Parties Represented:
   Hoai Ngo

Michael H. Gibson Esq.
Satterlee Stephens Burke & Burke
230 Park Avenue
New York, NY   10169-0079
Phone: 212-818-9200
mgibson@ssbb.com
   Parties Represented:
   Oppenheimer & Co. Inc.

I declare under penalty of perjury the foregoing to be true and correct. Executed at New York, NEW

YORK on  June 20, 2019.

Vickie Johnston
VJohnston@jamsadr.com