# EXHIBIT E

JUDICIAL ARBITRATION AND MEDIATION SERVICES

– – – – – – – – – – – – – – – – – – – – – – – – – – x

HOAI NGO,                                           :

                      Claimant,        :

                              :   JAMS Case No.: 1425025377

          -against-                          :

OPPENHEIMER & CO. INC.,                             :

                  Respondent.      :

– – – – – – – – – – – – – – – – – – – – – – – – – – x

## **RESPONDENT'S POST-HEARING MEMORANDUM OF LAW**

SATTERLEE STEPHENS LLP

Michael H. Gibson
John I. Coster IV
230 Park Avenue, 11th Floor
New York, New York 10169
(212) 818-9200
(212) 818-9606 (fax)

*Attorneys for Respondent*

# Table of Contents

**Page**

PRELIMINARY STATEMENT ...................................................................................1

THE EVIDENCE ........................................................................................................2

    Claimant's Employment with Oppenheimer ...................................................2

    Jane Ross ........................................................................................................4

    Oppenheimer's Employee Policies .................................................................5

    Claimant "Explores" the Potential for an FMLA Leave of Absence ..................7

    Claimant's Time Out of the Office for the Birth of His Child ...........................9

    The Removal of Claimant's Supervisory Responsibilities ...............................13

    Claimant's FMLA Leave ...............................................................................18

    Claimant's Return to Work ............................................................................20

    Claimant's 2014 and 2015 Discretionary Bonuses .......................................23

    Claimant's Termination .................................................................................25

    The HYR Group Following Mr. Ngo's Termination .......................................28

    Claimant's Post-Termination Employment ....................................................29

ARGUMENT .............................................................................................................32

POINT I     CLAIMANT HAS FAILED TO ESTABLISH ANY VIOLATION OF
              THE FMLA ...................................................................................................32

    I.     Claimant Received All of the FMLA Leave He Requested and Was
          Entitled To ....................................................................................................33

          A.    Oppenheimer fully complied with all FMLA requirements with
                 respect to Claimant's leave request due to his aneurysm .........................34

          B.    Claimant never asked for FMLA leave prior to his aneurysm ..................36

          C.    Claimant was not "discouraged" from requesting FMLA leave ...............38

          D.    If Claimant had been on FMLA leave prior to his aneurysm, then
                 he would have exceeded his twelve weeks and forfeited any right
                 to reinstatement ......................................................................................42

i

|  |  |  |  |
|---|---|---|---|
| | E. | Claims arising out of any alleged interference are time-barred | 42 |
| II. | | Claimant Has Not Demonstrated Any Retaliation for Taking FMLA Leave | 43 |
| | A. | The removal of Claimant's supervisory responsibilities was unrelated to any FMLA leave | 44 |
| | B. | Claimant has shown no improper reduction of his discretionary bonuses | 49 |
| | C. | Claimant's FMLA leave was not a factor in his termination | 52 |

POINT II   CLAIMANT'S DISCRIMINATION AND RETALIATION CLAIMS SHOULD BE DENIED ............................................. 55

    I.    Claimant's Gender Discrimination Claims ........................................... 55

    II.    Claimant's Disability Discrimination and Retaliation Claims ............................ 57

POINT III   CLAIMANT'S ALLEGED DAMAGES ..................................................... 59

    Claimant's Alleged Compensatory Damages ..................................................... 59

    Claimant Has Failed to Mitigate His Alleged Damages ..................................... 62

    Claimant's Alleged Emotional Distress Damages .............................................. 63

    Claimant's Request for Punitive Damages ......................................................... 64

CONCLUSION ................................................................................................................ 64

3172086_2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnett v. Revere Smelting & Ref. Corp.*,
   67 F. Supp. 2d 378, 385 (S.D.N.Y. 1999) ....................................................36

*Bonura v. Chase Manhattan Bank, N.A.*,
   629 F. Supp 353 (S.D.N.Y. 1986) ...............................................................60

*Boyar v. City of New York*,
   2010 WL 4345737 (S.D.N.Y. Oct.28, 2010) .........................................50, 60

*Clemens v. Moody's Analytics, Inc.*,
   2018 WL 1750586 (S.D.N.Y. Apr. 9, 2018).................................................49

*Cooper v. New York State Nurses Ass'n*,
   847 F.Supp.2d 437 (E.D.N.Y. 2012) .....................................................63, 64

*Dasrath v. Stony Brook Univ. Med. Ctr.*,
   2015 WL 1223797 (E.D.N.Y. Mar. 17, 2015)......................................50, 60

*Di Giovanna v. Beth Israel Med. Ctr.*,
   651 F. Supp. 2d 193 (S.D.N.Y. 2009).........................................................41

*Douyon v. New York City Dep't of Educ.*,
   665 F. App'x 54 (2d Cir. 2016)...................................................................42

*Feingold v. New York*,
   366 F.3d 138 (2d Cir. 2004).......................................................................58

*Garrett v. Garden City Hotel, Inc.*,
   2007 WL 1174891 at *21 (E.D.N.Y. April 19, 2007)).............................52

*Graziado v. Culinary Inst. of Am.*,
   817 F.3d 415 (2d Cir. 2016).................................................................33, 36

*Guary v. Upstate Nat. Bank*,
   618 F.Supp.2d 272 (W.D.N.Y. 2009) .........................................................57

*Hamilton v. Niagara Frontier Transp. Authority*,
   2008 WL 4724324 (W.D.N.Y. October 24, 2008) ................................62, 63

*Holder v. Illinois Dept. of Corrections*,
   2012 WL 223357 (S.D. Ill. January 25, 2012)............................................62

i

*Horsting v. St. John's Riverside Hospital,*
    2018 WL 1918617 (S.D.N.Y. April 18, 2018) ...............................................36, 37

*Kolivas v. Credit Agricole,*
    125 F.3d 844 (2d Cir. 1997)............................................................................57

*Lewis v. New York City Police Dept.*
    at 325 .............................................................................................................42

*McLaughlin v. Richland Show Co.,*
    486 U.S. 128, 133, 108 S.Ct. 1677 (1988)................................................42, 43

*Meder v. City of New York,*
    2007 WL 1231626 .........................................................................................52

*Melman v. Montefiore Medical Center,*
    98 A.D.3d 107 (First Dep't 2012)....................................................................55

*Miller v. AT&T Corp.,*
    250 F.3d 820 (4th Cir. 2001) ..........................................................................62

*Muhleisen v. Wear Me Apparel LLC,*
    644 F.Supp.2d 375 (S.D.N.Y. 2009)................................................................37

*Pasternak v. Down Kim,*
    961 F.Supp.2d 593 (S.D.N.Y. 2013)................................................................60

*Perry v. NYSARC, Inc.,*
    424 Fed.Appx. 23 (2d. Cir. 2011).....................................................................53

*Porter v. New York Univ. Sch. of Law,*
    392 F.3d 530, 531-531 (2d. Cir. 2004). ..........................................................42

*Rakowsky v. Johnson,*
    2017 WL 8777369 (N.D.N.Y. October 25, 2017) ...........................................52

*Reilly v. Revlon, Inc.,*
    620 F.Supp.2d 524, 535 (S.D.N.Y. 2009) .............................................32, 38, 42

*Santiago v. Department of Transp.,*
    50 F.Supp.3d 136, 144 (D.Conn. 2014)............................................................38

*Santiago v. New York City Police Dep't,*
    .........................................................................................................................36

*Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,*
    183 F.3d 155, 161–62 (2d Cir.1999).................................................................32

3172086_2

*Sista v. CDC Ixis N. Am., Inc.*,
    445 F.3d 161 (2d Cir. 2006)................................................................................48

*Sommer v. The Vanguard Grp.*,
    461 F. 3d 397 (3d Cir. 2006).................................................................................49

*Steiner v. Sprint*,
    957 F.Supp. 65 (S.D.N.Y. 1997)..........................................................................53

*Thomas v. iStar Financial Inc.*,
    508 F.Supp.2d 252 (S.D.N.Y. 2007).....................................................................61

*Vale*, 80 F.Supp.3d at 434 (E.D.N.Y. 2015) .................................................................58

*Vale v. Great Neck Water Pollution Control Dist.*,
    80 F.Supp.3d 426, 433 (E.D.N.Y. 2015) .............................................................57

*Vega v. Hempstead Union Free School Dist.*,
    801 F.3d 72 (2d Cir. 2015)....................................................................................55

*Vicioso v. Pisa Bros., Inc.*,
    1998 WL 355415 (S.D.N.Y. July 1, 1998) .........................................................64

*White v. Andy Frain Servs., Inc.*,
    2014 WL 3896066 (E.D.N.Y. Aug.8, 2014).................................................50, 60

*Woods v. Start Treatment & Recovery Ctrs., Inc.*,
    864 F.3d 158 (2d Cir. 2017).............................................................................32, 43

**Statutes**

29 U.S.C. § 2612(a)(1)(A) and (D)..................................................................................32

29 U.S.C. § 2615(a)(1)......................................................................................................32

29 U.S.C. § 2617(a)(1)(A)(iii)..........................................................................................62

29 U.S.C. § 2617(c)(1).......................................................................................................42

42 U.S.C. § 2000e–5(e)(1).................................................................................................55

**Other Authorities**

29 C.F.R. § 825.216(a)......................................................................................................48

29 C.F.R. § 825.302(d) .....................................................................................................37

3172086_2

JUDICIAL ARBITRATION AND MEDIATION SERVICES

– – – – – – – – – – – – – – – – – – – – – – – – – – x

HOAI NGO,                                        :

                       Claimant,        :   JAMS Case No.: 1425025377

          -against-                      :

OPPENHEIMER & CO. INC.,                          :

                  Respondent.      :

– – – – – – – – – – – – – – – – – – – – – – – – – – x

## RESPONDENT'S POST-HEARING MEMORANDUM OF LAW

      Respondent Oppenheimer & Co. Inc. ("Oppenheimer" or "Respondent"), through its attorneys, Satterlee Stephens LLP, respectfully submits the following Post-Hearing Memorandum of Law following the hearings in the above matter.

## PRELIMINARY STATEMENT

      The evidence submitted at the hearing unequivocally demonstrates that Oppenheimer did not interfere with Claimant Hoai Ngo's ("Mr. Ngo" or "Claimant") rights under the Family and Medical Leave Act ("FMLA"), nor did it unlawfully retaliate against him for taking an FMLA leave of absence. Moreover, there is absolutely no evidence that Oppenheimer took any adverse employment action against Mr. Ngo, or treated him unfairly, as a result of either his male sex or any alleged disability.

      Mr. Ngo was clearly advised of his right to take an FMLA leave of absence for the birth of his child.  He chose not to.  He was provided with the required application to request an FMLA leave for that reason.  He chose not to submit it.  Subsequently, as a result of a medical condition, Mr. Ngo requested and received 11 weeks of FMLA leave to recover.  When Mr. Ngo

returned to work after his FMLA leave he returned to the same position at the same salary that he had the day that he commenced his leave.

Finally, there is no evidence that any decision that Oppenheimer made regarding Mr. Ngo's subsequent discretionary compensation, nor the termination of his at-will employment nearly two years after his time out of the office was retaliatory for taking an FMLA leave, or related to his male sex or alleged disability.

For these reasons, it is respectfully submitted that Claimant's Statement of Claim should be denied in its entirety.

## THE EVIDENCE

### Claimant's Employment with Oppenheimer

Mr. Ngo was hired by Oppenheimer on or about August 18, 2009.  Ex. 110.  There is no dispute that Mr. Ngo's employment with Oppenheimer was "at-will".  *Id.* at p.2; Tr. 406:19-21. While employed at Oppenheimer, Mr. Ngo was entitled to a base salary and was eligible for a discretionary annual bonus.  With the exception of allegedly one year (for which he does not seek damages), Mr. Ngo concedes that he was never entitled to any guaranteed bonus while employed by Oppenheimer.  Ex. 110 at p. 1;   Tr. 406:4-10; *see also* Tr. 824:4-11.

From 2009 through October of 2013, Mg. Ngo was employed as a Senior Analyst in Oppenheimer's High Yield Research group ("HYR"), covering his core sectors of chemicals, paper and packaging, and some mining and metals.  During this time period, Mr. Ngo reported to Todd Morgan, Oppenheimer's then Head of HYR. Ex. 110 at p.1; Tr. 405:2-15.  Mr. Morgan reported directly to Robert Lowenthal, Oppenheimer's then Head of Taxable Fixed Income. Tr. 405:16-18; Ex. 9.

2

Mr. Ngo testified that, while employed by Oppenheimer, he received two promotions.  In 2010, he was promoted to Senior Director.  In 2014, he was promoted to Managing Director.  Tr. 85:14-21; Tr. 86:7-23; Ex. 2 at OPCO 0005; 0008.

In October of 2013, Mr. Morgan resigned from Oppenheimer and Mr. Ngo and his colleague Colleen Burns were named Co-Heads of HYR.  Upon becoming the Co-Head of HYR, Mr. Ngo (like Mr. Morgan before him) reported directly to Mr. Lowenthal.  Tr. 429:23-430:2.[1] With regard to his new position, Mr. Ngo did not receive a new business title (he subsequently was promoted to Managing Director), nor was there any change to Mr. Ngo's salary structure. Mr. Ngo continued to receive the same $150,000 base salary that he was receiving prior to his new position, and remained eligible for a discretionary annual bonus.[2]

Mr. Ngo's job functions did not change significantly after becoming the Co-Head of HYR.  He described essentially two new daily responsibilities that he took on: (i) reviewing and sending the Morning Blast email; and (ii) performing senior analyst approval for additional research ("SA").  Tr. 87:8-88:10.[3]

Mr. Ngo and Ms. Burns both testified that it took approximately 10-15 minutes to review and send the daily Morning Blast email.  Tr. 438:9-12; Tr. 737:23-738:14.  With regard to the second aspect of her new responsibilities, Ms. Burns testified that, depending on the size of a

---

[1] The decision to make Mr. Ngo the Co-Head of HYR was made by Mr. Lowenthal.  Tr. 1116:15-20; Tr. 832:7-10.

[2] As Mr. Ngo testified, the October 2013 increase in his salary to $150,000 had nothing to do with his new position as the Co-Head of HYR.  Rather, it was the result of a 2012 agreement between Mr. Ngo and Mr. Lowenthal whereby his salary was increased.  However, at the time of the agreement, Oppenheimer was in the midst of a salary freeze.  As such, the $50,000 in additional compensation was paid to Mr. Ngo in 2012 in the form of quarterly bonuses, rather than a salary increase.  The salary increase became permanent in October of 2013.  Tr. 102:22-103:16; Ex. 2 at OPCO 0006.

[3] Mr. Ngo also testified that he took on responsibilities related to being a "mentor" and also hiring.  *Id.* However, when Mr. Ngo was named Co-Head of HYR he was "mentoring" one analyst – Sean Sneeden.  That number never significantly increased.  Oppenheimer did little to no hiring within HYR from 2013 through the present.  Mr. Ngo also testified that he also allegedly took on compliance related responsibilities.  However, Mr. Ngo later clarified that those compliance responsibilities were essentially the same as his SA'ing.  Tr. 89:23-90:17.

3

piece of research, it could take "anywhere from 5 to 15 minutes" to complete an SA (Tr. 739:7-10) and that on an average day in 2014, she SA'd "three or four" pieces of research. Tr. 739:19-21. Altogether, Ms. Burns testified that she spent "less than two hours" of her day in 2014 performing her responsibilities as the Co-Head of HYR. The rest of her day was spent performing the function of a research analyst covering her sectors. In short, Ms. Burns testified that the responsibilities she took on as the Co-Head of HYR, "[W]asn't the main part of [her] job" and was not an important factor to Oppenheimer customers. Tr. 740:9-16; Tr.742:10-19; *see also* Tr. 834:20-835:10.

To this point, when explaining why he did not reduce Mr. Ngo's base salary after he removed his supervisory responsibilities in July of 2014, Mr. Lowenthal testified:

> The job function of research analyst, the co-head and the supervisory functions were all -- the supervisory portion of that job was a small piece of the job and it was separated between two people. The job function of research analyst was still in place. He was hired to be a research analyst. He was paid the same when he was a research analyst. There was no reason to have him as a supervisor. So it seemed -- there was no reason to increase their pay when they became supervisors and no reason to deduct it when Hoai stopped being a supervisor...

Tr. 854:6-23. Mr. Lowenthal later addressed the lack of any Oppenheimer Personnel Change Notice ("PCN") detailing Mr. Ngo and Ms. Burns' elevation to Co-Heads of HYR:

> Because their titles did not change, not their corporate titles. They were coheads of a group...it's not a corporate title. It's a distinction. It's a meaningless title. You're either a managing director, an executive director, a senior director, a director, an associate or an analyst. Those are the official titles. Head is not a title.

Tr. 1038:10-24.

**Jane Ross**

During the relevant time period, Jane Ross was the Head of Oppenheimer's High Yield Sales Desk. During her lengthy career, Ms. Ross has never been employed as a research analyst,

4

nor has she ever supervised any research analyst. Tr. 1107:15-25.  Ms. Ross reported directly to

Mr. Lowenthal.  Tr. 1108:2-9; Tr. 823:2-4.    At no time did Ms. Ross have the authority to: (i)

hire; (ii) terminate; (iii) set compensation; (iv) discipline; or (v) grant or deny requests for leave

of absence for research analysts. Tr. 1111:6-21; Tr. 824:12-825:3.

Mr. Ngo admitted that he has never seen a single Oppenheimer document which

identifies Ms. Ross as his supervisor.  The only alleged support which Mr. Ngo could proffer for

the self-serving "implication" that Ms. Ross was somehow his supervisor was his conclusory

allegation that Ms. Ross ran the entire High Yield business (which was never the case), and the

fact that Ms. Ross is the individual who executed his offer letter with Oppenheimer.  Tr. 451:21-

452:17; Ex. 110.  However, Ms. Ross unequivocally testified that she never supervised Mr. Ngo,

nor did she ever consider her execution of Mr. Ngo's offer letter to be an "implication" that she

was his supervisor.  Tr. 1113:7-1114:9.  In fact, the offer letter makes very clear on its face that

Mr. Ngo would be reporting to Mr. Morgan. Ex. 110.[4]  Ms. Burns likewise testified that she

never reported to Ms. Ross, either as a research analyst or as the Co-Head/Head of HYR, nor did

she ever consider Ms. Ross to be her supervisor.  Tr. 734:18-735:2.

**Oppenheimer's Employee Policies**

Oppenheimer's employee policies can be found in the company's Employee Handbook.

All Oppenheimer employees, as a condition of their employment, are required to acknowledge

that they have read and understand the Employee Handbook.  Mr. Ngo did so on two separate

occasions. Ex. 111; Tr. 408:11-409:22.

The Employee Handbook contains a Non-Discrimination Policy that generally prohibits

discrimination based on various factors, including sex and disability, as it pertains to any

---

[4] Tellingly, while taking the position that Ms. Ross signing his offer letter somehow "implied" that she was his supervisor at Oppenheimer, Mr. Ngo made so such implication with regard to the Fitch Ratings Inc. ("Fitch") human resources employee who signed his 2017 offer letter.  Tr. 628:12-629:6; Ex. 104.

circumstance of employment. The policy provides that, when incidents of discrimination occur, they are to be reported immediately to the employee's supervisor or to the Human Resources Department ("HR"). Ex. 8 at OPCO 00040. The Employee Handbook also contains an Americans with Disabilities Act ("ADA") policy. *Id.* Mr. Ngo testified that he never once during his entire employment reported to HR or to Mr. Lowenthal that he felt that he was being discriminated or retaliated against by Oppenheimer based on his male sex or any alleged disability. Tr. 415:21-416:15.[5]

Oppenheimer's Leaves of Absence policy provides that **all** leaves of absence require a prior written request to be made to HR. Ex. 8 at OPCO 00052. Oppenheimer does not have a parental, maternity, or paternity leave policy. Rather, as provided by the Employee Handbook, qualifying Oppenheimer employees are entitled to 12 weeks of unpaid FMLA leave for certain family and medical reasons during a 12 month period, including caring for a newborn child and a serious health condition. *Id.* at OPCO 00053. Oppenheimer's policies with regard to leaves of absence are entirely gender neutral. At the conclusion of an FMLA leave of absence, the policy provides that the employee "generally has the right to return to the same or to an equivalent position." *Id.*

The FMLA policy further provides:

> **Requests for FMLA Leave**: An employee should request FMLA leave by submitting a written request for such leave to the Human Resources Department.
>
> The employee is expected to give the Company thirty (30) days advance notice, if practical, ***when applying*** for an FMLA leave. When the need for the leave is not foreseeable, an employee is expected to give notice as soon as practical, except in

---

[5] The Employee Handbook also contains a Tape Recording Policy that prohibits the recording of any conversation which takes place in Oppenheimer's offices or is related to Oppenheimer's business without prior written authorization. A violation of the Tape Recording Policy may subject the employee to discipline, including termination. Ex. 8 at OPCO 00047.

extraordinary circumstances.

*Id.* at OPCO 00055 (emphasis added).[6]   The authority to approve or disapprove an application for FMLA leave is vested solely with Oppenheimer's HR department.  Tr. 1086:15-19.

**Claimant "Explores" the Potential for an FMLA Leave of Absence**

On May 12, 2014, Mr. Ngo advised Mr. Lowenthal that he was having a baby via surrogacy and that he was considering taking some time out of the office for the birth of the child. Tr. 137:24-140:8.  Mr. Ngo first discussed the potential for taking a leave of absence with Mr. Lowenthal because he was his direct supervisor.  *Id.* Mr. Ngo testified that it was important to keep his supervisor informed regarding time that he was going to be spending out of the office.  Tr. 454:10-20.

Mr. Ngo admits that, at the time of this conversation, he did not know whether he was going to take an FMLA leave.  Tr. 460:18-22.  To this end, he described the conversation as "exploratory."  Tr. 140:2-8.   Mr. Lowenthal did not tell Mr. Ngo that he could not or should not take as much leave as he was entitled to under Oppenheimer's policies.  Quite the opposite, he directed Mr. Ngo to contact Lenore Denys, Oppenheimer's then Director of HR, to discuss what his leave options were.  Tr. 454:25-456:2.  Mr. Lowenthal made clear to Mr. Ngo that he should discuss his options to take a leave of absence with Ms. Denys, and, once he had decided what, if any, leave he would take, Mr. Ngo should discuss work coverage for his time out of the office with his colleagues Ms. Ross and Ms. Burns.  Tr. 456:3-6; 459:5-10; Tr. 837:25-838:16.

That same day, Mr. Ngo emailed Ms. Denys stating that he was "trying to figure out leave."  Ms. Denys responded shortly thereafter, advising Mr. Ngo that he was entitled to 12 weeks of unpaid leave under Oppenheimer's FMLA policy and directed Mr. Ngo to the policy

---

[6] Any suggestion that the notice requirement is suggestive, as opposed to mandatory, is contradicted by the reference to the employee's requirement to "apply" for FMLA leave.

contained in the Employee Handbook. Mr. Ngo forwarded Ms. Denys' email to Mr. Lowenthal

and thanked him for his help and understanding. Ex. 113.[7] Mr. Ngo "went straight to page 17"

of the Employee Handbook and read the FMLA section. Tr. 461:13-16; 462:14-20. Following

this limited interaction with Ms. Denys in May of 2014, Mr. Ngo admittedly never once again

contacted Ms. Denys or anyone else in HR to discuss a leave of absence in connection with the

birth of his baby or for any other reason. Tr. 462:21-463:19; Tr. 1086:3-14.

In short, as of May 12, 2014, Mr. Ngo admittedly was made aware of his right to take 12

weeks of unpaid FMLA leave in connection with the birth of his child and had an HR contact for

the purposes of availing himself of that right. Tr. 464:16-21.

Following his exchange with Mr. Lowenthal and Ms. Denys, Mr. Ngo next discussed

potential time out of the office with Ms. Ross. It was during this conversation, that Mr. Ngo

alleges that Ms. Ross "attempted to dissuade" him from taking an FMLA leave of absence or

from taking the full 12 weeks allowed. The conversation was initiated by Mr. Ngo. Tr. 465:19-

21; Tr. 1118:23-1119:10. As with his prior conversation with Mr. Lowenthal, Mr. Ngo admits

that Ms. Ross did not tell him that he could not or should not take the full 12 weeks of FMLA

leave that he was entitled to. Tr. 468:7-469:13; *see also* Tr. 1121:13-25. Rather, from the "tone"

of the comments that Ms. Ross made regarding how she handled leave when she had her

children, Mr. Ngo "implied" that Ms. Ross (who was not his supervisor) did not want him to take

the full 12 weeks of FMLA leave. Tr. 469:14-470:5. Importantly, Mr. Ngo specifically told

Ms. Ross that Ms. Denys had told him that he was entitled to 12 weeks of FMLA leave. Tr.

470:22-471:9.

---

[7] Both Mr. Ngo and Ms. Denys testified that they also spoke briefly on the telephone shortly before or after
their May 12th email exchange.

3172086_2

Ms. Ross made clear in her testimony that it was never her intent to "attempt to dissuade" Mr. Ngo from availing himself of his FMLA rights. Tr. 1122:2-8. Rather, Ms. Ross simply shared her personal experiences with Mr. Ngo because **he asked her** as part of what he testified was an "exploratory" time period. Tr. 1122:9-1123:6.

Mr. Ngo also alleges that he felt "discouraged" by Ms. Ross because she had allegedly rejected his suggestion that Ms. Burns run the three-person HYR group while he was out of the office for the birth of his child. Tr. 157:14-158:11. Ms. Ross denies that this conversation took place and once again testified that she did not have the authority to make any such accommodation, as she did not supervise HYR– Mr. Lowenthal did. Tr. 1121:5-12.

Despite believing that Ms. Ross was "implying" through her "tone" that he should not avail himself of his FMLA rights, Mr. Ngo did not ask Ms. Ross to clarify her comments because he supposedly believed that any such inquiry would be "argumentative." Tr. 475:13-15. Additionally, following the conversation in which he believed that Ms. Ross was attempting to interfere with his FMLA rights and treating him differently as a result of his male sex, Mr. Ngo did not complain to HR or to Mr. Lowenthal, nor did he document the incident in any way. 477:5-481:2.[8]

**Claimant's Time Out of the Office for the Birth of His Child**

On June 20, 2014, Mr. Ngo left the office for the birth of his child. Tr. 486:16-22. Mr. Ngo admits that he was not on an FMLA leave as of his departure. Tr. 1258:25-1259:4. Three witnesses, Mr. Lowenthal, Ms. Ross, and Ms. Burns each consistently testified that it was their understanding that: (i) Mr. Ngo had elected not to take a leave of absence under the FMLA; (ii)

---

[8] In or around this same time period, Mr. Ngo allegedly discovered that two female employees in Oppenheimer's fixed income department were allegedly "paid for portions" of their respective FMLA leaves when they gave birth to their children. Mr. Ngo likewise failed to notify anyone in HR or Mr. Lowenthal that he felt that he was being treated differently than these employees based on his male sex. Tr. 486:9-15.

9

he was going to be working remotely from California utilizing his laptop computer and
Oppenheimer's California offices; and (iii) he was going to be returning to the office within
approximately 2-4 weeks. Tr. 843:23-844:30; Tr. 1124:10-1125:18; Tr. 743:6-744:3.
Specifically, Mr. Lowenthal testified, "He said he did not want to take an FMLA leave. He
wanted to continue to get paid, he wanted to continue to work as long as he could within an
accommodation of physical location on the West Coast where he could continue to perform his
job function." Indeed, after Ms. Burns opined to Mr. Ngo that he should avail himself of his
FMLA rights, he declined to. *Id.*

Upon his arrival in California, Mr. Ngo testified that he was checking his Oppenheimer
email regularly. In fact, he testified that he was checking his email, "[p]retty much every day."
Tr. 488:18-489:8. Mr. Ngo was also calling the office approximately once a week to discuss
work matters with Ms. Burns (Tr. 489:15-23; Tr. 502:5-7; Tr. 745:10-21) and speaking
telephonically with other Oppenheimer employees. Tr. 496:2-5. Mr. Ngo remotely continued to
perform his functions as the Co-Head of HYR. For example, he continued to SA Sean Sneeden's
research, when published. Ex. 125; Tr. 746:24-748:8; Tr. 493:16-494:13. Indeed, despite his
allegation that he was somehow "forced" to work while he was allegedly on leave, Mr. Ngo sent
an email to Ms. Burns on July 25, 2014 (a month after the birth of his child and days after he
claims to have "made clear" that he had decided to take leave) offering to cover all SA
responsibilities. Ex. 128; Tr. 507:9-508:9; Tr. 751:18-752:15. During this same time period,
Mr. Ngo admittedly could not recall (nor could Ms. Burns or Ms. Ross) one single instance in
which Mr. Ngo told any Oppenheimer employee that he: (i) should not be working because he
was on a leave of absence; or (ii) was being forced to work. Tr. 494:14-18; 508:18-511:5; Tr.
753:5-9; Tr. 761:12-24; Tr. 1124:24-1125:9.

In exchange for the services that he continued to perform for Oppenheimer while working remotely in California, and as he was **not** on a leave of absence, Mr. Ngo continued to be paid his base salary. Mr. Ngo never once contacted anyone at Oppenheimer to state that he should not be receiving his pay because he believed that he was on an FMLA leave. Tr. 490:4-12; 511:18-24. This should not be surprising because that was precisely the arrangement that he reached with Mr. Lowenthal before he left the office.

On the evening of Sunday, July 13, 2014, Mr. Ngo sent an email to Ms. Ross and Ms. Burns stating that he was not going to be returning to the office until August 25, 2014. Ex. 114. Despite testifying that he first approached Mr. Lowenthal regarding the issue of potentially taking a leave of absence because he was his supervisor and that it was important to keep Mr. Lowenthal apprised of the time that he would be out of the office, Mr. Ngo chose not to copy Mr. Lowenthal on the email, or attempt to contact him before sending it. Equally important, Mr. Ngo did not copy or contact anyone from HR, the department that Mr. Lowenthal specifically directed Mr. Ngo to contact regarding taking a leave of absence and the only department that could approve a request for leave. The email: (i) makes no reference to the FMLA; (ii) makes no reference to "leave" of any kind; and (iii) contains no request for more time out of the office. To the contrary, it simply states that Mr. Ngo (who at the time he wrote the email admits that he was working remotely from California) would not be returning to the office until August 25, 2014. Ex. 114; Tr. 514:5-516:15.[9]

Within his email, Mr. Ngo again confirmed that he is "checking email and [is] available if anyone needs anything." Moreover, Mr. Ngo twice thanked Ms. Ross (whom he alleges

---

[9] This July 13th email in which Mr. Ngo believes that he somehow made it "clear" that he was taking FMLA leave and would not be working was sent three days before he SA'd Mr. Sneeden's research (Ex. 125) and twelve days before he offered to handle all SA'ing responsibilities for Ms. Burns (Ex. 128).

11

violated his FMLA rights and discriminated against him in their prior May 2014 meeting) and Ms. Burns for all of their "good wishes", "understanding", "help", and "support" throughout the "entire process." Ex. 114.

Upon receiving Mr. Ngo's email, both Ms. Ross and Ms. Burns reasonably assumed that Mr. Ngo was communicating that he was extending the accommodation that he had reached with Mr. Lowenthal prior to departing the office in June *i.e.* working remotely from California. Indeed, setting aside the fact that there is absolutely no reference to a request for a leave of absence within the communication, neither Ms. Burns nor Ms. Ross had the authority to approve any such request. Tr. 1128:16-22; Tr. 1130:3-10; Tr. 757:5-22. Ms. Ross testified that, had she understood Mr. Ngo's email to in any way be a request for an FMLA leave of absence, she would have referred Mr. Ngo to the same party that Mr. Lowenthal originally did – HR. Tr. 1130:3-6. Both recipients also took notice of Mr. Ngo's "curious" decision not to include Mr. Lowenthal on the email. Tr. 1127:20-1128:4; Tr. 756:20-757:4.

Ms. Ross was admittedly "frustrated" when she received Mr. Ngo's email, but not because he had been out of the office for the birth of his child or because he appeared to decide to be out longer. In responding to Mr. Ngo's email the following day, Ms. Ross made no attempt to "dissuade" Mr. Ngo from taking as much time out of the office as he needed. Rather, she stated that she was happy to hear that Mr. Ngo's baby was healthy and thriving, requested pictures, and stated, "[w]e'll see you sometime in August." Ex. 114; Tr. 522:7-15. Ms. Ross' frustration was directed at the fact that Mr. Ngo, in electing not to take an FMLA leave, had indicated that he would be returning to the office in a period of 2-4 weeks, which would have placed him back in New York in mid-July. Oppenheimer had prepared for Mr. Ngo's absence during this relatively short and slow time period for the business. However, August is not a slow

12

time period for the High Yield business.  August is in fact one of the four busiest time periods in

every year– second quarter earnings.  And it is for this reason that Ms. Ross asked Mr. Ngo how

he planned to remotely handle his work responsibilities associated with the earnings period.  Ex.

114; Tr. 1127:25-1128:14; 1132:5-15; Tr. 1190:20-1191:6. [10]

Following his receipt of Ms. Ross' email, Mr. Ngo called Ms. Burns to discuss the

matter.  Once again, Mr. Ngo did not tell Ms. Burns (or anyone else) that he should not be

working on second quarter earnings because he believed that he was on an FMLA leave of

absence.  Tr. 523:19-525:7; Tr. 761:12-24.  Instead, Mr. Ngo responded to Ms. Ross' email by

stating, "We can see what John can do while I am away.  I can help out more when I am back in

New York as the logistics will be better." Ex. 114.[11]  In other words, rather than make any

reference to the alleged leave of absence that he now claims to have been on or was somehow

requesting, Mr. Ngo suggested in his email that it will "logistically" be easier for him to assist

with second quarter earnings when he returns to New York, as opposed to working remotely

from California.

Once again, Mr. Ngo failed to report to anyone, or in any way document, that he believed

that Ms. Ross was violating his FMLA rights or treating him differently due to the fact that he

was a man. Tr. 527:6-528:6.

**The Removal of Claimant's Supervisory Responsibilities**

Considering that Mr. Ngo had not seen fit to include him on his July 13th email, the first

time that Mr. Lowenthal learned that Mr. Ngo would not be returning to the office for over

---

[10] Considering the importance of second quarter earnings and her understanding that Mr. Ngo was working remotely from California, Ms. Burns testified that she did not believe that it was inappropriate for Ms. Ross to inquire from Mr. Ngo how he intended to fulfil his responsibilities.  Tr. 760:11-17.

[11] John Daniels was a junior analyst who was not qualified to handle Mr. Ngo's second quarter earnings' responsibilities, including his supervisory ones.  Tr. 762:15-19; Tr. 1132:23-1133:18.

another month was the following business day, July 14, 2014, when Ms. Ross and Ms. Burns

discussed the matter with him.  Tr. 847:2-15; Tr. 849:7-18; Tr. 762:23-763:23; Tr. 1136:22-

1137:10.

Upon learning of Mr. Ngo's newfound plans, Mr. Lowenthal testified that he was

"disappointed" that Mr. Ngo, "was unilaterally deciding to stay on the West Coast without

having discussed it with me…" Tr. 847:16-848:3.   Mr. Lowenthal believed that Mr. Ngo's

conduct "showed poor judgment" and a "lack of acknowledgment" of the heavily regulated

nature of the business that he was employed to be a supervisor in.  As a result of this fact, Mr.

Lowenthal decided to make Ms. Burns the sole Head of HYR.  Tr. 850:10-851:10.

Mr. Lowenthal also testified that he came to the realization that there was no need to have

two supervisors in HYR supervising one or two additional research analysts.  Tr. 861:19-862:9.

Indeed, Mr. Ngo's predecessor (Mr. Morgan) never had a Co-Head of HYR, nor has there ever

been once since.  Tr. 735:20-22; Tr. 765:22-766:14; Tr. 832:18-20.

It was not until one or two days later, after Mr. Lowenthal had to instruct Ms. Burns to

direct Mr. Ngo to call him, that the two spoke directly.  Tr. 763:18-23; Tr. 855:22-25.  During

this telephone conversation, Mr. Lowenthal advised Mr. Ngo that his limited supervisory

responsibilities were being removed and that Ms. Burns would be the sole Head of HYR going

forward.  Mr. Lowenthal did not tell Mr. Ngo that he was required to return to the office

immediately.  Rather, as he did back in May, Mr. Lowenthal again instructed Mr. Ngo to decide

what he wanted to do with regard to potentially taking a formal leave of absence and to

communicate his decision to HR.  Mr. Lowenthal further testified that, had Mr. Ngo told him

during that call that he intended to take an FMLA leave, he would have responded, "That's fine,

please fill out the proper paperwork, send it in to HR and let us know the dates upon which you

plan on beginning that leave." Lowenthal Tr. 857:23-858:6.[12]  In fact, Mr. Ngo alleges that

during this conversation he stated to Mr. Lowenthal, "I would sign whatever papers he needed."

Tr. 532:2-7.  Following this conversation, Mr. Ngo did not send any follow-up writing to Mr.

Lowenthal or anyone else indicating his belief that he was now on an FMLA leave of absence.

Tr. 533:4-19.  Quite the opposite, just days later, he offered in writing to handle all SA'ing

responsibilities for the department while Ms. Burns was out of the office. Ex. 128.

Once again, following this conversation with Mr. Lowenthal in which he allegedly felt

that his FMLA rights were being interfered with and he was being discriminated against, Mr.

Ngo did not contact HR with regard to the issue.  Tr. 538:19-539:10.

On July 18, 2014, the day after they spoke, Mr. Lowenthal emailed a letter to Mr. Ngo.

Ex. 45.  Mr. Ngo does not dispute that the letter was sent or that he received it.  Tr. 249:11-19.

Instead, Mr. Ngo self-servingly and disingenuously alleges that he somehow "missed" the email

and did not open it until several months later when he returned to the office.  Tr. 244:16-21; Tr.

542:11-17.  Mr. Ngo's suggestion that he conveniently "missed" Mr. Lowenthal's email lacks

credibility for several reasons.  First, as set forth above, Mr. Ngo testified that he was checking

emails every day.  Indeed, just five days prior to the date on which Mr. Lowenthal sent his letter,

Mr. Ngo advised Ms. Ross and Ms. Burns, "I am still checking email..." Ex. 114.  Second, it is

Mr. Ngo's testimony that on the day before the letter was sent, he had a conversation with Mr.

Lowenthal in which he: (i) believed that Mr. Lowenthal was punishing him for taking time out of

the office; (ii) believed that Mr. Lowenthal was angry with him; (iii) concluded that his job was

in jeopardy; and (iv) allegedly told Mr. Lowenthal that he would "sign anything" in order to

---

[12] While Mr. Ngo disputes that Mr. Lowenthal told him during this conversation that his supervisory
responsibilities were being removed, he does admit that Mr. Lowenthal told him that he was no longer going to be
sending the Morning Blast email (one of the two functions of the group head) and testified that the effect of that
decision would be, "signaling to the market to some degree...I was no longer the group head."  Tr. 535:8-536:8;
537:2-13.

15

avail himself of his FMLA rights.  Tr. 542:18-543:4; Tr. 589:3-13.  It is simply unfathomable

that Mr. Ngo, a supervisor in a highly regulated industry,  can be heard to suggest that, under

these circumstances, he somehow accidentally "missed" the email that Mr. Lowenthal sent to

him the very next day with the subject line, "Follow-Up."[13]  It should also be noted that the fact

that Mr. Ngo would allegedly "miss" this crucial email from his supervisor only further supports

Mr. Lowenthal's conclusion that Mr. Ngo's "behavior was a red flag…in terms of whether or not

he was paying attention to detail and whether or not he was really thinking about his job

responsibilities."  Tr. 869:10-15.

        The letter first recounts the understanding that Mr. Lowenthal and Mr. Ngo reached prior

to his departure from the office on June 20, 2014, *i.e.* that Mr. Ngo had elected <u>not</u> to take an

FMLA leave of absence, that he would be working remotely from California for 2-4 weeks, and

that he would continue to be paid.  The letter further points out that, had Mr. Lowenthal known

that Mr. Ngo would be out of the office for a period of over two months, he "would have

expected [Mr. Ngo] to communicate that to [HR] at the time that [he] asked [Mr. Ngo] to speak

with them regarding the Firm's policies on paternity leave."  Ex. 45.  In other words, Ms. Denys

told Mr. Ngo on May 12, 2014 that he could take up to 12 weeks of unpaid leave under the

FMLA.  Mr. Ngo elected not to.  Mr. Lowenthal permitted Mr. Ngo to work remotely from

California for the birth of his child and to continue to be paid, upon Mr. Ngo's voluntary

representation that he would be returning in 2-4 weeks.  Had Mr. Lowenthal known that Mr. Ngo

would take more than two months out of the office, he would have been perfectly fine with that.

However, he would have also: (i) instructed Mr. Ngo again to contact Ms. Denys and take the 12

---

[13] As set forth below, the issue of whether or not Mr. Ngo did open Mr. Lowenthal's email or intentionally
neglected to open the email is irrelevant.  Moreover, Claimant's reliance on the fact that the letter was not also
mailed to Mr. Ngo is misplaced.  Of course, as Mr. Ngo was in California, had Mr. Lowenthal mailed the letter to
Mr. Ngo's home, it would not have been received for over another month.

weeks of <u>unpaid</u> leave that he was entitled to; and (ii) expected that Mr. Ngo would have worked with Ms. Ross and Ms. Denys to prepare for an absence of 2 plus months (including during earnings season), as opposed to 2-4 weeks.

The letter next reminds Mr. Ngo as to what was discussed in the parties' conversation of the prior day to the extent that Ms. Burns would, "absorb all of the tasks associated with the supervisory elements of the Research Department". *Id.* In other words, Ms. Burns would be the sole Head of HYR moving forward.

Finally, contrary to any suggestion that Oppenheimer in any way, shape, or form attempted to interfere with Mr. Ngo's right to take FMLA leave, the letter provides Mr. Ngo (who had already been out of the office for a month) with the FMLA paperwork necessary to avail himself of 12 weeks of unpaid FMLA leave. *Id.* The very first page of the paperwork supplied to Mr. Ngo makes clear, "FMLA provides up to 12 weeks of unpaid job protected leave. You are <u>required</u> to fill out FMLA material." *Id.* (emphasis in original). Ms. Denys testified that had Mr. Ngo ever contacted HR following May 12, 2014 and indicated that he wanted to take an FMLA leave, Oppenheimer, pursuant to its standard policy, would have sent him the very same FMLA application that was contained within Mr. Lowenthal's letter. Tr. 1086:20-1087-7.[14] It is undisputed that Mr. Ngo: (i) never filled out the FMLA paperwork; (ii) never contacted Oppenheimer's HR department to advise that he wished to take a leave of absence under the FMLA; and (iii) continued to receive his paycheck, without objection.

The fact that Mr. Lowenthal both made his decision to remove Mr. Ngo's supervisory responsibilities and communicated that decision to Mr. Ngo in July of 2014 is further reflected

---

[14] To this end, on July 15, 2014, three days before Mr. Lowenthal sent his letter containing Oppenheimer's FMLA application, Ms. Denys advised Mr. Lowenthal, "Hoai can *apply* for unpaid leave under FMLA…" Ex. 52 (emphasis added).

within his July 21, 2014 email to Ms. Burns in which he states that he had communicated to Mr. Ngo that, "Beginning today, [Ms. Burns is] the sole supervisory analyst in the fixed income department." Ex. 56. Claimant has attempted to rely on writings which it believes suggest that Mr. Lowenthal's decision was somehow temporary in nature. However, Mr. Lowenthal testified that the decision was not temporary and that he never once revisited or reconsidered the decision. Tr. 861:14-863:4. This is further supported by the secretly and unethically recorded November 3, 2014 conversation between Mr. Lowenthal and Mr. Ngo in which Mr. Lowenthal makes clear that the decision was "permanent." Ex. 86(b) at p. 7, Line 9. Finally, Ms. Burns testified that when Mr. Lowenthal advised her of his decision, he did not indicate in any way that the decision was temporary. Rather, Ms. Burns testified, "He basically said, you're going to handle the supervisory responsibilities going forward…" Tr. 765:10-18.

**Claimant's FMLA Leave**

On or about August 16, 2014 (prior to returning to office), Mr. Ngo suffered a brain aneurysm. Tr. 221:5-222:5. It was at this point that Mr. Ngo went on an FMLA leave of absence. Unlike the time period during which he was in California, multiple Oppenheimer documents establish that Oppenheimer was aware that Mr. Ngo was on an FMLA leave of absence and treated him as such.

For example, Oppenheimer PCN forms reflect Mr. Ngo going out on medical disability and having his auto-pay cancelled on August 20, 2014 (effective August 18, 2014) (Ex. 112 at OPCO 0004) and returning from medical disability on November 10, 2014 (effective November 3, 2014) (Ex. 112 at OPCO 0003). Unlike the time period when he was in California, Mr. Ngo ceased receiving his paycheck and his paystubs for the time period of August 18, 2014 through November 3, 2014 reflect $0 in compensation and state "LOA" (leave of absence). Ex. 11(g); Tr.

18

1218:19-1219:7.  During this same time period, Mr. Ngo admits that he was not doing any work

for Oppenheimer, nor was he asked to work.  Tr. 562:15-22.

Both Ms. Denys and Jaime Bridges, another Oppenheimer HR employee, testified that

they had not seen any document within Mr. Ngo's personnel file which would indicate that he

was on an FMLA leave, or any leave of absence, prior to suffering his August 16th aneurysm.

Tr. 1087:21-1088:2; Tr. 1213:16-1214:9.

The **only** document which the Claimant was able to point to as alleged support for his

suggestion that he was on an FMLA leave prior to suffering his aneurysm was an August 18,

2014 email from Ms. Bridges in which she states that, as a result of Mr. Lowenthal's July 18,

2014 letter, Oppenheimer, "[w]ould consider [Mr. Ngo's] FMLA to have started on [July] 18th.

His job protection is good until October 10th."  Ex. 60.  However, Claimant's reliance on this

single communication ignores both its context and several other contemporaneous writings.  As

to context, Claimant ignores the fact that August 18, 2014 was a confusing time for

Oppenheimer as Mr. Ngo is concerned.  Mr. Ngo had just suffered his aneurysm.  HR had

learned that Mr. Ngo had already been out of the office for over two months, despite the fact that

he: (i) was still getting paid; and (ii) had on several occasions elected not to avail himself of

FMLA leave, including failing to fill out the FMLA application that Mr. Lowenthal had provided

to him on July 18th.  Ms. Bridges testified that her email was the result of confusion and her lack

of knowledge that Ms. Denys had already confirmed that Mr. Ngo was not previously on FMLA

leave.  Tr. 1224:16-1226:11.

To this end, that same day, Ms. Bridges' supervisor, Ms. Denys, sent an email stating that

she was not aware that Mr. Lowenthal had permitted Mr. Ngo to be out of the office for the prior

two months and to continue to get paid.  More importantly, Ms. Denys concluded, "Looks like

19

we will have to give [Mr. Ngo] 12 weeks now for his medical condition since we never had him take leave as of yet." Ex. 59.  Another employee in HR, Kristen Decker, replied to Ms. Denys, "Rob sent you a message back in July in regards to his baby.  You replied back about unpaid FMLA leave. Nothing happened after that.  We never heard from Hoai.  We should put him on FMLA…"  *Id.*  These two emails alone conclusively establish that Oppenheimer was not treating Mr. Ngo as being on FMLA leave prior to his aneurysm (nor was it required to).  If Mr. Ngo was already on FMLA leave prior to August 18th, then Oppenheimer could not possibly have been required to "give him 12 weeks" of FMLA leave as of that day, as the FMLA only provides for up to 12 weeks of leave.  Moreover, if Mr. Ngo was already on FMLA leave, there would be no reason to "put him on FMLA" as Ms. Decker stated.  Finally, on October 6, 2014, Ms. Denys emailed Ms. Bridges advising that Mr. Ngo's FMLA leave, "goes until mid November." Ex. 70.  Working back 12 weeks from mid-November results in an FMLA start date in mid-August, not mid-July.  Tr. 1088:6-1090:20; Tr. 1221:16-1224:4.

**Claimant's Return to Work**

Mr. Ngo returned to the office on November 3, 2014: (i) 19 ½ weeks from the day he left the office for the birth of his child; (ii) 16 weeks from his July 13, 2014 email to Ms. Ross and Ms. Burns and his July 17th conversation with Mr. Lowenthal; and (iii) 11 weeks after he suffered his brain aneurysm.  Everyone understood  (with the exception of Mr. Ngo) that he was returning in the capacity as a Senior Research Analyst, just as he had been advised by Mr. Lowenthal on July 17, 2014.  Tr. 766:15-21; Tr. 888:21-889:13.  This is the same position that Mr. Ngo held as of the day he started his FMLA leave.  Mr. Lowenthal reminded Mr. Ngo on his first day back to the office (the first time that he had spoken to him since July 17th) that he was a research analyst and that he should circle back with Ms. Ross and Ms. Burns regarding getting up to speed.  *Id.*

20

The next day (shortly after acknowledging that he had read and understood Oppenheimer's Employee Handbook, including its Tape Recording Policy), Mr. Ngo decided to surreptitiously record a second conversation with Mr. Lowenthal – a violation of Oppenheimer policy that could have resulted in Mr. Ngo's immediate termination. Mr. Ngo, who now claims to have been discriminated and retaliated against by Mr. Lowenthal for months leading up to the conversation, started the exchange by apologizing to Mr. Lowenthal. Ex. 86(b) at page 2, lines 3-4. Mr. Ngo then brazenly tells his boss, "I have always been honest with you", despite the fact that he now admits the statement was an outright lie. *Id.* at page 2, line 12; Tr. 581:15-21. Next, Mr. Ngo, who testified multiple times that he allegedly "made it clear" that he was taking an FMLA leave both within his July 13, 2014 email (that does not even mention a leave) and during his July 17th conversation with Mr. Lowenthal, states, "I think there was some confusion with that leave…" Ex. 86(b) at page 2, line 15. Mr. Ngo goes on to explain his belief that he had worked out the terms of his alleged "leave" with Ms. Ross and Ms. Burns. At that point, Mr. Lowenthal interrupts Mr. Ngo and makes clear:

> Just to re-characterize what I told you to do, which was my direction was really towards Lenore Denys in terms of the three months versus none. The policies and permissions to leave, um, were completely nonstandard, so I said I don't know anything about it. It was not up to Jane or Colleen's discretion as to how much leave you could have.

*Id.* at page 3, line 10-15. Mr. Ngo did not dispute Mr. Lowenthal's recollection of their conversation. To the contrary, he replied, "Sure." *Id.*

Mr. Lowenthal continued by recounting that he had instructed Mr. Ngo to speak to Ms. Denys regarding the company policy on taking an FMLA leave and that his instruction to speak to Ms. Ross and Ms. Burns was a "professional courtesy" in order to ensure that work coverage was accounted for during whatever leave period Mr. Ngo worked out with HR. Once again, Mr.

3172086_2

Ngo responded, "Oh yeah, yeah, yeah" and admitted that his failure to follow that instruction was, "[his] fault." *Id.* at page 3, line 18-23.

Mr. Ngo (who conveniently alleges to have missed Mr. Lowenthal's July 18th email forwarding the FMLA application) next states, "I told you over the phone, I was totally prepared to sign anything. *Id.* at page 4, line 4. Mr. Lowenthal then makes clear that his July decision to remove Mr. Ngo's supervisory responsibilities had absolutely nothing to do with Mr. Ngo's aneurysm, which had not even occurred as of the date of the decision, to which Mr. Ngo replied, "Sure." *Id.* at page 4, line 6-12. Mr. Lowenthal also noted that Oppenheimer had "changed the business model" *Id.* at page 4, line 19.

After Mr. Ngo explained that he checked emails every day and spoke to Ms. Burns on a weekly basis during his "leave" in California, Mr. Lowenthal clarified, "You were paid leave. It wasn't a leave of absence." *Id.* at page 5, line 4-16.[15]

Tellingly, during the entirety of this conversation, which only Mr. Ngo was aware was being recorded, he never **once** disputed any statement made by Mr. Lowenthal or any of the statements made within Mr. Lowenthal's July 18th letter as they pertained to the agreement that Mr. Lowenthal and Mr. Ngo had reached prior to his departure on June 20, 2014.

The circumstances of this secretly recorded conversation speak volumes. Mr. Ngo, an attorney who was already discussing potential claims against Oppenheimer with other attorneys, went into that secretly recorded conversation hoping to create "Exhibit A" for a lawsuit against Oppenheimer. However, Mr. Lowenthal didn't say what Mr. Ngo had hoped. And that is

---

[15] This clarification by Mr. Lowenthal, made during a recorded conversation that was not disclosed by Mr. Ngo allegedly so that he could ensure Mr. Lowenthal's truthfulness, further demonstrates that Mr. Lowenthal's use of the word "leave" within his July 18th communication to Mr. Ngo does not demonstrate any alleged understanding that Mr. Ngo was on an FMLA leave of absence as of that date. Tr. 866:23-867:10. Rather, the record is clear that Mr. Lowenthal used the term "leave" to describe Mr. Ngo's status of not being in the office.

22

precisely why Mr. Ngo waited another nearly 2 years, when he was terminated, to file an EEOC charge against Oppenheimer.

Finally, on November 6, 2014, Ms. Ross sent an email to her sales staff welcoming Mr. Ngo back to the office, and reminding her staff of the decision, "put in place in July" to make Ms. Burns the sole Head of HYR.  Ex. 85.

**Claimant's 2014 and 2015 Discretionary Bonuses**

The 2014 Discretionary Bonus

In February of 2015 Mr. Ngo was paid a discretionary bonus of $100,000 for work performed in 2014 – a year in which he was out of the office for over four months between June 20, 2014 and November 3, 2014, including performing no work whatsoever while he was on FMLA leave during the period of August 18, 2014 through November 3, 2014. Ex. 11-H.

Mr. Ngo's discretionary bonus was set by Mr. Lowenthal and Mr. Ngo was advised of the amount of the bonus by Ms. Burns, his then supervisor. Tr. 824:12-15.  The factors considered by Mr. Lowenthal in setting the discretionary bonuses of research analysts included, among other things: (i) the size of the department bonus pool; (ii) individual performance and productivity; (iii) the profitability of the asset class covered by the analyst; and (iv) the performance of both the department, and Oppenheimer as a company. Tr. 825:4-826:16; Ex. 19.

While Ms. Ross often provided her routine evaluation of research analyst performance to Mr. Lowenthal, she played no role in setting the amount of Mr. Ngo's discretionary bonus. Indeed, the amount of the bonus awarded to Mr. Ngo was not even made known to Ms. Ross. Tr. 826:17-827: 5.

When Ms. Burns advised Mr. Ngo that he was being awarded a $100,000 discretionary bonus, he acknowledged that he expected that his bonus would be reduced as a result of the time that he was out of the office in 2014, but felt that the $100,000 figure was "disproportionally

23

low." Tr. 773:7-774:2.  Despite now alleging that the $100,000 discretionary bonus was discriminatory, retaliatory, and punishment for the time that he had spent out of the office the prior year, Mr. Ngo admittedly never complained to HR regarding his compensation, nor did he make any effort to discuss the matter with Mr. Lowenthal.  Tr. 602:12-18; 603:20-604:15.  Ms. Burns, who described herself as Mr. Ngo's friend, while feeling that the $100,000 discretionary bonus was low, never believed that it was punishment for Mr. Ngo either being out of the office for the birth of his child, or for taking an FMLA leave to recover from his aneurysm.  Tr. 775:9-18.

For 2014, Ms. Burns, who was not out of the office for four months and who bore a significant portion of the burden for having Mr. Ngo out of the office for such an extended time period, received a discretionary bonus of $235,000.  Ex. 12(d); Tr. 777:3.  Despite the fact that Ms. Burns considered Mr. Ngo to be her friend, she testified that it would not have been fair for Mr. Ngo to receive the same bonus that she received for 2014, because she "didn't think [their] contribution was the same in that year" due to the fact that "[She] wasn't out of the office for a period of time and [she] also [stepped] up and [tried] to handle more of the stuff for the desk at that time."  Tr. 777:15-778:2.  Ms. Burn's opinion was echoed by Mr. Lowenthal, who set the level of both Ms. Burns and Mr. Ngo's discretionary bonuses.  Tr. 906:20-907:15.

Mr. Sneeden, the only other High Yield senior research analyst employed by Oppenheimer for the entirety of 2014, likewise did not spend 4 months out of the office and received a discretionary bonus of $135,000 – only $35,000 more than Mr. Ngo.  Ex. 13 at OPCO 001215.

The 2015 Discretionary Bonus

In February of 2016, Mr. Ngo was paid a discretionary bonus of $175,000 for his work during 2015.  Ex. 11-I.  Once again the bonus was set by Mr. Lowenthal and delivered to Mr.

24

Ngo by Ms. Burns. Tr. 607:6-18; Tr. 781:24-782:18.  In connection with this bonus, Mr.

Lowenthal took $25,000 out of the bonus set for Peter Albano (Oppenheimer's current Head of

Global Fixed Income) and reallocated that amount to Mr. Ngo. Ex. 116; Tr. 911:9-913:16.

In setting his bonus, Mr. Lowenthal did not take into consideration the fact that Mr. Ngo

was no longer the Co-Head of HYR.  Indeed, as Mr. Lowenthal testified, "Some of the most

highly paid people in the high-yield department do not have a head of any kind of title."  Tr.

916:11-24.[16]  Moreover, the fact that Mr. Ngo had spent time out of the office 1 ½ years earlier

for the birth of his child and took and FMLA leave of absence to recover from his aneurysm

played no role in the $175,000 discretionary bonus paid to Mr. Ngo in 2016.  Tr. 927:7-15.

Unlike the bonus that he received in 2015 for work in 2014, Mr. Ngo did not register any

complaint with Ms. Burns regarding the amount of the discretionary bonus.  Tr. 782:3-18.

Mr. Ngo's $175,000 discretionary bonus paid in 2016 was only $60,000 less than the

discretionary bonus Ms. Burns received.  Ex. 12-E.  It was also $25,000 more than the $150,000

discretionary bonus paid to Mr. Sneeden in 2016.  Ex. 13 at OPCO 001214.

**Claimant's Termination**

2015 and 2016 were not particularly profitable years for Oppenheimer.  In fact, in 2016,

Oppenheimer had no profit.  Mr. Lowenthal, a member of Oppenheimer's Board of Directors,

described these years as, "Among the hardest years the firm has had in recent history including

the financial crisis."  Tr. 920:23-921:4.

---

[16] On cross-examination, counsel for Claimant suggested that Mr. Lowenthal had testified at his deposition that Ms. Burns' status as the Head of HYR was a factor in the discretionary bonuses that Mr. Lowenthal set for her. This is not true.  In fact, Mr. Lowenthal testified that the factor considered was, "[s]he was working the full year quite diligently so she probably got paid something similar to what she had been paid in the past."  Following that question, counsel simply asked Mr. Lowenthal, "And she was also now supervisor of the group, correct?"  In response to that question Mr. Lowenthal responded "Yes", confirming that point.  However, he did not suggest in any way that here status as "Head" played any role in his compensation decision.  Tr. 1026:8-16.

3172086_2

Oppenheimer's 2015 Annual Report reflects that the company's net profit was just less than $2 million, compared to almost $9 million in 2014 – a decrease of almost 78%. During that same time period, the number of individuals employed by Oppenheimer was reduced from 3,434 to 3,290 (4.5%). Ex. 90 at OPCO 000491-000492. Oppenheimer's 2016 Annual Report reflects that the company's net profit was <u>negative</u> ($1,161,000). The number of individuals employed by Oppenheimer continued to decline, now to 3,098 (down 10% from 2014). Ex. 91 at OPCO 000511.

As is often the case in the industry, the financial setbacks suffered by Oppenheimer in 2015 and 2016 resulted in reduced compensation and lay-offs. Mr. Ngo himself testified, "[P]eople who work on Wall Street get laid off for cost-cutting all the time." Tr. 403:21-404:2. Indeed, Mr. Ngo had been laid-off by two Wall Street employers (JPMorgan and RBS Greenwich Capital) prior to his employment by Oppenheimer. Tr. 401:2-402:2. Oppenheimer has a particular reputation for cost-cutting. Tr. 403:8-20; Tr. 788:14-16. Moreover, unlike salespeople who are paid commissions based on their revenue generation, research analysts, in Mr. Ngo's own words, are a "cost center." Tr. 616:10-15. During the time period of January 1, 2014 through December 31, 2016, Oppenheimer eliminated 118 job positions. 71 of those position eliminations took place in 2016.[17] Ex. 36; Tr. 1229:8-1231:22. Oppenheimer's financial struggles also resulted in reduced discretionary bonus pools companywide. Tr. 923:5-11; Tr. 1231:23-1232:8.

The High Yield business within which Mr. Ngo was employed was acquired by Oppenheimer in 2008 through its acquisition of the business from Canadian Imperial Bank of

---

[17] As Jaime Bridges, the Oppenheimer employee who created the exhibit testified, the chart only reflects employees who were terminated as a result of position elimination, and does not account for employees who were involuntarily terminated for other reasons. Tr. 1230:12-20.

26

Commerce ("CIBC").  Tr. 828:17-829:24.   As Mr. Lowenthal testified, by 2014, Oppenheimer

had already begun to exit the industries that Mr. Ngo covered:

> We no longer had access to the billion dollars warehouse
> facility that CIBC had offered us.  The issuers in the chemicals
> and packaging industries were no longer being covered by bankers,
> they were no longer being covered by equity research.  We had
> made a decision.  To focus on our core and target relevant
> secondary trading opportunities as well as our core sectors of
> technology, consumer and health care.

Tr. 899:19-900:13.[18]

On June 30, 2016, over two years after he left the office for the birth of his child and over

1 ½ years after he went on FMLA leave to recover from his aneurysm, Mr. Ngo's at-will

employment was terminated.  The decision to terminate Mr. Ngo was made by Mr. Lowenthal.

Tr. 925:22-25; Tr. 926:10-12; Tr. 786:25-787:11.  Mr. Lowenthal considered a number of factors

in making his decision, none of which related to the time that Mr. Ngo spent out of the office in

2014 or the fact that he no longer had the title of Co-Head of HYR.  These factors included: (i)

the performance of Oppenheimer as a firm; (ii) the performance of High Yield sales and trading;

and (iii) the reduced importance of Mr. Ngo's sectors to Oppenheimer as a firm.  Tr. 926:13-

927:19.[19]

Oppenheimer's PCN reflecting Mr. Ngo's termination provides "Department

Restructuring" as the reason for termination.  Ex. 112 at OPCO 00001.

---

[18] Mr. Lowenthal later testified, "[W]e were getting out of chemicals we were getting out of paper and packaging, metals.  Those legacy sectors related to CIBC were no longer relevant to the ongoing business of Oppenheimer's high-yield department.  Tr. 1037:7-14; *see also* Tr. 1044:25-1045:7.

[19] Ms. Ross, the Head of Sales, further testified regarding the sectors covered by Mr. Ngo, "We had no coverage on the equity side in chemicals and papers, and there were no bankers in that space.  So from the firm's perspective, I understood that that was not a sector – those sectors were not that important. From my perspective in the high-yield group, it was also not a sector that was as important in the marketplace. Tr. 1150:22-1151-5.

27

**The HYR Group Following Mr. Ngo's Termination**

In the three years since Mr. Ngo was terminated, Oppenheimer has not hired any research analyst to cover any of the sectors that were covered by Mr. Ngo.  Tr. 794:22-795:7; Tr. 932:25-933:10; Tr. 1045:13-18; Tr. 1150:2-12.  Currently, Oppenheimer only employs only two high yield research analysts, Ms. Burns and Jiten Joshi.  Tr. 737:10-13; Tr. 834:5-12.  Mr. Joshi was hired in or around March of 2016 (shortly before Mr. Ngo's termination).  Mr. Joshi's core sectors of coverage are technology, media, and telecommunications ("TMT").  Tr. 791:14-792:-19; Tr. 932:8-9.  As Mr. Lowenthal testified, TMT was one of the "historic franchise sectors" at Oppenheimer.  TMT was "always an important component for the firm".  Tr. 931:20-23; Tr. 932:2-5. Ms. Burns described TMT as "priority sectors."  Tr. 792:8-11.  Mr. Joshi was hired following the resignation of Umesh Bhandary (who covered TMT).  Prior to Mr. Bhandary, Mr. Morgan covered TMT.  Mr. Ngo did not publish in TMT while he was at Oppenheimer.  Tr. 932:10-24.  Mr. Lowenthal, in testifying that Oppenheimer's March 2016 hiring of Mr. Joshi was not unusual in light of the cost-cutting that the firm was undertaking at the time, stated:

> I think that the business - - cutting costs is one component of
> analyzing and adjusting your business for future challenges.  Our
> decision at the time had been to focus on our historic capabilities
> and where we had alignment with other parts of the firm.  So consumer,
> technology, and health care are the historic franchise sectors for
> the firm.  That's were our bankers were focused.  That's where our
> research division was focused.  And technology is an enormous
> industry within the high-yield debt market.  So it was natural for us
> to support that.  Todd Morgan, who was the former head of high-yield
> research, was a technology research analyst in high-yield.  So it was
> always an important component for the firm.  And if we were going
> to turn our performance as a firm around, we needed to focus on our
> core capabilities.

Tr. 931:12-932:7.

HYR currently publishes significantly less than it did during the period of 2009 through 2016.  For example, the two analyst group no longer publishes the Morning Blast email (the core

28

supervisory function that Mr. Ngo and Ms. Burns took on when becoming Co-Heads of the desk). 738:15-20. As the sole Head of HYR, Ms. Burns currently SA's (the other core function of the group Head) less than one piece of research a day. Tr. 739:11-18.

The reduced production of HYR since Mr. Ngo's termination has been reflected in the discretionary bonuses paid to Ms. Burns during the time period. For example, Ms. Burns' discretionary bonus paid in 2017 for work in 2016 was reduced from $235,000 to $200,000. Ex. 12-F; Tr. 783:17-784:2. In 2018, Ms. Burns received a $170,000 discretionary bonus for work she performed in 2017. Tr. 784:6-11. Finally, in February of this year, Ms. Burns received a $165,000 discretionary bonus for work performed in 2018. Ex. 137; Tr. 784:12-16.[20]

## Claimant's Post-Termination Employment

Following his termination from Oppenheimer, Mr. Ngo first took a month off and then set about looking for new employment. Tr. 623:16-624:7. In applying for positions, Mr. Ngo advised potential employers (including his former Oppenheimer colleague Mr. Morgan) that he was laid-off by Oppenheimer because it was "cutting costs" and because "[his] sectors did not have the investment banking coverage." Mr. Ngo also referred to "series of layoffs" and "budget cuts" at Oppenheimer. Ex. 121. In other words, Mr. Ngo conveyed the precise reason why his position was eliminated by Oppenheimer and has not been filled in the three years since.

On or about June 9, 2017, Mr. Ngo was hired by Fitch. While employed by Fitch, Mr. Ngo received a base salary of $220,000 - $70,000 more than his salary at the time of his

---

[20] While unhappy with her discretionary bonuses for the past two years, Ms. Burns did not believe that Oppenheimer was discriminating or retaliating against her. Rather, she understood that discretionary compensation is reflective of a "bunch of things", including the overall performance of Oppenheimer as a company, the overall performance of the high yield business, and her individual contribution to the business. Tr. 785:13-786:3

29

termination by Oppenheimer.  Like at Oppenheimer, Mr. Ngo was also eligible for a discretionary bonus.  Ex. 104; Tr. 629:18-24.[21]

Mr. Ngo's employment with Fitch was involuntarily terminated on or about January 31, 2018.  Ex. 124.  In response to a Subpoena which directed the production of, "Copies of documents sufficient to demonstrate the reason for the termination of Mr. Ngo's employment with Fitch", Fitch produced a single Fitch "90 Day Performance Review" of Mr. Ngo.  Ex. 122. Among other things, the performance review made the following assessments of Mr. Ngo: (i) "Hoai has been invited to participate in projects like high yield covenant reviews and running and supervising ratings related to direct lending which are all in the high yield space…To date Hoai does not feel this is commensurate with his expectations."; (ii) reluctance to take on the responsibilities and role that has been carved out for him; and (iii) difficulty accepting constructive thoughts and viewpoints from colleagues.  The review also notes:

> [W]e would expect him to accept workflow requests and work critiques in a professional manner.  In a recent feedback session following a significant time investment on my part, Hoai indicated that he was being 'babysat' and that questions/comments were 'political' and made for an 'unproductive morning.'.  Declining of request from senior colleagues and argumentative reactions to constructive criticism and viewpoints are not only unprofessional but discourage colleagues from working with Hoai.

Most relevant, the review notes:

> In addition, Hoai's in-office schedule in unpredictable.  Not only are we working in live credit markets where company updates could occur at any time, senior members of the corporates team need to be accessible given their role in the rating process, including supervising junior analysts and report approval.  In at least one instance Hoai's late arrival to the office caused a RAC to be published later than expected, following some time spent by colleagues trying to find him.

---

[21] In fact, Mr. Ngo was hired as the highest paid Senior Director at Fitch in his department.  Tr. 375:22-376:2.

Ex. 122.

Mr. Ngo testified extensively with regard to an alleged a subsequent revised performance review that was not produced by Fitch. Mr. Ngo described how he argued adamantly against statements within the review that he felt were inaccurate, unfair, or untrue. Tr. 634:2-643:12. It is telling that Mr. Ngo apparently was perfectly capable of advocating for himself and arguing when he felt that he was being treated unfairly by Fitch, yet attempts to explain his silence over two full years at Oppenheimer in which he felt that he was being unlawfully discriminated and retaliated against simply as the result of being "scared for his job."

Fitch originally offered Mr. Ngo $16,500 in severance. Mr. Ngo demanded additional compensation and was ultimately awarded $55,000 in severance pay for the less than one year that he was employed. Ex. 124; Tr. 644:17-645:12.

Following his termination from Fitch, in seeking out new employment, Mr. Ngo told prospective employers that Fitch was "not a good fit" for him. Ex. 107 at Pl. 000624; Pl, 000631; Tr. 643:18-21.

On October 5, 2018, Mr. Ngo was hired by Bloomberg, where he currently remains employed. At Bloomberg, Mr. Ngo is being paid an annual base salary of $225,000 - $75,000 more than his base salary at the time that he was terminated by Oppenheimer. Again, Mr. Ngo is eligible for a discretionary annual bonus. Ex. 105; Tr. 646:23-647:14.

## ARGUMENT

As set forth below, it is respectfully submitted that all of Claimant's various claims should be denied. Claimant has failed to establish any of the following: (i) that Oppenheimer interfered with his rights under the FMLA; (ii) that Oppenheimer retaliated against him for availing himself of his FMLA rights; (iii) that Oppenheimer took any adverse employment action against him based on his male sex; or (iv) that Oppenheimer took any adverse employment action against him based on his alleged disability.

### POINT I

### CLAIMANT HAS FAILED TO ESTABLISH ANY VIOLATION OF THE FMLA

The FMLA entitles qualifying employees to take a total of up to twelve weeks of *unpaid* leave in any 12-month period due to, as is relevant here, "the birth of a son or daughter of the employee and in order to care for such son or daughter," or "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(A) and (D). An employee taking FMLA leave is generally job-protected, *i.e.,* upon returning from such leave he must be restored to the same or equivalent position he held "when the leave commenced." *Id.* § 2614(a). However,

> The right to reinstatement is not … absolute[.] "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, the employee has no right to restoration to another position under FMLA." 29 C.F.R. § 825.214(b); *see Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155, 161–62 (2d Cir.1999). And once the twelve weeks of guaranteed leave are exhausted, if the employee does not return to work—for whatever reason—the employer can replace the employee, as long as the employer is not doing so to punish the employee for exercising her FMLA rights.

*Reilly v. Revlon, Inc.*, 620 F. Supp. 2d 524, 534 (S.D.N.Y. 2009).

The FMLA makes it unlawful for an employer to "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" under the statute. 29 U.S.C. § 2615(a)(1). To

32

establish a violation under § 2615(a)(1), an employee must prove, by a preponderance of the evidence, one of two theories: (1) interference – i.e., "the employer has prevented or otherwise impeded the employee's ability to exercise rights under the FMLA" – or (2) retaliation, i.e., "an employee actually exercising her rights … under the FMLA and then being subjected to some adverse employment action." *Woods v. Start Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 166 (2d Cir. 2017). Here, the Claimant has failed to meet his burden of establishing a cause of action under either theory.

As an initial point, it is telling that after months of extensive documentary discovery, three depositions, and four days of evidentiary hearings, the Claimant still cannot articulate with any degree of consistency what his actual claims are. Rather, Claimant continues to argue multiple alternate theories of his case, some of which entirely contradict each other. For example, on the one hand, Claimant alleges that Ms. Ross interfered with his FMLA rights by "attempting to dissuade" him from taking an FMLA leave for the birth of his child. However, Claimant simultaneously alleges that he did in fact take an FMLA leave for the birth of his child and that Oppenheimer unlawfully retaliated against him for doing so. Simply put, both cannot be true. Similarly, Claimant argues that Oppenheimer interfered with his FMLA rights by forcing him to work during his alleged FMLA leave. However, in direct contradiction of this allegation, Claimant (in an attempt to create the illusion of an FMLA leave that never took place), argues that he was doing little to no work while he was in California for the birth of his child. Again, both of these allegations cannot be true. Claimant's inability to concisely and consistently plead his claims speaks volumes as to their collective meritless nature.

I.      **Claimant Received All of the FMLA Leave He Requested and Was Entitled To**

To prevail on a claim of interference with FMLA rights, a claimant must establish, by a preponderance of the evidence, "1) that [he] is an eligible employee under the FMLA; 2) that the

33

defendant is an employer as defined by the FMLA; 3) that [he] was entitled to take leave under the FMLA; 4) that [he] gave notice to the defendant of [his] intention to take leave; and 5) that [he] was denied benefits to which [he] was entitled under the FMLA." *Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 424 (2d Cir. 2016). Claimant has failed to prove that he was denied benefits with respect to any properly noticed FMLA leave request.

### A.   Oppenheimer fully complied with all FMLA requirements with respect to Claimant's leave request due to his aneurysm

The evidence at the hearing conclusively demonstrates that Mr. Ngo requested and received **one**, and only one, FMLA leave in 2014 – the 11 weeks of FMLA leave that he took between August 18, 2014 and November 3, 2014 as a result of his aneurysm. Oppenheimer in no way interfered with or retaliated against Mr. Ngo in connection with that leave of absence. To the contrary, the evidence is clear that Oppenheimer immediately took steps to put him on leave – unpaid – and recording his going out on medical disability.

Moreover, it is clear that upon his recovery, he was welcomed back to the same research analyst position (with the same salary) that he occupied on August 18 – *i.e.*, when his FMLA leave "commenced" – thus satisfying Oppenheimer's obligations under § 2614(a)(1). To the extent Claimant contends that he was entitled to reinstatement of his supervisory role, that claim must be rejected, because, the removal of Mr. Ngo's supervisory responsibilities unquestionably occurred in July 2014, a month *before* his FMLA leave commenced.

The evidence clearly establishes the timing of this transfer of responsibilities from Claimant to Ms. Burns. Mr. Lowenthal, Ms. Burns, and Ms. Ross all testified that Mr. Lowenthal decided to remove Mr. Ngo's limited supervisory responsibilities on or about July 14, 2014, when he learned, not from Mr. Ngo, but from Ms. Ross and Ms. Burns, that Mr. Ngo had unilaterally elected to extend the agreement that he reached with Mr. Lowenthal to work

remotely from California and continue to get paid for another month.  Tr. 764:11-22; Tr. 856:24-857:22; Tr. 1137:20-1138:6.   The timing of this decision is further established by multiple documents entered into evidence, including but not limited to: (i) Mr. Lowenthal's July 18, 2014 letter to Mr. Ngo (Ex. 45); Mr. Lowenthal's July 21, 2014 email to Ms. Burns advising that she is the, "Sole supervisory analyst in the Fixed Income research department" (Ex. 56); (iii) Ms. Ross' November 6, 2014 email to her sales staff regarding the decision "put in place in July" to make Ms. Burns the Head of HYR (Ex. 85); and (iv) the transcript of the recording of Mr. Ngo's November 3, 2014 conversation with Mr. Lowenthal (Ex. 86(b) at page 4).  In fact, Claimant's own Pre-Hearing Memorandum of Law states at page 18, "Ngo's demotion occurred immediately after his request to extend FMLA leave" – which he alleges took place on July 13, 2014.

Mr. Ngo argued at the hearing that he was not told about Mr. Lowenthal's decision until he returned to work on November 3, 2014.  Mr. Lowenthal disputes this and testified that he informed Mr. Ngo of his decision during their July 17th conversation.  This is supported by the "Follow-up" letter Mr. Lowenthal sent to Mr. Ngo the very next day.  Ex. 45.  The fact that Mr. Ngo conveniently alleges to not have read that letter until November should not be held against Oppenheimer.  Moreover, at a minimum, Mr. Ngo admits that during their July 17th conversation, Mr. Lowenthal advised him that he was removing his name from the Morning Blast email – one of the two supervisory functions of the Head of HYR.  Mr. Ngo testified that Mr. Lowenthal's decision in this regard was, "signaling to the market to some degree, my belief is, I was no longer the group head."  Tr. 535:15-536:8.  In any event, the controlling date with regard to the issue is the date on which Mr. Lowenthal effected his decision, not the date on which Mr. Ngo was advised of it (especially when considering the fact that Mr. Ngo was not in

the office to discuss the decision further for over another 3 months after his July 17th conversation with Mr. Lowenthal).  The question, in other words, is whether Claimant was the Co-Head of HYR on August 18, 2014, and not only has Claimant failed to prove that he was, the evidence is overwhelmingly to the contrary.

### B.      Claimant never asked for FMLA leave prior to his aneurysm

Claimant has no possible interference claim arising prior to his aneurysm-related leave, because at no time before then did he "[give] notice to [Oppenheimer] of his intention to take leave." *Graziado*, 817 F.3d at 424.  While Mr. Ngo has argued that he was somehow on an FMLA leave while he was in California following the birth of his child, he offers only his self-serving testimony that he made it "clear" to various Oppenheimer employees (none of whom worked in HR) that he had decided at some point while he was in California to take an FMLA leave.  There is absolutely no evidence to support this allegation.  Indeed, Mr. Ngo, an attorney, never once: (i) contacted HR to state that he wanted to take an FMLA leave; (ii) wrote to anyone indicating that he had decided to take an FMLA leave or a "leave" of any kind; (iii) filled out the required FMLA application that was sent to him; or (iv) complained that he should not be working because he believed that he was on a leave of absence.  And, of course, he continued to be paid this entire time.  In short, Mr. Ngo continued to do exactly what he did as of the date he left the office on June 20th when he admits he was not on leave, *i.e.* work remotely and continue to receive his paycheck without objection.

As Your Honor held in the Report and Recommendation, adopted by the District Court Judge, in *Santiago v. New York City Police Dep't*, "the employer is not required to be clairvoyant." *Santiago*, 2007 WL 4382752, at *17 (S.D.N.Y. Dec. 14, 2007), *aff'd*, 329 F. App'x 328 (2d Cir. 2009) (*quoting Barnett v. Revere Smelting & Ref. Corp.*, 67 F. Supp.2d 378, 385

(S.D.N.Y. 1999)).  Moreover, the District Court held in *Horsting v. St. John's Riverside Hospital*, 2018 WL 1918617 at *5 n. 4 (S.D.N.Y. April 18, 2018):

> [t]he FMLA was not designed simply to benefit workers, but to balance the needs of workers with the legitimate business interests of employers.  An employer is entitled to sufficient information to 'assess its own employment needs for the duration that [the employee] would be [on leave].'

*Id.* (*citing Ridlings v. Riverside Medical Center*, 537 F.3d 755, 768 (7th Cir. 2008)).  To this end, the FMLA regulations make clear that an employer may institute reasonable notice requirements and that, absent extenuating circumstances, if an employee's fails to follow such requirements his FMLA leave "may be delayed or denied."  29 C.F.R. § 825.302(d).

Here, Oppenheimer informed Mr. Ngo **twice** in writing, in May and July 2014, of his rights under the FMLA, directed him to the FMLA policy in Oppenheimer's handbook, and provided him with the necessary HR paperwork to be filled out to take FMLA leave.  Not only did Mr. Ngo choose to ignore Oppenheimer, he failed to take any action whatsoever that would lead a reasonable employer to conclude that he had elected to take an FMLA leave.  *See also infra* at 44.  In *Muhleisen v. Wear Me Apparel LLC*, 644 F.Supp.2d 375, 390 (S.D.N.Y. 2009), in granting summary judgment dismissing plaintiff's FMLA claims, the Court held:

> Here, it is undisputed that although defendant provided plaintiff with forms titled "Request For Leave Under the Family and Medical Leave Act" and "Certification of Health Care Provider," along with other paperwork by which to request leave under the FMLA, plaintiff never formally exercised her right to that unpaid leave under the FMLA by submitting the paperwork.  Plaintiff's failure is hardly surprising, since defendant offered her a preferable arrangement to that which is required under the statute – that is twelve weeks' *paid* maternity leave.  Plaintiff's decision not to complete the FMLA paperwork means that she is unable to now satisfy the first element of her *prima facie* claim of retaliation.

Here, as in *Muhleisen*, Mr. Ngo was provided with an FMLA application and failed to submit it.

Moreover, as in *Muhleisen*, Mr. Ngo availed himself of an alternate option to the unpaid leave

37

provided for by the FMLA and Oppenheimer's policy, *i.e.* working remotely from California and continuing to be paid. As such, Oppenheimer inferred, as would any reasonable employer would, that Mr. Ngo had continued to elect not to take FMLA leave, just as he admittedly did when he left the office in June.

### C.    Claimant was not "discouraged" from requesting FMLA leave

Not only does the evidence establish clearly that Claimant never made a proper leave request prior to August 18, 2014, it further demonstrates that – contrary to his apparent contention – his failure to do so was not due to any actions by Oppenheimer to dissuade him from making such a request. A plaintiff who asserts an FMLA interference claim on a "discouragement" theory must establish by a preponderance of evidence that he attempted to assert his FMLA rights and was discouraged from taking FMLA leave or that "the employer's purported acts of discouragement would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise his or her FMLA rights." *Santiago v. Department of Transp.*, 50 F.Supp.3d 136, 144 (D.Conn. 2014); *quoting Reilly v. Revlon, Inc.*, 620 F.Supp.2d 524, 535 (S.D.N.Y. 2009). Claimant has failed to carry this burden.

Mr. Ngo's apparent "discouragement" claim relies upon a May 2014 conversation that he had with Ms. Ross. Mr. Ngo admits that at the time that he spoke to Oppenheimer about a potential leave of absence in May of 2014, he had not decided whether or not he intended to take leave. Rather he described himself as "exploring options" and being in an "exploratory phase." Tr. 141:3-10; Tr. 151:20-23. He further testified, in response to a question from the Arbitrator, as follows:

| Arb. Dolinger: | At that point that you make, based on your review of the handbook, had you made a decision as to whether this is what you wanted to opt for? |
|---|---|
| Witness: | No. |

38

Tr. 147:11-16.  Moreover, as set forth above, Mr. Ngo had already spoken to his direct

supervisor, Mr. Lowenthal and Ms. Denys, who advised Mr. Ngo that he was entitled to take 12

weeks of unpaid FMLA leave.  In other words, Mr. Ngo was admittedly fully aware of what his

rights were. Tr. 464:17-21.

Nonetheless, Mr. Ngo alleges that his rights were interfered with during a subsequent

conversation with Ms. Ross that he initiated.  Mr. Ngo has testified multiple times in this

proceeding, both at deposition and at the hearing, that neither Ms. Ross, nor **any** other

Oppenheimer employee ever told him that he: (i) could not take an FMLA leave; (ii) should not

take an FMLA leave; or (iii) could or should not take the entire 12 weeks of FMLA leave that

Ms. Denys had just told him he was entitled to. Tr. 468:7-469:13.  Nonetheless, Mr. Ngo

believes that Ms. Ross was "implying" through her "tone" that Mr. Ngo should not take the

entire 12 weeks of FMLA leave that he was entitled to.  Tr. 467:21-468:6.  This "implication"

was based on the fact that Ms. Ross relayed her personal experience with regard to how she

handled leave when she had her children.[22] Tr. 469:14-470:5.

Ms. Ross testified very clearly that it was not her intent to dissuade or attempt to dissuade

Mr. Ngo from availing himself of his FMLA rights, nor did she have any authority to.  Ms. Ross'

testimony is fully consistent with the admitted fact that Mr. Ngo was "exploring" the potential to

take an FMLA leave.  To this end, Mr. Ngo asked Ms. Ross what she did when she had her

children and Ms. Ross shared her experience.  Tr. 1118:23-1125:9.  Mr. Ngo never once

protested Ms. Ross' sharing of her experiences, or asked her for any clarifications regarding her

alleged "implications."  Tr. 475:13-15.

---

[22] Mr. Ngo also alleges that Ms. Ross "implied" that he should not take a lengthy leave because she
allegedly refused his suggestion that Ms. Burns take over full supervisory responsibilities during the time period that
he was out of the office.  Ms. Ross denies this exchange.  In any event, Ms. Ross would have had no authority to
approve or disapprove any such request as she did not supervise either of Mr. Ngo or Ms. Burns.

39

Despite this conversation in which he claims to have inferred that Ms. Ross was improperly attempting to dissuade him from exercising his FMLA rights, Mr. Ngo failed to address the matter to HR or Mr. Lowenthal, document the matter in any way, or file an EEOC charge for over another 2 years (despite his understanding as an attorney of the concept of statutes of limitations). Tr. 478:8-481:11. The record is entirely devoid of any complaint by Mr. Ngo.[23] Quite the opposite, nearly two months later, Mr. Ngo emailed Ms. Ross thanking her for all of her "help and concern." Ex. 114.

Setting aside the fact that Ms. Ross never attempted to interfere with Mr. Ngo's FMLA rights, she had absolutely no authority to. Mr. Ngo has bent over backwards in a failed attempt to establish Ms. Ross as his supervisor. This is simply not the case. As set forth above, Ms. Ross has never once, in a 35 year career, worked as a research analyst or supervised research analysts. There is not a single Oppenheimer document that supports the allegation that Ms. Ross ever supervised Mr. Ngo. Ms. Burns, who shared the same job title as Mr. Ngo from 2009 through July of 2014, testified that she never reported to Ms. Ross or considered Ms. Ross to be her supervisor. Tr. 734:18-735:2.

After arguing that Ms. Ross dissuaded him from taking an FMLA leave, Mr. Ngo argues, in the alternative, that he did in fact take that leave (which in of itself defeats any interference claim), but that Ms. Ross next attempted to interfere with Mr. Ngo's alleged leave on July 14, 2014. On that day, Ms. Ross responded to Mr. Ngo's July 13th email in which he advised Ms. Ross that he would not be returning to the office for another month. Ex. 114.

Mr. Ngo argues that this email somehow constituted a "request" for an FMLA leave of absence. As previously discussed, there is simply no merit to that argument. However, as it

---

[23] Mr. Ngo's extensive testimony regarding his Fitch performance review demonstrates that Mr. Ngo is quite capable of stating when he believes that he is being treated unfairly or his rights are being infringed upon.

40

applies to Mr. Ngo's interference claim, Ms. Ross responded to the email by stating, "we'll see you sometime in August." *Id.* In other words, Ms. Ross once again made absolutely no attempt to deny Mr. Ngo any time that he needed out of the office to be with his child – whether FMLA leave or pursuant to the arrangement that he had reached with Mr. Lowenthal.  However, as Ms. Ross was understandably under the impression that Mr. Ngo had elected **not** to take an FMLA leave, she was concerned as to how he was going to handle his responsibilities with regard to the very busy second quarter earnings period and inquired as to that point.  In response, Mr. Ngo tellingly did not state, "I am on an FMLA leave" or "I should not be working."  Rather, Mr. Ngo (who states in his email that he is available if anyone needs anything) took the position that he would work it out with Ms. Burns and Mr. Daniels and that he would be able to "help out more" when he returned to New York. *Id.* In other words, Mr. Ngo would "logistically" be able to do more when he was not working remotely from California.  Setting aside the fact that Mr. Ngo was not on an FMLA leave at this time, there is no evidence whatsoever that he was required to do any work on second quarter earnings.  To the contrary, that burden was shouldered by Ms. Burns. Tr. 776:7-24.

Mr. Ngo's self-serving "implications" regarding his belief that Ms. Ross disapproved of him taking leave cannot establish a cause of action. *Di Giovanna v. Beth Israel Med. Ctr.,* 651 F. Supp. 2d 193, 200-2001 (S.D.N.Y. 2009) ("Di Giovanna's subjective feelings, assuming he actually had the feelings he now claims he had, about what they actually said are insufficient to constitute interference under the FMLA, and not one of the alleged statements would have dissuaded a similarly situated employee of ordinary resolve from attempting to exercise FMLA rights.").  Here, Mr. Ngo had just been told by his supervisor and the director of Oppenheimer's HR department that he was free to take 12 weeks of FMLA leave.  It is submitted

41

that under the above circumstances, no similarly situated employee of ordinary resolve would have refrained from availing himself of his FMLA rights as a result of a conversation that the employee himself initiated with someone who was not his supervisor.

**D.      If Claimant had been on FMLA leave prior to his aneurysm, then he would have exceeded his twelve weeks and forfeited any right to reinstatement**

Even assuming that Mr. Ngo is correct that his FMLA leave somehow started in June or July of 2014 (and he is not), this fact would itself defeat Mr. Ngo's claims under the FMLA. There is simply no provision of the FMLA or any Oppenheimer policy that provides for more than 12 weeks of job protected leave. If Mr. Ngo in fact commenced his so-called FMLA leave on June 20th (when he left the office), June 24th (when his child was born), July 13th (when he emailed Ms. Ross and Ms. Burns), or July 17th (when he spoke to Mr. Lowenthal), then his 12 weeks of job protected leave would have expired well before his return work to on November 3, 2014, *i.e.*, at a time when he would have been unable to return to work. In other words, on November 3rd, Oppenheimer could have demoted, terminated, or taken any other lawful adverse employment action with regard to Mr. Ngo. *See Reilly*, 620 F. Supp. 2d at 534.

**E.      Claims arising out of any alleged interference are time-barred**

Finally, even if there were any evidence to support Claimant's FMLA interference claims (and it is submitted that there is not), it is respectfully submitted that the claim is time-barred. Generally, claims under the FMLA must be brought within two years of the violation, unless the Claimant succeeds in demonstrating that the violation was willful, in which a court may apply a three years statute of limitation. 29 U.S.C. § 2617(c)(1); *Douyon v. New York City Dep't of Educ.*, 665 F. App'x 54, 57 (2d Cir. 2016). *See* 29 U.S.C. § 2617(c)(1). "[A]n employer acts willfully when he or she 'knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FMLA].'" *Lewis v. New York City Police Dept.* 908 F.Supp.2d

42

213, 325, *citing Porter v. New York Univ. Sch. of Law*, 392 F.3d 530, 531-531 (2d. Cir. 2004). *Id.*, quoting *McLaughlin v. Richland Show Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677 (1988). "If an employer acts reasonably in determining its legal obligation, its action cannot be deemed willful...If an employer acts unreasonably, but not recklessly, in determining its legal obligation, then...it should not be...considered [willful]." *Id.*

Here, there cannot possibly be any suggestion that when Ms. Ross shared her personal experiences with Mr. Ngo when he approached her during his "exploration" regarding potentially taking an FMLA leave, she knew or showed reckless disregard for Mr. Ngo's FMLA rights. Moreover, when Ms. Ross asked Mr. Ngo how he intended to handle second quarter earnings in July of 2014 (after he stated he was available), she likewise did not willfully violate the FMLA (or violate it at all), as she had no reason to believe that Mr. Ngo had in fact decided to take an FMLA leave.

In conclusion, there is absolutely no evidence in the record that remotely supports the proposition that Oppenheimer made any attempt to interfere with the one additional week of FMLA leave that Mr. Ngo was entitled to take in 2014 – or any request for FMLA leave during that time period.

## II.    Claimant Has Not Demonstrated Any Retaliation for Taking FMLA Leave

After alleging that he was somehow discouraged from taking an FMLA leave for the birth of his child, Claimant next alleges that he did take an FMLA leave and that Oppenheimer subsequently unlawfully retaliated against him. Once again, both cannot be true. In this case, neither are true.

To establish a claim for retaliation under the FMLA, Claimant must prove, by a preponderance of the evidence, that his taking of FMLA leave was a "negative factor" in some adverse employment action taken by Oppenheimer. *See Woods*, 864 F.3d at 168-69. Claimant's

43

retaliation claims arise out of three alleged adverse employment actions: (i) the removal of his

supervisory responsibilities in July of 2014; (ii) a purported reduction in the discretionary

bonuses he received in February of both 2015 and 2016; and (iii) the termination of his at-will

employment in June of 2016.  All three claims fail as a matter of law and as a matter of fact.

### A.  The removal of Claimant's supervisory responsibilities was unrelated to any FMLA leave

Claimant alleges that Oppenheimer unlawfully retaliated against him when Mr.

Lowenthal decided to remove his supervisory responsibilities and to make Ms. Burns the sole

Head of HYR.  Claimant is wrong.

As discussed above, the evidence establishes that Mr. Lowenthal removed Claimant's

supervisory role in July 2014.  As further discussed above, Mr. Ngo was unequivocally **not** on an

on an FMLA leave when Mr. Lowenthal made his decision in July of 2014 -- because he never

requested such leave.  Mr. Ngo was advised in May by the Director of Oppenheimer's HR

department that he had the right to take 12 weeks of unpaid FMLA leave for the birth of his

child. Mr. Ngo admits that, at the time of that "exploratory" conversation, he had not made up

his mind as to whether he was going to take an FMLA leave.  In fact, Mr. Ngo admits that when

he left the office on June 20, 2014, he still had not decided whether or not he was going to take

an FMLA leave.  Tr. 1258:25-1259:4.[24]

Mr. Ngo also admits that he never once again contacted Ms. Denys, or anyone else in

HR, regarding the issue.  Ms. Denys testified, consistent with Oppenheimer's Employee

Handbook, that only the HR department had the authority to approve an FMLA leave and, had

Mr. Ngo ever contacted her again and indicated that he wanted to avail himself of his FMLA

---

[24] At or around that same time, Mr. Ngo was advising third parties that he intended to work remotely from California for approximately one month – precisely what he had told Oppenheimer. Ex. 139.

rights, she would have sent him an FMLA application.  Indeed, Ms. Denys would have sent Mr.

Ngo the very FMLA application that: (i) was included within Mr. Lowenthal's July 18, 2014

letter; (ii) states on its face that the employee is required to fill out; and (iii) Mr. Ngo admits he

never submitted.  Tr. 1086:3-1087:7; Ex. 45.  Moreover, both Mr. Lowenthal and Ms. Ross

testified that had Mr. Ngo ever indicated to them that he wanted to take an FMLA leave, they

would have referred him to HR, again, to fill out the necessary paperwork.  Tr. 844:21-845:6; Tr.

1130:3-6.

      Unable to deny that he never filled out any paperwork of informed anyone in HR that he

wanted to take an FMLA leave, Mr. Ngo attempts to argue that his July 13, 2014 email to Ms.

Ross and Ms. Burns (Ex. 114) somehow qualifies as a substitute for the required application.

This argument fails for numerous reasons.  First of all, as set forth above, only HR can approve a

request for FMLA leave.  As Ms. Denys testified, "FMLA was administered by the human

resources department in all cases."  Tr. 1086:15-19.  Neither Ms. Ross nor Ms. Burns had that

authority.  Indeed, neither of them were even Mr. Ngo's supervisor.  Mr. Ngo had previously

emailed with Ms. Denys, who specifically drew his attention to Oppenheimer's FMLA policy,

which he acknowledged reading, including the notice provision.  Tr. 461:17-462:20.  Any

alleged "confusion" with regard to Mr. Ngo's alleged "leave" could easily have been addressed

had Mr. Ngo simply copied Ms. Denys on his July 13th email or contacted her separately – he did

not.

      Second, there is absolutely no reference to the FMLA within the email.  Indeed, there is

no reference whatsoever to any "leave of absence" of any kind.  Mr. Ngo had left the office with

the understanding that he would be working remotely from California.  His July 13th email

simply states that he was not going to return until August 25th, while continuing to check emails

45

and being available to assist with anything. There was simply no reasonable basis for anyone to believe that he now had allegedly decided to take an FMLA leave. Any alleged "confusion" with regard to this issue could easily have been addressed had Mr. Ngo simply referenced the FMLA or a "leave of absence" within his email, in which case Ms. Ross, as she testified, would have referred him to HR. Once again, he did not.

Finally, even if Ms. Ross or Ms. Burns were authorized to approve a request for FMLA leave (and they were not), the email contains no such request. Rather, the communication affirmatively states that Mr. Ngo would not be returning to the office until August 25th. To this point, both Ms. Ross and Ms. Burns testified that they reasonably understood Mr. Ngo email to be stating that he had decided to extend the working remotely arrangement that he had reached with Mr. Lowenthal after he told both Ms. Ross and Ms. Burns that he had decided not to take FMLA leave. Tr. 757:23-758:7; Tr. 1130:7-10.

Ms. Burns, Ms. Ross, and Mr. Lowenthal's belief that Mr. Ngo had elected to simply extend his working remotely relationship through August 25th is based on more than the fact that he had originally indicated to each of them that he was not taking and FMLA leave and the fact that he made no request or reference to any leave within his July 13th email. Mr. Ngo's subsequent conduct supported their belief. It is undisputed that Mr. Ngo continued to get paid until such time as he went on an actual FMLA leave following his aneurysm. Mr. Ngo never once questioned why he was getting paid, despite the fact that he allegedly believed himself to be on an FMLA leave of absence. Tr. 490:4-12. Moreover, despite now claiming to have "made clear" that he was taking an FMLA leave, Mr. Ngo continued to provide services to Oppenheimer. For example, within the very July 13th email that Mr. Ngo now alleges to somehow be a "request" for FMLA leave, Mr. Ngo states, "I am still checking email and

46

available if anyone needs anything." Ex. 114.  Just three days after sending his July 13[th] email,
Mr. Ngo SA'd a piece of research authored by Sean Sneeden.  Ex. 125.  In other words, Mr. Ngo
engaged in one of the two basic functions of the HYR Head.  Tr. 491:14-17.  A week later, on
July 25, 2014, Mr. Ngo voluntarily offered to handle all SA'ing responsibilities.  Ex. 128.  Ms.
Burns testified that neither of these two particular emails surprised her, as Mr. Ngo had been
working remotely, as he indicated he would when he left the office on June 20[th].  Tr. 748:3-8; Tr.
752:10-15.  Mr. Ngo admitted that he never once responded to any email from any Oppenheimer
employee by stating that he should not be working because he believed himself to be on a leave
of absence.  Rather, Mr. Ngo described himself as "put[ting] out fires."  Tr. 510:11-20.  In other
words, Mr. Ngo was doing his job.

It should be noted that Mr. Ngo was not "demoted" by Mr. Lowenthal.  Mr. Ngo has self-
servingly inflated the import of the title that he held for less than one year of "Co-Head" of HYR
– a title that never existed at Oppenheimer before October of 2013 and has not existed since July
of 2014.  Mr. Lowenthal's decision to make Ms. Burns the sole Head of HYR did not result in
**any** reduced guaranteed compensation to Mr. Ngo.  When Mr. Ngo returned to work on
November 3, 2014, he continued to be paid the same base salary of $150,000 a year that he was
paid as of June of 2014.  In fact, $150,000 continued to be Mr. Ngo's base salary until the day
that he was terminated.  Moreover, when Mr. Ngo returned to work on November 3, 2014, he
returned as an Oppenheimer Managing Director – the same title that he had as of June 2014.  Mr.
Ngo retained that title through his termination in June of 2016.  Tr. 451:2-6; Tr. 598:11-17.

The only change to Mr. Ngo's job responsibilities was that he was no longer sending out
the Morning Blast email, and no longer in charge of SA'ing other research analysts' work.
However, the Morning Blast was never reassigned to Ms. Burns.  Rather, going forward (up until

47

3172086_2

the department ceased sending it all together), the Morning Blast was sent from a general high yield email address.  To the extent that Mr. Ngo argues that he was no longer involved in hiring decisions, it is noted that from July of 2014 through the present, Oppenheimer hired **one** high yield research analyst – Mr. Joshi.[25]

In short, on both June 20, 2014 (the day that he left for California) and August 18, 2014 (the day that he went on FMLA leave), Mr. Ngo was a Managing Director and a research analyst, with a salary of $150,000 per year and eligible for a discretionary bonus.  When he returned to work on November 3, 2014, Mr. Ngo was a Managing Director and a research analyst, with a salary of $150,000 per year and eligible for a discretionary bonus.  Finally, on the day that he was terminated, 1 ½ years later, Mr. Ngo was a Managing Director and a research analyst, with a salary of $150,000 per year and eligible for a discretionary bonus.  As such, Mr. Ngo was in fact returned to the same position, with the same compensation that he was entitled to at the time that he went on FMLA leave.  Therefore, Mr. Ngo's FMLA claim, as it pertains to the removal of his supervisory responsibilities, is without merit.

Moreover, the record reflects that Mr. Lowenthal made a determination that there was simply no need to have two co-supervisors in HYR.  There had never been Co-Heads of HYR before Mr. Morgan resigned and Oppenheimer has never since had Co-Heads of HYR.  Tr. 832:14-20; Tr. 861:19-862:9.  The FMLA does not require an employer to reinstate an employee "who would have lost his position even if he had not taken FMLA leave." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 175 (2d Cir. 2006); 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement…than if the employee had been continuously employed during the FMLA leave period.).

---

[25] Moreover, while Ms. Burns was technically the sole "Head" of HYR.  She did not set Mr. Ngo's compensation and she was not involved in the decision to terminate him.

48

3172086_2

Finally, even if there were any evidence of an FMLA violation, the claim is barred by the FMLA's general two year statute of limitations, and there is no evidence in the record which supports the conclusion that any alleged violation of the FMLA stemming from the self-described "confusion" that was a direct result of Mr. Ngo conduct was willful.

**B.      Claimant has shown no improper reduction of his discretionary bonuses**

Claimant next alleges that Oppenheimer unlawfully retaliated against him in connection with $275,000 in discretionary bonuses that were paid to him in February of 2015 and 2016. As set forth above, Mr. Ngo has not and cannot dispute that his base salary or any other benefit to which he was entitled was not reduced as a result of the removal of his supervisory responsibilities. As such, Mr. Ngo's alleged damages arise entirely out of compensation that he had absolutely no contractual or legal entitlement to.

In February of 2015, Mr. Lowenthal awarded Mr. Mr. Ngo a discretionary bonus in the amount of $100,000 for work that he performed in 2014. Ex. 11(h). In setting the level of the discretionary bonus, Mr. Lowenthal testified that he was not seeking to "punish" Mr. Ngo for having taken time out of the office for the birth of his child or for taking an FMLA leave to recover from his aneurysm.[26] Tr. 906:5-13. 2014 was a year in which Mr. Ngo was not present in the office for over four consecutive months. During the time period of June 20, 2014 through early August 2014, Mr. Ngo was working remotely from California and being paid his salary. During the time period of August 18, 2014 through November 3, 2014, Mr. Ngo was on FMLA leave and not doing any work of any kind.

Employers are entitled under the FMLA to take reduced productivity due to an FMLA leave into account in awarding incentive bonuses. *Sommer v. The Vanguard Grp.*, 461 F. 3d

---

[26] Any such suggestion is belied by the fact that Mr. Lowenthal did not require Mr. Ngo to go on unpaid FMLA leave for the birth of his child and allowed him to work remotely and continue to receive his base salary for a period of two months.

397, 401 (3d Cir. 2006); *Clemens v. Moody's Analytics, Inc.,* 2018 WL 1750586, at \*7 (S.D.N.Y. Apr. 9, 2018).  It is illogical to conclude that while Mr. Ngo was on 11 weeks of FMLA leave in 2014, he was not entitled to be paid his base salary under the statute or under Oppenheimer's written policies, but that he was somehow entitled to discretionary incentive compensation for work that he did not do during that same time period.  Indeed, Ms. Burns testified that when she informed Mr. Ngo that he would be receiving a $100,000 discretionary bonus, he felt that his bonus was "disproportionally low" – indicating that he was aware that his discretionary compensation would be impacted somewhat by the four months that he did not come to the office and the nearly three months that he did not do any work at all.  Tr. 773:20-774:2.

Furthermore, it is well settled law in this Circuit that a failure to provide discretionary pay is **not** an adverse employment action. *See Boyar v. City of New York*, 2010 WL 4345737, at \*3 (S.D.N.Y. Oct.28, 2010) ("while it is undisputed that he [plaintiff] received no such [discretionary] bonus, the failure to provide it does not pass the test for an "adverse employment action'"); *Dasrath v. Stony Brook Univ. Med. Ctr.,* 2015 WL 1223797, at \*10 (E.D.N.Y. Mar. 17, 2015) ("the employer's decision not to award a discretionary bonus does not change the terms or conditions of Plaintiff's employment and consequently cannot constitute an adverse employment action"); *White v. Andy Frain Servs., Inc.*, 2014 WL 3896066, at \*6 (E.D.N.Y. Aug.8, 2014) ("[plaintiff's] claim that he was denied a discretionary raise is also not an adverse employment action"). Here, there is no dispute that Mr. Ngo's bonus was discretionary and not guaranteed. Tr. 121:9-121:7; Ex. 110. As such, there is no merit to Mr. Ngo's argument that the reduction in his discretionary bonus was unlawful, retaliatory, or an adverse employment action.

Setting aside the fact that Mr. Ngo had no contractual right to a bonus for work in 2014, it would have been inequitable for Ms. Burns, who was not out of the office for 4 months and who

50

was shouldering the burden of many of Mr. Ngo's responsibilities, to receive the same discretionary bonus that Mr. Ngo received for work performed that year.[27]  Tr. 777:15-778:2; Tr. 906:20-907:15.  The lack of any punitive motive in the setting of Mr. Ngo's $100,000 bonus is further demonstrated by the $135,000 discretionary bonus that was paid to Sean Sneeden, who was likewise not out of the office for 4 months in 2014.  Ex. 13 at OPCO 001215.

Moreover, Mr. Ngo's discretionary bonus for work in 2014 was paid to him in February of 2015.  He did not file his federal lawsuit alleging FMLA violations against Oppenheimer until March 8, 2017.  Ex. 109.  For the reasons set forth above, any allegation that the discretionary bonus paid to Mr. Ngo in February if 2015 was a violation of the FMLA should be subject to the statute's general two year limitation and is therefore time-barred.

In February of 2016, 1 ½ years after the time that he spent out of the office in 2014, Mr. Lowenthal awarded Mr. Ngo a discretionary bonus of $175,000 – $75,000 more than he received the prior year.  Ms. Burns received a discretionary bonus of $235,000.  Ex. 12(e).  Mr. Sneeden received a discretionary bonus of $150,000 - $25,000 less than Mr. Ngo.  Ex. 13 at OPCO 001214.  In setting the $150,000 discretionary bonus that he awarded to Mr. Ngo, Mr. Lowenthal considered negative feedback that he had received from the High Yield salespeople through Ms. Ross, including reduced exposure to clients.  Tr. 909:7- 911:7.  Nonetheless, in connection with that $175,000 bonus, Mr. Lowenthal took $25,000 out of the pocket of Peter Albano, the current Head of Global Fixed Income at Oppenheimer, in order to increase Mr. Ngo's bonus – a fact which belies any alleged retaliatory motive.  Tr. 911:9-913:16.  Mr. Ngo did not raise any objection with Ms. Burns regarding the amount.  Tr. 782:3-18.

---

[27] Ms. Burns received a discretionary bonus of $235,000 in 2015, for work performed in 2014. Ex. 12(d).

51

Mr. Ngo's claims arising out of the discretionary bonuses paid to him are also rendered meritless when considering the passage of time. "District courts in [the Second Circuit] have consistently held that a passage of more than two months between the protected activity and the adverse employment action does not allow for an inference of causation." *Meder v. City of New York*, 2007 WL 1231626 at *6 n.5 (*quoting Garrett v. Garden City Hotel, Inc.*, 2007 WL 1174891 at *21 (E.D.N.Y. April 19, 2007)). Here, Mr. Ngo testified that he first believed Mr. Ngo to be "angry" with him in July of 2014 when he learned that Mr. Ngo was not going to be returning to the office until August 25th. Mr. Lowenthal awarded Mr. Ngo his $100,000 bonus in February of 2015 (6 months later) and his $175,000 discretionary bonus in February 2015 (1 ½ years later).

In conclusion, there is no evidence to support the proposition that any discretionary bonus paid to Mr. Ngo was a violation of the FMLA, or otherwise unlawful.

### C.   Claimant's FMLA leave was not a factor in his termination

On June 30, 2016, **two years** after he left the office for the birth of his child and over 1 ½ years after going on FMLA leave to recover from his aneurysm, Mr. Ngo's at-will employment was terminated. The decision to terminate Mr. Ngo's employment was made by Mr. Lowenthal (Tr. 925:22-25) and was made for legitimate non-discriminatory and non-retaliatory reasons that had nothing to do with the time that Mr. Ngo spent out of the office in 2014.[28] Tr. 927:7-19. As set forth above, the passage of time between Mr. Ngo's 2014 time out of the office and his June 2016 termination does not support an inference of retaliatory conduct. To this end, In *Rakowsky v. Johnson*, 2017 WL 8777369 (N.D.N.Y. October 25, 2017) the plaintiff alleged that his

---

[28] Indeed, this is supported by the fact that, only 4 ½ months earlier, Mr. Lowenthal paid Mr. Ngo a $175,000 discretionary bonus. Logic would dictate that if the Claimant's imaginative theory that Mr. Lowenthal waited two years to punish Mr. Ngo by terminating him, he would have done so before paying him $175,000 in discretionary compensation.

3172086_2

employer retaliated against him for an EEOC complaint that he had previously filed.  In

dismissing the complaint, the Court held that a 10 month passage of time between the protected

activity and the adverse employment action, "is insufficient to establish a causal connection

between the alleged retaliatory actions and plaintiff's protected activity." In *Steiner v. Sprint*, 957

F.Supp. 65 (S.D.N.Y. 1997), the Court, in dismissing plaintiff's claim for retaliation under the

ADEA, held that a three year lapse between an EEOC complaint filed by the plaintiff and the

alleged retaliatory employment action was, "***far too long*** to permit a reasonable fact-finder to

infer a causal connection between the two situations…" (emphasis added); *See also*, *Perry v.*

*NYSARC, Inc.*, 424 Fed.Appx. 23, 26 (2d. Cir. 2011) ("Action taken twenty months after the

protected activity suggests, by itself, no causality at all.").

Mr. Ngo was terminated as a result of "Department Restructuring."  Ex. 112 at OPCO

00001.  Mr. Lowenthal testified that the decision to terminate Mr. Ngo was based on a

"combination of factors" – none of which related to his time out of the office.  First, he pointed

to the fact that the $30 million dollars in revenue that the High Yield business had generated

when Mr. Ngo was hired in 2009 had declined considerably.  Moreover, Oppenheimer did not

have any banking or equity coverage in any of the sectors that Mr. Ngo covered.  Tr. 926:13-

927:6.  As a result, Oppenheimer elected to cut costs and to, "focus on [Oppenheimer's] historic

capabilities and where [it] had alignment with other parts of the firm."  These "historic

capabilities" included consumer (Ms. Burns' sector) and TMT (Mr. Joshi's sectors).[29]  Tr.

931:12-932:7.  With regard to Mr. Ngo's primary sectors of chemicals and paper and packaging,

Mr. Lowenthal testified, "Every other business division had gotten out of it already, and it was

no longer - - it was a legacy effort from CIBC, and it was no longer a part of our current strategy

---

[29] Again, Ms. Burns and Mr. Joshi remain the only two high yield analysts currently employed by Oppenheimer.

at the time or future strategy." Tr. 1044:25-1045:7.   Ms. Ross further testified that she understood, from a firm-wide perspective, Mr. Ngo's sectors, "were not that important" and that from her, "perspective in the high-yield group, it was also not a sector that was as important in the marketplace." Tr. 1150:22-1151:5.

High yield was not the only Oppenheimer business that suffered in 2015 and 2016, nor was Mr. Ngo the only Oppenheimer employee laid off.  In fact, Oppenheimer suffered a net profit <u>loss</u> in 2016. Ex. 91 at OPCO 000511. From January 1, 2014 through December 31, 2016, Oppenheimer eliminated 118 jobs – 71 of which occurred in 2016.[30]  Ex. 36. Tr. 1229:19-1231:22.

The fact that Mr. Ngo was not terminated for any discriminatory, retaliatory, or other unlawful reasons is further bolstered by the current state of Oppenheimer's HYR department. As set forth above, from the date of Mr. Ngo's termination through the present, Oppenheimer has not hired anyone to cover Mr. Ngo's sectors.  Moreover, the HYR group is currently comprised of two total research analysts: (i) Ms. Burns; and (ii) Mr. Joshi.  During this same time period, the discretionary bonuses paid to the Head of HYR (Ms. Burns) and upon which nearly all of Mr. Ngo's compensatory damages claim is based, has declined every single year.

Finally, the meritless nature of Mr. Ngo's claim that he was terminated for retaliatory or discriminatory reasons is reflected in the multitude of emails that he sent to prospective employers where he <u>volunteered</u> that he was the victim of a series of lay-offs at Oppenheimer as a result of the fact that the company was cutting costs and that it had no banking coverage in his sectors – all of which is true.  Ex. 121.

---

[30] Mr. Ngo's suggestion that the elimination of his position was somehow retaliatory because no salespeople were terminated from high yield is misguided.  Sales people generate revenue.  They are paid a commission based on their production.  They are not paid a salary and they do not receive bonuses.  As Mr. Ngo himself testified, research analysts are a "cost center" and do not generate revenue.  As such, it is logical that a research analyst would be more likely to be subject to a cost cutting measure than a salesperson.

3172086_2

POINT II

## CLAIMANT'S DISCRIMINATION AND
## RETALIATION CLAIMS SHOULD BE DENIED

In addition to his FMLA claims, Claimant has alleged equally meritless claims under Title VII, New York State Human Rights Law, New York City Administrative Code, and the ADA, alleging that Oppenheimer discriminated against him based on his male sex and his alleged disability. As set forth below, Claimant failed to submit any evidence to support these claims and they should therefore be denied.

I.      **Claimant's Gender Discrimination Claims**

Plaintiff's Title VII, New York State Human Rights Law, and New York City Administrative Code claims all arise out of his claim that he was treated differently based on his male gender. In order to prevail on these claims, Claimant must prove that he suffered an adverse employment action and that his sex or disability was at least a "motivating factor" in Oppenheimer's decision to take such action. *Vega v. Hempstead Union Free School Dist.*, 801 F.3d 72, 86 (2d Cir. 2015) ("the 'motivating factor' standard still applies to [Title VII] discrimination claims based on race, color, religion, sex, or national origin.");[31] *Melman v. Montefiore Medical Center*, 98 A.D.3d 107, 127 (First Dep't 2012) ("[p]laintiff should prevail in an action under the NYCHRL if he or she proves that unlawful discrimination was one of the motivating factors...for an adverse employment decision.").

The record is entirely void of <u>any</u> evidence that supports any argument that Mr. Ngo's male gender played a role in any alleged adverse employment action taken against him, let alone that it was a motivating factor.

---

[31] It is also noted that Mr. Ngo's claims under Title VII as they pertain to the removal of his supervisory responsibilities and any action taken prior to that are barred by the statute's 300 day limitation. *See* 42 U.S.C. § 2000e–5(e)(1).

The only specific allegation that Mr. Ngo made with regard to his sex discrimination claim arises out of his belief that two female employees in Oppenheimer's fixed income department (Brigid Donnelly and Lynn Johnson) were allegedly paid for portions of their FMLA leaves. Like Mr. Ngo, Brigid Donnelly was a salaried employee. Ms. Donnelly's FMLA file clearly reflects that when she commenced her FMLA leave following the birth of her child, she had her auto-pay cancelled – just as Mr. Ngo's had done when he commenced his FMLA leave in August 2014. Ex. 80 at OPCO 001628. Ms. Donnelly was not paid during her FMLA leave. Rather, like Mr. Ngo when he was on FMLA leave, Ms. Donnelly received short term disability payments. In short, Mr. Ngo was not treated at all differently than Ms. Donnelly, let alone as a result of his sex.

Ms. Johnson was a commissioned salesperson. Setting aside minimum wage requirements, Ms. Johnson did not get paid unless she generated revenue for Oppenheimer. When Ms. Johnson went on her FMLA leave following the birth of her child, she reached an arrangement with another commissioned salesperson that they would split the commission on any transactions that he made with regard to Ms. Johnson's clients. Tr. 933:15-934:4; Tr. 1152:17-1155:2. This arrangement is not at all unusual with commission-based salespeople. More importantly, both Ms. Ross and Mr. Lowenthal testified that their respective approvals of requests for this accommodation was in no way based on the gender of the salesperson, nor has Mr. Ngo submitted any evidence of the same.[32] Tr. 934:5-18; Tr. 1155:3-17.

In short, there is absolutely no evidence in the record to support the claim that Oppenheimer treated Mr. Ngo any differently or took any adverse employment action against him as a result of his male sex.

---

[32] Tellingly, Mr. Ngo made no attempt to call either Ms. Donnelly or Ms. Johnson as witnesses in this proceeding to testify regarding the terms of their respective FMLA leaves.

56

II.     **Claimant's Disability Discrimination and Retaliation Claims**

Plaintiff has also alleged discrimination and retaliation claims under the ADA.  In order to make a prima facie showing of disability discrimination, a plaintiff must establish: (i) the employer is subject to the ADA; (ii) the plaintiff was a person with a disability within the meaning the ADA; (iii) the plaintiff was qualified to perform the essential elements of his job; and (iv) and the plaintiff suffered an adverse employment action as a result of his disability. *Vale v. Great Neck Water Pollution Control Dist.*, 80 F.Supp.3d 426, 433 (E.D.N.Y. 2015).  In order to make a prima facie showing of retaliation under the ADA, a plaintiff must establish: (i) he engaged in an activity protected by the ADA; (ii) the employer was aware of the activity; (iii) the employer took adverse employment action against the employee; and (iv) a causal connection between the alleged adverse action and the protected activity. *Id.* at 438.  Claimant's ADA claims fail for a number of reasons.

First, Claimant cannot establish that he is subject to the ADA. Mr. Ngo testified that the alleged disability that his claim is based upon is the aneurysm that he suffered in August of 2014. Tr. 415:7-14.  However, Mr. Ngo also admitted that his aneurysm resulted in no permanent disability.  To this end, Mr. Ngo testified that on the day that he returned to work from his FMLA leave he told Mr. Lowenthal, "I have no disability from this aneurysm." Tr. 237:15-238:7.  "[C]ourts in this circuit, and the vast majority of courts elsewhere, have held that temporary disabilities do not trigger the protections of the ADA…" *Vale,* 80 F.Supp.3d at 436 (*quoting Fouad v. Jeport Hotel Corp.*, 2005 WL 1866329 at *2 (S.D.N.Y. August 5, 2005)); *Guary v. Upstate Nat. Bank*, 618 F.Supp.2d 272, 275 (W.D.N.Y. 2009).  As such, Claimant cannot establish that he suffered any alleged disability that entitles him to ADA protection.

Second, Claimant has failed to establish that any alleged adverse employment action was taken against him as a result of any disability or any protected activity he undertook.  In *Kolivas*

57

*v. Credit Agricole*, 125 F.3d 844 (2d Cir. 1997) the Second Circuit affirmed the District Court's granting of summary judgment dismissing plaintiff's ADA claim, noting, "The uncontroverted evidence is that the appellant's former supervisor…decided to terminate appellant …prior to [her] learning about the appellant's treatment for depression." Here, there can be no dispute that Mr. Lowenthal did not know about Mr. Ngo's alleged disability resulting from his aneurysm when he removed Mr. Ngo's supervisory responsibilities in July of 2014, **as Mr. Ngo had not even suffered the aneurysm yet**. As such, Mr. Lowenthal's decision cannot possibly be a violation of the ADA.

"A plaintiff suffers an 'adverse employment action' under the ADA when 'he or she endured materially adverse change' in the terms and conditions of employment. Vale, 80 F.Supp.3d at 434 (E.D.N.Y. 2015) (*quoting Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)). A materially adverse change is a change in working conditions that, "is more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* Examples of materially adverse employment actions include termination, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, and significantly diminished responsibilities. *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004). Here, the only action complained of by Claimant that qualifies as an adverse employment action is his termination, which occurred nearly 2 years after the protected activity. The removal of Mr. Ngo's supervisory responsibilities (which occurred <u>before</u> his alleged disability) did not result in any: (i) decrease in salary; (ii) less distinguished title; (iii) loss of any benefits; or (iv) significantly diminished responsibilities.

Finally, there is absolutely no evidence in the record which suggests that that any alleged disability on the part of Mr. Ngo played any role in Mr. Lowenthal's decision to award

58

discretionary bonuses to him in February of 2015 and 2016, or his decision to terminate Mr. Ngo's at-will employment nearly two years later.

For these reasons, Claimant has not met his burden of establishing a violation of the ADA.

## POINT III

### CLAIMANT'S ALLEGED DAMAGES

As set forth above, Claimant is not entitled to recover any damages in this proceeding. However, even if Your Honor should find that Oppenheimer is in some way liable to the Claimant, it is respectfully submitted that his so-called "damages analysis" is riddled with speculation, inconsistency, and inflation.

**Claimant's Alleged Compensatory Damages**

Mr. Ngo's only guaranteed compensation at Oppenheimer was admittedly his $150,000 base salary. He is currently earning a base salary of $175,000 at Bloomberg. Nonetheless, his 26 footnote compensatory "damages analysis" seeks an amazing $1.5 million in damages. Ex. 1.

Through his first category, Claimant seeks $254,166 in alleged compensatory damages for the time period of 2015 through June 30, 2016. Mr. Ngo admits that this category of damages is entirely based on the two discretionary bonuses that he received in 2015 and 2016 and what he self-servingly speculates his discretionary bonus would have been had Mr. Lowenthal not removed his supervisory responsibilities in July of 2014 (despite the fact that Mr. Lowenthal testified that the title of "Head" of HYR played no role in his decisions). In short, Claimant has taken the $278,833 discretionary bonus that he received in 2013 and assumed that he would have received that same sum in both 2015 and 2016, as opposed to the $100,000 and $175,000 that he received respectively. Ex. 1(a); Tr. 654:4-655:7.

Claimant's computation ignores several facts.  First, Claimant's claim is entirely speculative to the extent that it seeks the recovery of discretionary bonuses.  *Pasternak v. Down Kim*, 961 F.Supp.2d 593, 597 (S.D.N.Y. 2013) (claim for discretionary bonuses held to be "undeterminable and speculative"); *Bonura v. Chase Manhattan Bank, N.A.*, 629 F. Supp 353, 361 (S.D.N.Y. 1986).  Additionally, as discussed above, the failure to provide a discretionary bonus is not an adverse employment action.  *See* Boyar, 2010 WL 4345737, at 3; *Dasrath*, 2015 WL 1223797, at 10; *White*, 2014 WL 3896066 at 6.

Second, with regard to his alleged damages for 2015, which represent bonuses for work produced in 2014, Claimant conveniently ignores the fact that he was out of the office for four months in 2014, three of which he did no work during.  As set forth above, Oppenheimer was entitled to take this into consideration when setting his discretionary compensation for this time period.  Indeed, when awarded the bonus, Mr. Ngo himself acknowledged that he expected the figure to be reduced as a result of the third of the year that he did not come to work.  Finally, the argument ignores the fact that Ms. Burns' discretionary bonus has been reduced from $235,000 to $200,000 to $170,000 to $165,000 over the past few years.

Through his second category, Claimant seeks alleged compensatory damages for the period of July 1, 2016 through the hearings in this matter.  Ex. 1(b).  Claimant's analysis is once again flawed.  To this end, it again improperly speculates that Mr. Ngo would have continued to receive his base salary of $150,000 and a discretionary bonus of $270,833 every year in perpetuity.  This is not just speculative – it is simply false.  That is reflected in the fact that Ms. Burns received a discretionary bonus of $165,000 for her work in 2018.  It is beyond logic suggest that Mr. Ngo would have continued to receive a discretionary bonus of $270,000 a year

60

to cover sectors that Oppenheimer no longer does business in (as evidenced by the fact that Mr. Ngo was never replaced) and to supervise one single research analyst (Mr. Joshi).

Finally, by his third category of damages, Mr. Ngo seeks $531,434 in damages constituting what he speculates to be the additional compensation that he would have earned at Oppenheimer as opposed to Bloomberg (where he is currently employed) from the date of the hearing through the next five (5) years. As an initial point, when considering the fact that Oppenheimer has not hired anyone to cover Mr. Ngo's sectors and does no business in those sectors, to suggest that Mr. Ngo would continue to be employed at all at Oppenheimer through 2023 is beyond speculative. *Thomas v. iStar Financial Inc.*, 508 F.Supp.2d 252, 260 (S.D.N.Y. 2007) ("In light of the evidence at trial, a finding that [plaintiff] would remain at [defendant]…seven years beyond his actual termination – is unduly speculative, and not sufficiently supported by the trial evidence."). Second, the alleged damages are again based entirely on the $270,833 discretionary bonus that Mr. Ngo speculates he would have been paid at Oppenheimer, despite the fact that the current Head of HYR was just recently paid an annual bonus of $165,000. Indeed, Mr. Ngo is currently making $75,000 **more** in guaranteed compensation at Bloomberg than he ever received at Oppenheimer. Moreover, Mr. Ngo's analysis is speculation on top of speculation to the extent that it guesses what he believes his future discretionary bonuses at Bloomberg will be and then self-servingly subtracts that sum from what he speculates his discretionary bonus at Oppenheimer would have been.

In short, Mr. Ngo's damages calculation is based almost entirely on discretionary bonus compensation that is not in any way supported by the evidence and ignores the fact that he is currently being paid more guaranteed compensation than he received at Oppenheimer – as he also did while employed by Fitch.

Claimant also seeks the recovery of liquidated damages in the form of "double damages" arising out of his meritless FMLA claim and his inflated alleged damages arising thereunder. A Court has discretion not to award liquidated damages where the violation was "in good faith and that the employer had reasonable grounds for believing that the act or omissions was not a violation of the [FMLA]." 29 U.S.C. § 2617(a)(1)(A)(iii); *Holder v. Illinois Dept. of Corrections*, 2012 WL 223357 at *2 (S.D. Ill. January 25, 2012). For the reasons set forth above, any alleged violation of the FMLA by Oppenheimer was certainly in good faith. As such, Claimant is not entitled to liquidated damages.

**Claimant Has Failed to Mitigate His Alleged Damages**

Unlike Title VII, the FMLA does not expressly require a plaintiff to mitigate damages. However, Courts have consistently extended the common law obligation to mitigate damages to FMLA claims. *Hamilton v. Niagara Frontier Transp. Authority*, 2008 WL 4724324 at *1 (W.D.N.Y. October 24, 2008); *Miller v. AT&T Corp.*, 250 F.3d 820, 838 (4th Cir. 2001). Here, despite being offered and accepting two jobs that entitle him to more guaranteed compensation that he ever received at Oppenheimer, Mr. Ngo failed to mitigate his alleged damages.

Mr. Ngo's failure to mitigate arises out of the circumstances of the termination of his employment with Fitch. Unsurprisingly, Claimant fought tooth and nail to avoid the issuance of a Subpoena to Fitch for this very information. The performance review produced by Fitch reflects that, just like while at Oppenheimer, Mr. Ngo's "in-office schedule" was unpredictable at Fitch. Mr. Ngo was also reluctant to take on the responsibilities carved out for him at Fitch and challenged his superiors by accusing them of wasting his time and being "political." Ex. 122. Following his termination and his receipt of $55,000 in severance from Fitch, Mr. Ngo told prospective employers that he had left Fitch because it was not a "good fit" for him. As such, the

62

record reflects that Mr. Ngo no longer wanted to work at Fitch.  Rather than quit, he essentially abandoned his job until he was terminated, collected severance, and then looked for a new job.

For these reasons, it is submitted that Mr. Ngo failed to mitigate his damages and should not be entitled to any damages following the date that he was hired by Fitch.

**Claimant's Alleged Emotional Distress Damages**

Claimant also seeks the recovery of damages for alleged "emotional distress, humiliation, and pain and suffering."  It is respectfully submitted that there is no evidence in the record to support such a claim for damages.

"Courts both within and outside of the Second Circuit have generally 'denied recovery for pain and suffering, emotional distress, or physical injury suffered as a result of an FMLA violation, because the FMLA specifically lists types of damages that an employer may be liable for, and it includes damages only insofar as they are the actual monetary losses of the employee such as salary and benefits and certain liquidated damages."[33] *Cooper v. New York State Nurses Ass'n*, 847 F.Supp.2d at 452 (E.D.N.Y. 2012) (*quoting Smith v. Westchester County*, 769 F.Supp.2d 448, 469 n.23 (S.D.N.Y. 2011)); *Hamilton*, 2008 WL 4724324 at *6 (W.D.N.Y. October 24, 2008).

Mr. Ngo admits that he never visited any doctor or mental health physician in connection with any alleged adverse employment action taken against him by Oppenheimer, nor was he ever prescribed any medication.  Tr. 662:3-10.  Following the removal of his supervisory responsibilities, any alleged "emotional distress, humiliation, and pain and suffering" did not restrict Mr. Ngo from continuing to work at Oppenheimer for nearly an additional two years or from receiving hundreds of thousands of dollars in compensation, including multiple

---

[33] Once again excluding discretionary compensation.

3172086_2

discretionary bonuses. Tr. 662:11-25.   Likewise, following the termination of Mr. Ngo's employment in June of 2016, any alleged "emotional distress, humiliation, and pain and suffering" did not restrict Mr. Ngo from seeking out employment and being hired by not one, but two employers – both of which offered Mr. Ngo more guaranteed compensation than he ever received at Oppenheimer. Tr. 663:2-7.   Finally, any alleged "emotional distress, humiliation, and pain and suffering" did not keep Mr. Ngo from going on vacations in both 2016 and 2017.   Tr. 617:16-618:7.

**Claimant's Request for Punitive Damages**

Punitive damages are not available under the FMLA.  *Cooper*, 847 F.Supp.2d at 452 (E.D.N.Y. 2012) (*citing Roff v. Low Surgical & Med. Supply, Inc.*, 2004 WL 5544995 at *10 (E.D.N.Y. March 11, 2004); *Vicioso v. Pisa Bros., Inc.*, 1998 WL 355415 at *4 (S.D.N.Y. July 1, 1998).

Moreover, there is no evidence in the record upon which to base any award of punitive damages against Oppenheimer.  Quite the opposite, the record conclusively demonstrates that Mr. Ngo's rights were not violated, and if they were, the violation was not the result of any willful, outrageous or malicious conduct on the part of Oppenheimer.

## CONCLUSION

For the above reasons, it is respectfully submitted that Claimant's Statement of Claim in this proceeding should be denied in its entirety.

3172086_2

Dated:   April 5, 2019

SATTERLEE STEPHENS LLP

By: _____
       Michael H. Gibson
       John I. Coster IV
230 Park Avenue, 11th Floor
New York, New York 10169
(212) 818-9200

65