# EXHIBIT H

1
2   JUDICIAL ARBITRATION AND MEDIATION SERVICES
3   -----------------------------------------x
    In the Matter of the Arbitration Between:
4
5   HOAI NGO,
6       Claimant,
7       -and-
8
9   OPPENHEIMER & CO., INC.,
10      Respondent.
11
    Case No. 1425025377
12  -----------------------------------------x
13          620 Eighth Avenue
            New York, New York
14
            March 4, 2019
15          9:30 a.m.
16  B E F O R E :
17      HON. MICHAEL H. DOLINGER, ARBITRATOR
18
        Darby Ginsberg, Registered
19      Professional Reporter and Notary
        Public for the State of New York
20
21
22
23
24
25

---

**2**

1
2   APPEARANCES:
3
4
5   VLADECK RASKIN & CLARK, P.C.
6       Attorneys for Claimant
7       565 Fifth Avenue, 9th Floor
8       New York, New York 10017
9       212.403.7311
10  BY:  JEREMIAH IADEVAIA
11      jiadevaia@vladeck.com
12      VALDI LICUL
13      vlicul@vladeck.com
14      EMILY MILLER
15      emiller@vladeck.com
16      CONNOR HOFFMAN
17      choffman@vladeck.com
18
19
20
21
22
23
24
25

---

**3**

1
2   APPEARANCES (CONTINUED):
3
4
5   SATTERLEE & STEPHENS, LLP
6       Attorneys for Respondent
7       230 Park Avenue, Suite 1130
8       New York, New York 10169
9       212.818.9200
10  BY:  MICHAEL H. GIBSON
11      mgibson@ssbb.com
12      JOHN COSTER
13      john.coster@ssbb.com
14
15
16  PRESENT:
17  JOHN T. McGUIRE, Deputy General Counsel
18      Oppenheimer & Co., Inc.
19  WILLIAM M. CASSARINI, Managing Director,
20      Senior Counsel, Oppenheimer & Co., Inc.
21
22
23
24
25

---

**4**

1
2           ARBITRATOR DOLINGER:  We are
3   about to start a hearing, and I would
4   ask if there are any issues that either
5   or both sides wish to deal with before
6   we start with testimony.
7           MR. GIBSON:  Did you -- I was
8   going to ask:  Did you want to address
9   the evidentiary issue now and get it
10  out of the way if the judge wanted to?
11          MR. IADEVAIA:  Does that make
12  sense?
13          ARBITRATOR DOLINGER:  That's fine
14  with me.  I can see you are referring
15  to a March 1st letter from plaintiff's
16  counsel in the nature of an ad limine
17  application with respect to two pieces
18  of evidence.  I have not seen a
19  response to it, but I am happy to hear
20  it from the other side about --
21          MR. GIBSON:  We did file a --
22  Your Honor, we did file response, but I
23  would be more than happy to --
24          MR. IADEVAIA:  Well, I have not
25  been gifted with it, unfortunately, and

5

1
2  sometimes the system doesn't work quite
3  perfectly, this being a human
4  operation.
5       MR. GIBSON:  Sure.  Your Honor,
6  there are two exhibits at issue.  The
7  rest have been stipulated to.
8       The first item is a performance
9  evaluation that was done by Fitch
10  Ratings, one of Mr. Ngo's subsequent
11  employers after Oppenheimer, and as
12  Your Honor may recall, there was a
13  subpoena issued for that; and the
14  specific reason for the subpoena was to
15  get information regarding the
16  circumstances under which Fitch
17  terminated Mr. Ngo, and when we had
18  sought the subpoena, it was
19  specifically with regard to the issue
20  of mitigation of damages.
21       Having received that document,
22  which is the only document that Fitch
23  produced responsive to the subpoena, we
24  believe it not only goes towards
25  mitigation of damages, but it also goes

6

1
2  relevant to our defense in this action.
3       As Your Honor may recall, one of
4  the explanations that's been offered by
5  Oppenheimer for its decision to strip
6  certain supervisory responsibilities
7  away from Mr. Ngo was our position that
8  Mr. Ngo had left the office for some
9  amount of time; that he was not on an
10  FMLA leave during that time, and that
11  he had essentially unilaterally
12  extended his time out of the office
13  without telling his supervisor; and in
14  that Fitch performance evaluation,
15  amongst other performance deficiencies,
16  it notes Mr. Ngo's schedule out of the
17  office is unpredictable and that
18  deadlines had been passed and that
19  Mr. Ngo was allegedly not taking on
20  certain roles and responsibilities, and
21  we believe that's quite relevant to our
22  defense in this case.
23       ARBITRATOR DOLINGER:  By the way,
24  how do you deal with the several cases
25  cited by claimant that suggest

7

1
2  performance problems not amounting to a
3  failure to mitigate --
4       MR. GIBSON:  Well, Your Honor --
5       ARBITRATOR DOLINGER:  -- are
6  irrelevant to the valuation of the
7  employee's performance during his job
8  that is pertinent to the hearing?
9       MR. GIBSON:  Well, Your Honor, I
10  don't believe that, looking at that
11  Fitch performance evaluation, I don't
12  think that it's limited simply to
13  performance.  I believe Mr. Ngo was
14  simply not doing his job at
15  Oppenheimer.
16       ARBITRATOR DOLINGER:  Sounds like
17  performance.
18       MR. GIBSON:  Well, I think that's
19  a -- I think, Your Honor, in our --
20  when we briefed the subpoena, we had
21  submitted case law for the proposition
22  that if there is gross recklessness or
23  gross disregard for company policy,
24  that that could be a mitigation issue;
25  and I would respectfully submit that

8

1
2  not coming to work, letting these
3  deadlines pass, not taking on roles and
4  responsibilities is not being a poor
5  analyst; that's deciding, I don't want
6  to work.  And I think that's certainly
7  relevant to mitigation, I would
8  respectfully submit, and also relevant
9  to our defense in this proceeding.
10       And I would also say, Your
11  Honor -- and this was in our submission
12  which I apologize you probably didn't
13  get.
14       ARBITRATOR DOLINGER:  By the way,
15  I would be happy to receive a copy now
16  if you have a copy.
17       MR. GIBSON:  Sure.  We do.
18       And neither of these items are
19  going to be utilized in Mr. Ngo's
20  testimony, or at least direct
21  testimony, so we could certainly show
22  this if Your Honor wants to take
23  further time to consider it.
24       And, Your Honor, I am sorry.  The
25  last thing I was going to say with

9

1
2  regard to that piece of evidence is:
3  We are in arbitration, Your Honor,
4  obviously, and rules of evidence are
5  relaxed, and Your Honor is as capable
6  as any arbitrator at looking at a piece
7  of evidence and determining its weight.
8  This is a confidential proceeding.
9  That document is not going to be used
10  anywhere outside of this room, and I
11  respectfully believe it should be
12  entered into evidence for whatever
13  value Your Honor deems it to have.
14      ARBITRATOR DOLINGER:  The other
15  items was news articles?
16      MR. GIBSON:  Yes, Your Honor.
17  And that goes specifically to the issue
18  of Mr. Ngo's termination, which took
19  place in June of 2016.
20      One of the legitimate non-
21  discriminatory reasons we have given
22  for Mr. Ngo's termination was the
23  economic hardship that Oppenheimer was
24  suffering at that time; the fact that
25  there were several rounds of lay-offs

10

1
2  going.  Claimant has argued that that
3  explanation is pretext for
4  discrimination, and these articles,
5  which include numbers of quotes from
6  Oppenheimer official show the rounds of
7  lay-offs and economic hardships.  And I
8  would also point out, Your Honor, one
9  of those articles refers to many
10  lay-offs that had been done by Robert
11  Lowenthal, the son of Oppenheimer's
12  CEO.  Mr. Lowenthal is the individual
13  who terminated Mr. Ngo.
14      Once again, I would just say,
15  Your Honor, if Your Honor looks at it
16  and doesn't think it has a whole lot of
17  weight, then we are fine with that, but
18  we don't see any reason it should be in
19  evidence.
20      ARBITRATOR DOLINGER:  By the way,
21  are you also intending to put in
22  evidence, non-hearsay evidence about
23  lay-offs and the financial situations?
24      MR. GIBSON:  Absolutely, Your
25  Honor.  Mr. Lowenthal will testify to

11

1
2  that.
3      ARBITRATOR DOLINGER:  Anything
4  else from the other side?
5      MR. IADEVAIA:  Beyond what's in
6  our letter, Your Honor.  I mean, I
7  would just add for purposes the
8  articles that it's clearly hearsay or
9  the articles are plainly hearsay; and
10  Mr. Lowenthal is going to be here to
11  testify, so the articles are completely
12  unnecessary and don't add anything to
13  the proceedings, and if anything, they
14  are an attempt to sort of bolster the
15  credibility of Mr. Lowenthal's
16  testimony, and they shouldn't be used
17  for that purpose.
18      And with respect to the Fitch
19  review, I think our article -- our
20  arguments are in the letter.  We don't
21  think that there is anything close
22  to -- in that review that's close to
23  meeting the standard for cutting off
24  damages, and there is no suggestion of
25  a violation of any policy or misconduct

12

1
2  and certainly not a suggestion that
3  Mr. Ngo is not showing up to work as
4  Respondent's counsel seems so suggest.
5      And we also think that to argue
6  that the -- the information that's
7  contained within that review supports
8  defendant's legitimate
9  non-discriminatory reason is clearly
10  propensity evidence; meant to say that
11  Mr. Ngo, because he was accused of
12  being late in the review or something
13  to that effect, was late or didn't take
14  his work seriously at Fitch, and
15  certainly that couldn't have informed
16  Fitch's -- I am sorry -- not Fitch, but
17  it couldn't have informed Oppenheimer's
18  decision because this happened after he
19  had left Oppenheimer.
20      ARBITRATOR DOLINGER:  Okay.  I am
21  going to overrule the objection to the
22  Fitch documents, not because I have
23  come to any conclusion that it is
24  supportive or not supportive of
25  mitigation arguments, but simply to

13

1   provide the groundwork for the record,
2   if you will, for each side to argue its
3   respective position on mitigation of
4   damages.
5        With respect to the newspaper
6   articles, I will hold off on that.
7   It's clearly hearsay, and hearsay
8   generally is permitted in arbitration
9   hearings.  But depending on what the
10  testimony is from Mr. Lowenthal or
11  anyone else who may offer competent
12  testimony about the circumstances of
13  Claimant's departure from Oppenheimer,
14  we will see whether there is any reason
15  to allow newspaper articles to come in.
16       At this point, anything further
17  before we call --
18       MR. IADEVAIA:  Nothing from us.
19       ARBITRATOR DOLINGER:  And I know
20  we had a discussion in an earlier
21  conference about whether the opening
22  statements, and I expressed my general
23  view of it, but let me know if you want
24  to do anything other than --
25

14

1
2        MR. IADEVAIA:  I think we are
3   ready to begin.
4        ARBITRATOR DOLINGER:  Are we
5   ready at this point?  Are you all
6   hooked up?
7        MR. IADEVAIA:  Yes, I think.
8        MR. LICUL:  Oh, just one
9   question, Mike and I had a discussion
10  this morning.  I thought we had agreed
11  that we were not going to do closings,
12  and we were going to brief that.
13       Is that --
14       ARBITRATOR DOLINGER:  That's
15  fine.
16       MR. LICUL:  I mean, was that the
17  agreement?
18       MR. GIBSON:  I thought it was on
19  the table, but we are fine with that.
20       MR. LICUL:  Okay.
21       ARBITRATOR DOLINGER:  Okay.
22  Good.
23       Would you raise your right hand,
24  please?
25       (Continued on next page)

15

1                    Ngo - Direct
2   HOAI NGO,
3        called as a witness, having been first
4        duly sworn, was examined and testified
5        as follows:
6        ARBITRATOR DOLINGER:  Please
7   state your full name.
8        THE WITNESS:  My name is Hoai
9   Ngo.  H-O-A-I, last name is spelled
10  N-G-O.
11       ARBITRATOR DOLINGER:  You may
12  begin.
13  EXAMINATION
14  BY MR. IADEVAIA:
15  Q.   Good morning, Mr. Ngo.
16  A.   Morning.
17       MR. LICUL:  Your Honor, may I?  I
18  am sorry.  It may be easier if Hoai
19  sits over there.  Right?  So you are
20  not -- is that fine.
21       ARBITRATOR DOLINGER:  Wherever
22  you want.
23       MR. LICUL:  I think it might be
24  easier.
25  Q.   Mr. Ngo, are you married?

16

1                    Ngo - Direct
2   A.   No.
3   Q.   Do you have a partner?
4   A.   Yes, I do.
5   Q.   And what's your partner's name?
6   A.   Colin Bekemeyer.
7   Q.   And how long have you been in a
8   relationship with Mr. Bekemeyer?
9   A.   Probably 20 years now.
10  Q.   Do you have any children?
11  A.   Yes.
12  Q.   How many?
13  A.   We have two children.
14  Q.   And how old are your children?
15  A.   Lily is about four and a half,
16  and Liam is about eight months old now.
17  Q.   Did you attend college?
18  A.   I did.
19  Q.   And where did you attend college?
20  A.   UC San Diego.
21  Q.   And did you receive a degree from
22  UC San Diego?
23  A.   I did.
24  Q.   And what -- in what did you
25  receive a degree?

17

Ngo - Direct

2    A.    Bachelor's of arts and
3  literature.
4    Q.    And when did you receive the
5  degree?
6    A.    In 1994.
7    Q.    Did you attend any other school
8  after college?
9    A.    I did.
10   Q.    And where?
11   A.    Tulane Law School.
12   Q.    Did you receive a degree from
13 Tulane?
14   A.    I did.
15   Q.    And what degree?
16   A.    A juris doctorate.
17   Q.    And when did you receive your
18 juris doctorate?
19   A.    1998.
20   Q.    Did you take the bar exam after
21 receiving your JD?
22   A.    Yes, I did.
23   Q.    And which state's bar exam?
24   A.    New York state.
25   Q.    Did you pass the New York State

---

18

Ngo - Direct

2  Bar exam?
3    A.    I did.
4    Q.    Have you sought admission to the
5  New York State Bar?
6    A.    Yes.
7    Q.    And have you sought admission to
8  any other state's bar?
9    A.    No.
10   Q.    Were you admitted to the New York
11 State Bar?
12   A.    I was.
13   Q.    Approximately when were you
14 admitted to the New York State Bar?
15   A.    I believe it was a year after law
16 school, 1999.
17   Q.    Are you currently admitted to the
18 New York Bar?
19   A.    Yes, I am.
20   Q.    What's your status?
21   A.    It's retired status.
22   Q.    And what does retired status
23 mean?
24   A.    It means I don't practice law,
25 and I never practiced law post law school.

---

19

Ngo - Direct

2    Q.    And why not?
3    A.    Because I went into a career in
4  finance.
5    Q.    After law school, did you receive
6  any other formal education?
7    A.    Yes, I did.
8    Q.    And where did you attend school
9  after law school?
10   A.    I went to the French Culinary
11 Institute.
12   Q.    And did you receive a degree from
13 the French Culinary Institute?
14   A.    No.  I did not graduate.
15   Q.    And what years did you attend the
16 French Culinary Institute?
17   A.    Let's see, it was right before
18 Oppenheimer.  So I believe in either 2008
19 -- it was in between 2008 and 2009.
20   Q.    Why did you leave the French
21 Culinary Institute?
22   A.    I was in the middle of the
23 classes, and I got my job offer at
24 Oppenheimer.
25   Q.    What was your first full-time job

---

20

Ngo - Direct

2  in finance?
3    A.    It was at JPMorgan.
4    Q.    And when did you start at
5  JPMorgan, approximately?
6    A.    In 1999.
7    Q.    What was your position with
8  JPMorgan when you started there?
9    A.    It was an analyst.
10   Q.    And did you work in a particular
11 part of the bank?
12   A.    Yes.  I worked in the investment
13 bank.
14   Q.    So you were an analyst in
15 investment banking?
16   A.    That's correct.
17   Q.    And what were your
18 responsibilities as an analyst for JPMorgan
19 when you started there?
20   A.    It was an entry level role, so I
21 was basically doing financial models.  I
22 was a part of a team, and we did some
23 mergers and acquisitions activity.  We did
24 some financing, but it was on the corporate
25 side.

21

Ngo - Direct

1  Q.   When did you leave JPMorgan?
2
3  A.   2001.
4  Q.   And did your title change while
5  you were at JPMorgan from analyst?
6  A.   No.
7  Q.   Why did you leave JPMorgan?
8  A.   There were a series of lay-offs,
9  and then also subsequently I received a job
10 offer at Bear Stearns.
11 Q.   All right.  So did you accept the
12 job at Bear Stearns?
13 A.   I did.
14 Q.   And how -- when did you start
15 working at Bear Stearns?
16 A.   I believe it was 2001.
17 Q.   And for how long were you there,
18 approximately?
19 A.   2001 to 2006.
20 Q.   What was your first title at Bear
21 Stearns?
22 A.   I was an associate.
23 Q.   And were you an associate in a
24 particular part of the bank?
25 A.   Yes.  I was an associate in

22

Ngo - Direct

1
2  equity research.
3  Q.   And how did the title of
4  associate at Bear Stearns compare to your
5  title at JPMorgan?
6  A.   It was a progression.  It was a
7  promotion, actually.  So usually someone at
8  that junior level goes from an analyst to
9  associate.
10 Q.   And what were your
11 responsibilities as an associate in equity
12 research at JPMorgan?
13 A.   As an associate in equity
14 research, I provided -- I was a part of a
15 team in support to a senior analyst.  We
16 covered various -- we covered the chemical
17 sector, and we also covered various
18 companies.
19 Q.   When you say you "covered the
20 chemical sector," what do you mean by that?
21 A.   In equity research we published
22 formal research.  We published formal
23 buy-sell-hold recommendations on the
24 companies we covered.
25 Q.   Were you promoted during your

23

Ngo - Direct

1
2  tenure at Bear Stearns?
3  A.   Yes, I was.
4  Q.   How many times?
5  A.   Twice.
6  Q.   And what was your first
7  promotion?
8  A.   My first promotion was from
9  associate to a vice-president.
10 Q.   And what was your second
11 promotion?
12 A.   Second promotion was from a vice-
13 president to a director.
14 Q.   And did your responsibilities
15 change while you worked for Bear Stearns?
16 A.   Yes.
17 Q.   And how did they change?
18 A.   Well, at the first promotion from
19 associate to vice-president, I officially
20 became a senior analyst, which means --
21 it's different from an analyst in
22 investment banking, but it's a senior
23 analyst where I am the one that's leading
24 the sector coverage and writing the
25 research and the leads to that coverage.

24

Ngo - Direct

1
2  Q.   Okay.  And were you a senior
3  analyst in equities?
4  A.   No.  A part of the promotion was
5  I moved.  That's when I transitioned from
6  equities to high yield research; and I
7  transitioned to the high yield, which is
8  credit, the credit side of the business,
9  different part of the capital structure.
10 Q.   What is high yield?  What does
11 that refer to?
12 A.   In terms of research, it's
13 basically different parts of the capital
14 structure.  So if you look at capital
15 structure for a company, there is debt,
16 there is equity, and various analysts hedge
17 funds, buy certain pieces of the capital
18 structure.  So I covered high yield, which
19 is the debt side of the companies, and high
20 yield specifically relative -- when you
21 call it high yield, it pertains to debt for
22 below investment grade credit.  So credits
23 rated below the rating agency scale of BBB.
24 Q.   And when you moved into the high
25 yield senior analyst role, did you focus on

25

Ngo - Direct

1  a particular industry sector?
2      A.   Yes.  I added -- yes.
3      Q.   And what does that mean?
4      A.   You become an expert in the
5  sectors that you cover.  So in equity
6  research I covered chemicals.
7          In high yield research I covered,
8  not only chemicals, but subsequent to that,
9  I started with chemicals, but subsequently
10  I added paper and packaging.  I also added
11  building materials.
12      Q.   And how was it that you added
13  those sectors?
14      A.   Part of it was my job
15  performance.  I did very well.  They asked
16  me to cover more, and with that extra
17  coverage came extra -- obviously, extra
18  promotions or salary over the years, but it
19  was more of a function to -- it was
20  basically added responsibilities.
21      ARBITRATOR DOLINGER:  By the way,
22  you mentioned publishing reports.  Are
23  these reports published to clients of
24  the firm or to the public or to some
25

26

Ngo - Direct

1  other universe of readers?
2      THE WITNESS:  Sure.  When I refer
3  to publishing, I refer to -- it goes
4  to -- it is public, but it's not just
5  to the general public.  It goes to
6  clients, meaning publicly probably
7  asset managers, hedge funds; and
8  sometimes it will go -- to answer your
9  question -- sometimes it goes to the
10  public through news reporters who have
11  access to the report to refer to the
12  report saying so-and-so analyst
13  published this piece, et cetera.
14      Q.   And as a senior analyst in high
15  yield at Bear Stearns, you were -- did you
16  work with clients?
17      A.   Yes.  Yes.
18      Q.   And in what way?
19      A.   So there was the publishing
20  element that went to the clients, but there
21  was also -- for sell side, describe the
22  sell side research.  That's what they call
23  it in the industry jargon in the business.
24      ARBITRATOR DOLINGER:  Sell side

27

Ngo - Direct

1  research?
2      THE WITNESS:  Yes.  So in the
3  industry sometimes people distinguish
4  sell side versus buy side.
5      Buy side is -- to make it
6  simple -- are the clients who buy the
7  product, whether it be the equity,
8  whether the debt; and then sell side is
9  the side that helps facilitate the
10  sales of that.  So I was a part of sell
11  side research.
12      Q.   And did Bear Stearns charge the
13  clients for the research that you were
14  providing?
15      A.   No.  They did not.  Generally,
16  for sell side you don't charge for the
17  research.  It's a part of sales and trading
18  that they generate commissions in:  I have
19  this report, you should read it.  It's a
20  great or not-so-great report, who knows.
21  It -- you know, it helps facilitate trades.
22      Q.   Why did you -- why did you leave
23  Bear Stearns?
24      A.   I was bid away from another firm.

28

Ngo - Direct

1      Q.   And what firm was that?
2      A.   It was RBS Greenwich Capital.
3      Q.   And you accepted -- did you
4  accept the job at RBS?
5      A.   I did.
6      Q.   And why did you leave Bear
7  Stearns for RBS?
8      A.   One, it was a promotion.  So I
9  went from a director to a managing
10  director.
11      And then two, it was -- it was
12  more money, more compensation than Bear
13  Stearns.
14      Q.   And how long did you work at RBS
15  Greenwich Capital?
16      A.   I worked there for almost a year
17  or a little over a year.  I am sorry.  I
18  think it was a little over a year.
19      Q.   I think you mentioned this, but
20  what was your title at RBS?
21      A.   Sure.  It was a managing
22  director.
23      Q.   And what was your position there
24  when you started?

29

Ngo - Direct

2    A.    I was a -- I was, again, a senior
3  analyst on the credit side, but I also
4  added -- I also covered high yield and also
5  high grade debt.
6    Q.    And so when you say on the credit
7  side, what do you mean by that?
8    A.    Well, again, I was -- high yield
9  is part of the credit side, but the
10 nuance -- the difference between this job
11 versus the Bear Stearns job is that I
12 extended my coverage to some degree in that
13 I now covered high grade companies, which
14 is technically higher quality companies
15 based on a rating agency scale.
16   Q.    And did you make -- did you also
17 have responsibility for high yield
18 companies?
19   A.    That's correct.
20   Q.    And just to be clear, what are --
21 what's the difference between the high
22 yield and the high -- what was the term you
23 used?
24   A.    High grade.
25   Q.    High grade, yes.

30

Ngo - Direct

2    A.    Yes.  They are both bonds, so
3  just to present it, they are both bonds,
4  but the difference is is that high grade
5  companies have -- are generally higher
6  quality companies, meaning that they have a
7  higher rating -- higher rate.  So if you
8  look at a simple company like Walmart,
9  which is singly -- everyone views that it's
10 high grade, but it's a very solid rated
11 company.
12        If a company were to fall below
13 BBB ratings, so it goes A, and various
14 grades of A and then B.  If you fall below
15 BBB, you would go to high yield.
16        So the difference is -- so I
17 guess, in the Drexel days, they used to
18 call it high yield because it generated
19 higher coupons.  To simplify, they were
20 junk bonds basically, but now they call it
21 "high yield."
22   Q.    And were you responsible for
23 particular sectors at RBS Greenwich
24 Capital?
25   A.    Yes, I was.

31

Ngo - Direct

2    Q.    Okay.  And what were your sector
3  coverage?  What was your sector coverage
4  when you started RBS?
5    A.    I started with chemicals.
6    Q.    Did you add any sectors?
7    A.    I started with chemicals, and I
8  believe I covered paper and packaging
9  and -- chemicals and paper and packaging,
10 and then eventually I added -- well, I
11 switched to TMT at the end.
12   Q.    And what is TMT?
13   A.    Sorry.  TMT stands for -- I think
14 it's telecom, media, and technology.  So
15 that's the abbreviation.  It's a sector.
16 So that would be the, you know, stuff like
17 AT&T, Windstream, those types of companies.
18   Q.    And just to be clear, so you
19 started -- when you started at RBS, your
20 sectors were chemicals and paper and
21 packaging?
22   A.    That's correct.
23   Q.    And then you switched?
24   A.    Yes.
25   Q.    And you switched to which sector?

32

Ngo - Direct

2    A.    TM -- TMT.
3    Q.    And what were your
4  responsibilities as a senior analyst at
5  RBS?  What were you doing?
6    A.    It was similar to my job at Bear
7  Stearns in that I provided research on
8  companies with and I also published
9  research on companies that were
10 published -- not published, but we had more
11 of a desk model, meaning that I didn't
12 formally publish.  I wrote similar
13 research, but it wasn't -- it was more what
14 in the industry calls "Bloombergs," that
15 they are not formal research; doesn't have
16 a formal recommendation, but you write
17 about the companies, and you began to
18 facilitate trades for the trading desk.
19        ARBITRATOR DOLINGER:  How do you
20   facilitate trades?
21        THE WITNESS:  Sure.  The easy way
22   to look at it is that, one, is the
23   published research so that a client
24   knows that we have an analyst covering
25   this industry.  So if a salesperson

33

Ngo - Direct

1 were to say, hey, I have XYZ bonds to
2 unload.  Do you have an analyst
3 covering it?  And then the salesperson
4 would say, yes.  I have an analyst
5 covering it.  Do you want to talk to
6 them?  Do you need help?
7        So that's one way we facilitate.
8        The other way we facilitate is if
9 a salesperson said to an analyst on the
10 credit side, I have these bonds for
11 sale for a client.  Can you help me?
12        So what we would do is we would
13 write the salespeople kind of talking
14 points that -- so that they talk to
15 other -- because they wanted to find
16 the other side of the trade, we would
17 give them talking points to them
18 facilitate that trade.
19    Q.    What was your -- why did you
20 leave RBS?
21    A.    Lay-offs.
22    Q.    What was your next job after --
23 full-time job after RBS?
24    A.    It was -- it was Oppenheimer.

34

Ngo - Direct

1    Q.    And when did you begin working
2 for Oppenheimer?
3    A.    In 2009.
4    Q.    And when did you leave RBS?
5    A.    In 2007.
6    Q.    Did you work between 2007 and
7 2009?
8    A.    No.
9    Q.    And why not?
10    A.    Well, that was the financial
11 crisis.  That was the year that Bear
12 Stearns crumbled.  That was the year that
13 Lehman crumbled, and obviously, there were
14 problems.  Merrill Lynch.  There were very
15 few Wall Street jobs, and part of the
16 reason I went to cooking school is I wanted
17 to engage my mind during that period.
18    Q.    Mr. Ngo, do you currently have
19 any professional licenses?
20    A.    Yes, I do.
21    Q.    And how many do you have?
22    A.    I believe I have three.
23    Q.    Okay.  And what are those
24 licenses?

35

Ngo - Direct

1    A.    I have Series 7, Series 63 and
2 Series 16.
3    Q.    And what is the Series 7 license?
4    A.    I believe Series 7 -- I took it
5 so long ago -- it's a broker-dealer.  So
6 all of the investment bank employees have
7 to take it.  I remember getting it, not at
8 Oppenheimer, but actually I got my Series 7
9 and 63 certifications during my tenure at
10 JPMorgan.
11    Q.    Okay.  And your Series 16?
12    A.    Series 16 is more pertaining
13 to -- I received my Series 16 at Bear
14 Stearns, and that is a supervisory analyst
15 certification, and that allows you to
16 certify analysts' reports on the compliance
17 level.
18    Q.    And which organization provides
19 those licenses?
20    A.    I believe it's FINRA.
21    Q.    When did you -- when did you
22 start work working at Oppenheimer?
23    A.    In August of 2009.
24    Q.    And what was your title when you

36

Ngo - Direct

1 started there?
2    A.    I was a director.
3    Q.    And what was your position when
4 you started there?
5    A.    I was a senior analyst.
6    Q.    And did you work in a particular
7 group?
8    A.    Yes.
9    Q.    And what was that group?
10    A.    I worked for the high yield
11 group.
12    Q.    What I want to do is ask you to
13 take a look at Exhibit 2, please?
14    A.    I am at Exhibit 2.
15    Q.    Okay.  And if you could let us
16 know what these -- well, first of all, have
17 you seen these documents before today?  You
18 can take your time to flip through the
19 documents.
20    A.    Did you want me to go through all
21 of Exhibit 2 or did you want to go to
22 certain documents?
23    Q.    I was going to ask you if you
24 have seen these documents before today.

37

Ngo - Direct

1
2    A.    Yes.  I have seen these
3    documents.
4    Q.    And generally, what are these
5    documents?
6    A.    It looks like internal
7    Oppenheimer documents relating to
8    personnel.
9    Q.    And anybody in particular?
10    A.    I believe I saw my name.  I
11    believe it's just my -- my name.
12    MR. IADEVAIA:  We move for
13    admission of these records.  Any
14    objection?
15    MR. GIBSON:  No objection.  And
16    if it's okay with the judge, I think
17    with regard to the -- with the
18    exception of two exhibits, we have no
19    objection to the admission of anything.
20    Do you want to just stipulate that
21    everything is in or --
22    ARBITRATOR DOLINGER:  That's fine
23    with me.
24    MR. IADEVAIA:  That's fine with
25    us.  Yes.  Okay.

38

Ngo - Direct

1
2    ARBITRATOR DOLINGER:  Very well.
3    So then all of exhibits contained in a
4    set of four binders, what have been
5    presented to me, are received unless
6    there is -- there is --
7    MR. IADEVAIA:  There are the two
8    exhibits that were disputed except one
9    you have already ruled on.
10    ARBITRATOR DOLINGER:  What is the
11    number of the article exhibits?
12    MS. MILLER:  It's going to be
13    number 120.
14    ARBITRATOR DOLINGER:  Other than
15    Exhibit 120, all exhibits in these
16    binders are received.
17    (All exhibits received in
18    evidence.)
19    Q.    Mr. Ngo, did you receive an offer
20    letter from Oppenheimer?
21    A.    I did.
22    Q.    Okay.  If you could take a look
23    at Exhibit 110, please?
24    A.    In part two?
25    Q.    No.  No.  It's a separate

39

Ngo - Direct

1    exhibit.  It would be in a different book.
2
3    A.    Oh, sorry.
4    MR. GIBSON:  It should say the
5    range of the exhibits.  That will
6    probably help you.
7    THE WITNESS:  Exhibit --
8    Exhibit 110?
9    MR. GIBSON:  Correct.
10    THE WITNESS:  Got it.  Thanks,
11    Mike.
12    MR. GIBSON:  You got it.
13    Q.    Mr. Ngo, can you see the screen
14    because the exhibit is up there?
15    A.    Oh, got it.  Got it.  I can see
16    -- but I want to open it.  It's kind of
17    far.  So --
18    MR. IADEVAIA:  Sure.  That's
19    fine.
20    THE WITNESS:  I have my glasses,
21    but still it's a little far.  Okay.  I
22    am at the exhibit.
23    Q.    Okay.  And what is Exhibit 110?
24    A.    This is my offer letter from
25    Oppenheimer.

40

Ngo - Direct

1
2    Q.    And who signed your offer letter?
3    A.    Jane Ross, I believe.  Let me
4    just double-check that, the back.  That's
5    correct.  Jane Ross.
6    Q.    And as of August of 2009, what
7    was your -- what's your understanding of
8    Ms. Ross's title?
9    A.    She was the head of the high
10    yield desk.
11    Q.    Which department was high yield
12    research part of at Oppenheimer when you
13    joined?
14    A.    It was part of the high yield
15    desk.
16    Q.    And was the high yield desk part
17    of a bigger organization?
18    A.    Sure.  Research is -- high yield
19    is a part of taxable -- the technical term
20    at Oppenheimer was taxable fixed income.
21    Q.    Okay.  And what does taxable
22    fixed income mean generally?
23    A.    I think the easy way to explain
24    it is it's really fixed income, but they
25    call it taxable fixed income, but it's

41

Ngo - Direct

1  bonds, any debt instrument.
2  ARBITRATOR DOLINGER:  Corporate
3  bonds as opposed to municipal bonds
4  which would not be taxable?
5  THE WITNESS:  I think that's the
6  way they described it.  The irony
7  though was a muni bond desk is part of
8  taxable.  You are right when you say
9  taxable.  That was the way they
10 categorized it as taxable fixed income,
11 but you are correct, Judge.
12 Q.    And who was the head of taxable
13 fixed income at Oppenheimer when you
14 joined?
15 A.    It was Robert Lowenthal.
16 Q.    And did Mr. Lowenthal remain head
17 of taxable fixed income for the entirety of
18 your employment at Oppenheimer?
19 A.    Yes, he did.
20 Q.    And what was his title, his
21 corporate title at the time you joined?
22 A.    I believe he was managing
23 director, but I think he might have had
24 other titles.  I think he was on, I think,
25

42

Ngo - Direct

1  the compensation committee, but I don't
2  know, he was managing director.
3  Q.    Do you know if he was a member of
4  the board of directors?
5  A.    I believe he was.
6  Q.    Do you know what Mr. Lowenthal --
7  Mr. Robert Lowenthal's relationship is to
8  the chief executive officer at Oppenheimer?
9  A.    Yes.  Robert Lowenthal is the son
10 of Bud Lowenthal.
11 Q.    And Bud Lowenthal, what's his
12 title?
13 A.    He is the CEO of Oppenheimer.  I
14 also believe he owns the majority, a big
15 chunk of the shares, too.
16 Q.    How was -- when you joined --
17 when you joined Oppenheimer in 2009, how
18 was taxable fixed income organized?
19 A.    Well, it's organized -- the easy
20 way to organize is it was organized on
21 silos.  There were -- in taxable fixed
22 income, which is basically debt, there were
23 different desks.  So one desk was high
24 yield desk.  The other desk was the

43

Ngo - Direct

1  investment grade desk, which is high yield
2  desk.  We also had an emerging markets
3  desk, and I believe we had -- as I
4  mentioned, I think we expanded to have a
5  muni desk as well, but they were
6  categorized mainly by the category of debt
7  because clients trade that way.  So some
8  hedge funds are only restricted to doing
9  only high yield.  Some hedge funds only do
10 equities.  Some hedge funds would be multi
11 strategy, but generally on the client side
12 our desk mirrors our clients in that we had
13 a high grade desk.  We had a high yield
14 desk, and then we had an equity desk, too,
15 but that wasn't a part of taxable fixed
16 income.
17 Q.    And in terms of the high yield
18 desk, were there groups or teams that were
19 part of that desk?
20 A.    Yes.
21 Q.    And what were those groups or
22 teams when you joined Oppenheimer?
23 A.    So when most clients think of the
24 high yield desk, they would think of high
25

44

Ngo - Direct

1  yield -- each desk, so there would be a
2  sales element, a trading element, and then
3  sometimes a research element.
4  Q.    And specifically for high yield,
5  what were the groups or teams on the high
6  yield desk when you joined?
7  A.    When I joined, there was a
8  research.  There was a high yield, the high
9  yield desk included high yield sales and
10 trading.  It's also sales, but then I think
11 it might have been "collabs" or separated
12 at one point, but there was high yield
13 sales.  There was high yield trading, and
14 there was high yield research.
15 Just keep in mind the way the
16 structure was that each department -- so
17 high yield had its own P&L.  High grade had
18 its own P&L.  So all the silos kind of
19 behave --
20 ARBITRATOR DOLINGER:  Meaning
21 what?
22 THE WITNESS:  Profit and loss.
23 Q.    So the high yield desk had a P&L;
24 is that right?
25

45

Ngo - Direct

1    A.    That's correct.
2    Q.    What did -- when you joined
3    Oppenheimer, what did high yield sales --
4    what did the high yield sales team do?
5    A.    So as you asked that we have a
6    separate P&L, so sales -- so our P&L was
7    pertaining to sales, trading and research,
8    and we all -- bonus pools was determined to
9    some degree from that pool.  Sales
10   basically booked commissions.  So they
11   would do -- they generated money by, you
12   know, if they were commissioning a sale of
13   a bond, they would get a cut of that sale.
14        So if you -- if a salesperson
15   unloaded $10 million of bonds, they would
16   get a commission from that, and that would
17   be their profit, not loss.  But again, when
18   I say P&L, that would be their P&Ls that
19   they would generate commissions from those
20   trades.
21        There was some small element of
22   trading that some of the traders would take
23   small positions, and say the bond moved up
24   or down, there would be some P&L from that,

46

Ngo - Direct

1    but as far as the P&L from high yield, the
2    high yield desk, it was primarily driven by
3    sales.
4        ARBITRATOR DOLINGER:  So when you
5        refer to trading as distinct from
6        sales, was that trading done by
7        Oppenheimer itself?
8        THE WITNESS:  Yes.  You know, as
9        you will see in the news, there is
10       always talk about some desks taking
11       positions, meaning that the trader
12       would take positions.  So sometimes
13       what a trader would do is that they
14       would -- if a client -- say a client
15       had $10 million of bonds for sale,
16       right, and the salesperson would try to
17       sell it to another person.  So usually
18       it would be an asset manager or hedge
19       fund, another client, but sometimes the
20       traders would take those positions as
21       well and hold it in inventory with the
22       hopes that it would actually increase
23       in value, and that would be extra
24       profit for that department.

47

Ngo - Direct

1        Now, Oppenheimer was a little bit
2    different that we were riskless shop,
3    meaning that we didn't like to take
4    trading positions.  So, for example,
5    like the year that I was group head in
6    2014, I could see our P&L a little
7    better.  I think in 2014, sales
8    generated -- I want to say 2014 we
9    generated 16.5 million in P&L, and
10   trading was less than a million of that
11   P&L because it was a riskless desk,
12   meaning that our customers -- our risk
13   management restricted our traders from
14   buying, keeping positions in the
15   inventory.
16        Does that answer your question?
17       ARBITRATOR DOLINGER:  Yes.
18   Q.    What did the traders do,
19   primarily?  What was -- what did the
20   traders do in high yield?
21   A.    So for Oppenheimer it was really
22   almost a cost center because they didn't
23   generate much P&L, so they facilitated the
24   trades.

48

Ngo - Direct

1    Q.    And the trade -- and when you say
2    they are facilitating the trades, who are
3    they facilitating the trades for?
4    A.    So a simple desk would work this
5    way.  A salesperson would say, hi to our
6    trader -- I have a 20 million of bonds for
7    sale here.  And the trader would send runs
8    out to his clients as well and say, Hi.  We
9    have 20 million of say, you know, XYZ
10   company bonds for sale, and that's what the
11   trader would do.  He would help facilitate
12   the trade, but the majority of the trade
13   really, as far as credit, went to the
14   salespeople because it was their client,
15   and salespeople were paid a much larger
16   commission than the trading function was.
17   Q.    And what was the relationship
18   between high yield sales and high yield
19   research when you started at Oppenheimer?
20   A.    Sure.  Research was a cost center
21   in that we -- research was a cost center,
22   so we helped facilitate trades for sales.
23   Q.    What do you mean by cost center?
24   A.    Well, we don't charge -- as I

49

Ngo - Direct

1  mentioned, we don't charge for our
2  research.  So the research is a courtesy to
3  our clients, and usually salespeople help
4  control our distribution.  So if a
5  salesperson said to me, why did you add
6  this person to your distribution list?
7  That client would receive our research, and
8  in theory, that client would remember
9  Oppenheimer for a trade, and we would make
10  money through our sales desk since we did
11  not charge for the research.
12      Q.    And when you joined high yield
13  research, who was the head of high yield
14  research?
15      A.    Todd Morgan.
16      Q.    And when you joined Oppenheimer,
17  who was the head of the high yield sales
18  team?
19      A.    It was Jane Ross.
20      Q.    When you joined Oppenheimer, who
21  did you report to?
22      A.    I reported to Todd Morgan, but
23  also I implicitly reported to Jane Ross as
24  head of the high yield desk.

50

Ngo - Direct

1      Q.    And if you take a look at
2  Exhibit 110 again, who does the -- what
3  does the letter -- who does the letter say
4  you report to?  If you look on the first
5  page.
6          ARBITRATOR DOLINGER:  I think it
7  says Todd Morgan.
8          MR. IADEVAIA:  Okay.
9          THE WITNESS:  Yes.  It's the
10  third page, I believe, and it says that
11  I report to Todd Morgan, who is the
12  head of research.
13          ARBITRATOR DOLINGER:  It also
14  says another person.
15          THE WITNESS:  And it says another
16  person on the last page.
17      Q.    Did Mr. Morgan report to Miss
18  Ross?
19      A.    He -- he reported to Robert
20  Lowenthal, but he couldn't report to Miss
21  Ross on a compliance level.
22      Q.    And why did you say that?
23      A.    Because there is an issue in
24  research and sales trading, even though we

51

Ngo - Direct

1  are a part of one group, is that you have
2  to have -- on a compliance level, you have
3  to have research separated from sales and
4  trading; and that was the way it was at
5  Bear Stearns and all the previous firms I
6  worked for, and there is a reasoning behind
7  it.
8      Q.    What's the reasoning behind it?
9      A.    Sure.  On the compliance level,
10  there are several reasons:  So one, you
11  want research, in theory, to be
12  independent.  You don't want to -- since
13  you are publishing formal research, you
14  want to say that -- to compliance that this
15  is independent research.  It's not related
16  to investment banking.  It's not related to
17  sales and trade or specific positions
18  because that would create a bias.
19          So in -- for a research
20  department, even though we were -- and what
21  the compliance does is they will separate
22  research by, you know, department heads,
23  but also even physically that you will be
24  in a separate room, separate from the

52

Ngo - Direct

1  trading desk because there is one -- like
2  there is some aspects that you don't want
3  to front-run the market.  So you don't want
4  to say that a salesperson influenced your
5  decision if you put a buy recommendation on
6  a bond or a sell recommendation on a bond,
7  but legally it needs to be separate.
8      Q.    You said that you implicitly
9  reported to Ms. Ross; is that right?
10      A.    Yes.
11      Q.    Okay.  And what's your basis for
12  saying that?
13      A.    Well, as I mentioned, we are a
14  cost center.  So of the, say, the revenues
15  in 2014, majority of that was driven by
16  sales.  So a sales desk generally at a
17  trading desk shop is usually run by two --
18  two factions because research -- research
19  never runs it because research is always a
20  cost center.  So it -- a desk is usually
21  run by the person who kind of generates the
22  most revenue, who drives that revenue of
23  that segment.
24          So, for example, at Oppenheimer,

53

Ngo - Direct

1 since we were a riskless desk, the sales
2 desk really was the key driver for, you
3 know, choosing coverage, choosing what we
4 focus on. They were the key driver. They
5 generate the most revenues, and that was
6 how we made money.
7     Q.    And how -- during your time at
8 Oppenheimer, approximately how big was the
9 sales team? How many people worked on the
10 sales team?
11     A.    In high yield?
12     Q.    In high yield.
13     A.    In high yield, I believe we
14 had -- it was the largest sales desk in
15 fixed income, and it was about 12
16 salespeople.
17     Q.    And approximately how many people
18 were on the -- how many research analysts
19 did you have in high yield?
20     A.    Well, high yield, there were
21 various analysts during different times,
22 but it was always smaller than the sales
23 desk because we were a cost center.
24     Q.    Did Ms. Ross ever tell you that

54

Ngo - Direct

1 she was the head of high yield research?
2     A.    Well, at one point I remember
3 when I became group -- the co-group head,
4 she had said to me -- we were talking about
5 coverage and what we should cover, and she
6 said, you know, I could help you figure out
7 what to cover, and she said, I could even,
8 you know, help you review reports because,
9 you know, I -- you know, she -- she was
10 basically trying to dictate what we were
11 reporting, but I kind of pushed back and
12 said to her, look, there is a fine line on
13 telling us what to cover and that we need
14 to be separate; but it was implicit that
15 everyone knew in the group that sales
16 dominated our department, and we had to
17 make -- I mean, all of our decisions,
18 whether it be analyst coverage, was
19 determined to some degree by what sales and
20 trading was trading.
21     Q.    And was Ms. Ross -- to your
22 knowledge, was Ms. Ross involved in your
23 hiring?
24     A.    Yes.

55

Ngo - Direct

1     Q.    And how so?
2     A.    Well, when I first interviewed
3 for the job, one, she interviewed me; and
4 then, two, when I had interviewed for the
5 job, the friends who told me about the job,
6 they said that Jane Ross led the desk, and
7 that she was kind of the decision-maker for
8 the analysts.
9     Q.    And did -- during your time
10 working at Oppenheimer, did Ms. Ross
11 interview other candidates for high yield
12 research analyst positions?
13     A.    She interviewed every analyst
14 that came through the door.
15     Q.    And do you know who made the
16 decision to hire you?
17     A.    Well, I believe it was a
18 combination. I don't know the exact
19 specifics, but I know that Jane Ross was a
20 big part of it. So was Todd Morgan. So
21 was, obviously, Rob Lowenthal.
22     I remember in my interview that
23 Jane was concerned that I had a large break
24 in my résumé; that I had been out of work

56

Ngo - Direct

1 from between 2009 and 2007, and she was
2 concerned about -- I remember Todd Morgan
3 telling me this -- she was concerned
4 about -- about being -- my being current
5 with the market.
6     So I remember I had to go back
7 and interview again with Jane Ross to kind
8 of prove to her that my market skills were
9 current, and then subsequent to that
10 meeting, that was, I believe, my
11 second-to-last meeting, final meeting with
12 Rob Lowenthal subsequent to that, I guess
13 she must have given the green light to hire
14 me.
15     Q.    As the senior analyst at
16 Oppenheimer, when you started there, what
17 were your responsibilities?
18     A.    It was similar to Bear Stearns
19 that my responsibility was more trade
20 driven, more sales driven. I was a senior
21 analyst.
22     Q.    Okay. And what did it mean to be
23 a senior analyst at Oppenheimer?
24     A.    Sure. I covered various sectors,

57

Ngo - Direct

1  various stages.  It means to do analysis on
2  companies, particularly high yield
3  companies, whether it be -- and give
4  trading recommendations, formal trading
5  recommendations of sell, hold or buy.
6      Q.    Did you produce research in your
7  role as senior analyst at Oppenheimer?
8      A.    Yes, I did.
9      Q.    What form of research?
10     A.    It was written research.  It was
11 given to our clients for free.  I produced
12 individual reports.  I produced
13 various what we call "Bloombergs," which
14 are shorter reports to facilitate trades.
15 I produced research for the sales desk, and
16 I also participated in our morning blast
17 distribution.
18     Q.    And what is the morning blast
19 distribution?
20     A.    The morning blast distribution
21 is -- we sent it every morning, and we sent
22 it to over a thousand accounts, our big
23 accounts, and it showcased all of the
24 research for our analysts for that

58

Ngo - Direct

1  department; and then it was also forwarded
2  to our salespeople every morning as kind of
3  an introduction saying, good morning.
4  These are our trade ideas from our
5  analysts, et cetera.  This is what's going
6  on in the market just to help salespeople
7  engage clients every day.
8      Q.    And who compiled the information
9  that went into the morning blast?
10     A.    It was traditionally compiled by
11 the group head, the head of research at the
12 time.
13     Q.    And did the individuals who were
14 not the group head, but were analysts, did
15 they have a role in compiling the
16 information?
17     A.    We contributed to it, and then
18 the senior analyst would SA approve it, but
19 also monitor to say if anything was in
20 there that, you know, maybe we should add
21 this or maybe we should put this company
22 in.  It was my role at that stage was to
23 contribute to the morning blast as part of
24 my job.

59

Ngo - Direct

1      Q.    You said SA.  What does SA mean?
2      A.    That means supervisory analyst
3  approval, and every report -- written
4  report, needs to be supervisory analyst
5  approved, by I think that's a regulation
6  under FINRA, and that's usually done by the
7  group head.  Or -- I take that back.  SA
8  approval doesn't have to be done by the
9  group head, but generally is done by the
10 group head, but I also had SA approval
11 because I had my Series 16 certification.
12 So sometimes if my group head, Todd Morgan,
13 the head of high yield research was not
14 available, I would SA for him, but
15 generally he would SA, do the final
16 approval.
17     Q.    And who sent the morning blast?
18 Which person at Oppenheimer when you
19 started there?
20     A.    The head of research.
21     Q.    Okay.  And who was that just --
22     A.    Todd Morgan.
23     Q.    What investment recommendations
24 did you make while you were a senior

60

Ngo - Direct

1  analyst at Oppenheimer?
2      A.    We had three categories
3  investment recommendations would be.  I
4  think -- I believe we had an outperform, a
5  market perform, and an underperform, which
6  is the equivalent to buy, hold and sell,
7  right?  So three recommendations.
8      Q.    And who were your clients that
9  you worked with as a senior analyst?
10     A.    We had over a thousand clients,
11 so they were various asset managers, hedge
12 funds.
13     Q.    And when you started at
14 Oppenheimer, what industry sector or
15 sectors did you cover?
16     A.    When I first started Oppenheimer,
17 I initially covered paper and packaging.
18 That was the sector that the previous
19 analyst covered, and then I eventually
20 added more sectors along the way.
21     Q.    And what other sectors did you
22 add?
23     A.    I added chemicals after paper and
24 packaging, and then when one of our

61

Ngo - Direct

1 analysts left, I added some basic
2 materials, and then I added some metals and
3 mining.
4
5     Q.    Approximately when did you add
6 chemicals?
7     A.    I believe it was shortly after
8 my -- I want to say it was shortly after my
9 initiation for paper.  I did the paper
10 initiation first, and so I want to say it
11 was maybe three months, four months after
12 my August 2009 start date.
13     Q.    When you say "initiation," what
14 do you mean?
15     A.    Sure.  Sometimes on a formal
16 level if you were to -- it depends.
17 Sometimes it -- sometimes analysts will do
18 this, they will initiate on a sector.  So
19 they will write a larger report.  Generally
20 our reports at Oppenheimer, a formal report
21 would be anywhere from 5 to 10 pages, but
22 an initiation would be -- like in my case,
23 I believe it was over 80 pages, that first
24 initiation report.
25     It's just the lingo of saying --

62

Ngo - Direct

1
2 salespeople love those reports because it
3 basically signals to the market that you
4 are an expert in that sector.
5     Q.    And how did you get assigned
6 chemicals as a sector?
7     A.    Well, I had expertise in it.  My
8 prior job at Bear Stearns I covered
9 chemicals, but at the time when I was
10 hired, I was hired really for paper and
11 packaging because the previous analyst only
12 covered paper and packaging, and they
13 wanted to continue the trading on that
14 sector.
15     Q.    And how did you get assigned
16 metals and mining?
17     A.    Well, the assignment by sector
18 was based on sales.  Like if sales was
19 generating more tradition -- more
20 commissions in one sector, then Jane would
21 suggest to the research department and say,
22 we should cover these sectors.
23     So I added chemicals.  We traded
24 that, and then I added eventually metals
25 and mining, or sometimes if we didn't have

63

Ngo - Direct

1
2 an analyst assigned to a sector, sometimes
3 the salespeople would get best athlete
4 analysts to cover those sectors to fill
5 those gaps to make sure that we could help
6 facilitate sales and trading.
7     Q.    But how specifically did you get
8 assigned metals and mining?
9     A.    I formally received it at one
10 point.  Miss Ross asked me to cover.
11     Q.    Okay.  And what were the
12 circumstances of her asking you to cover
13 metals and mining?
14     A.    It was an actively traded sector.
15 We were getting commissions from that
16 sector.  The metals and mining sector was
17 also volatile during that period, meaning
18 the more volatility, the more trading of
19 bonds, and it was more a sales and trading
20 decision.
21     Q.    Had someone previously been
22 assigned -- a research analyst been
23 assigned to metals and mining before you
24 were assigned it?
25     A.    Yes.

64

Ngo - Direct

1
2     Q.    And who was that person?
3     A.    That was Chris Doherty.
4     Q.    And did -- what happened to
5 Mr. Doherty?
6     A.    Mr. Doherty left the firm I
7 believe two years after my tenure, and they
8 transferred a lot of his coverage to me.
9     Q.    And did that include metals and
10 mining?
11     A.    Yes.
12     Q.    Do you understand the term
13 "equity research coverage"?
14     A.    Yes, I do.
15     Q.    And what does that mean?
16     A.    I used to be an equity research
17 analyst, so equity research coverage is
18 different from high yield.  Well, it's
19 research, but for equities, which is
20 stocks.
21     Q.    Okay.  And when I -- and when you
22 were asked to pick up metals and mining,
23 was there equity research coverage at
24 Oppenheimer?
25     A.    No.  There was not.

65

Ngo - Direct

1   Q.   Was there investment banking
2   coverage at that time?
3   A.   No.  There was not.
4   Q.   Approximately when were you asked
5   to pick up metals and mining?
6   A.   It was various times through the
7   year.  It was based on the trading volumes,
8   again, because you have to remember
9   something.  Analysts get a little bit --
10  the more sectors you cover, the harder it
11  is for you to do your job because you are
12  added more companies to cover.
13  So I would gradually cover a lot
14  of the names after Chris Doherty left,
15  which was metals and mining and basically
16  materials, and then I believe in the last
17  two years of my tenure, metals and mining
18  became more active.  So I covered more of
19  it, and there was more of an aggressive
20  push by sales and trading to cover the
21  metals and mining names versus my sector
22  names, my original sector names, because it
23  was generating more trading revenue at the
24  time.

67

Ngo - Direct

1   Give me some talking points and help
2   facilitate that trade.
3   So at various sometimes -- not
4   just me, Todd Morgan was asked that as
5   well.  The best analysts were always asked,
6   could you cover more sectors?
7   So I would cover other sectors
8   that way, but also, for example, when Todd
9   Morgan left in August then 2013, I took
10  over some of his names that he covered in
11  the media, media and telecom space to help
12  facilitate the trades.
13  ARBITRATOR DOLINGER:  Was your
14  involvement, then, limited in
15  time to specific proposed trades or
16  once you picked up a sector, such as
17  you have alluded to, that you would
18  keep it during your tenure there?
19  THE WITNESS:  Well, I think that
20  for -- that sometimes happens.  So, for
21  example, metals and mining, I think I
22  started just picking up some one-off
23  names, and then they officially gave it
24  as marketing to say I covered metals

66

Ngo - Direct

1   Q.   And you mentioned that the
2   sectors you covered over your tenure at
3   Oppenheimer were paper and packaging,
4   chemicals, basic materials, metals and
5   mining; is that right?
6   A.   Yes.  When I left, those were
7   officially my sectors that we marketed to
8   compliance; that I covered these sectors.
9   Q.   And during your tenure at
10  Oppenheimer, were there any other sectors
11  that you covered?
12  A.   Yes.  There were.
13  Q.   And on what basis?
14  A.   Like I said, it depends.  You
15  know, I was known as best athlete there,
16  meaning I was a very quick analyst.  So if a
17  salesperson, say they had a trade on a
18  company, they had a salesperson call me and
19  said, we have a commission for 20 million
20  bonds in the gaming and lodging sector, for
21  example, right?  And they would say, Hoai,
22  could you help us?  Just like maybe put
23  together a model?  Give me financial stats.

68

Ngo - Direct

1   and mining.
2   The other -- you have to remember
3   something.  We were -- so when we would
4   market, we would say -- because you
5   can't say an analyst covers six sectors
6   because at some shops, like, for
7   example, Goldman Sachs only had a
8   chemicals -- their analysts only
9   covered chemicals; and when I had
10  chemicals, paper packaging and basic
11  materials, my counterparts at bigger
12  shops had just one sector.  Right?
13  So on a marketing perspective, if
14  you officially said you covered too
15  many, it became almost dilutive or
16  maybe not believable to -- not
17  believable is not the right word.  It
18  can show that you are not as strong a
19  sector expert as saying your
20  counterparts, right?
21  Q.   Between 2009 and June of 2014,
22  did you receive feedback regarding your
23  performance at Oppenheimer?
24  A.   Yes, I did.

69

Ngo - Direct

Q.   Okay.  And in what format was that feedback provided?

A.   It was in the form of mainly oral.  So I would get feedback from Jane or Todd, and then also I would -- there was a formal review one year.

Q.   Okay.  And which year was that?

A.   Also I received a review from Rob my final year, by the way.  So it wasn't just Jane, Todd or Rob.  When I became co-head, Rob.

Q.   And I am focused on the period between 2009 and 2014 when you said your -- when you said that Mr. Lowenthal gave you feedback, which year are you referring to?

A.   I believe I was promoted to co-head in August -- sorry -- in the fall of 2013, and he gave me feedback during bonus time in February of 2014.

Q.   What year did you receive a written performance review?

A.   We did it one year.  Todd Morgan did it one year.  I believe it was 2012, if I am correct.

70

Ngo - Direct

Q.   Why don't we take a look at the exhibit, Exhibit 34.

A.   What exhibit number?

Q.   34?

A.   34.  Got it.

Q.   Are you there?

A.   I am there.

Q.   Okay.  Could you turn specifically to the number -- if you look on the bottom right- hand corner there is Bates numbers.  If you could look for OPCO 1258, please?

A.   I actually misspoke.  My formal review was done in 2010.  I am sorry.

     What exhibit are you talking about?

Q.   We are in Exhibit 34, and if you turn to page 1258?

A.   Correct.  I am here.

Q.   Okay.  And what is this document?

A.   This is the -- this is a formal written review.

Q.   And is it your review?

A.   Yes, it is.

71

Ngo - Direct

Q.   Okay.  And did you receive the review in 2010?

A.   That's correct.

Q.   The review is dated December 22, 2010; is that right?

A.   That is correct.

Q.   All right.  And do you recall receiving it around that time?

A.   Yes, around that time.

Q.   And who gave you -- who presented you with this written review?

A.   Todd Morgan.

Q.   And what was Mr. Morgan's role at the time?

A.   He was the head of research.

Q.   If you take a look at the top of this, toward the top of the document it says, "Contribution during the year."  Do you see that?

A.   Yes.

Q.   Okay.  And under it, it says, "Please rate and comment on this individual's contribution to Oppenheimer's leveraged financial activities."  Do you

72

Ngo - Direct

see that?

A.   Yes.  I do see that.

Q.   Okay.  And on the left -- on the left side there is a header that says "published research," do you see that?

A.   Yes.  I do see that.

Q.   Okay.  And under it, it says, "Frequency, volume of written credit ideas, breadth of coverage."  Do you see that?

A.   Yes.  I do see that.

Q.   And next to that text is the number five.  Do you see that?

A.   I do see that.

Q.   And what is your understanding as to the meaning of or significance of the five?

A.   Well, this is the first -- this is the only year I remember in 2010 that we did reviews, and Todd Morgan decided to give -- do formal reviews.

     These reviews, just to give you context, these numbers refer to salespeople.  So when we did this review, it wasn't a peer-to-peer review by the

73

Ngo - Direct

1  analyst.  It was a review done by the
2  salespeople because, as I said, they could
3  show you a P&L.  So they were -- they --
4  you know, we worked for them.  So
5  salespeople would rank.
6      So what this five represents --
7  sorry to be so longwinded with the
8  answer -- what the five number represents,
9  it represents that five salespeople ranked
10  me as exceptional in category.
11  Q.    And the category is frequency,
12  volume of written credit ideas, breadth and
13  coverage, right?
14  A.    Yes.  It says that five people
15  ranked me as exceptional for the frequency
16  of my research, volume referring to the
17  number, the volume of reports, whether it
18  be a Bloomberg or whether it be a formal
19  report, and then exceptional in this
20  context is my breadth of coverage probably
21  referencing to how many companies I covered
22  or also maybe how many industries I
23  covered.  So breadth meaning, obviously, a
24  salesperson wants you to cover more.
25

74

Ngo - Direct

1
2  Q.    Okay.  And next to the number
3  five to the right is the number one.  Do
4  you see that?
5  A.    Yes.
6  Q.    And what's your understanding of
7  the meaning of the one?
8      MR. GIBSON:  Your Honor, just an
9      objection.  Understanding we are in
10      arbitration here, but there is no
11      foundation.  Unless Mr. Ngo reviewed
12      himself and created his own performance
13      valuation, I don't know what basis
14      there is for him to explain how it is
15      that Mr. Morgan came to give him
16      certain ratings.
17      ARBITRATOR DOLINGER:  So far the
18      testimony has been that this is his
19      understanding, and I am sure he will be
20      questioned by both sides about the
21      sources of his understanding.
22      MR. GIBSON:  Thank you, Your
23      Honor.
24      ARBITRATOR DOLINGER:  Sure.
25  Q.    Okay.  Just to be clear, your

75

Ngo - Direct

1  understanding is, is that the number there,
2  is that number a rating?
3
4  A.    No.
5  Q.    Okay.  What is that number?
6  What's your understanding of that number?
7  A.    That number means that five
8  salespeople ranked me.  So my understanding
9  is that -- is that each salesperson was
10  given this review, and they would check off
11  what the ranking would be.
12      So if I was a salesperson, I
13  would rank in this case five salespeople
14  checked off that I was exceptional in this
15  review, and then this -- this review is a
16  compilation of those salespeople's
17  comments.
18  Q.    And what's the basis of your --
19  of that understanding?
20  A.    Todd Morgan told me that.
21  Q.    And when did he tell you that?
22  A.    When he presented this review to
23  me.
24  Q.    So I think I asked you what that
25  number one reflects.  So if you look at the

76

Ngo - Direct

1
2  five, and you move to the right and you see
3  that number one?  Do you see where I am
4  referring to?  Let me try again.
5      So the row that says frequency,
6  volume of written credit ideas and breadth
7  of coverage; do you see that?
8  A.    Sorry.  Let me focus.  Yes.  Yes.
9  Yes.
10  Q.    All right.  So then to the right
11  is the number five.  Do you see that?
12  A.    Yes.
13  Q.    Okay.  And to the right of that
14  is a number one.  Do you see that?
15  A.    That is correct.
16  Q.    Okay.  And what is that number
17  one?  What is your understanding of what
18  that number one means?
19  A.    That means in the review process
20  one salesperson ranked me significantly
21  exceeded expectations for the frequency,
22  volume -- frequently, volume, written
23  credit ideas and breadth of my coverage.
24  Q.    And next to that one to the right
25  is another one, and what do you understand

77

Ngo - Direct

1  that one to mean?
2      A.     That means that one salesperson
3  said that I met their expectations in terms
4  of my frequency, volume, written credit
5  ideas and breadth of coverage.
6      Q.     Okay.  And there is a column that
7  says did not meet expectations; do you see
8  that?
9      A.     Yes.
10     Q.     And so to the right of the one
11 that you just referenced, there is no
12 number there.  What do you understand that
13 to mean?
14     A.     That means no one ranked me below
15 expectations in that category.
16     Q.     Okay.  Below the published
17 research is a category called columns --
18 comments.  Sorry.  Do you see that?
19     A.     Yes.
20     Q.     Okay.  And what's your
21 understanding as to what this section is?
22     A.     What Todd Morgan told me at the
23 time of this review is that at the --
24 salespeople were presented with this

78

Ngo - Direct

1  review.  So they had a section to write
2  comments on -- pertaining to this section,
3  obviously.  And so this is a compilation of
4  all the sales people's comments.  So some
5  salespeople might have said nothing.  Some
6  might have said more, but this is a
7  compilation of various salespeople's
8  comments.
9      Q.     Okay.  And if you look below to
10 the next section, it says "Client and sales
11 force communication."  Do you see that?
12     A.     Yes.
13     Q.     Okay.  And there is a heading
14 underneath that says, "Level of
15 interaction, new issue tracking,
16 responsiveness."  Do you see that?
17     A.     Yes.
18     Q.     And to the right of that text is
19 the number five.  Do you see that?
20     A.     Yes.
21     Q.     Okay.  And what's your
22 understanding of what that five means?
23     A.     That means that five salespeople
24 in that category ranked me exceptional.

79

Ngo - Direct

1      In the category level
2  interaction, tracking responsiveness,
3  responsiveness really responds -- the way I
4  interpret it is that the title of this is
5  client and sales force communication.  It
6  refers to your level of interaction with
7  the sales force.  So the more interaction
8  you have, the better it is for commissions
9  and trades, which is what this refers to.
10     Q.     Okay.  And below client and sales
11 force communication, there is also a
12 "comment" section.  Do you see that?
13     A.     Yes.
14     Q.     Okay.  And what's your
15 understanding of the comments in that
16 comment section?
17     A.     Again, this is a compilation of
18 salespeople's comments on my interaction
19 with sales and sales force, the sales desk.
20     Q.     Okay.  And what's your basis --
21 what's the basis for that understanding?
22     A.     Todd Morgan told me that when he
23 gave me this review.
24     Q.     Okay.  If you turn the page, page

80

Ngo - Direct

1  1259, and, you know, is your
2  understanding -- there is a section here
3  that's called "capabilities and knowledge."
4  Do you see that?
5      A.     Yes.
6      Q.     Okay.  And again there is
7  categories on the left starting with
8  "product technical knowledge."  Do you see
9  that?
10     A.     Yes.  I see that.
11     Q.     Okay.  And to the right of those
12 categories are numbers.  Do you see those
13 numbers?
14     A.     Yes.  You see those numbers.
15     Q.     Okay.  And again, are these --
16 what are those numbers?
17     A.     That means in this -- in this
18 case it means that five salespeople ranked
19 me as exceptional, and one of the best I
20 have worked with in terms to my product and
21 technical knowledge.  It also means to the
22 two, it means that two salespeople said
23 that I significantly exceeded their
24 expectations, pertaining to my product

Ngo - Direct

1 knowledge, product and technical knowledge.
2 Q. Okay. And if you look below,
3 there is a comment section. Do you see
4 that?
5 A. Yes. I see that.
6 Q. Okay. And are these comments
7 from salespeople as well? Is that your
8 understanding?
9 A. Yes.
10 Q. Okay. And the basis of your
11 understanding?
12 A. That Todd Morgan gave me -- told
13 me this.
14 Q. Below that, the comment section,
15 there is a section called, "Please comment
16 on positive attributes, areas that need
17 improvement, other." Do you see that?
18 A. Yes.
19 Q. Okay. And what's your
20 understanding as to the text that falls
21 below there?
22 A. That was just more feedback from
23 the salespeople. Like of course, for
24 example, they said that I am willing to

Ngo - Direct

1 help on new names. It's something a
2 salesperson would say. They want you to
3 cover more stuff.
4 Q. So this is information -- from
5 your understanding, this is information
6 provided by salespeople?
7 A. Oh, yes. I mean, you can -- the
8 text really says it. I mean, some saying
9 it's help on new names. That's referring
10 to a salesperson saying it's good that this
11 analyst covers new names for our trading
12 desk.
13 Q. Okay. And your basis for that
14 understanding that salespeople had provided
15 that information is what?
16 A. Yes.
17 Q. What's your basis for that?
18 A. Sorry. Todd Morgan told me that.
19 Q. And the last category, "What have
20 you done, can you do to help this
21 individual in the group be more
22 successful?" Do you see the text below
23 there?
24 A. Yes.

Ngo - Direct

1 Q. Okay. And where is that
2 information coming from that's provided in
3 the text?
4 A. My understanding is that it's
5 coming from salespeople.
6 Q. And what's the basis of your
7 understanding?
8 A. Todd Morgan told me that.
9 Q. Other than the Exhibit 34 that we
10 just looked at, did you receive any other
11 written performance evaluations during your
12 time at Oppenheimer?
13 A. No, I did not.
14 Q. Did you receive oral feedback
15 regarding your performance?
16 A. Yes, I did.
17 Q. And how often did you receive the
18 oral feedback?
19 A. It was pretty sporadic. It could
20 be Jane saying, great job on this trade.
21 It could be from a salesperson
22 saying, great job. You helped me unload
23 these bonds. But the formal -- the more
24 formal review process was usually around

Ngo - Direct

1 bonus time in February.
2 Q. And who did you receive the
3 feedback from around bonus time in
4 February?
5 A. Well, it was -- it's not
6 necessarily a formal review. It was just
7 that we were getting our bonus numbers in
8 February, and usually Todd Morgan, the head
9 of research at the time, would sit us down,
10 and then we talk about -- give some
11 feedback to the analysts because it was a
12 closed-door meeting. So it was an
13 opportunity to say, you did a great job
14 this. You didn't do this. That was the --
15 I would say that would be the closest we
16 had to a review.
17 Q. Okay. And what -- focusing on
18 the period between 2009 and 2014,
19 generally, what was the feedback you were
20 receiving during these reviews bonus time?
21 A. Yes. Sales force, I always got
22 along with sales force. They always said I
23 was open to covering new sectors; that I
24 was good for the P&L; that I -- that --

85

Ngo - Direct

1  that my research was very good and very
2  timely.  I always got feedback from -- Jane
3  would say to me, you did a great job with
4  the sector, and sometimes I would get added
5  more sectors as a result.
6      And then for Todd Morgan my
7  reviews similarly were always very strong
8  verbally.  He always tried to get me more
9  money, so I never felt -- I never felt
10 concerned about my reviews.  I felt that I
11 had a good rapport with the sales desk and
12 my colleagues.
13     Q.   Were you promoted at Oppenheimer?
14     A.   Yes.
15     Q.   And how many times?
16     A.   Twice.
17     Q.   What was your first promotion?
18     A.   My first promotion, I believe,
19 was in 2010 from director to a senior
20 director.
21     MR. IADEVAIA:  Can we take a
22 really short break?  We were going to
23 take a mid-morning break anyway.  Is
24 now a good time to do it?

86

Ngo - Direct

1      ARBITRATOR DOLINGER:  That's
2  fine.
3      (Recess taken.)
4  EXAMINATION CONTINUED
5  BY MR. IADEVAIA:
6      Q.   Did your responsibilities change
7  when you were promoted to senior director?
8      A.   No.
9      Q.   Did you remain a senior analyst
10 when you were promoted to senior director?
11     A.   That's correct.
12     Q.   Do you know who made the decision
13 to promote you to senior director?
14     A.   I -- I assume that it was Todd
15 Morgan or Rob Lowenthal or -- I don't know.
16 I just know I was promoted.
17     Q.   What was your next promotion?
18     A.   I was promoted to managing
19 director.
20     Q.   And when you were promoted to
21 managing director?
22     A.   I believe it was in 2013.
23     Q.   Did your responsibilities change
24 when you were promoted to managing

87

Ngo - Direct

1  director?
2      A.   Yes, they did.
3      Q.   And how did they change?
4      A.   Variety of things.  I was -- from
5  that managing director promotion, I was
6  promoted to co-head of research.
7      Q.   And how did your responsibilities
8  change as co-head of research?
9      A.   A variety of things changed.
10 One, I was now in charge of the morning
11 blast, which -- and the morning blast was
12 the introductory research for clients that
13 came out every morning.  I had to SA the
14 morning blast.  I had to review analysts'
15 work more aggressively.  So I would be the
16 supervisory analyst every morning for all
17 of the reports, not just in the morning,
18 but even reports that came out in the
19 afternoon.
20     There was a lot of compliance
21 issues that we had to deal with.  So I had
22 to work with various senior people at
23 Oppenheimer like Cary Holcomb or Steven
24 Krasner, who was the attorney for fixed

88

Ngo - Direct

1  income.
2      There was also more engagement
3  with sales and assignment of sectors and
4  managerial tasks pertaining to being group
5  head.
6      Also, let's see, supervisory.
7  And then also I was in charge of running
8  the group, being a mentor to our analysts.
9  I was also in charge of hiring as well.
10     Q.   You said that you were appointed
11 co-head; is that right?
12     A.   That's correct.
13     Q.   Who was a your co-head?
14     A.   Colleen Burns.
15     Q.   And who is Ms. Burns?
16     A.   She is another analyst in the
17 group.
18     Q.   And when did Ms. Burns start at
19 Oppenheimer; do you know?
20     A.   I don't know her exact dates, but
21 I know that she started prior to my
22 August 2009.  So when she was -- she was
23 already there.  I believe she was there --
24 she was there before the merge with CIBC,

89

Ngo - Direct

1  so she would have started with CIBC and
2  then Oppenheimer bought the CIBC investment
3  banking business.  She was already -- she
4  had been there since the beginning of
5  Oppenheimer.
6     Q.    And when was that, approximately?
7     A.    Don't quote me, but I believe
8  that Oppenheimer bought the business in
9  2007, but I am not certain.
10    Q.    And when -- who -- Mr. Morgan had
11 previously been co-head; is that right?
12    A.    That's correct.
13    Q.    And what happened to Mr. Morgan
14 at the time you were promoted?
15    A.    He was bid away and left.
16    Q.    So he left Oppenheimer?
17    A.    That's correct.
18    Q.    Before you were appointed
19 co-head, was there a co-head structure to
20 lead the group of high yield research?
21    A.    Not that I know of.
22    Q.    You mentioned that you -- you had
23 compliance responsibilities as co-head of
24 high yield research.  What were those

90

Ngo - Direct

1  compliance responsibilities?
2     A.    You know, it was a lot of
3  compliance stuff.  It could be -- start
4  with just reviewing the research.  So
5  certify the SA and know, was really a part
6  of it was compliance, a part of it was
7  content.  The part of the compliance was to
8  make sure that analysts don't say any
9  inflammatory comments like, we guarantee
10 that you will get some type of return.
11 That's something we cannot say.
12        There is a lot of compliance
13 could also mean, you know, that that's one
14 aspect of it.  Compliance can mean also
15 making sure that -- I think that's the way
16 to explain it.
17    Q.    When you became co-head, who
18 reported to you?
19    A.    Sean Sneeden.
20    Q.    Did anyone other than Mr. Sneeden
21 report to you?
22    A.    At that time, no.
23        ARBITRATOR DOLINGER:  Can you
24 spell that?

91

Ngo - Direct

1     THE WITNESS:  Sean, S-E-A-N, and
2  last name, S-N-E-E-D-E-N.
3     Q.    And what was Mr. Sneeden's
4  position at the time?
5     A.    I want to say that he was a
6  director or senior director.  I am not sure
7  at the time.
8     Q.    Okay.  And --
9     A.    I want to say he -- I think he
10 was a director and then he was promoted to
11 senior director.  Eventually out of my
12 tenure he was promoted again.
13    Q.    And he was a research analyst?
14    A.    That's correct.
15    Q.    Did that -- did it change?  Did
16 you at some point have other people report
17 to you?
18    A.    Yes.
19    Q.    Okay.  And who were those other
20 people?
21    A.    So eventually, we were able to
22 add -- we hired Umesh Bhandary, and I
23 believe that was in early 2014.  We also
24 hired John Daniels.  And I believe that was

92

Ngo - Direct

1  in -- I think in May of 2014.  We also
2  hired Lucila Broide.  I think you are going
3  to ask, L-U-C-I-L-L-A, and then Broide is
4  B-R-O-I-D-E, and I think that eventually we
5  also added -- at one point Rob promoted
6  Colleen, and I to head all of the taxable
7  fixed income.  So then what collapsed into
8  that is Omar Zeolla, the emerging market,
9  also reported to us.
10    Q.    When you said Mr. Lowenthal
11 promoted you to head all of taxable fixed
12 income, what do you mean by that?
13    A.    I think he was very impressed
14 with the work so far because when we became
15 co-heads, we made some changes, and he told
16 us that Lucila would report to us, and we
17 would be head of taxable fixed income
18 research.
19    Q.    Specifically research within
20 taxable fixed income, correct?
21    A.    Exactly.  So he expanded our
22 management capability, the management.
23    Q.    Mr. Bhandary, what was his title
24 when he was hired?

93

Ngo - Direct

2    A.    I believe he was a senior
3  director or director.
4    Q.    And what was his position?
5    A.    He was a senior analyst.
6    Q.    And in research and high yield?
7    A.    In high yield research, correct.
8    Q.    And Mr. Daniels, what was his
9  title and position?
10    A.    I believe he was an associate --
11  associate.
12    Q.    And did he work in high yield
13  research?
14    A.    Yes.  In high yield research.
15    Q.    And Ms. Broide, what was her
16  title and position?
17    A.    I want to say she was a director,
18  and she was a director in sovereign
19  research.
20    Q.    And when she worked in sovereign
21  research, she reported to you?
22    A.    That's correct.
23    ARBITRATOR DOLINGER:  Sovereign
24  research referring to governments?
25    THE WITNESS:  That's correct.

94

Ngo - Direct

2  Sovereign entities, so she covered
3  countries and their sovereign debt, so
4  basically bonds or loans issued out of
5  that sovereign entity.
6    Q.    For the morning blast, when you
7  were promoted to co-head, whose name was it
8  sent under at the time of the promotion?
9    A.    Jane decided after talking --
10  normally the morning blast is sent by the
11  group head.  So previously it was sent by
12  Todd Morgan; and so in situation we had
13  two co-heads.  So Jane Ross sat with
14  Colleen and I and decided she wanted my
15  name to be -- the morning blast to be sent
16  under my name.
17    Q.    Did she tell you why?
18    A.    She didn't get into details why
19  she decided that that's what she wanted.  I
20  didn't want to make a big deal out of it
21  and make Colleen feel of less of a co-head,
22  so I never asked.
23    Q.    And in terms of the compliance
24  responsibilities that you had as co-head of
25  high yield research, did both you and

95

Ngo - Direct

1  Ms. Burns have the same responsibilities?
2    A.    You know, on paper that we did,
3  but it was -- the structure for the time
4  that we did co-head it was clear that the
5  bulk of the co- heading responsibilities
6  were shifted to me.
7    We were a team, but it just --
8  for example, the morning blast is a good
9  example.  Jane wanted the morning blast to
10  come from me, not Colleen, because she felt
11  that -- I think the implied was that she
12  felt that I had more a reputation or
13  something that she wanted that to be on the
14  marketing that I was the head of the
15  morning blast; and with that morning blast
16  responsibility coming from my name, it
17  created more work in the sense that if a
18  client responded to that email saying, what
19  does this mean?  Can we talk to this
20  analyst?  It would go directly to my email,
21  and I would be responsible for assigning
22  that or addressing that question.
23    Q.    When you were promoted to
24  co-head, did you maintain any of your

96

Ngo - Direct

2  previous responsibilities as a research
3  analyst in high yield?
4    A.    Yes, I did.
5    ARBITRATOR DOLINGER:  By the way,
6  in the morning blast, if there were
7  different discrete items, would they be
8  identified as originating with a
9  particular analyst or because your name
10  was on the morning blast, it would all
11  be potentially yours?
12    THE WITNESS:  Sure.  It's a good
13  question.  I actually changed the
14  format, so the blast format was -- it
15  used to be that it was the morning
16  blast would be a compilation by
17  analyst.  So it would say that this
18  analyst wrote this report or has these
19  five -- like it was basically a
20  two-pager kind of, right?
21    And then the second -- so what I
22  did when I became group head, since we
23  didn't have as many analysts, I tried
24  to make it sound that -- rather than
25  make it -- I made it more sector

Ngo - Direct

1  specific saying that, for example, more
2  effective saying -- so I covered three
3  sectors right so I would say, oh, paper
4  and packaging, here is some research
5  from here, and chemical here is some.
6  Sean was oil and gas. Here is some
7  research from Sean, and it would have a
8  link to that analyst's research. Does
9  that visually explain it?
10          ARBITRATOR DOLINGER: Yes.
11          And normally if a client wanted
12  to talk further about a given item,
13  would that client go through you or go
14  to the analyst who is identified as the
15  source of the item?
16          THE WITNESS: Sure. It could be
17  both. It could be whatever they are
18  comfortable with. If it's a portfolio
19  manager, he would just rather deal with
20  the group head and say, hey, what does
21  this mean? Can you arrange this for me
22  or what does your analyst mean on this?
23  But generally they should go to the
24  analyst because that person has the

Ngo - Direct

1  expertise. Even though I was the group
2  head, I didn't know oil and gas as well
3  as say Sean Sneeden did.
4          So I would say, go talk to Sean,
5  and this is what he meant, and then
6  some of the stuff was also market
7  driven. So some of the morning blasts
8  had individual research, but one of the
9  things that I changed is I kind of had
10  a market commentary for the first
11  paragraph. So I made it sound more --
12  more broad. So it created a new
13  section called, you know, "yesterday's
14  market." So we would give -- as a
15  group head, I would give a summary of
16  what happened in the market the day
17  before and say that, you know, the
18  market traded off because of XYZ, and
19  these are the bonds, and then I added a
20  sales component to it where the
21  salespeople would say, these are the
22  bonds that we are focused on trading,
23  and then -- and then we would -- then
24  we would have research below.

Ngo - Direct

1      Q.   Other than the morning blast,
2  what other types of research were you
3  producing?
4      A.   I was producing my own sector
5  coverage.
6      Q.   In your capacity as co-head of
7  high yield research, other than the morning
8  blasts, were you providing SA approvals,
9  supervisory approval for other types of
10  research?
11      A.   Yes.
12      Q.   And what was that other -- what
13  were those other types of research?
14      A.   Well, at the time I was the only
15  one with the SA approval. Colleen had not
16  received a certification yet. So I
17  approved every research that came out.
18      Q.   And what are other types of
19  research? So you have the morning blast.
20  What are other types of research?
21      A.   So sometimes an analyst will
22  write a separate report on this company
23  saying that we -- even research, actually,
24  put it in the morning blast the next day,

Ngo - Direct

1  but sometimes a morning report comes out at
2  7:30 in the morning, so sometimes an
3  analyst would get a report out say at 9:00
4  or at 4:00 at night. So each of those
5  individual reports would need SA approval.
6          Or throughout the trading day, if
7  an analyst wanted to write a Bloomberg to
8  like, you know, facilitate trades for
9  bonds, so rather than wait the next day, he
10  would write it, you know, maybe five bullet
11  points on a credit, but I was -- I -- there
12  was a gray area that it needed SA approval,
13  but I also wanted everything SA approval
14  just to be extra compliant.
15      Q.   And you mentioned that -- who is
16  Cary Holcomb?
17      A.   He is one of the senior people at
18  Oppenheimer. I believe he is -- some
19  people would say that, yes, he is a senior
20  managing director, I believe.
21      Q.   And do you know which department
22  he worked in?
23      A.   He worked in taxable fixed
24  income.

101

Ngo - Direct

1   Q.   And did you work with him on
2   compliance issues?
3   A.   Yes.
4   Q.   How were you paid at Oppenheimer?
5   A.   It was a variety of factors.  Oh,
6   sorry.  I was paid a base and bonus.
7   Q.   And what was your base salary
8   when you started working there?
9   A.   I believe my base was $100,000.
10  Q.   Did you receive raises in your
11  base compensation during your time at
12  Oppenheimer?
13  A.   Yes, I did.
14  Q.   And how many times?
15  A.   Twice.
16  Q.   Two raises in your base
17  compensation?
18  A.   That's correct.
19  Q.   What was the -- what was the
20  first raise?
21  A.   The first raise, I believe, was
22  in -- from 100 to 150,000.
23  Q.   Okay.
24  A.   For base.
25

102

Ngo - Direct

1   Q.   Okay.  And approximately when did
2   that raise take place?
3   A.   I believe it was in 2012.
4   Q.   Okay.  And there was a second
5   raise; is that what your testimony is?
6   A.   No.  No.  There was only one
7   raise base-wise from 100 to 150, but it was
8   done in installments.  It wasn't done in
9   one lump sum.  I can explain that.
10  Q.   So when you testified before that
11  there were multiple raises, what you meant
12  was that the raises were done over time?
13  A.   Yes.  For that base raise,
14  correct.
15  Q.   Okay.  And so the total raise is
16  what?  What was the raise?
17  A.   So to simplify, it went from 100
18  to 150,000.
19  Q.   Who approved the raise?
20  A.   Rob Lowenthal.
21  Q.   And when were you -- you were
22  told that -- when were you told that you
23  would receive the raise?
24  A.   I believe I was told in -- I want
25

103

Ngo - Direct

1   to say March of 2012.  It was after my bid
2   away.  I was told by Rob that he would
3   give -- he would raise us, but then he
4   couldn't -- he couldn't do it -- do the
5   raise because there was a freeze of some
6   sort.  So what he did is, he gave it in
7   installments rather than making it
8   permanent, but actually maybe the reference
9   to the two raises would be at one point it
10  became permanent.  Like there wasn't any
11  more installments.  It just became a
12  permanent 150,000.
13  Q.   Okay.  When did the raise become
14  permanent?
15  A.   I want to say it was in 2013.
16  Q.   And so between when he told you
17  about the raise in 2012 and when the raise
18  became permanent in 2013, you said there
19  were installments?
20  A.   Yes.
21  Q.   What do you mean by that?
22  A.   Well, Rob had said that he
23  couldn't do the raise because there was
24  some type of technical issue, whether it be
25

104

Ngo - Direct

1   a hiring -- I didn't know the
2   technicalities.  All I know he couldn't
3   give us the $100,000 -- I mean the $50,000
4   outright.  Maybe it was -- he was a part of
5   the compensation committee, so I don't know
6   what the logistics were.  So he said would
7   it be okay if we gave it to you in
8   installments, and that was fine.
9   Q.   Okay.  And did you, in fact,
10  receive those installments?
11  A.   Yes.
12  Q.   Okay.  And what's your
13  recollection of what those installments
14  were?
15  A.   I don't know the exact dollar
16  amount, but I know it was in more than two
17  pieces.
18  Q.   Okay.  Well, I am going to ask
19  you to take a look at Exhibit --
20  Exhibit 11D, please.
21  A.   11.  I am sorry.  11?  I am
22  sorry, 11D?  Okay.
23  Q.   Okay.  And if you can take a look
24  at the second page of this exhibit, that's
25

105

Ngo - Direct

1  Bates stamped OPCO 126?  What is OPCO 126?
2  A.    It's an earnings statement from
3  A.    It's an earnings statement from
4  the period date ending, I believe,
5  4/15/2012.
6  Q.    Okay.  And it's an earnings
7  statement for you, right?
8  A.    That's correct.
9  Q.    Okay.  And if you look on the
10  left-hand side, do you see it says Bonus?
11  A.    Yes.
12  Q.    Okay.  And the amount is what?
13  A.    41 -- $4,167.
14  Q.    Is this one of the payments that
15  you received from Mr. Lowenthal after he
16  agreed to give you a raise, but before it
17  went into effect?
18  A.    That's correct.
19  Q.    Okay.  And if you turn to the
20  next page, 134?  It's Bates numbered 134.
21  A.    I see it.
22  Q.    Okay.  And what is this?
23  A.    This is another bonus.  My
24  interpretation is it's another bonus of
25  about 12,500.

106

Ngo - Direct

1
2  Q.    What do you mean it's your
3  interpretation?  What do you mean by that?
4  A.    Well, I think it's related to the
5  $50,000 bonus stuff that we were
6  referencing.
7  ARBITRATOR DOLINGER:  I thought
8  the $50,000 was related to your base
9  pay, not bonus.
10  THE WITNESS:  Yes.  But it's now
11  saying bonus, right?  So I am thinking
12  that what he did is he gave that base
13  pay, I believe he gave it in increments
14  in the form of a bonus, but it's really
15  not, and then at one point in 2013, he
16  made it permanent.
17  Q.    Okay.  So this is one of the
18  payments that you received in lieu of a
19  raise before the raise became permanent?
20  A.    That's correct.
21  Q.    Okay.  If you turn the page to
22  1 -- Bates number 140?  It's the next page
23  in the exhibit?
24  A.    Yes.
25  Q.    Okay.  And what is this document?

107

Ngo - Direct

1
2  A.    It's a pay stub ending 10/15/2012
3  for an amount of 12,500.
4  Q.    And is this -- is it your
5  understanding that this is another bonus
6  that you received in lieu of the raise that
7  went -- became permanent in 2013?
8  A.    That's correct.
9  Q.    I am going to ask you to take a
10  look at Exhibit 11E, please?  And if you
11  turn to the second page of that exhibit
12  with the document bearing Bates number 155
13  OPCO?  Let me know when you are there.
14  A.    I am there.
15  Q.    What is this document?
16  A.    Earnings statement ending
17  4/15/2013.
18  Q.    And what does it reflect?  There
19  is a payment here of 12,500.  What does it
20  reflect?
21  A.    I believe it's a bonus payment of
22  12,500.
23  Q.    And is this the bonus payment
24  that you understand was in lieu of the
25  raise that Mr. Lowenthal had approved in

108

Ngo - Direct

1
2  2012?
3  A.    I believe so.
4  Q.    Okay.  And the next page, OPCO
5  163, what is this?
6  A.    It's an earnings statement ending
7  7/31/2013.
8  Q.    Okay.  And what is -- who is it
9  an earnings statement for?
10  A.    It's an earnings statement for me
11  in the amount of 12,500.
12  Q.    And what's your understanding of
13  the purpose of this payment?
14  A.    That -- again, I think that's a
15  base equalizer.
16  Q.    Okay.  So it's a bonus payment in
17  lieu of a raise?
18  A.    Yes.
19  Q.    Okay.  And if you take a look at
20  160 -- OPCO 169, which is the next page in
21  the exhibit?  And what is this?
22  A.    It's an earnings statement ending
23  10/15/2013.
24  Q.    And for who is the earnings
25  statement?

Ngo - Direct

1
2    A.    It's for me.
3    Q.    Okay.  And the earnings statement
4  reflects that you received a payment of
5  12,500; do you see that?
6    A.    That is correct.
7    Q.    And for what -- what's the
8  purpose or basis of that payment?
9    A.    I believe, again, it's a bonus
10  equalizer.
11    Q.    So a bonus in lieu of a raise?
12    A.    Yes.
13    Q.    And if you could take a look at
14  Exhibit 2?  And I am going to ask you to
15  take a look at the page with the Bates
16  Number 6 -- hold on a second -- with the
17  Bates Number 6.  It's OPCO 6.
18    A.    Okay.
19    Q.    Okay.  And what is this document?
20    A.    It's a personnel change by
21  Oppenheimer.
22    Q.    Okay.  And have you seen this
23  document before today?
24    A.    I have.
25    Q.    And if you look in -- and what is

Ngo - Direct

1
2  this document saying about personnel
3  change?
4    A.    I believe this is basically
5  formalizing saying my salary is being
6  changed to a base of 150,000 per year.
7    Q.    And what's the effective date?
8  If you look at the bottom, what does it
9  say?
10    A.    10/1/2013.
11    Q.    So is your understanding that
12  your bonus went into effect -- I am
13  sorry -- that your raise went into effect
14  in October of 2013?
15    A.    That's correct.
16    Q.    What were the circumstances of
17  your getting a raise?
18    A.    That derived from my -- in 2012,
19  I was bid away by a competitor firm.
20    Q.    And who was the competitor firm?
21    A.    CIBC, which is a Canadian bank.
22    Q.    When you say "bid away," what do
23  you mean?
24    A.    Well, they had solicited me to
25  come in for a job.  They were trying to

Ngo - Direct

1
2  rebuild their desk.  So they -- I
3  interviewed with them and met with various
4  people, and they gave me a formal offer for
5  another job.
6    Q.    And do you recall what the terms
7  of that offer were?
8    A.    Yes.  It was for a senior analyst
9  role, a senior analyst role.
10    Q.    And what were the compensation
11  terms of the offer?
12    A.    They were willing to give me a
13  guarantee of about $420,000.
14    Q.    And was there a -- so that was
15  total compensation?
16    A.    Total compensation, but it was
17  guaranteed base and bonus for the year.
18    Q.    And was there a certain salary
19  that was guaranteed?
20    A.    They were guarantying me a base
21  of 150, and then a bonus of 420 minus 150.
22    Q.    Did you discuss the competing
23  offer with anyone at Oppenheimer?
24    A.    Yes.
25    Q.    And with whom?

Ngo - Direct

1
2    A.    I spoke to Todd Morgan, Jane
3  Ross, and also Rob Lowenthal.
4    Q.    What did you discuss with
5  Mr. Morgan?
6    A.    I first told Todd Morgan that my
7  assumption is that I was leaving.  I first
8  told Todd Morgan that I was leaving and
9  going to take a competing offer.
10    Q.    What did Mr. Morgan say?
11    A.    You know, he was upset about it,
12  and he said, how much are they offering
13  you?
14          And I said, they are offering me
15  a total compensation guarantee of about
16  420, and I -- keep in mind at the time I
17  think I made all in about 270.  So it was a
18  big jump.  So he was -- he didn't think
19  that they could match the number.
20    ARBITRATOR DOLINGER:
21    Technically, was this a one-year
22    guarantee or a longer-term guarantee?
23    THE WITNESS:  Yes.  So usually
24    what a lot of firms will do is that for
25    the first year they will give you a

113

Ngo - Direct

1    guaranteed bonus to recruit you to
2    come.
3
4         Oppenheimer has done that in the
5    past.  I know that we have done that,
6    and then afterwards your bonuses are
7    discretionary.
8         Q.    So the CIBC offer was a salary of
9    150 and a guaranteed bonus for one year of
10   the difference between 420 and 150?
11        A.    That's correct.
12        Q.    Did you discuss with Mr. Morgan
13   whether or not Oppenheimer would match the
14   offer in order to retain you?
15        A.    Yes, we did.
16        Q.    And what was that discussion?
17        A.    Well, he didn't think they would
18   match it.  So at the end of the day -- I
19   don't know this for certain -- but I think
20   the -- the number, at least base-wise, I
21   know was more than his salary.
22        Q.    Did Mr. Morgan say anything about
23   the practice of Oppenheimer in matching
24   bids?
25        A.    Yeah.  He told me that they were

114

Ngo - Direct

1    not going to match because sometimes what
2    happens is that when someone bids bid
3    away, the firm comes back and matches, and
4    he said that in his history with the firm,
5    they don't match.  So we assumed that I
6    would be departing from the firm.
7         Q.    Are you aware of other instances
8    in which Oppenheimer matched an offer in
9    order to retain an employee?
10        A.    Not during my tenure.
11        Q.    What did you discuss with
12   Ms. Ross about the offer you received from
13   CIBC?
14        A.    Well, after I spoke to Todd, I
15   guess he spoke to Jane, and he spoke to
16   Rob.
17        Jane Ross, I remember her calling
18   me into the office to discuss the offer and
19   saying that she did not want me to leave
20   and that she was going to do everything
21   that she could to make sure that I
22   stayed.
23        I had told her that Todd didn't
24   think that we would be able to match the

115

Ngo - Direct

1    competing offer, but she said, "I will
2    handle it."
3         Q.    What happened next?
4         A.    Well, I don't know exactly what
5    happened.
6         My next conversation was with Rob
7    Lowenthal about the number, and he said
8    that this was way too much money because
9    they had never paid a senior analyst that
10   much money, and I don't know what Todd
11   Morgan's salary was, but I just know the
12   base was lower than the 150; and he said
13   that -- but you are worth it.  I can't give
14   you -- he think I was offered -- actually,
15   I want to say I was offered 425, and Rob
16   said that I will offer you a guarantee of
17   420.  He could get to the 420, but he said
18   to me that he didn't think that he could
19   get it through to -- through the
20   compensation committee.
21        So he said if you believe me, we
22   can do a handshake, and I guarantee that
23   your bonus will get -- your total
24   compensation will get to that level at the

116

Ngo - Direct

1    end of the year.
2         And then we also discussed the
3    base adjustment, and that's how the base
4    adjustment came about.
5         Q.    The base adjustment being your
6    raise from 100,000 to 150?
7         A.    That's correct.  That was the
8    catalyst for the base increase.
9         Q.    And you said there was a
10   handshake deal.  Could you explain that
11   handshake deal?
12        A.    Yeah.  I knew that it was a
13   struggle for Rob to get me to that salary.
14   It's a big jump.  So -- and I knew that he
15   was -- I felt that he was being honest that
16   he was saying -- I had interacted with him
17   here and there through the years, and I
18   took a risk to some degree by saying that
19   I -- I took a handshake rather than a
20   contractual agreement that I had with CIBC
21   that he would get me to that level.
22        ARBITRATOR DOLINGER:  Was it your
23        understanding that in matching or in
24        the match with CIBC that what was being

117

Ngo - Direct

2  offered to you by Oppenheimer was a
3  one-year guarantee also?
4       THE WITNESS:  Yes.
5       Q.    And just to be clear on the terms
6  of the handshake deal, what were they?
7       A.    I think it was a good-faith
8  gesture on my part, too, to say that I
9  believe you, and I believe in the firm.
10  And it was also a good- faith effort for me
11  to say, I am willing to stay, and I
12  appreciated it.  I appreciated the raise.
13  I appreciated the confidence that Jane
14  gave, and I know that Jane was the key
15  driver to getting that raise, and I thanked
16  her for it.
17       Q.    And the raise that you received
18  was not a one-time promise, right?
19       A.    The base raise was permanent.
20       Q.    Okay.  And the -- and the bonus
21  component of the deal, when was that going
22  to be paid pursuant to your handshake deal?
23       A.    So bonuses are paid in early
24  February or January.  I received the CIBC
25  offer -- I believe it was in March or I

118

Ngo - Direct

2  told them about it in March.  And then the
3  bonus component would be paid in the
4  following bonus cycle, which would be
5  February of 2000 -- that year it would have
6  been 2013.
7       Q.    And did Mr. Lowenthal live up to
8  the handshake deal and pay the bonus?
9       A.    Yes, he did.
10       Q.    During your tenure, were there
11  other research analysts who left
12  Oppenheimer voluntarily to join another
13  bank?
14       A.    Yes.
15       Q.    And who were they?
16       A.    Todd Morgan, Chris Doherty.
17  Let's see, Chris Doherty.  Grant -- I can't
18  remember Grant's last name.  During my
19  whole tenure in research?
20       Q.    Yes.
21       A.    In research?  I only
22  know research.  I don't know the other.
23       Q.    I am asking about research.
24       A.    Research.  So there was Grant,
25  Todd Morgan left.  Chris Doherty left.

119

Ngo - Direct

2  Lucila Broide left.  Umesh Bhandary left.
3  And did I say Chris Doherty?
4       Q.    You did.
5       A.    I did say Chris Doherty, and then
6  I think -- I think that's it.
7       Q.    So did Oppenheimer -- to your
8  knowledge, did Oppenheimer offered to match
9  any of the offers made by the other banks
10  in order to retain those analysts?
11       A.    No.
12       ARBITRATOR DOLINGER:  Would you
13  have reason in your role at the time to
14  learn whether such an offer would have
15  was made or not?
16       THE WITNESS:  Yes.  In the case
17  of Grant, I mean, we were a small
18  group, so I knew that Grant was not bid
19  back.  He told me that.  I also knew
20  that Chris Doherty was not bid back.
21  He told me that.  And Todd Morgan, in
22  fact, there was talks about him being
23  bid back, but my understanding is Jane
24  said no.
25       Q.    What about Mr. Bhandary?

120

Ngo - Direct

2       A.    Mr. Bhandary told me that
3  basically Rob said, you can go.
4       Q.    And Lucila Broide?
5       A.    I don't think she was bid away.
6  I think she just quit.
7       Q.    How often did you receive bonuses
8  during your employment at Oppenheimer?
9       A.    Annually.
10       Q.    Other than those, what you
11  referred to as the sub-bonuses in lieu of
12  raises?
13       A.    That's correct.
14       Q.    And when were the annual bonuses
15  paid?
16       A.    They were usually paid in --
17  depending on the calendar date, but it was
18  usually in late January, early February.
19       Q.    And for which period of time were
20  the bonuses that were paid in February
21  intended to cover?
22       A.    They were to cover the prior
23  year.
24       Q.    So could you give us an example
25  using years?

121

Ngo - Direct

A. Sure. So, for example, in 2012, you would have a base salary of X amount from 2012, and then you would supplement that base salary by a bonus that was given in February.

Q. Of which year?

A. 2013.

Q. Were bonuses guaranteed at Oppenheimer while you worked there?

A. No. But, obviously, there are rare circumstances, but generally no.

Q. Okay. Other than the one year where you had the handshake deal with Mr. Lowenthal, were there any other times that your bonus was guaranteed at Oppenheimer?

A. No.

Q. Was it your understanding that the bonuses were discretionary?

A. That's correct.

Q. And what's the basis of that understanding?

A. Because they could fluctuate throughout the year, and sometimes people

122

Ngo - Direct

didn't get bonuses, right? So it's -- it was discretionary.

Q. Okay. Did anyone ever tell you that the bonuses were discretionary?

A. I think probably. I am assuming, yes.

Q. Do you know how your bonuses were determined?

A. I have -- I don't know the exact science, but I know that there were various factors at play.

Q. And how do you know that there were various factors at play?

A. Todd Morgan would tell me over the years, and then also in becoming a group head, I understood what the variables -- I had a further understanding of what the variables would be.

Q. And what was your understanding of the factors that went into setting your bonus?

A. It -- there was nothing -- it was very arbitrary -- not arbitrary, but it depended on a variety of factors. It could

123

Ngo - Direct

depend on the trading volume for the high yield sales desk that day. We could start there. That was probably a big driver of it, if our sales desk had very good P&L that year.

And specific to the analysts it would be driven by, you know, some performance issues, like if -- like if the sales force said that you were a valuable analyst. If you look at the review that we went through in 2010, those are some of the variables that demonstrates how many variables go in the determination, and it could be a function of how many reports you -- no. It's just a function of a variety of things; of -- I think it's just more related to -- it could be various things.

Q. At any time during your employment, were you given targets at the beginning of the year?

A. No.

Q. Were you given goals at the beginning of the year?

A. No.

124

Ngo - Direct

Q. Were you told that your bonuses were dependent on meeting targets?

A. No.

Q. Were you told that bonuses were tied to the number of research reports you completed?

A. No.

Q. Were you told that the bonuses were tied to the volume of research that you produced?

A. No.

Q. Were you ever given any statistical analysis of the number of reports that you produced in a given year?

A. No.

Q. For the period of 2009 to -- for the period of bonuses for 2009 to 2013, who told you about the bonuses each year?

A. With the exception of my outlier year, I would say that it was Todd Morgan.

Q. And when you received the bonus, did you get any explanation as to the basis for the bonus?

A. Yeah. Todd Morgan always just

125

Ngo - Direct

1 said, you did a good job. The sales force
2 likes you. Keep doing a good job.
3 Q. When did you receive your first
4 bonus at Oppenheimer?
5 A. If I started August of 2009, I
6 would -- I received it in -- I received the
7 first bonus in February of 2013. I am
8 sorry. 2010. Sorry.
9 Q. Why don't we take a look the
10 Exhibit 11B.
11 A. D?
12 MR. GIBSON: "B" as in boy.
13 Q. What is 11B?
14 ARBITRATOR DOLINGER: These are
15 W-2 statements?
16 Q. No. 11B.
17 A. B. Sorry.
18 Q. It's okay.
19 A. These are earnings statements.
20 Q. And earnings statements for whom?
21 A. For me.
22 Q. Okay. And what does this earning
23 statement reflect?
24 A. It reflects that I received a

126

Ngo - Direct

1 bonus of 20,000 on 1/29/2010.
2 Q. Okay. And what was this a bonus
3 for?
4 A. I believe since that was done,
5 like I said, late January, early February,
6 this is my bonus pertaining to my 2009
7 performance.
8 Q. Okay. And for how long did you
9 work in 2009?
10 A. So this was a sub -- since I
11 started in August of 2009, so it reflected
12 a bonus from August of 2009 all the way
13 probably to 12/31/of 2009.
14 Q. Did you receive a bonus for your
15 work in 2010?
16 A. Yes, I did.
17 Q. And approximately when did you
18 receive that bonus?
19 A. So for my work in 2010, I would
20 presumably received a bonus in February of
21 2011.
22 Q. Okay. If you take a look at
23 Exhibit 11C? And 11C, is this the pay stub
24 for your bonus in -- for 2010?

127

Ngo - Direct

1 A. That's correct.
2 Q. Okay. And as you said, it was
3 paid in and around February of 2011?
4 A. So here this one was 2/1/2011,
5 yes.
6 Q. Okay. And the amount of the
7 bonus is 170,000?
8 A. That is correct.
9 Q. And who gave you this bonus? Who
10 presented you with the bonus information?
11 A. Todd Morgan.
12 Q. Okay. If you take a look at 11D,
13 please, the next exhibit? Are you there?
14 A. Yes.
15 Q. Did you receive a bonus for your
16 work in 2011?
17 A. I did.
18 Q. And when did you receive that
19 bonus?
20 A. I received it in the following
21 year, 1/30 -- the beginning of the year,
22 1/31/2012.
23 Q. Okay. And is 11D the earnings
24 statement for that bonus?

128

Ngo - Direct

1 A. That's correct.
2 Q. For your 2011 bonus?
3 A. That's correct.
4 Q. And the amount is how much?
5 A. 150,000.
6 Q. Okay. And who gave you this
7 bonus? Who presented you with the bonus
8 information?
9 A. Todd Morgan.
10 Q. Did you receive a bonus for your
11 work in 2012?
12 A. Yes, I did.
13 Q. Okay. And approximately when did
14 you receive that bonus?
15 A. In either late January or early
16 February of 2013.
17 Q. And if you take a look at 11E,
18 please? Is this an earnings statement that
19 reflects payment of your 2012 bonus?
20 A. Yes, it does.
21 Q. Okay. And what's the amount of
22 this bonus?
23 A. It's $270,833.
24 Q. Okay. And did you -- and who

129

Ngo - Direct

1  presented you with this bonus information,
2  the bonus numbers?
3      A.    Todd Morgan.
4      Q.    And if you take -- did you
5  receive a bonus for your work in 2013?
6      A.    Yes, I did.
7      Q.    And approximately when did you
8  receive that bonus payment?
9      A.    In February of 2014.
10      Q.    And who presented you with that
11  bonus information for 2013?
12      A.    That was when I -- that was after
13  Todd Morgan left, so I became the co-head.
14  So it was presented to me by Robert
15  Lowenthal, Rob Lowenthal.
16      Q.    Okay.  And how much -- well,
17  actually, if you can look at 11F, please?
18  And is this the earnings statement
19  reflecting the bonus payment for your work
20  in 2013?
21      A.    That's correct.
22      Q.    And how much is this bonus
23  payment?
24      A.    270,000.

130

Ngo - Direct

1      Q.    So the bonus payment for 2013 and
2  the bonus payment for 2014 are roughly the
3  same?  I am sorry.  Let me retract it.
4      The bonus payment for work done
5  in 2013 is roughly the same as the bonus
6  payment for work done in 2012?
7      A.    That's correct.
8      Q.    And if you want, you can take a
9  look at 11E to confirm that.  Right?  The
10  amount is about 270?
11      A.    That's correct.  That's correct.
12      Q.    And the amount in 11F is 270,000?
13      A.    That's correct.
14      Q.    The handshake deal that you had
15  with Mr. Lowenthal, what -- for what bonus
16  was that handshake -- did that handshake
17  deal cover?
18      A.    That covered 2012.
19      Q.    Okay.  So that would be -- that
20  would be the bonus that was paid in
21  February of 2013?
22      A.    That's correct.
23      Q.    Which is reflected in
24  Exhibit 11E?

131

Ngo - Direct

1      A.    That's correct.
2      Q.    Just double-check.
3      A.    That's correct.
4      Q.    Going to 11F, which is the bonus
5  payment paid for 2013 and 2014, you said
6  Mr. Lowenthal presented you with the bonus
7  information then?
8      A.    That's correct.
9      Q.    Okay.  Did what did Mr. Lowenthal
10  say to you when he gave you this bonus
11  amount?
12      A.    No.  This reflected, obviously,
13  my contribution also, as well reflected my
14  bonus for the 2013 period, but it also
15  reflected my bonus for being co-head and
16  being recently promoted to co-head of the
17  group.
18      He told me that he was very happy
19  with the changes that I had made as new
20  co-head.  He was happy with the changes I
21  made to the morning blast in making it more
22  user-friendly.  He complemented me on
23  the -- because in this review, he for the
24  first time introduced giving me feedback

132

Ngo - Direct

1  based on being co-head of the group.
2      So one of the things he
3  complicated me on was changing the morning
4  blast and how was user-friendly, and how as
5  the firm it was great marketing for the
6  firm.
7      He also complemented me on my
8  ability to hire and attract new talent
9  because the group was only three people,
10  and over the years we had problems hiring
11  people, and I was able to find Umesh
12  Bhandary, John Daniels, and at the time I
13  don't know if he had hired Lucila yet, but
14  he was very pleased that we had filled the
15  gap from Todd Morgan leaving.
16      He told me the salespeople were
17  very happy that I was covering some of
18  Todd's sectors while he was gone and just
19  filling the gap for sales, and he also told
20  me that this was, you know -- that my
21  contributions were reflected in this --
22  this new bonus and that there was more
23  upside from here.
24      He also told me that year that he

133

Ngo - Direct

1  recognized that even though we had a
2  co-head structure, that he was -- that he
3  was very happy with my work, and he
4  recognized what I did more -- I assumed
5  more of the co-head responsibilities, and
6  he told me that he was paying me more than
7  Ms. Burns.
8      Q.   And when he said that he was
9  paying you more than Ms. Burns, what did
10 you understand that to mean?
11     A.   I believe -- Ms. Burns and I had
12 the same base.  He was saying he was paying
13 me a larger bonus this year than Ms. Burns
14 to reflect my extra contribution to the
15 co-head role.
16     Q.   And did -- and when did this
17 conversation take place, approximately?
18     A.   I believe it was days before this
19 earning statement.  We usually have the
20 conversation about bonuses within a week of
21 the actual check presented.  I don't know
22 the date, but --
23     Q.   11F, the earnings statement is
24 dated February 4th, 2014; do you see that?

134

Ngo - Direct

1      A.   Yes.
2      Q.   So the conversation, your
3  recollection is it took place around that
4  date?
5      A.   Before that date, yes.
6      Q.   Was there any handshake deal that
7  you had with Mr. Lowenthal for the calendar
8  year 2013?
9      A.   For the calendar year 2013, no.
10     Q.   Mr. Ngo, when did you have your
11 first child?
12     A.   In June of 2014.
13     Q.   And before having your first
14 child, did you tell anyone at work that you
15 were having a baby?
16     A.   Before the birth of my child?
17     Q.   Yes.
18     A.   Yes.
19     Q.   And who was the first person you
20 recall telling at Oppenheimer that you were
21 having a baby?
22     A.   I think it was Colleen Burns.
23     Q.   And when approximately did you
24 tell Ms. Burns?

135

Ngo - Direct

1      A.   I believe it was in May, early
2  May of 2014.
3      Q.   And what did you tell Ms. Burns?
4  What do you recall?
5      A.   I remember telling her because --
6  I always kept my personal life separate at
7  work, so I remember telling her for the
8  first time that I was gay because,
9  obviously, if you are having a baby, people
10 are going to ask.  So I just said -- I came
11 out to Colleen, Ms. Burns, Colleen, and
12 said that, you know, I am having a baby in
13 July, and we can work out coverage and
14 figure out how to do this, and that was the
15 conversation.
16     Q.   Okay.  Why did you approach
17 Ms. Burns?
18     A.   Well, we were colleagues.  We
19 were running a group together.  I knew that
20 I would need to figure out coverage with
21 her regardless of what Jane said.  It was
22 something to -- we were working as a team,
23 and also she was my colleague over the
24 years, and I felt it was common courtesy to

136

Ngo - Direct

1  tell her before I discussed it with others.
2      Q.   And when you say "coverage," what
3  do you mean?
4      A.   My thought was is I hadn't
5  decided yet how much time I was going to
6  take, but I figured that I would take some
7  time because my daughter would be born in
8  California via surrogacy.  So I assumed
9  that I wanted to talk to her, give her a
10 heads up that presumably her workload would
11 probably increase because of my absence.
12     Q.   Okay.  And when you say take some
13 time, what do you mean by take some time?
14     A.   Take leave; be out of the office.
15     Q.   And what do you mean by "leave"?
16     A.   Be out of the office not working.
17     Q.   Did you discuss any options with
18 Ms. Burns during this conversation in May
19 of 2014?
20     A.   We discussed timing.  I remember
21 saying that I don't know if I am going to
22 take the full three months of leave, and I
23 remember her being very sweet and
24 supportive and saying, why?  I don't have

137

Ngo - Direct

1  kids, but my girl friends do, and you need
2  to take the three months because it's a lot
3  of work for your -- especially your first
4  child, and she encouraged me to take three
5  months.
6  Q.    And during this conversation with
7  Ms. Burns, did you tell her that you wanted
8  to work remotely after the baby was born?
9  A.    We didn't go into detail. We
10  just talked about general -- the length of
11  time that I would take, and she also gave
12  me assurances that -- she said to me, look,
13  you have done most of the group head stuff.
14  I am happy to pick up slack and cover for
15  you, and we talked about me being gone for
16  three months.
17  Q.    Okay. But did you say to
18  Ms. Burns that you were -- one possibility
19  was that you would be working remotely
20  after the baby was born?
21  A.    No. We didn't discuss those
22  details.
23  Q.    After your conversation with
24  Ms. Burns, who did you speak to at

138

Ngo - Direct

1  Oppenheimer about having a baby and being
2  out of the office?
3  A.    Robert Lowenthal.
4  Q.    And why did you talk to
5  Mr. Lowenthal?
6  A.    Because I reported to
7  Mr. Lowenthal.
8  Q.    And what did you say to Mr.
9  Lowenthal?
10  A.    I -- you know, again, I came out
11  to him for the first time and said I was
12  gay; said that my partner and I were having
13  a baby via surrogacy, and I wanted to know
14  what the options were for leave because not
15  many men in the department had taken leave
16  before, and I wanted to know if there were
17  any special -- if there was, one, a
18  maternity leave policy or if there was a
19  maternity leave policy or a maternity leave
20  policy that included gay couples.
21  Q.    And when did this conversation
22  take place?
23  A.    In May of 2014.
24  Q.    And did you discuss with

139

Ngo - Direct

1  Mr. Lowenthal that you were having the baby
2  via surrogacy?
3  A.    I did.
4  Q.    And did you tell him where the
5  baby was going to be born?
6  A.    Yes.
7  Q.    And where is that? Where was
8  that?
9  A.    I told him our baby would be born
10  in California via surrogacy in Sacramento.
11  Q.    And did you tell Mr. Lowenthal
12  when the baby's due date was, the
13  approximate due date?
14  A.    Yes. At that time I had a sense
15  of the due date, and it was targeted to be
16  in July of 2014.
17  Q.    Well, was it the end of July, the
18  beginning of July? Do you remember?
19  A.    I don't remember, but I remember
20  it being after Fourth of July thinking that
21  it was after the Fourth of July.
22  Q.    And did you discuss with
23  Mr. Lowenthal during this conversation
24  taking a leave of absence?

140

Ngo - Direct

1  A.    I discussed -- at this point it
2  was exploratory. I wanted to ask him what
3  my options were. I didn't know what the
4  leave policy was. I didn't know who had
5  taken leave before and what precedent that
6  had. I was -- I was -- at that stage it
7  was exploratory.
8  Q.    And what did Mr. Lowenthal say
9  during this conversation, if anything?
10  A.    Yeah, he said that, you know,
11  we -- he said, I am sure we have options,
12  Hoai. Talk to HR, and we will work
13  something out, and he said to me to also
14  talk to Jane and Colleen to work it out.
15  Q.    And did he say what he was
16  looking for you to work out with Jane and
17  Colleen?
18  A.    He was saying work out coverage
19  while you are gone.
20  Q.    And what do you mean by -- what
21  did you understand him to mean by coverage
22  while you are gone?
23  A.    Someone to do my work while I was
24  gone and make sure that the trading was --

141

Ngo - Direct

1  to do my work while I was gone, coverage.
2  Q.   And you said that you discussed
3  options with Mr. Lowenthal; is that right?
4  A.   Not that I -- I was exploring
5  options.  So what he told me was, talk to
6  HR, and then he said also to talk to Jane
7  Ross and Colleen.
8  Q.   Options for what?
9  A.   Taking leave.
10  Q.   And when you say "leave," "taking
11  leave," what do you mean by that?
12  A.   Being out of the office and not
13  working.
14  Q.   And during the conversation that
15  you had with Mr. Lowenthal, did
16  Mr. Lowenthal use the word "leave"?
17  A.   I don't know what the exact
18  wording was, but we specifically talked
19  about leave options, which is why he
20  referred me to HR.
21  Q.   And also -- he also -- and he
22  referred you beyond just HR, right?
23  A.   Yes.  He said, talk to HR.  Talk
24  to Jane Ross, and talk to Colleen Burns.
25

142

Ngo - Direct

1  Q.   And did you discuss with
2  Mr. Lowenthal when your leave might start?
3  A.   We talked a little bit about the
4  logistics of it, but that was a followup
5  conversation; but in the first
6  conversation -- sometimes I get confused
7  which -- and I told him about birth date,
8  and that Lily was expected -- she was not
9  Lily yet -- but she was expected in July;
10  that we talked about -- a little bit about
11  flying out there and working before the
12  birth, and then a little bit -- we
13  previewed a little bit about what we -- how
14  much time I would take off, but we
15  didn't -- we hadn't determined it yet
16  because I still needed to talk to HR to see
17  what the timing was.
18  Q.   Did you speak to HR about leave?
19  A.   Yes.
20  Q.   And when, approximately?
21  A.   That same day.
22  Q.   And when was the conversation
23  with Mr. Lowenthal?
24  A.   I believe it was in May --
25

143

Ngo - Direct

1  May 2014.
2  Q.   And who in HR did you speak with?
3  A.   I believe her name was Lenore
4  Denys.
5  Q.   I am going to ask you to take a
6  look at Exhibit 48, please.
7  A.   40 --
8  Q.   48, please.
9  A.   Uh-huh.
10  Q.   And --
11  A.   Wait.  40?  Sorry.
12  Q.   48, please.
13  A.   48.  Got it now.  I thought you
14  said 40A.  48.
15  Q.   Okay.  If you take a look at the
16  bottom email, that's an email from you to
17  Ms. Denys?
18  A.   That's correct.
19  Q.   And it's dated May 12, 2014?
20  A.   That's correct.
21  Q.   Okay.  And did you send this
22  email after your conversation with
23  Mr. Lowenthal that you discussed -- you
24  described earlier?
25

144

Ngo - Direct

1  A.   Can I get a chance to read it?
2  Q.   Yes.  Please do.
3  A.   Could you repeat the question?
4  Q.   The question is whether or not
5  you sent this email before or after your
6  conversation with Mr. Lowenthal that you
7  just described?
8  A.   This makes sense.  This was at
9  11:14, and it was after my conversation
10  with Mr. Lowenthal.
11  Q.   And in the email, what are you
12  asking Ms. Denys?
13  A.   I am asking her to -- that what
14  are the firm -- the policies the firm has
15  in place?  And I am specifically asking her
16  what is the policy for paternity leave?  I
17  am also asking her when I say, I don't
18  think there is precedent for a gay couple,
19  but are there any comps or policies in
20  place?  I am asking her if there is,
21  say maybe -- I wanted to know if any gay
22  couples had taken this leave because I --
23  because if you didn't have a paternity
24  leave policy, the question was, would a gay

145

Ngo - Direct

1  couple be able -- the implications was,
2  would a gay couple be able to get some of
3  the policies from the maternity leave.
4      Q.   And when you are asking about
5  paternity leave, what do you mean by
6  "leave" there?
7      A.   Not working; not being in the
8  office.
9      Q.   And in response, and Ms. Denys
10 responds to your email, correct?
11     A.   Yes.
12     Q.   And that response is contained
13 within Exhibit 48?  It's the email above?
14     A.   That's correct.
15     Q.   Okay.  And Ms. Denys says --
16 well, why don't we just read what it says?
17         Ms. Denys writes in the email,
18 "We do not have a separate paternity leave
19 policy, but you may be entitled to 12 weeks
20 of unpaid leave under Family and Medical
21 Leave.  You can refer to page 17 in the
22 employee handbook for the details.  The
23 handbook can be found on the company
24 intranet under Employee Benefits."

146

Ngo - Direct

1      Do you see where I just read?
2      A.   Yes.
3      Q.   Okay.  Did you take a look at the
4  employee handbook after getting this email?
5      A.   Yes, I did.
6      Q.   And did you specifically look at
7  the section of the handbook that she had
8  referred you to?
9      A.   Yes, I did.
10     Q.   And what do you recall the
11 handbook saying in that section?
12     A.   I remember the handbook saying
13 that there was a -- that I could take three
14 weeks -- sorry -- three months of unpaid
15 leave under the Family Medical Leave Act.
16     Q.   And you forwarded this email to
17 Ms. Denys to Mr. Lowenthal; is that right?
18     A.   Yes.
19     Q.   Okay.  And that's the top email
20 in Exhibit 48?
21     A.   That's correct.
22     Q.   And why did you forward the email
23 to Mr. Lowenthal?
24     A.   Because, like I said when we --

147

Ngo - Direct

1  when I had spoken to Rob, he didn't -- he
2  said there is a policy in place, but he
3  didn't know what it was.  So we were both
4  kind of exploring what policies there were.
5  So as a courtesy, based on our
6  conversation, I thought I would forward it
7  to him.  So this is -- this is the research
8  I found from HR.  This is the policy, and
9  that is why I forwarded it to him.
10         ARBITRATOR DOLINGER:  At that
11     point that you make, based on your
12     review of the handbook, had you made a
13     decision as to whether this is what you
14     wanted to opt for?
15         THE WITNESS:  No.
16     Q.   Who is the next person that you
17 told at Oppenheimer that you were having a
18 baby?
19     A.   Well, I went down the list.  So
20 Rob told me to talk to Jane.
21     Q.   Before you had a conversation
22 with Ms. Ross, did you talk to anybody else
23 at Oppenheimer about having a baby?
24     A.   I talked to a couple of people,

148

Ngo - Direct

1  yes.
2      Q.   Okay.  And who are the couple of
3  people you are referring to?
4      A.   I spoke to -- I don't know if it
5  was after or before Jane to tell you the
6  truth -- but I spoke to Lynn Johnson and
7  Bridget Donnelly.
8      Q.   And who is Lynn Johnson?
9      A.   Lynn Johnson is a sales woman in
10 high yield sales.
11     Q.   And why did you tell Ms. Johnson
12 that you were having a baby and exploring
13 your options for leave?
14     A.   Well, for one, she was my friend;
15 and second, she -- we were friendly, and so
16 it's a very sensitive question to ask, but
17 she had taken maternity leave for the birth
18 of her son Henry, and I wanted to know what
19 type of leave she took and how it worked.
20     Q.   And what did she tell you?
21     A.   She said that she was able to
22 take three months of leave, and that she
23 said that the policy at Oppenheimer was
24 rather fluid; that there was no specific

149

Ngo - Direct

1  maternity leave policy to point to, and
2  that you had to negotiate it with your
3  managers.
4      Q.    And did she tell you what she
5  negotiated with her managers for leave?
6      A.    She told me that Jane had
7  approved taking three months' leave, and
8  that she approved getting 50 percent of her
9  commission during her leave.
10     Q.    So Ms. Johnson told you that
11 during her maternity -- during her parental
12 leave that she was paid some money?
13     A.    That's correct.
14     Q.    And she was paid money by
15 Oppenheimer?
16     A.    That's correct.
17     Q.    And what was the form of the
18 compensation that she received?
19     A.    Fifty percent of her commissions.
20     Q.    Okay. Did she provide any other
21 information about those commissions at that
22 time?
23     A.    Yeah. What it basically means is
24 that she had another salesperson shadow her

150

Ngo - Direct

1  accounts. So each salesperson is assigned
2  to individual accounts, and during her
3  three months of leave, the -- in this case
4  it was Al who covered her accounts. Her
5  accounts, whatever trades that he made in
6  those accounts during her three-month
7  leave, she received 50 percent of that
8  commission.
9      Q.    And I am sorry, Ms. Johnson
10 reported to who at the time of her
11 maternity leave?
12     A.    Jane Ross and Robert Lowenthal.
13     Q.    And Ms. Ross was the head of high
14 yield sales at the time?
15     A.    That's correct.
16     Q.    And Mr. Lowenthal, he was the
17 head of fixed income?
18     A.    Taxable fixed income, to be
19 technical, yes.
20     Q.    And did -- did Ms. Johnson
21 suggest that you speak to anybody else?
22     A.    Yes. She said to me to talk
23 to -- she referred me to -- because there
24 were very few women in the department and

151

Ngo - Direct

1  very few women who took leave. So she told
2  me to refer to the other woman who had
3  taken leave, which was Bridget Donnelly.
4      Q.    And who was Ms. Donnelly?
5      A.    Bridget Donnelly is in fixed
6  income. She reports to Robert Lowenthal, I
7  believe. I know there is another manager
8  there, but I don't know what that is -- but
9  I know that she is a part of taxable fixed
10 income.
11     Q.    And she was at the time that you
12 had the conversation with her?
13     A.    That's correct.
14     Q.    And you had the conversation with
15 her around May of 2014?
16     A.    That's correct.
17     Q.    And why -- why did you -- why did
18 you talk to Ms. Donnelly?
19     A.    Well, again, I was in an
20 exploratory phase to figure out what leave
21 options I had, and so she had given me --
22 so Lynn said -- she said talk to Bridget
23 because, as Lynn said, each case is
24 different because Oppenheimer doesn't have

152

Ngo - Direct

1  a formal policy. So she told me to talk to
2  Bridget Donnelly who -- who I believe she
3  was pregnant at that time, to tell you the
4  truth, and she was -- I can't remember if
5  she had her baby at the time, but she had
6  had a baby in 2000 -- prior. She had gone
7  through this drill.
8      Q.    So she had been at Oppenheimer
9  previously when she had a baby?
10     A.    You know, I am thinking of it
11 later. She had another baby. She had
12 already had her baby when I spoke to her in
13 2014.
14     Q.    Okay. And what did you say to
15 Ms. Donnelly during this conversation?
16     A.    I told her that we were having a
17 baby, and that I needed to figure out what
18 type of leave I should take, and that Lynn
19 had suggested I speak to her.
20     Q.    And what did Ms. Donnelly say to
21 you?
22     A.    She was consistent with what Lynn
23 said; that Oppenheimer doesn't have a
24 maternity leave policy formally, and you

153

Ngo - Direct

1  have to negotiate it with your manager, and
2  that each case is a little bit different.
3      She told me that her leave was a
4  mixture of disability leave and some leave
5  by her manager, but she didn't give me
6  details, and I felt -- but she told me it
7  was a combination of things.
8      Q.   When you say "a combination of
9  things," what do you mean?
10     A.   I think that she said some
11 portions were unpaid and some were paid,
12 and then some were paid from the discretion
13 of the manager, and some portions were paid
14 through disability.
15     Q.   And do you know how -- did she
16 tell you how long she had been out of the
17 office for her leave?
18     A.   She had been gone for three
19 months.
20     Q.   And she said that for some of
21 that time period she received disability
22 pay?
23     A.   I remember her saying disability,
24 and she said other compensation, but I

154

Ngo - Direct

1  didn't ask her for the full details of
2  that.
3      Q.   And that -- your understanding
4  was, based on what she said, that the other
5  compensation was paid by Oppenheimer?
6      A.   Yes.  And it was at the
7  discretion of their manager.
8      Q.   When you were discussing leave
9  options with Ms. Donnelly, what did you
10 mean by "leave"?
11     A.   Being out -- like Lynn and
12 Bridget -- being out of the office for the
13 period of time and not working.
14     Q.   You said that you had a
15 conversation with Ms. Ross; is that right?
16     A.   That's correct.
17     Q.   And approximately when did you
18 have that conversation with Ms. Ross about
19 having a baby and leave options?
20     A.   I want to say it was on probably
21 the same day, but later in the day or very
22 close to my conversation with Rob.
23     Q.   So in mid May 2014?
24     A.   That's correct.

155

Ngo - Direct

1      Q.   And what did you say during that
2  conversation with Ms. Ross?
3      A.   You know, I told her that I had
4  spoken to Rob, and he said to speak to you
5  about -- well, first I had to tell her that
6  I was gay and I was having a baby.  I told
7  her that we were having a baby via
8  surrogacy, and that the baby would be born
9  in California, and that I would need to
10 figure out leave.
11     I told her that I had spoken to
12 Robert Lowenthal, and he said to speak to
13 her and Colleen to work out my leave.
14     Q.   And what did she say in response?
15     A.   Well, first she was probably
16 surprised because I never really told her
17 anything personal.  The first thing she
18 asked, she asked me -- she asked me what
19 type of leave did I expect to take?  And I
20 said to her that I didn't know at that
21 stage, but I was entitled to three months,
22 and that I had spoken to HR about potential
23 leave, and I had spoken to Rob; and I told
24 her that we needed to be prepared for me

156

Ngo - Direct

1  taking, you know, extended time and I was
2  willing to work with her and Colleen about
3  my coverage.
4      Q.   And did she say anything about
5  her own experience taking leave?
6      A.   So then next she said to me -- so
7  when I told her that we needed to think of
8  a contingency of me being gone for three
9  months, she had said to me -- because I
10 remember talking to her about three months,
11 relaying to her that HR said I was entitled
12 to three months.  Then she said to me
13 that -- then she said to me, well, most
14 women make the mistake of taking the three
15 months leave and taking leave in the
16 beginning, and that most women take the
17 leave in the beginning, but she thinks that
18 women should take their leave at the tail
19 end of their kids' years, namely the
20 teenage years, when the kids, she felt,
21 needed you more.
22     Q.   And during the discussion with
23 Ms. Ross, did you have -- did you talk
24 about work coverage while you might be out

157

Ngo - Direct

1  on leave?
2     A.   Yes.  So when she had given me
3  that story, to me, I felt discouraged when
4  she first told me that -- she implied to
5  me -- she had told me she had only taken
6  two months' leave for her two daughters.
7  So the implication was that she was
8  implying to me that I don't take two
9  months, and I had said to her like, I don't
10 know what I am going to do yet, but I am
11 entitled to three months.  So let's focus
12 on talking about coverage while I am away.
13       And so then I discussed with her
14 about the -- so I was basically trying to
15 refocus the conversation to talk about
16 coverage; and then I spoke to her about the
17 morning blast and saying that in my
18 absence, we will need to switch -- probably
19 switch the morning blast to Ms. Burns or do
20 some type of co-morning blast or something
21 because I will be out of the office.
22       And then she discouraged me and
23 said, no, she did not want that, and I said
24 why not?  And she said, because I want

158

Ngo - Direct

1  continuity in the research.  I want the
2  emails to come from you.  She didn't feel
3  that Colleen was strong enough to shoulder
4  the responsibility to being the face of
5  research.  So she wanted the morning blast
6  to continue to be sent from my name, and
7  then there were other details of the
8  conversation.  So after that discussion --
9  did you have a question or did you want me
10 to keep going?
11    Q.   No.  I mean, were there other
12 things that you discussed with
13 Ms. Ross during this same discussion?
14    A.   Sure.
15    Q.   Okay.  And what were those other
16 things?
17    A.   So I am not even sure about the
18 order, but the three things that she had
19 kind of mentioned to me is, one, we
20 discussed -- I remember talking about the
21 morning blast, talking about coverage,
22 talking about the duration and that she had
23 implied she didn't want me to take more
24 than the two months that she took, and then

159

Ngo - Direct

1  the next discussion that we discussed is
2  she asked me at the end -- I think it was
3  the end -- she asked me what my partner
4  did, and I said to her I didn't think that
5  was really relevant because, you know, my
6  fear was that she would some -- it was -- I
7  am just -- I always kept it separate, and
8  then she said, no, come on.  Tell me what
9  does your partner do?
10       I said, he is an analyst.  And
11 then she delved further and asked me an
12 analyst where?  And I told her it was
13 Oaktree Capital, and she gave me this look
14 of -- for some reason that -- that I didn't
15 need this job or she gave me the look of
16 that, you know, she wanted see how hungry I
17 was -- and then I said -- not hungry, but
18 then she asked me, what does he do at Oak
19 Tree Capital?  And I remember she was
20 asking me more leading questions because I
21 was not being so forthright about that
22 information.
23       Then she asked me what he does,
24 and I said portfolio manager, and then she

160

Ngo - Direct

1  just kind of rolled her eyes and just
2  said -- didn't say anything.
3     Q.   Did you, during the discussion
4  with Ms. Ross, did you discuss with her
5  your plans for taking leave?
6     A.   So after, you know, the
7  conversation with -- talking about her
8  leave and her two months, and then the
9  conversation with the morning blast where
10 she pushed back and then the final question
11 about my partner and what he does, I felt
12 that she was discouraging, and I got the
13 memo that she didn't want me to -- she
14 wasn't supportive about the leave.  So
15 what -- where we had left it off was, I
16 said to her, look, why don't I work
17 remotely until the birth of my child?  And
18 then after two weeks, I will decide how
19 much leave I want to take.
20    Q.   And what did Ms. Ross say in
21 response to that proposed plan?
22    A.   You know, it was kind of a
23 compromise.  I didn't commit to a time.  I
24 just said to her that I would take -- quite

161

Ngo - Direct

1 frankly, I was a little scared because she
2 is the head of the high yield desk.  She is
3 the head of sales.  She controls -- she had
4 a lot of influence, and she was, in my
5 view, an implicit manager of -- my implicit
6 manager.  So I kind of backed off, and then
7 we had left it that I would decide after
8 two weeks, but in the interim prior to my
9 leave, I would train John to do my work;
10 work with Colleen on the coverage.
11     ARBITRATOR DOLINGER:  John?
12     THE WITNESS:  John is the
13     associate in the group.
14     ARBITRATOR DOLINGER:  What is his
15     name?
16     THE WITNESS:  John Daniels.
17     So it was an understanding that I
18     would take some type of leave; I just
19     didn't know how much, but that we would
20     prepare for it ahead of time.
21 Q.    And did you discuss with Ms. Ross
22 whether after the birth of your baby,
23 during that two-week period you were
24 talking about, whether you would be doing

162

Ngo - Direct

1 work during that time?
2 A.    I said I would be taking leave.
3 Q.    And what did you mean when you
4 said you were going to take leave?
5 A.    That I would be not working and
6 not in the office.
7 Q.    And did Ms. Ross object to your
8 plan?
9 A.    Well, she implicitly objected to
10 me taking potentially three months, but
11 she -- the plan that we had settled after
12 the conversation of two weeks after --
13 giving the decision two weeks after the
14 birth of our child was -- she agreed with
15 that.
16 Q.    And just to be clear, the
17 discussion -- the plan that you discussed
18 with Ms. Ross, this -- everything you have
19 just described in terms of the conversation
20 with Ms. Ross, that happened in one
21 discussion?
22 A.    Yes.  And I think that we
23 followed up with maybe some -- ironed out a
24 few more details after, but yes.  I think

163

Ngo - Direct

1 it was the bulk of the discussion was that.
2 That was the game plan coming out of the
3 meeting.
4 Q.    And when you had that discussion
5 with Ms. Ross, had you wanted to take more
6 than -- had you wanted to take the 12 weeks
7 of leave?
8 A.    You know, I don't know at the
9 time.  I think I was being -- I didn't know
10 exactly how much time I wanted to take yet.
11 We had never had a baby before.  I didn't
12 know what time I was going to ask.  Colleen
13 was pushing me to take the three months
14 because she knew that I would be really
15 busy, but I didn't know at that stage yet.
16 Q.    And did you want to set an end
17 date beyond the two weeks that you proposed
18 to Ms. Ross?
19 A.    I mean, I certainly -- I pushed
20 back on her when she implied that -- to
21 take two months.  I said to her that I
22 wasn't going to relinquish those rights;
23 that I wanted to leave the option for three
24 months, but I did not relay to her exactly

164

Ngo - Direct

1 how much time I would take -- wanted to
2 take yet.
3 Q.    And why not?
4 A.    Because I was scared.  I was
5 scared to lose my job.  I was scared to
6 lose confidence from Ms. Ross.  Remember,
7 Ms. Ross was the key driver in getting my
8 bid away approved.  Ms. Ross ran sales.
9 She was head of P&L.  She was the key
10 figure in the group, and plus, Rob said to
11 work it out with Jane and Colleen.
12 Q.    And did you discuss with Ms. Ross
13 whether or not the leave would be
14 compensated?
15 A.    No.
16 Q.    How did you feel coming out of
17 the meeting with Ms. Ross?
18 A.    I felt discouraged.  I felt a
19 little bit of pressure that I couldn't take
20 the three months' leave.  I was a little
21 worried because I didn't know what to
22 expect having a new baby, but I -- I felt
23 discouraged.
24     MR. IADEVAIA:  Do you want to

165

Ngo - Direct

1    take a lunch break here?
2        ARBITRATOR DOLINGER:  That's
3    fine.
4        (Luncheon recess:  12:34 p.m.)

166

Ngo - Direct

1        AFTERNOON SESSION
2            (1:20 p.m.)
3    HOAI NGO,
4        resumed and testified as follows:
5        ARBITRATOR DOLINGER:  Shall we
6    resume?
7    EXAMINATION CONTINUED
8    BY MR. IADEVAIA:
9        Q.    Okay.  Before the lunch we were
10   talking about your discussion with
11   Ms. Ross.  Do you recall, generally, that
12   testimony?
13       A.    Yes.
14       Q.    Okay.  During the discussion with
15   Ms. Ross, did you propose a plan of leave
16   to her?
17       A.    Yes, I did.
18       Q.    And what was your proposal?
19       A.    The proposal was that I would
20   work leading up to the birth of our child,
21   and that I would fly to California and work
22   remotely from the San Francisco office
23   until the birth of our child; and then I
24   would take the two weeks of leave, and then

167

Ngo - Direct

1    after that, I would decide -- I would tell
2    them the exact length of the leave.
3        Q.    And when you were discussing
4    leave with Ms. Ross, were you talking about
5    any type of leave other than FMLA leave?
6        A.    I assumed it was FMLA.  We did
7    not use the -- I don't know if we used that
8    language, but we said it was leave.
9        Q.    And had you had a discussion with
10   anybody at Oppenheimer about a leave other
11   than FMLA leave?
12       A.    Yes.  I mean, could you repeat
13   the question?  Sorry.
14       MR. IADEVAIA:  Sure.
15       Could you read back the question?
16       (Record read.)
17       THE WITNESS:  Oh, other than
18   FMLA, no.  The answer is no.
19       Q.    Did you believe that Ms. Ross
20   during this conversation discouraged you in
21   some way?
22       A.    Yes.
23       Q.    Okay.  And in what way did she
24   discourage you?

168

Ngo - Direct

1        A.    Again, it was a combination of
2    things.  It was her not wanting me to
3    change the morning blast.  It was her
4    telling me that she had only taken two
5    months for the birth -- leave for the birth
6    of her two children; and then it was a
7    combination of just, you know, feeling them
8    out, getting the impressions from her.
9        Q.    And when you made your -- when
10   you proposed to her your leave, being you
11   would go to California for the birth of the
12   child, and then within two weeks after the
13   birth of the child you would let them know
14   how long you would be out, what did
15   Ms. Ross say in response, if anything?
16       A.    She agreed to it.  She didn't --
17   that's where we left the conversation.
18       Q.    Did she object when you made that
19   proposal?
20       A.    No.
21       Q.    After your conversation with
22   Ms. Ross, who did you speak to next about
23   your leave?
24       A.    I spoke to Colleen Burns.

169

Ngo - Direct

1  Q.   And what did you discuss with
2  Ms. Burns?
3  A.   No.  I told her that I had spoken
4  to Rob, and he said to work it out between
5  Jane and Colleen.  So I was relaying -- I
6  told her that I had spoken to Jane as well
7  now.
8  Q.   And approximately when did you
9  have this discussion with Ms. Burns?
10  A.   I think it was right after my
11  discussion with Ms. Ross.
12  Q.   Okay.  And what did you tell
13  Ms. Burns about your discussion with
14  Ms. Ross, if anything?
15  A.   I didn't give her the details.  I
16  just said to her the conclusion of the
17  meeting was that Jane and I had decided
18  that -- well, I told her, obviously, I told
19  her the conversation with Rob; that we -- I
20  was supposed to work it out with Jane and
21  her, and the discussion with Jane we had
22  agreed that I would work leading up to the
23  birth of our baby; work remotely, and then
24  after our baby was born, take two weeks of
25

170

Ngo - Direct

1  leave, and then after that, I would decide,
2  give them the exact duration of that leave.
3  Q.   And what did Ms. Burns say in
4  response, if anything?
5  A.   She was very supportive.  She was
6  very nice.  She agreed.
7  Q.   And did you discuss with
8  Ms. Burns any other aspect of your
9  conversation with Ms. Ross?
10  A.   I told her -- I did tell her that
11  I thought that the conversation with
12  Ms. Ross was discouraging.  I did tell
13  her -- I recall telling her that -- that my
14  impression was that Ms. Ross did not want
15  me to take the full three months of FMLA
16  leave; and I do remember -- because it was
17  right after my conversation with Jane, and
18  I remember again being discouraged after
19  that conversation and probably relaying
20  that same extent to Ms. Burns.
21  Q.   And what did Ms. Burns say in
22  response to you saying that you felt
23  discouraged by Ms. Ross?
24  A.   Well, she was supportive.  She
25

171

Ngo - Direct

1  said, Hoai, you should try to take the full
2  three months' leave.  But I said, this is
3  what Jane and I worked out, and we will
4  decide the duration of that leave after two
5  weeks.
6  Q.   Who did you speak to next about
7  your leave after the conversation with
8  Ms. Ross -- I mean -- Ms. Burns?
9  A.   I spoke with Mr. Lowenthal.
10  Q.   Okay.
11  A.   Rob Lowenthal.
12  Q.   And approximately when did you
13  speak to Mr. Lowenthal?
14  A.   I don't know if it was that day,
15  but it was shortly after -- I think I had
16  so many conversations that it might have
17  been the next day.
18  Q.   And this was before you -- before
19  the birth of your child?
20  A.   Yes.
21  Q.   And what did you discuss with
22  Mr. Lowenthal?
23  A.   I told him that I had spoken
24  to -- because the previous conversation I
25

172

Ngo - Direct

1  had with him, I had spoken to him about my
2  conversation with Lenore Denys.  This
3  conversation I was relaying to him what I
4  had -- my conversations with Jane and
5  Ms. -- and Colleen Burns.
6  Q.   And what did you say to
7  Mr. Lowenthal about those discussions?
8  A.   I said that I had worked out a
9  plan with Jane and Colleen; that I would be
10  working all the way leading up to the birth
11  of our child remotely from California.  I
12  told him that I would begin taking two
13  weeks leave after the birth of our child,
14  and after that two weeks I would give them
15  a final determination as to the duration of
16  that leave.
17  Q.   And what did Mr. Lowenthal say in
18  response?
19  A.   He agreed.
20  Q.   And how did agree?  How did he
21  express his agreement?
22  A.   He didn't have a problem with it.
23  He just -- my sense is that I followed his
24  instructions, and I handled it with Jane

173

Ngo - Direct

1 and Colleen.
2    Q.    Did he object?
3    A.    No.
4    Q.    Did you end up -- did you --
5 strike that.
6        In the conversation with
7 Mr. Lowenthal, did you use the word
8 "leave"?
9    A.    Yes.
10    Q.    And what was your -- what did you
11 understand or what did you mean when you
12 used the word "leave"?
13    A.    That I wouldn't be in the office.
14    Q.    And would you be working while
15 you were not in the office on leave?
16    A.    No.  I would not be working.
17    Q.    Did you -- when you were talking
18 to Mr. Lowenthal, did you discuss whether
19 the leave would be compensated?
20    A.    No.  We did not have that
21 discussion.
22    Q.    Did Mr. Lowenthal ask you during
23 this discussion to provide an end date for
24 your leave?

174

Ngo - Direct

1    A.    No, he did not.
2    Q.    Before traveling to California,
3 did you make any arrangements at work to
4 cover for you?
5    A.    Yes.
6    Q.    And what were those arrangements?
7    A.    I worked with Colleen and Jane
8 about coverage.  I talked to Colleen
9 about -- I worked with our associate John
10 about coverage as well.  I had walked John
11 through -- because earnings was going to
12 occur while -- assuming while the baby --
13 while I was out.  So I worked with John
14 about walking him through all the models.
15 I set up all the financial models so that
16 it was easy for him to input numbers, so he
17 could disseminate it to the sales force.  I
18 walked through with John what names would
19 report, and then we had agreed that -- and
20 then Colleen and I had walked through some
21 of the issues, some compliance issues and
22 some of the issues that she would need to
23 do while I was out.
24    Q.    And did you arrange -- did you

175

Ngo - Direct

1 take any equipment with you when you
2 traveled to California?
3    A.    Yes.  Rob and I talked about the
4 laptop.  It's consistent with the plan.  He
5 said that we would issue you a laptop, and
6 it's actually interesting we didn't have a
7 laptop dedicated to the department.  So Rob
8 got me a laptop to take to California.
9    Q.    And did you take to laptop to
10 California?
11    A.    Yes, I did.
12    Q.    And were there any arrangements
13 made in terms of remote access to the
14 Oppenheimer systems?
15    A.    Yes.  I got the laptop, but it
16 was really -- but I also got clearance to
17 work from San Francisco prior to the birth
18 of our daughter because I would be working
19 out of the San Francisco office.  We had
20 also set up some training for me to take in
21 San Francisco prior to the birth of our
22 daughter.
23    Q.    And the work arrangements that
24 you were making in discussions with

176

Ngo - Direct

1 Mr. Lowenthal, did you -- what did you say
2 about whether or not you would continue to
3 do that work after the baby was born?
4    A.    Yeah, we had an agreement that
5 when the baby was born, that I would take
6 two weeks of leave, and then after that I
7 would give him the duration, but we didn't
8 discuss beyond that.
9    Q.    And you did, in fact -- did you
10 travel to California for the birth of your
11 child?
12    A.    Yes, we did.
13    Q.    And approximately when did you
14 travel to California?
15    A.    I believe the scheduled -- I had
16 talked -- had approved with Rob that we
17 would leave at least two weeks before the
18 date because I remember the agency,
19 surrogate agency, saying that we should be
20 there two weeks before in case our
21 surrogate were to give birth early.  So I
22 believe we left on June 20th.
23    Q.    And when had you first gone to
24 Mr. Lowenthal to let him know that you were

177

Ngo - Direct

1  having a baby and considering your options
2  for leave?  When did that happen?
3  A.    It was in May 2014.
4  Q.    So the gap between when you
5  initially went to him and when you traveled
6  to California, approximately how much time
7  had passed?
8  A.    It was over a month.
9  Q.    Did you, in fact, work in
10 California before the baby was born?
11 A.    Yes, I did.
12 Q.    Okay.  And for how long?
13 A.    We worked -- I worked for -- I
14 think three days because my daughter was
15 born early.  Our daughter was born early.
16 Q.    And you arrived in California
17 approximately when?  What was the date?
18 A.    I believe it was June 20th.
19 Q.    And when was your daughter born?
20 A.    She was born June 24th.
21 Q.    And when was the due date for
22 your daughter?
23 A.    I believe it was in July.  I want
24 to say close to July 4th.

178

Ngo - Direct

1  Q.    So you expected to work longer
2  than three days when you went out to
3  California?
4  A.    That's correct.
5  Q.    And did you, in fact, do work in
6  California before the baby was born?
7  A.    I did.
8  Q.    Okay.  And what sorts of things
9  did you do?
10 A.    I supervised analysts, SA'd which
11 is supervisory analysis, reviewed the
12 morning blast.  I also attended a training
13 session for my Series 24 in the San
14 Francisco office, and was in contact with
15 the salespeople.
16 Q.    And after the baby was born, did
17 you -- strike that.  I am sorry.
18 Did you say the date that your
19 baby was born?
20 A.    It was June 24th.
21 Q.    Of 2014?
22 A.    '14.  Sorry.
23 Q.    All right.  And after your baby
24 was born, did you communicate with

179

Ngo - Direct

1  Oppenheimer about when you would be
2  returning to the office?
3  A.    Can you repeat the question?
4  Q.    Sure.  Let me ask another
5  question.
6  Did you do work after the baby
7  was born while you were in California?
8  A.    No.
9  Q.    Did you communicate with
10 Oppenheimer, anybody at Oppenheimer, about
11 when you would be returning to the office
12 after your leave?
13 A.    Yes.
14 Q.    And who did you talk to?
15 A.    I talked to Jane and Colleen
16 Burns.
17 Q.    Okay.  And what did you discuss
18 with Ms. Burns about returning to the
19 office and your leave?
20 A.    I think I spoke to Ms. Burns
21 first and talked about -- you know, first
22 it was a light conversation about the baby,
23 and then I talked to her about would it
24 work out?  I talked to her about we had met

180

Ngo - Direct

1  with a doctor that -- well, when Lily was
2  born the first doctor that delivered her
3  knew that we were from New York; suggested
4  that she not fly until we had her
5  immunization shots, and I wanted to get
6  back to work.  Colin -- we wanted to get
7  back home, but we wanted to get a second
8  opinion.
9  So we went to another physician
10 in my mom's -- because Lily was born in
11 Sacramento.  We had to drive another six
12 hours to Morro Bay, which is where we
13 stayed, which is where my mom lives.  Both
14 cities are in California, and then we
15 waited to get -- I think at the one-month
16 visit, no -- not one month -- sorry.  After
17 the second week, we had another doctor
18 checkup, and then we asked the pediatrician
19 at the time what was the recommendation for
20 flying, and she was consistent and said
21 that you should wait until your kid has
22 immunization shots.  So we asked her what
23 is the earliest you think that we could fly
24 back?  And she said it would be six weeks

181

Ngo - Direct

1  so that she could at least have one round
2  of immunization shots and not all
3  immunization shots.  So the context of that
4  conversation, I relayed that to Colleen.
5
6     Q.   And what did Ms. Burns say in
7  response?
8     A.   She was supportive.  I made it
9  clear to her that I did not think that I
10  would be back for another six weeks, and
11  that I would take leave for another six
12  weeks, and we talked about if she could
13  handle it; and she said that we were well
14  prepared; that John was prepared; that she
15  was prepared, and she didn't have a problem
16  with me taking another six weeks.
17     Q.   Did you come up with an end date
18  as to when you would return to the office
19  from your leave?
20     A.   Through my conversation with
21  Ms. Burns, yes.
22     Q.   And what did you decide to do?
23     A.   I believe we decided to set the
24  return date to August 25th, so that would
25  give me -- give us -- I believe that would

182

Ngo - Direct

1
2  give us another -- we would fly -- the plan
3  was that we would fly back to New York, and
4  we would have a week to get help,
5  interview, and just get settled and I would
6  start work the week after, which is
7  August 25th.  Sorry.  August -- yes,
8  August 25th.
9     Q.   August 25th of which year?
10     A.   2014.
11     Q.   And did you tell Ms. Burns that
12  you would be working remotely while you
13  were out of the office between July and
14  August 25th?
15     A.   No.
16     Q.   Did you discuss work coverage
17  with Ms. Burns during these discussions
18  about your returning to the office?
19     A.   Prior to this?
20     Q.   No.  No.  This discussion.
21     A.   We had already -- we had already
22  trained John, and we had already decided
23  how to handle it; that I would not be
24  working.  Did I answer your question?
25     Q.   Yes.

183

Ngo - Direct

1
2     Did Ms. Burns tell you that she
3  expected you to be doing work between mid
4  July and the end of August?
5     A.   No.
6     Q.   Did Ms. Burns object to the
7  August 25th date?
8     A.   No.
9     Q.   And why did you tell Ms. Burns
10  your plan for being out of the office on
11  leave through the 25th?
12     A.   Because Rob had said to work it
13  out with Colleen and Jane.  I spoke to
14  Ms. Burns prior to my conversation with
15  Jane because, as a courtesy, I wanted to
16  make sure that she was okay with the
17  proposed end date.
18     Q.   And Ms. Burns was your co-head at
19  the time, correct?
20     A.   That's correct.
21     ARBITRATOR DOLINGER:  When was
22  this conversation?
23     THE WITNESS:  It was -- I believe
24  it was probably a week after Lily was
25  born or I don't know the exact date,

184

Ngo - Direct

1
2  but it was within the first two weeks
3  because where we had left it is I would
4  give a decision in that two weeks, so
5  somewhere in the two weeks I spoke to
6  her first as a courtesy.
7     Q.   Why don't we -- could you take a
8  look at Exhibit 83, please?  So the
9  email -- there is an email chain in
10  Exhibit 38, and the bottom email is from
11  Ms. Burns to you dated July 13th, 2014; and
12  Ms. Burns writes, "Hey, hope the doctor
13  went well.  Can you just forward me
14  whatever email you sent to Jane just so I
15  am aware in case she talks to me?  Thanks,
16  Colleen."
17     Do you see that text?
18     A.   Yes, I do.
19     Q.   Okay.  What was your
20  understanding as to what Ms. Burns was
21  saying there?
22     A.   Well, like I said, I had spoken
23  to her sometime prior to that, and I told
24  her that I was going to email Jane and give
25  her a precise date of my return.

185

Ngo - Direct

1   Q.   Did you end up sending an email
2   to Ms. Ross about your leave and return
3   date?
4   A.   Yes.
5   Q.   Can we take a look at Exhibit 51,
6   please?  So Exhibit 51 is an email chain
7   among Ms. Ross, Ms. Burns, and Mr. Ngo.
8   The bottom email is dated July 13th, 2014.
9   That's an email from you to Ms. Burns and
10  Ms. Ross, correct?
11  A.   That's correct.
12  Q.   Okay.  And what are you telling
13  Ms. Burns and Ms. Ross in this email?
14  A.   Can I take a minute to read it?
15  Q.   Yes.  Please read the email
16  carefully.  Yes.
17  A.   Okay.
18  Q.   Okay.  Let me ask you a different
19  question.
20       What did you say in your email --
21  in this email about returning to work?
22  A.   I basically told Ms. Ross that we
23  could not fly for at least another six
24  weeks, and that I would return to work on

186

Ngo - Direct

1   August 25th; that I was asking for -- I was
2   finalizing my leave.
3   Q.   And did you -- you explained to
4   Ms. Ross that you planned to be out of the
5   office until August 25th due to the birth
6   of your daughter and the subsequent
7   treatment, the immunization shots she had
8   to receive?
9   A.   That is correct.
10  Q.   In the email you wrote, "In the
11  meantime, I am still checking email and
12  available if anyone needs anything."
13       Are you saying there that you
14  planned to do work?
15  A.   No.  I threw that more as a
16  common courtesy.
17  Q.   And you also wrote, "I mainly
18  wanted to give a realistic timeframe."
19       Do you see that text?
20  A.   Yes.
21  Q.   What did you mean by that?
22  A.   Where Jane and I had left it off
23  is that I would take two weeks and decide.
24  So I was just kind to posturing up, leading

187

Ngo - Direct

1   up to giving her the final time.
2   Q.   In that email you also write,
3   "Thanks for all of the good wishes and
4   understanding through the entire process."
5       Did I make that up?  Yes.  The
6   first line you say, "Thanks for all the
7   good wishes and understanding throughout
8   the entire process."
9       Do you see that text?
10  A.   That's correct.
11  Q.   Why did you write that?
12  A.   I was being polite.  I was being
13  cordial in the email, and also Ms. Ross had
14  sent me, I think, a nice email after the
15  birth of our daughter saying
16  congratulations.
17  Q.   And you believe -- I mean, at
18  this point in time, Ms. Ross was your
19  manager, right?
20  MR. GIBSON:  Objection.
21  ARBITRATOR DOLINGER:  Overruled.
22  He can answer.
23  MR. GIBSON:  I know.
24  THE WITNESS:  Well, as I

188

Ngo - Direct

1   mentioned, Ross -- from my perspective,
2   Ms. Ross, she is head of sales, was the
3   implicit manager for the high yield
4   group, and Rob had told me to discuss
5   it with Jane and Colleen, and he was
6   deferring this issue to -- I felt it
7   was similar to Bridget or Lynn talking
8   to a manager about their leave.
9   Q.   If you had returned to the office
10  on August 25th, how much time would you
11  have been out of the office not working
12  total?
13  A.   Two months.
14  Q.   So when would the start of that
15  time be?
16  A.   The start of my leave?
17  Q.   Yes.
18  A.   It would have been at the birth
19  of my daughter on June 24th.
20  Q.   Okay.  And so the two months is
21  from June 24th to August 25th?
22  A.   That's correct.
23  Q.   And Ms. Ross, she responds to
24  your email, right?

189

Ngo - Direct

1    A.    That is correct.
2    Q.    And that's reflected in the email
3 above from Ms. Ross to you dated July 14th,
4 2014, right?
5    A.    Yes.
6    Q.    In the email to you, Ms. Ross
7 writes, "See you sometime in August."  Do
8 you see that?
9    A.    Yes.
10   Q.    What did you understand her to
11 mean when she wrote that?
12   A.    She was saying that she agreed to
13 my August -- that I would not be working
14 until August.
15   Q.    And did she -- she didn't object
16 to your being out of leave on leave until
17 August in this email, right?
18   A.    Yes and no.  The next line -- the
19 first line she is saying that she will see
20 me sometime in August, and the second line
21 tells a different story.
22   Q.    And what's that story?
23   A.    Well, in the second line she
24 says, "Let us know how you plan to handle

190

Ngo - Direct

1 second quarter earnings reports."
2    Q.    And what are second quarter
3 earnings reports?
4    A.    That's basically saying, are you
5 going to produce research and cover the
6 second quarter earnings reports?
7    ARBITRATOR DOLINGER:  When would
8 second quarter earnings reports come
9 out?
10   THE WITNESS:  Sure.  So second
11 quarter in a normal -- every company
12 has their year end date that's
13 different, but the standard year end
14 date is June usually of the year end
15 December 31, 2014.
16   A second quarter earnings report
17 would imply a June 30th, 2014,
18 earnings, and then under SEC guidelines
19 companies have at least 45 days, a
20 45-day window to report earnings.
21   So if a company finished earnings
22 on June 30th of 2014, they would
23 release earnings to present those
24 earnings within 45 days from June.  So

191

Ngo - Direct

1 it would be this timeframe.
2    ARBITRATOR DOLINGER:  That would
3 be mid August, approximately?
4    THE WITNESS:  It would go through
5 mid August.
6    ARBITRATOR DOLINGER:  And then
7 when that is done, researchers, whether
8 at Oppenheimer or other equivalent
9 institutions, would then do what?  And
10 in what timeframe?
11   THE WITNESS:  Sure.  Earnings
12 reports is -- it's the busy period for
13 sales and trade because with earnings
14 there is a lot of volatility with
15 trading because companies report
16 earnings and sometimes they miss
17 estimates.  Sometimes they go above
18 estimates or sometimes they are in line
19 with estimates.
20   So what a research analyst would
21 do -- it's actually our peek period.
22 So there is four periods where analysts
23 will say, this is my busy period, and
24 that's usually in the earnings period.

192

Ngo - Direct

1    Various companies -- in my case I
2 covered three sectors that were very
3 large, so various companies would
4 report earnings, and then I would have
5 to analyze the data, write about the
6 data, and then communicate that data
7 via written report or verbal to the
8 sales desk.
9    ARBITRATOR DOLINGER:  And
10 normally was there an expectation or a
11 pattern as to how quickly after an
12 earnings report would come out, say in
13 mid August, how quickly analysts would
14 turn around whatever he or she was
15 going to do about those reports?
16   THE WITNESS:  That's a good
17 question.  So obviously a good analyst,
18 the ideal is to -- when a company
19 reports, and sometimes the companies
20 usually report at 7:00 in the morning.
21 Usually they do it before the market
22 opens around 7:00 or sometimes after
23 the market, and the analyst would
24 generally write about it as soon as he

193

Ngo - Direct

1  can -- he or she can, and then digest
2  the information and transmit that
3  information in the same way.
4      So generally for me, I would --
5  if a company reported at 7:00 a.m., I
6  would try to have something to the
7  sales force within ten minutes, and so
8  the way I was able to do that is I
9  would prepare ahead of time, have my
10 models ready, have the write-up ready,
11 and disseminate that news, that report
12 or that analysis to sales quickly.
13     ARBITRATOR DOLINGER:  And so,
14 roughly speaking, in your experience,
15 the amount of time that would be
16 devoted to preparing a response to an
17 earnings report would be about ten
18 minutes?
19     THE WITNESS:  No.  There is a lot
20 of preparation before, but that's the
21 quick -- that's the quick -- that's the
22 ideal.
23     Sometimes an earnings is a little
24 more complicated, meaning that they

*(note: lines renumbered below)*

194

Ngo - Direct

1      announce because usually earnings --
2  companies will announce other things,
3  they are selling an asset or something
4  like that; that it could be more work
5  than just ten minutes of work.
6      Actually, some -- like, for
7  example, some analysts, for example, if
8  a company reports after the close, for
9  example, sometimes you will be there
10 for another two hours analyzing the
11 data because, one, the market's already
12 closed, and you can kind of do the more
13 complete analysis.  So ten -- it's not
14 a ten-minute per company rule.  I am
15 saying that there is a -- that goes to
16 the level of time urgency in getting
17 that report out.  But sometimes it
18 could be an hour after the release.
19 Depends on how complicated the release
20 is.
21     ARBITRATOR DOLINGER:  And you say
22 that there is certain models that you
23 would prepare in advance; is that
24 correct?

195

Ngo - Direct

1      THE WITNESS:  Well, not everyone
2  does that, but that's what I would
3  normally do.
4      ARBITRATOR DOLINGER:  And in
5  anticipating that you were going to
6  take up to three months' leave, you
7  mentioned that you were leaving to
8  Mr. Daniels, I believe, this sort of
9  work; is that correct?
10     THE WITNESS:  That's correct.
11     ARBITRATOR DOLINGER:  And would
12 you have, in anticipation of all that,
13 had available to him some models or
14 whatever other data sets you need --
15 you felt you would have needed if you
16 were doing it for him to use?
17     THE WITNESS:  Yes.  So in
18 preparation of my leave, knowing that I
19 would be out, I updated all the models
20 to make sure like the first quarter was
21 already updated, and then the second
22 quarter what I would do, I would --
23 because the company releases financial
24 data like sales, cost of goods sold and

196

Ngo - Direct

1      stuff like that, so I prepared the
2  models to make it user-friendly for
3  Mr. Daniels, and said that, you know, I
4  would make an Excel cell blue, and say,
5  okay, this one, when this company
6  reports, we need to put in these
7  numbers, and it will pull out my EBITDA
8  calculation, which is what the credit
9  people care about, the EBITDA, earnings
10 before interest, taxes and
11 depreciation.
12     So I kind of made it
13 user-friendly for Mr. Daniels, those
14 models.  Plus, I also spoke to
15 Mr. Daniels because there would be over
16 50 companies reporting, I told him that
17 I updated all the models before my
18 departure, but I also told him, these
19 are the companies if you run out of
20 time sometimes there is four companies
21 reporting in the morning, right?  I
22 said if you run out of time, these are
23 the names that the sales desk feels are
24 more important or this name or I walk

197

1   Ngo - Direct
2   him through this name report.  This is
3   what I am looking for.  These are the
4   issues that can come up.  So I tried to
5   give him more preparation knowing that
6   he wouldn't be as, say, experienced as
7   I was.  So I was walking him through,
8   and also I didn't think he would be
9   able to cover all of the companies that
10  I would because of his experience
11  level, so I prioritized which companies
12  were more important.
13          ARBITRATOR DOLINGER:  Okay.
14  Thank you.
15          THE WITNESS:  Sure.
16      Q.   And in response to Ms. Ross's
17  email, you write an email which is the top
18  email in Exhibit 51, right?  Is that right?
19      A.   That's correct.
20      Q.   Okay.  And in that email you say,
21  "I just spoke with Colleen.  We can see
22  what John can do while I am away.  I can
23  help out more when I am back in New York as
24  the logistics will be better."
25          Did I read that correctly?

198

1          Ngo - Direct
2      A.   That's correct.
3      Q.   Okay.
4          ARBITRATOR DOLINGER:  By the way,
5  had you, either before you left for
6  California or at some time while you
7  were in California, conveyed to
8  Ms. Ross essentially the preparations
9  that you have now described in
10  anticipation of the flood of quarterly
11  earnings reports, setting up
12  Mr. Daniels in a position to be able to
13  most efficiently handle that stuff?
14          THE WITNESS:  I -- I gave her an
15  indication that I would train for the
16  scenario because I was going to be gone
17  at least two weeks, right?  And then
18  plus two weeks leading up to it, so
19  yes, I had told her that in my initial
20  discussion that I will work with
21  Colleen and John to figure out how to
22  do it.
23          I had discussed it with
24  Ms. Burns, Colleen, about the coverage
25  and how we would deal with it.  So it

199

1          Ngo - Direct
2  was -- there was a lot of preparation.
3  We already had a set date.  Our
4  daughter wasn't born yet.  I knew I was
5  going two weeks early.  There was a lot
6  of preparation leading up to it, and
7  Ms. Burns and Ms. Ross were well aware
8  of that.
9          ARBITRATOR DOLINGER:  Uh-huh.
10      Q.   So in that email you say, "I just
11  spoke with Colleen."
12          What do you recall about that
13  discussion with -- well, first of all, did
14  you have a discussion with Ms. Burns after
15  you received Ms. Ross's email?
16      A.   Yes, I did.
17      Q.   And what do you recall about that
18  discussion?
19      A.   I remember telling Colleen that,
20  again, Jane -- you know, that Jane is
21  discouraging me to take the leave.  She is
22  asking me about earnings, and that it was
23  implicit that saying -- like she was -- in
24  the first sentence she was saying I approve
25  your time in August.  However, how do you

200

1          Ngo - Direct
2  plan to work while you are gone because
3  there is no way you could do earnings
4  from -- well, you could, but it would be a
5  lot of work from California.  Plus the time
6  change.  So if a company reported at
7  7:00 a.m., I would have to wake up at
8  4:00 a.m. with a newborn baby and do
9  earnings.
10          So I discussed -- I remember
11  discussing with Ms. Burns how frustrating
12  it was, and that basically Jane Ross was
13  discouraging me from taking the leave that
14  was -- and then she had said -- came back
15  to me and said, don't worry about it.  I
16  will help out John.  You have already
17  prepared all of this stuff.  Just take your
18  leave.
19      Q.   When you say she came back to me,
20  who is the "she"?
21      A.   Ms. Burns in our conversation I
22  told -- I relayed her what -- how I
23  interpreted Ms. Ross's email, and then we
24  talked about the level of discouragement in
25  taking the leave and how we should approach

201

Ngo - Direct

1  it, and again, Colleen was always
2  supportive.  She said, just take the leave.
3  I will handle it with John.
4      Q.    And John is Mr. Daniels?
5      A.    That's correct.
6      Q.    After the email exchange in
7  Exhibit 51, did you have any further
8  discussions or communications with Ms. Ross
9  about your leave?
10     A.    No.
11     Q.    Did you have other discussions
12 with Ms. Burns about your August 25th
13 return date?
14     A.    No.  We had agreed that it would
15 be August 25th.  Maybe we -- can you ask me
16 the question again?
17     Q.    Sure.  Did you have any other
18 discussions with Ms. Burns about your
19 August 25th return date?
20     A.    Not the date because we had
21 already set the date.  We would have other
22 conversations subsequent to that, but the
23 terms of the date, it was very clear that I
24 was returning August 25th and would be out.

202

Ngo - Direct

1      ARBITRATOR DOLINGER:  Just on
2  that point, that I note that in your
3  first three emails that were part of
4  Exhibit 51 you mentioned that the date
5  August 25th, but you also go on to say,
6  I will let you all know and try to get
7  back to the office earlier.
8          Did you think it would be
9  required or useful for you to update
10 whoever you felt you had to communicate
11 with at Oppenheimer about your plans,
12 whether or not you were going to be
13 able to get back earlier than
14 August 25th.
15         THE WITNESS:  I -- if I were to
16 come back earlier, I would have told
17 them.  I think I was more posturing and
18 saying, trying to be -- knowing that
19 Ms. Ross was discouraging me to take
20 the two months leave, I was just trying
21 to posture and say, if I can get back
22 earlier, then maybe I could; but then I
23 was really setting her this date of
24 saying here is August 25th.  And then I

203

Ngo - Direct

1  was consistent when I spoke to -- I
2  spoke to Ms. Burns, and we agreed that
3  it would be August 25th; and then when
4  I respond to Ms. Ross, I make it clear
5  that it's not any earlier at that
6  stage.
7      Q.    Did you have a discussion with
8  Mr. Lowenthal after you received the -- I
9  mean, after you exchanged the email with
10 Ms. Ross that's reflected in Exhibit 51?
11     A.    After the email, yes.
12     Q.    And who initiated the
13 conversation with Mr. Lowenthal?
14     A.    I did.
15     Q.    And approximately when did you
16 have that conversation with Mr. Lowenthal?
17     A.    I want to say it was two or three
18 days after this email.
19     Q.    So approximately July 16th or
20 17th?
21     A.    That sounds about right.
22     Q.    And why did you decide to reach
23 out to Mr. Lowenthal after sending this
24 email?

204

Ngo - Direct

1      A.    Because after I sent my final
2  email to Ms. Ross saying that I would
3  return on August 25th, Ms. Burns and I
4  spoke over the phone, and she said that
5  Jane, as soon as she received the email,
6  marched straight into Rob's office and that
7  she appeared that she had a long
8  conversation with Rob, and that Rob
9  appeared -- and she spoke to Rob, and Rob
10 appeared angry about me.  She said that --
11 I think she used word "angry."  He seemed
12 angry about me, about the email or after
13 his discussion with Jane.  She didn't know.
14         And she also said that Rob had
15 said to her that he was taking me -- I
16 don't know the timing, if it was right
17 after, I just know that she said that Jane
18 spoke to Rob, but that one point he
19 communicated to Colleen that he was taking
20 me off the morning blast.
21     Q.    Just to be clear, the discussion
22 you described that you had with Ms. Burns,
23 right, that was after the email that's
24 reflected in Exhibit 51, correct?

205

Ngo - Direct

1    A.    That's correct.
2    Q.    And Ms. Burns was describing what
3 Ms. Ross did in response to receiving the
4 email?
5    A.    That is correct.
6    Q.    And just to be clear, if you
7 could say it again with using the names of
8 the people?
9          So who marched into whose office?
10   A.    Okay.  Colleen told me that after
11 the email was sent, because we all sit on
12 the same floor, that Jane marched right
13 into Rob's office, and that Jane and Ross
14 -- Jane and Rob had a separate conversation
15 in her office -- in his office.
16         Ms. Burns was not privy to that
17 conversation, but she sensed that Jane was
18 upset, and then she also told me that
19 subsequently -- I don't know -- she did
20 speak to Mr. Rob at that point, and she
21 told me that Rob was upset, and that Rob
22 was going to remove me from the morning
23 blast.
24   Q.    And did that lead you to call

206

Ngo - Direct

1 Mr. Lowenthal?
2    A.    Yes.
3    Q.    And why is that?
4    A.    Because she told me that Rob was
5 upset.  She told me that Jane was upset.  I
6 wanted to try to handle what was going on.
7    Q.    And when did you actually talk to
8 Mr. Lowenthal?
9    A.    I believe I called him a couple
10 of times, and he didn't answer, and so
11 finally I just left a message with his
12 assistant to have him give me a call.
13   Q.    And did you actually connect with
14 him?
15   A.    Yes.
16   Q.    Okay.  And what did you discuss
17 during the call with Mr. Lowenthal?
18   A.    I discussed with him -- I told
19 him that Colleen had suggested that I give
20 him a call.  I told him that -- I gave him
21 our update on what was going on in
22 California.  I told him that two doctors
23 had recommended that we not fly for at
24 least six to eight weeks for the birth of

207

Ngo - Direct

1 -- after Lily's birth due to immunization
2 shots.  I told him that the return date of
3 August 25th allowed us to do that.  I told
4 him that we would like -- that I would like
5 to take leave until August 25th, and then
6 he told me that he was surprised.  He
7 thought that I was only going to take two
8 weeks, and I said to him that circumstances
9 had changed with the immunization issues,
10 and I also told him that August 25th was
11 more of a reasonable timeframe.
12        I also told him that -- he
13 appeared angry.  I don't know if angry --
14 but angry or disappointed.  You could tell
15 he was -- was not happy with the
16 August 25th date.  And I told him that --
17 that I wasn't saying -- I told him -- I
18 said, look, logistically, it's me and my
19 partner, and I am not saying that my job is
20 more or less important than his job, but
21 someone's got to take some time off to take
22 care of our child and that normally -- I
23 don't know about normal -- a normal
24 couple -- not to say that we were

208

Ngo - Direct

1 abnormal -- but a normal couple would
2 have -- especially since I work with a lot
3 of men, you would have a woman take three
4 months off, and I explained to him that my
5 partner and I were kind of dividing the
6 three months off; that I would take
7 leave -- take the leave until August 25th,
8 and then my partner would probably take a
9 leave to -- after that to take coverage of
10 our child.
11   Q.    And why did you provide that
12 level of detail to Mr. Lowenthal when
13 explaining that you and your partner were
14 trying to split up the -- you were
15 splitting up the time off?
16   A.    Because I could tell from his
17 tone of voice -- and Colleen had told me
18 this as well -- that he was disappointed
19 with the August 25th date, and I trade to,
20 you know, appeal to -- not appeal to the
21 senses -- but try to soften the news that I
22 was not returning until August 25th and not
23 working until August 25th; and I tried to
24 give him perspective that it wasn't -- that

209

Ngo - Direct

1  this is more common -- since he had never
2  dealt with a gay couple taking leave, I was
3  telling him that this is actually what
4  normal people do in the office; that one
5  person takes three months off. That was my
6  rationale in trying to bring up that issue.
7      Q.    During the discussion with
8  Mr. Lowenthal, did you talk about work
9  coverage?
10     A.    We talked about the morning
11 blast.
12     Q.    What did you discuss about the
13 morning blast with Mr. Lowenthal?
14     A.    Well, I made it clear -- I mean,
15 after I had made clear to him that I was
16 not coming back until August 25th, I said
17 to him that -- and again, I sensed that he
18 was angry and disappointed with the
19 August 25th date. And actually, after my
20 conversation I had mentioned, you know,
21 that one person -- someone has to take care
22 of our child, take some level of leave, he
23 said, do whatever you need to do. I
24 remember it was very short, and so then we

210

Ngo - Direct

1  talked about the morning blast after that
2  conversation.
3      Q.    And what did you discuss with
4  Mr. Lowenthal about the morning blast?
5      A.    I told him that Colleen had told
6  me that he planned to remove me from the
7  morning blast, and then I said to him that
8  I would be willing to -- because I remember
9  Jane saying to me that one of her
10 complaints -- issues with me taking the
11 leave is that she wanted continuity of the
12 research, and she wanted the morning blast
13 to come from me.
14          So as a courtesy, and knowing
15 that Mr. Lowenthal was already okaying the
16 leave, I offered to say that I could SA the
17 morning blast; that would take maybe a half
18 hour in the morning to do, and if he wanted
19 to continue my name being on the morning
20 blast, I could do that.
21     Q.    And why did you offer to do that?
22     A.    Because at that stage I could
23 tell that Rob was upset, you know. His
24 curt comments, do what you need to do. I

211

Ngo - Direct

1  didn't feel like he understood why I needed
2  to take the leave off, and I was trying to,
3  you know, preserve my relationship with him
4  and not make him any angrier or
5  disappointed than he already is or was.
6      Q.    And what did Mr. Lowenthal say in
7  response?
8      A.    He said, no. I am taking you off
9  the morning blast.
10     Q.    And were you concerned that
11 Mr. Lowenthal was removing your name from
12 the morning blast?
13     A.    I was concerned, yes.
14     Q.    And why were you concerned?
15     A.    Because the tone that he set was
16 so abrupt. It wasn't -- you know, when I
17 had discussed with Jane about the morning
18 blast, I wanted to be gradual to say that
19 maybe it would have been coming from
20 Colleen and it would be signed from two
21 group heads, but Rob's removal was very
22 abrupt. He wanted it to come, not from
23 Colleen, but he wanted it to come from
24 Oppenheimer; and it would have sent more of

212

Ngo - Direct

1  a signal to the market that maybe --
2  because it would go out to a thousand
3  investors and they would say, why is Hoai
4  not here? It would look like I was
5  terminated.
6          So that part scared me, but it
7  also was just his tone, and I could tell he
8  was not happy about me asking for leave
9  through August 25th.
10     Q.    And before you went on leave --
11 strike that.
12          You had a -- when you went on
13 leave, the morning blast, did the morning
14 blast continue to be sent under your name?
15     A.    While I was on leave?
16     Q.    Yeah, initially.
17     A.    So the morning blast was -- for
18 the first two weeks of the leave, yes.
19     Q.    Was it that way until you had
20 this discussion with Mr. Lowenthal in mid
21 July?
22     A.    No. After my discussion with
23 Mr. Lowenthal, he removed me from the
24 morning blast.

213

Ngo - Direct

1    Q.    Right.  So before that
2    discussion, was the morning blast sent
3    under your name?
4    A.    Yes.  But it could also be --
5    remember, Colleen had already had her SA
6    approval at that stage, so she could SA
7    approve the morning blast so the morning
8    blast could still come out under my name
9    without me being there.
10   Q.    And had that happened while you
11   were in California after the birth of your
12   child?
13   A.    Yes.  After the birth of my
14   child, Colleen took over the responsibility
15   of SAing the morning blast.
16   Q.    But the morning blast was still
17   being sent under our name for the period
18   after the birth of your child until you had
19   this conversation with Mr. Lowenthal?
20   A.    That's correct.
21   Q.    Beyond the morning blast email,
22   did you discuss any other responsibilities
23   with Mr. Lowenthal --
24   A.    No.

214

Ngo - Direct

1    Q.    -- during this conversation?
2    A.    No.
3    Q.    Did you have any discussion with
4    him about your position as co-head of the
5    group?
6    A.    No.
7    Q.    How did you feel after the
8    conversation with Mr. Lowenthal?
9    A.    I felt worried about my job.  I
10   felt worried that -- I felt worried that I
11   would lose my job.  I felt worried -- this
12   was the first tough conversation I ever had
13   with Rob.
14        Over the years I have worked with
15   Rob, he has always been very positive with
16   me.  We always had a good relationship, but
17   this, to me, was a kind of a turning point.
18   Q.    In terms of your leave, what was
19   your understanding as to its status
20   following the conversation with
21   Mr. Lowenthal?
22   A.    My understanding was that I was
23   on leave, and I was not working until
24   August 25th.

215

Ngo - Direct

1    Q.    And during the phone conversation
2    with Mr. Lowenthal, did he tell you that
3    you had to return before August 25th?
4    A.    No.  I told him that I would be
5    on leave until August 25th.
6        ARBITRATOR DOLINGER:  Had
7    there -- before you went to California,
8    had you been advised that to get FMLA
9    leave you had to fill out some forms or
10   go through other procedures or simply
11   were left to negotiate with various of
12   the higher-ups about the terms of what
13   would be an FMLA leave?
14        THE WITNESS:  No.  The only
15   conversation I had with that was when I
16   spoke to Lenore Denys on May 12th, is
17   that she referred me to page 17 of the
18   manual, and that's the only formal
19   conversation on FMLA paperwork that I
20   -- that I would recall.
21   Q.    Before the baby was born -- and
22   we may have covered this, so my
23   apologies -- but before the baby was born
24   but while you were in California, did you

216

Ngo - Direct

1    do work there?
2    A.    Before the baby was born, yes, I
3    did.
4    Q.    Okay.  And after your daughter
5    was born, did you perform work for the
6    company?
7    A.    No.
8    Q.    Did you communicate with the
9    office beyond these discussions about
10   leave?
11   A.    No.
12   Q.    Did you have conversations with
13   Ms. Burns during this period of time?
14   A.    Well, I thought you were
15   excluding those about the leave.
16   Q.    Well, other than about leave,
17   about work?
18   A.    I don't recall, no.
19   Q.    Did you check your emails during
20   this period?
21   A.    Sporadically.
22   Q.    Did you consider checking the
23   emails to be doing work?
24   A.    No.

217

Ngo - Direct

1  Q.   What did you consider it to be?
2  A.   Well, I was a manager, so I would
3  just check messages to see -- where I left
4  it with Colleen is if there was an
5  emergency, give me a call but I would
6  just -- I would check just to check to see
7  if there was anything urgent.
8  Q.   I am going to ask you to take a
9  look at Exhibit 8, please.  What do you
10  recognize Exhibit 8 to be?
11  A.   It's the Oppenheimer -- I believe
12  it is the employee manual.
13  Q.   Okay.  And if you turn to page
14  OPCO 39, looking at the bottom of the page,
15  do you see a date?
16  A.   March 1st, 2014.
17  Q.   If you then turn to OPCO 55?
18  A.   Yes.
19  Q.   Actually, let's go back a couple
20  of pages to OPCO 53.  Do you see that?  Let
21  me know when you get to that page.
22  A.   Yes.
23  Q.   Okay.  And what do you -- is this
24  the -- is this the Family Medical Leave Act

218

Ngo - Direct

1  policy of Oppenheimer on page OPCO 53?
2  A.   That's correct.
3  Q.   Okay.  And I am reading Bates
4  numbers, but do you see the page number
5  there --
6  A.   Yes.
7  Q.   -- of the handbook?  And what's
8  the page number?
9  A.   Page 17.
10  Q.   Okay.  And was this the page that
11  Ms. Denys had referred you to in her email?
12  A.   Yes.
13  Q.   And if you turn to OPCO 55, let
14  me know when you are there.
15  A.   I am there.
16  Q.   And do you see a section called
17  Request for FMLA Leave?
18  A.   I do.
19  Q.   And can you read to me that first
20  clause?
21  A.   "An employee should request FMLA
22  leave by submitting a written request for
23  such leave to the human resources
24  department."

219

Ngo - Direct

1  Q.   What's your understanding of the
2  word "should"?
3  A.   That it's not required.
4  Q.   Did you request FMLA leave in
5  writing in connection with the birth of
6  your child?
7  A.   Yes.
8  Q.   Okay.  And when did you make that
9  request?
10  A.   I made that request in my email
11  to Ms. Ross and Ms. Burns on July -- I
12  believe it was July 13th.
13  Q.   And is that the email we looked
14  at previously, Exhibit 51?  Cross-check for
15  me.  Is that the email you are referring
16  to?
17  A.   Yes.  July 13th.
18  Q.   And before the July 13, 2014,
19  email, had you previously requested to be
20  on leave in writing?
21  A.   No.
22  Q.   Did you request leave before the
23  birth of the child before that July 13th
24  email, though?

220

Ngo - Direct

1  A.   Yes.
2  Q.   Okay.  And how did you make that
3  request?
4  A.   I had a conversation with Jane,
5  and I had a conversation with Rob that I
6  would take two weeks of leave after the
7  birth of our child.
8  Q.   And did you ever make a request
9  to HR for leave in writing in connection
10  with the birth of your child?
11  A.   No, I did not.
12  Q.   And why not?
13  A.   Because I didn't think I needed
14  to.  I thought that I was communicating it
15  to Rob and Jane, and they didn't -- my
16  initial request for the two weeks' leave,
17  they never asked -- when I even talked to
18  Rob for the two weeks, he never asked me to
19  fill out any FMLA paperwork.
20  Q.   When you had the discussion with
21  Mr. Lowenthal in mid May of 2014, what did
22  he tell you to do in connection with your
23  leave?
24  A.   We had agreed that I would take

221

Ngo - Direct

1 the two weeks' leave, and he said to work
2 it out with Jane and Colleen.  Those were
3 my instructions.
4      Q.    Did you end up returning to work
5 at the end of August 2015 -- 2014?  Sorry.
6      A.    No.  I did not.
7      Q.    And why not?
8      A.    I had a medical emergency.
9      Q.    And what was your medical
10 emergency?
11      A.    I suffered from a brain aneurysm.
12      Q.    And just generally, what is a
13 brain aneurysm?
14      A.    It's a form of a stroke.  It's a
15 bleeding of the blood vessel, and then it
16 -- it prohibits brain flow -- blood flow to
17 the brain, and then it impacts certain
18 brain function.
19      Q.    And when, approximately, did you
20 suffer the aneurysm?
21      A.    In early August.  No.  No.
22 Sorry.  In August.
23      Q.    Do you remember when in August?
24      A.    I still blank out this date

222

Ngo - Direct

1 because it's such a hard date.  I believe
2 it was August 16th.
3      Q.    Of which year?
4      A.    2014.
5      Q.    And what happened when you
6 suffered the aneurysm?
7      A.    We had just gotten back from
8 California, and I was getting ready to do
9 all the stuff I needed to do before work,
10 and I was at the Equinox gym, and I felt a
11 sudden pain in my head.
12      Q.    And do you recall what happened
13 next after that?
14      A.    Yeah, I -- I felt a little dizzy,
15 and I felt that something was wrong, so I
16 asked the front desk to walk me to the old
17 St. Vincent's emergency, which is a block
18 away, and to walk me over there to the
19 emergency room.
20      Q.    Okay.  And did you end up
21 receiving medical treatment in connection
22 with your aneurysm?
23      A.    Yes.  So prior to me going
24 unconscious, I had told the front desk that

223

Ngo - Direct

1 there was a history of aneurysm in my
2 family.  So they rushed me to MRI, and they
3 saw the bleed, and they rushed me from an
4 ambulance from there to Lenox Hospital to
5 be treated by a neurologist.
6      Q.    And at this point when you are
7 getting treated, you were unconscious?
8      A.    I woke up at one point in between
9 the surgery.
10      Q.    And what kind of surgery did you
11 have?
12      A.    I had a -- well, it's brain
13 surgery.  They were going to seal the
14 ruptured blood vessel.
15      Q.    And following the surgery, did
16 you remain in the hospital?
17      A.    Yes.
18      Q.    And for how long?
19      A.    I was in the ICU, I believe,
20 leading up to the surgery, that was one
21 day; and then after the surgery I was in
22 the ICU, I believe, for another -- I want
23 to say two or three weeks, and then I had
24 to come back to the ICU because there were

224

Ngo - Direct

1 complications.
2      Q.    And the second time that you were
3 in the ICU, how long were you there,
4 approximately?
5      A.    I think a week in the ICU and
6 maybe another week in the hospital.
7      Q.    After suffering the aneurysm, did
8 you communicate with Oppenheimer about
9 being out of work?
10      A.    Through my partner, yes.
11      Q.    And what is your understanding of
12 what your partner communicated with
13 Oppenheimer?
14      A.    I believe the day after the bleed
15 on August 16th, I believe Colin called Rob
16 and gave him the news.
17      Q.    And what's the basis for that
18 belief?
19      A.    I remember him telling me, and he
20 filling out the paperwork, but to be
21 honest, I was a little bit -- it was very
22 fuzzy for me.
23      Q.    And who is the "he"?  Who told
24 you?  You said he told you.

225

Ngo - Direct

A.     Colin told me that.  Colin is my partner.

Q.     And when you say Mr. Bekemeyer filed out the paperwork, what paperwork are you referring to?

A.     My understanding is he told me that he spoke to Rob, and Rob said to fill out the medical disability forms, and he filled those out.

Q.     Was there a point in time when you communicated with Oppenheimer about returning to the office after your aneurysm?

A.     Yes.

Q.     And who did you communicate with?

A.     Rob Lowenthal.

Q.     And approximately when did you communicate with Mr. Lowenthal?

A.     I believe over email.

Q.     And approximately -- do you remember approximately when that email was?

A.     I want to say it was in October of 2014.

Q.     And do you remember when you said

226

Ngo - Direct

you -- approximately when you said you would be returning to the office?

A.     I think in that October email I gave him a November 3rd return date.

Q.     And were you getting -- were you working -- after suffering the aneurysm, were you performing work for Oppenheimer?

A.     No.

Q.     And were you getting paid while you were out of the office?  Were you getting paid by Oppenheimer?

A.     After the aneurysm?

Q.     Yes.

A.     I believe I was on disability, and that would mean, no, I was not being paid.

Q.     Could you take a look at Exhibit 72, please?  Exhibit 72 is an email exchange between you and Mr. Lowenthal. The bottom email is from you dated October 9, 2014.

In this email do you give Mr. Lowenthal the date as to when you expect to return to the office?

227

Ngo - Direct

A.     Yes.

Q.     Okay.  And that date is?

A.     Monday, November 3rd.

Q.     And did you explain to Mr. Lowenthal the basis for the November 3rd return date?

A.     Yes, I did.

Q.     What was your explanation?

A.     I gave him a brief rundown of my stay, and I said to him that this was post physical therapy and doctor visits, so I gave him an idea of when I was medically approved to return to work.

Q.     And after suffering the aneurysm, were you limited physically in any way?

A.     No.

Q.     Was your ability to walk affected?

A.     Well, after being on bed rest for two months, I couldn't walk.  So I had to go through physical therapy to walk again, but by the time I returned in November 3rd, I was fine.

Q.     At the bottom of the email -- on

228

Ngo - Direct

the bottom email, and at the bottom of the email, you write, "I want to thank you for all of your support and concern."  Do you see that?

A.     Yes.

Q.     Okay.  And what -- why did you write that?

A.     I was being polite, and I was also referencing the fact that people like Diane Fox and Colleen Burns had -- Diane Fox are written me a note while I was in the hospital, and Colleen Burns had visited me and brought flowers, of course.

Q.     And when you say you were being polite, what do you mean by that?

A.     Well, Rob never visited me in the hospital, nor did he send me any cards, and neither did Jane.  So I was being polite in a sense that I didn't really want to -- I mean it occurred to me that they had never sent me anything.  So I was just being polite in that email to kind of group him into that thank you -- with the thank you for Ms. Fox, Diane Fox and Colleen.

229

Ngo - Direct

2    Q.    During the -- let me ask this:
3    Did Oppenheimer pay you for any of the
4    period that you were out of the office on
5    leave between June and August?
6    A.    Yes, they did.
7    Q.    Okay.  And for what period of
8    time did you receive pay from Oppenheimer?
9    A.    I believe I received base
10   compensation from June of -- June through
11   my aneurysm.  So I believe June through
12   August 16th or 17th, depending on when they
13   got the medical disability forms.
14   Q.    And did you have any discussions
15   with Oppenheimer at any point while you
16   were getting paid or before you got paid,
17   before you went on leave, as to whether you
18   would get paid?
19   A.    No.
20   Q.    Why did Oppenheimer pay you for
21   that period of time between when your baby
22   was born and when you suffered the
23   aneurysm?
24   A.    I don't know.  I -- when I had
25   talked to Rob about taking the leave, my

230

Ngo - Direct

2    assumption is that I asked him for -- I
3    didn't know if I used the exact words --
4    but FMLA leave, which was unpaid leave.  So
5    I had no expectations of compensation, and
6    I remember having a conversation with
7    Ms. Burns when I told her that I finished
8    my conversation with Rob, and she asked, is
9    he paying you?  And I said, I don't know.
10   Q.    When did that conversation with
11   Ms. Burns take place, approximately?
12   A.    I think after my conversation
13   with Rob.
14   Q.    And which conversation with
15   Mr. Lowenthal are you referring to?
16   A.    It was the conversation I believe
17   in July 16th.
18   Q.    Was there a point in time that
19   you learned that you were getting paid by
20   Oppenheimer while you were out on leave
21   for -- in connection with your baby?
22   A.    Yes.  I believe it was my -- I
23   don't know the exact date, but I believe it
24   was at the end of July because I had that
25   conversation with Colleen probably after

231

Ngo - Direct

2    the 16th, shortly after.
3             And then I think at the end of
4    July at one point I was so busy with Lily
5    and everything that I checked my pay stub
6    online and remember seeing that I was
7    getting paid.
8    Q.    And were you surprised that you
9    were being paid?
10   A.    Not really because if you
11   remember, my conversations when I did my
12   research or asked around that Lynn Johnson
13   was paid for portions of her leave.
14   Bridget said she was paid for portions of
15   her leave, and I was honestly thinking Rob
16   was just continuing to do the same
17   considering my years of service and, you
18   know, my relationship, my -- based on my
19   tenure at the firm.
20   Q.    And did you, in fact, return to
21   the office on November 3rd?
22   A.    Yes, I did.
23   Q.    And that was November 3rd, 2014?
24   A.    That's correct.
25   Q.    And did you have any discussions

232

Ngo - Direct

2    about your work status on November 3rd when
3    you returned to the office?
4    A.    Yes, I did.
5    Q.    And with whom did you have
6    discussions?
7    A.    Rob Lowenthal.
8    Q.    And who initiated the discussion?
9    A.    I believe I did.
10   Q.    And why did you initiate that
11   discussion?
12   A.    It was my first day back, and I
13   thought that I would check in with him on
14   my first day back.
15   Q.    And what did you discuss during
16   the meeting with -- the discussion with
17   Mr. Lowenthal on November 3rd?
18   A.    At first we kept it light.  We
19   talked about my recovery.  We talked about
20   Lily, and then he told me -- and I told him
21   that I was excited to be back at work, and
22   then he told me that I had been gone for
23   too long, and that I could not expect to
24   have the same job that I had been, and that
25   changes had happened at the firm, and that

233

Ngo - Direct

1 he was going to remove my compliance
2 responsibilities from me.
3     Q.   Did he explain to you what the
4 compliance responsibilities meant?
5     A.   No.  That was a little vague
6 because that's only one portion of my job.
7 So I asked him, what does that mean?  And
8 he said -- he kind of shrugged his
9 shoulders and just said, just do what you
10 need to do, and get back to work.
11    Q.   Was this the first time that
12 Mr. Lowenthal had said to you that he was
13 removing your responsibilities?
14    A.   Yes.
15    Q.   Had he previously told you that
16 he was taking away the morning blast from
17 you?
18    A.   He did, but that -- that's
19 just -- I thought that he was doing it more
20 on a compliance level or some degree it was
21 just being -- I do sense it was some level
22 of -- of eroding, but it wasn't -- of my
23 responsibilities -- but it wasn't -- I
24 didn't view it as removing me as a co-head

234

Ngo - Direct

1 at that point.
2     ARBITRATOR DOLINGER:  Wait.
3 When -- going back when Mr. Lowenthal
4 advised you, you think it was in
5 July -- that he was removing you from
6 the daily blast, the morning blast --
7     THE WITNESS:  That's morning
8 blast.  Yes.
9     ARBITRATOR DOLINGER:  All right.
10 Did he indicate that that was the
11 period of time that you were away or
12 that was a permanent thing?
13    THE WITNESS:  He didn't give me a
14 timeframe.  I don't remember that.
15    Q.   And in this November 3rd
16 discussion with Mr. Lowenthal when he said
17 he was removing your supervisory -- is that
18 the word, "supervisory" responsibilities?
19    A.   Those are the words that he used,
20 yes.
21    Q.   And did you understand that to be
22 on a permanent basis he was taking them
23 away?
24    A.   Well, that was the first time

235

Ngo - Direct

1 that I realized, wow, I think he might be
2 demoting me, and that was a very strong --
3 to me, that was -- that's why I asked him
4 what does that mean?  And he didn't clarify
5 it with me.  And then in that conversation
6 he also referenced a letter that he had
7 written or something like that, and he said
8 that I had made it clear to you in my
9 letter.  I didn't know what he was
10 referring to at the time.
11    Q.   When he said he had made it clear
12 to you, what did you -- what did you
13 understand him to mean?  Made what clear to
14 you?
15    A.   Well, I was asking him, what do
16 you mean by removing my compliance, my
17 compliance responsibilities?  And I believe
18 his response was, I had already made it
19 clear to you in my letter.  And he was
20 referencing a letter that I didn't know
21 existed.  So that was the -- that caused --
22 I didn't know what he was referring to at
23 that stage.
24    Q.   And did Mr. Lowenthal say

236

Ngo - Direct

1 anything to you during this conversation
2 about being unavailable?
3     A.   Yes.  That's -- he started the
4 conversation by saying I had been gone too
5 long, and I remember him saying that I
6 cannot expect to have the same job or the
7 same position when you have been gone so
8 long; that things change, and I remember
9 saying to him that -- that -- that I didn't
10 want to argue with him, but I said what has
11 changed?  Right.
12    Q.   And what did Mr. Lowenthal say?
13    A.   I remember him telling me that
14 the emerging markets analyst, Omar Zeolla,
15 was going to a desk model, and that was
16 compliance change, but we had already
17 worked through those compliance changes
18 prior to my departure.  That happened
19 before my departure, and I remember having
20 those meetings with Cary Holcomb.  So he
21 didn't really give me a concrete reason
22 what had changed, from my perspective,
23 knowing that that was already changed in
24 the works before.

237

Ngo - Direct

He also told me -- and so I think
at that stage, too, when he said I had been
gone too long, I remember him saying that I
had been gone -- I think he thought that I
had been gone for ten months, but it was
just a much longer period than I remember
being out; and I remember telling him
that -- because I actually thought that
maybe he was referring to that, you know,
my capabilities, maybe because I just got
back from my aneurysm.  I remember saying
to him that if this pertains to my medical
ability, I will tell you that I am -- the
doctor has cleared me to work.  I have no
disability; that I can handle the work
because 50 percent of the people -- for my
condition I know from my doctor that
50 percent of the people who have a brain
aneurysm die, and then the other 50 percent
have some sort -- of the 50 that survive,
50 percent have a permanent disability,
whether it be like they can't do -- write
or something like that.

So when he was questioning, I

238

Ngo - Direct

felt he was questioning my capabilities.  I
remember in that conversation saying to him
that the doctor had cleared me to work.  I
had no disability from this aneurysm, and I
remember emphasizing to him that I am ready
to go back to work and do my job.

Q.    And during this discussion, did
you talk to Mr. Lowenthal about whether you
remained co-head of the high yield research
group?

A.    Well, I think that's when he said
to me -- we didn't use those words exactly.
That's when he said, the only thing that he
alluded to that was that he was removing my
compliance responsibilities, and when I
asked him what that meant, he was vague
with me and didn't answer.

Q.    Did you specifically ask him
about your co-head job?

A.    Not at that conversation.

Q.    And what, if anything, did you
say in response to Mr. Lowenthal saying
that he was taking away -- I just want to
be clear about this.  Did he say he was

239

Ngo - Direct

taking away your compliance
responsibilities or your supervisory
responsibilities?

A.    I think -- I am pretty certain it
was compliance or supervisory, but those
are kind of the -- I think he used
compliance.  I remember it being compliance
because he was talking about Omar and the
compliance issues with moving him to a desk
model, meaning that he wasn't going to
publish formal -- formal research; that he
was going to do a desk model and that is a
compliance issue.  So I believe the words
were probably compliance.

ARBITRATOR DOLINGER:  Who is
Omar?

THE WITNESS:  He was the emerging
markets analyst.

Q.    How did you feel about your
discussion with Mr. Lowenthal on
November 3rd?

A.    Well, I felt -- you know, I have
known Rob for a while.  I felt, again,
discouraged, and I felt that -- at first I

240

Ngo - Direct

was just really just in shock.  It was my
first day back, and I was just -- I -- my
conversation with him ended again so
abruptly by him just saying, do your job
that I was just -- I was just in shock, and
I was worried about my job.

ARBITRATOR DOLINGER:  When he
said, just do your job, you didn't
respond by asking, what is my job at
this point?

THE WITNESS:  I could tell he was
frustrated, so I just didn't -- I
didn't want to argue with him.  I think
it was becoming a contentious
conversation when I asked him what that
meant.  And when he didn't answer, I
didn't want to keep arguing with him,
already feeling that my job was in
jeopardy.  So I didn't want to, I
guess, exacerbate the situation.

So I just -- I tend to -- for me,
when I am have dealt with a situation
like that, I tend to try to take a step
back rather than be so reactionary.  So

241

Ngo - Direct

1   rather -- I asked him the question I
2   felt at the time, I asked him the
3   question, what does that mean?  And
4   when he came back with a vague response
5   and kind of curt saying, just go back
6   and do your job, to me, that was kind
7   of someone saying, I don't want to talk
8   about it, right?
9        So I just -- I just said, okay.
10  Went back to my desk.  That's -- that's
11  how I recall it.
12  Q.    And the question, what do I mean
13  was in response to which statement that
14  Mr. Lowenthal made?  What do you mean?  You
15  said what does that mean, right?
16  A.    I asked him, when he asked me,
17  you would not be in charge of the
18  compliance portion of the business.  I
19  said, what does that mean?  And he just
20  said -- he said, just do our job.
21       And then, again, he referenced
22  that letter that he had discussed it with
23  me or something, so then I was a little bit
24  unsure of that.

242

Ngo - Direct

1        ARBITRATOR DOLINGER:  By the way,
2   did you ever discover that there was a
3   letter that you had not yet seen?
4        THE WITNESS:  So after that
5   conversation, when he referenced that
6   letter, I didn't know what he was
7   referring to, so I went back to my
8   desk, and then went through my emails;
9   and you have to remember something, I
10  had -- I think John made fun of me that
11  I had 115,000 emails that were unopened
12  because what happens as an analyst when
13  you cover so many companies, you get
14  these things called news alerts.  So
15  you have a Bloomberg email, so whenever
16  there is any news on a company, and
17  it's not just any big news, it could be
18  like trading volumes or the market
19  closed this day, but you can't separate
20  out the emails.
21       So on a given day, I get tons of
22  emails that say NLRT, which is news
23  alerts, and then my regular email is
24  mixed with those news alerts.  So

243

Ngo - Direct

1   that's why I had so many unopened
2   messages when I got back.
3        So when I skim emails when I am
4   away from the office, I am kind of
5   trying to go past those news alerts,
6   and then see, but you need those news
7   alerts because if there is anything
8   that breaks on your company you cover,
9   that would be something that you would
10  have to research further or like bonds
11  would move and then you have to react
12  fast; but mixed in with my emails was
13  tons of news alerts.  So I came back to
14  my desk and went through my emails.
15  Q.    Okay.  Let's take a look at that
16  letter.  Exhibit 45, please.
17       So is this the email and the
18  attached letter that you were just
19  testifying to, Mr. Ngo?
20  A.    Yes.
21  Q.    And the email, the cover email is
22  from Mr. Lowenthal to you on July 18, 2014.
23  Did you -- when you -- well, strike that.
24       When did you first review this

244

Ngo - Direct

1   letter?
2   A.    It would be when I got back to
3   the office on November 3rd.
4   Q.    And what -- I mean I think we
5   have gone through this -- but what prompted
6   you to look for this letter?
7   A.    In my conversation with Rob, he
8   had referenced a letter.
9   Q.    And that conversation was the one
10  you had on which day, November 3rd?
11  A.    On November 3rd.
12  Q.    And were you checking emails in
13  July of 2014?
14  A.    I was.
15  Q.    And how did you miss
16  Mr. Lowenthal's email?
17  A.    Again, I must have missed it, and
18  it was an error on my part.  I -- like I
19  said, I received so many news alerts, I did
20  not open this one.
21  Q.    Did you see it and ignore it when
22  you -- in July of 2014?
23  A.    No.  I would not have done that.
24  Q.    So if you can turn the page and

245

Ngo - Direct

1  look at the letter?
2  A.   Sure.
3  Q.   I want you to take a minute to
4  read through the letter.  Let me know when
5  you are finished.
6  A.   Okay.  Thank you.  Okay.  I am
7  ready.
8  Q.   In the letter Mr. Lowenthal
9  writes -- it's in the second paragraph --
10 he writes, "When we discussed your time
11 off, it was my understanding from you that
12 you would need at least two weeks' leave
13 and with the possibility of extending that
14 leave for an additional two weeks,
15 depending on the health and needs of the
16 baby."
17 Do you see what I just read?
18 A.   Yes.
19 Q.   Okay.  Was that what you had told
20 Mr. Lowenthal?  Did he accurately describe
21 what you had told him?
22 A.   No.
23 Q.   And how is that statement
24 inaccurate?

246

Ngo - Direct

1  A.   Where I had left it with Jane,
2  Rob and Colleen was that I would have -- I
3  would need weeks -- I would work -- that I
4  would need two weeks of leave after the
5  birth of our child, and I never discussed
6  saying I would only need two other weeks.
7  Q.   And in the letter, Mr. Lowenthal
8  writes, "I was willing" -- we are in the
9  second paragraph, last sentence?
10 "I was willing to accommodate
11 your initial request permitted the
12 flexibility with your return date and kept
13 you on Oppenheimer's payroll."  Do you see
14 that text?
15 A.   Yes.
16 Q.   Okay.  Did you ask Mr. Lowenthal
17 before your leave to be kept on
18 Oppenheimer's payroll?
19 A.   No.  We never discussed that, and
20 I never asked.
21 Q.   The letter is dated July 18,
22 2014, correct?
23 A.   That's correct.
24 Q.   Okay.  And how many days earlier

247

Ngo - Direct

1  or how much earlier did you have your
2  conversation with Mr. Lowenthal before this
3  letter?
4  A.   I believe this is two days after
5  my conversation with Mr. Lowenthal on
6  July 16th.
7  Q.   And in this letter in the third
8  paragraph, in the middle of the paragraph,
9  Mr. Lowenthal writes, "In your absence, I
10 intend for Colleen Burns as co-head of
11 fixed income research to absorb all of the
12 tasks associated with the supervisory
13 elements of the research department."  Do
14 you see that text?
15 A.   Yes.
16 Q.   And did Mr. Lowenthal say that to
17 you during your conversation on or about
18 July 16, 2014?
19 A.   No, he did not.
20 Q.   And attached to this letter is --
21 what is attached to this letter, if you
22 turn to the next page?
23 A.   Looks like FMLA forms.
24 Q.   And did you fill out these FMLA

248

Ngo - Direct

1  forms?
2  A.   No, I did not.
3  Q.   And why not?
4  A.   Because I never received this.  I
5  didn't receive it.  I didn't get -- I
6  didn't open the email.  It was never sent
7  to my address.  He just never received the
8  FMLA forms.
9  Q.   Mr. Lowenthal sent the letter to
10 you by email, correct?
11 A.   That's correct.
12 Q.   Did you receive -- do you know if
13 Mr. Lowenthal sent the letter or the forms
14 using any other means other than email?
15 A.   No.  I did not receive it in
16 California nor did I receive it post our
17 return in August in New York.
18 Q.   Did you receive --
19 ARBITRATOR DOLINGER:  Just to be
20 clear, when you say you did not receive
21 it, is there any indication that you
22 would not, as of July 18th, receive
23 this email with the attached letter in
24 your email account?

249

Ngo - Direct

2    THE WITNESS:  I never opened it,
3  and -- I never opened it, and I am sure
4  that Oppenheimer can show that I opened
5  my email, but I never opened it, and I
6  went back on November 3rd, I remember
7  because you know it changes color.
8  Like if you read an email, it changes
9  color so it's not black.  It's white.
10 It was still black.
11    Q.    But do you have any reason to
12 doubt that you received the email on
13 July 18th via your work email?
14    A.    Oh, no.  I don't dispute that I
15 received it, but I just never -- I didn't
16 catch it, so I didn't open it, and I
17 remember when I returned to my office on
18 November 3rd, it was still black when I
19 opened it.
20    Q.    To your knowledge, did
21 Mr. Lowenthal send the letter and the
22 attached FMLA paperwork by mail?
23    A.    No.
24    Q.    Do you have any knowledge of him
25 sending it by any other means other than

250

Ngo - Direct

2  the email?
3    A.    No.
4    Q.    Did Mr. Lowenthal ever tell you
5  that he sent it to you in any other way
6  other than email?
7    A.    No.
8    Q.    After the November 3rd discussion
9  with Mr. Lowenthal, did you have any other
10 discussions with Mr. Lowenthal about your
11 status at work?
12    A.    Yes.
13    Q.    And when did you have that
14 discussion?
15    A.    The next day, November 4th.
16    Q.    Of 2014?
17    A.    That's correct.
18    Q.    And who initiated that
19 discussion?
20    A.    I initiated it.
21    Q.    And why did you initiate the
22 discussion with Mr. Lowenthal on
23 November 4th?
24    A.    Well, it was a couple of things.
25 After my November 3rd conversation, it was

251

Ngo - Direct

2  unclear to me what my job was.
3    I had spoken to Ms. Burns, and I
4  asked her, did you know that if I was
5  demoted or if I am no longer co-head of the
6  group, and she said she didn't know.
7    My staff had no knowledge or no
8  announcement that I was no longer co-head
9  of the group, and I remember that day
10 Lucila Broide asking me, Hoai, could you
11 help me with this issue?  You know, asking
12 me as a group head, could you ask me this
13 issue.
14    Also, the sales force had not
15 known -- had no indication that I was no
16 longer co-head of the group.  One of our
17 sales desks, one of our -- Rob Roman, one
18 of our salesmen, had instant messaged me
19 and asked me if -- he joined me in a
20 conversation with another account portfolio
21 manager saying, could you talk to our group
22 head about this, blah, blah, about this
23 issue?  And so I didn't know where my
24 status stood.
25    I had the impression that Rob --

252

Ngo - Direct

2  I got the impression that when Rob said he
3  was taking away my compliance, plus the
4  curtness of the conversation, plus
5  reading this letter, I was still unsure
6  what was going on.  So I came in to his
7  office to get clarity.
8    Q.    And the communication you had
9  with Mr. Roman, that took place before your
10 discussion with Mr. Lowenthal on
11 November 4th?
12    A.    That's correct.
13    MR. IADEVAIA:  I need to -- could
14 I take just a two-minute break?  If you
15 want to do a longer break now, that's
16 fine.
17    ARBITRATOR DOLINGER:  Okay.
18    (Recess taken.)
19    ARBITRATOR DOLINGER:  Resume.
20 EXAMINATION CONTINUED
21 BY MR. IADEVAIA:
22    Q.    Before the break you testified to
23 a conversation you had with Mr. Lowenthal
24 on November 4th; is that right?
25    A.    That's correct.

253

Ngo - Direct

1    Q.    Okay.  Did you record the
2    conversation with Mr. Lowenthal on
3    November 4th?
4    A.    Yes, I did.
5    Q.    And in what manner did you record
6    the conversation?
7    A.    I just brought in my iPhone.
8    Q.    And where was the -- where was
9    your recorder on you?
10   A.    In my pocket.
11   Q.    Did you tell Mr. Lowenthal that
12   you were recording the meeting?
13   A.    No, I did not.
14   Q.    I am going to ask you to take a
15   look at Exhibit 8.  Let me know when you
16   get there.
17   A.    I am there.
18   Q.    Okay.  And what is Exhibit 8?
19   What do you recognize it to be?
20   A.    It's Oppenheimer's handbook.
21   Q.    And if you take a look at
22   page 40, OPCO 47, that's the Bates number.
23   Let me know when you are there.
24   A.    I am there.
25

254

Ngo - Direct

1    Q.    And do you see the heading Tape
2    Recording Policy?
3    A.    Yes, I do.
4    Q.    And if you look in the second
5    paragraph, we will read it for the record,
6    it says, "Without the prior written
7    authorization of the company's chief
8    executive officer, general counsel or
9    deputy general counsel, employees are
10   prohibited from taping or otherwise
11   recording, whether openly or secretly, any
12   conversation, communication, activity or
13   event that occurs in Oppenheimer's
14   facilities and/or is directly or indirectly
15   related to Oppenheimer's business."
16       Do you see that text?
17   A.    Yes, I do.
18   Q.    And was recording the
19   conversation on November 4th between you
20   and Mr. Lowenthal in violation of that
21   policy?
22   A.    Yes, it was.
23   Q.    Why did you record the
24   November 4th meeting?
25

255

Ngo - Direct

1    A.    Well, it was a combination of
2    things.  As I said, I had just gotten back
3    on November 3rd, and Rob had given me
4    indication that my job was in jeopardy.
5        I was a little just flustered at
6    that point because that was my first day
7    back as well, but I was scared for my job.
8    It was a combination of that conversation
9    and then the prior conversation to that
10   was -- prior heated exchange.  It's not
11   heated, but the -- I had another difficult
12   exchange with Rob on July 16th.  So it was
13   a combination of the July 16th, the
14   November 3rd conversation that I felt a
15   little -- I felt scared about losing my
16   job.
17   Q.    And so why would you decide to
18   tape record a conversation based on being
19   scared for your job?
20   A.    I just -- I felt like I wanted to
21   protect myself and just make sure that --
22   it's almost like if you wanted to have a
23   third party there just in case.
24   Q.    Did you record any other meetings
25

256

Ngo - Direct

1    during your employment at Oppenheimer?
2    A.    No, I did not.
3    Q.    And why didn't you tell
4    Mr. Lowenthal that you were recording the
5    meeting?
6    A.    I -- I didn't want to.
7    Q.    Why didn't you want to?
8    A.    Because if I told him I was
9    recording, he wouldn't be honest with me,
10   either.  So I didn't -- I did not tell him.
11   Q.    If we could take a look at
12   Exhibit 86?
13       MR. GIBSON:  Is this the audio?
14       MR. IADEVAIA:  Yes.  This is the
15   audio.  What I propose we do, because
16   there is transcripts, Judge Dolinger,
17   there is a transcript from claimant and
18   a transcript from respondent; I was
19   going to -- I don't think it's helpful
20   to listen to the audio; but I was going
21   to suggest that maybe we read the
22   transcript.  It's seven, eight pages
23   double-spaced, and then I could ask him
24   a couple of questions.

257

Ngo - Direct

1  ARBITRATOR DOLINGER: Okay.
2  MR. IADEVAIA: Is that okay?
3  MR. GIBSON: I am going to play
4  it.
5  MR. IADEVAIA: That's fine.
6  MR. GIBSON: I just want to make
7  sure I am reserving that.
8  MR. IADEVAIA: Okay.
9  So we are going to -- we will
10  reference defendant's transcript, which
11  is B because it has line numbers, so it
12  makes it easier.
13  MR. GIBSON: So 86B?
14  MR. IADEVAIA: Yes.
15  Q.  So if you could read it Mr. Ngo?
16  A.  Yes.
17  ARBITRATOR DOLINGER: I take it B
18  is your version?
19  MR. GIBSON: No. B is actually
20  respondent's version. It has line
21  numbers. It makes it easier to go
22  through.
23  I mean, would it be better just
24  to play it? Is that preferable?

258

Ngo - Direct

1  ARBITRATOR DOLINGER: I can read
2  it faster than I can play it. It's
3  probably clearer than the audio.
4  MR. GIBSON: It absolutely is.
5  (Pause)
6  THE WITNESS: Okay.
7  Q.  Okay. If you take a look at
8  page 2, line 3, the transcript says that --
9  and the first line three it says, "I just
10  want to apologize."
11  Do you see that text?
12  A.  Line 3, yes.
13  Q.  Page 2, lines 3 to 4?
14  A.  Yes.
15  Q.  Okay. Why did you apologize to
16  Mr. Lowenthal?
17  A.  You know, it's a strategy that I
18  have when I -- I knew that I had a
19  contentious conversation with him the day
20  before, so rather than start the
21  conversation in swinging, I would rather
22  just be deferential and just start off
23  saying, I apologize.
24  Q.  If you take a look at page 2,

259

Ngo - Direct

1  line 12, the transcript says that you say,
2  "I have always been honest with you." Do
3  you see that text?
4  A.  Yes.
5  Q.  Did you believe that secretly
6  recording Mr. Lowenthal -- a conversation
7  with Mr. Lowenthal was being honest?
8  A.  No.
9  Q.  On page 2, line 15, you use the
10  word "confusion." The sentence is, "I
11  think that there was confusion with that
12  leave." Do you see that text?
13  A.  Yes.
14  Q.  Whose confusion are you referring
15  to there?
16  A.  I am referring to Mr. -- to
17  Mr. Lowenthal's confusion.
18  Q.  And do you believe that your
19  communications about leave with
20  Mr. Lowenthal were confusing?
21  A.  No. I think I was pretty clear
22  about the dates that I wanted to be on
23  leave.
24  Q.  Why did you use that word

260

Ngo - Direct

1  "confusing" -- "confusion" there?
2  A.  Well, the previous conversation
3  that he had referenced that we had the day
4  before, he had said, I thought that you
5  were going to take just two weeks off. So
6  I was basically saying to him, that I am
7  sorry that you were confused on that issue,
8  but it was very clear that I had asked for
9  more time than that.
10  Q.  On page 3, line 23, the
11  transcript says that you said to
12  Mr. Lowenthal, "That's my fault and I agree
13  with that."
14  Why -- again, why were you
15  apologizing to Mr. Lowenthal there?
16  A.  Look, he was my boss. He was
17  angry with me the day before. This
18  conversation is leading up to -- I got the
19  sense that yesterday that he was demoting
20  me. I was trying to save and preserve my
21  relationship with him, preserve my job. I
22  was trying to make amends to our
23  relationship.
24  Q.  If you take a look at page 4,

261

Ngo - Direct

1  lines 4 to 5, it says -- the transcript
2  says that you say to Mr. Lowenthal, "I was
3  totally prepared to sign anything."  Do you
4  see that text?
5      A.    Yes.
6      Q.    Okay.  And what did you mean when
7  you said, "I was totally prepared to sign
8  anything"?
9      A.    I was referring to FMLA, FMLA
10  paperwork.  I was referring to my
11  conversation with him on July 16th when
12  he -- I said to him, whatever you need for
13  me to sign for time off, I am willing to do
14  so.
15      Q.    And during that July 16th or so
16  conversation with Mr. Lowenthal, did
17  Mr. Lowenthal tell you that he was going to
18  send you FMLA paperwork?
19      A.    No.
20      Q.    Did he tell you he was going to
21  send you any paperwork?
22      A.    No.
23      Q.    If you --
24      A.    Can I just qualify, too, that,

262

Ngo - Direct

1  remember, I had read his August -- his
2  July 18th email at this stage.  I had read
3  it the day before, and one of my fears was
4  that he had sent this paperwork, and then I
5  didn't obviously respond to it.  So I
6  didn't want him to get the impression that
7  I was not willing to sign it.
8      Q.    And why didn't you respond to it?
9      A.    Because I never received it.
10      Q.    You hadn't opened the email?
11      A.    I am sorry.  Yes.  That's the
12  better way to -- yes.  That's correct.  I
13  did receive it, but I did not open it.
14      Q.    If you take a look at page 5,
15  line 3 to 5 -- lines 3 to 5, the
16  transcript -- according to the transcript,
17  you say to Mr. Lowenthal, "When I was in
18  California, I didn't check.  I did not
19  check," and there is a hyphen, "I checked
20  emails every day."  Do you see that?
21      A.    Yes.
22      Q.    So when you were in California
23  following the birth of your baby, did you
24  check -- did you check emails, work emails?

263

Ngo - Direct

1      A.    Yes.  I did check them every day.
2          ARBITRATOR DOLINGER:  I thought
3  you said earlier that you would
4  periodically check them.
5          THE WITNESS:  Well, I misspoke.
6  I mean, I know that I would check it
7  every day.  Maybe when I said -- I
8  might have said sporadically, but I
9  checked it pretty much every day.  I
10  misspoke.  I apologize.
11      Q.    And then the next sentence is, "I
12  called.  I spoke to her at least once a
13  week."  Do you see that text?
14      A.    Yes.
15      Q.    Okay.  Who is the "her"?
16      A.    Colleen Burns.
17      Q.    And what are you saying there?
18      A.    I am saying that, again, I am
19  trying to be deferential to him to say that
20  as a manager I didn't just drop the ball.
21  I would check in with Ms. Burns.
22      Q.    And did you, in fact, while you
23  were in California after the birth of your
24  child, did you, in fact, check in with

264

Ngo - Direct

1  Ms. Burns about work-
2  related issues?
3      A.    Yes.  We also had an
4  understanding that if there was anything
5  she needed, that she could call my cell
6  directly.
7      Q.    If you take a look at page 7,
8  line 3, this is -- according to the
9  transcript, Mr. Lowenthal says to you, "And
10  she was being -- that she was made single
11  head of research."  Do you see that text?
12      A.    Yes.
13      Q.    What do you understand
14  Mr. Lowenthal -- Mr. Lowenthal having said
15  to you there?  What you understand that
16  sentence to mean?
17      A.    That was clear to me that he is
18  telling me that I am no longer head of
19  research.
20      Q.    And that who is head of research?
21      A.    Colleen Burns.
22      Q.    And on that same page, lines 6 to
23  7, according to the transcript, you say,
24  "No.  She never told me that, so I didn't

265

Ngo - Direct

1  know that.  So I knew that it was in the
2  interim, right, but I didn't know that it
3  was decided."
4        What did you mean by that?
5     A.    Well, Colleen had never told me
6  that.  I was relaying to him that she never
7  told me that while I was on leave.  In
8  fact, the conversations we had in between
9  she never mentioned anything about she
10 being exclusively on leave.
11        The second sentence when I said I
12 knew that it was in the interim, that's in
13 -- that's in response to the fact that I
14 had read his letter on November 3rd, and
15 then it did say that I was -- that she was
16 co-head in the interim.
17    Q.    So while you were out of the
18 office on leave between June and November,
19 did Ms. Burns tell you that she had been
20 made head -- sole head of research?
21    A.    No.  I would have remembered
22 that.
23    Q.    Did Ms. Burns tell you during
24 that period that she had been made interim

266

Ngo - Direct

1  sole head of research?
2     A.    No.  She did not.
3     Q.    And then on page 7, line 9
4  Mr. Lowenthal, according to the transcript,
5  Mr. Lowenthal says to you, "It's
6  permanent."  What did you understand that
7  to mean?
8     A.    It means that I am permanently
9  demoted from -- I am no longer co-head of
10 research.
11    Q.    And was this the first time that
12 you had learned that Ms. Burns had been
13 made permanent sole head of high yield
14 research?
15    A.    Yes.
16    Q.    If you take a look at page 8,
17 lines 6 to 7, you -- according to the
18 transcript, you say to Mr. Lowenthal, "And
19 then also on a technical note, Jane should
20 probably tell the salespeople.  Yesterday
21 Rob put me on a conferencing with someone
22 saying, this is why he is the co-head of
23 the group."  Do you see that text?
24    A.    Yes.

267

Ngo - Direct

1     Q.    And what did you mean in those
2  sentences?
3     A.    The salespeople -- no one in the
4  group had known that Colleen was the head.
5  I shouldn't say known.  I can only speak
6  for certain people.  I know my staff did
7  not know that I was no longer co-head of
8  research and Colleen was the head of
9  research.
10        I also know that the salesperson,
11 Rob Roman, from talking to -- I only talked
12 to two salespeople, to be honest.  Rob
13 Roman did not know that I was not co-head,
14 and Lynn Johnson, I asked her later, I
15 said, did you know that Colleen is sole
16 head of research?  She said, no.  Jane
17 never told us that.
18        Rob Roman was just more of an
19 unsolicited.  He sent me an instant
20 message.  We can get -- they are called
21 Bloombergs where you can get an instant
22 message from someone, and he had sent an
23 instant message to an account and asked me
24 to join and say, could you talk to Hoai,

268

Ngo - Direct

1  head of research, and it was clear to me he
2  didn't know.  That's significant because
3  Rob was our highest grossing salesperson.
4  She hadn't told him that there were changes
5  in research, and that was a clear example
6  of how that puts me in an uncomfortable
7  position because I am not going to say to
8  an account, oh, I -- that should go to
9  Colleen, not me at that point.
10    Q.    And when you say that your staff
11 was unaware, who was your staff?
12    A.    All the research analysts that
13 reported to me, and as I mentioned, the day
14 prior, Lucila Broide had asked me a
15 question that was a management question,
16 and I didn't know what to say.
17    Q.    Why didn't you know what to say?
18    A.    Because it wasn't clear to me
19 that I was demoted because all Rob said is
20 he is removing my compliance questions, and
21 she wasn't asking me a compliance question.
22 She was asking me to SA her work, and she
23 wanted to know -- I think she was -- I
24 never -- I said to her, I think I deferred

269

Ngo - Direct

1  the conversation, but I think she was going
2  to ask me to some level -- some level of
3  leave or something, but I think it was more
4  than just work, but I never followed
5  through with it.
6      Q.    Other than the question that
7  Ms. -- is it Broide or Broide?
8      A.    Broide.
9      Q.    Other than the question that Ms.
10 Broide asked you, how did you know that the
11 other research analysts were unaware that
12 you had been demoted?
13     A.    Well, I didn't ask all of them,
14 but I remember talking to Umesh Bhandary.
15 We went to lunch, and I said, did you
16 tell -- did you know that I am no longer
17 co-head of the group?  And he said no.
18 There was no announcement to that extent.
19         And according to Mr. Bhandary, he
20 said that -- and then I guess the -- after
21 my conversation with Rob, Colleen
22 apparently told the group that she was the
23 sole head of the group, and I asked him how
24 she did that.

270

Ngo - Direct

1          We all sat in a room, and I guess
2  she just turned around and said, hey, by
3  the way, I am the sole head of the group.
4      Q.    And who was in that room?
5      A.    I don't know.  I wasn't there at
6  the time.  Umesh told me that is what
7  happened, and I don't know who was in the
8  room, but I am assuming he meant that most
9  of the people in the room who were there.
10     Q.    Did you see any announcement
11 about your return to work, a written
12 announcement about your return to work?
13     A.    No.
14     Q.    Did you see any announcement --
15 was there ever a written announcement about
16 your no longer being co-head?
17     A.    No.  And, in fact, they hadn't
18 even changed -- I guess in my Bloomberg
19 profile it says co-head of research, and it
20 still had co-head of research.  I had to
21 manually call Bloomberg to say remove that
22 from my title.
23     Q.    When did you call Bloomberg and
24 ask them to do so?

271

Ngo - Direct

1      A.    It was after I returned, after my
2  conversation with Rob.  It was clear to me
3  I was no longer group head, and keep in
4  mind, I didn't make that change to co-head
5  on Bloomberg.  It was something that
6  Bloomberg -- that Oppenheimer did
7  internally, and so I had to actually figure
8  it out and call the Bloomberg rep and say,
9  we need to change this title.
10     Q.    Did you ever see an email from
11 Ms. Ross regarding your status as co-head?
12     A.    Yes.
13     Q.    And how did she -- strike that.
14         Who was the email sent to?
15     A.    It was sent to the salespeople.
16     Q.    And how did you get or how did
17 you see a copy of that email because you
18 are not a salesperson, right?
19     A.    That's correct.
20     Q.    Yes.
21     A.    Lynn Johnson, who is my friend,
22 said to me -- at lunch she said, we got
23 this weird email from Jane Ross saying that
24 you were no longer co-head of the group.

272

Ngo - Direct

1      Q.    And approximately when did
2  Ms. Ross send the email, do you know?
3      A.    I believe it was -- I want to say
4  it was right after this conversation with
5  Rob.  I don't know the exact date, but we
6  can -- it's -- I know it's in the
7  documents.
8      Q.    Yeah.  Let's take a look at it.
9  Exhibit 85.  The quality of the copies is
10 not great, but this is the version I think
11 that was produced in discovery.
12         Is this the email that you are
13 referring to, the email announcement about
14 your status as co-head?
15     A.    That's correct.
16     Q.    And this is an email from
17 Ms. Ross?
18     A.    That's correct.
19     Q.    And could you tell from this
20 email if -- who it's sent to from this
21 document?
22     A.    Actually, I cannot, but I know
23 that I received this from Lynn Johnson.
24     Q.    And did Ms. Johnson forward it to

273

Ngo - Direct

1 you electronically?
2     A.    No.  She printed it out.
3     Q.    And she gave you a hard copy?
4     A.    That's correct.
5     Q.    And who did Ms. Johnson say this
6 email was sent to?
7     A.    She said it was sent to all of
8 the salespeople.
9     Q.    And the date of this email is
10 November 6, 2014; is that right?
11     A.    That's correct.
12     Q.    And so that's after the
13 conversation you had with Mr. Lowenthal in
14 which he tells you you are being demoted?
15     A.    That's correct.
16     Q.    And I think to read -- to read it
17 for the record, just because it's hard to
18 read, let me know if you disagree with my
19 reading.
20         "Hey, all.  Meant to go through
21 this in the morning meeting, but I was
22 stuck on 95 for two hours.
23         As we welcome Hoai back, I wanted
24 to remember -- remind everybody that

274

Ngo - Direct

1 Colleen remains head of research, which we
2 put in place in July, and Hoai will
3 continue to cover chem -- chemicals, paper,
4 mining, et cetera.  Any supervisory
5 research issues" -- I can't read that word,
6 is it should -- "should continue to go
7 through Colleen."  Do you see that?
8     A.    Yes.
9     Q.    Okay.  And are you aware of any
10 announcement, whether in writing or orally,
11 that Ms. Burns had been made sole head of
12 research before what's Exhibit 85?
13     A.    No.
14     Q.    I am going to ask you to take a
15 look at Exhibit 128, please.
16     A.    Yes.
17     Q.    So, Mr. Ngo, what is Exhibit 128?
18     A.    It's me corresponding with
19 Ms. Burns on my BlackBerry.
20     Q.    Okay.  And it's -- so it's an
21 email you sent to Ms. Burns on July 25,
22 2014?
23     A.    That's correct.
24     Q.    Okay.  And as of July 25, 2014,

275

Ngo - Direct

1 what was your status?
2     A.    I was on -- I was on leave out of
3 the office.
4     Q.    Okay.  And in the email you
5 write, "I think you are out in July.  Do
6 you want me to SA while you are gone?"
7 What is SA?
8     A.    Supervisory approval.
9     Q.    So what are you asking Ms. Burns?
10 What are you offering to do for Ms. Burns?
11     A.    Well, I -- in one of our
12 conversations I knew that Ms. Burns was
13 working -- was going on vacation, so as a
14 common courtesy, you know, as colleagues, I
15 asked -- I was being nice and saying, do
16 you want me to help you out while you are
17 on vacation especially when she was
18 covering for me while I was gone.
19     Q.    And what did Ms. Burns say in
20 response to your offer?
21     A.    She was so kind.  She said, don't
22 worry about it.  You have a baby to handle.
23 You're out.  You are on leave.  I will
24 handle it.

276

Ngo - Direct

1     Q.    And if she had agreed or accepted
2 your offer to SA, how much time would that
3 have taken you to do?
4     A.    You know, it would just mean
5 waking up at 4:00 in the morning and just
6 reviewing the morning blast, and it would
7 take maybe -- it depends.  Depends on how
8 much research there is that day, but I
9 would say anywhere from five minutes to
10 10 minutes, maybe.
11     Q.    And if you could take a look at
12 Exhibit 126?  What is this document?
13     A.    This is an email from me to
14 Ms. Burns and the group.
15     Q.    When you say "the group," what
16 are you referring to?
17     A.    The group analysts in -- that
18 reported to us.  So that's Sean Sneeden,
19 Umesh Bhandary, and John Daniels and
20 Jessica Xu, who I believe was an intern.
21     Q.    And the date of the email is
22 July 18, 2014?
23     A.    Correct.
24     Q.    And what was your status as of

277

Ngo - Direct

1  that date?
2  A.    I was on leave.  I was not
3  working.
4  Q.    And what are you doing here in
5  the -- in the email -- actually, strike
6  that.
7         If you look down in the email, do
8  you see in -- so if you look down in the
9  email, you see the text that says,
10 auto-forwarded by a Rule?
11 A.    Yes.
12 Q.    What does that mean?
13 A.    Well, this is weekly wrap-up, and
14 I believe that I was the only one that
15 Bloomberg gave access to this because they
16 didn't want too many people from the
17 distribution list to do it, and I believe
18 that -- I believe Colleen probably in one
19 of our conversations must have said, could
20 you forward me today's weekly wrap-up from
21 Gowri.
22 Q.    Does the auto-forwarded by a
23 Rule, does that mean there was some
24 automatic setting?

278

Ngo - Direct

1  A.    Oh, you know what it is?  Now --
2  before I left, I was the only one who got
3  this email, right?  So before I left, I set
4  up an automatic forward that it goes
5  automatically to the group, and I think
6  that's what this is.
7  Q.    So where it says from you to the
8  group, that was -- your understanding is
9  that that was because of the auto setting?
10 A.    Yes.  That's exactly what it is.
11 I remember, so one of the tasks I wanted to
12 get done before I left and to prepare the
13 group, I was the only one who got this
14 email.  So I set up an automatic forward
15 rule.
16 Q.    After your leave of absence in
17 the summer of 2014, and your return to work
18 on November 3rd, 2014, did Oppenheimer
19 promote you?
20 A.    I am sorry.  Could you repeat the
21 question?
22 Q.    Sure.  Were you promoted after
23 returning from leave in November of 2014?
24 A.    No.

279

Ngo - Direct

1  Q.    And after you returned from your
2  leave, did you receive any raises in your
3  base salary from Oppenheimer?
4  A.    No.
5  Q.    And so your base salary before
6  you went on leave was how much?
7  A.    150,000.
8  Q.    And what was your base salary at
9  the time that your employment was
10 terminated?
11 A.    150,000.
12 Q.    After you returned from leave in
13 November of 2014, did you receive any
14 bonuses from Oppenheimer?
15 A.    Yes, I did.
16 Q.    And did you receive a bonus for
17 2014?
18 A.    Yes, I did.
19 Q.    And approximately when did you
20 receive that bonus?
21 A.    The 2014 bonus would have been
22 received in February of 2015.
23 Q.    And what was the bonus amount
24 that you received in February of 2015 for

280

Ngo - Direct

1  2014?
2  A.    I believe it was a hundred
3  thousand.
4  Q.    All right.  Let's take a look at
5  Exhibit 11H, please.
6         So looking at 11H, it's a
7  document Bates numbered -- there is two
8  pages here, a document Bates numbered OPCO
9  209 and OPCO 211.
10        Focusing on the first page, what
11 does that show?  What is that document?
12 A.    The first page?
13 Q.    Yes.
14 A.    It shows the earnings statement.
15 Q.    And an earnings statement for
16 whom?
17 A.    For me.
18 Q.    And the earning amount is 40,000;
19 is that right?
20 A.    That's correct.
21 Q.    And what does the stub say in
22 terms of the basis for the payment?  What
23 does this pay stub say?
24 A.    It says "management bonus."

281

Ngo - Direct

1
2    Q.    And if you turn the page, OPCO
3  211, what is this document?
4    A.    It's another earnings statement.
5    Q.    And if you take a look, and it
6  says, what -- how much is the payment for?
7    A.    60,000.
8    Q.    And what's the basis for the
9  payment?
10   A.    It's a bonus.
11   Q.    So when you say that your bonus
12  in -- for 2014 paid in 2015 was 100,000,
13  it's the total of these two pay stubs?
14   A.    Yes.  For some reason, I don't
15  know why, but it was sent -- it was an
16  installments.  Usually it's just one
17  payment, but for some reason it's in
18  installments.
19   Q.    And you don't know why it's in
20  two payments?
21   A.    I didn't know why, and I didn't
22  notice at the time.
23   Q.    And how did your 2014 bonus, the
24  100,000 bonus, compare to your 2013 bonus?
25   A.    It was significantly less.

282

Ngo - Direct

1
2    Q.    How much less?
3    A.    I believe the prior year I was
4  paid a $270,000 bonus, so it was l$70,000
5  less.
6    Q.    Who told you about the 2014 bonus
7  paid in 2015?
8    A.    Colleen Burns.
9    Q.    And what did she say when she
10  told you what your bonus would be?
11   A.    She was very -- you know, you
12  always give a little bit of your comments
13  on your work.  I was amazed that you did a
14  very good job getting back.  There was no
15  change in research.  Like she said that she
16  was surprised, for example, that -- that I
17  came back, and there was no gap in research
18  because I -- I worked harder after hearing
19  Rob's stuff, so I just made sure that I was
20  working.  So she complimented me on that,
21  and she gave me a number of a hundred
22  thousand dollars for my bonus.
23   Q.    And what did you say to her after
24  she gave you the number?
25   A.    I told her this is significantly

283

Ngo - Direct

1
2  less than what I was paid before.  Why did
3  I get a hundred thousand dollar bonus?
4    Q.    And what did she say in response?
5    A.    She said, let me talk to Rob and
6  get back to you.
7    Q.    And did you have another
8  conversation with Ms. Burns about your 2014
9  bonus paid in 2015?
10   A.    Yes.
11   Q.    And approximately how long after
12  the initial conversation?
13   A.    I don't think it was the next
14  day.  It was maybe within a week.  She had
15  to talk to Rob about it.
16   Q.    And what did you and Ms. Burns
17  discuss in the subsequent conversation you
18  had with Ms. Burns?
19   A.    She said that Rob said I was
20  getting paid for my contribution.
21   Q.    Meaning what?
22   A.    That's what I asked her.  I said,
23  what does that mean?
24   Q.    And but being paid for your
25  contribution meaning your bonus was

284

Ngo - Direct

1
2  related -- he was saying that your bonus
3  was related to your contribution?
4    A.    I don't know what he was saying.
5  That was just the words that she gave me,
6  and, if anything, it meant to me that I
7  accepted it for face value because at that
8  point, I was already demoted.  I already
9  felt worried about losing my job.  I really
10  wasn't going to make waves and ask what
11  further clarification that meant.  I
12  already asked what -- how they arrived at
13  the hundred thousand, and if all he is
14  giving me is for my contribution, that's --
15  I took it.
16   Q.    Did you believe that you were
17  being punished for taking a leave?
18   A.    Absolutely.
19   Q.    And why did you believe that?
20   A.    My compensation was being cut
21  significantly.
22   Q.    How much time in total were you
23  out of the office on leave?
24   A.    So that would start from Lily's
25  birth in June of 2014 -- June -- I can't

285

Ngo - Direct

1 remember my daughter's birthday, that's a
2 bad dad, June 24, 2014 until my return, I
3 believe, November 3rd.
4     Q.    And approximately how much time
5 is that?  Can you estimate for us?
6     A.    So hold on.  About four to
7 five months.
8     Q.    Okay.  And how many months does
9 that mean that you worked in 2014?
10    A.    You subtract those from 12, so
11 that would be like six to seven.
12    Q.    Seven to eight?
13    A.    Seven to eight.  Sorry.  I can't
14 do math anymore without a calculator.
15    Q.    And your bonus in 2013 had been
16 what?
17    A.    In 2013?
18    Q.    Yes.
19    A.    270,000.
20    Q.    And that bonus was paid in what
21 year?
22    A.    My bonus in -- it was paid in
23 2014.
24    Q.    Okay.  And your bonus for 2012

286

Ngo - Direct

1 had been what?
2     A.    I believe 270,000.
3     Q.    And that bonus had been paid in
4 which year?
5     A.    2013.
6     Q.    When you got back from leave in
7 November of 2014, what work did you do?
8     A.    Can you repeat the question?
9     Q.    Yeah, sure.  So when you returned
10 from leave in November of 2014, did you
11 resume any of your previous duties?
12    A.    I did what Rob told me to do, my
13 job, and I covered the sectors that I
14 originally covered.
15    Q.    You covered the sectors as a
16 research analyst?
17    A.    That's correct.
18    Q.    And what did that entail?  I want
19 to focus on the period of November,
20 December of 2014.
21    A.    So I covered the sectors.  I
22 covered chemicals.  I covered paper and
23 packaging.  I covered metals and mining.
24 And again, I covered various sectors

287

Ngo - Direct

1 whenever we had an action.  An action means
2 a commission on something.
3     Q.    Okay.  And in covering those
4 sectors, what does that mean?  What were
5 you actually doing?
6     A.    Well, it was just a way of
7 allocating -- it's an easy way if a sales
8 person has a commission, if they have a
9 commission in the metals and mining sector,
10 that they are going to come to me for
11 advice of what to do if they have a -- so
12 it's a way of apportioning sector coverage
13 to me.
14    Q.    Did you do any reports in that
15 timeframe, in November and December of
16 2014?
17    A.    I did what I used -- what I
18 always did.  I wrote a combination of
19 reports, and then Bloombergs, and I also
20 participated in the morning blast as an
21 author.  I did sales calls.  I did client
22 calls.  I did the same job that I did -- I
23 did the same amount of work that I did
24 before.

288

Ngo - Direct

1     Q.    The same amount of work as a
2 research analyst?
3     A.    That's correct.
4     Q.    And at the point in November when
5 you come back to the office is when you
6 learned that you had been demoted, right?
7     A.    That's correct.
8     Q.    All right.  So did you have your
9 supervisory responsibilities at that point?
10    A.    I did, but we gave them all -- I
11 did, but we gave -- I think Colleen did
12 most of the supervisory analyst stuff.
13 Even though I could still do it because I
14 had my certification, but I deferred to her
15 because she was the head of the group.
16    Q.    Did you lose any responsibilities
17 once you were demoted as co-head?
18    A.    Yes.  A lot.
19    Q.    And what were those
20 responsibilities that you lost?
21    A.    Like, as I just mentioned, I
22 didn't SA anymore.  I was backup if Colleen
23 wasn't available.  I didn't do the
24 supervisory analyst work.  I didn't do any

289

Ngo - Direct

1  of the hiring.  I didn't do any of the -- I
2  didn't do any of the conversations liaising
3  with compliance.  I didn't do -- I wasn't a
4  mentor to our analysts anymore in that
5  capacity, at least.  I mean, I still tried
6  to maintain -- I tried to help them, but I
7  wasn't officially their manager.
8       Q.    Did you receive a bonus for
9  calendar year 2015?
10      A.    Yes, I did.
11      Q.    And approximately when did you
12  receive that bonus?
13      A.    For calendar year 2015, I
14  received it in 2016 in February.
15      Q.    And what was the bonus that you
16  received in 2016 for calendar year 2015?
17      A.    I want to say -- I am just
18  blanking out.
19      Q.    That's okay.  Let's take a look
20  at Exhibit 11I.
21      A.    175.
22      Q.    So Exhibit 11I is a pay stub for
23  you?
24      A.    Yes.
25

290

Ngo - Direct

1       Q.    Okay.  And the payment there is
2  175, and what's your understanding of what
3  that payment is for?
4       A.    That was my bonus for 2015.
5       Q.    And how did your 2015 bonus
6  compare to the bonus that was paid to you
7  for 2013?
8       A.    For 2013, it was significantly
9  less.  I was paid about 270.  So it's
10 almost a hundred thousand dollars less.
11      Q.    And how did it -- the bonus paid
12 to you in 2015, how did it -- well, strike
13 that.
14            How did the bonus that was paid
15 for work done in 2015 compare to the bonus
16 paid for work done in 2012?
17      A.    It was significantly less.
18      Q.    And what was that 2012 bonus?
19      A.    I believe I was paid 270 bonus,
20 and here I am getting paid 175 for doing
21 the same job I did during those periods as
22 a regular analyst.
23      Q.    Who is Jiten Joshi?
24      A.    He was a new analyst that we
25

291

Ngo - Direct

1  hired right before I was terminated.
2       Q.    And do you recall approximately
3  when he began working for the firm?
4       A.    I don't know the exact date, but
5  I know that we overlapped a little bit.
6       Q.    And what sector or sectors did
7  Mr. Joshi cover when he started at
8  Oppenheimer?
9       A.    When he started at Oppenheimer,
10 he covered TMT.
11      Q.    And what is TMT?
12      A.    Telecom, media and technology.
13      Q.    And was that -- were those
14 sectors -- was that sector different than
15 the sectors that you covered?
16      A.    Yes, it was.
17      Q.    Okay.  And what experience, if
18 any, did you have covering TMT?
19      A.    Well, I had a little bit,
20 obviously.  I had some during my tenure at
21 RBS.  I covered TMT a little bit in the
22 period that we let go of -- that Todd
23 Morgan left in October of 2013 and covered
24 it on a temporary basis until we hired
25

292

Ngo - Direct

1  Umesh Bhandary.
2       Q.    Did anyone at Oppenheimer ask you
3  if you would cover TMT around the time that
4  Mr. Joshi started working there?
5       A.    No.
6       Q.    During your tenure at
7  Oppenheimer, was it your experience or
8  understanding that sector coverage was a
9  factor in hiring decisions for high yield
10 analysts?
11      A.    It was one factor, but it was one
12 factor of many.
13      Q.    And what were the other factors?
14      A.    Well, it -- you know, we always
15 wanted to find the best athlete.  So when I
16 was doing -- when I was a group head in
17 2014, we were looking for best athletes.
18      Q.    What do you mean by best
19 athletes?
20      A.    The best analysts, not just
21 sector specific, like who could write the
22 best reports, who could communicate well
23 with salespeople because that was more
24 important.
25

293

Ngo - Direct

1
2    Q.    And during your career, were
3    there times that you had added sectors both
4    at Oppenheimer and before you got to
5    Oppenheimer?
6    A.    Yes.  In my career, and my
7    experience at Oppenheimer as well.
8    Q.    And during your tenure at
9    Oppenheimer, did other analysts retain new
10   sectors for which they had not had previous
11   experience?
12   A.    It depends on the analyst.  If
13   they were a good athlete, then we could
14   give them more sectors.  If they were not
15   so great, we wouldn't burden them with more
16   sectors.
17   Q.    But were there times where
18   analysts in the high yield group in
19   Oppenheimer picked up new sectors that they
20   didn't previously have experience with?
21   A.    Yes.
22   Q.    Were you involved in the hiring
23   process for analysts at Oppenheimer when
24   you worked there?
25   A.    Yes.

294

Ngo - Direct

1
2    Q.    And what was your involvement?
3    A.    Well, as a regular senior
4    analyst, we always had a policy that we
5    would -- since we were small group, we were
6    in a small room, that every new analyst
7    that we hired we would interview.  So
8    everyone got to interview the person who
9    was a part of your team.  That's one.
10         And then two, when I was the
11   co-head in 2014, I was in charge of the
12   hiring process.
13   Q.    Did you interview Mr. Joshi
14   before Oppenheimer hired him?
15   A.    No.
16   Q.    And why not?
17   A.    Well, it's funny, I never had the
18   opportunity to, and I remember asking
19   Colleen why I did not interview him; and
20   she said that, you must have been out that
21   day.
22         But, in fact, I will say the day
23   he was there, I remember Sean -- because I
24   sat next to Sean Sneeden -- that he was
25   going into the conference room to interview

295

Ngo - Direct

1
2    Jiten Joshi.
3    Q.    Why did you end up leaving
4    Oppenheimer?
5    A.    I was fired.
6    Q.    And when were you fired?
7    A.    I was fired in July of 2016 -- is
8    it June 30, 2016?
9    Q.    And how did you find out that you
10   were being fired?
11   A.    I got a call to head to HR.
12   Q.    And who did you meet with when
13   you were being told that you were fired?
14   A.    I had to go down, I think
15   downstairs to another room, and I was --
16   when I went in the room was someone from HR
17   and then Colleen Burns.
18   Q.    And what was said to you during
19   this meeting?
20   A.    They said that my position was
21   being terminated.
22   Q.    Did they tell you why your
23   position was being terminated?
24   A.    First they said it was
25   cost-cutting.

296

Ngo - Direct

1
2    Q.    And did you say anything response
3    to that explanation?
4    A.    I said, that doesn't make sense
5    because our sales desk is doing well.  I
6    remember telling them that it also doesn't
7    make sense because -- it doesn't make sense
8    because we just hired a new senior analyst.
9    Q.    And who was that senior analyst?
10   A.    Jiten Joshi.
11   Q.    To your knowledge, was anyone
12   else in fixed income let go the day that
13   you were fired?
14   A.    No.
15   Q.    Was there any other justification
16   given for your firing?
17   A.    Yes.
18   Q.    And what was that?
19   A.    So after I asked them about the
20   cost- cutting and questioned it because we
21   had just hired Jiten Joshi, and I knew that
22   the sales numbers were fine, they shifted
23   the -- Colleen -- I think it was Ms. Burns
24   who said, well, we don't have equity
25   research in your sectors.

297

Ngo - Direct

1  Q.   And what does -- what did you
2  understand equity research in your sectors
3  to mean?
4  A.   I think the implication is, is
5  that we didn't have the investment banking
6  coverage in our sector because normally, in
7  your -- in a big shop you will want
8  investment bankers to cover -- to have more
9  equity research -- equity research more
10 matters more for investment banking
11 coverage than high yield, but that's what
12 she was implying.
13 Q.   What do you understand equity
14 research coverage to mean?
15 A.   So sorry.  It means that we
16 didn't have an analyst who covered my
17 sectors.
18 Q.   In equity?
19 A.   In equity.
20 Q.   During the conversation with
21 Ms. Burns and HR, did you ask whether your
22 firing was related to your leave?
23 A.   Yes, I did.
24 Q.   And what did you say?

299

Ngo - Direct

1  THE WITNESS:  Sorry about that.
2  I sidetracked.
3  I had asked her was this related
4  to me taking leave for my -- our baby
5  and also my medical leave?
6  Q.   And what, if anything, did
7  Ms. Burns or HR say in response?
8  A.   I don't recall Ms. Burns saying
9  anything, but I remember Ms. Bridges saying
10 I wasn't there.  I don't know anything
11 about that.
12 Q.   And Ms. Bridges was who?
13 A.   The HR representative.
14 Q.   Who was present for the meeting?
15 A.   That's correct.
16 Q.   And when she said that she wasn't
17 there, what did you understand that to
18 mean?
19 A.   I just -- it just meant that she
20 didn't know anything about it.  So I -- it
21 meant, to me, that she didn't want to
22 address it, and then Ms. Burns didn't say
23 anything.  So no one addressed my question.
24 Q.   How did you feel at the time

298

Ngo - Direct

1  A.   Well, first I questioned the
2  equity research comment because we never
3  had equity research in metals and mining,
4  and they had asked me to add that sector;
5  didn't make sense.  It was really based on
6  trading volume, not investment banking.
7  The quick answer to that is,
8  Oppenheimer doesn't have a balance sheet.
9  So we don't need a lot of bond deals, the
10 investment banking excuse didn't make sense
11 to me.  So I questioned that, and said that
12 we did not have equity research for my
13 sectors in metals and mining ever, paper
14 ever, during my tenure there, and I believe
15 we had a chemicals equity research analyst,
16 but I believe he left in 2014 and was never
17 replaced.
18 So I brought that issue up to
19 them, maybe not to that extent, but I said
20 that doesn't make sense.  We never had
21 equity research covered in my sector.
22 MR. IADEVAIA:  Could you read
23 back my question, please?
24 (Record read.)

300

Ngo - Direct

1  about the explanations given for why
2  Oppenheimer fired you?
3  A.   Repeat the question.  I am sorry.
4  Q.   Sure.  How did you feel at the
5  time when you were fired, how did you feel
6  about the explanations that were given for
7  why Oppenheimer fired you?
8  A.   I didn't believe they -- I didn't
9  believe they were credible.
10 Q.   And why didn't you believe that
11 the cost-cutting explanation was credible?
12 A.   Because I know our sales desk was
13 doing well.  I knew that we had never fired
14 an analyst before in high yield.  I knew,
15 if anything, we were always looking to hire
16 and add to the group, whether it be
17 salespeople or research analysts, and it
18 didn't make sense that we just hired
19 another senior analyst.
20 Q.   And that senior analyst was Mr.
21 Joshi?
22 A.   Exactly.
23 Q.   And did you believe Oppenheimer
24 fired you because there was no equity

301

Ngo - Direct

1
2  research coverage for your sectors?
3      A.    Not at all.
4      Q.    At the time that you were fired,
5  what sectors did you cover?
6      A.    I covered chemicals, paper and
7  packaging, and metals and mining.
8      Q.    And at the time that you were
9  fired, was there equity research coverage
10  for the chemicals sector?
11      A.    No.
12      Q.    Had they ever been equity
13  research coverage for the chemical sector
14  during your tenure at Oppenheimer?
15      A.    Which sector are you referring
16  to?
17      Q.    Chemicals?
18      A.    Yes.  There have.
19      Q.    And when did chemicals stop
20  having equity research coverage at
21  Oppenheimer?
22      A.    I believe the analyst left in
23  2014.
24      Q.    You mentioned investment banking
25  coverage.  What does investment banking

302

Ngo - Direct

1
2  coverage mean?  What do you understand it
3  to mean?
4      A.    It means that there is an
5  investment banker that covers that
6  industry.
7      Q.    Okay.  And at the time that you
8  were fired, did chemicals have investment
9  banking coverage at Oppenheimer?
10      A.    No.
11      Q.    Did paper and packaging have
12  equity research coverage at the time you
13  were fired?
14      A.    No.
15      Q.    Did paper and packaging ever have
16  equity research coverage during your
17  Oppenheimer tenure?
18      A.    No.
19      Q.    And when you were let go, did
20  paper and packaging have investment banking
21  coverage?
22      A.    No.
23      Q.    And did paper and packaging ever
24  have investment banking coverage while you
25  worked at Oppenheimer?

303

Ngo - Direct

1
2      A.    I think it may have had it the
3  first year, but after that, I don't recall
4  any banker -- any bankers after that.
5      Q.    And at the time you were let go,
6  did metals and mining have equity research
7  coverage?
8      A.    No.
9      Q.    And during your tenure at
10  Oppenheimer, did it ever have equity -- did
11  metals and mining ever have equity research
12  coverage?
13      A.    No.
14      Q.    Did -- at the time of your
15  firing, did metals and mining have
16  investment banking coverage?
17      A.    No.
18      Q.    And did metals and mining ever
19  have investment banking coverage during
20  your tenure at Oppenheimer?
21      A.    No.
22      Q.    Were you surprised by your
23  firing?
24      A.    Yes.
25      Q.    And why do you say yes?

304

Ngo - Direct

1
2      A.    Yes and no.  I was surprised that
3  I was fired.
4          No, I wasn't surprised in the
5  sense that ever since I returned from my --
6  it was a chain of events ever since I asked
7  for leave in May of 2014, my relationship
8  with Rob and Jane changed significantly;
9  and that I felt that they had not -- I
10  wasn't their golden child anymore.  I could
11  tell that they had lost -- I had lost a lot
12  of reputation starting in 2014.
13      Q.    And what's your basis for saying
14  that they had lost faith in your -- or had
15  lost your reputation?
16      A.    Well, I had less interaction with
17  them, one.
18          Two, Rob didn't -- I was
19  officially demoted in 2014; and for Jane, I
20  just -- she wasn't going to clearly fight
21  for me like she did when I had my bid offer
22  with CBIC.  I could tell that we did not
23  have that same level of rapport.
24      Q.    And what about -- did your
25  compensation since returning from leave

305

```
 1            Ngo - Direct
 2   affect your perception as to how Rob -- how
 3   Mr. Lowenthal and Ms. Ross viewed you?
 4        A.   Yeah, absolutely.  I mean, I
 5   could see the numbers declining year over
 6   year versus the prior year when I was a
 7   regular senior analyst; and I don't know
 8   for certain, but I think that I was
 9   actually not paid as well relative to the
10   other senior analysts anymore.
11            I don't know.  It's too
12   sensitive, but I didn't get a sense that I
13   was -- I mean, for a period I was the
14   highest paid senior analyst, and I didn't
15   get a sense that I was at that level
16   anymore.  And also the numbers showed it
17   year over year.  I could just see my year
18   over year declined.
19        Q.   During your firing meeting, did
20   you say to Ms. Burns or HR that you
21   believed that your firing was based on your
22   gender?
23        A.   Not to that extent, but obviously
24   it relates to -- I did say that is it
25   related to my leave.
```

306

```
 1            Ngo - Direct
 2        Q.   And did you say that you believe
 3   that your firing was based on your
 4   disability or the fact that you had
 5   requested time off in connection with your
 6   disability?
 7        A.   I had -- I asked if it was
 8   related to the baby and also the
 9   disability.  I asked that, yes.
10        Q.   Do you -- do you believe that
11   Oppenheimer violated your FMLA rights?
12        A.   Yes.
13        Q.   And did you -- during your
14   employment at Oppenheimer, did you have
15   that belief?
16        A.   Yes.
17        Q.   And did you complain about the
18   FMLA violations to anyone at Oppenheimer?
19        A.   No.
20        Q.   And why not?
21        A.   Well, Rob is the CEO's son, and I
22   really just wanted to focus on trying to
23   keep my job.
24        Q.   Do you believe -- during your
25   employment at Oppenheimer, did you believe
```

307

```
 1            Ngo - Direct
 2   that Oppenheimer had discriminated against
 3   you based on your gender?
 4        A.   Yes.
 5        Q.   Do you believe that during your
 6   employment at Oppenheimer that they -- the
 7   company had discriminated against you based
 8   on your disability?
 9        A.   Yes.
10        Q.   And during your employment, did
11   you make any complaints about
12   discrimination internally?
13        A.   No, I did not.
14        Q.   During your employment, do you
15   know if the company had policies that
16   prohibit discrimination?
17        A.   Yes.  I was aware of those.
18        Q.   Let's take a look at Exhibit 8.
19   What is -- Exhibit 8 is the handbook?
20        A.   That's correct.
21        Q.   If you could turn to the Bates
22   number OPCO 40?  Let me know when you are
23   there.
24        A.   I am there.
25        Q.   Okay.  And if you look, do you
```

308

```
 1            Ngo - Direct
 2   see the non-discrimination policy?
 3        A.   Yes.
 4        Q.   Okay.  And under that policy do
 5   you see bolded text?
 6        A.   Yes.
 7        Q.   Okay.  And for the record, what
 8   the text says is, "When incidents of
 9   discrimination occur, they are to be
10   reported immediately, preferably in
11   writing, to the respective supervisor or
12   directly to the director of human
13   resources."  Do you see that text?
14        A.   Yes.
15        Q.   Okay.  And did you at any point
16   during your employment at Oppenheimer
17   report the discrimination that you believed
18   you had suffered to human resources?
19        A.   No, I did not.
20        Q.   Or to a supervisor?
21        A.   No, I did not.
22        Q.   And why not?
23        A.   I was scared of losing my job.
24   I'd already been demoted.  I just wanted to
25   mitigate the damages to some degree.
```

309

Ngo - Direct

1  Q.   Did you seek -- this is a
2  yes-or-no question -- but did you seek
3  legal assistance in connection with your
4  treatment at Oppenheimer while you still
5  worked there?
6  A.   Yes, I did.
7  Q.   And when was the first time that
8  you sought legal assistance?
9  A.   It was after my conversation with
10  Rob, so it was probably around November 4th
11  of 2014.
12  Q.   So was it after that conversation
13  you had with Mr. Lowenthal on November 4th?
14  A.   Yes.  But I mean, I also spoke to
15  other friends who were lawyers.  I remember
16  having that conversation even --
17  Q.   I don't want you to disclose any
18  conversations you had with lawyers.
19  A.   That's probably around May, too.
20  Q.   You had a conversation May of
21  which year?
22  A.   Of 2014, after my conversation
23  with Jane.
24  Q.   Which conversation with Ms. Ross?

310

Ngo - Direct

1  A.   The conversation of May of 2014
2  when I felt that she was discouraging me
3  from taking a leave.
4  Q.   And in May of 2014, did you take
5  any legal action against Oppenheimer?
6  A.   No.
7  Q.   And in November of 2014 or
8  thereafter, did you take legal action?
9  A.   No.
10  Q.   And why not?
11  A.   I had just -- I just had my
12  aneurysm, recovered from my aneurysm.  We
13  had a newborn baby.  We just had a lot
14  going on in our lives, and I just didn't
15  feel -- I wanted to focus on trying to
16  retain my job.
17  Q.   Were you worried that if you did
18  take legal action, that your job would be
19  in jeopardy?
20  A.   Yes.
21  Q.   And why was that?
22  A.   Well, I think that if I -- I
23  think that if I reported it, again, the
24  hierarchy is Rob is a very -- the CEO's

311

Ngo - Direct

1  son.  So I didn't think that I would get
2  much help there, so I would rather just
3  focus on trying to keep my job.
4  Q.   I am going to ask you to take a
5  look at Exhibit 90, please.
6  MR. GIBSON:  I am sorry.  90?
7  MR. IADEVAIA:  Yes.
8  Actually, before we do that, what
9  I would like to do is show the witness
10  and everyone else an exhibit that lists
11  the bonuses, a demonstrative that lists
12  the bonuses each year that Mr. Ngo
13  received from Oppenheimer.
14  Do we have a copies of those?
15  MS. MILLER:  Yes.
16  (Break taken.)
17  Q.   Before the break, I had asked you
18  to take a look at Exhibit 90.  Do you
19  see -- do you have Exhibit 90 in front of
20  you?
21  A.   Yes, I do.
22  Q.   Okay.  Exhibit 90 says on the
23  cover page, Oppenheimer Holdings Inc.
24  Annual Report 2015.

312

Ngo - Direct

1  Have you seen this document
2  before today?
3  A.   Yes, I have.
4  Q.   Were you involved at all in the
5  compiling the information that is contained
6  within Exhibit 90?
7  A.   Yes.
8  Q.   You were involved in --
9  A.   I am sorry.  I am tired.  Repeat
10  the question.  Sorry.
11  Q.   Yes.  Were you involved at all in
12  compiling the information that is contained
13  within Exhibit 90?
14  A.   No.
15  Q.   Have you independently verified
16  any of the information that is contained
17  within Exhibit 90?
18  A.   No.
19  Q.   If you take a look, if you turn
20  to OPCO page 491, please?  Let me know when
21  you are there.
22  A.   I am here.
23  Q.   Okay.  And at the top of the
24  page, does it say Financial Highlights

313

Ngo - Direct

1    Annual Report 2015?
2    A.   Yes.  That's correct.
3    Q.   Okay.  And below that there is a
4    chart; is that right?
5    A.   Yes.
6    Q.   Okay.  And that chart on the far
7    left-hand corner has categories of
8    information; is that right?
9    A.   That's correct.
10   Q.   And on the top row of the chart
11   there are years; do you see that?
12   A.   Yes, I do.
13   Q.   Okay.  And looking at the
14   categories of information starting with
15   Gross Revenue and ending with Number of
16   Employees, do you have any knowledge as to
17   what those terms mean as used in this
18   report?
19   A.   I can read it, yes.
20   Q.   Right.  But did you, were you
21   involved in at all -- strike that.
22        Does this page define those
23   terms, gross revenue and profit before
24   income taxes, et cetera?  Does the page, on
25

314

Ngo - Direct

1    the page?
2    A.   Does the page define it?
3    Q.   Yes.  Define those terms.
4    A.   You want me to define the terms?
5    Q.   No.  I am asking does the page
6    define those terms?
7    A.   No, it does not.
8    Q.   As a person who's worked in
9    finance, do you have an understanding of
10   what gross revenue generally means?
11   A.   Yes, I do.
12   Q.   And what's your understanding of
13   what gross revenue generally means?
14   A.   It just means the total revenues
15   generated presumably for the years that the
16   column corresponds to.
17   Q.   And under that it says Profit and
18   then in parentheses, loss before income
19   tax.
20        Generally, do you understand --
21   what do you understand the term "profit
22   before income taxes" to mean?
23   A.   That would generally mean that's
24   the profitability without taking into
25

315

Ngo - Direct

1    account taxes.
2    Q.   And the category below that says
3    Net Profit and then parentheses, loss, and
4    there is an asterisk.  What does -- well,
5    first, the asterisk says Attributable to
6    Oppenheimer Holding, Inc. at the bottom of
7    the page.  Do you see that?
8    A.   That's correct.
9    Q.   What's your general understanding
10   of what net profit means?
11   A.   That would be below profit before
12   income taxes, so presumably means net
13   profit after taking into account
14   everything, which would mean including
15   taxes in this case.
16   Q.   Okay.  If you look, what does the
17   chart say about the firm's profits before
18   income taxes in 2012?  What's the number
19   according to the chart?
20   A.   In what year?
21   Q.   2012.
22   A.   Negative 527 million.
23   Q.   Okay.  And what does the chart
24   say about the --
25

316

Ngo - Direct

1    A.   Wait.  That's actually -- it's in
2    thousands of dollars.  So it's negative
3    $527,000.
4    Q.   And that's what the chart says,
5    right?
6    A.   That's correct.
7    Q.   Okay.  And in 2015, what does the
8    chart say about profit before income taxes?
9    What's the number?
10   A.   The profit before taxes is 6711.
11   Q.   So what is that number if you do
12   it in the thousands of dollars?
13        ARBITRATOR DOLINGER:  6.7
14   million.
15        THE WITNESS:  6.7 million.
16        MR. IADEVAIA:  Thank you.
17        ARBITRATOR DOLINGER:  You're
18   welcome.
19   Q.   Based solely on the chart, which
20   year did Oppenheimer have higher profits,
21   2012 or 2015?
22   A.   2015.
23   Q.   And what does the chart say about
24   the firm's net profit in 2012?
25

317

Ngo - Direct

1  A.   It -- in the net profit in 2012,
2  it's negative 3.6 million.
3  Q.   Okay.  And what does the chart
4  say about the firm's net profit in 2015?
5  A.   That it is a positive 1.2 -- I am
6  rounding up, so it's 2 million.
7  Q.   Based solely on the chart, which
8  year did Oppenheimer have worse net
9  profits, 2012 or 2015?
10  A.   2012.
11  ARBITRATOR DOLINGER:  You do the
12  direct the way you want to, but I am
13  not sure what this is really proving at
14  all taking -- if you want to start
15  comparing 2013.
16  MR. IADEVAIA:  I am not going to
17  do any other years, Your Honor.
18  ARBITRATOR DOLINGER:  I
19  understand why, but go ahead.
20  Q.   And what was your bonus for 2012
21  that was paid in 2013?
22  A.   My bonus in 2012.
23  Q.   There is a chart on the screen
24  there.

318

Ngo - Direct

1  A.   Okay.  270,000.
2  Q.   Okay.  And what was your bonus
3  for 2015 that was paid in 2016?
4  A.   175,000.
5  Q.   What is your understanding of the
6  relationship between Oppenheimer's overall
7  performance and your bonus?
8  A.   It is a factor, but my
9  understanding is what drives -- what drove
10  my bonus was what was the P&L for high
11  yield.
12  Q.   During the --
13  ARBITRATOR DOLINGER:  There is
14  nothing at the annual report, is there,
15  that would show the figures for high
16  yield?
17  THE WITNESS:  Not in the annual
18  report, but I believe that we have --
19  they provide the detail.
20  ARBITRATOR DOLINGER:  Okay.
21  THE WITNESS:  I don't think the
22  annual report goes into that granular.
23  I didn't skim through all of the annual
24  report, but I doubt that they would

319

Ngo - Direct

1  give you specifically high yield.
2  Q.   Why don't you take a look at
3  Exhibit 95?
4  So have you seen Exhibit 95
5  before today?
6  A.   Yes, I have.
7  Q.   Okay.  And what do you understand
8  Exhibit 95 to be?
9  A.   This is a P&L specifically to the
10  high yield department.
11  Q.   And if you look at the bottom of
12  the document, do you see the category grand
13  total?
14  A.   That's correct.
15  Q.   Okay.  And if you look over at
16  the top -- top columns, do you see YTD?  Do
17  you see that?
18  A.   Yes.
19  Q.   What do you understand YTD to
20  mean in this document?
21  A.   It shows that the grand total in
22  P&L, which is basically sales for high
23  yield, in 2012 was 13.4 million.
24  Q.   Okay.  And do you know that

320

Ngo - Direct

1  13.4 million or 13.387 million, do you know
2  what that number is?
3  A.   So basically, no, as I mentioned
4  before, that the group, the P&L is driven
5  by either sales or trading.  So in this
6  case, in that year trading generated only
7  780,000, and then in sales generated
8  $12,607,550 of that profit.
9  Q.   Do you know that the 13.387
10  number, is that profit or revenue?
11  A.   It's revenue, but I could --
12  revenue.
13  Q.   If you take a look at Exhibit 96?
14  And I am sorry.  For which year is 95?
15  A.   2012.
16  Q.   If you look at Exhibit 96, which
17  year -- what is this document?
18  A.   It's the P&L for high yield, yes.
19  P&L for high yield in 2013.
20  Q.   Okay.  And what is the grand
21  total number on -- for high yield as of
22  December 31st, 2013?
23  A.   It's $16,990,383.
24  Q.   Okay.  If you turn to Exhibit 97,

321

Ngo - Direct

1
2 please?  Okay.  And what is this document?
3     A.    It's the P&L for high yield in
4 December of -- for the yearend
5 December 2014.
6     Q.    Okay.  And what is the grand
7 total revenue for -- as of December 31st,
8 2014?
9     A.    It's $16,512,292.
10     Q.    Okay.  And if you take a look at
11 Exhibit 98, please?  And what is
12 Exhibit 98?
13     A.    It's the P&L for high yield in
14 December, ending December 31st, 2015.
15     Q.    And what is the year-to-date
16 number for as of December 31st, 2015?
17 What's the year-to-date grand total?
18     A.    It's $17,173,223.
19     Q.    During the time that you
20 worked -- and 2015 was the last full year
21 you worked at Oppenheimer, correct?
22     A.    2015?
23     Q.    Yes.
24     A.    Yes.  I mean -- yes.
25     Q.    You worked part of 2016?

322

Ngo - Direct

1
2     A.    Yes.  Yes.
3     Q.    During the time you worked at
4 Oppenheimer, did the bank lay off employees
5 for financial reasons?
6     A.    I don't know.
7     Q.    You are unaware as to whether or
8 not the bank laid off employees at the firm
9 for financial reasons?
10     A.    Well, I assume that they did, but
11 I just don't know the detail for the whole
12 firm.  I wasn't privy to -- well, I guess I
13 could look at --
14     Q.    No.  I am not asking you to look
15 at any charts.  I am asking you --
16     A.    Could you repeat the question?
17 Sorry.
18     Q.    Sure.  Do you have any knowledge
19 as to whether or not the firm Oppenheimer
20 did lay-offs at any point during your
21 tenure there --
22     A.    Oh --
23     Q.    -- for economic reasons?
24     A.    Oh, sorry.  Yes.  Yes.  Yes.
25     Q.    Okay.  And how frequent were the

323

Ngo - Direct

1
2 economic-based lay-offs at Oppenheimer?
3     A.    They were frequent.  They were
4 frequent.  They were frequent.
5     Q.    Did -- during your employment at
6 Oppenheimer, did Oppenheimer lay off any
7 analysts for financial reasons in the whole
8 firm?
9     A.    Yes, they did.
10     Q.    From which departments are you
11 aware of lay-offs for economic reasons of
12 analysts?
13     A.    It -- most of the lay-offs for
14 analysts occurred in the equity research
15 department.
16     Q.    Were there layoffs of analysts
17 within the investment bank?
18     A.    I believe so, yes.
19     Q.    And were there layoffs --
20 economic-
21 based layoffs during your tenure at
22 Oppenheimer within fixed income?
23     A.    Yes, there were.
24     Q.    And which groups?
25     A.    They would be -- I believe -- I

324

Ngo - Direct

1
2 remember them -- I don't know, but I think
3 that there might have been some layoffs in
4 investment grade or some other taxable
5 fixed income.
6     Q.    But they were analysts?
7     A.    Oh, analysts.  No.
8     Q.    Why don't we read back the
9 question?
10     A.    Repeat the question.
11     Q.    Were there any analysts within
12 fixed income that were laid off based on
13 economic reasons?
14     A.    No.
15     Q.    During your tenure, anyone -- was
16 there anyone that you are aware of who was
17 laid off for financial reasons from high
18 yield research?
19     A.    No.
20     Q.    Other than you?
21     A.    Sorry.  Except for me.
22     Q.    Supposedly?
23     A.    Yes.
24     Q.    During your tenure, was anyone
25 ever laid off for financial reasons, to

325

Ngo - Direct

1  your knowledge, from high yield sales?
2  
3       A.    No.
4       Q.    And during your tenure at
5  Oppenheimer, approximately how many
6  salespeople worked in high yield sales?
7       A.    About 12.
8       Q.    There was 12 on a team; is that
9  right?
10      A.    High yield salespeople, correct.
11      Q.    And that was true, more or less,
12  throughout your employment at Oppenheimer?
13      A.    It didn't change much --
14      Q.    Okay.
15      A.    -- that number.
16      Q.    And what's your basis for saying
17  that, to your knowledge, there was no
18  layoffs for financial reasons of the high
19  yield sales team?
20      A.    The employees didn't change much.
21      Q.    And in terms of the high yield
22  analysts, would you know if there were
23  layoffs for financial reasons?
24      A.    Yes.
25      Q.    And how would you know that?

326

Ngo - Direct

1
2       A.    Well, if the analysts left, I
3  think they would tell me.  I had good
4  relationships with a lot of guys.  They
5  would tell me if they were fired.
6       Q.    And was there ever any sort of
7  announcement to you that any of the
8  analysts within the high yield research
9  group were being laid off for economic
10  reasons?
11      A.    No.
12      Q.    During your tenure at
13  Oppenheimer, Mr. Morgan left, correct?
14      A.    That's correct.
15      Q.    And what's your understanding as
16  to the circumstances of Mr. Morgan's
17  departure?
18      A.    He got another job offer, I
19  believe, at Jeffries.
20      Q.    Was he laid off for economic
21  reasons?
22      A.    No.
23      Q.    And during your tenure, did Umesh
24  Bhandary leave Oppenheimer?
25      A.    Yes, he did.

327

Ngo - Direct

1
2       Q.    And what is your understanding as
3  to the circumstances of Mr. Bhandary's
4  departure?
5       A.    He left voluntarily for another
6  job at Jeffries.
7       Q.    And was he let go, as far as you
8  know, for -- as part of an economic layoff?
9       A.    No.
10      Q.    And Lucila Broide, she left
11  Oppenheimer during your tenure, correct?
12      A.    Yes.
13      Q.    Okay.  And what were the
14  circumstances of her departure?
15      A.    I believe she voluntarily left.
16  I think she might have wanted to spend time
17  with her family, but I don't recall there
18  being a job.
19      Q.    And is it your understanding that
20  she was let go as part of an economic
21  layoff?
22      A.    No.
23      Q.    And Mr. Daniels, John Daniels
24  left during your time at Oppenheimer?
25      A.    That's correct.

328

Ngo - Direct

1
2       Q.    And what were the circumstances
3  of Mr. Daniel's departure?
4       A.    He voluntarily resigned.
5       Q.    And so he was not let go as part
6  of an economic layoff, correct?
7       A.    That's correct.
8       MR. IADEVAIA:  That's all I have
9  other than the next issues.
10      MR. GIBSON:  You have another
11  half hour?
12      MR. IADEVAIA:  I would say less
13  than an hour.
14      ARBITRATOR DOLINGER:  Okay.  Any
15  other issues you want to take up on
16  either side before we break for the
17  day?
18      MR. GIBSON:  No.
19      MR. IADEVAIA:  No.
20      ARBITRATOR DOLINGER:  Okay.  Go
21  in peace.
22      (Time noted:  4:52 p.m.)
23
24
25

329

```
1
2                   CERTIFICATE
3
4    STATE OF NEW YORK   )
5                        )ss.
6    COUNTY OF NEW YORK  )
7
8        I, DARBY GINSBERG, a Registered
9    Professional Reporter and Notary Public
10   within and for the State of New York, do
11   hereby certify:
12       That the above transcript is a true
13   record of the arbitration proceedings held
14   on March 4, 2019.
15       I further certify that I am not
16   related to any of the parties to this action
17   by blood or marriage, and that I am in no
18   way interested in the outcome of this
19   matter.
20
21
                _____
22
                   DARBY GINSBERG
23
24
25
```

330

```
1
2    March 4, 2019
3
4                   INDEX
5    WITNESS        DIRECT CROSS REDIRECT RECROSS
6    Hoai Ngo       15
7
     EXHIBITS                    PAGE
8
     All exhibits received in
9    Evidence except for 120        38
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## $

**$10** [2] - 45:16, 46:16
**$100,000** [2] - 101:10, 104:4
**$12,607,550** [1] - 320:9
**$16,512,292** [1] - 321:9
**$16,990,383** [1] - 320:24
**$17,173,223** [1] - 321:18
**$270,000** [1] - 282:4
**$270,833** [1] - 128:24
**$4,167** [1] - 105:13
**$420,000** [1] - 111:13
**$50,000** [3] - 104:4, 106:5, 106:8
**$527,000** [1] - 316:4

## '

**'14** [1] - 178:23

## 1

**1** [1] - 106:22
**1.2** [1] - 317:6
**1/29/2010** [1] - 126:2
**1/30** [1] - 127:22
**1/31/2012** [1] - 127:23
**10** [2] - 61:21, 276:11
**10/1/2013** [1] - 110:10
**10/15/2012** [1] - 107:2
**10/15/2013** [1] - 108:23
**100** [3] - 101:23, 102:8, 102:18
**100,000** [3] - 116:7, 281:12, 281:24
**10017** [1] - 2:8
**10169** [1] - 3:8
**11** [2] - 104:22
**110** [4] - 38:23, 39:8, 39:23, 50:3
**1130** [1] - 3:7
**115,000** [1] - 242:12
**11:14** [1] - 144:10
**11B** [3] - 125:11, 125:14, 125:17
**11C** [2] - 126:24
**11D** [4] - 104:21, 104:23, 127:13, 127:24
**11E** [4] - 107:10, 128:18, 130:10, 130:25
**11F** [4] - 129:18, 130:13, 131:5, 133:24
**11H** [2] - 280:6, 280:7
**11I** [2] - 289:21, 289:23
**12** [8] - 53:16, 143:20, 145:20, 163:7, 259:2, 285:11, 325:7, 325:8
**12,500** [6] - 105:25, 107:3,

107:19, 107:22, 108:11, 109:5
**12/31/of** [1] - 126:14
**120** [3] - 38:13, 38:15, 330:9
**1258** [2] - 70:13, 70:19
**1259** [1] - 80:2
**126** [3] - 105:2, 276:13
**128** [2] - 274:16, 274:18
**12:34** [1] - 165:5
**12th** [1] - 215:17
**13** [1] - 219:19
**13.387** [2] - 320:2, 320:10
**13.4** [2] - 319:24, 320:2
**134** [2] - 105:20
**13th** [5] - 184:11, 185:9, 219:13, 219:18, 219:24
**140** [1] - 106:22
**1425025377** [1] - 1:11
**14th** [1] - 189:4
**15** [2] - 259:10, 330:6
**150** [7] - 102:8, 111:21, 113:9, 113:10, 115:13, 116:7
**150,000** [7] - 101:23, 102:19, 103:13, 110:6, 128:6, 279:8, 279:12
**155** [1] - 107:12
**16** [6] - 35:3, 35:12, 35:13, 35:14, 59:12, 247:19
**16.5** [1] - 47:10
**160** [1] - 108:20
**163** [1] - 108:5
**169** [1] - 108:20
**16th** [11] - 203:20, 222:3, 224:16, 229:12, 230:17, 231:2, 247:7, 255:13, 255:14, 261:12, 261:16
**17** [3] - 145:22, 215:18, 218:10
**175** [3] - 289:22, 290:3, 290:21
**175,000** [1] - 318:5
**17th** [2] - 203:21, 229:12
**18** [3] - 243:23, 246:22, 276:23
**18th** [3] - 248:23, 249:13, 262:3
**1994** [1] - 17:6
**1998** [1] - 17:19
**1999** [2] - 18:16, 20:6
**1:20** [1] - 166:3
**1st** [2] - 4:15, 217:17

## 2

**2** [9] - 36:14, 36:15, 36:22, 109:14, 258:9, 258:14, 258:25, 259:10, 317:7
**2/1/2011** [1] - 127:5
**20** [4] - 16:9, 48:7, 48:10,

66:21
**20,000** [1] - 126:2
**2000** [2] - 118:5, 152:7
**2001** [3] - 21:3, 21:16, 21:19
**2006** [1] - 21:19
**2007** [4] - 34:6, 34:7, 56:2, 89:10
**2008** [2] - 19:18, 19:19
**2009** [20] - 19:19, 34:4, 34:8, 35:24, 40:6, 42:18, 56:2, 61:12, 68:22, 69:14, 84:19, 88:23, 124:17, 124:18, 125:6, 126:7, 126:10, 126:12, 126:13, 126:14
**2010** [10] - 70:15, 71:3, 71:6, 72:19, 85:20, 123:12, 125:9, 126:16, 126:20, 126:25
**2011** [4] - 126:22, 127:4, 127:17, 128:3
**2012** [26] - 69:24, 102:4, 103:2, 103:18, 108:2, 110:18, 121:2, 121:4, 128:12, 128:20, 130:7, 130:19, 285:25, 290:17, 290:19, 315:19, 315:22, 316:22, 316:25, 317:2, 317:10, 317:11, 317:21, 317:23, 319:24, 320:16
**2013** [34] - 67:10, 69:19, 86:23, 103:16, 103:19, 106:15, 107:7, 110:14, 118:6, 121:8, 124:18, 125:8, 128:17, 129:6, 129:12, 129:21, 130:2, 130:6, 130:22, 131:6, 131:15, 134:9, 134:10, 281:24, 285:16, 285:18, 286:6, 290:8, 290:9, 291:24, 317:16, 317:22, 320:20, 320:23
**2014** [84] - 47:7, 47:8, 47:9, 52:16, 68:22, 69:14, 69:20, 84:19, 91:24, 92:2, 129:10, 130:3, 131:6, 133:25, 134:13, 135:3, 136:20, 138:24, 139:17, 143:2, 143:20, 151:16, 152:14, 154:24, 177:4, 178:22, 182:10, 184:11, 185:9, 189:5, 190:16, 190:18, 190:23, 217:17, 219:19, 220:22, 221:6, 222:5, 225:24, 226:22, 231:23, 243:23, 244:14, 244:23, 246:23, 247:19, 250:16, 273:11, 274:23, 274:25, 276:23, 278:18, 278:19, 278:24, 279:14, 279:18, 279:22, 280:2, 281:12,

281:23, 282:6, 283:8, 284:25, 285:3, 285:10, 285:24, 286:8, 286:11, 286:21, 287:17, 292:18, 294:11, 298:17, 301:23, 304:7, 304:12, 304:19, 309:12, 309:23, 310:2, 310:5, 310:8, 321:5, 321:8
**2015** [25] - 221:6, 279:23, 279:25, 281:12, 282:7, 283:9, 289:10, 289:14, 289:17, 290:5, 290:6, 290:13, 290:16, 311:25, 313:2, 316:8, 316:22, 316:23, 317:5, 317:10, 318:4, 321:14, 321:16, 321:20, 321:22
**2016** [7] - 9:19, 289:15, 289:17, 295:7, 295:8, 318:4, 321:25
**2019** [3] - 1:14, 329:14, 330:2
**209** [1] - 280:10
**20th** [2] - 176:23, 177:19
**211** [2] - 280:10, 281:3
**212.403.7311** [1] - 2:9
**212.818.9200** [1] - 3:9
**22** [1] - 71:5
**23** [1] - 260:11
**230** [1] - 3:7
**24** [2] - 178:14, 285:3
**24th** [4] - 177:21, 178:21, 188:20, 188:22
**25** [2] - 274:22, 274:25
**25th** [34] - 181:24, 182:7, 182:8, 182:9, 182:14, 183:7, 183:11, 186:2, 186:6, 188:11, 188:22, 201:13, 201:16, 201:20, 201:25, 202:6, 202:15, 202:25, 203:4, 204:4, 207:4, 207:6, 207:11, 207:17, 208:8, 208:20, 208:23, 208:24, 209:17, 209:20, 212:10, 214:25, 215:4, 215:6
**270** [4] - 112:17, 130:11, 290:10, 290:20
**270,000** [5] - 129:25, 130:13, 285:20, 286:3, 318:2

## 3

**3** [7] - 258:9, 258:13, 258:14, 260:11, 262:16, 264:9
**3.6** [1] - 317:3
**30** [1] - 295:8
**30th** [2] - 190:18, 190:23
**31** [1] - 190:16
**31st** [4] - 320:23, 321:7, 321:14, 321:16

**34** [5] - 70:3, 70:5, 70:6,
70:18, 83:10
**38** [2] - 184:10, 330:9
**39** [1] - 217:15
**3rd** [22] - 226:5, 227:4,
227:7, 227:23, 231:21,
231:23, 232:2, 232:17,
234:16, 239:22, 244:4,
244:11, 244:12, 249:6,
249:18, 250:8, 250:25,
255:4, 255:15, 265:15,
278:19, 285:4

**4**

**4** [6] - 1:14, 258:14, 260:25,
261:2, 329:14, 330:2
**4/15/2012** [1] - 105:5
**4/15/2013** [1] - 107:17
**40** [4] - 143:8, 143:12,
253:23, 307:22
**40,000** [1] - 280:19
**40A** [1] - 143:15
**41** [1] - 105:13
**420** [5] - 111:21, 112:16,
113:10, 115:18
**425** [1] - 115:16
**45** [3] - 190:20, 190:25,
243:17
**45-day** [1] - 190:21
**47** [1] - 253:23
**48** [7] - 143:7, 143:9,
143:13, 143:14, 143:15,
145:14, 146:21
**491** [1] - 312:21
**4:00** [3] - 100:5, 200:8,
276:6
**4:52** [1] - 328:22
**4th** [11] - 133:25, 177:25,
250:15, 250:23, 252:11,
252:24, 253:4, 254:20,
254:25, 309:11, 309:14

**5**

**5** [5] - 61:21, 261:2, 262:15,
262:16
**50** [8] - 149:9, 150:8,
196:17, 237:17, 237:19,
237:20, 237:21, 237:22
**51** [8] - 185:6, 185:7,
197:18, 201:8, 202:5,
203:11, 204:25, 219:15
**527** [1] - 315:23
**53** [2] - 217:21, 218:2
**55** [2] - 217:18, 218:14
**565** [1] - 2:7

**6**

**6** [6] - 109:16, 109:17,
264:23, 266:18, 273:11
**6.7** [2] - 316:14, 316:16
**60,000** [1] - 281:7
**620** [1] - 1:13
**63** [2] - 35:2, 35:10
**6711** [1] - 316:11

**7**

**7** [8] - 35:2, 35:4, 35:5,
35:9, 264:8, 264:24, 266:4,
266:18
**7/31/2013** [1] - 108:7
**72** [1] - 226:19
**780,000** [1] - 320:8
**7:00** [4] - 192:21, 192:23,
193:6, 200:7
**7:30** [1] - 100:3

**8**

**8** [7] - 217:10, 217:11,
253:16, 253:19, 266:17,
307:18, 307:19
**80** [1] - 61:23
**83** [1] - 184:8
**85** [2] - 272:10, 274:13
**86** [1] - 256:13
**86B** [1] - 257:14

**9**

**9** [2] - 226:22, 266:4
**90** [8] - 311:6, 311:7,
311:19, 311:20, 311:23,
312:7, 312:14, 312:18
**95** [5] - 273:23, 319:4,
319:5, 319:9, 320:15
**96** [2] - 320:14, 320:17
**97** [1] - 320:25
**98** [2] - 321:11, 321:12
**9:00** [1] - 100:4
**9:30** [1] - 1:15
**9th** [1] - 2:7

**A**

**a.m** [4] - 1:15, 193:6, 200:7,
200:8
**abbreviation** [1] - 31:15
**ability** [3] - 132:9, 227:18,
237:14
**able** [10] - 91:22, 114:25,
132:12, 145:2, 145:3,
148:22, 193:9, 197:9,

198:12, 202:14
**abnormal** [1] - 208:2
**abrupt** [2] - 211:17, 211:23
**abruptly** [1] - 240:5
**absence** [5] - 136:12,
139:25, 157:19, 247:10,
278:17
**absolutely** [4] - 10:24,
258:5, 284:18, 305:4
**absorb** [1] - 247:12
**accept** [2] - 21:11, 28:5
**accepted** [3] - 28:4, 276:2,
284:7
**access** [3] - 26:12, 175:14,
277:16
**accommodate** [1] - 246:11
**according** [5] - 262:17,
264:9, 264:24, 266:5,
266:18, 269:20, 315:20
**account** [6] - 248:25,
251:20, 267:24, 268:9,
315:2, 315:14
**accounts** [7] - 57:23, 57:24,
150:2, 150:3, 150:5, 150:6,
150:7
**accurately** [1] - 245:21
**accused** [1] - 12:11
**acquisitions** [1] - 20:23
**Act** [2] - 146:16, 217:25
**action** [6] - 6:2, 287:2,
310:6, 310:9, 310:19, 329:16
**active** [1] - 65:19
**actively** [1] - 63:14
**activities** [1] - 71:25
**activity** [2] - 20:23, 254:13
**actual** [1] - 133:22
**ad** [1] - 4:16
**add** [10] - 11:7, 11:12, 31:6,
49:6, 58:21, 60:23, 61:5,
91:23, 298:5, 300:17
**added** [10] - 25:3, 25:11,
25:13, 25:21, 29:4, 31:10,
60:21, 60:24, 61:2, 61:3,
62:23, 62:24, 65:13, 85:5,
92:6, 98:20, 293:3
**additional** [1] - 245:15
**address** [3] - 4:8, 248:8,
299:23
**addressed** [1] - 299:24
**addressing** [1] - 95:23
**adjustment** [3] - 116:4,
116:5, 116:6
**admission** [4] - 18:4, 18:7,
37:13, 37:19
**admitted** [3] - 18:10, 18:14,
18:17
**advance** [1] - 194:24
**advice** [1] - 287:12
**advised** [2] - 215:9, 234:5
**affect** [1] - 305:2
**affected** [1] - 227:19

**afternoon** [1] - 87:20
**AFTERNOON** [1] - 166:2
**afterwards** [1] - 113:6
**agency** [4] - 24:23, 29:15,
176:19, 176:20
**aggressive** [1] - 65:20
**aggressively** [1] - 87:16
**ago** [1] - 35:6
**agree** [2] - 172:21, 260:13
**agreed** [13] - 14:10, 105:16,
162:15, 168:17, 169:23,
170:7, 172:20, 174:20,
189:13, 201:15, 203:3,
220:25, 276:2
**agreement** [4] - 14:17,
116:21, 172:22, 176:5
**ahead** [3] - 161:21, 193:10,
317:20
**AI** [1] - 150:5
**alerts** [7] - 242:15, 242:24,
242:25, 243:6, 243:8,
243:14, 244:20
**allegedly** [1] - 6:19
**allocating** [1] - 287:8
**allow** [1] - 13:16
**allowed** [1] - 207:4
**allows** [1] - 35:16
**alluded** [2] - 67:18, 238:15
**almost** [5] - 28:17, 47:23,
68:16, 255:23, 290:11
**amazed** [1] - 282:13
**ambulance** [1] - 223:5
**amends** [1] - 260:23
**amount** [17] - 6:9, 104:17,
105:12, 107:3, 108:11,
121:3, 127:7, 128:5, 128:22,
130:11, 130:13, 131:12,
193:16, 279:24, 280:19,
287:24, 288:2
**amounting** [1] - 7:2
**analysis** [5] - 57:2, 124:14,
178:12, 193:13, 194:14
**analyst** [90] - 8:5, 20:9,
20:14, 20:18, 21:5, 22:8,
22:15, 23:20, 23:21, 23:23,
24:3, 24:25, 26:13, 26:15,
29:3, 32:4, 32:24, 33:3, 33:5,
33:10, 35:15, 36:6, 54:19,
55:13, 55:14, 56:16, 56:22,
56:24, 57:8, 58:19, 59:3,
59:5, 60:2, 60:10, 60:20,
62:11, 63:2, 63:22, 64:17,
66:17, 68:6, 73:2, 82:12,
86:10, 87:17, 88:17, 91:14,
93:5, 95:21, 96:3, 96:9,
96:17, 96:18, 97:15, 97:23,
97:25, 99:22, 100:4, 100:8,
111:8, 111:9, 115:10,
123:11, 159:11, 159:13,
191:21, 192:18, 192:24,
236:15, 239:19, 242:13,

333

286:17, 288:3, 288:13, 288:25, 290:23, 290:25, 293:12, 294:4, 294:6, 296:8, 296:9, 297:17, 298:16, 300:15, 300:20, 300:21, 301:22, 305:7, 305:14

**analyst's** [1] - 97:9

**analysts** [45] - 24:16, 53:19, 53:22, 55:9, 57:25, 58:6, 58:15, 61:2, 61:17, 63:4, 65:10, 67:6, 68:9, 84:12, 88:9, 90:9, 96:23, 118:11, 119:10, 123:7, 178:11, 191:23, 192:14, 194:8, 268:13, 269:12, 276:18, 289:5, 292:11, 292:21, 293:9, 293:18, 293:23, 300:18, 305:10, 323:7, 323:12, 323:14, 323:16, 324:6, 324:7, 324:11, 325:22, 326:2, 326:8

**analysts'** [2] - 35:17, 87:15

**analyze** [1] - 192:6

**analyzing** [1] - 194:11

**AND** [1] - 1:2

**aneurysm** [18] - 221:12, 221:14, 221:21, 222:7, 222:23, 223:2, 224:8, 225:14, 226:7, 226:13, 227:15, 229:11, 229:23, 237:12, 237:20, 238:5, 310:13

**angrier** [1] - 211:5

**angry** [8] - 204:11, 204:12, 204:13, 207:14, 207:15, 209:19, 260:18

**announce** [2] - 194:2, 194:3

**announcement** [9] - 251:8, 269:19, 270:11, 270:13, 270:15, 270:16, 272:14, 274:11, 326:7

**Annual** [2] - 311:25, 313:2

**annual** [5] - 120:14, 318:15, 318:18, 318:23, 318:24

**annually** [1] - 120:9

**answer** [10] - 26:9, 47:17, 73:9, 167:19, 182:24, 187:23, 206:11, 238:18, 240:17, 298:8

**anticipating** [1] - 195:6

**anticipation** [2] - 195:13, 198:10

**anyway** [1] - 85:24

**apologies** [1] - 215:24

**apologize** [5] - 8:12, 258:11, 258:16, 258:24, 263:11

**apologizing** [1] - 260:16

**appeal** [2] - 208:21

**APPEARANCES** [2] - 2:2,

3:2

**appeared** [4] - 204:8, 204:10, 204:11, 207:14

**application** [1] - 4:17

**appointed** [2] - 88:11, 89:19

**apportioning** [1] - 287:13

**appreciated** [3] - 117:12, 117:13

**approach** [2] - 135:17, 200:25

**approval** [11] - 59:4, 59:9, 59:11, 59:17, 99:10, 99:16, 100:6, 100:13, 100:14, 213:7, 275:9

**approvals** [1] - 99:9

**approve** [3] - 58:19, 199:24, 213:8

**approved** [9] - 59:6, 99:18, 102:20, 107:25, 149:8, 149:9, 164:9, 176:17, 227:14

**approximate** [1] - 139:14

**arbitrary** [2] - 122:24

**arbitration** [4] - 9:3, 13:9, 74:10, 329:13

**ARBITRATION** [1] - 1:2

**Arbitration** [1] - 1:3

**arbitrator** [1] - 9:6

**ARBITRATOR** [84] - 1:17, 4:2, 4:13, 6:23, 7:5, 7:16, 8:14, 9:14, 10:20, 11:3, 12:20, 13:20, 14:4, 14:14, 14:21, 15:6, 15:11, 15:21, 25:22, 26:25, 32:19, 37:22, 38:2, 38:10, 38:14, 41:3, 44:21, 46:5, 47:18, 50:7, 50:14, 67:14, 74:17, 74:24, 86:2, 90:24, 93:23, 96:5, 97:11, 106:7, 112:20, 116:23, 119:12, 125:15, 147:11, 161:12, 161:15, 165:3, 166:6, 183:21, 187:22, 190:8, 191:3, 191:7, 192:10, 193:14, 194:22, 195:5, 195:12, 197:13, 198:4, 199:9, 202:2, 215:7, 234:3, 234:10, 239:16, 240:8, 242:2, 248:20, 252:17, 252:19, 257:2, 257:18, 258:2, 263:3, 316:14, 316:18, 317:12, 317:19, 318:14, 318:21, 328:14, 328:20

**area** [1] - 100:13

**areas** [1] - 81:17

**argue** [4] - 12:5, 13:3, 236:11, 240:14

**argued** [1] - 10:2

**arguing** [1] - 240:18

**arguments** [2] - 11:20, 12:25

**arrange** [2] - 97:22, 174:25

**arrangements** [4] - 174:4, 174:7, 175:13, 175:24

**arrived** [2] - 177:17, 284:12

**article** [2] - 11:19, 38:11

**articles** [8] - 9:15, 10:4, 10:9, 11:8, 11:9, 11:11, 13:7, 13:16

**arts** [1] - 17:2

**aspect** [2] - 90:15, 170:9

**aspects** [1] - 52:3

**asset** [4] - 26:8, 46:19, 60:12, 194:4

**assigned** [8] - 62:5, 62:15, 63:2, 63:8, 63:22, 63:23, 63:24, 150:2

**assigning** [1] - 95:22

**assignment** [2] - 62:17, 88:4

**assistance** [2] - 309:4, 309:9

**assistant** [1] - 206:13

**associate** [13] - 21:22, 21:23, 21:25, 22:4, 22:9, 22:11, 22:13, 23:9, 23:19, 93:10, 93:11, 161:14, 174:10

**associated** [1] - 247:13

**assume** [2] - 86:15, 322:10

**assumed** [4] - 114:6, 133:5, 136:9, 167:7

**assuming** [3] - 122:6, 174:13, 270:9

**assumption** [2] - 112:7, 230:2

**assurances** [1] - 137:13

**asterisk** [2] - 315:5, 315:6

**AT&T** [1] - 31:17

**athlete** [4] - 63:3, 66:16, 292:16, 293:13

**athletes** [2] - 292:18, 292:20

**attached** [5] - 243:19, 247:21, 247:22, 248:24, 249:22

**attempt** [1] - 11:14

**attend** [5] - 16:17, 16:19, 17:7, 19:8, 19:15

**attended** [1] - 178:13

**attorney** [1] - 87:25

**Attorneys** [2] - 2:6, 3:6

**attract** [1] - 132:9

**Attributable** [1] - 315:6

**attributes** [1] - 81:17

**audio** [4] - 256:14, 256:16, 256:21, 258:4

**August** [63] - 35:24, 40:6, 61:12, 67:10, 69:18, 88:23, 125:6, 126:12, 126:13, 181:24, 182:7, 182:8, 182:9, 182:14, 183:4, 183:7, 186:2, 186:6, 188:11, 188:22,

189:8, 189:14, 189:15, 189:18, 189:21, 191:4, 191:6, 192:14, 199:25, 201:13, 201:16, 201:20, 201:25, 202:6, 202:15, 202:25, 203:4, 204:4, 207:4, 207:6, 207:11, 207:17, 208:8, 208:20, 208:23, 208:24, 209:17, 209:20, 212:10, 214:25, 215:4, 215:6, 221:6, 221:22, 221:23, 221:24, 222:3, 224:16, 229:5, 229:12, 248:18, 262:2

**author** [1] - 287:22

**authorization** [1] - 254:8

**auto** [3] - 277:11, 277:23, 278:10

**auto-forwarded** [2] - 277:11, 277:23

**automatic** [3] - 277:25, 278:5, 278:15

**automatically** [1] - 278:6

**available** [4] - 59:15, 186:13, 195:14, 288:24

**Avenue** [3] - 1:13, 2:7, 3:7

**aware** [7] - 114:8, 184:15, 199:7, 274:10, 307:17, 323:11, 324:16

---

# B

**baby** [52] - 134:16, 134:22, 135:10, 135:13, 137:9, 137:21, 138:2, 138:14, 139:2, 139:6, 139:10, 147:19, 147:24, 148:13, 152:6, 152:7, 152:10, 152:12, 152:13, 152:18, 154:20, 155:7, 155:8, 155:9, 161:23, 163:12, 164:23, 169:24, 169:25, 174:13, 176:4, 176:6, 177:2, 177:11, 178:7, 178:17, 178:20, 178:24, 179:7, 179:23, 200:8, 215:22, 215:24, 216:3, 229:21, 230:21, 245:17, 262:24, 275:23, 299:5, 306:8, 310:14

**baby's** [1] - 139:13

**Bachelor's** [1] - 17:2

**backed** [1] - 161:7

**backup** [1] - 288:23

**bad** [1] - 285:3

**balance** [1] - 298:9

**ball** [1] - 263:21

**bank** [9] - 20:11, 20:13, 21:24, 35:7, 110:21, 118:13, 322:4, 322:8, 323:17

**banker** [2] - 302:5, 303:4

**bankers** [2] - 297:9, 303:4

334

**banking** [16] - 20:15, 23:22, 51:17, 65:2, 89:4, 297:6, 297:11, 298:7, 298:11, 301:24, 301:25, 302:9, 302:20, 302:24, 303:16, 303:19
**banks** [1] - 119:9
**Bar** [5] - 18:2, 18:5, 18:11, 18:14, 18:18
**bar** [3] - 17:20, 17:23, 18:8
**base** [28] - 101:7, 101:8, 101:10, 101:12, 101:17, 101:25, 102:8, 102:14, 106:8, 106:12, 108:15, 110:6, 111:17, 111:20, 113:20, 115:13, 116:4, 116:6, 116:9, 117:19, 121:3, 121:5, 133:13, 229:9, 279:4, 279:6, 279:9
**base-wise** [2] - 102:8, 113:20
**based** [19] - 29:15, 62:18, 65:8, 132:2, 147:6, 147:12, 154:5, 231:18, 255:19, 298:6, 305:21, 306:3, 307:3, 307:7, 316:20, 317:8, 323:2, 323:21, 324:12
**basic** [3] - 61:2, 66:5, 68:11
**basis** [21] - 52:12, 66:14, 74:13, 75:18, 79:21, 79:22, 81:11, 82:14, 82:18, 83:7, 109:8, 121:22, 124:23, 224:18, 227:6, 234:23, 280:23, 281:8, 291:25, 304:13, 325:16
**Bates** [12] - 70:12, 105:2, 105:20, 106:22, 107:12, 109:15, 109:17, 218:4, 253:23, 280:8, 280:9, 307:21
**Bay** [1] - 180:13
**BBB** [3] - 24:23, 30:13, 30:15
**Bear** [19] - 21:10, 21:12, 21:15, 21:20, 22:4, 23:2, 23:15, 26:16, 27:13, 27:24, 28:7, 28:13, 29:11, 32:6, 34:12, 35:14, 51:6, 56:19, 62:8
**bearing** [1] - 107:12
**became** [14] - 23:20, 54:4, 65:19, 68:16, 69:11, 90:18, 92:15, 96:22, 103:11, 103:12, 103:19, 106:19, 107:7, 129:14
**become** [2] - 25:5, 103:14
**becoming** [2] - 122:16, 240:15
**bed** [1] - 227:20
**began** [2] - 32:17, 291:4
**begin** [4] - 14:3, 15:12, 34:2, 172:13

**beginning** [7] - 89:5, 123:21, 123:24, 127:22, 139:19, 156:17, 156:18
**behave** [1] - 44:20
**behind** [2] - 51:7, 51:9
**Bekemeyer** [3] - 16:6, 16:8, 225:4
**belief** [2] - 224:19, 306:15
**believable** [2] - 68:17, 68:18
**below** [16] - 24:22, 24:23, 30:12, 30:14, 77:15, 77:17, 78:10, 79:11, 81:3, 81:15, 81:22, 82:23, 98:25, 313:4, 315:3, 315:12
**Benefits** [1] - 145:25
**best** [9] - 63:3, 66:16, 67:6, 80:20, 292:16, 292:18, 292:19, 292:21, 292:23
**better** [5] - 47:8, 79:9, 197:24, 257:24, 262:13
**between** [23] - 19:19, 29:10, 29:21, 34:7, 48:19, 56:2, 68:22, 69:14, 84:19, 103:17, 113:10, 169:5, 177:5, 182:13, 183:3, 223:9, 226:20, 229:5, 229:21, 254:20, 265:9, 265:19, 318:7
**Between** [1] - 1:3
**beyond** [6] - 11:5, 141:23, 163:18, 176:9, 213:22, 216:10
**Bhandary** [11] - 91:23, 92:24, 119:2, 119:25, 120:2, 132:13, 269:15, 269:20, 276:20, 292:2, 326:24
**Bhandary's** [1] - 327:3
**bias** [1] - 51:19
**bid** [12] - 27:25, 89:16, 103:2, 110:19, 110:22, 114:3, 119:18, 119:20, 119:23, 120:5, 164:9, 304:21
**bids** [2] - 113:24, 114:3
**big** [10] - 42:15, 53:9, 55:21, 57:23, 94:20, 112:18, 116:15, 123:4, 242:18, 297:8
**bigger** [2] - 40:17, 68:12
**binders** [2] - 38:4, 38:16
**birth** [37] - 134:17, 142:8, 142:13, 148:18, 160:18, 161:23, 162:15, 166:21, 166:24, 168:6, 168:12, 168:14, 169:24, 171:20, 172:11, 172:14, 175:18, 175:22, 176:11, 176:22, 186:6, 187:16, 188:19, 206:25, 207:2, 213:12, 213:14, 213:19, 219:6, 219:24, 220:8, 220:11, 246:6, 262:24, 263:24, 284:25

**birthday** [1] - 285:2
**bit** [14] - 47:2, 65:10, 142:4, 142:11, 142:13, 142:14, 153:3, 164:20, 224:22, 241:24, 282:12, 291:6, 291:20, 291:22
**black** [3] - 249:9, 249:10, 249:18
**BlackBerry** [1] - 274:20
**blah** [2] - 251:22
**blank** [1] - 221:25
**blanking** [1] - 289:19
**blast** [62] - 57:17, 57:19, 57:21, 58:10, 58:24, 59:18, 87:12, 87:15, 94:6, 94:10, 94:15, 95:9, 95:10, 95:16, 96:6, 96:10, 96:14, 96:16, 99:2, 99:20, 99:25, 131:22, 132:5, 157:18, 157:20, 157:21, 158:6, 158:22, 160:10, 168:4, 178:13, 204:21, 205:24, 209:12, 209:14, 210:2, 210:5, 210:8, 210:13, 210:18, 210:21, 211:10, 211:13, 211:19, 212:14, 212:15, 212:18, 212:25, 213:3, 213:8, 213:9, 213:16, 213:17, 213:22, 233:17, 234:7, 234:9, 276:7, 287:21
**blasts** [2] - 98:8, 99:9
**bleed** [2] - 223:4, 224:15
**bleeding** [1] - 221:16
**block** [1] - 222:18
**blood** [4] - 221:16, 221:17, 223:15, 329:17
**Bloomberg** [10] - 73:19, 100:8, 242:16, 270:19, 270:22, 270:24, 271:6, 271:7, 271:9, 277:16
**Bloombergs** [4] - 32:14, 57:14, 267:22, 287:20
**blue** [1] - 196:5
**board** [1] - 42:5
**bolded** [1] - 308:5
**bolster** [1] - 11:14
**bond** [6] - 41:8, 45:14, 45:24, 52:7, 298:10
**bonds** [20] - 30:2, 30:3, 30:20, 33:2, 33:11, 41:2, 41:4, 45:16, 46:16, 48:7, 48:11, 63:19, 66:22, 83:24, 94:4, 98:20, 98:23, 100:10, 243:11
**bonus** [116] - 45:9, 69:20, 84:2, 84:4, 84:8, 84:21, 101:7, 105:23, 105:24, 106:5, 106:9, 106:11, 106:14, 107:5, 107:21, 107:23, 108:16, 109:9, 109:11, 110:12, 111:17,

111:21, 113:2, 113:9, 115:24, 117:20, 118:3, 118:4, 118:8, 121:5, 121:16, 122:22, 124:22, 124:24, 125:5, 125:8, 126:2, 126:3, 126:7, 126:13, 126:15, 126:19, 126:21, 126:25, 127:8, 127:10, 127:11, 127:16, 127:20, 127:25, 128:3, 128:8, 128:11, 128:15, 128:20, 128:23, 129:2, 129:3, 129:6, 129:9, 129:12, 129:20, 129:23, 130:2, 130:3, 130:5, 130:6, 130:16, 130:21, 131:5, 131:7, 131:11, 131:15, 131:16, 132:23, 133:14, 279:17, 279:21, 279:22, 279:24, 280:25, 281:10, 281:11, 281:23, 281:24, 282:4, 282:6, 282:10, 282:22, 283:3, 283:9, 283:25, 284:2, 285:16, 285:21, 285:23, 285:25, 286:4, 289:9, 289:13, 289:16, 290:5, 290:6, 290:7, 290:12, 290:15, 290:16, 290:19, 290:20, 317:21, 317:23, 318:3, 318:8, 318:11
**Bonus** [1] - 105:10
**bonuses** [20] - 113:6, 117:23, 120:7, 120:11, 120:14, 120:20, 121:9, 121:20, 122:2, 122:5, 122:8, 124:2, 124:5, 124:9, 124:18, 124:19, 133:21, 279:15, 311:12, 311:13
**book** [1] - 39:2
**booked** [1] - 45:11
**born** [28] - 136:8, 137:9, 137:21, 139:6, 139:10, 155:9, 169:25, 176:4, 176:6, 177:11, 177:16, 177:20, 177:21, 178:7, 178:17, 178:20, 178:25, 179:8, 180:3, 180:11, 183:25, 199:4, 215:22, 215:24, 216:3, 216:6, 229:22
**boss** [1] - 260:17
**bottom** [12] - 70:11, 110:8, 143:17, 184:10, 185:9, 217:15, 226:21, 227:25, 228:2, 315:7, 319:12
**bought** [2] - 89:3, 89:9
**boy** [1] - 125:13
**brain** [7] - 221:12, 221:14, 221:17, 221:18, 221:19, 223:13, 237:19
**breadth** [7] - 72:10, 73:13, 73:21, 73:24, 76:6, 76:23, 77:6
**break** [9] - 55:24, 85:23,

85:24, 165:2, 252:14,
252:15, 252:22, 311:18,
328:16
  **Break** [1] - 311:17
  **breaks** [1] - 243:9
  **bridges** [2] - 299:10,
299:13
  **Bridget** [8] - 148:8, 151:4,
151:6, 151:23, 152:3,
154:13, 188:8, 231:14
  **brief** [2] - 14:12, 227:10
  **briefed** [1] - 7:20
  **bring** [1] - 209:7
  **broad** [1] - 98:13
  **Broide** [12] - 92:3, 92:4,
93:15, 119:2, 120:4, 251:10,
268:15, 269:8, 269:9,
269:11, 327:10
  **BROIDE** [1] - 92:5
  **broker** [1] - 35:6
  **broker-dealer** [1] - 35:6
  **brought** [3] - 228:14, 253:8,
298:19
  **Bud** [2] - 42:11, 42:12
  **building** [1] - 25:12
  **bulk** [2] - 95:6, 163:2
  **bullet** [1] - 100:11
  **burden** [1] - 293:15
  **burns** [72] - 133:10, 134:25,
135:4, 135:12, 135:18,
136:19, 137:8, 137:19,
137:25, 157:20, 169:3,
169:10, 169:14, 170:4,
170:9, 170:21, 170:22,
171:9, 179:19, 179:21,
181:6, 181:21, 182:11,
182:17, 183:2, 183:6, 183:9,
183:14, 183:18, 184:11,
184:12, 184:20, 185:8,
185:10, 185:14, 198:24,
199:7, 199:14, 200:11,
200:21, 201:13, 201:19,
203:3, 204:4, 204:23, 205:3,
205:17, 216:14, 219:12,
230:11, 251:3, 263:22,
264:2, 265:20, 265:24,
266:13, 274:20, 274:22,
275:10, 275:11, 275:13,
275:20, 276:15, 283:8,
283:16, 283:18, 296:23,
297:22, 299:8, 299:9,
299:23, 305:20
  **Burns** [21] - 88:15, 88:16,
88:19, 95:2, 133:8, 133:12,
133:14, 134:23, 141:25,
168:25, 172:6, 179:17,
228:11, 228:13, 230:7,
247:11, 263:17, 264:22,
274:12, 282:8, 295:17
  **business** [6] - 24:8, 26:24,
89:4, 89:9, 241:19, 254:16

**busy** [4] - 163:16, 191:13,
191:24, 231:4
  **buy** [8] - 22:23, 24:17, 27:5,
27:6, 27:7, 52:6, 57:6, 60:7
  **buy-sell-hold** [1] - 22:23
  **buying** [1] - 47:15
  **BY** [6] - 2:10, 3:10, 15:14,
86:6, 166:9, 252:21

## C

  **calculation** [1] - 196:9
  **calculator** [1] - 285:15
  **calendar** [6] - 120:17,
134:8, 134:10, 289:10,
289:14, 289:17
  **California** [31] - 136:9,
139:11, 155:10, 166:22,
168:12, 172:12, 174:3,
175:3, 175:9, 175:11,
176:11, 176:15, 177:7,
177:11, 177:17, 178:4,
178:7, 179:8, 180:15, 198:6,
198:7, 200:5, 206:23,
213:12, 215:8, 215:25,
222:9, 248:17, 262:19,
262:23, 263:24
  **Canadian** [1] - 110:21
  **candidates** [1] - 55:12
  **cannot** [3] - 90:12, 236:7,
272:23
  **capabilities** [3] - 80:4,
237:11, 238:2
  **capability** [1] - 92:23
  **capable** [1] - 9:5
  **capacity** [2] - 99:7, 289:6
  **capital** [4] - 24:9, 24:13,
24:14, 24:17
  **Capital** [5] - 28:3, 28:16,
30:24, 159:14, 159:20
  **cards** [1] - 228:18
  **care** [3] - 196:10, 207:23,
209:22
  **career** [3] - 19:3, 293:2,
293:6
  **carefully** [1] - 185:17
  **Cary** [3] - 87:24, 100:17,
236:21
  **Case** [1] - 1:11
  **case** [15] - 6:22, 7:21,
61:22, 75:13, 80:19, 119:16,
150:4, 151:24, 153:3,
176:21, 184:15, 192:2,
255:24, 315:16, 320:7
  **cases** [1] - 6:24
  **CASSARINI** [1] - 3:19
  **catalyst** [1] - 116:9
  **catch** [1] - 249:16
  **categories** [5] - 60:3, 80:8,
80:13, 313:8, 313:15

  **categorized** [2] - 41:11,
43:7
  **category** [10] - 43:7, 73:11,
73:12, 77:16, 77:18, 78:25,
79:2, 82:20, 315:3, 319:13
  **caused** [1] - 235:22
  **CBIC** [1] - 304:22
  **cell** [2] - 196:5, 264:6
  **center** [7] - 47:23, 48:21,
48:22, 48:24, 52:15, 52:21,
53:24
  **CEO** [2] - 10:12, 42:14
  **CEO's** [2] - 306:21, 310:25
  **certain** [13] - 6:6, 6:20,
24:17, 36:23, 74:16, 89:10,
111:18, 113:19, 194:23,
221:18, 239:5, 267:7, 305:8
  **certainly** [5] - 8:6, 8:21,
12:2, 12:15, 163:20
  **CERTIFICATE** [1] - 329:2
  **certification** [4] - 35:16,
59:12, 99:17, 288:15
  **certifications** [1] - 35:10
  **certify** [4] - 35:17, 90:6,
329:11, 329:15
  **cetera** [4] - 26:14, 58:6,
274:5, 313:25
  **chain** [3] - 184:9, 185:7,
304:6
  **chance** [1] - 144:2
  **change** [19] - 21:4, 23:15,
23:17, 86:7, 86:24, 87:4,
87:9, 91:16, 109:20, 110:3,
168:4, 200:6, 236:9, 236:17,
271:5, 271:10, 282:15,
325:13, 325:20
  **changed** [10] - 87:10,
96:13, 98:10, 110:6, 207:10,
236:12, 236:23, 236:24,
270:19, 304:8
  **changes** [8] - 92:16,
131:20, 131:21, 232:25,
236:18, 249:7, 249:8, 268:5
  **changing** [1] - 132:4
  **charge** [10] - 27:13, 27:17,
48:25, 49:2, 49:12, 87:11,
88:8, 88:10, 241:18, 294:11
  **chart** [13] - 313:5, 313:7,
313:11, 315:18, 315:20,
315:24, 316:5, 316:9,
316:20, 316:24, 317:4,
317:8, 317:24
  **charts** [1] - 313:4
  **check** [19] - 40:4, 75:10,
131:3, 133:22, 216:20,
217:4, 217:7, 219:15,
232:13, 262:19, 262:20,
262:25, 263:2, 263:5, 263:7,
263:22, 263:25
  **checked** [4] - 75:14, 231:5,
262:20, 263:10

  **checking** [3] - 186:12,
216:23, 244:13
  **checkup** [1] - 180:19
  **chem** [1] - 274:4
  **chemical** [4] - 22:16, 22:20,
97:6, 301:13
  **chemicals** [24] - 25:7, 25:9,
25:10, 31:5, 31:7, 31:9,
31:20, 60:24, 61:6, 62:6,
62:9, 62:23, 66:5, 68:9,
68:10, 68:11, 274:4, 286:23,
298:16, 301:6, 301:10,
301:17, 301:19, 302:8
  **chief** [2] - 42:9, 254:8
  **child** [27] - 134:12, 134:15,
134:17, 137:5, 160:18,
162:15, 166:21, 166:24,
168:13, 168:14, 171:20,
172:12, 172:14, 176:12,
207:23, 208:11, 209:23,
213:13, 213:15, 213:19,
219:7, 219:24, 220:8,
220:11, 246:6, 263:25,
304:10
  **children** [4] - 16:10, 16:13,
16:14, 168:7
  **choffman@vladeck.com**
[1] - 2:17
  **choosing** [2] - 53:4
  **Chris** [8] - 64:3, 65:15,
118:16, 118:17, 118:25,
119:3, 119:5, 119:20
  **chunk** [1] - 42:16
  **CIBC** [9] - 88:25, 89:2, 89:3,
110:21, 113:8, 114:14,
116:21, 116:25, 117:24
  **circumstances** [10] - 5:16,
13:13, 63:12, 110:16,
121:12, 207:9, 326:16,
327:3, 327:14, 328:2
  **cited** [1] - 6:25
  **cities** [1] - 180:15
  **Claimant** [2] - 1:6, 2:6
  **claimant** [3] - 6:25, 10:2,
256:18
  **Claimant's** [1] - 13:14
  **clarification** [1] - 284:11
  **clarify** [1] - 235:5
  **clarity** [1] - 252:7
  **CLARK** [1] - 2:5
  **classes** [1] - 19:23
  **clause** [1] - 218:21
  **clear** [26] - 29:20, 31:18,
74:25, 95:5, 117:5, 162:17,
181:9, 201:24, 203:5,
204:22, 205:7, 209:15,
209:16, 235:9, 235:12,
235:14, 235:20, 238:25,
248:21, 259:22, 260:9,
264:18, 268:2, 268:6,
268:19, 271:3

**clearance** [1] - 175:17
**cleared** [2] - 237:15, 238:4
**clearer** [1] - 258:4
**clearly** [4] - 11:8, 12:9, 13:8, 304:20
**Client** [1] - 78:11
**client** [15] - 32:23, 33:12, 43:12, 46:15, 46:20, 48:15, 49:8, 49:9, 79:6, 79:11, 95:19, 97:12, 97:14, 287:22
**clients** [16] - 25:24, 26:7, 26:17, 26:21, 27:7, 27:14, 43:8, 43:13, 43:24, 48:9, 49:4, 57:12, 58:8, 60:9, 60:11, 87:13
**close** [5] - 11:21, 11:22, 154:23, 177:25, 194:9
**closed** [3] - 84:13, 194:13, 242:20
**closed-door** [1] - 84:13
**closest** [1] - 84:16
**closings** [1] - 14:11
**Co** [2] - 3:18, 3:20
**co** [54] - 54:4, 69:12, 69:18, 87:7, 87:9, 88:12, 88:14, 89:12, 89:20, 89:24, 90:18, 92:16, 94:7, 94:13, 94:21, 94:24, 95:5, 95:6, 95:25, 99:7, 129:14, 131:16, 131:17, 131:21, 132:2, 133:3, 133:6, 133:16, 157:21, 183:18, 214:5, 233:25, 238:10, 238:20, 247:11, 251:5, 251:8, 251:16, 265:17, 266:10, 266:23, 267:8, 267:14, 269:18, 270:17, 270:20, 270:21, 271:5, 271:12, 271:25, 272:15, 288:18, 294:11
**CO** [1] - 1:9
**co-group** [1] - 54:4
**co-head** [49] - 69:12, 69:18, 87:7, 87:9, 88:12, 88:14, 89:12, 89:20, 89:24, 90:18, 94:7, 94:21, 94:24, 95:5, 95:25, 99:7, 129:14, 131:16, 131:17, 131:21, 132:2, 133:3, 133:6, 133:16, 183:18, 214:5, 233:25, 238:10, 238:20, 247:11, 251:5, 251:8, 251:16, 265:17, 266:10, 266:23, 267:8, 267:14, 269:18, 270:17, 270:20, 270:21, 271:5, 271:12, 271:25, 272:15, 288:18, 294:11
**co-heads** [2] - 92:16, 94:13
**co-morning** [1] - 157:21
**Colin** [5] - 16:6, 180:7, 224:16, 225:2

**collabs** [1] - 44:12
**collapsed** [1] - 92:8
**colleague** [1] - 135:24
**colleagues** [3] - 85:13, 135:19, 275:15
**Colleen** [72] - 88:15, 92:7, 94:14, 94:21, 95:11, 99:16, 134:23, 135:12, 140:15, 140:18, 141:8, 144:25, 155:14, 156:3, 158:4, 161:11, 163:13, 164:12, 168:25, 169:6, 172:6, 172:10, 173:2, 174:8, 174:9, 174:21, 179:16, 181:5, 183:13, 184:16, 188:6, 197:21, 198:21, 198:24, 199:11, 199:19, 201:2, 204:20, 205:11, 206:20, 208:18, 210:6, 211:21, 211:24, 213:6, 213:15, 217:5, 221:3, 228:11, 228:13, 228:25, 230:25, 246:3, 247:11, 263:17, 264:22, 265:6, 267:5, 267:9, 267:16, 268:10, 269:22, 274:2, 274:8, 277:19, 282:8, 288:12, 288:23, 294:19, 295:17, 296:23
**college** [3] - 16:17, 16:19, 17:8
**color** [2] - 249:7, 249:9
**column** [1] - 77:7, 314:17
**columns** [2] - 77:18, 319:17
**combination** [9] - 55:19, 153:8, 153:9, 168:2, 168:8, 255:2, 255:9, 255:14, 287:19
**comfortable** [1] - 97:19
**coming** [8] - 8:2, 83:3, 83:6, 95:17, 163:3, 164:17, 209:17, 211:20
**comment** [7] - 71:23, 79:13, 79:17, 81:4, 81:15, 81:16, 298:3
**commentary** [1] - 98:11
**comments** [11] - 75:17, 77:19, 78:3, 78:5, 78:9, 79:16, 79:19, 81:7, 90:10, 210:25, 282:12
**commission** [8] - 45:17, 48:17, 66:21, 149:10, 150:9, 287:3, 287:9, 287:10
**commissioning** [1] - 45:13
**commissions** [8] - 27:19, 45:11, 45:20, 62:20, 63:15, 79:9, 149:20, 149:22
**commit** [1] - 160:24
**committee** [3] - 42:2, 104:6, 115:21
**common** [4] - 135:25, 186:17, 209:2, 275:15
**communicate** [9] - 178:25,

179:10, 192:7, 202:11, 216:9, 224:9, 225:16, 225:19, 292:23
**communicated** [3] - 204:20, 224:13, 225:12
**communicating** [1] - 220:15
**communication** [5] - 78:12, 79:6, 79:12, 252:8, 254:13
**communications** [2] - 201:9, 259:20
**companies** [28] - 22:18, 22:24, 24:19, 29:13, 29:14, 29:18, 30:5, 30:6, 31:17, 32:8, 32:9, 32:17, 57:3, 57:4, 65:13, 73:22, 190:20, 191:16, 192:2, 192:4, 192:20, 194:3, 196:17, 196:20, 196:21, 197:9, 197:11, 242:14
**company** [24] - 7:23, 24:15, 30:8, 30:11, 30:12, 48:11, 58:22, 66:20, 99:23, 145:24, 190:12, 190:22, 192:19, 193:6, 194:9, 194:15, 195:24, 196:6, 200:6, 216:7, 242:17, 243:9, 307:7, 307:15
**company's** [1] - 254:8
**compare** [4] - 22:4, 281:24, 290:7, 290:16
**comparing** [1] - 317:16
**compensated** [2] - 164:15, 173:20
**compensation** [18] - 28:13, 42:2, 101:12, 101:18, 104:6, 111:10, 111:15, 111:16, 112:15, 115:21, 115:25, 149:19, 153:25, 154:6, 229:10, 230:5, 284:20, 304:25
**competent** [1] - 13:12
**competing** [3] - 111:22, 112:9, 115:2
**competitor** [2] - 110:19, 110:20
**compilation** [5] - 75:16, 78:4, 78:8, 79:18, 96:16
**compiled** [2] - 58:9, 58:11
**compiling** [3] - 58:16, 312:6, 312:13
**complain** [1] - 306:17
**complaints** [2] - 210:11, 307:11
**complemented** [2] - 131:23, 132:8
**complete** [1] - 194:14
**completed** [1] - 124:7
**completely** [1] - 11:11
**compliance** [38] - 35:17, 50:22, 51:3, 51:10, 51:15, 51:22, 66:9, 87:21, 89:24,

90:2, 90:4, 90:7, 90:8, 90:13, 90:15, 94:23, 101:3, 174:22, 233:2, 233:5, 233:21, 235:17, 235:18, 236:17, 236:18, 238:16, 239:2, 239:6, 239:8, 239:10, 239:14, 239:15, 241:19, 252:3, 268:21, 268:22, 289:4
**compliant** [1] - 100:15
**complicated** [3] - 132:4, 193:25, 194:20
**complications** [1] - 224:2
**complimented** [1] - 282:20
**component** [2] - 98:21, 117:21, 118:3
**compromise** [1] - 160:24
**comps** [1] - 144:20
**concern** [1] - 228:4
**concerned** [7] - 55:24, 56:3, 56:4, 85:11, 211:11, 211:14, 211:15
**conclusion** [2] - 12:23, 169:17
**concrete** [1] - 236:22
**condition** [1] - 237:18
**conference** [2] - 13:22, 294:25
**conferencing** [1] - 266:22
**confidence** [2] - 117:13, 164:7
**confidential** [1] - 9:8
**confirm** [1] - 130:10
**confused** [2] - 142:7, 260:8
**confusing** [2] - 259:21, 260:2
**confusion** [5] - 259:11, 259:12, 259:15, 259:18, 260:2
**congratulations** [1] - 187:17
**connect** [1] - 206:14
**connection** [7] - 219:6, 220:10, 220:23, 222:22, 230:21, 306:5, 309:4
**CONNOR** [1] - 2:16
**consider** [3] - 8:23, 216:23, 217:2
**considering** [2] - 177:2, 231:17
**consistent** [4] - 152:23, 175:5, 180:21, 203:2
**contact** [1] - 178:15
**contained** [6] - 12:7, 38:3, 145:13, 312:6, 312:13, 312:17
**content** [1] - 90:8
**contentious** [2] - 240:15, 258:20
**context** [3] - 72:23, 73:21, 181:4
**contingency** [1] - 156:9

**continue** [7] - 62:13, 158:7, 176:3, 210:20, 212:15, 274:4, 274:7
**CONTINUED** [4] - 3:2, 86:5, 166:8, 252:20
**continued** [1] - 14:25
**continuing** [1] - 231:16
**continuity** [2] - 158:2, 210:12
**contractual** [1] - 116:21
**contribute** [1] - 58:24
**contributed** [1] - 58:18
**Contribution** [1] - 71:19
**contribution** [7] - 71:24, 131:14, 133:15, 283:20, 283:25, 284:3, 284:14
**contributions** [1] - 132:22
**control** [1] - 49:5
**controls** [1] - 161:4
**conversation** [124] - 115:7, 133:18, 133:21, 134:3, 135:16, 136:19, 137:7, 137:24, 138:22, 139:24, 140:10, 141:15, 142:6, 142:7, 142:23, 143:23, 144:7, 144:10, 147:7, 147:22, 151:13, 151:15, 152:16, 154:16, 154:19, 154:23, 155:3, 157:16, 158:9, 160:8, 160:10, 162:13, 162:20, 167:21, 168:18, 168:22, 169:20, 170:10, 170:12, 170:18, 170:20, 171:8, 171:25, 172:3, 172:4, 173:7, 179:23, 181:5, 181:20, 183:14, 183:22, 200:21, 203:14, 203:17, 204:9, 205:15, 205:18, 209:21, 210:3, 213:20, 214:2, 214:9, 214:13, 214:21, 215:2, 215:16, 215:20, 220:5, 220:6, 230:6, 230:8, 230:10, 230:12, 230:14, 230:16, 230:25, 235:6, 236:2, 236:5, 238:3, 238:21, 240:4, 240:16, 242:6, 244:8, 244:10, 247:3, 247:6, 247:18, 250:25, 251:20, 252:4, 252:23, 253:3, 253:7, 254:13, 254:20, 255:9, 255:10, 255:15, 255:19, 258:20, 258:22, 259:7, 260:3, 260:19, 261:12, 261:17, 269:2, 269:22, 271:3, 272:5, 273:14, 283:8, 283:12, 283:17, 297:21, 309:10, 309:13, 309:17, 309:21, 309:23, 309:25, 310:2
**conversations** [10] - 171:17, 172:5, 201:23,

216:13, 231:11, 265:9, 275:13, 277:20, 289:3, 309:19
**conveyed** [1] - 198:7
**cooking** [1] - 34:17
**copies** [2] - 272:10, 311:15
**copy** [4] - 8:15, 8:16, 271:18, 273:4
**cordial** [1] - 187:14
**corner** [2] - 70:12, 313:8
**corporate** [3] - 20:24, 41:3, 41:22
**correct** [114] - 20:16, 29:19, 31:22, 39:9, 40:5, 41:12, 45:2, 69:25, 70:20, 71:4, 71:7, 76:15, 86:12, 88:13, 89:13, 89:18, 91:15, 92:21, 93:7, 93:22, 93:25, 101:19, 102:15, 105:8, 105:18, 106:20, 107:8, 109:6, 110:15, 113:11, 116:8, 120:13, 121:21, 127:2, 127:9, 128:2, 128:4, 129:22, 130:8, 130:12, 130:14, 130:23, 131:2, 131:4, 131:9, 143:19, 143:21, 145:11, 145:15, 146:22, 149:14, 149:17, 150:16, 151:14, 151:17, 154:17, 154:25, 178:5, 183:19, 183:20, 185:11, 185:12, 186:10, 187:11, 188:23, 189:2, 194:25, 195:10, 195:11, 197:19, 198:2, 201:6, 204:25, 205:2, 205:6, 213:21, 218:3, 231:24, 246:23, 246:24, 248:11, 248:12, 250:17, 252:12, 252:25, 262:13, 271:20, 272:16, 272:19, 273:5, 273:12, 273:16, 274:24, 276:24, 280:21, 286:18, 288:4, 288:8, 299:16, 307:20, 313:3, 313:10, 315:9, 316:7, 319:15, 321:21, 325:10, 326:13, 326:14, 327:11, 327:25, 328:6, 328:7
**correctly** [1] - 197:25
**corresponding** [1] - 274:19
**corresponds** [1] - 314:17
**cost** [11] - 47:23, 48:21, 48:22, 48:24, 52:15, 52:21, 53:24, 195:25, 295:25, 296:20, 300:12
**cost-cutting** [2] - 295:25, 300:12
**COSTER** [1] - 3:12
**Counsel** [2] - 3:17, 3:20
**counsel** [4] - 4:16, 12:4, 254:9, 254:10
**counterparts** [2] - 68:12,

68:21
**countries** [1] - 94:3
**COUNTY** [1] - 329:6
**couple** [12] - 144:19, 145:2, 145:3, 147:25, 148:3, 206:10, 207:25, 208:2, 209:3, 217:20, 250:24, 256:25
**couples** [2] - 138:21, 144:23
**coupons** [1] - 30:19
**course** [2] - 81:24, 228:14
**courtesy** [8] - 49:3, 135:25, 147:6, 183:15, 184:6, 186:17, 210:15, 275:15
**cover** [34] - 25:6, 25:17, 54:6, 54:8, 54:14, 60:16, 62:22, 63:4, 63:10, 63:12, 65:11, 65:13, 65:14, 65:21, 67:7, 67:8, 73:25, 82:4, 120:21, 120:22, 130:18, 137:15, 174:5, 190:6, 197:9, 242:14, 243:9, 243:22, 274:4, 291:8, 292:4, 297:9, 301:5, 311:24
**coverage** [59] - 23:24, 23:25, 25:18, 29:12, 31:3, 53:4, 54:6, 54:19, 64:8, 64:13, 64:17, 64:23, 65:3, 72:10, 73:14, 73:21, 76:7, 76:23, 77:6, 99:6, 135:14, 135:21, 136:3, 140:19, 140:22, 141:2, 156:4, 156:25, 157:13, 157:17, 158:22, 161:11, 174:9, 174:11, 182:16, 198:24, 208:10, 209:10, 287:13, 292:9, 297:7, 297:12, 297:15, 301:2, 301:9, 301:13, 301:20, 301:25, 302:2, 302:9, 302:12, 302:16, 302:21, 302:24, 303:7, 303:12, 303:16, 303:19
**covered** [47] - 22:16, 22:17, 22:19, 22:24, 24:18, 25:7, 25:8, 29:4, 29:13, 31:8, 56:25, 60:18, 60:20, 62:8, 62:12, 65:19, 66:3, 66:9, 66:12, 67:11, 67:25, 68:10, 68:15, 73:22, 73:24, 94:2, 97:3, 130:19, 150:5, 192:3, 215:23, 286:14, 286:15, 286:16, 286:22, 286:23, 286:24, 286:25, 291:11, 291:16, 291:22, 291:24, 297:17, 298:22, 301:6
**covering** [8] - 32:24, 33:4, 33:6, 84:24, 132:18, 275:19, 287:4, 291:19
**covers** [3] - 68:6, 82:12, 302:5

**create** [1] - 51:19
**created** [3] - 74:12, 95:18, 98:13
**credibility** [1] - 11:15
**credible** [2] - 300:10, 300:12
**credit** [15] - 24:8, 24:22, 29:3, 29:6, 29:9, 33:11, 48:14, 72:9, 73:13, 76:6, 76:23, 77:5, 100:12, 196:9
**credits** [1] - 24:22
**crisis** [1] - 34:12
**CROSS** [1] - 330:5
**cross** [1] - 219:15
**cross-check** [1] - 219:15
**crumbled** [2] - 34:13, 34:14
**Culinary** [4] - 19:10, 19:13, 19:16, 19:21
**current** [2] - 56:5, 56:10
**curt** [2] - 210:25, 241:6
**curtness** [1] - 252:4
**customers** [1] - 47:13
**cut** [2] - 45:14, 284:20
**cutting** [4] - 11:23, 295:25, 296:20, 300:12
**cycle** [1] - 118:4

**D**

**dad** [1] - 285:3
**daily** [1] - 234:7
**damages** [5] - 5:20, 5:25, 11:24, 13:5, 308:25
**Daniel's** [1] - 328:3
**Daniels** [13] - 91:25, 93:8, 132:13, 161:17, 195:9, 196:4, 196:14, 196:16, 198:12, 201:5, 276:20, 327:23
**DARBY** [2] - 329:8, 329:22
**Darby** [1] - 1:18
**data** [6] - 192:6, 192:7, 194:12, 195:15, 195:25
**date** [54] - 61:12, 105:4, 110:7, 120:17, 133:23, 134:5, 134:6, 139:13, 139:14, 139:16, 142:8, 163:18, 173:24, 176:19, 177:18, 177:22, 178:19, 181:17, 181:24, 183:7, 183:17, 183:25, 184:25, 185:4, 190:13, 190:15, 199:3, 201:14, 201:20, 201:21, 201:22, 201:24, 202:5, 202:24, 207:3, 207:17, 208:20, 209:20, 217:16, 221:25, 222:2, 226:5, 226:24, 227:3, 227:7, 230:23, 246:13, 272:6, 273:10, 276:22, 277:2, 291:5, 321:15, 321:17

338

**dated** [8] - 71:5, 133:25, 143:20, 184:11, 185:9, 189:4, 226:21, 246:22
**dates** [2] - 88:21, 259:23
**daughter** [12] - 136:8, 175:19, 175:23, 177:15, 177:16, 177:20, 177:23, 186:7, 187:16, 188:20, 199:4, 216:5
**daughter's** [1] - 285:2
**daughters** [1] - 157:7
**days** [9] - 30:17, 133:19, 177:15, 178:3, 190:20, 190:25, 203:19, 246:25, 247:5
**deadlines** [2] - 6:18, 8:3
**deal** [16] - 4:5, 6:24, 87:22, 94:20, 97:20, 116:11, 116:12, 117:6, 117:21, 117:22, 118:8, 121:14, 130:15, 130:18, 134:7, 198:25
**dealer** [1] - 35:6
**deals** [1] - 298:10
**dealt** [2] - 209:3, 240:23
**debt** [9] - 24:15, 24:19, 24:21, 27:9, 29:5, 41:2, 42:23, 43:7, 94:3
**December** [11] - 71:5, 190:16, 286:21, 287:16, 320:23, 321:4, 321:5, 321:7, 321:14, 321:16
**decide** [9] - 160:19, 161:8, 167:2, 170:2, 171:5, 181:22, 186:24, 203:23, 255:18
**decided** [9] - 72:20, 94:9, 94:14, 94:19, 136:6, 169:18, 181:23, 182:22, 265:4
**deciding** [1] - 8:5
**decision** [10] - 6:5, 12:18, 52:6, 55:8, 55:17, 63:20, 86:13, 147:14, 162:14, 184:4
**decision-maker** [1] - 55:8
**decisions** [2] - 54:18, 292:10
**declined** [1] - 305:18
**declining** [1] - 305:5
**dedicated** [1] - 175:8
**deems** [1] - 9:13
**defendant's** [2] - 12:8, 257:11
**defense** [3] - 6:2, 6:22, 8:9
**deferential** [2] - 258:23, 263:20
**deferred** [2] - 268:25, 288:15
**deferring** [1] - 188:7
**deficiencies** [1] - 6:15
**define** [5] - 313:23, 314:3, 314:4, 314:5, 314:7
**degree** [12] - 16:21, 16:25,

17:5, 17:12, 17:15, 19:12, 29:12, 45:10, 54:20, 116:19, 233:21, 308:25
**delivered** [1] - 180:3
**delved** [1] - 159:12
**demonstrates** [1] - 123:13
**demonstrative** [1] - 311:12
**demoted** [10] - 251:5, 266:10, 268:20, 269:13, 273:15, 284:8, 288:7, 288:18, 304:19, 308:24
**demoting** [2] - 235:3, 260:20
**Denys** [10] - 143:5, 143:18, 144:13, 145:10, 145:16, 145:18, 146:18, 172:3, 215:17, 218:12
**departing** [1] - 114:7
**department** [16] - 40:11, 44:17, 46:25, 51:21, 51:23, 54:17, 58:2, 62:21, 100:22, 138:16, 150:25, 175:8, 218:25, 247:14, 319:11, 323:15
**departments** [1] - 323:10
**departure** [8] - 13:14, 196:19, 236:19, 236:20, 326:17, 327:4, 327:14, 328:3
**depended** [1] - 122:25
**dependent** [1] - 124:3
**depreciation** [1] - 196:12
**deputy** [1] - 254:10
**Deputy** [1] - 3:17
**derived** [1] - 110:18
**describe** [2] - 26:22, 245:21
**described** [6] - 41:7, 143:25, 144:8, 162:20, 198:9, 204:23
**describing** [1] - 205:3
**desk** [58] - 32:11, 32:18, 40:10, 40:15, 40:16, 41:8, 42:24, 42:25, 43:2, 43:3, 43:4, 43:6, 43:13, 43:14, 43:15, 43:19, 43:20, 43:25, 44:2, 44:7, 44:10, 44:24, 46:3, 47:12, 48:5, 49:11, 49:25, 52:2, 52:17, 52:18, 52:21, 53:2, 53:3, 53:15, 53:24, 55:7, 57:16, 79:20, 82:13, 85:12, 111:2, 123:3, 123:5, 161:3, 192:9, 196:24, 222:17, 222:25, 236:16, 239:10, 239:13, 241:11, 242:9, 243:15, 296:5, 300:13
**desks** [3] - 42:24, 46:11, 251:17
**detail** [4] - 137:10, 208:13, 318:20, 322:11
**details** [8] - 94:18, 137:23, 145:23, 153:7, 154:2, 158:8, 162:25, 169:16

**determination** [2] - 123:14, 172:16
**determined** [4] - 45:9, 54:20, 122:9, 142:16
**determining** [1] - 9:7
**devoted** [1] - 193:17
**Diane** [3] - 228:11, 228:25
**dictate** [1] - 54:11
**die** [1] - 237:20
**Diego** [2] - 16:20, 16:22
**difference** [5] - 29:10, 29:21, 30:4, 30:16, 113:10
**different** [15] - 23:21, 24:9, 24:13, 39:2, 42:24, 47:3, 53:22, 64:18, 96:7, 151:25, 153:3, 185:19, 189:22, 190:14, 291:15
**difficult** [1] - 255:12
**digest** [1] - 193:2
**dilutive** [1] - 68:16
**direct** [2] - 8:20, 317:13
**DIRECT** [1] - 330:5
**directly** [4] - 95:21, 254:15, 264:7, 308:12
**director** [26] - 23:13, 28:10, 28:11, 28:23, 36:3, 41:24, 42:3, 85:20, 85:21, 86:8, 86:11, 86:14, 86:20, 86:22, 87:2, 87:6, 91:7, 91:11, 91:12, 93:3, 93:17, 93:18, 100:21, 308:12
**Director** [1] - 3:19
**directors** [1] - 42:5
**disability** [14] - 153:5, 153:15, 153:22, 153:24, 225:9, 226:15, 229:13, 237:16, 237:22, 238:5, 306:4, 306:6, 306:9, 307:8
**disagree** [1] - 273:19
**disappointed** [4] - 207:15, 208:19, 209:19, 211:6
**disclose** [1] - 309:18
**discourage** [1] - 167:25
**discouraged** [8] - 157:4, 157:23, 164:19, 164:24, 167:21, 170:19, 170:24, 239:25
**discouragement** [1] - 200:24
**discouraging** [6] - 160:13, 170:13, 199:21, 200:13, 202:20, 310:3
**discover** [1] - 242:3
**discovery** [1] - 272:12
**discrete** [1] - 96:7
**discretion** [2] - 153:13, 154:8
**discretionary** [4] - 113:7, 121:20, 122:3, 122:5
**discriminated** [1] - 307:2, 307:7

**discrimination** [6] - 10:4, 307:12, 307:16, 308:2, 308:9, 308:17
**discriminatory** [2] - 9:21, 12:9
**discuss** [27] - 111:22, 112:4, 113:12, 114:12, 114:19, 136:18, 137:22, 138:25, 139:23, 142:2, 160:5, 161:22, 164:13, 169:2, 170:8, 171:22, 173:19, 176:9, 179:18, 182:16, 188:5, 206:17, 209:13, 210:4, 213:23, 232:15, 283:17
**discussed** [19] - 116:3, 136:2, 136:21, 140:2, 141:3, 143:24, 157:14, 158:13, 158:21, 159:2, 162:18, 198:23, 200:10, 206:19, 211:18, 241:23, 245:11, 246:6, 246:20
**discussing** [3] - 154:9, 167:4, 200:19
**discussion** [46] - 13:21, 14:9, 113:16, 156:23, 158:9, 158:14, 159:2, 160:4, 162:18, 162:22, 163:2, 163:5, 166:11, 166:15, 167:10, 169:10, 169:12, 169:14, 169:22, 173:22, 173:24, 182:20, 198:20, 199:13, 199:14, 199:18, 203:8, 204:14, 204:22, 209:8, 212:21, 212:23, 213:3, 214:4, 220:21, 232:8, 232:11, 232:16, 234:17, 238:8, 239:21, 250:8, 250:14, 250:19, 250:22, 252:10
**discussions** [11] - 172:8, 175:25, 182:17, 201:9, 201:12, 201:19, 216:10, 229:14, 231:25, 232:6, 250:10
**dispute** [1] - 249:14
**disputed** [1] - 38:8
**disregard** [1] - 7:23
**disseminate** [2] - 174:18, 193:12
**distinct** [1] - 46:6
**distinguish** [1] - 27:4
**distribution** [6] - 49:5, 49:7, 57:18, 57:20, 57:21, 277:18
**dividing** [1] - 208:6
**dizzy** [1] - 222:15
**doctor** [8] - 180:2, 180:3, 180:18, 184:12, 227:12, 237:15, 237:18, 238:4
**doctorate** [2] - 17:16, 17:18

**doctors** [1] - 206:23
**document** [22] - 5:21, 5:22, 9:9, 70:21, 71:18, 106:25, 107:12, 107:15, 109:19, 109:23, 110:2, 272:22, 276:13, 280:8, 280:9, 280:12, 281:3, 312:2, 319:13, 319:21, 320:18, 321:2
**documents** [9] - 12:22, 36:18, 36:20, 36:23, 36:25, 37:3, 37:5, 37:7, 272:8
**Doherty** [10] - 64:3, 64:5, 64:6, 65:15, 118:16, 118:17, 118:25, 119:3, 119:5, 119:20
**Dolinger** [1] - 256:17
**DOLINGER** [84] - 1:17, 4:2, 4:13, 6:23, 7:5, 7:16, 8:14, 9:14, 10:20, 11:3, 12:20, 13:20, 14:4, 14:14, 14:21, 15:6, 15:11, 15:21, 25:22, 26:25, 32:19, 37:22, 38:2, 38:10, 38:14, 41:3, 44:21, 46:5, 47:18, 50:7, 50:14, 67:14, 74:17, 74:24, 86:2, 90:24, 93:23, 96:5, 97:11, 106:7, 112:20, 116:23, 119:12, 125:15, 147:11, 161:12, 161:15, 165:3, 166:6, 183:21, 187:22, 190:8, 191:3, 191:7, 192:10, 193:14, 194:22, 195:5, 195:12, 197:13, 198:4, 199:9, 202:2, 215:7, 234:3, 234:10, 239:16, 240:8, 242:2, 248:20, 252:17, 252:19, 257:2, 257:18, 258:2, 263:3, 316:14, 316:18, 317:12, 317:19, 318:14, 318:21, 328:14, 328:20
**dollar** [2] - 104:16, 283:3
**dollars** [4] - 282:22, 290:11, 316:3, 316:13
**dominated** [1] - 54:17
**done** [23] - 5:9, 10:10, 46:7, 59:7, 59:9, 59:10, 70:15, 73:2, 82:21, 102:9, 102:13, 113:4, 113:5, 126:5, 130:5, 130:7, 137:14, 191:8, 244:24, 278:13, 290:16, 290:17
**Donnelly** [9] - 148:8, 151:4, 151:5, 151:6, 151:19, 152:3, 152:16, 152:21, 154:10
**door** [2] - 55:15, 84:13
**double** [3] - 40:4, 131:3, 256:24
**double-check** [2] - 40:4, 131:3
**double-spaced** [1] - 256:24
**doubt** [2] - 249:12, 318:25

**down** [6] - 45:25, 84:10, 147:20, 277:8, 277:9, 295:14
**downstairs** [1] - 295:15
**Drexel** [1] - 30:17
**drill** [1] - 152:8
**drive** [1] - 180:12
**driven** [7] - 46:3, 52:16, 56:21, 98:8, 123:8, 320:5
**driver** [5] - 53:3, 53:5, 117:15, 123:4, 164:8
**drives** [2] - 52:23, 318:10
**drop** [1] - 263:21
**drove** [1] - 318:10
**due** [6] - 139:13, 139:14, 139:16, 177:22, 186:6, 207:2
**duly** [1] - 15:4
**duration** [5] - 158:23, 170:3, 171:5, 172:16, 176:8
**during** [88] - 6:10, 7:7, 22:25, 34:18, 35:10, 53:8, 53:22, 55:10, 63:17, 66:10, 67:19, 69:19, 71:19, 83:12, 84:21, 101:12, 114:11, 118:10, 118:18, 120:8, 123:19, 136:19, 137:7, 139:24, 140:10, 141:15, 149:10, 149:12, 150:3, 150:7, 152:16, 155:2, 156:23, 158:14, 160:4, 161:24, 162:2, 166:15, 167:21, 173:23, 182:17, 206:18, 209:8, 214:2, 215:2, 216:14, 216:20, 229:2, 232:15, 236:2, 238:8, 247:18, 256:2, 261:16, 265:24, 290:22, 291:21, 292:7, 293:2, 293:8, 295:18, 297:21, 298:15, 301:14, 302:16, 303:9, 303:19, 305:19, 306:13, 306:24, 307:5, 307:10, 307:14, 308:16, 318:13, 321:19, 322:3, 322:20, 323:5, 323:21, 324:15, 324:24, 325:4, 326:12, 326:23, 327:11, 327:24
**duties** [1] - 286:12

# E

**earliest** [1] - 180:24
**early** [11] - 91:24, 117:23, 120:18, 126:6, 128:16, 135:2, 176:22, 177:16, 199:5, 221:22
**earning** [3] - 125:23, 133:20, 280:19
**earnings** [43] - 105:3, 105:6, 107:16, 108:6, 108:9, 108:10, 108:22, 108:24, 109:3, 125:20, 125:21,

127:24, 128:19, 129:19, 133:24, 174:12, 190:2, 190:4, 190:7, 190:9, 190:17, 190:19, 190:21, 190:22, 190:24, 190:25, 191:12, 191:14, 191:17, 191:25, 192:5, 192:13, 193:18, 193:24, 194:2, 196:10, 198:11, 199:22, 200:3, 200:9, 280:15, 280:16, 281:4
**easier** [4] - 15:18, 15:24, 257:13, 257:22
**easy** [5] - 32:21, 40:23, 42:20, 174:17, 287:8
**EBITDA** [2] - 196:8, 196:10
**economic** [12] - 9:23, 10:7, 322:23, 323:2, 323:11, 323:20, 324:13, 326:9, 326:20, 327:8, 327:20, 328:6
**economic-based** [1] - 323:2
**education** [1] - 19:6
**effect** [4] - 12:13, 105:17, 110:12, 110:13
**effective** [2] - 97:3, 110:7
**efficiently** [1] - 198:13
**effort** [1] - 117:10
**eight** [5] - 16:16, 206:25, 256:23, 285:13, 285:14
**Eighth** [1] - 1:13
**either** [7] - 4:4, 19:18, 128:16, 198:5, 256:11, 320:6, 328:16
**electronically** [1] - 273:2
**element** [5] - 26:21, 44:3, 44:4, 45:22
**elements** [1] - 247:14
**email** [110] - 95:19, 95:21, 143:17, 143:23, 144:6, 144:12, 145:11, 145:14, 145:18, 146:5, 146:17, 146:20, 146:23, 184:9, 184:10, 184:14, 184:24, 185:2, 185:7, 185:9, 185:10, 185:14, 185:16, 185:21, 185:22, 186:11, 186:12, 187:3, 187:14, 187:15, 188:25, 189:3, 189:7, 189:18, 197:17, 197:18, 197:20, 199:10, 199:15, 200:23, 201:7, 203:10, 203:12, 203:19, 203:25, 204:3, 204:6, 204:13, 204:24, 205:5, 205:12, 213:22, 218:12, 219:11, 219:14, 219:16, 219:20, 219:25, 225:20, 225:22, 226:4, 226:19, 226:21, 226:23, 227:25, 228:2, 228:3, 228:23, 242:16, 242:24, 243:18, 243:22, 244:17, 248:7, 248:11,

248:15, 248:24, 248:25, 249:5, 249:8, 249:12, 249:13, 250:2, 250:6, 262:3, 262:11, 271:11, 271:15, 271:18, 271:24, 272:3, 272:13, 272:14, 272:17, 272:21, 273:7, 273:10, 274:22, 275:5, 276:14, 276:22, 277:6, 277:8, 277:10, 278:4, 278:15
**emails** [15] - 158:3, 202:4, 216:20, 216:24, 242:9, 242:12, 242:21, 242:23, 243:4, 243:13, 243:15, 244:13, 262:21, 262:25
**emergency** [7] - 217:6, 221:9, 221:11, 222:18, 222:20
**emerging** [4] - 43:3, 92:9, 236:15, 239:18
**emiller@vladeck.com** [1] - 2:15
**EMILY** [1] - 2:14
**emphasizing** [1] - 238:6
**Employee** [1] - 145:25
**employee** [5] - 114:10, 145:23, 146:5, 217:13, 218:22
**employee's** [1] - 7:7
**Employees** [1] - 313:17
**employees** [5] - 35:7, 254:10, 322:4, 322:8, 325:20
**employers** [1] - 5:11
**employment** [13] - 41:19, 120:8, 123:20, 256:2, 279:10, 306:14, 306:25, 307:6, 307:10, 307:14, 308:16, 323:5, 325:12
**encouraged** [1] - 137:5
**end** [23] - 31:11, 113:18, 116:2, 139:18, 156:20, 159:3, 159:4, 163:17, 173:5, 173:24, 181:17, 183:4, 183:17, 185:2, 190:13, 190:14, 190:15, 221:5, 221:6, 222:21, 230:24, 231:3, 295:3
**ended** [1] - 240:4
**ending** [7] - 105:4, 107:2, 107:16, 108:6, 108:22, 313:16, 321:14
**engage** [2] - 34:18, 58:8
**engagement** [1] - 88:3
**entail** [1] - 286:19
**entered** [1] - 9:12
**entire** [2] - 187:5, 187:9
**entirety** [1] - 41:18
**entities** [1] - 94:2
**entitled** [4] - 145:20, 155:22, 156:12, 157:12
**entity** [1] - 94:5

340

entry [1] - 20:20
equalizer [2] - 108:15, 109:10
Equinox [1] - 222:11
equipment [1] - 175:2
equities [4] - 24:3, 24:6, 43:11, 64:19
equity [34] - 22:2, 22:11, 22:13, 22:21, 24:16, 25:6, 27:8, 43:15, 64:13, 64:16, 64:17, 64:23, 296:24, 297:3, 297:10, 297:14, 297:19, 297:20, 298:3, 298:4, 298:13, 298:16, 298:22, 300:25, 301:9, 301:12, 301:20, 302:12, 302:16, 303:6, 303:10, 303:11, 323:14
equivalent [2] - 60:7, 191:9
eroding [1] - 233:23
error [1] - 244:19
especially [3] - 137:4, 208:3, 275:18
essentially [2] - 6:11, 198:8
estimate [1] - 285:6
estimates [3] - 191:18, 191:19, 191:20
et [4] - 26:14, 58:6, 274:5, 313:25
evaluation [3] - 5:9, 6:14, 7:11
evaluations [1] - 83:12
event [1] - 254:14
events [1] - 304:6
eventually [6] - 31:10, 60:20, 62:24, 91:12, 91:22, 92:5
Evidence [1] - 330:9
evidence [10] - 4:18, 9:2, 9:4, 9:7, 9:12, 10:19, 10:22, 12:10, 38:18
evidentiary [1] - 4:9
exacerbate [1] - 240:21
exact [12] - 55:19, 88:21, 104:16, 122:10, 141:18, 167:3, 170:3, 183:25, 230:3, 230:23, 272:6, 291:5
exactly [7] - 92:22, 115:5, 163:11, 163:25, 238:13, 278:11, 300:23
exam [3] - 17:20, 17:23, 18:2
EXAMINATION [4] - 15:13, 86:5, 166:8, 252:20
examined [1] - 15:4
example [17] - 47:5, 52:25, 66:23, 67:9, 67:22, 68:8, 81:25, 95:9, 95:10, 97:2, 120:24, 121:2, 194:8, 194:10, 268:6, 282:16
exceeded [2] - 76:21, 80:24

Excel [1] - 196:5
except [3] - 38:8, 324:21, 330:9
exception [2] - 37:18, 124:20
exceptional [6] - 73:11, 73:16, 73:20, 75:14, 78:25, 80:20
exchange [4] - 201:7, 226:20, 255:11, 255:13
exchanged [1] - 203:10
excited [1] - 232:21
excluding [1] - 216:16
exclusively [1] - 265:11
excuse [1] - 298:11
executive [2] - 42:9, 254:9
Exhibit [64] - 36:14, 36:15, 36:22, 38:15, 38:23, 39:8, 39:23, 50:3, 70:3, 70:18, 83:10, 104:20, 104:21, 107:10, 109:14, 125:11, 126:24, 130:25, 143:7, 145:14, 146:21, 184:8, 184:10, 185:6, 185:7, 197:18, 201:8, 202:5, 203:11, 204:25, 217:10, 217:11, 219:15, 226:19, 243:17, 253:16, 253:19, 256:13, 272:10, 274:13, 274:16, 274:18, 276:13, 280:6, 289:21, 289:23, 307:18, 307:19, 311:6, 311:19, 311:20, 311:23, 312:7, 312:14, 312:18, 319:4, 319:5, 319:9, 320:14, 320:17, 320:25, 321:11, 321:12
exhibit [13] - 39:2, 39:7, 39:14, 39:22, 70:3, 70:4, 70:16, 104:25, 106:23, 107:11, 108:21, 127:14, 311:11
exhibits [9] - 5:6, 37:18, 38:3, 38:8, 38:11, 38:15, 38:17, 39:5, 330:8
EXHIBITS [1] - 330:7
existed [1] - 235:22
expanded [2] - 43:5, 92:22
expect [5] - 155:20, 164:23, 226:25, 232:23, 236:7
expectation [1] - 192:11
expectations [6] - 76:21, 77:4, 77:8, 77:16, 80:25, 230:5
expected [4] - 142:9, 142:10, 178:2, 183:3
experience [6] - 156:6, 193:15, 197:10, 291:18, 292:8, 293:7, 293:11, 293:20
experienced [1] - 197:6
expert [3] - 25:5, 62:4,

68:20
expertise [2] - 62:7, 98:2
explain [8] - 40:23, 74:14, 90:17, 97:10, 102:10, 116:11, 227:5, 233:4
explained [2] - 186:4, 208:5
explaining [1] - 208:14
explanation [5] - 10:3, 124:23, 227:9, 296:3, 300:12
explanations [2] - 6:4, 300:2, 300:7
exploratory [3] - 140:3, 140:8, 151:21
exploring [3] - 141:5, 147:5, 148:13
express [1] - 172:22
expressed [1] - 13:23
extended [3] - 6:12, 29:12, 156:2
extending [1] - 245:14
extent [4] - 170:21, 269:19, 298:20, 305:23
extra [6] - 25:17, 25:18, 46:24, 100:15, 133:15
eyes [1] - 160:2

## F

face [2] - 158:5, 284:7
facilitate [14] - 27:10, 27:22, 32:18, 32:20, 33:8, 33:9, 33:19, 48:12, 48:23, 57:15, 63:6, 67:3, 67:13, 100:9
facilitated [1] - 47:24
facilitating [2] - 48:3, 48:4
facilities [1] - 254:15
fact [15] - 9:24, 104:10, 119:22, 176:10, 177:10, 178:6, 228:10, 231:20, 263:23, 263:25, 265:9, 265:14, 270:18, 294:22, 306:4
factions [1] - 52:19
factor [4] - 292:10, 292:12, 292:13, 318:9
factors [6] - 101:6, 122:12, 122:14, 122:21, 122:25, 292:14
failure [1] - 7:3
faith [3] - 117:7, 117:10, 304:14
fall [3] - 30:12, 30:14, 69:18
falls [1] - 81:21
Family [3] - 145:21, 146:16, 217:25
family [2] - 223:3, 327:17
far [8] - 39:17, 39:21, 46:2, 48:14, 74:17, 92:15, 313:7, 327:7

fast [1] - 243:13
faster [1] - 258:3
fault [1] - 260:13
fear [1] - 159:7
fears [1] - 262:4
February [20] - 69:20, 84:2, 84:5, 84:9, 117:24, 118:5, 120:18, 120:20, 121:6, 125:8, 126:6, 126:21, 127:4, 128:17, 129:10, 130:22, 133:25, 279:23, 279:25, 289:15
feedback [13] - 68:23, 69:3, 69:5, 69:16, 69:19, 81:23, 83:15, 83:19, 84:4, 84:12, 84:20, 85:3, 131:25
felt [36] - 85:10, 85:11, 95:11, 95:13, 116:16, 135:25, 153:7, 156:21, 157:4, 160:12, 164:19, 164:23, 170:23, 188:7, 195:16, 202:11, 214:10, 214:11, 214:12, 222:11, 222:15, 222:16, 238:2, 239:23, 239:24, 239:25, 241:3, 255:15, 255:16, 255:21, 284:9, 304:9, 310:3
few [4] - 34:16, 150:25, 151:2, 162:25
Fifth [1] - 2:7
fifty [1] - 149:20
fight [1] - 304:20
figure [9] - 54:7, 135:15, 135:21, 151:21, 152:18, 155:11, 164:11, 198:21, 271:8
figured [1] - 136:7
figures [1] - 318:16
file [2] - 4:21, 4:22
filed [1] - 225:5
fill [5] - 63:4, 215:10, 220:20, 225:8, 247:25
filled [2] - 132:15, 225:10
filling [2] - 132:20, 224:21
final [7] - 56:12, 59:16, 69:10, 160:11, 172:16, 187:2, 204:2
finalizing [1] - 186:3
finally [1] - 206:12
finance [3] - 19:4, 20:2, 314:10
financial [14] - 10:23, 20:21, 34:11, 66:25, 71:25, 174:16, 195:24, 322:5, 322:9, 323:7, 324:17, 324:25, 325:18, 325:23
Financial [1] - 312:25
financing [1] - 20:24
fine [16] - 4:13, 10:17, 14:15, 14:19, 15:20, 37:22, 37:24, 39:19, 54:13, 86:3,

104:9, 165:4, 227:24, 252:16, 257:6, 296:22

**finished** [3] - 190:22, 230:7, 245:6

**FINRA** [2] - 35:21, 59:7

**fired** [17] - 295:5, 295:6, 295:7, 295:10, 295:13, 296:13, 300:3, 300:6, 300:8, 300:14, 300:25, 301:4, 301:9, 302:8, 302:13, 304:3, 326:5

**firing** [7] - 296:16, 297:23, 303:15, 303:23, 305:19, 305:21, 306:3

**firm** [21] - 25:25, 27:25, 28:2, 64:6, 110:19, 110:20, 114:4, 114:5, 114:7, 117:9, 132:6, 132:7, 144:15, 231:19, 232:25, 291:4, 322:8, 322:12, 322:19, 323:8

**firm's** [3] - 315:18, 316:25, 317:5

**firms** [2] - 51:6, 112:24

**first** [69] - 5:8, 15:3, 19:25, 21:20, 23:6, 23:8, 23:18, 36:17, 50:5, 55:3, 60:17, 61:10, 61:23, 72:18, 85:18, 85:19, 98:11, 101:21, 101:22, 112:6, 112:7, 112:25, 125:4, 125:8, 131:25, 134:12, 134:14, 134:20, 135:9, 137:4, 138:12, 142:6, 155:6, 155:16, 155:18, 157:5, 176:24, 179:22, 180:3, 184:2, 184:6, 187:7, 189:20, 195:21, 199:13, 199:24, 202:4, 212:19, 214:13, 218:20, 232:12, 232:14, 232:18, 233:12, 234:25, 239:25, 240:3, 243:25, 255:7, 258:10, 266:12, 280:11, 280:13, 295:24, 298:2, 303:3, 309:8, 315:6

**Fitch** [9] - 5:9, 5:16, 5:22, 6:14, 7:11, 11:18, 12:14, 12:16, 12:22

**Fitch's** [1] - 12:16

**five** [19] - 72:13, 72:17, 73:7, 73:9, 73:10, 73:15, 74:3, 75:7, 75:13, 76:2, 76:11, 78:20, 78:23, 78:24, 80:19, 96:19, 100:11, 276:10, 285:8

**fixed** [26] - 40:20, 40:22, 40:24, 40:25, 41:11, 41:14, 41:18, 42:19, 42:22, 43:16, 53:16, 87:25, 92:8, 92:12, 92:18, 92:21, 100:24, 150:18, 150:19, 151:6, 151:10, 247:12, 296:12, 323:22, 324:5, 324:12

**flexibility** [1] - 246:13

**flip** [1] - 36:19

**flood** [1] - 198:10

**floor** [1] - 205:13

**Floor** [1] - 2:7

**flow** [2] - 221:17

**flowers** [1] - 228:14

**fluctuate** [1] - 121:24

**fluid** [1] - 148:25

**flustered** [1] - 255:6

**fly** [7] - 166:22, 180:5, 180:24, 182:2, 182:3, 185:24, 206:24

**flying** [2] - 142:12, 180:21

**FMLA** [23] - 6:10, 167:6, 167:7, 167:12, 167:19, 170:16, 215:9, 215:14, 215:20, 218:18, 218:22, 219:5, 220:20, 230:4, 247:24, 247:25, 248:9, 249:22, 261:10, 261:19, 306:11, 306:18

**focus** [8] - 24:25, 53:5, 76:8, 157:12, 286:20, 306:22, 310:16, 311:4

**focused** [2] - 69:13, 98:23

**focusing** [2] - 84:18, 280:11

**followed** [3] - 162:24, 172:24, 269:5

**following** [5] - 118:4, 127:21, 214:21, 223:16, 262:24

**follows** [2] - 15:5, 166:5

**followup** [1] - 142:5

**force** [12] - 78:12, 79:6, 79:8, 79:12, 79:20, 84:22, 84:23, 123:10, 125:2, 174:18, 193:8, 251:14

**form** [5] - 57:10, 69:4, 106:14, 149:18, 221:15

**formal** [22] - 19:6, 22:22, 32:15, 32:16, 51:14, 57:5, 61:15, 61:20, 69:7, 70:14, 70:22, 72:21, 73:19, 83:24, 83:25, 84:7, 111:4, 152:2, 215:19, 239:12

**formalizing** [1] - 110:5

**formally** [3] - 32:12, 63:9, 152:25

**format** [3] - 69:2, 96:14

**forms** [7] - 215:10, 225:9, 229:13, 247:24, 248:2, 248:9, 248:14

**forthright** [1] - 159:22

**forward** [7] - 146:23, 147:7, 184:13, 272:25, 277:21, 278:5, 278:15

**forwarded** [5] - 58:2, 146:17, 147:10, 277:11, 277:23

**foundation** [1] - 74:11

**four** [6] - 16:15, 38:4, 61:11, 191:23, 196:21, 285:7

**Fourth** [2] - 139:21, 139:22

**Fox** [3] - 228:11, 228:12, 228:25

**fox** [1] - 228:25

**Francisco** [5] - 166:23, 175:18, 175:20, 175:22, 178:15

**frankly** [1] - 161:2

**free** [1] - 57:12

**freeze** [1] - 103:6

**French** [4] - 19:10, 19:13, 19:16, 19:20

**Frequency** [1] - 72:9

**frequency** [5] - 73:12, 73:16, 76:5, 76:21, 77:5

**frequent** [4] - 322:25, 323:3, 323:4

**frequently** [1] - 76:22

**friend** [2] - 148:15, 271:22

**friendly** [5] - 131:23, 132:5, 148:16, 196:3, 196:14

**friends** [4] - 55:6, 137:2, 309:16

**front** [4] - 52:4, 222:17, 222:25, 311:20

**front-run** [1] - 52:4

**frustrated** [1] - 240:13

**frustrating** [1] - 200:11

**full** [8] - 15:7, 19:25, 33:24, 136:23, 154:2, 170:16, 171:2, 321:20

**full-time** [2] - 19:25, 33:24

**fun** [1] - 242:11

**function** [5] - 25:20, 48:17, 123:15, 123:16, 221:19

**fund** [1] - 46:20

**funds** [6] - 24:17, 26:8, 43:9, 43:10, 43:11, 60:13

**funny** [1] - 294:17

**fuzzy** [1] - 224:23

**G**

**game** [1] - 163:3

**gaming** [1] - 66:22

**gap** [4] - 132:16, 132:20, 177:5, 282:17

**gaps** [1] - 63:5

**gas** [2] - 97:7, 98:3

**gay** [9] - 135:9, 138:13, 138:21, 144:19, 144:22, 144:25, 145:3, 155:7, 209:3

**gender** [2] - 305:22, 307:3

**general** [6] - 13:23, 26:6, 137:11, 254:9, 254:10, 315:10

**General** [1] - 3:17

**generally** [21] - 13:9, 27:16, 30:5, 37:4, 40:22, 43:12, 52:17, 59:10, 59:16, 61:19, 84:20, 97:24, 121:12, 166:12, 192:25, 193:5, 221:13, 314:11, 314:14, 314:21, 314:24

**generate** [4] - 27:19, 45:20, 47:24, 53:6

**generated** [7] - 30:18, 45:12, 47:9, 47:10, 314:16, 320:7, 320:8

**generates** [1] - 52:22

**generating** [2] - 62:19, 65:24

**gesture** [1] - 117:8

**GIBSON** [29] - 3:10, 4:7, 4:21, 5:5, 7:4, 7:9, 7:18, 8:17, 9:16, 10:24, 14:18, 37:15, 39:4, 39:9, 39:12, 74:8, 74:22, 125:13, 187:21, 187:24, 256:14, 257:4, 257:7, 257:14, 257:20, 258:5, 311:7, 328:10, 328:18

**gifted** [1] - 4:25

**Ginsberg** [1] - 1:18

**GINSBERG** [2] - 329:8, 329:22

**girl** [1] - 137:2

**given** [17] - 9:21, 56:14, 57:12, 75:10, 97:13, 121:5, 123:20, 123:23, 124:13, 124:15, 151:22, 157:3, 242:22, 255:4, 296:16, 300:2, 300:7

**glasses** [1] - 39:20

**goals** [1] - 123:23

**golden** [1] - 304:10

**Goldman** [1] - 68:8

**good-faith** [1] - 117:7

**goods** [1] - 195:25

**governments** [1] - 93:24

**Gowri** [1] - 277:22

**grade** [11] - 24:22, 29:5, 29:13, 29:24, 29:25, 30:4, 30:10, 43:2, 43:14, 44:18, 324:4

**grades** [1] - 30:14

**gradual** [1] - 211:19

**gradually** [1] - 65:14

**graduate** [1] - 19:14

**grand** [5] - 319:13, 319:22, 320:21, 321:6, 321:17

**Grant** [4] - 118:17, 118:24, 119:17, 119:18

**Grant's** [1] - 118:18

**granular** [1] - 318:23

**gray** [1] - 100:13

**great** [9] - 27:21, 83:21, 83:23, 84:14, 85:4, 132:6, 272:11, 293:15

342

**green** [1] - 56:14
**Greenwich** [3] - 28:3, 28:16, 30:23
**gross** [5] - 7:22, 7:23, 313:24, 314:11, 314:14
**Gross** [1] - 313:16
**grossing** [1] - 268:4
**groundwork** [1] - 13:2
**group** [64] - 36:8, 36:10, 36:12, 47:6, 51:2, 54:4, 54:16, 58:12, 58:15, 59:8, 59:10, 59:11, 59:13, 82:22, 88:5, 88:9, 88:18, 89:21, 94:11, 96:22, 97:21, 98:2, 98:16, 119:18, 122:17, 131:18, 132:2, 132:10, 135:20, 137:14, 161:14, 164:11, 188:5, 211:22, 214:6, 228:23, 238:11, 251:6, 251:9, 251:12, 251:16, 251:21, 266:24, 267:5, 269:18, 269:23, 269:24, 270:4, 271:4, 271:25, 276:15, 276:16, 276:18, 278:6, 278:9, 278:14, 288:16, 292:17, 293:18, 294:5, 300:17, 320:5, 326:9
**groups** [4] - 43:19, 43:22, 44:6, 323:24
**guarantee** [8] - 90:10, 111:13, 112:15, 112:22, 115:17, 115:23, 117:3
**guaranteed** [6] - 111:17, 111:19, 113:2, 113:9, 121:9, 121:16
**guarantying** [1] - 111:20
**guess** [8] - 30:17, 56:13, 114:16, 240:21, 269:21, 270:2, 270:19, 322:12
**guidelines** [1] - 190:19
**guys** [1] - 326:4
**gym** [1] - 222:11

## H

**half** [3] - 16:15, 210:18, 328:11
**hand** [4] - 14:23, 70:12, 105:10, 313:8
**handbook** [10] - 145:23, 145:24, 146:5, 146:8, 146:12, 146:13, 147:13, 218:8, 253:21, 307:19
**handle** [10] - 115:3, 181:13, 182:23, 189:25, 198:13, 201:4, 206:7, 237:16, 275:23, 275:25
**handled** [1] - 172:25
**handshake** [12] - 115:23, 116:11, 116:12, 116:20,

117:6, 117:22, 118:8, 121:14, 130:15, 130:17, 134:7
**happy** [10] - 4:19, 4:23, 8:15, 131:19, 131:21, 132:18, 133:4, 137:15, 207:16, 212:9
**hard** [3] - 222:2, 273:4, 273:18
**harder** [2] - 65:11, 282:18
**hardship** [1] - 9:23
**hardships** [1] - 10:7
**head** [110] - 40:9, 41:13, 41:17, 47:6, 49:14, 49:18, 49:25, 50:13, 54:2, 54:4, 58:12, 58:15, 59:8, 59:10, 59:11, 59:13, 59:14, 59:21, 69:12, 69:18, 71:16, 84:9, 87:7, 87:9, 88:6, 88:12, 88:14, 89:12, 89:20, 89:24, 90:18, 92:7, 92:12, 92:18, 94:7, 94:11, 94:21, 94:24, 95:5, 95:15, 95:25, 96:22, 97:21, 98:3, 98:16, 99:7, 122:17, 129:14, 131:16, 131:17, 131:21, 132:2, 133:3, 133:6, 133:16, 137:14, 150:14, 150:18, 161:3, 161:4, 164:10, 183:18, 188:3, 214:5, 222:12, 233:25, 238:10, 238:20, 247:11, 251:5, 251:8, 251:12, 251:16, 251:22, 264:12, 264:19, 264:21, 265:17, 265:21, 266:2, 266:10, 266:14, 266:23, 267:5, 267:8, 267:9, 267:14, 267:17, 268:2, 269:18, 269:24, 270:4, 270:17, 270:20, 270:21, 271:4, 271:5, 271:12, 271:25, 272:15, 274:2, 274:12, 288:16, 288:18, 292:17, 294:11, 295:11
**header** [1] - 72:5
**heading** [3] - 78:14, 95:6, 254:2
**heads** [5] - 51:23, 92:16, 94:13, 136:11, 211:22
**health** [1] - 245:16
**hear** [1] - 4:19
**hearing** [3] - 4:3, 7:8, 282:18
**hearings** [1] - 13:10
**hearsay** [5] - 10:22, 11:8, 11:9, 13:8
**heated** [2] - 255:11, 255:12
**hedge** [7] - 24:16, 26:8, 43:9, 43:10, 43:11, 46:19, 60:12
**held** [1] - 329:13

**help** [22] - 33:7, 33:12, 39:6, 48:12, 49:4, 54:7, 54:9, 58:7, 63:5, 66:24, 67:2, 67:12, 82:2, 82:10, 82:21, 182:4, 197:23, 200:16, 251:11, 275:17, 289:7, 311:3
**helped** [2] - 48:23, 83:23
**helpful** [1] - 256:20
**helps** [2] - 27:10, 27:22
**Henry** [1] - 148:19
**hereby** [1] - 329:11
**hi** [1] - 48:6
**Hi** [1] - 48:9
**hierarchy** [1] - 310:25
**high** [106] - 24:6, 24:7, 24:10, 24:18, 24:19, 24:21, 24:24, 25:8, 26:15, 29:4, 29:5, 29:8, 29:13, 29:17, 29:21, 29:22, 29:24, 29:25, 30:4, 30:10, 30:15, 30:18, 30:21, 36:11, 40:9, 40:11, 40:14, 40:16, 40:18, 42:24, 43:2, 43:10, 43:14, 43:18, 43:25, 44:5, 44:6, 44:9, 44:10, 44:13, 44:14, 44:15, 44:18, 44:24, 45:4, 45:5, 46:2, 46:3, 47:21, 48:19, 49:13, 49:14, 49:18, 49:25, 53:12, 53:13, 53:14, 53:20, 53:21, 54:2, 55:12, 57:3, 59:14, 64:18, 89:21, 89:25, 93:6, 93:7, 93:12, 93:14, 94:25, 96:3, 99:8, 123:2, 148:11, 150:14, 161:3, 188:4, 238:10, 266:14, 292:10, 293:18, 297:12, 300:15, 318:11, 318:16, 319:2, 319:11, 319:23, 320:19, 320:20, 320:22, 321:3, 321:13, 324:17, 325:2, 325:6, 325:10, 325:18, 325:21, 326:8
**higher** [7] - 29:14, 30:5, 30:7, 30:19, 215:13, 316:21
**higher-ups** [1] - 215:13
**highest** [2] - 268:4, 305:14
**Highlights** [1] - 312:25
**himself** [1] - 74:12
**hire** [4] - 55:17, 56:14, 132:9, 300:16
**hired** [14] - 62:10, 91:23, 91:25, 92:3, 92:25, 132:14, 291:2, 291:25, 294:7, 294:14, 296:8, 296:21, 300:19
**hiring** [8] - 54:24, 88:10, 104:2, 132:11, 289:2, 292:10, 293:22, 294:12
**history** [2] - 114:5, 223:2
**HOAI** [4] - 1:5, 15:2, 15:9, 166:4

**Hoai** [11] - 15:8, 15:18, 66:23, 140:13, 171:2, 212:4, 251:10, 267:25, 273:24, 274:3, 330:6
**HOFFMAN** [1] - 2:16
**Holcomb** [3] - 87:24, 100:17, 236:21
**hold** [7] - 13:7, 22:23, 46:22, 57:6, 60:7, 109:16, 285:7
**Holding** [1] - 315:7
**Holdings** [1] - 311:24
**home** [1] - 180:8
**HON** [1] - 1:17
**honest** [6] - 116:16, 224:22, 256:10, 259:3, 259:8, 267:13
**honestly** [1] - 231:15
**Honor** [23] - 4:22, 5:5, 5:12, 6:3, 7:4, 7:9, 7:19, 8:11, 8:22, 8:24, 9:3, 9:5, 9:13, 9:16, 10:8, 10:15, 10:25, 11:6, 15:17, 74:8, 74:23, 317:18
**hooked** [1] - 14:6
**hope** [1] - 184:12
**hopes** [1] - 46:23
**Hospital** [1] - 223:5
**hospital** [4] - 223:17, 224:7, 228:13, 228:18
**hour** [4] - 194:19, 210:19, 328:11, 328:13
**hours** [3] - 180:13, 194:11, 273:23
**HR** [18] - 140:13, 141:7, 141:21, 141:23, 141:24, 142:17, 142:19, 143:3, 147:9, 155:23, 156:12, 220:10, 295:11, 295:16, 297:22, 299:8, 299:14, 305:20
**human** [4] - 5:3, 218:24, 308:12, 308:18
**hundred** [5] - 280:3, 282:21, 283:3, 284:13, 290:11
**hungry** [2] - 159:17, 159:18
**hyphen** [1] - 262:20

## I

**IADEVAIA** [32] - 2:10, 4:11, 4:24, 11:5, 13:19, 14:2, 14:7, 15:14, 37:12, 37:24, 38:7, 39:18, 50:9, 85:22, 86:6, 164:25, 166:9, 167:15, 252:13, 252:21, 256:15, 257:3, 257:6, 257:9, 257:15, 298:23, 311:8, 316:17, 317:17, 328:8, 328:12, 328:19
**ICU** [5] - 223:20, 223:23,

223:25, 224:4, 224:6
**idea** [1] - 227:13
**ideal** [2] - 192:19, 193:23
**ideas** [6] - 58:5, 72:9, 73:13, 76:6, 76:23, 77:6
**identified** [2] - 96:8, 97:15
**ignore** [1] - 244:22
**immediately** [1] - 308:10
**immunization** [2] - 180:6, 180:23, 181:3, 181:4, 186:8, 207:2, 207:10
**impacts** [1] - 221:18
**implication** [2] - 157:8, 297:5
**implications** [1] - 145:2
**implicit** [5] - 54:15, 161:6, 188:4, 199:23
**implicitly** [3] - 49:24, 52:9, 162:10
**implied** [4] - 95:12, 157:5, 158:24, 163:21
**imply** [1] - 190:18
**implying** [2] - 157:9, 297:13
**important** [4] - 196:25, 197:12, 207:21, 292:25
**impressed** [1] - 92:14
**impression** [4] - 170:15, 251:25, 252:2, 262:7
**impressions** [1] - 168:9
**improvement** [1] - 81:18
**inaccurate** [1] - 245:25
**INC** [1] - 1:9
**Inc** [4] - 3:18, 3:20, 311:24, 315:7
**incidents** [1] - 308:8
**include** [2] - 10:5, 64:9
**included** [2] - 44:10, 138:21
**including** [1] - 315:15
**income** [32] - 40:20, 40:22, 40:24, 40:25, 41:11, 41:14, 41:18, 42:19, 42:23, 43:17, 53:16, 88:2, 92:8, 92:13, 92:18, 92:21, 100:25, 150:18, 150:19, 151:7, 151:11, 247:12, 296:12, 313:25, 314:19, 314:23, 315:13, 315:19, 316:9, 323:22, 324:5, 324:12
**increase** [3] - 46:23, 116:9, 136:12
**increments** [1] - 106:13
**independent** [2] - 51:13, 51:16
**independently** [1] - 312:16
**INDEX** [1] - 330:3
**indicate** [1] - 234:11
**indication** [4] - 198:15, 248:22, 251:15, 255:5
**indirectly** [1] - 254:15
**individual** [6] - 10:12, 57:13, 82:22, 98:9, 100:6,

150:3
**individual 's** [1] - 71:24
**individuals** [1] - 58:14
**industries** [1] - 73:23
**industry** [7] - 25:2, 26:24, 27:4, 32:14, 32:25, 60:15, 302:6
**inflammatory** [1] - 90:10
**influence** [1] - 161:5
**influenced** [1] - 52:5
**information** [22] - 5:15, 12:6, 58:9, 58:17, 82:5, 82:6, 82:16, 83:3, 127:11, 128:9, 129:2, 129:12, 131:8, 149:22, 159:23, 193:3, 193:4, 312:6, 312:13, 312:17, 313:9, 313:15
**informed** [2] - 12:15, 12:17
**initial** [4] - 198:19, 220:17, 246:12, 283:12
**initiate** [3] - 61:18, 232:10, 250:21
**initiated** [4] - 203:13, 232:8, 250:18, 250:20
**initiation** [5] - 61:9, 61:10, 61:13, 61:22, 61:24
**input** [1] - 174:17
**installments** [9] - 102:9, 103:8, 103:12, 103:20, 104:9, 104:11, 104:14, 281:16, 281:18
**instances** [1] - 114:8
**instant** [4] - 251:18, 267:20, 267:22, 267:24
**Institute** [4] - 19:11, 19:13, 19:16, 19:21
**institutions** [1] - 191:10
**instructions** [2] - 172:25, 221:4
**instrument** [1] - 41:2
**intend** [1] - 247:11
**intended** [1] - 120:21
**intending** [1] - 10:21
**interacted** [1] - 116:17
**interaction** [6] - 78:16, 79:3, 79:7, 79:8, 79:19, 304:16
**interest** [1] - 196:11
**interested** [1] - 329:18
**interesting** [1] - 175:7
**interim** [5] - 161:9, 265:3, 265:13, 265:17, 265:25
**intern** [1] - 276:21
**internal** [1] - 37:6
**internally** [2] - 271:8, 307:12
**interpret** [1] - 79:5
**interpretation** [2] - 105:24, 106:3
**interpreted** [1] - 200:23
**interview** [9] - 55:12, 55:23,

56:8, 182:5, 294:7, 294:8, 294:13, 294:19, 294:25
**interviewed** [5] - 55:3, 55:4, 55:5, 55:14, 111:3
**intranet** [1] - 145:25
**introduced** [1] - 131:25
**introduction** [1] - 58:4
**introductory** [1] - 87:13
**inventory** [4] - 46:22, 47:16
**investment** [26] - 20:12, 20:15, 23:22, 24:22, 35:7, 43:2, 51:17, 59:24, 60:4, 65:2, 89:3, 297:6, 297:9, 297:11, 298:7, 298:11, 301:24, 301:25, 302:5, 302:8, 302:20, 302:24, 303:16, 303:19, 323:17, 324:4
**investors** [1] - 212:4
**involved** [6] - 54:23, 293:22, 312:5, 312:9, 312:12, 313:22
**involvement** [2] - 67:15, 294:2
**iPhone** [1] - 253:8
**ironed** [1] - 162:24
**irony** [1] - 41:7
**irrelevant** [1] - 7:6
**issue** [17] - 4:9, 5:6, 5:19, 7:24, 9:17, 50:24, 78:16, 103:25, 175:6, 188:7, 209:7, 239:14, 251:11, 251:13, 251:23, 260:8, 298:19
**issued** [2] - 5:13, 94:4
**issues** [15] - 4:4, 87:22, 101:3, 123:9, 174:22, 174:23, 197:4, 207:10, 210:11, 239:10, 264:3, 274:6, 328:9, 328:15
**item** [3] - 5:8, 97:13, 97:16
**items** [3] - 8:18, 9:15, 96:7
**itself** [1] - 46:8

## J

**Jane** [74] - 40:3, 40:5, 49:20, 49:24, 55:7, 55:20, 55:24, 56:8, 62:20, 69:5, 69:11, 83:21, 85:3, 94:9, 94:13, 95:10, 112:2, 114:16, 114:18, 117:13, 117:14, 119:23, 135:22, 140:15, 140:17, 141:7, 141:25, 147:21, 148:6, 149:7, 150:13, 164:12, 169:6, 169:7, 169:18, 169:21, 169:22, 170:18, 171:4, 172:5, 172:10, 172:25, 174:8, 179:16, 183:13, 183:15, 184:14, 184:24, 186:23, 188:6, 199:20,

200:12, 204:6, 204:14, 204:18, 205:13, 205:14, 205:15, 205:18, 206:6, 210:10, 211:18, 220:5, 220:16, 221:3, 228:19, 246:2, 266:20, 267:17, 271:24, 304:8, 304:19, 309:24
**January** [4] - 117:24, 120:18, 126:6, 128:16
**jargon** [1] - 26:24
**JD** [1] - 17:21
**Jeffries** [2] - 326:19, 327:6
**jeopardy** [3] - 240:20, 255:5, 310:20
**JEREMIAH** [1] - 2:10
**Jessica** [1] - 276:21
**jiadevaia@vladeck.com** [1] - 2:11
**Jiten** [4] - 290:24, 295:2, 296:10, 296:21
**job** [64] - 7:7, 7:14, 19:23, 19:25, 21:9, 21:12, 25:15, 28:5, 29:10, 29:11, 32:6, 33:23, 33:24, 55:4, 55:6, 58:25, 62:8, 65:12, 83:21, 83:23, 84:14, 85:4, 110:25, 111:5, 125:2, 125:3, 159:16, 164:6, 207:20, 207:21, 214:10, 214:12, 232:24, 233:7, 236:7, 238:7, 238:20, 240:5, 240:7, 240:9, 240:10, 240:19, 241:7, 241:21, 251:2, 255:5, 255:8, 255:17, 255:20, 260:22, 282:14, 284:9, 286:14, 287:23, 290:22, 306:23, 308:23, 310:17, 310:19, 311:4, 326:18, 327:6, 327:18
**jobs** [1] - 34:16
**John** [20] - 91:25, 132:13, 161:10, 161:12, 161:13, 161:17, 174:10, 174:11, 174:14, 174:19, 181:14, 182:22, 197:22, 198:21, 200:16, 201:4, 201:5, 242:11, 276:20, 327:23
**JOHN** [2] - 3:12, 3:17
**john.coster @ssbb.com** [1] - 3:13
**Johnson** [13] - 148:7, 148:9, 148:10, 148:12, 149:11, 150:10, 150:21, 231:12, 267:15, 271:22, 272:24, 272:25, 273:6
**join** [2] - 118:12, 267:25
**joined** [13] - 40:13, 41:15, 41:22, 42:17, 42:18, 43:23, 44:7, 44:8, 45:3, 49:13, 49:17, 49:21, 251:19
**Joshi** [8] - 290:24, 291:8,

344

292:5, 294:13, 295:2,
296:10, 296:21, 300:22
**JPMorgan** [10] - 20:3, 20:5,
20:8, 20:18, 21:2, 21:5, 21:7,
22:5, 22:12, 35:11
**judge** [2] - 4:10, 37:16
**Judge** [2] - 41:12, 256:17
**JUDICIAL** [1] - 1:2
**July** [44] - 135:14, 139:17,
139:18, 139:19, 139:21,
139:22, 142:10, 177:24,
177:25, 182:13, 183:4,
184:11, 185:9, 189:4,
203:20, 212:22, 219:12,
219:13, 219:18, 219:19,
219:24, 230:17, 230:24,
231:4, 234:6, 243:23,
244:14, 244:23, 246:22,
247:7, 247:19, 248:23,
249:13, 255:13, 255:14,
261:12, 261:16, 262:3,
274:3, 274:22, 274:25,
275:6, 276:23, 295:7
**jump** [2] - 112:18, 116:15
**June** [22] - 9:19, 68:22,
134:13, 176:23, 177:19,
177:21, 178:21, 188:20,
188:22, 190:15, 190:18,
190:23, 190:25, 229:5,
229:10, 229:11, 265:19,
284:25, 285:3, 295:8
**junior** [1] - 22:8
**junk** [1] - 30:20
**juris** [2] - 17:16, 17:18
**justification** [1] - 296:15

## K

**keep** [9] - 44:16, 67:19,
112:16, 125:3, 158:11,
240:18, 271:4, 306:23, 311:4
**keeping** [1] - 47:15
**kept** [5] - 135:7, 159:8,
232:18, 246:13, 246:18
**key** [5] - 53:3, 53:5, 117:14,
164:8, 164:10
**kid** [1] - 180:22
**kids** [2] - 137:2, 156:21
**kids'** [1] - 156:20
**kind** [28] - 33:14, 39:16,
44:19, 52:22, 54:12, 55:8,
56:8, 58:3, 96:20, 98:10,
147:5, 158:20, 160:2,
160:23, 161:7, 186:25,
194:13, 196:13, 208:6,
214:18, 223:11, 228:23,
233:9, 239:7, 241:6, 241:7,
243:5, 275:22
**knowing** [5] - 195:19,
197:5, 202:19, 210:15,
236:24

**knowledge** [15] - 54:23,
80:4, 80:9, 80:22, 81:2,
119:8, 249:20, 249:24,
251:7, 296:11, 313:17,
322:18, 325:2, 325:17
**known** [6] - 66:16, 239:24,
251:15, 267:5, 267:6
**knows** [2] - 27:21, 32:24
**Krasner** [1] - 87:25

## L

**I$70,000** [1] - 282:4
**I70,000** [1] - 127:8
**laid** [6] - 322:8, 324:12,
324:17, 324:25, 326:9,
326:20
**language** [1] - 167:9
**laptop** [6] - 175:5, 175:6,
175:8, 175:9, 175:10, 175:16
**large** [2] - 55:24, 192:4
**larger** [3] - 48:16, 61:19,
133:14
**largest** [1] - 53:15
**last** [10] - 8:25, 15:9, 50:17,
56:12, 65:17, 82:20, 91:3,
118:18, 246:10, 321:20
**late** [5] - 12:12, 12:13,
120:18, 126:6, 128:16
**Law** [1] - 17:11
**law** [7] - 7:21, 18:15, 18:24,
18:25, 19:5, 19:9
**lawyers** [2] - 309:16,
309:19
**lay** [12] - 9:25, 10:7, 10:10,
10:23, 21:8, 33:22, 322:4,
322:20, 323:2, 323:6,
323:11, 323:13
**lay-offs** [10] - 9:25, 10:7,
10:10, 10:23, 21:8, 33:22,
322:20, 323:2, 323:11,
323:13
**layoff** [3] - 327:8, 327:21,
328:6
**layoffs** [6] - 323:16, 323:19,
323:21, 324:3, 325:18,
325:23
**lead** [2] - 89:21, 205:25
**leading** [10] - 23:23,
159:21, 166:21, 169:23,
172:11, 186:25, 198:18,
199:6, 223:21, 260:19
**leads** [1] - 23:25
**learn** [1] - 119:14
**learned** [3] - 230:19,
266:13, 288:7
**least** [11] - 8:20, 113:20,
176:18, 181:2, 185:24,
190:20, 198:17, 206:25,
245:13, 263:13, 289:6
**leave** [202] - 6:10, 19:20,

21:2, 21:7, 27:23, 28:7,
33:21, 34:5, 114:20, 136:15,
136:16, 136:23, 138:15,
138:16, 138:19, 138:20,
139:25, 140:5, 140:6,
141:10, 141:11, 141:12,
141:17, 141:20, 142:3,
142:19, 144:17, 144:23,
144:25, 145:4, 145:6, 145:7,
145:19, 145:21, 146:16,
148:14, 148:18, 148:20,
148:23, 149:2, 149:6, 149:8,
149:10, 149:13, 150:4,
150:8, 150:12, 151:2, 151:4,
151:21, 152:19, 152:25,
153:4, 153:5, 153:18, 154:9,
154:11, 154:20, 155:11,
155:14, 155:20, 155:24,
156:6, 156:16, 156:18,
156:19, 157:2, 157:7, 160:6,
160:9, 160:15, 160:20,
161:10, 161:19, 162:3,
162:5, 163:8, 163:24,
164:14, 164:21, 166:16,
166:25, 167:3, 167:5, 167:6,
167:9, 167:11, 167:12,
168:6, 168:11, 168:24,
170:2, 170:3, 170:17, 171:3,
171:5, 171:8, 172:14,
172:17, 173:9, 173:13,
173:16, 173:20, 173:25,
176:7, 176:18, 177:3,
179:13, 179:20, 181:11,
181:19, 183:11, 185:3,
186:3, 188:9, 188:17,
189:17, 195:7, 195:19,
199:21, 200:13, 200:18,
200:25, 201:3, 201:10,
202:21, 207:6, 208:8,
208:10, 209:3, 209:23,
210:12, 210:17, 211:3,
212:9, 212:11, 212:14,
212:16, 212:19, 214:19,
214:24, 215:6, 215:10,
215:14, 216:11, 216:16,
216:17, 218:23, 218:24,
219:5, 219:21, 219:23,
220:7, 220:10, 220:17,
220:24, 221:2, 229:5,
229:17, 229:25, 230:4,
230:20, 231:13, 231:15,
245:13, 245:15, 246:5,
246:18, 259:13, 259:20,
259:24, 265:8, 265:11,
265:19, 269:4, 275:3,
275:24, 277:3, 278:17,
278:24, 279:3, 279:7,
279:13, 284:17, 284:23,
286:7, 286:11, 297:23,
299:5, 299:6, 304:7, 304:25,
305:25, 310:4, 326:24
**Leave** [4] - 145:22, 146:16,

217:25, 218:18
**leaving** [5] - 112:7, 112:8,
132:16, 195:8, 295:3
**led** [1] - 55:7
**left** [43] - 6:8, 12:19, 61:2,
64:6, 65:15, 66:7, 67:10,
72:4, 72:5, 80:8, 89:16,
89:17, 105:10, 118:11,
118:25, 119:2, 129:14,
160:16, 161:8, 168:18,
176:23, 184:3, 186:23,
198:5, 206:12, 215:12,
217:4, 246:2, 278:3, 278:4,
278:13, 291:24, 298:17,
301:22, 313:8, 326:2,
326:13, 327:5, 327:10,
327:15, 327:24
**left-hand** [2] - 105:10,
313:8
**legal** [5] - 309:4, 309:9,
310:6, 310:9, 310:19
**legally** [1] - 52:8
**legitimate** [2] - 9:20, 12:8
**Lehman** [1] - 34:14
**length** [2] - 137:11, 167:3
**Lenore** [3] - 143:4, 172:3,
215:17
**Lenox** [1] - 223:5
**less** [13] - 47:11, 94:21,
207:21, 281:25, 282:2,
282:5, 283:2, 290:10,
290:11, 290:18, 304:16,
325:11, 328:12
**letter** [35] - 4:15, 11:6,
11:20, 38:20, 39:24, 40:2,
50:4, 235:7, 235:10, 235:20,
235:21, 241:23, 242:4,
242:7, 243:17, 243:19,
244:2, 244:7, 244:9, 245:2,
245:5, 245:9, 246:8, 246:22,
247:4, 247:8, 247:21,
247:22, 248:10, 248:14,
248:24, 249:21, 252:5,
265:15
**letting** [1] - 8:2
**Level** [1] - 78:15
**level** [22] - 20:20, 22:8,
35:18, 50:22, 51:3, 51:10,
61:16, 79:2, 79:7, 115:25,
116:22, 194:17, 197:11,
200:24, 208:13, 209:23,
233:21, 233:22, 269:3,
304:23, 305:15
**leveraged** [1] - 71:25
**liaising** [1] - 289:3
**Liam** [1] - 16:16
**license** [1] - 35:4
**licenses** [3] - 34:20, 34:25,
35:20
**LICUL** [6] - 2:12, 14:8,
14:16, 14:20, 15:17, 15:23

345

**lieu** [6] - 106:18, 107:6, 107:24, 108:17, 109:11, 120:11

**life** [1] - 135:7

**light** [3] - 56:14, 179:23, 232:18

**Lily** [8] - 16:15, 142:9, 142:10, 180:2, 180:11, 183:24, 231:4, 232:20

**Lily's** [2] - 207:2, 284:24

**limine** [1] - 4:16

**limited** [3] - 7:12, 67:15, 227:16

**line** [18] - 54:13, 187:7, 189:19, 189:20, 189:21, 189:24, 191:19, 257:12, 257:21, 258:9, 258:10, 258:13, 259:2, 259:10, 260:11, 262:16, 264:9, 266:4

**lines** [5] - 258:14, 261:2, 262:16, 264:23, 266:18

**lingo** [1] - 61:25

**link** [1] - 97:9

**list** [3] - 49:7, 147:20, 277:18

**listen** [1] - 256:21

**lists** [2] - 311:11, 311:12

**literature** [1] - 17:3

**live** [1] - 118:7

**lives** [2] - 180:14, 310:15

**LLP** [1] - 3:5

**loans** [1] - 94:4

**lodging** [1] - 66:22

**logistically** [1] - 207:19

**logistics** [3] - 104:7, 142:5, 197:24

**longer-term** [1] - 112:22

**longwinded** [1] - 73:8

**look** [81] - 24:14, 30:8, 32:22, 36:14, 38:22, 50:2, 50:5, 54:13, 70:2, 70:10, 70:13, 71:17, 75:25, 78:10, 81:3, 104:20, 104:24, 105:9, 107:10, 108:19, 109:13, 109:15, 109:25, 110:8, 123:11, 125:10, 126:23, 127:13, 128:18, 129:18, 130:10, 137:13, 143:7, 143:16, 146:4, 146:7, 184:8, 185:6, 207:19, 212:5, 217:10, 226:18, 243:16, 244:7, 245:2, 253:16, 253:22, 254:5, 256:12, 258:8, 258:25, 260:17, 260:25, 262:15, 264:8, 266:17, 272:9, 274:16, 276:12, 277:8, 277:9, 280:5, 281:5, 289:20, 307:18, 307:25, 311:6, 311:19, 312:20, 315:17, 319:3,

319:12, 319:16, 320:14, 320:17, 321:10, 322:13, 322:14

**looked** [2] - 83:11, 219:14

**looking** [9] - 7:10, 9:6, 140:17, 197:3, 217:15, 280:7, 292:18, 300:16, 313:14

**looks** [3] - 10:15, 37:6, 247:24

**lose** [2] - 164:6, 164:7, 214:12, 288:17

**losing** [3] - 255:16, 284:9, 308:23

**loss** [4] - 44:23, 45:18, 314:19, 315:4

**lost** [5] - 288:21, 304:11, 304:14, 304:15

**love** [1] - 62:2

**Lowenthal** [143] - 10:11, 10:12, 10:25, 11:10, 13:11, 41:16, 41:17, 42:7, 42:10, 42:11, 42:12, 50:21, 55:22, 56:13, 69:15, 86:16, 92:11, 102:21, 105:15, 107:25, 112:3, 115:8, 118:7, 121:15, 129:16, 130:16, 131:7, 131:10, 134:8, 138:4, 138:6, 138:8, 138:10, 139:2, 139:12, 139:24, 140:9, 141:4, 141:16, 141:17, 142:3, 142:24, 143:24, 144:7, 144:11, 146:18, 146:24, 150:13, 150:17, 151:7, 155:13, 171:10, 171:12, 171:14, 171:23, 172:8, 172:18, 173:8, 173:19, 173:23, 176:2, 176:25, 203:9, 203:14, 203:17, 203:24, 206:2, 206:9, 206:18, 208:13, 209:9, 209:14, 210:5, 210:16, 211:7, 211:12, 212:21, 212:24, 213:20, 213:24, 214:9, 214:22, 215:3, 220:22, 225:17, 225:19, 226:20, 226:24, 227:6, 230:15, 232:7, 232:17, 233:13, 234:4, 234:17, 235:25, 236:13, 238:9, 238:23, 239:21, 241:15, 243:23, 245:9, 245:21, 246:8, 246:17, 247:3, 247:6, 247:10, 247:17, 248:10, 248:14, 249:21, 250:4, 250:9, 250:10, 250:22, 252:10, 252:23, 253:3, 253:12, 254:21, 256:5, 258:17, 259:7, 259:8, 259:21, 260:13, 260:16, 261:3, 261:17, 261:18, 262:18,

264:10, 264:15, 266:5, 266:6, 266:19, 273:14, 305:3, 309:14

**Lowenthal's** [4] - 11:15, 42:8, 244:17, 259:18

**lower** [1] - 115:13

**Lucila** [8] - 92:3, 92:17, 119:2, 120:4, 132:14, 251:10, 268:15, 321:10

**LUCILLA** [1] - 92:4

**lump** [1] - 102:10

**lunch** [4] - 165:2, 166:10, 269:16, 271:23

**Luncheon** [1] - 165:5

**Lynch** [1] - 34:15

**Lynn** [13] - 148:7, 148:9, 148:10, 151:23, 151:24, 152:19, 152:23, 154:12, 188:8, 231:12, 267:15, 271:22, 272:24

# M

**mail** [1] - 249:22

**maintain** [2] - 95:25, 289:7

**majority** [3] - 42:15, 48:13, 52:16

**maker** [1] - 55:8

**management** [5] - 47:14, 92:23, 268:16, 280:25

**manager** [17] - 46:19, 97:20, 151:8, 153:2, 153:6, 153:14, 154:8, 159:25, 161:6, 161:7, 187:20, 188:4, 188:9, 217:3, 251:21, 263:21, 289:8

**managerial** [1] - 88:5

**managers** [4] - 26:8, 60:12, 149:4, 149:6

**Managing** [1] - 3:19

**managing** [9] - 28:10, 28:22, 41:23, 42:3, 86:19, 86:22, 86:25, 87:6, 100:21

**manner** [1] - 253:6

**manual** [2] - 215:19, 217:13

**manually** [1] - 270:22

**March** [8] - 1:14, 4:15, 103:2, 117:25, 118:2, 217:17, 329:14, 330:2

**marched** [3] - 204:7, 205:10, 205:13

**market** [12] - 52:4, 56:6, 56:9, 58:7, 60:6, 62:3, 68:5, 92:9, 98:7, 98:11, 98:15, 98:17, 98:19, 192:22, 192:24, 212:2, 242:19

**market's** [1] - 194:12

**marketed** [1] - 66:8

**marketing** [4] - 67:25, 68:14, 95:15, 132:6

**markets** [3] - 43:3, 236:15,

239:19

**marriage** [1] - 329:17

**married** [1] - 15:25

**match** [8] - 112:19, 113:13, 113:18, 114:2, 114:6, 114:25, 116:25, 119:8

**matched** [1] - 114:9

**matches** [1] - 114:4

**matching** [2] - 113:23, 116:24

**materials** [5] - 25:12, 61:3, 65:17, 66:5, 68:12

**maternity** [9] - 138:19, 138:20, 145:4, 148:18, 149:2, 149:12, 150:12, 152:25

**math** [1] - 285:15

**matter** [1] - 329:19

**Matter** [1] - 1:3

**matters** [1] - 297:11

**McGUIRE** [1] - 3:17

**mean** [92] - 11:6, 14:16, 18:23, 22:20, 25:4, 29:7, 40:22, 48:24, 54:18, 56:23, 59:2, 61:14, 64:15, 77:2, 77:14, 82:8, 82:9, 90:14, 90:15, 92:13, 95:20, 97:22, 97:23, 103:22, 104:4, 106:2, 106:3, 110:23, 119:17, 133:11, 136:4, 136:14, 136:16, 140:21, 140:22, 141:12, 145:6, 153:10, 154:11, 158:12, 162:4, 163:20, 167:13, 171:9, 173:12, 186:22, 187:18, 189:12, 203:10, 209:15, 226:16, 228:16, 228:21, 233:8, 235:5, 235:14, 235:17, 241:4, 241:13, 241:15, 241:16, 241:20, 244:5, 257:24, 261:7, 263:7, 264:17, 265:5, 266:8, 267:2, 276:5, 277:13, 277:24, 283:23, 285:10, 287:5, 289:6, 292:19, 297:4, 297:15, 299:19, 302:2, 302:3, 305:4, 305:13, 309:15, 313:18, 314:23, 314:24, 315:15, 319:21, 321:24

**meaning** [16] - 26:7, 30:6, 32:11, 44:21, 46:12, 47:4, 47:13, 63:17, 66:17, 72:16, 73:24, 74:7, 193:25, 239:11, 283:21, 283:25

**means** [27] - 18:24, 23:20, 57:2, 59:3, 75:7, 76:18, 76:19, 77:3, 77:15, 78:23, 78:24, 80:18, 80:19, 80:22, 80:23, 149:24, 248:15, 249:25, 266:9, 287:2, 297:16, 302:4, 314:11,

314:14, 314:15, 315:11, 315:13

**meant** [12] - 12:10, 98:6, 102:12, 233:5, 238:17, 240:17, 270:9, 273:21, 284:6, 284:11, 299:20, 299:22

**meantime** [1] - 186:12

**media** [4] - 31:14, 67:12, 291:13

**MEDIATION** [1] - 1:2

**medical** [7] - 221:9, 221:10, 222:22, 225:9, 229:13, 237:13, 299:6

**Medical** [3] - 145:21, 146:16, 217:25

**medically** [1] - 227:13

**meet** [2] - 77:8, 295:12

**meeting** [17] - 11:23, 56:11, 56:12, 84:13, 124:3, 163:4, 164:18, 169:18, 232:16, 253:13, 254:25, 256:6, 273:22, 295:19, 299:15, 305:19

**meetings** [2] - 236:21, 255:25

**member** [1] - 42:4

**memo** [1] - 160:14

**men** [2] - 138:16, 208:4

**mentioned** [18] - 25:23, 28:20, 43:5, 49:2, 52:14, 66:2, 89:23, 100:16, 158:20, 188:2, 195:8, 202:5, 209:21, 265:10, 268:14, 288:22, 301:24, 320:4

**mentor** [2] - 88:9, 289:5

**merge** [1] - 88:25

**mergers** [1] - 20:23

**Merrill** [1] - 34:15

**message** [4] - 206:12, 267:21, 267:23, 267:24

**messaged** [1] - 251:18

**messages** [2] - 217:4, 243:3

**met** [3] - 77:4, 111:3, 179:25

**metals** [25] - 61:3, 62:16, 62:24, 63:8, 63:13, 63:16, 63:23, 64:9, 64:22, 65:6, 65:16, 65:18, 65:22, 66:5, 67:22, 67:25, 286:24, 287:10, 298:4, 298:14, 301:7, 303:6, 303:11, 303:15, 303:18

**mgibson @ssbb.com** [1] - 3:11

**MICHAEL** [2] - 1:17, 3:10

**mid** [8] - 85:24, 154:24, 183:3, 191:4, 191:6, 192:14, 212:21, 220:22

**mid-morning** [1] - 85:24

**middle** [2] - 19:22, 247:9

**might** [12] - 15:23, 41:24, 44:12, 78:6, 78:7, 142:3, 156:25, 171:17, 235:2, 263:9, 324:3, 327:16

**Mike** [2] - 14:9, 39:11

**MILLER** [3] - 2:14, 38:12, 311:16

**million** [15] - 45:16, 46:16, 47:10, 47:11, 48:7, 48:10, 66:21, 315:23, 316:15, 316:16, 317:3, 317:7, 319:24, 320:2

**mind** [4] - 34:18, 44:16, 112:16, 271:5

**mining** [26] - 61:4, 62:16, 62:25, 63:8, 63:13, 63:16, 63:23, 64:10, 64:22, 65:6, 65:16, 65:18, 65:22, 66:6, 67:22, 68:2, 274:5, 286:24, 287:10, 298:4, 298:14, 301:7, 303:6, 303:11, 303:15, 303:18

**minus** [1] - 111:21

**minute** [4] - 185:15, 194:15, 245:4, 252:14

**minutes** [5] - 193:8, 193:19, 194:6, 276:10, 276:11

**mirrors** [1] - 43:13

**misconduct** [1] - 11:25

**Miss** [3] - 50:18, 50:21, 63:10

**miss** [2] - 191:17, 244:16

**missed** [1] - 244:18

**misspoke** [3] - 70:14, 263:6, 263:11

**mistake** [1] - 156:15

**mitigate** [2] - 7:3, 308:25

**mitigation** [6] - 5:20, 5:25, 7:24, 8:7, 12:25, 13:4

**mixed** [2] - 242:25, 243:13

**mixture** [1] - 153:5

**model** [5] - 32:11, 66:25, 236:16, 239:11, 239:13

**models** [10] - 20:21, 174:15, 174:16, 193:11, 194:23, 195:14, 195:20, 196:3, 196:15, 196:18

**mom** [1] - 180:14

**mom's** [1] - 180:11

**Monday** [1] - 227:4

**money** [9] - 28:13, 45:12, 49:11, 53:7, 85:10, 115:9, 115:11, 149:13, 149:15

**monitor** [1] - 58:20

**month** [4] - 150:7, 177:9, 180:16, 180:17

**months** [36] - 16:16, 61:11, 136:23, 137:3, 137:6, 137:17, 146:15, 148:23, 150:4, 153:20, 155:22,

156:10, 156:11, 156:13, 156:16, 157:10, 157:12, 158:25, 160:9, 162:11, 163:14, 163:22, 163:25, 168:6, 170:16, 188:14, 188:21, 202:21, 208:5, 208:7, 209:6, 227:21, 237:6, 285:8, 285:9

**months'** [5] - 149:8, 157:7, 164:21, 171:3, 195:7

**Morgan** [47] - 49:16, 49:23, 50:8, 50:12, 50:18, 55:21, 56:3, 59:13, 59:23, 67:5, 67:10, 69:23, 71:13, 72:20, 74:15, 75:20, 77:23, 79:23, 81:13, 82:19, 83:9, 84:9, 85:7, 86:16, 89:11, 89:14, 94:12, 112:2, 112:5, 112:6, 112:8, 112:10, 113:12, 113:22, 118:16, 118:25, 119:21, 122:15, 124:21, 124:25, 127:12, 128:10, 129:4, 129:14, 132:16, 291:24, 326:13

**Morgan's** [3] - 71:14, 115:12, 326:16

**morning** [79] - 14:10, 15:15, 15:16, 57:17, 57:19, 57:21, 57:22, 58:3, 58:4, 58:10, 58:24, 59:18, 85:24, 87:11, 87:12, 87:14, 87:15, 87:17, 87:18, 94:6, 94:10, 94:15, 95:9, 95:10, 95:16, 96:6, 96:10, 96:15, 98:8, 99:2, 99:8, 99:20, 99:25, 100:2, 100:3, 131:22, 132:4, 157:18, 157:20, 157:21, 158:6, 158:22, 160:10, 168:4, 178:13, 192:21, 196:22, 204:21, 205:23, 209:11, 209:14, 210:2, 210:5, 210:8, 210:13, 210:18, 210:19, 210:20, 211:10, 211:13, 211:18, 212:14, 212:18, 212:25, 213:3, 213:8, 213:16, 213:17, 213:22, 233:17, 234:7, 234:8, 273:22, 276:6, 276:7, 287:21

**Morro** [1] - 180:13

**most** [10] - 43:24, 52:23, 53:6, 137:14, 156:14, 156:17, 198:13, 270:9, 288:13, 323:13

**move** [3] - 37:12, 76:2, 243:12

**moved** [3] - 24:5, 24:24, 45:24

**moving** [1] - 239:10

**MR** [64] - 4:7, 4:11, 4:21, 4:24, 5:5, 7:4, 7:9, 7:18, 8:17, 9:16, 10:24, 11:5,

13:19, 14:2, 14:7, 14:8, 14:16, 14:18, 14:20, 15:14, 15:17, 15:23, 37:12, 37:15, 37:24, 38:7, 39:4, 39:9, 39:12, 39:18, 50:9, 74:8, 74:22, 85:22, 86:6, 125:13, 164:25, 166:9, 167:15, 187:21, 187:24, 252:13, 252:21, 256:14, 256:15, 257:3, 257:4, 257:6, 257:7, 257:9, 257:14, 257:15, 257:20, 258:5, 298:23, 311:7, 311:8, 316:17, 317:17, 328:8, 328:10, 328:12, 328:18, 328:19

**MRI** [1] - 223:3

**MS** [2] - 38:12, 311:16

**multi** [1] - 43:11

**multiple** [1] - 102:12

**muni** [2] - 41:8, 43:6

**municipal** [1] - 41:4

**must** [4] - 56:14, 244:18, 277:20, 294:20

---

**N**

**N-G-O** [1] - 15:10

**name** [24] - 15:7, 15:8, 15:9, 16:5, 37:10, 37:11, 91:3, 94:7, 94:15, 94:16, 95:17, 96:9, 118:18, 143:4, 158:7, 161:16, 196:25, 197:2, 210:20, 211:12, 212:15, 213:4, 213:9, 213:18

**namely** [1] - 156:20

**names** [12] - 65:15, 65:22, 65:23, 67:11, 67:24, 82:2, 82:10, 82:12, 174:19, 196:24, 205:8

**nature** [1] - 4:16

**necessarily** [1] - 84:7

**need** [24] - 33:7, 54:14, 81:17, 100:6, 135:21, 137:2, 155:10, 157:19, 159:16, 174:23, 195:15, 196:7, 209:24, 210:25, 233:11, 243:7, 245:13, 246:4, 246:5, 246:7, 252:13, 261:13, 271:10, 298:10

**needed** [11] - 100:13, 142:17, 152:18, 155:25, 156:8, 156:22, 195:16, 211:2, 220:14, 222:10, 264:6

**needs** [4] - 52:8, 59:5, 186:13, 245:16

**negative** [3] - 315:23, 316:3, 317:3

**negotiate** [3] - 149:3, 153:2, 215:12

**negotiated** [1] - 149:6

**Net** [1] - 315:4

347

**net** [6] - 315:11, 315:13, 316:25, 317:2, 317:5, 317:9
**neurologist** [1] - 223:6
**never** [36] - 18:25, 52:20, 85:10, 94:22, 115:10, 155:17, 163:12, 209:2, 220:18, 220:19, 228:17, 228:21, 246:6, 246:20, 246:21, 248:5, 248:7, 248:8, 249:2, 249:3, 249:5, 249:15, 262:10, 264:25, 265:6, 265:7, 265:10, 267:18, 268:25, 269:5, 294:17, 298:3, 298:17, 298:21, 300:14
**NEW** [2] - 329:4, 329:6
**new** [15] - 78:16, 82:2, 82:10, 82:12, 84:24, 98:13, 131:20, 132:9, 132:23, 164:23, 290:25, 293:9, 293:19, 294:6, 296:8
**New** [18] - 1:13, 1:19, 2:8, 3:8, 17:24, 17:25, 18:5, 18:10, 18:14, 18:18, 180:4, 182:3, 197:23, 248:18, 329:10
**newborn** [2] - 200:8, 310:14
**news** [15] - 9:15, 26:11, 46:10, 193:12, 208:22, 224:17, 242:15, 242:17, 242:18, 242:23, 242:25, 243:6, 243:7, 243:14, 244:20
**newspaper** [2] - 13:6, 13:16
**next** [30] - 14:25, 33:23, 72:12, 74:2, 76:24, 78:11, 86:18, 99:25, 100:10, 105:20, 106:22, 108:4, 108:20, 115:4, 115:7, 127:14, 147:17, 156:7, 159:2, 168:23, 171:7, 171:18, 189:19, 222:14, 247:23, 250:15, 263:12, 283:13, 294:24, 328:9
**Ngo** [22] - 5:17, 6:7, 6:8, 6:19, 7:13, 10:13, 12:3, 12:11, 15:9, 15:15, 15:25, 34:19, 38:19, 39:13, 74:11, 134:11, 185:8, 243:20, 257:16, 274:18, 311:13, 330:6
**NGO** [3] - 1:5, 15:2, 166:4
**Ngo's** [5] - 5:10, 6:16, 8:19, 9:18, 9:22
**nice** [3] - 170:7, 187:15, 275:16
**night** [1] - 100:5
**NLRT** [1] - 242:23
**non** [4] - 9:20, 10:22, 12:9, 308:2
**non-discrimination** [1] -

308:2
**non-discriminatory** [1] - 12:9
**non-hearsay** [1] - 10:22
**normal** [5] - 190:12, 207:24, 208:2, 209:5
**normally** [6] - 94:10, 97:12, 192:11, 195:4, 207:23, 297:7
**not-so-great** [1] - 27:21
**Notary** [2] - 1:19, 329:9
**note** [3] - 202:3, 228:12, 266:20
**noted** [1] - 328:22
**notes** [1] - 6:16
**nothing** [4] - 13:19, 78:6, 122:23, 318:15
**notice** [1] - 281:22
**November** [41] - 226:5, 227:4, 227:7, 227:23, 231:21, 231:23, 232:2, 232:17, 234:16, 239:22, 244:4, 244:11, 244:12, 249:6, 249:18, 250:8, 250:15, 250:23, 250:25, 252:11, 252:24, 253:4, 254:20, 254:25, 255:4, 255:15, 265:15, 265:19, 273:11, 278:19, 278:24, 279:14, 285:4, 286:8, 286:11, 286:20, 287:16, 288:5, 309:11, 309:14, 310:8
**nuance** [1] - 29:10
**number** [43] - 38:11, 38:13, 70:4, 70:10, 72:13, 73:9, 73:18, 74:2, 74:3, 75:2, 75:3, 75:5, 75:6, 75:7, 75:25, 76:3, 76:11, 76:14, 76:16, 76:18, 77:13, 78:20, 106:22, 107:12, 112:19, 113:20, 115:8, 124:6, 124:14, 218:5, 218:9, 253:23, 282:21, 282:24, 307:22, 315:19, 316:10, 316:12, 320:3, 320:11, 320:22, 321:16, 325:15
**Number** [3] - 109:16, 109:17, 313:16
**numbered** [3] - 105:20, 280:8, 280:9
**numbers** [17] - 10:5, 70:12, 72:23, 80:13, 80:14, 80:15, 80:17, 84:8, 129:3, 174:17, 196:8, 218:5, 257:12, 257:22, 296:22, 305:5, 305:16

---

## O

**Oak** [1] - 159:19
**Oaktree** [1] - 159:14
**object** [5] - 162:8, 168:19,

173:3, 183:6, 189:16
**objected** [1] - 162:10
**objection** [6] - 12:21, 37:14, 37:15, 37:19, 74:9, 187:21
**obviously** [14] - 9:4, 25:18, 34:14, 55:22, 73:24, 78:4, 121:11, 131:13, 135:10, 169:19, 192:18, 262:6, 291:21, 305:23
**occur** [2] - 174:13, 308:9
**occurred** [2] - 228:21, 323:14
**occurs** [1] - 254:14
**October** [5] - 110:14, 225:23, 226:4, 226:22, 291:24
**OF** [2] - 329:4, 329:6
**offer** [25] - 13:12, 19:23, 21:10, 38:19, 39:24, 40:2, 111:4, 111:7, 111:11, 111:23, 112:9, 113:8, 113:14, 114:9, 114:13, 114:19, 115:2, 115:17, 117:25, 119:14, 210:22, 275:21, 276:3, 304:21, 326:18
**offered** [6] - 6:4, 115:15, 115:16, 117:2, 119:8, 210:17
**offering** [3] - 112:12, 112:14, 275:11
**offers** [1] - 119:9
**office** [51] - 6:8, 6:12, 6:17, 114:19, 136:15, 136:17, 138:3, 141:13, 145:9, 153:18, 154:13, 157:22, 162:7, 166:23, 173:14, 173:16, 175:20, 178:15, 179:3, 179:12, 179:20, 181:18, 182:13, 182:18, 183:10, 186:6, 188:10, 188:12, 202:8, 204:7, 205:10, 205:14, 205:16, 209:5, 216:10, 225:13, 226:3, 226:11, 226:25, 229:4, 231:21, 232:3, 243:5, 244:4, 249:17, 252:7, 265:19, 275:4, 284:23, 288:6
**officer** [2] - 42:9, 254:9
**official** [1] - 10:6
**officially** [6] - 23:19, 66:8, 67:24, 68:15, 289:8, 304:19
**offs** [10] - 9:25, 10:7, 10:10, 10:23, 21:8, 33:22, 322:20, 323:2, 323:11, 323:13
**often** [2] - 83:18, 120:7
**oil** [2] - 97:7, 98:3
**okaying** [1] - 210:16
**old** [3] - 16:14, 16:16, 222:17
**Omar** [4] - 92:9, 236:15,

239:9, 239:17
**once** [4] - 10:14, 67:17, 263:13, 288:18
**one** [96] - 5:10, 6:3, 9:20, 10:8, 14:8, 23:23, 28:9, 32:22, 33:8, 38:8, 42:24, 44:13, 51:2, 51:11, 52:2, 54:3, 55:4, 60:25, 62:20, 63:9, 67:23, 68:13, 69:7, 69:23, 69:24, 74:3, 74:7, 75:25, 76:3, 76:14, 76:17, 76:18, 76:20, 76:24, 76:25, 77:2, 77:3, 77:11, 77:15, 80:20, 87:11, 90:14, 92:6, 98:9, 99:16, 100:18, 102:7, 102:10, 103:10, 105:14, 106:15, 106:17, 112:21, 113:9, 117:3, 117:18, 121:13, 127:5, 132:3, 137:19, 138:18, 148:15, 158:20, 162:21, 180:16, 180:17, 181:2, 194:12, 196:6, 204:19, 209:5, 209:22, 210:10, 223:9, 223:21, 231:4, 233:7, 244:10, 244:21, 251:16, 251:17, 262:4, 267:4, 275:12, 277:15, 277:19, 278:3, 278:12, 278:14, 281:16, 292:12, 294:9, 299:24, 304:17
**one-month** [1] - 180:16
**one-off** [1] - 67:23
**one-time** [1] - 117:18
**one-year** [2] - 112:21, 117:3
**online** [1] - 231:6
**OPCO** [18] - 70:13, 105:2, 107:13, 108:4, 108:20, 109:17, 217:15, 217:18, 217:21, 218:2, 218:14, 253:23, 280:9, 280:10, 281:2, 307:22, 312:21
**open** [6] - 39:16, 84:24, 244:21, 248:7, 249:16, 262:14
**opened** [6] - 249:2, 249:3, 249:4, 249:5, 249:19, 262:11
**opening** [1] - 13:22
**openly** [1] - 254:12
**opens** [1] - 192:23
**operation** [1] - 5:4
**opinion** [1] - 180:9
**OPPENHEIMER** [1] - 1:9
**Oppenheimer** [160] - 3:18, 3:20, 5:11, 6:5, 7:15, 9:23, 10:6, 12:19, 13:14, 19:18, 19:24, 33:25, 34:3, 35:9, 35:23, 37:7, 38:20, 39:25, 40:12, 40:20, 41:14, 41:19, 42:9, 42:14, 42:18, 43:23, 45:4, 46:8, 47:2, 47:22,

348

48:20, 49:10, 49:17, 49:21,
52:25, 53:9, 55:11, 56:17,
56:24, 57:8, 59:19, 60:2,
60:15, 60:17, 61:20, 64:24,
66:4, 66:11, 68:24, 83:13,
85:14, 87:24, 88:20, 89:3,
89:6, 89:9, 89:17, 100:19,
101:5, 101:13, 109:21,
111:23, 113:4, 113:13,
113:23, 114:9, 117:2,
118:12, 119:7, 119:8, 120:8,
121:10, 121:17, 125:5,
134:21, 138:2, 147:18,
147:24, 148:24, 149:16,
151:25, 152:9, 152:24,
154:6, 167:11, 175:15,
179:2, 179:11, 191:9,
202:12, 211:25, 217:12,
218:2, 224:9, 224:14,
225:12, 226:8, 226:12,
229:3, 229:8, 229:15,
229:20, 230:20, 249:4,
256:2, 271:7, 278:19, 279:4,
279:15, 291:9, 291:10,
292:3, 292:8, 293:4, 293:5,
293:7, 293:9, 293:19,
293:23, 294:14, 295:4,
298:9, 300:3, 300:8, 300:24,
301:14, 301:21, 302:9,
302:17, 302:25, 303:10,
303:20, 306:11, 306:14,
306:18, 306:25, 307:2,
307:6, 308:16, 309:5, 310:6,
311:14, 311:24, 315:7,
316:21, 317:9, 321:21,
322:4, 322:19, 323:2, 323:6,
323:22, 325:5, 325:12,
326:13, 326:24, 327:11,
327:24

**Oppenheimer 's** [9] - 10:11,
12:17, 71:24, 246:14,
246:19, 253:21, 254:14,
254:16, 318:7

**opportunity** [2] - 84:14,
294:18

**opposed** [1] - 41:4
**opt** [1] - 147:15
**option** [1] - 163:24
**options** [13] - 136:18,
138:15, 140:4, 140:12,
141:4, 141:6, 141:9, 141:20,
148:14, 151:22, 154:10,
154:20, 177:2

**oral** [3] - 69:5, 83:15, 83:19
**orally** [1] - 274:11
**order** [4] - 113:14, 114:10,
119:10, 158:19

**organization** [2] - 35:19,
40:17

**organize** [1] - 42:21
**organized** [3] - 42:19,
42:20, 42:21

**original** [1] - 65:23
**originally** [1] - 286:15
**originating** [1] - 96:8
**otherwise** [1] - 254:11
**outcome** [1] - 329:18
**outlier** [1] - 124:20
**outperform** [1] - 60:5
**outright** [1] - 104:5
**outside** [1] - 9:10
**overall** [1] - 318:7
**overlapped** [1] - 291:6
**overrule** [1] - 12:21
**overruled** [1] - 187:22
**own** [5] - 44:18, 44:19,
74:12, 99:5, 156:6
**owns** [1] - 42:15

**P**

**P&L** [24] - 44:18, 44:19,
44:24, 45:7, 45:19, 45:25,
46:2, 47:7, 47:10, 47:12,
47:24, 73:4, 84:25, 123:5,
164:10, 318:11, 319:10,
319:23, 320:5, 320:19,
320:20, 321:3, 321:13
**P&Ls** [1] - 45:19
**P.C** [1] - 2:5
**p.m** [3] - 165:5, 166:3,
328:22
**packaging** [17] - 25:11,
31:8, 31:9, 31:21, 60:18,
60:25, 62:11, 62:12, 66:4,
68:11, 97:5, 286:24, 301:7,
302:11, 302:15, 302:20,
302:23
**page** [51] - 14:25, 50:6,
50:11, 50:17, 70:19, 79:25,
104:25, 105:20, 106:21,
106:22, 107:11, 108:4,
108:20, 109:15, 145:22,
215:18, 217:14, 217:15,
217:22, 218:2, 218:5, 218:9,
218:10, 218:11, 244:25,
247:23, 253:23, 258:9,
258:14, 258:25, 259:10,
260:11, 260:25, 262:15,
264:8, 264:23, 266:4,
266:17, 280:11, 280:13,
281:2, 311:24, 312:21,
312:25, 313:23, 313:25,
314:2, 314:3, 314:6, 315:8
**PAGE** [1] - 330:7
**pager** [1] - 96:20
**pages** [5] - 61:21, 61:23,
217:21, 256:23, 280:9
**paid** [51] - 48:16, 101:5,
101:7, 115:10, 117:22,
117:23, 118:3, 120:15,
120:16, 120:20, 127:4,
130:21, 131:6, 149:13,

149:15, 153:12, 153:13,
153:14, 154:6, 226:10,
226:12, 226:17, 229:16,
229:18, 230:19, 231:7,
231:9, 231:13, 231:14,
281:12, 282:4, 282:7, 283:2,
283:9, 283:20, 283:24,
285:21, 285:23, 286:4,
290:7, 290:10, 290:12,
290:15, 290:17, 290:20,
290:21, 305:9, 305:14,
317:22, 318:4

**pain** [1] - 222:12
**paper** [22] - 25:11, 31:8,
31:9, 31:20, 60:18, 60:24,
61:9, 62:10, 62:12, 66:4,
68:11, 95:3, 97:4, 274:4,
286:23, 298:14, 301:6,
302:11, 302:15, 302:20,
302:23
**paperwork** [10] - 215:20,
220:20, 224:21, 225:5,
249:22, 261:11, 261:19,
261:22, 262:5
**paragraph** [6] - 98:12,
245:10, 246:10, 247:9, 254:6
**parental** [1] - 149:12
**parentheses** [2] - 314:19,
315:4
**Park** [1] - 3:7
**part** [36] - 20:11, 20:22,
21:24, 22:14, 24:4, 24:9,
25:15, 27:11, 27:18, 29:9,
34:16, 38:24, 40:12, 40:14,
40:16, 40:19, 41:8, 43:16,
43:20, 51:2, 55:21, 58:24,
90:6, 90:7, 90:8, 104:5,
117:8, 151:10, 202:4, 212:7,
244:19, 294:9, 321:25,
327:8, 327:20, 328:5
**participated** [2] - 57:17,
287:21
**particular** [7] - 20:10,
21:24, 25:2, 30:23, 36:7,
37:9, 96:9
**particularly** [1] - 57:3
**parties** [1] - 329:16
**partner** [12] - 16:3, 138:13,
159:4, 159:10, 160:12,
207:20, 208:6, 208:9,
208:14, 224:11, 224:13,
225:3
**partner's** [1] - 16:5
**parts** [1] - 24:13
**party** [1] - 255:24
**pass** [2] - 8:3, 17:25
**passed** [2] - 6:18, 177:8
**past** [2] - 113:5, 243:6
**paternity** [4] - 144:17,
144:24, 145:6, 145:19
**pattern** [1] - 192:12

**pause** [1] - 258:6
**pay** [13] - 106:9, 106:13,
107:2, 118:8, 126:24,
153:23, 229:3, 229:8,
229:20, 231:5, 280:24,
281:13, 289:23
**paying** [4] - 133:7, 133:10,
133:13, 230:9
**payment** [22] - 107:19,
107:21, 107:23, 108:13,
108:16, 109:4, 109:8,
128:20, 129:9, 129:20,
129:24, 130:2, 130:3, 130:5,
130:7, 131:6, 280:23, 281:6,
281:9, 281:17, 290:2, 290:4
**payments** [3] - 105:14,
106:18, 281:20
**payroll** [2] - 246:14, 246:19
**peace** [1] - 328:21
**pediatrician** [1] - 180:19
**peek** [1] - 191:22
**peer** [2] - 72:25
**peer-to-peer** [1] - 72:25
**people** [25] - 27:4, 53:10,
53:18, 73:15, 87:23, 91:17,
91:21, 100:18, 100:20,
111:4, 121:25, 132:10,
132:12, 135:10, 147:25,
148:4, 196:10, 205:9, 209:5,
228:10, 237:17, 237:19,
267:7, 270:10, 277:17
**people's** [1] - 78:5
**per** [2] - 110:6, 194:15
**percent** [7] - 149:9, 149:20,
150:8, 237:17, 237:19,
237:20, 237:22
**perception** [1] - 305:2
**perfectly** [1] - 5:3
**perform** [2] - 60:6, 216:6
**performance** [17] - 5:8,
6:14, 6:15, 7:2, 7:7, 7:11,
7:13, 7:17, 25:16, 68:24,
69:22, 74:12, 83:12, 83:16,
123:9, 126:8, 318:8
**performing** [1] - 226:8
**period** [28] - 34:18, 63:17,
69:13, 84:19, 105:4, 120:19,
124:17, 124:18, 131:15,
153:22, 154:14, 161:24,
191:13, 191:22, 191:24,
191:25, 213:18, 216:14,
216:21, 229:4, 229:7,
229:21, 234:12, 237:7,
265:25, 286:20, 291:23,
305:13
**periodically** [1] - 263:5
**periods** [2] - 191:23,
290:22
**permanent** [14] - 103:9,
103:11, 103:13, 103:15,
103:19, 106:16, 106:19,

107:7, 117:19, 234:13,
234:23, 237:22, 266:7,
266:14
  **permanently** [1] - 266:9
  **permitted** [2] - 13:9, 246:12
  **person** [15] - 46:18, 49:7,
50:15, 50:17, 52:22, 59:19,
64:2, 97:25, 134:20, 147:17,
209:6, 209:22, 287:9, 294:8,
314:9
  **personal** [2] - 135:7,
155:18
  **personnel** [3] - 37:8,
109:20, 110:2
  **perspective** [4] - 68:14,
188:2, 208:25, 236:23
  **pertaining** [6] - 35:13, 45:8,
78:3, 80:25, 88:5, 126:7
  **pertains** [2] - 24:21, 237:13
  **pertinent** [1] - 7:8
  **phase** [1] - 151:21
  **phone** [2] - 204:5, 215:2
  **physical** [2] - 227:12,
227:22
  **physically** [2] - 51:24,
227:16
  **physician** [1] - 180:10
  **pick** [3] - 64:22, 65:6,
137:15
  **picked** [2] - 67:17, 293:19
  **picking** [1] - 67:23
  **piece** [3] - 9:2, 9:6, 26:14
  **pieces** [3] - 4:17, 24:17,
104:18
  **place** [11] - 9:19, 102:3,
133:18, 134:4, 138:23,
144:16, 144:21, 147:3,
230:11, 252:9, 274:3
  **plainly** [1] - 11:9
  **plaintiff's** [1] - 4:15
  **plan** [12] - 160:22, 162:9,
162:12, 162:18, 163:3,
166:16, 172:10, 175:5,
182:2, 183:10, 189:25, 200:2
  **planned** [3] - 186:5, 186:15,
210:7
  **plans** [2] - 160:6, 202:12
  **play** [5] - 122:12, 122:14,
257:4, 257:25, 258:3
  **pleased** [1] - 132:15
  **plus** [6] - 164:11, 196:15,
198:18, 200:5, 252:3, 252:4
  **pocket** [1] - 253:11
  **point** [33] - 10:8, 13:17,
14:5, 44:13, 54:3, 63:10,
91:17, 92:6, 103:10, 106:15,
140:2, 147:12, 149:2,
187:19, 202:3, 204:19,
205:21, 214:18, 223:7,
223:9, 225:11, 229:15,
230:18, 231:4, 234:2,

240:11, 255:7, 268:10,
284:8, 288:5, 288:10,
308:15, 322:20
  **points** [4] - 33:15, 33:18,
67:2, 100:12
  **policies** [5] - 144:15,
144:20, 145:4, 147:5, 307:15
  **policy** [20] - 7:23, 11:25,
138:19, 138:20, 138:21,
140:5, 144:17, 144:25,
145:20, 147:3, 147:9,
148:24, 149:2, 152:2,
152:25, 218:2, 254:22,
294:4, 308:2, 308:4
  **Policy** [1] - 254:3
  **polite** [5] - 187:13, 228:9,
228:16, 228:19, 228:23
  **pool** [1] - 45:10
  **pools** [1] - 45:9
  **poor** [1] - 8:4
  **portfolio** [3] - 97:19,
159:25, 251:20
  **portion** [2] - 233:7, 241:19
  **portions** [4] - 153:12,
153:14, 231:13, 231:14
  **position** [15] - 6:7, 13:4,
20:7, 28:24, 36:4, 91:5, 93:4,
93:9, 93:16, 98:12, 214:5,
236:8, 268:8, 295:20, 295:23
  **positions** [8] - 45:24,
46:12, 46:13, 46:21, 47:5,
47:15, 51:18, 55:13
  **positive** [3] - 81:17, 214:16,
317:6
  **possibility** [2] - 137:19,
245:14
  **post** [3] - 18:25, 227:11,
248:17
  **posture** [1] - 202:22
  **posturing** [2] - 186:25,
202:18
  **potential** [1] - 155:23
  **potentially** [2] - 96:11,
162:11
  **practice** [2] - 18:24, 113:23
  **practiced** [1] - 18:25
  **precedent** [2] - 140:6,
144:19
  **precise** [1] - 184:25
  **preferable** [1] - 257:25
  **preferably** [1] - 308:10
  **pregnant** [1] - 152:4
  **preparation** [5] - 193:21,
195:19, 197:5, 199:2, 199:6
  **preparations** [1] - 198:8
  **prepare** [4] - 161:21,
193:10, 194:24, 278:13
  **prepared** [8] - 155:25,
181:14, 181:15, 196:2,
200:17, 261:4, 261:8
  **preparing** [1] - 193:17

  **present** [3] - 30:3, 190:24,
299:15
  **PRESENT** [1] - 3:16
  **presented** [11] - 38:5,
71:11, 75:22, 77:25, 127:11,
128:8, 129:2, 129:11,
129:15, 131:7, 133:22
  **preserve** [3] - 211:4,
260:21, 260:22
  **president** [2] - 23:9, 23:13,
23:19
  **pressure** [1] - 164:20
  **presumably** [4] - 126:21,
136:11, 314:16, 315:13
  **pretext** [1] - 10:3
  **pretty** [4] - 83:20, 239:5,
259:22, 263:10
  **previewed** [1] - 142:14
  **previous** [8] - 51:6, 60:19,
62:11, 96:2, 171:25, 260:3,
286:12, 293:10
  **previously** [8] - 63:21,
89:12, 94:11, 152:10,
219:15, 219:20, 233:16,
293:20
  **primarily** [2] - 46:3, 47:20
  **printed** [1] - 273:3
  **prioritized** [1] - 197:11
  **privy** [2] - 205:17, 322:12
  **problem** [2] - 172:23,
181:15
  **problems** [3] - 7:2, 34:15,
132:11
  **procedures** [1] - 215:11
  **proceeding** [2] - 8:9, 9:8
  **proceedings** [2] - 11:13,
329:13
  **process** [6] - 76:19, 83:25,
187:5, 187:9, 293:23, 294:12
  **produce** [2] - 57:7, 190:6
  **produced** [7] - 5:23, 57:12,
57:13, 57:16, 124:11,
124:15, 272:12
  **producing** [2] - 99:4, 99:5
  **product** [5] - 27:8, 80:9,
80:21, 80:25, 81:2
  **professional** [1] - 34:20
  **Professional** [2] - 1:19,
329:9
  **profile** [1] - 270:20
  **Profit** [2] - 314:18, 315:4
  **profit** [15] - 44:23, 45:18,
46:25, 313:24, 314:22,
315:11, 315:12, 315:14,
316:9, 316:11, 316:25,
317:2, 317:5, 320:9, 320:11
  **profitability** [1] - 314:25
  **profits** [3] - 315:18, 316:21,
317:10
  **progression** [1] - 22:6
  **prohibit** [1] - 307:16

  **prohibited** [1] - 254:11
  **prohibits** [1] - 221:17
  **promise** [1] - 117:18
  **promote** [2] - 86:14, 278:20
  **promoted** [19] - 22:25,
69:17, 85:14, 86:8, 86:11,
86:17, 86:19, 86:21, 86:25,
87:7, 89:15, 91:11, 91:13,
92:6, 92:12, 94:7, 95:24,
131:17, 278:23
  **promotion** [13] - 22:7, 23:7,
23:8, 23:11, 23:12, 23:18,
24:4, 28:9, 85:18, 85:19,
86:18, 87:6, 94:8
  **promotions** [1] - 25:19
  **prompted** [1] - 244:6
  **propensity** [1] - 12:10
  **proposal** [3] - 166:19,
166:20, 168:20
  **propose** [2] - 166:16,
256:16
  **proposed** [5] - 67:16,
160:22, 163:18, 168:11,
183:17
  **proposition** [1] - 7:21
  **protect** [1] - 255:22
  **prove** [1] - 56:9
  **provide** [5] - 13:2, 149:21,
173:24, 208:12, 318:20
  **provided** [6] - 22:14, 32:7,
69:3, 82:7, 82:15, 83:3
  **provides** [1] - 35:19
  **providing** [2] - 27:15, 99:9
  **proving** [1] - 317:14
  **Public** [2] - 1:19, 329:9
  **public** [4] - 25:25, 26:5,
26:6, 26:11
  **publicly** [1] - 26:7
  **publish** [2] - 32:12, 239:12
  **published** [10] - 22:21,
22:22, 25:24, 26:14, 32:8,
32:10, 32:23, 72:6, 77:17
  **publishing** [4] - 25:23,
26:4, 26:20, 51:14
  **pull** [1] - 196:8
  **punished** [1] - 284:17
  **purpose** [3] - 11:17,
108:13, 109:8
  **purposes** [1] - 11:7
  **pursuant** [1] - 117:22
  **push** [1] - 56:9
  **pushed** [3] - 54:12, 160:11,
163:20
  **pushing** [1] - 163:14
  **put** [8] - 10:21, 52:6, 58:22,
66:24, 99:25, 196:7, 266:22,
274:3
  **puts** [1] - 268:7

349

## Q

**qualify** [1] - 261:25
**quality** [3] - 29:14, 30:6, 272:10
**quarter** [8] - 190:2, 190:3, 190:7, 190:9, 190:12, 190:17, 195:21, 195:23
**quarterly** [1] - 198:10
**questioned** [4] - 74:20, 296:20, 298:2, 298:12
**questioning** [2] - 237:25, 238:2
**questions** [3] - 159:21, 256:25, 268:21
**quick** [4] - 66:17, 193:22, 298:8
**quickly** [4] - 66:18, 192:12, 192:14, 193:13
**quit** [1] - 120:6
**quite** [4] - 5:2, 6:21, 160:25
**quote** [1] - 89:8
**quotes** [1] - 10:5

## R

**raise** [31] - 14:23, 101:21, 101:22, 102:3, 102:6, 102:8, 102:14, 102:16, 102:17, 102:20, 102:24, 103:4, 103:6, 103:14, 103:18, 103:24, 105:16, 106:19, 107:6, 107:25, 108:17, 109:11, 110:13, 110:17, 116:7, 117:12, 117:15, 117:17, 117:19
**raises** [7] - 101:11, 101:17, 102:12, 102:13, 103:10, 120:12, 279:3
**ran** [1] - 164:9
**range** [1] - 39:5
**rank** [2] - 73:6, 75:13
**ranked** [7] - 73:10, 73:16, 75:8, 76:20, 77:15, 78:25, 80:19
**ranking** [1] - 75:11
**rapport** [2] - 85:12, 304:23
**rare** [1] - 121:12
**RASKIN** [1] - 2:5
**rate** [2] - 30:7, 71:23
**rated** [2] - 24:23, 30:10
**rather** [11] - 96:24, 97:20, 100:10, 103:8, 116:20, 148:25, 240:25, 241:2, 258:21, 258:22, 311:3
**rating** [4] - 24:23, 29:15, 30:7, 75:3
**Ratings** [1] - 5:10
**ratings** [2] - 30:13, 74:16
**rationale** [1] - 209:7

**RBS** [13] - 28:3, 28:5, 28:8, 28:15, 28:21, 30:23, 31:4, 31:19, 32:5, 33:21, 33:24, 34:5, 291:22
**reach** [1] - 203:23
**react** [1] - 243:12
**reactionary** [1] - 240:25
**read** [28] - 27:20, 144:2, 145:17, 146:2, 167:16, 167:17, 185:15, 185:16, 197:25, 218:20, 245:5, 245:18, 249:8, 254:6, 256:22, 257:16, 258:2, 262:2, 262:3, 265:15, 273:17, 273:19, 274:6, 298:23, 298:25, 313:20, 324:8
**readers** [1] - 26:2
**reading** [3] - 218:4, 252:5, 273:20
**ready** [7] - 14:3, 14:5, 193:11, 222:9, 238:6, 245:8
**realistic** [1] - 186:19
**realized** [1] - 235:2
**really** [23] - 40:24, 47:22, 48:14, 53:3, 62:10, 79:4, 82:9, 85:23, 90:6, 106:14, 155:17, 159:6, 163:15, 175:17, 202:24, 228:20, 231:10, 236:22, 240:2, 284:9, 298:6, 306:22, 317:14
**reason** [11] - 5:14, 10:18, 12:9, 13:15, 34:17, 119:13, 159:15, 236:22, 249:11, 281:14, 281:17
**reasonable** [1] - 207:12
**reasoning** [2] - 51:7, 51:9
**reasons** [14] - 9:21, 51:11, 322:5, 322:9, 322:23, 323:7, 323:11, 324:13, 324:17, 324:25, 325:18, 325:23, 326:10, 326:21
**rebuild** [1] - 111:2
**receive** [46] - 8:15, 16:21, 16:25, 17:4, 17:12, 17:17, 19:5, 19:12, 38:19, 49:8, 68:23, 69:21, 71:2, 83:11, 83:15, 83:18, 84:3, 101:11, 102:24, 104:11, 120:7, 125:4, 126:15, 126:19, 127:16, 127:19, 128:11, 128:15, 129:6, 129:9, 186:9, 229:8, 248:6, 248:13, 248:16, 248:17, 248:19, 248:21, 248:23, 262:14, 279:3, 279:14, 279:17, 279:21, 289:9, 289:13
**received** [42] - 5:21, 21:9, 35:14, 38:5, 38:16, 38:17, 63:9, 69:9, 99:17, 105:15, 106:18, 107:6, 109:4,

114:13, 117:17, 117:24, 124:22, 125:7, 125:25, 126:21, 127:21, 149:19, 150:8, 153:22, 199:15, 203:9, 204:6, 229:9, 244:20, 248:5, 248:8, 249:12, 249:15, 262:10, 272:24, 279:23, 279:25, 289:15, 289:17, 311:14, 330:8
**receiving** [5] - 17:21, 71:9, 84:21, 205:4, 222:22
**recently** [1] - 131:17
**Recess** [2] - 86:4, 252:18
**recess** [1] - 165:5
**recklessness** [1] - 7:22
**recognize** [2] - 217:11, 253:20
**recognized** [2] - 133:2, 133:5
**recollection** [2] - 104:14, 134:4
**recommendation** [4] - 32:16, 52:6, 52:7, 180:20
**recommendations** [6] - 22:23, 57:5, 57:6, 59:24, 60:4, 60:8
**recommended** [1] - 206:24
**record** [10] - 13:2, 253:2, 253:6, 254:6, 254:24, 255:19, 255:25, 273:18, 308:7, 329:13
**Record** [2] - 167:17, 298:25
**recorder** [1] - 253:10
**recording** [6] - 253:13, 254:12, 254:19, 256:5, 256:10, 259:7
**Recording** [1] - 254:3
**records** [1] - 37:13
**recovered** [1] - 310:13
**recovery** [1] - 232:19
**RECROSS** [1] - 330:5
**recruit** [1] - 113:2
**REDIRECT** [1] - 330:5
**refer** [8] - 24:11, 26:3, 26:4, 26:12, 46:6, 72:23, 145:22, 151:3
**reference** [2] - 103:9, 257:11
**referenced** [6] - 77:12, 235:7, 241:22, 242:6, 244:9, 260:4
**referencing** [4] - 73:22, 106:6, 228:10, 235:21
**referred** [7] - 120:11, 141:21, 141:23, 146:9, 150:24, 215:18, 218:12
**referring** [21] - 4:14, 69:16, 73:17, 76:4, 82:10, 93:24, 148:4, 219:16, 225:6, 230:15, 235:11, 235:23, 237:10, 242:8, 259:15,

259:17, 261:10, 261:11, 272:14, 276:17, 301:15
**refers** [3] - 10:9, 79:7, 79:10
**reflect** [4] - 107:18, 107:20, 125:24, 133:15
**reflected** [9] - 126:12, 130:24, 131:13, 131:14, 131:16, 132:22, 189:3, 203:11, 204:25
**reflecting** [1] - 129:20
**reflects** [4] - 75:25, 109:4, 125:25, 128:20
**refocus** [1] - 157:16
**regard** [3] - 5:19, 9:2, 37:17
**regarding** [4] - 5:15, 68:23, 83:16, 271:12
**regardless** [1] - 135:22
**Registered** [2] - 1:18, 329:8
**regular** [4] - 242:24, 290:23, 294:3, 305:7
**regulation** [1] - 59:6
**related** [14] - 51:16, 51:17, 106:4, 106:8, 123:18, 254:16, 264:3, 284:2, 284:3, 297:23, 299:4, 305:25, 306:8, 329:16
**relates** [1] - 305:24
**relating** [1] - 37:7
**relationship** [10] - 16:8, 42:8, 48:18, 211:4, 214:17, 231:18, 260:22, 260:24, 304:7, 318:7
**relationships** [1] - 326:4
**relative** [2] - 24:20, 305:9
**relaxed** [1] - 9:5
**relay** [1] - 163:25
**relayed** [2] - 181:5, 200:22
**relaying** [5] - 156:12, 169:6, 170:20, 172:4, 265:7
**release** [3] - 190:24, 194:19, 194:20
**releases** [1] - 195:24
**relevant** [5] - 6:2, 6:21, 8:7, 8:8, 159:6
**relinquish** [1] - 163:23
**remain** [3] - 41:17, 86:10, 223:17
**remained** [1] - 238:10
**remains** [1] - 274:2
**remember** [67] - 35:8, 49:9, 54:3, 55:23, 56:3, 56:7, 65:9, 68:3, 72:19, 114:18, 118:18, 135:6, 135:8, 136:21, 136:24, 139:19, 139:20, 146:13, 152:5, 153:24, 156:11, 158:21, 159:20, 164:7, 170:17, 170:19, 176:19, 199:19, 200:10, 209:25, 210:9, 213:6, 221:24, 224:20, 225:22,

351

225:25, 230:6, 231:6, 231:11, 234:15, 236:6, 236:9, 236:14, 236:20, 237:4, 237:7, 237:8, 237:12, 238:3, 238:6, 239:8, 242:10, 249:6, 249:17, 251:9, 262:2, 269:15, 273:25, 278:12, 285:2, 294:18, 294:23, 296:6, 299:10, 309:16, 324:2
**remembered** [1] - 265:22
**remind** [1] - 273:25
**remote** [1] - 175:14
**remotely** [7] - 137:9, 137:20, 160:18, 166:23, 169:24, 172:12, 182:12
**removal** [1] - 211:22
**remove** [4] - 205:23, 210:7, 233:2, 270:22
**removed** [1] - 212:24
**removing** [8] - 211:12, 233:14, 233:25, 234:6, 234:18, 235:17, 238:15, 268:21
**rep** [1] - 271:9
**repeat** [9] - 144:4, 167:13, 179:4, 278:21, 286:9, 300:4, 312:10, 322:16, 324:10
**replaced** [1] - 298:18
**report** [40] - 26:12, 26:13, 27:20, 27:21, 49:22, 50:5, 50:12, 50:18, 50:21, 59:4, 59:5, 61:19, 61:20, 61:24, 73:20, 90:22, 91:17, 92:17, 96:18, 99:23, 100:2, 100:4, 174:20, 190:17, 190:21, 191:16, 192:5, 192:8, 192:13, 192:21, 193:12, 193:18, 194:18, 197:2, 308:17, 313:19, 318:15, 318:19, 318:23, 318:25
**Report** [2] - 311:25, 313:2
**reported** [15] - 49:23, 49:24, 50:20, 52:10, 90:19, 92:10, 93:21, 138:7, 150:11, 193:6, 200:6, 268:14, 276:19, 308:10, 310:24
**Reporter** [2] - 1:19, 329:9
**reporters** [1] - 26:11
**reporting** [3] - 54:12, 196:17, 196:22
**reports** [29] - 25:23, 25:24, 35:17, 54:9, 57:13, 57:15, 61:20, 62:2, 73:18, 87:18, 87:19, 100:6, 123:15, 124:6, 124:15, 151:7, 190:2, 190:4, 190:7, 190:9, 191:13, 192:16, 192:20, 194:9, 196:7, 198:11, 287:15, 287:20, 292:23
**representative** [1] - 299:14
**represents** [3] - 73:7, 73:9,

73:10
**reputation** [3] - 95:13, 304:12, 304:15
**Request** [1] - 218:18
**request** [10] - 218:22, 218:23, 219:5, 219:10, 219:11, 219:23, 220:4, 220:9, 220:17, 246:12
**requested** [2] - 219:20, 306:5
**required** [2] - 202:10, 219:4
**research** [168] - 22:2, 22:12, 22:14, 22:21, 22:22, 23:25, 24:6, 24:12, 25:7, 25:8, 26:23, 27:2, 27:12, 27:14, 27:18, 32:7, 32:9, 32:13, 32:15, 32:23, 40:12, 40:18, 44:4, 44:9, 44:15, 45:8, 48:20, 48:21, 48:22, 49:3, 49:8, 49:12, 49:14, 49:15, 50:13, 50:25, 51:4, 51:12, 51:14, 51:16, 51:20, 51:23, 52:19, 52:20, 53:19, 54:2, 55:13, 57:7, 57:10, 57:11, 57:16, 57:25, 58:12, 59:14, 59:21, 62:21, 63:22, 64:13, 64:16, 64:17, 64:19, 64:23, 66:18, 71:16, 72:6, 73:17, 77:18, 84:10, 85:2, 87:7, 87:9, 87:13, 89:21, 89:25, 90:5, 91:14, 92:19, 92:20, 93:6, 93:7, 93:13, 93:14, 93:19, 93:21, 93:24, 94:25, 96:2, 97:5, 97:8, 97:9, 98:9, 98:25, 99:3, 99:8, 99:11, 99:14, 99:18, 99:20, 99:21, 99:24, 118:11, 118:19, 118:21, 118:22, 118:23, 118:24, 124:6, 124:10, 147:8, 158:2, 158:6, 190:6, 191:21, 210:13, 231:12, 238:10, 239:12, 243:11, 247:12, 247:14, 264:12, 264:20, 264:21, 265:21, 266:2, 266:11, 266:15, 267:9, 267:10, 267:17, 268:2, 268:6, 268:13, 269:12, 270:20, 270:21, 274:2, 274:6, 274:13, 276:9, 282:15, 282:17, 286:17, 288:3, 296:25, 297:3, 297:10, 297:15, 298:3, 298:4, 298:13, 298:16, 298:22, 300:18, 301:2, 301:9, 301:13, 301:20, 302:12, 302:16, 303:6, 303:11, 323:14, 324:18, 326:8
**researchers** [1] - 191:8
**reserving** [1] - 257:8
**resigned** [1] - 328:4
**resources** [3] - 218:24,

308:13, 308:18
**respect** [3] - 4:17, 11:18, 13:6
**respectfully** [3] - 7:25, 8:8, 9:11
**respective** [2] - 13:4, 308:11
**respond** [4] - 203:5, 240:10, 262:6, 262:9
**responded** [1] - 95:19
**respondent** [1] - 256:19
**Respondent** [2] - 1:10, 3:6
**Respondent 's** [1] - 12:4
**respondent 's** [1] - 257:21
**responds** [2] - 79:4, 145:11, 188:24
**response** [24] - 4:19, 4:22, 145:10, 145:13, 155:15, 160:22, 168:16, 170:5, 170:23, 172:19, 181:7, 193:17, 197:16, 205:4, 211:8, 235:19, 238:23, 241:5, 241:14, 265:14, 275:21, 283:4, 296:2, 299:8
**responsibilities** [32] - 6:6, 6:20, 8:4, 20:18, 22:11, 23:14, 25:21, 32:4, 56:18, 86:7, 86:24, 87:8, 89:24, 90:2, 94:24, 95:2, 95:6, 96:2, 133:6, 213:23, 233:3, 233:5, 233:14, 233:24, 234:19, 235:18, 238:16, 239:3, 239:4, 288:10, 288:17, 288:21
**responsibility** [5] - 29:17, 56:20, 95:17, 158:5, 213:15
**responsible** [2] - 30:22, 95:22
**responsive** [1] - 5:23
**responsiveness** [3] - 78:17, 79:3, 79:4
**rest** [2] - 5:7, 227:20
**restricted** [2] - 43:9, 47:14
**result** [1] - 85:6
**resume** [3] - 166:7, 252:19, 286:12
**resumed** [1] - 166:5
**retain** [5] - 113:14, 114:10, 119:10, 293:9, 310:17
**retired** [2] - 18:21, 18:22
**retract** [1] - 130:4
**return** [22] - 90:11, 181:18, 181:24, 184:25, 185:3, 185:25, 201:14, 201:20, 204:4, 207:3, 215:4, 226:5, 226:25, 227:7, 227:14, 231:20, 246:13, 248:18, 270:12, 270:13, 278:18, 285:3
**returned** [9] - 188:10, 227:23, 232:3, 249:17,

271:2, 279:2, 279:13, 286:10, 304:5
**returning** [12] - 179:3, 179:12, 179:19, 182:18, 185:22, 201:25, 208:23, 221:5, 225:13, 226:3, 278:24, 304:25
**Revenue** [1] - 313:16
**revenue** [10] - 52:23, 65:24, 313:24, 314:11, 314:14, 320:11, 320:12, 320:13, 321:7
**revenues** [3] - 52:15, 53:6, 314:15
**review** [33] - 11:19, 11:22, 12:7, 12:12, 54:9, 69:7, 69:9, 69:22, 70:15, 70:23, 70:24, 71:3, 71:5, 71:12, 72:24, 72:25, 73:2, 75:10, 75:15, 75:22, 76:19, 77:24, 78:2, 79:24, 83:25, 84:7, 84:17, 87:15, 123:11, 131:24, 147:13, 243:25
**reviewed** [2] - 74:11, 178:12
**reviewing** [1] - 90:5, 276:7
**reviews** [6] - 72:20, 72:21, 72:22, 84:21, 85:8, 85:11
**rights** [2] - 163:23, 306:11
**risk** [2] - 47:13, 116:19
**riskless** [3] - 47:3, 47:12, 53:2
**Rob** [85] - 55:22, 56:13, 69:9, 69:11, 69:12, 86:16, 92:6, 102:21, 103:3, 103:23, 112:3, 114:17, 115:7, 115:16, 116:14, 120:3, 129:16, 147:2, 147:21, 154:23, 155:5, 155:24, 164:11, 169:5, 169:20, 171:12, 175:4, 175:8, 176:17, 183:12, 188:5, 204:9, 204:10, 204:15, 204:19, 205:15, 205:21, 205:22, 206:5, 210:24, 214:14, 214:16, 220:6, 220:16, 220:19, 224:16, 225:8, 225:17, 228:17, 229:25, 230:8, 230:13, 231:15, 232:7, 239:24, 244:8, 246:3, 251:17, 251:25, 252:2, 255:4, 255:13, 266:22, 267:12, 267:13, 267:19, 268:4, 268:20, 269:22, 271:3, 272:6, 283:5, 283:15, 283:19, 286:13, 304:8, 304:18, 305:2, 306:21, 309:11, 310:25
**Rob's** [4] - 204:7, 205:14, 211:22, 282:19
**Robert** [10] - 10:10, 41:16,

352

42:8, 42:10, 50:20, 129:15,
138:4, 150:13, 151:7, 155:13
**role** [10] - 20:20, 24:25,
57:8, 58:16, 58:23, 71:14,
111:9, 119:13, 133:16
**roles** [2] - 6:20, 8:3
**rolled** [1] - 160:2
**Roman** [5] - 251:17, 252:9,
267:12, 267:14, 267:19
**room** [11] - 9:10, 51:25,
222:20, 270:2, 270:5, 270:9,
270:10, 294:6, 294:25,
295:15, 295:16
**Ross** [85] - 40:3, 40:5,
49:20, 49:24, 50:19, 50:22,
52:10, 53:25, 54:22, 54:23,
55:7, 55:11, 55:20, 56:8,
63:10, 94:13, 112:3, 114:13,
114:18, 141:8, 141:25,
147:23, 150:13, 150:14,
154:16, 154:19, 155:3,
156:24, 158:14, 160:5,
160:21, 161:22, 162:8,
162:19, 162:21, 163:6,
163:19, 164:7, 164:8, 164:9,
164:13, 164:18, 166:12,
166:16, 167:5, 167:20,
168:16, 168:23, 169:12,
169:15, 170:10, 170:13,
170:15, 170:24, 171:9,
185:3, 185:8, 185:11,
185:14, 185:23, 186:5,
187:14, 187:19, 188:2,
188:3, 188:24, 189:4, 189:7,
198:8, 199:7, 200:12, 201:9,
202:20, 203:5, 203:11,
204:3, 205:4, 205:14,
219:12, 271:12, 271:24,
272:3, 272:18, 305:3, 309:25
**Ross's** [4] - 40:8, 197:16,
199:15, 200:23
**roughly** [3] - 130:3, 130:6,
193:15
**round** [1] - 181:2
**rounding** [1] - 317:7
**rounds** [2] - 9:25, 10:6
**row** [2] - 76:5, 313:11
**rule** [2] - 194:15, 278:16
**Rule** [2] - 277:11, 277:24
**ruled** [1] - 38:9
**rules** [1] - 9:4
**run** [5] - 52:4, 52:18, 52:22,
196:20, 196:23
**rundown** [1] - 227:10
**running** [2] - 88:8, 135:20
**runs** [2] - 48:8, 52:20
**ruptured** [1] - 223:15
**rushed** [2] - 223:3, 223:4
**résumé** [1] - 55:25

## S

**S-N-E-E-D-E-N** [1] - 91:3
**SA** [22] - 58:19, 59:2, 59:8,
59:11, 59:15, 59:16, 87:14,
90:6, 99:9, 99:16, 100:6,
100:13, 100:14, 210:17,
213:6, 213:7, 268:23, 275:7,
275:8, 276:3, 288:23
**SA'd** [1] - 178:11
**Sachs** [1] - 68:8
**Sacramento** [2] - 139:11,
180:12
**SAing** [1] - 213:16
**salary** [13] - 25:19, 101:8,
110:5, 111:18, 113:8,
113:21, 115:12, 116:14,
121:3, 121:5, 279:4, 279:6,
279:9
**sale** [3] - 33:12, 45:13,
45:14, 46:16, 48:8, 48:11
**sales** [81] - 27:11, 27:18,
44:3, 44:10, 44:11, 44:14,
45:4, 45:5, 45:7, 45:8, 45:10,
46:4, 46:7, 47:8, 48:19,
48:23, 49:11, 49:18, 50:25,
51:4, 51:18, 52:17, 53:2,
53:10, 53:11, 53:15, 53:23,
54:16, 54:20, 56:21, 57:16,
62:18, 63:6, 63:19, 65:21,
78:5, 78:11, 79:6, 79:8,
79:11, 79:20, 84:22, 84:23,
85:12, 88:4, 98:21, 123:3,
123:5, 123:10, 125:2,
132:20, 148:10, 148:11,
150:15, 161:4, 164:9,
174:18, 188:3, 191:14,
192:9, 193:8, 193:13,
195:25, 196:24, 251:14,
251:17, 287:8, 287:22,
296:5, 296:22, 300:13,
319:23, 320:6, 320:8, 325:2,
325:6, 325:19
**salesmen** [1] - 251:18
**salespeople** [37] - 33:14,
48:15, 48:16, 49:4, 53:17,
58:3, 58:7, 62:2, 63:3, 72:24,
73:3, 73:6, 73:10, 75:8,
75:13, 77:25, 78:6, 78:24,
80:19, 80:23, 81:8, 81:24,
82:7, 82:15, 83:6, 98:22,
132:17, 178:16, 266:21,
267:4, 267:13, 271:16,
273:9, 292:24, 300:18,
325:6, 325:10
**salespeople's** [3] - 75:16,
78:8, 79:19
**salesperson** [23] - 32:25,
33:4, 33:10, 45:15, 46:17,
48:6, 49:6, 52:5, 66:19,
66:20, 73:25, 75:9, 75:12,

76:20, 77:3, 82:3, 82:11,
83:22, 149:25, 150:2,
267:11, 268:4, 271:19
**San** [7] - 16:20, 16:22,
166:23, 175:18, 175:20,
175:22, 178:14
**sat** [3] - 94:13, 270:2,
294:24
**SATTERLEE** [1] - 3:5
**save** [1] - 260:21
**saw** [2] - 37:10, 223:4
**scale** [2] - 24:23, 29:15
**scared** [9] - 161:2, 164:5,
164:6, 212:7, 255:8, 255:16,
255:20, 308:23
**scenario** [1] - 198:16
**schedule** [1] - 6:16
**scheduled** [1] - 176:16
**school** [7] - 17:7, 18:16,
18:25, 19:5, 19:8, 19:9,
34:17
**School** [1] - 17:11
**science** [1] - 122:11
**screen** [2] - 39:13, 317:24
**seal** [1] - 223:14
**Sean** [9] - 90:20, 91:2, 97:7,
97:8, 98:4, 98:5, 276:19,
294:23, 294:24
**SEAN** [1] - 91:2
**SEC** [1] - 190:19
**second** [25] - 23:10, 23:12,
56:12, 96:21, 102:5, 104:25,
107:11, 109:16, 148:16,
180:8, 180:18, 189:21,
189:24, 190:2, 190:3, 190:7,
190:9, 190:11, 190:17,
195:22, 224:3, 245:10,
246:10, 254:5, 265:12
**second-to-last** [1] - 56:12
**secretly** [2] - 254:12, 259:6
**section** [14] - 77:22, 78:2,
78:3, 78:11, 79:13, 79:17,
80:3, 81:4, 81:15, 81:16,
98:14, 146:8, 146:12, 218:17
**sector** [4] - 22:17, 22:20,
23:24, 25:2, 31:2, 31:3,
31:15, 31:25, 60:15, 60:19,
61:18, 62:4, 62:6, 62:14,
62:17, 62:20, 63:2, 63:14,
63:16, 65:22, 65:23, 66:22,
67:17, 68:13, 68:20, 85:5,
96:25, 99:5, 287:10, 287:13,
291:7, 291:15, 292:9,
292:22, 297:7, 298:5,
298:22, 301:10, 301:13,
301:15
**sectors** [44] - 25:6, 25:14,
30:23, 31:6, 31:20, 56:25,
60:16, 60:21, 60:22, 62:22,
63:4, 65:11, 66:3, 66:8, 66:9,
66:11, 67:7, 67:8, 68:6,

84:24, 85:6, 88:4, 97:4,
132:19, 192:3, 286:14,
286:16, 286:22, 286:25,
287:5, 291:7, 291:15,
291:16, 293:3, 293:10,
293:14, 293:16, 293:19,
296:25, 297:3, 297:18,
301:24, 301:2, 301:5
**see** [93] - 4:14, 10:18,
13:15, 19:17, 39:13, 39:15,
46:10, 47:7, 71:20, 72:2,
72:3, 72:6, 72:7, 72:10,
72:11, 72:13, 72:14, 74:4,
76:2, 76:3, 76:7, 76:11,
76:14, 77:8, 77:19, 78:12,
78:17, 78:20, 79:13, 80:5,
80:9, 80:11, 80:13, 80:15,
81:4, 81:6, 81:18, 82:23,
88:7, 105:10, 105:21, 109:5,
118:17, 133:25, 142:17,
146:2, 159:17, 184:17,
186:20, 187:10, 189:9,
189:20, 197:21, 217:4,
217:7, 217:16, 217:21,
218:5, 218:17, 228:5, 243:7,
244:22, 245:18, 246:14,
247:15, 254:2, 254:17,
258:12, 259:4, 259:13,
261:5, 262:21, 263:14,
264:12, 266:24, 270:11,
270:15, 271:11, 271:18,
274:8, 277:9, 277:10, 305:5,
305:17, 308:2, 308:5,
308:13, 311:20, 313:12,
315:8, 319:13, 319:17,
319:18
**See** [1] - 189:8
**seeing** [1] - 231:6
**seek** [2] - 309:2, 309:3
**segment** [1] - 52:24
**sell** [12] - 22:23, 26:22,
26:23, 26:25, 27:5, 27:9,
27:11, 27:17, 46:18, 52:7,
57:6, 60:7
**selling** [1] - 194:4
**send** [7] - 48:8, 143:22,
228:18, 249:21, 261:19,
261:22, 272:3
**sending** [3] - 185:2, 203:24,
249:25
**senior** [39] - 22:15, 23:20,
23:22, 24:2, 24:25, 26:15,
29:2, 32:4, 36:6, 56:16,
56:21, 56:24, 57:8, 58:19,
59:25, 60:10, 85:20, 86:8,
86:10, 86:11, 86:14, 87:23,
91:7, 91:12, 93:2, 93:5,
100:18, 100:20, 111:8,
111:9, 115:10, 294:3, 296:8,
296:9, 300:20, 300:21,
305:7, 305:10, 305:14
**Senior** [1] - 3:20

**sense** [18] - 4:12, 95:18, 139:15, 144:9, 172:24, 228:20, 233:22, 260:20, 296:4, 296:7, 298:6, 298:11, 298:21, 300:19, 304:5, 305:12, 305:15

**sensed** [2] - 205:18, 209:18

**senses** [1] - 208:22

**sensitive** [2] - 148:17, 305:12

**sent** [32] - 57:22, 59:18, 94:8, 94:10, 94:11, 94:15, 144:6, 158:7, 184:14, 187:15, 204:2, 205:12, 211:25, 212:15, 213:3, 213:18, 228:22, 248:7, 248:10, 248:14, 250:5, 262:5, 267:20, 267:23, 271:15, 271:16, 272:21, 273:7, 273:8, 274:22, 281:15

**sentence** [6] - 199:24, 246:10, 259:11, 263:12, 264:17, 265:12

**sentences** [1] - 267:3

**separate** [13] - 38:25, 45:7, 51:22, 51:25, 52:8, 54:15, 99:23, 135:7, 145:19, 159:8, 205:15, 242:20

**separated** [2] - 44:12, 51:4

**Series** [11] - 35:2, 35:3, 35:4, 35:5, 35:9, 35:12, 35:13, 35:14, 59:12, 178:14

**series** [1] - 21:8

**seriously** [1] - 12:14

**service** [1] - 231:17

**SERVICES** [1] - 1:2

**SESSION** [1] - 166:2

**session** [1] - 178:14

**set** [10] - 38:4, 163:17, 174:16, 175:21, 181:23, 199:3, 201:22, 211:16, 278:4, 278:15

**sets** [1] - 195:15

**setting** [1] - 122:21, 198:11, 202:24, 277:25, 278:10

**settled** [2] - 162:12, 182:5

**seven** [4] - 256:23, 285:12, 285:13, 285:14

**several** [3] - 6:24, 9:25, 51:11

**shadow** [1] - 149:25

**shall** [1] - 166:6

**shares** [1] - 42:16

**sheet** [1] - 298:9

**shifted** [2] - 95:7, 296:22

**shock** [2] - 240:2, 240:6

**shop** [3] - 47:3, 52:18, 297:8

**shops** [2] - 68:7, 68:13

**short** [2] - 85:23, 209:25

**shorter** [1] - 57:15

**shortly** [4] - 61:7, 61:8, 171:16, 231:2

**shots** [6] - 180:6, 180:23, 181:3, 181:4, 186:8, 207:3

**shoulder** [1] - 158:4

**shoulders** [1] - 233:10

**show** [8] - 8:21, 10:6, 68:19, 73:4, 249:4, 280:12, 311:10, 318:16

**showcased** [1] - 57:24

**showed** [1] - 305:16

**showing** [1] - 12:3

**shows** [2] - 280:15, 319:22

**shrugged** [1] - 233:9

**side** [25] - 4:20, 11:4, 13:3, 20:25, 24:8, 24:19, 26:22, 26:23, 26:25, 27:5, 27:6, 27:9, 27:10, 27:12, 27:17, 29:3, 29:7, 29:9, 33:11, 33:17, 43:12, 72:5, 105:10, 328:16

**sides** [2] - 4:5, 74:20

**sidetracked** [1] - 299:3

**sign** [4] - 261:4, 261:8, 261:14, 262:8

**signal** [1] - 212:2

**signals** [1] - 62:3

**signed** [2] - 40:2, 211:21

**significance** [1] - 72:16

**significant** [1] - 268:3

**significantly** [8] - 76:20, 80:24, 281:25, 282:25, 284:21, 290:9, 290:18, 304:8

**silos** [2] - 42:22, 44:19

**similar** [4] - 32:6, 32:12, 56:19, 188:8

**similarly** [1] - 85:8

**simple** [3] - 27:7, 30:8, 48:5

**simplify** [2] - 30:19, 102:18

**simply** [4] - 7:12, 7:14, 12:25, 215:11

**single** [1] - 264:11

**singly** [1] - 30:9

**sit** [2] - 84:10, 205:12

**sits** [1] - 15:19

**situation** [3] - 94:12, 240:21, 240:23

**situations** [1] - 10:23

**six** [9] - 68:6, 180:12, 180:25, 181:10, 181:11, 181:16, 185:24, 206:25, 285:12

**skills** [1] - 56:9

**skim** [2] - 243:4, 318:24

**slack** [1] - 137:15

**small** [5] - 45:22, 45:24, 119:17, 294:5, 294:6

**smaller** [1] - 53:23

**Sneeden** [5] - 90:20, 90:21, 98:4, 276:19, 294:24

**Sneeden 's** [1] - 91:4

**so-and-so** [1] - 26:13

**soften** [1] - 208:22

**sold** [1] - 195:25

**sole** [7] - 265:21, 266:2, 266:14, 267:16, 269:24, 270:4, 274:12

**solely** [2] - 316:20, 317:8

**solicited** [1] - 110:24

**solid** [1] - 30:10

**someone** [9] - 22:7, 63:21, 114:3, 140:24, 209:22, 241:8, 266:22, 267:23, 295:16

**sometime** [3] - 184:23, 189:8, 189:21

**sometimes** [31] - 5:2, 26:9, 26:10, 27:4, 44:4, 46:13, 46:20, 59:13, 61:15, 61:17, 62:25, 63:2, 67:4, 67:21, 85:5, 99:22, 100:2, 100:3, 114:2, 121:25, 142:7, 191:17, 191:18, 191:19, 192:20, 192:23, 193:24, 194:10, 194:18, 196:21

**somewhere** [1] - 184:5

**son** [5] - 10:11, 42:10, 148:19, 306:21, 311:2

**soon** [2] - 192:25, 204:6

**sorry** [44] - 8:24, 12:16, 15:18, 28:18, 31:13, 39:3, 69:18, 70:15, 73:8, 76:8, 77:19, 82:19, 101:7, 104:22, 104:23, 110:13, 125:9, 125:18, 130:4, 143:12, 146:15, 150:10, 167:14, 178:18, 178:23, 180:17, 182:7, 221:6, 221:23, 260:8, 262:12, 278:21, 285:14, 297:16, 299:2, 300:4, 311:7, 312:10, 312:11, 320:15, 322:17, 322:24, 324:21

**sort** [5] - 11:14, 103:7, 195:9, 237:21, 326:6

**sorts** [1] - 178:9

**sought** [4] - 5:18, 18:4, 18:7, 309:9

**sound** [2] - 96:24, 98:12

**sounds** [2] - 7:16, 203:22

**source** [1] - 97:16

**sources** [1] - 74:21

**sovereign** [6] - 93:18, 93:20, 93:23, 94:2, 94:3, 94:5

**space** [1] - 67:12

**spaced** [1] - 256:24

**speaking** [1] - 193:15

**special** [1] - 138:18

**specific** [7] - 5:14, 51:18, 67:16, 97:2, 123:7, 148:25, 292:22

**specifically** [13] - 5:19,

9:17, 24:20, 44:5, 63:7, 70:10, 92:20, 141:19, 144:16, 146:7, 238:19, 319:2, 319:10

**specifics** [1] - 55:20

**spell** [1] - 90:25

**spelled** [1] - 15:9

**spend** [1] - 327:16

**split** [1] - 208:15

**splitting** [1] - 208:16

**spoken** [11] - 147:2, 155:5, 155:12, 155:23, 155:24, 169:4, 169:7, 171:24, 172:2, 184:22, 251:3

**sporadic** [1] - 83:20

**sporadically** [2] - 216:22, 263:9

**ss** [1] - 329:5

**St** [1] - 222:18

**staff** [4] - 251:7, 267:7, 268:11, 268:12

**stage** [10] - 58:23, 140:7, 155:22, 163:16, 203:7, 210:23, 213:7, 235:24, 237:3, 262:3

**stages** [1] - 57:2

**stamped** [1] - 105:2

**standard** [1] - 11:23, 190:14

**stands** [1] - 31:13

**start** [17] - 4:3, 4:6, 20:4, 21:14, 35:23, 61:12, 88:19, 90:4, 123:3, 142:3, 182:6, 188:15, 188:17, 258:21, 258:23, 284:24, 317:15

**started** [26] - 20:8, 20:19, 25:10, 28:25, 31:4, 31:5, 31:7, 31:19, 36:2, 36:5, 48:20, 56:17, 59:20, 60:14, 60:17, 67:23, 88:22, 89:2, 101:9, 125:6, 126:12, 236:4, 291:8, 291:10, 292:5

**starting** [3] - 80:8, 304:12, 313:15

**State** [6] - 1:19, 17:25, 18:5, 18:11, 18:14, 329:10

**state** [2] - 15:7, 17:24

**STATE** [1] - 329:4

**state's** [2] - 17:23, 18:8

**statement** [20] - 105:3, 105:7, 107:16, 108:6, 108:9, 108:10, 108:22, 108:25, 109:3, 125:24, 127:25, 128:19, 129:19, 133:20, 133:24, 241:14, 245:24, 280:15, 280:16, 281:4

**statements** [4] - 13:23, 125:16, 125:20, 125:21

**statistical** [1] - 124:14

**stats** [1] - 66:25

**status** [11] - 18:20, 18:21,

353

18:22, 214:20, 232:2, 250:11, 251:24, 271:12, 272:15, 275:2, 276:25

**stay** [1] - 117:11, 227:11

**stayed** [2] - 114:23, 180:14

**Stearns** [19] - 21:10, 21:12, 21:15, 21:21, 22:4, 23:2, 23:15, 26:16, 27:13, 27:24, 28:8, 28:14, 29:11, 32:7, 34:13, 35:15, 51:6, 56:19, 62:8

**step** [1] - 240:24

**STEPHENS** [1] - 3:5

**Steven** [1] - 87:24

**still** [13] - 39:21, 142:17, 186:12, 213:9, 213:17, 221:25, 249:10, 249:18, 252:5, 270:21, 288:14, 289:6, 309:5

**stipulate** [1] - 37:20

**stipulated** [1] - 5:7

**stocks** [1] - 64:20

**stood** [1] - 251:24

**stop** [1] - 301:19

**story** [3] - 157:4, 189:22, 189:23

**straight** [1] - 204:7

**strategy** [2] - 43:12, 258:18

**Street** [1] - 34:16

**strike** [8] - 173:6, 178:18, 212:12, 243:24, 271:14, 277:6, 290:13, 313:22

**strip** [1] - 6:5

**stroke** [1] - 221:15

**strong** [4] - 68:19, 85:8, 158:4, 235:3

**structure** [8] - 24:9, 24:14, 24:15, 24:18, 44:17, 89:20, 95:4, 133:3

**struggle** [1] - 116:14

**stub** [6] - 107:2, 126:24, 231:5, 280:22, 280:24, 289:23

**stubs** [1] - 281:13

**stuck** [1] - 273:23

**stuff** [12] - 31:16, 82:4, 90:4, 98:7, 106:5, 137:14, 196:2, 198:13, 200:17, 222:10, 282:19, 288:13

**sub** [2] - 120:11, 126:11

**sub-bonuses** [1] - 120:11

**submission** [1] - 8:11

**submit** [2] - 7:25, 8:8

**submitted** [1] - 7:21

**submitting** [1] - 218:23

**subpoena** [5] - 5:13, 5:14, 5:18, 5:23, 7:20

**subsequent** [7] - 5:10, 25:9, 56:10, 56:13, 186:7, 201:23, 283:17

**subsequently** [3] - 21:9,

---

25:10, 205:20

**subtract** [1] - 285:11

**successful** [1] - 82:23

**sudden** [1] - 222:12

**suffer** [1] - 221:21

**suffered** [4] - 221:12, 222:7, 229:22, 308:18

**suffering** [4] - 9:24, 224:8, 226:7, 227:15

**suggest** [5] - 6:25, 12:4, 62:21, 150:22, 256:22

**suggested** [3] - 152:20, 180:4, 206:20

**suggestion** [2] - 11:24, 12:2

**Suite** [1] - 3:7

**sum** [1] - 102:10

**summary** [1] - 98:16

**summer** [1] - 278:18

**supervised** [1] - 178:11

**supervisor** [3] - 6:13, 308:11, 308:20

**supervisory** [18] - 6:6, 35:15, 59:3, 59:5, 87:17, 88:7, 99:10, 178:12, 234:18, 234:19, 239:3, 239:6, 247:13, 274:5, 275:9, 288:10, 288:13, 288:25

**supplement** [1] - 121:4

**support** [2] - 22:15, 228:4

**supportive** [8] - 12:24, 136:25, 160:15, 170:6, 170:25, 181:8, 201:3

**supports** [1] - 12:7

**supposed** [1] - 169:21

**supposedly** [1] - 324:22

**surgery** [6] - 223:10, 223:11, 223:14, 223:16, 223:21, 223:22

**surprised** [7] - 155:17, 207:7, 231:8, 282:16, 303:22, 304:2, 304:4

**surrogacy** [5] - 136:9, 138:14, 139:3, 139:11, 155:9

**surrogate** [2] - 176:20, 176:22

**survive** [1] - 237:21

**sweet** [1] - 136:24

**swinging** [1] - 258:22

**switch** [2] - 157:19, 157:20

**switched** [3] - 31:11, 31:23, 31:25

**sworn** [1] - 15:4

**system** [1] - 5:2

**systems** [1] - 175:15

---

**T**

---

**table** [1] - 14:19

**tail** [1] - 156:19

---

**talent** [1] - 132:9

**talks** [2] - 119:22, 184:15

**Tape** [1] - 254:2

**tape** [1] - 255:19

**taping** [1] - 254:11

**targeted** [1] - 139:16

**targets** [2] - 123:20, 124:3

**tasks** [3] - 88:5, 247:13, 278:12

**tax** [1] - 314:20

**taxable** [21] - 40:19, 40:20, 40:21, 40:25, 41:5, 41:9, 41:10, 41:11, 41:13, 41:18, 42:19, 42:22, 43:16, 92:7, 92:12, 92:18, 92:21, 100:24, 150:19, 151:10, 324:4

**taxes** [9] - 196:11, 313:25, 314:23, 315:2, 315:13, 315:16, 315:19, 316:9, 316:11

**team** [11] - 20:22, 22:15, 45:5, 49:19, 53:10, 53:11, 95:8, 135:23, 294:9, 325:8, 325:19

**teams** [3] - 43:19, 43:23, 44:6

**technical** [7] - 40:19, 80:9, 80:22, 81:2, 103:25, 150:20, 266:20

**technicalities** [1] - 104:3

**technically** [2] - 29:14, 112:21

**technology** [2] - 31:14, 291:13

**teenage** [1] - 156:21

**telecom** [3] - 31:14, 67:12, 291:13

**temporary** [1] - 291:25

**ten** [6] - 193:8, 193:18, 194:6, 194:14, 194:15, 237:6

**ten-minute** [1] - 194:15

**tend** [2] - 240:22, 240:24

**tenure** [28] - 23:2, 35:10, 64:7, 65:18, 66:3, 66:10, 67:19, 91:13, 114:11, 118:10, 118:19, 231:19, 291:21, 292:7, 293:8, 298:15, 301:14, 302:17, 303:9, 303:20, 322:21, 323:21, 324:15, 324:24, 325:4, 326:12, 326:23, 327:11

**term** [5] - 29:22, 40:19, 64:12, 112:22, 314:22

**terminated** [7] - 5:17, 10:13, 212:6, 279:11, 291:2, 295:21, 295:23

**termination** [2] - 9:18, 9:22

**terms** [20] - 24:12, 43:18, 77:4, 80:21, 94:23, 111:6, 111:11, 117:5, 162:20,

---

175:14, 201:24, 214:19, 215:13, 280:23, 313:18, 313:24, 314:4, 314:5, 314:7, 325:21

**testified** [4] - 15:4, 102:11, 166:5, 252:22

**testify** [2] - 10:25, 11:11

**testifying** [1] - 243:20

**testimony** [9] - 4:6, 8:20, 8:21, 11:16, 13:11, 13:13, 74:18, 102:6, 166:13

**text** [23] - 72:12, 78:19, 81:21, 82:9, 82:23, 83:4, 184:17, 186:20, 187:10, 246:15, 247:15, 254:17, 258:12, 259:4, 259:13, 261:5, 263:14, 264:12, 266:24, 277:10, 308:5, 308:8, 308:13

**thanked** [1] - 117:15

**THE** [51] - 15:8, 26:3, 27:3, 32:21, 39:7, 39:10, 39:20, 41:6, 44:23, 46:9, 50:10, 50:16, 67:20, 91:2, 93:25, 96:12, 97:17, 106:10, 112:23, 117:4, 119:16, 147:16, 161:13, 161:17, 167:18, 183:23, 187:25, 190:11, 191:5, 191:12, 192:17, 193:20, 195:2, 195:11, 195:18, 197:15, 198:14, 202:16, 215:15, 234:8, 234:14, 239:18, 240:12, 242:5, 249:2, 258:7, 263:6, 299:2, 316:16, 318:18, 318:22

**theory** [2] - 49:9, 51:12

**therapy** [2] - 227:12, 227:22

**thereafter** [1] - 310:9

**thinking** [4] - 106:11, 139:21, 152:11, 231:15

**thinks** [1] - 156:18

**third** [3] - 50:11, 247:8, 255:24

**thousand** [8] - 57:23, 60:11, 212:3, 280:4, 282:22, 283:3, 284:13, 290:11

**thousands** [2] - 316:3, 316:13

**three** [41] - 34:23, 60:3, 60:8, 61:11, 97:3, 132:10, 136:23, 137:3, 137:5, 137:17, 146:14, 146:15, 148:23, 149:8, 150:4, 150:7, 153:19, 155:22, 156:9, 156:11, 156:13, 156:15, 157:12, 158:19, 162:11, 163:14, 163:24, 164:21, 170:16, 171:3, 177:15, 178:3, 192:3, 195:7, 202:4, 203:18, 208:4, 208:7, 209:6,

223:24, 258:10

**three-month** [1] - 150:7

**threw** [1] - 186:16

**throughout** [4] - 100:7, 121:25, 187:8, 325:12

**tied** [2] - 124:6, 124:10

**timeframe** [6] - 186:19, 191:2, 191:11, 207:12, 234:15, 287:16

**timely** [1] - 85:3

**timing** [3] - 136:21, 142:18, 204:17

**tired** [1] - 312:10

**title** [16] - 21:4, 21:20, 22:3, 22:5, 28:21, 35:25, 40:8, 41:21, 41:22, 42:13, 79:5, 92:24, 93:9, 93:16, 270:23, 271:10

**titles** [1] - 41:25

**TM** [1] - 32:2

**TMT** [5] - 31:11, 31:12, 31:13, 32:2, 291:11, 291:12, 291:19, 291:22, 292:4

**today** [5] - 36:18, 36:25, 109:23, 312:3, 319:6

**today's** [1] - 277:21

**Todd** [43] - 49:16, 49:23, 50:8, 50:12, 55:21, 56:3, 59:13, 59:23, 67:5, 67:9, 69:6, 69:11, 69:23, 71:13, 72:20, 75:20, 77:23, 79:23, 81:13, 82:19, 83:9, 84:9, 85:7, 86:15, 94:12, 112:2, 112:6, 112:8, 114:15, 114:24, 115:11, 118:16, 118:25, 119:21, 122:15, 124:21, 124:25, 127:12, 128:10, 129:4, 129:14, 132:16, 291:23

**Todd's** [1] - 132:19

**together** [2] - 66:25, 135:20

**tone** [3] - 208:18, 211:16, 212:8

**tons** [2] - 242:22, 243:14

**took** [12] - 9:18, 35:5, 67:10, 116:19, 116:20, 134:4, 148:20, 151:2, 158:25, 213:15, 252:9, 284:15

**top** [8] - 71:17, 71:18, 146:20, 197:17, 312:24, 313:11, 319:17

**total** [14] - 102:16, 111:15, 111:16, 112:15, 115:24, 188:13, 281:13, 284:22, 314:15, 319:14, 319:22, 320:22, 321:7, 321:17

**totally** [2] - 261:4, 261:8

**tough** [1] - 214:13

**toward** [1] - 71:18

**towards** [1] - 5:24

**tracking** [2] - 78:16, 79:3

**trade** [15] - 33:17, 33:19, 43:8, 48:2, 48:13, 49:10, 51:18, 56:20, 58:5, 66:19, 67:3, 83:21, 191:14, 208:20

**traded** [3] - 62:23, 63:14, 98:19

**trader** [5] - 46:12, 46:14, 48:7, 48:8, 48:12

**traders** [5] - 45:23, 46:21, 47:14, 47:19, 47:21

**trades** [14] - 27:22, 32:18, 32:20, 45:21, 47:25, 48:3, 48:4, 48:23, 57:15, 67:13, 67:16, 79:10, 100:9, 150:6

**trading** [37] - 27:18, 32:18, 44:3, 44:11, 44:14, 45:8, 45:23, 46:6, 46:7, 47:5, 47:11, 48:17, 50:25, 51:5, 52:2, 52:18, 54:21, 57:5, 62:13, 63:6, 63:18, 63:19, 65:8, 65:21, 65:24, 82:12, 98:23, 100:7, 123:2, 140:25, 191:16, 242:19, 298:7, 320:6, 320:7

**tradition** [1] - 62:19

**traditionally** [1] - 58:11

**train** [2] - 161:10, 198:15

**trained** [1] - 182:22

**training** [2] - 175:21, 178:13

**transcript** [15] - 256:18, 256:19, 256:23, 257:11, 258:9, 259:2, 260:12, 261:2, 262:17, 264:10, 264:24, 266:5, 266:19, 329:12

**transcripts** [1] - 256:17

**transferred** [1] - 64:8

**transitioned** [2] - 24:5, 24:7

**transmit** [1] - 193:3

**travel** [2] - 176:11, 176:15

**traveled** [2] - 175:3, 177:6

**traveling** [1] - 174:3

**treated** [2] - 223:6, 223:8

**treatment** [3] - 186:8, 222:22, 309:5

**Tree** [1] - 159:20

**tried** [6] - 85:9, 96:23, 197:4, 208:24, 289:6, 289:7

**true** [2] - 325:11, 329:12

**truth** [2] - 148:7, 152:5

**try** [8] - 46:17, 76:4, 171:2, 193:7, 202:7, 206:7, 208:22, 240:24

**trying** [15] - 54:11, 110:25, 157:15, 202:19, 202:21, 208:15, 209:7, 211:3, 243:6, 260:21, 260:23, 263:20, 306:22, 310:16, 311:4

**Tulane** [2] - 17:11, 17:13

**turn** [16] - 70:9, 70:19,

79:25, 105:19, 106:21, 107:11, 192:15, 217:14, 217:18, 218:14, 244:25, 247:23, 281:2, 307:21, 312:20, 320:25

**turned** [1] - 270:3

**turning** [1] - 214:18

**twice** [3] - 23:5, 85:17, 101:16

**two** [78] - 4:17, 5:6, 16:13, 28:12, 37:18, 38:7, 38:24, 52:18, 52:19, 55:5, 64:7, 65:18, 80:23, 94:13, 96:20, 101:17, 103:10, 104:17, 157:7, 157:9, 158:25, 160:9, 160:19, 161:9, 161:24, 162:13, 162:14, 163:18, 163:22, 166:25, 168:5, 168:7, 168:13, 169:25, 171:5, 172:13, 172:15, 176:7, 176:18, 176:21, 184:2, 184:4, 184:5, 186:24, 188:14, 188:21, 194:11, 198:17, 198:18, 199:5, 202:21, 203:18, 206:23, 207:8, 211:21, 212:19, 220:7, 220:17, 220:19, 221:2, 223:24, 227:21, 245:13, 245:15, 246:5, 246:7, 247:5, 252:14, 260:6, 267:13, 273:23, 280:8, 281:13, 281:20, 294:10, 304:18

**two-minute** [1] - 252:14

**two-pager** [1] - 96:20

**two-week** [1] - 161:24

**type** [8] - 90:11, 103:25, 148:20, 152:19, 155:20, 157:21, 161:19, 167:6

**types** [6] - 31:17, 99:3, 99:10, 99:14, 99:19, 99:21

## U

**UC** [2] - 16:20, 16:22

**Umesh** [8] - 91:23, 119:2, 132:12, 269:15, 270:7, 276:20, 292:2, 326:23

**unavailable** [1] - 236:3

**unaware** [3] - 268:12, 269:12, 322:7

**unclear** [1] - 251:2

**uncomfortable** [1] - 268:7

**unconscious** [2] - 222:25, 223:8

**under** [16] - 5:16, 59:7, 71:22, 72:8, 94:8, 94:16, 145:21, 145:25, 146:16, 190:19, 212:15, 213:4, 213:9, 213:18, 308:4, 314:18

**underneath** [1] - 78:15

**underperform** [1] - 60:6

**understand** [22] - 64:12, 76:25, 77:13, 107:24, 133:11, 140:22, 173:12, 189:11, 234:22, 235:14, 264:14, 264:16, 266:7, 297:3, 297:14, 299:18, 302:2, 314:21, 314:22, 317:20, 319:8, 319:20

**understood** [2] - 122:17, 211:2

**unfortunately** [1] - 4:25

**unilaterally** [1] - 6:11

**universe** [1] - 26:2

**unless** [2] - 38:5, 74:11

**unload** [2] - 33:3, 83:23

**unloaded** [1] - 45:16

**unnecessary** [1] - 11:12

**unopened** [2] - 242:12, 243:2

**unpaid** [4] - 145:21, 146:15, 153:12, 230:4

**unpredictable** [1] - 6:17

**unsolicited** [1] - 267:20

**unsure** [2] - 241:25, 252:5

**up** [48] - 12:3, 14:6, 39:14, 45:24, 64:22, 65:6, 67:17, 67:23, 118:7, 136:11, 137:15, 162:24, 166:21, 169:23, 172:11, 173:5, 174:16, 175:21, 181:17, 185:2, 186:25, 187:2, 187:6, 193:11, 195:7, 197:4, 198:11, 198:18, 199:6, 200:7, 208:15, 208:16, 209:7, 221:5, 222:21, 223:9, 223:21, 260:19, 276:6, 277:14, 277:21, 278:5, 278:15, 293:19, 295:3, 298:19, 317:7, 328:15

**update** [2] - 202:10, 206:22

**updated** [3] - 195:20, 195:22, 196:18

**ups** [1] - 215:13

**upset** [6] - 112:11, 205:19, 205:22, 206:6, 210:24

**upside** [1] - 132:24

**urgency** [1] - 194:17

**urgent** [1] - 217:8

**useful** [1] - 202:10

**user** [4] - 131:23, 132:5, 196:3, 196:14

**user-friendly** [4] - 131:23, 132:5, 196:3, 196:14

**utilized** [1] - 8:19

## V

**vacation** [2] - 275:14, 275:18

**vague** [3] - 233:6, 238:17,

356

241:5
**VALDI** [1] - 2:12
**valuable** [1] - 123:10
**valuation** [2] - 7:6, 74:13
**value** [3] - 9:13, 46:24, 284:7
**variables** [4] - 122:18, 122:19, 123:13, 123:14
**variety** [5] - 87:5, 87:10, 101:6, 122:25, 123:16
**various** [21] - 22:16, 22:17, 24:16, 30:13, 53:22, 56:25, 57:2, 57:14, 60:12, 65:7, 67:4, 78:8, 87:23, 111:3, 122:11, 122:14, 123:18, 192:2, 192:4, 215:12, 286:25
**verbal** [1] - 192:8
**verbally** [1] - 85:9
**verified** [1] - 312:16
**version** [3] - 257:19, 257:21, 272:11
**versus** [4] - 27:5, 29:11, 65:22, 305:6
**vessel** [2] - 221:16, 223:15
**via** [7] - 136:9, 138:14, 139:3, 139:11, 155:8, 192:8, 249:13
**vice** [3] - 23:9, 23:12, 23:19
**vice-president** [2] - 23:9, 23:19
**view** [3] - 13:24, 161:6, 233:25
**viewed** [1] - 305:3
**views** [1] - 30:9
**Vincent's** [1] - 222:18
**violated** [1] - 306:11
**violation** [2] - 11:25, 254:21
**violations** [1] - 306:18
**visit** [1] - 180:17
**visited** [2] - 228:13, 228:17
**visits** [1] - 227:12
**visually** [1] - 97:10
**VLADECK** [1] - 2:5
**vlicul@vladeck.com** [1] - 2:13
**voice** [1] - 208:18
**volatile** [1] - 63:17
**volatility** [2] - 63:18, 191:15
**volume** [11] - 72:9, 73:13, 73:17, 73:18, 76:6, 76:22, 77:5, 123:2, 124:10, 298:7
**volumes** [2] - 65:8, 242:19
**voluntarily** [4] - 118:12, 327:5, 327:15, 328:4

**W**

**W-2** [1] - 125:16
**wait** [5] - 100:10, 143:12, 180:22, 234:3, 316:2

**waited** [1] - 180:16
**wake** [1] - 200:7
**waking** [1] - 276:6
**walk** [6] - 196:25, 222:17, 222:19, 227:18, 227:21, 227:22
**walked** [3] - 174:11, 174:19, 174:21
**walking** [2] - 174:15, 197:7
**Wall** [1] - 34:16
**Walmart** [1] - 30:8
**wants** [2] - 8:22, 73:25
**waves** [1] - 284:10
**week** [10] - 133:21, 161:24, 180:18, 182:4, 182:6, 183:24, 224:6, 224:7, 263:14, 283:14
**weekly** [2] - 277:14, 277:21
**weeks** [5] - 145:20, 146:15, 160:19, 161:9, 162:13, 162:14, 163:7, 163:18, 166:25, 168:13, 169:25, 171:6, 172:14, 172:15, 176:7, 176:18, 176:21, 180:25, 181:10, 181:12, 181:16, 184:2, 184:4, 184:5, 185:25, 186:24, 198:17, 198:18, 199:5, 206:25, 207:9, 212:19, 220:7, 220:19, 223:24, 245:15, 246:4, 246:5, 246:7, 260:6
**weeks'** [3] - 220:17, 221:2, 245:13
**weight** [2] - 9:7, 10:17
**weird** [1] - 271:24
**welcome** [2] - 273:24, 316:19
**white** [1] - 249:9
**whole** [4] - 10:16, 118:19, 322:11, 323:7
**WILLIAM** [1] - 3:19
**willing** [9] - 81:25, 111:12, 117:11, 156:3, 210:9, 246:9, 246:11, 261:14, 262:8
**window** [1] - 190:21
**Windstream** [1] - 31:17
**wise** [2] - 102:8, 113:20
**wish** [1] - 4:5
**wishes** [2] - 187:4, 187:8
**witness** [2] - 15:3, 311:10
**WITNESS** [52] - 15:8, 26:3, 27:3, 32:21, 39:7, 39:10, 39:20, 41:6, 44:23, 46:9, 50:10, 50:16, 67:20, 91:2, 93:25, 96:12, 97:17, 106:10, 112:23, 117:4, 119:16, 147:16, 161:13, 161:17, 167:18, 183:23, 187:25, 190:11, 191:5, 191:12, 192:17, 193:20, 195:2,

195:11, 195:18, 197:15, 198:14, 202:16, 215:15, 234:8, 234:14, 239:18, 240:12, 242:5, 249:2, 258:7, 263:6, 299:2, 316:16, 318:18, 318:22, 330:5
**woke** [1] - 223:9
**woman** [3] - 148:10, 151:3, 208:4
**women** [5] - 150:25, 151:2, 156:15, 156:17, 156:19
**word** [10] - 68:18, 141:17, 173:8, 173:13, 204:12, 219:3, 234:19, 259:11, 259:25, 274:6
**wording** [1] - 141:19
**words** [5] - 230:3, 234:20, 238:13, 239:14, 284:5
**workload** [1] - 136:11
**works** [1] - 236:25
**worried** [8] - 164:22, 214:10, 214:11, 214:12, 240:7, 284:9, 310:18
**worry** [2] - 200:15, 275:23
**worse** [1] - 317:9
**worth** [1] - 115:14
**wow** [1] - 235:2
**wrap** [2] - 277:14, 277:21
**wrap-up** [2] - 277:14, 277:21
**write** [18] - 32:16, 33:14, 61:19, 78:2, 99:23, 100:8, 100:11, 187:3, 187:12, 192:6, 192:25, 193:11, 197:17, 228:3, 228:8, 237:23, 275:6, 292:22
**write-up** [1] - 193:11
**writes** [7] - 145:18, 184:12, 189:8, 245:10, 245:11, 246:9, 247:10
**writing** [6] - 23:24, 219:6, 219:21, 220:10, 274:11, 308:11
**written** [18] - 57:11, 59:4, 69:22, 70:23, 71:12, 72:9, 73:13, 76:6, 76:22, 77:5, 83:12, 192:8, 218:23, 228:12, 235:8, 254:7, 270:12, 270:16
**wrote** [6] - 32:12, 96:18, 186:11, 186:18, 189:12, 287:19

**X**

**Xu** [1] - 276:21
**XYZ** [3] - 33:2, 48:10, 98:19

**Y**

**year** [71] - 18:15, 28:17, 28:18, 28:19, 34:12, 34:13, 47:6, 65:8, 69:7, 69:8, 69:10, 69:16, 69:21, 69:23, 69:24, 71:19, 72:19, 110:6, 111:17, 112:21, 112:25, 113:9, 116:2, 117:3, 118:5, 120:23, 121:7, 121:13, 121:25, 123:6, 123:21, 123:24, 124:15, 124:19, 124:21, 127:22, 132:25, 133:14, 134:9, 134:10, 182:9, 190:13, 190:14, 190:15, 222:4, 282:3, 285:22, 286:5, 289:10, 289:14, 289:17, 303:3, 305:5, 305:6, 305:17, 305:18, 309:22, 311:13, 315:21, 316:21, 317:9, 320:7, 320:15, 320:18, 321:15, 321:17, 321:20
**year-to-date** [2] - 321:15, 321:17
**yearend** [1] - 321:4
**years** [17] - 16:9, 19:15, 25:19, 64:7, 65:18, 116:18, 120:25, 122:16, 132:11, 135:25, 156:20, 156:21, 214:15, 231:17, 313:12, 314:16, 317:18
**yes-or-no** [1] - 309:3
**yesterday** [2] - 260:20, 266:21
**yesterday's** [1] - 98:14
**yield** [97] - 24:6, 24:7, 24:10, 24:18, 24:20, 24:21, 24:25, 25:8, 26:16, 29:4, 29:8, 29:17, 29:22, 30:15, 30:18, 30:21, 36:11, 40:10, 40:11, 40:14, 40:16, 40:18, 42:25, 43:2, 43:10, 43:14, 43:18, 43:25, 44:2, 44:5, 44:7, 44:9, 44:10, 44:13, 44:14, 44:15, 44:18, 44:24, 45:4, 45:5, 46:2, 46:3, 47:21, 48:19, 49:13, 49:14, 49:18, 49:25, 53:12, 53:13, 53:14, 53:20, 53:21, 54:2, 55:12, 57:3, 59:14, 64:18, 89:21, 89:25, 93:6, 93:7, 93:12, 93:14, 94:25, 96:3, 99:8, 123:3, 148:11, 150:15, 161:3, 188:4, 238:10, 266:14, 292:10, 293:18, 297:12, 300:15, 318:12, 318:17, 319:2, 319:11, 319:24, 320:19, 320:20, 320:22, 321:3, 321:13, 324:18, 325:2, 325:6, 325:10, 325:19, 325:21,

326:8
  **YORK** [2] - 329:4, 329:6
  **York** [18] - 1:13, 1:19, 2:8, 3:8, 17:24, 17:25, 18:5, 18:10, 18:14, 18:18, 180:4, 182:3, 197:23, 248:18, 329:10
  **YTD** [2] - 319:17, 319:20

# Z

**Zeolla** [2] - 92:9, 236:15

358

1
2           JAMS ARBITRATION
            No. 1425025377
3    _____
4    HOAI NGO,
5           Claimant,
6       and
7
     OPPENHEIMER & CO., INC.,
8
9           Respondent.
10   _____
11
12   BEFORE:   JUDGE MICHAEL DOLINGER, Arbitrator
13
14              Day 2
15              New York, New York
16              March 5, 2019
17
18
19
20
21
22   Reported by:
23   Eileen Mulvenna, CSR/RMR/CRR
24
25

359

1
2    A P P E A R A N C E S:
3
4    ON BEHALF OF CLAIMANT:
5       VLADECK RASKIN & CLARK, P.C.
6          565 Fifth Avenue, 9th Floor
7          New York, New York  10017
8       Phone:   212.403.7311
9       By:    JEREMIAH IADEVAIA, ESQ.
10           jiadevaia@vladeck.com
11           VALDI LICUL, ESQ.
12           vlicul@vladeck.com
13
14   ON BEHALF OF RESPONDENT:
15      SATTERLEE & STEPHENS LLP
16          230 Park Avenue, Suite 1130
17          New York, New York
18      Phone:   212.404.8726
19      By:    MICHAEL H. GIBSON, ESQ.
20           mgibson@ssbb.com
21           JOHN COSTER, ESQ.
22           john.coster@ssbb.com
23
24
25

360

1
2    ALSO PRESENT:
3           Emily Miller (Pending admission)
4           Connor Hoffman, Paralegal
5           Diana Sur, Esq., In-house Oppenheimer
6           Donald Corbett, Esq., In-house Oppenheimer
7
8
9    WITNESS:
10          Hoai Ngo
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

361

1
2               I N D E X
3    WITNESS        EXAMINATION BY          PAGE
4
     HOAI NGO
5
6       MR. IADEVAIA - DIRECT (CONT'D)   362
7       MR. GIBSON - CROSS          399
8       MR. IADEVAIA - REDIRECT       665
9       MR. GIBSON - RECROSS         690
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

362

NGO - DIRECT

1   NGO - DIRECT
2   HOAI NGO,
3       having been previously duly sworn by The
4       Arbitrator, was examined and testified further as
5       follows:
6   DIRECT EXAMINATION (CONT'D)
7   BY MR. IADEVAIA:
8       Q.   Good morning, Mr. Ngo.
9       A.   Good morning.
10      Q.   Yesterday you testified that you were
11  demoted in November of 2014; is that right?
12      A.   That's correct.
13      Q.   And your demotion was a demotion --
14  you had been cohead and you were removed from the
15  cohead job; is that right?
16      A.   That's correct.
17      Q.   Following the demotion, did who you
18  reported to directly change?
19      A.   Yes.
20      Q.   And how did it change?
21      A.   I now reported to Colleen Burns.
22      Q.   Who had you reported, before the
23  demotion, to directly?
24      A.   Robert Lowenthal.
25      Q.   Have you worked since leaving

363

NGO - DIRECT

1   NGO - DIRECT
2   Oppenheimer?
3       A.   Yes.
4       Q.   And what was your next job after
5   Oppenheimer?
6       A.   It was at Fitch Ratings.
7       Q.   When did you begin working for Fitch?
8       A.   Let's see.  I believe it was a little
9   over a year after Oppenheimer, so I believe it was
10  July of 2017.
11      Q.   So for approximately 13 months, you
12  were employed after being fired by Oppenheimer?
13      A.   I'm sorry.  Could you repeat the
14  question.
15      Q.   Sure.
16           For how many months were you
17  unemployed?
18      A.   Unemployed.
19      Q.   Yes, between Fitch and Oppenheimer.
20      A.   A little over a year.
21      Q.   And so I want to focus on that time
22  period.  Okay?
23      A.   Sure.
24      Q.   Between July 1, 2016, and July 2017.
25           During that period -- during this

364

NGO - DIRECT

1   period, what did you do to look for work?
2       A.   A variety of things.  I networked.  I
3   did drinks with colleagues to see if there were any
4   jobs available.  I tried to go to any events that
5   were for employment just to network.  Then I also
6   sent out my résumé.  I updated my LinkedIn profile.
7   Networked through LinkedIn.  Sent résumés out.
8   Spoke to headhunters.
9       Q.   Did you apply for jobs during this
10  period of time?
11      A.   Yes.
12      Q.   Did you speak to recruiters in an
13  effort to find jobs?
14      A.   Yes.
15      Q.   What kind of companies did you apply
16  to during this period?
17      A.   Variety of companies.  Asset managers,
18  hedge funds.  I applied for some corporate jobs,
19  like an investor relations to diversify my base
20  options for jobs.  I applied for some corporate
21  development jobs.  A variety of finance jobs.
22      Q.   When you say "corporate jobs," are you
23  distinguishing corporate from finance jobs?
24      A.   What I mean by "corporate" is that the

365

NGO - DIRECT

1   previous job I was in was -- I was in a market job.
2   When I say "corporate job," I was looking more along
3   the lines of -- if you do investor relations, that's
4   a different type of job, but you can segue and say,
5   I know the company.  So I was trying to be creative
6   and look for different types of jobs.
7       Q.   And did you apply for jobs that were
8   not on Wall Street, non-Wall Street jobs?
9       A.   Yes.
10      Q.   What kind of positions did you apply
11  for?
12      A.   I tried to apply for some management
13  jobs.  I applied for some senior analyst jobs.  I
14  applied for -- like I said, I remember applying --
15  trying to use the angle -- investor relations jobs.
16  Various finance jobs.
17      Q.   I'm going to ask you to take a look at
18  Exhibit 106, please.  If you could let us know what
19  Exhibit 106 is.
20      A.   The bulk of 106?  Because there's a
21  lot of documents.  Are you talking just the first
22  page or --
23      Q.   No.
24           What is 106?  And if you need to --

366

NGO - DIRECT

1    A.    Got it.  I believe it's a variety of
2    e-mails, me applying for jobs, looking for jobs,
3    networking pertaining to my job search.
4        Q.    Did you engage in any job search
5    efforts that are not reflected in these documents
6    during the period of time we're talking about?
7        A.    Yes.
8        Q.    Okay.  And what did you do beyond what
9    would be reflected in the e-mails?
10       A.    That would be networking.  That would
11   be calling someone, even if it's as light as saying,
12   hi, how are you doing?  Some people remind me -- I'm
13   looking for a job.
14       Q.    Focusing on the period between
15   July 2016 and July 2017, did you have any job
16   interviews?
17       A.    Could you -- could you repeat the
18   question again.
19       Q.    Sure.
20           So I'm talking about the period
21   between Oppenheimer and Fitch.
22       A.    Yes.
23       Q.    Did you have any job interviews?
24       A.    Yes, I did.

367

NGO - DIRECT

1        Q.    Where did you interview?
2        A.    I think I made progress interviewing
3    at Credit Agricole and also Fitch.
4        Q.    At Credit Agricole, what job did you
5    interview for?
6        A.    It was a senior credit analyst job.
7        Q.    And did you receive an offer from
8    Credit Agricole?
9        A.    No, I did not.
10       Q.    And Fitch, did you apply -- did you
11   interview for more than one position at Fitch?
12       A.    Yes, I did.
13       Q.    When was the first time that you
14   interviewed for a job at Fitch?
15       A.    I first interviewed for a job -- it
16   was a little bit creative from my other job.  It was
17   an investor development job.
18       Q.    When did that happen, approximately?
19       A.    I believe -- I want to say I started
20   talking to them in November, but there was a period
21   of time it took to go through it.
22       Q.    Well, November of which year?
23       A.    Oh, sorry.  I believe it was -- I want
24   to say started talking to them in November of 2016

368

NGO - DIRECT

1    or early 2017.  I can't remember.
2        Q.    What was that position?  I'm sorry.
3    The first position?
4        A.    It was called -- I believe it was
5    called -- I ultimately did not get it.  I think it
6    was called investor development.
7        Q.    You actually interviewed with Fitch
8    for that job?
9        A.    Yes.
10       Q.    You did not receive an offer from them
11   for that position?
12       A.    That's correct.
13       Q.    During the period between -- during
14   the period between August -- or
15   July 2017, before being offered the job with Fitch,
16   were you offered any other jobs?
17       A.    No.
18       Q.    During that period, did you have any
19   salary requirements?
20       A.    No.
21       Q.    In looking for work after Oppenheimer
22   but before Fitch, did you give a reason why you left
23   Oppenheimer to potential employers?
24       A.    Yes.

369

NGO - DIRECT

1        Q.    And what were those reasons that you
2    gave?
3        A.    Well, I gave the reasons that they had
4    given me in my firing.  I told them that I was laid
5    off.  I told people a variety of things because
6    just -- I told people that I was laid off.  I told
7    people that the reasons were because there was
8    cost-cutting.  I think I might have used that term.
9    And I might have -- and I think I also told people
10   that there was maybe no investment banking -- same
11   dialog that they had given me when they fired me.
12       Q.    When you say "they had given me when
13   they fired me," are you referring to Oppenheimer?
14       A.    Yes.
15       Q.    So the reasons that Oppenheimer -- and
16   I think you said Ms. Burns and someone from HR --
17   gave you at the time that you were being let go?
18       A.    Yes.
19       Q.    Those were the explanations that you
20   gave to potential employers when you're looking for
21   a job?
22       A.    That's correct.
23       Q.    Do you believe that cost-cutting was
24   the reason you were let go from Oppenheimer?

370

NGO - DIRECT

1
2     A.    No.
3     Q.    Do you believe that lack of equity
4  research coverage or banking coverage was the reason
5  that you were left go from Oppenheimer?
6     A.    No.
7     Q.    Why did you tell potential employers
8  that you left Oppenheimer due to cost-cutting?
9     A.    It was just posturing to find a job.
10  It was just my way -- not posturing is the right
11  word.  It's my way of downplaying my loss of the job
12  to a potential employer.
13     Q.    Did you tell any potential employers
14  that you were let go from Oppenheimer for unlawful
15  reasons?
16     A.    No.
17     Q.    Why not?
18     A.    Because I didn't think that would be
19  help -- be helpful in finding a job.
20     Q.    I'm going to ask you to take a look at
21  Exhibit 121, please.
22     A.    121?
23     Q.    Please.
24           So this is an e-mail from you to
25  Gregory Parker, and it's dated July 21st, 2016.

371

NGO - DIRECT

1
2           Who is Mr. Parker?
3     A.    I believe Greg Parker is the head of
4  high-yield research at Lord Abbett at that time.
5     Q.    In the e-mail, you say, "I
6  unfortunately recently lost my position at
7  Oppenheimer.  They were cutting costs and my sectors
8  did not have the investment banking coverage."
9           Do you see that text?
10     A.    Yes.
11     Q.    Was that accurate when you wrote it,
12  from your perspective?
13     A.    From my perspective, no.
14     Q.    And in what way was it not accurate?
15     A.    Because I didn't believe I was let go
16  of Oppenheimer because of cost-cutting and
17  investment banking.
18     Q.    Why did you tell Mr. Parker that that
19  was the reason that you were let go from
20  Oppenheimer?
21     A.    Again, it was a way to -- it was a way
22  to introduce myself and not -- it was a way to
23  introduce myself and look for a job.
24     Q.    And were you worried that if you
25  said -- why didn't you tell Mr. Parker that the

372

NGO - DIRECT

1
2  reason you were let go from Oppenheimer was because
3  Oppenheimer violated the FMLA or discriminated
4  against you because of your gender and disability?
5     A.    I just don't think those details would
6  be helpful in finding a job.
7     Q.    If you could take a look at
8  Exhibit 104, please.
9           Mr. Ngo, you eventually got a job
10  offer from Fitch; correct?
11     A.    That's correct.
12     Q.    And when -- and what is Exhibit 104?
13     A.    That is my offer letter from Fitch
14  Ratings.
15     Q.    And what position were you hired for?
16     A.    It was a senior director in
17  corporates.
18     Q.    And did your title change at any point
19  during your employment at Fitch?
20     A.    No.
21     Q.    Did your position change there?
22     A.    No.
23     Q.    What were your responsibilities as a
24  senior director in the corporate department at
25  Fitch?

373

NGO - DIRECT

1
2     A.    I was working at a rating agency.  So
3  it was credit analysis on various companies that I
4  covered in the retail -- in the retail sector.
5     Q.    So what was your sector?
6     A.    Retail.
7     Q.    Had you had any experience working in
8  consumer retail before you joined Fitch?
9     A.    No.
10     Q.    And -- but Fitch hired you.
11           Did they tell you why they hired you
12  despite not having that research [sic] in consumer
13  retail?
14     A.    Yes.  They -- they were looking for
15  best athlete.
16     Q.    When you say "best athlete," what do
17  you mean?
18     A.    I mean, they would look for -- ideally
19  maybe they were looking for the best analyst.  So
20  there was a lot of questioning on how do you look at
21  companies.  And they obviously thought that I can
22  transfer my knowledge on company coverage to the
23  retail sector.
24     Q.    What was your starting salary at
25  Fitch?

374

NGO - DIRECT

1
2     A.    220,000.
3     Q.    Did that salary change during the time
4  that you worked at Fitch?
5     A.    No.
6     Q.    Was it your understanding that your
7  position at Fitch was eligible for a bonus?  Were
8  you eligible for a bonus?
9     A.    Yes.
10    Q.    What was the bonus range that was
11 available to you at Fitch?
12    A.    I was told that the bonus -- I asked
13 them -- I remember asking Mike Simonton, who's the
14 head of research, during interviews, what is the
15 maximum bonus -- what kind of bonus can I expect?
16 Because rating agencies have a different bonus
17 structure than a normal Wall Street firm.
18    Q.    So what did he say in terms of what
19 the maximum bonus was?
20    A.    He said that it would be anywhere from
21 10 to 20 percent of your base.
22    Q.    And what does that work out to
23 mathematically?
24    A.    Well, on a 220,000 base, that would be
25 anywhere from 22,000 to 44,000, if my math is

375

NGO - DIRECT

1
2  correct.
3     Q.    You said that the bonus structure was
4  different at Fitch than it was at a Wall Street
5  firm.
6           What did you mean by that?
7     A.    Well, rating agencies don't have the
8  outside bonus structure.  Like you don't have a
9  million dollars sales from like -- P&L from like
10 sales.  So a rating agency is known not to have --
11 your salary is mainly driven by your base versus a
12 bonus.
13    Q.    Did you ever receive a bonus at Fitch?
14    A.    No.
15    Q.    Why not?
16    A.    I was let go.
17    Q.    And you were let go before Fitch paid
18 bonuses for the year?
19    A.    That's correct.
20    Q.    Did you quit your job at Fitch?
21    A.    No, I did not.
22    Q.    Why did you leave Fitch?
23    A.    I was told that my position was
24 terminated because I was the highest paid senior
25 director on the floor, and I wasn't performing at

376

NGO - DIRECT

1
2  that level.
3     Q.    Who told you that?
4     A.    HR.
5     Q.    And when did they tell you that?
6     A.    I believe it was in June of 2018.
7     Q.    June of 2018?
8     A.    Hold on one second.  Sorry.
9           January of 2018.
10    Q.    And that was the time that you were
11 let go?
12    A.    Yes.
13    Q.    Did anyone tell you at Fitch that you
14 were fired for violating Fitch's company policies?
15    A.    No.
16    Q.    Did anyone tell you that you were
17 fired from Fitch for misconduct?
18    A.    No.
19    Q.    Did anyone tell you that you were
20 fired for insubordination?
21    A.    No.
22    Q.    Did you receive any severance from
23 Fitch?
24    A.    Yes, I did.
25    Q.    How much severance did you receive

377

NGO - DIRECT

1
2  from Fitch?
3     A.    I believe I received 55,000.
4     Q.    And at any point in your time at
5  Fitch, were you given a performance improvement
6  plan?
7     A.    No.
8     Q.    Were you given a written warning?
9     A.    No.
10    Q.    I'm going to ask you to take a look at
11 Exhibit 123.
12          What is Exhibit 123?
13    A.    These appear to be my W-2 forms.
14    Q.    Is it your -- your W-2 for a specific
15 year?
16    A.    Yes.
17    Q.    Which year?
18    A.    2017.
19    Q.    And this is W-2 from Fitch; right?
20    A.    That's correct.
21    Q.    Reflects how much money you earned
22 from Fitch in 2017?
23    A.    That's correct.
24    Q.    And the number there is 97,307, right,
25 in the gross pay?

378

NGO - DIRECT

1    Do you see that at the top?
2    A.    Yes.
3    Q.    And if you take a look at Exhibit 130,
4 please.
5    And what is Exhibit 130?
6    A.    It is a pay stub.
7    Q.    It's your pay stub from Fitch?
8    A.    That's correct.
9    Q.    And is it -- if you look, the pay
10 period ending is May 19, 2018.
11    Do you see that?
12    A.    Yes.
13    Q.    Do you understand this to be your
14 final pay stub from Fitch?
15    A.    Yes.
16    Q.    Does this pay stub reflect the
17 severance payment that you received from Fitch?
18    A.    Yes.
19    Q.    And so if you look on the left-hand
20 side of the page, do you see the category "Gross
21 Pay"?
22    Do you see those words?
23    A.    Yes.
24    Q.    If you look over, all the way to the

379

NGO - DIRECT

1    right, do you see the number $75,730?
2    A.    Yes.
3    Q.    And that's under the column
4    "Year-to-date."
5    Do you see that?
6    A.    Yes.
7    Q.    Do you understand this pay stub -- the
8    75,730 to reflect all the compensation you received
9    from Fitch in 2018?
10    A.    That's correct.
11    Q.    So you left Fitch in or around January
12    of 2018; is that right?
13    A.    That's correct.
14    Q.    Have you worked since leaving Fitch?
15    A.    Yes.
16    Q.    Where did you work since leaving
17    Fitch?
18    A.    Bloomberg.
19    Q.    And when did you join Bloomberg?
20    A.    I believe it was October of 2018.
21    Q.    For what period of time -- so what
22    period of time after leaving Fitch were you
23    unemployed?
24    A.    Between February 1st of 2018 till my

380

NGO - DIRECT

1    employment at Bloomberg in October of 2018.
2    Q.    So I want to focus on that period of
3    time.
4    A.    Sure.
5    Q.    During this period, what did you do to
6    look for work, if anything?
7    A.    I did my networking.  I did my -- I
8    did networking.  I applied for various jobs.  Spoke
9    to headhunters.  Interviewed for a job.  Same as I
10    did before.
11    Q.    Did you use LinkedIn?
12    A.    Yes.
13    Q.    How did you use LinkedIn?
14    A.    I used LinkedIn to network with
15    people.  I would talk with people in chats.  I
16    remember talking to -- for example, I used -- I
17    spoke to head of research at BNP Paribus.
18    Q.    What kind of positions have you looked
19    for during this period, between February and October
20    of 2018?
21    A.    I looked for credit analyst jobs.  I
22    looked for investor relations jobs.  I looked for
23    development jobs.  I looked for any job I could
24    find.

381

NGO - DIRECT

1    Q.    I want to ask you to take a look at
2    Exhibit 107, please.
3    What do you recognize -- what is
4    Exhibit 107?
5    A.    I believe it's various e-mails and
6    correspondence to me and various people searching
7    for a job.
8    Q.    These are e-mails reflecting your
9    efforts to find another job after Fitch?
10    A.    That's a correct description, yes.
11    Q.    Did you engage in any job efforts that
12    are not reflected in these documents?
13    A.    Yes.  Again, a lot of it is just
14    networking, talking to people, having drinks,
15    dinners with various people in the industry.
16    Q.    Focusing on the period between
17    February 2018 and October of 2018, did you have any
18    job interviews other than Bloomberg?
19    A.    Yes, I did.
20    Q.    Where did you interview?
21    A.    I interviewed at BNP Paribus.
22    Q.    Other than BNP Paribus, did you
23    interview anywhere else, and Bloomberg?
24    A.    I don't think so.

382

NGO - DIRECT

1  Q.    And were you offered the job at BNP
2
3  Paribus?
4  A.    No, I was not.
5  Q.    Before being offered the job at
6  Bloomberg, were you offered any other jobs?  Talking
7  about the period between February and October 2018.
8  A.    No, I was not.
9  Q.    During that period, did you have any
10  salary requirements?
11  A.    No, I did not.
12  Q.    If you could take a look at
13  Exhibit 103, please.
14      What is Exhibit 103?
15  A.    It's a job -- it's a job log that I --
16  that -- I created documents in some of my job
17  search.
18  Q.    You created this job log?
19  A.    That's correct.
20  Q.    And how close in time to the various
21  job networking and job search efforts did you create
22  this log -- did you make entries into the log?  Do
23  you remember?
24  A.    I'm sorry.  Could you repeat the
25  question.

383

NGO - DIRECT

1
2  Q.    Sure.
3      So how soon after making the effort to
4  find the job -- the job search efforts --
5  A.    Sure.
6  Q.    -- did you make the entry in this log?
7  A.    It was after my firing at Oppenheimer.
8  Q.    So you kept this log after you were
9  let go from Oppenheimer?
10  A.    Yes.
11  Q.    Mr. Ngo, are you currently working for
12  Bloomberg?
13  A.    Yes, I am.
14  Q.    And what's your title at Bloomberg?
15  A.    A senior credit analyst.
16  Q.    And what is your -- do you have a
17  sector?
18      Are you assigned to a specific sector
19  or sectors?
20  A.    Consumer right now.
21  Q.    And what are your responsibilities as
22  a senior analyst at Bloomberg in the consumer
23  sector?
24  A.    I do credit analysis on companies in
25  the consumer sector.

384

NGO - DIRECT

1
2  Q.    If you take a look at Exhibit 105,
3  please.
4      Are you there?
5  A.    Yes, I am.
6  Q.    Is this your Bloomberg offer letter?
7  A.    Yes, it is.
8  Q.    And what is your salary at Bloomberg?
9  A.    It's a base salary of 225,000, plus an
10  option for a bonus.
11  Q.    So you're eligible for a bonus at
12  Bloomberg?
13  A.    That's correct.
14  Q.    And what is the Bloomberg bonus?
15  A.    It's capped at 50,000.
16  Q.    And is there any guarantee in the
17  first year?
18  A.    I think Bloomberg, if I remember, they
19  guarantee a certain -- up to a certain percent of
20  the bonus, but not a hundred percent of it.
21  Q.    If you look in your offer letter, in
22  the paragraph that's -- with the header "Cash
23  Bonus" --
24  A.    Yes.
25  Q.    -- do you see there's text that says,

385

NGO - DIRECT

1
2  "In February 2019, however, you are guaranteed to
3  receive at least 80 percent of the target cash
4  bonus" --
5  A.    That's --
6  Q.    -- "or USD 6,668"?
7      Do you see that?
8  A.    Yes.
9  Q.    And I guess just at the start of that
10  section, it says, "For 2018, you'll be eligible to
11  receive a discretionary cash bonus with an
12  annualized target value of $50,000."
13      So the 80 percent of the target, what
14  do you understand that to be as a guaranteed minimum
15  for 2018?
16  A.    Oh, for 2018 -- well, for 2018, I
17  believe it's prorated from that amount, but -- but
18  they are saying that you are capped at a $50,000
19  bonus and guaranteed up to 80 percent of that
20  50,000.
21  Q.    Let me clarify because I think I
22  confused it there.
23      When does Bloomberg -- what is your
24  understanding as to when Bloomberg pays bonuses?
25  A.    I believe they pay it after the full

386

NGO - DIRECT

1 year. So they pay it -- I've only been there for
2 now four months, so they pay it I believe in
3 February, I think.
4 Q. And have you received a bonus yet from
5 Bloomberg?
6 A. I believe I received a small prorated
7 bonus.
8 Q. A small what?
9 A. A prorated bonus.
10 Q. A prorated bonus.
11 Do you know how much that bonus was?
12 A. I believe it's -- I didn't see the
13 paycheck. I put it all into 401(k), so I didn't see
14 the actual amount, but I assume it is about -- I
15 think it's a percent of that 50 prorated by October,
16 November, December.
17 THE ARBITRATOR: There's a reference
18 in the offer letter to a calculation. Seems
19 to say you're guaranteed, for 2018, $6,668.
20 Is that probably in the range of what you may
21 have received?
22 THE WITNESS: Yes. Sorry. Yes. Yes.
23 Like I said, I didn't really -- it was
24 such -- it was not a major factor, so I just

387

NGO - DIRECT

1 remember -- I haven't really tried to look at
2 my statements, to tell you the truth. And I
3 know that I allocated -- you can do an
4 allocation where you want a hundred percent
5 in the beginning of your pay to go to a
6 401(k). And I did that so I couldn't see the
7 pay stub, to tell you the truth.
8 BY MR. IADEVAIA:
9 Q. Since leaving -- if you could take a
10 look at Exhibit 105, please.
11 A. Yes.
12 Q. I'm sorry. 131. I misspoke. 131.
13 A. Sorry.
14 Q. And if you turn to -- let's start with
15 the last page of Exhibit 131, please. If you look
16 at the last page --
17 A. Of 131?
18 Q. Yes, please.
19 A. Yes.
20 Q. What is this?
21 A. It's my W-2 for 2018.
22 Q. From Bloomberg?
23 A. That's correct.
24 Q. And if you look at the top right side

388

NGO - DIRECT

1 of the page, there's a gross pay amount.
2 Do you see the gross pay amount being
3 $39,873?
4 A. Yes.
5 Q. And so is that -- is it your
6 understanding that's the amount you received from
7 Bloomberg in 2018?
8 A. That's correct.
9 Q. So if you turn to the first page of
10 Exhibit 131, please.
11 What is this?
12 A. It is a pay stub from Bloomberg.
13 Q. And it's a pay stub to you, right, for
14 payment to you?
15 A. That's correct.
16 Q. And the date of the pay stub -- the
17 pay end date is January 31, 2019.
18 Do you see that?
19 A. That's correct.
20 Q. And this pay stub, if you look --
21 year-to-date as of January 31, 2019, how much does
22 it show that you had been paid at Bloomberg?
23 A. I believe that's $2,419.69.
24 Q. 2,419 --

389

NGO - DIRECT

1 A. Or that is just this -- no, it says
2 year-to-date, 2,419.16.
3 Q. That's the net pay. If you look over
4 to the total gross pay, year-to-date --
5 A. Sorry. Total gross pay, it's $18,750.
6 Q. And if you turn the page -- this is an
7 earlier -- if you turn to the next page, that's an
8 earlier pay stub from Bloomberg, correct, earlier
9 than the previous page?
10 A. Yes.
11 Q. Since leaving Oppenheimer, were there
12 any jobs where you received offers, but you rejected
13 those offers?
14 A. No, there were not.
15 Q. I'm going to ask you to take a look at
16 Exhibit 1A, please.
17 A. 1A?
18 Q. Yes.
19 A. Got it.
20 Q. What do you recognize -- what do you
21 recognize Exhibit 1A to be?
22 A. It is lost compensation from
23 Oppenheimer from the period I was employed, from
24 January 31st, 2015, to June 30th of 2016.

390

NGO - DIRECT

1      Q.    You said January 31st.
2            Do you mean January 1st?
3      A.    1st, yes.
4      Q.    Is it your understanding this is a
5  chart for your alleged lost wages while you worked
6  for Oppenheimer?
7      A.    Yes.
8      Q.    And it's starting from the period of
9  January 1st, 2015, which is -- what's the
10  significance of 2015?
11     A.    2015?  That is after my demotion
12  and -- that's after my demotion.
13     Q.    And does this January 1st, 2015,
14  moving forward encompass the period where you
15  received what you believe to be unlawfully reduced
16  bonuses?
17     A.    That's correct.
18     Q.    If you take a look in -- at the -- on
19  the page, in the second column, it says,
20  "Compensation received."
21           Do you see that?
22     A.    "Compensation" -- yes.
23     Q.    And what's your understanding as to
24  what the numbers are in that column?

391

NGO - DIRECT

1      A.    That reflects the compensation I
2  received from Oppenheimer.
3      Q.    And for the relevant period, so for
4  2013, what's that -- that number is 420,833.
5            What do you understand that to mean?
6      A.    That is my total compensation from
7  Oppenheimer in 2013.
8      Q.    And is it your understanding that
9  number is based on the W-2s for 2013 -- your W-2 for
10  2013?
11     A.    Yes.
12           (Discussion off the record.)
13     Q.    What's your understanding of the
14  column "Compensation would have received"?
15     A.    That's basically saying the
16  compensation I would have received if I was not
17  demoted -- was not demoted.
18     Q.    And not discriminated against?
19     A.    Yes.
20     Q.    And does that -- the number there
21  is -- for 2015, the number that's listed in that
22  column, "Compensation would have received," is
23  420,833.
24           What is that number?

392

NGO - DIRECT

1      A.    That's the compensation I would have
2  received in 2015.
3      Q.    And do you know -- is that the amount
4  that you did receive in 2013 before your leave?
5      A.    That is correct.
6      Q.    If you look on the chart that's
7  reflected on the column "Compensation received" next
8  to the year 2013, to the right of 2013.
9      A.    Yes.
10     Q.    Do you see that?
11           What is the column "Difference"?
12  What's your understanding of what that signifies?
13     A.    It takes the compensation I would have
14  received minus the compensation I received.
15     Q.    And if you look, there's a total
16  number at the bottom of 254,166.
17           What is that number?
18     A.    That totals the differences in 2015
19  and 2016.
20     Q.    Is that the amount of damages that
21  you're seeking for the period that you remained at
22  Oppenheimer in terms of lost wages?
23     A.    Yes.
24     Q.    If you look at 1B, please.

393

NGO - DIRECT

1            What is 1B?
2      A.    It's a chart for lost compensation for
3  the period after Oppenheimer fired me.
4      Q.    Is there a date range for which this
5  chart covers?
6      A.    I believe it goes from the date of the
7  firing, June 30, 2016, to current.
8      Q.    And the column that says,
9  "Compensation received," what are those numbers?
10           What's your understanding of those
11  numbers?
12     A.    That's how much compensation I
13  received during that time period.
14     Q.    And what is that information based on?
15     A.    It's based on my W-2s, I believe.
16     Q.    For the calendar year; correct?
17     A.    For the calendar year, that's correct.
18     Q.    If you look next to that column, it's
19  "Compensation would have received."
20           Do you see that?
21     A.    Yes.
22     Q.    And what's your understanding as to
23  the numbers listed in that column?
24     A.    That's basically the compensation I

394

NGO - DIRECT

1 would have received from Oppenheimer if I was
2 employed during that period.
3     Q.    And not been subject to
4 discrimination?
5     A.    That's correct.
6     Q.    What is the -- last column is
7 "Difference."
8         What is your understanding of
9 "Difference"?
10     A.    That would be the -- it's a
11 calculation of the difference between my
12 compensation I would have received and the actual
13 compensation I received in that year.
14     Q.    And the compensation in the category
15 "Compensation received," where did you receive that
16 compensation from?  This is after you left
17 Oppenheimer.
18     A.    Employment at other firms.
19     Q.    Which ones?
20     A.    I believe it's a combination of Fitch
21 and also Bloomberg.
22     Q.    And if you look, there's a total
23 number.  That total number is 730,317.
24         What does that number reflect?

395

NGO - DIRECT

1     A.    That's a summation of the difference
2 of the time period between July 1st, 2016, to
3 year-to-date.
4     Q.    And the difference of what?
5     A.    The compensation I would have received
6 and the compensation I actually received in those
7 years.
8     Q.    If you take a look at 1C, please.
9         What is 1C?
10     A.    It's an estimated -- it's a
11 calculation of -- it compares my actual estimated
12 compensation and then the compensation I would have
13 received.
14     Q.    And the compensation -- the estimated
15 actual compensation, do you know what that's based
16 on?
17     A.    It's based on my Bloomberg base and
18 bonus.
19     Q.    And the compensation you would have
20 received, what's your understanding as to what
21 that's based on?
22     A.    That's the compensation I would have
23 received if I was at Oppenheimer at that -- at that
24 time frame.

396

NGO - DIRECT

1     Q.    And if you were at Oppenheimer, but
2 for the discrimination; right?
3     A.    That's correct.
4     Q.    And what is your understanding of the
5 difference -- the category -- the column called
6 "Difference"?
7     A.    It represents the lost income in that
8 year.
9     Q.    Based on the difference between what
10 and what?
11     A.    Based on the compensation I would have
12 received at Oppenheimer and the compensation that I
13 will receive at Bloomberg.
14     Q.    And the 531,434, which is the total
15 row, what's your understanding of what that means?
16     A.    That represents the summation of the
17 compensation I would have received from 2019 to
18 2023.
19     Q.    Are you making claims for emotional
20 distress in this case?
21     A.    Yes, I am.
22     Q.    And how, if at all, were you
23 emotionally affected by your demotion at
24 Oppenheimer?

397

NGO - DIRECT

1     A.    I was sad.  It was a difficult time.
2 It was right after my aneurysm.  And just the
3 painful loss of losing a job and not having the
4 income.  And it was just a very tough time.
5     Q.    I had asked specifically about your
6 demotion, not about the firing.
7     A.    Yes, it was -- it was everything.  It
8 was from the -- started at the May conversation with
9 Jane, with the -- added to the July conversation
10 with Rob and then culminated with the demotion in
11 November, then culminating again with the firing in
12 June of 2016.
13     Q.    And how did all those actions make you
14 feel?
15     A.    I felt very sad.  I felt -- I felt
16 emotionally -- I felt drained.  I felt stress and
17 pressure.  I lost, you know, my job, my reputation
18 to some degree.  I lost income.  I lost the security
19 of a job.
20     Q.    Did you seek any medical attention in
21 connection with the stress that you were feeling --
22 emotional distress you were feeling as a result of
23 Oppenheimer's actions?
24     A.    No.

398

```
 1            NGO - DIRECT
 2     Q.   Why not?
 3     A.   That's just not my personality.  I've
 4  never been to a therapist.  I deal with situations
 5  like this by talking to friends and family, and I
 6  feel like I have a network.  That I don't need to go
 7  that route.
 8            MR. IADEVAIA:  We're done.
 9            THE ARBITRATOR:  Okay.  Thank you.
10  Cross-examination?
11            MR. GIBSON:  Can we take five minutes?
12  I know it's early.  Do you want to take a
13  quick five minutes and go to lunch after
14  or -- what does everybody want to do?  I
15  don't mean lunch now.  Take the midmorning
16  now, go straight through to lunch or --
17            THE ARBITRATOR:  I would say right now
18  let's take a five-minute --
19            MR. GIBSON:  Very good.
20            THE ARBITRATOR:  -- break later on.
21            MR. GIBSON:  Thank you.
22            (Recess from the record.)
23
24
25
```

399

```
 1            NGO - CROSS
 2  CROSS-EXAMINATION
 3  BY MR. GIBSON:
 4     Q.   Good morning, Mr. Ngo.
 5     A.   Good morning.
 6     Q.   In my examination, I may repeat a
 7  couple of questions that you testified about on your
 8  direct and just ask that you indulge me.  I'm going
 9  to try to avoid that where possible so we don't go
10  over some ground again.
11            Am I correct that you have a law
12  degree?
13     A.   That is correct.
14     Q.   And when and where did you obtain that
15  law degree from?
16     A.   I received it from Tulane Law School
17  in 1998.
18     Q.   When you were in law school, did you
19  take any classes in discrimination?
20     A.   I took the basic classes.  I don't
21  remember taking anything specifically on
22  discrimination.
23     Q.   And I believe you took and passed the
24  bar exam of the State of New York?
25     A.   That's correct.
```

400

```
 1            NGO - CROSS
 2     Q.   If I'm correct, you've never practiced
 3  law.
 4     A.   That is correct.
 5     Q.   I'm going to ask you to take a look at
 6  Exhibit 108.
 7            Do you recognize that to be a copy of
 8  your résumé, Mr. Ngo?
 9     A.   Yes.
10     Q.   I note in the bottom, where you
11  reference your education at Tulane, that you
12  received a certification in European law and
13  arbitration?
14     A.   That is correct.
15     Q.   And in connection with that
16  certification, did you become familiar with written
17  agreements to arbitrate?
18     A.   I took -- yes, I -- yes.
19     Q.   And I also note that you did some
20  work -- I don't know if it was an internship -- at
21  Chrysler Corporation?
22     A.   That is correct.
23     Q.   The legal contract analysis that you
24  did, did that involve employment contracts at all?
25     A.   Not that I recall.
```

401

```
 1            NGO - CROSS
 2     Q.   And according to your résumé, it
 3  appears that you worked at J.P. Morgan as an
 4  investment banking analyst for approximately three
 5  years?
 6     A.   I don't think that's correct.  The
 7  timing is two years.  1999 to 2001.
 8     Q.   So it couldn't have been '99 --
 9     A.   Actually it's a little bit longer,
10  you're right.
11     Q.   Somewhere between two and three years?
12     A.   Yes.  Yes.  Yes.
13     Q.   Did you voluntarily resign that
14  position?
15     A.   No.
16     Q.   You were laid off; correct?
17     A.   That's correct.
18     Q.   I also see on your résumé that you
19  worked at RBS Greenwich as a senior high-yield
20  investment-grade analyst for approximately a year?
21     A.   A little over a year, yes.
22     Q.   And did you voluntarily resign that
23  position?
24     A.   No.
25     Q.   You were laid off; correct?
```

402

NGO - CROSS

1     A.   That's correct.
2     Q.   And, in fact, Mr. Ngo, if you look at
3  your résumé , it reflects, during this time period,
4  that you worked for five employers?
5     A.   Hold on.
6          (Pause.)
7     A.   That's correct.
8     Q.   And for three of those employers, you
9  worked for three years or less; correct?
10         J.P. Morgan --
11    A.   Yes.  Yes.
12    Q.   In fact, Oppenheimer is the company
13 that you worked for the longest period of time of
14 all the entities listed on your résumé?
15    A.   I think it was comparable to Bear
16 Stearns time frame.
17    Q.   Now, after you were laid off by
18 J.P. Morgan, did you sue J.P. Morgan for retaliation
19 or discrimination?
20    A.   No, I did not.
21    Q.   When you were laid off by RBS, did you
22 sue RBS for discrimination or retaliation?
23    A.   No, I did not.
24    Q.   In fact, would you agree with me,

403

NGO - CROSS

1  Mr. Ngo, that layoffs are quite common on Wall
2  Street?
3     A.   Yes.
4     Q.   One of the reasons that layoffs happen
5  on Wall Street is cost-cutting; correct?
6     A.   That is correct.
7     Q.   In fact, if you just draw your
8  attention to the screen at the front of the room,
9  I'm just going to ask you if you recall at your
10 deposition testifying, "The firm is always -- the
11 firm has a reputation for trying to cut costs.  Most
12 Wall Street firms do, to be quite frank."
13         Do you recall that testimony?
14    A.   Yes.
15    Q.   What was the firm that you were
16 referring to that has a reputation for trying to cut
17 costs?
18    A.   I was probably referring to
19 Oppenheimer.
20    Q.   And then under that, do you recall
21 testifying, "Because it's generic way, so that
22 people who work on Wall Street get laid off for
23 cost-cutting all the time"?
24         Do you remember that testimony?

404

NGO - CROSS

1     A.   Yes.
2     Q.   So let's talk a little bit about your
3  hiring at Oppenheimer.
4          When were you hired by Oppenheimer?
5     A.   I believe it was August of 2009.
6     Q.   And let's take a look at Exhibit 110,
7  which I think you testified a little bit about.
8          And just to be clear, do you recognize
9  this as your offer letter from Oppenheimer?
10    A.   Yes, I do.
11    Q.   And that's your signature on the last
12 page?
13    A.   Yes.
14    Q.   Now, looking at the first paragraph of
15 the first page of the letter --
16    A.   Yes.
17    Q.   Do you have that in --
18    A.   First --
19    Q.   First page, first paragraph.
20    A.   Hold on one second.  I need to get my
21 glasses.
22    Q.   Sure.
23         (Pause.)
24    A.   Please proceed.

405

NGO - CROSS

1     Q.   Sure.
2          The last sentence of the first
3  paragraph, where it states, "You will be located at
4  300 Madison Avenue and will be reporting to Todd
5  Morgan," do you see that, sir?
6     A.   Yes, I do.
7     Q.   What was Mr. Morgan's position at the
8  time that you were hired by Oppenheimer?
9     A.   He was head of high-yield research.
10    Q.   And, in fact, if I recall correctly,
11 at your deposition, you testified that it was
12 Mr. Morgan who first told you that you had been
13 hired by Oppenheimer?
14    A.   I think that is correct.
15    Q.   And at the time that you were hired by
16 Oppenheimer, whom did Mr. Morgan report to?
17    A.   He reported to Robert Lowenthal.
18    Q.   And looking now at the second
19 paragraph of your offer letter, am I correct, sir,
20 that it provides for a $100,000 base salary?
21    A.   That is correct.
22    Q.   And if we look at the last sentence of
23 that second paragraph, it states, "You will be
24 eligible for a non-guaranteed discretionary bonus."

406

1          NGO - CROSS
2          Do you see that, sir?
3      A.   Yes.
4      Q.   Mr. Ngo, you never signed any
5   agreement with Oppenheimer that provided for a
6   guaranteed bonus; isn't that correct?
7      A.   Not signed, correct.
8      Q.   Did you ever see any writing by
9   Oppenheimer that guaranteed you a bonus?
10     A.   Writing, no.
11     Q.   Now, if we go to the second page of
12  your agreement -- or offer letter, I should say.
13  I'm sorry.
14          Without reading the entire thing,
15  unless you'd like to, but take your time, if you
16  look at the second full paragraph that starts,
17  "Employment with Oppenheimer," do you see that, sir?
18     A.   Yes, I do.
19     Q.   Would you agree with me that your
20  employment at Oppenheimer was at-will?
21     A.   Yes.
22     Q.   And then also, if we look at the very
23  next paragraph, that starts, "With the exception of
24  any claims or disputes arising under the Employee
25  Retirement Income Securities Act," do you see that,

407

1   sir?
2      A.   Yes.
3      Q.   Would you agree with me that, in this
4   offer letter, you agreed that all disputes arising
5   out of your employment with Oppenheimer, with the
6   exception of ERISA claims, are subject to
7   arbitration?
8      A.   Hold on.  Let me read this.
9      Q.   Please, take your time.
10          (Pause.)
11     A.   Could you repeat the question, please.
12     Q.   Sure.
13          Would you agree with me that, with the
14  exception of ERISA claims, this paragraph provides
15  that all of your disputes with Oppenheimer arising
16  out of your employment are subject to arbitration?
17     A.   That's how I think this clause reads.
18     Q.   And then, finally, if you would just
19  look at the last page of the offer letter.
20          (Pause.)
21     Q.   And do you see the paragraph that
22  starts, "This offer supersedes and replaces all
23  prior offers"?
24     A.   Yes.

408

1          NGO - CROSS
2      Q.   And do you see the last sentence that
3   states, "This offer cannot be amended or otherwise
4   modified except in writing, signed by you and an
5   officer of Oppenheimer"?
6      A.   Yes.
7      Q.   Now, you're familiar, as we heard from
8   your testimony, with the Oppenheimer employee
9   handbook?
10     A.   That's correct.
11     Q.   I'd like you to take a look at
12  Exhibit 111, please.  And I'd first just like to
13  take a look at the first page of the exhibit.  So
14  please take your time and let me know when you're
15  ready.
16          (Pause.)
17     A.   I'm ready.
18     Q.   You see this first document is titled,
19  "Acknowledgment and Understanding," and it's dated
20  August 21, 2009?
21          Is that shortly after you commenced
22  your employment with Oppenheimer?
23     A.   That is correct.
24     Q.   And is that your signature at the
25  bottom of this document?

409

1          NGO - CROSS
2      A.   Yes, it is.
3      Q.   And we see in the first two paragraphs
4   of this acknowledgment and understanding, it states,
5   "I acknowledge receipt of the Oppenheimer & Co.,
6   Inc. (The Company) employee handbook in effect as of
7   December 1, 2006, on the date indicated below.  This
8   employee handbook is intended as a general reference
9   guide to the benefits, conditions, rules and
10  procedures governing your employment with The
11  Company."
12          Do you recall receiving a copy of the
13  employee handbook on or around the time you
14  commenced your employment with Oppenheimer?
15     A.   Yes.
16     Q.   And I just also note, if you look at
17  the very last sentence of the acknowledgment, it
18  also states, "This handbook contains a pre-dispute
19  arbitration clause set forth on page 23 within the
20  accompanying agreement."
21          Do you see that, sir?
22     A.   Yes.
23     Q.   Do you ever recall signing an
24  arbitration agreement with Oppenheimer?
25     A.   An arbitration agreement?

410

NGO - CROSS

1    Q.   An agreement to arbitrate disputes.
2    A.   I remember signing an update to the
3  handbook.
4    Q.   Let's take a look at the second
5  exhibit -- second page of the exhibit.  I'm sorry.
6  Let me know --
7    A.   Second page of the exhibit.
8    Q.   It's OPCO 2.
9    A.   Sorry.  OPCO 2.
10   Q.   Let me know when you've had a chance
11  to review that, sir.
12   A.   Sure.
13        (Pause.)
14   A.   Yes.
15   Q.   And am I correct that this appears to
16  be an e-mail from yourself to Kristen Decker at
17  Oppenheimer dated November 3, 2014?
18   A.   That is correct.
19   Q.   And the subject line is "Employee
20  handbook acknowledgment received"?
21   A.   That is correct.
22   Q.   Now, if we look down about halfway
23  through the document, we see the field titled,
24  "Name."

411

NGO - CROSS

1        And does it have your name next to
2  that?
3    A.   Yes.
4    Q.   And your e-mail address next to the
5  title that says, "E-mail address"?
6    A.   That's correct.
7    Q.   And under that it says, "I agree to
8  the terms of the arbitration agreement."
9        And do you see where it says, "Yes"?
10   A.   Yes.
11   Q.   Did you type that "Yes" in there?
12   A.   I believe that was a toggle, yes.
13   Q.   By "toggle" you mean you affirmatively
14  selected "Yes" to be the answer to that question?
15   A.   Yes.
16   Q.   And underneath that it states, "I
17  understand and acknowledge the entire Oppenheimer
18  employee handbook."
19        And did you toggle a "Yes" in order to
20  reply to that question?
21   A.   Yes.
22   Q.   And you, in fact, did receive a copy
23  of the revised Oppenheimer employee handbook on that
24  day, November 3rd; isn't that true, Mr. Ngo?

412

NGO - CROSS

1    A.   Not physical, I don't recall.  I
2  believe it was an electronic copy, yes.
3    Q.   Let's take a look at Exhibit 88,
4  please.  Let me know when you've had a chance to
5  review that.
6    A.   Sure.
7        (Pause.)
8    Q.   Am I correct, sir, that this appears
9  to be a November 3rd -- with the exception of the
10  bottom e-mail -- e-mail exchange between yourself
11  and Yulia McPherson at Oppenheimer?
12   A.   That's correct.
13   Q.   Do you remember who Ms. McPherson was?
14   A.   Yes, I believe Yulia worked in the
15  compliance department.
16   Q.   The subject line is "Revised
17  Oppenheimer employee handbook."
18        And if we look at the second e-mail
19  from the bottom from Ms. McPherson to yourself, it
20  states, "Hoai, welcome back and please complete the
21  below.  Thank you, Yulia."
22        Was November 3rd, in fact, your first
23  day back in the office?
24   A.   That's correct.

413

NGO - CROSS

1    Q.   2015?
2        And then you respond to Ms. McPherson,
3  "Thanks.  Okay.  I read it.  Do I need to send the
4  acknowledgment?"
5        Do you see that, sir?
6    A.   Yes.
7    Q.   Did you, in fact, read the employee
8  handbook on November 3rd, 2014?
9    A.   I believe I skimmed it.
10   Q.   Skimmed it.
11        It was this exchange that led you to
12  fill out the electronic acknowledgment that we just
13  looked at in the prior exhibit?
14   A.   That's correct.
15   Q.   Let's take a look at that employee
16  handbook again, which was Exhibit 8.
17   A.   Exhibit 8?
18   Q.   Yes, sir.
19   A.   Okay.
20   Q.   I'm certainly not going to ask you to
21  read the entire document.  Where I'd like to start
22  is page 4 of the document, which has the numbering
23  OPCO 40.
24   A.   Number 40, which is page 40; is that

414

NGO - CROSS

1    correct, Mike?
2        Q.    It's OPCO 40, which is page 4 of the
3    document.
4        A.    Yes, that's what I'm on.
5        Q.    Very good.  Thank you, sir.
6            First I'd just like to ask you -- if
7    you look at the bottom right corner above the page
8    number, do you see a date of March 1st, 2014?
9        A.    Yes, I do.
10       Q.    And then on the left side of the page,
11   where we have the title, "Nondiscrimination Policy,"
12   I'd like you to take a look at the section that is
13   in bold.
14       A.    Yes.
15       Q.    Where it says, "When incidents of
16   discrimination occur, they are to be reported
17   immediately, preferably in writing, to the
18   respective supervisor or directly to the director of
19   human resources."
20           Do you see that, sir?
21       A.    I do.
22       Q.    Now, in this arbitration proceeding,
23   Mr. Ngo, you've alleged that you were discriminated
24   against by Oppenheimer?

415

NGO - CROSS

1        A.    That is correct.
2        Q.    And am I correct that you're alleging
3    that you were discriminated against by Oppenheimer
4    based on your male sex?
5        A.    That is correct.
6        Q.    And am I also correct that you have
7    alleged that Oppenheimer discriminated against you
8    based on a disability?
9        A.    That is correct.
10       Q.    And what disability is it that you
11   believe you've been discriminated against based on?
12       A.    I believe it's pertaining to my
13   aneurysm.
14       Q.    Mr. Ngo, isn't it true that, in your
15   entire career at Oppenheimer, you never once
16   reported, either in writing or verbally, to human
17   resources that you believed that you were being
18   discriminated against based on your male sex?
19       A.    That is incorrect.
20       Q.    With the exception -- with the
21   exception of the date of your termination, is it not
22   true that you have never reported to Oppenheimer's
23   human resources department, either verbally or in
24   writing, that you had been discriminated against

416

NGO - CROSS

1    based on your male sex?
2        A.    That is correct.
3        Q.    With the exception of the date of your
4    termination, is it correct that you've never
5    reported, in writing or verbally, to Oppenheimer's
6    human resources department that you were being
7    discriminated against based on a disability?
8        A.    To human resources, correct.
9        Q.    And isn't it true, Mr. Ngo, that in
10   your entire career at Oppenheimer, that you never
11   reported, either in writing or verbally, to Robert
12   Lowenthal that you believed you were being
13   discriminated against based on your male sex?
14       A.    That is correct.
15       Q.    Now, if we look on that same page of
16   the employee manual on the right side, do you see
17   the "Americans with Disabilities Act"?
18       A.    Yes, I do.
19       Q.    And you have alleged a cause of action
20   for discrimination and retaliation under the
21   Americans with Disabilities Act in this case;
22   correct?
23       A.    That is correct.
24       Q.    Do you recall testifying yesterday

417

NGO - CROSS

1    that on November 3rd, when you returned to work at
2    Oppenheimer, you told Mr. Lowenthal, I don't have a
3    disability?
4        A.    Yes, I do recall.
5        Q.    Did you ever request an accommodation
6    from Oppenheimer's human resources department based
7    on your disability?
8        A.    An accommodation?
9        Q.    Correct.
10       A.    I believe so, yes.
11       Q.    Do you recall testifying at your
12   deposition that the accommodation that you requested
13   from Oppenheimer as a result of your aneurysm was to
14   take a leave of absence?
15       A.    That is correct.
16       Q.    And you were granted that leave of
17   absence; correct, Mr. Ngo?
18       A.    I believe so.
19       Q.    Approximately when did you suffer your
20   brain aneurysm?
21       A.    I believe it was in August of 2014.
22       Q.    And you were out of the office on a
23   leave of absence from August 18th through
24   November 3rd, 2014?

418

```
1        A.    Those dates sound correct.
2        Q.    Were you paid your salary during that
3   time?
4        A.    I believe I was not.
5        Q.    And the reason that you were not paid
6   your salary during that time period is because
7   Oppenheimer doesn't have a paid leave policy;
8   correct, Mr. Ngo?
9        A.    I don't know the technicals.  I just
10  know that I was on disability.
11       Q.    Have you ever seen an Oppenheimer
12  policy that provides for a paid leave of absence?
13       A.    Could you repeat the question, please.
14       Q.    Sure.
15             Have you ever seen a written
16  Oppenheimer policy that provides for a paid leave of
17  absence?
18       A.    Written, no.
19       Q.    Let's go to page 11 of the handbook,
20  if we could.
21             You gave some testimony about this
22  tape-recording policy yesterday.
23             Do you recall that, sir?
24       A.    Wait.  Mike --
```

419

```
1                     NGO - CROSS
2        Q.    I'm sorry.  It's OPCO 47.  Page 11 of
3   the handbook.  Same exhibit.  I apologize.
4        A.    I thought you were going to
5   Exhibit 11.  Got it.
6              What page?
7        Q.    It's OPCO 47, which is page 11.
8        A.    Yes, I'm now on the same page.
9        Q.    Do you recall giving some testimony
10  yesterday about this tape-recording policy?
11       A.    That's correct.
12       Q.    I believe you testified that you did
13  not fully comply with that policy during your time
14  at Oppenheimer?
15       A.    That is correct.
16       Q.    And we saw that you tape-recorded a
17  conversation with Mr. Lowenthal -- I believe you
18  said it was on November 4th of 2014?
19       A.    That is correct.
20       Q.    And you did not tell Mr. Lowenthal
21  that you were taping that conversation?
22       A.    That is correct.
23       Q.    And you did not ask permission from
24  anybody at Oppenheimer to tape that conversation?
25       A.    That is correct.
```

420

```
1                     NGO - CROSS
2        Q.    In fact, Mr. Ngo, am I correct that
3   the November 4th tape recording of the conversation
4   that you had with Mr. Lowenthal happened the day
5   after you read Oppenheimer's employee handbook that
6   Yulia McPherson had asked you about?
7        A.    If you -- sorry.  Could you repeat the
8   question.
9        Q.    Sure.
10             Do you recall we took a look at -- I'm
11  happy to go back to it if you need to refresh your
12  recollection.
13             Do you remember we looked at an e-mail
14  exchange you had with Yulia McPherson about the
15  employee handbook?
16       A.    Yes.
17       Q.    That was dated November 3rd; correct?
18       A.    That's correct.
19       Q.    You told Ms. McPherson in that e-mail
20  exchange that you had read the employee handbook?
21       A.    Yes.  I had acknowledged it, yes.
22       Q.    You actually said in that e-mail "I've
23  read it"; correct?
24       A.    That's correct.
25       Q.    Then you recorded your conversation
```

421

```
1                     NGO - CROSS
2   with Mr. Lowenthal the next day, on November 4th;
3   correct?
4        A.    That is correct.
5        Q.    And if you look at the last paragraph
6   of the tape-recording policy, that starts "Any
7   employee who violates."
8              Do you see that, Mr. Ngo?
9        A.    Yes, but let me read the whole
10  paragraph.
11       Q.    Please.  Take your time.
12             (Pause.)
13       A.    Yes.
14       Q.    Would you agree with me, Mr. Ngo, that
15  you could have been terminated by Oppenheimer for
16  recording that conversation with Mr. Lowenthal?
17       A.    Yes.
18       Q.    Now, staying in Exhibit 8, if we could
19  turn to OPCO 52.  And I'd just like you to read to
20  yourself the leaves of absence section, and let me
21  know when you're ready.
22       A.    Oh, 52.
23       A.    Yes, which is page 16 of the handbook.
24       A.    How far do you want me to read?
25       Q.    Just the section that says, "Leaves of
```

422

NGO - CROSS

1  absence."
2  A.  Do you want me to go past "Specific
3  leave" or no?
4  Q.  Just that one paragraph.
5  A.  I've read it.
6  Q.  And do you see, sir, the last sentence
7  of that section of the employee handbook says, "In
8  all cases, a prior written request is needed and
9  must be submitted to the human resources
10  department"?
11  Do you see that, sir?
12  A.  Yes, I read that.
13  Q.  You testified at length yesterday
14  about some time that you spent out of the office
15  following the birth of your child?
16  A.  That is correct.
17  Q.  Did you ever submit a written request
18  to Oppenheimer's human resources department for a
19  leave of absence in connection with the time that
20  you spent out of the office for the birth of your
21  child in 2014?
22  A.  To human resources, no.
23  Q.  In fact, do you recall at your
24  deposition, Mr. Ngo, if you take a look at the

423

NGO - CROSS

1  screen, I asked you, "How many times during your
2  employment at Oppenheimer did you request a leave of
3  absence in writing?"
4  MR. IADEVAIA:  I'm just asking if
5  we're going to show deposition portions, we'd
6  like an opportunity to look at the transcript
7  so we can make sure it's complete.
8  MR. GIBSON:  Absolutely.
9  MR. IADEVAIA:  We have it here.  I
10  don't know --
11  MR. GIBSON:  Sure.  I'll go slow.  I
12  have the page number up there, so...
13  Judge, if you'd like a copy of the
14  full transcript, I'd be happy -- oh, you do.
15  Okay.
16  THE ARBITRATOR:  At least I believe I
17  do.
18  MR. GIBSON:  Did you give Mr. Ngo's as
19  well?
20  MR. LICUL:  I think we -- yes.  Yes.
21  MR. GIBSON:  Is everyone ready?
22  BY MR. GIBSON:
23  Q.  Do you remember at your deposition,
24  Mr. Ngo, I asked you, "How many times during your

424

NGO - CROSS

1  employment at Oppenheimer did you request a leave of
2  absence in writing?"
3  And after your attorney's objection,
4  you answered, "I believe just once."
5  And then I asked you, "And when was
6  that one time?"
7  And your answer was "After my
8  aneurysm."
9  Do you see that, sir?
10  A.  That's correct, but I also believe I'm
11  clarifying that statement later.
12  Q.  I'm just asking if you remember that
13  testimony.
14  A.  Okay.  But -- yes, I do remember that
15  testimony.
16  Q.  And your aneurysm occurred after you
17  were in California for the birth of your child;
18  correct?
19  A.  That's correct.
20  THE ARBITRATOR:  Just to ensure
21  continuity, you say you qualified the answer
22  later in the deposition.  Putting aside
23  whatever it is you said at your deposition,
24  is there any qualification that you would

425

NGO - CROSS

1  offer now to the answer that you gave, that
2  is, quote, "I believe just once"?
3  THE WITNESS:  I thought he was
4  referring to human resources, but I believe
5  that I said -- he had asked me further
6  questions later asking me if I had asked for
7  leave in a form of writing.  And I said I
8  believe that I did ask for leave in the form
9  of writing via e-mail to Ms. Ross and
10  Ms. Burns in August -- in July of 2016.
11  MR. GIBSON:  2014?
12  THE WITNESS:  Sorry, 2014.
13  BY MR. GIBSON:
14  Q.  And let's take -- if you recall --
15  this is another slide from your deposition, page 76
16  to 77.
17  MR. GIBSON:  If everyone wants to let
18  me know when they're ready.
19  (Pause.)
20  BY MR. GIBSON:
21  Q.  At your deposition, Mr. Ngo, do you
22  recall I asked you, "In connection with the birth of
23  your child, did you submit a written request for
24  FMLA leave to Oppenheimer's human resources

426

NGO - CROSS

1  department?"
2          And after your attorney's objection,
3  you answered, "No."
4          Do you recall that testimony, sir?
5      A.   Yes.
6      Q.   Do you want to qualify that testimony
7  at all, or do you recall that to be the case?
8      A.   Yeah, that's the case.
9      Q.   Now, turning back to Exhibit A, which
10  is the handbook, let's take a look at the FMLA
11  section, which is on the very next page, OPCO 53.
12          The first section under the FMLA --
13  the first paragraph under the FMLA section states,
14  "Oppenheimer & Co., Inc. Will comply with all
15  provisions of the Family and Medical Leave Act
16  (FMLA) by providing up to 12 weeks of unpaid leave
17  to eligible employees for certain family and medical
18  reasons or up to 26 weeks of unpaid leave for care
19  for an injured or ill-covered service member or
20  veteran -- service member caregiver leave during a
21  12-month period."
22          Now, I think I asked you this already,
23  Mr. Ngo, but just to be clear, am I correct you've
24  never seen any Oppenheimer written policy that

427

NGO - CROSS

1  provides for a paid leave of absence?
2      A.   That is correct.
3      Q.   Let's go to page 19.  I will represent
4  to you, but feel free to double-check, that we are
5  still under the Family and Medical Leave Act
6  section.
7      A.   Yes.
8      Q.   We see here -- I believe you testified
9  a little bit about this section on direct from your
10  attorney.  Where it says, "Request for FMLA leave:
11  An employee should request FMLA leave by submitting
12  a written request for such leave to the human
13  resources department.  The employee is expected to
14  give the company 30 days' advance notice, if
15  practical, when applying for an FMLA leave.  When
16  the need for the leave is not foreseeable, an
17  employee is expected to give notice as soon as
18  practical, except in extraordinary circumstances."
19          Now, Mr. Ngo, you testified that you
20  never requested a leave of absence for the birth of
21  your child from human resources either verbally or
22  in writing; is that correct?
23      A.   To human resources, correct.
24      Q.   And is there any reason you can think

428

NGO - CROSS

1  of why you couldn't have done that?
2      A.   Could you repeat the question.
3      Q.   Sure -- well, let me ask you this
4  way -- I'll withdraw the question.
5          When you left the office for the birth
6  of your child, there was nothing that physically or
7  mentally kept you from submitting a written request
8  for a leave of absence to Oppenheimer's human
9  resources department; correct?
10      A.   You're saying -- I'm sorry.  It's a
11  longer question, so --
12      Q.   We saw here that it says, in the
13  policy, "When the need for leave is not foreseeable,
14  an employee is expected to give notice as soon as
15  practical, except in extraordinary circumstances."
16          Am I correct, sir, that when you left
17  the office in June of 2014, there were no
18  extraordinary circumstances that would have kept you
19  from contacting Oppenheimer's human resources
20  department about taking a leave of absence?
21      A.   There could be timing issues.  I mean,
22  I sent them an e-mail requesting it to Jane and
23  Colleen.
24      Q.   Right, but we're talking about human

429

NGO - CROSS

1  resources.
2      A.   Oh, to human resources.
3      Q.   Correct.
4      A.   Okay.  I suppose I could have.
5      Q.   Now, up until the fall of 2013, if I'm
6  correct, Mr. Morgan was the head of high-yield
7  research?
8      A.   That is correct.
9      Q.   And did Mr. Morgan ever have a cohead
10  of high-yield research?
11      A.   No, he did not.
12      Q.   And if I'm correct, in or around
13  October of 2013, Mr. Morgan resigned from
14  Oppenheimer?
15      A.   That is correct.
16      Q.   And that's when you and Ms. Burns
17  became the coheads of the high-yield research group?
18      A.   That is correct.
19      Q.   And at the time of his resignation,
20  who was Mr. Morgan reporting to?
21      A.   I believe Robert Lowenthal.
22      Q.   And am I correct, sir, that as of the
23  time you became the cohead of the group, you
24  reported to Mr. Lowenthal?

430

NGO - CROSS

1    A.    Yes.
2    Q.    Now, when Mr. Morgan resigned, am I
3    correct that there were three total high-yield
4    research analysts at Oppenheimer, not counting
5    Mr. Morgan?
6    A.    That is correct.
7    Q.    And two of those were yourself and
8    Ms. Burns?
9    A.    That is correct.
10   Q.    And who was the third?
11   A.    Sean Sneeden.
12   Q.    So am I correct that as of the time
13   you became cohead of the high-yield research group,
14   there were two supervisors and one analyst?
15   A.    That is correct.
16   Q.    High-yield research was never a large
17   group at Oppenheimer, was it, Mr. Ngo?
18   A.    Relative to sales, no.
19   Q.    In your entire time at Oppenheimer, do
20   you ever recall there being more than six high-yield
21   research analysts?
22   A.    I think --
23   Q.    At one time.  I'm sorry.  I should
24   clarify that.

431

NGO - CROSS

1    Do you ever recall there being more
2    than six employed high-yield research analysts at
3    one time?
4    A.    No.
5    Q.    Do you ever recall there being more
6    than five high-yield research analysts employed at
7    one time?
8    A.    Hold on.  Let me just try to think at
9    the peak after we did the hiring.  So it was...
10        (Pause.)
11   A.    That is correct.
12   Q.    Now, once you received the title of
13   cohead of high-yield research, you continued to
14   publish in your sectors; correct, sir?
15   A.    That is correct.
16   Q.    And what were those sectors again?
17   A.    Chemicals, paper and packaging, metals
18   and mining.
19   Q.    And we're not going to spend a lot of
20   time on this, but if you would quickly just turn, to
21   please review it, to Exhibit 102.
22        (Pause.)
23   A.    I'm at 102.
24   Q.    Thank you.

432

NGO - CROSS

1    Mr. Ngo, I'm going to represent to you
2    you're not on this e-mail, but I'll ask you if
3    you've ever seen it before.
4    A.    I've never seen it before.
5    Q.    Okay.  And my first -- we see this is
6    an e-mail from Ms. Burns to Mr. Lowenthal that's
7    dated February 18, 2015, with the subject line,
8    "Bios."
9    A.    Correct.
10   Q.    And underneath that, we see six
11   individuals identified.
12        Am I correct that not all of those
13   individuals are high-yield research analysts?
14   A.    That is correct.
15   Q.    And, in fact, Ms. Broide was an
16   emerging markets and sovereign analyst?
17   A.    I think she was just sovereign.
18   Q.    Mr. Lipkin, am I correct that he was
19   munis?
20   A.    That is correct.
21   Q.    Am I correct that as of the date of
22   Ms. Burns' e-mail here in February of 2015, there
23   were a total of four high-yield research analysts
24   inclusive of yourselves and Ms. Burns?

433

NGO - CROSS

1    A.    High-yield, correct.
2    Q.    And you testified yesterday that your
3    core coverage was chemicals, metals and mining, and
4    paper and packaging?
5    A.    That's correct.
6    Q.    But that -- forgive me -- correct me
7    if I'm using different language here.
8        And that you may have picked up
9    another sector to publish, like a one-off; is that
10   a fair description?
11   A.    That's a fair description.
12   Q.    Would you agree with me here, in this
13   biography provided by Ms. Burns, it states that your
14   sectors are metals and mining, paper and packaging,
15   and chemicals?
16   A.    Let me read the bio, please.
17   Q.    Please.  Please.
18        (Pause.)
19   A.    That is correct.
20   Q.    No reference to what we talked about
21   yesterday, TMT, in your bio?
22   A.    No.
23   Q.    While we're on this exhibit -- I
24   apologize, I'm jumping ahead a little bit, but so we

434

NGO - CROSS

1  don't have to go back to it.
2        This e-mail in February of 2015 was
3  following the date on which you believe you were
4  demoted by Oppenheimer; am I correct?
5        A.   Yes.
6        Q.   It was your understanding that as of
7  this time, you were no longer the cohead of the
8  high-yield research group?
9        A.   That is correct.
10       Q.   And you felt that that removal of that
11  title was a demotion?
12       A.   Yes.
13       Q.   Would you agree with me, sir, that if
14  you look at the e-mail that was drafted by
15  Ms. Burns, in her biography, she doesn't refer to
16  herself as the head of the high-yield research
17  group?
18       A.   Let me read her profile for a second.
19       Q.   Please.  Please.
20            (Pause.)
21       A.   Not in this profile she addresses it.
22       Q.   In fact, if we compare Ms. Burns'
23  profile to yours, you both have the same corporate
24  title, managing director?

435

NGO - CROSS

1        A.   Sure.
2        Q.   And you both have the same job title
3  of senior analyst?
4        A.   Well, they were all senior analysts.
5        Q.   And then after that, the only
6  difference between the biographies is your
7  experience in the industry and what respective
8  sectors you covered?
9        A.   According to this bio, yes.
10       Q.   Thank you.
11            What were the sectors that Ms. Burns
12  covered when you were at Oppenheimer?
13       A.   I believe she covered consumer and
14  retail.
15       Q.   And what sectors did Mr. Sneeden
16  cover?
17       A.   I believe Sean covered oil and gas.
18       Q.   Oil and gas?
19       A.   That's correct.
20       Q.   Would you agree with me, Mr. Ngo, that
21  after becoming the cohead of high-yield research,
22  the core responsibility of your job remained to
23  publish in your respective sectors?
24       A.   No.

436

NGO - CROSS

1        Q.   Do you believe the supervisory
2  responsibilities that you took on were a major part
3  of your daily work at Oppenheimer?
4        A.   It was a large part, yes.
5        Q.   Let's talk about some of those
6  additional responsibilities.
7             And I think one of them that you gave
8  some testimony about yesterday was the morning
9  blast?
10       A.   That's correct.
11       Q.   And if I'm correct, you did not author
12  the morning blast yourself; right, sir?
13       A.   It was a compilation of some pieces I
14  did author.
15       Q.   But when you refer to "a compilation,"
16  it was bits and pieces of research from other
17  analysts that was put together?
18       A.   That is correct.
19       Q.   For the time period that you were the
20  cohead of high-yield research, it went out under
21  your name; am I correct?
22       A.   Could you repeat the question, please.
23       Q.   Sure.
24            During the time period that you were

437

NGO - CROSS

1  the cohead of the high-yield research group, am I
2  correct that this compilation of research that's the
3  morning blast was sent out under your name?
4        A.   Not during the whole time because Rob
5  switched it in July.
6        Q.   And it's your testimony that you were
7  not demoted until November of 2014?
8        A.   I was not notified until November of
9  2014.
10       Q.   That's when you claim to be -- have
11  been notified; correct?
12       A.   That's correct.
13       Q.   The morning blast wasn't a significant
14  part of your duties as the cohead of the group, was
15  it, Mr. Ngo?
16       A.   I disagree with that.
17       Q.   Did you testify yesterday it was about
18  two pages long?
19       A.   I said it could be about two pages,
20  but sometimes it was longer.  If it was earnings
21  season, it was more than two pages because there
22  were a lot of companies reporting.
23       Q.   Earnings season is quarterly, four
24  times a year?

438

NGO - CROSS

1    A.    Four times a year.

2    Q.    When it wasn't earning season, was it

3  about a two-page e-mail?

4    A.    Again, it depends on what -- what

5  happens, what's topical that day.  If someone

6  includes a longer report or -- but it's -- I

7  couldn't say that it's just two pages.

8    Q.    Did you testify yesterday it took

9  about ten minutes to review and approve the morning

10 blast?

11   A.    If there were no complications, yes.

12   Q.    Now, before you were the sender of the

13 morning blast, who did it come out under -- from, I

14 should say?  I apologize.

15   A.    Todd Morgan.

16   Q.    Who did -- after you ceased to be the

17 sender of the morning blast, do you know who it came

18 from?

19   A.    It came from Oppenheimer.

20   Q.    From the company?

21   A.    Yes.  They decided to make it

22 nondenominational, and they didn't put Ms. Burns on

23 it.

24   Q.    So as far as you know, the morning

439

NGO - CROSS

1  blast never came from Ms. Burns; correct?

2    A.    That is correct.

3    Q.    Now, am I correct that another part of

4  your supervisory role was to SA research?

5    A.    That is correct.

6    Q.    But you were able to SA research even

7  before you were given the position of cohead due to

8  your certification?

9    A.    That is correct.

10   Q.    When you were given the title of

11 cohead of high-yield research in 2013, whose

12 research were you reviewing and approving?

13   A.    Various analysts'.

14   Q.    How many?

15   A.    In what time period?

16   Q.    Let's say October of 2013, when you

17 first got the title of cohead.

18   A.    It would have been Sean and Colleen.

19 And then if -- I believe we might have done some of

20 the emerging market stuff, too.  And then also

21 Lucila Broide.

22   Q.    Lucila Broide I believe was in --

23   A.    And also John Daniels as well, who was

24 a research analyst.

440

NGO - CROSS

1    Q.    Was Mr. Daniels there in 2013?

2    A.    Oh, sorry.  Not in 2013, correct.

3    Q.    How long on average would you say it

4  takes to SA a piece of research?

5    A.    On average?

6    Q.    Yes.

7    A.    It depends.  If it -- if it's a long

8  report, you'd have to read a ten-page report, right.

9  So if it's a short report of two pages, it would be

10 shorter.  But it also depended, too, on -- it

11 depends.  If it was a two-page report, I think I

12 could do it in ten minutes.

13   Q.    What about if it was a ten-page

14 report; how long do you think it would take to SA?

15   A.    Just the length -- to read a ten-page

16 report and just to make sure some things --

17 sometimes if there was questions with the analysts

18 saying, why is this here?, then that would take a

19 little longer.  But I would say probably add another

20 five, ten minutes.  I don't know.  It depends on the

21 report.

22        THE ARBITRATOR:  Apart from inquiring

23        with the source about something that's been

24        said in the report, would you do any --

441

NGO - CROSS

1  sometimes any editing of the report, the

2  text?

3        THE WITNESS:  It depends on the

4        report.  For example, like Lucila Broide,

5        when she first started, there was a lot of

6        editing.  So she wasn't able -- when I first

7        SA'd her work, I would say, you have to go

8        back and rewrite this section.  Then that

9        took her maybe another day or two, and then

10       I'd have to go back and say -- it depends.

11       For example, Sean Sneeden, when he

12       first started, he was more junior.  So we

13       have to do more SA'ing.  By the time he

14       became more senior, it was less.

15 BY MR. GIBSON:

16   Q.    From the time of October 2013, when

17 you became the cohead of the research group, through

18 May of 2014, how many high-yield research reports

19 would you say you personally reviewed in an average

20 day?

21   A.    In a average day?

22   Q.    Uh-huh.

23   A.    There would be the morning blast,

24 which is a report in itself --

442

NGO - CROSS

1    Q.   Let's set -- I appreciate that. Let's
2    set the morning blast aside and just talk about any
3    other additional research in your average day that
4    you would have to review and SA.
5         A.   Again, it depends on the period.
6    Because if it's earnings, all those Bloombergs are
7    considered reports. They all need to be SA'd. So
8    if you have -- like Sean Sneeden, who covered oil
9    and gas, during earnings, there's a lot of companies
10   reporting. So some days it could be, you know,
11   something as high as -- it depends.
12        Because you cannot physically write --
13   if, say, ten companies reported that day, you can't
14   write on all ten. So sometimes Sean would write on
15   maybe five of them, and that would take some more
16   time. I don't know the exact number. It just
17   depends on the seasonality and it depends on news
18   that breaks for each company.
19        Q.   That's a fair point, so let me see if
20   I can narrow it down a little bit.
21        A.   Sure.
22        Q.   First, let's talk about -- let's not
23   talk about earnings season.
24        When you were not in earnings season,

443

NGO - CROSS

1    on an average day -- again, the time period is
2    October of 2013 through May of 2014, on your average
3    day, how many pieces of research are you SA'ing?
4         A.   It's very hard to say average per day
5    because each day is different. There would be at
6    least -- at a minimum, you would have to do the
7    morning blast. And then throughout the day, if
8    there was any trading on a company and someone wrote
9    a Bloomberg, then I would need to SA that. So to be
10   honest, Mike, I really don't know -- I've never
11   calculated an average of how many I SA'ed a day.
12        THE ARBITRATOR: Can you offer an
13        estimate at least of a range on a quiet day
14        to a busy day?
15        THE WITNESS: Sure. Like a quiet day,
16        without any news, would pretty much be the
17        morning blast, maybe one or two Bloombergs
18        throughout the day. At busy day could be 25
19        companies, you know, during earnings.
20        Because earnings is where everyone worked
21        late and people would have to write more
22        reports, and you try to cover as many
23        companies as you can that day.

444

NGO - CROSS

1    BY MR. GIBSON:
2         Q.   So talking about one of those --
3         MR. GIBSON: I'm sorry, Judge, were
4    you --
5         THE ARBITRATOR: I was going to ask,
6    for a busy day, the hypothetical 25
7    companies, normally what would you likely
8    expect in terms of how much time you would
9    have to devote to that?
10        THE WITNESS: To SA'ing?
11        THE ARBITRATOR: Yes.
12        THE WITNESS: Well, I SA my own
13   companies, so it was always just a long day.
14   So I would say if it was an experienced
15   analyst, I could just read the report and
16   say, okay. If it was an inexperienced
17   analyst, then I'd have to be a little bit
18   more careful and say -- because I have to
19   juggle my work as well, right, during that
20   busy period.
21        So I don't know if I -- I just don't
22   know averages. During earnings -- earnings
23   were 12-hour days, long days. So there would
24   be a lot of SA'ing, plus I SA my own work as

445

NGO - CROSS

1    well. So it just -- it just depended.
2         THE ARBITRATOR: So if you said -- I
3    think you said for a simple report, it might
4    not take more than, say, ten minutes. If you
5    assume that the 25 companies -- simple -- all
6    of them involving simple reports, to do the
7    simple math, that's 250 minutes, which is
8    somewhere around --
9         THE WITNESS: Sixty divided by
10   twenty-five --
11        THE ARBITRATOR: Four hours or more,
12   something like that.
13        THE WITNESS: Yes, but that's -- it
14   depends. I don't think I honestly spent four
15   hours SA'ing a day, right. Well, it depends.
16   If it was Lucila's report -- I remember
17   sitting down with her for a couple of hours
18   and say, hey, Lucila, you need to probably
19   mention this about sovereign or something
20   like that. She was new. And it really
21   varied by the analyst.
22        THE ARBITRATOR: By the way, one other
23   question about this.
24        If the report contains, as I assume

446

NGO - CROSS

1    these reports typically would, a specific
2    fact, including data, did you have any
3    obligation to check the data?  Or did you
4    just assume that whatever was specific to
5    that extent in the reports was accurate?
6         THE WITNESS:  "Check the data"?  What
7    do you mean, like verify the data?
8         THE ARBITRATOR:  Like a fact-checker.
9         THE WITNESS:  Again, it depended on
10   the analyst, right.  If it was a very strong
11   analyst, I'd look through their numbers a
12   little bit more because there are mistakes,
13   right.  Maybe you calculated EBITDA wrong,
14   maybe your model was not functioning right.
15        Or if you looked at some of the
16   statistics.  If someone said something was
17   levered ten times, that would be a red flag.
18   The average leverage in high-yields is about
19   five, so what's wrong with this company?
20        If it was a distressed company which
21   we wrote about, sometimes you would have to
22   be more careful because the analyst --
23   distress is just a much more bigger beast to
24   analyze, right.  You have to make sure that

447

NGO - CROSS

1    there's not any errors.
2         I'm certainly sure that I am guilty of
3    missing some errors, but the goal was -- is
4    to try to mitigate those errors, serve as a
5    mentor for some of the analysts, and say,
6    hey, why don't you do it this way.
7         Some days -- like, for example, when I
8    initiated on the paper and packaging sector,
9    that was an 80-page report.  That would take
10   a lot longer to SA than -- you have to read
11   80 pages and then check the data and just --
12   so every day -- every day was different, as
13   far as SA'ing.
14        THE ARBITRATOR:  Thank you.
15   BY MR. GIBSON:
16        Q.   When you were cohead of the high-yield
17   research group, did you receive a salary increase?
18        A.   Base-wise, no.
19        Q.   Your base salary didn't go up?
20        A.   When I was promoted, I don't believe
21   so.
22        Q.   Well, going off your testimony
23   yesterday, if I recall correctly, you had received
24   an increase in salary the year before that was paid

448

NGO - CROSS

1    periodically.
2         Do you remember that testimony
3    yesterday?
4         A.   Yes.
5         Q.   Is it your understanding that when you
6    became the cohead of high-yield research, that
7    change in base salary became permanent?
8         A.   I don't think the catalyst for that
9    base salary becoming permanent was the promotion to
10   cohead.  I'm not certain on the timing.  I just know
11   that Rob had said that when I can clear it, I would
12   clear the 150- base.
13        Q.   If we could take a look at
14   Exhibit 112.
15        Mr. Ngo, so everyone knows, I think
16   with this exhibit, there may be some jostling
17   around.  Because I'm not sure that we put them in
18   our book the same way you put them in your book.  We
19   put them in Bates Stamp order.  I don't know if you
20   did.  I'm going to be referring to the same
21   documents.  They might not be in the same order.
22        A.   Okay.
23        Q.   Mr. Ngo, yesterday I believe you gave
24   some testimony regarding these personnel change

449

NGO - CROSS

1    form -- notice forms.
2         Do you recall that?
3         A.   Yes, I did.
4         Q.   I'd like to take a look at the one
5    that's dated October 18, 2013.  That has the Bates
6    No. OPCO 6 on it.
7         Do you have that one in front of you,
8    Mr. Ngo?
9         A.   Yes, I do.
10        Q.   As I said, this one is dated
11   October 18, 2013.  If you look above that, it has an
12   effective date of October 1st, 2013.
13        A.   Where are the dates you're looking at
14   again, Mike?  I'm sorry.
15        Q.   Sure.
16        If you look in the bottom left corner
17   of the form --
18        A.   "Effective date," it says "10/1," and
19   then there's a date of 10/18/13.
20        Q.   Correct.
21        We see that has an effective date of
22   10/1/13?
23        A.   That's correct.
24        Q.   Is that at or about the time that you

450

NGO - CROSS

1   became the cohead of high-yield research?
2   A.   I believe it was in October.  I don't
3   know the exact date.
4   Q.   And if we look to the right side of
5   the form, there's a field called "Notes and
6   Explanation"?
7   A.   Yes.
8   Q.   It says, "Salary increase effective
9   10/1/13"?
10  A.   Yes.
11  Q.   And looking to the left and a little
12  bit up from that field, do you see the field that
13  says, "Salary"?
14  A.   That's correct.
15  Q.   And it reflects "$150,000"?
16  A.   That's correct.
17  Q.   What was your salary at Oppenheimer in
18  2014?
19  A.   It was $150,000.
20  Q.   And what was it in 2015?
21  A.   $150,000 base.
22  Q.   And -- correct.
23       And what was your base salary in 2016?
24  A.   My base was 150,000.

451

NGO - CROSS

1   Q.   Am I correct, sir, that from the date
2   that your base salary was increased to $150,000 in
3   October of 2013, it was never reduced by
4   Oppenheimer?
5   A.   Base, correct.
6   Q.   And staying on this form, if you look
7   in the upper right corner, do you see the field that
8   says, "Immediate Supervisor"?
9   A.   Yes.
10  Q.   And whose name is printed under that?
11  A.   Robert Lowenthal.
12  Q.   And do you recognize that to be
13  Mr. Lowenthal's signature in the bottom right of the
14  document where it says, "Final Approval"?
15  A.   Yes.
16  Q.   Have you ever seen one of these forms
17  that identifies Jane Ross as your immediate
18  supervisor?
19  A.   No, I have not.
20  Q.   In fact, Mr. Ngo, you've never seen
21  any Oppenheimer document that identifies Ms. Ross as
22  your supervisor; isn't that true?
23  A.   I disagree with that characterization.
24  Q.   What document would you say identifies

452

NGO - CROSS

1   Ms. Ross as your immediate supervisor?
2   A.   I think that my offer letter was
3   signed by Jane Ross.
4   Q.   I'm happy to go back to it if you'd
5   like to.
6        Was there anywhere in that letter
7   where Ms. Ross was identified as your supervisor?
8   A.   Well, she signed it and she implied
9   that -- that she was the head of high-yield desk.
10  Q.   Setting aside implications, is there
11  anywhere in that letter where Ms. Ross is identified
12  as your supervisor?
13  A.   Not directly.
14  Q.   In fact, it directly states that Todd
15  Morgan is your supervisor; correct, Mr. Ngo?
16  A.   That is correct.
17  Q.   Now, you testified yesterday on
18  May 12, 2014, you informed Mr. Lowenthal that you
19  and your partner were going to have a baby via
20  surrogacy?
21  A.   That is correct.
22  Q.   And during that conversation with
23  Mr. Lowenthal on May 12th, did you discuss the
24  potential for taking a leave of absence?

453

NGO - CROSS

1   A.   The first conversation -- the
2   potential, yes.
3   Q.   And the reason you asked -- you
4   discussed that issue with Mr. Lowenthal was that he
5   was your supervisor; right?
6   A.   That is correct.
7        MR. GIBSON:  And I'll give everybody a
8   chance to take a look at the transcript.
9   This is on page 118.
10       (Pause.)
11       MR. GIBSON:  Is everybody ready?
12       MR. IADEVAIA:  I mean, Judge, I know
13  we're in arbitration.  This isn't really
14  cross-examination and he just testified to
15  this.  I don't know what the need to do this
16  is.
17       THE ARBITRATOR:  I'm not sure about
18  need as a basis for the objection.  If
19  nothing else, since Mr. Ngo is the party in
20  the case, his deposition can be used for any
21  purpose.  So to the extent that's an
22  objection, it's overruled.
23       MR. IADEVAIA:  Okay.
24       MR. GIBSON:  I promise I don't have

454

NGO - CROSS

1    many more of these.
2    BY MR. GIBSON:
3        Q.    Mr. Ngo, do you recall at your
4    deposition, when we were discussing your May 12
5    conversation with Mr. Lowenthal, I asked you, "Why
6    did you tell -- why did you tell Rob Lowenthal?"
7            Your answer was, "Because I had to get
8    my leave approved by him."
9        Then I asked you, "Because he was your
10   immediate supervisor?"
11            And your response, "That is correct."
12            And then I asked you, "Would you agree
13   with me that it would be important to keep your
14   supervisor informed the time that you were going to
15   be out of the office?"
16            And after your client's [sic]
17   objection, you testified, "Yes."
18            Do you recall that testimony?
19       A.    Yes, I recall it.
20       Q.    Do you want to qualify that testimony
21   at all?
22       A.    No, not at this stage.  I don't see
23   anything...
24       Q.    Now, during this first conversation
25

455

NGO - CROSS

1    with Mr. Lowenthal on May 12th, he didn't tell you
2    that you could not take a leave of absence to be
3    with your baby for her birth, did he?
4        A.    In May, correct.
5        Q.    And he didn't tell you that he would
6    prefer that you didn't take a leave of absence;
7    correct?
8        A.    Not in those words, no.
9        Q.    And he didn't tell you that you were
10   only entitled to a certain amount of leave during
11   that conversation?
12       A.    Repeat the question, please.
13       Q.    Sure.
14            During that first conversation with
15   Mr. Lowenthal on May 12, he didn't tell you that you
16   were only entitled to a certain time period of
17   leave; correct?
18       A.    No.
19       Q.    In fact, Mr. Lowenthal specifically
20   told you to speak to Oppenheimer's human resources
21   department; right?
22       A.    That's correct.
23       Q.    I think he told you to speak to Lenore
24   Denys about that?
25

456

NGO - CROSS

1        A.    That's correct.
2        Q.    And then he told you to speak to Jane
3    Ross and Colleen Burns about work coverage while you
4    were out of the office; right?
5        A.    That's correct.
6        Q.    Now, did you, in fact, speak to human
7    resources?
8        A.    I did.
9        Q.    And we saw an e-mail with Ms. Denys
10   that we're going to look at again, but I wanted to
11   ask you, do you recall whether you had a
12   conversation with Ms. Denys before the e-mail
13   exchange?
14       A.    I know I spoke with Ms. Denys.  I
15   believe it was after the exchange -- it was after
16   the e-mail exchange with Ms. Denys.
17       Q.    How long after?
18       A.    It was very quickly right after, I
19   believe.
20       Q.    What do you recall during that
21   conversation?
22       A.    I remember her saying to refer to
23   page 17 in the employee manual.  And then I might
24   have asked her for some clarity on some issues
25

457

NGO - CROSS

1    and -- yes.
2        Q.    And are you sure that that
3    conversation didn't take place before the e-mail in
4    which we saw Ms. Denys told you where to find the
5    employee handbook?
6        A.    I'm not certain, Mike.  I just know
7    that I remember e-mailing her and I remember talking
8    to her.  I don't know exactly the order it was.
9        Q.    Would you agree with me that the
10   telephone conversation you had with Ms. Denys was
11   within a day or two, either before or after, the
12   e-mail?
13       A.    Again, I don't know if it was before
14   or after, but I know it was fairly within that
15   range.
16       Q.    Thank you.
17            Now, at the time that you spoke with
18   Ms. Denys, was it your understanding that she was
19   the director of Oppenheimer's human resources
20   department?
21       A.    I knew she was in human resources,
22   correct.
23       Q.    During that conversation, did
24   Ms. Denys ever tell you that you could not take a
25

458

1          NGO - CROSS
2   leave of absence for the birth of your child?
3          A.   No, she did not.
4          Q.   Did she tell you that you should not
5   take a leave of absence for the birth of your child?
6          A.   No, she did not.
7          Q.   Let's take a look at that e-mail.  And
8   I apologize, I think I have it as a different
9   exhibit.  It might be in here twice.  Let's look at
10  113, if we can.  Let me know when you've had a
11  chance to review it, sir.
12         A.   I reviewed this yesterday.
13         Q.   So at the bottom of Exhibit 113, we
14  see the e-mail from yourself to Ms. Denys.  And it's
15  titled "Maternity/Paternity Policy."
16              And you state, "Hi, Lenore.  I spoke
17  to Rob Lowenthal this morning.  I am having a baby
18  with my partner - the baby is due July 3 - and I am
19  trying to figure out leave.  Rob suggested I speak
20  to you to find out what the policy -- the policy the
21  firm has in place, what is the policy for paternity
22  leave.  Also I don't know if there is precedent for
23  a gay couple, but are there any comps or policies in
24  place?"
25              Am I correct that that's the same day

459

1          NGO - CROSS
2   that you spoke to Mr. Lowenthal that you sent this
3   e-mail to Ms. Denys?
4          A.   That is correct.
5          Q.   And would you agree with me, sir, that
6   there's no reference in your e-mail to Ms. Denys to
7   work coverage?
8          A.   No, because that was something that I
9   was supposed to deal -- that was something I was
10  supposed to deal with Colleen and Jane.
11         Q.   Right.
12              Because you were supposed to deal with
13  Ms. Ross and Ms. Burns about work coverage, and you
14  were supposed to deal with Ms. Denys about taking a
15  leave of absence; correct?
16         A.   I was actually inquiring of Ms. Denys
17  about -- that's not a correct characterization.  I
18  was told to inquire to Ms. Denys about the policy.
19  And the e-mail that I'm writing to her is I'm
20  inquiring about the policy.
21         Q.   Right.
22              And you were supposed to talk -- if
23  you decided to take a leave of absence, you were
24  supposed to discuss with Ms. Burns and Ms. Ross work
25  coverage during that leave; correct?

460

1          NGO - CROSS
2          A.   I also thought that means discuss --
3   giving them dates and giving them exact time frame
4   as well.
5          Q.   You didn't have any understanding that
6   you needed to advise Ms. Denys whether or not you
7   wanted to take a leave of absence?
8          A.   No, because as --
9          Q.   Is the answer yes or no?
10         A.   Well -- repeat the question, please.
11         Q.   Sure.
12              It wasn't your understanding in May of
13  2014 that you needed to advise human resources of
14  whether or not you wanted to take a leave of
15  absence?
16         A.   I did not think -- I did not think
17  that was a requirement.
18         Q.   Now, would you agree with me, sir,
19  that -- in your May 12th e-mail to Ms. Denys, you
20  don't tell her that you're going to take a leave of
21  absence; correct, sir?
22         A.   At that point, I had not decided, yes.
23         Q.   In fact, you say that you're trying to
24  figure out leave?
25         A.   Yes.

461

1          NGO - CROSS
2          Q.   And above that, we see Ms. Denys'
3   response e-mail to you.  And it appears she
4   responded approximately seven minutes later?
5          A.   That's correct.
6          Q.   And she states, "We do not have a
7   separate paternity leave policy, but you may be
8   entitled to 12 weeks of unpaid leave under the
9   Family and Medical Leave.  You can refer to page 17
10  in the employee handbook for the details.  The
11  handbook can be found on the company's intranet
12  under the employee benefits."
13              After receiving this e-mail from
14  Ms. Denys, you did go and read the Oppenheimer FMLA
15  policy; correct, Mr. Ngo?
16         A.   I went straight to page 17.
17         Q.   At your deposition, at pages 122 to
18  123, I asked you, "Now, after you received this
19  e-mail from Ms. Denys, did you, in fact, go to the
20  employee handbook reference?"
21              And your answer was, "I did.  I did.
22  I remember reading it."
23              And then I asked you, "When you
24  read -- when you looked at the employee handbook,
25  did you read the FMLA section?"

462

NGO - CROSS

1    And the answer is "Yes."
2    Is it your testimony, Mr. Ngo, that
3    you only read page 17?
4    A.    I went straight to that page, yes.
5    Q.    My question was, is it your testimony
6    that you only read page 17?
7    A.    I believe that's probably correct.  I
8    looked at the section that she referenced to.
9    Q.    Well, she referenced you to the FMLA
10   section that was on page 17; correct?
11   A.    Yes, I remember going to the employee
12   handbook, hit search, go straight to page 17.
13   Q.    Did you go down to the next page to
14   see what else it may have said under that section?
15   A.    I believe I read just the FMLA
16   section.  I just remember reading the relevant
17   section that she referenced.
18   Q.    Was that the entire FMLA section?
19   A.    I believe so.
20   Q.    Now, with the exception of the
21   telephone call that you described with Ms. Denys
22   that you said may have happened before, it may have
23   happened after, but somewhere in that time period,
24   did you ever contact Ms. Denys and tell her that you

463

NGO - CROSS

1    wanted to take a leave of absence -- withdrawn.
2    Did you ever contact Ms. Denys and
3    tell her that you wanted to take a leave of absence
4    for the birth of your child?
5    A.    No, I did not.
6    Q.    Did you ever contact anyone in human
7    resources and tell them that you wanted to take a
8    leave of absence for the birth of your child?
9    A.    No, I did not.
10   Q.    With the exception of the one
11   telephone call that you described with Ms. Denys,
12   between the time that you received this e-mail from
13   her and August 15, 2014, did you ever contact anyone
14   in Oppenheimer's human resources department for any
15   reason?
16   A.    Did I?
17   Q.    Yes.
18   A.    No.
19   Q.    Now, going back to Exhibit 113, am I
20   correct, sir, that that same day that you spoke to
21   Ms. Lowenthal and communicated with Ms. Denys, you
22   forwarded Ms. Denys' e-mail to Mr. Lowenthal?
23   A.    That is correct.
24   Q.    And in your e-mail to Mr. Lowenthal,

464

NGO - CROSS

1    you specifically reference the FMLA section of the
2    employee handbook?
3    A.    Yes, I do reference it.
4    Q.    And can you read the last sentence of
5    your e-mail to Mr. Lowenthal.
6    A.    "Thanks for being so understanding and
7    helpful today.  Hoai."
8    Q.    Mr. Ngo, you would not dispute that as
9    of May 12, 2014, Oppenheimer had made you aware that
10   you were entitled to 12 weeks of unpaid leave under
11   the FMLA in connection with the birth of your child,
12   would you?
13   A.    I'm sorry.  Could you repeat that
14   question.
15   Q.    Sure.  I'll rephrase it.
16   Would you agree with me that as of
17   May 12, 2014, Oppenheimer had made you aware that
18   you were entitled to 12 weeks of unpaid leave under
19   the FMLA in connection with the birth of your child?
20   A.    That is correct.
21   MR. GIBSON:  Judge, is this a good
22   time to take the midmorning break?
23   THE ARBITRATOR:  That's fine.
24   (Recess from the record.)

465

NGO - CROSS

1    THE ARBITRATOR:  Why don't we proceed.
2    MR. GIBSON:  Thank you.
3    BY MR. GIBSON:
4    Q.    Mr. Ngo, am I correct that after your
5    e-mail communications with Mr. Lowenthal and
6    Ms. Denys on May 12th, you spoke to Jane Ross?
7    A.    That is correct.
8    Q.    And was that conversation that same
9    day, May 12th?
10   A.    I believe so.  It was very close in
11   proximity.
12   Q.    Am I correct that one of the reasons
13   you went to speak to Ms. -- I'm sorry -- Ms. Ross is
14   because Mr. Lowenthal told you to speak to Ms. Ross
15   about work coverage should you take a leave?
16   A.    He said, yes, talk to Jane and
17   Colleen.  Yes.
18   Q.    And you are the one who approached
19   Ms. Ross for that conversation; correct, sir?
20   A.    That's correct.
21   Q.    Now, I'd like you to take a look at
22   Exhibit 129, please, which is a copy of your
23   statement of claim in this proceeding.  And
24   specifically page 6.

466

NGO - CROSS

1
2        (Pause.)
3        Q.   I note here, at paragraph 29 of your
4    statement of claim, it alleges, "When Ngo met with
5    Ross, however, she attempted to dissuade Ngo from
6    taking paternity leave.  Ross emphasized that she
7    did not use her full 12 weeks of maternity leave
8    when she had her two children.  She also said that
9    women make a mistake when taking so much time off
10   after their children are born because kids need
11   their mothers more during their teenage years."
12       Mr. Ngo, do you recall giving
13   testimony about this conversation with Ms. Ross at
14   your deposition?
15       A.   Yes, I do.
16       Q.   And do you recall testifying, during
17   your deposition, that Ms. Ross implied that most
18   people need -- I'm sorry -- that most women need --
19   withdrawn.
20       Do you recall testifying, quote --
21       THE ARBITRATOR:  Page what?
22       MR. GIBSON:  This is actually -- I
23   don't have a slide, but it's page 131,
24   line 23.
25       THE WITNESS:  This is my deposition?

467

NGO - CROSS

1
2    BY MR. GIBSON:
3        Q.   Yes.  Yes.
4        A.   What exhibit is it because --
5        Q.   It's not.  Your counsel is just
6    looking at the transcript of the deposition.
7        A.   Okay.  Got it.  Got it.  Got it.
8        Q.   And my question is, do you recall
9    testifying that Ms. Ross, quote, "implied that most
10   people need -- women make the mistake of taking it
11   earlier than later because she had teenage kids and
12   she said that she would have taken the leave later"?
13       Do you recall that?
14       A.   I recall saying that she stated that
15   claim to me and the implication was that she was
16   implying that I take that amount of time or less.
17       Q.   So the implication was that she was
18   implying that you should take less leave?  Was that
19   what your testimony was?
20       A.   I think that's correct.
21       Q.   Also, for reference, this is at
22   line -- I'm sorry -- page 132, line 5.
23       Do you recall testifying, quote, "She
24   also told me -- like her tone was also -- you know,
25   you can tell from telling me that story about the --

468

NGO - CROSS

1
2    her situation, she was implying to me that
3    somehow -- I got the impression that she was
4    implying that I should take less leave"?
5        Do you recall that testimony?
6        A.   Yes.
7        Q.   Ms. Ross never told you that you could
8    not take a leave under the FMLA for the birth of
9    your child, did she, Mr. Ngo?
10       A.   Not directly.
11       Q.   And Ms. Ross never told you that you
12   should not take a leave of absence under the FMLA?
13       A.   Not directly.
14       Q.   Ms. Ross never told you that you
15   should not take time out of the office to be with
16   your newborn child, did she?
17       A.   Repeat that question.
18       Q.   Sure.
19       Ms. Ross never told you that you
20   should not take time out of the office to be with
21   your newborn child, did she?
22       A.   She approved the first two weeks, so,
23   no, that's not correct.
24       Q.   So the answer is she never told you
25   that you should not --

469

NGO - CROSS

1
2        A.   That is correct.
3        Q.   -- take time to be with your child?
4        A.   That's correct.
5        Q.   Ms. Ross never told you that you could
6    be disciplined by Oppenheimer if you spent time out
7    of the office to be with your child; is that
8    correct?
9        A.   Not directly, yes.
10       Q.   In fact, Ms. Ross never told you that
11   you should take less than 12 weeks of leave for the
12   birth of your child; isn't that true?
13       A.   Not directly, correct.
14       Q.   You just believed that she was
15   implying that through her tone; am I correct?
16       A.   Not just tone.  It's the comments that
17   she made.  It's a combination of things.  It was the
18   telling me a story about her kids and her four --
19   saying she took less than three months off and that
20   she took two months off.  I mean, she had never told
21   me that detail before, and I didn't think that was
22   relevant to the conversation.
23       And the second thing that she said to
24   me was that she -- she was discouraging again about
25   transferring the morning blast to Ms. Burns.

470

NGO - CROSS

1
2        And the third thing that she said to
3    me was -- that I found a little bit disconcerting
4    was her inquiring so aggressively what my partner
5    did.
6        Q.   Let's talk again -- I want to talk
7    about the first thing you said there, which was that
8    she -- you felt that she was implying that you
9    should take no leave or reduced leave because she
10   had told you about her personal experiences with her
11   children?
12       A.   That's correct.
13       Q.   And I think you said that you never
14   had had a conversation with her about that before?
15       A.   That is correct.
16       Q.   How many prior conversations did you
17   have with Ms. Ross about the issue of taking a leave
18   of absence for the birth of a child?
19       A.   Prior to that?
20       Q.   Correct.
21       A.   None.
22       Q.   In fact, am I correct, sir, that you
23   specifically told Ms. Ross during that conversation
24   that Ms. Denys had previously made you aware of your
25   rights under the FMLA?

471

NGO - CROSS

1
2        A.   That is correct.
3        Q.   And, in fact, just to clarify, at
4    page 37 of your deposition, when talking about that
5    conversation, you testified, "And I just said, well,
6    here's what -- the rights that I spoke with Lenore
7    Denys about."
8        Do you remember that testimony?
9        A.   Yes, I do.
10       Q.   When you told --
11       MR. IADEVAIA:  It's just an answer.
12   Can we at least get the question?  I think
13   it's misleading.
14       THE ARBITRATOR:  Okay.
15       MR. GIBSON:  Well, my only question
16   was did he tell Ms. Denys that -- Ms. Ross
17   that he had just spoken to Ms. Denys about
18   those rights.
19       MR. IADEVAIA:  But if you're going to
20   use the transcript --
21       THE ARBITRATOR:  Let's stop the
22   interchange --
23       MR. GIBSON:  Fair point.
24       THE ARBITRATOR:  -- at this point.
25   It's a long answer.

472

NGO - CROSS

1
2        MR. GIBSON:  It's usually the result
3    of a bad question.
4        (Pause.)
5        THE ARBITRATOR:  I guess the question
6    was, "Can you describe for me each instance
7    where Robert Lowenthal either interfered
8    with, restrained or denied you of your rights
9    under the FMLA," and the answer goes on for
10   pages.
11       In any event, let's proceed to the
12   next question.
13       MR. GIBSON:  Thank you.
14   BY MR. GIBSON:
15       Q.   Now, after you told Ms. Ross that
16   Ms. Denys had informed you that you were entitled to
17   12 weeks of leave under the FMLA, Ms. Ross didn't
18   dispute that, did she?
19       A.   Well -- could you repeat the question.
20   I'm sorry.
21       Q.   Sure.
22       After you told Ms. Ross that Ms. Denys
23   had informed you that you were entitled to 12 weeks
24   of FMLA leave, Ms. Ross didn't dispute that, did
25   she?

473

NGO - CROSS

1
2        A.   That's not necessarily the way I would
3    describe it.
4        Q.   Well, is the answer no or yes?  Did
5    she dispute it?
6        A.   Well, she -- from my perspective, she
7    disputed it by proceeding further about telling
8    about her time off and saying that she took less
9    than the three months.  I think those are correlated
10   to the timing.
11       THE ARBITRATOR:  I take it from what
12   you're saying, correct me if I'm wrong, is
13   that although Ms. Ross did not indicate to
14   you that you were not entitled to a full 12
15   weeks, she was suggesting to you implicitly,
16   based on her experience as she recounted it,
17   that it might be advisable or would be
18   advisable for you to take less than 12 weeks;
19   is that fair?
20       THE WITNESS:  Exactly.  Because she
21   never told me what her leave was with her
22   daughters.  She never gave me any parental
23   advice before or even after.  So it was kind
24   of uncharacteristic for her to give me that
25   personal information because we never had

474

NGO - CROSS

1
2    that type of relationship that she would
3    share with me about how much time maybe women
4    take.
5         Sometimes -- like, for example,
6    Colleen had said to me she thought that women
7    should take three months.  We had that
8    relationship, but Jane and I did not have
9    that relationship, so I thought that comment
10   was a little bit out of character.
11   BY MR. GIBSON:
12   Q.    As a result, you were surprised to be
13   getting parental advice, I believe you said, from
14   Ms. Ross?
15   A.    Yes.
16   Q.    She didn't give you any career advice,
17   did she?
18   A.    What?
19   Q.    She didn't give you any career advice
20   during that conversation, did she?
21   A.    Well, there's an implicit -- if she's
22   saying -- if she is implying me not to take the
23   leave, I guess that is somewhat career advice,
24   wouldn't you say?
25   Q.    You think it was -- I'm asking you.

475

NGO - CROSS

1
2    A.    I don't think it was career advice.  I
3    think it was an implicit statement for her to
4    give me the -- it was implicit, when she gave me two
5    months off, that that is what she took.  And, you
6    know, my feeling even through the process was that
7    when I ultimately asked for two months, that number
8    wasn't -- I felt that was kind of in the range of
9    what she had told me, like she thought that was
10   acceptable, right.
11        But I don't know -- my sense was,
12   overall, she didn't want me to take much time off.
13   Q.    Did you ask Ms. Ross during that
14   conversation to clarify any of her implications?
15   A.    No.  That would be argumentative.
16   Q.    You believe that would be
17   argumentative?
18   A.    When she said that, I wasn't going to
19   challenge her and say, what do you mean by it?  I
20   just -- she was -- she was -- she was the head of
21   the high-yield group.  I did not want to argue with
22   her at that stage.
23   Q.    You mean she was the head of the
24   high-yield sales desk; correct?
25   A.    I viewed her as the head of the group.

476

NGO - CROSS

1
2    Sales dominated the P&L for that group, and it was a
3    very known fact that Jane ran the high-yield group.
4    Q.    Did you ever see a document that
5    identified Jane Ross as the head of the entire
6    high-yield group?
7    A.    The only document that I can point to
8    is really my offer letter that kind of sums up, in
9    my view, when she signed it, that she is the head of
10   high-grade -- high-yield.
11   Q.    Just -- I think you testified that you
12   never saw one of those personnel change form notices
13   that identified Ms. Ross as your immediate
14   supervisor?
15   A.    I also testified that --
16   Q.    Is the answer to that yes?
17   A.    That's correct.
18   Q.    We saw that particular one indicated
19   that Robert Lowenthal was your immediate supervisor?
20   A.    That is correct.
21   Q.    Mr. Lowenthal never reported to Jane
22   Ross, did he?
23   A.    No.
24   Q.    Rob Lowenthal was the head of the
25   entire global fixed income business at that time;

477

NGO - CROSS

1
2    right?
3    A.    He's head of taxable fixed income,
4    correct.
5    Q.    Now, you came out of that meeting with
6    Ms. Ross feeling discouraged, if I understood you
7    correctly?
8    A.    That's about right.
9    Q.    And you felt that she wasn't -- I
10   think your exact testimony in your deposition was
11   that she didn't support you taking any long
12   durational leave.
13        Is that what you recall?
14   A.    I recall that, yes.
15   Q.    When you completed this conversation
16   with Ms. Ross, did you feel that she was interfering
17   with the FMLA rights that Ms. Denys had just told
18   you about that same day?
19   A.    Yes.
20   Q.    Did you believe that Ms. Ross was
21   treating you differently because you were a man?
22   A.    Yes.
23   Q.    Did you feel she was being
24   understanding of your situation?
25   A.    No.

478

NGO - CROSS

1
2    Q.    Did you feel she was being helpful of
3    your situation?
4    A.    No.
5    Q.    Did you feel she was being supportive
6    of your situation?
7    A.    No.
8    Q.    Now, you had just discussed your FMLA
9    rights with Ms. Denys that same day; correct?
10   A.    That's correct.
11   Q.    Did you call Ms. Denys after that
12   conversation with Ms. Ross?
13   A.    No.
14   Q.    Did you ever subsequently tell
15   Ms. Denys that you thought Ms. Ross was interfering
16   with your FMLA rights?
17   A.    I did not.
18   Q.    Did you tell that to anyone else at
19   human resources?
20   A.    Human resources, no.
21   Q.    Did you tell anyone else in
22   Oppenheimer's human resources department that you
23   felt Ms. Ross was treating you differently because
24   you were a man?
25   A.    Human resources, no.

479

NGO - CROSS

1
2    Q.    Did you report to Mr. Lowenthal that
3    you thought Ms. Ross was trying to dissuade you from
4    taking an FMLA leave?
5    A.    No.
6    Q.    Did you tell Mr. Lowenthal that you
7    felt that Ms. Ross was treating you differently
8    because of your male sex?
9    A.    No.
10   Q.    Did you document in any way at that
11   time that you thought Ms. Ross was interfering with
12   your FMLA rights?
13   A.    No, I did not.
14   Q.    Treating you differently based on your
15   male gender?
16   A.    No, I did not.
17   Q.    This conversation took place in May of
18   2014?
19   A.    That's correct.
20   Q.    And as of that date, you felt that
21   Oppenheimer was discriminating against you based on
22   your gender?
23   A.    That's correct.
24   Q.    How many EEOC complaints did you file
25   against Oppenheimer?

480

NGO - CROSS

1
2    A.    I believe just one.
3    Q.    And you filed that EEOC charge of
4    discrimination in October of 2016; am I correct,
5    sir?
6    A.    I believe that is correct.
7    Q.    And that would be over two years after
8    the conversation you had with Ms. Ross?
9    A.    That is correct.
10   Q.    Did you also file a lawsuit against
11   Oppenheimer in the United States District Court for
12   the Southern District of New York?
13   A.    Yes, I did.
14   Q.    And in that lawsuit, did you allege a
15   violation of Family and Medical Leave Act?
16   A.    Yes, I did.
17   Q.    Do you recall when you filed that
18   lawsuit?
19   A.    My attorneys did.  I don't know the
20   exact date.
21   Q.    If I told you March of 2017, would
22   that sound about correct?
23   A.    I think that sounds about correct.
24   Q.    Would you agree with me that that's
25   almost three years after you had that conversation

481

NGO - CROSS

1
2    with Ms. Ross?
3    A.    Yes.
4    Q.    Mr. Ngo, possessing a law degree, are
5    you familiar with the concept of statutes of
6    limitation?
7    A.    As a layman, yes.
8    Q.    Are you generally aware of the fact
9    that if you don't file a claim in a timely manner,
10   you may be barred from asserting it in the future?
11   A.    Yes.
12   Q.    Now, you also allege in your statement
13   of claim -- and I believe you gave some testimony
14   yesterday -- that in or around May of 2014, you
15   learned that two female colleagues at Oppenheimer
16   were paid for portions of their leaves in connection
17   with the birth of their children?
18   A.    That is correct.
19   Q.    Who were those two individuals again?
20   A.    Lynn Johnson and Brigid Donnelly.
21   Q.    When did you learn, approximately,
22   that they had been paid for portions of their leaves
23   of absence?
24   A.    It was around that time.  It was a
25   separate conversation with both of them.

482

NGO - CROSS

1
2    Q.   And when you had that conversation
3    with them, did that make you feel as though you were
4    being treated differently by Oppenheimer than
5    Ms. Johnson and Ms. Bridges [sic]?
6    A.   If it was based on my -- post my
7    discussion with Jane Ross, yes.
8    Q.   And did you think --
9         THE ARBITRATOR:  Why would you assume,
10   based on your discussion with Ms. Ross, that
11   you were being discriminated against in light
12   of whatever Ms. Johnson and Ms. Donnelly told
13   you?
14        THE WITNESS:  Sure.  Well, Lynn
15   Johnson got her leave -- my understanding is
16   she got her leave for Henry first approved by
17   Jane.  And according to Lynn, Jane was
18   supportive of her taking the full three
19   months.
20        And, in fact, when Lynn had her second
21   child, Josie, Jane supported the three
22   months.  And not only did she support the
23   three months, Lynn had actually said the last
24   two weeks, I can't make that three months,
25   can I extend, and then Jane gave her the

483

NGO - CROSS

1
2    extension, according to what Lynn had told
3    me.
4         So based on, you know, my direct
5    conversation with Jane in May compared to
6    what -- Lynn's conversation with -- and the
7    actual results with Ms. Ross, it was a stark
8    difference from my point of view.
9    BY MR. GIBSON:
10   Q.   And just to follow up on the judge's
11   question, did you feel -- if I understood correctly
12   from your answer, you felt that you were being
13   treated differently by Ms. Ross based on how
14   Ms. Johnson and how -- and Ms. Donnelly had conveyed
15   to you that Ms. Ross was supportive?  Is that -- of
16   their leaves, and you felt she wasn't supportive of
17   yours?
18   A.   I'd say that's such a long question --
19   Q.   It was kind of a long question.  It
20   was a horrible question.
21        If I understand you correctly, the
22   reason that you felt that you were being treated
23   differently than Ms. Donnelly and Ms. Johnson is
24   because you felt that Ms. Ross wasn't being
25   supportive of your taking a leave than you felt that

484

NGO - CROSS

1    she was of Ms. Donnelly and Ms. Johnson?
2
3    A.   Well, Ms. Donnelly and Ms. Johnson
4    both told me that it was done on a case-by-case
5    basis and it's at the discretion of your manager.
6    Clearly, Lynn's leave was at the discretion of Jane.
7    Brigid Donnelly was at the discretion of her manager
8    I don't know.
9         Then also Rob told me to go work it
10   out with Jane and Colleen, so I assumed that Jane
11   would be the person that would be the deciding
12   factor.
13        And so based on my conversation with
14   Jane and my conversation with Lynn and Brigid about
15   how their managers basically approved some sort of
16   leave for them, I did feel that I was being treated
17   differently.
18   Q.   Ms. Ross didn't deny you any leave
19   during that conversation; correct?
20   A.   It was based on my May conversation
21   with her where she implied that I not take the full
22   three-month leave.
23   Q.   And she did not deny you any leave
24   during that conversation; correct?
25   A.   Not in those exact words.

485

NGO - CROSS

1
2    Q.   You mentioned that you felt that the
3    final decision -- if I understood you correctly, the
4    final decision about your leave rested with
5    Ms. Ross?
6         Is that what your testimony was?
7    A.   Yes.
8    Q.   And that's because Mr. Lowenthal told
9    you to discuss work coverage with Ms. Ross and
10   Ms. Burns while you were out of the office?
11   A.   There were a lot of things that Rob
12   would say.  Just talk to Jane about it, talk to Jane
13   about it.  Because Jane effectively ran a very large
14   P&L group.  And Rob knew that Jane knew the
15   business, Jane knew what was the workings going on
16   with the high-yield group.  She knew what we were
17   trading, what we focus on.  Jane was a very
18   important piece to Rob's management style, in
19   particular, to, I know from experience, my group.
20   Q.   And you said Rob would always say,
21   talk to Jane about it.
22   A.   We saw that Mr. Lowenthal also told
23   you to talk to Lenore Denys about Oppenheimer's
24   leave policy; correct?
25   A.   He told me to go talk to --

486

NGO - CROSS

1
2    Q.   Is the answer correct?  I'm not asking
3  for a narrative answer.
4         My question is, Mr. Lowenthal told you
5  to speak to Ms. Denys about taking a leave of
6  absence; correct?
7    A.   He told me to speak to Ms. Denys about
8  what the policy is.
9    Q.   Did you ever tell anybody at human
10  resources that you felt that you were receiving
11  different treatment than Ms. Johnson or
12  Ms. Donnelly?
13   A.   No, I did not.
14   Q.   Did you ever tell Mr. Lowenthal that?
15   A.   No, I did not.
16   Q.   Now, you left to go to California for
17  the birth of your child on June 20, 2014, if I'm
18  correct?
19   A.   That is correct.
20   Q.   And would you agree that that was over
21  a month since the conversation that you had with
22  Ms. Ross?
23   A.   That is correct, Mike.
24   Q.   When you left the office on June 20th,
25  you didn't tell Mr. Lowenthal that you were taking

487

NGO - CROSS

1
2  an FMLA leave, did you?
3    A.   I did tell him that I was taking two
4  weeks after the birth of my child, and that is FMLA
5  leave.
6    Q.   Did you tell Mr. Lowenthal that you
7  were taking an FMLA leave?
8    A.   I said I was taking leave -- we agreed
9  that I would take two weeks after the birth of our
10  child.
11   Q.   Did you ever tell Ms. Ross when you
12  left the office that you were taking an FMLA leave?
13   A.   I told Ms. Ross that the plan was that
14  I was going to take two weeks after the birth of our
15  child for leave and then decide afterwards.
16   Q.   So the answer to my question is, no,
17  you didn't tell Ms. Ross that you were taking an
18  FMLA leave; am I correct?
19   A.   I disagree with that characterization.
20  I told her --
21   Q.   Did you use the word "FMLA" --
22       THE ARBITRATOR:  Let him finish his
23  answer.
24       THE WITNESS:  If you want -- you're
25  asking did I use "FMLA"?  No.  I told her

488

NGO - CROSS

1
2  that -- specifically that I was going to take
3  leave and not work from the -- after the
4  birth of my child for two weeks and that I
5  would discuss the final date afterwards.
6  BY MR. GIBSON:
7    Q.   You took a laptop with you when you
8  left for California; right?
9    A.   Yes, I did.
10   Q.   The reason you took a laptop with you
11  is that you were going to work remotely for some
12  time; correct?
13   A.   Prior to the birth of our daughter,
14  correct.
15   Q.   Just prior to the birth of your
16  daughter?
17   A.   That's what we agreed to.
18   Q.   From the period of June 20, 2014, when
19  you left, through the end of July, were you checking
20  e-mails?
21   A.   Yes, I was.
22   Q.   Were you sending e-mails?
23   A.   Yes, I was.
24   Q.   And at your deposition, at page 151,
25  do you recall I asked you, "In this general time

489

NGO - CROSS

1
2  period, how often did you check e-mails?"
3       And your answer was, "I checked it
4  pretty much every day.  I had a BlackBerry,
5  obviously.  And I checked it I would say about every
6  day."
7       Do you remember that testimony?
8    A.   Yes, I do.
9    Q.   And then also, at page 60 of your
10  transcript, I asked you, "Were you still checking
11  e-mail roughly every day about that time?"
12       And your answer was "Yes."
13       Do you recall that?
14   A.   That's correct.
15   Q.   During this same time period of
16  June 20, 2014, through July of 2014, were you
17  calling the office?
18   A.   I would talk to Colleen, yes.
19   Q.   How often would you talk to Ms. Burns?
20   A.   It just depended.  It depended.  Some
21  days it would be -- I would talk to her maybe -- I
22  would say maybe once a week.  Or sometimes it would
23  be more sporadic.  I don't know.
24   Q.   I'm sorry.  I didn't mean to cut you
25  off.

490

NGO - CROSS

1
2    A.    I know I kept in conversation with her
3    for sure, whether it be text, phone, yes.
4    Q.    During this time period of June 20th
5    through July, you were getting paid your base salary
6    by Oppenheimer; correct, Mr. Ngo?
7    A.    Yes, that is correct.
8    Q.    And at any time during this time
9    period, did you contact anyone at Oppenheimer and
10   state that you should not be getting paid because
11   you were on an FMLA leave?
12   A.    No, I did not.
13   Q.    And you knew that Oppenheimer didn't
14   pay employees when they were on FMLA leave; correct?
15   A.    That's not correct.
16   Q.    You saw -- you saw that in the
17   employee manual, right, when you read it?
18   A.    Yes, but I also heard -- from talking
19   to Lynn Johnson and Brigid Donnelly, my impression
20   was that some portions of leave are paid and that
21   it's at the discretion of the firm.  So I did not
22   think that there was a policy that you just do not
23   get paid during FMLA.
24   Q.    Well, you said that you felt that
25   Ms. Ross had the final decision about you taking a

491

NGO - CROSS

1
2    leave; was that your testimony?
3    A.    That is correct.
4    Q.    And you felt you -- you were under the
5    understanding, from your conversations with
6    Ms. Donnelly and Ms. Johnson, that Ms. Ross had the
7    discretion to set the terms of your leave?
8    A.    Yes.
9    Q.    Including getting paid?
10   A.    She did that for Ms. Johnson, yes.
11   Q.    Did you ever ask Ms. Ross, am I going
12   to get paid while I'm out of the office?
13   A.    We didn't discuss that.
14   Q.    One of your functions as the cohead of
15   the high-yield research group was to use the term
16   "SA"; correct?
17   A.    Yes.
18   Q.    Take a look at Exhibit 125, please.
19         (Pause.)
20   Q.    And I'd like to start at the bottom
21   e-mail, which is dated July 16, 2014, from Sean
22   Sneeden.
23         Do you see that, sir?
24   A.    I see that.
25   Q.    Is this almost a month after you left

492

NGO - CROSS

1
2    the office for the birth of your child?
3    A.    Yes.
4    Q.    And also almost a month since your
5    child was born?
6    A.    Yes.
7    Q.    And Mr. Sneeden writes to a number of
8    individuals, including yourself, and states, "Please
9    review and approve AC OK SS."
10         Do you see that, sir?
11   A.    It says, "SA OK HN," no?  Oh, okay.
12   Q.    At the bottom.
13   A.    At the bottom.  Got it.  Okay.
14   Q.    Do you see that?
15   A.    Okay.
16   Q.    And underneath Mr. Sneeden's e-mail,
17   am I correct that this is a piece of research that
18   he was looking to have approved?
19   A.    That is correct.
20   Q.    And above Mr. Sneeden's e-mail, we see
21   a response from a Paula Kanno?
22   A.    Uh-huh.
23   Q.    And I see from her signature block
24   Ms. Kanno was in the control room?
25   A.    That is correct.

493

NGO - CROSS

1
2         THE ARBITRATOR:  What is the control
3    room?
4         THE WITNESS:  It's compliance.  So
5    every research needs -- every research needs
6    to be approved by compliance and also needs
7    to be SA-approved.
8    BY MR. GIBSON:
9    Q.    And then above that, we see an e-mail
10   from you, Mr. Ngo, that says, "SA OK YN."
11         Do you see that, sir?
12   A.    "HN," yes.
13   Q.    I'm sorry.  My apologies.
14   A.    I get the mistake.  My name is Hoai.
15   I get it.
16   Q.    This is you approving Mr. Sneeden's
17   research; correct, Mr. Ngo?
18   A.    That is correct.
19   Q.    This is you completing one of your
20   functions as the cohead of the high-yield research
21   group; correct?
22   A.    You know, it's me giving a courtesy.
23   I think if you look at the timing of this e-mail,
24   it's at 3:12.  I'll bet you anything that -- because
25   it's an unusual time to get something SA'ed, and I

494

1          NGO - CROSS
2    was checking e-mails every day.
3          And I believe he couldn't find -- he
4    must have not have been able to find Colleen to
5    approve it.  So as a courtesy, I wanted to get his
6    research out timely.  And I saw and so I SA'ed it
7    for him.
8          Q.   I appreciate that answer, but my
9    question was simply, this is you doing one of your
10    functions as the cohead of high-yield research;
11    correct?
12          A.   Yes.  That was one of my functions.
13    Yes.
14          Q.   When Mr. Sneeden wrote this to you,
15    did you e-mail him back and indicate that you
16    shouldn't be approving research during this time
17    period?
18          A.   No.
19          Q.   Now, Ms. Burns is also on this e-mail
20    from Mr. Sneeden; correct?
21          A.   That's correct.
22          Q.   Also, I note Mr. Sneeden's initial
23    e-mail at the bottom is from 3:12 p.m.?
24          A.   That's correct.
25          Q.   And how long is this piece of research

495

1          NGO - CROSS
2    that he's asking to have SA'ed?
3          (Pause.)
4          A.   It's one, two, three -- five pages.
5          Q.   And looking at your response to
6    Mr. Sneeden, how long did it take you to SA it?
7          A.   Very quick -- fairly quickly.
8          Q.   Under five minutes?
9          A.   Yes.
10          Q.   During the time period of June 20th,
11    2014, through the end of July, did you participate
12    in any business conference calls?
13          A.   Could you repeat that question,
14    please.
15          Q.   Sure.
16          During the time period of May 20th,
17    2014, through July of 2014, did you participate in
18    any business conference calls?
19          MR. IADEVAIA:  May or June?
20          MR. GIBSON:  I'm sorry.  Thank you,
21    Jeremiah.
22    BY MR. GIBSON:
23          Q.   June 20th, 2014, through July of 2014.
24          A.   How would you describe business
25    conference calls?

496

1          NGO - CROSS
2          Q.   Did you participate in any conference
3    calls with other Oppenheimer employees?
4          A.   I spoke to other Oppenheimer
5    employees, yes.
6          Q.   Did you participate in a conference
7    call with Umesh Bhandary on July 21st with regard to
8    a company called Artisan?
9          A.   Not that I recall, but I'm not sure.
10          MR. GIBSON:  I'm going to ask to have
11    an exhibit marked that's not in the exhibit
12    book, if I may.
13          Let me give it to you.  You can hand
14    that to Jeremiah and a copy to the witness,
15    too (handing).
16          I guess this would be Exhibit 132 if
17    admitted.
18          (Pause.)
19          MR. GIBSON:  Are there any objections
20    to the exhibit before --
21          MR. IADEVAIA:  This is produced in
22    discovery?
23          MR. GIBSON:  Yes, this is that massive
24    discovery request that you asked for and got
25    of every e-mail sent and received by Mr. Ngo

497

1          NGO - CROSS
2    during that time period.
3          MR. IADEVAIA:  No objection.
4          THE ARBITRATOR:  Okay.  Exhibit 132 is
5    received.
6    BY MR. GIBSON:
7          Q.   Now, Mr. Ngo, this appears to be an
8    e-mail from yourself to Umesh Bhandary that's dated
9    July 21, 2014.
10          Do you see that, sir?
11          A.   That's correct.
12          Q.   Does this refresh your recollection at
13    all if you participated in a conference call with
14    Mr. Bhandary?
15          A.   I didn't participate -- see, that's
16    where -- the gray area.  You said did I participate
17    in the call.  This, from what I'm reading from this
18    e-mail, is me giving him comments on some of the
19    questions that he was going to ask the company.
20          Q.   Thank you.  And that was going to be
21    my clarification question.  I appreciate that.
22          A.   Sure.
23          Q.   So am I correct that Mr. Bhandary sent
24    you -- if you look, there's some attachments to this
25    e-mail?

498

NGO - CROSS

2    A.    Yes.
3    Q.    Am I correct that Mr. Bhandary sent
4  you a list of questions that he was going to raise
5  during that conference call?
6    A.    Yes.
7    Q.    Am I correct that you reviewed that --
8  excuse me -- and made some edits to that and some
9  suggestions?
10    A.    Yes, I remember Umesh calling me.
11  Because what I had told people, if you need me for
12  emergency, please give me a call.  Now I'm
13  remembering this.
14          Umesh called me and said why.  I'm
15  going to go meet with this company.  It's kind of an
16  important company.  Could you help me out and give
17  me some feedback?
18          So I was checking e-mails every day so
19  I said, sure, I'll do that.  That's what you do as a
20  manager.  Someone asks you for -- trust me,
21  everyone's being respectful of my time.  So these
22  requests from Umesh or Sean even for that SA were
23  very seldom.
24          It was just they knew if they needed,
25  to contact me for emergency or something important,

499

NGO - CROSS

2  they would.
3    Q.    On the attachment, am I correct that
4  the blue -- the text that's in blue are the edits
5  and suggestions that you made to the list of
6  questions?
7    A.    Yes.
8    Q.    When Mr. Bhandary sent you this e-mail
9  on July 21st, did you tell him that you shouldn't be
10  doing this work because you were on a leave of
11  absence?
12    A.    He knew that.  And that's why, when he
13  called, he asked me, if you can do me a favor, to do
14  this.
15          And you have to remember something.  I
16  had just hired Umesh at this time, so I felt bad
17  that he was a new person and I just hired him and
18  then I take leave.
19          So I said to him, before I leave, if
20  you need help with anything -- I'm going to be out
21  of the office.  I'll be happy to help.
22          But he knew it was a rare circumstance
23  to ask me.
24    Q.    So I think my question was, when
25  Mr. Bhandary sent you this e-mail, did you tell him,

500

NGO - CROSS

1  I shouldn't be doing this work because I'm on a
2  leave?
3  leave?
4    A.    No, I did not.  I offered -- he asked
5  me and I did it.
6          THE ARBITRATOR:  I take it, correct me
7      if I'm wrong, you didn't have any reason to
8      believe at the time that if you were on a
9      legitimate FMLA leave, that you would be
10      prohibited from helping out if people from
11      the office called you for assistance?
12          THE WITNESS:  As a manager, yes.  I
13      didn't feel there was a prohibition.  I was
14      just behaving as a manager, that if you
15      couldn't get ahold of Colleen, please call
16      me.  If you couldn't -- if you needed extra
17      help on something you needed as an emergency
18      basis -- and most people respected that.
19          I think I only SA'd one note for Sean
20      the whole time.  I think for Umesh, this may
21      have been my only correspondence the whole
22      time.
23          It was a very known fact that -- as a
24      manager, I'm not going to say -- especially
25      somebody I just hired, I'm not going to say,

501

NGO - CROSS

2  leave me alone.  I wanted to be helpful.
3  BY MR. GIBSON:
4    Q.    I think you testified that you spoke
5  to Ms. Burns periodically during this time period?
6    A.    That's correct.
7    Q.    Do you recall -- and if you need to
8  take a look at it, I'm happy to point it to you.
9          In your EEOC charge of discrimination,
10  do you recall stating between mid July and mid
11  August 2014, that you routinely checked in with the
12  office recording work matters?
13    A.    I checked in with Ms. Burns, correct.
14    Q.    Routinely?
15    A.    I think that's fair.  It depends --
16  like I said, it depended on the week.  It depended
17  if -- she knew that if she needed me for an
18  emergency basis, she would.  And then some days, she
19  needed more help.
20          You have to remember something.
21  Colleen was not used to being cohead -- I mean --
22  cohead of the group.  Most people assume -- it was a
23  very hard thing to get people used to the fact that
24  she was the head because she didn't do most of the
25  work.

502

NGO - CROSS

1    So I remember telling her, this will
2    be a good opportunity for you to take the reins and
3    people start asking you for help and not me.
4        So that's -- so she would call me to
5    say, I need extra advice here on something, and I
6    was happy to help her.
7        Q.   So, Mr. Ngo, a couple of things.
8        First of all, Ms. Burns became the
9    cohead of the group the same day that you did;
10   correct?
11       A.   That's correct.
12       Q.   Ms. Burns had been at Oppenheimer
13   before you were hired by Oppenheimer; correct?
14       A.   That's correct.
15       Q.   Would you agree with me, sir, that
16   checking in with the office routinely is not the
17   same thing as helping out in an emergency
18   circumstance?
19       A.   It de- -- I don't know if I -- could
20   you repeat the question.  Sorry.
21       Q.   Sure.
22       Would you agree with me that checking
23   in with the office routinely regarding work matters
24   is not the same as helping out in an emergency

503

NGO - CROSS

1    situation?
2        A.   I believe I checked in with Colleen
3    via our conversations routinely.
4        Is that what you're asking me to
5    confirm?
6        Q.   My question is, would you agree with
7    me that saying that you checked in with the office
8    routinely on work matters is not the same thing as
9    just helping out in an emergency situation?
10       A.   I -- I don't know what your nuance is.
11   I agree those are two different things.  I don't
12   know what you're trying to refer to, but --
13       Q.   Thank you.
14       Can you take a look at Exhibit 127.
15   Let me know when you've had a chance to review that.
16       (Pause.)
17       Q.   Ready, sir?
18       A.   I'm ready.
19       Q.   Now, this appears, on the bottom, to
20   be an e-mail from Dan Berner to yourself, dated
21   July 21st, 2014?
22       A.   Wait.  You're saying 120 --
23       MR. IADEVAIA:  27.
24       THE WITNESS:  I'm in the wrong one.

504

NGO - CROSS

1    BY MR. GIBSON:
2        Q.   127.
3        (Pause.)
4        A.   Yes.
5        Q.   This is an e-mail from Dan Berner to
6    yourself dated July 21, 2014?
7        A.   Yes.
8        Q.   And Mr. Berner says, "Hey, Hoai.  Just
9    checking in to see how all is going baby-wise.  I
10   imagine you're swamped, but drop me a line as you
11   get a free moment.  Talk soon."
12       My question is, who was Mr. Berner?
13       A.   Dan Berner works at Oppenheimer, and
14   he works at the proprietary desk.  And if I recall,
15   he ran a small book.
16       Q.   Was he a trader?
17       A.   Yes, but for equities.
18       Q.   Got you.
19       And your response to Mr. Berner was,
20   "Hey, I'm good.  She was born and healthy.  We're
21   still in Cali, though.  Doctor will not allow us to
22   fly until the first round of shots.  So tough
23   managing it all from here."
24       What you felt was "tough managing it

505

NGO - CROSS

1    all from here" was your responsibilities as the
2    cohead of the high-yield research group; correct?
3        A.   No, I was talking about managing a
4    baby because we had to stay at my mom's for six
5    weeks.  So managing a newborn baby not in your home
6    is what I was referring to.
7        Q.   Did you speak to Mr. Berner?
8        A.   Might have.
9        Q.   Do you recall what he was inquiring
10   about?
11       A.   Dan Berner didn't work for our
12   department.  Dan Berner was a friend in a different
13   department.  And he covered -- he traded his own
14   equity book.  So as a friend, I would -- actually,
15   Dan Berner would ask me for help, and I was happy to
16   help him out.
17       But he had no association with P&L for
18   my department.  It was someone in the firm saying,
19   hey, Hoai, you know equities, too.  Can you help me
20   out?
21       And legally I could not have given him
22   advice on equities because --
23       Q.   I didn't ask that.  I think now --
24       THE ARBITRATOR:  Could you --

506

NGO - CROSS

1
2     MR. GIBSON:  We're getting these long
3     narrative answers and --
4     THE WITNESS:  Okay.
5     THE ARBITRATOR:  That comes with the
6     trade.
7     MR. GIBSON:  Fair enough.
8     THE ARBITRATOR:  I would appreciate it
9     if you would not interrupt the witness when
10    he answers.
11    MR. GIBSON:  Fair enough.  Sure.
12    THE WITNESS:  I'm sorry, Mike.  I'll
13    try to be shorter.
14 BY MR. GIBSON:
15    Q.   My question was, did you -- do you
16 recall having a conversation with Mr. Berner?
17    A.   I don't know if I called him back.  I
18 may have if I had a spare moment because I wanted to
19 help -- I would -- I probably did, to help him out.
20    Q.   Do you recall what you may have been
21 helping him out with?
22    A.   I can't remember what he was asking
23 for, to be honest.  We just had a lot going on with
24 the new baby.  I don't remember what he asked me.
25 I'm assuming it was probably saying, I own a

507

NGO - CROSS

1
2 position in this, what do you think?  And -- but I
3 don't know.
4    Q.   Can you turn to Exhibit 128, please.
5    A.   Yes.
6    Q.   We saw this exhibit yesterday;
7 correct?
8    A.   I think I have, yes.
9    Q.   And this was a July 25th e-mail from
10 yourself to Ms. Burns?
11    A.   That is correct.
12    Q.   And this was a month after your child
13 was born?
14    A.   That is correct.
15    Q.   And you say to Ms. Burns, "I think you
16 are out in July.  Did you want me to SA while you
17 are gone?"
18    A.   Yes.
19    Q.   This is you offering to Ms. Burns to
20 do one of your functions as the cohead of the
21 high-yield research group?
22    A.   During this period, as you know, I
23 spoke to Ms. Burns periodically.  And I knew that
24 she was taking vacation.  And I wanted to offer
25 her -- in many respects to be conscious that she

508

NGO - CROSS

1
2 wanted to take vacation and I was on leave, but I
3 wanted to say, hey, if you needed me to -- to SA a
4 few things so that you can have a more enjoyable
5 vacation, I --
6    Q.   So is the answer, yes, this is you
7 offering to do one of your job functions as the
8 cohead of high-yield research?
9    A.   That is correct, Mike.
10    Q.   Thank you.
11    Mr. Ngo, isn't it true that during the
12 period of June 20, 2014, through August 17, 2014,
13 you never told anybody at Oppenheimer that you
14 should not be working because you were on a leave of
15 absence?
16    A.   Repeat the question.  I'm sorry.
17    Q.   Sure.
18    Isn't it true that from the period of
19 June 20, 2014, through August 17, 2014, you never
20 once told anybody at Oppenheimer that you should not
21 be working because you were on an FMLA leave of
22 absence?
23    A.   What I had told people was that I was
24 going to be out, and if you needed me for emergency
25 reasons, I'd be happy to help out.  I told my team

509

NGO - CROSS

1
2 that.  Ms. Burns understood that.  I think I might
3 have even offered it to Jane as well.  But my team
4 knew that I was out and if you needed me for
5 emergency reasons, certainly call me.
6    Q.   So is the answer, yes, you never told
7 anybody at Oppenheimer that you should not be
8 working because you were on a FMLA leave of absence?
9    A.   Well, basically I would say the answer
10 is no.  Because I told my team that I was going to
11 be on a leave of absence and that I would not be
12 working.
13    Q.   Did you ever tell -- my question was,
14 did you ever tell anybody, in response to a request
15 for assistance or to have something SA'ed, I
16 shouldn't do this because I'm on a leave of absence?
17    A.   I think I actually remember I had
18 limits on what I would do, right.  So I remember
19 someone asking me -- I think it was someone from LA
20 asking me if I would help out on some credit or
21 something.  And I said to him, no, I'm out on leave.
22    Q.   Who is that person?
23    A.   I can't remember, but there were some
24 instances where people -- I would check my
25 BlackBerry and someone could ask something, and I

510

NGO - CROSS

1 would call them back and say, no, I'm out on leave.
2
3 Q. So you don't remember who that one
4 person was?
5 A. I don't know. I mean, that's -- I
6 can't recall, to tell you the truth.
7 Q. Did you ever recall sending an e-mail
8 to anybody -- you were checking your BlackBerry
9 every day?
10 A. Yes.
11 Q. Do you ever recall sending an e-mail
12 to somebody and saying, this was not within the
13 limits of what I said I would do?
14 A. That's not the way I approached it. I
15 approached it as I put out fires. So if there
16 was -- as a manager, I would check BlackBerrys to
17 see -- and there may have been an occasion, for
18 example, when Sean asked me to SA and he couldn't
19 find Colleen, that I would step in and say, sure, I
20 would do it.
21 Q. So is the answer to my question,
22 yes -- I forgot the question.
23 Is the answer to my question, no, you
24 do not recall sending an e-mail to anybody saying
25 that you were not doing this work because you didn't

511

NGO - CROSS

1
2 agree to do it while you were out of the office on
3 leave?
4 A. I don't remember sending an e-mail to
5 that extent.
6 Q. Thank you.
7 A. Yes.
8 Q. Putting out fires was part of your job
9 as a manager; right, Mr. Ngo?
10 A. Yes.
11 Q. Is it also true that you never once
12 told anybody at Oppenheimer, during the period of
13 June 20, through August 17 of 2014, that you
14 shouldn't be getting paid because you were on an
15 FMLA leave of absence?
16 A. I'm sorry. Mike, could you repeat
17 that question.
18 Q. Certainly.
19 Isn't it also true that during the
20 time period of May 20 -- June 20, 2014, through
21 August 17, 2014, you never once told anybody at
22 Oppenheimer that you should not be getting paid
23 because you were on an FMLA leave of absence?
24 A. I did not tell anyone that.
25 MR. GIBSON: Judge, what time did you

512

NGO - CROSS

1 want to take a lunch break?
2
3 THE ARBITRATOR: Basically whenever
4 you think there's --
5 MR. GIBSON: Is this a good time for
6 everybody?
7 MR. IADEVAIA: It's up to you.
8 THE ARBITRATOR: Okay. We'll take
9 about 30 minutes.
10 (Luncheon recess from the record.)

513

NGO - CROSS

1
2 A F T E R N O O N   S E S S I O N
3 (1:15 p.m.)
4 HOAI NGO,
5 having been previously sworn, resumed the
6 stand and testified further as follows:
7 CROSS-EXAMINATION (Cont'd.)
8 BY MR. GIBSON:
9 Q. Mr. Ngo, can you turn to Exhibit 114.
10 A. Sure.
11 Q. And we saw this exhibit yesterday;
12 correct?
13 A. That is correct.
14 Q. And I'd like to start by looking at
15 your e-mail on the bottom dated July 13, 2014, to
16 Ms. Burns and Ms. Ross.
17 And you sent this e-mail a little over
18 three weeks after you left the office for the birth
19 of your child?
20 A. That is correct.
21 Q. Now, Mr. Ngo, you testified at your
22 deposition -- I believe you also testified here --
23 that you felt that this e-mail constituted a request
24 for a leave of absence for the birth of your child;
25 is that correct?

514

NGO - CROSS

1    A.    Yes.
2    Q.    I would like to ask you a few
3 questions about that statement.
4         My first question, sir, is, would you
5 agree with me that there's no reference to the FMLA
6 in this e-mail?
7    A.    I agree there's no FMLA reference.
8    Q.    And, in fact, there's no reference to
9 a leave of absence at all in this e-mail; correct?
10   A.    Hold on one second.  Let me read this
11 one more time.
12   Q.    Take your time to read it.
13        (Pause.)
14   A.    Please proceed.  What's the question
15 again?
16   Q.    My question is, you would agree with
17 me there's no reference to a leave of absence
18 anywhere in this e-mail; correct?
19   A.    I disagree with that.  I think there
20 is a reference to a leave of absence in this e-mail.
21   Q.    Can you tell me where the word "leave"
22 appears in this?
23        THE ARBITRATOR:  Other than the word
24        "Leave" about leaving California?

515

NGO - CROSS

1         MR. GIBSON:  Yes.
2         THE WITNESS:  I think that's the only
3         time the word "leave" is there, yes.
4    BY MR. GIBSON:
5    Q.    Would you also agree with me, sir,
6 that there's nowhere on this e-mail where you were
7 requesting time out of the office?
8    A.    I disagree with that.
9    Q.    Well, you see here it says, "My plan
10 is to come back to the office by August 25th";
11 correct?
12   A.    Yes.  And I also subsequently say that
13 I will not get back to the office any earlier.
14   Q.    Correct.
15        And my question was that you were not
16 requesting time out of the office from anyone in
17 this e-mail, are you?
18   A.    I disagree with that characterization.
19   Q.    Where's the request?
20   A.    The request is saying, "My plan is to
21 come back to the office by August 25th."  And I
22 clarify further in the e-mail saying that "I will
23 let you know if I get back to the office any
24 earlier."  That implies I am not going to be in the

516

NGO - CROSS

1 office prior to August 25th.
2    Q.    And it's your --
3    A.    And then I also solidify that next
4 sentence saying, "I mainly wanted to give a
5 realistic time frame."
6    Q.    It's your understanding that by saying
7 that you are not going to come back to the office
8 until August 25th and that you're still checking
9 e-mail if anyone needs anything and that if you
10 could solidify your schedule earlier, you will let
11 people know and get back to them -- it's your
12 understanding that that is a request for time out of
13 the office?
14   A.    Yes.
15   Q.    And you didn't copy Lenore Denys on
16 this e-mail; correct?
17   A.    That is correct.
18   Q.    And you did not in any way communicate
19 to human resources that you would now not be
20 returning to the office until August 25th?
21   A.    That is correct.
22   Q.    I also see you didn't copy
23 Mr. Lowenthal in this e-mail; right?
24   A.    That is correct.

517

NGO - CROSS

1    Q.    Did you call Mr. Lowenthal before you
2 sent this e-mail?
3    A.    No.
4    Q.    Do you recall we saw earlier that you
5 testified at your deposition that you thought it
6 would be important to keep your supervisor informed
7 of time out of the office?
8    A.    That is correct.
9    Q.    In fact, isn't it true, Mr. Ngo, that
10 you didn't even think to call Mr. Lowenthal until
11 Ms. Burns subsequently told you that he wanted you
12 to call him?
13   A.    That is correct.
14   Q.    And you also say in this e-mail that
15 you're "still checking e-mails and am available if
16 anyone needs anything"; correct?
17   A.    That is correct.
18   Q.    And that was because you were
19 continuing to work remotely from California, sir?
20   A.    No, that's me saying that I will be
21 out of the office and if there's any emergency,
22 sure, give me a call.
23   Q.    Is there any reference to an emergency
24 in here?

518

NGO - CROSS

1    A.   No, but I think that it was pretty
2  clear from my e-mail.  And the fact is that Jane did
3  not call me any time prior to this August 25th.
4  And, believe me, if she thought I was working, she
5  would have called me.
6    Q.   And we saw this e-mail dated July 13th
7  was sent before the exhibit we looked at earlier
8  where you were SA'ing Sean Sneeden's work; correct?
9    A.   I'm sorry.  Can you repeat the
10  question.
11    Q.   Sure.
12       You sent this e-mail on July 13, 2014,
13  and that was before the e-mail in which you were
14  SA'ing Sean Sneeden's work that we looked at
15  earlier?
16    A.   I don't know the exact date that Sean
17  Sneeden -- but the dates are on the e-mail.  I'm
18  sure you're probably correct.
19    Q.   Thank you.
20       And you sent this e-mail before you
21  offered to Ms. Burns later in July to SA while she
22  was out of the office; is that correct, sir?
23    A.   Again, I'm assuming these dates are
24  correct, yes.
25

519

NGO - CROSS

1    Q.   Now, this e-mail that you sent on
2  July 13th, would you agree with me that it was
3  approximately two months after the discussion with
4  Ms. Ross in which you believe she was attempting to
5  interfere with your FMLA rights?
6    A.   Well, we also had subsequent
7  conversations prior to my June 20th discussion.  It
8  wasn't that I just had one discussion with her in
9  May.  There was a lot of preparation and knowing
10  about the time frame and stuff like that.  So I
11  don't know exact dates of those conversations, but I
12  wouldn't say that -- as far as tolling it, I would
13  say that we had conversations leading all the way up
14  to June 20th.
15    Q.   So the first time that you believe
16  Ms. Ross was interfering with the FMLA rights was in
17  your conversation on May 12th; is that correct?
18    A.   That's correct.
19    Q.   And is it your testimony that from
20  that time through the date of this e-mail, there
21  were other instances where you felt that Ms. Ross
22  was interfering with those rights?
23    A.   No.  I felt that she was interfering
24  with my rights based on my conversation in May.
25

520

NGO - CROSS

1    Q.   Okay.
2    A.   And we had agreed to that other -- the
3  time schedule.  So then, at that point, I didn't
4  feel that she was interfering at this stage.
5    Q.   Okay.  Let me go back to the first
6  question then because I think we had a little bit of
7  a disconnect.
8    A.   Yes.
9    Q.   This July 13th e-mail was sent two
10  months after your May 12th conversation with
11  Ms. Ross in which you felt that she was interfering
12  with your FMLA rights?
13    A.   That sounds correct.
14    Q.   And you testified that during that
15  conversation, she was not supportive of you?
16    A.   The May conversation, correct.
17    Q.   And you start this e-mail to Ms. Burns
18  and Ms. Ross with the line, "Thanks for all the good
19  wishes and understanding throughout this entire
20  process"; correct?
21    A.   That is correct.
22    Q.   And then when we look at the last
23  sentence -- the last paragraph, the second sentence,
24  "Thanks again for all your help and concern";
25

521

NGO - CROSS

1  correct?
2    A.   That is correct.
3    Q.   It's your testimony, sir, that you
4  only wrote that to be cordial to Ms. --
5    A.   To some degree.  Also, I was asking
6  for leave and that's -- I didn't want to pair it
7  with anything.  I wanted to make the tone of the
8  e-mail lighter.
9    Q.   You believe, again, you were asking
10  for leave in this e-mail.
11    A.   That is correct.
12    Q.   Did anyone indicate to you before the
13  birth of your baby that it was unlikely she would be
14  able to fly for several weeks after she was born?
15    A.   No.
16    Q.   Did you ever discuss, during the
17  surrogacy process, how long it would be before the
18  baby was able to return to New York?
19    A.   Yes.
20    Q.   What do you remember learning during
21  that conversation?
22    A.   I remember talking to our agency
23  saying, how long do people usually fly with a
24  newborn baby?  Like what is the standard that people
25

522

NGO - CROSS

1  do?  And -- because I was trying to get an
2  estimation for time, right.  And I remember getting
3  a variety of answers, that they deferred it to the
4  physicians.
5  
6      Q.    Thank you.
7          Now, in response to your July 13th
8  e-mail to Ms. Ross and Ms. Burns, did Ms. Ross ever
9  tell you, either in writing or verbally, that you
10  needed to return to the office right away?
11      A.    Verbally or in writing.  No.
12      Q.    Did she ever tell you, verbally or in
13  writing, that she was disappointed that you were out
14  of the office for the birth of your child?
15      A.    No.
16      Q.    And let's take a look at Ms. Ross'
17  response.  Ms. Ross states, "Glad everything is
18  going well and that little Lily is healthy and
19  thriving.  Send photos and we'll see you sometime in
20  August.  Let us know how you plan to handle 2Q
21  earnings."
22          Which we understand now to be
23  second-quarter earnings?
24      A.    That is correct.
25      Q.    And second-quarter earnings were an

523

NGO - CROSS

1  
2  important time of year for the sales desk; would you
3  agree with that, sir?
4      A.    That is correct.
5      Q.    When Ms. Ross asked you about how
6  second-quarter earnings would be handled, did you
7  feel that she was interfering with your FMLA rights?
8      A.    Yes.
9      Q.    Did you respond to her e-mail by
10  telling her that?
11      A.    Yes.
12      Q.    And is that the response up here?
13      A.    That is correct.
14          THE ARBITRATOR:  "Up here" being on
15      the same document?
16          MR. GIBSON:  Yes, the very top e-mail.
17      I'm sorry, Judge.
18  BY MR. GIBSON:
19      Q.    Did you tell Ms. Ross ever, in writing
20  or verbally, that you should not be working on
21  second-quarter earnings because you were on a leave
22  of absence?
23      A.    That is basically what I'm responding
24  to her.  The implication is when I say that I'm not
25  going to do -- I said -- in this e-mail, I respond,

524

NGO - CROSS

1  "We can see what John can do while I am away."  I
2  did not offer to do the second-quarter earnings.
3      Q.    So I want to set aside implications,
4  and I'm asking about the actual words that you used.
5          Did you ever tell Ms. Ross, either in
6  this e-mail, a subsequent e-mail or a telephone
7  conversation, that you should not be working on
8  second-quarter earnings because you were on a leave
9  of absence?
10      A.    I believe this e-mail's conveying that
11  to her.  And, in fact, she never asked me for any
12  second-quarter earnings while I was away, so I think
13  it was conveyed very appropriately.
14      Q.    I'll ask the question one more time.
15  I don't want to talk about implications or what you
16  were trying to convey.
17          My question is simply, did you ever
18  tell Ms. Ross, in writing, an e-mail, other form of
19  writing or in person or on the telephone, I should
20  not be doing second-quarter earnings because I am on
21  a leave of absence?
22      A.    Yes.
23      Q.    When did you say that?
24      A.    I'm saying that in this response right

525

NGO - CROSS

1  
2  now and --
3      Q.    Where does it say "leave of absence"
4  in this response?
5          THE ARBITRATOR:  I think we can all
6      read the words.
7          THE WITNESS:  Yes.
8  BY MR. GIBSON:
9      Q.    Do you recall testifying that the
10  reason that you did not tell Ms. Ross that you
11  should not be working was, quote, "I didn't want it
12  to be more contentious than it already is"?
13      A.    To some degree.
14      Q.    Did you think that Ms. Ross stating
15  that "Glad everything is going well and that little
16  Lily is healthy and thriving" and asking for you to
17  send photographs was a contentious statement on her
18  part?
19      A.    That statement alone, no.
20      Q.    And looking at your response to
21  Ms. Ross, you state, "Thanks.  I will send more pics
22  later.  She has gained almost a pound.  I just spoke
23  with Colleen.  We can see what John can do while I
24  am away.  I can help out more when I'm back in
25  New York as the logistics get better.  Thanks again,

526

NGO - CROSS

1   Hoai."
2
3           And my first question, is, "John" the
4   John Daniels that we spoke about?
5       A.   That is correct.
6       Q.   And I think you testified -- or
7   answered the judge's question about some preparation
8   work that you did with Mr. Daniels before you left
9   the office in June?
10      A.   That's correct.
11      Q.   Did you prepare Mr. Daniels to do --
12  handle second-quarter earnings?
13      A.   Yes.
14      Q.   What was Mr. Daniels' title in 2014?
15      A.   He was an associate.
16      Q.   Was he a senior analyst?
17      A.   No.
18      Q.   Do you know how much Mr. Daniels was
19  paid in 2014?
20      A.   I can't remember.  I remember setting
21  the salary -- I want to say he was paid -- I want to
22  say 80,000.  I can't remember the exact amount.
23      Q.   Do high-yield research analysts
24  typically get paid $80,000 a year at Oppenheimer?
25      A.   Starting analysts.  I mean, that's --

527

NGO - CROSS

1   I think Sean started at that level.
2       Q.   In fact, your base salary was almost
3   double that at the time; correct?
4       A.   Yes.
5       Q.   Now, following this e-mail exchange on
6   July 14th with Ms. Ross, did you report to human
7   resources that you felt you were being forced
8   to work while you were on a leave of absence?
9       A.   No, I did not.
10      Q.   Did you report to human resources that
11  you felt you were being treated differently than
12  female employees?
13      A.   To human resources, no.
14      Q.   Did you report either of those to
15  Robert Lowenthal?
16      A.   No.
17      Q.   Did you document in any way that you
18  felt your FMLA rights were being interfered with?
19      A.   No.
20      Q.   Did you document in any way that you
21  felt you were being discriminated against?
22      A.   Can I take that back, actually?
23      Q.   Sure you can.
24      A.   Can you repeat that question again.

528

NGO - CROSS

1       Q.   Sure.
2
3           Did you document in any way in July of
4   2014 following this e-mail that you felt your FMLA
5   rights were being interfered with?
6       A.   Document, no.
7       Q.   Would you agree with me that this
8   exchange with Ms. Ross happened over two years
9   before you filed your EEOC charge of discrimination?
10      A.   That is correct.
11      Q.   And over two years before you filed
12  your FMLA lawsuit against Oppenheimer?
13      A.   That is correct.
14      Q.   Now, I think you testified on direct
15  that after you sent this e-mail to Ms. Ross and
16  Ms. Burns, it was your understanding that Ms. Ross
17  showed the e-mail to Mr. Lowenthal?
18      A.   That is correct.
19      Q.   And what was that understanding based
20  on?
21      A.   In my conversation with Colleen, she
22  had told me that.
23      Q.   And shortly --
24      A.   Take that back.
25      Q.   Please.

529

NGO - CROSS

1       A.   I'm not sure if she showed it to Rob.
2   All I know is that Colleen told me that Rob -- after
3   the e-mail was sent, Jane went into Rob's office.
4   So -- yes.
5       Q.   And I'm going to skip through just
6   quickly.
7
8           It's your understanding that you spoke
9   to -- if I understood from your testimony yesterday,
10  that you definitely spoke with Mr. Lowenthal either
11  on the 16th or 17th of July?
12      A.   That is correct.
13      Q.   Is that the first time that you spoke
14  with Mr. Lowenthal, either in person or by e-mail,
15  since you sent the July 13th e-mail to Ms. Ross and
16  Ms. Burns?
17      A.   That is correct.
18      Q.   And where were you geographically when
19  you had that conversation?
20      A.   I was in California.
21      Q.   When was the first day that you
22  returned to New York from California?
23      A.   It was sometime in August.  It was a
24  week before my aneurysm, I believe.  So I believe it
25  was --

530

1    NGO - CROSS
2        Q.   First or second week of August?
3        A.   August 16th.  And my aneurysm was
4    probably -- I would back it out.  It was around
5    August 11th.
6        Q.   So let's talk a little bit about your
7    conversation with Mr. Lowenthal.  In your statement
8    of claim, you allege, quote, that you understood
9    that Lowenthal was angry about you having taken
10   parental leave.
11           Do you remember that?
12       A.   That's correct.
13       Q.   Mr. Lowenthal never told you that he
14   was angry with you that you needed time out of the
15   office for your baby, did he?
16       A.   Well, he didn't say it in those words,
17   but I could tell from the conversation, and also
18   based on Colleen's conversation, that he was -- I
19   don't know if I'd use "angry."  I could tell -- she
20   said he was disappointed or maybe angry.  I can't
21   remember the exact wording, but yes.
22       Q.   But Mr. Lowenthal never told you that;
23   correct?
24       A.   Oh, no.  He did not tell me that he
25   was angry.

531

1    NGO - CROSS
2        Q.   Okay.  Thank you.
3            In fact, we saw that it was
4    Mr. Lowenthal who, back in May, was the one who
5    directed you to go reach out to Lenore Denys to see
6    what your leave rights were; correct?
7        A.   That is correct.
8        Q.   And you thanked him for being
9    understanding and help -- his help in that regard?
10       A.   At that time, he certainly was
11   helpful.
12       Q.   So you just assumed that Mr. Lowenthal
13   was angry at you; correct?
14       A.   That's not correct.
15       Q.   During that conversation with
16   Mr. Lowenthal, did he tell you that you needed to
17   return to the office right away?
18       A.   No, he did not use those words.
19       Q.   In fact, if I think I recall -- if I
20   recall correctly, you said that he told you that you
21   should do what you needed to do?
22       A.   That is correct.
23       Q.   I think you testified that you can't
24   recall whether you used the term "FMLA" during that
25   conversation with Mr. Lowenthal?

532

1        A.   I know that I gave him -- I believe --
2    I believe I said to him that I wanted to take leave,
3    and I told him that I would sign whatever papers he
4    needed.  I don't know if I used the exact "FMLA"
5    wording, but I said that I was taking time off for
6    taking care of our child.
7        Q.   Do you believe you made it very clear
8    to Mr. Lowenthal during that conversation that you
9    were taking a leave?
10       A.   Yes.
11       Q.   Was it your understanding, Mr. Ngo,
12   that you were on a leave of absence prior to that
13   conversation?
14       A.   Yes, we had agreed that I was taking
15   leave after the birth of our child.
16       Q.   So it was your understanding, when you
17   spoke to Mr. Lowenthal, that you were already on
18   leave, but then you feel you made it perfectly clear
19   to him that you were taking a leave?
20       A.   My understanding is -- what we had
21   communicated was I would take a leave from birth of
22   my child, and then two weeks I would give them a
23   final date of what that leave -- the extension of
24   that leave -- or maybe not extend that leave, but I

533

1    NGO - CROSS
2    said I would tell them two weeks after the birth of
3    our child.
4        Q.   But you didn't tell that to
5    Mr. Lowenthal until he told Ms. Burns to call you;
6    correct?
7        A.   Well, he told me to work it out with
8    Jane and Colleen, but, yes, I did tell him in my
9    conversation with him on July 16th.
10       Q.   Did you ever send an e-mail to
11   Mr. Lowenthal after your conversation indicating
12   that you were taking a leave of absence?
13       A.   I didn't feel -- I thought that it was
14   pretty clear in the conversation.  No.
15       Q.   So the answer is no.
16           Did you ever send any other writing to
17   Mr. Lowenthal indicating that you were taking a
18   leave of absence?
19       A.   No, I did not.
20       Q.   And following that conversation with
21   Mr. Lowenthal on the 16th or 17th of July, did you
22   continue to receive your paycheck?
23       A.   Yes, I did.
24       Q.   Do you ever recall telling
25   Mr. Lowenthal after that conversation that you

534

NGO - CROSS

1  shouldn't be getting paid anymore because you were
2  taking a leave of absence?
3      A.   No, we never that had discussion.
4      Q.   And that conversation with
5  Mr. Lowenthal on the 16th or the 17th, am I correct,
6  sir, that took place about a week before you asked
7  Ms. Burns if you wanted her -- if she wanted you to
8  SA while she was gone?
9      A.   I'm sorry.  Mike, would you --
10     Q.   Bad question.
11     A.   Yes.
12     Q.   Your conversation with Mr. Lowenthal
13 on the 16th or 17th where you made it clear you were
14 taking a leave of absence, am I correct, sir, that
15 that's about a week before you offered to SA for
16 Ms. Burns while she was out of the office?
17     A.   That sounds about right, yes.
18     Q.   Now, you testified, I believe, that
19 you don't recall Mr. Lowenthal telling you during
20 that conversation that you were no longer the cohead
21 of the high-yield research group?
22     A.   That is correct.
23     Q.   But you clearly understood that, did
24 you not, sir?

535

NGO - CROSS

1      A.   It wasn't clear to me.
2      Q.   Did you think it was possible?
3      A.   Possible maybe.  I mean, I obviously
4  felt there was an erosion of confidence by him
5  taking me off the morning blast abruptly, but, yes,
6  that is a possibility.
7      Q.   Well, I'm happy -- you brought up the
8  morning blast.
9          Sending the morning blast was one of
10 the two or three supervisory functions that you
11 described as the new functions you took on when you
12 became the cohead of the group; correct?
13     A.   That is correct.
14     Q.   And do you remember giving this
15 testimony at your deposition?  It's page 190.  When
16 you were testifying about the morning blast, you
17 said, "Sure.  It's traditionally sent by the group
18 head.  And it showcases all the analysts' work.
19 It's a marketing tool as well.  And by removing me
20 off the morning blast, it was signaling to the
21 market to some degree, my belief is, I was no longer
22 the group head."
23     MR. IADEVAIA:  I need a second to look
24 at it.

536

NGO - CROSS

1      MR. GIBSON:  Please, take your time.
2      MR. IADEVAIA:  Okay.
3      (Pause.)
4      MR. IADEVAIA:  Okay.
5  BY MR. GIBSON:
6      Q.   Do you remember that testimony, sir?
7      A.   Yes.
8      Q.   When Mr. Lowenthal told you that the
9  morning blast was no longer coming from you, you
10 knew that you were no longer the cohead of the
11 group, didn't you, Mr. Ngo?
12     A.   That's not correct.
13     THE ARBITRATOR:  One point of
14 clarification about that.
15         During this telephone conversation, as
16 distinguished from the later e-mail that
17 Mr. Lowenthal sent you I think two days
18 later --
19     THE WITNESS:  Sure.
20     THE ARBITRATOR:  -- did he in his
21 conversation indicate to you that he was
22 taking you off the morning blast for the
23 period of time that you were away or that he
24 was taking you off, period?

537

NGO - CROSS

1      THE WITNESS:  He didn't specify
2  timing.  He just said, I'm taking you off the
3  morning blast.  And he was kind of abrupt
4  about it.  Because that was kind of one of
5  the last things that we were discussing that
6  I was trying to -- that -- I could tell he
7  was angry, so I was saying, about the morning
8  blast, do you want me to still SA it?  I can
9  do it in the morning.  Because I was up every
10 two hours anyway, so I said I can do it.  And
11 then he said he was taking me off the morning
12 blast.
13         You know, in the context of this
14 deposition comment, what I'm saying is -- is
15 that -- I'm not saying it was my belief that
16 I was no longer group head.  I was saying
17 that if the morning blast were to be switched
18 to somebody else and the client got the
19 e-mail saying that I -- it was no longer
20 coming from me, being used to getting it
21 coming from me, they would think that I was
22 no longer cohead.
23         Because, for example, when Todd Morgan
24 left the firm and I switched the morning

538

NGO - CROSS

1   blast to my name and sent it out, I got
2       several e-mails from accounts saying, did
3       Todd leave?  Where is he?
4           So that's what I'm referring to there.
5           But it's not saying that -- at that
6       time that I thought I was demoted.  It's
7       saying that if the morning blast were to
8       switch, to some degree, it would imply that
9       it -- is that I would no longer be the group
10      head.  That's what that is referring to.
11  BY MR. GIBSON:
12      Q.    With regard to that implication, I
13  think you testified that once your name was taken
14  off the morning blast, from that day forward, for as
15  long as you can recall, the morning blast was coming
16  from -- just from the company; correct?
17      A.    That is correct.
18      Q.    Now, in this conversation with
19  Mr. Lowenthal, did you feel that he was discouraging
20  you from taking more time out of the office to be
21  with your child?
22      A.    Yes.
23      Q.    Did you feel that he was retaliating
24  against you for the time you had already been out of
25

539

NGO - CROSS

1   the office?
2       A.    Yes.
3       Q.    Did you feel that he was treating you
4   differently than other Oppenheimer employees because
5   you were a man?
6       A.    Yes.
7       Q.    Did you report any of that to human
8   resources?
9       A.    No, I did not.
10      Q.    Now, I think you've testified several
11  times, both at your deposition and here today, that
12  you were checking e-mails almost every day during
13  this time period?
14      A.    That is correct.
15      Q.    And we saw you stated that in your
16  July 13th e-mail to Ms. Burns and Ms. Ross?
17          Let me clarify that.
18          You said you're still checking
19  e-mails?
20      A.    Yes.
21      Q.    And we saw that you were reviewing and
22  responding to e-mails by -- from Mr. Sneeden and
23  Mr. Berner?
24      A.    On those occasions, yes.
25

540

NGO - CROSS

1       Q.    And also that e-mail from Mr. Bhandary
2   about the questions for that conference call?
3       A.    I -- I think that -- that e-mail --
4   I'm a little bit confused on it, that e-mail.  My
5   recollection now is on that e-mail -- is this -- now
6   I remember, because I've had so many conversations
7   with Mr. Bhandary -- is that that e-mail from
8   Mr. Bhandary -- the response that you gave me when I
9   was reading it said it came from me, but it really
10  didn't come from me.
11          What happened is it came from -- now I
12  remember.  Because it was so long ago.  It was three
13  years ago.  I was reviewing my e-mails, and I
14  remember seeing an e-mail sent from me.  And I said,
15  what is this?
16          And I remember talking to Colleen
17  about it.  Is someone sending e-mails from my
18  e-mail?
19          And apparently what happened is there
20  was an intern there who was sitting at my desk and
21  using my password.  And she was working for -- on
22  this project with Umesh and then sent that reply.
23  Because that e-mail -- the contents of that e-mail
24  were not written by me.
25

541

NGO - CROSS

1           So I apologize.  It was confusion on
2   my part.  Because when you read an e-mail that says
3   it comes from you, the presumption is that it is.
4   But I forgot that it was a weird day where there was
5   an intern, her name was Jessica Hsu, I believe, that
6   wrote from my e-mail.  And I remember catching that
7   when I was checking e-mails.
8       Q.    Do you believe it was Ms. Hsu who
9   helped Mr. Bhandary draft those questions?
10      A.    Yes.
11      Q.    You don't recall partaking in that in
12  any way, shape or form?
13      A.    I don't think that that's one of the
14  instances where I helped Mr. Bhandary.  I do not
15  think -- I remember that day.  I remember saying to
16  Colleen, what is this e-mail?  And she explained to
17  me that what happened is that Jessica was writing
18  that, and I believe that e-mail came from Ms. Hsu.
19      Q.    Take a look at Exhibit 45, please.
20      A.    Sure.  Sorry.  I have the wrong
21  binder.  Sure.
22          (Pause.)
23      Q.    And you gave some testimony about this
24  e-mail yesterday, but looking at it again, we see
25

542

NGO - CROSS

1   it's a July 18th, 2014, e-mail from Mr. Lowenthal to
2   yourself.  And it's got the subject line,
3   "Follow-up."
4        Do you see that?
5    A.   Yes, I see it.
6    Q.   And this was sent five days after you
7   wrote to Ms. Ross and Ms. Burns that you were still
8   checking e-mails?
9    A.   Yes, that sounds correct.
10    Q.   Do you have any reason to believe this
11   e-mail was not sent?
12    A.   No.
13    Q.   In fact, are you aware that your
14   attorneys produced a copy of this e-mail in this
15   arbitration proceeding?
16    A.   That's correct.
17    Q.   Now, during the conversation that you
18   had with Mr. Lowenthal either the day or two days
19   before this e-mail, you felt that Mr. Lowenthal was
20   punishing you?
21    A.   That is correct.
22    Q.   And you felt he was angry with you?
23    A.   That is correct.
24    Q.   And I believe you testified that you
25

543

NGO - CROSS

1   felt your job was in jeopardy after you got off that
2   telephone call?
3    A.   That is correct.
4    Q.   And is it your testimony, Mr. Ngo,
5   that you did not open this e-mail from Mr. Lowenthal
6   until several months after it was sent?
7    A.   I believe it was November 3rd, yes,
8   that is correct.
9    Q.   If you can keep that in front of you,
10   but also just -- actually, withdrawn.
11        Let's look at the attachment to the
12   e-mail, which is Mr. Lowenthal's July 18th letter.
13        And Mr. Lowenthal first states,
14   "Congratulations on the arrival of your new baby.
15   Although the event and impending responsibilities
16   may seem overwhelming now, parenthood is a marvelous
17   experience.  I'm sure you will enjoy the great
18   journey you are about to begin."
19        Mr. Ngo, did you feel that
20   Mr. Lowenthal was angry when he wrote that to you?
21    A.   Not based on that paragraph.
22    Q.   Okay.  And during the call -- the
23   conversation that you had with him the day before or
24   two days before, did he congratulate you on the

544

NGO - CROSS

1   birth of your baby?
2    A.   My July 16th conversation with him?
3    Q.   Correct.
4    A.   No, I don't believe he did.
5    Q.   And in the second paragraph,
6   Mr. Lowenthal states, "I need to take the
7   opportunity now to clarify the details regarding
8   your leave from Oppenheimer and your return.  When
9   we discussed your time off, it was my understanding
10   from you that you would need at least two weeks'
11   leave with the possibility of extending that leave
12   for an additional two weeks depending on the health
13   and needs of the baby.  I believe that June 20,
14   2014, is when your leave began.
15        "As you know, Oppenheimer does not
16   have a paid paternity leave policy.  I was willing
17   to accommodate your initial request, permitted the
18   flexibility with your return date and kept you on
19   Oppenheimer's payroll."
20        Do you see that, sir?
21    A.   I see that.
22    Q.   And didn't you, in fact, propose to
23   Mr. Lowenthal before you left the office in June
24   that you would continue to work remotely?

545

NGO - CROSS

1    A.   No.  I said I would work remotely
2   prior to the birth of my baby.  And this e-mail is
3   consistent that he's saying that I believe that
4   June -- oh, no.  He's saying, "I believe that
5   [June 20th] is when your leave began."
6        No, my understanding with him was that
7   I would work until the birth of our child.
8    Q.   And did you not suggest to
9   Mr. Lowenthal before you left that you were not
10   going to take an FMLA leave because you wanted to
11   continue to get paid?
12    A.   No.
13    Q.   So you believe Mr. Lowenthal's
14   recollection of the discussion that you had in
15   paragraph 2 -- referenced in paragraph 2 here is
16   wrong?
17    A.   I believe so, yes.
18    Q.   Do you think he just made it up?
19    A.   I just think that's what -- that's --
20   that was his understanding of the events.
21    Q.   And if you read this e-mail on
22   July 18th, you would have contacted Mr. Lowenthal
23   and told him that he misremembered those
24   circumstances?

546

NGO - CROSS

1    A.    Probably, yes.

2    Q.    In paragraph 3, it says, "The main

3  catalyst for my sending this letter is I was

4  recently notified that your current intention is to

5  remain out of the office through the end of August.

6  Had you initially requested such an extended leave

7  period, there would have been discussions on work

8  coverage, particularly with regard to your

9  supervisory responsibilities.

10         "In your absence, I intend for Colleen

11  Burns, as cohead of fixed income, to absorb all of

12  the tasks associated with your supervisory elements

13  of the research department.  Had I known you would

14  be absent for over two months, I would have also

15  expected you to communicate that to Oppenheimer's

16  human resources department at the time that I asked

17  you to speak with them regarding the firm's policies

18  on paternity leave."

19         Do you see that, sir?

20    A.    Yes, I see that.

21    Q.    Mr. Ngo, if you had read this letter

22  on the day it was sent to you, you would understand

23  that you were no longer the cohead of high-yield

24  research; correct, sir?

547

NGO - CROSS

1    A.    That would -- well, excuse me.  Hold

2  on one second.

3    Q.    Sure.  Please feel free to read the

4  whole letter so you can put it in context.

5         (Pause.)

6    A.    Now can you repeat the question.

7    Q.    Sure.

8         If you had read this letter on

9  July 18, 2014, when it was sent to you, you would

10  have certainly understood that you were no longer

11  the cohead of high-yield research; correct, sir?

12    A.    Well, first, it says, "in your

13  absence."  So that could imply to me that -- just

14  reading the language of this letter that says "in

15  your absence," that could imply to me that I was no

16  longer cohead during that period of leave.

17         So this letter is not indicating to me

18  that it is permanent, but, obviously, the tone of

19  the letter -- if I had received it prior, I would

20  have thought this was a little bit, again,

21  discouraging.

22    Q.    When Mr. Lowenthal states that had

23  you -- had he known you would be absent over -- out

24  of the office for over two months, that he would

548

NGO - CROSS

1  have expected you to communicate that to human

2  resources, is that inconsistent with your

3  recollection of what Mr. Lowenthal instructed you to

4  do with regard to your leave out of the office?

5    A.    He did not tell me to go to human

6  resources.  Our initial conversation with human

7  resources was exploratory to find out what the

8  policy was in place because he himself was confused.

9         In this e-mail -- in this paragraph,

10  he says to me "In your ab-" -- he says that "Had you

11  initially requested such an extended leave period,

12  there would have been discussions on work coverage,

13  particularly with respect to your supervisory

14  responsibilities."

15         And, in fact, it's consistent with him

16  saying to discuss it with Jane and Colleen about my

17  work coverage, which is what we did prior to my

18  departure.

19    Q.    And I'm not talking about the work

20  coverage aspect of it.  I'm talking about

21  Mr. Lowenthal's statement that had he known you

22  would be absent for over two months, he would have

23  also have expected you to communicate that to

24  Oppenheimer's human resources department "at the

549

NGO - CROSS

1  time that I asked you to speak with them regarding

2  the firm's policies on paternity leave."

3    A.    But he never discussed reporting to HR

4  with me prior to me departing.  So this is the first

5  time I am hearing of this.  And I opened this

6  letter -- as I've told you, I opened this letter on

7  November 3rd.

8    Q.    Had you opened this letter on

9  July 18th, would you have contacted Mr. Lowenthal

10  and refreshed his recollection as to what his

11  instructions were?

12    A.    If I had received this e-mail on

13  July 18th, I would have called him to ask for

14  clarity, yes.

15    Q.    Now, Mr. Lowenthal doesn't say in this

16  letter that you need to return to the office right

17  away, does he?

18    A.    No, he does not.

19    Q.    In fact, in the fourth paragraph,

20  Mr. Lowenthal states, "I have now spoken with the

21  human resources representative and received the

22  enclosed Family and Medical Leave Act summary for

23  your review and acknowledgment.  Unfortunately, as

24  discussed above, Oppenheimer does not offer paid

550

NGO - CROSS

1  family leave.  You are, however, entitled to take
2  unpaid leave time over and above your allotted
3  vacation.  Questions concerning this should be
4  addressed in the materials or can be addressed to
5  the benefits department head," and then there's a
6  telephone number.
7        Do you see that, sir?
8     A.   I see that.
9     Q.   If you could take a look at the
10  attached -- next page, the first page of the
11  attachment.
12        And you see this document with the
13  subject line "Family and Medical Leave"?
14     A.   Yes, I do.
15     Q.   And if you go down to the line that
16  starts with "FMLA provides."
17     A.   Sorry.  I'm looking for my glasses.
18     Q.   It's under the check box, after the
19  last check box for short-term disability.
20     A.   Oh, okay.
21     Q.   Do you see -- I'm sorry.
22     A.   I see it now, yes.
23     Q.   Do you see where it says, "FMLA
24  provides for up to 12 weeks of unpaid, job-protected

551

NGO - CROSS

1  leave.  You are required to fill out FMLA material"?
2     A.   Yes, I see that.
3     Q.   You were already aware of the fact
4  that you were not entitled to be paid during an FMLA
5  leave; correct?
6     A.   I was -- it was not clear to me.
7  Remember, I did not receive this form or any FMLA
8  paperwork -- this is the first time FMLA paperwork
9  has been introduced to me.  And I did not see this
10  form that was attached to the November 3rd e-mail.
11     Q.   Do you recall in Ms. Denys' May 12,
12  2014, e-mail, she said that you were entitled to 12
13  weeks of unpaid FMLA leave?
14     A.   That's correct.  But also, as I
15  testified, too, is that when I had spoken to Brigid
16  and Lynn, they said it was a fluid policy.  So both
17  of them took FMLA leave, but both of them were paid
18  for some portions of it.
19     Q.   And do you recall, after speaking to
20  Ms. Denys, reading the FMLA section of the handbook?
21     A.   Yes.  I remember going to page 17,
22  correct.
23     Q.   And page 17 very clearly stated that
24  you were entitled to 12 weeks of unpaid FMLA leave?

552

NGO - CROSS

1     A.   I agree with you that it said that,
2  and I remember reading that.  But, again, my
3  understanding, from talking to the two women who had
4  taken leave, that it was -- there was no formal
5  maternity leave policy, and it was negotiated with
6  your manager.
7     Q.   Okay.
8        THE ARBITRATOR:  Knowing that, that
9  is, that it is -- at least the presumption is
10  that this is unpaid leave, but being aware,
11  from your discussions with these two women,
12  that some arrangements could be made with
13  your supervisor to the contrary, did you then
14  go to any of the various people who might be
15  deemed your supervisor and say, I'd like to
16  have paid leave, or discuss it with them in
17  any form?
18        THE WITNESS:  When I asked for FMLA
19  leave, I assumed it would be unpaid.  When I
20  talked to Rob at my July 16th conversation,
21  we never had that discussion of pay.  And I
22  remember, in fact, talking to Colleen
23  afterwards -- my discussion with Rob, saying
24  he was upset and what was going on.  She

553

NGO - CROSS

1  didn't know.
2        I remember her asking me, are you
3  getting paid?
4        And I said I didn't know.
5        So there was no expectation, but when
6  I checked my pay stub, I was not surprised
7  that I was paid.  Because if you look at --
8  I'm paid two months of base, that's -- that's
9  50,000 relative to a $470,000 salary.  And
10  Lynn was paid 50 percent of her commissions.
11  So it didn't seem that egregious to me to
12  say, hey, something is wrong.
13        I just assumed that Rob approved my
14  FMLA and that -- great, he paid me for that
15  pay -- paid me base pay.  And I was thinking,
16  well, it could just be based on my longevity
17  of service or -- similar to what Brigid got.
18  I didn't know the exact details of what she
19  got paid, but she said she was paid for
20  portions of her leave.
21        So it wasn't -- it wasn't a surprise
22  to me, but I wasn't going to -- it wasn't so
23  egregious to call up and say, why am I paid
24  some exorbitant amount of money, because it

554

NGO - CROSS

1  was a small amount relative to my total
2
3  compensation.
4      Do you understand my perspective
5  there?
6  BY MR. GIBSON:
7      Q.   I don't think it matters.  If I
8  understand it -- if the judge understands it, that's
9  good enough for me.
10     Mr. Ngo, I think you just stated, in
11 answering the Judge's question, that you felt that
12 Rob Lowenthal had approved your FMLA leave?
13     A.   Based on my July 16th conversation and
14 him approving me not returning until August 25th,
15 yes.
16     Q.   But I thought it was your testimony
17 that Rob told you needed to work that out with
18 Jane Ross.
19     A.   No, he told me to work it out with
20 Jane Ross in May.  The July conversation, it was --
21 it was a finalized time saying that I would come
22 back August 25th.
23     Q.   Now, I think you also just said that
24 essentially it didn't seem -- don't let me put words
25 in your mouth -- a big deal that you were getting

555

NGO - CROSS

1  your base salary; is that correct?
2      A.   I misspoke.  I shouldn't have said
3  "Big deal."  I was just saying that relative to the
4  total compensation and relative to the comp. Of -- I
5  know the exact number for Lynn was 50 percent of her
6  pay.  I don't know what Brigid's is, but I just know
7  that if you were to back out 50 percent of that two
8  months relative to my total compensation, it didn't
9  seem -- maybe should not have said "big deal."  It
10 just didn't seem as egregious.
11     Q.   Let me be clear.  You didn't say that.
12 I said that, so --
13     A.   Sorry.  I don't know.  So this is like
14 a very long day.  So sorry, Mike.
15     Q.   But also, Mr. Ngo, you're alleging in
16 this proceeding that you were discriminated against
17 based on your male gender in part because
18 Ms. Johnson was getting paid, correct, while she was
19 on her leave?
20     A.   That is correct.
21     Q.   And you learned about those
22 circumstances before you left Oppenheimer, correct,
23 in June of 2014?
24     A.   That is correct.

556

NGO - CROSS

1      Q.   And you didn't go to Ms. Ross or
2  Mr. Lowenthal or Ms. Denys or anybody else and say,
3  am I going to be paid?  Because the policy says it's
4  unpaid, but I heard Lynn Johnson got paid.
5      Did you have any conversation like
6  that?
7      A.   No, because it was discretionary.  And
8  I wasn't -- to me the priority was to take the time
9  off.  The pay was -- to me to ask for FMLA, the key
10 driver was not compensation.  It was to take care of
11 our child and be there for our child the first three
12 months of their birth.  So the compensation was
13 not -- is one piece of the puzzle, and I wasn't
14 going to argue with Jane about it.
15     Q.   But now you're suing Oppenheimer
16 saying that you were discriminated against, in part,
17 because of that very reason; correct?
18     A.   That is correct.
19     Q.   And you felt that you were being
20 discriminated against for that reason before you
21 left the office in June of 2014; correct?
22     A.   That is correct.
23     Q.   Now, just to close the book on
24 Exhibit 45, you never filled out any of these

557

NGO - CROSS

1  applications in connection with your time out of the
2  office for the birth of your child; correct,
3  Mr. Ngo?
4      A.   That is correct.
5      Q.   Would you agree with me, Mr. Ngo, that
6  there was some degree of confusion regarding your
7  time out of the office in July of 2014 -- in June of
8  2014?
9      A.   What are the dates you're giving me
10 again, Mike?
11     Q.   From June 20, 2014, through the date
12 that you suffered your brain aneurysm, would you
13 agree with me that there was confusion with regard
14 to your time out of the office?
15     A.   No.
16     Q.   Did you say that to Mr. Lowenthal when
17 you returned to work?
18     A.   I believe that in my second
19 conversation, I was being deferential from him.
20 Because if you remember something, I had read, after
21 that, his letter, and I knew the subtext of it.  So
22 from reading his letter, as we just went through,
23 that he had a misunderstanding of the time, thinking
24 I would take two weeks, I may have referenced to him

558

NGO - CROSS

1  that he may have been confused -- I didn't accuse
2  him of it, but I was saying -- being deferential
3  saying that there is some confusion.  But I was
4  really pertaining to his understanding versus what I
5  was very clear on the August 25th date.
6      Q.   So the answer to my question is, yes,
7  you did say to Mr. Lowenthal that there was some
8  degree of confusion?
9      A.   I believe that is correct.
10     Q.   Now, Ms. Denys -- let's talk about
11 that confusion.
12          Ms. Denys was the very first person
13 that Rob Lowenthal told you to speak about FMLA
14 leave; correct?
15     A.   That is correct.
16     Q.   And you had Ms. Denys' e-mail address?
17     A.   Yes.
18     Q.   And you could have reached Ms. Denys
19 by telephone?
20     A.   Sure.
21     Q.   Wouldn't you agree with me, Mr. Ngo,
22 that any confusion could have been cleared up by
23 simply calling or e-mailing Ms. Denys and saying, I
24 am taking a leave of absence for the birth of my

559

NGO - CROSS

1  baby?
2      A.   Rob didn't ask me to go to Ms. Denys
3  to give her the dates.  He said to me to work it out
4  with Jane and Colleen.
5      Q.   He told you to work out the work
6  coverage with Jane and Colleen; right?
7      A.   That also meant to me the date that I
8  would be out.
9      Q.   Did you believe -- that's what that
10 meant to you -- withdrawn.
11          You had read the FMLA section of the
12 handbook?
13     A.   That's correct.
14     Q.   And we saw in there where it said
15 requests for a leave of absence of the FMLA should
16 be made to human resources?
17     A.   Should, yes.
18     Q.   Yes.
19          And it was your understanding that
20 Mr. Lowenthal had told you that you should work out
21 your request for a leave of absence with Jane Ross
22 and Colleen Burns?
23     A.   That is correct.
24     Q.   Did your daughter return with you to

560

NGO - CROSS

1  New York when you first came back in August?
2      A.   Of course, yes.
3      Q.   You know what I mean by that.
4          Was she able to fly when she came
5  back?
6      A.   Yes.  Yes.  Please don't call the
7  child --
8      Q.   That was a horrible question.  It was
9  not what I intended.
10          During the time that you were in
11 California --
12     A.   It's okay.  You're going to be a new
13 dad soon.  You'll get it.  You'll get it.
14     Q.   Nobody asked me if I take my
15 daughters...
16          During the time that you were in
17 California from June 20th through the first or
18 second week of August, was your partner also there
19 with you present?
20     A.   I'm sorry.  Now you've got to repeat
21 the question.
22     Q.   I know.
23          During the time that you were in
24 California --

561

NGO - CROSS

1      A.   Yes.
2      Q.   -- was your partner there as well?
3      A.   Yes, he was.
4      Q.   And was your partner employed during
5  that time period?
6      A.   Yes, he was.
7      Q.   Are you aware of whether your partner
8  took an FMLA leave of absence for all or some of
9  that period?
10     A.   I don't think that -- I don't think he
11 did.
12     Q.   As far as you know, was he being paid
13 during that time period?
14     A.   Yes.
15     Q.   Now, you were unable to return to work
16 on August 25th?
17     A.   That is correct.
18     Q.   And was that as a result of your brain
19 aneurysm?
20     A.   That is correct.
21     Q.   And how long -- I think you testified
22 about this.
23          How long were you hospitalized for
24 your brain aneurysm?

562

NGO - CROSS

1    A.   I would say at least a month.

2    Q.   Do you recall approximately what day

3    you returned home from the hospital?

4    A.   To be honest, I was so fuzzy, I don't

5    remember the exact date, but I believe it was -- I

6    want to say it was sometime in October.

7    Q.   And from the date that you suffered

8    your brain aneurysm through your first day back at

9    Oppenheimer on November 3rd, am I correct you didn't

10   do any work?

11   A.   Repeat the question again, please,

12   Mike.

13   Q.   Sure.

14        From the date that you suffered your

15   brain aneurysm through your first day back at

16   Oppenheimer, am I correct that you didn't do any

17   work?

18   A.   That is correct.

19   Q.   And am I correct that nobody asked you

20   to do any work?

21   A.   That is correct.

22   Q.   Nobody told you you had to work?

23   A.   That is correct.

24   Q.   And you didn't get paid during that

25

563

NGO - CROSS

1    time period?

2    A.   That is correct.

3    Q.   You received disability benefits;

4    correct?

5    A.   That is correct.

6    Q.   In fact, it was disability benefits

7    that Ms. Bridges -- not Ms. Bridges -- Brigid

8    Donnelly was getting paid while she was on her

9    leave, isn't it?

10   A.   That's not my understanding.  I know

11   that there was some disability payments, from my

12   conversation with her.  And she said there was some

13   discretionary time off of managers or something.

14   Like I said, I didn't know -- it's very

15   uncomfortable to ask people what, basically, they're

16   paid, right.  So I just remember saying it was a

17   combination -- I do agree with you that she said

18   some of it was disability and that she said that --

19   I don't know what -- she never gave me exact

20   numbers.

21   Q.   Could we go to Exhibit 11, please.

22   A.   Yes.  I'm at Exhibit 11.

23   Q.   I'll represent to you that these are a

24   collection of compensation records for your

25

564

NGO - CROSS

1    employment at Oppenheimer.

2        And I'd like you to turn to the page

3    that has the Bates No. Oppenheimer 188, please.

4    A.   I'm sorry --

5    Q.   188 in the bottom right corner.  It's

6    hard to see on the W-2 page, but if you turn to the

7    next page, you'll be able to see the numbers.

8    A.   Oh, okay.  Now I'm seeing the 188.

9    Yes.

10   Q.   And does this appear to be an earnings

11   statement from Oppenheimer dated June 30th, 2014?

12   A.   That is correct.

13   Q.   And would this be the first pay stub

14   or pay period that you received after you left the

15   office for the birth of your baby?

16   A.   That is correct.

17   Q.   And we see that it provides for full

18   payment of your base salary?

19   A.   That is correct.

20   Q.   Just going forward, would you agree

21   with me that the same is true leading up to

22   Oppenheimer 192?

23   A.   That is -- can I see -- 192 stops.

24   And that's basically --

25

565

NGO - CROSS

1    Q.   Correct.

2        Would you say that --

3    A.   That's around my aneurysm date, which

4    is correct.

5    Q.   Thank you, and I think you may have

6    just -- so when we're looking at Oppenheimer --

7    A.   Just trying to speed things up.

8    Q.   When we're looking at Oppenheimer 192,

9    does this appear to be an earnings statement with a

10   pay date of August 29, 2014?

11   A.   That is correct.

12   Q.   And is this the first pay stub that

13   you would have received after you suffered your

14   brain aneurysm?

15   A.   That is correct.

16   Q.   And we see that this is for zero

17   dollars?

18   A.   Yes.

19   Q.   And if you see, there's some

20   handwriting on this pay stub that says, "LOA."

21   A.   Yes.

22   Q.   Do you have any understanding what

23   that stands for?

24   A.   I'm assuming it stands for "leave of

25

566

NGO - CROSS

1
2  absence."
3      Q.   Because you were on a leave of absence
4  when you had your brain aneurysm; correct, sir?
5      A.   That is correct.
6      Q.   Would you agree with me, sir, that the
7  zero dollars in compensation and the handwritten
8  "LOA" is on every pay stub until we get to OPCO 202?
9      A.   That is correct.
10     Q.   And this one is dated November 28,
11  2014?
12     A.   That is correct.
13     Q.   And that is after you returned to
14  work?
15     A.   That is correct.
16     Q.   We see handwritten here "RTW 11/3/14"?
17     A.   Yes.
18     Q.   Do you have an understanding what that
19  might stand for?
20     A.   Something "return" -- "return to
21  work."
22     Q.   "Return to work"?
23     A.   I guess, yes.
24     Q.   And underneath it says, "November 3,
25  2014"; correct?

567

NGO - CROSS

1
2      A.   Seems very reasonable to me.
3      Q.   During your -- the time that you were
4  out of the office recovering from your brain
5  aneurysm, did you communicate with anybody as to
6  your health status and your anticipated return date?
7      A.   I'm sorry.  Could you repeat the
8  question.
9      Q.   Sure.
10         During the time that you were out of
11  the office recovering from your brain aneurysm, did
12  you communicate with anybody at Oppenheimer
13  regarding your health status and your anticipated
14  return date?
15     A.   Yes.
16     Q.   Was Mr. Lowenthal one of those
17  individuals?
18     A.   Yes.
19     Q.   And we looked at this yesterday.
20         Let's turn to Exhibit 72, please.
21     A.   What was the exhibit again, Mike?
22     Q.   7-2.
23     A.   7-2.  These are big binders.
24         (Pause.)
25     Q.   I'm not going to walk through it all

568

NGO - CROSS

1
2  again.  We looked at it yesterday.
3         But would you agree with me that this
4  is the e-mail dated October 9th in which you updated
5  Mr. Lowenthal as to your physical recovery and your
6  anticipated return to work?
7      A.   That is correct.
8      Q.   And I'd like you to just read the
9  first sentence of the last paragraph in this e-mail.
10     A.   I'm sorry.  You want me to read the
11  first sentence in the last paragraph?
12     Q.   Yes.
13     A.   That starts with "I want to"?
14     Q.   Yes.
15     A.   "I want to thank you for all your
16  support and concern."
17     Q.   Thank you.
18         And the next sentence?
19     A.   "Everyone at Oppenheimer has been so
20  nice through this ordeal."
21     Q.   And this was after your phone call
22  with Mr. Lowenthal in which you believed he was
23  punishing you for being out of the office?
24     A.   You're saying after my July 16th call,
25  that's correct.

569

NGO - CROSS

1
2      Q.   Correct.  Thank you.
3         Now, you returned to work on
4  November 3rd, sir?
5      A.   November 3rd?
6      Q.   Yes.
7      A.   That is correct.
8      Q.   If I told you that the time period
9  between August 18th, 2014, and November 3, 2014, was
10  a -- is 11 weeks, would that sound about right to
11  you?
12     A.   Sounds about right.
13     Q.   If I told you that the period of time
14  between June 20, 2014, and November 3rd, 2014, was
15  just under 20 weeks, would that sound about right to
16  you?
17     A.   Sounds about right.
18     Q.   When you reviewed the Oppenheimer
19  employee handbook FMLA policy, did you see any
20  policy that provided for 19 weeks of job-protected
21  leave?
22     A.   Nineteen weeks is -- what is -- three
23  months is twelve weeks.  I remember it saying three
24  months, right.
25     Q.   There's not 19 weeks in three months;

570

1    NGO - CROSS
2  correct, Mr. Ngo?  You agree?
3       A.   Yes, I remember it saying three
4  months.  That's correct.  I'm trying to back out and
5  do math, so...
6       Q.   Now, I think yesterday you testified
7  about two conversations that you had with
8  Mr. Lowenthal, I believe, on the first and second
9  day upon your return in November?
10      A.   Yes, that is correct.
11      Q.   And let's talk about the first
12 conversation that you had with Mr. Lowenthal on
13 November 3rd.
14           And you allege in your statement of
15 claim that in this conversation, Mr. Lowenthal,
16 quote, "made it clear that he was disappointed that
17 Ngo had taken leave."
18           Do you recall that?
19      A.   That is correct.
20      Q.   Now, we also saw that, in
21 Mr. Lowenthal's July 18th e-mail, he sent you
22 paperwork to take 12 weeks of FMLA leave.
23           Do you recall that?
24      A.   I believe we reviewed that, yes.
25      Q.   And that was sent to you after you had

571

1  already been out of the office for a month before
2  that; correct?
3       A.   You have to ask -- ask me the question
4  again, please.
5       Q.   Sure.
6            Mr. Lowenthal sent you the paperwork
7  to take 12 weeks unpaid FMLA leave after you had
8  already been out of the office for a month before
9  that; correct?
10      A.   That is correct.
11      Q.   And do you believe that Mr. Lowenthal
12 advising you in July that you could take 12 weeks of
13 leave to be a sign that he was disappointed in you
14 for taking a leave of absence?
15      A.   You're saying based on the letter or
16 based on the conversation?
17      Q.   Well, looking at that letter now --
18      A.   Which July 18th -- when you say
19 July 18, are you referring to the letter?
20      Q.   Yes.
21      A.   Okay.  So ask me the question again,
22 please.
23      Q.   Do you believe Mr. Lowenthal was angry
24 with you when he offered for you to take 12 weeks of

572

1    NGO - CROSS
2  job-protected FMLA leave on July 18, 2014?
3       A.   If you read the context of that
4  letter -- because you're basing it on reading the
5  letter, which I read on November 3rd -- if I read
6  the whole letter, I would get the feeling, and I
7  felt that way when I read it on November 3rd, that
8  he was disappointed, the tone of that letter.
9       Q.   Despite the fact that you had already
10 been out of the office for a month and he was
11 offering for you to spend another 12 months [sic]
12 out of the office?
13           THE ARBITRATOR:  Twelve weeks.
14           MR. GIBSON:  Twelve weeks.
15 BY MR. GIBSON:
16      Q.   I apologize.  Big difference.
17      A.   I'm sorry.  Repeat that question
18 again.
19      Q.   Sure.
20           You felt that the tone of the letter
21 was angry despite the fact that you had already been
22 out of the office for a month and that he was
23 providing you with the opportunity to spend 12 more
24 weeks out of the office?
25      A.   Yes.  You have to also remember that

573

1    NGO - CROSS
2  that was based -- that that feeling was based on
3  reading the letter for the first time, July 18th
4  letter, plus having my first conversation with him,
5  in which he seemed disappointed and said to me I had
6  been gone for too long.  So, yes, that was probably
7  a correct assessment.
8       Q.   Do you think it's possible that
9  Mr. Lowenthal was upset with you that he had to find
10 out from Ms. Ross that you weren't going to come
11 back --
12           (Reporter seeks clarification.)
13      Q.   Do you think it's possible that
14 Mr. Lowenthal was upset with you that he had to
15 learn from Ms. Ross, and not directly from you, that
16 you were going to be out of the office for another
17 month?
18      A.   I think that -- I do not know what he
19 was thinking at the time, but that can certainly be
20 a plausible explanation for some of his feelings at
21 that time.
22      Q.   Your statement of claim also alleges
23 that during this first conversation with
24 Mr. Lowenthal on November 3rd, quote, "Lowenthal
25 stated that he was removing some of Ngo's

574

NGO - CROSS

1
2 supervisory responsibilities and that Ngo was no
3 longer in charge of the compliance part of the
4 business."
5      Do you recall that allegation?
6    A.   Yes, I do.
7    Q.   Mr. Ngo, didn't Mr. Lowenthal tell you
8 back when you spoke to him in July that the morning
9 blast was no longer being sent under your name?
10   A.   He did say that.
11   Q.   And that was one of your supervisory
12 responsibilities?
13   A.   That is correct.
14   Q.   And you testified that removing your
15 name off the morning blast could send a message to
16 the market that you were no longer the cohead of the
17 high-yield research group?
18   A.   You're saying he said that or I said
19 that?  I can't remember.
20   Q.   You testified to that.
21   A.   Yes.  I did testify to that, correct.
22   Q.   And didn't Mr. Lowenthal tell you,
23 during that same conversation on June 16th or
24 June 17th [sic], that Colleen Burns was the sole
25 head of high-yield research going forward?

575

NGO - CROSS

1
2    A.   You mean July 16th?
3    Q.   Yes, I apologize.
4      July 16th.
5    A.   You said June 16th.
6    Q.   Didn't Mr. Lowenthal also tell you, on
7 July 16th or the 17th, whenever you spoke, that
8 going forward, Ms. Burns was going to be the sole
9 head of the high-yield research group?
10   A.   He did not say that to me.
11   Q.   You had another conversation with
12 Mr. Lowenthal the next day, on November 4th?
13   A.   That is correct.
14   Q.   And is that the conversation that you
15 recorded?
16   A.   That is correct.
17   Q.   And did Mr. Lowenthal invite you to
18 speak to him, or did you go to him?
19   A.   I came to him.
20   Q.   Now, I want to be clear.  I am not
21 asking you to tell me about any conversation that
22 you had with an attorney.
23      At the time that you recorded that
24 conversation with Mr. Lowenthal on November 4th, had
25 you spoken to an attorney regarding your employment

576

NGO - CROSS

1
2 status at Oppenheimer?
3    A.   Yes.
4    Q.   Had you spoken to an attorney about
5 potentially bringing a claim against Oppenheimer?
6    A.   Wait.  Could you rewind the question.
7 I need dates.
8    Q.   Sure.
9      At the time that you recorded your
10 conversation with Mr. Lowenthal on November 4th,
11 2014, had you spoken to an attorney about your
12 employment status at Oppenheimer?
13   A.   I had spoken to some friends who are
14 attorneys, correct.
15   Q.   And you had spoken to those friends
16 who are attorneys about potentially bringing a claim
17 against Oppenheimer?
18   A.   No, we did not discuss that at this
19 stage.
20   Q.   Are either of your partner's parents
21 attorneys?
22   A.   Yes, my partner's father is an
23 attorney.
24   Q.   And did you tell Mr. Lowenthal that
25 you were recording that conversation?

577

NGO - CROSS

1
2    A.   No, I did not.
3    Q.   And I believe you testified that you
4 used your iPhone to record it?
5    A.   That is correct.
6    Q.   Did you place your iPhone somewhere
7 where Mr. Lowenthal couldn't see it?
8    A.   That is correct.
9    Q.   Where was that?
10   A.   In my pocket.
11   Q.   Do you recall testifying, I believe at
12 your deposition and yesterday, that the reason that
13 you didn't tell Mr. Lowenthal that you were
14 recording the conversation is because you wanted to
15 ensure that he would be truthful?
16   A.   To some degree, that's part of it,
17 yes.
18   Q.   Do you believe that he spoke
19 truthfully in that conversation?
20   A.   Yes, I believe from -- yes --
21 partially no.  I mean, you have to ask me the
22 question again.  Are you saying overall did I find
23 him truthful or did you say --
24   Q.   Do you believe he lied at all in that
25 conversation?

578

NGO - CROSS

1 A. Not that I can remember certain
2 instances, no.
3 MR. GIBSON: At this point, if we
4 could take a short break, we're going to set
5 up to play the audio of that conversation.
6 Off the record.
7 (Recess from the record.)
8 THE ARBITRATOR: Before you start,
9 just a note about scheduling. I can go till
10 just before 5 o'clock. I have to make a
11 brief phone call at 5.
12 MR. GIBSON: Okay.
13 THE ARBITRATOR: I could go even a
14 little bit beyond 5.
15 MR. GIBSON: Okay. I'm going to shoot
16 to get Mr. Ngo finished before 5.
17 THE ARBITRATOR: Okay.
18 MR. GIBSON: At this point, I'm going
19 to play Exhibit 86, which is the audio
20 recording that there's been some testimony
21 about.
22 BY MR. GIBSON:
23 Q. And if you would, Mr. Ngo -- if you
24 could take a look at Exhibit 86B, which is one of

579

NGO - CROSS

1 the transcripts from that recording.
2 A. Sure.
3 MR. GIBSON: And we can use that to
4 follow along.
5 THE WITNESS: Can I write on this, by
6 the way?
7 BY MR. GIBSON:
8 Q. As long as that is --
9 MR. IADEVAIA: No.
10 BY MR. GIBSON:
11 Q. The answer is no.
12 A. Okay.
13 MR. LICUL: It's for other witnesses,
14 too.
15 THE WITNESS: I'll pretend I'm
16 writing. It helps me to follow stuff.
17 MR. GIBSON: Sure.
18 MR. LICUL: You can take notes on a
19 piece of paper.
20 THE WITNESS: I won't.
21 MR. GIBSON: Is everybody ready?
22 (Audio is played.)
23 BY MR. GIBSON:
24 Q. Mr. Ngo, I'd like to go through this

580

NGO - CROSS

1 transcript again from the beginning of Exhibit 86B
2 and ask you a few questions about what we just
3 listened to.
4 A. Sure. Go ahead, Mike.
5 Q. So first of all, I think you gave some
6 testimony about this on direct examination, but you
7 start out very early in the conversation by
8 apologizing to Mr. Lowenthal?
9 A. That's just -- that's the way I wanted
10 to start this conversation, correct.
11 Q. And this was the day after you believe
12 that Mr. Lowenthal first told you that you were
13 demoted?
14 A. He -- well, it was the first day
15 after, correct.
16 Q. And this was the day after you felt
17 that Mr. Lowenthal was discriminating and
18 retaliating against you?
19 A. Well, that starts prior to that day,
20 but, yes, this is after those preceding events.
21 Q. And we see, on page 2 of the
22 transcript, which is the first full page of text, at
23 line 15 -- you gave some testimony about this
24 yesterday -- you said --

581

NGO - CROSS

1 A. Do you have something -- I think
2 yesterday we had something with all the lines --
3 Q. I think you're on A. It's B.
4 A. Sorry. Got it.
5 Q. There you go.
6 A. Page 2B, right. Sorry.
7 15?
8 Q. Correct.
9 And what you state here is, "And what
10 happened -- I think there was confusion with that
11 leave."
12 Do you see that, sir?
13 A. That's correct.
14 Q. You also see, on page 2, line 12,
15 where you state, "I've always been honest with you"?
16 A. That is correct.
17 Q. Did you testify yesterday you didn't
18 believe you were being honest with Mr. Lowenthal at
19 that time?
20 A. That is correct.
21 Q. Do you regularly record conversations
22 with people without telling them?
23 A. No.
24 Q. Would you be happy if someone recorded

582

NGO - CROSS

1  a business conversation with you without telling
2  you?
3
4       A.   No.
5       Q.   Let's take a look at page 3 of the
6  transcript, please.  And Mr. Lowenthal states, at
7  line 10, "Just to recharacterize what I told you to
8  do, which is, my direction was really toward Lenore
9  Denys in terms of the three-month versus none.  The
10  policies and permissions to leave were completely
11  nonstandard, so I didn't know anything about it.  It
12  was not up to Jane or Colleen's discretion as to how
13  much leave you could have."
14       Do you see that, sir?
15       A.   That is correct.
16       Q.   And what was your response to
17  Mr. Lowenthal when he said that?
18       A.   I was deferential.  I wasn't going to
19  argue with him, so I said, "Sure."
20       Q.   But you don't think Mr. Lowenthal was
21  lying when he said this; correct?
22       A.   I think he mischar- -- I think he was
23  lying.  I think he was mischaracterizing our
24  conversation.  He never told me to discuss my leave
25  with Lenore Denys.  The only reference he made to

583

NGO - CROSS

1
2  Lenore Denys was for me to find out what the policy
3  was in place.
4       Q.   So let's backtrack a little bit, to
5  make sure I understand correctly.
6       The reason that -- one of reasons that
7  you recorded the conversation was because you wanted
8  to make sure that Mr. Lowenthal was truthful;
9  correct?  You testified about that?
10       A.   I don't think it would coerce him to
11  be truthful, but I wanted to -- that was part of the
12  reason, I guess.  But I don't --
13       Q.   Okay.
14       A.   Sure.
15       Q.   I'm sorry.  I didn't mean to cut you
16  off.
17       A.   Repeat that question again.  You're
18  saying --
19       Q.   Sure.
20       One of the reasons you testified you
21  didn't tell Mr. Lowenthal that you were recording
22  the conversation is because you wanted him to be
23  truthful?
24       A.   I guess that's one of the reasons,
25  correct.

584

NGO - CROSS

1       Q.   And I think before we took our break,
2  you testified that you didn't recall him lying
3  during this conversation?
4       A.   Well, I didn't have the whole
5  transcript in front of me, to tell you the truth.
6  And so I asked you to repeat it because I wasn't
7  sure what you were saying, but if you want me to go
8  line by line and analyze it, like we're doing now, I
9  can tell you the veracity of each comment
10  individually as we're going now.
11       But at the time when you asked me, it
12  was a 12-minute conversation, so now I have it in
13  front of me.  I'm happy to answer your questions.
14       Q.   So the line, "It was not up to Jane or
15  Colleen's discretion as to how much leave you could
16  have," you believe that was not a truthful statement
17  by Mr. Lowenthal?
18       A.   That is correct.  Because he had told
19  me to work it out with Jane and Colleen.
20       Q.   And you responded -- but, nonetheless,
21  you responded by saying "Sure"; correct?
22       A.   Yes -- I mean, keep in mind, at this
23  point, it was my November 3rd conversation.  I was
24  scared to lose my job.  I had read his letter for

585

NGO - CROSS

1
2  the first time that he wrote in July, which was not
3  very friendly towards me.  And it was a confluence
4  of things.  So the attitude to come into this
5  conversation was to be deferential.
6       Q.   If I recall correctly, when you got
7  off the phone with Mr. Lowenthal on either
8  July 16th or 17th, you also felt that your job was
9  in jeopardy?
10       A.   That's correct.
11       Q.   But you didn't record your first
12  conversation with Mr. Lowenthal; right?
13       A.   No, I did not.
14       Q.   And at line 23 -- well, let me
15  continue.
16       At line 16, Mr. Lowenthal states,
17  "There's a company policy and I pointed you to
18  Lenore to look into that."
19       You state, "Yeah, and I talked to
20  Lenore.  I did -- I did talk to Lenore."
21       Mr. Lowenthal states, "Whatever the
22  dialog between you and Colleen is professional
23  courtesy only."
24       Is that statement by Mr. Lowenthal
25  consistent with what you recall him saying to you

586

NGO - CROSS

1  back in July -- May of 2014?
2      A.   I'm sorry.  Which statement?
3      MR. IADEVAIA:  Which statement?
4  BY MR. GIBSON:
5      Q.   Where Mr. Lowenthal says, "Whatever
6  the dialog was between you and Colleen is
7  professional courtesy only," is that consistent with
8  what Mr. Lowenthal's instructions were to you in May
9  of 2014?
10     A.   No.
11     Q.   And what was your response to that
12 statement?
13     A.   I said, "Oh, yes.  Yes.  Yes."
14     Q.   Mr. Lowenthal --
15     A.   As I said, I wasn't planning to argue
16 with him over factual inaccuracies.  I was about to
17 lose -- I thought I was about to lose my job, so of
18 course I'm not going to argue with him about it.
19     Q.   You went in there just to record
20 essentially and hear what he had to say?
21     A.   No.  I needed clarity on what my job
22 title was, as I mentioned.  I needed clarity -- I
23 wanted to apologize to him that I did not read the
24 letter on July -- that he sent to me July 18th.

587

NGO - CROSS

1      My purpose in this conversation was
2  also to try to salvage the relationship that we used
3  to have.  We used to have a very good relationship.
4  And post me asking for leave and taking the leave,
5  it just became very sour and it was very apparent to
6  me.  So Rob Lowenthal was my boss.  I was trying to
7  be -- I was trying to keep my job.
8      Q.   And you don't deny that --
9  Mr. Lowenthal's statement that he directed you to
10 Lenore Denys to talk about Oppenheimer's FMLA
11 policies; correct?
12     A.   We went over that.  He did on the
13 first day in May, said to talk to Lenore Denys about
14 what the policies were and what was available to me.
15     Q.   And going back to Exhibit -- page 3 on
16 line 23, after that dialog with Mr. Lowenthal, you
17 state, "And that's my fault and I agree with you."
18     Do you believe you were partially at
19 fault for any confusion while you were out of the
20 office in July of 2014?
21     A.   I do not believe that to be the case.
22 I thought it was very clear that I asked for
23 August 26 leave during my July conversation with
24 him.  And, in fact, the implication is even -- if

588

NGO - CROSS

1  you look at the letter that he sent July 18 with the
2  FMLA paperwork, it seems to be consistent.  I had
3  talked to him about a leave.
4      So if you're asking me -- when I say
5  that's my fault and I agree with that and you want
6  to go over these comments, I can tell you that a lot
7  of these comments are taken out of context, that I'm
8  just trying to preserve my job and preserve my
9  relationship with Mr. Lowenthal.
10     Q.   And on page 4, please, at the first
11 line, you say, "Well, sure.  I'm just saying that I
12 wasn't trying to hide it."
13     Now, was the "it" that you're talking
14 about the fact that you were not going to be
15 returning to the office until August 25th?
16     A.   Yes, that sounds right.
17     Q.   But you didn't copy Mr. Lowenthal on
18 the e-mail, right, the July 13th e-mail?
19     A.   We established that I did not.
20     Q.   I know.
21     And you didn't call Mr. Lowenthal
22 beforehand to tell him about that.
23     A.   No, but I obviously spoke to him about
24 it on July 16th.

589

NGO - CROSS

1      Q.   Got you.
2      Now, staying on page 4, line 4, you
3  state, "I told you over the phone I was totally
4  prepared to sign anything."
5      Do you see that, sir?
6      A.   Yes.
7      Q.   Did you say that to Mr. Lowenthal
8  during the telephone conversation on July 16th or
9  17th?
10     A.   I think I might have said that when we
11 were talking about I wanted to be out until
12 August 26th.
13     Q.   Did you ever -- following your
14 conversation with Mr. Lowenthal, did you ever call
15 him or e-mail him to follow up and say, are there
16 forms I need to sign to be on FMLA leave?
17     A.   Well, he said just to do what you need
18 to do.  He didn't tell me to sign any forms.
19     Q.   My question was not that, though.
20     My question was, following the
21 conversation on July 16th or 17th, when you
22 allegedly told Mr. Lowenthal, I'll sign -- I'm
23 totally prepared to sign anything, did you ever call
24 him or e-mail him to follow up and ask if there was

590

NGO - CROSS

1
2  any paperwork?
3      A.   No, I did not.
4      Q.   Would you agree that had you, he would
5  have told you about that July 18th letter he sent
6  you?
7          Do you think that's a fair assumption?
8      A.   I think that's a fair assumption.
9      Q.   On page 4, at line 6, Mr. Lowenthal
10  states, "Look.  The issue around your personal
11  health is completely separate from the issues around
12  going to California."
13          Do you see that?
14      A.   Yes.
15      Q.   And also when you go down to line 19,
16  you see where Mr. Lowenthal said, "We changed the
17  business model"?
18      A.   Yes.
19      Q.   Now, from your -- the date that you
20  returned to Oppenheimer through the end of your
21  employment, was that approximately a year and a
22  half, give or take?
23      A.   Could you repeat the question.
24      Q.   You worked at Oppenheimer for about
25  another year and a half after you returned in

591

NGO - CROSS

1
2  November of 2014?
3      A.   That is correct.
4      Q.   During that time period, did Ms. Burns
5  ever have another cohead of high-yield research?
6      A.   No, she did not.
7      Q.   Do you know who's currently the head
8  of high-yield research at Oppenheimer?
9      A.   I don't know.
10      Q.   Go to page 5.  If you look -- starting
11  on line 13, you say, "And I had talked to Colleen
12  and I told her -- I go, yeah, I spoke to Rob, I'm on
13  a leave of absence until the 26th."
14          And Mr. Lowenthal responded, "You were
15  paid leave.  It wasn't a leave of absence."
16          Is that consistent with your
17  discussion with Mr. Lowenthal?
18      THE ARBITRATOR:  Which discussion?
19      THE WITNESS:  Which discussion?
20  BY MR. GIBSON:
21      Q.   Is that consistent with the fact that
22  you weren't on leave of absence in July of 2014?
23      A.   Based on what discussion?
24      Q.   I'll withdraw the question.
25          When Mr. Lowenthal said to you, "It a

592

NGO - CROSS

1
2  leave of absence," did you believe that that was a
3  correct statement?
4      A.   I did not believe that was a correct
5  statement.
6      Q.   You state again, here on line 18, that
7  "I will sign whatever."
8          Do you see that, sir?
9      A.   I see that.  That is correct.
10      Q.   Now, you testified that Mr. Lowenthal
11  didn't tell you during your July telephone call that
12  Ms. Burns was the sole head of high-yield research.
13      A.   That is correct.
14      Q.   But you did know that she was at least
15  the head of high-yield research on an interim basis;
16  isn't that true?
17      A.   He did not say that to me.
18      Q.   Take a look at page 7, please.  On
19  line 3, Mr. Lowenthal says, "And she was being --
20  that she was made single head of research.  I don't
21  know.  Did she not tell you that?  Did she not have
22  that discussion with you?"
23          And you state, "No, she never told me
24  that, so I didn't know that.  So I knew it was in
25  the interim, right, but I didn't know that it was

593

NGO - CROSS

1
2  decided."
3          Is it your testimony, Mr. Ngo, that as
4  of July 18th, 2014, you did not know that Ms. Burns
5  was the interim head of high-yield research?
6      A.   That is correct.  And what this
7  reference is is -- when I said I knew it was in the
8  interim, it was in reference to me reading his
9  letter on November 3rd that clearly stated that, in
10  the -- in my absence, she would have been the cohead
11  of research.
12      Q.   So when you said "I knew," that is
13  entirely based on you having seen the letter the day
14  before?
15      A.   Yes.  And also, remember, I said that
16  Colleen never told me that.  I think if I had
17  known -- if Rob had told me that I was the head of
18  research on interim basis in July, I would think I
19  would have asked Colleen in our conversations to
20  give me some clarity on that.  And obviously I
21  didn't have that clarity because we never had that
22  discussion.
23          So what I am referring to is that I
24  had read the letter on November 3rd that was dated
25  July 18th, and I'm saying that I understand that's

594

NGO - CROSS

1 what Rob had said.
2
3     Q.   Mr. Ngo, isn't it true that you
4 recorded this conversation with Mr. Lowenthal
5 because you were trying to create evidence for a
6 lawsuit?
7     A.   No.
8     Q.   And Mr. Lowenthal didn't say what you
9 had hoped he'd say, and that's why you didn't file a
10 charge of discrimination until another year and a
11 half, until after you were laid off?
12     A.   That's not correct.
13     Q.   Now, I am correct that when you came
14 back to work in November of 2014, it took some time
15 for you to get up to speed?
16     A.   In November of 2014?
17     Q.   Sure.
18     A.   I mean, I'm sure there was some time.
19 I remember Ms. Burns saying to me that she was
20 surprised how quickly that I was able to get up to
21 speed and that I spoke in the morning meeting -- I
22 spoke in the -- every morning we have a morning
23 meeting where analysts talk about work. I didn't
24 just sit there for a week; I started to get back to
25 work.

595

NGO - CROSS

1
2     Q.   Did you publish often in November and
3 December?
4     A.   I participated in the morning blast,
5 yes.
6     Q.   Aside from the morning blast.
7     A.   That's publishing, though.
8     Q.   Aside from that, did you publish
9 anything else?
10     A.   Morning blast, Bloombergs.
11     Q.   Do you remember what your compensation
12 was -- total compensation received from Oppenheimer
13 in 2014?
14     A.   I'm sorry. Could you repeat the
15 question.
16     Q.   Sure.
17          Do you remember what the total
18 compensation you were paid by Oppenheimer in 2014
19 was?
20     A.   You're talking about calendar year
21 2014?
22     Q.   That you actually received. Just so I
23 don't have to make you guess, can you turn to
24 Exhibit --
25     A.   I want to say what tab it is? So I'm

596

NGO - CROSS

1 speaking correctly.
2
3     Q.   11 -- go to Exhibit 11A. If you turn
4 in -- I apologize. It's a little difficult to see
5 the Bates numbers.
6     A.   Hold on a second. It's so big.
7          11A; is that correct?
8     Q.   Of the 2014 W-2.
9     A.   But 11A --
10     Q.   If you keep turning.
11     A.   Got it. Yes.
12     Q.   Now, 2014, am I correct, sir, was the
13 year in which you believe that Oppenheimer
14 discriminated against you?
15     A.   That is correct.
16     Q.   Retaliated against you?
17     A.   That is correct.
18     Q.   Denied you your rights under the FMLA?
19     A.   That is correct.
20     Q.   You believe you were treated unfairly
21 by Oppenheimer in 2014?
22     A.   That is correct.
23     Q.   In 2014, would you agree with me,
24 Mr. Ngo, that you were not present in the office for
25 over four months?

597

NGO - CROSS

1
2     A.   That sounds correct.
3     Q.   And for 11 weeks of that period,
4 specifically when you were recovering from your
5 brain aneurysm, you weren't doing any work at all by
6 Oppenheimer?
7     A.   That is --
8     Q.   Work for Oppenheimer?
9     A.   That is correct.
10     Q.   And your total compensation for
11 2004 -- '14, am I correct, was $388,750?
12     A.   That is correct.
13     Q.   Did you work for Oppenheimer for
14 all --
15          THE ARBITRATOR: I'm sorry.
16          Which year are we talking about?
17 2014?
18          MR. GIBSON: Yes, sir.
19          THE ARBITRATOR: Okay.
20          MR. GIBSON: Gross pay.
21          THE ARBITRATOR: I'm looking at the
22 wages, tips, et cetera, 366,042. Oh, okay.
23 I see. Got it. Okay. Sorry about that.
24          MR. GIBSON: No worries. Thank you.
25

598

NGO - CROSS

1  BY MR. GIBSON:
2     Q.   I'm sorry.  I don't know if I asked
3  you the question.
4          Did you work for Oppenheimer for all
5  of 2015?
6     A.   Yes, I did.
7     Q.   What was your job title during that
8  time?
9     A.   I was a managing director.
10    Q.   And, in fact, you were a managing
11 director before you left the office in June of 2014
12 for the birth of your child?
13    A.   That is correct.
14    Q.   Were you a managing director when you
15 were terminated in June of 2016?
16    A.   That is correct.
17    Q.   And what was your -- were you a
18 research analyst in 2015?
19    A.   That is correct.
20    Q.   Did you continue to cover paper,
21 chemicals, and mining primarily?
22    A.   Paper, chemicals, packaging --
23    Q.   And packaging?
24    A.   -- and also mining, yes.

599

NGO - CROSS

1
2     Q.   I believe you testified about a bonus
3  that you received in 2015 for the calendar year
4  2014?
5     A.   That is correct.
6     Q.   You would have received that in
7  February of 2015?
8     A.   That is correct.
9     Q.   Who told you what your bonus amount
10 was?
11    A.   Colleen Burns.
12    Q.   Was Ms. Ross present during that
13 conversation?
14    A.   No, she was not.
15    Q.   And I believe we saw, but feel free to
16 go back through it, that you received a bonus of
17 $100,000 for 2014?
18    A.   That sounds correct, Mike.
19    Q.   Was it your understanding that
20 Ms. Burns was the one who set that amount?
21    A.   No, I think it was a combination of
22 things.  I think that it was set by Rob and her.
23 I'm sure she had input on it, which is why I asked
24 her, after she gave me the $100,000, what does this
25 mean?  And certainly she came back and said, let me

600

NGO - CROSS

1  talk to Rob.  So obviously that implies that both
2  she and Rob had some input on that compensation.
3     Q.   Is it fair to say you were not happy
4  with that bonus?
5     A.   That is correct.
6     Q.   And did you think that that
7  discretionary bonus was unfair?
8     A.   Yes, I did.
9     Q.   Did you think Mr. Lowenthal was
10 punishing you for the time that you were out of the
11 office in 2014?
12    A.   Yes, I did.
13    Q.   Did you expect that you would receive
14 the same discretionary bonus in 2014 that you
15 received in 2013?
16    A.   To some degree, yes.
17    Q.   Isn't it true that you anticipated
18 that your discretionary bonus would be reduced
19 somewhat for the amount of time that you were out of
20 the office?
21    A.   I don't know.  There's a lot of
22 calculations in that number.
23    Q.   Didn't you tell -- did you tell
24 Ms. Burns, during your conversation about your bonus

601

NGO - CROSS

1  for 2014, that you felt that you were being
2  overpenalized for the time that you were out of the
3  office?
4     A.   You're talking -- in 2014, I asked her
5  what -- for the 2015 bonus, I asked her, how was
6  this calculated?  And I don't know if I asked her
7  specifically what the details were, but then she --
8  and she said -- it was a very short conversation.
9  She said, let me talk to Rob and get back to you.
10    Q.   So do you recall, during that
11 conversation when she gave you that $100,000 number,
12 telling her that you felt that you were being
13 overpenalized for time out of the office in 2014?
14    A.   I don't remember saying that.  Because
15 I think if I said that, that would sound very
16 combative, so it doesn't sound like something I
17 would say at that stage, because I was already
18 worried about my job.
19         I think I just asked her, how was this
20 determined?  And we didn't get into a whole
21 conversation about it.  So she went over to Rob.
22 But I don't know.  I can't remember if I had said
23 that or not, but it doesn't sound like something I
24 would say, given the circumstances.

602

NGO - CROSS

1    Q.    You were concerned about your job at
2    that time?
3    A.    Yes, because I was just demoted.  I
4    was demoted the year prior.  And, again, all of
5    these confluence of events, the conversation with
6    Rob, the conversation with Jane.  So of course I
7    was, yes.
8    Q.    Did you record that conversation with
9    Ms. Burns?
10    A.    No, I did not.
11    Q.    After receiving the amount of your
12    bonus for the year 2014, did you ever discuss that
13    amount directly with Mr. Lowenthal?
14    A.    No, I was scared to, and I was
15    following protocol.  I'm supposed to talk to
16    Ms. Burns about my bonus at that stage if I report
17    to her.
18    Q.    Where's that protocol written?
19    A.    Well, for the years that I got my
20    bonus, you always get it from the head of research.
21    So the years that I got bonuses from Todd Morgan, I
22    never talked to Rob after that with the exception of
23    my bid away.
24    Generally you get a number from the
25

603

NGO - CROSS

1    head of research and that's it.  I'm not going to
2    argue with Rob about it.  I guess I could, but I
3    don't believe that was normal protocol.
4    Q.    Well, if I understood you correctly,
5    it was your understanding that Mr. Lowenthal played
6    a significant role in the determination of the
7    amount of that bonus.
8    A.    That's correct.
9    Q.    And, in fact, you testified that you
10    asked -- Ms. Burns said she was going to discuss it
11    with Rob and get back to you?
12    A.    That is correct.
13    Q.    I think you testified yesterday that
14    when Ms. Burns got back to you, she stated something
15    along the lines that Mr. Lowenthal said that it
16    was -- that was your contribution to the firm?
17    A.    He said it was based on my
18    contribution to the firm, yes.
19    Q.    Did you ever go to Mr. Lowenthal for
20    further clarification on that?
21    A.    Of course not.  I mean, he -- she
22    basically -- that would be confrontational with him,
23    and I didn't want to anger him any more and
24    potentially lose my job.  It was very clear to me
25

604

NGO - CROSS

1    that the bonus number was significantly lower than
2    last year's.
3    And I asked for clarification, which I
4    think is the most I could be without pushing the
5    boundaries.  And all I got was an answer that it was
6    based on my contribution.  And I could tell from the
7    way that Colleen told me that she didn't want -- I
8    didn't want to put her on the spot and go back to
9    Rob and say, what do you mean by that?  I just
10    left it alone.
11    Q.    Did you ever complain to human
12    resources about that bonus and say you felt you were
13    being discriminated or retaliated against?
14    A.    No, I did not.
15    Q.    During 2015, did you look for work
16    anywhere else?
17    A.    I did.
18    Q.    How many job applications would you
19    say you put in in 2015?
20    A.    I don't know.  But I was -- I was
21    looking for another job because I obviously felt
22    scared of losing my job, and I was looking for
23    another job.  And I remember interviewing at another
24    firm.
25

605

NGO - CROSS

1    Q.    How many firms would you say you
2    interviewed with in 2015?
3    A.    It was -- it was tough finding a job
4    because, remember, I was demoted, so my reputation
5    had been diminished to some capacity.  So I remember
6    looking for a job.  And I remember I got very close
7    to a job offer at Shenkman Capital.
8    Q.    Did any job that you interviewed
9    with -- were any of them aware of the fact that you
10    had been demoted at Oppenheimer?
11    A.    Yes.
12    Q.    Which one?
13    A.    I mean, all the accounts knew I wasn't
14    group head anymore.  The morning blast wasn't coming
15    from me anymore.  I remember some accounts saying to
16    me -- after I got back saying, what happened?  You
17    disappeared and the morning blast is not coming from
18    you.
19    And I said, oh, I'm not the group head
20    anymore.  And if we had meetings with accounts, I
21    would tell people that I was not the group head
22    anymore.
23    So what's question again?
24    Q.    Did any of those customers believe --
25

606

NGO - CROSS

1  clients believe that Ms. Burns had been demoted?
2      A.    Ms. Burns?
3      Q.    Correct.
4      A.    No.
5      Q.    Ms. Burns' name wasn't on the morning
6  blast at this point; correct?
7      A.    Well, some people didn't know that --
8  I mean, it didn't red flag it, but I wasn't going to
9  discuss Mrs. Burns' status with someone.
10         THE ARBITRATOR:  Was Ms. Burns' name
11  ever on the morning blast?
12         THE WITNESS:  No, it was not.
13 BY MR. GIBSON:
14     Q.    Now, did you --
15     A.    After he took my name, he made it
16 nondenominational.  He said it was coming from --
17 the morning blast would say Oppenheimer research or
18 something like that, to answer your question.
19     Q.    Did you receive a discretionary bonus
20 for the work you did in 2015?
21     A.    Yes, I did.
22     Q.    Would that have been paid in February
23 of 2016?
24     A.    That is correct.

607

NGO - CROSS

1      Q.    We looked at that yesterday.  You
2  recall that was $175,000?
3      A.    I think that's about the right number,
4  yes.
5      Q.    And who told you what your
6  discretionary bonus for 2015 was going to be?
7      A.    Colleen Burns.
8      Q.    Was Ms. Ross involved in that
9  conversation?
10     A.    We never discussed our bonus numbers.
11 The only time I ever had a discussion with Ms. Ross
12 about bonus was during my bid away.
13     Q.    Who do you believe set the amount of
14 your $175,000 discretionary bonus?
15     A.    Again, it's a combination of factors.
16 I believe it was -- it was Rob, and Colleen would
17 have input.
18     Q.    And you received $75,000 more than you
19 received the year before?
20     A.    From that -- from that low base,
21 correct.
22     Q.    When you received your bonus for 2015,
23 you didn't tell Ms. Burns that you felt you were
24 being overpenalized, did you?

608

NGO - CROSS

1      A.    At that point, I just didn't want to
2  get her involved.  I just said, thank you.
3      Q.    In fact, you didn't complain at all to
4  Ms. Burns about that $175,000 bonus?
5      A.    To be quite frank, if you look at the
6  last time that I spoke to her about my bonus and
7  questioned it, I got a very limited response.  So I
8  wasn't going to repeat that again because it would
9  have aggravated the situation.
10         But, no, I was not happy with the
11 bonus considering that when I was a senior analyst
12 with no manager responsibilities, I was paid 270.
13     Q.    Did you tell Mr. Lowenthal that you
14 were unhappy with that $175,000 discretionary bonus?
15     A.    No, I did not.
16     Q.    During 2015, am I correct that
17 Mr. Sneeden's job was also research analyst?
18     A.    That is correct.
19     Q.    Same job title that you had in 2015?
20     A.    That is correct.
21     Q.    Do you know if Mr. Sneeden received a
22 discretionary bonus for 2015?
23     A.    I assume he did, yes.
24     Q.    Let's take a look at Exhibit 13,

609

NGO - CROSS

1  please.
2          You'll see this exhibit is a number of
3  W-2s for Mr. Sneeden.  I'd like you to turn in to
4  the one for 2015, which is OPCO 1215.
5          Do you see that, sir?
6      A.    Yes.
7      Q.    And you see on this W-2 where it's
8  written -- in the middle, there's some handwriting
9  that says, "$135,000 bonus"?
10     A.    You're talking about Exhibit [sic]
11 1215 --
12     Q.    Correct.
13     A.    -- and I see it's written, "$135,000
14 bonus."
15     Q.    And that's $40,000 less than the bonus
16 that you received in 2015?
17     A.    From one -- taking 170- minus 135-,
18 correct.
19     Q.    Do you know who --
20         MR. GIBSON:  Is there something you
21 wanted?
22         MR. IADEVAIA:  I mean, I'll just deal
23 with it --
24         THE WITNESS:  It's a handwritten

610

NGO - CROSS

1  number, so I don't know --
2
3      MR. IADEVAIA:  I think you got the
4  wrong year, but --
5      MR. GIBSON:  You know what, I'm not
6  sure if you're right, but it's a fair point.
7  BY MR. GIBSON:
8      Q.  Let's take a look at Mr. Sneeden's W-2
9  for 2016.
10      And you see for 2016, there's a
11  handwritten "$150,000 bonus"?
12      A.  Yes.
13      Q.  And that's $25,000 less than you
14  received for 2015?
15      A.  That's correct.
16      Q.  Thank you.
17      Who was -- in 2016, who was Peter
18  Albano?
19      A.  Do we have the compensation for the
20  other senior analysts, like Umesh?
21      Q.  I'm sure if --
22      A.  I'm just saying that if you're trying
23  to make an argument --
24      Q.  I'm not trying to make an argument,
25  Mr. Ngo.  I'm just asking questions.

611

NGO - CROSS

1
2      A.  Okay.
3      Q.  Do you recall who Peter Albano was in
4  2016?
5      A.  Yes.
6      Q.  What was Mr. Albano's job title in
7  2016?
8      A.  I think at one point, he was head of
9  high-yield sales with the exception -- they carved
10  out Jane.  So -- sorry.  That he was head of credit
11  sales, but then they carved high-yield, so that he
12  was not in charge of Ms. Ross.
13      Q.  Would you define -- would you say that
14  Mr. Albano was a pretty senior Oppenheimer employee
15  in 2016?
16      A.  Yes, he was -- on the administrative
17  side, yes.
18      Q.  And are you aware of the fact that
19  Mr. Albano is currently the head of fixed income at
20  Oppenheimer?
21      A.  I did not know that.  Congratulations
22  to Mr. Albano.
23      Q.  Do you remember I asked you at your
24  deposition whether it would surprise you if
25  Mr. Lowenthal took $25,000 out of Peter Albano's

612

NGO - CROSS

1  2015 bonus to pay it to, and you said it would
2  surprise you?
3
4      A.  It would surprise me because I don't
5  know any of that data.  So, yes.
6      Q.  So am I correct that for the year
7  2015, you received your base salary of $150,000 and
8  a discretionary bonus of $175,000?
9      A.  That sounds right, correct.
10      Q.  Your total compensation for work
11  performed in 2015 was $325,000?
12      A.  That is correct.
13      Q.  Now, you were terminated by
14  Oppenheimer on June 30, 2016; correct?
15      A.  That is correct.
16      Q.  And you would agree with me, sir, that
17  that's about two years after you left for the birth
18  of your child?
19      A.  That is correct.
20      Q.  Would you also agree with me that
21  that's just under two years after you suffered your
22  brain aneurysm?
23      A.  That is correct.
24      Q.  And it's your belief that Oppenheimer
25  terminated your employment as retaliation for being

613

NGO - CROSS

1  out of the office for the birth of your child?
2
3      A.  But also my aneurysm as well, correct.
4      Q.  You were an at-will employee, correct,
5  sir, at the time you were terminated?
6      A.  That is correct.
7      Q.  Is it your understanding that because
8  you had a baby, that you were entitled to work at
9  Oppenheimer in perpetuity?
10      A.  Could you repeat that question.
11      Q.  Sure.
12      Is it your understanding that because
13  you had a child, you were entitled to work at
14  Oppenheimer in perpetuity?
15      A.  You're saying if I had a baby, did I
16  have expectations that my job would be indefinite?
17      Q.  Correct.
18      A.  No.
19      Q.  Was it your understanding that if you
20  took a leave of absence for a brain aneurysm, that
21  your work at Oppenheimer would be indefinite?
22      A.  I did not expect indefinite
23  employment.
24      Q.  And you would agree with me, sir, that
25  Oppenheimer could have terminated your employment in

614

1    NGO - CROSS
2    2015 at any time; correct?
3        A.   Yes, but it depends on like -- I mean,
4    yes, you can.  Yes.
5        Q.   Oppenheimer didn't have to wait until
6    June 30th to fire you for any reason?
7        A.   They could have -- it's an at-will
8    employee.
9        Q.   In fact, Oppenheimer paid you a
10   discretionary bonus of $175,000 just five months
11   before it terminated your employment; correct, sir?
12       A.   That is correct.
13       Q.   And it didn't have to do that either,
14   did it?
15       A.   No.
16       Q.   Your bonus was 100 percent
17   discretionary; correct, sir?
18       A.   That is correct.
19       Q.   Who told you that you were being
20   terminated?
21       A.   Colleen Burns and I believe HR's rep,
22   Jaime Bridges.
23       Q.   Are you sure that it was Jaime
24   Bridges?
25       A.   Actually, I'm not sure, to tell you

615

1    NGO - CROSS
2    the truth, because, remember, I had never met her
3    before.  And I remember her saying that she didn't
4    know, but I think it was.  And I might be
5    associating her because I'm seeing the documents
6    now, but it was an HR rep.
7        Q.   Was Ms. Ross present for that
8    discussion?
9        A.   Yes, you're correct.  I don't know if
10   it was Jaime.  I know it was an HR rep.
11       Q.   Okay.  As far as you can recall, it
12   was just the HR rep and Ms. Burns.
13       A.   Yes.  You have to remember that
14   conversation was a very brief conversation.  And
15   obviously I was not prepared for it.  And I
16   obviously know who Colleen Burns is, but I don't
17   remember the name of a person.
18       Q.   But Ms. Ross was not present for that
19   conversation?
20       A.   She was not present.
21       Q.   And I believe you testified that
22   during that conversation, you were told that your
23   position was being eliminated due to cost cuts?
24       A.   Repeat the question, please, Mike.
25       Q.   Sure.

616

1    NGO - CROSS
2        During that conversation with HR and
3    Ms. Burns, you were told that your position was
4    being eliminated due to cost cuts?
5        A.   That is correct.
6        Q.   As we saw earlier, you testified that
7    Oppenheimer has a reputation for cutting costs;
8    correct, sir?
9        A.   That is correct.
10       Q.   And the position of research analyst
11   is a cost center, is it not, sir?
12       A.   It is a cost center, correct.
13       Q.   Research analysts do not generate
14   revenue directly?
15       A.   That is correct.
16       Q.   At the time that you were laid off in
17   June of 2016, were you aware that Oppenheimer was
18   undertaking rounds of layoffs?
19       A.   I was not aware of it.
20       Q.   Did you hear any water cooler talk
21   about layoffs in the spring of 2016?
22       A.   Usually you hear water cooler talk
23   about Oppenheimer layoffs in January, right before
24   bonus.  So June is not a common time to hear about
25   water cooler talk, if that's what you're asking me.

617

1    NGO - CROSS
2        Q.   How about January of 2016?  Did you
3    hear any water cooler talk in January of 2016 about
4    layoffs or prospective layoffs at Oppenheimer?
5        A.   There's always water cooler talk in
6    January in the years I've been there, because that's
7    right before bonus.  So a firm can conserve cash by
8    not giving the bonus for people, so they give the
9    layoffs generally in January.
10       Q.   How soon after you were terminated did
11   you start looking for a new job?
12       A.   I believe I met -- I think the first
13   week was tough, so I probably started the next week.
14   I remember reaching out to a few people afterwards,
15   but I started fairly soon after the notice.
16       Q.   Did you take a vacation in 2016?
17       A.   You know, I think we might have had
18   plans already to go to Seattle to see my in-laws,
19   family.  And I believe, if I remember correctly, I
20   had already booked the ticket.  And I think I was
21   supposed to go on vacation.  And then I was let go,
22   so we went to Seattle and then came back.
23       Q.   Did you travel to Budapest?  Is that
24   the vacation -- did you travel to Budapest in 2016?
25       A.   I did, but it was not after -- no, I

618

NGO - CROSS

1    traveled to Budapest I believe -- no, it was not
2    2016, it was 2017.  Because I had already received
3    my offer -- or it was -- I took the Budapest
4    vacation because I had already had indications of an
5    offer from Fitch verbally, that's correct, but it
6    was not right after the layoff.
7        Q.    How many employers would you estimate
8    you submitted a résumé to between the time of your
9    termination from Oppenheimer and your hiring by
10   Fitch?
11       A.    I don't know, but a lot of those
12   e-mails are in this file.
13       Q.    How many interviews do you recall
14   going on?
15       A.    I didn't have much progress on the
16   interview front.  I interviewed at Credit Agricole,
17   and I interviewed at Fitch Ratings.
18       Q.    Are those the only two interviews that
19   you can recall going on?
20       A.    Formal interviews, yes.
21       Q.    Other than -- I think you testified
22   about this, but other than Fitch, did you receive
23   any offers?
24       A.    No.

619

NGO - CROSS

1        Q.    I also think you testified, when you
2    were applying for jobs -- again, this is between
3    your Oppenheimer termination and your Fitch
4    employment -- what types of positions were you
5    interviewing for?
6        A.    A variety of positions.  I mean, some
7    of them were exactly credit analyst positions.  Some
8    of them were management positions.  Some of them
9    were investor relations.  Some of them were
10   corporate development.  I tried to expand the reach
11   as far as I could.
12       Q.    Let's take a look at Exhibit 121,
13   please.
14           Now, you testified a little bit about
15   these e-mails on direct, and I'm not going to go
16   through every one of them, but I'd like to ask you
17   about a few of them.
18       A.    Sure.  Go ahead, Mike.
19       Q.    Just starting with the first one, your
20   e-mail to Mr. Parker, you state in this e-mail, "I
21   unfortunately recently lost my position at
22   Oppenheimer.  They were cutting costs and my sectors
23   did not have the investment banking coverage."
24           Do you see that?

620

NGO - CROSS

1        A.    Yes, I do.
2        Q.    And if I understood your testimony on
3    direct, you didn't really believe that was why you
4    got laid off?
5        A.    No, I did not.
6        Q.    But you put that in there -- remind me
7    why you put that in there.
8        A.    I was trying to find a job.
9        Q.    Did you need to offer a reason in that
10   e-mail as to why you weren't employed at Oppenheimer
11   anymore?
12       A.    I think so.  I think that employers
13   will ask you inevitably in an interview, what
14   happened at your job at Oppenheimer?  So I may as
15   well just get to the point and say and let's focus
16   on my résumé and my qualifications.
17       Q.    You said that -- would you agree with
18   me, sir -- and please feel free to go through
19   them --
20       A.    Sure.
21       Q.    -- that in every one of these e-mails,
22   you stated that you were terminated by Oppenheimer
23   either from cost cuts or lack of coverage in your
24   sectors?

621

NGO - CROSS

1        A.    That's correct.  That sounds about
2    right, yes.
3        Q.    If you could take a look at the third
4    e-mail in, which is Plaintiff 313.
5        A.    What number are you --
6        Q.    Same exhibit, 121, and the
7    third e-mail in.  At the bottom, it says, PL313.
8        A.    That is correct.  Okay.
9            THE ARBITRATOR:  121 --
10           MR. GIBSON:  It's Exhibit 121.
11           THE ARBITRATOR:  I have 121 and it
12   appears to be a single sheet of paper.
13           MR. GIBSON:  Looks like we may have --
14           MR. IADEVAIA:  The same thing with my
15   book.  There must have been some mistake.
16           MR. GIBSON:  I think -- did you --
17   didn't you ask questions about this exhibit?
18           MR. IADEVAIA:  We asked about the
19   first document.
20           MR. GIBSON:  Okay.  Well, you know
21   what I'll do --
22           MR. IADEVAIA:  We know that there's
23   more pages, yes.  We're not disputing that.
24           MR. GIBSON:  Okay.

622

NGO - CROSS

1 You know what I'll do, if it's all
2 right, your Honor, I'll just ask the
3 questions and we can fix the exhibit book for
4 you.
5 THE ARBITRATOR: Sure.
6 MR. GIBSON: Fair enough?
7 MR. IADEVAIA: Yes. That's fine.
8 MR. GIBSON: You know what, why
9 don't -- what's in the witness book?
10 MR. IADEVAIA: He has multiple
11 e-mails.
12 MR. GIBSON: I'll give the judge our
13 extra copy.
14 MR. IADEVAIA: There you go.
15 BY MR. GIBSON:
16 Q. And the e-mail I'm looking at is
17 Plaintiff 313, the third one into the exhibit.
18 Do you see that, sir?
19 A. Yes, I see it.
20 Q. And this e-mail appears to be from you
21 to T. Morgan at Jefferies.
22 Is that Todd Morgan?
23 A. That is correct. My old boss.
24 Q. Did you get an interview with

623

NGO - CROSS

1 Mr. Morgan?
2 A. They were not hiring. I remember
3 talking to him about a position at Jefferies.
4 Q. And, in fact, in this particular
5 e-mail, you told Mr. Morgan, "I got let go at
6 Oppenheimer. They are cutting costs and said that
7 my sector didn't have the banking coverage."
8 Do you see that?
9 A. That is correct.
10 Q. And then look to the line next down --
11 the next line down.
12 A. That's okay. I understand what you're
13 saying. You're saying either way.
14 Q. No.
15 I'm looking at where it says, "I think
16 my plan is to take this month off, but I am quietly
17 reaching out to a few people."
18 A. Yes.
19 Q. Was it your intent to take the month
20 of July off?
21 A. I'll tell you, when you look for a job
22 on Wall Street, it's a sprint. People look at you
23 of how long you've been out, and people want to
24 see -- people -- the longer you're out, the more

624

NGO - CROSS

1 stale you are.
2 So what I'm saying to Rob -- Todd, I'm
3 taking a month off, but, in fact, I'm actually
4 really looking for a job. Because I'm kind of
5 giving myself some time so it doesn't look that it
6 took me so long to find a job.
7 Q. Take a look at the next page,
8 Plaintiff 570.
9 A. Uh-huh.
10 Q. And this is an e-mail to Olivia
11 Talbert --
12 A. Taberay.
13 Q. -- Taberay. Thank you.
14 In this one you say you lost your job
15 at Oppenheimer due to budget cuts. You also say, "I
16 thought I had a job lined up, but it unfortunately
17 fell apart last week."
18 What job was that?
19 A. That was -- when I initially first
20 interviewed at Fitch, I interviewed for an investor
21 development role. If you want to give me the date,
22 I can tell you that it was around this time that I
23 went to Budapest, because I know it was right
24 before.

625

NGO - CROSS

1 I initially interviewed at Fitch for
2 an investment development role, and I was told that
3 I got the job. And then I found out subsequently,
4 talking to HR -- I was told that I received the job
5 verbally from the group head. And then once he told
6 me that, I said, okay, I think I can go to vacation
7 now. I remember going to Budapest right after that.
8 But then subsequent to that, as they
9 were filling out the paperwork, someone internally
10 had priority over me and took the job. So that's
11 what I'm referring to.
12 When I lost that job, actually, the
13 way I came back to Fitch is they said to me, if
14 there's any -- you were obviously liked in the
15 process. If there's any job that you want later,
16 let us know. And that's how subsequently, later, I
17 came back as a retail analyst.
18 Q. Thank you.
19 Let's take a look at the next page,
20 345.
21 I'll ask you, do you recall this
22 exchange with Mr. Corsair?
23 A. Yes, Todd.
24 Q. You told Mr. Corsair -- I think this

626

NGO - CROSS

1 one is out of order in that the more recent e-mail
2 is at the top of the page.
3 You state to Mr. Corsair, "We had a
4 round of layoffs at Oppenheimer."
5 A. Uh-huh.
6 Q. Do you see that one, sir?
7 A. Yes.
8 Q. Was it your understanding that you
9 were part of a round of layoffs at Oppenheimer?
10 A. Well, they told me that there was
11 cost-cutting and there were layoffs, yes. I mean --
12 yes.
13 Q. And you see Mr. Corsair's response
14 below, if you look towards the middle, on the
15 third line, he says, "This stuff happens to so many
16 people at one point or another."
17 Do you agree with Mr. Corsair?
18 A. Yes, we already went over that
19 testimony. It happens in our business.
20 Q. You can set that exhibit aside. I
21 won't go through the rest of them.
22 If you could just quickly take a look
23 at Exhibit 103.
24 THE ARBITRATOR: 103?

627

NGO - CROSS

1 MR. GIBSON: Yes.
2 BY MR. GIBSON:
3 Q. You gave some testimony on your
4 direct, but I just want to clarify.
5 When you created this document -- each
6 date has an entry, correct, for some action that was
7 taken on that date?
8 A. That's correct.
9 Q. Did you input that data at or about
10 the time of that actual date, or was this created
11 all at once subsequently?
12 A. No, sometimes it was -- I would -- I
13 didn't update it every day, but sometimes I'd put in
14 three entries for the week or something, but it
15 was -- it tried to be current, but if you asked me
16 exact timing, it was on or about.
17 Q. But it wasn't -- you didn't create the
18 whole document at once, is my question.
19 A. No. No. It was a gradual thing that
20 I started after my firing at Oppenheimer.
21 Q. And you ultimately were hired by Fitch
22 I believe in June of 2017?
23 A. That's correct.
24 Q. And with the exception of the other

628

NGO - CROSS

1 position at Fitch, is this the first offer that you
2 received since your termination from Oppenheimer?
3 A. That is correct.
4 Q. Let's take a look at that offer
5 letter, which is Exhibit 104.
6 When was the first time that you
7 learned that you were being offered this position?
8 A. From Fitch? I believe it might have
9 been a few days before June 19th. They gave me the
10 verbal offer and then the contract came.
11 Q. By the way, we notice on this Fitch
12 offer letter, if you look at the signature, it was
13 signed by an Anna Gaberkorn in the human resources
14 department.
15 A. Yes.
16 Q. Was it your understanding that you
17 were reporting to Ms. Gaberkorn?
18 A. No. It says on the offer letter that
19 I'm reporting to Mike Simonton, Monica Aggarwal.
20 She's HR -- if you look at the last paragraph of
21 that offer letter, it says that on behalf of Mike
22 Simonton, who's the head of corporates, Monica
23 Aggarwal, who's the head of the retail team.
24 Those are the two people that I

629

NGO - CROSS

1 reported to.
2 Q. So you didn't understand that because
3 Ms. Gaberkorn signed this letter, you would be
4 reporting to her in any way; correct?
5 A. Yes.
6 MR. IADEVAIA: Can we take a break?
7 Just a few minutes.
8 MR. GIBSON: Absolutely.
9 MR. IADEVAIA: Is that okay, Judge?
10 THE ARBITRATOR: Yes.
11 (Recess from the record.)
12 BY MR. GIBSON:
13 Q. So, Mr. Ngo, before we broke, we were
14 about to take a look at Exhibit 104, which was your
15 Fitch offer letter.
16 A. Yes.
17 Q. And am I correct, sir, that your offer
18 at Fitch provided for an annual salary of $220,000?
19 A. That is correct.
20 Q. Am I correct, sir, that that is
21 $70,000 more than your highest salary ever was at
22 Oppenheimer?
23 A. Base, yes.
24 Q. Correct. I'm just talking about

630

NGO - CROSS

1  salary.
2      A.   Sure.
3      Q.   In fact, sir, that's $70,000 more than
4  the highest guaranteed salary you ever had at
5  Oppenheimer?
6      A.   Repeat the question, Mike.
7      Q.   Sure.
8          Is it fair to say that that's $70,000
9  more than the highest guaranteed compensation that
10  you ever had at Oppenheimer?
11      A.   Well, you know, there was an implied
12  guarantee in 2000 --
13      Q.   That's a fair point.  Let's --
14      A.   Yes.
15      Q.   You know -- fair point.
16      A.   It was a verbal, but yes.
17      Q.   Let's take out the one year where you
18  stated, I believe, that Mr. Lowenthal said that he
19  would match -- he would get you to a certain number
20  by the end of the year.
21      A.   That is correct.
22      Q.   Taking that year aside, is it fair to
23  say that the $220,000 in guaranteed salary that you
24  received at Fitch was $70,000 more than the highest

631

NGO - CROSS

1  guaranteed salary you ever received at Oppenheimer?
2      A.   That is correct.
3      Q.   And it also provides for an annual
4  discretionary bonus?
5      A.   That is correct.
6      Q.   Now, we talked about this to some
7  degree, but were you laid off by Fitch for
8  cost-cutting?
9      A.   I was terminated.
10      Q.   So let's take a look at Exhibit 122.
11          Now, prior to your termination by
12  Fitch -- first, let me ask you, have you ever seen
13  this document before it was produced in this
14  lawsuit?
15      A.   I've seen it at Fitch.  Yes, I have
16  seen it.
17      Q.   Was it presented to you in a
18  performance evaluation?
19      A.   Yes.
20      Q.   And when did that performance
21  evaluation take place?
22      A.   Hold on one second.
23      Q.   Sure.
24      A.   Can I just look at this document

632

NGO - CROSS

1  first.
2      Q.   Please.  Take your time.
3          (Pause.)
4          MR. GIBSON:  While we're on this
5  document, your Honor, I want to clarify one
6  thing.  If you look at the very last page,
7  there's some highlighting.
8          THE ARBITRATOR:  I noticed that.
9          MR. GIBSON:  That was not done by my
10  office.  That was how it was produced.
11          THE ARBITRATOR:  Okay.  And I take it
12  the handwritten words, added text at the
13  bottom of that --
14          MR. GIBSON:  That's correct, your
15  Honor.  We have made no changes to this
16  document.
17  BY MR. GIBSON:
18      Q.   So just to be clear, were you, in
19  fact, presented with a copy of this while you were
20  at Fitch?
21      A.   Yes.
22      Q.   And was that during a performance
23  evaluation?
24      A.   Yes.

633

NGO - CROSS

1      Q.   And do you remember approximately when
2  that performance evaluation was?
3      A.   I think there should be a date,
4  correct.  No, but I believe it was in -- it was 90
5  days from my start day.  It was a 90-day review.
6      Q.   And if you look on the last page,
7  there's no signature --
8      A.   Yes.
9      Q.   -- but there's a signature line on the
10  right side that says, "David Silverman"?
11      A.   That's correct.
12      Q.   Who is Mr. Silverman?
13      A.   He was the person who prepared this
14  review.
15      Q.   Is he the one who gave you the
16  performance evaluation?
17      A.   Yes.
18      Q.   And looking at the first page of this
19  evaluation --
20      A.   Uh-huh.
21      Q.   -- you see the numbered sections?
22  Number 1 starts "Knowledge and expertise."
23      A.   Yes.
24      Q.   Let's look on --

634

NGO - CROSS

1
2      A.    Can I say something about this review?
3      Q.    Sure.
4      A.    This is not my -- the added text is my
5  handwriting.
6      Q.    Got you.
7      A.    And this highlighting -- this is not
8  the review that we agreed upon, because my review
9  was revised after our conversation with them that
10  some things were inaccurate.
11      Q.    Okay.
12      A.    So the fact that this is not the
13  signed review, it's not the final review that was
14  agreed upon.  So some of the things that you may be
15  referring to were not -- not included, just so you
16  know.
17      Q.    I just want to represent, so the
18  record is clear, this is the only document that was
19  produced by Fitch in response to the subpoena that
20  was issued by the judge in this --
21      A.    Got it.  Got it.  I'm just letting you
22  know that I know there are two versions.  Because I
23  remember talking to Monica that this review was not
24  accurate, and then she changed -- some sections were
25  deleted.  So that's why there's two versions of it,

635

NGO - CROSS

1
2  and this is not the version that I have because --
3  it's not the finalized version because I would have
4  signed it.
5      THE ARBITRATOR:  Do you have a copy of
6  the finalized version?
7      THE WITNESS:  No, I just remember --
8      MR. IADEVAIA:  Sorry.  I don't.
9      THE WITNESS:  I don't.  But I just
10  know that when I say "added text," this was
11  one of the conversations that I had with HR
12  saying that -- when we discussed this review
13  in February, that this review is not
14  accurate.  So this is not -- in many
15  respects, this is kind of a rough draft
16  because it says, "added text" and then
17  highlights certain sections that were not
18  accurate.  And then I signed a new version.
19  BY MR. GIBSON:
20      Q.    Okay.  Let's talk about --
21      A.    You can keep talking about it for the
22  relevance, what you need, but I'm just giving you
23  context.
24      Q.    I appreciate that context.  Thank you.
25      So under Section 1, "Knowledge and

636

NGO - CROSS

1
2  expertise," you see there's -- the third paragraph
3  down, it says, "Hoai has some notions about his
4  role -- what his role should be given his high-yield
5  background.  Hoai has been invited to participate in
6  projects like high-yield covenant reviews and
7  running and supervising ratings related to direct
8  lending, which are all in the high-yield space, a
9  key role given Fitch's growth priorities.  To date,
10  Hoai does not feel this is commensurate with his
11  expectations."
12      My question is, do you have knowledge
13  as to whether that section made it into the final
14  review?
15      A.    I don't remember, but I can say that I
16  don't agree with this review.
17      Q.    Did you tell Mr. Silverman that you
18  disagreed with this particular portion?
19      A.    There were some portions obviously I
20  don't remember.  But if you ask me today, I do not
21  agree with that.
22      Q.    And number 4 at the bottom,
23  "Productivity" -- let's see.  That goes over on to
24  page 2nd -- page 2.
25      A.    Yes.

637

NGO - CROSS

1
2      Q.    And at the top of page 2, that
3  paragraph, you see the last sentence, "Would also
4  expect Hoai as a senior director level to
5  participate in projects outside of primary coverage,
6  particularly ones that can utilize his credit
7  background."
8      Do you recall whether that made it
9  into the final version?
10      A.    I think so.
11      Q.    Did you disagree with that?
12      A.    Like I said, there were several
13  portions of this review that I disagreed with.
14      Q.    Let's look down at Bullet Point -- or
15  paragraph No. 6, "Interpersonal skills."  And the
16  first sentence of that section states, "Hoai has
17  shown reluctance to take on the responsibilities and
18  role that has been carved out for him."
19      Do you recall whether that made it
20  into the final version?
21      A.    I disagreed with that portion.  I know
22  I did.  I don't know if it came into the final
23  version, but I disagreed with it.
24      Q.    Did you tell Mr. Silverman that?
25      A.    I told Ms. Aggarwal and Mr. Silverman.

638

NGO - CROSS

1
2    Q.    Ms. Aggarwal is the individual from
3    HR?
4    A.    And also Ms. Gaberkorn as well.
5    Q.    Got you.
6        At the end of paragraph 6, it states,
7    "Hoai also has some difficulty accepting
8    constructive thoughts and viewpoints from colleagues
9    who are trying to use their expertise and
10   Fitch-specific experience to help produce
11   high-quality work."
12       Do you know whether that made it into
13   the final version?
14   A.    Could you show me the line again.
15   Q.    This is the very last paragraph --
16   very last paragraph of Section 6, "Interpersonal
17   skills."
18   A.    Sorry.  Last -- okay.
19   Q.    If you could just read that and tell
20   me if you recall whether that made it into the final
21   version.
22   A.    I don't know, but I disagreed with his
23   review, obviously.  I didn't sign it.
24   Q.    Did you disagree with that particular
25   statement?

639

NGO - CROSS

1
2    A.    I disagree with it, correct.
3    Q.    Let's go down to Section 7,
4    "Professionalism."  And that first paragraph says,
5    "Hoai supports the firm's nondiscriminatory
6    policies; however, as a member of a team with a
7    defined structure, we would expect him to accept
8    work flow requests and work critiques in a
9    professional manner.
10       "In a recent feedback session
11   following a significant time investment on my part,
12   Hoai indicated he felt that he was being 'baby-sat'
13   and that the question comments were 'political' and
14   made for a 'unproductive' morning.
15       "Declining requests from senior
16   colleagues and argumentative reactions to
17   constructive criticism and viewpoints are not only
18   unprofessional, but discourage colleagues from
19   working with Hoai."
20       Do you recall whether that made it
21   into the final version?
22   A.    I disputed that.  I disputed that
23   portion, yes.
24   Q.    Do you know if it made it into the
25   final version?

640

NGO - CROSS

1
2    A.    I don't recall, Mike.
3    Q.    Do you remember the conversation that
4    Mr. Silverman is referencing in here?
5    A.    Yes, I do.
6    Q.    Was Mr. Silverman your boss or one of
7    your bosses?
8    A.    He wasn't.  So if you look at the
9    offer letter, he was not one of my bosses.  But it
10   was -- I don't need to get into details of it, but
11   he was a senior director as well, and I believe
12   that -- he was a senior director, and I did not
13   report to him, but he was -- to me he was a
14   colleague and he was not officially my direct
15   report, but he wrote this review.
16   Q.    Did you tell him that you felt you
17   were being baby-sat and that his comments were
18   making for an unproductive morning?
19   A.    Those are taken out of context of a
20   heated discussion he and I had during the credit
21   committee.  And I don't feel like it's relevant to
22   discuss -- I mean, you can ask me, but I just -- I
23   don't see any point in --
24   Q.    Let me see if I can help with the
25   point.

641

NGO - CROSS

1
2        You've testified several times today
3    that you never pointed out to anybody at Oppenheimer
4    all these many instances when you felt that you were
5    being discriminated against or retaliated against
6    because you didn't want to be argumentative.
7        Do you recall that testimony?
8    A.    That's correct.
9    Q.    Did you have a problem having this
10   conversation that's described here with
11   Mr. Silverman as being argumentative?
12   A.    I don't think it was as argumentative
13   as the way he describes it.  In fact, I don't
14   recall -- I disputed that -- those -- that
15   characterization of that conversation.
16   Q.    Okay.  And the second paragraph under
17   "Professionalism" states, "In addition, Hoai's
18   in-office schedule is unpredictable.  Not only are
19   we working in live credit markets where company
20   updates could occur at any time, senior members of
21   the corporates team need to be accessible given
22   their role from the rating process, including
23   supervising junior analysts and report approval.
24       "In at least one instance, Hoai's late
25   arrival to the office caused an RAC to be published

642

NGO - CROSS

1  later than expected, following some time spent by
2  colleagues trying to find him."
3  
4      Do you recall whether that made it
5  into the final version?
6      A.   That did not make it into the final
7  version.
8      Q.   Is that because you disputed it?
9      A.   That's because what he was accusing me
10 of -- what he was saying was, I expected something
11 to publish later, it was easily proven that it was
12 not published later.
13     Q.   And let's take a look at the last page
14 of the document, please.
15     Under paragraph 9 for "Quality focus,"
16 starting about halfway in, it says, "In addition, we
17 would like him to be more open to advice and
18 viewpoints as he settles into the role of credit
19 agency analyst.  Finally, we have seen some
20 deadlines slip a bit without supportive reasoning.
21 Going forward, we would expect these deadlines or
22 commitments to be met in a timely fashion."
23     Do you know whether those sentences
24 made it into the final?
25     A.   Those did not make it in, and that's

643

NGO - CROSS

1
2  probably why they were highlighted.
3      Just so you know, after this 90-day
4  review, I spoke to HR about this and it was not --
5  it did not -- I asked if it was a negative review,
6  and they said they were just being constructive.  I
7  was not put on a performance improvement plan post
8  this, which is the standard policy in these reviews.
9      So if it sounds negative -- I felt it
10 was, but I didn't agree with it, and it obviously
11 didn't put me on performance improvement review post
12 this 90-day review.
13     Q.   Thank you.
14     Mr. Ngo, at the time you were
15 terminated by Fitch, isn't it true you didn't want
16 to work anymore?
17     A.   No.
18     Q.   Do you recall telling any potential
19 employers following your termination by Fitch that
20 it, quote, wasn't a good fit for you?
21     A.   Yes, I did say that.
22     Q.   Did you file an EEOC claim against
23 Fitch after your termination?
24     A.   No.
25     Q.   Did you sue Fitch?

644

NGO - CROSS

1
2      A.   No.
3      Q.   Did you threaten to sue Fitch?
4      A.   No.
5      Q.   Did you ever communicate to Fitch,
6  either personally or through a third party, that you
7  believed that your termination by Fitch was
8  discriminatory?
9      A.   No.
10     Q.   Or unlawful?
11     A.   No.
12     Q.   And I believe you testified that you
13 received severance from Fitch?
14     A.   That's correct.
15     Q.   And I believe that number was $55,000?
16     A.   That is correct.
17     Q.   Was $55,000 the initial amount of
18 severance that was offered by Fitch?
19     A.   No, it was not.
20     Q.   How much was originally offered?
21     A.   I believe it was 16,500.
22     Q.   And you demanded more?
23     A.   Well, the reasoning -- when I talked
24 to Anna Gaberkorn about it, she said that's -- I
25 said, how was that number arrived?

645

NGO - CROSS

1
2      And she said, that was the amount of
3  time they would expect for me to find another job.
4      But then I highlighted to her that
5  back in November, another senior director at my
6  level, with my level of qualifications, was in my
7  group, who was let go was still unemployed.  And I
8  felt that that wasn't the right -- that wasn't the
9  right amount of time to find a job.  That's what the
10 difference in 16,000 versus 55,000 reflects.
11     Q.   So you asked for more severance.
12     A.   I did ask.
13     Q.   Did you take any leaves of absence
14 when you were at Fitch?
15     A.   No.
16     Q.   So if I'm correct, your last date at
17 work at Fitch was January 1st, 2018?  Or am I wrong
18 about that?
19     A.   No, it's January 31 --
20     Q.   31st.  I'm sorry.
21     You were hired by Bloomberg on
22 October 5th, 2018?
23     A.   That is correct.
24     Q.   In between those dates, did you take
25 any vacations?

646

NGO - CROSS

1    A.   I took vacation -- my normal vacation
2    to see family, yes.
3    Q.   In that time period -- again, now
4    we're talking about the time period between your
5    termination at Fitch and your hiring at Bloomberg --
6    how many interviews did you go on?
7    A.   I interviewed -- I interviewed at
8    BNP Paribus shortly after being let go at Fitch.
9    And I think that was the only interview beyond
10   Bloomberg.
11   Q.   How many résumés would you say you
12   sent out in that time period?
13   A.   I don't know.  I know I sent out
14   résumés whenever I found a job that I felt was
15   appropriate for me to apply for.
16   Q.   Did you have any salary demands?
17   A.   No.
18   Q.   Did you receive -- I'm sorry.  I think
19   you answered this, but did you receive any offers
20   prior to your offer from Bloomberg?
21   A.   No.
22   Q.   Let's take a look at your Bloomberg
23   offer letter, which is Exhibit 105.
24       And my first question, sir, is, am I

647

NGO - CROSS

1    correct that you have an annual salary of $225,000
2    at Bloomberg?
3    A.   That is correct.
4    Q.   And, again, is that $75,000 higher
5    than the most guaranteed comp. You've ever had at
6    Oppenheimer, with the exception of that one year?
7    A.   A base, correct.
8    Q.   Is your current base salary at
9    Bloomberg $225,000?
10   A.   That is correct.
11   Q.   And you're also eligible for a
12   discretionary bonus?
13   A.   That is correct.
14   Q.   From the time of your termination at
15   Oppenheimer through the present, were you offered
16   any positions as a research analyst covering
17   chemicals?
18   A.   Sorry.  Repeat the question, Mike.
19   Q.   Sure.
20       This is for your entire time period
21   after your termination from Oppenheimer.
22       Were you offered any positions as a
23   research analyst covering chemicals?
24   A.   No.

648

NGO - CROSS

1    Q.   Were you offered any job positions as
2    a research analyst covering paper and packaging?
3    A.   No.
4    Q.   Were you offered any jobs as a
5    research analyst covering mining and metals?
6    A.   No.
7    Q.   If we could go to Exhibit 6, please.
8    I'm going to ask you to go to the second page of
9    that exhibit.
10   A.   Yes.
11   Q.   I just have a few quick questions
12   about this document.
13       Do you recognize this to be the EEOC
14   charge of discrimination that was filed by your
15   attorneys against Oppenheimer in this action?
16   A.   Yes, I do.
17   Q.   Looking at that second page, that's
18   the actual charge, is that your signature at the
19   bottom?
20   A.   Yes, it is.
21   Q.   Are those both your signatures?
22   A.   Yes.
23   Q.   And under -- above the first one on
24   the left, it says, "I declare under penalty of

649

NGO - CROSS

1    perjury that the foregoing is true and correct"?
2    A.   That is correct.
3    Q.   And above the right, "I swear or
4    affirm that I read the above charge and that it is
5    true to the best of my knowledge, information and
6    belief"?
7    A.   Yes.
8    Q.   Do you see on this form, on the right
9    side, a box that says, "Date discrimination took
10   place"?
11   A.   Yes.
12   Q.   Do you see to the left side it says,
13   "Earliest"?
14   A.   Yes.
15   Q.   And the date under that is June 30th,
16   2016?
17   A.   Yes.
18   Q.   Is that the date that you were
19   terminated by Oppenheimer?
20   A.   That is correct.
21   Q.   Take a look at Exhibit 109.  Likewise,
22   just a few questions on this document.
23       And the first is, do you recognize
24   this, sir, to be the complaint that your attorneys

650

1    NGO - CROSS
2    filed against Oppenheimer in the United States
3    District Court for the Southern District of
4    New York?
5        A.    Yes.
6        Q.    This complaint, if you look at the
7    top, was filed on March 8, 2017?
8        A.    That is correct.
9        Q.    And would you agree with me, sir, that
10   that is -- excuse me -- over two years since your
11   conversation with Ms. Ross in May of 2014?
12       A.    It appears so, yes.
13       Q.    And over two years since your
14   discussions with Mr. Lowenthal in June of 2014?
15       A.    That is correct.
16       Q.    And over two years after your
17   conversation with Mr. Lowenthal in November of 2014?
18       A.    That is correct.
19       Q.    And it's also more than two years
20   after you received your $100,000 bonus in February
21   of 2015; correct, sir?
22       A.    That's about right, yes.
23       Q.    Now, I'd like to ask you a few
24   questions about your damages in this proceeding.
25       A.    Sure.

651

1                NGO - CROSS
2        Q.    And the first thing that I'd like to
3    talk to you about is the damages that you're
4    claiming up to the date that you were terminated by
5    Oppenheimer.
6        A.    Okay.
7        Q.    Would you agree with me, sir, that
8    every penny of those damages that you're seeking
9    arises out of the discretionary bonuses?
10       A.    Repeat the question, though.
11       Q.    Sure.
12             Would you agree with me that the
13   entirety of the damages that you're seeking in this
14   proceeding up until June 30th of 2016 arises out of
15   discretionary bonuses?
16       A.    I would characterize it that way
17   because -- no.
18       Q.    Well --
19       A.    I'm saying that a lot of it is
20   embedded as bonus income.
21       Q.    Right.
22             You're not claiming that you weren't
23   paid any of your salary; correct?
24       A.    My base was the same, correct.  Yes.
25       Q.    So your entire claim for damages

652

1    NGO - CROSS
2    leading up to June 30 of 2016 is based on bonuses?
3        A.    That's correct.
4        Q.    And you've testified that, with the
5    exception of that one year, you never had guaranteed
6    bonuses at Oppenheimer?
7        A.    That is correct, too.
8        Q.    And if we could take a look at your
9    damages analysis, which you testified a little bit
10   about before.  It's Exhibit 1.
11       A.    What?
12       Q.    Exhibit 1, specifically 1A we'll start
13   with.
14             Mr. Ngo, have you reviewed this
15   document before today?
16       A.    Let me get to it first.  Sorry.
17       Q.    Sure.  Take your time.
18       A.    Yes, we reviewed it yesterday.
19       Q.    Okay.  Did you see it before
20   yesterday?
21       A.    Yes, I did.
22       Q.    We see it's titled, "Lost compensation
23   for the period Oppenheimer employed Ngo from
24   January 1, 2015, through June 30, 2016."
25             And I'd like to first look at the

653

1                NGO - CROSS
2    column for 2015.
3        A.    Yes.
4        Q.    Under the "Compensation received," it
5    states $250,000?
6        A.    Yes.
7        Q.    And am I correct that that's your
8    $150,000 base salary for 2015 plus the $100,000
9    discretionary bonus that you were paid in 2015?
10       A.    I think that -- did we do it -- the
11   bonus is mismatched, but I think that's --
12       Q.    Well, the title's compensation -- of
13   that column is "Compensation received"; correct?
14       A.    Hold up one second.
15       Q.    Take your time.
16       A.    If you don't mind.
17             (Pause.)
18             Got it.  So 2015 reflects -- got it.
19       Q.    Am I correct that that's your $150,000
20   base salary that you were paid in 2015 plus the
21   $100,000 discretionary bonus that you received in
22   2015 for the prior year?
23       A.    That sounds correct.
24       Q.    And then in the next column to the
25   right of that, under "Compensation would have

654

NGO - CROSS

1  received," we see it says $420,833?
2
3      A.   Yes.
4      Q.   And am I correct, sir, that what
5  you're saying here is that if you had received the
6  $270,833 discretionary bonus that you received in
7  2013, as opposed to the 100,000 in 2015, that you
8  would have received an additional $170,833 in
9  compensation in 2015?
10      A.   Yes, that sounds right.  The 420 is
11  the compensation I received prior to the
12  discrimination, yes.
13      Q.   2013.
14      A.   Yes.  And it's based on a 2013 number.
15      Q.   And your position is that if you had
16  gotten -- you received the same $150,000 base salary
17  in 2015 that you received in 2013?
18      A.   That is correct.
19      Q.   And your position is that if you had
20  gotten the same discretionary bonus in 2015 that you
21  received in 2013, you would have made just over an
22  extra $170,000 for the year?
23      A.   Yes.
24      Q.   To be clear, that bonus for 2015 was
25  for 2014; correct?

655

NGO - CROSS

1
2      A.   The base -- this 250 is what -- I
3  believe they're using the actual numbers.
4      Q.   Right.
5          And that would be the $100,000 bonus
6  that was paid to you in 2015 for 2014?
7      A.   I think that sounds about correct.
8      Q.   And that was the year that you were
9  out of the office for four months, correct,
10  consecutively?
11      A.   I believe so.
12      Q.   Mr. Ngo, was your discretionary bonus
13  the same every single year you were at Oppenheimer?
14      A.   No.  It increased every year prior to
15  that discrimination.
16      Q.   Do you know whether Ms. Burns'
17  discretionary bonus was the same every year at
18  Oppenheimer?
19      A.   No, it was not the same.
20      Q.   Do you know if Mr. Sneeden's was the
21  same every year?
22      A.   I don't think that mine was the same
23  every year.  I don't know their bonus numbers, but
24  it's not guaranteed -- it's not exactly the same
25  number every year.

656

NGO - CROSS

1
2      Q.   So it's a discretionary bonus.  It can
3  go up, it can go down; correct?
4      A.   That is correct.
5      Q.   Let's take a look at 1B.  And the
6  title of this section is "Lost compensation for
7  period after Oppenheimer fired Ngo from June 30,
8  2016, through March -- through March 8, 2019."
9          Do you see that, sir?
10      A.   Yes.
11      Q.   And now during portions of this time
12  period, you've been employed by both Fitch and
13  Bloomberg?
14      A.   That is correct.
15      Q.   We saw at both of those jobs, your
16  only form of guaranteed compensation was more than
17  your guaranteed compensation at Oppenheimer?
18      A.   My -- you're right.  Okay.  Yes.  Yes.
19  Base versus base, that's correct.
20      Q.   So on this particular chart, with the
21  exception of the time period when you were
22  unemployed between jobs, am I also correct that all
23  of the damages you're seeking on this chart have to
24  do with discretionary bonuses?
25      A.   I don't think that's correct because

657

NGO - CROSS

1
2  in 2016, I think that includes both base -- this 4-
3  includes the base of 150-; am I correct?
4      Q.   Well, what I'm saying is -- we've
5  already established that your guaranteed base salary
6  was more at both Fitch and Bloomberg; correct?
7      A.   That's correct.
8      Q.   And you're seek- -- despite that,
9  you're seeking damages for compensation that you
10  received while you were at Fitch and Bloomberg --
11  you believe it would have been more if you were at
12  Oppenheimer; correct?
13      A.   Well, that's correct, because the
14  bonus structure is very different.
15      Q.   That's not my question.
16      A.   I'm giving you the answer.  Okay.
17  Sorry.
18      Q.   And considering the fact that you were
19  making more guaranteed money at both Fitch and
20  Oppenheimer [sic] in the form of base salary than
21  you ever received at Oppenheimer, that compensation
22  you're seeking from both Fitch and Bloomberg is
23  discretionary bonuses; correct?
24      A.   Well, no, bonus for Bloomberg, it's a
25  set number, actually.  The bonus number is --

658

NGO - CROSS

1  they're saying that it will be no more than $50,000.
2  And I believe in this estimate, when we calculate it
3  out, they erred on the conservative side to include
4  the $50,000 guaranteed bonus.
5  Q.   And you're claiming that if you were
6  at Oppenheimer, you would have made more money
7  because you would have gotten a larger discretionary
8  bonus; correct?
9  A.   Yes.  If you look at the way Wall
10 Street behaves and if you look at the history of
11 bonuses on Wall Street is that a Wall Street job
12 generally has a bonus number that's a multiple of a
13 base.
14         There's a saying in Wall Street that
15 you say that, they starve you -- compensation at
16 Wall Street is that they starve you to make you
17 hungry.  Meaning that they pay you a very low base,
18 and that most of your compensation really is bonus.
19         But in the Fitch job and you look at
20 Bloomberg, that's not a Wall Street job.  The
21 compensation is based more on your base, and then
22 the bonus -- Fitch was discretionary, but it gave me
23 a range of 10 to 20 percent, but Bloomberg actually
24 spells it out to you that you're not going to get an

659

NGO - CROSS

1  outsized bonus that's a multiple of your base.
2  Q.   I think my question was, am I correct
3  that the damages that you are seeking in Exhibit 1B
4  for the time period that you were employed by either
5  Fitch or Bloomberg are based on additional
6  compensation that you believe you would have
7  received at Oppenheimer in the form of discretionary
8  bonuses?
9  A.   That's correct.
10 Q.   Thank you.
11         Forgive me if I asked this already.
12         Is it your understanding that
13 Ms. Burns is currently still the head of high-yield
14 research at Oppenheimer?
15 A.   I don't know.
16 Q.   You testified yesterday, I believe,
17 that high-yield research was always looking to add
18 to the group.
19         Do you remember that testimony?
20 A.   During my tenure, yes, that's correct.
21 Q.   Do you know how many high-yield
22 research analysts are currently employed by
23 Oppenheimer, with the exception of Ms. Burns?
24 A.   I don't know.

660

NGO - CROSS

1  Q.   If I told you it was one, would that
2  surprise you?
3  A.   It wouldn't surprise me because people
4  leave.  I don't know if it's -- I don't know the
5  workings of the group.
6  Q.   Do you know what Ms. Burns'
7  discretionary bonus was for 2016 at Oppenheimer?
8  A.   No, I do not.
9  Q.   If I told you it was $200,000, would
10 that surprise you?
11 A.   Again, I don't have a basis to say
12 surprise or not.  I'm not there.  I don't know what
13 the P&L is.  I don't know what the circumstances
14 are.  I just don't know.
15 Q.   Would it surprise you if I told you
16 Ms. Burns' discretionary bonus in 2017 was $175,000?
17 A.   Again, I don't have a basis of
18 knowledge to say it surprises me or not.  I'm not
19 there to make that assumption.
20 Q.   Would it surprise you if I told you
21 that Ms. Burns' discretionary bonus for 2018 at
22 Oppenheimer was $165,000?
23 A.   Again, I don't have a basis to say yes
24 or no.

661

NGO - CROSS

1  THE ARBITRATOR:  I assume this
2  evidence will be presented in some competent
3  form.
4  MR. GIBSON:  Yes, sir.
5  THE ARBITRATOR:  Okay.
6  BY MR. GIBSON:
7  Q.   Mr. Ngo, you've testified that you
8  don't have a basis to understand what bonus
9  Ms. Burns may have gotten or not gotten, but you
10 believe you have a basis to state that you would
11 have continued to receive a discretionary bonus of
12 $270,000 every year going forward for the next six
13 or seven years at Oppenheimer if you hadn't been
14 terminated?
15 A.   It's based on individual performance,
16 as you know.  So I don't know if I was there, I
17 would be performing at the same level.  So I can't
18 say that her -- the correlation of her numbers going
19 down has any correlation to mine.  I don't have a
20 basis, a foundation for that.
21 Q.   And am I correct in Exhibit --
22 withdrawn.
23         Now, you're seeking emotional distress
24 and pain and suffering damages in this proceeding?

662

NGO - CROSS

1    A.    That is correct.
2    Q.    And I believe you testified that you
3  never visited a doctor or a mental health therapist
4  for any of that?
5    A.    That is correct.
6    Q.    Did you ever take any -- were you
7  prescribed any medications for pain, suffering
8  emotional distress?
9    A.    No.
10    Q.    And any pain and suffering or
11  emotional distress that you suffered at Oppenheimer
12  as a result of the removal of your supervisory
13  responsibilities, that didn't keep you from working
14  at Oppenheimer for the next year and a half, did it,
15  sir?
16    A.    I was stressed during that period and
17  it was a period of sadness.  I had just got back
18  from my aneurysm.  It was a very tough year.  So
19  there was emotional distress.  It was just stress
20  during that period.
21    Q.    I'm just asking you, it didn't keep
22  you from working for Oppenheimer for another year
23  and a half; correct?
24    A.    That's correct.

663

NGO - CROSS

1    Q.    And it didn't keep you from working at
2  Fitch?
3    A.    That's correct.
4    Q.    And it's not keeping you from working
5  at Bloomberg today?
6    A.    That's correct.
7    Q.    Do you feel you suffered any pain and
8  suffering or emotional distress when you were
9  terminated by Fitch?
10    A.    Not to the same degree.
11    MR. GIBSON:  I think I'm done.  Can we
12  take two minutes, Judge?
13    THE ARBITRATOR:  Sure.
14    (Recess from the record.)
15    MR. GIBSON:  Thank you very much,
16  Mr. Ngo.  I don't have any further questions.
17    MR. IADEVAIA:  We just have a few
18  follow-up questions --
19    THE ARBITRATOR:  Fine.
20    MR. IADEVAIA:  -- for redirect.
21    THE WITNESS:  Do I switch seats or
22  stay here?
23    THE ARBITRATOR:  Depends on your
24  energy level.

664

NGO - CROSS

1    MR. GIBSON:  Do you need the exhibits?
2    MR. IADEVAIA:  Yes.
3    MR. GIBSON:  You want me to bring them
4  over to him?
5    MR. IADEVAIA:  Maybe just go over
6  there.
7    MR. GIBSON:  The witness' are over
8  there.
9    MR. IADEVAIA:  They're right there,
10  but I think it's better so then Judge
11  Dolinger can see.
12    (Pause.)

665

NGO - REDIRECT

1  REDIRECT EXAMINATION
2  BY MR. IADEVAIA:
3    Q.    Mr. Ngo, could you turn to
4  Exhibit 113, please.
5    THE ARBITRATOR:  You said 113?
6    MR. IADEVAIA:  Yes.
7    THE WITNESS:  Yes.
8  BY MR. IADEVAIA:
9    Q.    So this e-mail you've testified a lot
10  about over the course of the last two days.  The
11  bottom two e-mails are -- the bottom e-mail is from
12  you to Ms. Denys, and then the top e-mail -- the
13  middle e-mail is from Ms. Denys to you.
14    In Ms. Denys' e-mail to you, she says
15  nothing about Family and Medical Leave Act forms; is
16  that right?
17    A.    That is correct.
18    Q.    Okay.  And she doesn't say in this
19  e-mail to you that you need -- before you're going
20  to be granted any leave or FMLA leave, you need to
21  get approval from HR, does she?
22    A.    No, she does not.
23    Q.    And she refers you to page 17 of the
24  handbook; is that right?

666

NGO - REDIRECT

1     A.   That is correct.
2     Q.   And if you could take a look at
3  Exhibit 8, page 17, please.
4     A.   I'm sorry.  Exhibit 8?
5     Q.   Yes.
6          (Pause.)
7     A.   Okay.
8     Q.   Are you there?
9     A.   Yes.
10    Q.   So page 17 is the start of the Family
11 and Medical Leave Act contained within the 2014
12 Oppenheimer handbook; correct?
13    A.   Correct.
14    Q.   And if you turn a page earlier,
15 page 16, was that the page that Mr. Gibson was
16 asking you about where he asked you -- he pointed
17 you to the "Leaves of Absence" section?
18         Do you see that?
19    A.   Could you give me the pages so I can
20 follow you.
21    Q.   Sure.  I didn't mean to go so fast.
22         If you go back one page to page 16?
23    A.   I'm starting at what page?
24    Q.   I want you to start on page 17.  Okay.

667

NGO - REDIRECT

1     A.   Okay.  Page 17.  By the manual, you
2  mean.
3     Q.   Yes.
4     A.   Got it.
5     Q.   Let me know when you get there.
6     A.   Yes, got it.
7     Q.   And is this the page that Ms. Denys
8  referred you to?
9     A.   Yes, page 17.
10    Q.   And that's the start of the
11 Oppenheimer Family and Medical Leave Act --
12    A.   That is correct.
13    Q.   -- section; right?
14    A.   That is correct.
15    Q.   And if you turn back a page, page 16,
16 is that -- if you look, do you see the heading
17 "Leaves of Absence"?
18    A.   Correct.
19    Q.   And is that the language that
20 Mr. Gibson asked you about earlier today?
21    A.   Yes, I believe so.
22    Q.   That's distinct from the FMLA section
23 of the handbook; correct?
24    A.   That is correct.

668

NGO - REDIRECT

1     Q.   Going back to the Family -- the FMLA
2  policy in the handbook.  If you turn to page 19 of
3  the handbook.
4     A.   Correct.
5     Q.   Page 19 of the handbook says --
6  there's a section that says, "Requests for FMLA
7  Leave."
8          Do you see that?
9     A.   Yes.
10    Q.   Is there anything in the "Requests for
11 FMLA Leave" about forms, about FMLA forms?
12    A.   You mean from going down?
13    Q.   Yes.
14    A.   I don't see the word "forms."
15    Q.   And are there any forms attached to
16 this handbook, any FMLA forms attached to the
17 handbook, to your knowledge?  You can look through
18 the handbook if you need to.
19    A.   To the handbook?
20    Q.   Yes.
21         (Pause.)
22    A.   No.
23    Q.   Okay.  And does the -- I think we went
24 over this language, but the language for the

669

NGO - REDIRECT

1  "Requests for FMLA Leave," it says that "An employee
2  should request FMLA leave by submitting a written
3  request for such leave to HR"; right?
4     A.   That is correct.
5     Q.   And it doesn't require that you submit
6  such -- submit the request for FMLA leave to HR in
7  writing; is that right?
8     A.   Yes, I agree with that.
9          THE ARBITRATOR:  Did you read, at some
10 point before you went off to California,
11 page 16 of the handbook?
12         THE WITNESS:  No.  Honestly, she
13 referred me to page 17.  So I remember going
14 electronically and then just typing "Find/Go
15 17," so I went to 17.
16         THE ARBITRATOR:  So it was not a
17 scenario where you had a hard copy that you
18 might be paging through.
19         THE WITNESS:  No, I don't have that on
20 my desk.  I just remember going online and
21 hit Control F, find, and that takes you to
22 17.
23         THE ARBITRATOR:  Okay.

670

NGO - REDIRECT

1    BY MR. IADEVAIA:
2        Q.    There was a period of time in 2012 and
3    2013 where you were receiving quarterly bonuses from
4    Oppenheimer; is that right?
5        A.    That is correct.
6        Q.    And did those quarterly bonuses stop
7    when your raise went into effect in October of 2013?
8        A.    Correct.  Yes.
9        Q.    Mr. Ngo, it's possible to have more
10   than one supervisor at a time; is that right?
11       A.    Yes.
12       Q.    And, in fact, you and Ms. Burns were
13   cohead of a group for a period of time in 2014; is
14   that right?
15       A.    That is correct.
16       Q.    If you could take a look at
17   Exhibit 108, please.
18             This is your résumé.  And you
19   testified earlier today that you lost some of these
20   jobs within a certain time frame.  And I think the
21   question was whether or not you sued any employer --
22   whether you sued any employer other than
23   Oppenheimer.
24             Do you remember that testimony and

671

NGO - REDIRECT

1    questioning?
2        A.    Yes.
3        Q.    And your answer was you had not,
4    right, you didn't sue?
5        A.    I had not.
6        Q.    And why not?  Why didn't you sue those
7    other employers?
8        A.    I didn't feel they violated any of my
9    rights.
10       Q.    You testified earlier today about your
11   understanding of at-will employment, right, which is
12   you could be fired for any reason at any time; is
13   that correct?
14       A.    That is correct.
15       Q.    Is it your understanding that even as
16   an at-will employee, that the employer is limited in
17   firing you in certain situations?
18       A.    I believe so.
19       Q.    And does that include when -- a
20   retaliation for taking FMLA leave, for example?
21       A.    Yes.
22       Q.    And does it include discrimination or
23   retaliation based on your gender or disability?
24       A.    Yes.

672

NGO - REDIRECT

1        Q.    Okay.  Earlier today, you were asked
2    about the nature of your disability claims.
3             Do you recall that testimony?
4        A.    Yes.
5        Q.    The disability that you identified was
6    your aneurysm; is that right?
7        A.    That is correct.
8        Q.    And I think you also testified that
9    you requested a reasonable accommodation, and that
10   reasonable accommodation was a leave of absence; is
11   that right?
12       A.    That is correct.
13       Q.    And I believe you further testified
14   that you were granted the leave of absence from
15   Oppenheimer in connection with your aneurysm; is
16   that right?
17       A.    That is correct.
18       Q.    Is your claim in this case of
19   disability discrimination and retaliation based on
20   the fact that when you returned from your leave of
21   absence, you were demoted and then subsequently your
22   pay was slashed and subsequent to that you were
23   fired?
24       A.    Yes, I didn't have the same job as I

673

NGO - REDIRECT

1    had prior.
2        Q.    And there were other actions; right?
3    There was the bonus reduction?
4        A.    That's correct.
5        Q.    Did anyone at Oppenheimer say to you
6    if you did not fill out FMLA forms, you were not
7    going to receive leave?
8        A.    No.
9        Q.    Did anyone ever tell you that you were
10   not getting FMLA leave because you were out more
11   than 12 weeks?
12       A.    No.
13       Q.    You've testified over the course of
14   the last two days multiple times about a May
15   discussion with Ms. Ross.
16             Do you recall that testimony?
17       A.    Yes.
18       Q.    And I think you said that you felt
19   discouraged about taking leave based on your
20   discussion with her.
21       A.    Yes.
22       Q.    And I think there was -- I want you to
23   clarify for us specifically what Mrs. -- what
24   Ms. Ross said to you as opposed to what you implied

674

NGO - REDIRECT

1  during that conversation.  Okay.
2
3      A.    Yes.
4      Q.    Did Ms. Ross tell you how much time
5  she was out for leave when she had children?
6      A.    Yes.  She explicitly told me that she
7  had taken no more than two months off.  She -- I
8  remember her giving me a month.
9      Q.    During that conversation, did she say
10  to you anything about women making mistakes in
11  connection with their leave?
12      A.    Yes.  She explicitly told me that
13  women make the mistake of taking too much leave at
14  the front end versus when kids need you at the later
15  end.
16      Q.    Did she say what "the later end" meant
17  during this conversation?
18      A.    I think she might have said "teenage
19  years" or I might have just known it.  Because I
20  know her daughters at the time were teenagers.
21  That's what I recall her telling me.
22      Q.    When you were made cohead, were you
23  told it was a promotion?
24      A.    Yes.
25      Q.    And who told you it was a promotion?

675

NGO - REDIRECT

1
2      A.    Both Jane Ross and Robert Lowenthal.
3      Q.    And were the other analysts within the
4  high-yield group advised that you had been made
5  cohead?
6      A.    Yes.
7      Q.    And who does that include?
8      A.    Sean Sneeden, and then also it
9  includes the sales force.
10      Q.    Were others outside of high-yield told
11  that you were cohead?
12      A.    Yes, it was a known fact in the
13  department.
14      Q.    Was there ever a PR announcement that
15  said that you were cohead?
16      A.    There have been some PR announcements
17  that referenced it, but also my Bloomberg profile
18  had changed to be cohead.
19      Q.    Do you recall any of the public
20  relations announcements that mentioned that you were
21  cohead?
22      A.    Yes, there was one I remember -- like
23  there was one when we hired Lucila.  They had said
24  we were the coheads of fixed income research.
25      Q.    And this was -- when I say "PR

676

NGO - REDIRECT

1  announcement," what does that mean?
2
3      A.    It means sometimes Oppenheimer will
4  say that -- like in the case with Lucila, they said,
5  we are hiring someone in emerging markets, and then
6  an announcement that said that she would report to
7  coheads in taxable fixed income and referenced my
8  name and Ms. Burns'.
9      Q.    When you say "PR," that's released to
10  the public?  It's a press releases?
11      A.    Yes, it is a press release.
12      Q.    When you were demoted in November of
13  2014, was your staff eventually told about the
14  demotion?
15      A.    After -- yes, in November of 2014.
16      Q.    And that was after you had the
17  conversation with Mr. Lowenthal on November 4th?
18      A.    That is correct.
19      Q.    And were people outside of high-yield
20  research told that you were no longer cohead of the
21  group in November of 2014?
22      A.    I think the announcements -- Ms. Burns
23  announced it to the group in the room, and I believe
24  Ms. Ross announced it to the group via e-mail.
25      MR. IADEVAIA:  This has not -- was not

677

NGO - REDIRECT

1  part of our exhibit list.  Actually, do you
2  mind bringing one over to...
3      (Pause.)
4      MR. IADEVAIA:  I can represent it's
5  our demand letter.  Do you have any
6  objection, Mr. Gibson?
7      MR. GIBSON:  No.
8      THE ARBITRATOR:  This is deemed, what,
9  133?
10      MR. IADEVAIA:  Is that what we're up
11  to?
12      MS. MILLER:  I think it would be 132.
13      THE ARBITRATOR:  There was a 132
14  earlier.
15      MR. GIBSON:  Was I wrong when I said
16  132?
17      MS. MILLER:  We have 131 joint
18  exhibits, but one of them isn't admitted yet.
19      MR. GIBSON:  Do you want to just call
20  it 133 for the record?  And we don't have the
21  one that's not admitted.  There will be a gap
22  if it's not.
23      THE ARBITRATOR:  Okay.
24      No objection?

678

NGO - REDIRECT

1    MR. GIBSON:  No, your Honor.

2    THE ARBITRATOR:  Exhibit 133 is

3    received then.

4 BY MR. IADEVAIA:

5    Q.   Is Exhibit 133 the letter that your

6 lawyer sent on your behalf to Oppenheimer in August

7 of 2016 complaining about discrimination and

8 violations of the FMLA?

9    A.   Yes.

10    (Discussion off the record.)

11    Q.   Mr. Ngo, if you could take a look at

12 Exhibit 11D.

13    (Pause.)

14    Q.   It's a bulky exhibit.  I'm just going

15 to ask you to turn to OPCO 192, please.

16    A.   11 --

17    Q.   11D.

18    THE ARBITRATOR:  D doesn't seem --

19    MR. IADEVAIA:  It's just 11.  It's not

20 11D.  Sorry.

21    THE WITNESS:  Got it.

22    MR. IADEVAIA:  I can't read my own

23 writing.  I apologize.

24    THE WITNESS:  Yes.

679

NGO - REDIRECT

1 BY MR. IADEVAIA:

2    Q.   And this is the pay stub that

3 Mr. Gibson showed you earlier.

4    And I think this is the first pay

5 stub -- you testified the first pay stub after your

6 aneurysm; is that right?

7    A.   That is correct.

8    Q.   And there's a handwritten note here

9 that says, "LOA."

10    Do you see that?

11    A.   Yes.

12    Q.   And is that your handwritten note?

13    A.   No.

14    Q.   And when did this -- when you received

15 a pay stub from Oppenheimer, did it have a

16 handwritten note that said, "LOA"?

17    A.   No.

18    Q.   All right.  If you could take a look

19 at Exhibit 88, please.

20    A.   I have it right here.  Thank you.

21    Q.   Do you recognize reviewing this e-mail

22 earlier today with Mr. Gibson?

23    A.   Yes.

24    Q.   And this is an e-mail that -- an

680

NGO - REDIRECT

1 e-mail exchange -- at least with the exception of

2 the bottom e-mail, an e-mail exchange between you

3 and Ms. McPherson at Oppenheimer about the --

4 signing the employee handbook?

5    A.   That is correct.

6    Q.   And the date that you -- you say that

7 you read the handbook was on November 3rd, 2014; is

8 that right?

9    A.   That is correct.

10    Q.   And that was the day that you had

11 returned from your leave; right?

12    A.   That is correct.

13    Q.   It was the first day back at work

14 after you had your aneurysm?

15    A.   Yes.

16    Q.   And did you believe that you had a

17 choice in signing the employee handbook?

18    A.   No.

19    Q.   And if you look at the very bottom of

20 the e-mail, the e-mail from Ms. McPherson to a group

21 of people, including you, there's text that I think

22 is bolded.  It's certainly bigger than the rest of

23 the text.

24    And it says -- it's in red in the

681

NGO - REDIRECT

1 electronic copy, but in any event -- "In order to

2 avoid the disciplinary action taken against you by

3 the firm, please make sure to return the employee

4 handbook by November 7, 2014.  Please see the link

5 below."

6    So Ms. McPherson is warning you and

7 the others that if you don't sign this handbook,

8 you're going to be disciplined?

9    A.   Yes.

10    Q.   Mr. Ngo, just to be clear on this, do

11 you believe that you were let go or fired from

12 Oppenheimer as part of layoffs, cost-cutting

13 layoffs?

14    A.   No.

15    Q.   And when you told -- in an effort to

16 find jobs, you told potential employers and other

17 individuals you reached out to that you were

18 terminated from Oppenheimer as part of a

19 cost-cutting measure or as part of a layoff, did you

20 believe that at the time?

21    A.   No, I did not.

22    MR. IADEVAIA:  I'm going to ask -- I'm

23    going to -- so here's another exhibit we'd

24    like to add.

682

NGO - REDIRECT

1
2     (Discussion off the record.)
3     MR. IADEVAIA:  So this was not part of
4   the exhibits that we submitted.  We realized
5   today, in looking through the 2014 handbook,
6   that it was missing pages and so we wanted to
7   make sure to get in the full copy of the
8   handbook.
9     MR. GIBSON:  The one that's already
10   been marked, Exhibit 8, is missing pages?
11     MR. IADEVAIA:  Yes.
12     MR. GIBSON:  If that's the case, I
13   have no objection.
14     MR. IADEVAIA:  And specifically it did
15   not include the arbitration agreement, which
16   turns up at page 28 of 32, if you take a
17   look.
18     Any objection?
19     MR. GIBSON:  No.
20     THE ARBITRATOR:  Deem this 134, and
21   it's received.
22     MR. GIBSON:  Do you think you have
23   much left to go?
24     MR. IADEVAIA:  Fifteen minutes.
25     MR. GIBSON:  I think the judge has a

683

NGO - REDIRECT

1
2   call at five; correct?
3     THE ARBITRATOR:  That's correct.
4     MR. GIBSON:  Right now I have one or
5   two recross, but it may have to be tomorrow
6   morning.  It's up to you.
7     MR. IADEVAIA:  Keep going.
8     This is another proposed exhibit that
9   was not included in our exhibit list.
10     MR. GIBSON:  This is the letter that
11   Fitch sent before the subpoena was granted.
12     No objection.
13     THE ARBITRATOR:  Exhibit 135 is
14   received.
15   BY MR. IADEVAIA:
16     Q.   Mr. Ngo, have you seen this letter
17   before today?
18     A.   The Fitch letter?
19     Q.   Yes.
20     A.   Yes, I have.
21     Q.   This is the letter that was sent to my
22   attention from Fitch regarding the circumstances of
23   your departure from there?
24     A.   That is correct.
25     Q.   I'll ask you to take a look at

684

NGO - REDIRECT

1   Exhibit 6, please.
2
3     Are you there?
4     A.   I'm there.
5     Q.   And this was your EEOC submission that
6   you were asked about earlier today; is that right?
7     A.   That is correct.
8     Q.   And if you turn to the second page,
9   this is the cover page for your EEOC filing; is that
10   right?
11     A.   Yes.
12     Q.   And attached to the cover page is an
13   EEOC affidavit.
14     Do you see that?  It's the subsequent
15   page --
16     A.   Yes.
17     Q.   -- that's Bates stamped PL 173 through
18   PL 183.
19     Do you see that?  It's 11 pages.
20     A.   Yes.  At the end?
21     Q.   Yes.
22     A.   Yes.
23     Q.   Could you turn back to PL 173, please.
24     A.   173?
25     Q.   Which is the first page of your

685

NGO - REDIRECT

1
2   affidavit.
3     A.   Yes.
4     Q.   Okay.  And in this first paragraph,
5   you say, among other things, "Oppenheimer also
6   discriminated against me because of my disability
7   and retaliated against me for requesting a
8   reasonable accommodation of a medical leave by
9   demoting me significantly, slashing my compensation
10   and firing me."
11     Do you see that?
12     A.   Yes.
13     Q.   And the "demotion" that's referenced
14   there, that demotion took place before June 30th,
15   2016?
16     A.   Correct.
17     Q.   And the slashing of your compensation,
18   that took place before June 30, 2016?
19     A.   That is correct.
20     Q.   And if you turn back to page 2 of this
21   exhibit, the cover page, the charge of
22   discrimination.
23     A.   Yep.
24     Q.   And if you look in that box that you
25   were testifying to earlier where it says, "June 30,

686

NGO - REDIRECT

1  2016" --
2      Do you see that box?  Take a second.
3      MR. GIBSON:  Second page of the
4  exhibit.
5      THE WITNESS:  The second page of this
6  exhibit?  Sorry.  Got it.  Thank you, Mike.
7  BY MR. IADEVAIA:
8      Q.   Why don't you take a sip of water.
9      A.   I tried to.  This cough is coming at
10 the very end.  Sorry.
11     Q.   That's all right.
12     A.   Go ahead.
13     Q.   Do you see where it says, "June 30,
14 2016"?
15     A.   Yes.
16     Q.   When you submitted this charge of
17 discrimination, did you mean to indicate to the EEOC
18 that the earliest date of discrimination at
19 Oppenheimer was June 30, 2016?
20     A.   No.
21     Q.   And is it your understanding that the
22 way this form should look is that the work -- that
23 the word "All" --
24     Do you see that word "All"?
25

687

NGO - REDIRECT

1      A.   Yes.
2      Q.   -- was next to the word "Latest" and
3  got pushed over?
4      A.   Yes.
5      Q.   And that the date, as a result, also
6  got pushed down into the -- you know, over to where
7  it is?
8      A.   Uh-huh.
9      Q.   Is it your intention that what you
10 meant to indicate on this form was that the latest
11 discrimination happened on June 30, 2016, at
12 Oppenheimer?
13     A.   That is correct.
14     (Discussion off the record.)
15     Q.   Do you recall that earlier today you
16 testified about an e-mail with Mr. Bhandary during
17 the July period that you were out on leave due to --
18 after the birth of your child?
19     A.   Yes, I did.
20     MR. IADEVAIA:  And that exhibit was
21 marked as -- what exhibit was that?  Is
22 that --
23     MR. GIBSON:  132.
24     MR. IADEVAIA:  -- 132?  Okay.  He may

688

NGO - REDIRECT

1  need a copy.
2      MS. MILLER:  Yes.
3      MR. IADEVAIA:  Thank you.
4      Do we have more copies of 132?
5      MR. GIBSON:  You want Hoai to have
6  this one; right?
7      MR. IADEVAIA:  I want both, yes.
8      MR. GIBSON:  Didn't we give you a
9  copy?
10     MR. IADEVAIA:  You may have.
11     MS. MILLER:  That's our copy.
12     MR. GIBSON:  This one has a little
13 highlighting on it, but if you don't mind,
14 you can use it.
15     MR. IADEVAIA:  No.
16     THE ARBITRATOR:  Cat's out of the bag
17 already.
18     MR. GIBSON:  Here you go.
19     MR. IADEVAIA:  Okay.  So we're now up
20 to what?  130 --
21     THE ARBITRATOR:  136, I believe.
22     MR. IADEVAIA:  -- 6?
23     THE ARBITRATOR:  Yes.
24     MR. IADEVAIA:  Proposed Exhibit 136
25

689

NGO - REDIRECT

1  was not included in our materials.
2      Is there any objection to this
3  exhibit?
4      MR. GIBSON:  No objection.
5      THE ARBITRATOR:  Exhibit 136 is
6  received.
7  BY MR. IADEVAIA:
8      Q.   And if you take a look at
9  Exhibit 132 -- I keep forgetting --
10     MR. IADEVAIA:  132?
11 BY MR. GIBSON:
12     Q.   -- Exhibit 132, that's the e-mail that
13 says it's from you to Mr. Bhandary; is that right?
14     A.   Yes.
15     Q.   And if you look at Exhibit 136 and you
16 look at the bottom e-mail there, that's the same
17 e-mail supposedly from you to Mr. Bhandary?
18     A.   Yes.
19     Q.   And is it your understanding that the
20 subsequent e-mails in 136 are the complete version
21 of Exhibit 136?
22     A.   That is correct.
23     MR. IADEVAIA:  That's it.
24     MR. GIBSON:  Judge, I've got three

690

```
1                NGO - RECROSS
2        questions, if you think I can squeeze it in.
3        I want to get you to your call.
4                THE ARBITRATOR:  It's all right.
5  RECROSS EXAMINATION
6  BY MR. GIBSON:
7        Q.   Mr. Ngo, you've testified several
8  times today that you believe you were demoted on
9  November 3rd, 2014?
10       A.   I believe I was given notice on
11  November 3rd, yes.
12       Q.   Is it your understanding that the
13  decision to demote you was made back in July of
14  2014?
15       A.   I did not know that.
16       Q.   Would it surprise you -- have you seen
17  your attorney's prehearing brief in this matter?
18       A.   Yes, I have.
19       Q.   Did it surprise you to read on
20  page 18, "Ngo's demotion occurred immediately after
21  his request to extend FMLA leave"?
22       A.   I guess -- that's the way it reads,
23  yes.
24       Q.   Is that true?
25       A.   No -- can you read the line again for
```

691

```
1                NGO - RECROSS
2  me.
3        Q.   Sure.
4            "Ngo's demotion occurred immediately
5  after his request to extend FMLA leave."
6            That took place in July; correct?
7        A.   That took place in July, yes.
8        Q.   Only one or two other questions.
9            Can you go back to Exhibit 45.
10       A.   Exhibit 45?
11       Q.   Yes, sir.  This was Mr. Lowenthal's
12  e-mail to you.
13       A.   Yes.
14       Q.   And you testified several times on
15  examination by your counsel that nobody at
16  Oppenheimer ever told you that you have to sign any
17  forms for your FMLA leave; is that correct?
18       A.   That is correct.
19       Q.   I'd like you to look at the first page
20  of the attachment to Mr. Lowenthal's letter.
21       A.   Yes.
22       Q.   Do you see here where it says, "FMLA
23  provides up to 12 weeks of unpaid, job-protected
24  leave.  You are required to fill out FMLA material"?
25           And "are required" is underlined.
```

692

```
1                NGO - RECROSS
2            Do you see that, sir?
3        A.   Yes.
4        Q.   The only reason you didn't see this is
5  because you didn't open the e-mail; correct,
6  Mr. Ngo?
7        A.   I didn't open it until November 3rd,
8  correct.
9        Q.   Thank you.
10               MR. GIBSON:  No further questions.
11               MR. IADEVAIA:  Nothing else.
12               THE ARBITRATOR:  Okay.  Let me ask
13       this:  Where are we in terms of planning for
14       the other witnesses?
15               MR. GIBSON:  So tomorrow we are going
16       to have -- start with Colleen Burns.  And I
17       believe -- by the way, I am not going to call
18       Mr. Burkmeyer [ph].
19            Am I pronouncing it correct?
20               THE WITNESS:  My partner?
21               MR. GIBSON:  Yes.
22               THE WITNESS:  Backemyer [ph].
23               MR. GIBSON:  I apologize.
24            I'm not going to call him.  So we'll
25       start with Colleen Burns.  I expect I will
```

693

```
1                NGO - RECROSS
2       have about an hour and a half of direct with
3       her.  And then Mr. Lowenthal will be here at
4       noon.
5            And I think between those two
6       witnesses and your cross, that will probably
7       fill the day.
8            And then Thursday, we will have both
9       Ms. Ross and Jaime Bridges by telephone.  And
10      I think there's a chance we could finish on
11      Thursday.
12               MR. IADEVAIA:  There's nobody else
13      after that; right?
14               MR. GIBSON:  Yes.
15               MR. IADEVAIA:  So if that's the
16      case -- okay.  Fair enough.
17               THE ARBITRATOR:  At this point, then,
18      am I correct in inferring that the claimant
19      rests?
20               MR. LICUL:  Yes.
21               MR. IADEVAIA:  Oh --
22               MR. GIBSON:  That's a big question.
23               MR. IADEVAIA:  -- with our
24      deposition --
25               MR. LICUL:  I will say the way we've
```

694

1       NGO - RECROSS
2    agreed to do this is with the deposition
3    designations and just to have all the
4    witnesses come one time.
5        THE ARBITRATOR:  Yes.
6        MR. LICUL:  So I suppose we rest
7    subject to that caveat, that we're not
8    calling witnesses twice.
9        THE ARBITRATOR:  Right.  Okay.  Thank
10   you.
11       MR. GIBSON:  Are we off the record?
12       THE ARBITRATOR:  Anything else at this
13   point?
14       MR. GIBSON:  No, thank you.
15       THE ARBITRATOR:  Please.
16       We're off the record.
17       (The hearing adjourned.  The time is
18   4:54 p.m.)
19
20
21
22
23
24
25

695

C E R T I F I C A T E

STATE OF NEW YORK  )
                ss:
COUNTY OF NEW YORK )

        I, Eileen Mulvenna, CSR/RMR/CRR, and
Notary Public within and for the State of New York,
do hereby certify that the foregoing proceedings
were taken before me on March 5, 20198;
        That the within transcript is a true
record of said proceedings;
        That I am not connected by blood or
marriage with any of the parties herein nor
interested directly or indirectly in the matter
in controversy, nor am I in the employ of any
of the counsel.
        IN WITNESS WHEREOF, I have hereunto  set my
hand this 14th day of March, 2019.

        _____

        Eileen Mulvenna, CSR/RMR/CRR

696

## $

**$100,000** [8] - 405:21, 599:17, 599:24, 601:12, 650:20, 653:8, 653:21, 655:5
**$135,000** [2] - 609:10, 609:14
**$150,000** [9] - 450:16, 450:20, 450:22, 451:3, 610:11, 612:7, 653:8, 653:19, 654:16
**$165,000** [1] - 660:23
**$170,000** [1] - 654:22
**$170,833** [1] - 654:8
**$175,000** [7] - 607:3, 607:15, 608:5, 608:15, 612:8, 614:10, 660:17
**$18,750** [1] - 389:6
**$2,419.69** [1] - 388:24
**$200,000** [1] - 660:10
**$220,000** [2] - 629:19, 630:24
**$225,000** [2] - 647:2, 647:10
**$25,000** [2] - 610:13, 611:25
**$250,000** [1] - 653:5
**$270,000** [1] - 661:13
**$270,833** [1] - 654:6
**$325,000** [1] - 612:11
**$388,750** [1] - 597:11
**$39,873** [1] - 388:4
**$40,000** [1] - 609:16
**$420,833** [1] - 654:2
**$470,000** [1] - 553:10
**$50,000** [4] - 385:12, 385:18, 658:2, 658:5
**$55,000** [2] - 644:15, 644:17
**$6,668** [1] - 386:20
**$70,000** [4] - 629:22, 630:4, 630:9, 630:25
**$75,000** [2] - 607:19, 647:5
**$75,730** [1] - 379:2
**$80,000** [1] - 526:24

## '

**'14** [1] - 597:11
**'99** [1] - 401:8
**'baby** [1] - 639:12
**'baby-sat'** [1] - 639:12
**'political'** [1] - 639:13
**'unproductive '** [1] - 639:14

## 1

**1** [7] - 363:24, 409:7, 633:23, 635:25, 652:10,

652:12, 652:24
**10** [3] - 374:21, 582:7, 658:24
**10/1** [1] - 449:19
**10/1/13** [2] - 449:23, 450:10
**10/18/13** [1] - 449:20
**100** [1] - 614:16
**100,000** [1] - 654:7
**10017** [1] - 359:7
**102** [2] - 431:22, 431:24
**103** [4] - 382:13, 382:14, 626:24, 626:25
**104** [4] - 372:8, 372:12, 628:6, 629:15
**105** [3] - 384:2, 387:11, 646:24
**106** [4] - 365:19, 365:20, 365:21, 365:25
**107** [2] - 381:3, 381:5
**108** [2] - 400:6, 670:18
**109** [1] - 649:22
**11** [12] - 418:20, 419:2, 419:5, 419:7, 563:22, 563:23, 569:10, 596:3, 597:3, 678:17, 678:20, 684:19
**11/3/14** [1] - 566:16
**110** [1] - 404:7
**111** [1] - 408:12
**112** [1] - 448:15
**113** [5] - 458:10, 458:13, 463:20, 665:5, 665:6
**1130** [1] - 359:16
**114** [1] - 513:9
**118** [1] - 453:10
**11A** [3] - 596:3, 596:7, 596:9
**11D** [3] - 678:13, 678:18, 678:21
**11th** [1] - 530:5
**12** [28] - 426:17, 452:19, 454:5, 455:16, 461:8, 464:10, 464:11, 464:18, 464:19, 466:7, 469:11, 472:17, 472:23, 473:14, 473:18, 550:25, 551:12, 551:13, 551:25, 570:22, 571:8, 571:13, 571:25, 572:11, 572:23, 581:15, 673:12, 691:23
**12-hour** [1] - 444:24
**12-minute** [1] - 584:13
**12-month** [1] - 426:22
**120** [1] - 503:23
**121** [7] - 370:21, 370:22, 619:13, 621:7, 621:10, 621:11, 621:12
**1215** [2] - 609:5, 609:12
**122** [2] - 461:17, 631:11
**123** [3] - 377:11, 377:12, 461:18

**125** [1] - 491:18
**127** [2] - 503:15, 504:3
**128** [1] - 507:4
**129** [1] - 465:23
**12th** [7] - 452:24, 455:2, 460:19, 465:7, 465:10, 519:18, 520:11
**13** [5] - 363:11, 513:15, 518:13, 591:11, 608:25
**130** [3] - 378:4, 378:6, 688:21
**131** [7] - 387:13, 387:16, 387:18, 388:11, 466:23, 677:18
**132** [12] - 467:22, 496:16, 497:4, 677:13, 677:14, 677:17, 687:24, 687:25, 688:5, 689:10, 689:11, 689:13
**133** [4] - 677:10, 677:21, 678:3, 678:6
**134** [1] - 682:20
**135** [2] - 609:18, 683:13
**136** [6] - 688:22, 688:25, 689:6, 689:16, 689:21, 689:22
**13th** [7] - 518:7, 519:3, 520:10, 522:7, 529:15, 539:17, 588:19
**1425025377** [1] - 358:2
**14th** [2] - 527:7, 695:20
**15** [3] - 463:14, 580:24, 581:8
**150** [2] - 448:13, 657:3
**150,000** [1] - 450:25
**151** [1] - 488:24
**16** [7] - 421:23, 491:21, 585:16, 666:16, 666:23, 667:16, 669:12
**16,000** [1] - 645:10
**16,500** [1] - 644:21
**16th** [19] - 529:11, 530:3, 533:9, 533:21, 534:6, 534:14, 544:3, 552:21, 554:13, 568:24, 574:23, 575:2, 575:4, 575:5, 575:7, 585:8, 588:25, 589:9, 589:22
**17** [23] - 456:24, 461:9, 461:16, 462:4, 462:7, 462:11, 462:13, 508:12, 508:19, 511:13, 511:21, 551:22, 551:24, 665:24, 666:4, 666:11, 666:25, 667:2, 667:10, 669:14, 669:16, 669:23
**170** [1] - 609:18
**173** [3] - 684:17, 684:23, 684:24
**17th** [9] - 529:11, 533:21, 534:6, 534:14, 574:24, 575:7, 585:8, 589:10, 589:22

**18** [9] - 432:8, 449:6, 449:12, 547:10, 571:20, 572:2, 588:2, 592:6, 690:20
**183** [1] - 684:18
**188** [3] - 564:4, 564:6, 564:9
**18th** [14] - 417:24, 542:2, 543:13, 545:23, 549:10, 549:14, 569:9, 570:21, 571:19, 573:3, 586:25, 590:5, 593:4, 593:25
**19** [7] - 378:11, 427:4, 569:20, 569:25, 590:15, 668:3, 668:6
**190** [1] - 535:16
**192** [4] - 564:23, 564:24, 565:9, 678:16
**1998** [1] - 399:17
**1999** [1] - 401:7
**19th** [1] - 628:10
**1:15** [1] - 513:3
**1A** [4] - 389:17, 389:18, 389:22, 652:12
**1B** [4] - 392:25, 393:2, 656:5, 659:4
**1C** [2] - 395:9, 395:10
**1st** [9] - 379:25, 390:3, 390:4, 390:10, 390:14, 395:3, 414:9, 449:13, 645:17

## 2

**2** [10] - 358:14, 410:9, 410:10, 545:16, 580:22, 581:15, 636:24, 637:2, 685:20
**2,419** [1] - 388:25
**2,419.16** [1] - 389:3
**20** [14] - 374:21, 486:17, 488:18, 489:16, 508:12, 508:19, 511:13, 511:20, 544:14, 557:12, 569:14, 569:15, 658:24
**2000** [1] - 630:13
**2001** [1] - 401:7
**2004** [1] - 597:11
**2006** [1] - 409:7
**2009** [2] - 404:6, 408:20
**2012** [1] - 670:3
**2013** [27] - 391:5, 391:8, 391:10, 391:11, 392:5, 392:9, 429:6, 429:14, 439:12, 439:17, 440:2, 440:3, 441:17, 443:3, 449:6, 449:12, 449:13, 451:4, 600:16, 654:7, 654:13, 654:14, 654:17, 654:21, 670:4, 670:8
**2014** [109] - 362:11, 410:18, 413:9, 414:9, 417:22, 417:25, 419:18, 422:22,

697

425:12, 425:13, 428:18,
437:8, 437:10, 441:19,
443:3, 450:19, 452:19,
460:13, 463:14, 464:10,
464:18, 479:18, 481:14,
486:17, 488:18, 489:16,
491:21, 495:11, 495:17,
495:23, 497:9, 501:11,
503:22, 504:7, 508:12,
508:19, 511:13, 511:20,
511:21, 513:15, 518:13,
526:14, 526:19, 528:4,
542:2, 544:15, 547:10,
551:13, 555:24, 556:22,
557:8, 557:9, 557:12,
564:12, 565:11, 566:11,
566:25, 569:9, 569:14,
572:2, 576:11, 586:2,
586:10, 587:21, 591:2,
591:22, 593:4, 594:14,
594:16, 595:13, 595:18,
595:21, 596:8, 596:12,
596:21, 596:23, 597:17,
598:12, 599:4, 599:17,
600:12, 600:15, 601:2,
601:5, 601:14, 602:13,
650:11, 650:14, 650:17,
654:25, 655:6, 666:12,
670:14, 676:13, 676:15,
676:21, 680:8, 681:5, 682:5,
690:9, 690:14

**2015** [48] - 389:25, 390:10,
390:11, 390:12, 390:14,
391:22, 392:3, 392:19,
413:2, 432:8, 432:23, 434:3,
450:21, 598:6, 598:19,
599:3, 599:7, 601:6, 604:16,
604:20, 605:3, 606:21,
607:7, 607:23, 608:17,
608:20, 608:23, 609:5,
609:17, 610:14, 612:2,
612:7, 612:11, 614:2,
650:21, 652:24, 653:2,
653:8, 653:9, 653:18,
653:20, 653:22, 654:7,
654:9, 654:17, 654:20,
654:24, 655:6

**2016** [43] - 363:24, 366:16,
367:25, 368:15, 370:25,
389:25, 392:20, 393:8,
395:3, 397:13, 425:11,
450:24, 480:4, 598:16,
606:24, 610:9, 610:10,
610:17, 611:4, 611:7,
611:15, 612:14, 616:17,
616:21, 617:2, 617:3,
617:16, 617:24, 618:3,
649:17, 651:14, 652:2,
652:24, 656:8, 657:2, 660:8,
678:8, 685:15, 685:18,
686:2, 686:15, 686:20,
687:12

**2017** [12] - 363:10, 363:24,
366:16, 368:2, 368:16,
377:18, 377:22, 480:21,
618:3, 627:23, 650:7, 660:17

**2018** [23] - 376:6, 376:7,
376:9, 378:11, 379:10,
379:13, 379:21, 379:25,
380:2, 380:21, 381:18,
382:7, 385:10, 385:15,
385:16, 386:20, 387:22,
388:8, 645:17, 645:22,
660:22

**2019** [7] - 358:16, 385:2,
388:18, 388:22, 396:18,
656:8, 695:20

**20198** [1] - 695:11

**202** [1] - 566:8

**2023** [1] - 396:19

**20th** [9] - 486:24, 490:4,
495:10, 495:16, 495:23,
519:8, 519:15, 545:6, 560:18

**21** [3] - 408:20, 497:9,
504:7

**212.403.7311** [1] - 359:8

**212.404.8726** [1] - 359:18

**21st** [4] - 370:25, 496:7,
499:9, 503:22

**22,000** [1] - 374:25

**220,000** [2] - 374:2, 374:24

**225,000** [1] - 384:9

**23** [4] - 409:19, 466:24,
585:14, 587:17

**230** [1] - 359:16

**25** [3] - 443:19, 444:7,
445:6

**250** [2] - 445:8, 655:2

**254,166** [1] - 392:17

**25th** [12] - 507:9, 515:11,
515:22, 516:2, 516:9,
516:21, 518:4, 554:14,
554:22, 558:6, 561:17,
588:16

**26** [2] - 426:19, 587:24

**26th** [2] - 589:13, 591:13

**27** [1] - 503:24

**270** [1] - 608:13

**28** [2] - 566:10, 682:16

**29** [2] - 466:3, 565:11

**2B** [1] - 581:7

**2nd** [1] - 636:24

**2Q** [1] - 522:20

## 3

**3** [8] - 410:18, 458:18,
546:3, 566:24, 569:9, 582:5,
587:16, 592:19

**30** [12] - 393:8, 427:15,
512:9, 612:14, 652:2,
652:24, 656:7, 685:18,

685:25, 686:14, 686:20,
687:12

**300** [1] - 405:5

**30th** [6] - 389:25, 564:12,
614:6, 649:16, 651:14,
685:14

**31** [3] - 388:18, 388:22,
645:19

**313** [2] - 621:5, 622:18

**31st** [3] - 389:25, 390:2,
645:20

**32** [1] - 682:16

**345** [1] - 625:21

**362** [1] - 361:6

**366,042** [1] - 597:22

**37** [1] - 471:4

**399** [1] - 361:7

**3:12** [2] - 493:24, 494:23

**3rd** [25] - 411:25, 412:10,
412:23, 413:9, 417:2,
417:25, 420:17, 543:8,
549:8, 551:11, 562:10,
569:4, 569:5, 569:14,
570:13, 572:5, 572:7,
573:24, 584:24, 593:9,
593:24, 680:8, 690:9,
690:11, 692:7

## 4

**4** [8] - 413:23, 414:3,
588:11, 589:3, 590:9,
636:22, 657:2

**40** [4] - 413:24, 413:25,
414:3

**401(k** [1] - 386:14

**401(k)** [1] - 387:7

**420** [1] - 654:10

**420,833** [2] - 391:5, 391:24

**44,000** [1] - 374:25

**45** [4] - 541:20, 556:25,
691:9, 691:10

**47** [2] - 419:2, 419:7

**4:54** [1] - 694:18

**4th** [7] - 419:18, 420:3,
421:2, 575:12, 575:24,
576:10, 676:17

## 5

**5** [8] - 358:16, 467:22,
578:11, 578:12, 578:15,
578:17, 591:10, 695:11

**50** [4] - 386:16, 553:11,
555:6, 555:8

**50,000** [3] - 384:15, 385:20,
553:10

**52** [2] - 421:19, 421:22

**53** [1] - 426:12

**531,434** [1] - 396:15

**55,000** [2] - 377:3, 645:10

**565** [1] - 359:6

**570** [1] - 624:9

**5th** [1] - 645:22

## 6

**6** [9] - 449:7, 465:25, 590:9,
637:15, 638:6, 638:16,
648:8, 684:2, 688:23

**6,668** [1] - 385:6

**60** [1] - 489:9

**665** [1] - 361:8

**690** [1] - 361:9

## 7

**7** [3] - 592:18, 639:3, 681:5

**7-2** [2] - 567:22, 567:23

**72** [1] - 567:20

**730,317** [1] - 394:24

**75,730** [1] - 379:9

**76** [1] - 425:16

**77** [1] - 425:17

## 8

**8** [8] - 413:17, 413:18,
421:18, 650:7, 656:8, 666:4,
666:5, 682:10

**80** [4] - 385:3, 385:13,
385:19, 447:12

**80,000** [1] - 526:22

**80-page** [1] - 447:10

**86** [1] - 578:20

**86B** [2] - 578:25, 580:2

**88** [2] - 412:4, 679:20

## 9

**9** [1] - 642:15

**90** [1] - 633:5

**90-day** [3] - 633:6, 643:3,
643:12

**97,307** [1] - 377:24

**9th** [2] - 359:6, 568:4

## A

**ab** [1] - 548:11

**Abbett** [1] - 371:4

**able** [8] - 439:7, 441:7,
494:4, 521:15, 521:19,
560:5, 564:8, 594:20

**abrupt** [1] - 537:4

**abruptly** [1] - 535:6

**absence** [73] - 417:15,
417:18, 417:24, 418:13,

698

418:18, 421:20, 422:2,
422:20, 423:4, 424:3, 427:2,
427:21, 428:9, 428:21,
452:25, 455:3, 455:7, 458:2,
458:5, 459:15, 459:23,
460:7, 460:15, 460:21,
463:2, 463:4, 463:9, 468:12,
470:18, 481:23, 486:6,
499:11, 508:15, 508:22,
509:8, 509:11, 509:16,
511:15, 511:23, 513:24,
514:10, 514:18, 514:21,
523:22, 524:10, 524:22,
525:3, 527:9, 532:13,
533:12, 533:18, 534:3,
534:15, 546:11, 547:14,
547:16, 558:25, 559:16,
559:22, 561:9, 566:2, 566:3,
571:15, 591:13, 591:15,
591:22, 592:2, 593:10,
613:20, 645:13, 672:11,
672:15, 672:22

**Absence** [2] - 666:18,
667:18

**absent** [3] - 546:15, 547:24,
548:23

**Absolutely** [2] - 423:9,
629:9

**absorb** [1] - 546:12

**AC** [1] - 492:9

**accept** [1] - 639:7

**acceptable** [1] - 475:10

**accepting** [1] - 638:7

**accessible** [1] - 641:21

**accommodate** [1] - 544:18

**accommodation** [6] -
417:6, 417:9, 417:13,
672:10, 672:11, 685:8

**accompanying** [1] - 409:20

**According** [1] - 435:10

**according** [3] - 401:2,
482:17, 483:2

**accounts** [4] - 538:3,
605:14, 605:16, 605:21

**accurate** [6] - 371:11,
371:14, 446:6, 634:24,
635:14, 635:18

**accuse** [1] - 558:2

**accusing** [1] - 642:9

**acknowledge** [2] - 409:5,
411:18

**acknowledged** [1] - 420:21

**Acknowledgment** [1] -
408:19

**acknowledgment** [6] -
409:4, 409:17, 410:21,
413:5, 413:13, 549:24

**Act** [10] - 406:25, 416:18,
416:22, 426:16, 427:6,
480:15, 549:23, 665:16,
666:12, 667:12

**action** [4] - 416:20, 627:7,
648:16, 681:3

**actions** [3] - 397:14,
397:24, 673:3

**actual** [9] - 386:15, 394:13,
395:12, 395:16, 483:7,
524:5, 627:11, 648:19, 655:3

**add** [3] - 440:20, 659:18,
681:25

**added** [5] - 397:10, 632:13,
634:4, 635:10, 635:16

**addition** [2] - 641:17,
642:16

**additional** [5] - 436:7,
442:4, 544:13, 654:8, 659:6

**address** [3] - 411:5, 411:6,
558:17

**addressed** [2] - 550:5

**addresses** [1] - 434:22

**adjourned** [1] - 694:17

**administrative** [1] - 611:16

**admission** [1] - 360:3

**admitted** [3] - 496:17,
677:19, 677:22

**advance** [1] - 427:15

**advice** [9] - 473:23, 474:13,
474:16, 474:19, 474:23,
475:2, 502:6, 505:23, 642:17

**advisable** [2] - 473:17,
473:18

**advise** [2] - 460:6, 460:13

**advised** [1] - 475:4

**advising** [1] - 571:13

**affected** [1] - 396:24

**affidavit** [2] - 684:13, 685:2

**affirm** [1] - 649:5

**affirmatively** [1] - 411:14

**afterwards** [4] - 487:15,
488:5, 552:24, 617:14

**agencies** [2] - 374:16,
375:7

**agency** [4] - 373:2, 375:10,
521:23, 642:19

**Aggarwal** [4] - 628:20,
628:24, 637:25, 638:2

**aggravated** [1] - 608:10

**aggressively** [1] - 470:4

**ago** [2] - 540:13, 540:14

**agree** [53] - 402:25, 406:19,
407:4, 407:14, 411:8,
421:14, 433:13, 434:14,
435:21, 454:13, 457:10,
459:5, 460:18, 464:17,
480:24, 486:20, 502:16,
502:23, 503:7, 503:12,
511:2, 514:6, 514:8, 514:17,
515:6, 519:3, 523:3, 528:7,
552:2, 557:6, 557:14,
558:22, 563:18, 564:21,
566:6, 568:3, 570:2, 587:18,
588:6, 590:4, 596:23,

612:16, 612:20, 613:24,
620:18, 626:18, 636:16,
636:21, 643:10, 650:9,
651:7, 651:12, 669:9

**agreed** [8] - 407:5, 487:8,
488:17, 520:3, 532:15,
634:8, 634:14, 694:2

**agreement** [8] - 406:5,
406:12, 409:20, 409:24,
409:25, 410:2, 411:9, 682:15

**agreements** [1] - 400:17

**Agricole** [4] - 367:4, 367:5,
367:9, 618:17

**ahead** [4] - 433:25, 580:5,
619:19, 686:13

**ahold** [1] - 500:15

**Albano** [5] - 610:18, 611:3,
611:14, 611:19, 611:22

**Albano's** [2] - 611:6,
611:25

**allegation** [1] - 574:5

**allege** [4] - 480:14, 481:12,
530:8, 570:14

**alleged** [4] - 390:6, 414:24,
415:8, 416:20

**allegedly** [1] - 589:23

**alleges** [2] - 466:4, 573:22

**alleging** [2] - 415:3, 555:16

**allocated** [1] - 387:4

**allocation** [1] - 387:5

**allotted** [1] - 550:3

**allow** [1] - 504:22

**almost** [6] - 480:25, 491:25,
492:4, 525:22, 527:3, 539:13

**alone** [3] - 501:2, 525:19,
604:11

**ALSO** [1] - 360:2

**amended** [1] - 408:3

**Americans** [2] - 416:18,
416:22

**amount** [22] - 385:17,
386:15, 388:2, 388:3, 388:7,
392:4, 392:21, 455:11,
467:16, 526:22, 553:25,
554:2, 599:9, 599:20,
600:20, 602:12, 602:14,
603:8, 607:14, 644:17,
645:2, 645:9

**analysis** [4] - 373:3,
383:24, 400:23, 652:9

**analyst** [30] - 365:14, 367:7,
373:19, 380:22, 383:15,
383:22, 401:4, 401:20,
430:15, 432:17, 435:4,
439:25, 444:16, 444:18,
445:22, 446:11, 446:12,
446:23, 526:16, 598:19,
608:12, 608:18, 616:10,
619:8, 625:18, 642:19,
647:17, 647:24, 648:3, 648:6

**analysts** [18] - 430:5,

430:22, 431:3, 431:7,
432:14, 432:24, 435:5,
436:18, 440:18, 447:6,
526:23, 526:25, 594:23,
610:20, 616:13, 641:23,
659:23, 675:3

**analysts'** [2] - 439:14,
535:19

**analyze** [2] - 446:25, 584:9

**aneurysm** [27] - 397:3,
415:14, 417:14, 417:21,
424:9, 424:17, 529:24,
530:3, 557:13, 561:20,
561:25, 562:9, 562:16,
565:4, 565:15, 566:4, 567:5,
567:11, 597:5, 612:22,
613:3, 613:20, 662:19,
672:7, 672:16, 679:7, 680:15

**anger** [1] - 603:24

**angle** [1] - 365:16

**angry** [11] - 530:9, 530:14,
530:19, 530:20, 530:25,
531:13, 537:8, 542:23,
543:21, 571:24, 572:21

**Anna** [2] - 628:14, 644:24

**announced** [2] - 676:23,
676:24

**announcement** [3] -
675:14, 676:2, 676:6

**announcements** [3] -
675:16, 675:20, 676:22

**annual** [3] - 629:19, 631:4,
647:2

**annualized** [1] - 385:12

**answer** [35] - 411:15,
424:8, 424:22, 425:2, 454:8,
460:9, 461:21, 462:2,
468:24, 471:11, 471:25,
472:9, 473:4, 476:16,
483:12, 486:2, 486:3,
487:16, 487:23, 489:3,
489:12, 494:8, 508:6, 509:6,
509:9, 510:21, 510:23,
533:15, 558:7, 579:12,
584:14, 604:6, 606:19,
657:16, 671:4

**answered** [4] - 424:5,
426:4, 526:7, 646:20

**answering** [1] - 554:11

**answers** [3] - 506:3,
506:10, 522:4

**anticipated** [4] - 567:6,
567:13, 568:6, 600:18

**anything..** [1] - 454:24

**anyway** [1] - 537:11

**Apart** [1] - 440:23

**apart** [1] - 624:18

**apologies** [1] - 493:13

**apologize** [11] - 419:3,
433:25, 438:15, 458:8,
541:2, 572:16, 575:3,

699

586:24, 596:4, 678:24,
692:23
  **apologizing** [1] - 580:9
  **apparent** [1] - 587:6
  **appear** [3] - 377:13, 564:11,
565:10
  **applications** [2] - 557:2,
604:19
  **applied** [5] - 364:19,
364:21, 365:14, 365:15,
380:9
  **apply** [7] - 364:10, 364:16,
365:8, 365:11, 365:13,
367:11, 646:16
  **applying** [4] - 365:15,
366:3, 427:16, 619:3
  **appreciate** [5] - 442:2,
494:8, 497:21, 506:8, 635:24
  **approached** [2] - 465:19,
510:14, 510:15
  **appropriate** [1] - 646:16
  **appropriately** [1] - 524:14
  **Approval** [1] - 451:15
  **approval** [2] - 641:23,
665:22
  **approve** [3] - 438:10,
492:9, 494:5
  **approved** [9] - 454:9,
468:22, 482:16, 484:15,
492:18, 493:6, 493:7,
553:14, 554:12
  **approving** [4] - 439:13,
493:16, 494:16, 554:14
  **arbitrate** [2] - 400:17, 410:2
  **ARBITRATION** [1] - 358:2
  **arbitration** [11] - 400:13,
407:8, 407:17, 409:19,
409:24, 409:25, 411:9,
414:23, 453:14, 542:16,
682:15
  **ARBITRATOR** [85] -
386:18, 398:9, 398:17,
398:20, 423:17, 424:21,
440:23, 443:13, 444:6,
444:12, 445:3, 445:12,
445:23, 446:9, 447:15,
453:18, 464:24, 465:2,
466:21, 471:14, 471:21,
471:24, 472:5, 473:11,
482:9, 487:22, 493:2, 497:4,
500:6, 505:25, 506:5, 506:8,
512:3, 512:8, 514:24,
523:14, 525:5, 536:14,
536:21, 552:9, 572:13,
578:9, 578:14, 578:18,
591:18, 597:15, 597:19,
597:21, 606:11, 621:10,
621:12, 622:6, 626:25,
629:11, 632:9, 632:12,
635:5, 661:2, 661:6, 663:14,
663:20, 663:24, 665:6,

669:10, 669:17, 669:24,
677:9, 677:14, 677:24,
678:3, 678:19, 682:20,
683:3, 683:13, 688:17,
688:22, 688:24, 689:6,
690:4, 692:12, 693:17,
694:5, 694:9, 694:12, 694:15
  **Arbitrator** [2] - 358:12,
362:4
  **area** [1] - 497:16
  **argue** [6] - 475:21, 556:15,
582:19, 586:16, 586:19,
603:3
  **argument** [2] - 610:23,
610:24
  **argumentative** [6] - 475:15,
475:17, 639:16, 641:6,
641:11, 641:12
  **arises** [2] - 651:9, 651:14
  **arising** [3] - 406:24, 407:5,
407:16
  **arrangements** [1] - 552:13
  **arrival** [2] - 543:15, 641:25
  **arrived** [1] - 644:25
  **Artisan** [1] - 496:8
  **Aside** [2] - 595:6, 595:8
  **aside** [6] - 424:23, 442:3,
452:11, 524:4, 626:21,
630:23
  **aspect** [1] - 548:21
  **asserting** [1] - 481:10
  **assessment** [1] - 573:7
  **Asset** [1] - 364:18
  **assigned** [1] - 383:18
  **assistance** [2] - 500:11,
509:15
  **associate** [1] - 526:15
  **associated** [1] - 546:13
  **associating** [1] - 615:5
  **association** [1] - 505:18
  **assume** [8] - 386:15, 445:6,
445:25, 446:5, 482:9,
501:22, 608:24, 661:2
  **assumed** [4] - 484:10,
531:12, 552:20, 553:14
  **assuming** [3] - 506:25,
518:24, 565:25
  **assumption** [3] - 590:7,
590:8, 660:20
  **at-will** [5] - 406:20, 613:4,
614:7, 671:12, 671:17
  **athlete** [2] - 373:15, 373:16
  **attached** [5] - 550:11,
551:11, 668:16, 668:17,
684:12
  **attachment** [4] - 499:3,
543:12, 550:12, 691:20
  **attachments** [1] - 497:24
  **attempted** [1] - 466:5
  **attempting** [1] - 519:5
  **attention** [3] - 397:21,

403:9, 683:22
  **attitude** [1] - 585:4
  **attorney** [6] - 427:11,
575:22, 575:25, 576:4,
576:11, 576:23
  **attorney's** [3] - 424:4,
426:3, 690:17
  **attorneys** [7] - 480:19,
542:15, 576:14, 576:16,
576:21, 648:16, 649:25
  **Audio** [1] - 579:23
  **audio** [2] - 578:6, 578:20
  **August** [36] - 368:15, 404:6,
408:20, 417:22, 417:24,
425:11, 463:14, 501:11,
508:12, 508:19, 511:13,
511:21, 515:11, 515:22,
516:2, 516:9, 516:21, 518:4,
522:20, 529:23, 530:2,
530:3, 530:5, 546:6, 554:14,
554:22, 558:6, 560:2,
560:19, 561:17, 565:11,
569:9, 587:24, 588:16,
589:13, 678:7
  **author** [2] - 436:12, 436:15
  **available** [4] - 364:5,
374:11, 517:16, 587:15
  **Avenue** [3] - 359:6, 359:16,
405:5
  **average** [10] - 440:4, 440:6,
441:20, 441:22, 442:4,
443:2, 443:3, 443:5, 443:12,
446:19
  **averages** [1] - 444:23
  **avoid** [2] - 399:9, 681:3
  **aware** [12] - 464:10, 464:18,
470:24, 481:8, 542:14,
551:4, 552:11, 561:8,
605:10, 611:18, 616:17,
616:19

**B**

  **baby** [21] - 452:20, 455:4,
458:17, 458:18, 504:10,
505:5, 505:6, 506:24,
521:14, 521:19, 521:25,
530:15, 543:15, 544:2,
544:14, 545:3, 559:2,
564:16, 613:8, 613:15,
640:17
  **baby-sat** [1] - 640:17
  **baby-wise** [1] - 504:10
  **Backemyer** [1] - 692:22
  **background** [2] - 636:5,
637:7
  **backtrack** [1] - 583:4
  **Bad** [1] - 534:11
  **bad** [2] - 472:3, 499:16
  **bag** [1] - 688:17
  **banking** [7] - 369:11, 370:4,

371:8, 371:17, 401:4,
619:24, 623:8
  **bar** [1] - 399:24
  **barred** [1] - 481:10
  **base** [39] - 364:20, 374:21,
374:24, 375:11, 384:19,
395:18, 405:21, 447:20,
448:8, 448:10, 448:13,
450:22, 450:24, 450:25,
451:3, 490:5, 527:3, 553:9,
553:16, 555:2, 564:19,
607:21, 612:7, 647:8, 647:9,
651:24, 653:8, 653:20,
654:16, 655:2, 656:19,
657:2, 657:3, 657:5, 657:20,
658:14, 658:18, 658:22,
659:2
  **Base** [4] - 447:19, 451:6,
629:24, 656:19
  **Base-wise** [1] - 447:19
  **Based** [4] - 396:10, 396:12,
554:13, 591:23
  **based** [44] - 391:10,
393:15, 393:16, 395:16,
395:18, 395:22, 415:5,
415:9, 415:12, 415:19,
416:2, 416:8, 416:14, 417:7,
473:16, 479:14, 479:21,
482:6, 482:10, 483:4,
483:13, 484:13, 484:20,
519:25, 528:19, 530:18,
543:22, 553:17, 555:18,
571:16, 571:17, 573:2,
593:13, 603:18, 604:7,
652:2, 654:14, 658:22,
659:6, 661:16, 671:24,
672:20, 673:20
  **basic** [1] - 399:20
  **basing** [1] - 572:4
  **basis** [12] - 453:19, 484:5,
500:18, 501:18, 592:15,
593:18, 660:12, 660:18,
660:24, 661:9, 661:11,
661:21
  **Bates** [5] - 448:20, 449:6,
564:4, 596:5, 684:17
  **Bear** [1] - 402:16
  **beast** [1] - 446:24
  **became** [11] - 429:18,
429:24, 430:14, 441:15,
441:18, 448:7, 448:8, 450:2,
502:9, 535:13, 587:6
  **become** [1] - 400:16
  **becoming** [2] - 435:22,
448:10
  **BEFORE** [1] - 358:12
  **beforehand** [1] - 588:23
  **began** [2] - 544:15, 545:6
  **begin** [2] - 363:7, 543:19
  **beginning** [2] - 387:6,
580:2

700

behalf [2] - 628:22, 678:7
BEHALF [2] - 359:4, 359:14
behaves [1] - 658:11
behaving [1] - 500:14
belief [4] - 535:22, 537:16, 612:24, 649:7
below [4] - 409:7, 412:22, 626:15, 681:6
benefits [5] - 409:9, 461:12, 550:6, 563:4, 563:7
Berner [12] - 503:21, 504:6, 504:9, 504:13, 504:14, 504:20, 505:8, 505:12, 505:13, 505:16, 506:16, 539:24
best [4] - 373:15, 373:16, 373:19, 649:6
bet [1] - 493:24
better [2] - 525:25, 664:11
between [27] - 363:19, 366:15, 366:22, 368:14, 368:15, 380:20, 381:17, 382:7, 394:12, 395:3, 396:10, 401:11, 412:11, 435:7, 463:13, 501:10, 569:9, 569:14, 585:22, 586:7, 618:9, 619:3, 645:24, 646:5, 656:22, 680:3, 693:5
Between [2] - 363:24, 379:25
beyond [3] - 366:9, 578:15, 646:10
Bhandary [15] - 496:7, 497:8, 497:14, 497:23, 498:3, 499:8, 499:25, 540:2, 540:8, 540:9, 541:10, 541:15, 687:17, 689:14, 689:18
bid [2] - 602:24, 607:13
big [6] - 554:25, 555:4, 555:10, 567:23, 596:6, 693:22
Big [1] - 572:16
bigger [2] - 446:24, 680:23
binder [1] - 541:22
binders [1] - 567:23
bio [3] - 433:17, 433:22, 435:10
biographies [1] - 435:7
biography [2] - 433:14, 434:16
Bios [1] - 432:9
birth [43] - 422:16, 422:21, 424:18, 425:23, 427:21, 428:6, 455:4, 458:2, 458:5, 463:5, 463:9, 464:12, 464:20, 468:8, 469:12, 470:18, 481:17, 486:17, 487:4, 487:9, 487:14, 488:4, 488:13, 488:15, 492:2, 513:18, 513:24, 521:14,

522:14, 532:16, 532:22, 533:2, 544:2, 545:3, 545:8, 556:13, 557:3, 558:25, 564:16, 598:13, 612:17, 613:2, 687:19
bit [21] - 367:17, 401:9, 404:3, 404:8, 427:10, 433:25, 442:21, 444:18, 446:13, 450:13, 470:3, 474:10, 520:7, 530:6, 540:5, 547:21, 578:15, 583:4, 619:15, 642:20, 652:9
bits [1] - 436:17
BlackBerry [3] - 489:4, 509:25, 510:8
BlackBerrys [1] - 510:16
blast [38] - 436:10, 436:13, 437:4, 437:14, 438:11, 438:14, 438:18, 439:2, 441:24, 442:3, 443:8, 443:18, 469:25, 535:6, 535:9, 535:10, 535:17, 535:21, 536:10, 536:23, 537:4, 537:9, 537:13, 537:18, 538:2, 538:8, 538:15, 538:16, 574:9, 574:15, 595:4, 595:6, 595:10, 605:15, 605:18, 606:7, 606:12, 606:18
block [1] - 492:23
blood [1] - 695:14
Bloomberg [43] - 379:19, 379:20, 380:2, 381:19, 381:24, 382:6, 383:12, 383:14, 383:22, 384:6, 384:8, 384:12, 384:14, 384:18, 385:23, 385:24, 386:6, 387:23, 388:8, 388:13, 388:23, 389:9, 394:22, 395:18, 396:14, 443:10, 645:21, 646:6, 646:11, 646:21, 646:23, 647:3, 647:10, 656:13, 657:6, 657:10, 657:22, 657:24, 658:21, 658:24, 659:6, 663:6, 675:17
Bloombergs [3] - 442:7, 443:18, 595:10
blue [2] - 499:4
BNP [5] - 380:18, 381:22, 381:23, 382:2, 646:9
bold [1] - 414:14
bolded [1] - 680:23
bonus [95] - 374:7, 374:8, 374:10, 374:12, 374:15, 374:16, 374:19, 375:3, 375:8, 375:12, 375:13, 384:10, 384:11, 384:14, 384:20, 385:4, 385:11, 385:19, 386:5, 386:8, 386:10, 386:11, 386:12, 395:19, 405:25, 406:6,

406:9, 599:2, 599:9, 599:16, 600:5, 600:8, 600:15, 600:19, 600:25, 601:6, 602:13, 602:17, 602:21, 603:8, 604:2, 604:13, 606:20, 607:7, 607:11, 607:13, 607:15, 607:23, 608:5, 608:7, 608:12, 608:15, 608:23, 609:10, 609:15, 609:16, 610:11, 612:2, 612:8, 614:10, 614:16, 616:24, 617:7, 617:8, 631:5, 647:13, 650:20, 651:20, 653:9, 653:11, 653:21, 654:6, 654:20, 654:24, 655:5, 655:12, 655:17, 655:23, 656:2, 657:14, 657:24, 657:25, 658:5, 658:9, 658:13, 658:19, 658:23, 659:2, 660:8, 660:17, 660:22, 661:9, 661:12, 673:4
Bonus [1] - 384:23
bonuses [14] - 375:18, 385:24, 390:17, 602:22, 651:9, 651:15, 652:2, 652:6, 656:24, 657:23, 658:12, 659:9, 670:4, 670:7
book [9] - 448:19, 496:12, 504:16, 505:15, 556:24, 621:16, 622:4, 622:10
booked [1] - 617:20
born [5] - 466:10, 492:5, 504:21, 507:13, 521:15
boss [1] - 587:7, 622:24, 640:6
bosses [2] - 640:7, 640:9
bottom [25] - 392:17, 400:10, 408:25, 412:11, 412:20, 414:8, 449:17, 451:14, 458:13, 491:20, 492:12, 492:13, 494:23, 503:20, 513:15, 564:6, 621:8, 632:14, 636:22, 648:20, 665:12, 680:3, 680:20, 689:17
boundaries [1] - 604:6
box [5] - 550:19, 550:20, 649:10, 685:24, 686:3
brain [13] - 417:21, 557:13, 561:19, 561:25, 562:9, 562:16, 565:15, 566:4, 567:4, 567:11, 597:5, 612:22, 613:20
break [6] - 398:20, 464:23, 512:2, 578:5, 584:2, 629:7
breaks [1] - 442:19
Bridges [6] - 482:5, 563:8, 614:22, 614:24, 693:9
brief [3] - 578:12, 615:14, 690:17
Brigid [7] - 481:20, 484:7,

484:14, 490:19, 551:16, 553:18, 563:8
Brigid's [1] - 555:7
bring [1] - 664:4
bringing [3] - 576:5, 576:16, 677:3
Broide [4] - 432:16, 439:22, 439:23, 441:5
broke [1] - 629:14
brought [1] - 535:8
Budapest [6] - 617:23, 617:24, 618:2, 618:4, 624:24, 625:8
budget [1] - 624:16
bulk [1] - 365:21
bulky [1] - 678:15
Bullet [1] - 637:14
Burkmeyer [1] - 692:18
Burns [71] - 362:21, 369:17, 425:11, 429:17, 430:9, 432:7, 432:25, 433:14, 434:16, 435:12, 438:23, 439:2, 456:4, 459:13, 459:24, 469:25, 485:10, 489:19, 494:19, 501:5, 501:13, 502:9, 502:13, 507:10, 507:15, 507:19, 507:23, 509:2, 513:16, 517:12, 518:22, 520:18, 522:8, 528:16, 529:16, 533:5, 534:8, 534:17, 539:17, 542:8, 546:12, 559:23, 574:24, 575:8, 591:4, 592:12, 593:4, 594:19, 599:11, 599:20, 600:25, 602:10, 602:17, 603:11, 603:15, 606:2, 606:3, 607:8, 607:24, 608:5, 614:21, 615:12, 615:16, 616:3, 659:14, 659:24, 661:10, 670:13, 676:22, 692:16, 692:25
Burns' [10] - 432:23, 434:23, 606:6, 606:10, 606:11, 655:16, 660:7, 660:17, 660:22, 676:8
business [9] - 476:25, 485:15, 495:12, 495:18, 495:24, 574:4, 582:2, 590:17, 626:20
busy [4] - 443:15, 443:19, 444:7, 444:21
BY [56] - 361:3, 362:7, 387:9, 399:3, 423:23, 425:14, 425:21, 441:16, 444:2, 447:16, 454:3, 465:4, 467:2, 472:14, 474:11, 483:9, 488:6, 493:8, 495:22, 497:6, 501:3, 504:2, 506:14, 513:8, 515:5, 523:18, 525:8, 536:6, 538:12, 554:6, 572:15, 578:23, 579:8,

579:11, 579:24, 586:5, 591:20, 598:2, 606:14, 610:7, 622:16, 627:3, 629:13, 632:18, 635:19, 661:7, 665:3, 665:9, 670:2, 678:5, 679:2, 683:15, 686:8, 689:8, 689:12, 690:6

## C

**calculate** [1] - 658:3
**calculated** [3] - 443:12, 446:14, 601:7
**calculation** [3] - 386:19, 394:12, 395:12
**calculations** [1] - 600:23
**calendar** [4] - 393:17, 393:18, 595:20, 599:3
**Cali** [1] - 504:22
**California** [12] - 424:18, 486:16, 488:8, 514:25, 517:20, 529:20, 529:22, 560:12, 560:18, 560:25, 590:12, 669:11
**cannot** [2] - 408:3, 442:13
**capacity** [1] - 605:6
**Capital** [1] - 605:8
**capped** [2] - 384:15, 385:18
**care** [3] - 426:19, 532:7, 556:11
**career** [6] - 415:16, 416:11, 474:16, 474:19, 474:23, 475:2
**careful** [2] - 444:19, 446:23
**caregiver** [1] - 426:21
**carved** [3] - 611:9, 611:11, 637:18
**case** [12] - 396:21, 416:22, 426:8, 426:9, 453:21, 484:4, 587:22, 672:19, 676:4, 682:12, 693:16
**case-by-case** [1] - 484:4
**cases** [1] - 422:9
**Cash** [1] - 384:22
**cash** [3] - 385:3, 385:11, 617:7
**Cat's** [1] - 688:17
**catalyst** [2] - 448:9, 546:4
**catching** [1] - 541:7
**category** [3] - 378:21, 394:15, 396:6
**caused** [1] - 641:25
**caveat** [1] - 694:7
**ceased** [1] - 438:17
**center** [1] - 616:12
**certain** [12] - 384:19, 426:18, 448:11, 455:11, 455:17, 457:7, 578:2, 630:20, 635:17, 670:21, 671:18

**Certainly** [1] - 511:18
**certainly** [8] - 413:21, 447:3, 509:5, 531:10, 547:11, 573:19, 599:25, 680:23
**certification** [3] - 400:12, 400:16, 439:9
**certify** [1] - 695:10
**cetera** [1] - 597:22
**challenge** [1] - 475:19
**chance** [6] - 410:11, 412:5, 453:9, 458:11, 503:16, 693:10
**change** [8] - 362:18, 362:20, 372:18, 372:21, 374:3, 448:8, 448:25, 476:12
**changed** [1] - 590:16, 634:24, 675:18
**changes** [1] - 632:16
**character** [1] - 474:10
**characterization** [5] - 451:24, 459:17, 487:19, 515:19, 641:15
**characterize** [1] - 651:16
**charge** [4] - 480:3, 501:9, 528:9, 574:3, 594:10, 611:12, 648:15, 648:19, 649:5, 685:21, 686:17
**chart** [6] - 390:6, 392:7, 393:3, 393:6, 656:20, 656:23
**chats** [1] - 380:16
**check** [8] - 427:5, 446:4, 447:12, 489:2, 509:24, 510:16, 550:19, 550:20
**Check** [1] - 446:7
**checked** [7] - 489:3, 489:5, 501:11, 501:13, 503:3, 503:8, 553:7
**checker** [1] - 446:9
**checking** [14] - 488:19, 489:10, 494:2, 498:18, 502:17, 502:23, 504:10, 510:8, 516:9, 517:16, 539:13, 539:19, 541:8, 542:9
**Chemicals** [1] - 431:18
**chemicals** [6] - 433:4, 433:16, 598:22, 598:23, 647:18, 647:24
**child** [46] - 422:16, 422:22, 424:18, 425:24, 427:22, 428:7, 458:2, 458:5, 463:5, 463:9, 464:12, 464:20, 468:9, 468:16, 468:21, 469:3, 469:7, 469:12, 470:18, 482:21, 486:17, 487:4, 487:10, 487:15, 488:4, 492:2, 492:5, 507:12, 513:19, 513:24, 522:14, 532:7, 532:16, 532:23, 533:3, 538:22, 545:8, 556:12, 557:3, 560:8,

598:13, 612:18, 613:2, 613:13, 687:19
**children** [5] - 466:8, 466:10, 470:11, 481:17, 674:5
**choice** [1] - 680:18
**Chrysler** [1] - 400:21
**circumstance** [2] - 499:22, 502:19
**circumstances** [8] - 427:19, 428:16, 428:19, 545:25, 555:23, 601:25, 660:14, 683:22
**claim** [14] - 437:11, 465:24, 466:4, 467:15, 481:9, 481:13, 530:8, 570:15, 573:22, 576:5, 576:16, 643:22, 651:25, 672:19
**Claimant** [1] - 358:5
**claimant** [1] - 693:18
**CLAIMANT** [1] - 359:4
**claiming** [1] - 651:4, 651:22, 658:6
**claims** [5] - 396:20, 406:24, 407:7, 407:15, 672:3
**clarification** [5] - 497:21, 536:15, 573:12, 603:21, 604:4
**clarify** [10] - 385:21, 430:25, 471:3, 475:14, 515:23, 539:18, 544:8, 627:5, 632:6, 673:24
**clarifying** [1] - 424:12
**clarity** [6] - 456:25, 549:15, 586:22, 586:23, 593:20, 593:21
**CLARK** [1] - 359:5
**classes** [2] - 399:19, 399:20
**clause** [2] - 407:18, 409:19
**clear** [21] - 404:9, 426:24, 448:12, 448:13, 518:3, 532:8, 532:19, 533:14, 534:14, 535:2, 551:7, 555:12, 558:6, 570:16, 575:20, 587:23, 603:25, 632:19, 634:18, 654:24, 681:11
**cleared** [1] - 558:23
**clearly** [3] - 534:24, 551:24, 593:9
**Clearly** [1] - 484:6
**client** [1] - 537:19
**client's** [1] - 454:17
**clients** [1] - 606:2
**close** [4] - 382:20, 465:11, 556:24, 605:7
**CO** [1] - 358:7
**Co** [2] - 409:5, 426:15
**coerce** [1] - 583:10
**cohead** [47] - 362:14,

362:15, 429:10, 429:24, 430:14, 431:14, 434:8, 435:22, 436:21, 437:2, 437:15, 439:8, 439:12, 439:18, 441:18, 447:17, 448:7, 448:11, 450:2, 491:14, 493:20, 494:10, 501:21, 501:22, 502:10, 505:3, 507:20, 508:8, 534:21, 535:13, 536:11, 537:23, 546:12, 546:24, 547:12, 547:17, 574:16, 591:5, 593:10, 670:14, 674:22, 675:5, 675:11, 675:15, 675:18, 675:21, 676:20
**coheads** [3] - 429:18, 675:24, 676:7
**colleague** [1] - 640:14
**colleagues** [6] - 364:4, 481:15, 638:8, 639:16, 639:18, 642:3
**collection** [1] - 563:25
**Colleen** [41] - 362:21, 428:24, 439:19, 456:4, 459:10, 465:18, 474:6, 484:10, 489:18, 494:4, 500:15, 501:21, 503:3, 510:19, 525:23, 528:21, 529:3, 533:8, 540:17, 541:17, 546:11, 548:17, 552:23, 559:5, 559:7, 559:23, 574:24, 584:20, 585:22, 586:7, 591:11, 593:16, 593:19, 599:11, 604:8, 607:8, 607:17, 614:21, 615:16, 692:16, 692:25
**Colleen's** [3] - 530:18, 582:12, 584:16
**column** [15] - 379:4, 390:20, 390:25, 391:15, 391:23, 392:8, 392:12, 393:9, 393:19, 393:24, 394:7, 396:6, 653:2, 653:13, 653:24
**combative** [1] - 601:17
**combination** [5] - 394:21, 469:17, 563:18, 599:21, 607:16
**coming** [8] - 536:10, 537:21, 537:22, 538:16, 605:15, 605:18, 606:17, 686:10
**commenced** [2] - 408:21, 409:14
**commensurate** [1] - 636:10
**comment** [3] - 474:9, 537:15, 584:10
**comments** [6] - 469:16, 497:18, 588:7, 588:8, 639:13, 640:17

702

commissions [1] - 553:11
commitments [1] - 642:22
committee [1] - 640:21
common [2] - 403:2, 616:24
communicate [7] - 516:19, 546:16, 548:2, 548:24, 567:5, 567:12, 644:5
communicated [2] - 463:22, 532:22
communications [1] - 465:6
comp [2] - 555:5, 647:6
companies [13] - 364:16, 364:18, 373:3, 373:21, 383:24, 437:23, 442:10, 442:14, 443:20, 443:24, 444:8, 444:14, 445:6
company [17] - 365:6, 373:22, 376:14, 402:13, 427:15, 438:21, 442:19, 443:9, 446:20, 446:21, 496:8, 497:19, 498:15, 498:16, 538:17, 585:17, 641:19
Company [2] - 409:6, 409:11
company's [1] - 461:11
comparable [1] - 402:16
compare [1] - 434:23
compared [1] - 483:5
compares [1] - 395:12
compensation [56] - 379:9, 389:23, 391:2, 391:7, 391:17, 392:2, 392:14, 392:15, 393:3, 393:13, 393:25, 394:13, 394:14, 394:15, 394:17, 395:6, 395:7, 395:13, 395:15, 395:16, 395:20, 395:23, 396:12, 396:13, 396:18, 554:3, 555:5, 555:9, 556:11, 556:13, 563:25, 566:7, 595:11, 595:12, 595:18, 597:10, 600:3, 610:19, 612:10, 630:10, 652:22, 653:12, 654:9, 654:11, 656:6, 656:16, 656:17, 657:9, 657:21, 658:16, 658:19, 658:22, 659:7, 685:9, 685:17
Compensation [11] - 390:21, 390:23, 391:15, 391:23, 392:8, 393:10, 393:20, 394:16, 653:4, 653:13, 653:25
competent [1] - 661:3
compilation [3] - 436:14, 436:16, 437:3
complain [2] - 604:12, 608:4

complaining [1] - 678:8
complaint [2] - 649:25, 650:6
complaints [1] - 479:24
complete [3] - 412:21, 423:8, 689:21
completed [1] - 477:15
completely [2] - 582:10, 590:11
completing [1] - 493:19
compliance [4] - 412:16, 493:4, 493:6, 574:3
complications [1] - 438:12
comply [2] - 419:13, 426:15
comps [1] - 458:23
concept [1] - 481:5
concern [2] - 520:25, 568:16
concerned [1] - 602:2
concerning [1] - 550:4
conditions [1] - 409:9
conference [8] - 495:12, 495:18, 495:25, 496:2, 496:6, 497:13, 498:5, 540:3
confidence [1] - 535:5
confirm [1] - 503:6
confluence [1] - 585:3, 602:6
confrontational [1] - 603:23
confused [4] - 385:22, 540:5, 548:9, 558:2
confusion [9] - 541:2, 557:7, 557:14, 558:4, 558:9, 558:12, 558:23, 581:11, 587:20
congratulate [1] - 543:25
Congratulations [2] - 543:15, 611:21
connected [1] - 695:14
connection [10] - 397:22, 400:15, 422:20, 425:23, 464:12, 464:20, 481:16, 557:2, 672:16, 674:11
Connor [1] - 360:4
conscious [1] - 507:25
consecutively [1] - 655:10
conservative [1] - 658:4
conserve [1] - 617:7
considered [1] - 442:8
considering [2] - 608:12, 657:18
consistent [7] - 545:4, 548:16, 585:25, 586:8, 588:3, 591:16, 591:21
constituted [1] - 513:23
constructive [3] - 638:8, 639:17, 643:6
Consumer [1] - 383:20
consumer [5] - 373:8, 373:12, 383:22, 383:25,

435:14
  CONT'D [2] - 361:6, 362:6
  Cont'd [1] - 513:7
  contact [6] - 462:25, 463:3, 463:7, 463:14, 490:9, 498:25
  contacted [2] - 545:23, 549:10
  contacting [1] - 428:20
  contained [1] - 666:12
  contains [2] - 409:18, 445:25
  contentious [2] - 525:12, 525:17
  contents [1] - 540:24
  context [7] - 537:14, 547:5, 572:3, 588:8, 635:23, 635:24, 640:19
  continue [5] - 533:22, 544:25, 545:12, 585:15, 598:21
  continued [2] - 431:14, 661:12
  continuing [1] - 517:20
  continuity [1] - 424:22
  contract [2] - 400:23, 628:11
  contracts [1] - 400:24
  contrary [1] - 552:14
  contribution [3] - 603:17, 603:19, 604:7
  Control [1] - 669:22
  control [2] - 492:24, 493:2
  controversy [1] - 695:17
  conversation [139] - 397:9, 397:10, 419:17, 419:21, 419:24, 420:3, 420:25, 421:16, 452:23, 453:2, 454:6, 454:25, 455:12, 455:15, 456:13, 456:22, 457:4, 457:11, 457:24, 465:9, 465:20, 466:13, 469:22, 470:14, 470:23, 471:5, 474:20, 475:14, 477:15, 478:12, 479:17, 480:8, 480:25, 481:25, 482:2, 483:5, 483:6, 484:13, 484:14, 484:19, 484:20, 484:24, 486:21, 490:2, 506:16, 519:18, 519:25, 520:11, 520:16, 520:17, 521:22, 524:8, 528:21, 529:19, 530:7, 530:17, 530:18, 531:15, 531:25, 532:9, 532:14, 533:9, 533:11, 533:14, 533:20, 533:25, 534:5, 534:13, 534:21, 536:16, 536:22, 538:19, 542:18, 543:24, 544:3, 548:7, 552:21, 554:13, 554:20, 556:6, 557:20, 563:13, 570:12,

570:15, 571:17, 573:4, 573:23, 574:23, 575:11, 575:14, 575:21, 575:24, 576:10, 576:25, 577:14, 577:19, 577:25, 578:6, 580:8, 580:11, 582:2, 582:24, 583:7, 583:22, 584:4, 584:13, 584:24, 585:5, 585:12, 587:2, 587:24, 589:9, 589:15, 589:22, 594:4, 599:13, 600:25, 601:9, 601:12, 601:22, 602:6, 602:7, 602:9, 607:10, 615:14, 615:19, 615:22, 616:2, 634:9, 640:3, 641:10, 641:15, 650:11, 650:17, 674:2, 674:9, 674:17, 676:17
  conversations [11] - 470:16, 491:5, 503:4, 519:8, 519:12, 519:14, 540:7, 570:7, 581:22, 593:19, 635:11
  convey [1] - 524:17
  conveyed [2] - 483:14, 524:14
  conveying [1] - 524:11
  cooler [5] - 616:20, 616:22, 616:25, 617:3, 617:5
  copies [1] - 688:5
  copy [20] - 400:7, 409:12, 411:23, 412:3, 423:14, 465:23, 496:14, 516:16, 516:23, 542:15, 588:18, 622:14, 632:20, 635:5, 669:18, 681:2, 682:7, 688:2, 688:10, 688:12
  Corbett [1] - 360:6
  cordial [1] - 521:5
  core [2] - 433:4, 435:23
  corner [4] - 414:8, 449:17, 451:8, 564:6
  corporate [9] - 364:19, 364:21, 364:23, 364:24, 364:25, 365:3, 372:24, 434:24, 619:11
  corporates [3] - 372:17, 628:23, 641:21
  Corporation [1] - 400:21
  correct [543] - 362:12, 362:16, 368:13, 369:23, 372:10, 372:11, 375:2, 375:19, 377:20, 377:23, 378:9, 379:11, 379:14, 381:11, 382:19, 384:13, 387:24, 388:9, 388:16, 388:20, 389:9, 390:18, 392:6, 393:17, 393:18, 394:6, 396:4, 399:11, 399:13, 399:25, 400:2, 400:4, 400:14, 400:22, 401:6, 401:16, 401:17,

703

401:25, 402:2, 402:8,
402:10, 403:6, 403:7,
405:15, 405:20, 405:22,
406:6, 406:7, 408:10,
408:23, 410:16, 410:19,
410:22, 411:7, 412:9,
412:13, 412:25, 413:15,
414:2, 415:2, 415:3, 415:6,
415:7, 415:10, 416:3, 416:5,
416:9, 416:15, 416:23,
416:24, 417:16, 417:18,
418:2, 418:9, 419:11,
419:15, 419:19, 419:22,
419:25, 420:2, 420:17,
420:18, 420:23, 420:24,
421:3, 421:4, 422:17,
424:11, 424:19, 424:20,
426:24, 427:3, 427:23,
427:24, 428:10, 428:17,
429:7, 429:9, 429:13,
429:16, 429:19, 429:23,
430:4, 430:7, 430:10,
430:13, 430:16, 431:12,
431:15, 431:16, 432:13,
432:15, 432:19, 432:21,
432:22, 433:2, 433:6, 433:7,
433:20, 434:5, 434:10,
435:20, 436:11, 436:12,
436:19, 436:22, 437:3,
437:12, 437:13, 439:2,
439:3, 439:4, 439:6, 439:10,
440:3, 449:24, 450:15,
450:17, 450:23, 451:2,
451:6, 452:16, 452:17,
452:22, 453:7, 454:12,
455:5, 455:8, 455:18,
455:23, 456:2, 456:6,
457:23, 458:25, 459:4,
459:15, 459:17, 459:25,
460:21, 461:5, 461:15,
462:8, 462:11, 463:21,
463:24, 464:21, 465:5,
465:8, 465:13, 465:20,
465:21, 467:20, 468:23,
469:2, 469:4, 469:8, 469:13,
469:15, 470:12, 470:15,
470:22, 471:2, 473:12,
475:24, 476:17, 476:20,
477:4, 478:9, 478:10,
479:19, 479:23, 480:4,
480:6, 480:9, 480:22,
480:23, 481:18, 484:19,
484:24, 485:24, 486:2,
486:6, 486:18, 486:19,
486:23, 487:18, 488:12,
488:14, 489:14, 490:6,
490:7, 490:14, 490:15,
491:3, 491:16, 492:17,
492:19, 492:25, 493:17,
493:18, 493:21, 494:11,
494:20, 494:21, 494:24,
497:11, 497:23, 498:3,

498:7, 499:3, 500:6, 501:6,
501:13, 502:11, 502:12,
502:14, 502:15, 505:3,
507:7, 507:11, 507:14,
508:9, 513:12, 513:13,
513:20, 513:25, 514:10,
514:19, 515:12, 516:17,
516:18, 516:22, 516:25,
517:9, 517:14, 517:17,
517:18, 518:9, 518:19,
518:23, 518:25, 519:18,
519:19, 520:14, 520:17,
520:21, 520:22, 521:2,
521:3, 521:12, 522:24,
523:4, 523:13, 526:5,
526:10, 527:4, 528:10,
528:13, 528:18, 529:12,
529:17, 530:12, 530:23,
531:6, 531:7, 531:13,
531:14, 531:22, 533:6,
534:6, 534:15, 534:23,
535:13, 535:14, 536:13,
538:17, 538:18, 539:15,
542:10, 542:17, 542:22,
542:24, 543:4, 543:9,
546:25, 547:12, 551:6,
551:15, 551:23, 555:2,
555:19, 555:21, 555:23,
555:25, 556:18, 556:19,
556:22, 556:23, 557:3,
557:5, 558:10, 558:15,
558:16, 559:14, 559:24,
561:18, 561:21, 562:10,
562:17, 562:19, 562:20,
562:22, 562:24, 563:3,
563:5, 563:6, 564:13,
564:17, 564:20, 565:5,
565:12, 565:16, 566:4,
566:5, 566:9, 566:12,
566:15, 566:25, 568:7,
568:25, 569:7, 570:2, 570:4,
570:10, 570:19, 571:3,
571:10, 571:11, 573:7,
574:13, 574:21, 575:13,
575:16, 576:14, 577:5,
577:8, 580:11, 580:16,
581:14, 581:17, 581:21,
582:15, 582:21, 583:9,
583:25, 584:19, 584:22,
585:10, 587:12, 591:3,
592:3, 592:4, 592:9, 592:13,
593:6, 594:12, 594:13,
596:7, 596:12, 596:15,
596:17, 596:19, 596:22,
597:2, 597:9, 597:11,
597:12, 598:14, 598:17,
598:20, 599:5, 599:8,
599:18, 600:6, 603:9,
603:13, 606:7, 606:25,
607:22, 608:17, 608:19,
608:21, 609:19, 610:15,
612:6, 612:9, 612:12,

612:14, 612:15, 612:19,
612:23, 613:3, 613:4, 613:6,
614:2, 614:11, 614:12,
614:17, 614:18, 615:9,
616:5, 616:8, 616:9, 616:12,
616:15, 618:6, 621:2, 621:9,
622:24, 623:10, 627:7,
627:9, 627:24, 628:4, 629:5,
629:18, 629:20, 629:21,
630:22, 631:3, 631:6,
632:15, 633:5, 633:12,
639:2, 641:8, 644:14,
644:16, 645:16, 645:23,
647:2, 647:4, 647:8, 647:11,
647:14, 649:2, 649:3,
649:21, 650:8, 650:15,
650:18, 650:21, 651:23,
651:24, 652:3, 652:7, 653:7,
653:13, 653:19, 653:23,
654:4, 654:18, 654:25,
655:7, 655:9, 656:3, 656:4,
656:14, 656:19, 656:22,
656:25, 657:3, 657:6, 657:7,
657:12, 657:13, 657:23,
658:9, 659:3, 659:10,
659:21, 661:22, 662:2,
662:6, 662:24, 662:25,
663:4, 663:7, 665:18, 666:2,
666:13, 667:13, 667:15,
667:24, 667:25, 669:5,
670:6, 670:16, 671:14,
671:15, 672:8, 672:13,
672:18, 673:5, 676:18,
679:8, 680:6, 680:10,
680:13, 683:2, 683:3,
683:24, 684:7, 685:19,
687:14, 689:23, 691:6,
691:17, 691:18, 692:5,
692:8, 692:19, 693:18

   **Correct** [19] - 417:10,
429:4, 432:10, 449:21,
470:20, 515:15, 544:4,
565:2, 569:2, 581:9, 606:4,
609:13, 613:17, 629:25,
666:14, 667:19, 668:5,
670:9, 685:16
   **correctly** [12] - 405:11,
447:24, 477:7, 483:11,
483:21, 485:3, 531:20,
583:5, 585:6, 596:2, 603:5,
617:19
   **correlated** [1] - 473:9
   **correlation** [2] - 661:19,
661:20
   **correspondence** [2] -
381:7, 500:21
   **Corsair** [4] - 625:23,
625:25, 626:4, 626:18
   **Corsair's** [1] - 626:14
   **cost** [15] - 369:9, 369:24,
370:8, 371:16, 403:6,
403:24, 615:23, 616:4,

616:11, 616:12, 620:24,
626:12, 631:9, 681:13,
681:20
   **cost-cutting** [10] - 369:9,
369:24, 370:8, 371:16,
403:6, 403:24, 626:12,
631:9, 681:13, 681:20
   **COSTER** [1] - 359:21
   **costs** [6] - 371:7, 403:12,
403:18, 616:7, 619:23, 623:7
   **cough** [1] - 686:10
   **counsel** [3] - 467:5, 691:15,
695:18
   **counting** [1] - 430:5
   **COUNTY** [1] - 695:6
   **couple** [4] - 399:7, 445:18,
458:23, 502:8
   **course** [6] - 560:3, 586:19,
602:7, 603:22, 665:11,
673:14
   **Court** [2] - 480:11, 650:3
   **courtesy** [3] - 493:22,
494:5, 585:23, 586:8
   **covenant** [1] - 636:6
   **cover** [6] - 435:17, 443:23,
598:21, 684:9, 684:12,
685:21
   **coverage** [20] - 370:4,
371:8, 373:22, 433:4, 456:4,
459:7, 459:13, 459:25,
465:16, 485:9, 546:9,
548:13, 548:18, 548:21,
559:7, 619:24, 620:24,
623:8, 637:5
   **covered** [8] - 373:4, 426:20,
435:9, 435:13, 435:14,
435:18, 442:9, 505:14
   **covering** [4] - 647:17,
647:24, 648:3, 648:6
   **covers** [1] - 393:6
   **create** [3] - 382:21, 594:5,
627:18
   **created** [4] - 382:16,
382:18, 627:6, 627:11
   **creative** [2] - 365:6, 367:17
   **Credit** [4] - 367:4, 367:5,
367:9, 618:17
   **credit** [12] - 367:7, 373:3,
380:22, 383:15, 383:24,
509:20, 611:10, 619:8,
637:6, 640:20, 641:19,
642:18
   **criticism** [1] - 639:17
   **critiques** [1] - 639:8
   **cross** [2] - 453:15, 693:6
   **CROSS** [269] - 361:7, 399:1,
399:2, 400:1, 401:1, 402:1,
403:1, 404:1, 405:1, 406:1,
407:1, 408:1, 409:1, 410:1,
411:1, 412:1, 413:1, 414:1,
415:1, 416:1, 417:1, 418:1,

704

419:1, 420:1, 421:1, 422:1,
423:1, 424:1, 425:1, 426:1,
427:1, 428:1, 429:1, 430:1,
431:1, 432:1, 433:1, 434:1,
435:1, 436:1, 437:1, 438:1,
439:1, 440:1, 441:1, 442:1,
443:1, 444:1, 445:1, 446:1,
447:1, 448:1, 449:1, 450:1,
451:1, 452:1, 453:1, 454:1,
455:1, 456:1, 457:1, 458:1,
459:1, 460:1, 461:1, 462:1,
463:1, 464:1, 465:1, 466:1,
467:1, 468:1, 469:1, 470:1,
471:1, 472:1, 473:1, 474:1,
475:1, 476:1, 477:1, 478:1,
479:1, 480:1, 481:1, 482:1,
483:1, 484:1, 485:1, 486:1,
487:1, 488:1, 489:1, 490:1,
491:1, 492:1, 493:1, 494:1,
495:1, 496:1, 497:1, 498:1,
499:1, 500:1, 501:1, 502:1,
503:1, 504:1, 505:1, 506:1,
507:1, 508:1, 509:1, 510:1,
511:1, 512:1, 513:1, 513:7,
514:1, 515:1, 516:1, 517:1,
518:1, 519:1, 520:1, 521:1,
522:1, 523:1, 524:1, 525:1,
526:1, 527:1, 528:1, 529:1,
530:1, 531:1, 532:1, 533:1,
534:1, 535:1, 536:1, 537:1,
538:1, 539:1, 540:1, 541:1,
542:1, 543:1, 544:1, 545:1,
546:1, 547:1, 548:1, 549:1,
550:1, 551:1, 552:1, 553:1,
554:1, 555:1, 556:1, 557:1,
558:1, 559:1, 560:1, 561:1,
562:1, 563:1, 564:1, 565:1,
566:1, 567:1, 568:1, 569:1,
570:1, 571:1, 572:1, 573:1,
574:1, 575:1, 576:1, 577:1,
578:1, 579:1, 580:1, 581:1,
582:1, 583:1, 584:1, 585:1,
586:1, 587:1, 588:1, 589:1,
590:1, 591:1, 592:1, 593:1,
594:1, 595:1, 596:1, 597:1,
598:1, 599:1, 600:1, 601:1,
602:1, 603:1, 604:1, 605:1,
606:1, 607:1, 608:1, 609:1,
610:1, 611:1, 612:1, 613:1,
614:1, 615:1, 616:1, 617:1,
618:1, 619:1, 620:1, 621:1,
622:1, 623:1, 624:1, 625:1,
626:1, 627:1, 628:1, 629:1,
630:1, 631:1, 632:1, 633:1,
634:1, 635:1, 636:1, 637:1,
638:1, 639:1, 640:1, 641:1,
642:1, 643:1, 644:1, 645:1,
646:1, 647:1, 648:1, 649:1,
650:1, 651:1, 652:1, 653:1,
654:1, 655:1, 656:1, 657:1,
658:1, 659:1, 660:1, 661:1,
662:1, 663:1, 664:1

**Cross** [1] - 398:10
**cross-examination** [1] -
453:15
**Cross-examination** [1] -
398:10
**CROSS-EXAMINATION** [2]
- 399:2, 513:7
**CSR/RMR/CRR** [3] -
358:23, 695:8, 695:22
**culminated** [1] - 397:11
**culminating** [1] - 397:12
**current** [4] - 393:8, 546:5,
627:16, 647:9
**customers** [1] - 605:25
**cut** [4] - 403:12, 403:17,
489:24, 583:15
**cuts** [4] - 615:23, 616:4,
620:24, 624:16
**cutting** [14] - 369:9, 369:24,
370:8, 371:7, 371:16, 403:6,
403:24, 616:7, 619:23,
623:7, 626:12, 631:9,
681:13, 681:20

# D

**dad** [1] - 560:14
**daily** [1] - 436:4
**damages** [11] - 392:21,
650:24, 651:3, 651:8,
651:13, 651:25, 652:9,
656:23, 657:9, 659:4, 661:25
**Dan** [6] - 503:21, 504:6,
504:14, 505:12, 505:13,
505:16
**Daniels** [6] - 439:24, 440:2,
526:4, 526:8, 526:11, 526:18
**Daniels'** [1] - 526:14
**data** [7] - 446:3, 446:4,
446:7, 446:8, 447:12, 612:5,
627:10
**Date** [1] - 649:10
**date** [52] - 379:5, 388:17,
388:18, 388:22, 389:3,
389:5, 393:5, 393:7, 395:4,
409:7, 414:9, 415:22, 416:4,
432:22, 434:4, 449:13,
449:19, 449:20, 449:22,
450:4, 451:2, 479:20,
480:20, 488:5, 518:17,
519:21, 532:24, 544:19,
557:12, 558:6, 559:8, 562:6,
562:8, 562:15, 565:4,
565:11, 567:6, 567:14,
590:19, 624:22, 627:7,
627:8, 627:11, 633:4, 636:9,
645:16, 649:16, 649:19,
651:4, 680:7, 686:19, 687:6
**dated** [17] - 370:25, 408:19,
410:18, 420:17, 432:8,
449:6, 449:11, 491:21,

497:8, 503:21, 504:7,
513:15, 518:7, 564:12,
566:10, 568:4, 593:24
**dates** [10] - 418:2, 449:14,
460:3, 518:18, 518:24,
519:12, 557:10, 559:4,
576:7, 645:24
**daughter** [2] - 488:13,
488:16, 559:25
**daughters** [2] - 473:22,
674:20
**daughters .** [1] - 560:16
**David** [1] - 633:11
**days** [14] - 442:11, 444:24,
447:8, 489:21, 501:18,
536:18, 542:7, 542:19,
543:25, 628:10, 633:6,
665:11, 673:15
**days'** [1] - 427:15
**de** [1] - 502:20
**deadlines** [2] - 642:20,
642:21
**deal** [9] - 398:4, 459:9,
459:10, 459:12, 459:14,
554:25, 555:4, 555:10,
609:23
**December** [3] - 386:17,
409:7, 595:3
**decide** [1] - 487:15
**decided** [4] - 438:22,
459:23, 460:22, 593:2
**deciding** [1] - 484:11
**decision** [4] - 485:3, 485:4,
490:25, 690:13
**Decker** [1] - 410:17
**declare** [1] - 648:25
**Declining** [1] - 639:15
**Deem** [1] - 682:20
**deemed** [2] - 552:16, 677:9
**deferential** [1] - 557:20,
558:3, 582:18, 585:5
**deferred** [1] - 522:4
**define** [1] - 611:13
**defined** [1] - 639:7
**definitely** [1] - 529:10
**degree** [14] - 397:19,
399:12, 399:15, 481:4,
521:6, 525:13, 535:22,
538:9, 557:7, 558:9, 577:16,
600:17, 631:8, 663:11
**deleted** [1] - 634:25
**demand** [1] - 677:6
**demanded** [1] - 644:22
**demands** [1] - 646:17
**demote** [1] - 690:13
**demoted** [15] - 362:11,
391:18, 434:5, 437:8, 538:7,
580:14, 602:4, 602:5, 605:5,
605:11, 606:2, 672:22,
676:12, 690:8
**demoting** [1] - 685:9

**demotion** [15] - 362:13,
362:17, 362:23, 390:12,
390:13, 396:24, 397:7,
397:11, 434:12, 676:14,
685:13, 685:14, 690:20,
691:4
**Denied** [1] - 596:18
**denied** [1] - 472:8
**deny** [3] - 484:18, 484:23,
587:9
**Denys** [55] - 455:25,
456:10, 456:13, 456:15,
456:17, 457:5, 457:11,
457:19, 457:25, 458:14,
459:3, 459:6, 459:14,
459:16, 459:18, 460:6,
460:19, 461:14, 461:19,
462:22, 462:25, 463:3,
463:12, 463:22, 465:7,
470:24, 471:7, 471:16,
471:17, 472:16, 472:22,
477:17, 478:9, 478:11,
478:15, 485:23, 486:5,
486:7, 516:16, 531:5,
551:21, 556:3, 558:11,
558:13, 558:19, 558:24,
559:3, 582:9, 582:25, 583:2,
587:11, 587:14, 665:13,
665:14, 667:8
**Denys'** [5] - 461:2, 463:23,
551:12, 558:17, 665:15
**departing** [1] - 549:5
**department** [24] - 372:24,
412:16, 415:24, 416:7,
417:7, 422:11, 422:19,
426:2, 427:14, 428:10,
428:21, 455:22, 457:21,
463:15, 478:22, 505:13,
505:14, 505:19, 546:14,
546:17, 548:25, 550:6,
628:15, 675:13
**departure** [2] - 548:19,
683:23
**depended** [7] - 440:11,
445:2, 446:10, 489:20,
501:16
**deposition** [29] - 403:11,
405:12, 417:13, 422:25,
423:6, 423:24, 424:23,
424:24, 425:16, 425:22,
453:21, 454:5, 461:17,
466:14, 466:17, 466:25,
467:6, 471:4, 477:10,
488:24, 513:22, 517:6,
535:16, 537:15, 539:12,
577:12, 611:24, 693:24,
694:2
**describe** [3] - 472:6, 473:3,
495:24
**described** [4] - 462:22,
463:12, 535:12, 641:10
**describes** [1] - 641:13

705

**description** [3] - 381:11, 433:11, 433:12

**designations** [1] - 694:3

**desk** [6] - 452:10, 475:24, 504:15, 523:2, 540:21, 669:21

**despite** [3] - 373:12, 572:21, 657:8

**Despite** [1] - 572:9

**detail** [1] - 469:21

**details** [6] - 372:5, 461:10, 544:8, 553:19, 601:8, 640:10

**determination** [1] - 603:7

**determined** [1] - 601:21

**development** [7] - 364:22, 367:18, 368:7, 380:24, 619:11, 624:22, 625:3

**devote** [1] - 444:10

**dialog** [4] - 369:12, 585:22, 586:7, 587:17

**Diana** [1] - 360:5

**Difference** [4] - 392:12, 394:8, 394:10, 396:7

**difference** [9] - 394:12, 395:2, 395:5, 396:6, 396:10, 435:7, 483:8, 572:16, 645:10

**differences** [1] - 392:19

**different** [12] - 365:5, 365:7, 374:16, 375:4, 433:8, 443:6, 447:13, 458:8, 486:11, 503:12, 505:13, 657:14

**differently** [10] - 477:21, 478:23, 479:7, 479:14, 482:4, 483:13, 483:23, 484:17, 527:12, 539:5

**difficult** [2] - 397:2, 596:4

**difficulty** [1] - 638:7

**diminished** [1] - 605:6

**dinners** [1] - 381:16

**direct** [11] - 399:8, 427:10, 483:4, 528:14, 580:7, 619:16, 620:4, 627:5, 636:7, 640:14, 693:2

**DIRECT** [39] - 361:6, 362:1, 362:6, 363:1, 364:1, 365:1, 366:1, 367:1, 368:1, 369:1, 370:1, 371:1, 372:1, 373:1, 374:1, 375:1, 376:1, 377:1, 378:1, 379:1, 380:1, 381:1, 382:1, 383:1, 384:1, 385:1, 386:1, 387:1, 388:1, 389:1, 390:1, 391:1, 392:1, 393:1, 394:1, 395:1, 396:1, 397:1, 398:1

**directed** [2] - 531:5, 587:10

**direction** [1] - 582:8

**directly** [13] - 362:18, 362:23, 414:19, 452:14, 452:15, 468:10, 468:13, 469:9, 469:13, 573:15,

602:14, 616:14, 695:16

**director** [13] - 372:16, 372:24, 375:25, 414:19, 434:25, 457:20, 598:10, 598:12, 598:15, 637:4, 640:11, 640:12, 645:5

**Disabilities** [2] - 416:18, 416:22

**disability** [17] - 372:4, 415:9, 415:11, 416:8, 417:4, 417:8, 418:11, 550:20, 563:4, 563:7, 563:12, 563:19, 671:24, 672:3, 672:6, 672:20, 685:6

**disagree** [9] - 437:17, 451:24, 487:19, 514:20, 515:9, 515:19, 637:11, 638:24, 639:2

**disagreed** [5] - 636:18, 637:13, 637:21, 637:23, 638:22

**disappeared** [1] - 605:18

**disappointed** [6] - 522:13, 530:20, 570:16, 571:14, 572:8, 573:5

**disciplinary** [1] - 681:3

**disciplined** [2] - 469:6, 681:9

**disconcerting** [1] - 470:3

**disconnect** [1] - 520:8

**discourage** [1] - 639:18

**discouraged** [2] - 477:6, 673:20

**discouraging** [3] - 469:24, 538:20, 547:22

**discovery** [2] - 496:22, 496:24

**discretion** [7] - 484:5, 484:6, 484:7, 490:21, 491:7, 582:12, 584:16

**discretionary** [35] - 385:11, 405:25, 556:8, 563:14, 600:8, 600:15, 600:19, 606:20, 607:7, 607:15, 608:15, 608:23, 612:8, 614:10, 614:17, 631:5, 647:13, 651:9, 651:15, 653:9, 653:21, 654:6, 654:20, 655:12, 655:17, 656:2, 656:24, 657:23, 658:8, 658:23, 659:8, 660:8, 660:17, 660:22, 661:12

**discriminated** [19] - 372:3, 391:19, 414:24, 415:4, 415:8, 415:12, 415:19, 415:25, 416:8, 416:14, 482:11, 527:22, 555:17, 556:17, 556:21, 596:14, 604:14, 641:5, 685:6

**discriminating** [2] - 479:21, 580:18

**discrimination** [23] - 394:5, 396:3, 399:19, 399:22, 402:20, 402:23, 414:17, 416:21, 480:4, 501:9, 528:9, 594:10, 648:15, 649:10, 654:12, 655:15, 671:23, 672:20, 678:8, 685:22, 686:18, 686:19, 687:12

**discriminatory** [1] - 644:8

**discuss** [15] - 452:24, 459:24, 460:2, 485:9, 488:5, 491:13, 521:17, 548:17, 552:17, 576:18, 582:24, 602:13, 603:11, 606:10, 640:22

**discussed** [7] - 453:5, 478:8, 544:10, 549:4, 549:25, 607:11, 635:12

**discussing** [2] - 454:5, 537:6

**Discussion** [3] - 391:13, 678:11, 682:2, 687:15

**discussion** [20] - 482:7, 482:10, 519:4, 519:8, 519:9, 534:4, 545:15, 552:22, 552:24, 591:17, 591:18, 591:19, 591:23, 592:22, 593:22, 607:12, 615:8, 640:20, 673:16, 673:21

**discussions** [4] - 546:8, 548:13, 552:12, 650:14

**dispute** [5] - 409:18, 464:9, 472:18, 472:24, 473:5

**disputed** [5] - 473:7, 639:22, 641:14, 642:8

**disputes** [4] - 406:24, 407:5, 407:16, 410:2

**disputing** [1] - 621:24

**dissuade** [2] - 466:5, 479:3

**distinct** [1] - 667:23

**distinguished** [1] - 536:17

**distinguishing** [1] - 364:24

**distress** [8] - 396:21, 397:23, 446:24, 661:24, 662:9, 662:12, 662:20, 663:9

**distressed** [1] - 446:21

**District** [4] - 480:11, 480:12, 650:3

**diversify** [1] - 364:20

**divided** [1] - 445:10

**doctor** [1] - 662:4

**Doctor** [1] - 504:22

**document** [29] - 408:18, 408:25, 410:24, 413:22, 413:23, 414:4, 451:15, 451:22, 451:25, 476:4, 476:7, 479:10, 523:15, 527:18, 527:21, 528:3, 550:13, 621:20, 627:6, 627:19, 631:14, 631:25, 632:6, 632:17, 634:18,

642:14, 648:13, 649:23, 652:15

**Document** [1] - 528:6

**documents** [6] - 365:22, 366:6, 381:13, 382:16, 448:22, 615:5

**DOLINGER** [1] - 358:12

**Dolinger** [1] - 664:12

**dollars** [3] - 375:9, 565:18, 566:7

**dominated** [1] - 476:2

**Donald** [1] - 360:6

**done** [6] - 398:8, 428:2, 439:20, 484:4, 632:10, 663:12

**Donnelly** [11] - 481:20, 482:12, 483:14, 483:23, 484:2, 484:3, 484:7, 486:12, 490:19, 491:6, 563:9

**double** [2] - 427:5, 527:4

**double-check** [1] - 427:5

**down** [15] - 410:23, 442:21, 445:18, 462:14, 550:16, 590:15, 623:11, 623:12, 636:3, 637:14, 639:3, 656:3, 661:20, 668:13, 687:7

**downplaying** [1] - 370:11

**draft** [2] - 541:10, 635:15

**drafted** [1] - 434:15

**drained** [1] - 397:17

**draw** [1] - 403:8

**drinks** [2] - 364:4, 381:15

**driven** [1] - 375:11

**driver** [1] - 556:11

**drop** [1] - 504:11

**due** [7] - 370:8, 439:8, 458:18, 615:23, 616:4, 624:16, 687:18

**duly** [1] - 362:3

**durational** [1] - 477:12

**During** [27] - 363:25, 368:14, 368:19, 380:6, 382:9, 436:25, 444:23, 455:15, 457:24, 489:15, 490:4, 495:10, 495:16, 507:22, 531:15, 536:16, 560:11, 560:17, 560:24, 567:3, 567:10, 591:4, 604:16, 608:17, 616:2, 659:21, 674:9

**during** [77] - 363:25, 364:10, 364:17, 366:7, 368:14, 372:19, 374:3, 374:14, 380:20, 393:14, 394:3, 402:4, 418:3, 418:7, 419:13, 423:2, 423:25, 426:21, 437:5, 442:10, 443:20, 444:20, 452:23, 454:25, 455:11, 456:21, 459:25, 466:11, 466:16, 470:23, 474:20, 475:13,

706

484:19, 484:24, 490:8,
490:23, 494:16, 497:2,
498:5, 501:5, 508:11,
511:12, 511:19, 520:15,
521:17, 521:21, 531:24,
532:9, 534:20, 539:13,
542:18, 543:23, 547:17,
551:5, 561:5, 561:14,
562:25, 573:23, 574:23,
584:4, 587:24, 589:9,
592:11, 598:8, 599:12,
600:25, 601:11, 607:13,
615:22, 632:23, 640:20,
656:11, 662:17, 662:21,
674:2, 674:17, 687:17
**duties** [1] - 437:15

# E

**E-mail** [1] - 411:6
**e-mail** [168] - 370:24, 371:5,
410:17, 411:5, 412:11,
412:19, 420:13, 420:19,
420:22, 425:10, 428:23,
432:3, 432:7, 432:23, 434:3,
434:15, 438:4, 456:10,
456:13, 456:17, 457:4,
457:13, 458:7, 458:14,
459:3, 459:6, 459:19,
460:19, 461:3, 461:13,
461:19, 463:13, 463:23,
463:25, 464:6, 465:6,
489:11, 491:21, 492:16,
492:20, 493:9, 493:23,
494:15, 494:19, 494:23,
496:25, 497:8, 497:18,
497:25, 499:8, 499:25,
503:21, 504:6, 507:9, 510:7,
510:11, 510:24, 511:4,
513:15, 513:17, 513:23,
514:7, 514:10, 514:19,
514:21, 515:7, 515:18,
515:23, 516:10, 516:17,
516:24, 517:3, 517:15,
518:3, 518:7, 518:13,
518:14, 518:18, 518:21,
519:2, 519:21, 520:10,
520:18, 521:9, 521:11,
522:8, 523:9, 523:16,
523:25, 524:7, 524:19,
527:6, 528:4, 528:15,
528:17, 529:4, 529:14,
529:15, 533:10, 536:17,
537:20, 539:17, 540:2,
540:4, 540:5, 540:6, 540:8,
540:15, 540:19, 540:24,
541:3, 541:7, 541:17,
541:19, 541:25, 542:2,
542:12, 542:15, 542:20,
543:6, 543:13, 545:3,
545:22, 548:10, 549:13,

551:11, 551:13, 558:17,
568:4, 568:9, 570:21,
588:19, 589:16, 589:25,
619:21, 620:11, 621:5,
621:8, 622:17, 622:21,
623:6, 624:11, 626:2,
665:10, 665:12, 665:13,
665:14, 665:15, 665:20,
676:24, 679:22, 679:25,
680:2, 680:3, 680:21,
687:17, 689:13, 689:17,
689:18, 691:12, 692:5
**e-mail's** [1] - 524:11
**e-mailing** [2] - 457:8,
558:24
**e-mails** [24] - 366:3,
366:10, 381:6, 381:9,
488:20, 488:22, 489:2,
494:2, 498:18, 517:16,
538:3, 539:13, 539:20,
539:23, 540:14, 540:18,
541:8, 542:9, 618:13,
619:16, 620:22, 622:12,
665:12, 689:21
**Earliest** [1] - 649:14
**earliest** [1] - 686:19
**early** [3] - 368:2, 398:12,
580:8
**earned** [1] - 377:21
**earning** [1] - 438:3
**earnings** [21] - 437:21,
442:7, 442:10, 442:24,
442:25, 443:20, 443:21,
444:23, 522:21, 522:23,
522:25, 523:6, 523:21,
524:3, 524:9, 524:13,
524:21, 526:12, 564:11,
565:10
**Earnings** [1] - 437:24
**easily** [1] - 642:11
**EBITDA** [1] - 446:14
**editing** [2] - 441:2, 441:7
**edits** [2] - 498:8, 499:4
**education** [1] - 400:11
**EEOC** [10] - 479:24, 480:3,
501:9, 528:9, 643:22,
648:14, 684:5, 684:9,
684:13, 686:18
**effect** [2] - 409:6, 670:8
**Effective** [1] - 449:19
**effective** [3] - 449:13,
449:22, 450:9
**effectively** [1] - 485:13
**effort** [3] - 364:14, 383:3,
681:16
**efforts** [5] - 366:6, 381:10,
381:12, 382:21, 383:4
**egregious** [2] - 553:12,
553:24, 555:11
**Eileen** [3] - 358:23, 695:8,
695:22

either [19] - 415:17, 415:24,
416:12, 427:22, 457:12,
472:7, 522:9, 524:6, 527:15,
529:10, 529:14, 542:19,
576:20, 585:7, 614:13,
620:24, 623:14, 644:6, 659:5
**electronic** [3] - 412:3,
413:13, 681:2
**electronically** [1] - 669:15
**elements** [1] - 546:13
**eligible** [7] - 374:7, 374:8,
384:11, 385:10, 405:25,
426:18, 647:12
**eliminated** [2] - 615:23,
616:4
**embedded** [1] - 651:20
**emergency** [11] - 498:12,
498:25, 500:17, 501:18,
502:18, 502:25, 503:10,
508:24, 509:5, 517:22,
517:24
**emerging** [3] - 432:17,
439:21, 676:5
**Emily** [1] - 360:3
**emotional** [7] - 396:20,
397:23, 661:24, 662:9,
662:12, 662:20, 663:9
**emotionally** [2] - 396:24,
397:17
**emphasized** [1] - 466:6
**employ** [1] - 695:17
**employed** [11] - 363:12,
389:24, 394:3, 431:3, 431:7,
561:5, 620:11, 652:23,
656:12, 659:5, 659:23
**Employee** [2] - 406:24,
410:20
**employee** [37] - 408:8,
409:6, 409:8, 409:13,
411:19, 411:24, 412:18,
413:8, 413:16, 416:17,
420:5, 420:15, 420:20,
421:7, 422:8, 427:12,
427:14, 427:18, 428:15,
456:24, 457:6, 461:10,
461:12, 461:20, 461:24,
462:12, 464:3, 490:17,
569:19, 611:14, 613:4,
614:8, 669:2, 671:17, 680:5,
680:18, 681:4
**employees** [6] - 426:18,
490:14, 496:3, 496:5,
527:13, 539:5
**employer** [4] - 370:12,
670:22, 670:23, 671:17
**employers** [11] - 368:24,
369:21, 370:7, 370:13,
402:5, 402:9, 618:8, 620:13,
643:19, 671:8, 681:17
**Employment** [2] - 394:19,
406:17

employment [22] - 364:6,
372:19, 380:2, 400:24,
406:20, 407:6, 407:17,
408:22, 409:10, 409:14,
423:3, 424:2, 564:2, 575:25,
576:12, 590:21, 612:25,
613:23, 613:25, 614:11,
619:5, 671:12
**enclosed** [1] - 549:23
**encompass** [1] - 390:15
**end** [12] - 388:18, 488:19,
495:11, 546:6, 590:20,
630:21, 638:6, 674:14,
674:15, 674:16, 684:20,
686:11
**ending** [1] - 378:11
**energy** [1] - 663:25
**engage** [2] - 366:5, 381:12
**enjoy** [1] - 543:18
**enjoyable** [1] - 508:4
**ensure** [2] - 424:21, 577:15
**entire** [12] - 406:14, 411:18,
413:22, 415:16, 416:11,
430:20, 462:19, 476:5,
476:25, 520:20, 647:21,
651:25
**entirely** [1] - 593:13
**entirety** [1] - 651:13
**entities** [1] - 402:15
**entitled** [14] - 455:11,
455:17, 461:8, 464:11,
464:19, 472:16, 472:23,
473:14, 550:2, 551:5,
551:13, 551:25, 613:8,
613:13
**entries** [2] - 382:22, 627:15
**entry** [2] - 383:6, 627:7
**equities** [3] - 504:18,
505:20, 505:23
**equity** [2] - 370:3, 505:15
**ERISA** [2] - 407:7, 407:15
**erosion** [1] - 535:5
**erred** [1] - 658:4
**errors** [3] - 447:2, 447:4,
447:5
**especially** [1] - 500:24
**Esq** [2] - 360:5, 360:6
**ESQ** [4] - 359:9, 359:11,
359:19, 359:21
**essentially** [2] - 554:24,
586:21
**established** [2] - 588:20,
657:5
**estimate** [3] - 443:14,
618:8, 658:3
**estimated** [3] - 395:11,
395:12, 395:15
**estimation** [1] - 522:3
**et** [1] - 597:22
**European** [1] - 400:12
**evaluation** [6] - 631:19,

707

631:22, 632:24, 633:3,
633:17, 633:20
  **event** [3] - 472:11, 543:16,
681:2
  **events** [4] - 364:5, 545:21,
580:21, 602:6
  **eventually** [2] - 372:9,
676:13
  **evidence** [2] - 594:5, 661:3
  **exact** [16] - 442:17, 450:4,
460:3, 477:10, 480:20,
484:25, 518:17, 519:12,
526:22, 530:21, 532:5,
553:19, 555:6, 562:6,
563:20, 627:17
  **exactly** [3] - 457:9, 619:8,
655:24
  **Exactly** [1] - 473:20
  **exam** [1] - 399:24
  **EXAMINATION** [6] - 361:3,
362:6, 399:2, 513:7, 665:2,
690:5
  **examination** [5] - 398:10,
399:6, 453:15, 580:7, 691:15
  **examined** [1] - 362:4
  **example** [8] - 380:17,
441:5, 441:12, 447:8, 474:5,
510:18, 537:24, 671:21
  **except** [3] - 408:4, 427:19,
428:16
  **exception** [17] - 406:23,
407:7, 407:15, 412:10,
415:21, 415:22, 416:4,
462:21, 463:11, 602:23,
611:9, 627:25, 647:7, 652:5,
656:21, 659:24, 680:2
  **exchange** [2] - 412:11,
413:12, 420:14, 420:20,
456:14, 456:16, 456:17,
527:6, 528:8, 625:23, 680:2,
680:3
  **excuse** [3] - 498:8, 547:2,
650:10
  **exhibit** [35] - 408:13, 410:6,
410:8, 413:14, 419:3,
433:24, 448:17, 458:9,
467:4, 496:11, 496:20,
507:6, 513:11, 518:8,
567:21, 609:3, 621:7,
621:18, 622:4, 622:18,
626:21, 648:10, 677:2,
678:15, 681:24, 683:8,
683:9, 685:21, 686:5, 686:7,
687:21, 687:22, 689:4
  **Exhibit** [84] - 365:19,
365:20, 370:21, 372:8,
372:12, 377:11, 377:12,
378:4, 378:6, 381:3, 381:5,
382:13, 382:14, 384:2,
387:11, 387:16, 388:11,
389:17, 389:22, 400:6,

404:7, 408:12, 412:4,
413:17, 413:18, 419:5,
421:18, 426:10, 431:22,
448:15, 458:13, 463:20,
465:23, 491:18, 496:16,
497:4, 503:15, 507:4, 513:9,
541:20, 556:25, 563:22,
563:23, 567:20, 578:20,
578:25, 580:2, 587:16,
595:24, 596:3, 608:25,
609:11, 619:13, 621:11,
626:24, 628:6, 629:15,
631:11, 646:24, 648:8,
649:22, 652:10, 652:12,
659:4, 661:22, 665:5, 666:4,
666:5, 670:18, 678:3, 678:6,
678:13, 679:20, 682:10,
683:13, 684:2, 688:25,
689:6, 689:10, 689:13,
689:16, 689:22, 691:9,
691:10
  **exhibits** [3] - 664:2, 677:19,
682:4
  **exorbitant** [1] - 553:25
  **expand** [1] - 619:11
  **expect** [9] - 374:15, 444:9,
600:14, 613:22, 637:4,
639:7, 642:21, 645:3, 692:25
  **expectation** [1] - 553:6
  **expectations** [2] - 613:16,
636:11
  **expected** [8] - 427:14,
427:18, 428:15, 546:16,
548:2, 548:24, 642:2, 642:10
  **experience** [6] - 373:7,
435:8, 473:16, 485:19,
543:18, 638:10
  **experienced** [1] - 444:15
  **experiences** [1] - 470:10
  **expertise** [3] - 633:23,
636:2, 638:9
  **explained** [1] - 541:17
  **Explanation** [1] - 450:7
  **explanation** [1] - 573:20
  **explanations** [1] - 369:20
  **explicitly** [2] - 674:6,
674:12
  **exploratory** [1] - 548:8
  **extend** [4] - 482:25, 532:25,
690:21, 691:5
  **extended** [2] - 546:7,
548:12
  **extending** [1] - 544:12
  **extension** [2] - 483:2,
532:24
  **extent** [3] - 446:6, 453:22,
511:5
  **extra** [4] - 500:16, 502:6,
622:14, 654:22
  **extraordinary** [3] - 427:19,
428:16, 428:19

**F**

  **fact** [63] - 402:3, 402:13,
402:25, 403:8, 405:11,
411:23, 412:23, 413:8,
420:2, 422:24, 432:16,
434:23, 446:3, 446:9,
451:21, 452:15, 455:20,
456:7, 460:23, 461:19,
469:10, 470:22, 471:3,
476:3, 481:8, 482:20,
500:23, 501:23, 514:9,
517:10, 518:3, 524:12,
527:3, 531:3, 531:19,
542:14, 544:23, 548:16,
549:20, 551:4, 552:23,
563:7, 572:9, 572:21,
587:25, 588:15, 591:21,
598:11, 603:10, 605:10,
608:4, 611:18, 614:9, 623:5,
624:4, 630:4, 632:20,
634:12, 641:13, 657:18,
670:13, 672:21, 675:12
  **fact-checker** [1] - 446:9
  **factor** [2] - 386:25, 484:12
  **factors** [1] - 607:16
  **factual** [1] - 586:17
  **Fair** [5] - 471:23, 506:7,
506:11, 622:7, 693:16
  **fair** [13] - 433:11, 433:12,
442:20, 473:19, 501:15,
590:7, 590:8, 600:4, 610:6,
630:9, 630:14, 630:16,
630:23
  **fairly** [3] - 457:15, 495:7,
617:15
  **fall** [1] - 429:6
  **familiar** [3] - 400:16, 408:7,
481:5
  **Family** [10] - 426:16, 427:6,
461:9, 480:15, 549:23,
550:14, 665:16, 666:11,
667:12, 668:2
  **family** [5] - 398:5, 426:18,
550:2, 617:19, 646:3
  **far** [7] - 421:24, 438:25,
447:14, 519:13, 561:13,
615:11, 619:12
  **fashion** [1] - 642:22
  **fast** [1] - 666:22
  **father** [1] - 576:22
  **fault** [3] - 587:18, 587:20,
588:6
  **favor** [1] - 499:13
  **February** [13] - 379:25,
380:20, 381:18, 382:7,
385:2, 386:4, 432:8, 432:23,
434:3, 599:7, 606:23,
635:13, 650:20
  **feedback** [2] - 498:17,
639:10

  **feelings** [1] - 573:20
  **fell** [1] - 624:18
  **felt** [54] - 397:16, 397:17,
434:11, 470:8, 475:8, 477:9,
478:23, 479:7, 479:20,
483:12, 483:16, 483:22,
483:24, 483:25, 485:2,
486:10, 490:24, 491:4,
499:16, 504:25, 513:23,
519:22, 519:24, 520:12,
527:8, 527:12, 527:19,
527:22, 528:4, 535:5,
542:20, 542:23, 543:2,
554:11, 556:20, 572:7,
572:20, 580:17, 585:8,
601:2, 601:13, 604:13,
604:22, 607:24, 639:12,
640:16, 641:4, 643:9, 645:8,
646:15, 673:19
  **female** [2] - 481:15, 527:13
  **few** [12] - 508:4, 514:3,
580:3, 617:14, 619:18,
623:18, 628:10, 629:8,
642:12, 649:23, 650:23,
663:18
  **field** [5] - 410:24, 450:6,
450:13, 451:8
  **Fifteen** [1] - 682:24
  **Fifth** [1] - 359:6
  **figure** [2] - 458:19, 460:24
  **file** [6] - 479:24, 480:10,
481:9, 594:9, 618:13, 643:22
  **filed** [7] - 480:3, 480:17,
528:9, 528:11, 648:15,
650:2, 650:7
  **filing** [1] - 684:9
  **fill** [5] - 413:13, 551:2,
673:7, 691:24, 693:7
  **filled** [1] - 556:25
  **filling** [1] - 625:10
  **Final** [1] - 451:15
  **final** [18] - 378:15, 485:3,
485:4, 488:5, 490:25,
532:24, 634:13, 636:13,
637:9, 637:20, 637:22,
638:13, 638:20, 639:21,
639:25, 642:5, 642:6, 642:24
  **finalized** [3] - 554:21,
635:3, 635:6
  **Finally** [1] - 642:19
  **finally** [1] - 407:19
  **finance** [3] - 364:22,
364:24, 365:17
  **Find/Go** [1] - 669:15
  **fine** [2] - 464:24, 622:8
  **Fine** [1] - 663:20
  **finish** [2] - 487:22, 693:10
  **finished** [1] - 578:17
  **fire** [1] - 614:6
  **fired** [11] - 363:12, 369:12,
369:14, 376:14, 376:17,

708

376:20, 393:4, 656:7,
671:13, 672:24, 681:12
 **fires** [2] - 510:15, 511:8
 **firing** [8] - 369:5, 383:7,
393:8, 397:7, 397:12,
627:21, 671:18, 685:10
 **firm** [14] - 374:17, 375:5,
403:11, 403:12, 403:16,
458:21, 490:21, 505:19,
537:25, 603:17, 603:19,
604:25, 617:7, 681:4
 **firm's** [3] - 546:18, 549:3,
639:5
 **firms** [3] - 394:19, 403:13,
605:2
 **First** [6] - 404:19, 404:20,
414:7, 442:23, 502:9, 530:2
 **first** [87] - 365:22, 367:14,
367:16, 368:4, 384:17,
388:10, 404:15, 404:16,
404:20, 405:3, 405:13,
408:12, 408:13, 408:18,
409:3, 412:23, 426:13,
426:14, 432:6, 439:18,
441:6, 441:7, 441:13, 453:2,
454:25, 455:15, 468:22,
470:7, 482:16, 504:23,
514:5, 519:16, 520:6, 526:3,
529:13, 529:21, 543:14,
547:13, 549:5, 550:11,
551:9, 556:12, 558:13,
560:2, 560:18, 562:9,
562:16, 564:14, 565:13,
568:9, 568:11, 570:8,
570:11, 573:3, 573:4,
573:23, 580:6, 580:13,
580:15, 580:23, 585:2,
585:11, 587:14, 588:11,
617:12, 619:20, 621:20,
624:20, 628:2, 628:7,
631:13, 632:2, 633:19,
637:16, 639:4, 646:25,
648:24, 649:24, 651:2,
652:16, 652:25, 679:5,
679:6, 680:14, 684:25,
685:4, 691:19
 **fit** [1] - 643:20
 **Fitch** [90] - 363:6, 363:7,
363:19, 366:22, 367:4,
367:11, 367:12, 367:15,
368:8, 368:16, 368:23,
372:10, 372:13, 372:19,
372:25, 373:8, 373:10,
373:25, 374:4, 374:7,
374:11, 375:4, 375:13,
375:17, 375:20, 375:22,
376:13, 376:17, 376:23,
377:2, 377:5, 377:19,
377:22, 378:8, 378:15,
378:18, 379:10, 379:12,
379:15, 379:18, 379:23,
381:10, 394:21, 618:6,

618:11, 618:18, 618:23,
619:4, 624:21, 625:2,
625:14, 627:22, 628:2,
628:9, 628:12, 629:16,
629:19, 630:25, 631:8,
631:13, 631:16, 632:21,
634:19, 638:10, 643:15,
643:19, 643:23, 643:25,
644:3, 644:5, 644:7, 644:13,
644:18, 645:14, 645:17,
646:6, 646:9, 656:12, 657:6,
657:10, 657:19, 657:22,
658:20, 658:23, 659:6,
663:3, 663:10, 683:11,
683:18, 683:22
 **Fitch's** [2] - 376:14, 636:9
 **Fitch-specific** [1] - 638:10
 **five** [14] - 398:11, 398:13,
398:18, 402:5, 431:7,
440:21, 442:16, 445:11,
446:20, 495:4, 495:8, 542:7,
614:10, 683:2
 **five-minute** [1] - 398:18
 **fix** [1] - 622:4
 **fixed** [6] - 476:25, 477:3,
546:12, 611:19, 675:24,
676:7
 **flag** [2] - 446:18, 606:9
 **flexibility** [1] - 544:19
 **Floor** [1] - 359:6
 **floor** [1] - 375:25
 **flow** [1] - 639:8
 **fluid** [1] - 551:17
 **fly** [4] - 504:23, 521:15,
521:24, 560:5
 **FMLA** [100] - 372:3, 425:25,
426:11, 426:13, 426:14,
426:17, 427:11, 427:12,
427:16, 461:14, 461:25,
462:10, 462:16, 462:19,
464:2, 464:12, 464:20,
468:8, 468:12, 470:25,
472:9, 472:17, 472:24,
477:17, 478:8, 478:16,
479:4, 479:12, 487:2, 487:4,
487:7, 487:12, 487:18,
487:21, 487:25, 490:11,
490:14, 490:23, 500:9,
508:21, 509:8, 511:15,
511:23, 514:6, 514:8, 519:6,
519:17, 520:13, 523:7,
527:19, 528:4, 528:12,
531:24, 532:5, 545:11,
550:17, 550:24, 551:2,
551:5, 551:8, 551:9, 551:14,
551:18, 551:21, 551:25,
552:19, 553:15, 554:12,
556:10, 558:14, 559:12,
559:16, 561:9, 569:19,
570:22, 571:8, 572:2,
587:11, 588:3, 589:17,
596:18, 665:21, 667:23,

668:2, 668:7, 668:12,
668:17, 669:2, 669:3, 669:7,
671:21, 673:7, 673:11,
678:9, 690:21, 691:5,
691:17, 691:22, 691:24
 **focus** [5] - 363:21, 380:3,
485:17, 620:16, 642:15
 **Focusing** [2] - 366:15,
381:17
 **Follow** [1] - 542:4
 **follow** [7] - 483:10, 579:5,
579:17, 589:16, 589:25,
663:19, 666:21
 **follow-up** [1] - 663:19
 **Follow-up** [1] - 542:4
 **following** [11] - 422:16,
434:4, 527:6, 528:4, 533:20,
589:14, 589:21, 602:16,
639:11, 642:2, 643:19
 **Following** [1] - 362:17
 **follows** [2] - 362:5, 513:6
 **force** [1] - 675:9
 **forced** [1] - 527:8
 **foregoing** [2] - 649:2,
695:10
 **foreseeable** [2] - 427:17,
428:14
 **forgetting** [1] - 689:10
 **Forgive** [1] - 659:12
 **forgive** [1] - 433:7
 **forgot** [2] - 510:22, 541:5
 **form** [19] - 425:8, 425:9,
449:2, 449:18, 450:6, 451:7,
476:12, 524:19, 541:13,
551:8, 551:11, 552:18,
649:9, 656:16, 657:20,
659:8, 661:4, 686:23, 687:11
 **Formal** [1] - 618:21
 **formal** [1] - 552:5
 **forms** [13] - 377:13, 449:2,
451:17, 589:17, 589:19,
665:16, 668:12, 668:15,
668:16, 668:17, 673:7,
691:17
 **forth** [1] - 409:19
 **forward** [7] - 390:15,
538:15, 564:21, 574:25,
575:8, 642:21, 661:13
 **forwarded** [1] - 463:23
 **foundation** [1] - 661:21
 **four** [7] - 386:3, 432:24,
437:24, 445:15, 469:18,
596:25, 655:9
 **Four** [2] - 438:2, 445:12
 **fourth** [1] - 549:20
 **frame** [6] - 395:25, 402:17,
460:3, 516:6, 519:11, 670:21
 **frank** [2] - 403:13, 608:6
 **free** [5] - 427:5, 504:12,
547:4, 599:15, 620:19
 **friend** [2] - 505:13, 505:15

 **friendly** [1] - 585:3
 **friends** [3] - 398:5, 576:13,
576:15
 **front** [7] - 403:9, 449:8,
543:10, 584:6, 584:14,
618:17, 674:14
 **full** [10] - 385:25, 406:16,
423:15, 466:7, 473:14,
482:18, 484:21, 564:18,
580:23, 682:7
 **fully** [1] - 419:13
 **functioning** [1] - 446:15
 **functions** [8] - 491:14,
493:20, 494:10, 494:12,
507:20, 508:7, 535:11,
535:12
 **funds** [1] - 364:19
 **future** [1] - 481:10
 **fuzzy** [1] - 562:5

## G

 **Gaberkorn** [5] - 628:14,
628:18, 629:4, 638:4, 644:24
 **gained** [1] - 525:22
 **gap** [1] - 677:22
 **gas** [3] - 435:18, 435:19,
442:10
 **gay** [1] - 458:23
 **gender** [5] - 372:4, 479:15,
479:22, 555:18, 671:24
 **general** [2] - 409:8, 488:25
 **generally** [3] - 481:8, 617:9,
658:13
 **Generally** [1] - 602:25
 **generate** [1] - 616:13
 **generic** [1] - 403:22
 **geographically** [1] - 529:18
 **Gibson** [5] - 666:16,
667:21, 677:7, 679:4, 679:23
 **GIBSON** [139] - 359:19,
361:7, 361:9, 398:11,
398:19, 398:21, 399:3,
423:9, 423:12, 423:19,
423:22, 423:23, 425:12,
425:14, 425:18, 425:21,
441:16, 444:2, 444:4,
447:16, 453:8, 453:12,
453:25, 454:3, 464:22,
465:3, 465:4, 466:22, 467:2,
471:15, 471:23, 472:2,
472:13, 472:14, 474:11,
483:9, 488:6, 493:8, 495:20,
495:22, 496:10, 496:19,
496:23, 497:6, 501:3, 504:2,
506:2, 506:7, 506:11,
506:14, 511:25, 512:5,
513:8, 515:2, 515:5, 523:16,
523:18, 525:8, 536:2, 536:6,
538:12, 554:6, 572:14,
572:15, 578:4, 578:13,

709

578:16, 578:19, 578:23,
579:4, 579:8, 579:11,
579:18, 579:22, 579:24,
586:5, 591:20, 597:18,
597:20, 597:24, 598:2,
606:14, 609:21, 610:5,
610:7, 621:11, 621:14,
621:17, 621:21, 621:25,
622:7, 622:9, 622:13,
622:16, 627:2, 627:3, 629:9,
629:13, 632:5, 632:10,
632:15, 632:18, 635:19,
661:5, 661:7, 663:12,
663:16, 664:2, 664:4, 664:8,
677:8, 677:16, 677:20,
678:2, 682:9, 682:12,
682:19, 682:22, 682:25,
683:4, 683:10, 686:4,
687:24, 688:6, 688:9,
688:13, 688:19, 689:5,
689:12, 689:25, 690:6,
692:10, 692:15, 692:21,
692:23, 693:14, 693:22,
694:11, 694:14
   **given** [13] - 369:5, 369:12,
369:13, 377:5, 377:8, 439:8,
439:11, 505:22, 601:25,
636:4, 636:9, 641:21, 690:10
   **Glad** [2] - 522:17, 525:15
   **glasses** [2] - 404:22,
550:18
   **global** [1] - 476:25
   **goal** [1] - 447:4
   **governing** [1] - 409:10
   **grade** [2] - 401:20, 476:10
   **gradual** [1] - 627:20
   **granted** [4] - 417:17,
665:21, 672:15, 683:11
   **gray** [1] - 497:16
   **great** [2] - 543:18, 553:15
   **Greenwich** [1] - 401:19
   **Greg** [1] - 371:3
   **Gregory** [1] - 370:25
   **gross** [5] - 377:25, 388:2,
388:3, 389:5, 389:6
   **Gross** [2] - 378:21, 597:20
   **ground** [1] - 399:10
   **group** [46] - 429:18, 429:24,
430:14, 430:18, 434:9,
434:18, 437:2, 437:15,
441:18, 447:18, 475:21,
475:25, 476:2, 476:3, 476:6,
485:14, 485:16, 485:19,
491:15, 493:21, 501:22,
502:10, 505:3, 507:21,
534:22, 535:13, 535:18,
535:23, 536:12, 537:17,
538:10, 574:17, 575:9,
605:15, 605:20, 605:22,
625:6, 645:7, 659:19, 660:6,
670:14, 675:4, 676:21,

676:23, 676:24, 680:21
   **growth** [1] - 636:9
   **guarantee** [3] - 384:16,
384:19, 630:13
   **guaranteed** [19] - 385:2,
385:14, 385:19, 386:20,
405:25, 406:6, 406:9, 630:5,
630:10, 630:24, 631:2,
647:6, 652:5, 655:24,
656:16, 656:17, 657:5,
657:19, 658:5
   **guess** [10] - 385:9, 472:5,
474:23, 496:16, 566:23,
583:12, 583:24, 595:23,
603:3, 690:22
   **guide** [1] - 409:9
   **guilty** [1] - 447:3

## H

   **half** [6] - 590:22, 590:25,
594:11, 662:15, 662:24,
693:2
   **halfway** [2] - 410:23,
642:16
   **hand** [3] - 378:20, 496:13,
695:20
   **handbook** [48] - 408:9,
409:6, 409:8, 409:13,
409:18, 410:4, 410:21,
411:19, 411:24, 412:18,
413:9, 413:17, 418:20,
419:3, 420:5, 420:15,
420:20, 421:23, 422:8,
426:11, 457:6, 461:10,
461:11, 461:20, 461:24,
462:13, 464:3, 551:21,
559:13, 569:19, 665:25,
666:13, 667:24, 668:3,
668:4, 668:6, 668:17,
668:18, 668:19, 668:20,
669:12, 680:5, 680:8,
680:18, 681:5, 681:8, 682:5,
682:8
   **handing** ) [1] - 496:15
   **handle** [2] - 522:20, 526:12
   **handled** [1] - 523:6
   **handwriting** [3] - 565:21,
609:9, 634:5
   **handwritten** [8] - 566:7,
566:16, 609:25, 610:11,
632:13, 679:9, 679:13,
679:17
   **happy** [13] - 420:11,
423:15, 452:5, 499:21,
501:8, 502:7, 505:16,
508:25, 535:8, 581:25,
584:14, 600:4, 608:11
   **hard** [4] - 443:5, 501:23,
564:7, 669:18
   **head** [40] - 371:3, 374:14,

380:18, 405:10, 429:7,
434:17, 452:10, 475:20,
475:23, 475:25, 476:5,
476:9, 476:24, 477:3,
501:24, 535:19, 535:23,
537:17, 538:11, 550:6,
574:25, 575:9, 591:7,
592:12, 592:15, 592:20,
593:5, 593:17, 602:21,
603:2, 605:15, 605:20,
605:22, 611:8, 611:10,
611:19, 625:6, 628:23,
628:24, 659:14
   **header** [1] - 384:22
   **headhunters** [2] - 364:9,
380:10
   **heading** [1] - 667:17
   **health** [5] - 544:13, 567:6,
567:13, 590:11, 662:4
   **healthy** [3] - 504:21,
522:18, 525:16
   **hear** [5] - 586:21, 616:20,
616:22, 616:24, 617:3
   **heard** [3] - 408:7, 490:18,
556:5
   **hearing** [2] - 549:6, 694:17
   **heated** [1] - 640:20
   **hedge** [1] - 364:19
   **help** [21] - 370:19, 498:16,
499:20, 499:21, 500:17,
501:19, 502:4, 502:7,
505:16, 505:17, 505:20,
506:19, 508:25, 509:20,
520:25, 525:24, 531:9,
638:10, 640:24
   **helped** [2] - 541:10, 541:15
   **helpful** [6] - 370:19, 372:6,
464:8, 478:2, 501:2, 531:11
   **helping** [5] - 500:10,
502:18, 502:25, 503:10,
506:21
   **helps** [1] - 579:17
   **Henry** [1] - 482:16
   **hereby** [1] - 695:10
   **herein** [1] - 695:15
   **hereunto** [1] - 695:19
   **herself** [1] - 434:17
   **hi** [1] - 366:13
   **Hi** [1] - 458:16
   **hide** [1] - 588:13
   **High** [2] - 430:17, 433:2
   **high** [64] - 371:4, 401:19,
405:10, 429:7, 429:11,
429:18, 430:4, 430:14,
430:21, 431:3, 431:7,
431:14, 432:14, 432:24,
434:9, 434:17, 435:22,
436:21, 437:2, 439:12,
441:19, 442:12, 446:19,
447:17, 448:7, 450:2,
452:10, 475:21, 475:24,

476:3, 476:6, 476:10,
485:16, 491:15, 493:20,
494:10, 505:3, 507:21,
508:8, 526:23, 534:22,
546:24, 547:12, 574:17,
574:25, 575:9, 591:5, 591:8,
592:12, 592:15, 593:5,
611:9, 611:11, 636:4, 636:6,
636:8, 638:11, 659:14,
659:18, 659:22, 675:4,
675:10, 676:19
   **high-grade** [1] - 476:10
   **high-quality** [1] - 638:11
   **High-yield** [2] - 430:17,
433:2
   **high-yield** [60] - 371:4,
401:19, 405:10, 429:7,
429:11, 429:18, 430:4,
430:14, 430:21, 431:3,
431:7, 431:14, 432:14,
432:24, 434:9, 434:17,
435:22, 436:21, 437:2,
439:12, 441:19, 447:17,
448:7, 450:2, 452:10,
475:21, 475:24, 476:3,
476:6, 476:10, 485:16,
491:15, 493:20, 494:10,
505:3, 507:21, 508:8,
526:23, 534:22, 546:24,
547:12, 574:17, 574:25,
575:9, 591:5, 591:8, 592:12,
592:15, 593:5, 611:9,
611:11, 636:4, 636:6, 636:8,
659:14, 659:18, 659:22,
675:4, 675:10, 676:19
   **high-yields** [1] - 446:19
   **higher** [1] - 647:5
   **highest** [5] - 375:24,
629:22, 630:5, 630:10,
630:25
   **highlighted** [2] - 643:2,
645:4
   **highlighting** [3] - 632:8,
634:7, 688:14
   **highlights** [1] - 635:17
   **himself** [1] - 548:9
   **hired** [14] - 372:15, 373:10,
373:11, 404:5, 405:9,
405:14, 405:16, 499:16,
499:17, 500:25, 502:14,
627:22, 645:21, 675:23
   **hiring** [6] - 404:4, 431:10,
618:10, 623:3, 646:6, 676:5
   **history** [1] - 658:11
   **hit** [2] - 462:13, 669:22
   **HN** [2] - 492:11, 493:12
   **Hoai** [17] - 360:10, 412:21,
464:8, 493:14, 504:9,
505:20, 526:2, 636:3, 636:5,
636:10, 637:4, 637:16,
638:7, 639:5, 639:12,
639:19, 688:6

710

**HOAI** [4] - 358:4, 361:4, 362:2, 513:4
**Hoai's** [2] - 641:17, 641:24
**Hoffman** [1] - 360:4
**Hold** [10] - 376:8, 402:6, 404:21, 407:9, 431:9, 514:11, 547:2, 596:6, 631:23, 653:14
**home** [2] - 505:6, 562:4
**honest** [5] - 443:11, 506:23, 562:5, 581:16, 581:19
**honestly** [1] - 445:15
**Honestly** [1] - 669:13
**Honor** [7] - 622:3, 632:6, 632:16, 678:2
**hoped** [1] - 594:9
**horrible** [2] - 483:20, 560:9
**hospital** [1] - 562:4
**hospitalized** [1] - 561:24
**hour** [1] - 693:2
**hours** [4] - 445:12, 445:16, 445:18, 537:11
**house** [2] - 360:5, 360:6
**HR** [15] - 369:17, 376:4, 549:4, 615:6, 615:10, 615:12, 616:2, 625:5, 628:21, 635:11, 638:3, 643:4, 665:22, 669:4, 669:7
**HR's** [1] - 614:21
**Hsu** [3] - 541:6, 541:9, 541:19
**Human** [2] - 478:20, 478:25
**human** [42] - 414:20, 415:17, 415:24, 416:7, 416:9, 417:7, 422:10, 422:19, 422:23, 425:5, 425:25, 427:13, 427:22, 427:24, 428:9, 428:20, 428:25, 429:3, 455:21, 456:7, 457:20, 457:22, 460:13, 463:7, 463:15, 478:19, 478:22, 486:9, 516:20, 527:7, 527:11, 527:14, 539:8, 546:17, 548:2, 548:6, 548:7, 548:25, 549:22, 559:17, 604:12, 628:14
**hundred** [2] - 384:20, 387:5
**hungry** [1] - 658:18
**hypothetical** [1] - 444:7

**I**

**IADEVAIA** [74] - 359:9, 361:6, 361:8, 362:7, 387:9, 398:8, 423:5, 423:10, 453:13, 453:24, 471:11, 471:19, 495:19, 496:21, 497:3, 503:24, 512:7, 535:24, 536:3, 536:5, 579:10, 586:4, 609:23,

610:3, 621:15, 621:19, 621:23, 622:8, 622:11, 622:15, 629:7, 629:10, 635:8, 663:18, 663:21, 664:3, 664:6, 664:10, 665:3, 665:7, 665:9, 670:2, 676:25, 677:5, 677:11, 678:5, 678:20, 678:23, 679:2, 681:23, 682:3, 682:11, 682:14, 682:24, 683:7, 683:15, 686:8, 687:21, 687:25, 688:4, 688:8, 688:11, 688:16, 688:20, 688:23, 688:25, 689:8, 689:11, 689:24, 692:11, 693:12, 693:15, 693:21, 693:23

**ideally** [1] - 373:18
**identified** [6] - 432:12, 452:8, 452:12, 476:5, 476:13, 672:6
**identifies** [3] - 451:18, 451:22, 451:25
**ill** [1] - 426:20
**ill-covered** [1] - 426:20
**imagine** [1] - 504:11
**Immediate** [1] - 451:9
**immediate** [5] - 451:18, 452:2, 454:11, 476:13, 476:19
**immediately** [3] - 414:18, 690:20, 691:4
**impending** [1] - 543:16
**implication** [5] - 467:15, 467:17, 523:24, 538:13, 587:25
**implications** [4] - 452:11, 475:14, 524:4, 524:16
**implicit** [3] - 474:21, 475:3, 475:4
**implicitly** [1] - 473:15
**implied** [6] - 452:9, 466:17, 467:9, 484:21, 630:12, 673:25
**implies** [2] - 515:25, 600:2
**imply** [3] - 538:9, 547:14, 547:16
**implying** [7] - 467:16, 467:18, 468:2, 468:4, 469:15, 470:8, 474:22
**important** [6] - 454:14, 485:18, 498:16, 498:25, 517:7, 523:2
**impression** [2] - 468:3, 490:19
**improvement** [3] - 377:5, 643:7, 643:11
**IN** [1] - 695:19
**In-house** [2] - 360:5, 360:6
**in-laws** [1] - 617:18
**in-office** [1] - 641:18

**inaccuracies** [1] - 586:17
**inaccurate** [1] - 634:10
**Inc** [2] - 409:6, 426:15
**INC** [1] - 358:7
**incidents** [1] - 414:16
**include** [5] - 658:4, 671:20, 671:23, 675:7, 682:15
**included** [3] - 634:15, 683:9, 689:2
**includes** [4] - 438:7, 657:2, 657:3, 675:9
**Including** [1] - 491:9
**including** [4] - 446:3, 492:8, 641:22, 680:22
**inclusive** [1] - 432:25
**income** [10] - 396:8, 397:5, 397:19, 476:25, 477:3, 546:12, 611:19, 651:20, 675:24, 676:7
**Income** [1] - 406:25
**inconsistent** [1] - 548:3
**incorrect** [1] - 415:20
**increase** [3] - 447:18, 447:25, 450:9
**increased** [2] - 451:3, 655:14
**indefinite** [3] - 613:16, 613:21, 613:22
**indicate** [6] - 473:13, 494:15, 521:13, 536:22, 686:18, 687:11
**indicated** [2] - 409:7, 476:18, 639:12
**indicating** [3] - 533:11, 533:17, 547:18
**indications** [1] - 618:5
**indirectly** [1] - 695:16
**individual** [2] - 638:2, 661:16
**individually** [1] - 584:11
**individuals** [6] - 432:12, 432:14, 481:19, 492:8, 567:17, 681:18
**indulge** [1] - 399:8
**industry** [2] - 381:16, 435:8
**inevitably** [1] - 620:14
**inexperienced** [1] - 444:17
**inferring** [1] - 693:18
**information** [5] - 393:15, 473:25, 649:6
**informed** [5] - 452:19, 454:15, 472:16, 472:23, 517:7
**initial** [4] - 494:22, 544:18, 548:7, 644:17
**initiated** [1] - 447:9
**injured** [1] - 426:20
**input** [4] - 599:23, 600:3, 607:18, 627:10
**inquire** [1] - 459:18
**inquiring** [5] - 440:23,

459:16, 459:20, 470:4, 505:10
**instance** [2] - 472:6, 641:24
**instances** [5] - 509:24, 519:22, 541:15, 578:3, 641:4
**instructed** [1] - 548:4
**instructions** [2] - 549:12, 586:9
**insubordination** [1] - 376:20
**intend** [1] - 546:11
**intended** [2] - 409:8, 560:10
**intent** [1] - 623:20
**intention** [2] - 546:5, 687:10
**interchange** [1] - 471:22
**interested** [1] - 695:16
**interfere** [1] - 519:6
**interfered** [2] - 472:7, 527:19, 528:5
**interfering** [9] - 477:16, 478:15, 479:11, 519:17, 519:23, 519:24, 520:5, 520:12, 523:7
**interim** [5] - 592:15, 592:25, 593:5, 593:8, 593:18
**intern** [2] - 540:21, 541:6
**internally** [1] - 625:10
**internship** [1] - 400:20
**Interpersonal** [2] - 637:15, 638:16
**interrupt** [1] - 506:9
**interview** [9] - 367:2, 367:6, 367:12, 381:21, 381:24, 618:17, 620:14, 622:25, 646:10
**Interviewed** [1] - 380:10
**interviewed** [13] - 367:15, 367:16, 368:8, 381:22, 605:3, 605:9, 618:17, 618:18, 624:21, 625:2, 646:8
**interviewing** [3] - 367:3, 604:24, 619:6
**interviews** [8] - 366:17, 366:24, 374:14, 381:19, 618:14, 618:19, 618:21, 646:7
**intranet** [1] - 461:11
**introduce** [2] - 371:22, 371:23
**introduced** [1] - 551:10
**investment** [8] - 369:11, 371:8, 371:17, 401:4, 401:20, 619:24, 625:3, 639:11
**investment-grade** [1] - 401:20
**investor** [8] - 364:20, 365:4, 365:16, 367:18, 368:7, 380:23, 619:10,

711

624:21
**invite** [1] - 575:17
**invited** [1] - 636:5
**involve** [1] - 400:24
**involved** [2] - 607:9, 608:3
**involving** [1] - 445:7
**iPhone** [2] - 577:4, 577:6
**issue** [3] - 453:5, 470:17, 590:10
**issued** [1] - 634:20
**issues** [3] - 428:22, 456:25, 590:11
**itself** [1] - 441:25

## J

**J.P** [4] - 401:3, 402:11, 402:19
**Jaime** [4] - 614:22, 614:23, 615:10, 693:9
**JAMS** [1] - 358:2
**Jane** [46] - 397:10, 428:23, 451:18, 452:4, 456:3, 459:10, 465:7, 465:17, 474:8, 476:3, 476:5, 476:21, 482:7, 482:17, 482:21, 482:25, 483:5, 484:6, 484:10, 484:14, 485:12, 485:13, 485:14, 485:15, 485:17, 485:21, 509:3, 518:3, 529:4, 533:8, 548:17, 554:18, 554:20, 556:15, 559:5, 559:7, 559:22, 582:12, 584:15, 584:20, 602:7, 611:10, 675:2
**January** [17] - 376:9, 379:12, 388:18, 388:22, 389:25, 390:2, 390:3, 390:10, 390:14, 616:23, 617:2, 617:3, 617:6, 617:9, 645:17, 645:19, 652:24
**Jefferies** [2] - 622:22, 623:4
**jeopardy** [2] - 543:2, 585:9
**JEREMIAH** [1] - 359:9
**Jeremiah** [2] - 495:21, 496:14
**Jessica** [2] - 541:6, 541:18
**jiadevaia@vladeck.com** [1] - 359:10
**job** [99] - 362:15, 363:4, 365:2, 365:3, 365:5, 366:4, 366:5, 366:14, 366:16, 366:24, 367:5, 367:7, 367:15, 367:16, 367:17, 367:18, 368:9, 368:16, 369:22, 370:9, 370:11, 370:19, 371:23, 372:6, 372:9, 375:20, 380:10, 380:24, 381:8, 381:10, 381:12, 381:19, 382:2, 382:5, 382:15, 382:16,

382:18, 382:21, 383:4, 397:4, 397:18, 397:20, 435:3, 435:23, 508:7, 511:8, 543:2, 550:25, 569:20, 572:2, 584:25, 585:8, 586:18, 586:22, 587:8, 588:9, 598:8, 601:19, 602:2, 603:25, 604:19, 604:22, 604:23, 604:24, 605:4, 605:7, 605:8, 605:9, 608:18, 608:20, 611:6, 613:16, 617:11, 620:9, 620:15, 623:22, 624:5, 624:7, 624:15, 624:17, 624:19, 625:4, 625:5, 625:11, 625:13, 625:16, 645:3, 645:9, 646:15, 648:2, 658:12, 658:20, 658:21, 672:25, 691:23
**job-protected** [4] - 550:25, 569:20, 572:2, 691:23
**jobs** [31] - 364:5, 364:10, 364:14, 364:19, 364:21, 364:22, 364:23, 364:24, 365:7, 365:8, 365:9, 365:14, 365:16, 365:17, 366:3, 368:17, 380:9, 380:22, 380:23, 380:24, 382:6, 389:13, 619:3, 648:5, 656:15, 656:22, 670:21, 681:17
**John** [5] - 439:24, 524:2, 525:23, 526:3, 526:4
**JOHN** [1] - 359:21
**john.coster@ssbb.com** [1] - 359:22
**Johnson** [14] - 481:20, 482:5, 482:12, 482:15, 483:14, 483:23, 484:2, 484:3, 486:11, 490:19, 491:6, 491:10, 555:19, 556:5
**join** [1] - 379:20
**joined** [1] - 373:8
**joint** [1] - 677:18
**Josie** [1] - 482:21
**jostling** [1] - 448:17
**journey** [1] - 543:19
**JUDGE** [1] - 358:12
**judge** [4] - 554:8, 622:13, 634:20, 682:25
**Judge** [10] - 423:14, 444:4, 453:13, 464:22, 511:25, 523:17, 629:10, 663:13, 664:11, 689:25
**judge's** [2] - 483:10, 526:7
**Judge's** [1] - 554:11
**juggle** [1] - 444:20
**July** [87] - 363:10, 363:24, 366:16, 368:15, 368:16, 370:25, 395:3, 397:10, 425:11, 437:6, 458:18,

488:19, 489:16, 490:5, 491:21, 495:11, 495:17, 495:23, 496:7, 497:9, 499:9, 501:10, 503:22, 504:7, 507:9, 507:16, 513:15, 518:7, 518:13, 518:22, 519:3, 520:10, 522:7, 527:7, 528:3, 529:11, 529:15, 533:9, 533:21, 539:17, 542:2, 543:13, 544:3, 545:23, 547:10, 549:10, 549:14, 552:21, 554:13, 554:20, 557:8, 568:24, 570:21, 571:13, 571:19, 571:20, 572:2, 573:3, 574:8, 575:2, 575:4, 575:7, 585:2, 585:8, 586:2, 586:25, 587:21, 587:24, 588:2, 588:19, 588:25, 589:9, 589:22, 590:5, 591:22, 592:11, 593:4, 593:18, 593:25, 623:21, 687:18, 690:13, 691:6, 691:7
**jumping** [1] - 433:25
**June** [55] - 376:6, 376:7, 389:25, 393:8, 397:13, 428:18, 486:17, 486:24, 488:18, 489:16, 490:4, 495:10, 495:19, 495:23, 508:12, 508:19, 511:13, 511:20, 519:8, 519:15, 526:9, 544:14, 544:24, 545:5, 545:6, 555:24, 556:22, 557:8, 557:12, 560:18, 564:12, 569:14, 574:23, 574:24, 575:5, 598:12, 598:16, 612:14, 614:6, 616:17, 616:24, 627:23, 628:10, 649:16, 650:14, 651:14, 652:2, 652:24, 656:7, 685:14, 685:18, 685:25, 686:14, 686:20, 687:12
**junior** [2] - 441:13, 641:23

## K

**Kanno** [2] - 492:21, 492:24
**Keep** [1] - 683:7
**keep** [11] - 454:14, 517:7, 543:10, 584:23, 587:8, 596:10, 635:21, 662:14, 662:22, 663:2, 689:10
**keeping** [1] - 663:5
**kept** [5] - 383:8, 428:8, 428:19, 490:2, 544:19
**key** [2] - 556:10, 636:9
**kids** [4] - 466:10, 467:11, 469:18, 674:14
**kind** [13] - 364:16, 365:11, 374:15, 380:19, 473:23,

475:8, 476:8, 483:19, 498:15, 537:4, 537:5, 624:5, 635:15
**Knowing** [1] - 552:9
**knowing** [1] - 519:10
**Knowledge** [2] - 633:23, 635:25
**knowledge** [5] - 373:22, 636:12, 649:6, 660:19, 668:18
**known** [9] - 375:10, 476:3, 500:23, 546:14, 547:24, 548:22, 593:17, 674:19, 675:12
**knows** [1] - 448:16
**Kristen** [1] - 410:17

## L

**LA** [1] - 509:19
**lack** [2] - 370:3, 620:24
**laid** [11] - 369:5, 369:7, 401:16, 401:25, 402:18, 402:22, 403:23, 594:11, 616:16, 620:5, 631:8
**language** [5] - 433:8, 547:15, 667:20, 668:25
**laptop** [2] - 488:7, 488:10
**large** [3] - 430:17, 436:5, 485:13
**larger** [1] - 658:8
**Last** [1] - 638:18
**last** [32] - 387:16, 387:17, 394:7, 404:12, 405:3, 405:23, 407:20, 408:2, 409:17, 421:5, 422:7, 464:5, 482:23, 520:23, 520:24, 537:6, 550:20, 568:9, 568:11, 604:3, 608:7, 624:18, 628:21, 632:7, 633:7, 637:3, 638:15, 638:16, 642:13, 645:16, 665:11, 673:15
**late** [2] - 443:22, 641:24
**Latest** [1] - 687:3
**latest** [1] - 687:11
**law** [6] - 399:11, 399:15, 399:18, 400:3, 400:12, 481:4
**Law** [1] - 399:16
**laws** [1] - 617:18
**lawsuit** [6] - 480:10, 480:14, 480:18, 528:12, 594:6, 631:15
**lawyer** [1] - 678:7
**layman** [1] - 481:7
**layoff** [2] - 618:7, 681:20
**layoffs** [11] - 403:2, 403:5, 616:18, 616:21, 616:23, 617:4, 617:9, 626:5, 626:10, 626:12, 681:13, 681:14
**leading** [3] - 519:14,

712

564:22, 652:2
**learn** [2] - 481:21, 573:15
**learned** [3] - 481:15, 555:22, 628:8
**learning** [1] - 521:21
**least** [11] - 385:3, 423:17, 443:7, 443:14, 471:12, 544:11, 552:10, 562:2, 592:14, 641:24, 680:2
**Leave** [12] - 426:16, 427:6, 461:9, 480:15, 549:23, 550:14, 665:16, 666:12, 667:12, 668:8, 668:12, 669:2
**leave** [224] - 375:22, 392:5, 417:15, 417:17, 417:24, 418:8, 418:13, 418:17, 422:4, 422:20, 423:3, 424:2, 425:8, 425:9, 425:25, 426:17, 426:19, 426:21, 427:2, 427:11, 427:12, 427:13, 427:16, 427:17, 427:21, 428:9, 428:14, 428:21, 452:25, 454:9, 455:3, 455:7, 455:11, 455:18, 458:2, 458:5, 458:19, 458:22, 459:15, 459:23, 459:25, 460:7, 460:14, 460:20, 460:24, 461:7, 461:8, 463:2, 463:4, 463:9, 464:11, 464:19, 465:16, 466:6, 466:7, 467:12, 467:18, 468:4, 468:8, 468:12, 469:11, 470:9, 470:17, 472:17, 472:24, 473:21, 474:23, 477:12, 479:4, 482:15, 482:16, 483:25, 484:6, 484:16, 484:18, 484:22, 484:23, 485:4, 485:24, 486:5, 487:2, 487:5, 487:7, 487:8, 487:12, 487:15, 487:18, 488:3, 490:11, 490:14, 490:20, 491:2, 491:7, 499:10, 499:18, 499:19, 500:3, 500:9, 501:2, 508:2, 508:14, 508:21, 509:8, 509:11, 509:16, 509:21, 510:2, 511:3, 511:15, 511:23, 513:24, 514:10, 514:18, 514:21, 514:22, 514:25, 515:4, 521:7, 521:11, 523:21, 524:9, 524:22, 525:3, 527:9, 530:10, 531:6, 532:3, 532:10, 532:13, 532:16, 532:19, 532:20, 532:22, 532:24, 532:25, 533:12, 533:18, 534:3, 534:15, 538:4, 544:9, 544:12, 544:15, 544:17, 545:6, 545:11, 546:7, 546:19, 547:17, 548:5, 548:12,

549:3, 550:2, 550:3, 551:2, 551:6, 551:14, 551:18, 551:25, 552:5, 552:6, 552:11, 552:17, 552:20, 553:21, 554:12, 555:20, 558:15, 558:25, 559:16, 559:22, 561:9, 563:10, 565:25, 566:3, 569:21, 570:17, 570:22, 571:8, 571:14, 571:15, 572:2, 581:12, 582:10, 582:13, 582:24, 584:16, 587:5, 587:24, 588:4, 589:17, 591:13, 591:15, 591:22, 592:2, 613:20, 660:5, 665:21, 669:3, 669:4, 669:7, 671:21, 672:11, 672:15, 672:21, 673:8, 673:11, 673:20, 674:5, 674:11, 674:13, 680:12, 685:8, 687:18, 690:21, 691:5, 691:17, 691:24
**leaves** [5] - 421:20, 481:16, 481:22, 483:16, 645:13
**Leaves** [3] - 421:25, 666:18, 667:18
**leaving** [-] - 362:25, 379:15, 379:17, 379:23, 387:10, 389:12, 514:25
**led** [1] - 413:12
**left** [31] - 368:23, 370:5, 370:8, 378:20, 379:12, 394:17, 414:11, 428:6, 428:17, 449:17, 450:12, 486:16, 486:24, 487:12, 488:8, 488:19, 491:25, 513:18, 526:8, 537:25, 544:24, 545:10, 555:23, 556:22, 564:15, 598:12, 604:11, 612:17, 648:25, 649:13, 682:23
**left-hand** [1] - 378:20
**legal** [-] - 400:23
**legally** [-] - 505:22
**legitimate** [1] - 500:9
**lending** [-] - 636:8
**length** [2] - 422:14, 440:16
**Lenore** [14] - 455:24, 458:16, 471:6, 485:23, 516:16, 531:5, 582:8, 582:25, 583:2, 585:18, 585:20, 587:11, 587:14
**less** [11] - 402:10, 441:15, 467:16, 467:18, 468:4, 469:11, 469:19, 473:8, 473:18, 609:16, 610:13
**letter** [60] - 372:13, 384:6, 384:21, 386:19, 404:10, 404:16, 405:20, 406:12, 407:5, 407:20, 452:3, 452:7, 452:12, 476:8, 543:13, 546:4, 546:22, 547:5, 547:9,

547:15, 547:18, 547:20, 549:7, 549:9, 549:17, 557:22, 557:23, 571:16, 571:18, 571:20, 572:4, 572:5, 572:6, 572:8, 572:20, 573:3, 573:4, 584:25, 586:25, 588:2, 590:5, 593:9, 593:13, 593:24, 628:6, 628:13, 628:19, 628:22, 629:4, 629:16, 640:9, 646:24, 677:6, 678:6, 683:10, 683:16, 683:18, 683:21, 691:20
**letting** [1] - 634:21
**level** [7] - 376:2, 527:2, 637:4, 645:6, 661:18, 663:25
**leverage** [1] - 446:19
**levered** [1] - 446:18
**LICUL** [7] - 359:11, 423:21, 579:14, 579:19, 693:20, 693:25, 694:6
**lied** [1] - 577:24
**light** [2] - 366:12, 482:11
**lighter** [1] - 521:9
**likely** [1] - 444:8
**Likewise** [1] - 649:22
**Lily** [2] - 522:18, 525:16
**limitation** [-] - 481:6
**limited** [2] - 608:8, 671:17
**limits** [2] - 509:18, 510:13
**line** [33] - 410:20, 412:17, 432:8, 466:24, 467:22, 504:11, 520:19, 542:3, 550:14, 550:16, 580:24, 581:15, 582:7, 584:9, 584:15, 585:14, 585:16, 587:17, 588:12, 589:3, 590:9, 590:15, 591:11, 592:6, 592:19, 623:11, 623:12, 626:16, 633:10, 638:14, 690:25
**lined** [1] - 624:17
**lines** [3] - 365:4, 581:3, 603:16
**link** [1] - 681:5
**LinkedIn** [5] - 364:7, 364:8, 380:12, 380:14, 380:15
**Lipkin** [1] - 432:19
**list** [4] - 498:4, 499:5, 677:2, 683:9
**listed** [3] - 391:22, 393:24, 402:15
**listened** [1] - 580:4
**live** [1] - 641:19
**LLP** [1] - 359:15
**LOA** [4] - 565:21, 566:8, 679:10, 679:17
**located** [1] - 405:4
**log** [6] - 382:15, 382:18, 382:22, 383:6, 383:8
**logistics** [1] - 525:25

**longest** [1] - 402:14
**longevity** [1] - 553:17
**look** [136] - 364:2, 365:7, 365:18, 370:20, 371:23, 372:7, 373:18, 373:20, 377:10, 378:4, 378:10, 378:20, 378:25, 380:7, 381:2, 382:12, 384:2, 384:21, 387:2, 387:11, 387:16, 387:25, 388:21, 389:4, 389:16, 390:19, 392:7, 392:16, 392:25, 393:19, 394:23, 395:9, 400:5, 402:3, 404:7, 405:23, 406:16, 406:22, 407:20, 408:11, 408:13, 409:16, 410:5, 410:23, 412:4, 412:19, 413:16, 414:8, 414:13, 416:16, 420:10, 421:5, 422:25, 423:7, 426:11, 434:15, 446:12, 448:14, 449:5, 449:12, 449:17, 450:5, 451:7, 453:9, 456:11, 458:7, 458:9, 465:22, 491:18, 493:23, 497:24, 501:8, 503:15, 520:23, 522:16, 535:24, 541:20, 543:12, 550:10, 553:8, 578:25, 582:5, 585:18, 588:2, 591:10, 592:18, 604:16, 608:6, 608:25, 610:8, 619:13, 621:4, 623:11, 623:22, 623:23, 624:6, 624:8, 625:20, 626:15, 626:23, 628:5, 628:13, 628:21, 629:15, 631:11, 631:25, 632:7, 633:7, 633:25, 637:14, 640:8, 642:13, 646:23, 649:22, 650:6, 652:8, 652:25, 656:5, 658:10, 658:11, 658:20, 666:3, 667:17, 668:18, 670:17, 678:12, 679:19, 680:20, 682:17, 683:25, 685:24, 686:23, 689:9, 689:16, 689:17, 691:19
**Look** [1] - 590:10
**looked** [15] - 380:19, 380:22, 380:23, 380:24, 413:14, 420:13, 446:16, 461:24, 462:9, 518:8, 518:15, 567:19, 568:2, 607:2
**looking** [32] - 365:3, 366:3, 366:14, 368:22, 369:21, 373:14, 373:19, 404:15, 405:19, 449:14, 450:12, 467:6, 492:18, 495:5, 513:14, 525:20, 541:25, 550:18, 565:7, 565:9, 571:18, 597:21, 604:22, 604:23, 605:7, 617:11,

713

622:17, 623:16, 624:5,
633:19, 659:18, 682:5
  **Looking** [1] - 648:18
  **Looks** [1] - 621:14
  **Lord** - 371:4
  lose [4] - 584:25, 586:18,
603:25
  **losing** [2] - 397:4, 604:23
  **loss** [2] - 370:11, 397:4
  **Lost** [2] - 652:22, 656:6
  lost [13] - 371:6, 389:23,
390:6, 392:23, 393:3, 396:8,
397:18, 397:19, 619:22,
624:15, 625:13, 670:20
  low [2] - 607:21, 658:18
  **Lowenthal** [160] - 362:24,
405:18, 416:13, 417:3,
419:17, 419:20, 420:4,
421:2, 421:16, 429:22,
429:25, 432:7, 451:12,
452:19, 452:24, 453:5,
454:6, 454:7, 455:2, 455:16,
455:20, 458:17, 459:2,
463:22, 463:23, 463:25,
464:6, 465:6, 465:15, 472:7,
476:19, 476:21, 476:24,
479:2, 479:6, 485:8, 485:22,
486:4, 486:14, 486:25,
487:6, 516:24, 517:2,
517:11, 527:16, 528:17,
529:10, 529:14, 530:7,
530:9, 530:13, 530:22,
531:4, 531:12, 531:16,
531:25, 532:9, 532:18,
533:5, 533:11, 533:17,
533:21, 533:25, 534:6,
534:13, 534:20, 536:9,
536:18, 538:20, 542:2,
542:19, 542:20, 543:6,
543:14, 543:21, 544:7,
544:24, 545:10, 545:23,
547:23, 548:4, 549:10,
549:16, 549:21, 554:12,
556:3, 557:17, 558:8,
558:14, 559:21, 567:16,
568:5, 568:22, 570:8,
570:12, 570:15, 571:7,
571:12, 571:24, 573:9,
573:14, 573:24, 574:7,
574:22, 575:6, 575:12,
575:17, 575:24, 576:10,
576:24, 577:7, 577:13,
580:9, 580:13, 580:18,
581:19, 582:6, 582:17,
582:20, 583:8, 583:21,
584:18, 585:7, 585:12,
585:16, 585:21, 585:24,
586:6, 586:15, 587:7,
587:17, 588:10, 588:18,
588:22, 589:8, 589:15,
589:23, 590:9, 590:16,
591:14, 591:17, 591:25,

592:10, 592:19, 594:4,
594:8, 600:10, 602:14,
603:6, 603:16, 603:20,
608:14, 611:25, 630:19,
650:14, 650:17, 675:2,
676:17, 693:3
  **Lowenthal 's** [9] - 451:14,
543:13, 545:14, 548:22,
570:21, 586:9, 587:10,
691:11, 691:20
  lower [1] - 604:2
  **Lucila** [6] - 439:22, 439:23,
441:5, 445:19, 675:23, 676:4
  **Lucila's** [1] - 445:17
  **lunch** [4] - 398:13, 398:15,
398:16, 512:2
  **Luncheon** [1] - 512:10
  lying [3] - 582:21, 582:23,
584:3
  **Lynn** [12] - 481:20, 482:14,
482:17, 482:20, 482:23,
483:2, 484:14, 490:19,
551:17, 553:11, 555:6, 556:5
  **Lynn's** [2] - 483:6, 484:6

## M

  **Madison** [1] - 405:5
  **mail** [169] - 370:24, 371:5,
410:17, 411:5, 411:6,
412:11, 412:19, 420:13,
420:19, 420:22, 425:10,
428:23, 432:3, 432:7,
432:23, 434:3, 434:15,
438:4, 456:10, 456:13,
456:17, 457:4, 457:13,
458:7, 458:14, 459:3, 459:6,
459:19, 460:19, 461:3,
461:13, 461:19, 463:13,
463:23, 463:25, 464:6,
465:6, 489:11, 491:21,
492:16, 492:20, 493:9,
493:23, 494:15, 494:19,
494:23, 496:25, 497:8,
497:18, 497:25, 499:8,
499:25, 503:21, 504:6,
507:9, 510:7, 510:11,
510:24, 511:4, 513:15,
513:17, 513:23, 514:7,
514:10, 514:19, 514:21,
515:7, 515:18, 515:23,
516:10, 516:17, 516:24,
517:3, 517:15, 518:3, 518:7,
518:13, 518:14, 518:18,
518:21, 519:2, 519:21,
520:10, 520:18, 521:9,
521:11, 522:8, 523:9,
523:16, 523:25, 524:7,
524:19, 527:6, 528:4,
528:15, 528:17, 529:4,
529:14, 529:15, 533:10,

536:17, 537:20, 539:17,
540:2, 540:4, 540:5, 540:6,
540:8, 540:15, 540:19,
540:24, 541:3, 541:7,
541:17, 541:19, 541:25,
542:2, 542:12, 542:15,
542:20, 543:6, 543:13,
545:3, 545:22, 548:10,
549:13, 551:11, 551:13,
558:17, 568:4, 568:9,
570:21, 588:19, 589:16,
589:25, 619:21, 620:11,
621:5, 621:8, 622:17,
622:21, 623:6, 624:11,
626:2, 665:10, 665:12,
665:13, 665:14, 665:15,
665:20, 676:24, 679:22,
679:25, 680:2, 680:3,
680:21, 687:17, 689:13,
689:17, 689:18, 691:12,
692:5
  mail's [1] - 524:11
  mailing [2] - 457:8, 558:24
  mails [24] - 366:3, 366:10,
381:6, 381:9, 488:20,
488:22, 489:2, 494:2,
498:18, 517:16, 538:3,
539:13, 539:20, 539:23,
540:14, 540:18, 541:8,
542:9, 618:13, 619:16,
620:22, 622:12, 665:12,
689:21
  main [1] - 546:3
  major [2] - 386:25, 436:3
  male [7] - 415:5, 415:19,
416:2, 416:14, 479:8,
479:15, 555:18
  man [3] - 477:21, 478:24,
539:6
  management [3] - 365:13,
485:18, 619:9
  manager [10] - 484:5,
484:7, 498:20, 500:12,
500:14, 500:24, 510:16,
511:9, 552:7, 608:13
  managers [3] - 364:18,
484:15, 563:14
  managing [8] - 434:25,
504:24, 504:25, 505:4,
505:6, 598:10, 598:11,
598:15
  manner [2] - 481:9, 639:9
  manual [4] - 416:17,
456:24, 490:17, 667:2
  March [8] - 358:16, 414:9,
480:21, 650:7, 656:8,
695:11, 695:20
  marked [3] - 496:11,
682:10, 687:22
  market [4] - 365:2, 439:21,
535:22, 574:16
  marketing [1] - 535:20

  markets [3] - 432:17,
641:19, 676:5
  marriage [1] - 695:15
  marvelous [1] - 543:17
  massive [1] - 496:23
  match [1] - 630:20
  material [2] - 551:2, 691:24
  materials [2] - 550:5, 689:2
  maternity [2] - 466:7, 552:6
  **Maternity/Paternity** [1] -
458:15
  math [3] - 374:25, 445:8,
570:5
  **mathematically** [1] -
374:23
  matter [2] - 690:17, 695:16
  matters [4] - 501:12,
502:24, 503:9, 554:7
  maximum [2] - 374:15,
374:19
  **McPherson** [10] - 412:12,
412:14, 412:20, 413:3,
420:6, 420:14, 420:19,
680:4, 680:21, 681:7
  mean [40] - 364:25, 373:17,
373:18, 375:6, 390:3, 391:6,
398:15, 411:14, 428:22,
446:8, 453:13, 469:20,
475:19, 475:23, 489:24,
501:21, 510:5, 526:25,
535:4, 560:4, 575:2, 577:21,
583:15, 584:23, 594:18,
599:25, 603:22, 604:10,
605:14, 606:9, 609:23,
614:3, 619:7, 626:12,
640:22, 666:22, 667:3,
668:13, 676:2, 686:18
  **Meaning** [1] - 658:18
  means [3] - 396:16, 460:2,
676:3
  meant [4] - 559:8, 559:11,
674:16, 687:11
  measure [1] - 681:20
  medical [3] - 397:21,
426:18, 685:8
  **Medical** [9] - 426:16, 427:6,
461:9, 480:15, 549:23,
550:14, 665:16, 666:12,
667:12
  medications [1] - 662:8
  meet [1] - 498:15
  meeting [3] - 477:5, 594:21,
594:23
  meetings [1] - 605:21
  member [3] - 426:20,
426:21, 639:6
  members [1] - 641:20
  mental [1] - 662:4
  mentally [1] - 428:8
  mention [1] - 445:20
  mentioned [3] - 485:2,

586:23, 675:20
  **mentor** [1] - 447:6
  **message** [1] - 574:15
  **met** [4] - 466:4, 615:2,
617:12, 642:22
  **metals** [4] - 431:18, 433:4,
433:15, 648:6
  **mgibson @ssbb.com** [1] -
359:20
  **MICHAEL** [2] - 358:12,
359:19
  **mid** [2] - 501:10
  **middle** [3] - 609:9, 626:15,
665:14
  **midmorning** [2] - 398:15,
464:23
  **might** [18] - 369:9, 369:10,
439:20, 445:4, 448:22,
456:24, 458:9, 473:17,
509:2, 552:15, 566:19,
589:11, 615:4, 617:17,
628:9, 669:19, 674:18,
674:19
  **Might** [1] - 505:9
  **Mike** [25] - 374:13, 414:2,
418:25, 443:11, 449:15,
457:7, 486:23, 506:12,
508:9, 511:16, 534:10,
555:15, 557:11, 562:13,
567:21, 580:5, 599:18,
615:24, 619:19, 628:20,
628:22, 630:7, 640:2,
647:19, 686:7
  **MILLER** [4] - 677:13,
677:18, 688:3, 688:12
  **Miller** [1] - 360:3
  **million** [1] - 375:9
  **mind** [4] - 584:23, 653:16,
677:3, 688:14
  **mine** [2] - 655:22, 661:20
  **minimum** [2] - 385:14,
443:7
  **mining** [6] - 431:19, 433:4,
433:15, 598:22, 598:25,
648:6
  **minus** [2] - 392:15, 609:18
  **minute** [1] - 398:18
  **minutes** [13] - 398:11,
398:13, 438:10, 440:13,
440:21, 445:5, 445:8, 461:4,
495:8, 512:9, 629:8, 663:13,
682:24
  **mischar** [1] - 582:22
  **mischaracterizing** [1] -
582:23
  **misconduct** [1] - 376:17
  **misleading** [1] - 471:13
  **mismatched** [1] - 653:11
  **misremembered** [1] -
545:24
  **missing** [3] - 447:4, 682:6,

682:10
  **misspoke** [2] - 387:13,
555:3
  **mistake** [5] - 466:9, 467:10,
493:14, 621:16, 674:13
  **mistakes** [2] - 446:13,
674:10
  **misunderstanding** [1] -
557:24
  **mitigate** [1] - 447:5
  **model** [2] - 446:15, 590:17
  **modified** [1] - 408:4
  **mom's** [1] - 505:5
  **moment** [2] - 504:12,
506:18
  **money** [4] - 377:21, 553:25,
657:19, 658:7
  **Monica** [3] - 628:20,
628:23, 634:23
  **month** [16] - 484:22,
486:21, 491:25, 492:4,
507:12, 562:2, 571:2, 571:9,
572:10, 572:22, 573:17,
582:9, 623:17, 623:20,
624:4, 674:8
  **months** [31] - 363:11,
363:16, 386:3, 469:19,
469:20, 473:9, 474:7, 475:5,
475:7, 482:19, 482:22,
482:23, 482:24, 519:4,
520:11, 543:7, 546:15,
547:25, 548:23, 553:9,
555:9, 556:13, 569:23,
569:24, 569:25, 570:4,
572:11, 596:25, 614:10,
655:9, 674:7
  **Morgan** [2] - 401:3,
402:11, 402:19, 405:6,
405:13, 405:17, 429:7,
429:10, 429:14, 429:21,
430:3, 430:6, 438:16,
452:16, 537:24, 602:22,
622:22, 622:23, 623:2, 623:6
  **Morgan's** [1] - 405:8
  **morning** [49] - 362:8,
362:9, 399:4, 399:5, 436:9,
436:13, 437:4, 437:14,
438:10, 438:14, 438:18,
438:25, 441:24, 442:3,
443:8, 443:18, 458:17,
469:25, 535:6, 535:9,
535:10, 535:17, 535:21,
536:10, 536:23, 537:4,
537:8, 537:10, 537:12,
537:18, 537:25, 538:8,
538:15, 538:16, 574:8,
574:15, 594:21, 594:22,
595:4, 595:6, 605:15,
605:18, 606:6, 606:12,
606:18, 639:14, 640:18,
683:6
  **Morning** [1] - 595:10

  **most** [8] - 466:17, 466:18,
467:9, 500:18, 501:24,
604:5, 647:6, 658:19
  **Most** [2] - 403:12, 501:22
  **mothers** [1] - 466:11
  **mouth** [1] - 554:25
  **moving** [1] - 390:15
  **MR** [217] - 361:6, 361:7,
361:8, 361:9, 362:7, 387:9,
398:8, 398:11, 398:19,
398:21, 399:3, 423:5, 423:9,
423:10, 423:12, 423:19,
423:21, 423:22, 423:23,
425:12, 425:14, 425:18,
425:21, 441:16, 442:2,
444:4, 447:16, 453:8,
453:12, 453:13, 453:24,
453:25, 454:3, 464:22,
465:3, 465:4, 466:22, 467:2,
471:11, 471:15, 471:19,
471:23, 472:2, 472:13,
472:14, 474:11, 483:9,
488:6, 493:8, 495:19,
495:20, 495:22, 496:10,
496:19, 496:21, 496:23,
497:3, 497:6, 501:3, 503:24,
504:2, 506:2, 506:7, 506:11,
506:14, 511:25, 512:5,
512:7, 513:8, 515:2, 515:5,
523:16, 523:18, 525:8,
535:24, 536:2, 536:3, 536:5,
536:6, 538:12, 554:6,
572:14, 572:15, 578:4,
578:13, 578:16, 578:19,
578:23, 579:4, 579:8,
579:10, 579:11, 579:14,
579:18, 579:19, 579:22,
579:24, 586:4, 586:5,
591:20, 597:18, 597:20,
597:24, 598:2, 606:14,
609:21, 609:23, 610:3,
610:5, 610:7, 621:11,
621:14, 621:15, 621:17,
621:19, 621:21, 621:23,
621:25, 622:7, 622:8, 622:9,
622:11, 622:13, 622:15,
622:16, 627:2, 627:3, 629:7,
629:9, 629:10, 629:13,
632:5, 632:10, 632:15,
632:18, 635:8, 635:19,
661:5, 661:7, 663:12,
663:16, 663:18, 663:21,
664:2, 664:3, 664:4, 664:6,
664:8, 664:10, 665:3, 665:7,
665:9, 670:2, 676:25, 677:5,
677:8, 677:11, 677:16,
677:20, 678:2, 678:5,
678:20, 678:23, 679:2,
681:23, 682:3, 682:9,
682:11, 682:12, 682:14,
682:19, 682:22, 682:24,
682:25, 683:4, 683:7,

683:10, 683:15, 686:4,
686:8, 687:21, 687:24,
687:25, 688:4, 688:6, 688:8,
688:9, 688:11, 688:13,
688:16, 688:19, 688:20,
688:23, 688:25, 689:5,
689:8, 689:11, 689:12,
689:24, 689:25, 690:6,
692:10, 692:11, 692:15,
692:21, 692:23, 693:12,
693:14, 693:15, 693:20,
693:21, 693:22, 693:23,
693:25, 694:6, 694:11,
694:14
  **MS** [4] - 677:13, 677:18,
688:3, 688:12
  **multiple** [4] - 622:11,
658:13, 659:2, 673:15
  **Mulvenna** [3] - 358:23,
695:8, 695:22
  **munis** [1] - 432:20
  **must** [3] - 422:10, 494:4,
621:16

---

## N

  **Name** [1] - 410:25
  **name** [15] - 411:2, 436:22,
437:4, 451:11, 493:14,
538:2, 538:14, 541:6, 574:9,
574:15, 606:6, 606:11,
606:16, 615:17, 676:8
  **narrative** [2] - 486:3, 506:3
  **narrow** [1] - 442:21
  **nature** [1] - 672:3
  **necessarily** [1] - 473:2
  **need** [37] - 365:25, 398:6,
404:21, 413:4, 420:11,
427:17, 428:14, 442:8,
443:10, 445:19, 453:16,
453:19, 466:10, 466:18,
467:10, 498:11, 499:20,
501:7, 502:6, 535:24, 544:7,
544:11, 549:17, 576:7,
589:17, 589:18, 620:10,
635:22, 640:10, 641:21,
664:2, 665:20, 665:21,
668:19, 674:14, 688:2
  **needed** [19] - 422:9, 460:6,
460:13, 498:24, 500:16,
500:17, 501:17, 501:19,
508:3, 508:24, 509:4,
522:10, 530:14, 531:16,
531:21, 532:5, 554:17,
586:22, 586:23
  **needs** [6] - 493:5, 493:6,
516:10, 517:17, 544:14
  **negative** [2] - 643:5, 643:9
  **negotiated** [1] - 552:6
  **net** [1] - 389:4
  **network** [3] - 364:6, 380:15,

715

398:6
**networked** [1] - 364:3
**Networked** [1] - 364:8
**networking** [6] - 366:4,
366:11, 380:8, 380:9,
381:15, 382:21
**never** [52] - 398:4, 400:2,
406:4, 415:16, 415:23,
416:5, 416:11, 426:25,
427:21, 430:17, 432:5,
439:2, 443:11, 451:4,
451:21, 468:7, 468:11,
468:14, 468:19, 468:24,
469:5, 469:10, 469:20,
470:13, 473:21, 473:22,
473:25, 476:12, 476:21,
508:13, 508:19, 509:6,
511:11, 511:21, 524:12,
530:13, 530:22, 534:4,
549:4, 552:22, 556:25,
563:20, 582:24, 592:23,
593:16, 593:21, 602:23,
607:11, 615:2, 641:3, 652:5,
662:4
**new** [8] - 445:21, 499:17,
506:24, 535:12, 543:15,
560:13, 617:11, 635:18
**New** [14] - 358:15, 359:7,
359:17, 399:24, 480:12,
521:19, 525:25, 529:22,
560:2, 650:4, 695:9
**NEW** [2] - 695:4, 695:6
**newborn** [4] - 468:16,
468:21, 505:6, 521:25
**news** [2] - 442:18, 443:17
**next** [25] - 363:4, 389:8,
392:8, 393:19, 406:23,
411:2, 411:5, 421:2, 426:12,
462:14, 472:12, 516:4,
550:11, 564:8, 568:18,
575:12, 617:13, 623:11,
623:12, 624:8, 625:20,
653:24, 661:13, 662:15,
687:3
**NGO** [337] - 358:4, 361:4,
362:1, 362:2, 363:1, 364:1,
365:1, 366:1, 367:1, 368:1,
369:1, 370:1, 371:1, 372:1,
373:1, 374:1, 375:1, 376:1,
377:1, 378:1, 379:1, 380:1,
381:1, 382:1, 383:1, 384:1,
385:1, 386:1, 387:1, 388:1,
389:1, 390:1, 391:1, 392:1,
393:1, 394:1, 395:1, 396:1,
397:1, 398:1, 399:1, 400:1,
401:1, 402:1, 403:1, 404:1,
405:1, 406:1, 407:1, 408:1,
409:1, 410:1, 411:1, 412:1,
413:1, 414:1, 415:1, 416:1,
417:1, 418:1, 419:1, 420:1,
421:1, 422:1, 423:1, 424:1,
425:1, 426:1, 427:1, 428:1,

429:1, 430:1, 431:1, 432:1,
433:1, 434:1, 435:1, 436:1,
437:1, 438:1, 439:1, 440:1,
441:1, 442:1, 443:1, 444:1,
445:1, 446:1, 447:1, 448:1,
449:1, 450:1, 451:1, 452:1,
453:1, 454:1, 455:1, 456:1,
457:1, 458:1, 459:1, 460:1,
461:1, 462:1, 463:1, 464:1,
465:1, 466:1, 467:1, 468:1,
469:1, 470:1, 471:1, 472:1,
473:1, 474:1, 475:1, 476:1,
477:1, 478:1, 479:1, 480:1,
481:1, 482:1, 483:1, 484:1,
485:1, 486:1, 487:1, 488:1,
489:1, 490:1, 491:1, 492:1,
493:1, 494:1, 495:1, 496:1,
497:1, 498:1, 499:1, 500:1,
501:1, 502:1, 503:1, 504:1,
505:1, 506:1, 507:1, 508:1,
509:1, 510:1, 511:1, 512:1,
513:1, 513:4, 514:1, 515:1,
516:1, 517:1, 518:1, 519:1,
520:1, 521:1, 522:1, 523:1,
524:1, 525:1, 526:1, 527:1,
528:1, 529:1, 530:1, 531:1,
532:1, 533:1, 534:1, 535:1,
536:1, 537:1, 538:1, 539:1,
540:1, 541:1, 542:1, 543:1,
544:1, 545:1, 546:1, 547:1,
548:1, 549:1, 550:1, 551:1,
552:1, 553:1, 554:1, 555:1,
556:1, 557:1, 558:1, 559:1,
560:1, 561:1, 562:1, 563:1,
564:1, 565:1, 566:1, 567:1,
568:1, 569:1, 570:1, 571:1,
572:1, 573:1, 574:1, 575:1,
576:1, 577:1, 578:1, 579:1,
580:1, 581:1, 582:1, 583:1,
584:1, 585:1, 586:1, 587:1,
588:1, 589:1, 590:1, 591:1,
592:1, 593:1, 594:1, 595:1,
596:1, 597:1, 598:1, 599:1,
600:1, 601:1, 602:1, 603:1,
604:1, 605:1, 606:1, 607:1,
608:1, 609:1, 610:1, 611:1,
612:1, 613:1, 614:1, 615:1,
616:1, 617:1, 618:1, 619:1,
620:1, 621:1, 622:1, 623:1,
624:1, 625:1, 626:1, 627:1,
628:1, 629:1, 630:1, 631:1,
632:1, 633:1, 634:1, 635:1,
636:1, 637:1, 638:1, 639:1,
640:1, 641:1, 642:1, 643:1,
644:1, 645:1, 646:1, 647:1,
648:1, 649:1, 650:1, 651:1,
652:1, 653:1, 654:1, 655:1,
656:1, 657:1, 658:1, 659:1,
660:1, 661:1, 662:1, 663:1,
664:1, 665:1, 666:1, 667:1,
668:1, 669:1, 670:1, 671:1,
672:1, 673:1, 674:1, 675:1,

676:1, 677:1, 678:1, 679:1,
680:1, 681:1, 682:1, 683:1,
684:1, 685:1, 686:1, 687:1,
688:1, 689:1, 690:1, 691:1,
692:1, 693:1, 694:1
**Ngo** [90] - 360:10, 362:8,
372:9, 383:11, 399:4, 400:8,
402:3, 403:2, 406:4, 411:25,
414:24, 415:15, 416:10,
417:18, 418:9, 420:2, 421:8,
421:14, 422:25, 423:25,
425:22, 426:24, 427:20,
430:18, 432:2, 435:21,
437:16, 448:16, 448:24,
449:9, 451:21, 452:16,
453:20, 454:4, 461:15,
462:3, 464:9, 465:5, 466:4,
466:5, 466:12, 468:9, 481:4,
490:6, 493:10, 493:17,
496:25, 497:7, 502:8,
508:11, 511:9, 513:9,
513:21, 517:10, 532:12,
536:12, 543:5, 543:20,
546:22, 554:10, 555:16,
557:4, 557:6, 558:22, 570:2,
570:17, 574:2, 574:7,
578:17, 578:24, 579:25,
593:3, 594:3, 596:24,
610:25, 629:14, 643:14,
652:14, 652:23, 655:12,
656:7, 661:8, 663:17, 665:4,
670:10, 678:12, 681:11,
683:16, 690:7, 692:6
**Ngo's** [4] - 423:19, 573:25,
690:20, 691:4
**nice** [1] - 568:20
**Nineteen** [1] - 569:22
**Nobody** [2] - 560:15,
562:23
**nobody** [3] - 562:20,
691:15, 693:12
**non** [2] - 365:9, 405:25
**non-guaranteed** [1] -
405:25
**non-Wall** [1] - 365:9
**nondenominational** [2] -
438:23, 606:17
**Nondiscrimination** [1] -
414:12
**nondiscriminatory** [1] -
639:5
**none** [1] - 582:9
**None** [1] - 470:21
**nonetheless** [1] - 584:21
**nonstandard** [1] - 582:11
**noon** [1] - 693:4
**normal** [3] - 374:17, 603:4,
646:2
**normally** [1] - 444:8
**Notary** [1] - 695:9
**note** [10] - 400:10, 400:19,

409:16, 466:3, 494:22,
500:19, 578:10, 679:9,
679:13, 679:17
**notes** [1] - 579:19
**Notes** [1] - 450:6
**Nothing** [1] - 692:11
**nothing** [3] - 428:7, 453:20,
665:16
**notice** [7] - 427:15, 427:18,
428:15, 449:2, 617:15,
628:12, 690:10
**noticed** [1] - 632:9
**notices** [1] - 476:12
**notified** [3] - 437:9, 437:12,
546:5
**notions** [1] - 636:3
**November** [55] - 362:11,
367:21, 367:23, 367:25,
386:17, 397:12, 410:18,
411:25, 412:10, 412:23,
413:9, 417:2, 417:25,
419:18, 420:3, 420:17,
421:2, 437:8, 437:9, 543:8,
549:8, 551:11, 562:10,
566:10, 566:24, 569:4,
569:5, 569:9, 569:14, 570:9,
570:13, 572:5, 572:7,
573:24, 575:12, 575:24,
576:10, 584:24, 591:2,
593:9, 593:24, 594:14,
594:16, 595:2, 645:5,
650:17, 676:12, 676:15,
676:17, 676:21, 680:8,
681:5, 690:9, 690:11, 692:7
**nowhere** [1] - 515:7
**nuance** [1] - 503:11
**Number** [2] - 413:25,
633:23
**number** [36] - 377:24,
379:2, 391:5, 391:10,
391:21, 391:22, 391:25,
392:17, 392:18, 394:24,
394:25, 414:9, 423:13,
442:17, 475:7, 492:7, 550:7,
555:6, 600:23, 601:12,
602:25, 604:2, 607:4, 609:3,
610:2, 621:6, 630:20,
636:22, 644:15, 644:25,
654:14, 655:25, 657:25,
658:13
**numbered** [1] - 633:22
**numbering** [1] - 413:23
**numbers** [12] - 390:25,
393:10, 393:12, 393:24,
446:12, 563:21, 564:8,
596:5, 607:11, 655:3,
655:23, 661:19

---

# O

**o'clock** [1] - 578:11

716

**objection** [13] - 424:4, 426:3, 453:19, 453:23, 454:18, 497:3, 677:7, 677:25, 682:13, 682:18, 683:12, 689:3, 689:5

**objections** [1] - 496:19

**obligation** [1] - 446:4

**obtain** [1] - 399:14

**obviously** [14] - 373:21, 489:5, 535:4, 547:19, 588:24, 593:20, 600:2, 604:22, 615:15, 615:16, 625:15, 636:19, 638:23, 643:10

**occasion** [1] - 510:17

**occasions** [1] - 539:25

**occur** [2] - 414:17, 641:20

**occurred** [3] - 424:17, 690:20, 691:4

**October** [20] - 379:21, 380:2, 380:20, 381:18, 382:7, 386:16, 429:14, 439:17, 441:17, 443:3, 449:6, 449:12, 449:13, 450:3, 451:4, 480:4, 562:7, 568:4, 645:22, 670:8

**OF** [4] - 359:4, 359:14, 695:4, 695:6

**offer** [36] - 367:8, 368:11, 372:10, 372:13, 384:6, 384:21, 386:19, 404:10, 405:20, 406:12, 407:5, 407:20, 407:23, 408:3, 425:2, 443:13, 452:3, 476:8, 507:24, 524:3, 549:25, 605:8, 618:4, 618:6, 620:10, 628:2, 628:5, 628:11, 628:13, 628:19, 628:22, 629:16, 629:18, 640:9, 646:21, 646:24

**offered** [17] - 368:16, 368:17, 382:2, 382:5, 382:6, 500:4, 509:3, 518:22, 534:16, 571:25, 628:8, 644:18, 644:20, 647:16, 647:23, 648:2, 648:5

**offering** [3] - 507:19, 508:7, 572:11

**offers** [5] - 389:13, 389:14, 407:24, 618:24, 646:20

**office** [80] - 412:24, 417:23, 422:15, 422:21, 428:6, 428:18, 454:16, 456:5, 468:15, 468:20, 469:7, 485:10, 486:24, 487:12, 489:17, 491:12, 492:2, 499:21, 500:11, 501:12, 502:17, 502:24, 503:8, 511:2, 513:18, 515:8, 515:11, 515:14, 515:17, 515:22, 515:24, 516:2, 516:8, 516:14, 516:21,

517:8, 517:22, 518:23, 522:10, 522:14, 526:9, 529:4, 530:15, 531:17, 534:17, 538:21, 539:2, 544:24, 546:6, 547:25, 548:5, 549:17, 556:22, 557:3, 557:8, 557:15, 564:16, 567:4, 567:11, 568:23, 571:2, 571:9, 572:10, 572:12, 572:22, 572:24, 573:16, 587:21, 588:16, 596:24, 598:12, 600:12, 600:21, 601:4, 601:14, 613:2, 632:11, 641:18, 641:25, 655:9

**officer** [1] - 408:5

**officially** [1] - 640:14

**often** [3] - 489:2, 489:19, 595:2

**oil** [2] - 435:18, 442:9

**Oil** [1] - 435:19

**OK** [3] - 492:9, 492:11, 493:10

**old** [1] - 622:24

**Olivia** [1] - 624:11

**ON** [2] - 359:4, 359:14

**once** [12] - 415:16, 424:5, 425:3, 431:13, 489:22, 508:20, 511:11, 511:21, 538:14, 625:6, 627:12, 627:19

**One** [4] - 403:5, 491:14, 536:14, 583:20

**one** [88] - 367:12, 376:8, 404:21, 422:5, 424:7, 430:15, 430:24, 431:4, 431:8, 433:10, 436:8, 443:18, 444:3, 445:23, 449:5, 449:8, 449:11, 451:17, 463:11, 465:13, 465:19, 476:12, 476:18, 480:2, 493:19, 494:9, 494:12, 495:4, 500:19, 503:25, 507:20, 508:7, 510:3, 514:11, 514:12, 519:9, 524:15, 531:4, 535:10, 537:5, 541:14, 547:3, 556:14, 566:10, 567:16, 574:11, 578:25, 583:6, 583:24, 599:20, 605:13, 609:5, 609:18, 611:8, 619:17, 619:20, 620:22, 622:18, 624:15, 626:2, 626:7, 626:17, 630:18, 631:23, 632:6, 633:16, 635:11, 640:6, 640:9, 641:24, 647:7, 648:24, 652:5, 653:14, 660:2, 666:23, 670:11, 675:22, 675:23, 677:3, 677:19, 677:22, 682:9, 683:4, 688:7, 688:13, 691:8,

694:4

**one-off** [1] - 433:10

**ones** [2] - 394:20, 637:6

**online** [1] - 669:21

**OPCO** [12] - 410:9, 410:10, 413:24, 414:3, 419:2, 419:7, 421:19, 426:12, 449:7, 566:8, 609:5, 678:16

**open** [4] - 543:6, 642:17, 692:5, 692:7

**opened** [3] - 549:6, 549:7, 549:9

**Oppenheimer** [220] - 360:5, 360:6, 363:2, 363:5, 363:9, 363:12, 363:19, 366:22, 368:22, 368:24, 369:14, 369:16, 369:25, 370:5, 370:8, 370:14, 371:7, 371:16, 371:20, 372:2, 372:3, 383:7, 383:9, 389:12, 389:24, 390:7, 391:3, 391:8, 392:23, 393:4, 394:2, 394:18, 395:24, 396:2, 396:13, 396:25, 402:13, 403:20, 404:4, 404:5, 404:10, 405:9, 405:14, 405:17, 406:5, 406:9, 406:17, 406:20, 407:6, 407:16, 408:5, 408:8, 408:22, 409:5, 409:14, 409:24, 410:18, 411:18, 411:24, 412:12, 412:18, 414:25, 415:4, 415:8, 415:16, 416:11, 417:3, 417:14, 418:8, 418:12, 418:17, 419:14, 419:24, 421:15, 423:3, 424:2, 426:15, 426:25, 429:15, 430:5, 430:18, 430:20, 434:5, 435:13, 436:4, 438:20, 450:18, 451:5, 451:22, 461:14, 464:10, 464:18, 469:6, 479:21, 479:25, 480:11, 481:15, 482:4, 490:6, 490:9, 490:13, 496:3, 496:4, 502:13, 502:14, 504:14, 508:13, 508:20, 509:7, 511:12, 511:22, 526:24, 528:12, 539:5, 544:9, 544:16, 549:25, 555:23, 556:16, 562:10, 562:17, 564:2, 564:4, 564:12, 564:23, 565:7, 565:9, 567:12, 568:19, 569:18, 576:2, 576:5, 576:12, 576:17, 590:20, 590:24, 591:8, 595:12, 595:18, 596:13, 596:21, 597:6, 597:8, 597:13, 598:5, 605:11, 606:18, 611:14, 611:20, 612:14, 612:24, 613:9,

613:14, 613:21, 613:25, 614:5, 614:9, 616:7, 616:17, 616:23, 617:4, 618:10, 619:4, 619:23, 620:11, 620:15, 620:23, 623:7, 624:16, 626:5, 626:10, 627:21, 628:3, 629:23, 630:6, 630:11, 631:2, 641:3, 647:7, 647:16, 647:22, 648:16, 649:20, 650:2, 651:5, 652:6, 652:23, 655:13, 655:18, 656:7, 656:17, 657:12, 657:20, 657:21, 658:7, 659:8, 659:15, 659:24, 660:8, 660:23, 661:14, 662:12, 662:15, 662:23, 666:13, 667:12, 670:5, 670:24, 672:16, 673:6, 676:3, 678:7, 679:16, 680:4, 681:13, 681:19, 685:5, 686:20, 687:13, 691:16

**OPPENHEIMER** [1] - 358:7

**Oppenheimer 's** [18] - 397:24, 415:23, 416:6, 417:7, 420:5, 422:19, 425:25, 428:9, 428:20, 455:21, 457:20, 463:15, 478:22, 485:23, 544:20, 546:16, 548:25, 587:11

**opportunity** [4] - 423:7, 502:3, 544:8, 572:23

**opposed** [2] - 654:7, 673:25

**option** [1] - 384:10

**options** [1] - 364:21

**ordeal** [1] - 568:20

**order** [6] - 411:20, 448:20, 448:22, 457:9, 626:2, 681:2

**originally** [1] - 644:20

**otherwise** [1] - 408:3

**outside** [4] - 375:8, 637:5, 675:10, 676:19

**outsized** [1] - 659:2

**overall** [2] - 475:12, 577:22

**overpenalized** [3] - 601:3, 601:14, 607:25

**overruled** [1] - 453:23

**overwhelming** [1] - 543:17

**own** [5] - 444:13, 444:25, 505:14, 506:25, 678:23

## P

**P&L** [5] - 375:9, 476:2, 485:14, 505:18, 660:14

**P.C** [1] - 359:5

**p.m** [3] - 494:23, 513:3, 694:18

**packaging** [7] - 431:18, 433:5, 433:15, 447:9,

598:23, 598:24, 648:3
**PAGE** [1] - 361:3
**page** [114] - 365:23, 378:21, 387:16, 387:17, 388:2, 388:10, 389:7, 389:8, 389:10, 390:20, 404:13, 404:16, 404:20, 406:11, 407:20, 408:13, 409:19, 410:6, 410:8, 413:23, 413:25, 414:3, 414:8, 414:11, 416:16, 418:20, 419:6, 419:7, 419:8, 421:23, 423:13, 425:16, 426:12, 427:4, 438:4, 440:9, 440:12, 440:14, 440:16, 453:10, 456:24, 461:9, 461:16, 462:4, 462:5, 462:7, 462:11, 462:13, 462:14, 465:25, 466:23, 467:22, 471:4, 488:24, 489:9, 535:16, 550:11, 551:22, 551:24, 564:3, 564:7, 564:8, 580:22, 580:23, 581:15, 582:5, 587:16, 588:11, 589:3, 590:9, 591:10, 592:18, 624:8, 625:20, 626:3, 632:7, 633:7, 633:19, 636:24, 637:2, 642:13, 648:9, 648:18, 665:24, 666:4, 666:11, 666:15, 666:16, 666:23, 666:24, 666:25, 667:8, 667:10, 667:16, 668:3, 669:12, 669:14, 682:16, 684:8, 684:9, 684:12, 684:15, 684:25, 685:20, 685:21, 686:4, 686:6, 690:20, 691:19
**Page** [5] - 419:2, 466:21, 581:7, 667:2, 668:6
**pages** [14] - 437:19, 437:20, 437:22, 438:8, 440:10, 447:12, 461:17, 472:10, 495:4, 621:24, 666:20, 682:6, 682:10, 684:19
**paging** [1] - 669:19
**paid** [55] - 375:17, 375:24, 388:23, 418:3, 418:6, 418:8, 418:13, 418:17, 427:2, 447:25, 481:16, 481:22, 490:5, 490:10, 490:20, 490:23, 491:9, 491:12, 511:14, 511:22, 526:19, 526:21, 526:24, 534:2, 544:17, 545:12, 549:25, 551:5, 551:18, 552:17, 553:4, 553:8, 553:9, 553:11, 553:15, 553:16, 553:20, 553:24, 555:19, 556:4, 556:5, 561:13, 562:25, 563:9, 563:17, 591:15, 595:18, 606:23, 608:13,

614:9, 651:23, 653:9, 653:20, 655:6
**pain** [4] - 661:25, 662:8, 662:11, 663:8
**painful** [1] - 397:4
**pair** [1] - 521:7
**Paper** [1] - 598:23
**paper** [8] - 431:18, 433:5, 433:15, 447:9, 579:20, 598:21, 621:13, 648:3
**papers** [1] - 532:4
**paperwork** [7] - 551:9, 570:22, 571:7, 588:3, 590:2, 625:10
**paragraph** [36] - 384:22, 404:15, 404:20, 405:4, 405:20, 405:24, 406:16, 406:23, 407:15, 407:22, 421:5, 421:10, 422:5, 426:14, 466:3, 520:24, 543:22, 544:6, 545:16, 546:3, 548:10, 549:20, 568:9, 568:11, 628:21, 636:2, 637:3, 637:15, 638:6, 638:15, 638:16, 639:4, 641:16, 642:15, 685:4
**paragraphs** [1] - 409:3
**Paralegal** [1] - 360:4
**parental** [3] - 473:22, 474:13, 530:10
**parenthood** [1] - 543:17
**parents** [1] - 576:20
**Paribus** [5] - 380:18, 381:22, 381:23, 382:3, 646:9
**Park** [1] - 359:16
**Parker** [6] - 370:25, 371:2, 371:3, 371:18, 371:25, 619:21
**part** [19] - 436:3, 436:5, 437:15, 439:4, 511:8, 525:18, 541:3, 555:18, 556:17, 574:3, 577:16, 583:11, 626:10, 639:11, 677:2, 681:13, 681:19, 681:20, 682:3
**partaking** [1] - 541:12
**partially** [2] - 577:21, 587:19
**participate** [8] - 495:11, 495:17, 496:2, 496:6, 497:15, 497:16, 636:5, 637:5
**participated** [2] - 497:13, 595:4
**particular** [6] - 476:18, 485:19, 623:5, 636:18, 638:24, 656:20
**particularly** [3] - 546:9, 548:14, 637:6
**parties** [1] - 695:15
**partner** [8] - 452:20, 458:18, 470:4, 560:19,

561:3, 561:5, 561:8, 692:20
**partner's** [2] - 576:20, 576:22
**party** [2] - 453:20, 644:6
**passed** [1] - 399:23
**password** [1] - 540:22
**past** [1] - 422:3
**paternity** [6] - 458:21, 461:7, 466:6, 544:17, 546:19, 549:3
**Paula** [1] - 492:21
**Pause** [33] - 402:7, 404:24, 407:11, 407:21, 408:16, 410:14, 412:8, 421:12, 425:20, 431:11, 431:23, 433:19, 434:21, 453:11, 466:2, 472:4, 491:19, 495:3, 496:18, 503:17, 504:4, 514:14, 536:4, 541:23, 547:6, 567:24, 632:4, 653:17, 664:13, 666:7, 668:22, 677:4, 678:14
**pay** [44] - 377:25, 378:7, 378:8, 378:10, 378:15, 378:17, 379:8, 385:25, 386:2, 386:3, 387:6, 387:8, 388:2, 388:3, 388:13, 388:14, 388:17, 388:18, 388:21, 389:4, 389:5, 389:6, 389:9, 490:14, 552:22, 553:7, 553:16, 555:7, 556:10, 564:14, 564:15, 565:11, 565:13, 565:21, 566:8, 597:20, 612:2, 658:18, 672:23, 679:3, 679:5, 679:6, 679:16
**Pay** [1] - 378:22
**paycheck** [2] - 386:14, 533:22
**payment** [3] - 378:18, 388:15, 564:19
**payments** [1] - 563:12
**payroll** [1] - 544:20
**pays** [1] - 385:24
**peak** [1] - 431:10
**penalty** [1] - 648:25
**Pending** [1] - 360:3
**penny** [1] - 651:8
**People** [1] - 623:23
**people** [40] - 366:13, 369:6, 369:7, 369:8, 369:10, 380:16, 381:7, 381:15, 381:16, 403:23, 443:22, 466:18, 467:10, 498:11, 500:10, 500:18, 501:22, 501:23, 502:4, 508:23, 509:24, 516:12, 521:24, 521:25, 552:15, 563:16, 581:23, 605:22, 606:8, 617:8, 617:14, 623:18, 623:24, 623:25, 626:17,

628:25, 660:4, 676:19, 680:22
**per** [1] - 443:5
**percent** [13] - 374:21, 384:19, 384:20, 385:3, 385:13, 385:19, 386:16, 387:5, 553:11, 555:6, 555:8, 614:16, 658:24
**perfectly** [1] - 532:19
**performance** [9] - 377:5, 631:19, 631:21, 632:23, 633:3, 633:17, 643:7, 643:11, 661:16
**performed** [1] - 612:11
**performing** [2] - 375:25, 661:18
**period** [87] - 363:22, 363:25, 364:2, 364:11, 364:17, 366:7, 366:15, 366:21, 367:21, 368:14, 368:15, 368:19, 378:11, 379:22, 379:23, 380:3, 380:6, 380:20, 381:17, 382:7, 382:9, 389:24, 390:9, 390:15, 391:4, 392:22, 393:4, 393:14, 394:3, 395:3, 402:4, 402:14, 418:7, 426:22, 436:20, 436:25, 439:16, 442:6, 443:2, 444:21, 455:17, 462:24, 488:18, 489:2, 489:15, 490:4, 490:9, 494:17, 495:10, 495:16, 497:2, 501:5, 507:22, 508:12, 508:18, 511:12, 511:20, 536:24, 536:25, 539:14, 546:8, 547:17, 548:12, 561:6, 561:10, 561:14, 563:2, 564:15, 569:8, 569:13, 591:4, 597:3, 646:4, 646:5, 646:13, 647:21, 652:23, 656:7, 656:12, 656:21, 659:5, 662:17, 662:18, 662:21, 670:3, 670:14, 687:18
**periodically** [3] - 448:2, 501:5, 507:23
**perjury** [1] - 649:2
**permanent** [3] - 448:8, 448:10, 547:19
**permission** [1] - 419:23
**permissions** [1] - 582:10
**permitted** [1] - 544:18
**perpetuity** [2] - 613:9, 613:14
**person** [9] - 484:11, 499:17, 509:22, 510:4, 524:20, 529:14, 558:13, 615:17, 633:14
**personal** [3] - 470:10, 473:25, 590:10
**personality** [1] - 398:3

718

**personally** [2] - 441:20, 644:6
**personnel** [2] - 448:25, 476:12
**perspective** [4] - 371:12, 371:13, 473:6, 554:4
**pertaining** [3] - 366:4, 415:13, 558:5
**Peter** [3] - 610:17, 611:3, 611:25
**ph]** [2] - 692:18, 692:22
**phone** [5] - 490:3, 568:21, 578:12, 585:7, 589:4
**Phone** [2] - 359:8, 359:18
**photographs** [1] - 525:17
**photos** [1] - 522:19
**physical** [2] - 412:2, 568:5
**physically** [2] - 428:7, 442:13
**physicians** [1] - 522:5
**picked** [1] - 433:9
**pics** [1] - 525:21
**piece** [6] - 440:5, 485:18, 492:17, 494:25, 556:14, 579:20
**pieces** [3] - 436:14, 436:17, 443:4
**PL** [3] - 684:17, 684:18, 684:23
**PL313** [1] - 621:8
**place** [14] - 457:4, 458:21, 458:24, 479:17, 534:7, 548:9, 577:6, 583:3, 631:22, 649:11, 685:14, 685:18, 691:6, 691:7
**Plaintiff** [3] - 621:5, 622:18, 624:9
**plan** [7] - 377:6, 487:13, 515:10, 515:21, 522:20, 623:17, 643:7
**planning** [2] - 586:16, 692:13
**plans** [1] - 617:18
**plausible** [1] - 573:20
**play** [2] - 578:6, 578:20
**played** [2] - 579:23, 603:6
**plus** [5] - 384:9, 444:25, 573:4, 653:8, 653:20
**pocket** [1] - 577:10
**Point** [1] - 637:14
**point** [27] - 372:18, 377:4, 442:20, 460:22, 471:23, 471:24, 476:7, 483:8, 501:8, 520:4, 536:14, 578:4, 578:19, 584:24, 606:7, 608:2, 610:6, 611:8, 620:16, 626:17, 630:14, 630:16, 640:23, 640:25, 669:11, 693:17, 694:13
**pointed** [3] - 585:17, 641:3, 666:17

**policies** [8] - 376:14, 458:23, 546:18, 549:3, 582:10, 587:12, 587:15, 639:6
**Policy** [2] - 414:12, 458:15
**policy** [30] - 418:8, 418:13, 418:17, 418:23, 419:10, 419:13, 421:6, 426:25, 428:14, 458:20, 458:21, 459:18, 459:20, 461:7, 461:15, 485:24, 486:8, 490:22, 544:17, 548:9, 551:17, 552:6, 556:4, 569:19, 569:20, 583:2, 585:17, 643:8, 668:3
**portion** [2] - 636:18, 637:21, 639:23
**portions** [9] - 423:6, 481:16, 481:22, 490:20, 551:19, 553:21, 636:19, 637:13, 656:11
**position** [3] - 367:12, 368:3, 368:4, 368:12, 371:6, 372:15, 372:21, 374:7, 375:23, 401:14, 401:23, 405:8, 439:8, 507:2, 615:23, 616:3, 616:10, 619:22, 623:4, 628:2, 628:8, 654:15, 654:19
**positions** [9] - 365:11, 380:19, 619:5, 619:7, 619:8, 619:9, 647:17, 647:23, 648:2
**possessing** [1] - 481:4
**possibility** [2] - 535:7, 544:12
**possible** [5] - 399:9, 535:3, 573:8, 573:13, 670:10
**Possible** [1] - 535:4
**post** [4] - 482:6, 587:5, 643:7, 643:11
**posturing** [2] - 370:9, 370:10
**potential** [9] - 368:24, 369:21, 370:7, 370:12, 370:13, 452:25, 453:3, 643:18, 681:17
**potentially** [3] - 576:5, 576:16, 603:25
**pound** [1] - 525:22
**PR** [4] - 675:14, 675:16, 675:25, 676:9
**practical** [3] - 427:16, 427:19, 428:16
**practiced** [1] - 400:2
**pre** [1] - 409:18
**pre-dispute** [1] - 409:18
**precedent** [1] - 458:22
**preceding** [1] - 580:21
**prefer** [1] - 455:7
**preferably** [1] - 414:18
**prehearing** [1] - 690:17

**preparation** [2] - 519:10, 526:7
**prepare** [1] - 526:11
**prepared** [4] - 589:5, 589:24, 615:15, 633:14
**prescribed** [1] - 662:8
**PRESENT** [1] - 360:2
**present** [7] - 560:20, 596:24, 599:12, 615:7, 615:18, 615:20, 647:16
**presented** [3] - 631:18, 632:20, 661:3
**preserve** [2] - 588:9
**press** [2] - 676:10, 676:11
**pressure** [1] - 397:18
**presumption** [2] - 541:4, 552:10
**pretend** [1] - 579:16
**pretty** [5] - 443:17, 489:4, 518:2, 533:14, 611:14
**previous** [2] - 365:2, 389:10
**previously** [3] - 362:3, 470:24, 513:5
**primarily** [1] - 598:22
**primary** [1] - 637:5
**printed** [1] - 451:11
**priorities** [1] - 636:9
**priority** [2] - 556:9, 625:11
**problem** [1] - 641:9
**procedures** [1] - 409:10
**proceed** [4] - 404:25, 465:2, 472:11, 514:15
**proceeding** [8] - 414:23, 465:24, 473:7, 542:16, 555:17, 650:24, 651:14, 661:25
**proceedings** [2] - 695:10, 695:13
**process** [5] - 475:6, 520:21, 521:18, 625:16, 641:22
**produce** [1] - 638:10
**produced** [5] - 496:21, 542:15, 631:14, 632:11, 634:19
**Productivity** [1] - 636:23
**professional** [3] - 585:22, 586:8, 639:9
**Professionalism** [2] - 639:4, 641:17
**profile** [5] - 364:7, 434:19, 434:22, 434:24, 675:17
**progress** [2] - 367:3, 618:16
**prohibited** [1] - 500:10
**prohibition** [1] - 500:13
**project** [1] - 540:23
**projects** [2] - 636:6, 637:5
**promise** [1] - 453:25
**promoted** [1] - 447:21
**promotion** [3] - 448:10,

674:23, 674:25
**pronouncing** [1] - 692:19
**propose** [1] - 544:23
**proposed** [1] - 683:8
**Proposed** [1] - 688:25
**proprietary** [1] - 504:15
**prorated** [5] - 385:17, 386:7, 386:10, 386:11, 386:16
**prospective** [1] - 617:4
**protected** [4] - 550:25, 569:20, 572:2, 691:23
**protocol** [3] - 602:16, 602:19, 603:4
**proven** [1] - 642:11
**provided** [4] - 406:5, 433:14, 569:20, 629:19
**provides** [10] - 405:21, 407:15, 418:13, 418:17, 427:2, 550:17, 550:25, 564:18, 631:4, 691:23
**providing** [2] - 426:17, 572:23
**provisions** [1] - 426:16
**proximity** [1] - 465:12
**public** [2] - 675:19, 676:10
**Public** [1] - 695:9
**publish** [6] - 431:15, 433:10, 435:24, 595:2, 595:8, 642:11
**published** [2] - 641:25, 642:12
**publishing** [1] - 595:7
**punishing** [3] - 542:21, 568:22, 600:11
**purpose** [2] - 453:22, 587:2
**pushed** [2] - 687:4, 687:7
**pushing** [1] - 604:5
**put** [16] - 386:14, 436:18, 438:23, 448:18, 448:19, 448:20, 510:15, 547:5, 554:24, 604:9, 604:20, 620:7, 620:8, 627:14, 643:7, 643:11
**Putting** [2] - 424:23, 511:8
**puzzle** [1] - 556:14

## Q

**qualification** [1] - 424:25
**qualifications** [2] - 620:17, 645:6
**qualified** [1] - 424:22
**qualify** [2] - 426:7, 454:21
**quality** [1] - 638:11
**Quality** [1] - 642:15
**quarter** [9] - 522:23, 522:25, 523:6, 523:21, 524:3, 524:9, 524:13, 524:21, 526:12

719

**quarterly** [3] - 437:24, 670:4, 670:7
**questioned** [1] - 608:8
**questioning** [2] - 373:20, 671:2
**Questions** [1] - 550:4
**questions** [22] - 399:7, 425:7, 440:18, 497:19, 498:4, 499:6, 514:4, 540:3, 541:10, 580:3, 584:14, 610:25, 621:18, 622:4, 648:12, 649:23, 650:24, 663:17, 663:19, 690:2, 691:8, 692:10
**quick** [3] - 398:13, 495:7, 648:12
**quickly** [6] - 431:21, 456:19, 495:7, 529:7, 594:20, 626:23
**quiet** [2] - 443:14, 443:16
**quietly** [1] - 623:17
**quit** [1] - 375:20
**quite** [3] - 403:2, 403:13, 608:6
**quote** [9] - 425:3, 466:20, 467:9, 467:23, 525:11, 530:8, 570:16, 573:24, 643:20

## R

**RAC** [1] - 641:25
**raise** [2] - 498:4, 670:8
**ran** [3] - 476:3, 485:13, 504:16
**range** [7] - 374:10, 386:21, 393:5, 443:14, 457:16, 475:8, 658:24
**rare** [1] - 499:22
**RASKIN** [1] - 359:5
**rating** [5] - 373:2, 374:16, 375:7, 375:10, 641:22
**ratings** [1] - 636:7
**Ratings** [3] - 363:6, 372:14, 618:18
**RBS** [3] - 401:19, 402:22, 402:23
**reach** [2] - 531:5, 619:11
**reached** [2] - 558:19, 681:18
**reaching** [2] - 617:14, 623:18
**reactions** [1] - 639:16
**read** [52] - 407:9, 413:4, 413:8, 413:22, 420:5, 420:20, 420:23, 421:9, 421:19, 421:24, 422:6, 422:13, 433:17, 434:19, 440:9, 440:16, 444:16, 447:11, 461:14, 461:24, 461:25, 462:4, 462:7,

462:16, 464:5, 490:17, 514:11, 514:13, 525:6, 541:3, 545:22, 546:22, 547:4, 547:9, 557:21, 559:12, 568:8, 568:10, 572:3, 572:5, 572:7, 584:25, 586:24, 593:24, 638:19, 649:5, 669:10, 678:23, 680:8, 690:19, 690:25
**reading** [12] - 406:14, 461:22, 462:17, 497:17, 540:10, 547:15, 551:21, 552:3, 557:23, 572:4, 573:3, 593:8
**reads** [2] - 407:18, 690:22
**Ready** [1] - 503:18
**ready** [8] - 408:15, 408:17, 421:21, 423:22, 425:19, 453:12, 503:19, 579:22
**realistic** [1] - 516:6
**realized** [1] - 682:4
**really** [12] - 386:24, 387:2, 443:11, 445:21, 453:14, 476:8, 540:10, 558:5, 582:8, 620:4, 624:5, 658:19
**reason** [23] - 368:23, 369:25, 370:4, 371:19, 372:2, 418:6, 427:25, 453:4, 463:16, 483:22, 488:10, 500:7, 525:10, 542:11, 556:18, 556:21, 577:12, 583:6, 583:12, 614:6, 620:10, 671:13, 692:4
**reasonable** [4] - 567:2, 672:10, 672:11, 685:8
**reasoning** [2] - 642:20, 644:23
**reasons** [13] - 369:2, 369:4, 369:8, 369:16, 370:15, 403:5, 426:19, 465:13, 508:25, 509:5, 583:6, 583:20, 583:24
**receipt** [1] - 409:5
**receive** [21] - 367:8, 368:11, 375:13, 376:22, 376:25, 385:3, 385:11, 392:5, 394:16, 396:14, 411:23, 447:18, 533:22, 551:8, 600:14, 606:20, 618:23, 646:19, 646:20, 661:12, 673:8
**received** [86] - 377:3, 378:18, 379:9, 386:5, 386:7, 386:22, 388:7, 389:13, 390:16, 390:21, 391:3, 391:15, 391:17, 391:23, 392:3, 392:8, 392:15, 393:10, 393:14, 393:20, 394:2, 394:13, 394:14, 394:16, 395:6, 395:7, 395:14, 395:21, 395:24, 396:13, 396:18, 399:16,

400:12, 410:21, 431:13, 447:24, 461:18, 463:13, 496:25, 497:5, 547:20, 549:13, 549:22, 563:4, 564:15, 565:14, 595:12, 595:22, 599:3, 599:6, 599:16, 600:16, 607:19, 607:20, 607:23, 608:22, 609:17, 610:14, 612:7, 618:3, 625:5, 628:3, 630:25, 631:2, 644:13, 650:20, 653:4, 653:13, 653:21, 654:2, 654:5, 654:6, 654:8, 654:11, 654:16, 654:17, 654:21, 657:10, 657:21, 659:8, 678:4, 679:15, 682:21, 683:14, 689:7
**receiving** [5] - 409:12, 461:13, 486:10, 602:12, 670:4
**recent** [2] - 626:2, 639:10
**recently** [3] - 371:6, 546:5, 619:22
**Recess** [5] - 398:22, 464:25, 578:8, 629:12, 663:15
**recess** [1] - 512:10
**recharacterize** [1] - 582:7
**recognize** [9] - 381:4, 389:21, 389:22, 400:7, 404:9, 451:13, 648:14, 649:24, 679:22
**recollection** [6] - 420:12, 497:12, 540:6, 545:15, 548:4, 549:11
**record** [21] - 391:13, 398:22, 464:25, 512:10, 577:4, 578:7, 578:8, 581:22, 585:11, 586:20, 602:9, 629:12, 634:18, 663:15, 677:21, 678:11, 682:2, 687:15, 694:11, 694:16, 695:13
**recorded** [8] - 419:16, 420:25, 575:15, 575:23, 576:9, 581:25, 583:7, 594:4
**recording** [11] - 418:23, 419:10, 420:3, 421:6, 421:16, 501:12, 576:25, 577:14, 578:21, 579:2, 583:21
**records** [1] - 563:25
**recounted** [1] - 473:16
**recovering** [3] - 567:4, 567:11, 597:4
**recovery** [1] - 568:5
**RECROSS** [7] - 361:9, 690:1, 690:5, 691:1, 692:1, 693:1, 694:1
**recross** [1] - 683:5
**recruiters** [1] - 364:13

**red** [3] - 446:18, 606:9, 680:25
**redirect** [1] - 663:21
**REDIRECT** [27] - 361:8, 665:1, 665:2, 666:1, 667:1, 668:1, 669:1, 670:1, 671:1, 672:1, 673:1, 674:1, 675:1, 676:1, 677:1, 678:1, 679:1, 680:1, 681:1, 682:1, 683:1, 684:1, 685:1, 686:1, 687:1, 688:1, 689:1
**reduced** [4] - 390:16, 451:4, 470:9, 600:19
**reduction** [1] - 673:4
**refer** [5] - 434:16, 436:16, 456:23, 461:9, 503:13
**reference** [18] - 386:18, 400:11, 409:8, 433:21, 459:6, 461:20, 464:2, 464:4, 467:21, 514:6, 514:8, 514:9, 514:18, 514:21, 517:24, 582:25, 593:7, 593:8
**referenced** [8] - 462:9, 462:10, 462:18, 545:16, 557:25, 675:17, 676:7, 685:13
**referencing** [1] - 640:4
**referred** [2] - 667:9, 669:14
**referring** [12] - 369:14, 403:17, 403:19, 425:5, 448:21, 505:7, 538:5, 538:11, 571:20, 593:23, 625:12, 634:15
**refers** [1] - 665:24
**reflect** [3] - 378:17, 379:9, 394:25
**reflected** [4] - 366:6, 366:10, 381:13, 392:8
**reflecting** [1] - 381:9
**reflects** [5] - 391:2, 402:4, 450:16, 645:10, 653:18
**Reflects** [1] - 377:21
**refresh** [2] - 420:11, 497:12
**refreshed** [1] - 549:11
**regard** [6] - 496:7, 531:9, 538:13, 546:9, 548:5, 557:14
**regarding** [9] - 448:25, 502:24, 544:8, 546:18, 549:2, 557:7, 567:13, 575:25, 683:22
**regularly** [1] - 581:22
**reins** [1] - 502:3
**rejected** [1] - 389:13
**related** [1] - 636:7
**relations** [6] - 364:20, 365:4, 365:16, 380:23, 619:10, 675:20
**relationship** [6] - 474:2, 474:8, 474:9, 587:3, 587:4, 588:10
**relative** [5] - 553:10, 554:2,

720

555:4, 555:5, 555:9
**Relative** [1] - 430:19
**release** [1] - 676:11
**released** [1] - 676:9
**releases** [1] - 676:10
**relevance** [1] - 635:22
**relevant** [4] - 391:4, 462:17, 469:22, 640:21
**reluctance** [1] - 637:17
**remain** [1] - 546:6
**remained** [2] - 392:22, 435:23
**remember** [97] - 365:15, 368:2, 374:13, 380:17, 382:23, 384:18, 387:2, 399:21, 403:25, 410:3, 412:14, 420:13, 423:24, 424:13, 424:15, 445:17, 448:3, 456:23, 457:8, 461:22, 462:12, 462:17, 471:8, 489:7, 498:10, 499:15, 501:20, 502:2, 506:22, 506:24, 509:17, 509:18, 509:23, 510:3, 511:4, 521:21, 521:23, 522:3, 526:20, 526:22, 530:11, 530:21, 535:15, 536:7, 540:7, 540:13, 540:15, 540:17, 541:7, 541:16, 551:22, 552:3, 552:23, 553:3, 557:21, 562:6, 563:17, 569:23, 570:3, 572:25, 574:19, 578:2, 593:15, 594:19, 595:11, 595:17, 601:15, 601:23, 604:24, 605:5, 605:6, 605:7, 605:16, 611:23, 615:2, 615:3, 615:13, 615:17, 617:14, 617:19, 623:3, 625:8, 633:2, 634:23, 635:7, 636:15, 636:20, 640:3, 659:20, 669:14, 669:21, 670:25, 674:8, 675:22
**Remember** [1] - 551:8
**remembering** [1] - 498:13
**remind** [2] - 366:13, 620:7
**remotely** [4] - 488:11, 517:20, 544:25, 545:2
**removal** [2] - 434:11, 662:13
**removed** [1] - 362:14
**removing** [3] - 535:20, 573:25, 574:14
**rep** [4] - 614:21, 615:6, 615:10, 615:12
**Repeat** [10] - 455:13, 468:17, 508:16, 562:12, 572:17, 583:17, 615:24, 630:7, 647:19, 651:10
**repeat** [25] - 363:13,

366:18, 382:24, 399:6, 407:12, 418:14, 420:7, 428:3, 436:23, 460:10, 464:14, 472:19, 495:13, 502:21, 511:16, 518:10, 527:25, 547:7, 560:21, 567:7, 584:7, 590:23, 595:14, 608:9, 613:10
**rephrase** [1] - 464:16
**replaces** [1] - 407:23
**reply** [2] - 411:21, 540:23
**report** [28] - 405:17, 438:7, 440:9, 440:10, 440:12, 440:15, 440:17, 440:22, 440:25, 441:2, 441:5, 441:25, 444:16, 445:4, 445:17, 445:25, 447:10, 479:2, 527:7, 527:11, 527:15, 539:8, 602:17, 640:13, 640:15, 641:23, 676:6
**Reported** [1] - 358:22
**reported** [13] - 362:18, 362:21, 362:22, 405:18, 414:17, 415:17, 415:23, 416:6, 416:12, 429:25, 442:14, 476:21, 629:2
**Reporter** [1] - 573:12
**reporting** [8] - 405:5, 429:21, 437:23, 442:11, 549:4, 628:18, 628:20, 629:5
**reports** [6] - 441:19, 442:8, 443:23, 445:7, 446:2, 446:6
**represent** [5] - 427:4, 432:2, 563:24, 634:17, 677:5
**representative** [1] - 549:22
**represents** [2] - 396:8, 396:17
**reputation** [5] - 397:18, 403:12, 403:17, 605:5, 616:7
**request** [22] - 417:6, 422:9, 422:18, 423:3, 424:2, 425:24, 427:12, 427:13, 428:8, 496:24, 509:14, 513:23, 515:20, 515:21, 516:13, 544:18, 559:22, 669:3, 669:4, 669:7, 690:21, 691:5
**Request** [1] - 427:11
**requested** [5] - 417:13, 427:21, 546:7, 548:12, 672:10
**requesting** [4] - 428:23, 515:8, 515:17, 685:7
**requests** [4] - 498:22, 559:16, 639:8, 639:15
**Requests** [3] - 668:7, 668:11, 669:2
**require** [1] - 669:6
**required** [3] - 551:2, 691:24, 691:25

**requirement** [1] - 460:17
**requirements** [2] - 368:20, 382:10
**Research** [1] - 616:13
**research** [82] - 370:4, 371:4, 373:12, 374:14, 380:18, 405:10, 429:8, 429:11, 429:18, 430:5, 430:14, 430:17, 430:22, 431:3, 431:7, 431:14, 432:14, 432:24, 434:9, 434:17, 435:22, 436:17, 436:21, 437:2, 437:3, 439:5, 439:7, 439:12, 439:13, 439:25, 440:5, 441:18, 441:19, 442:4, 443:4, 447:18, 448:7, 450:2, 491:15, 492:17, 493:5, 493:17, 493:20, 494:6, 494:10, 494:16, 494:25, 505:3, 507:21, 508:8, 526:23, 534:22, 546:14, 546:25, 547:12, 574:17, 574:25, 575:9, 591:5, 591:8, 592:12, 592:15, 592:20, 593:5, 593:11, 593:18, 598:19, 602:21, 603:2, 606:18, 608:18, 616:10, 647:17, 647:24, 648:3, 648:6, 659:15, 659:18, 659:23, 675:24, 676:20
**resign** [2] - 401:13, 401:22
**resignation** [1] - 429:20
**resigned** [2] - 429:14, 430:3
**resources** [44] - 414:20, 415:18, 415:24, 416:7, 416:9, 417:7, 422:10, 422:19, 422:23, 425:5, 425:25, 427:14, 427:22, 427:24, 428:10, 428:20, 429:2, 429:3, 455:21, 456:8, 457:20, 457:22, 460:13, 463:8, 463:15, 478:19, 478:20, 478:22, 478:25, 486:10, 516:20, 527:8, 527:11, 527:14, 539:9, 546:17, 548:3, 548:7, 548:8, 548:25, 549:22, 559:17, 604:13, 628:14
**respect** [1] - 548:14
**respected** [1] - 500:18
**respectful** [1] - 548:14
**respective** [3] - 414:19, 435:8, 435:24
**respects** [2] - 507:25, 635:15
**respond** [3] - 413:3, 523:9, 523:25
**responded** [4] - 461:4, 584:21, 584:22, 591:14
**Respondent** [1] - 358:9

**RESPONDENT** [1] - 359:14
**responding** [2] - 523:23, 539:23
**response** [18] - 454:12, 461:3, 492:21, 495:5, 504:20, 509:14, 522:17, 522:17, 523:12, 524:25, 525:4, 525:20, 540:9, 582:16, 586:12, 608:8, 626:14, 634:19
**responsibilities** [13] - 372:23, 383:21, 436:3, 436:7, 505:2, 543:16, 546:10, 548:15, 574:2, 574:12, 608:13, 637:17, 662:14
**responsibility** [1] - 435:23
**rest** [3] - 626:22, 680:23, 694:6
**rested** [1] - 485:4
**restrained** [1] - 472:8
**rests** [1] - 693:19
**result** [7] - 397:23, 417:14, 472:2, 474:12, 561:19, 662:13, 687:6
**results** [1] - 483:7
**resumed** [1] - 513:5
**retail** [8] - 373:4, 373:8, 373:13, 373:23, 435:15, 625:18, 628:24
**Retail** [1] - 373:6
**Retaliated** [1] - 596:16
**retaliated** [3] - 604:14, 641:5, 685:7
**retaliating** [2] - 538:24, 580:19
**retaliation** [7] - 402:19, 402:23, 416:21, 612:25, 671:21, 671:24, 672:20
**Retirement** [1] - 406:25
**Return** [1] - 566:22
**return** [15] - 521:19, 522:10, 531:17, 544:9, 544:19, 549:17, 559:25, 561:16, 566:20, 567:6, 567:14, 568:6, 570:9, 681:4
**returned** [10] - 417:2, 529:22, 557:18, 562:4, 566:13, 569:3, 590:20, 590:25, 672:21, 680:12
**returning** [3] - 516:21, 554:14, 588:16
**revenue** [1] - 616:14
**review** [28] - 410:12, 412:6, 431:22, 438:10, 442:5, 458:11, 492:9, 503:16, 549:24, 633:6, 633:15, 634:2, 634:8, 634:13, 634:23, 635:12, 635:13, 636:14, 636:16, 637:13, 638:23, 640:15, 643:4,

721

643:5, 643:11, 643:12
**reviewed** [7] - 441:20,
458:12, 498:7, 569:18,
570:24, 652:14, 652:18
**reviewing** [4] - 439:13,
539:22, 540:14, 679:22
**reviews** [2] - 636:6, 643:8
**revised** [2] - 411:24, 634:9
**Revised** [1] - 412:17
**rewind** [1] - 576:6
**rewrite** [1] - 441:9
**rights** [19] - 470:25, 471:6,
471:18, 472:8, 477:17,
478:9, 478:16, 479:12,
519:6, 519:17, 519:23,
519:25, 520:13, 523:7,
527:19, 528:5, 531:6,
596:18, 671:10
**Rob** [36] - 397:11, 437:5,
448:12, 454:7, 458:17,
458:19, 476:24, 484:9,
485:11, 485:14, 485:20,
529:2, 529:3, 552:21,
552:24, 553:14, 554:12,
554:17, 558:14, 559:3,
587:7, 591:12, 593:17,
594:2, 599:22, 600:2, 600:3,
601:10, 601:22, 602:7,
602:23, 603:3, 603:12,
604:10, 607:17, 624:3
**Rob's** [2] - 485:18, 529:4
**Robert** [9] - 362:24, 405:18,
416:12, 429:22, 451:12,
472:7, 476:19, 527:16, 675:2
**role** [10] - 439:5, 603:7,
624:22, 625:3, 636:4, 636:9,
637:18, 641:22, 642:18
**room** [4] - 403:9, 492:24,
493:3, 676:23
**Ross** [107] - 425:10, 451:18,
451:22, 452:2, 452:4, 452:8,
452:12, 456:4, 459:13,
459:24, 465:7, 465:14,
465:15, 465:20, 466:5,
466:6, 466:13, 466:17,
467:9, 468:7, 468:11,
468:14, 468:19, 469:5,
469:10, 470:17, 470:23,
471:16, 472:15, 472:17,
472:22, 472:24, 473:13,
474:14, 475:13, 476:5,
476:13, 476:22, 477:6,
477:16, 477:20, 478:12,
478:15, 478:23, 479:3,
479:7, 479:11, 480:8, 481:2,
482:7, 482:10, 483:7,
483:13, 483:15, 483:24,
484:18, 485:5, 485:9,
486:22, 487:11, 487:13,
487:17, 490:25, 491:6,
491:11, 513:16, 519:5,
519:17, 519:22, 520:12,

520:19, 522:8, 522:17,
523:5, 523:19, 524:6,
524:19, 525:10, 525:14,
525:21, 527:7, 528:8,
528:15, 528:16, 529:15,
539:17, 542:8, 554:18,
554:20, 556:2, 559:22,
573:10, 573:15, 599:12,
607:9, 607:12, 611:12,
615:7, 615:18, 650:11,
673:16, 673:25, 674:4,
675:2, 676:24, 693:9
**Ross'** [1] - 522:16
**rough** [1] - 635:15
**roughly** [1] - 489:11
**round** [2] - 504:23, 626:5,
626:10
**rounds** [1] - 616:18
**route** [1] - 398:7
**routinely** [5] - 501:11,
502:17, 502:24, 503:4, 503:9
**Routinely** [1] - 501:14
**row** [1] - 396:16
**RTW** [1] - 566:16
**rules** [1] - 409:9
**running** [1] - 636:7
**résumé** [9] - 364:7, 400:8,
401:2, 401:18, 402:4,
402:15, 618:9, 620:17,
670:19
**résumés** [3] - 364:8,
646:12, 646:15

---

# S

**SA** [22] - 439:5, 439:7,
440:5, 440:15, 442:5,
443:10, 444:13, 444:25,
447:11, 491:16, 492:11,
493:7, 493:10, 495:6,
498:22, 507:16, 508:3,
510:18, 518:22, 534:9,
534:16, 537:9
**SA'd** [3] - 441:8, 442:8,
500:19
**SA'ed** [5] - 443:12, 493:25,
494:6, 495:2, 509:15
**SA'ing** [8] - 441:14, 443:4,
444:11, 444:25, 445:16,
447:14, 518:9, 518:15
**SA-approved** [1] - 493:7
**sad** [2] - 397:2, 397:16
**sadness** [1] - 662:18
**Salary** [2] - 450:9, 450:14
**salary** [40] - 368:20, 373:24,
374:3, 375:11, 382:10,
384:8, 384:9, 405:21, 418:3,
418:7, 447:18, 447:20,
447:25, 448:8, 448:10,
450:18, 450:24, 451:3,
490:5, 526:21, 527:3,

553:10, 555:2, 564:19,
612:7, 629:19, 629:22,
630:2, 630:5, 630:24, 631:2,
646:17, 647:2, 647:9,
651:23, 653:8, 653:20,
654:16, 657:5, 657:20
**sales** [8] - 375:9, 375:10,
430:19, 475:24, 523:2,
611:9, 611:11, 675:9
**Sales** [1] - 476:2
**salvage** [1] - 587:3
**sat** [1] - 640:17
**sat'** [1] - 639:12
**SATTERLEE** [1] - 359:15
**saw** [22] - 419:16, 428:13,
456:10, 457:5, 476:12,
476:18, 485:22, 490:16,
494:6, 507:6, 513:11, 517:5,
518:7, 531:3, 539:16,
539:22, 559:15, 570:20,
599:15, 616:6, 656:15
**scared** [2] - 584:25, 602:15,
604:23
**scenario** [1] - 669:18
**schedule** [2] - 516:11,
520:4, 641:18
**scheduling** [1] - 578:10
**School** [1] - 399:16
**school** [1] - 399:18
**screen** [2] - 403:9, 423:2
**Sean** [15] - 430:12, 435:18,
439:19, 441:12, 442:9,
442:15, 491:21, 498:22,
500:19, 510:18, 518:9,
518:15, 518:17, 527:2, 675:8
**search** [6] - 366:4, 366:5,
382:17, 382:21, 383:4,
462:13
**searching** [1] - 381:7
**season** [5] - 437:22,
437:24, 438:3, 442:24,
442:25
**seasonality** [1] - 442:18
**seats** [1] - 663:22
**Seattle** [2] - 617:18, 617:22
**second** [40] - 376:8,
390:20, 404:21, 405:19,
405:24, 406:11, 406:16,
410:5, 410:6, 412:19,
434:19, 469:23, 482:20,
514:11, 520:24, 522:23,
522:25, 523:6, 523:21,
524:3, 524:9, 524:13,
524:21, 526:12, 530:2,
535:24, 544:6, 547:3,
557:19, 560:19, 570:8,
596:6, 631:23, 641:16,
648:9, 648:18, 653:14,
684:8, 686:3, 686:6
**Second** [2] - 410:8, 686:4
**second-quarter** [9] -

522:23, 522:25, 523:6,
523:21, 524:3, 524:9,
524:13, 524:21, 526:12
**Section** [3] - 635:25,
638:16, 639:3
**section** [28] - 385:10,
414:13, 421:20, 421:25,
422:8, 426:12, 426:13,
426:14, 427:7, 427:10,
441:9, 461:25, 462:9,
462:11, 462:15, 462:17,
462:18, 462:19, 464:2,
551:21, 559:12, 636:13,
667:16, 656:6, 666:18,
667:14, 667:23, 668:7
**sections** [3] - 633:22,
634:24, 635:17
**sector** [10] - 373:4, 373:5,
373:23, 383:17, 383:18,
383:23, 383:25, 433:10,
447:9, 623:8
**sectors** [11] - 371:7,
383:19, 431:15, 431:17,
433:15, 435:9, 435:12,
435:16, 435:24, 619:23,
620:25
**Securities** [1] - 406:25
**security** [1] - 397:19
**see** [147] - 363:8, 364:4,
371:9, 378:2, 378:12,
378:21, 378:23, 379:2,
379:6, 384:25, 385:7,
386:13, 386:14, 387:7,
388:3, 388:19, 390:22,
392:11, 393:21, 401:18,
405:6, 406:2, 406:8, 406:17,
406:25, 407:22, 408:2,
408:18, 409:3, 409:21,
410:24, 411:10, 413:6,
414:9, 414:21, 416:17,
421:8, 422:7, 422:12,
424:10, 427:9, 432:6,
432:11, 442:20, 449:22,
450:13, 451:8, 454:23,
458:14, 461:2, 462:15,
476:4, 491:23, 491:24,
492:10, 492:14, 492:20,
492:23, 493:9, 493:11,
497:10, 497:15, 504:10,
510:17, 515:10, 516:23,
522:19, 524:2, 525:23,
531:5, 541:25, 542:5, 542:6,
544:21, 544:22, 546:20,
546:21, 550:8, 550:9,
550:13, 550:22, 550:23,
550:24, 551:3, 551:10,
564:7, 564:8, 564:18,
564:24, 565:17, 565:20,
566:16, 569:19, 577:7,
580:22, 581:13, 581:15,
582:14, 589:6, 590:13,
590:16, 592:8, 592:9, 596:4,

597:23, 609:3, 609:6, 609:8, 609:14, 610:10, 617:18, 619:25, 622:19, 622:20, 623:9, 623:25, 626:7, 626:14, 633:22, 636:2, 636:23, 637:3, 640:23, 640:24, 646:3, 649:9, 649:13, 652:19, 652:22, 654:2, 656:9, 664:12, 666:19, 667:17, 668:9, 668:15, 679:11, 681:5, 684:14, 684:19, 685:11, 686:3, 686:14, 686:25, 691:22, 692:2, 692:4
**seeing** [3] - 540:15, 564:9, 615:5
**seek** [2] - 397:21, 657:8
**seeking** [8] - 392:22, 651:8, 651:13, 656:23, 657:9, 657:22, 659:4, 661:24
**seeks** [1] - 573:12
**seem** [8] - 543:17, 553:12, 554:24, 555:10, 555:11, 678:19
**segue** [1] - 365:5
**seldom** [1] - 498:23
**selected** [1] - 411:15
**Send** [1] - 522:19
**send** [6] - 413:4, 525:17, 525:21, 533:10, 533:16, 574:15
**sender** [2] - 438:13, 438:18
**sending** [7] - 488:22, 510:7, 510:11, 510:24, 511:4, 540:18, 546:4
**Sending** [1] - 535:10
**senior** [21] - 365:14, 367:7, 372:16, 372:24, 375:24, 383:15, 383:22, 401:19, 435:4, 435:5, 441:15, 526:16, 608:12, 610:20, 611:14, 637:4, 639:15, 640:11, 640:12, 641:20, 645:5
**sense** [1] - 475:11
**sent** [41] - 364:7, 428:23, 437:4, 459:2, 496:25, 497:23, 498:3, 499:8, 499:25, 513:17, 517:3, 518:8, 518:13, 518:21, 519:2, 520:10, 528:15, 529:4, 529:15, 535:18, 536:18, 538:2, 540:15, 540:23, 542:7, 542:12, 543:7, 546:23, 547:10, 570:21, 570:25, 571:7, 574:9, 586:25, 588:2, 590:5, 646:13, 646:14, 678:7, 683:11, 683:21
**Sent** [1] - 364:8
**sentence** [14] - 405:3,

405:23, 408:2, 409:17, 422:7, 464:5, 516:5, 520:24, 568:9, 568:11, 568:18, 637:3, 637:16
**sentences** [1] - 642:23
**separate** [3] - 461:7, 481:25, 590:11
**serve** [1] - 447:5
**service** [3] - 426:20, 426:21, 553:18
**session** [1] - 639:10
**set** [12] - 409:19, 442:2, 442:3, 491:7, 524:4, 578:5, 599:20, 599:22, 607:14, 626:21, 657:25, 695:19
**setting** [1] - 526:20
**Setting** [1] - 452:11
**settles** [1] - 642:18
**seven** [2] - 461:4, 661:14
**several** [8] - 521:15, 538:3, 539:11, 543:7, 637:12, 641:2, 690:7, 691:14
**severance** [7] - 376:22, 376:25, 378:18, 644:13, 644:18, 645:11
**sex** [5] - 415:5, 415:19, 416:2, 416:14, 479:8
**shape** [1] - 541:13
**share** [1] - 474:3
**sheet** [1] - 621:13
**Shenkman** [1] - 605:8
**shoot** [1] - 578:16
**short** [4] - 440:10, 550:20, 578:5, 601:9
**short-term** [1] - 550:20
**shorter** [2] - 440:11, 506:13
**shortly** [3] - 408:21, 528:23, 646:9
**shots** [1] - 504:23
**show** [3] - 388:23, 423:6, 638:14
**showcases** [1] - 535:19
**showed** [3] - 528:17, 529:2, 679:4
**shown** [1] - 637:17
**sic** [7] - 373:12, 454:17, 482:5, 572:11, 574:24, 609:11, 657:20
**side** [10] - 378:21, 387:25, 414:11, 416:17, 450:5, 611:17, 633:11, 649:10, 649:13, 658:4
**sign** [11] - 532:4, 571:14, 589:5, 589:17, 589:19, 589:23, 589:24, 592:7, 638:23, 681:8, 691:16
**signaling** [1] - 535:21
**signature** [8] - 404:12, 408:24, 451:14, 492:23, 628:13, 633:8, 633:10, 648:19

**signatures** [1] - 648:22
**signed** [11] - 406:4, 406:7, 408:4, 452:4, 452:9, 476:9, 628:14, 629:4, 634:13, 635:4, 635:18
**significance** [1] - 390:11
**significant** [3] - 437:14, 603:7, 639:11
**significantly** [2] - 604:2, 685:9
**signifies** [1] - 392:13
**signing** [4] - 409:23, 410:3, 680:5, 680:18
**Silverman** [8] - 633:11, 633:13, 636:17, 637:24, 637:25, 640:4, 640:6, 641:11
**similar** [1] - 553:18
**Simonton** [3] - 374:13, 628:20, 628:23
**simple** [4] - 445:4, 445:6, 445:7, 445:8
**simply** [2] - 494:9, 524:18, 558:24
**single** [3] - 592:20, 621:13, 655:13
**sip** [1] - 686:9
**sit** [1] - 594:24
**sitting** [2] - 445:18, 540:21
**situation** [7] - 468:2, 477:24, 478:3, 478:6, 503:2, 503:10, 608:10
**situations** [2] - 398:4, 671:18
**six** [5] - 430:21, 431:3, 432:11, 505:5, 661:13
**Sixty** [1] - 445:10
**skills** [2] - 637:15, 638:17
**skimmed** [1] - 413:10
**Skimmed** [1] - 413:11
**skip** [1] - 529:6
**slashed** [1] - 672:23
**slashing** [2] - 685:9, 685:17
**slide** [2] - 425:16, 466:23
**slip** [1] - 642:20
**slow** [1] - 423:12
**small** [4] - 386:7, 386:9, 504:16, 554:2
**Sneeden** [14] - 430:12, 435:16, 441:12, 442:9, 491:22, 492:7, 494:14, 494:20, 495:6, 518:18, 539:23, 608:22, 609:4, 675:8
**Sneeden's** [9] - 492:16, 492:20, 493:16, 494:22, 518:9, 518:15, 608:18, 610:8, 655:20
**so..** [2] - 423:13, 570:5
**sole** [3] - 574:24, 575:8, 592:12
**solidify** [2] - 516:4, 516:11
**someone** [14] - 366:12,

369:17, 438:6, 443:9, 446:17, 505:19, 509:19, 509:25, 540:18, 581:25, 606:10, 625:10, 676:5
**Someone** [1] - 498:20
**sometime** [3] - 522:19, 529:23, 562:7
**sometimes** [9] - 437:21, 440:18, 441:2, 442:15, 446:22, 489:22, 627:13, 627:14, 676:3
**Sometimes** [1] - 474:5
**somewhat** [2] - 474:23, 600:20
**Somewhere** [1] - 401:11
**somewhere** [3] - 445:9, 462:24, 577:6
**soon** [7] - 383:3, 427:18, 428:15, 504:12, 560:14, 617:10, 617:15
**Sorry** [21] - 376:8, 386:23, 387:14, 389:6, 410:10, 425:13, 502:21, 541:21, 550:18, 555:14, 581:5, 581:7, 597:23, 635:8, 638:18, 647:19, 652:16, 657:17, 678:21, 686:7, 686:11
**sorry** [44] - 363:13, 367:24, 368:3, 382:24, 387:13, 406:13, 410:6, 419:2, 420:7, 428:11, 430:24, 440:3, 444:4, 449:15, 464:14, 465:14, 466:18, 467:22, 472:20, 489:24, 493:13, 495:20, 506:12, 508:16, 511:16, 518:10, 523:17, 534:10, 550:22, 555:15, 560:21, 564:5, 567:7, 568:10, 572:17, 583:15, 586:3, 595:14, 597:15, 598:3, 611:10, 645:20, 646:19, 666:5
**sort** [1] - 484:15
**sound** [7] - 418:2, 480:22, 569:10, 569:15, 601:16, 601:17, 601:24
**sounds** [13] - 480:23, 520:14, 534:18, 542:10, 588:17, 597:2, 599:18, 612:9, 621:2, 643:9, 653:23, 654:10, 655:7
**Sounds** [2] - 569:12, 569:17
**sour** [1] - 587:6
**source** [1] - 440:24
**Southern** [2] - 480:12, 650:3
**sovereign** [3] - 432:17, 432:18, 445:20
**space** [1] - 636:8

723

**spare** [1] - 506:18
**speaking** [2] - 551:20, 596:2
**Specific** [1] - 422:3
**specific** [5] - 377:14, 383:18, 446:2, 446:5, 638:10
**specifically** [12] - 397:6, 399:21, 455:20, 464:2, 465:25, 470:23, 488:2, 597:4, 601:8, 652:12, 673:24, 682:14
**specify** [1] - 537:2
**speed** [3] - 565:8, 594:15, 594:21
**spells** [1] - 658:25
**spend** [2] - 431:20, 572:11, 572:23
**spent** [5] - 422:15, 422:21, 445:15, 469:6, 642:2
**spoken** [8] - 471:17, 549:21, 551:16, 575:25, 576:4, 576:11, 576:13, 576:15
**sporadic** [1] - 489:23
**spot** [1] - 604:9
**spring** [1] - 616:21
**sprint** [1] - 623:23
**squeeze** [1] - 690:2
**SS** [1] - 492:9
**ss** [1] - 695:5
**staff** [1] - 676:13
**stage** [6] - 454:23, 475:22, 520:5, 576:19, 601:18, 602:17
**stale** [1] - 624:2
**Stamp** [1] - 448:20
**stamped** [1] - 684:17
**stand** [2] - 513:6, 566:19
**standard** [2] - 521:25, 643:8
**stands** [2] - 565:24, 565:25
**stark** [1] - 483:7
**start** [18] - 385:9, 387:15, 413:22, 491:20, 502:4, 513:14, 520:18, 578:9, 580:8, 580:11, 617:11, 633:6, 652:12, 666:11, 666:25, 667:11, 692:16, 692:25
**started** [10] - 367:20, 367:25, 397:9, 441:6, 441:13, 527:2, 594:24, 617:13, 617:15, 627:21
**starting** [6] - 373:24, 390:9, 591:10, 619:20, 642:16, 666:24
**Starting** [1] - 526:25
**starts** [8] - 406:16, 406:23, 407:23, 421:6, 550:17, 568:13, 580:20, 633:23
**starve** [2] - 658:16, 658:17

**state** [13] - 458:16, 490:10, 525:21, 581:10, 581:16, 585:19, 587:18, 589:4, 592:6, 592:23, 619:21, 626:4, 661:11
**State** [2] - 399:24, 695:9
**STATE** [1] - 695:4
**statement** [23] - 424:12, 465:24, 466:4, 475:3, 481:12, 514:4, 525:17, 525:19, 530:7, 548:22, 564:12, 565:10, 570:14, 573:22, 584:17, 585:24, 586:3, 586:4, 586:13, 587:10, 592:3, 592:5, 638:25
**statements** [1] - 387:3
**states** [25] - 405:4, 405:24, 408:3, 409:4, 409:18, 411:17, 412:21, 426:14, 433:14, 452:15, 461:6, 492:8, 522:17, 543:14, 544:7, 547:23, 549:21, 582:6, 585:16, 585:21, 590:10, 637:16, 638:6, 641:17, 653:5
**States** [2] - 480:11, 650:2
**stating** [2] - 501:10, 525:14
**statistics** [1] - 446:17
**status** [5] - 567:6, 567:13, 576:2, 576:12, 606:10
**statutes** [1] - 481:5
**stay** [2] - 505:5, 663:23
**staying** [3] - 421:18, 451:7, 589:3
**Stearns** [1] - 402:17
**step** [1] - 510:19
**STEPHENS** [1] - 359:15
**still** [10] - 427:6, 489:10, 504:22, 516:9, 517:16, 537:9, 539:19, 542:8, 645:7, 659:14
**stop** [2] - 471:21, 670:7
**stops** [1] - 564:24
**story** [2] - 467:25, 469:18
**straight** [4] - 398:16, 461:16, 462:5, 462:13
**Street** [15] - 365:9, 374:17, 375:4, 403:3, 403:6, 403:13, 403:23, 623:23, 658:11, 658:12, 658:15, 658:17, 658:21
**stress** [3] - 397:17, 397:22, 662:20
**stressed** [1] - 662:17
**strong** [1] - 446:11
**structure** [5] - 374:17, 375:3, 375:8, 639:7, 657:14
**stub** [20] - 378:7, 378:8, 378:15, 378:17, 379:8, 387:8, 388:13, 388:14, 388:17, 388:21, 389:9,

553:7, 564:14, 565:13, 565:21, 566:8, 679:3, 679:6, 679:16
**stuff** [4] - 439:21, 519:11, 579:17, 626:16
**style** [1] - 485:18
**subject** [9] - 394:4, 407:7, 407:17, 410:20, 412:17, 432:8, 542:3, 550:14, 694:7
**submission** [1] - 684:5
**submit** [4] - 422:18, 425:24, 669:6, 669:7
**submitted** [4] - 422:10, 618:9, 682:4, 686:17
**submitting** [3] - 427:12, 428:8, 669:3
**subpoena** [2] - 634:19, 683:11
**subsequent** [6] - 519:7, 524:7, 625:9, 672:23, 684:14, 689:21
**subsequently** [7] - 478:14, 515:13, 517:12, 625:4, 625:17, 627:12, 672:22
**subtext** [1] - 557:22
**sue** [6] - 402:19, 402:23, 643:25, 644:3, 671:5, 671:7
**sued** [2] - 670:22, 670:23
**suffer** [1] - 417:20
**suffered** [7] - 557:13, 562:8, 562:15, 565:14, 612:21, 662:12, 663:8
**suffering** [4] - 661:25, 662:8, 662:11, 663:9
**suggest** [1] - 545:9
**suggested** [1] - 458:19
**suggesting** [1] - 473:15
**suggestions** [2] - 498:9, 499:5
**suing** [1] - 556:16
**Suite** [1] - 359:16
**summary** [1] - 549:23
**summation** [2] - 395:2, 396:17
**sums** [1] - 476:8
**supersedes** [1] - 407:23
**supervising** [2] - 636:7, 641:23
**supervisor** [16] - 414:19, 451:19, 451:23, 452:2, 452:8, 452:13, 452:16, 453:6, 454:11, 454:15, 476:14, 476:19, 517:7, 552:14, 552:16, 670:11
**Supervisor** [1] - 451:9
**supervisors** [1] - 430:15
**supervisory** [9] - 436:2, 439:5, 535:11, 546:10, 546:13, 548:14, 574:2, 574:11, 662:13
**support** [3] - 477:11,

482:22, 568:16
**supported** [1] - 482:21
**supportive** [7] - 478:5, 482:18, 483:15, 483:16, 483:25, 520:16, 642:20
**supports** [1] - 639:5
**suppose** [2] - 429:5, 694:6
**supposed** [8] - 459:9, 459:10, 459:12, 459:14, 459:22, 459:24, 602:16, 617:21
**supposedly** [1] - 689:18
**Sur** [1] - 360:5
**surprise** [12] - 553:22, 611:24, 612:3, 612:4, 660:3, 660:4, 660:11, 660:13, 660:16, 660:21, 690:16, 690:19
**surprised** [3] - 474:12, 553:7, 594:20
**surprises** [1] - 660:19
**surrogacy** [2] - 452:21, 521:18
**swamped** [1] - 504:11
**swear** [1] - 649:4
**switch** [2] - 538:9, 663:22
**switched** [3] - 437:6, 537:18, 537:25
**sworn** [2] - 362:3, 513:5

## T

**tab** [1] - 595:25
**Taberay** [2] - 624:13, 624:14
**Talbert** [1] - 624:12
**tape** [6] - 418:23, 419:10, 419:16, 419:24, 420:3, 421:6
**tape-recorded** [1] - 419:16
**tape-recording** [3] - 418:23, 419:10, 421:6
**taping** [1] - 419:21
**target** [3] - 385:3, 385:12, 385:13
**tasks** [1] - 546:13
**taxable** [2] - 477:3, 676:7
**team** [6] - 508:25, 509:3, 509:10, 628:24, 639:6, 641:21
**technicals** [1] - 418:10
**teenage** [3] - 466:11, 467:11, 674:18
**teenagers** [1] - 674:20
**telephone** [12] - 457:11, 462:22, 463:12, 524:7, 524:20, 536:16, 543:3, 550:7, 558:20, 589:9, 592:11, 693:9
**ten** [10] - 438:10, 440:9, 440:13, 440:14, 440:16,

440:21, 442:14, 442:15, 445:5, 446:18

**ten-page** [3] - 440:9, 440:14, 440:16

**tenure** [1] - 659:21

**term** [4] - 369:9, 491:15, 531:24, 550:20

**terminated** [18] - 375:24, 421:15, 598:16, 612:13, 612:25, 613:5, 613:25, 614:11, 614:20, 617:10, 620:23, 631:10, 643:15, 649:20, 651:4, 661:15, 663:10, 681:19

**termination** [12] - 415:22, 416:5, 618:10, 619:4, 628:3, 631:12, 643:19, 643:23, 644:7, 646:6, 647:15, 647:22

**terms** [7] - 374:18, 392:23, 411:9, 444:9, 491:7, 582:9, 692:13

**testified** [64] - 362:4, 362:10, 399:7, 404:8, 405:12, 419:12, 422:14, 427:9, 427:20, 433:3, 452:18, 453:15, 454:18, 471:5, 476:11, 476:15, 501:4, 513:6, 513:21, 513:22, 517:6, 520:15, 526:6, 528:14, 531:23, 534:19, 538:14, 539:11, 542:25, 551:16, 561:22, 570:6, 574:14, 574:20, 577:3, 583:9, 583:20, 584:3, 592:10, 599:2, 603:10, 603:14, 615:21, 616:6, 618:22, 619:2, 619:15, 641:2, 644:12, 652:4, 652:9, 659:17, 661:8, 662:3, 665:10, 670:20, 671:11, 672:9, 672:14, 673:14, 679:6, 687:17, 690:7, 691:14

**testify** [4] - 437:18, 438:9, 574:21, 581:18

**testifying** [12] - 403:11, 403:22, 416:25, 417:12, 466:16, 466:20, 467:9, 467:23, 525:9, 535:17, 577:11, 685:25

**testimony** [47] - 403:14, 403:25, 408:8, 418:22, 419:9, 424:14, 424:16, 426:5, 426:7, 436:9, 437:7, 447:23, 448:3, 448:25, 454:19, 454:21, 462:3, 462:6, 466:13, 467:19, 468:5, 471:8, 477:10, 481:13, 485:6, 489:7, 491:2, 519:20, 521:4, 529:9, 535:16, 536:7, 541:24, 543:5, 554:16, 578:21, 580:7, 580:24, 593:3, 620:3,

626:20, 627:4, 641:7, 659:20, 670:25, 672:4, 673:17

**text** [12] - 371:9, 384:25, 441:3, 490:3, 499:4, 580:23, 632:13, 634:4, 635:10, 635:16, 680:22, 680:24

**thanked** [1] - 531:8

**THE** [127] - 386:18, 386:23, 398:9, 398:17, 398:20, 423:17, 424:21, 425:4, 425:13, 440:23, 441:4, 443:13, 443:16, 444:6, 444:11, 444:12, 444:13, 445:3, 445:10, 445:12, 445:14, 445:23, 446:7, 446:9, 446:10, 447:15, 453:18, 464:24, 465:2, 466:21, 466:25, 471:14, 471:21, 471:24, 472:5, 473:11, 473:20, 482:9, 482:14, 487:22, 487:24, 493:2, 493:4, 497:4, 500:6, 500:12, 503:25, 505:25, 506:4, 506:5, 506:8, 506:12, 512:3, 512:8, 514:24, 515:3, 523:14, 525:5, 525:7, 536:14, 536:20, 536:21, 537:2, 552:9, 552:19, 572:13, 578:9, 578:14, 578:18, 579:6, 579:16, 579:21, 591:18, 591:19, 597:15, 597:19, 597:21, 606:11, 606:13, 609:25, 621:10, 621:12, 622:6, 626:25, 629:11, 632:9, 632:12, 635:5, 635:7, 635:9, 661:2, 661:6, 663:14, 663:20, 663:22, 663:24, 665:6, 665:8, 669:10, 669:13, 669:17, 669:20, 669:24, 677:9, 677:14, 677:24, 678:3, 678:19, 678:22, 678:25, 682:20, 683:3, 683:13, 686:6, 688:17, 688:22, 688:24, 689:6, 690:4, 692:12, 692:20, 692:22, 693:17, 694:5, 694:9, 694:12, 694:15

**therapist** [2] - 398:4, 662:4

**thinking** [1] - 553:16, 557:24, 573:19

**third** [8] - 430:11, 470:2, 621:4, 621:8, 622:18, 626:16, 636:2, 644:6

**thoughts** [1] - 638:8

**threaten** [1] - 644:3

**three** [26] - 401:4, 401:11, 402:9, 402:10, 430:4, 469:19, 473:9, 474:7, 480:25, 482:18, 482:21, 482:23, 482:24, 484:22,

495:4, 513:18, 535:11, 540:13, 556:12, 569:22, 569:23, 569:25, 570:3, 582:9, 627:15, 689:25

**three-month** [2] - 484:22, 582:9

**thriving** [2] - 522:19, 525:16

**throughout** [3] - 443:8, 443:19, 520:20

**Thursday** [2] - 693:8, 693:11

**ticket** [1] - 617:20

**timely** [3] - 481:9, 494:6, 642:22

**timing** [7] - 401:7, 428:22, 448:11, 473:10, 493:23, 537:3, 627:17

**tips** [1] - 597:22

**title** [16] - 372:18, 383:14, 411:6, 414:12, 431:13, 434:12, 434:25, 435:3, 439:11, 439:18, 526:14, 586:23, 598:8, 608:20, 611:6, 656:6

**title's** [1] - 653:12

**titled** [4] - 408:18, 410:24, 458:15, 652:22

**TMT** [1] - 433:22

**to..** [1] - 677:3

**today** [16] - 464:8, 539:12, 636:20, 641:2, 652:15, 663:6, 667:21, 670:20, 671:11, 672:2, 679:23, 682:5, 683:17, 684:6, 687:16, 690:8

**Todd** [9] - 405:5, 438:16, 452:15, 537:24, 538:4, 602:22, 622:23, 624:3, 625:24

**together** [1] - 436:18

**toggle** [3] - 411:13, 411:14, 411:20

**tolling** [1] - 519:13

**tomorrow** [2] - 683:5, 692:15

**tone** [7] - 467:24, 469:15, 469:16, 521:8, 547:19, 572:8, 572:20

**took** [33] - 367:22, 399:20, 399:23, 400:18, 420:10, 436:3, 438:9, 441:10, 469:19, 469:20, 473:8, 475:5, 479:17, 488:7, 488:10, 534:7, 535:12, 551:18, 561:9, 584:2, 594:14, 606:16, 611:25, 613:20, 618:4, 624:7, 625:11, 646:2, 649:10, 685:14, 685:18, 691:6, 691:7

**tool** [1] - 535:20

**top** [7] - 378:2, 387:25, 523:16, 626:3, 637:2, 650:7, 665:13

**topical** [1] - 438:6

**total** [15] - 389:5, 391:7, 392:16, 394:23, 394:24, 396:15, 430:4, 432:24, 554:2, 555:5, 555:9, 595:12, 595:17, 597:10, 612:10

**Total** [1] - 389:6

**totally** [2] - 589:4, 589:24

**totals** [1] - 392:19

**tough** [6] - 397:5, 504:23, 504:25, 605:4, 617:13, 662:19

**toward** [1] - 582:8

**towards** [2] - 585:3, 626:15

**trade** [1] - 506:6

**traded** [1] - 505:14

**trader** [1] - 504:17

**trading** [2] - 443:9, 485:17

**traditionally** [1] - 535:18

**transcript** [11] - 423:7, 423:15, 453:9, 467:6, 471:20, 489:10, 580:2, 580:23, 582:6, 584:6, 695:12

**transcripts** [1] - 579:2

**transfer** [1] - 373:22

**transferring** [1] - 469:25

**travel** [2] - 617:23, 617:24

**traveled** [1] - 618:2

**treated** [6] - 482:4, 483:13, 483:22, 484:16, 527:12, 596:20

**treating** [4] - 477:21, 478:23, 479:7, 539:4

**Treating** [1] - 479:14

**treatment** [1] - 486:11

**tried** [6] - 364:5, 365:13, 387:2, 619:11, 627:16, 686:10

**true** [20] - 411:25, 415:15, 415:23, 416:10, 451:23, 469:12, 508:11, 508:18, 511:11, 511:19, 517:10, 564:22, 592:16, 594:3, 600:18, 643:15, 649:2, 649:6, 690:24, 695:12

**trust** [1] - 498:20

**truth** [5] - 387:3, 387:8, 510:6, 584:6, 615:2

**truthful** [6] - 577:15, 577:23, 583:8, 583:11, 583:23, 584:17

**truthfully** [1] - 577:19

**try** [6] - 399:9, 431:9, 443:23, 447:5, 506:13, 587:3

**trying** [23] - 365:6, 365:16, 403:12, 403:17, 458:19, 460:23, 479:3, 503:13, 522:2, 524:17, 537:7, 565:8,

725

570:4, 587:7, 587:8, 588:9, 588:13, 594:5, 610:22, 610:24, 620:9, 638:9, 642:3

**Tulane** [1] - 399:16, 400:11

**turn** [22] - 387:15, 388:10, 389:7, 389:8, 421:19, 431:21, 507:4, 513:9, 564:3, 564:7, 567:20, 595:23, 596:3, 609:4, 665:4, 666:15, 667:16, 668:3, 678:16, 684:8, 684:23, 685:20

**turning** [2] - 426:10, 596:10

**turns** [1] - 682:16

**twelve** [1] - 569:23

**Twelve** [2] - 572:13, 572:14

**twenty** [1] - 445:11

**twenty-five** [1] - 445:11

**twice** [2] - 458:9, 694:8

**two** [70] - 401:7, 401:11, 409:3, 430:8, 430:15, 437:19, 437:20, 437:22, 438:4, 438:8, 440:10, 440:12, 441:10, 443:18, 457:12, 466:8, 468:22, 469:20, 475:4, 475:7, 480:7, 481:15, 481:19, 482:24, 487:3, 487:9, 487:14, 488:4, 495:4, 503:12, 519:4, 520:10, 528:8, 528:11, 532:23, 533:2, 535:11, 536:18, 537:11, 542:19, 543:25, 544:11, 544:13, 546:15, 547:25, 548:23, 552:4, 552:12, 553:9, 555:8, 557:25, 570:7, 612:17, 612:21, 618:19, 628:25, 634:22, 634:25, 650:10, 650:13, 650:16, 650:19, 663:13, 665:11, 665:12, 673:15, 674:7, 683:5, 691:8, 693:5

**two-page** [2] - 438:4, 440:12

**type** [3] - 365:5, 411:12, 474:2

**types** [2] - 365:7, 619:5

**typically** [2] - 446:2, 526:24

**typing** [1] - 669:15

## U

**ultimately** [3] - 368:6, 475:7, 627:22

**Umesh** [9] - 496:7, 497:8, 498:10, 498:14, 498:22, 499:16, 500:20, 540:23, 610:20

**unable** [1] - 561:16

**uncharacteristic** [1] - 473:24

**uncomfortable** [1] - 563:16

**Under** [3] - 495:8, 642:15, 653:4

**under** [34] - 379:4, 403:21, 406:24, 411:8, 416:21, 426:13, 426:14, 427:6, 436:21, 437:4, 438:14, 451:11, 461:8, 461:12, 462:15, 464:11, 464:19, 468:8, 468:12, 470:25, 472:9, 472:17, 491:4, 550:19, 569:15, 574:9, 596:18, 612:21, 635:25, 641:16, 648:24, 648:25, 649:16, 653:25

**underlined** [1] - 691:25

**underneath** [4] - 411:17, 432:11, 492:16, 566:24

**understand** [15] - 378:14, 379:8, 385:14, 391:6, 411:18, 483:21, 522:22, 546:23, 554:4, 554:8, 583:5, 593:25, 623:13, 629:3, 661:9

**understood** [10] - 477:6, 483:11, 485:3, 509:2, 529:9, 530:8, 534:24, 547:11, 603:5, 620:3

**undertaking** [1] - 616:18

**unemployed** [4] - 363:17, 379:24, 645:7, 656:22

**Unemployed** [1] - 363:18

**unfair** [1] - 600:8

**unfairly** [1] - 596:20

**Unfortunately** [1] - 549:24

**unfortunately** [3] - 371:6, 619:22, 624:17

**unhappy** [1] - 608:15

**United** [2] - 480:11, 650:2

**unlawful** [2] - 370:14, 644:10

**unlawfully** [1] - 390:16

**unless** [1] - 406:15

**unlikely** [1] - 521:14

**unpaid** [14] - 426:17, 426:19, 461:8, 464:11, 464:19, 550:3, 550:25, 551:14, 551:25, 552:11, 552:20, 556:5, 571:8, 691:23

**unpredictable** [1] - 641:18

**unproductive** [1] - 640:18

**unprofessional** [1] - 639:18

**unusual** [1] - 493:25

**Up** [1] - 523:14

**up** [42] - 384:19, 385:19, 423:13, 426:17, 426:19, 429:6, 433:9, 447:20, 450:13, 476:8, 483:10, 512:7, 519:14, 523:12, 535:8, 537:10, 542:4, 545:19, 550:25, 553:24, 558:23, 564:22, 565:8, 578:6, 582:12, 584:15,

589:16, 589:25, 594:15, 594:20, 624:17, 651:4, 651:14, 652:2, 653:14, 656:3, 663:19, 677:11, 682:16, 683:6, 688:20, 691:23

**update** [2] - 410:3, 627:14

**updated** [2] - 364:7, 568:4

**updates** [1] - 641:20

**upper** [1] - 451:8

**upset** [3] - 552:25, 573:9, 573:14

**USD** [1] - 385:6

**utilize** [1] - 637:6

## V

**vacation** [11] - 507:24, 508:2, 508:5, 550:4, 617:16, 617:21, 617:24, 618:5, 625:7, 646:2

**vacations** [1] - 645:25

**VALDI** [1] - 359:11

**value** [1] - 385:12

**varied** [1] - 445:22

**variety** [6] - 364:3, 364:22, 366:2, 369:6, 522:4, 619:7

**Variety** [1] - 364:18

**various** [7] - 373:3, 380:9, 381:6, 381:7, 381:16, 382:20, 552:15

**Various** [2] - 365:17, 439:14

**veracity** [1] - 584:10

**verbal** [2] - 628:11, 630:17

**verbally** [10] - 415:17, 415:24, 416:6, 416:12, 427:22, 522:9, 522:12, 523:20, 618:6, 625:6

**Verbally** [1] - 522:11

**verify** [1] - 445:18

**version** [14] - 635:2, 635:3, 635:6, 635:18, 637:9, 637:20, 637:23, 638:13, 638:21, 639:21, 639:25, 642:5, 642:7, 689:21

**versions** [2] - 634:22, 634:25

**versus** [6] - 375:11, 558:5, 582:9, 645:10, 656:19, 674:14

**veteran** [1] - 426:21

**via** [4] - 425:10, 452:20, 503:4, 676:24

**view** [2] - 476:9, 483:8

**viewed** [1] - 475:25

**viewpoints** [2] - 638:8, 639:17, 642:18

**violated** [2] - 372:3, 671:9

**violates** [1] - 421:7

**violating** [1] - 376:14

**violation** [1] - 480:15

**violations** [1] - 678:9

**visited** [1] - 662:4

**VLADECK** [1] - 359:5

**vlicul@vladeck.com** [1] - 359:12

**voluntarily** [2] - 401:13, 401:22

## W

**W-2** [9] - 377:13, 377:14, 377:19, 387:22, 391:10, 564:7, 596:8, 609:8, 610:8

**W-2s** [3] - 391:10, 393:16, 609:4

**wages** [3] - 390:6, 392:23, 597:22

**wait** [1] - 614:5

**Wait** [3] - 418:25, 503:23, 576:6

**walk** [1] - 567:25

**Wall** [15] - 365:9, 374:17, 375:4, 403:2, 403:6, 403:13, 403:23, 623:23, 658:10, 658:12, 658:15, 658:17, 658:21

**wants** [1] - 425:18

**warning** [2] - 377:8, 681:7

**was..** [1] - 431:10

**water** [6] - 616:20, 616:22, 616:25, 617:3, 617:5, 686:9

**week** [12] - 489:22, 501:16, 529:24, 530:2, 534:7, 534:16, 560:19, 594:24, 617:13, 624:18, 627:15

**weeks** [43] - 426:17, 426:19, 461:8, 464:11, 464:19, 466:7, 468:22, 469:11, 472:17, 472:23, 473:15, 473:18, 482:24, 487:4, 487:9, 487:14, 488:4, 505:6, 513:18, 521:15, 532:23, 533:2, 544:13, 550:25, 551:14, 551:25, 557:25, 569:10, 569:15, 569:20, 569:22, 569:23, 569:25, 570:22, 571:8, 571:13, 571:25, 572:13, 572:14, 572:24, 597:3, 673:12, 691:23

**weeks'** [1] - 544:11

**weird** [1] - 541:5

**welcome** [1] - 412:21

**WHEREOF** [1] - 695:19

**whole** [9] - 421:9, 437:5, 500:20, 500:21, 547:5, 572:6, 584:5, 601:21, 627:19

**willing** [1] - 544:17

**wise** [2] - 447:19, 504:10

**wishes** [1] - 520:20
**withdraw** [2] - 428:5, 591:24
**withdrawn** [5] - 463:2, 466:19, 543:11, 559:11, 661:23
**WITNESS** [45] - 360:9, 361:3, 386:23, 425:4, 425:13, 441:4, 443:16, 444:11, 444:13, 445:10, 445:14, 446:7, 446:10, 466:25, 473:20, 482:14, 487:24, 493:4, 500:12, 503:25, 506:4, 506:12, 515:3, 525:7, 536:20, 537:2, 552:19, 579:6, 579:16, 579:21, 591:19, 606:13, 609:25, 635:7, 635:9, 663:22, 665:8, 669:13, 669:20, 678:22, 678:25, 686:6, 692:20, 692:22, 695:19
**witness** [3] - 496:14, 506:9, 622:10
**witness'** [1] - 664:8
**witnesses** [5] - 579:14, 692:14, 693:6, 694:4, 694:8
**women** [9] - 466:9, 466:18, 467:10, 474:3, 474:6, 552:4, 552:12, 674:10, 674:13
**word** [9] - 370:11, 487:21, 514:22, 514:24, 515:4, 668:15, 686:24, 686:25, 687:3
**wording** [2] - 530:21, 532:6
**words** [9] - 378:23, 455:9, 484:25, 524:5, 525:6, 530:16, 531:18, 554:24, 632:13
**workings** [2] - 485:15, 660:6
**works** [2] - 504:14, 504:15
**worried** [2] - 371:24, 601:19
**worries** [1] - 597:24
**write** [5] - 442:13, 442:15, 443:22, 579:6
**writes** [1] - 492:7
**writing** [24] - 406:8, 408:4, 414:18, 415:17, 415:25, 416:6, 416:12, 423:4, 424:3, 425:8, 425:10, 427:23, 459:19, 522:9, 522:11, 522:13, 523:19, 524:19, 524:20, 533:16, 541:18, 579:17, 669:8, 678:24
**Writing** [1] - 406:10
**written** [14] - 377:8, 400:16, 418:16, 422:9, 422:18, 425:24, 426:25, 427:13, 428:8, 540:25, 602:19,

609:9, 609:14, 669:3
**Written** [1] - 418:19
**wrote** [10] - 371:11, 443:9, 446:22, 494:14, 521:5, 541:7, 542:8, 543:21, 585:2, 640:15

## Y

**year** [54] - 363:9, 363:20, 367:23, 375:18, 377:15, 377:17, 384:17, 386:2, 388:22, 389:3, 389:5, 392:9, 393:17, 393:18, 394:14, 395:4, 396:9, 401:20, 401:21, 437:25, 438:2, 447:25, 523:2, 526:24, 590:21, 590:25, 594:10, 595:20, 596:13, 597:16, 599:3, 602:5, 602:13, 607:20, 610:4, 612:6, 630:18, 630:21, 630:23, 647:7, 652:5, 653:22, 654:22, 655:8, 655:13, 655:14, 655:17, 655:21, 655:23, 655:25, 661:13, 662:15, 662:19, 662:23
**Year** [1] - 379:5
**year's** [1] - 604:3
**year-to-date** [4] - 388:22, 389:3, 389:5, 395:4
**Year-to-date** [1] - 379:5
**years** [22] - 395:8, 401:5, 401:7, 401:11, 402:10, 466:11, 480:7, 480:25, 528:8, 528:11, 540:14, 602:20, 602:22, 612:17, 612:21, 617:6, 650:10, 650:13, 650:16, 650:19, 661:14, 674:19
**yesterday** [31] - 416:25, 418:23, 419:10, 422:14, 433:3, 433:22, 436:9, 437:18, 438:9, 447:24, 448:4, 448:24, 452:18, 458:12, 481:14, 507:6, 513:11, 529:9, 541:25, 567:19, 568:2, 570:6, 577:12, 580:25, 581:3, 581:18, 603:14, 607:2, 652:18, 652:20, 659:17
**Yesterday** [1] - 362:10
**yield** [62] - 371:4, 401:19, 405:10, 429:7, 429:11, 429:18, 430:4, 430:14, 430:17, 430:21, 431:3, 431:7, 431:14, 432:14, 432:24, 433:2, 434:9, 434:17, 435:22, 436:21, 437:2, 439:12, 441:19, 447:17, 448:7, 450:2,

452:10, 475:21, 475:24, 476:3, 476:6, 476:10, 485:16, 491:15, 493:20, 494:10, 505:3, 507:21, 508:8, 526:23, 534:22, 546:24, 547:12, 574:17, 574:25, 575:9, 591:5, 591:8, 592:12, 592:15, 593:5, 611:9, 611:11, 636:4, 636:6, 636:8, 659:14, 659:18, 659:22, 675:4, 675:10, 676:19
**yields** [1] - 446:19
**YN** [1] - 493:10
**YORK** [2] - 695:4, 695:6
**York** [14] - 358:15, 359:7, 359:17, 399:24, 480:12, 521:19, 525:25, 529:22, 560:2, 650:4, 695:9
**yourself** [13] - 410:17, 412:11, 412:20, 421:20, 430:8, 436:13, 458:14, 492:8, 497:8, 503:21, 504:7, 507:10, 542:3
**yourselves** [1] - 432:25
**Yulia** [5] - 412:12, 412:15, 412:22, 420:6, 420:14

## Z

**zero** [2] - 565:17, 566:7

727

1
2            JAMS ARBITRATION
             No. 1425025377
3    _____
4    HOAI NGO,
5           Claimant,
6        and
7
     OPPENHEIMER & CO., INC.,
8
9           Respondent.
10   _____
11
12   BEFORE:   JUDGE MICHAEL DOLINGER, Arbitrator
13
14                Day 3
15                New York, New York
16                March 6, 2019
17
18
19
20
21
22   Reported by:
23   Eileen Mulvenna, CSR/RMR/CRR
24
25

728

1
2    A P P E A R A N C E S :
3
4    ON BEHALF OF CLAIMANT:
5        VLADECK RASKIN & CLARK, P.C.
6            565 Fifth Avenue, 9th Floor
7            New York, New York  10017
8        Phone:  212.403.7311
9        By:    JEREMIAH IADEVAIA, ESQ.
10              jiadevaia@vladeck.com
11              VALDI LICUL, ESQ.
12              vlicul@vladeck.com
13
14   ON BEHALF OF RESPONDENT:
15       SATTERLEE & STEPHENS LLP
16           230 Park Avenue, Suite 1130
17           New York, New York
18       Phone:  212.404.8726
19       By:    MICHAEL H. GIBSON, ESQ.
20              mgibson@ssbb.com
21              JOHN COSTER, ESQ.
22              john.coster@ssbb.com
23
24
25

729

1
2    ALSO PRESENT:
3           Emily Miller (Pending admission)
4           Connor Hoffman, Paralegal
5           Nicola Murphy, Esq., In-house
6           Oppenheimer
7
8
9    WITNESS:
10          Colleen Burns
11          Robert Lowenthal
12
13
14
15
16
17
18
19
20
21
22
23
24
25

730

1
2                 I N D E X
3    WITNESS       EXAMINATION BY          PAGE
4
     COLLEEN BURNS
5
6           MR. GIBSON - DIRECT     731
7           MR. LICUL - CROSS       795
8           MR. GIBSON - REDIRECT   814
9
10   ROBERT LOWENTHAL
11          MR. GIBSON - DIRECT     817
12          MR. LICUL - CROSS       935
13          MR. GIBSON - REDIRECT   1035
14
15
16
17
18
19
20
21
22
23
24
25

731

1
2   COLLEEN BURNS,
3       having been duly sworn by the Arbitrator,
4       was examined and testified as follows:
5   DIRECT EXAMINATION
6   BY MR. GIBSON:
7       Q.   Good morning, Ms. Burns.
8       A.   Good morning.
9       Q.   Who are you currently employed by?
10      A.   Oppenheimer.
11      Q.   And what is your current title at
12  Oppenheimer?
13      A.   Head of high-yield research.
14      Q.   Do you hold any FINRA licenses?
15      A.   Yes.
16      Q.   Which licenses?
17      A.   7, 63, 16 and 24.
18      Q.   Are any of those supervisory licenses?
19      A.   The 16 is supervisory analyst, and the
20  24 is a principal license.
21      Q.   Have any of your FINRA licenses ever
22  been revoked or suspended?
23      A.   No.
24      Q.   Do you know the claimant in this case,
25  Mr. Ngo?

732

1                   Burns - Direct
2       A.   Yes.
3       Q.   How did you come to know Mr. Ngo?
4       A.   I worked with him at Bear Stearns
5   before joining Oppenheimer.
6       Q.   With the exception of yesterday, when
7   was the last time you spoke to Mr. Ngo?
8       A.   A couple of years ago.
9       Q.   During the time that you worked with
10  Mr. Ngo, how would you describe your relationship
11  with him?
12      A.   We had a good relationship.  We were
13  friends.
14      Q.   Do you still consider Mr. Ngo to be a
15  friend?
16      A.   I haven't spoken to him in a while,
17  but, yes, I consider him to be a friend.
18      Q.   Can you briefly describe your work
19  history in the industry leading up to your hiring at
20  Oppenheimer.
21      A.   I started at Citigroup in 2000 out of
22  college.  I was in investment banking for about
23  three years.  And then in 2003, I moved over to Bear
24  Stearns in the high-yield research group.  Was there
25  for about four years.  And then went to CIBC in

733

1                   Burns - Direct
2   high-yield research.  And then Oppenheimer acquired
3   CIBC's fixed income business, and then moved over to
4   Oppenheimer as part of that.
5       Q.   When you first hired by Oppenheimer,
6   what was your job title?
7       A.   I was an analyst, high-yield analyst.
8       Q.   And can you generally describe what
9   your job responsibilities were as a high-yield
10  research analyst?
11      A.   I covered credits in the consumer,
12  retail and food and beverage sector, published
13  research, sent out updates, covered -- supported the
14  sales and trading desk.
15      Q.   Do you still cover those same sectors
16  you described?
17      A.   Yes.
18      Q.   And who did you report to at the time
19  that you were hired by Oppenheimer?
20      A.   Todd Morgan, who was the head of
21  high-yield research.
22      Q.   Was Mr. Morgan already at Oppenheimer
23  at the time you were hired?
24      A.   We came over together from CIBC.
25      Q.   Do you know who Jane Ross is?

734

1                   Burns - Direct
2       A.   Yes.
3       Q.   And from the time that you started at
4   Oppenheimer through 2016, do you recall what
5   Ms. Ross' job title was?
6       A.   She was the head of high-yield sales.
7       Q.   As a research analyst at Oppenheimer,
8   did you ever report to Ms. Ross?
9       A.   No.
10      Q.   Now, am I correct that Mr. Morgan
11  eventually resigned from Oppenheimer?
12      A.   Yes.
13      Q.   Who replaced him?
14      A.   Both me and Hoai, as coheads.
15      Q.   You're currently the head of
16  high-yield research?
17      A.   Yes.
18      Q.   Did you ever report to Ms. Ross in
19  your capacity as the cohead or the sole head of
20  high-yield research?
21      A.   No.
22      Q.   Did you ever at any time at
23  Oppenheimer consider Ms. Ross to be your supervisor?
24      A.   No.
25      Q.   Why not?

735

Burns - Direct

1
2     A.    She was the head of sales.
3     Q.    How are high-yield research analysts
4  compensated at Oppenheimer?
5     A.    Salary and discretionary bonus.
6     Q.    Did you ever have any agreement with
7  Oppenheimer that entitled you to a guaranteed bonus?
8     A.    No.
9     Q.    Now, I think you testified at some
10  point you became the cohead of high-yield research?
11     A.    Yes.
12     Q.    Do you recall when that was,
13  approximately?
14     A.    The end of 2013.
15     Q.    And what do you recall about the
16  circumstances of you obtaining that position?
17     A.    Todd Morgan left to go work somewhere
18  else, and both me and Hoai were promoted as coheads
19  at the time.
20     Q.    Did Mr. Morgan ever have a cohead of
21  high-yield research at Oppenheimer?
22     A.    No.
23     Q.    When you worked with Mr. Morgan at
24  CIBC, what was his title?
25     A.    He was the head of high-yield research

736

Burns - Direct

1
2  there.
3     Q.    While you were working together at
4  CIBC, did he ever have a cohead?
5     A.    No.
6     Q.    And at the time of Mr. Morgan's
7  resignation in 2013, who was he reporting to?
8     A.    Rob Lowenthal.
9     Q.    Did you continue to report to
10  Mr. Lowenthal when you became the cohead of
11  high-yield research?
12     A.    Yes.
13     Q.    What was Mr. Lowenthal's position at
14  that time?
15     A.    He was the head of global fixed
16  income.
17     Q.    To your knowledge, did Robert
18  Lowenthal ever report to Ms. Ross?
19     A.    No.
20     Q.    At the time that you and Mr. Ngo
21  became the coheads of high-yield research, aside
22  from yourselves, how many high-yield research
23  analysts did Oppenheimer employ?
24     A.    At that time?
25     Q.    Yes.

737

Burns - Direct

1
2     A.    One other.
3     Q.    Do you remember who that was?
4     A.    Sean Sneeden.
5     Q.    From 2013 through the present, what is
6  the highest number of high-yield research analysts
7  that you can recall Oppenheimer employing at the
8  same time, exclusive of yourself and Mr. Ngo?
9     A.    Maybe three.
10     Q.    And aside from yourself, how many
11  high-yield research analysts does Oppenheimer
12  currently employ?
13     A.    One.
14     Q.    Did your job responsibilities change
15  when you received the title of cohead of the
16  high-yield research group?
17     A.    A little.
18     Q.    How did they change?
19     A.    Well, I was supervising Sean, the one
20  analyst.  And then the head of the group at that
21  time also sent out the morning blast and, as an SA,
22  would SA research pieces.
23     Q.    And let's start with the morning
24  blast.
25            How much time does it take to send out

738

Burns - Direct

1
2  the morning blast?
3     A.    To actually send it out?  A couple
4  minutes.
5     Q.    Well, I'll withdraw the question.
6            Tell me about what you do as the --
7  what you did with regard to the morning blast.
8     A.    It was a compilation of analyst
9  research.  So you put it together, put it all in one
10  piece and then distribute it to the distribution
11  list.
12     Q.    And how long did it take to do that?
13     A.    To actually add it all together?  I
14  don't know.  Maybe 15 minutes.
15     Q.    And does the morning blast currently
16  come from you?
17     A.    No, we don't publish it anymore.
18     Q.    Why don't you publish it anymore?
19     A.    We're not publishing as much, so we
20  just stopped publishing it.
21     Q.    I think you also referenced SA'ing.
22     A.    Yes.
23     Q.    Can you talk a little bit about what
24  that is.
25     A.    It's basically supervisory analyst

739

Burns - Direct

1  approval.  So a research piece, before it goes out,
2  has to be approved by an SA.  You basically review
3  it, make sure there's no exaggerated language,
4  following the proper procedures basically, and then
5  distribute it.
6     Q.   How long does it typically take to
7  complete an SA for a piece of research?
8     A.   Anywhere from 5 to 15 minutes, if it
9  was a longer piece.
10     Q.   And currently, as the head of
11  high-yield research, how many SAs do you do in a
12  typical day?
13     A.   Today?
14     Q.   Yes.
15     A.   Zero.
16     Q.   Zero?
17     A.   Yes.
18     Q.   How many SAs would you say you did in
19  a typical day in 2014?
20     A.   On average, probably three or four.
21     Q.   What percent of your workday today
22  would you say that you spend doing your task as the
23  head of the high-yield research?
24     A.   Less than two hours, maybe less than

741

Burns - Direct

1     Q.   And do you recall sending this e-mail?
2     A.   Yes.
3     Q.   Do you recall why you sent this
4  e-mail?
5     A.   Yeah, Rob had asked for bios as part
6  of marketing.
7     Q.   So was it your understanding that
8  these bios would be utilized to market to clients
9  and potential clients?
10     A.   Yes, it was for the PR company.
11     Q.   Did you draft the biographies that are
12  contained in the response?
13     A.   Yes.  I got them from the research
14  analysts and put them all together in this e-mail,
15  yes.
16     Q.   The first question I want to ask -- we
17  see here there's six individuals listed.
18     A.   Uh-huh.
19     Q.   Are all six of those individuals
20  high-yield research analysts?
21     A.   No.  Jack Lipton was municipal
22  research, and Lucila Broide was an EM analyst.
23        THE ARBITRATOR:  EM?
24        THE WITNESS:  Emerging markets.

740

Burns - Direct

1  that.
2     Q.   Is it -- is it fair for me to assume
3  that the remainder of the day you spend doing your
4  tasks as a research analyst --
5     A.   Yes.
6     Q.   -- covering your sectors?
7     A.   Correct.
8     Q.   What percent of your time in 2014
9  would you say you spent conducting your supervisory
10  responsibilities?
11     A.   Less than two hours.
12     Q.   Did you ever consider your title as
13  the head or cohead of the high-yield research group
14  to be an important part of your job function?
15     A.   No, it wasn't the main part of my job.
16     Q.   Can you take a look at what's been
17  marked as Exhibit 102.  Just take a second and take
18  a look at that document, and let me know when you're
19  ready.
20        (Pause.)
21     A.   Yep.
22     Q.   And this appears to be an e-mail from
23  yourself to Robert Lowenthal from February of 2015.
24     A.   Correct.

742

Burns - Direct

1  BY MR. GIBSON:
2     Q.   So am I correct, Ms. Burns, at the
3  time this e-mail was sent, there were four
4  high-yield research analysts?
5     A.   Yes.
6     Q.   Yourself, Mr. Ngo and Mr. Sneeden and
7  Mr. Bhandary?
8     A.   Yes.
9     Q.   And I just want to note, in your
10  biography, is there any reference to your position
11  as the head of the high-yield research group?
12     A.   No.
13     Q.   Why didn't you include that?
14     A.   It wasn't the main part of my job.
15     Q.   Did you believe that your title as the
16  head of the high-yield research group was important
17  to clients?
18     A.   No.
19     Q.   Now, did there come a time when
20  Mr. Ngo left the office for some time to travel to
21  California?
22     A.   Yes.
23     Q.   And do you recall approximately when
24  that was?

743

Burns - Direct

1
2     A.    June 2014.
3     Q.    And do you recall why Mr. Ngo went to
4  California?
5     A.    He was having a baby in California.
6     Q.    And when Mr. Ngo left the office in
7  June of 2014, did you understand him to be on an
8  FMLA leave of absence?
9     A.    No.  He wasn't on a leave, based on my
10  understanding.
11     Q.    What was the basis for that
12  understanding?
13     A.    We discussed his game plan when he'd
14  be out there, and that he would be working remotely,
15  he would take a laptop, and he would do as much as
16  he could from out there.
17     Q.    That game plan that you discussed with
18  Mr. Ngo, did you give Mr. Ngo any of your personal
19  opinions on his game plan?
20     A.    Yes.  I thought he should take the
21  time.  I thought it would be hard to work from
22  California with the new baby and the time
23  difference.  I mean, you didn't know -- maybe the
24  baby could be colicky.
25     Q.    What was Mr. Ngo's response?

744

Burns - Direct

1
2     A.    He was going to work remotely out of
3  California.
4     Q.    Now, do you have any knowledge as to
5  whether Mr. Ngo had any conversations with Ms. Ross
6  regarding his spending time out of the office for
7  the birth of his baby?
8     A.    Yes.
9     Q.    How did you come to know of that
10  conversation?
11     A.    He told me.
12     Q.    "He" being Mr. Ngo?
13     A.    Yes.
14     Q.    And what do you recall Mr. Ngo telling
15  you about his conversation with Ms. Ross?
16     A.    That he felt that she wasn't
17  supportive of him taking leave.
18     Q.    And when Mr. Ngo was describing his
19  conversation with Ms. Ross to you, did he ever
20  indicate to you that Ms. Ross had told him he could
21  not take a leave?
22     A.    No.
23     Q.    Did you ever indicate to you that
24  Ms. Ross told him he could not take 12 weeks of
25  leave?

745

Burns - Direct

1
2     A.    No.
3     Q.    Did he ever indicate to you that
4  Ms. Ross was -- he felt Ms. Ross was treating him
5  differently because he was a man?
6     A.    No.
7     Q.    Who was Mr. Ngo's supervisor at that
8  time, in 2014?
9     A.    Rob.
10     Q.    Now, during the time period that
11  Mr. Ngo was in California, how often did you
12  communicate with him?
13     A.    We communicated frequently.
14     Q.    Was he sending e-mails?
15     A.    Yes.
16     Q.    Was he responding to e-mails?
17     A.    Yes.
18     Q.    Did you speak to him on the telephone?
19     A.    Yes.
20     Q.    How often?
21     A.    Once a week.  We spoke frequently.
22     Q.    Was Mr. Ngo doing any work during that
23  time period, to your knowledge?
24     A.    Yes.
25     Q.    What type of work do you recall him

746

Burns - Direct

1
2  doing?
3     A.    He was responding to e-mails, SA'ing
4  certain retail -- certain pieces, research pieces.
5     Q.    Take a look at Exhibit 125, please.
6  Just take a moment and review that, and let me know
7  when you've had a chance to review it.
8        (Pause.)
9     Q.    I'd like to start -- we see there's
10  three e-mails on this page, but I'd like to start
11  with the one that's about halfway down the page from
12  Mr. Sneeden.
13     A.    Right.
14     Q.    And we see this e-mail is dated
15  July 16, 2014?
16     A.    Yes.
17     Q.    Where was your -- to your
18  understanding, where was Mr. Ngo physically located
19  at that time?
20     A.    California.
21     Q.    How long had he been out of the
22  office?
23     A.    A couple weeks, maybe three weeks.
24     Q.    Now, we see that Mr. Sneeden sent an
25  e-mail to a number of people, including yourself and

747

Burns - Direct

1 Mr. Ngo?

2 A. Yes.

3 Q. And Mr. Sneeden says, "Please review

4 and approve AC OK SS"?

5 A. Yes.

6 Q. What's your understanding of what

7 Mr. Sneeden was requesting here?

8 A. He's asking for SA approval and

9 compliance approval to send out this piece.

10 Q. And above that, we see a response

11 e-mail from Paula Kanno?

12 A. Yes.

13 Q. Is it your understanding that that's

14 the compliance approval that Mr. Sneeden was looking

15 for?

16 A. Yes.

17 Q. And then above that, we see a response

18 from Mr. Ngo from that same day?

19 A. Yes.

20 Q. And Mr. Ngo writes "SA OK HN"?

21 A. Yes.

22 Q. What is your understanding of what

23 Mr. Ngo was communicating in this e-mail?

24 A. That was the supervisory analyst

748

Burns - Direct

1 approval.

2 Q. Were you surprised that Mr. Ngo SA'd

3 this particular piece of research for Mr. Sneeden?

4 A. No.

5 Q. Why not?

6 A. Because he was working from

7 California.

8 Q. During the time period that Mr. Ngo

9 was in California, did he ever tell you that he

10 should not be working because he was on leave of

11 absence?

12 A. No.

13 Q. And by the way, looking at

14 Mr. Sneeden's research, you see it's approximately

15 four and a half pages, would you say?

16 A. Yeah.

17 Q. And can you tell from this e-mail how

18 long it took Mr. Ngo to SA this piece?

19 A. Couple minutes.

20 Q. Is that an unusual length of time to

21 SA a piece of research this size?

22 A. No. It depends on how quick of a

23 reader you are. Like I said, it could take anywhere

24 from 5 minutes -- it depends on the length of a

749

Burns - Direct

1 piece. It could take a couple minutes up to 15

2 minutes, depending. And there's some charts and

3 stuff that -- the actual wording of it is basically

4 a page.

5 Q. And I'm sorry. I think I asked you

6 this already.

7 But at or about this time, in 2014,

8 how many pieces of research were you SA'ing in an

9 average day?

10 A. An average day, probably three to

11 four.

12 THE ARBITRATOR: Apart from this one

13 instance of an SA by Mr. Ngo while he was out

14 in California, are you aware of any other

15 instances in which he was SA'ing drafts?

16 THE WITNESS: I think he might have

17 SA'd other, but I don't recall specific

18 pieces.

19 THE ARBITRATOR: You think he might

20 have done it or you're uncertain as to

21 whether this is one isolated instance as

22 opposed to a pattern of conduct by him?

23 THE WITNESS: Well, I was SA'ing most

24 of them because I was an SA, too, and I was

750

Burns - Direct

1 there. But like I said, I think he may have

2 been SA'ing other ones, but I don't have

3 anything specific to point to.

4 THE ARBITRATOR: Okay.

5 BY MR. GIBSON:

6 Q. On that point, Ms. Burns, why were you

7 SA'ing most of them?

8 A. Well, I was there, so I would get them

9 and SA them when I received them.

10 THE ARBITRATOR: Do you get them

11 normally this way, that is by e-mail?

12 THE WITNESS: Yes, you get them by

13 e-mail most of the time.

14 THE ARBITRATOR: And as far as you can

15 tell during the time that Mr. Ngo was away,

16 were analysts sending their pieces for SA'ing

17 solely to you --

18 THE WITNESS: No, I believe --

19 THE ARBITRATOR: -- or would they send

20 it to a whole list of people, including you

21 and Mr. Ngo?

22 THE WITNESS: Yeah, it was sent to a

23 list of people, is my recollection.

24 THE ARBITRATOR: And if it was sent to

751

Burns - Direct

1    both you and Mr. Ngo, while he was away, how
2    would you or he determine which of the two of
3    you would do the SA'ing?
4        THE WITNESS:  You would see -- I mean,
5    you didn't discuss it.  You would just SA
6    it -- you would read it and SA it and send it
7    back and reply to all.
8        THE ARBITRATOR:  Okay.
9    BY MR. GIBSON:
10       Q.   Ms. Burns, if you could take a look at
11   Exhibit 128.
12       A.   Yes.
13       Q.   Let me know when you've had a chance
14   to review that.
15       (Pause.)
16       A.   Yes.
17       Q.   This appears to be an e-mail from
18   Mr. Ngo to yourself dated Friday, July 25th?
19       A.   Yes.
20       Q.   And Mr. Ngo states, "I think you are
21   out in July.  Did you want me to SA while you are
22   gone?"
23       Do you see that?
24       A.   Yes.

752

Burns - Direct

1        Q.   Do you recall receiving that e-mail?
2        A.   Yes.
3        Q.   And what is your understanding of what
4    Mr. Ngo was asking in this e-mail?
5        A.   I take vacation every year in late
6    July with my family.  He knows that.  So I was going
7    to be out for that week.  So he was asking me if I
8    wanted him to handle the SA'ing while I was out.
9        Q.   Do you think it was odd that Mr. Ngo
10   sent you that e-mail?
11       A.   No.
12       Q.   Why not?
13       A.   Because he was working from
14   California.
15       Q.   During the time period --
16       THE ARBITRATOR:  Let me ask this:
17       Does this particular e-mail suggest to you
18       that as a general rule, he wasn't SA'ing up
19       to that point and, therefore, felt the need
20       to ask you if you wanted him to cover for
21       you?
22       THE WITNESS:  No, I took it as he knew
23       I was going to be out and so he would handle
24       it and me not worry about it when I got it.

753

Burns - Direct

1    So he would handle all of it.
2        THE ARBITRATOR:  Okay.
3    BY MR. GIBSON:
4        Q.   Now, during the time period that
5    Mr. Ngo was in California for the birth of his baby,
6    did he ever indicate to you that he was being forced
7    in any way by Oppenheimer to work?
8        A.   No.
9        Q.   When Mr. Ngo left for California, did
10   he give you any idea of when he was expecting to
11   return to the office?
12       A.   A couple of weeks.
13       Q.   Did he tell you that?
14       A.   Yes.
15       Q.   And did there come a time when you
16   learned that Mr. Ngo was going to be out of the
17   office for a longer period of time?
18       A.   Yes.
19       Q.   How did you first become aware of
20   that?
21       A.   He told me, and then he also sent an
22   e-mail.
23       Q.   When did -- when he told you, was that
24   on a telephone conversation?

754

Burns - Direct

1        A.   I can't remember if it was telephone
2    or through text, but he told me that -- whatever --
3    what was going on with the baby.  We had been
4    frequently communicating.
5        THE ARBITRATOR:  You said at some
6        point that he had indicated he would be back
7        in a couple of weeks?  Did I understand you
8        correctly?
9        THE WITNESS:  That he would be out for
10       a couple of weeks, yes.
11       THE ARBITRATOR:  Approximately when
12       did he tell you that?  Before he went to --
13       THE WITNESS:  Before.  Before, yeah.
14       Before he left.  We didn't have a
15       conversation --
16       THE ARBITRATOR:  I see.
17   BY MR. GIBSON:
18       Q.   I think you testified that there was a
19   subsequent e-mail after your conversation?
20       A.   Yes.
21       Q.   Let's take a look at Exhibit 114,
22   please.  If you could just give that chain a quick
23   read and let me know when you're ready.
24       (Pause.)

755

Burns - Direct

1    A.    Okay.
2    Q.    So starting with the bottom e-mail on
3    the page from Mr. Ngo to yourself and Ms. Burns
4    dated Sunday, July 13, is that the e-mail you just
5    testified about?
6    A.    Yes.
7    Q.    And do you recall receiving this
8    e-mail from Mr. Ngo?
9    A.    Yes.
10    Q.    And we see in the first sentence of
11    the e-mail, Mr. Ngo states, "Thanks for all the good
12    wishes and understanding through this entire
13    process."
14          Do you see that?
15    A.    Yes.
16    Q.    And if we look at the last paragraph,
17    the second sentence states, "Thanks again for all
18    your help and support."
19    A.    Yes.
20    Q.    Were you surprised to read those lines
21    in Mr. Ngo's e-mail?
22    A.    No.
23    Q.    Why not?
24    A.    I think we were -- I was trying to be

756

Burns - Direct

1    helpful and supportive.
2    Q.    And we see -- in the third paragraph
3    of this e-mail that starts, "The doctor
4    recommended," do you see the sentence that states,
5    "Our plan is to leave" -- I'm sorry.
6          In the fourth paragraph --
7    A.    Yes.
8    Q.    -- "My plan is to come back to the
9    office by August 25th."
10    A.    Yes.
11    Q.    Were you Mr. Ngo's supervisor as of
12    July 13, 2014?
13    A.    No.
14    Q.    Was Ms. Ross?
15    A.    No.
16    Q.    Who was Mr. Ngo's supervisor at that
17    time?
18    A.    Rob Lowenthal.
19    Q.    When you received this e-mail, did you
20    notice that Mr. Lowenthal was not copied on it?
21    A.    Yes, he was not on the e-mail.
22    Q.    Did you have any reaction when you saw
23    that?
24    A.    Rob should have gotten the e-mail.

757

Burns - Direct

1    Q.    Why do you think Rob should have
2    gotten the e-mail?
3    A.    He was his boss.
4    Q.    Do you see any reference in this
5    e-mail to the FMLA?
6    A.    No.
7    Q.    Do you see any reference in this
8    e-mail to a leave of absence?
9    A.    No.
10    Q.    Do you see anywhere in this e-mail
11    where Mr. Ngo was requesting more time out of the
12    office?
13    A.    No.
14    Q.    Was it your understanding that you
15    could approve or disapprove of a leave of absence
16    for Mr. Ngo at this time?
17    A.    No.
18    Q.    Was it your understanding that
19    Ms. Ross could approve or disapprove of a leave of
20    absence for Mr. Ngo at this time?
21    A.    No.
22    Q.    When you received this e-mail from
23    Mr. Ngo, did you take that to be him requesting a
24    leave of absence from Oppenheimer?

758

Burns - Direct

1    A.    No.
2    Q.    What was your understanding of what
3    Mr. Ngo was communicating in this e-mail?
4    A.    That he was stating he'd be back in a
5    couple of weeks and -- an extension of the current
6    arrangement.
7    Q.    If we look above Mr. Ngo's e-mail, we
8    see a response from Ms. Ross?
9    A.    Yes.
10    Q.    And you're not copied on this
11    response; correct?
12    A.    No.
13    Q.    Did you ever see this e-mail?
14    A.    Yes.
15    Q.    And looking at Ms. Ross' response
16    where she states, "Glad everything is going well and
17    that little Lily is healthy and thriving.  Send
18    photos.  And we'll see you sometime in August" --
19    A.    Yes.
20    Q.    -- did it surprise you when you read
21    that from Ms. Ross?
22    A.    No.  It was a nice, understanding
23    response.
24    Q.    Keep your voice up a bit.

759

Burns - Direct

2  A.    Sorry.
3       Q.    And do you see in Ms. Ross' e-mail
4  where she asked Mr. Ngo how he intends to handle
5  second -- 2Q earnings?
6  A.    Yes.
7       Q.    What are 2Q earnings?
8  A.    It's a second-quarter period where
9  companies report their second-quarter performance.
10      Q.    And is that a busy time at
11 Oppenheimer?
12 A.    Yes.
13      Q.    Did you discuss the issue of
14 second-quarter earnings with Ms. Ross at or about
15 the time of this e-mail?
16 A.    Yes, I believe we discussed it after
17 this e-mail.
18      Q.    And what do you recall about that
19 conversation with Ms. Ross?
20 A.    We talked about the logistics of how
21 we were going to handle it, that John would help
22 fill in, and I would help oversee it.
23      Q.    Who was John?
24 A.    He's a junior analyst in the group.
25      THE ARBITRATOR:  That's Mr. Daniels?

760

Burns - Direct

2       THE WITNESS:  Yes, John Daniels.
3  BY MR. GIBSON:
4       Q.    During the conversation that you had
5  with Ms. Ross about second-quarter earnings, do you
6  recall Ms. Ross indicating that Mr. Ngo was on an
7  FMLA leave of absence?
8  A.    No.
9       Q.    Or on any leave of absence?
10 A.    No.
11      Q.    Did you think it was inappropriate for
12 Ms. Ross to ask questions from Mr. Ngo about how
13 second-quarter earnings would be handled?
14 A.    No.
15      Q.    Why not?
16 A.    Well, because it was a busy time and
17 he was working from out there.
18      Q.    And if we look one e-mail up to
19 Mr. Ngo's response to Ms. Ross --
20 A.    Yes.
21      Q.    -- in the second paragraph, Mr. Ngo
22 states, "I just spoke with Colleen.  I can see what
23 John can do while I'm away.  I can help out more
24 when I'm back in the office" -- I'm sorry -- "when
25 I'm back in New York, as the logistics will get

761

Burns - Direct

2  better."
3       Do you recall having that conversation
4  with Mr. Ngo?
5  A.    Yes, I believe we spoke before that.
6       Q.    And what do you recall about the
7  conversation that you had with him?
8  A.    I believe we just talked about
9  logistics, that John would try to handle as much and
10 I would help to fill in and cover the desk as much
11 as possible.
12      Q.    During that conversation with Mr. Ngo,
13 did he indicate to you his belief that he was on an
14 FMLA leave?
15 A.    No.
16      Q.    Did he tell you that he felt he was on
17 a leave of absence?
18 A.    No.
19      Q.    Did he tell you that he felt he should
20 not be working?
21 A.    No.
22      Q.    Did he tell you that he felt Ms. Ross
23 was forcing him to work?
24 A.    No.
25      Q.    And I think you testified that the

762

Burns - Direct

2  "John" reference is John Daniels?
3  A.    Yes.
4       Q.    Before Mr. Ngo left the office in June
5  of that year, do you have any knowledge as to
6  whether he discussed work coverage with Mr. Daniels?
7  A.    Yes, I believe they sat down and
8  discussed -- he showed him the models, where things
9  were and things of that nature.
10      Q.    Do you have any knowledge as to
11 whether Mr. Ngo prepared Mr. Daniels for covering
12 second-quarter earnings in his --
13 A.    I don't know their exact
14 communication.
15      Q.    In your opinion, was John Daniels
16 qualified to handle Mr. Ngo's responsibilities with
17 regard to second-quarter earnings?
18 A.    No.  He was a junior analyst, so he
19 couldn't do it on his own.
20      Q.    And who eventually covered those
21 second-quarter obligations?
22 A.    John and I did it together.  I helped.
23      Q.    Now, to your knowledge, did there come
24 a time when Mr. Lowenthal learned that Mr. Ngo was
25 not going to be returning to the office until

763

Burns - Direct

1   August 25th?
2   A.   Yes.
3   Q.   And do you know how Mr. Lowenthal came
4   to know that?
5   A.   I believe Jane told him.
6   Q.   What's your basis for that?
7   A.   I saw Jane go in there, and then
8   afterwards I spoke to Rob.
9   Q.   When you say you "saw Jane go in
10  there," was that Rob's office?
11  A.   Rob's office, yes.
12  Q.   And did you have any conversations
13  with Mr. Lowenthal about Mr. Ngo's e-mail?
14  A.   Yes.
15  Q.   How many conversations did you have?
16  A.   Two that I recall.
17  Q.   Tell me about what you recall about
18  the first conversation.
19  A.   The first conversation, when I went in
20  there, Rob was upset that obviously he was hearing
21  about this not directly from Hoai, and he asked me
22  to tell Hoai to call him.
23  Q.   And did you inform -- did you tell
24  Mr. Ngo to call --
25

764

Burns - Direct

1   A.   Yes, I did.
2   Q.   -- Mr. Lowenthal?
3   You've got to wait for me to finish
4   the question.
5   How soon after speaking to
6   Mr. Lowenthal did you tell Mr. Ngo that he should
7   call Mr. Lowenthal?
8   A.   How soon?  I talked to Hoai after I
9   spoke to Rob.
10  Q.   And did you -- I think you testified
11  you had a second conversation with Mr. Lowenthal?
12  A.   Yes.
13  Q.   And when approximately was that second
14  conversation?
15  A.   It was after he spoke to Hoai, so
16  maybe a day or two.
17  Q.   And what do you recall about that
18  second conversation with Mr. Lowenthal?
19  A.   That was when he told me that I would
20  be handling all the supervisory responsibilities of
21  the group going forward.
22  Q.   And was Ms. Ross present for that
23  conversation with Mr. Lowenthal?
24  A.   No.
25

765

Burns - Direct

1   Q.   During that second conversation you
2   had with Mr. Lowenthal, did he give you any specific
3   reason for why you were going to be the sole
4   supervisory analyst going forward?
5   A.   No.
6   Q.   Did he ever subsequently give you a
7   reason?
8   A.   No.
9   THE ARBITRATOR:  Did he indicate to
10  you at the time that this was to be a
11  permanent arrangement or temporary while
12  Mr. Ngo was out in California, or did he not
13  clarify that?
14  THE WITNESS:  He didn't clarify.  He
15  basically said, you're going to handle the
16  supervisory responsibilities going forward,
17  from my recollection.
18  BY MR. GIBSON:
19  Q.   Did Mr. Lowenthal ever indicate to you
20  that -- already got that question.
21  From the date on which you became the
22  sole head of high-yield research through the
23  present, have you ever had another cohead?
24  A.   No.
25

766

Burns - Direct

1   Q.   To your knowledge, has Oppenheimer
2   ever considered hiring anyone to be the cohead of
3   the group with you?
4   A.   No.
5   Q.   To your knowledge, has Oppenheimer
6   ever considered promoting another research analyst
7   to be the cohead of the group with you?
8   A.   No.
9   Q.   Would it surprise you if it did?
10  A.   Yeah.
11  Q.   Why?
12  A.   It's a small group.  It's not really
13  necessary.
14  Q.   After your conversation with
15  Mr. Lowenthal, did you have any understanding as to
16  what Mr. Ngo's job function would be when he
17  returned to the office?
18  A.   Well, I was handling all the
19  supervisory responsibilities, so he would be a
20  research analyst.
21  Q.   I'd like you to take -- it may be a
22  different book.  Take a look at Exhibit 56, please.
23  Just let me know when you've had a chance to review
24  that.
25

767

1          Burns - Direct
2          (Pause.)
3     A.   Okay.
4     Q.   This appears to be an e-mail from
5  Mr. Lowenthal to yourself, copying Steve Krasner and
6  Cary Holcomb, dated July 21st, 2014.
7          And do you recall receiving that
8  e-mail --
9     A.   Do I have the right one?
10    Q.   I'm sorry.  56?
11         MR. LICUL:  I don't think that's --
12         THE WITNESS:  No.  Sorry.  Wrong one.
13  BY MR. GIBSON:
14    Q.   So this is Rob Lowenthal to yourself
15  and Krasner and Holcomb?
16    A.   Yes.
17    Q.   Let me know when you've had a chance
18  to look at that.
19         (Pause.)
20    A.   Okay.
21    Q.   And this appears to be an e-mail from
22  Mr. Lowenthal to yourself, copying Steve Krasner and
23  Cary Holcomb, that's dated July 21st, 2014?
24    A.   Yes.
25    Q.   And do you recall receiving this

768

1  e-mail from Mr. Lowenthal?
2     A.   Yes.
3     Q.   Do you know who Steve Krasner and Cary
4  Holcomb are?
5     A.   Steve Krasner is legal, and Cary is
6  like compliance/risk management.
7     Q.   And in Mr. Lowenthal's e-mail to you,
8  if you look at the second line, it states,
9  "Beginning today, you are the sole supervisory
10  analyst in the fixed income research department."
11         Do you see that?
12    A.   Yes.
13    Q.   Was this e-mail the first time that
14  Mr. Lowenthal communicated to you that you were the
15  sole head of high-yield research going forward?
16    A.   No, we had a conversation a couple
17  days earlier where he told me.
18    Q.   Do you have any understanding as to
19  why Mr. Lowenthal would have sent this e-mail after
20  the conversation?
21    A.   I think it was just to document it.
22    Q.   When Mr. Lowenthal told you that you
23  were the sole head of high-yield research going
24  forward, did you believe it was unfair to Mr. Ngo?

769

1          Burns - Direct
2     A.   No.  I mean, I can understand why Rob
3  was upset with the way the situation was handled.
4  And I was -- I stepped up and was handling the
5  supervisory responsibilities.
6     Q.   Now, we saw in Mr. Ngo's July 13th
7  e-mail that he had anticipated returning to the
8  office on August 25th?
9     A.   Yes.
10    Q.   Did that, in fact, happen?
11    A.   No.
12    Q.   And do you recall why that didn't
13  happen?
14    A.   He had a brain aneurysm.
15    Q.   And you testified that while Mr. Ngo
16  was in California with his baby, it was your
17  understanding that he was working remotely?
18    A.   Yes.
19    Q.   And you were e-mailing with him
20  regularly?
21    A.   Yes.
22    Q.   You were speaking with him over the
23  telephone?
24    A.   Yes.
25    Q.   What work do you recall Mr. Ngo doing

770

1          Burns - Direct
2  after he suffered -- between the time when he
3  suffered his brain aneurysm and when he returned to
4  work?
5     A.   He wasn't working.
6     Q.   I'm sorry?
7     A.   He wasn't working.
8     Q.   How often were you communicating with
9  him during that time period?
10    A.   No, we weren't communicating through
11  e-mail.  I was checking in on him, but we weren't
12  communicating through e-mail or --
13    Q.   Did you visit him in the hospital?
14    A.   I did.
15    Q.   Do you recall when Mr. Ngo returned to
16  work?
17    A.   The beginning of November.
18    Q.   Did you have any conversations with
19  Mr. Ngo on the first day or two after he returned?
20    A.   Yes, I did.
21    Q.   What do you recall about those
22  conversations?
23    A.   Well, he had spoken to Rob on that
24  first day or second day when he was back, and he
25  was -- felt that Rob demoted him.

771

Burns - Direct

1    Q.    Were you surprised that Mr. Lowenthal
2    [sic] had told you that he felt that Rob had just
3    demoted him?
4    A.    Yes, it was my understanding that Rob
5    had told him back in July that I was handling the
6    supervisory responsibilities of the group going
7    forward.
8    Q.    Now, did Mr. Ngo receive a
9    discretionary bonus for the work that he had done in
10   2014?
11   A.    Yes.
12   Q.    And when would that discretionary
13   bonus have been paid?
14   A.    February 2015.
15   Q.    And who set that bonus amount?
16   A.    Robert Lowenthal.
17   Q.    Did Mr. Lowenthal discuss that
18   decision with you?
19   A.    Yes.
20   Q.    Why did he discuss it with you?
21   A.    I was the supervisor.
22   Q.    Was Ms. Ross involved in any of those
23   discussions?
24   A.    No.

772

Burns - Direct

1    Q.    If you could take a look at
2    Exhibit 11H.
3          By the way, Ms. Ross -- Ms. Burns,
4    before I ask you about that --
5    A.    Hold on.  Let me find it.
6          11H, you said?
7    Q.    Yes.
8    A.    Okay.
9    Q.    Actually -- withdrawn.
10         I'm just going to ask you about -- do
11   you see the two documents that are in Exhibit 11H?
12   A.    Yes.
13   Q.    And what do those appear to be?
14   A.    Pay stubs, bonus pay stubs.
15   Q.    And do you recall what Mr. Ngo's bonus
16   for 2014 was?
17   A.    A hundred thousand.
18   Q.    And is that what's reflected in these
19   pay stubs?
20   A.    Yes.
21   Q.    And I see here that that $100,000
22   appears to be broken down into two payments; one of
23   40,000, one of 60,000?
24   A.    Yes.

773

Burns - Direct

1    Q.    Do you have any recollection as to why
2    it was broken down in two payments?
3    A.    The 40,000 was the first amount Rob
4    was going to give, and then we discussed it.  I felt
5    the number was low, and he authorized the 60,000.
6    Q.    And who told Mr. Ngo -- well, who told
7    Mr. Ngo what his bonus for 2014 was going to be?
8    A.    I did.
9    Q.    And at the time that you told him, had
10   you already received the authorization for the extra
11   $60,000?
12   A.    Yes.
13   Q.    So am I correct that you told Mr. Ngo
14   that he would be receiving a $100,000?
15   A.    Yes.
16   Q.    And was Ms. Ross present in that
17   conversation?
18   A.    No.
19   Q.    What do you recall Mr. Ngo's reaction
20   being when you told him that his bonus was going to
21   be a $100,000 for 2014?
22   A.    He was very upset, obviously, being
23   down from the year before.  I think, you know, he
24   acknowledged that he was out of office for a period

774

Burns - Direct

1    of time, but felt that it was disproportionally low.
2          THE ARBITRATOR:  Let me ask this:  You
3    mentioned that you had some conversations
4    with Mr. Lowenthal about a bonus.  Could you
5    describe what it was, in substance, that he
6    said to you and you said to him --
7          THE WITNESS:  Oh, it was --
8          THE ARBITRATOR:  -- in these
9    conversations.
10         THE WITNESS:  -- more -- the
11   conversation was more like he has -- he sets
12   the bonus.  When he gave that number, I
13   thought it was low and that it should be
14   higher than that, and then he authorized the
15   60,000.
16         THE ARBITRATOR:  In the course -- was
17   it more than one conversation or just one?
18         THE WITNESS:  One conversation.
19         THE ARBITRATOR:  In the course of that
20   conversation, did he offer any explanation
21   for his decision as to the amount of the
22   bonus?
23         THE WITNESS:  Not that I recall.  I
24   mean, he basically -- he sets the number and

775

Burns - Direct

1      he felt like that's reflective of the
2      contribution, and that was the number he set.
3      I thought it was low.  I said I thought it
4      should be higher, and then he authorized the
5      additional 60-.
6            THE ARBITRATOR:  Okay.
7    BY MR. GIBSON:
8      Q.   Did you ever feel that the $100,000
9   bonus that was paid to Mr. Ngo for 2014 was
10  punishment for him being out of the office for the
11  birth of his child?
12     A.   No.
13     Q.   Did you ever feel that the $100,000
14  discretionary bonus that Mr. Ngo received for 2014
15  was punishment for taking a leave of absence for his
16  brain aneurysm?
17     A.   No.
18     Q.   Now, Mr. Ngo, if I'm correct, left for
19  the birth of his baby on June 20th of 2014?
20     A.   Yes.
21     Q.   If I'm correct, the next day he was at
22  work was November 3rd, 2014?
23     A.   Yes.
24     Q.   Would you agree with me that that's a


776

Burns - Direct

1  period of just over four months?
2     A.   Yes.
3     Q.   Were you out of the office for four
4  months in 2014?
5     A.   No.
6     Q.   And am I correct that you testified
7  that during the period of August 18th through
8  November 3rd, 2014, Mr. Ngo was not doing any work,
9  to your knowledge?
10     A.   No, he was recovering during that
11  time.
12     Q.   During the period June 20, 2014,
13  through August 17, 2014, the time period that
14  Mr. Ngo was in California, was he completing all of
15  his tasks as a research analyst?
16     A.   No.
17     Q.   Was he completing all of his tasks as
18  the cohead of the group?
19     A.   No.
20     Q.   Who was completing the remainder of
21  the work that wasn't getting done?
22     A.   I was covering some of it, and John
23  Daniels was covering some of it.
24     Q.   Do you recall what your discretionary

777

Burns - Direct

1  bonus for work done in 2014 was?
2     A.   235-.
3     Q.   Take a look at Exhibit 12D, please.
4           (Pause.)
5     Q.   Does that reflect your bonus paid for
6  2014?
7     A.   Yes.
8     Q.   And it's $235,000?
9     A.   Yes.
10     Q.   Ms. Burns, I think you testified
11  earlier that you consider yourself a friend of
12  Mr. Ngo?
13     A.   Yes.
14     Q.   Do you think it would have been fair
15  for Mr. Ngo to receive the same $235,000 bonus that
16  you received for 2014?
17     A.   No.
18     Q.   Why not?
19     A.   I don't think our contribution was the
20  same in that year.
21     Q.   Why not?
22     A.   Well, I wasn't out of the office for a
23  period of time, and I was also stepping up and
24  trying to handle more of the stuff for the desk at

778

Burns - Direct

1  that time.
2     Q.   Do you know whether Mr. Sneeden
3  received a bonus for work that he did in 2014?
4     A.   He did.
5     Q.   Can you take a look at Exhibit 13,
6  please.
7          (Pause.)
8     Q.   I'd like you to turn -- if you look in
9  the bottom right corner, there's a "Confidential
10  OPCO" in small letters.
11     A.   Yes.
12     Q.   If you can turn in to page 1216,
13  please.
14     Do you see what appears to be a 2014
15  W-2 for Mr. Sneeden?
16     A.   Yes, I believe -- yes.
17     Q.   And you see there's some handwriting
18  in the middle of the page that says, "$125,000
19  bonus"?
20     A.   Yes.
21     Q.   Do you have any knowledge as to
22  whether that represents Mr. Sneeden being paid a
23  $125,000 bonus in 2015 for 2014?
24     A.   Yes, that sounds right.

779

Burns - Direct

1    Q.   Do you remember what Mr. Sneeden's
2    bonus was for 2014?
3
4    A.   That sounds in the right range.
5    Q.   If you turn to the prior page, which
6    is 1215, what bonus number is indicated on
7    Mr. Sneeden's 2015 W-2?
8    A.   135-, 135,000.
9    Q.   Was Mr. Sneeden out of the office for
10   four months in 2014?
11   A.   No.
12   Q.   I want to go back to -- for a second
13   to your conversation with Mr. Ngo when you told him
14   about the $100,000 bonus.
15        After Mr. Ngo expressed his
16   displeasure with that number, did you ever indicate
17   to him that you would go discuss it further with Rob
18   Lowenthal?
19   A.   No, I don't recall that.  I recall, I
20   believe, telling him that if he wanted to discuss it
21   further with Rob Lowenthal, he could.
22   Q.   Following your February 2015
23   conversation with Mr. Ngo about his bonus, did you
24   have any other conversations with him in 2015 in
25   which he told you that he felt that Oppenheimer was

780

Burns - Direct

1    punishing him?
2    A.   No, not that I recall.
3    Q.   Any other conversations that year when
4    he told he felt he was being treated unfairly by
5    Oppenheimer?
6    A.   No, not that I recall.
7    Q.   Did Mr. Ngo work at Oppenheimer for
8    the entirety of 2015?
9    A.   Yes.
10   Q.   And what was his job title during that
11   year?
12   A.   High-yield research analyst.
13   Q.   And do you recall whether Mr. Ngo
14   received a discretionary bonus for work that he
15   performed in 2015?
16   A.   Yes.
17   Q.   Am I correct that that would have been
18   paid in February -- in about February of 2016?
19   A.   Yes.
20   Q.   Let's go back to Exhibit 11, please.
21   Specifically 11I -- oh, wait.  I'm sorry.  Yes, 11I.
22   Apologies.
23        And, Ms. Burns, looking at this
24   document, can you tell what Mr. Ngo's discretionary
25

781

Burns - Direct

1    bonus for work performed in 2015 was?
2    A.   $175,000.
3    Q.   Who made the decision to pay Mr. Ngo a
4    $175,000 discretionary bonus?
5
6    A.   Rob Lowenthal.
7    Q.   Was -- did you have any discussions
8    with Mr. Lowenthal about that number?
9    A.   Yes.
10   Q.   Was that conversation with
11   Mr. Lowenthal consistent with the conversation you
12   described in 2014?
13   A.   Yes.
14   Q.   Was Ms. Ross involved in that
15   discussion?
16   A.   No.
17   Q.   Did you think $175,000 was a fair
18   number?
19   A.   Yeah.  I mean, he got paid more than
20   Sean Sneeden did that year.
21   Q.   Who told Mr. Ngo that he was going to
22   receive a $175,000 discretionary bonus?
23   A.   I did.
24   Q.   Was Ms. Ross present for that
25   conversation?

782

Burns - Direct

1    A.   No.
2    Q.   What do you recall Mr. Ngo's reaction
3    being when you told him that his bonus was $175,000?
4    A.   I think he was okay with it.  I don't
5    recall anything out of the ordinary.
6    Q.   Did he indicate to you at all that he
7    felt that Mr. Lowenthal was discriminating against
8    him?
9    A.   No.
10   Q.   Retaliating against him?
11   A.   No.
12   Q.   Did he feel that Mr. Lowenthal was
13   still punishing him?
14   A.   No.
15   Q.   Did he feel that he was being treated
16   unfairly by Oppenheimer with regard to that bonus?
17   A.   No, not that I recall.
18   Q.   We saw that your bonus for the prior
19   year was $235,000; is that correct?
20   A.   Yes.
21   Q.   For 2014?  235-?
22   A.   Yes.
23   Q.   Has your bonus continued to be
24   $235,000 every year?
25

783

Burns - Direct

1   A.   No.
2   Q.   Has it ever been your understanding
3   that you would continue to receive a $235,000
4   discretionary bonus every year?
5   A.   No.
6   Q.   Let's take a look at Exhibit 12F,
7   please.
8        (Pause.)
9   Q.   And do you recognize what this is,
10  Ms. Burns?
11  A.   My pay stub.
12  Q.   And we see that this pay stub has a
13  pay date of February 6, 2017, in the upper right
14  corner?
15  A.   Yes.
16  Q.   And we see that it says, "Management
17  bonus: $200,000"?
18  A.   Yes, I think I'm -- yes.  I'm on the
19  right one now, yes.
20  Q.   You see that 200,000?
21  A.   Yes.
22  Q.   Is that your understanding, that that
23  $200,000 was your bonus paid for work performed in
24  2016?

784

Burns - Direct

1   A.   Yes.
2   Q.   That was $35,000 less than you
3   received in 2014?
4   A.   Correct.
5   Q.   Do you receive -- did you receive a
6   discretionary bonus for work that you performed in
7   2017?
8   A.   Yes.
9   Q.   Do you recall how much that was?
10  A.   I believe 170-.
11  Q.   Have you received your bonus for 2018
12  yet?
13  A.   Yes.
14  Q.   Do you recall how much that was?
15  A.   165-.
16  MR. GIBSON:  And, Judge, I'd just like
17  to add an exhibit.
18  Is there any objection?
19  Do you know what number we're up to?
20  MS. MILLER:  136?
21  MR. LICUL:  I think it's 137.
22  THE ARBITRATOR:  It's 137.
23  MR. GIBSON:  137.
24  Any objection?

785

Burns - Direct

1   MR. LICUL:  No objection.
2   THE ARBITRATOR:  Exhibit 137 is
3   received.
4   BY MR. GIBSON:
5   Q.   And, Ms. Burns, have you seen this
6   document before?
7   A.   Yes.
8   Q.   Does this reflect the $165,000 bonus
9   that you just testified that you received for work
10  that you did in 2018?
11  A.   Yes.
12  Q.   Were you happy with the bonuses that
13  you received the last two years?
14  A.   No.
15  Q.   Did you feel that Oppenheimer was
16  discriminating against you when they gave you those
17  bonuses?
18  A.   No.
19  Q.   Did you feel that you were being
20  retaliated against?
21  A.   No.
22  Q.   Why not?
23  A.   Well, I think bonuses are reflective
24  of a bunch of things; the overall performance of the

786

Burns - Direct

1   group, the firm, and assessment of your
2   contribution.
3   Q.   By the way, I apologize for going out
4   of order a little bit, but did you receive a raise
5   in your base salary at any point in 2014?
6   A.   Yes.
7   Q.   And how much was that raise?
8   A.   $25,000.
9   Q.   What do you recall about the
10  circumstances, how that came about?
11  A.   I had asked Rob for it.
12  Q.   And did Mr. Lowenthal grant that
13  request?
14  A.   Yes.
15  Q.   Was Mr. Ngo eventually terminated by
16  Oppenheimer?
17  A.   Yes.
18  Q.   Do you recall approximately when that
19  was?
20  A.   July 2016.
21  Q.   If I told you June 30th, does that
22  sound about right?
23  A.   Yes.
24  Q.   To your knowledge, who made the

787

Burns - Direct

1  decision to terminate Mr. Ngo's employment?
2
3      A.   Rob Lowenthal.
4      Q.   Did Mr. Lowenthal discuss that
5  decision with you?
6      A.   He told me.
7      Q.   Did he ask for your opinion?
8      A.   No.  He just told me.
9      Q.   And was Ms. Ross involved in that
10  discussion?
11      A.   No.
12      Q.   What do you recall about your
13  discussion with Mr. Lowenthal about his decision?
14      A.   He told me that he was letting Hoai
15  go, it was cost-cutting, and that they weren't
16  priority sectors.
17      Q.   When you say "they weren't priority
18  sectors," what are you talking about?
19      A.   He covered chemicals, paper, and metal
20  and mining.
21      Q.   During your conversation with
22  Mr. Lowenthal about his decision, did he make any
23  reference to the time that Mr. Ngo had been out of
24  the office in 2014 for the birth of his child?
25      A.   No.

788

Burns - Direct

1
2      Q.   During that conversation or any
3  subsequent conversation, did he make any reference
4  to the time that Mr. Ngo had spent recovering from
5  his brain aneurysm --
6      A.   No.
7      Q.   -- in 2014?
8      A.   No.
9      Q.   Did you disagree with Mr. Lowenthal's
10  decision?
11      A.   I certainly wasn't happy about it.  He
12  was a friend of mine.  But I understood it was
13  cost-cutting.
14      Q.   Does Oppenheimer have a reputation for
15  cost-cutting?
16      A.   Yes.
17      Q.   When Mr. Lowenthal told you that he
18  had decided to terminate Mr. Ngo, did you feel that
19  he was punishing Mr. Ngo for time that he spent out
20  of the office to be with his baby in 2014?
21      A.   No.
22      Q.   Did you feel that Mr. Lowenthal was
23  punishing Mr. Ngo for taking a leave of absence to
24  recover from his medical condition in 2014?
25      A.   No.

789

Burns - Direct

1
2      Q.   Why not?
3      A.   Well, it was cost-cutting.  We were
4  downsizing the group.  And those events happened two
5  years ago.
6      Q.   Do you have any recollection generally
7  as to how Oppenheimer performed as a company in 2015
8  and 2016?
9      A.   I believe they were -- they were
10  weaker years.  I believe they were.
11      Q.   Now, who told Mr. Ngo he was being
12  terminated?
13      A.   Myself and HR.
14      Q.   Was Ms. Bridges the individual from
15  HR?
16      A.   No.
17      Q.   Who do you recall it being?
18      A.   Melissa Castello, I believe.
19      Q.   Melissa Castello?
20      A.   Yeah.
21      Q.   Was that a difficult conversation for
22  you to have with Mr. Ngo?
23      A.   Yes.
24      Q.   Why?
25      A.   Well, I think it's always difficult to

790

Burns - Direct

1
2  have a conversation to let someone go, but he was
3  also a friend of mine.
4      Q.   What do you remember about that
5  conversation?
6      A.   He was upset.  He wanted to know why
7  him.
8      Q.   Did you -- before Mr. Ngo wanted to
9  know why him, did you give him any reason as to why
10  he was being terminated?
11      A.   Yes.  I told him we were letting him
12  go for cost-cutting reasons and --
13      Q.   And --
14      A.   -- it wasn't reflective of his
15  performance.
16      Q.   I'm sorry?
17      A.   It wasn't reflective of his
18  performance.
19      THE ARBITRATOR:  As far as you know,
20  since analysts, I gather, have different
21  sectors that they work on, does Oppenheimer
22  do a breakdown of earnings performance based
23  on sectors so that you could determine
24  whether one analyst has really hot sectors
25  and another has --

791

```
1              Burns - Direct
2          THE WITNESS:  Meaning earnings
3    performance?
4          THE ARBITRATOR:  Yes.
5          THE WITNESS:  How companies perform,
6    you're saying, or how -- I guess I'm not
7    understanding the question.
8          THE ARBITRATOR:  Let me put it this
9    way:  To the extent that there are different
10   sectors covered by various analysts, do you
11   know whether Oppenheimer does a breakdown of
12   Oppenheimer earnings sector by sector?
13         THE WITNESS:  I don't know.
14         THE ARBITRATOR:  Let me ask you one
15   other question.
16         The allusion here earlier in this
17   proceeding to the hiring of an analyst in the
18   year 2016 --
19         THE WITNESS:  Yes.
20         THE ARBITRATOR:  -- are you aware of
21   what that -- who that was and why that person
22   was hired?
23         THE WITNESS:  Yes.  It was earlier in
24   2016, I believe March 2016.  It was Jiten
25   Joshi, and he was hired to cover technology,
```

792

```
1              Burns - Direct
2    media and telecom, those sectors.
3          THE ARBITRATOR:  Do you have an
4    understanding of about why if Oppenheimer was
5    downsizing -- including downsizing in this
6    high-yield group, that it was then at the
7    same time hiring a new analyst in the group?
8          THE WITNESS:  Yes -- well, those
9    sectors were priority sectors.  We covered
10   them on the investment banking side and on
11   the equity research side.
12         THE ARBITRATOR:  When you say they
13   were "priority sectors," is that because --
14   does that reflect the decision that those are
15   sectors in which Oppenheimer is likely to
16   earn potentially a lot more than in other
17   sectors?
18         THE WITNESS:  Yes, I think that's how
19   Rob would describe them.
20         THE ARBITRATOR:  You mentioned media.
21   What are the other --
22         THE WITNESS:  Telecom, media and
23   technology.
24         THE ARBITRATOR:  Okay.
25         MR. GIBSON:  I think you may have just
```

793

```
1              Burns - Direct
2    wrapped up my examination, actually.
3    BY MR. GIBSON:
4        Q.   Well, let me not get too far ahead of
5    myself.
6            I think you testified that Mr. Ngo
7    asked something along the lines, when you told him
8    he was being terminated, why me?
9        A.   Yes.
10       Q.   What was your response to that?
11       A.   Basically we weren't priority sectors
12   of the firm and that was why.
13       Q.   A few more questions based on the
14   questions Judge Dolinger asked you.
15           During your time at Oppenheimer, was
16   Mr. Ngo publishing in any significant amount in
17   either technology, telecom or media?
18       A.   Hoai?
19       Q.   Yes.
20       A.   No.
21       Q.   I'll use the term "TMT."
22       A.   Yes.
23       Q.   Before Mr. Joshi was hired, was TMT
24   covered by any Oppenheimer research analyst?
25       A.   Yes, prior to him, Umesh covered it --
```

794

```
1              Burns - Direct
2        Q.   Mr. Bhandary?
3        A.   Yes, Bhandary.
4            -- when he was with us for a year.
5    And then prior to that, Todd Morgan, who was the
6    head of high-yield research, he covered the space.
7        Q.   When Mr. Joshi was hired, was
8    Mr. Bhandary still at the firm?
9        A.   No.
10       Q.   Now, Mr. Ngo was terminated almost
11   three years ago; is that correct?
12       A.   Yes.
13       Q.   And you have been the head of
14   high-yield research for that entire time period?
15       A.   Yes.
16       Q.   And how many research analysts do you
17   currently supervise?
18       A.   One.
19       Q.   Who is that research analyst?
20       A.   I'm blanking on his name.  Jiten
21   Joshi.
22       Q.   Following Mr. Ngo's termination, how
23   many research analysts did Oppenheimer hire to cover
24   chemicals?
25       A.   None.
```

795

Burns - Direct

1  Q. How many research analysts did
2  Oppenheimer hire to cover paper and packaging?
3
4  A. None.
5  Q. And how many research analysts did
6  Oppenheimer hire to cover mining and metals?
7  A. None.
8  MR. GIBSON: Can we take a short
9  break? I think I'm done.
10  THE ARBITRATOR: Yes.
11  MR. GIBSON: Thank you.
12  THE ARBITRATOR: Take five minutes.
13  (Recess from the record.)
14  THE ARBITRATOR: Cross-examination.
15  CROSS-EXAMINATION
16  BY MR. LICUL:
17  Q. Good morning, Ms. Burns.
18  A. Good morning.
19  Q. How are you?
20  A. Good.
21  Q. I just want to ask you a few
22  questions.
23  Ms. Burns, you started at
24  Oppenheimer -- or what was CIBC at the time in 2007;
25  correct?

796

Burns - Cross

1
2  A. Correct.
3  Q. So you had more tenure at
4  Oppenheimer/CIBC than Mr. Ngo did; correct?
5  A. Correct.
6  Q. And much of that time you reported to
7  Mr. Lowenthal; is that right?
8  A. When we first came over, I reported to
9  Todd Morgan. Then once Todd Morgan left, me and
10  Hoai became coheads and reported in to Rob
11  Lowenthal.
12  Q. Mr. Morgan reported to Mr. Lowenthal;
13  correct?
14  A. Correct.
15  Q. And it was your understanding that
16  Mr. Lowenthal was involved in setting your pay;
17  correct?
18  A. Mr. Lowenthal, yes, he set --
19  Q. Including your bonuses; correct?
20  A. Yes.
21  Q. And it was your understanding, and it
22  still is, that Mr. Lowenthal is one of the most
23  senior-level executives at the company; correct?
24  A. Correct.
25  Q. Would you describe him as being second

797

Burns - Cross

1
2  in command?
3  A. Yeah.
4  Q. And he is the son of the CEO, Bud
5  Lowenthal; correct?
6  A. Correct.
7  Q. And you're aware that in this
8  proceeding, Mr. Ngo is alleging that Mr. Lowenthal
9  somehow punished him unlawfully for taking leave;
10  correct?
11  A. Correct.
12  Q. Now, you testified that you became
13  cohead of high-yield research in October of 2013;
14  correct?
15  A. Yes.
16  Q. And prior to 2013, you did not
17  describe yourself as a head or a cohead of anything;
18  correct?
19  A. Correct.
20  Q. And beginning October of 2013, you
21  started utilizing the title of cohead; correct?
22  A. Yeah.
23  Q. And after Mr. Ngo was stripped of his
24  responsibilities, you started describing yourself as
25  the head of high-yield research; correct?

798

Burns - Cross

1
2  A. I think I've always said head of
3  high-yield research, actually -- my business card
4  said head of high-yield research. I actually don't
5  know if it said cohead.
6  Q. And when you testified earlier this
7  morning, you described your job as being the head of
8  high-yield research --
9  A. Correct.
10  Q. -- correct?
11  Now, I want to draw your attention to
12  the middle part of 2014.
13  You were aware that Mr. Ngo was having
14  a baby; correct?
15  A. Correct.
16  Q. And you knew that he was going to be
17  out of the office because of the birth of that baby;
18  correct?
19  A. Correct.
20  Q. And then you received, on July 13th,
21  an e-mail from Mr. Ngo that said that he needed to
22  stay out until August 25th; correct?
23  A. Yes.
24  Q. And you knew that -- from that e-mail
25  that he needed to take a longer period of time

799

Burns - Cross

1  because his daughter was unable to fly; correct?

2  A.  Yes.

3  Q.  The doctors had recommended that he

4  not -- that she not fly back to the East Coast;

5  correct?

6  A.  Correct.

7  Q.  And I think earlier in your testimony,

8  you stated that you believed that that July 13th

9  e-mail should have been sent to Mr. Lowenthal;

10  correct?

11  A.  Yes, he should have received an

12  e-mail.

13  Q.  You thought it was inappropriate for

14  Mr. Ngo to send it just to you; correct?

15  A.  Just to me.

16  Q.  Just to you and Ms. Ross; correct?

17  A.  Yes.

18  Q.  In fact, isn't it the case that you

19  knew that Mr. Ngo was going to send the e-mail to

20  you and Ms. Ross?

21  A.  Yes, he told me.

22  Q.  He told you; correct?

23  And if you take a look at Exhibit 83,

24  please.

800

Burns - Cross

1  A.  Yes.

2  Q.  In that e-mail, you expressly ask

3  Mr. Ngo to copy you on his e-mail to Ms. Ross;

4  correct?

5  A.  Correct.

6  Q.  And nowhere in that e-mail do you

7  state to Mr. Ngo that he should send his request to

8  Mr. Lowenthal; correct?

9  A.  Correct.

10  Q.  And I want to draw your attention to

11  Exhibit 56.

12  (Discussion off the record.)

13  BY MR. IADEVAIA:

14  Q.  Do you see Exhibit 56?

15  A.  Yes, I think I'm looking at it.

16  Q.  And it's in that e-mail that

17  Mr. Lowenthal writes to you that you are becoming --

18  he is suspending Mr. Ngo's supervisory

19  responsibilities; correct?

20  A.  Correct.

21  Q.  And the reason he's suspending

22  Mr. Ngo's supervisory responsibilities is based on

23  the delay of Mr. Ngo's return; correct?

24  A.  That's what the e-mail says.

801

Burns - Cross

1  Q.  That's what the e-mail says; correct?

2  A.  (No response.)

3  Q.  And nowhere in that e-mail does he

4  say, I am suspending Mr. Ngo's supervisory

5  responsibilities because Mr. Ngo should have sent me

6  the e-mail requesting additional leave or time out

7  of the office; correct?

8  A.  That's not what it says.

9  Q.  It does not say that.

10  A.  Correct.

11  Q.  Let me just clarify because I think it

12  was a confusing question.

13  Nowhere in this e-mail does

14  Mr. Lowenthal state that he is stripping Mr. Ngo of

15  supervisory responsibilities because Mr. Ngo should

16  have told him first that he needed more time off;

17  correct?

18  A.  That's not in the e-mail.

19  Q.  And you understood that this -- you

20  didn't know whether this was a temporary or

21  permanent stripping of responsibilities; correct?

22  A.  Well, I had spoken to him, and he had

23  told me that I was getting the supervisory

24  responsibilities going forward.

802

Burns - Cross

1  Q.  But you didn't know -- sorry.

2  Did you finish your answer?

3  A.  Yes.

4  Q.  You did not know whether that was

5  permanent or simply for the period that Mr. Ngo was

6  going to be away from the office; correct?

7  A.  That was what I was told, so it was

8  going forward. I didn't question whether it was --

9  the time period.

10  Q.  But I'm --

11  THE ARBITRATOR:  By the way, did you

12  see the July 18th e-mail that Mr. Lowenthal

13  sent to Mr. Ngo?

14  THE WITNESS:  July 18th.

15  THE ARBITRATOR:  There's been

16  testimony about it and it's in the record

17  somewhere that Mr. Lowenthal, after talking

18  with Mr. Ngo I think around July 16, sent him

19  two days later an e-mail saying, essentially,

20  you're no longer -- you're not going to be

21  doing the supervisory work in language that

22  suggested, at least, that it was pending his

23  return to Oppenheimer. And I'm just

24  wondering if you recall having seen that

803

Burns - Cross

1   e-mail.
2       THE WITNESS:  Yes, I think -- is this
3   the e-mail I think that you're referring to,
4   or is it a separate e-mail?  This is the
5   e-mail on the 21st.
6       MR. GIBSON:  Do you have an exhibit
7   number?
8       MR. IADEVAIA:  I think it's
9   Exhibit 45.
10      THE ARBITRATOR:  That's right.  It's
11  an e-mail attaching a letter.  It's
12  Exhibit 45.  And it's an e-mail, according to
13  testimony by Mr. Ngo, he did not actually
14  see -- although he -- his account received it
15  on July 18th, he didn't see it until --
16      (Reporter seeks clarification.)
17      THE ARBITRATOR:  It is an e-mail and
18  attached letter that was sent apparently on
19  July 18, but which Mr. Ngo testified he did
20  not actually see, because he hadn't opened it
21  until his return to work on November 3.
22      THE WITNESS:  Right.
23      THE ARBITRATOR:  My only question is
24  whether you were aware of or had seen this --

804

Burns - Cross

1       THE WITNESS:  No, I hadn't seen it.
2       THE ARBITRATOR:  Okay.  Thank you.
3   BY MR. IADEVAIA:
4   Q.   Can you turn back to 56, please.
5   A.   Yes.
6   Q.   Mr. Lowenthal writes to you that "I am
7   suspending his," meaning Mr. Ngo's, "supervisory
8   responsibilities until further discussion."
9       Do you see that?
10  A.   I do.
11  Q.   Does that indicate to you that the
12  suspension was temporary?
13  A.   Like I said, this e-mail says what it
14  says.  Again, he kind of said to me that I was
15  getting the supervisory responsibilities going
16  forward, and that was...
17  Q.   Now, I want to draw your attention to
18  mid August of 2018.
19      Mr. Ngo did not return to the office
20  as planned on August 25th; correct?
21  A.   Correct.
22  Q.   And that's because he suffered a brain
23  aneurysm; correct?
24  A.   Correct.

805

Burns - Cross

1   Q.   And you would agree that, in the
2   period he suffered a brain aneurysm until he
3   returned, he was on medical leave for his own health
4   condition; correct?
5   A.   Yes, he was out -- he wasn't -- he
6   wasn't working.
7   Q.   And you understood that that was
8   medical leave; correct?
9   A.   I mean, I didn't see the paperwork or
10  anything, but he was on recovery.
11  Q.   And it was during that period of time
12  that you received a raise from $150,000 a year to
13  $175,000 a year; correct?
14  A.   I don't remember the exact timing when
15  it hit, but I'm sure you have the document.
16  Q.   Take a look at Exhibit 12, please.
17  And specifically if you can turn to page 893.
18      So it's Exhibit 12.
19  A.   Okay.
20  Q.   On the bottom right-hand corner, you
21  should see a number --
22  A.   8 --
23  Q.   -- 893.
24  A.   893.  Okay.

806

Burns - Cross

1   Q.   Let me know when you're there.
2       (Pause.)
3   A.   I am here.
4   Q.   So page 893 is your pay stub for the
5   period ending September 30, 2014; correct?
6   A.   Yes.
7   Q.   And your pay for that period of time
8   is $6,250; correct?
9   A.   Yes.
10  Q.   And you are paid twice a month;
11  correct?
12  A.   Correct.
13  Q.   So you get 26 paychecks -- 24
14  paychecks, excuse me, in a year; correct?
15  A.   Yes.
16  Q.   And so would you agree with me that
17  6,250 times 24 is $150,000?
18  A.   Yes.
19  Q.   If you take a look at the next page,
20  894, that is your next pay stub; correct?
21  A.   Yes.
22  Q.   And that's for the period ending
23  October 15, 2014; correct?
24  A.   Yes.

807

Burns - Cross

1    Q.   And your rate of pay there is
2    $7,291.67.
3        Do you see that?
4    A.   Yes.
5    Q.   And would you agree with me that that
6    number, 7,291.67, times 24 is $175,000 a year?
7        Correct?
8    A.   Correct.
9    Q.   So does that refresh your recollection
10   that you received a pay increase in October of 2014?
11   A.   Yes.
12   Q.   And that was the period that Mr. Ngo
13   was on medical leave; correct?
14   A.   He was out of the office.
15   Q.   And on medical leave; correct?
16   A.   Yes, he was out.  He was out
17   recovering from his brain aneurysm.
18   Q.   You would agree with me that Mr. Ngo
19   did not return -- withdrawn -- that -- Mr. Ngo
20   returned on November 3rd, 2014; correct?
21   A.   Yes.
22   Q.   And he did not return to his job as a
23   supervisor; correct?
24   A.   Correct.  I was handling the

808

Burns - Cross

1    supervisory responsibilities at that time.
2    Q.   I want to draw your attention to
3    Exhibit 102, please.
4    A.   102?
5    Q.   I think it's a different binder.
6    A.   I got you.  I'm there.
7    Q.   You gave some testimony about that
8    document; correct?
9    A.   The e-mail, yes.
10   Q.   I think you described it as a -- bios
11   of the folks in fixed income research; correct?
12   A.   Yes.  In the research room, yep.
13   Q.   And you see your name is at the top;
14   right?
15   A.   Yeah.
16   Q.   Your name is at the top because you
17   were the head of that group; correct?
18   A.   My name was at the top.  Yes, it was
19   an order listing of all the people in the group.  I
20   don't know if it signified anything, but my name was
21   at the top.
22   Q.   It signified that you were the most
23   senior person; correct?
24   A.   Yes, I guess.

809

Burns - Cross

1    Q.   Well, you put this together; right?
2    A.   Yes, I aggregated all the lists.  I
3    don't know that I spent a lot of time thinking about
4    why I put myself there, but --
5    Q.   The names are not in alphabetical
6    order; right?
7    A.   Yeah, you're right.  I guess they're
8    not.
9    Q.   Ms. Lucila Broide reported to you;
10   correct?
11   A.   She technically, yes, did report in to
12   me.  She was part of the --
13   Q.   She reported to you.  You were her
14   supervisor; correct?
15   A.   Yes, Lucila Broide technically
16   reported to me.  She was part of the research,
17   though.  I wasn't involved in her day-to-day
18   supervision, but from a research perspective, she
19   did report to me.  I didn't give her her bonus
20   number.
21   Q.   But Oppenheimer presented to customers
22   and the rest of the world that you were Ms. Broide's
23   supervisor; correct?
24   A.   She reported -- technically she

810

Burns - Cross

1    reported to me.
2    Q.   My question is different.
3        My question is, did Oppenheimer tell
4    customers and clients that Ms. Broide reported to
5    you?
6    A.   I don't know what -- I don't know if
7    Oppenheimer did go around telling people.
8    Q.   And would you agree with me that if
9    Oppenheimer did that, that that information would
10   have to be accurate?
11   A.   Well, yeah.  I said she technically
12   reported in to me.
13   Q.   I want to show you what --
14       MR. LICUL:  This is exchanged in
15   discovery, but it's not an exhibit.  I guess
16   it will be 138.
17       Any objection, Mike?
18       MR. GIBSON:  No.
19       THE ARBITRATOR:  Exhibit 138 is
20   received.
21       MR. GIBSON:  I imagine this was in
22   that large e-mail file?  Otherwise it would
23   have a Bates number; right?
24       MR. LICUL:  You would have to ask the

811

Burns - Cross

1    smarter people.
2          MS. MILLER:  It was actually Bates
3    stamped as Plaintiff's 280 to 282.
4          MR. GIBSON:  Okay.  Then it was
5    produced.  No objection.
6    BY MR. LICUL:
7          Q.    Now, the cover e-mail is an e-mail
8    from Mr. Lowenthal to you; correct?
9          A.    Yes.
10         Q.    And it's June 24, 2014; correct?
11         A.    Yes.
12         Q.    And he attaches to that e-mail what
13   appears to be a press release, if you look on the
14   second page.
15         A.    Yes.
16         Q.    And that's announcing Ms. Broide's
17   hire?
18         A.    Yes.
19         Q.    And if you turn to the third page, the
20   paragraph that begins "According," do you see that?
21   It's up at the top.
22         A.    Yes.
23         Q.    And the last sentence of that
24   paragraph is, "Lucila will work at 85 Broad Street

812

Burns - Cross

1    where she will report to Hoai Ngo and Colleen Burns,
2    Oppenheimer's coheads of fixed income research."
3          Do you see that?
4          A.    I do.
5          Q.    That information is accurate; right?
6          A.    Yes.
7          Q.    And this was June of 2014 while you
8    were cohead with Mr. Ngo; correct?
9          A.    Yes.
10         Q.    I believe you testified earlier that
11   you did not believe that Mr. Ngo was on leave for
12   the birth of his daughter; correct?
13         A.    Correct.
14         Q.    Did you ever hear anyone describe
15   Mr. Ngo as being on leave?
16         A.    No.
17         Q.    I just want to turn your attention to
18   your bonuses.
19         You gave some testimony about your
20   annual bonuses; correct?
21         A.    Yes.
22         Q.    And I just want to -- you testified
23   that you received a bonus of $235,000 for calendar
24   year 2014; correct?

813

Burns - Cross

1          A.    Correct.
2          Q.    And that was paid in February of 2015;
3    correct?
4          A.    Correct.
5          Q.    And then for calendar year 2015, you
6    received the same bonus of $235,000; correct?
7          A.    Correct.
8          Q.    And that would have been in February
9    of 2016; correct?
10         A.    Correct.
11         Q.    And you received your bonuses in one
12   distribution; is that right?
13         A.    Yes.
14         Q.    In other words, you didn't get two
15   separate checks --
16         A.    No.
17         Q.    -- the way Mr. Ngo did.
18         A.    I got one.
19         Q.    You got one.  Okay.
20         MR. LICUL:  I don't have any further
21   questions.
22         THE ARBITRATOR:  Okay.  Any redirect?
23         MR. GIBSON:  Just a couple of
24   questions.

814

Burns - Redirect

1          Do you mind if I keep the witness
2    here?  It's just going to be a few questions.
3          Is that all right with you, Judge?
4          THE ARBITRATOR:  Sure.
5    REDIRECT EXAMINATION
6    BY MR. GIBSON:
7          Q.    Ms. Burns, you gave some testimony on
8    direct about the raise that you received in 2014?
9          A.    Yes.
10         Q.    And I just want to clarify,
11         When you received that raise, did
12   Mr. Lowenthal come to you and tell you that you were
13   having a raise, or did you request a raise from
14   Mr. Lowenthal?
15         A.    No, I requested a raise.
16         Q.    And I believe you were asked a number
17   of questions, both by Mr. Licul and by Judge
18   Dolinger, about whether you had any understanding as
19   to whether Mr. Lowenthal's decision in July of 2014
20   was temporary or permanent or interim.
21         Do you remember that?
22         A.    Yes.
23         Q.    Did Mr. Lowenthal ever tell you, after
24   the conversation in which you were told that you

815

Burns - Redirect

1   were the sole head of research going forward, that
2   he had reconsidered the decision?
3   A.   No.
4   Q.   Did he ever tell you that he was
5   considering reconsidering the decision?
6   A.   No.
7   Q.   If you could turn to one of the
8   exhibits Mr. Licul showed you, Exhibit 83.
9   A.   I think this is it.
10  Q.   By the way, before I ask you about
11  this document, did anybody else at Oppenheimer tell
12  you that they were under the impression that
13  Mr. Lowenthal was reconsidering his decision about
14  you being the sole head of high-yield research?
15  A.   No.
16  Q.   Now, Mr. Licul asked you about this
17  document and whether you indicated at all in here to
18  your -- in your response to Mr. Ngo that he should
19  copy Mr. Lowenthal on his e-mail.
20  A.   Yes.
21  Q.   At the time this e-mail was sent, you
22  were not Mr. Lowenthal's -- I'm sorry -- Mr. Ngo's
23  supervisor; correct?
24  A.   Correct, I wasn't.

816

Burns - Redirect

1   Q.   You were coheads?
2   A.   Correct.
3   Q.   You were colleagues?
4   A.   Correct.
5   Q.   Did you think it was your obligation
6   to tell Mr. Ngo who he should and should not advise
7   about his employment decisions?
8   A.   No.
9   MR. GIBSON:  No further questions.
10  THE ARBITRATOR:  Anything?
11  MR. LICUL:  Nothing further.
12  THE ARBITRATOR:  You're at liberty.
13  THE WITNESS:  Thank you.
14  MR. GIBSON:  Judge, I apologize for
15  this, but our next witness is going to be
16  getting here at noon.  So do you want to --
17  do you want to take an early lunch?  Do you
18  want to take --
19  THE ARBITRATOR:  If people are capable
20  eating lunch -- I suspect that lunch probably
21  is now in the process of being placed on that
22  table.
23  MR. GIBSON:  Let me first go see if
24  they're here earlier or if I can get them

817

Lowenthal - Direct

1   here earlier.
2   THE ARBITRATOR:  Okay.
3   (Recess from the record.)
4   ROBERT LOWENTHAL,
5   having been duly sworn by The Arbitrator,
6   was examined and testified as follows:
7   DIRECT EXAMINATION
8   BY MR. GIBSON:
9   Q.   Good afternoon, Mr. Lowenthal.
10  Who are you currently employed by?
11  A.   Oppenheimer.
12  Q.   And what is your current job title at
13  Oppenheimer?
14  A.   Head of investment banking.
15  Q.   And do you have a corporate title?
16  A.   Senior managing director.
17  Q.   Are you married, sir?
18  A.   Yes.
19  Q.   Do you have any children?
20  A.   Two.
21  Q.   Two.
22  Can you please summarize your
23  educational background.
24  A.   I got an undergraduate degree in

818

Lowenthal - Direct

1   business at Washington University in St. Louis; and
2   I received an MBA from Columbia Business School.
3   Q.   When did you receive your MBA?
4   A.   I graduated in 2007.
5   Q.   And do you have any FINRA licenses?
6   A.   I do.
7   Q.   Which ones?
8   A.   A long list.  7, 24, 55, 53, 3, 79.
9   There might be others.
10  Q.   Have any of your FINRA licenses ever
11  been suspended or revoked?
12  A.   No.
13  Q.   And when did you first start working
14  for Oppenheimer?
15  A.   1999.
16  Q.   And can you summarize for us your work
17  history leading up to Oppenheimer.
18  A.   I graduated in 1998.  I worked at
19  Salomon Smith Barney in a sales trading and
20  operations rotational program.  And on completion
21  there, I came to Oppenheimer.
22  Q.   And, Mr. Lowenthal, have you ever been
23  sued for discrimination?
24  A.   No.

819

Lowenthal - Direct

1   Q.   To your knowledge, aside from this
2   case, have you ever been alleged to have
3   discriminated against any Oppenheimer employee?
4   A.   No.
5   Q.   To your knowledge, aside from this
6   proceeding, have you ever been alleged to have
7   interfered with any Oppenheimer employees' FMLA
8   rights?
9   A.   No.
10  Q.   Does that surprise you?
11  A.   No.
12  Q.   Why not?
13  A.   I care deeply about our firm.  I've
14  been there 20 years.  I'm a big proponent of several
15  initiatives at the firm to make employment at the
16  firm something that people are proud of and feel
17  strongly about and retain their talent at the firm.
18       We rely on talent and the people that
19  go up and down the elevators.  And building an
20  environment that's highly ethical and highly values
21  employees is something I've always been a big
22  proponent of.
23  Q.   What was your title at Oppenheimer
24  during the time period of 2013 to 2016?

820

Lowenthal - Direct

1   A.   I was a senior managing director at
2   the time, and I was head of our global fixed income
3   business.
4   Q.   And was fixed income divided into
5   different asset classes?
6   A.   Yes.
7   Q.   And what were some of those asset
8   classes?
9   A.   Primarily, the two largest were
10  taxable fixed income and tax-exempt fixed income,
11  separating out the municipal and public finance
12  world from the credit and rates world.
13       Within credit and rates, you would
14  then have everything from corporate credit,
15  high-yield, high-grade, and then you'd have emerging
16  market corporate and sovereigns.  And then within
17  rates, there were agencies, treasuries and then
18  mortgages as well.
19  Q.   What is high-yield?  Tell us a little
20  bit more about that.
21  A.   High-yield is in reference to
22  corporate issuers that have a credit rating that is
23  below investment grade, which is triple-B.
24  Q.   And within the high-yield business,

821

Lowenthal - Direct

1   were there separate components of the business?
2   A.   The business was made up of three
3   pieces; sales, trading, and research.
4   Q.   And can you take a look -- there's
5   three exhibit binders in front of you.
6       Can you take a look at Exhibit 9.
7   A.   I have it open.
8   Q.   Do you generally recognize the form of
9   these documents?
10  A.   Yes.
11  Q.   What do they appear to be to you?
12  A.   Org charts.
13  Q.   And is it for a particular sector of
14  Oppenheimer's business?
15  A.   This is for the global fixed income
16  business, particularly the taxable fixed income
17  side.
18  Q.   And if you look in the bottom right
19  corner, in very small print, there's a number,
20  "Confidential OPCO"?
21  A.   Yes.
22  Q.   I'd like you to please turn to the one
23  that's 331.
24  A.   I've got it open.

822

Lowenthal - Direct

1   Q.   If you look above that small writing,
2   there's some even smaller writing.
3       And do you see the date August 30,
4   2013?
5   A.   Yes.
6   Q.   Were you the head of taxable fixed
7   income at that time?
8   A.   Yes.
9   Q.   Where would that be represented on
10  this chart?
11  A.   The top left, in a box next to
12  "Department Code D9," is my name.
13  Q.   And I think you also mentioned that
14  there was a component of the high-yield business
15  which was the sales aspect?
16  A.   Yes.
17  Q.   Who was the head of high-yield sales
18  at this time, in 2013?
19  A.   Jane Ross.
20  Q.   Where would you find that on this
21  chart?
22  A.   Within the sales bracket on the bottom
23  half of the page, about six boxes to the right, Jane
24  Ross' name is under "High-yield and Loan Sales."

823

Lowenthal - Direct

1   Q.   And who did Jane Ross report to at the
2   time of this organizational chart?
3   A.   She reported to me.
4   Q.   And where on this chart would you find
5   high-yield research?
6   A.   Underneath the "Research and Strategy"
7   bracket, "High-yield Research Department" is the
8   first one.
9   Q.   And who does this identify as the head
10  of high-yield research?
11  A.   Next to the "Department Code RD" is
12  the name "Todd Morgan."
13  Q.   Did Mr. Morgan ever report to Jane
14  Ross?
15  A.   No.
16  Q.   Did you ever report to Jane Ross?
17  A.   No.
18  Q.   And under Mr. Morgan's name on this
19  particular chart, we see four names; Colleen Burns,
20  Hoai Ngo, Sean Sneeden and Omar Zeolla.
21      To your knowledge, did any of those
22  individuals ever report to Ms. Ross?
23  A.   No.
24  Q.   Who did they report to at the time of

824

Lowenthal - Direct

1   this chart?
2   A.   Todd Morgan.
3   Q.   Now, as the former head of taxable
4   fixed income at Oppenheimer, are you familiar with
5   how high-yield research analysts are compensated?
6   A.   Yes.
7   Q.   How are they compensated?
8   A.   Salary and bonus.
9   Q.   Is the bonus a guaranteed bonus?
10  A.   No.
11  Q.   During the time period of 2013 through
12  2016, who set the bonuses for high-yield research
13  analysts?
14  A.   I did.
15  Q.   During that same time period, was
16  Ms. Ross authorized to set bonuses for research
17  analysts?
18  A.   No.
19  Q.   Was Ms. Ross authorized to hire
20  research analysts?
21  A.   No.
22  Q.   To terminate research analysts?
23  A.   No.
24  Q.   Was she authorized to grant leaves of

825

Lowenthal - Direct

1   absence for research analysts?
2   A.   No.
3   Q.   What were some of the factors that you
4   considered when setting the discretionary bonus for
5   a research analyst?
6   A.   The bonus pool for year-end
7   compensation is set by the firm.  And within that
8   bonus pool for the firm, an allocation is made for
9   the fixed income business, which then I allocate to
10  those eligible for year-end compensation.
11  Q.   Can you take a look at -- it's a
12  different book -- Exhibit 19, please.
13  A.   Yes.
14  Q.   Just let me know when you've had a
15  chance to take a look at that exhibit.
16      (Pause.)
17  A.   Yes.
18  Q.   And this appears to be an e-mail
19  exchange between yourself and Gerard Lanci from
20  April of 2016.
21      Do you know who Mr. Lanci is?
22  A.   Yes.
23  Q.   Who is he?
24  A.   He's in our internal audit department.

826

Lowenthal - Direct

1   Q.   And if you look at your e-mail to
2   Mr. Lanci that's dated April 14, 2016, you state,
3   "Gerry, I do not have any formal evaluations to
4   share.  The amounts decided are driven by the
5   permissible criteria listed below and overall
6   performance of the business unit and firm."
7      Do you see that, sir?
8   A.   Yes.
9   Q.   Do you see a list of criteria that's
10  below Mr. Lanci's e-mail?
11  A.   Yes.
12  Q.   Does that include some of the factors
13  that you considered when determining a discretionary
14  bonus for a high-yield research analyst?
15  A.   Yes.
16  Q.   When setting the bonus for a
17  high-yield research analyst, would you ever discuss
18  the bonus with Jane Ross?
19  A.   Not the dollar amounts.
20  Q.   What sorts of conversations would you
21  have with Ms. Ross?
22  A.   Engagement with client contact -- with
23  our clients in high-yield would be best measured by
24  the sales force, who has contact with clients on a

827

Lowenthal - Direct

1  regular basis.  So feedback on impressions made with
2  our clients and whether or not there was
3  contribution being made by research analysts to win
4  business.
5
6       Q.   Do high-yield salespeople get paid
7  bonuses?
8       A.   No.
9       Q.   How are they paid?
10      A.   On commission.
11      Q.   Now, do you know the claimant in this
12  case, Mr. Ngo?
13      A.   Yes.
14      Q.   When did you first come to be familiar
15  with Mr. Ngo?
16      A.   During his recruitment and hiring
17  process.
18      Q.   Do you recall approximately when that
19  was?
20      A.   In the 2010 time frame.
21      Q.   If I told you 2009, does that sound
22  about right?
23      A.   About right.
24      Q.   Did you interview Mr. Ngo?
25      A.   I don't remember.

828

Lowenthal - Direct

1
2       Q.   Do you know who made the decision to
3  hire Mr. Ngo?
4       A.   Todd Morgan.
5       Q.   And when Mr. Ngo was hired in 2009,
6  who would he have been reporting to?
7       A.   Todd Morgan.
8       Q.   And what was Mr. Morgan's job title at
9  that time?
10      A.   Head of high-yield research.
11      Q.   Who did he report to?
12      A.   To me.
13      Q.   What position do you recall Mr. Ngo
14  being hired to fill?
15      A.   That of a research analyst covering
16  specific sectors, including chemicals.
17      Q.   Do you recall -- in addition to
18  chemicals, do you recall any of the other sectors
19  that Mr. Ngo covered?
20      A.   Metals and mining and maybe some paper
21  and pulp.
22      Q.   Paper and pulp also referred to as
23  paper and packaging?
24      A.   Yes.  These were sectors that we
25  inherited from the acquisition of the business CIBC.

829

Lowenthal - Direct

1  So they were -- which was closed in 2008, that
2  transaction.
3       Q.   Tell me a little bit more about that
4  transaction and the inheritance of those sectors.
5       A.   The high-yield business came to
6  Oppenheimer through the acquisition of CIBC World
7  Markets, which was the acquisition of a business
8  including their investment banking, their equities
9  division and their leveraged loan business,
10 including high-yield sales, loan sales, trading and
11 research.
12          At the time, the business precrisis
13 had been built on balance sheet, whereby the bank
14 was lending to certain sectors that were strategic
15 to the bank.  That included the ones we just listed.
16          The leveraged loan sales and trading
17 business relied on the balance sheet of the bank.
18 We had a five-year warehouse facility in place prior
19 to the crisis to support that business by assisting
20 issuers in financing their businesses through
21 leveraged loans and high-yield issuance.
22          That agreement with CIBC expired in
23 2014.
24      Q.   Did you have an understanding -- when

830

Lowenthal - Direct

1  the CIBC business was acquired, did Mr. Morgan and
2  Ms. Burns come over from CIBC with that acquisition?
3       A.   Yes.
4       Q.   Do you recall a time when Mr. Ngo
5  received an offer from a competitor?
6       A.   Yes.
7       Q.   Do you recall who that competitor was?
8       A.   CIBC.
9       Q.   Did Oppenheimer make an offer to
10 retain Mr. Ngo --
11      A.   Yes.
12      Q.   -- from that competitor?
13          What do you recall -- were you
14 involved in that decision?
15      A.   Yes.
16      Q.   What do you recall about that
17 decision?
18      A.   CIBC had sold us a business that they
19 had in the US in 2007, as I was just explaining.
20 And they were exiting the US business.  And they had
21 agreed with us to be the provider of access to debt
22 financing to issuers in the US that they might like
23 to lend to.  It was a partnership, and it was meant
24 to be strategic alignment of two companies.

831

Lowenthal - Direct

1    After the crisis and in the ensuing
2    years, CIBC ultimately did not lend to the issuers
3    that we had identified and supported through our
4    various business lines.  The partnership was a
5    failure.  So that was the background of that
6    business.
7    Q.   And was that the first time that you
8    recall Oppenheimer making an offer to retain an
9    employee?
10   A.   No.
11   Q.   Now --
12   A.   It was odd that they chose to try and
13   recruit back personnel from a business that they had
14   sold to us, and it was disruptive to our reputation
15   in the business.  So the reasoning for us to retain
16   Hoai at the time was also optics around our business
17   and its separation from the bank of CIBC.
18   Q.   Did there come a time when Mr. Ngo
19   became the cohead of high-yield research?
20   A.   Yes.
21   Q.   And do you recall approximately when
22   that was?
23   A.   In the 2012, 2013 time frame.
24   Q.   If I told you in or about October of
25

832

Lowenthal - Direct

1    2013, would that sound about right?
2    A.   Yes.
3    Q.   And do you recall who was named as his
4    cohead?
5    A.   Colleen Burns.
6    Q.   Who made the decision to make Mr. Ngo
7    and Ms. Burns the coheads of high-yield research?
8    A.   I made the decision upon the
9    recommendation from Todd Morgan on his departure.
10   Q.   When you say Mr. Morgan's "departure,"
11   did Mr. Morgan resign from Oppenheimer?
12   A.   He did.
13   Q.   At the time of that decision, did you
14   think it was necessary to have two coheads of
15   high-yield research?
16   A.   I did not.
17   Q.   Did Mr. Morgan ever have coheads of
18   high-yield research?
19   A.   No.
20   Q.   Did Mr. Morgan give you any basis for
21   why he felt that the decision to make Hoai and
22   Colleen coheads would be the right move?
23   A.   Todd had believed that the
24   survivability of the business was in question, which

833

Lowenthal - Direct

1    was why he decided to leave and go to a larger
2    competitor.  He didn't have confidence in it.  He
3    felt that titles are cheap and that by elevating the
4    two people that were most senior in the business to
5    having cohead titles would aid in retention while
6    the firm figured out what its long-term plans would
7    be to support the business.
8    THE ARBITRATOR:  When you say "the
9    business was in question," what is the
10   "Business" that you're referring to?
11   THE WITNESS:  The revenue earned by
12   trading high-yield bonds and issuance of
13   high-yield debt for clients.
14   BY MR. GIBSON:
15   Q.   Do you recall who that larger
16   competitor that Mr. Morgan departed for was?
17   A.   He went to Jefferies.
18   Q.   Now, during the time period of 2013
19   through 2016, what would you say was the average
20   number of high-yield research analysts that
21   Oppenheimer employed?
22   A.   Three to four.
23   Q.   Which years?
24   Q.   2013 through 2016.
25   A.   Three to four.

834

Lowenthal - Direct

1    Q.   Would that include Mr. Ngo and
2    Ms. Burns?
3    A.   Yes.
4    Q.   Do you happen to know how many
5    high-yield research analysts Oppenheimer currently
6    employs?
7    A.   Two.
8    Q.   Is Ms. Burns one of those?
9    A.   Yes.
10   Q.   Do you know who the other one is?
11   A.   Jiten Joshi.
12   Q.   At the time that Mr. Ngo and Ms. Burns
13   were named as coheads of the group, do you recall
14   how many other research analysts -- high-yield
15   research analysts there were?
16   A.   I believe there was only one other.
17   Q.   Do you know who that was?
18   A.   Sean Sneeden.
19   Q.   Now, when Mr. Ngo and Ms. Burns became
20   coheads of the research group, did their job
21   responsibilities change?
22   A.   Their day-to-day job did not change,
23   but they were both asked to get supervisory licenses
24   for research approval so that they could approve

835

Lowenthal - Direct

1 each other's research and Sean's research as well
2 for dissemination.
3     Q.    Did they take on -- when you say
4 "their day-to-day" jobs didn't change, what do you
5 mean by that?
6     A.    The vast majority of their time and
7 effort was built around supporting clients and
8 communicating ideas to the marketplace in their core
9 sectors.
10     Q.    Did they take on certain other
11 supervisory responsibilities?
12     A.    Being a contact internally for the
13 compliance department, for any inquiries, as well as
14 keeping up with any changes in rules and signing off
15 on documentation that relates to policies and
16 procedures around the day-to-day operations of a
17 research analyst.
18     Q.    Now, after becoming the cohead of
19 high-yield research, is it your understanding that
20 Mr. Ngo continued to cover his core sectors?
21     A.    Yes.
22     Q.    Did Ms. Burns continue to cover her
23 sectors?
24     A.    Yes.
25

836

Lowenthal - Direct

1     Q.    Do you recall what Ms. Burns' sectors
2 were?
3     A.    Retail/consumer.
4     Q.    Are you familiar with the morning
5 blast?
6     A.    Yes.
7     Q.    Can you explain for us generally what
8 that is.
9     A.    That's -- the start of the day, the
10 sales group has a meeting to go over ideas in the
11 market, market events that may have been newsworthy
12 that morning or prior evening, for the research
13 analysts to comments on those events and those news
14 items, as well anything going on with the
15 companies under their coverage universe.  Those
16 ideas are then summarized in a single document to
17 circulate to clients.
18     Q.    In 2014, did you have any
19 understanding as to approximately how many clients
20 got that?
21     A.    It was a large distribution list that
22 was maintained by the research department for all of
23 our institutional clients.  I would venture to guess
24 it would be over 500 clients.
25

837

Lowenthal - Direct

1     Q.    Now, during his employment, did there
2 come a time when Mr. Ngo traveled to California for
3 some time?
4     A.    Yes.
5     Q.    Do you recall approximately when that
6 was?
7     A.    That was in the June, July time frame.
8     Q.    And do you recall why Mr. Ngo went to
9 California?
10     A.    He was adopting a child and was going
11 to pick the baby up.
12     Q.    How did you come to learn about that?
13     A.    He told me.
14     Q.    And what do you recall about the first
15 conversation that you had with Mr. Ngo on that
16 issue?
17     A.    He made me aware.  I congratulated him
18 and told him that I was supportive of what he would
19 need in order to do that.
20     Q.    And during that first conversation
21 with Mr. Ngo -- when was that conversation,
22 approximately?
23     A.    That was probably in April time frame.
24     Q.    And during that conversation with
25

838

Lowenthal - Direct

1 Mr. Ngo, did he discuss with you at all that he was
2 considering taking a leave of absence?
3     A.    No.  He asked me what he should do.  I
4 said he should talk with our HR department about
5 what our policies are and that he should make me
6 aware of what his decision would be in regards to
7 next steps, timing and things of that nature.  He
8 should coordinate, when the time was right, with his
9 colleagues so that they could plan around whatever
10 his decisions would be and what his availability
11 would be.
12     Q.    And when you told Mr. Ngo to speak to
13 HR, did you direct him to any particular person?
14     A.    I directed him to the head of HR,
15 Lenore Denys.
16     Q.    Did it surprise you that Mr. Ngo first
17 came to you to tell you that he was having a baby
18 and going to California?
19     A.    No.
20     Q.    Why not?
21     A.    I think, one, I'm his supervisor, so
22 telling me important life events that could affect
23 either his work or his schedule would make sense.
24 And I think he shared it with me on a personal basis

839

Lowenthal - Direct

1  because he was excited.

2      Q.   And do you know whether Mr. Ngo ever,

3  in fact, spoke with Ms. Denys or anyone else in

4  human resources?

5      A.   He did.

6      Q.   How did you come to know that?

7      A.   I followed up with Ms. Denys at the

8  time.  She and I kept in touch on the matter just to

9  make sure that I was aware, she was aware of any

10 news or information that was -- one of us might be

11 aware of that the other might not be.

12     Q.   I'm going to ask you to take a look at

13 Exhibit 113.  Please take your time and take a look

14 at that, and let me know when you're ready,

15 Mr. Lowenthal.

16         (Pause.)

17     A.   Okay.

18     Q.   So I'd like to start with the very

19 bottom e-mail, which is from Mr. Ngo to Ms. Denys,

20 and it's dated May 12, 2014.

21         And you're not copied on this e-mail,

22 but Mr. Ngo wrote to Ms. Denys, "Hi, Lenore.  I

23 spoke to Rob Lowenthal this morning.  I'm having a

24 baby with my partner - the baby is due July 3 - and

840

Lowenthal - Direct

1  I'm trying to figure out leave.  Rob suggested I

2  speak to you to find out what policy the firm has in

3  place, what is the policy for paternity leave.  Also

4  I do not think there's precedent for a gay couple,

5  but are there any comps or policies in place?"

6         Mr. Lowenthal, my first question is

7  where Mr. Ngo says, "I spoke to Rob Lowenthal this

8  morning," does this refresh your recollection as to

9  whether May 12 may have been the date that you had

10 that first conversation with Mr. Ngo?

11     A.   It could have been, yes.

12     Q.   And is Mr. Ngo's representation to

13 Ms. Denys about the conversation that you had

14 consistent with your recollection of that

15 conversation?

16     A.   Yes.

17     Q.   And we see above that that Ms. Denys

18 responded to Mr. Ngo that same date stating, "We do

19 not have a separate paternity leave policy, but you

20 may be entitled to 12 weeks of unpaid leave under

21 Family and Medical Leave.  You can refer to page 17

22 in the employee handbook for the details.  The

23 handbook can be found on the company intranet under

24 employee benefits."

841

Lowenthal - Direct

1         And then above that, Mr. Lowenthal, it

2  appears that Mr. Ngo forwarded his exchange with

3  Ms. Denys to you; is that correct?

4      A.   Yes.

5      Q.   And Mr. Ngo writes, "Hi, Rob.  Lenore

6  got back to me.  There is no paternity policy at the

7  firm.  I referenced the section she gave me.  What

8  she's referring to is the Family and Medical Leave

9  (FMLA) policy that does have a provision available

10 to care for the birth of a newborn child."

11         Then Mr. Ngo writes, "Thanks for being

12 so understanding and helpful today."

13         When you received this e-mail, were

14 you surprised that Mr. Ngo thanked you for being

15 helpful and understanding?

16     A.   No.

17     Q.   Why not?

18     A.   Because I thought I was.

19     Q.   And at any time after receiving this

20 e-mail from Mr. Ngo, did he tell you that he needed

21 more information regarding Oppenheimer's leave of

22 absence policy?

23     A.   No.

24     Q.   Did he ever tell you that he was

842

Lowenthal - Direct

1  unclear on what the leave of absence policy was?

2      A.   No.

3      Q.   Now, I think you had testified earlier

4  that you also gave some instruction to Mr. Ngo about

5  speaking with Ms. Ross and Ms. Burns?

6      A.   Yes.

7      Q.   What was that instruction?

8      A.   It was -- after he had spoken to

9  Lenore Denys, was knowledgeable about what -- what

10 the availability was around our policies and then

11 once he decided what he was going to do with regards

12 to his schedule, he should make his colleagues aware

13 of his plans, as well as myself.

14     Q.   And in 2014, you were Mr. Ngo's direct

15 supervisor; correct?

16     A.   Yes.

17     Q.   Did Mr. Ngo ever report to you that he

18 felt that Jane Ross was trying to dissuade him from

19 taking an FMLA leave of absence for the birth of his

20 baby?

21     A.   No.

22     Q.   Did he ever report to you that

23 Ms. Ross was attempting to dissuade him from taking

24 12 weeks of leave?

843

Lowenthal - Direct

1    A.    No.
2    Q.    Did he ever report to you that he felt
3 that Ms. Ross was not supporting him taking a leave
4 of absence?
5    A.    No.
6    Q.    Did Ms. Ross ever suggest to you that
7 she disapproved --
8    A.    No.
9    Q.    -- of Mr. Ngo taking a leave of
10 absence?
11   A.    No.
12   Q.    Now, did there come a time when
13 Mr. Ngo left the office for the birth of his child?
14   A.    Yes.
15   Q.    Do you recall approximately when that
16 was?
17   A.    In the July time frame, June or July
18 time frame.
19   Q.    If I told you June 20th, would that
20 sound about right?
21   A.    Sure.
22   Q.    Now, between your first conversation
23 with Mr. Ngo in May, where you directed him to
24 Ms. Denys, and his departure on June 20th, did you

844

Lowenthal - Direct

1 have any additional conversations with him about
2 what his plans were?
3    A.    No, other than he -- well, he did tell
4 me he'd be gone for a couple of weeks.  He and I
5 discussed that if he was -- he still had obligations
6 and that -- he told me he felt he was going to be
7 able to use the LA office and the laptop to perform
8 his responsibilities, he'd only be gone a couple of
9 weeks.
10        And I said, if anything changes, let
11 me know.
12   Q.    During that conversation, did Mr. Ngo
13 tell you that he was going to take an FMLA leave?
14   A.    He said he did not want to take an
15 FMLA leave.  He wanted to continue to get paid.  He
16 wanted to continue to work.  He felt that as though
17 he could -- with an accommodation of physical
18 location on the West Coast, he could continue to
19 perform his job function.
20   Q.    If Mr. Ngo had told you during any
21 conversation that he was going to take an FMLA leave
22 or wanted to take an FMLA leave, what would you have
23 done?
24   A.    I would have directed him back towards

845

Lowenthal - Direct

1 the HR department, fill out the proper paperwork and
2 let us know what your last day is so that we can
3 accommodate around you anything regarding client
4 contact and work schedules and perform -- supporting
5 the business in your absence.
6    Q.    Did you ever tell Mr. Ngo that he was
7 not entitled to take a leave of absence for the
8 birth of his child?
9    A.    No.
10   Q.    Did you ever tell him that he should
11 not take a leave of absence for the birth of his
12 child?
13   A.    No.
14   Q.    Was it your understanding that
15 Ms. Burns or Ms. Ross had the authority to approve
16 or disapprove a leave of absence for Mr. Ngo?
17   A.    No.
18   Q.    Who had that authority?
19   A.    The HR department.
20   Q.    Now, were you involved in having a
21 laptop computer issued to Mr. Ngo for his travel to
22 California?
23   A.    Yes.
24   Q.    Why was that done?

846

Lowenthal - Direct

1    A.    In order to work every day from the
2 West Coast, either in the office or out of the
3 office, he told me he needed a laptop so that he
4 could log in and perform his job function.
5    Q.    Now, when Mr. Ngo left the office for
6 the birth of his child in June of 2014, did you have
7 him taken off payroll?
8    A.    No.
9    Q.    Why not?
10   A.    He was continuing to work.  So it was
11 an accommodation for him to work on the West Coast
12 as opposed to in the office.
13   Q.    Now, I believe you testified that as
14 part of your discussions with Mr. Ngo, he had
15 indicated that he was going to be gone for a couple
16 of weeks; is that what your testimony was?
17   A.    Yes.
18   Q.    And Mr. Ngo left on June 20th?
19   A.    Yes.
20   Q.    Did Mr. Ngo, in fact, return to the
21 office in three to four weeks --
22   A.    No.
23   Q.    -- a couple of weeks, I should say.
24   A.    No.

847

Lowenthal - Direct

1    Q.    Was Mr. Ngo the first person to tell
2    you that he would not be returning to the office
3    within a couple of weeks?
4        A.    No, I don't recall hearing from Hoai
5    again until I asked Colleen to let him know I'd like
6    to speak to him after I heard that he had
7    unilaterally decided to continue working from the
8    West Coast for an indefinite period of time.
9        Q.    How did you come to learn that?
10       A.    I was made aware by Colleen.
11       Q.    And do you recall approximately when
12   that was?
13       A.    That was probably the middle to end of
14   July.
15       Q.    And what was your reaction -- did you
16   hear from Colleen or from Ms. Ross when Mr. Ngo was
17   now expecting to be back in the office?
18       A.    I was -- I was very surprised because
19   I hadn't heard from Hoai at all.  I hadn't heard
20   that the baby had been born.  I hadn't heard that he
21   needed log-in help.  I hadn't heard that he was, you
22   know -- I hadn't heard anything.  And so the fact
23   that the first news I heard was that he was
24   unilaterally deciding to stay on the West Coast
25

848

Lowenthal - Direct

1    without having discussed it with me and -- was
2    disappointing.
3        Q.    If you could take a look at
4    Exhibit 114, please.  Just let me know when you've
5    had a chance to review that.
6            (Pause.)
7        A.    Okay.
8        Q.    Now, Mr. Lowenthal, I'll represent
9    that you were not the author or recipient of any of
10   these e-mails.
11           My question is, prior to this legal
12   proceeding, had you ever seen this e-mail before?
13       A.    I don't recall seeing it before.
14       Q.    If you look at the bottom e-mail, and
15   that is dated July 13th, 2014, from Mr. Ngo to
16   Ms. Burns and Ms. Ross, do you see that?
17       A.    Yes, dated July 13th on this piece of
18   paper.
19       Q.    I'm sorry.  Did I say August?
20       A.    July 13th.
21       Q.    July 13th.  I apologize.  I may have
22   misspoke.
23           Do you see that e-mail, sir?
24       A.    Yes.
25

849

Lowenthal - Direct

1    Q.    Does approximately July 13th refresh
2    your recollection of in or about the time that you
3    found out that Mr. Ngo would not be returning to the
4    office for some additional time?
5        A.    Yes.
6        Q.    Do you recall how shortly after this
7    e-mail was sent you heard from either Ms. Ross or
8    Ms. Burns about what Mr. Ngo's plans were?
9        A.    It was likely the next day, after he
10   e-mailed this late on a Sunday night, that Colleen
11   came in and made me aware of the e-mail -- or the
12   news that she had heard from Hoai.
13       Q.    Was it Ms. Burns or Ms. Ross who had
14   told you?
15       A.    I mean, I likely heard from both of
16   them at some point during that same day, but -- I
17   spoke to both of them.
18       Q.    Looking at this e-mail now, do you see
19   any reference in this e-mail to the FMLA?
20       A.    No.
21       Q.    Do you see any reference in this
22   e-mail to a leave of absence?
23       A.    No.
24       Q.    Do you see anyplace in this e-mail
25

850

Lowenthal - Direct

1    where Mr. Ngo is requesting additional time out of
2    the office?
3        A.    No.  He's stating that he's taking
4    more time, but there's no request for permission.
5        Q.    If Mr. Ngo felt he needed more time
6    out of the office, would you expect that you would
7    be on this e-mail?
8        A.    Yes.
9        Q.    Now, following your conversations with
10   either Ms. Ross or Ms. Burns, did you make any
11   decisions regarding the status of Mr. Ngo's
12   employment with Oppenheimer?
13       A.    Not the status of his employment, but
14   his position as a supervisor was something that I
15   changed my mind on once I had learned that he had
16   begun to unilaterally make plans that he wasn't
17   discussing with me.
18           I thought it showed poor judgment and
19   a lack of acknowledgment of the environment that we
20   work in, which is heavily regulated and requires
21   that people you work for be made aware and be part
22   of a decision to just extend time periods away from
23   the office.
24       Q.    Did you remove Mr. Ngo's supervisory

851

Lowenthal - Direct

1  responsibilities because he wanted to be out of the
2  office to be with his newborn child?
3       A.   No, that was not the reason.
4       Q.   Did you do it to punish Mr. Ngo?
5       A.   No.
6       Q.   Did you consider the removal of
7  Mr. Ngo's supervisory responsibilities to be a
8  demotion?
9       A.   No.
10      Q.   Do you recall whether there was any
11 changes to Mr. Ngo's guaranteed compensation
12 following your decision to remove his supervisory
13 responsibilities?
14      A.   There was no guaranteed compensation.
15      Q.   There was no change to guaranteed --
16      A.   There was no guaranteed compensation.
17      Q.   Well, I'm talking about his base
18 salary.
19      A.   There was no change to any base
20 salaries.
21           This was a time frame that the firm
22 was under intense regulatory pressure.  It was in
23 and around the same time that we had made
24 settlements with -- a variety of which are all

852

Lowenthal - Direct

1  publicly known -- SEC and FINRA enforcement issues.
2           We had consultants in that were not
3  just looking to see whether or not we were abiding
4  by the regulatory rules, but whether or not we were
5  abiding our own policies.
6           So sensitivity around issues like
7  delegation of responsibilities for someone senior,
8  like me, it was something I was extremely sensitive
9  to.  So if I wasn't in complete alignment -- in tune
10 with someone that was -- I was relying on to sign
11 documents that they were doing their job, it gave me
12 great concern.  It was a very intense period.
13           THE ARBITRATOR:  When you refer to it
14      being a particular point of sensitivity --
15      when you refer to the sensitivity of being
16      sure that you have control over or
17      supervision over subordinates, what, in the
18      various investigations or other events that
19      you've sort of generally alluded to, was
20      pertinent to that concern?
21           THE WITNESS:  The issues around all of
22      our governance and supervisory structure was
23      being reviewed.  So the -- not just the
24      particulars about individual businesses.  So

853

Lowenthal - Direct

1  it was a postcrisis cleanup of sorts that
2  involved a very high-level review of all of
3  the firm's cascading responsibilities.  So it
4  was fairly intense, not just particular to a
5  single business unit or a single business
6  line within a business unit.
7           MR. GIBSON:  Judge, I apologize.  May
8      I take a quick two-second restroom break?
9           THE ARBITRATOR:  Of course.
10          (Recess from the record.)
11          MR. GIBSON:  Thank you.
12 BY MR. GIBSON:
13      Q.   Mr. Lowenthal, do you recall what
14 Mr. Ngo's base salary was in 2014?
15      A.   In and around 150-.
16      Q.   And if I told you it was 150,000, does
17 that sound right?
18      A.   That sounds right.
19      Q.   To your knowledge, what was Mr. Ngo
20 base salary in 2015?
21      A.   Should have been the same.
22      Q.   Do you know what his base salary was
23 in 2016?
24      A.   Should have been the same.

854

Lowenthal - Direct

1       Q.   If Mr. Ngo's base salary changed in
2  either 2014, 2015 or 2016, who would have made that
3  decision?
4       A.   I would have.
5       Q.   Now, you testified that in July of
6  2014, you removed certain of Mr. Ngo's supervisory
7  responsibilities.
8           Why didn't you remove -- why did not
9  reduce his base salary?
10      A.   The job function of a research
11 analyst, the cohead and the supervisory functions
12 were all -- the supervisory portion of that job was
13 a small piece of the job, and it was separated
14 between two people.  The job function of a research
15 analyst was still in place.  He was hired to be a
16 research analyst.  He was paid the same when he was
17 a research analyst.
18           There was no reason to have him as a
19 supervisor.  So it seemed -- there was no reason to
20 increase their pay when they became supervisors, and
21 no reason to deduct it when Hoai stopped being a
22 supervisor.
23           In many cases, we have what we call
24 producing managers where the core component of the

855

Lowenthal - Direct

1 job is the production elements of what you do, but
2 because we are a small firm, people have
3 responsibilities that are part of our regulatory
4 structure to also supervise.
5     Q.    And did there come a time when you
6 personally discussed with Mr. Ngo his new
7 anticipated return date to the office?
8     A.    I don't remember hearing -- after I
9 communicated to Hoai through a letter, I don't
10 remember hearing from him again until much later
11 that year.
12    Q.    Did you have a conversation with
13 Mr. Ngo before the letter?
14    A.    Yes.  The e-mail you showed me
15 earlier, Exhibit 114, I had asked -- upon hearing of
16 Hoai's decision to authorize himself to continue to
17 work permanently in -- on the West Coast, I told
18 Colleen to -- since she was in contact with Hoai --
19 to notify him I'd like to speak to him when it's
20 convenient for him about this decision of his.
21    Q.    Do you recall how shortly after your
22 conversation with Ms. Burns you, in fact, spoke to
23 Mr. Ngo?
24    A.    It was within a day or two.

856

Lowenthal - Direct

1     Q.    And if you could take a look at
2 Exhibit 54.
3     A.    Yep.
4     Q.    Just let me know when you've had a
5 chance to look at that.
6     A.    I see it.
7     Q.    This appears to be an e-mail from
8 Deborah Stone to yourself that's dated July 16,
9 2014.
10        Who is Ms. Stone?
11    A.    My executive assistant.
12    Q.    In the subject line, it says,
13 "Message:  Hoai Ngo," and then there appears to be a
14 phone number after that?
15    A.    Yes.
16    Q.    Did you understand this to be
17 Ms. Stone communicating to you that Mr. Ngo had
18 called you?
19    A.    Yes.  This is how Deborah communicated
20 by return call communication, so I know what time
21 people called and I know the number to call them
22 back on.
23    Q.    Do you recall whether July 16th was
24 the date that you spoke to Mr. Ngo?

857

Lowenthal - Direct

1     A.    I don't remember when I got back to
2 him, but it was shortly thereafter, the same
3 afternoon or the following morning.
4     Q.    And what do you recall about that
5 telephone conversation that you had with Mr. Ngo?
6     A.    I told him that I was surprised to
7 hear that he was staying on the West Coast and that
8 he hadn't let me know directly, that the time had
9 come for me to take away his supervisory
10 responsibilities, that it wasn't -- it wasn't
11 necessary any longer.
12        I was in touch with Colleen, who was
13 acting as supervisor as well, and that she could
14 perform that function.  I told him that he should
15 make a decision as to what he wants to do with
16 regards to permissibilities of coming back to the
17 office or not, but he should let HR know what his
18 decision was, and that, until I heard otherwise, he
19 would continue to be performing the work of a
20 research analyst, which was the core function of his
21 job.
22    Q.    During that conversation with Mr. Ngo,
23 if he had told you that he wanted to take a leave of
24 absence, what would you have -- what would your

858

Lowenthal - Direct

1 response have been?
2     A.    That's fine.  Please fill out the
3 proper paperwork.  Please send it in to HR and let
4 us know the dates upon which you plan on beginning
5 that leave.
6     Q.    And during that conversation, did you
7 tell Mr. Ngo -- with Mr. Ngo, did you tell him that
8 you were angry with him that he was taking more time
9 out of the office to be with his child?
10    A.    No.
11    Q.    Did you tell him that you were going
12 to punish him for being out of the office to be with
13 his child?
14    A.    No.
15    Q.    When you discussed the removal of
16 certain supervisory responsibilities from Mr. Ngo,
17 did you discuss the morning blast e-mail?
18    A.    We may have.  I do recall that -- the
19 morning blast needs to be sent out every day.  And
20 to the extent that there are responses -- at some
21 point -- that was not around that time.  That was
22 later.  That was -- that was later.  But we changed
23 the morning blast to come from an address that more
24 than one person could access if there's a response,

859

Lowenthal - Direct

1  and I think that was in August.
2      Q.   I'd like you to take a look at
3  Exhibit 3.
4      A.   Okay.
5      Q.   I'll represent to you, Mr. Lowenthal,
6  that this is a copy of Oppenheimer's answer to the
7  statement of claim in this proceeding.
8          Do you recall whether you read a copy
9  of this before it was filed?
10     A.   I reviewed it.
11     Q.   And I'd like you to turn to page 4 of
12 the answer.
13         And do you see the last paragraph that
14 starts "Mr. Ngo returned from his medical leave"?
15     A.   Yep.
16     Q.   It states, "Mr. Ngo returned from his
17 medical leave on November 3, 2014, approximately
18 four and a half months since he last appeared for
19 work in the office.  It was at this point that
20 Mr. Ngo was advised that his supervisory
21 responsibilities had been reassigned and that
22 Ms. Burns, who had been acting as the sole head of
23 high-yield research group during the entire time of
24 Mr. Ngo's absence, would continue in that regard."

860

Lowenthal - Direct

1      Do you see that statement, sir?
2      A.   Yes.
3      Q.   Is that statement 100 percent
4  accurate?
5      A.   No, I think it was -- it is true that
6  that conversation took place, but it was not the
7  first time that conversation took place.  So at that
8  point, I did remind Mr. Ngo that that was the status
9  of the organizational structure, but this was --
10 this was being reiterated after the discussion that
11 I had had with him prior to sending him a memo of
12 the same regard back in July.
13     THE ARBITRATOR:  One question about
14 that.
15     THE WITNESS:  Yes.
16     THE ARBITRATOR:  Referring back to the
17 Exhibit 45, which is your letter of July 18
18 to Mr. Ngo, that apparently postdated your
19 telephone discussion with him.
20     THE WITNESS:  Yes.
21     THE ARBITRATOR:  And looking at the
22 third paragraph, you say, in the middle of
23 that paragraph, "In your absence, I intend
24 for Colleen Burns, as cohead of fixed income

861

Lowenthal - Direct

1  research, to absorb all of the tasks
2  associated with the supervisory elements of
3  the research department."
4      Reading that seems to suggest that you
5  were removing Mr. Ngo from supervisory role
6  during his absence.  Was that your intention
7  at that time?
8      THE WITNESS:  My intention at the time
9  was to remove it upon speaking with him and
10 to document it thereafter in the coming day
11 or days so that it would be effective almost
12 immediately.
13     THE ARBITRATOR:  But my question is
14 whether it was your intention at that time
15 that the removal of his supervisory role was
16 permanent or was at least during the period
17 of his absence from the New York office.
18     THE WITNESS:  So to be perfectly
19 honest, my impression at the time was it
20 wasn't a two-person job and that this was
21 duplicitous.  We didn't need two people doing
22 it.  There was room for error or
23 finger-pointing or one person to do something
24 and not the other or mistakes to happen.

862

Lowenthal - Direct

1      And as I said earlier, my concern
2  around it was that we have -- we clean this
3  up and that there was -- so there was no
4  confusion and that I knew where I could find
5  and who I could speak with about these
6  functions that was down the hall from me.
7      I didn't intend to have two
8  supervisory analysts going forward.
9      THE ARBITRATOR:  And was that decision
10 informed, at least in part, by your
11 experience during the period that Mr. Ngo was
12 absent, finding that Ms. Burns could
13 adequately handle the supervisory role on her
14 own?
15     THE WITNESS:  Yes.
16 BY MR. GIBSON:
17     Q.   Well, touching on Judge Dolinger's
18 question, do you have any doubt in your mind that
19 you made the decision to remove Mr. Ngo's
20 supervisory responsibilities on or about July 16th
21 or July 17th, 2014?
22     A.   I have no doubt.
23     Q.   Did you ever reconsider that decision?
24     A.   No.

863

Lowenthal - Direct

1 Q. Did you ever tell anybody that you
2 were in the process of reconsidering that decision?
3 A. No.
4 Q. I'd like you to take a look at
5 Exhibit 52, please.
6 (Pause.)
7 MR. LICUL: I'm sorry, Mike. What was
8 it again?
9 MR. GIBSON: 5-2.
10 THE WITNESS: Okay.
11 BY MR. GIBSON:
12 Q. And this appears to be a July 2014
13 e-mail exchange between yourself and Ms. Denys. And
14 the subject line is "Hoai Ngo."
15 Was Ms. Denys the director of human
16 resources at that time?
17 A. Yes.
18 Q. And you write to Ms. Denys on
19 July 14th.
20 Is that the day that you found out
21 that Mr. Ngo would not be returning to the office
22 until August 25th?
23 A. Yes.
24 Q. And you state, "Lenore, Hoai may have

864

Lowenthal - Direct

1 called you earlier this spring at my request."
2 What were you referring to there?
3 A. When Hoai first brought to my
4 attention his plans and that I advised him to speak
5 to Lenore and find out information that would be
6 helpful to him in making decisions.
7 Q. And then you say, "He had a baby
8 through a surrogate last month and is taking
9 significant time off. Can you let me know what the
10 policy guidelines on paternity leave are."
11 Why did you make that request of
12 Ms. Denys?
13 A. I'm not familiar with all of our
14 policies and it's not -- Lenore is. And I've relied
15 upon her in the past, and she's always been
16 accurate. This is me reminding myself or finding
17 out or learning about what may be available with
18 regards to paternity leave for Hoai, to the extent
19 that there are accommodations I could make for him,
20 whether or not they fall within the policy or not
21 within the policy. I just wanted to be
22 knowledgeable of that at the time.
23 Q. And when you said Lenore was the
24 person that you would go to for that sort of

865

Lowenthal - Direct

1 information, is that why you referred Mr. Ngo to
2 human resources back in May of 2014?
3 A. Yes.
4 Q. And then Ms. Denys responds to you the
5 next day, "Hoai can apply for unpaid leave under the
6 FMLA (Family and Medical Leave Act). FMLA protects
7 his job for up to 12 weeks. Other than FMLA, we
8 have no policy on paternity leave."
9 Do you see that?
10 A. Yes.
11 Q. Did Ms. Denys' e-mail to you on
12 July 15, 2014, give you any indication that Mr. Ngo
13 was already on an FMLA leave?
14 A. No. This implies that he was not. He
15 had not elected to fill out any paperwork, otherwise
16 she would have informed me at the time of any status
17 that had changed.
18 Q. Now, let's go to Exhibit 45, which is
19 the letter that Judge Dolinger just asked you about
20 a few minutes ago.
21 A. Yes.
22 Q. And first I'd like to look at the
23 e-mail that's on the front. And it is from you to
24 Mr. Ngo, and it's dated July 18, 2014, and it has

866

Lowenthal - Direct

1 the subject line, "Follow-up."
2 And then you say, "Hoai, pursuant to
3 our conversation regarding your leave, please see
4 the attached memo."
5 Having read this e-mail now, do you
6 have any doubt in your mind that this letter was
7 sent after you spoke to Mr. Ngo on the telephone?
8 A. I have no doubt.
9 Q. And this was after you told Mr. Ngo
10 that his supervisory responsibilities were being
11 removed?
12 A. Yes.
13 Q. And I see in this e-mail you used the
14 term "leave."
15 Do you see that?
16 A. Yes.
17 Q. You just testified before that, at
18 least with regard to Ms. Denys' e-mail, you didn't
19 have any understanding that Mr. Ngo was on an FMLA
20 leave of absence?
21 A. No.
22 Q. Why did you use the word "leave" in
23 this e-mail?
24 A. This is me using the word "leave" in

867

Lowenthal - Direct

1  my own definition.  This is not disability leave,
2  it's not an FMLA leave, it's not
3  paternity/maternity.  It is for lack of a
4  description as to what was actually happening.
5       A longer description would have been
6  that -- regarding the conversation about the
7  accommodations we had made for him to work out of
8  the West Coast, not at 85 Broad Street.  That was
9  the context in which I was referring.
10      Q.  And let's take a look at the letter
11  that's attached to it.
12      And my first question, Mr. Lowenthal,
13  is -- and I want to be clear.  I do not want you to
14  discuss any conversations that you had with any
15  attorney at Oppenheimer.
16      But did you consult with anybody
17  regarding the drafting of this letter?
18      A.  I did.
19      Q.  Who did you consult with?
20      A.  Bill McCabe in our legal department,
21  and Lenore Denys.
22      Q.  Looking at the first paragraph of your
23  letter, it states, "Congratulations on the arrival
24  of your new baby.  Although the event and impending

868

Lowenthal - Direct

1  responsibilities may seem overwhelming now,
2  parenthood is a marvelous experience.  I am sure you
3  will enjoy the great journey you're about to begin."
4       Why did you write that?
5       A.  When I wrote the letter, I had it
6  reviewed by Bill and Lenore, but I do find that when
7  correspondence comes from me, it should reflect my
8  personality too.  And like I said, I think I'm
9  someone who has a high regard for family values, and
10  I wanted to be as helpful as I could be to Hoai
11  during this time in his life and make
12  accommodations, even if they weren't a part of
13  policy, to see that he would have any options that I
14  could make available to him just based on my being
15  his boss and being able to create those
16  opportunities for him.  So reflecting on the news
17  that he and I had discussed, I wanted him to know I
18  was still supportive of his family decisions and his
19  experience.
20      Q.  And leading up to this point, did you
21  feel that you had been understanding and
22  accommodating to Mr. Ngo?
23      A.  Yes.
24      Q.  And what are you attempting to convey

869

Lowenthal - Direct

1  to Mr. Ngo in the remainder of this letter?
2       A.  It's just specifying and codifying the
3  conversation we had.  You know, the idea that
4  someone unilaterally decides they're not coming back
5  to the office without informing their boss is an
6  unusual event.  I felt the need that we draw a line
7  in the sand and codify exactly where we stood so
8  there was no confusion.
9       His behavior was a red flag to me in
10  terms of whether or not he was paying attention to
11  detail and whether or not he was really thinking
12  about his job responsibilities.  So I felt the need
13  to overdocument, and well document, the conversation
14  and the status.
15      Q.  And if you look at the second
16  paragraph, it states -- starting in the sentence --
17  the second sentence, "When we discussed your time
18  off, it was my understanding from you that you would
19  need at least two weeks' leave with the possibility
20  of extending that leave for an additional two weeks
21  depending on the health and needs of the baby.
22      "I believe that June 20, '14, is when
23  your leave began.  As you know, Oppenheimer does not
24  have a paid paternity leave policy.  I was willing

870

Lowenthal - Direct

1  to accommodate your initial request, permitted the
2  flexibility with your return date, and kept you on
3  Oppenheimer's payroll."
4       Is that consistent with the
5  accommodation that you recall reaching with Mr. Ngo
6  back in May or June of 2014?
7       A.  Yes.
8       Q.  And we see there are some attachments
9  to the letter.  Can you quickly just take a look at
10  those.
11      (Pause.)
12      A.  Yes.
13      Q.  And where did you get those forms
14  from?
15      A.  Combination of Bill and Lenore.  I
16  don't remember which one gave them to me, but...
17      Q.  When you say you spoke to Lenore,
18  you're talking about Lenore Denys from human
19  resources?
20      A.  Yes.
21      Q.  Are you sure that it was Ms. Denys
22  that you were speaking to in human resources at that
23  time?
24      A.  I don't remember.

871

Lowenthal - Direct

1    Q.   Is it possible that it was Jaime
2    Bridges?
3
4    A.   It could have been, yes.
5    Q.   And going back to the letter,
6    July 18th --
7           MR. GIBSON:  Sorry, Judge.  Did you
8    have a question?
9           THE ARBITRATOR:  No.
10          MR. GIBSON:  Oh, okay.
11   BY MR. GIBSON:
12   Q.   I'd like to look at that -- the fourth
13   paragraph.
14          You state, "I have now spoken with the
15   human resources representative and received the
16   enclosed Family and Medical Leave Act summary for
17   your review and acknowledgment.  Unfortunately, as
18   discussed above, Oppenheimer does not offer paid
19   family leave.  You are, however, entitled to take
20   unpaid leave time over and above your allotted
21   vacation.  Questions concerning this should be
22   addressed in the materials or can be addressed to
23   the benefits department," and then there's a phone
24   number.
25          Are "the materials" you're referring

872

Lowenthal - Direct

1    to there the attachment to your letter?
2
3    A.   Yes.
4    Q.   Do you know whether Mr. Ngo ever
5    contacted human resources to tell them that he
6    wanted to take an FMLA leave for the birth of his
7    child?
8    A.   He did not.
9    Q.   Did Mr. Ngo ever contact you to
10   dispute any of the contents of this letter?
11   A.   No.  I don't recall getting a response
12   at all.
13   Q.   After finding out that Mr. Ngo needed
14   some more time out of the office, did you ever tell
15   him that he needed to return to the office
16   immediately?
17   A.   No.
18          THE ARBITRATOR:  The letter makes
19   reference to your understanding that Mr. Ngo
20   would be taking off two weeks and maybe
21   another two weeks.  Was that understanding
22   based on anything specific that Mr. Ngo said
23   to you?  And, if so, what was it that he
24   said?
25          THE WITNESS:  That he was continuing

873

Lowenthal - Direct

1    to perform his job function as a research
2    analyst, he was in contact with people in the
3    office, he would need to stay out in
4    California for another couple of weeks, and
5    that he would be returning to New York and
6    returning to 85 Broad Street, which is where
7    we're located.
8           THE ARBITRATOR:  This was a
9    conversation that you had approximately when?
10   While he was already in California or before
11   he left?
12          THE WITNESS:  The conversation that
13   this letter was documenting that occurred on
14   that Monday or Tuesday --
15          THE ARBITRATOR:  That was --
16          THE WITNESS:  -- after I learned that
17   he had extended his time.
18          THE ARBITRATOR:  Okay.
19          THE WITNESS:  He clarified it in the
20   conversation.  I documented what he had
21   clarified.  This is what he had told me, he
22   needed another couple of weeks.
23   BY MR. GIBSON:
24   Q.   Now, prior to sending this letter to

874

Lowenthal - Direct

1    Mr. Ngo, did you tell anybody else that Ms. Burns
2    would be the sole head of high-yield research going
3    forward?
4    A.   I told Colleen.  And I told Jane so
5    that she would be aware.  And then I would have told
6    my administrative staff so we could document it.
7    Q.   Let's take a look at Exhibit 56.  Let
8    me know when you've had a chance to read this.
9           (Pause.)
10   A.   Okay.
11   Q.   And this appears to be an e-mail dated
12   July 21st, 2014, from yourself to Ms. Burns.
13   A.   Yes.
14   Q.   And copied on this e-mail are Steve
15   Krasner and Cary Holcomb?
16   A.   Yes.
17   Q.   Who are Mr. Krasner and Mr. Holcomb?
18   A.   Cary Holcomb is the head of risk in
19   the fixed income business.
20          And Steven Krasner is a lawyer who
21   also worked in the fixed income department who
22   oversees many of the regulatory risks within the
23   business unit.
24   Q.   And in this e-mail, you say, "Colleen,

875

Lowenthal - Direct

1  I've communicated to Hoai that based on the delay of
2  his return until the end of August, I am suspending
3  his supervisory responsibilities until further
4  discussion.  Beginning today, you are the sole
5  supervisory analyst in the fixed income department.
6  Let me know of any questions or concerns that you
7  might have with your responsibilities."
8          Mr. Lowenthal, having read this now,
9  do you have any doubt in your mind that you had
10 communicated to Mr. Ngo, prior to the sending of
11 this e-mail, that you were removing his supervisory
12 responsibilities?
13     A.   I think it was pretty clear, yeah.
14         THE ARBITRATOR:  To follow up on the
15     language of this e-mail, we discussed earlier
16     the question of whether you intended, when
17     you communicated with Mr. Ngo in mid July,
18     for this removal of his supervisory role to
19     be permanent.  And you indicated, as I
20     understood it, that it was.
21         And yet in this e-mail, you're saying
22     that based on the delay of his return, you
23     were suspending his supervisory
24     responsibilities, quote, "until further

876

Lowenthal - Direct

1  discussion."
2          Were you intending by that to suggest
3     that the issue was still an open one, whether
4     this would be a permanent removal or not?
5         THE WITNESS:  The decision was final
6     in my mind.  I've been doing this long enough
7     to know that years can go by and you might
8     reinstate someone's responsibilities and that
9     to some extent you can't unilaterally --
10    first of all, he's a licensed supervisory
11    analyst so I can't unilaterally remove his
12    licenses.  That's something he's qualified
13    for and has registration for.
14         If years later I wanted to reinstate
15    it, it's my option to do that, but I had no
16    intention of reinstating it at any time.  To
17    the extent the rules change or there's two --
18    requirement to have two people, I don't know,
19    but there was no intention in my mind to
20    reinstate at any time in the near future of
21    the date of this e-mail or my letter.
22 BY MR. GIBSON:
23    Q.   And were there any further
24 discussions, as indicated in your e-mail, about

877

Lowenthal - Direct

1  reinstating Mr. Ngo as the cohead of high-yield
2  research?
3     A.   No.
4     Q.   Was this e-mail the first time that
5  you told Ms. Burns that she was the sole head of
6  high-yield research?
7     A.   No.  We had a conversation prior to
8  that.
9     Q.   Then why was there a need to send this
10 e-mail subsequently?
11    A.   I felt that documenting it with her
12 and my administrative staff was just a good
13 practice.  There were documents that would need to
14 be changed, org charts, possibly some 3110 letters
15 or whatever the predecessor letters were for
16 delegation of authorities.  Those go all the way
17 from the bottom of the organization to the CEO, and
18 we revise them periodically when circumstances
19 change.  So this is a notification on the record
20 that they should be doing that.
21    Q.   Now, we saw in Mr. Ngo's July 13th
22 e-mail that he indicated to Ms. Ross and Ms. Burns
23 that he would be returning to the office on
24 August 25th?

878

Lowenthal - Direct

1     A.   Yes.
2     Q.   Did that, in fact, happen?
3     A.   No.
4     Q.   Do you know why it did not happen?
5     A.   Hoai suffered from a health issue that
6  prevented him from coming back to the office.
7     Q.   And do you know approximately when
8  that was?
9     A.   It was in mid August.
10    Q.   And do you recall how you learned that
11 he had suffered a brain aneurysm?
12    A.   I believe I heard that from either
13 Colleen or Jane.
14    Q.   And can you take a look at Exhibit 48.
15    (Pause.)
16    A.   Yes.
17    Q.   And this e-mail appears -- it's not an
18 e-mail.  It's just a title, but it appears to be an
19 e-mail from yourself to Ms. Burns that's dated
20 August 18 --
21    A.   I'm on 48.  Is that where you are?
22    Q.   I apologize.  58.
23    A.   Okay.
24    Q.   Am I right now that this appears to be

879

Lowenthal - Direct

1  an e-mail from yourself to Ms. Burns dated
2  August 18, 2014?
3
4      A.    Yes.
5      Q.    And is that at or about the date that
6  you recall Mr. Ngo suffering his brain aneurysm?
7      A.    Yes.
8      Q.    And in the subject line of this, you
9  wrote, "Four-to-eight-week recovery."
10         Why did you send that e-mail to
11  Ms. Burns?
12     A.    She and I likely had a conversation,
13  not knowing how -- how badly the health issue may
14  have hurt Hoai and didn't know at all when he may or
15  may not be -- may or may not be able to either
16  resume, you know, normal life and what the injury
17  would have done to him personally.
18         And so I don't remember how I learned
19  of this, but I was told that the circumstances were
20  that he would be -- it would take four to eight
21  weeks for a full recovery.
22     Q.    Did you have any conversations with
23  Mr. Ngo's partner about how long his recovery might
24  take?
25     A.    Yes.  Yes.  That may be where I

880

Lowenthal - Direct

1  learned that.
2      Q.    Now, do you have any understanding as
3  to whether Mr. Ngo went on an FMLA leave of absence
4  following his brain aneurysm?
5      A.    He did.
6      Q.    How do you know that?
7      A.    I don't remember how I knew that, but
8  that was -- that was documented -- Lenore or Jaime
9  would have let me know that documentation was filled
10  out and that that was the change in status.
11     Q.    Let's take a look at Exhibit 112.
12         (Pause.)
13     Q.    Do you see in front of you, sir, a
14  number of documents called personnel change notices?
15     A.    Yes.
16     Q.    Have you ever seen these forms before?
17     A.    Yes.
18     Q.    What's your understanding as to what
19  the purpose of these forms is, generally speaking?
20     A.    Just to update our payroll benefits
21  and human resources personnel as to a change in
22  employee status.
23     Q.    And if you look at the -- I apologize.
24  I'm not sure if all the books are the same, but if

881

Lowenthal - Direct

1  you look at the third one in, is that one dated
2  August 20, 2014?
3      A.    Yes.
4      Q.    And it has an effective date of
5  August 18, 2014?
6      A.    Yes.
7      Q.    And is it your understanding that
8  that's at or about the time that Mr. Ngo suffered
9  his brain aneurysm?
10     A.    Yes.
11     Q.    Is that your signature on the bottom
12  right?
13     A.    Yes.
14     Q.    And here in the notes and
15  explanations, it says, "Out on medical disability
16  until further notice"?
17     A.    Yes.
18     Q.    It also says, "Auto pay canceled"?
19     A.    Yes.
20     Q.    Do you have any understanding as to
21  what that means?
22     A.    The handwriting of the upper part I
23  recognize as being Deborah's, but the bottom part
24  probably wasn't there when I signed it.  That looks

882

Lowenthal - Direct

1  like a different person.
2      Q.    Do you have an understanding as to
3  whether Mr. Ngo was being paid during the period of
4  time he was recovering from his brain aneurysm?
5      A.    No, he was not.
6      Q.    Did you ever see -- did you ever sign
7  a PCN like this one during the time period that
8  Mr. Ngo was out of the office for the birth of his
9  child?
10     A.    No, we did not.
11     Q.    At the time -- during the time period
12  that Mr. Ngo was out of the office recovering from
13  his brain aneurysm, were you communicating with him
14  about work?
15     A.    No.
16     Q.    To your knowledge, was he working at
17  all?
18     A.    No, he was not working.
19     Q.    Now, on the day that he suffered his
20  brain aneurysm, am I correct that -- what was
21  Mr. Ngo's job title on the day that he suffered his
22  brain aneurysm?
23     A.    Managing director, and he was research
24  analyst in the high-yield research group.

883

Lowenthal - Direct

1
2     Q.    And do you recall when Mr. Ngo's last
3  day of employment was?
4     A.    With the firm, I don't remember.
5     Q.    If I told you on or about June 30,
6  2016, would that sound correct?
7     A.    That sounds right.
8     Q.    And what was Mr. Ngo's job position on
9  that day?
10    A.    He was a research analyst and a
11  managing director in the high-yield research group.
12    Q.    I'd like you to take a look, please,
13  at Exhibit 72.
14          (Pause.)
15    A.    Okay.
16    Q.    And we see that the bottom e-mail is
17  an e-mail from Mr. Ngo to yourself dated Thursday,
18  October 9, 2014, with the subject line, "Update"?
19    A.    Yes.
20    Q.    Do you see that?
21    A.    Yes.
22    Q.    And in the first two paragraphs,
23  Mr. Ngo states, "I hope you are well.  I thought I
24  would give you an update on my situation and timing
25  as to my return.  I've been checking in with Colleen

884

Lowenthal - Direct

1
2  frequently.  I wanted to wait until my monthly
3  follow-up with my doctor yesterday to give you a
4  more thorough update."
5          Actually, I'm going to stop there and
6  ask you, were you surprised that Mr. Ngo was
7  checking in with you with regard to his status?
8     A.    A little, not much.  I mean, it was
9  the first time I had heard from him in a couple of
10  months.  It was fine that he let me know.  I was
11  pleased to see that he was keeping in touch with
12  Colleen.  It showed me that he understood she was
13  running the group and she was the one who should be
14  made aware more frequently than I should be, that --
15  of his status.
16    Q.    And then if we look down to the
17  third paragraph, Mr. Ngo states, "The follow-up
18  doctor visit went well.  The doctor and physical
19  therapist think my recovery is on track and that I
20  will be able to return to work on Monday,
21  November 3rd.
22          "The doctors have set my disability
23  through October 31st post my discharge last month.
24  I do not believe I need an extension.  And to be
25  frank, recovery is very boring.  I can't wait to get

885

Lowenthal - Direct

1
2  back to work and resume my normal day.  I have
3  another doctor appointment in two weeks and see
4  where I am as well."
5          Then in the last paragraph,
6  Mr. Lowenthal [sic] writes to you, "I want to thank
7  you for all your support and concern."
8          Did that surprise you that Mr. Ngo
9  thanked you for all your support and concern on
10  October 9, 2014?
11    A.    It did not surprise me.
12    Q.    Why not?
13    A.    Because I thought we -- at every
14  stage, we had been very understanding and
15  accommodating to the requests that Hoai had made
16  based on all the different circumstances surrounding
17  his not being in the office.
18    Q.    If we look at the very next sentence
19  in that final paragraph, it states, "Everyone at
20  Oppenheimer has been so nice through this ordeal";
21  correct?
22    A.    And I was pleased to hear that because
23  I think it was very true, and it says a lot about
24  the culture and the people who work at Oppenheimer.
25    Q.    As a result of receiving this update

886

Lowenthal - Direct

1
2  from Mr. Ngo, did you tell him, either in an e-mail
3  or over the telephone, that you were disappointed
4  that he was out of the office for such a long period
5  of time?
6     A.    No, I did not have any conversations
7  with Hoai.
8     Q.    And, in fact, we see your response
9  above was, "Hoai, good to hear you're feeling
10  better"?
11    A.    Yes.
12    Q.    If you take a look at the exhibit
13  right before that, which is Exhibit 71, am I
14  correct, Mr. Lowenthal, it appears that you
15  forwarded Mr. Ngo's e-mail to you to Jane Ross?
16    A.    Yes.
17    Q.    Why did you do that?
18    A.    Just to make sure that Jane was aware
19  of how Hoai was doing and what the timing looked
20  like around his reentry into the job.
21    Q.    And let's now go to Exhibit 73.
22          (Pause.)
23    A.    Yes.
24    Q.    And does it appear here that you also
25  forwarded Mr. Ngo's e-mail of October 9th to Lenore

887

Lowenthal - Direct

1   Denys?
2       A.   Yes.
3       Q.   Why did you forward that?
4       A.   Just to keep Lenore aware of the
5   latest update I had regarding Hoai in case there was
6   anything she needed to do.
7       Q.   Now, do you recall when Mr. Ngo first
8   returned to work?
9       A.   I believe it was on that date that he
10  had said, November 3rd, 4th, somewhere.  It was that
11  week.
12      Q.   And if I told you that the time period
13  between August 18th, 2014, and November 3rd, 2014,
14  was 11 weeks, would that sound accurate to you?
15      A.   Yes.
16      Q.   Do you have an understanding as to how
17  many weeks of job-protected leave Oppenheimer
18  policies provide for?
19      A.   The Family and Medical Leave is 12
20  weeks, is what I think it said earlier.
21      Q.   Where would you look to find that
22  policy?
23      A.   In our policy manual.
24      Q.   And if I told you that the time period
25

888

Lowenthal - Direct

1   between June 20, 2014, and November 3rd, 2014, was
2   almost 20 weeks, would that sound right?
3       A.   Sounds right.
4       Q.   Are you aware of any Oppenheimer
5   policy that provides for a 20-week job-protection
6   leave?
7       A.   No.
8       Q.   And did you have a conversation with
9   Mr. Ngo on the first day that he returned to work?
10      A.   I did.
11      Q.   What do you recall about that
12  conversation?
13      A.   I welcomed him back.  I was pleased he
14  was doing well and he was healthy.  I don't remember
15  the specifics of the rest of the conversation.
16      Q.   Did you tell Mr. Ngo during that
17  conversation that you were upset that he was out of
18  the office for so long?
19      A.   No.
20      Q.   Did you have any other conversation
21  with Mr. Ngo shortly after his return from work?
22      A.   I mean, I told him that he's reporting
23  to Colleen; that he should resume his job as a
24  research analyst and come up to speed as quickly as
25

889

Lowenthal - Direct

1   he can on the credits that he was -- that he was
2   covering prior to being out of the office; that we
3   hoped to have those research reports available as
4   soon as possible, hopefully even for the new year so
5   that we could have Q3 and Q4 research reports
6   available as soon as possible.  That would have been
7   my focus.
8           I would have also asked him to circle
9   back with Jane and Colleen about relevant credits in
10  the marketplace, market color, things that are
11  interesting to clients, sectors that are active that
12  would be useful for him to spend his time on.
13      Q.   Now, just to be clear, those items, do
14  you recall discussing that with Mr. Ngo in your
15  first conversation, or was that a subsequent
16  conversation?
17      A.   That would have been the initial
18  conversation, just, welcome back, here's the lay of
19  the land, you know.
20      Q.   And do you recall whether you had a
21  conversation with Mr. Ngo shortly thereafter?
22      A.   He came into my office the next day,
23  rehashed the same points that we had discussed the
24  day before.
25

890

Lowenthal - Direct

1       Q.   And I believe you said that
2   conversation took place in your office?
3       A.   Yes.
4       Q.   Did you invite Mr. Ngo to come down to
5   you to have that second discussion?
6       A.   No.
7       Q.   Do you know whether a recording of
8   that conversation exists?
9       A.   I do.
10      Q.   Did Mr. Ngo tell you that he was going
11  to record that conversation?
12      A.   No.
13      Q.   How did you come to learn that the
14  recording exists?
15      A.   I learned -- in the discovery aspects
16  of this case, my legal department made me aware.
17      Q.   What reaction did you have when you
18  learned that that conversation had been recorded?
19      A.   I was shocked.
20      Q.   Why?
21      A.   Because it's such -- it's such an
22  unethical thing to do after all that the firm had
23  done and the people around Hoai had done to support
24  him during his absence.  And the first couple of
25

891

Lowenthal - Direct

1   days back, the first thing he was doing is, you
2   know, recording me, having a conversation.  After
3   having abused my trust in the prior spring in not
4   informing me of his whereabouts and now he's
5   recording me, I just was really shocked.
6       Q.   Do you typically record business
7   conversations without advising the person you're
8   talking to?
9       A.   I've never done that.
10      Q.   Are you aware of any Oppenheimer
11  policies that concern the recording of business
12  conversations?
13      A.   I'm sure that's not allowed.
14          MR. GIBSON:  I think this might be a
15      good chance to take our midafternoon.  I
16      don't have a whole lot more, so...
17          THE ARBITRATOR:  Very well.
18          (Luncheon recess from the record.)

892

Lowenthal - Direct

1          A F T E R N O O N   S E S S I O N
2              (1:55 p.m.)
3   ROBERT LOWENTHAL,
4     having been previously sworn, resumed the
5     stand and testified further as follows:
6   DIRECT EXAMINATION (Cont'd.)
7   BY MR. GIBSON:
8       Q.   Mr. Lowenthal, can you take a look at
9   Exhibit 86B.
10      A.   Yes.
11          (Pause.)
12      Q.   And I'm going to represent to you that
13  this is a transcription of that recorded telephone
14  conversation we discussed.
15      A.   Okay.
16      Q.   Did you ever have an opportunity to
17  listen to that recording?
18      A.   Only parts of it.
19      Q.   And if you start on page 2 of the
20  document, which is the first full page of text, do
21  you see the line numbers on the left side of the
22  page?
23      A.   Yes.
24      Q.   At line 3, the beginning of this

893

Lowenthal - Direct

1   conversation, am I correct that Mr. Ngo apologizes
2   to you?
3       A.   Yes.
4       Q.   Were you surprised that he apologized
5   to you?
6       A.   No.  My recollection of the
7   conversation the day before was that he got -- he
8   raised his temper a little bit.  It was fine.
9       Q.   And if you look down to line 12 on
10  that same page, do you see where Mr. Ngo says, "I've
11  always been honest with you"?
12      A.   Which line number?
13      Q.   Line 12.
14      A.   Yes.
15      Q.   Knowing now that Mr. Ngo was recording
16  that conversation, do you think he was honest with
17  you at that time?
18      A.   No, I don't think so.
19      Q.   And then sticking on page 2 of the
20  transcript, at line 15, Mr. Ngo states, "And what
21  happened -- I think there was confusion with that
22  leave."
23          Do you see that, Mr. Lowenthal?
24      A.   Yes.

894

Lowenthal - Direct

1       Q.   Did you believe there was any
2   confusion with regard to Mr. Ngo's time out of the
3   office in July and June of 2014?
4       A.   I think the only person confused was
5   Hoai.  I think I was very clear on where things
6   stood.  I think that I was making our HR department
7   clear on what I understood it to be, what they
8   understood it to be in conversations with him.  So I
9   don't think that there was any confusion.  He was
10  continuing to be paid, and he was working out of
11  California.
12      Q.   Can you turn to page 3 of the
13  transcript.  And at line 10, you state, "Just to
14  recharacterize what I told you to do, which is, my
15  direction was really towards Lenore Denys in terms
16  of the three months versus none.  The policies and
17  permissions to leave were completely nonstandard, so
18  I said I don't know anything about it.  It was not
19  up to Jane or Colleen's discretion as to how much
20  leave you could have."
21          What were you conveying to Mr. Ngo in
22  that statement?
23      A.   That I was very specific and there --
24  there is no confusion amongst people who work for

895

Lowenthal - Direct

1  me, that when I tell them to do something, it's me
2  telling them to do it.  It's not their discretion to
3  go talk to their colleagues about whether or not
4  they agree with what I told them to do or whether or
5  not they should or shouldn't.
6
7        Here I told him to talk to HR.  What
8  he was doing was not -- there was no policy for it.
9  There was no paternity leave.  He had options
10 available to him.  They could help them understand
11 those options better than I could and that he should
12 elect, based on that understanding, as to what he
13 was going to do next, but that socializing it didn't
14 change my direction.
15    Q.   If you look at line 15, Mr. Ngo's
16 response, did he dispute your statement to him?
17    A.   No.
18    Q.   He's saying, "Sure"?
19    A.   That's correct.
20    Q.   And if you look at line 16, do you see
21 where you state, "There's a company policy, and I
22 pointed you to Lenore to look into that."
23       And Mr. Ngo responds, "Yeah, I talked
24 to Lenore.  I did talk to Lenore."
25    A.   Yes.

896

Lowenthal - Direct

1
2    Q.   Was that consistent with the
3  instruction that you gave Mr. Ngo back in May of
4  2014?
5    A.   Yes.  And confirmed by Lenore that she
6  had spoken to him.
7    Q.   At line 19, when you stated, "Whatever
8  the dialog was between you and Colleen is
9  professional courtesy only," what did you mean when
10 you said that?
11    A.   That professionals are expected to
12 make their teams aware of their status and their
13 availability.  No different than saying, I'll be on
14 a plane for six hours and won't be available.
15 Letting people know where you are, how to be reached
16 and what to expect when you're not in the office and
17 immediately available is a professional courtesy
18 that people offer to each other.
19       And that those communications with
20 Colleen back in May, when I asked him to have the
21 conversation with Colleen and Jane, was specifically
22 to let them know and prepare them for him to work on
23 the West Coast.  He'd be on different hours, not
24 down the hall any longer.
25    Q.   And if you look at line 21, did --

897

Lowenthal - Direct

1  does it appear that Mr. Ngo disputed your statement?
2    A.   He did not dispute it.
3    Q.   Take a look at page 4, please.
4    A.   Yes.
5    Q.   Now, we see here, at line 4, that
6  Mr. Ngo stated to you, "I told you over the phone I
7  was totally prepared to sign anything."
8        Do you see that, sir?
9    A.   Which line are you on?
10    Q.   Line 4 to line 5.
11    A.   Yep.
12    Q.   Do you recall Mr. Ngo telling you
13 during a conversation that he'd be totally prepared
14 to sign anything?
15    A.   I don't remember that.  I mean, I -- I
16 didn't ask him to sign anything back in May.
17    Q.   Well, in any subsequent
18 conversation -- I think -- to put it in context, I
19 believe Mr. Ngo was -- is -- I believe you're
20 talking about -- let me -- let's look at the --
21 let's look at the entire section.
22       Mr. Ngo says, "Well, sure.  I'm just
23 saying that I wasn't trying to hide it.  That's all
24 I'm saying.  I wouldn't have sent an official e-mail

898

Lowenthal - Direct

1  saying that August 26th was the date if I didn't
2  mean it.  You know what I mean?  And I was -- I
3  was -- I told you over the phone I was totally
4  prepared to sign anything."
5    A.   Which is why I sent him the FMLA --
6  the booklet and all the documents that would give
7  him that flexibility he needed or wanted if he chose
8  to elect to take it.
9    Q.   You sent that the very day after you
10 spoke --
11    A.   Yes.
12    Q.   -- to Mr. Ngo?
13    A.   Yes.  And that was in July, mid July.
14    Q.   At line 6 on page 4, you state, "Look.
15 The issue around your personal health is completely
16 separate from the issues around you going to
17 California."
18       What did you mean when you said that?
19    A.   There were -- back in May, Hoai
20 informed me that he would need to go to California
21 because he and his partner were having a child and
22 had to pick the baby up and bring the baby back to
23 New York, it would take a couple of weeks.  That was
24 the issues regarding California.

899

Lowenthal - Direct

1
2       Subsequent to that, in August, as we
3  saw on August 18, I was made aware that he had a
4  personal medical issue that prevented him from
5  coming back to work.  That's the separate issue that
6  occurred in August of the same year.
7       Q.    And on that point, just to clarify
8  something, the judge, I believe, had asked you a
9  question regarding when it was that Mr. Ngo
10 communicated to you that he would be out of the
11 office for a period of two to four weeks.
12      When was the first time that Mr. Ngo
13 communicated that suggestion to you?
14      A.    When he told me he was having a baby
15 and going to California, that was when he told me it
16 would take a couple of weeks.
17      Q.    And that was in May or June of 2014?
18      A.    Yes.
19      Q.    And staying on page 4 of the
20 transcript, at line 13, do you see the where it
21 says, "We changed the business model"?
22      A.    Yes.
23      Q.    What did you mean by that?
24      A.    Well, going back to a conversation we
25 were having earlier -- you know, this was five years

900

Lowenthal - Direct

1
2  after the acquisition of the CIBC business that
3  included the high-yield department.  We no longer
4  had access to the billion-dollar warehouse facility
5  that CIBC had offered to us.  The issuers and
6  corporate clients that we would be targeting in the
7  chemicals and packaging industries were no longer
8  being covered by bankers.  They were no longer being
9  covered by equity research.
10      We had made a decision to focus on our
11 core and target relevant secondary trading
12 opportunities as well as our core sectors of
13 technology, consumer and health care.
14      Q.    If you can turn to page 5.
15      A.    Yes.
16      Q.    Starting at line 13, Mr. Ngo states to
17 you, "And I had talked to Colleen and I told her --
18 I go, yeah, I spoke to Rob.  I'm on a leave of
19 absence until the 26th."
20      Your response was, "You were paid
21 leave.  It wasn't leave of absence."
22      What did you mean -- what were you
23 conveying in that sentence?
24      A.    He was paid to be out of the office.
25 It was a courtesy and accommodation to not be

901

Lowenthal - Direct

1
2  reporting into the main office on -- a trading desk
3  is not a function that is typically decentralized
4  with people operating from all different places.
5  It's very much a collaborative environment.
6       For him not to be there is -- it was
7  an accommodation and not to be in the room for the
8  morning meetings to accumulate the same knowledge as
9  everyone else on the team was getting by being
10 together, so that was -- he was paid to be working
11 and performing his job function while he was on the
12 West Coast.
13      Q.    And I think you may have stated this
14 already, but was it standard procedure for research
15 analysts to work remotely out of the office?
16      A.    No.
17      Q.    Now, I think you testified Mr. Ngo
18 returned to work on November 3rd of 2014?
19      A.    Yes.
20      Q.    What do you recall about Mr. Ngo's
21 work product for the remaining two months of 2014?
22      A.    I don't believe he published a
23 research report.
24      Q.    Did Mr. Ngo receive a discretionary
25 bonus for 2014?

902

Lowenthal - Direct

1
2       A.    He did.
3       Q.    Do you know when that would have been
4  paid?
5       A.    In February -- late January, early
6  February of the following year, 2015.
7       THE ARBITRATOR:  Normally, what sort
8  of pace would you expect from a research
9  analyst say for the two-month period that
10 you've alluded to, November, December, when
11 you say he didn't publish a single report?
12      THE WITNESS:  It would greatly depend
13 on the analyst and the timing of the year.
14 It's usually consistent to have earnings
15  three to four weeks after the end of a
16 quarter.  So September 30th would have been
17 the end of the prior quarter.
18      The third or fourth week of October,
19 most companies would have reported, in which
20 case, you know, review and analysis would
21 take place in November.  So the earliest you
22 would publish a prior quarter's earnings
23 would be mid November.
24 BY MR. GIBSON:
25      Q.    Did I ask you -- do you recall how

903

Lowenthal - Direct

1   much Mr. Ngo's discretionary bonus for 2014 was?
2
3       A.   I recall it being around $100,000.
4       Q.   Who decided to pay Mr. Ngo that bonus
5   of $100,000 for 2014?
6       A.   I did.
7       Q.   Did you discuss that decision with
8   anyone?
9       A.   Not the numbers.  I discussed
10  performance of prior -- prior to Hoai's leaving for
11  California, some review of whether or not the names
12  and the sectors continued to be relevant in our
13  business and thinking strategically about the
14  context around what each person and their job
15  function should be paid for the year.
16      Q.   Who would that conversation have been
17  with?
18      A.   I would discuss that with -- with the
19  head of sales, potentially the head of trading and
20  Colleen, who was then head of fixed income research.
21      Q.   And head of sales would be Ms. Ross?
22      A.   Yes.
23           THE ARBITRATOR:  How would it be
24  determined whether a particular sector was or
25  was not strategic?  Specifically what sort of

904

Lowenthal - Direct

1
2   data would be looked to for that purpose.
3           THE WITNESS:  So TRACE is a
4   require- -- is a pricing requirement for all
5   transactions in the bond market.  So you can
6   look at data that empirically tells you what
7   volumes are trading for each sector of every
8   credit.  That's one way of seeing what's
9   active in the marketplace.
10          So if you see that -- energy is
11  extremely active.  And in '14 and '15, it was
12  extremely active, if you recall, just the
13  environment that we were in.  It was $28 oil.
14  That becomes extremely strategic in the
15  moment.  That's where a lot of the volume is.
16          If you look at technology, you know,
17  as a subsector and how much it makes up of
18  the overall universe of high-yield bonds, in
19  terms of -- Verizon, as an example, it's a
20  $40 billion credit in its own right.  It
21  might be larger than the entire packaging
22  industry in that one company.
23          So looking at the volumes traded on
24  the marketplace and then looking at the
25  overall environment that you're in would lead

905

Lowenthal - Direct

1   you to making strategic decisions about how
2   you allocate your resources.
3
4           THE ARBITRATOR:  That would be data
5   about the market in general rather than how
6   much business Oppenheimer at the time was
7   doing in that sector?
8           THE WITNESS:  We had reports when Todd
9   Morgan worked for me that he would run that
10  would show our trading volumes by sector.  He
11  would share that with me, and he would run
12  it.  We would discuss that while it was -- it
13  was helpful, it wasn't determinative.
14          You could -- you can tell people not
15  to be in a sector and that's your advice,
16  right.  We think we should stay away from
17  owning, you know, energy at the moment
18  because we think it's got further to fall,
19  right.
20          That could be valued by a client who
21  may pay you back by transacting in health
22  care, because that's what they're active in.
23  So it's not always the most instructive data
24  point.
25          MR. GIBSON:  I'm sorry, Judge.  Are

906

Lowenthal - Direct

1   you --
2           THE ARBITRATOR:  Go ahead.
3   BY MR. GIBSON:
4       Q.   In paying Mr. Ngo that $100,000 bonus,
5   did you feel that you were punishing him for
6   spending time out of the office in 2014 for the
7   birth of his child?
8       A.   No.
9       Q.   Did you feel that you were punishing
10  him for taking a leave of absence to recover from
11  his brain aneurysm?
12      A.   No.
13      Q.   Did you feel that you were
14  discriminating against him because he was a man?
15      A.   No.
16      Q.   For -- do you recall whether Ms. Burns
17  received a discretionary bonus for 2014?
18      A.   She did.
19      Q.   Do you think it would have been fair
20  to pay Mr. Ngo the same discretionary bonus that
21  Ms. Burns received?
22      A.   No.
23      Q.   Why not?
24      A.   As a research analyst, Colleen that

907

Lowenthal - Direct

1  year had to perform at a higher level than she had
2  in prior years with respect to the idea generation
3  and the amount of contact she had to support with
4  clients.  So making up for the volume of ideas that,
5  you know -- that only three people were coming out
6  with, the team's down by 30 percent in terms of
7  volume of idea generation, so she would have to be
8  more active and more prolific to satisfy the sales
9  force need for product.
10     Q.    Why was it required for Ms. Burns to
11 be more active and more prolific?
12     A.    Because Hoai was gone for four months,
13 five months.  There was no research coming in in
14 those sectors.
15     Q.    Who told Mr. Ngo that -- what his
16 bonus for 2014 was going to be?
17     A.    Colleen informed him.
18     Q.    And after he received that bonus, did
19 Mr. Ngo ever tell you that he believed that the
20 amount was unfair?
21     A.    Did not.
22     Q.    Did he ever come to you to discuss the
23 amount at all?
24     A.    He did not.

908

Lowenthal - Direct

1
2     Q.    Now, did Mr. Ngo work for Oppenheimer
3  for the entirety of 2015?
4     A.    Yes.
5     Q.    What was his job title for that time
6  period?
7     A.    Managing director in the high-yield
8  research department.
9     Q.    And was he paid a discretionary bonus
10 for 2015?
11     A.    He was.
12     Q.    When would that have been paid?
13     A.    In January -- late January, early
14 February of 2016.
15     Q.    Do you recall how much the bonus that
16 he received that year was?
17     A.    I don't recall.
18     Q.    If I told you it was about $175,000,
19 would that sound about right?
20     A.    That sounds right.
21     Q.    Would you have discussed that bonus
22 with anybody at Oppenheimer other than Mr. Ngo?
23     A.    Same process would have ensued as to
24 what -- how we analyze what compensation should be
25 for each individual, the bonus pool that I'm given

909

Lowenthal - Direct

1  for my business decision, assessing each
2  department's contribution in that year, looking at
3  each individual's contribution, and then analyzing
4  what the strategic needs of the business are going
5  forward.
6     Q.    And do you recall having any specific
7  conversations with Ms. Ross about Mr. Ngo's
8  performance in 2015?
9     A.    I do -- well, at the end of 2015, when
10 I would have conversations about performance, or
11 even intermittently throughout the year when I would
12 check in with other senior people, ask, as an
13 example, Jane Ross, how's Hoai doing?  How are those
14 sectors doing with our clients?  Give me some
15 feedback.
16     Consistently her feedback was that
17 performance was poor, that the salespeople were not
18 bringing him out to see clients as often as they had
19 been, energy level was low, idea generation was low.
20 So that was the feedback I was getting consistently
21 through that year.
22     Q.    And --
23     THE ARBITRATOR:  Normally, was there a
24 consistent practice with salespeople bringing

910

Lowenthal - Direct

1  an analyst to meet with clients?
2     THE WITNESS:  Yes, that is an
3  important determination.  You can count the
4  number of meetings and phone calls you have
5  with an account to determine whether or not
6  our engagement levels are high.
7     There are actually systems that some
8  firms use just to document and measure the
9  number of interactions with a client so that
10 salespeople can follow up and say, you know,
11 you spoke to my analyst six times last month,
12 or, you had three one-on-ones with my
13 analyst, or, do you remember we went out for
14 an idea dinner that my analyst had presented,
15 you know, for half an hour on the subsector?
16     THE ARBITRATOR:  Would those
17 meetings --
18     THE WITNESS:  That's the product.
19     THE ARBITRATOR:  Would those meetings
20 then be triggered by the salesperson saying,
21 I want you, the analyst, to meet with the
22 client, or would the analyst reach out?
23     THE WITNESS:  Great analysts are
24 called directly by clients and asked their

911

Lowenthal - Direct

1  opinion.  And salespeople then see -- the
2  triggering of events will let salespeople
3  know, I just got off the phone with so and so
4  from Blackstone or GSO, meaning that I just
5  gave them insight.  If they transact, you
6  should be in front of them.
7  BY MR. GIBSON:
8      Q.    Are you familiar with Peter Albano?
9      A.    Yes.
10     Q.    And what was Mr. Albano's position
11 in -- at Oppenheimer in 2015?
12     A.    He was head of our credit group.  So
13 that included sales and trading.  I think at the
14 time -- he's been promoted several times over the
15 last five or six years.  So that period, he was head
16 of emerging markets, sales and investment-grade
17 sales.  I don't believe he was responsible for
18 high-yield sales yet.
19     Q.    Am I correct, sir, that -- you
20 mentioned Mr. Albano had been promoted a few times.
21     Does he currently have your former
22 position as the head of fixed income?
23     A.    Yes.
24     Q.    Would you agree with me that he's a

912

Lowenthal - Direct

1  pretty senior employee at Oppenheimer?
2      A.    Yes.
3      Q.    Can you take a look at Exhibit 116.
4      A.    Okay.
5      Q.    This appears to be an e-mail from
6  yourself to Albert Lowenthal and Lenore Denys dated
7  January 29, 2016.
8      And who is Albert Lowenthal?
9      A.    He is my father and the CEO and
10 chairman of the firm.
11     Q.    And the subject line is "Bonus
12 change."
13     Do you see that?
14     A.    Yes.
15     Q.    And you state, "I need to take 25K
16 from Peter Albano and give it to Hoai Ngo, leaving
17 them both with the following bonus totals."
18     What were you communicating to your
19 father and Ms. Denys in this e-mail?
20     A.    So on -- January 29th would be a date
21 upon which bonus pools have been finalized and
22 that -- payroll is actually -- has a final file
23 where numbers -- dollar amounts for individual
24 persons are already set up for distribution into the

913

Lowenthal - Direct

1  employee's bank accounts without -- prior to
2  communication.
3      So something like this would be
4  several days ahead of it actually hitting someone's
5  bank account, where, in the interim, we would be
6  communicating what people's bonuses are and what
7  their bonus was.
8      At this stage, there was no movement
9  in the bonus pool, so the only way to compensate
10 people at a more -- any more than you already had
11 anticipated is by -- by getting dollars somewhere
12 else.  And so Peter Albano is a senior person.
13 He's -- and so he's also on a discretionary bonus,
14 and I was able to find some additional compensation
15 for Hoai by taking it away from Peter.
16     Q.    And do you typically -- do you need to
17 get approval -- your father, Albert, goes by the
18 name Bud?
19     A.    Yes.
20     Q.    Do you typically need to get
21 permission from Bud Lowenthal to approve bonus
22 changes?
23     A.    At this -- at this stage, yes.  This
24 would be -- he will approve all bonuses and any

914

Lowenthal - Direct

1  funds needed to -- and he will review all
2  allocations of the bonuses.  If you don't have
3  enough money to pay all the people what you think
4  you need to pay them and you need more than what
5  your business unit is being allocated, that's where
6  your argument would be made.
7      In some cases, you think you're
8  dealing with a bonus pool of X and then it turns out
9  to be less than X and you have to make adjustments
10 for that.  And that would be through a communication
11 with Bud Lowenthal.
12     This change, in my recollection, was
13 late in the stage of a bonus analysis and was likely
14 after some of those conversations with Colleen and
15 Jane just to finalize numbers where -- people have
16 expectations.  Reflecting on that, letting Colleen
17 know where I anticipate her group to be, not
18 including herself.  She would tell me, look, I think
19 that we can -- I would like to make some room around
20 the edges, if possible.  And that would be the
21 late-stage discussion.
22     Q.    On this same topic of Bud Lowenthal's
23 involvement in the bonus process, can you take a
24 look at Exhibit 33.

915

Lowenthal - Direct

1    A.   Okay.
2    Q.   If you could just explain for us what
3    this exchange between yourself and Bud Lowenthal is
4    in regard to.
5    A.   Let me see what quarter this is.
6         (Pause.)
7    A.   So what's the question?
8    Q.   So what is it that you are
9    communicating to Bud Lowenthal in your e-mail of
10   January 14, 2014?
11   A.   So there's an attachment that I'm
12   referencing, which is a preliminary worksheet that I
13   would have been creating to help organize the bonus
14   allocation.  So it would include prior year pay,
15   salaries, year of hire, some basic information that
16   I would use as a worksheet.
17        But they -- that information may not
18   be helpful to him.  So, you know, typically we'll go
19   back and forth with names and numbers, but my
20   worksheets might have more data.
21   Q.   And would that data typically include
22   bonus proposals for the high-yield research group?
23   A.   It would include all of the
24   discretionary -- all of those who received
25

916

Lowenthal - Direct

1    discretionary compensation annually and that report
2    to me.
3    Q.   If you take a look at the next page,
4    which is the first page of the attachment.
5    A.   Yes.
6    Q.   And do you see a reference to the
7    high-yield research group and Ms. Burns and
8    Mr. Ngo's name under that?
9    A.   Yes.
10   Q.   I think you've testified about this
11   again, but when you awarded Mr. Ngo a $175,000
12   discretionary bonus for work performed in 2015, what
13   were some of the factors that you considered?
14   A.   The firm's overall success, or lack
15   thereof, the business unit, the department, and then
16   the individual.
17   Q.   When you decided to give Mr. Ngo that
18   $175,000, did the fact that his title was no longer
19   cohead of the high-yield research group play a
20   significant role in your decision?
21   A.   Some of the most highly paid people in
22   the high-yield department do not have a head of
23   anything title.
24   Q.   Am I correct that Ms. Burns was the

917

Lowenthal - Direct

1    sole head of high-yield research for the entire year
2    2015?
3    A.   Yes.
4    Q.   Do you recall what her discretionary
5    bonus was?
6    A.   In -- I don't remember.
7    Q.   If I told you it was $235,000, would
8    that sound about right?
9    A.   Yes.
10   Q.   Was Mr. Sneeden working at Oppenheimer
11   in 2015?
12   A.   Yes.
13   Q.   And what sectors did Mr. Sneeden
14   cover?
15   A.   Energy.
16   Q.   In 2015, was energy a significant
17   sector for Oppenheimer's fixed income high-yield
18   division?
19   A.   Yes, it was a very active sector in
20   the high-yield market.
21   Q.   How was the activity of energy
22   compared to chemicals or paper and packaging?
23   A.   The energy universe is much larger
24   than paper and packaging, and chemicals.  It was

918

Lowenthal - Direct

1    also an extremely volatile environment with oil
2    going from 108 to $28.  So it was an enormous
3    opportunity to transact in secondary bond trading.
4    Q.   If you could take a look at
5    Exhibit 13.
6         (Pause.)
7    A.   Yes.
8         THE ARBITRATOR:  You said 13?
9         MR. GIBSON:  Yes, sir.
10   BY MR. GIBSON:
11   Q.   And I'll represent to you this is a
12   number of W-2 forms for Sean Sneeden.
13   A.   Yes.
14   Q.   Can you take a look at OPCO 12 --
15   1215, which is his 2015 W-2.
16   A.   Yes.
17   Q.   Do you see that there's handwritten
18   "$135,000 bonus"?
19   A.   Yes.
20   Q.   Do you have any understanding as to
21   whether that $135,000 was paid for Mr. Sneeden in
22   2015 or work in 2014, or paid in 2016 for work in
23   2015?
24   A.   The W-2 -- I'm not sure what -- what

919

Lowenthal - Direct

1  that is, but the W-2 will reflect calendar year
2  payments as reported to the IRS.  So if you receive
3  compensation for the prior year in the following
4  January or February, it will fall in the following
5  year's W-2.
6      Q.   Okay.  But we see 135,000 on the 2015
7  W-2; correct?
8      A.   Yes.
9      Q.   If you look at the prior document,
10  which is the 2016 W-2, that one is for $150,000;
11  correct?
12     A.   Yes.
13     Q.   And both of those numbers, am I
14  correct, sir, are less than the $175,000 that
15  Mr. Ngo received for work in 2015?
16     A.   Yes.
17     Q.   Did you feel that you were
18  discriminating against Mr. Ngo in giving him a
19  $175,000 discretionary bonus for 2015?
20     A.   No.
21     Q.   Did you feel that you were punishing
22  Mr. Ngo by giving him a $175,000 discretionary
23  bonus?
24     A.   No.

920

Lowenthal - Direct

1      Q.   When you awarded Mr. Ngo a $175,000
2  bonus for 2015, did you take into account any of the
3  time that he was out of the office in 2014?
4      A.   No.
5      Q.   Did Mr. Ngo ever seek you out to
6  discuss the $175,000 bonus that you paid him?
7      A.   No.
8           I don't think this includes any stock.
9  There would be more on top of cash compensation,
10  which would be in OPY shares.
11     Q.   Are you currently on Oppenheimer's
12  board of directors?
13     A.   Yes.
14     Q.   And how long have you been on the
15  board of directors?
16     A.   Since 2013.
17     Q.   And as a member of the board of
18  directors, are you generally familiar with the
19  performance of Oppenheimer as a company from year to
20  year?
21     A.   Yes.
22     Q.   What do you generally recall about the
23  performance of Oppenheimer as a company in 2015 and
24  2016?

921

Lowenthal - Direct

1      A.   Among the hardest years the firm has
2  had in recent history, including the financial
3  crisis.
4      Q.   I'd like you to take a look at
5  Exhibit 90, if you could.
6      A.   9-0?
7      Q.   Yes, sir.
8           What do you recognize this document to
9  be, Mr. Lowenthal?
10     A.   This is our 2015 annual report.
11     Q.   There's already been some testimony
12  about this, so I'm going to try not to belabor it,
13  but if you would turn in to the page that says
14  OPCO 491.
15     A.   Yes.
16     Q.   And do you see the chart that states
17  "Financial Highlights"?
18     A.   Yes.
19     Q.   What was -- how did Oppenheimer's 2015
20  gross revenue compare to 2014?
21     A.   Down considerably.
22     Q.   How did Oppenheimer's net profit
23  compare in 2015 to 2014?
24     A.   Down considerably.  My recollection of

922

Lowenthal - Direct

1  this page was that we actually created the vertical
2  bars so that it wasn't as obvious that each number
3  was going down as a trend line.
4      Q.   Let's take a look --
5      A.   The axes are switched.
6      Q.   Are you saying usually the line
7  item --
8      A.   If you turn the page like this
9  (indicating), you'll see the numbers going down from
10  upper left to lower right.  We switched it this year
11  to obfuscate the trend.
12     Q.   Take a look at the next page, if you
13  will.
14          And do you see the section that's
15  titled, "Dear Fellow Shareholders"?
16     A.   Yes.
17     Q.   I'd like you to look at the right
18  side, the first sentence, that states, "For the
19  year, the company reported revenues of
20  928.3 million, a decrease of 7.6 percent from
21  1 billion the prior year, and reported a profit of
22  2.0 million compared to a profit of 8.8 million in
23  2014, a decrease of 77.8 percent."
24          Is that consistent with your general

923

Lowenthal - Direct

1 understanding of how Oppenheimer performed in 2015
2 as a company?
3
4       A.   Yes.
5       Q.   Do you recall Oppenheimer's
6 performance in 2015 having an effect on
7 discretionary bonuses for employees in the company?
8       A.   Yes.
9       Q.   What effect did it have?
10      A.   Bonus pool was lower to reflect the
11 lower profitability.
12      Q.   And if you could turn to the next
13 exhibit, which is Exhibit 91.
14           Do you recognize this document,
15 Mr. Lowenthal?
16      A.   Yes.
17      Q.   And what is this?
18      A.   This is our 2016 annual report to
19 shareholders.
20      Q.   Now, we saw in the 2015 annual report
21 that gross revenue and net profit were both down
22 from 2014; is that correct?
23      A.   Yes.
24      Q.   How did gross revenue in 2016 compare
25 to 2015?

924

Lowenthal - Direct

1
2      A.   Net profit was a loss.
3      Q.   Gross revenue.
4      A.   Gross revenue was down again.
5      Q.   And what was Oppenheimer's net profit
6 in 2016?
7      A.   We had a loss.
8      Q.   And also do you see a line item at the
9 bottom of that chart for "Number of employees"?
10     A.   Yes.
11     Q.   Would you agree with me,
12 Mr. Lowenthal, that according to this chart, the
13 number of employees at Oppenheimer has decreased
14 every year from 2012 through 2016?
15     A.   That's right.
16          MR. GIBSON:  At this point, I'm going
17 to -- do you want to talk about the news
18 articles?  I'm going to be trying to put them
19 in now.
20          MR. LICUL:  I think we made our
21 arguments; right?
22          MR. GIBSON:  Did we get a decision?
23          MR. LICUL:  No, but I think we made
24 our arguments.
25          MR. GIBSON:  So, your Honor, at this

925

Lowenthal - Direct

1 point, I was going to put those news articles
2 in.
3
4          THE ARBITRATOR:  Objection sustained.
5          MR. GIBSON:  Good enough.
6 BY MR. GIBSON:
7      Q.   Now, did there come a time that
8 Mr. Ngo was terminated by Oppenheimer?
9      A.   Yes.
10     Q.   And do you recall when that was?
11     A.   That was in mid 2016.
12     Q.   If I told you June 30th, 2016, would
13 that sound about right?
14     A.   Yes.
15     Q.   Would you agree with me, sir, that
16 that was approximately two years after Mr. Ngo left
17 the office for the birth of his baby?
18     A.   Yes.
19     Q.   And a little under two years after
20 Mr. Ngo suffered his brain aneurysm?
21     A.   Yes.
22     Q.   Who made the decision to terminate
23 Mr. Ngo's employment?
24     A.   I did, in collaboration with my
25 colleagues.

926

Lowenthal - Direct

1
2      Q.   And why --
3          THE ARBITRATOR:  Who were your
4 colleagues?
5          THE WITNESS:  It would be Colleen and
6 Jane, and head of trading, as well as Steven
7 and Cary, and possibly Pete Albano at the
8 time.
9 BY MR. GIBSON:
10     Q.   Are you the one who ultimately made
11 the decision?
12     A.   Yes.
13     Q.   And why did you decide to terminate
14 Mr. Ngo's employment?
15     A.   A combination of factors.  The
16 business of high-yield sales and trading in
17 leveraged loans had been a $30 million revenue
18 business when we had constructed it and he was hired
19 back in 2010 or 2009.
20          Seven years later, the business was
21 considerably less successful.  The loan department
22 had been closed down.  The bankers who covered
23 chemicals had long gone.  There was no equity
24 research in it.  So the business of high-yield sales
25 and trading was not performing as well as it used

927

Lowenthal - Direct

1  to.

3       And so cutting costs and accommodating
4  for those deteriorating performance metrics was a
5  necessity especially in light of the overall firm's
6  lack of profitability.

7    Q.   Did the fact that Mr. Ngo had spent
8  time out of the office for the birth of his child in
9  2014 impact your decision at all to terminate his
10  employment?

11   A.   No.

12   Q.   Did the fact that Mr. Ngo had suffered
13  a brain aneurysm and took a leave of absence in 2014
14  impact your decision to terminate him?

15   A.   No.

16   Q.   Did the fact that Mr. Ngo no longer
17  had the title of cohead of high-yield research
18  impact your decision to terminate his employment?

19   A.   Had no impact.

20   Q.   Can we go back to Exhibit 112, which
21  was that collection of PCNs.

22      And if you look at the very first one,
23  Mr. Lowenthal, that's dated June 30th, 2016.

24      Do you see that one, sir?

25   A.   Yes.

928

Lowenthal - Direct

2    Q.   And we see there's a box for
3  "Termination" and it's checked "Involuntary"?

4    A.   Yes.

5    Q.   Underneath that, am I correct, sir,
6  that the box "Laid off" is checked?

7    A.   Yes.

8    Q.   And then under "Notes and
9  Explanations" on the right side, do you see where it
10  says, "Department restructuring"?

11   A.   Yes.

12   Q.   Is that consistent with your
13  understanding of the reason that Mr. Ngo was
14  terminated?

15   A.   Yes.

16      THE ARBITRATOR:  What do these items
17      under the words "Department restructuring"
18      mean, if you can read them?

19      THE WITNESS:  I can't make out the
20      written language.

21      THE ARBITRATOR:  Okay.

22      THE WITNESS:  It's not my handwriting
23      and it's not my assistant's handwriting, so I
24      would -- again, sometimes I think these forms
25      are used for benefits or payroll purposes

929

Lowenthal - Direct

2  once they're sent to the HR department.  I
3  didn't write those.  Looks like a checklist;
4  benefits, auto pay -- I don't know.

5  BY MR. GIBSON:

6    Q.   I think you just answered what I was
7  going to ask.

8    A.   Yes.

9    Q.   By the way, we've looked at a couple
10  of these PCN forms for Mr. Ngo.

11      Have you ever seen one that indicated
12  that Jane Ross was Mr. Ngo's immediate supervisor?

13   A.   No.

14   Q.   Have you ever seen one of these PCNs
15  that was signed on the bottom by Ms. Ross?

16   A.   No, not for anyone outside of her
17  department.

18   Q.   Now, you mentioned cost-cutting.

19      In your experience in the industry,
20  when a firm has to cut costs, do those cuts come
21  exclusively from the sectors of the business that
22  are losing money?

23   A.   I think it can change form throughout,
24  but the -- the percentage -- the highest expense on
25  Wall Street is compensation.  It makes up, in our

930

Lowenthal - Direct

2  firm, as much as 75 percent to 80 percent in these
3  years of our overall expenses as a percentage of
4  revenue.

5       So when you're looking to save money
6  or conserve resources, an unknown environment that
7  you don't think you'll be performing in, then
8  cutting costs means cutting head count, it means
9  reducing compensation.  That's where firms in our
10  business save money.

11   Q.   On that topic, during your time as the
12  head of taxable fixed income, when the firm cut
13  costs, did it typically lay off salespeople?

14   A.   No.

15   Q.   Why not?

16   A.   That's where revenue is generated.

17   Q.   Do you know who Jiten Joshi is?  I
18  think you may have mentioned his name earlier.

19   A.   Yes, he's a high-yield research
20  analyst.

21   Q.   I believe you testified, to your
22  knowledge, he's the only current high-yield research
23  analyst other than Ms. Burns?

24   A.   Yes.

25   Q.   Do you recall when Mr. Joshi was hired

931

Lowenthal - Direct

1  by Oppenheimer?
2
3      A.   In and around 2014 or '15.
4      Q.   Let's --
5      A.   I don't recall.
6      Q.   If I told you it was in the spring of
7  2016, would that surprise you?
8      A.   Okay.
9      Q.   Now, you testified earlier that
10 Oppenheimer was cutting costs in 2016?
11     A.   Yes.
12     Q.   Do you think that's inconsistent with
13 the fact that it hired Mr. Joshi in 2016?
14     A.   No.  I think that the business --
15 cutting costs is one component of analyzing and
16 adjusting your business for future challenges.  Our
17 decision at the time had been to focus on our
18 historic capabilities and where we had alignment
19 with other parts of the firm.
20          So consumer, technology, and health
21 care are the historic franchise sectors for the
22 firm.  That's where our bankers were focused.
23 That's where our research division was focused.
24          And technology is an enormous industry
25 within the high-yield debt market.  So it was a

932

Lowenthal - Direct

1  natural for us to support that.  Todd Morgan, who
2  was the former head of high-yield research, was a
3  technology research analyst in high-yield.  So it
4  was always an important component for the firm.  And
5  if we were going to turn our performance as a firm
6  around, we needed to focus on our core capabilities.
7      Q.   Did Mr. Joshi cover technology?
8      A.   Yes.
9      Q.   And I think you mentioned that prior
10 to that, Todd Morgan had covered TMT?
11     A.   Yes.
12     Q.   Was there any analyst at Oppenheimer
13 who covered TMT between Mr. Morgan and Mr. Joshi?
14     A.   We had tried to replace Todd with
15 another research analyst in technology, whose name
16 was Umesh, and that didn't work out.
17     Q.   Is that Mr. Bhandary --
18     A.   Yes.
19     Q.   -- Umesh Bhandary?
20     A.   Yes.
21     Q.   To your knowledge, did Mr. Ngo ever
22 publish in technology?
23     A.   No.
24     Q.   How many research analysts has

933

Lowenthal - Direct

1  Oppenheimer hired to cover chemicals since Mr. Ngo
2  was terminated?
3      A.   None.
4      Q.   How many research analysts has
5  Oppenheimer hired to cover paper and packaging since
6  Mr. Ngo's termination?
7      A.   None.
8      Q.   How about metals and mining?
9      A.   None.
10     Q.   I just have two or three more
11 questions for you, Mr. Lowenthal.
12          Do you know who Lynn Johnson is?
13     A.   Yes.
14     Q.   Who was Lynn Johnson?
15     A.   She was a salesperson on the
16 high-yield desk.
17     Q.   How was Ms. Johnson compensated?
18     A.   She was a commission-paid employee.
19     Q.   Do you recall a time when Ms. Johnson
20 went on a FMLA leave for the birth of her child?
21     A.   Yes.
22     Q.   Do you recall whether Ms. Johnson was
23 paid any form of compensation during the time that
24 she was out of the office?

934

Lowenthal - Direct

1      A.   I think she had a commission share
2  arrangement with another salesperson who would be
3  covering her accounts while she was gone.
4      Q.   Is it unusual, in your experience,
5  that when a commissioned salesperson goes on a leave
6  of absence, they receive some or all of their
7  commissions?
8      A.   I think it varies.  It's not unusual
9  to have it happen.  It's not unusual to have it not
10 happen.  It's unique every time within the business,
11 depending on the business line.
12     Q.   And is it your understanding that the
13 decision as to whether an employee -- a salesperson
14 can receive some or all of their commissions during
15 the leave is based on whether that employee is a man
16 or a woman?
17     A.   It's got nothing to do with that.
18          MR. GIBSON:  Can we take two seconds,
19 Judge?
20          THE ARBITRATOR:  Yes.
21          (Recess from the record.)

935

1      Lowenthal - Cross
2  CROSS-EXAMINATION
3  BY MR. LICUL:
4      Q.   Good afternoon, Mr. Lowenthal.
5      A.   Good afternoon.
6      Q.   I believe it was your testimony that
7  you report to the CEO; correct?
8      A.   Yes.
9      Q.   And the CEO is your father; correct?
10     A.   Yes.
11     Q.   And you are also the chair of the
12 firm's management committee; is that right?
13     A.   Yes.
14     Q.   And in that role, you set the
15 direction for the firm's strategy; correct?
16     A.   Yes.
17     Q.   And there was a period of time from
18 2007 to 2016 where you were the head of fixed
19 income; correct?
20     A.   Yes.
21     Q.   Now, you've known that discrimination
22 is unlawful for a long time; correct?
23     A.   Yes.
24     Q.   And you've known that it's unlawful to
25 discriminate based on sex; correct?

936

1      Lowenthal - Cross
2      A.   Correct.
3      Q.   And you've known that it's unlawful to
4  discriminate based on disability; correct?
5      A.   Correct.
6      Q.   And you know that even an at-will
7  employee is protected from discrimination; correct?
8      A.   Correct.
9      Q.   And you know that Oppenheimer has
10 certain obligations to provide leave to its
11 employees; correct?
12     A.   Yes.
13     Q.   And you would refer to human resources
14 regarding what those rights are; correct?
15     A.   Yes.
16     Q.   And if someone from human resources
17 told you that an employee was entitled to leave, you
18 would accept that as being an appropriate answer;
19 correct?
20     A.   Yes.
21     Q.   And you know more specifically that
22 Oppenheimer has an obligation to provide medical
23 leave to employees in order to recover from a
24 medical condition; correct?
25     A.   Yes.

937

1      Lowenthal - Cross
2      Q.   And you also are aware that being on
3  leave means not being in the office; correct?
4      A.   Yes.
5      Q.   And it also means not doing their job,
6  that an employee who is on leave is not doing their
7  job; correct?
8      A.   Yes.  And not being paid.
9      Q.   I'm sorry?
10     A.   And they don't get paid.
11     Q.   Well, my question is a simpler one.
12          Being on leave means that somebody is
13 out of the office and not doing their job; correct?
14     A.   Depends what kind of leave.
15     Q.   Please take a look at your transcript.
16          Do you have the book?
17     A.   What page am I on?
18     Q.   Do you have the book in front of you?
19 I will get you the page, I promise.
20     MR. GIBSON:  Which book?
21 BY MR. LICUL:
22     Q.   I'm sorry.  I thought we had delivered
23 one.
24     A.   I'll look at whatever you give me.
25          (Pause.)

938

1      Lowenthal - Cross
2      Q.   Do you recall being deposed in this
3  case?
4      A.   Yes.
5      Q.   And you swore to give testimony under
6  oath; right?
7      A.   Yes.
8      Q.   And did you review your deposition
9  after -- well, were you given a copy of your
10 deposition to review in writing?
11     A.   Yes.
12     Q.   Did you do that?
13     A.   I did.
14     Q.   And you had a chance to correct it if
15 you needed to; correct?
16     A.   I did.
17     Q.   Take a look at page 31 of your
18 deposition.
19     A.   Yes.
20     Q.   I'm beginning on line 24.
21          Were you asked these questions and did
22 you give these answers:
23          "QUESTION:  When you use the word
24 'Leave,' what do you understand it to mean?
25          "ANSWER:  Not in the office."

939

Lowenthal - Cross

1  And then on page 32, beginning on.
2
3  Line 11:
4      "QUESTION:  Is there another -- is
5  there another way in which you use the word
6  'Leave'?
7      "ANSWER:  Not being in the office is
8  how I viewed it for reasons that are likely
9  personal.
10     "QUESTION:  Physically not being in
11  the office; is that what your testimony is?"
12     And there's an objection from your
13  counsel.
14     "ANSWER:  Yes, and not being
15  available.
16     "QUESTION:  Meaning not working?
17     "ANSWER:  Not being -- not doing their
18  job."
19     Were you asked those questions and did
20  you give those answers?
21  A.   Yes.
22  Q.   And you also understood that a person
23  who was on leave is entitled to their job when they
24  come back to the office; correct?
25  A.   Yes.

940

Lowenthal - Cross

1
2  Q.   And it would be inappropriate to
3  retaliate against someone for taking FMLA leave;
4  correct?
5  A.   Yes.
6  Q.   I want to turn your attention to
7  Oppenheimer's performance review process.
8      You're familiar with that process;
9  right?
10  A.   Yes.
11  Q.   And you were familiar with that
12  process when you oversaw fixed income; correct?
13  A.   Correct.
14  Q.   And the purpose of a performance
15  review process is to evaluate talent and communicate
16  with employees about their job performance; correct?
17  A.   Yes.
18  Q.   And you expect the performance review
19  process to be accurate; correct?
20  A.   Yes.
21  Q.   And you would also expect any written
22  reviews that you receive to be consistent with the
23  feedback you receive orally from managers; correct?
24  A.   With the exception that, you know,
25  there are -- there can be inconsistencies based on

941

Lowenthal - Cross

1  elapsed time, based on the type of questions that
2  are asked, based on -- I find that there's some
3  inflation in some evaluations just based on whether
4  or not the recipient will see the written review or
5  not versus what they're told.  There are -- there
6  are circumstances that lead some evaluations to not
7  be as accurate as they might be.
8
9  Q.   Please take a look at page 81 of your
10  transcript.  Beginning on line 21, were you asked
11  this question and did you give this answer:
12     "QUESTION:  Would you expect those
13  written reviews or that written feedback to
14  be consistent with what they told you orally?
15     "ANSWER:  Yes."
16     Were you asked that question and did
17  you give that answer?
18  A.   Yes.
19  Q.   And "they" being the managers?
20  A.   Yes.
21  Q.   And someone who receives a poor
22  performance review would probably not be eligible
23  for a promotion; isn't that right?
24  A.   Depends.  Sometimes it's cheaper to
25  give a title than money.

942

Lowenthal - Cross

1
2  Q.   Take a look at page 46 of your
3  deposition.
4      (Pause.)
5  A.   Yes.
6  Q.   Beginning on line 3, were you asked
7  this question and did you give this answer:
8      "QUESTION:  If someone received poor
9  performance reviews, would that person be
10  eligible for a promotion?
11     "ANSWER:  Probably not."
12     Was that your testimony?
13  A.   Yes.
14  Q.   And bonuses are tied to performance;
15  correct?
16  A.   Yes.
17  Q.   And you decide bonuses for employees
18  that reported up to you; correct?
19  A.   Yes.
20  Q.   I want to turn your attention to
21  Mr. Ngo.
22     You approved Oppenheimer hiring
23  Mr. Ngo; correct?
24  A.   Yes.
25  Q.   And Mr. Ngo was not hired as part of

943

Lowenthal - Cross

1    the purchase of the CIBC business; correct?
2        A.   Not as part of the transaction of
3    purchasing the business.  He was hired consistent
4    with the strategy that was -- that was a part of the
5    business we acquired.
6        Q.   Okay.  But he didn't -- he wasn't
7    previously employed by CIBC; correct?
8        A.   No.
9        Q.   Oppenheimer didn't inherit him as a
10   former CIBC employee; correct?
11       A.   No.
12       Q.   You hired him after the transaction?
13       A.   Yes.
14       Q.   Ms. Ross was involved in hiring
15   Mr. Ngo; correct?
16       A.   Yes.
17       Q.   And she was also involved in
18   determining whether Mr. Ngo would be promoted;
19   correct?
20       A.   I don't recall that.
21       Q.   Take a look at Exhibit 3.
22           MR. GIBSON:  Depo Exhibit 3 or Hearing
23   Exhibit 3?
24           MR. LICUL:  I'm sorry.  Joint

944

Lowenthal - Cross

1    Exhibit 3, please.
2        (Pause.)
3        A.   Okay.
4        Q.   Never mind.  Just put that -- I'll
5    withdraw that question.
6        I'm sorry.  Let me ask it again
7    because I just messed this up.
8        Ms. Ross was involved in deciding
9    whether or not Mr. Ngo would be promoted; correct?
10       A.   I don't recall.
11       Q.   Take a look at page 68 of your
12   transcript.
13       A.   Yes.
14           MR. GIBSON:  Give me one second.
15           MR. LICUL:  Sure.  Start at line 7.
16           MR. GIBSON:  Go ahead.  Thank you.
17   BY MR. LICUL:
18       Q.   Were you asked this question and did
19   you give this answer:
20           "QUESTION:  Was she" --
21           Meaning Ms. Ross.
22           -- "involved in determining whether
23   Mr. Ngo would be promoted?
24           "ANSWER:  She may have.  Her input

945

Lowenthal - Cross

1    would be valuable in my decision to do
2    that" --
3        A.   We're on 68?
4        Q.   Page 68.
5        A.   Yes.
6        Q.   And line 7.  Excuse me.
7            Do you have a different number?
8        A.   That's not what mine says.
9            MS. MILLER:  I'm sorry.  The
10   transcript is the second tab in the book.
11           MR. GIBSON:  Second tab.
12           MR. LICUL:  You may want to keep the
13   transcript out.
14           MR. GIBSON:  That's my fault.  I
15   closed it.
16           Here you go.
17           THE WITNESS:  Okay.  "Was she involved
18   in determining Mr. Ngo's bonus?"
19           Is that where you are?
20   BY MR. LICUL:
21       Q.   On line 7:
22           "QUESTION:  Was she involved in
23   determining whether Mr. Ngo would be
24   promoted?

946

Lowenthal - Cross

1            "ANSWER:  She may have.  Her input
2    would be valuable in my decision to do that."
3            Did you give that testimony?
4        A.   Yes.
5        Q.   Now, at the end of 2010, you promoted
6    Mr. Ngo to senior director; correct?
7        A.   Yes.
8        Q.   And you also promoted Ms. Burns at
9    that time; correct?
10       A.   Yes.  I trust that it's correct.  I
11   don't have that record and I don't remember it
12   specifically.  It's been nine years.
13       Q.   Take a look at Exhibit 31.  You might
14   want to -- no, it's not in there.
15           MR. GIBSON:  You can set that aside.
16   Keep that open.
17           THE WITNESS:  Okay.
18   BY MR. LICUL:
19       Q.   Do you see Exhibit 31?
20       A.   Yes.
21       Q.   I'm sorry.
22           It's Exhibit 31 and take a look at the
23   very last page of that, which is OPCO 1310.
24       A.   Okay.

947

Lowenthal - Cross

1    Q.    Do you see that?
2    A.    Yes.
3    Q.    Is that an end-of-year announcement of
4  Oppenheimer employees who were promoted --
5    A.    Yes.
6    Q.    -- at the end of 2010?
7          Does it show that both Mr. Ngo and
8  Ms. Burns were promoted at that time?
9    A.    Yes.
10   Q.    And Mr. Ngo was a better performer
11 than Ms. Burns; correct?
12   A.    I don't believe so.  That's not
13 correct.  I never said that.
14   Q.    Okay.  Your answer is no; correct?
15   A.    Yeah.
16   Q.    Todd Morgan was their manager at the
17 time, in 2010; correct?
18   A.    Yes.
19   Q.    And you relied on Todd Morgan -- Todd
20 Morgan's input regarding their performance; correct?
21   A.    Among others', yes.
22   Q.    Take a look at Exhibit 34.
23         (Pause.)
24   Q.    Now, is that an e-mail from Mr. Morgan
25

948

Lowenthal - Cross

1  to you regarding the performance of the analysts in
2  the high-yield business?
3    A.    Do you mind if I review it?
4    Q.    Of course.  Take your time.
5          (Pause.)
6    A.    Okay.
7    Q.    Is that an e-mail from Mr. Morgan to
8  you regarding the performance of the high-yield
9  analysts?
10   A.    This is an analysis of performance,
11 yes.
12   Q.    And attached to it are two performance
13 reviews, one for Ms. Burns and one for Mr. Ngo; is
14 that right?
15         I'll make it a little bit easier.
16         If you look at 1254, which is the
17 third page in --
18   A.    Yes.
19   Q.    -- do you see that that is a
20 performance review for Ms. Burns?
21   A.    Yes.
22   Q.    And if you look at page 1258, that is
23 a performance review for Mr. Ngo; correct?
24   A.    Yes.

949

Lowenthal - Cross

1    Q.    I just want to ask you a few
2  questions.
3          If you turn to page 1254, if you look
4  about a quarter of the way down, there's a section
5  labeled, "Published Research."
6          Do you see that?
7    A.    Yes.
8    Q.    And next to "Published Research,"
9  there are categories; "Exceptional," "Significantly
10 exceeds expectations," "Met expectations" and "Did
11 not meet expectations."
12         Do you see that?
13   A.    Yes.
14   Q.    Underneath those various categories
15 are numbers.
16         Do you see that?
17   A.    I do.
18   Q.    And those numbers reflect the number
19 of salespeople that rated Ms. Burns under the
20 various categories; correct?
21   A.    Yes.
22   Q.    Under "Published Research," no one
23 rated Ms. Burns as being exceptional; correct?
24   A.    No.

950

Lowenthal - Cross

1    Q.    Am I correct?
2    A.    That's correct.
3    Q.    And most of the salespeople rated
4  Ms. Burns as having met expectations in that --
5  those categories; correct?
6    A.    Yes.
7    Q.    And there's a category underneath that
8  that says, "Client and Sales Force Communication."
9          Do you see that?
10   A.    Yes.
11   Q.    And no salesperson rated Ms. Burns as
12 being exceptional in that category; correct?
13   A.    Correct.
14   Q.    In fact, most salespeople rated her as
15 being -- as having only met expectations; correct?
16   A.    Yes.
17   Q.    And there was also an expectation that
18 Ms. Burns would have expanded into other sections,
19 but she did not do so; correct?
20   A.    Yes.
21   Q.    Now, take a look at page 1258.
22         That is Mr. Ngo's review; correct?
23   A.    Yes.
24   Q.    And under those same categories --

951

Lowenthal - Cross

1  well, let's start with the first category,
2  "Published Research."
3
4       Most salespeople rated Mr. Ngo as
5  being exceptional in those categories; correct?
6  A.   In the year of 2010.
7  Q.   That's what I'm asking.
8  A.   Yes.
9  Q.   The answer is yes?
10 A.   In 2010, yes.
11 Q.   And then under "Client and Sales Force
12 Communication," most salespeople rated Mr. Ngo as
13 being exceptional in those categories too; correct?
14 A.   Yes.
15 Q.   And the salespeople praised Mr. Ngo's
16 ability to create a bigger and more credible
17 research presence; correct?
18 A.   I don't see those words.
19 Q.   Take a look at page 1258 under the
20 "Comments" section about halfway up.
21      (Pause.)
22 Q.   The first line states, and I will read
23 it to you, "Hoai has done a great job over the past
24 year of creating a much bigger and more credible
25 research presence for Oppenheimer in the high-yield

952

Lowenthal - Cross

1
2  paper/packaging and chemical spaces."
3       That's what the salespeople wrote; is
4  that right?
5  A.   Yes.
6  Q.   And the salespeople also praised
7  Mr. Ngo for being -- for his responsiveness, which
8  helps generate revenue; correct?
9  A.   Yes.
10 Q.   And the salespeople also praised
11 Mr. Ngo for his ability to conduct research outside
12 his assigned sectors; correct?
13 A.   Yes.
14 Q.   And for 2010, you gave Mr. Ngo a
15 bigger bonus -- discretionary bonus than Ms. Burns;
16 is that right?
17 A.   I'd have to look at the data.
18 Q.   Take a look at Exhibit 32.
19      (Pause.)
20 A.   Yes.
21 Q.   Before I ask you a question about
22 that, previously we had looked at Exhibit 31, which
23 is right before Exhibit 32.  Take a look at
24 Exhibit 31 for a second -- I'm sorry, no.  My
25 apologies.  33.

953

Lowenthal - Cross

1  MR. GIBSON:  33.
2  MR. LICUL:  I apologize.
3  THE WITNESS:  Yes.
4  BY MR. LICUL:
5  Q.   Now, 33 is the spreadsheet for 2010
6  bonuses, but it's the working spreadsheet, the
7  non-final spreadsheet; correct?
8  A.   Yes.
9  Q.   And in that spreadsheet, if you turn
10 to page 1229, you will see that both Ms. Burns and
11 Mr. Ngo were slated to receive $150,000 bonuses.
12      Do you see that?
13 A.   Yes.
14 Q.   Now, if you take a look at
15 Exhibit 32 --
16 A.   Yes.
17 Q.   -- Exhibit 32 is the final bonus
18 allocation spreadsheet; correct?
19 A.   Okay.
20 Q.   Am I right about that?
21 A.   Yes.
22 Q.   And if you look at the second page,
23 you will see that Ms. Burns got a $150,000 bonus and
24 Mr. Ngo got a $170,000 bonus; correct?

954

Lowenthal - Cross

1  A.   Yes.
2  Q.   And the prior year, Ms. Burns got --
3  received a $225,000 bonus.
4       Do you see that?
5  A.   Yes.
6  Q.   And Mr. Ngo has no bonus for the prior
7  year; is that right?
8  A.   Yes.
9  Q.   Is that because he was not at
10 Oppenheimer the full year?
11 A.   Yes.
12 Q.   And in 2011, you promoted Mr. Ngo to
13 executive director; correct?
14 A.   I don't have that in front me, but if
15 you say so, I'll take your word for it.
16 Q.   Let's take a look at Exhibit 3.
17 A.   Yes.
18 Q.   And I believe you mentioned this
19 document in your direct.
20      This is Oppenheimer's answer to
21 Mr. Ngo's statement of claim in this proceeding;
22 correct?
23 A.   Yes.
24 Q.   You reviewed this before it was filed;

955

Lowenthal - Cross

1  correct?

2  A.   Yes.

3  Q.   And if there were any errors in it,

4  you would have attempted to correct them; correct?

5  A.   Yes.

6  Q.   Take a look at paragraph 20.  If you

7  see the -- it's page 9.  And there are paragraph

8  numbers.  Take a look at paragraph 20, please.

9  (Pause.)

10  A.   Yes.

11  Q.   And in paragraph 20, Oppenheimer

12  states, "Oppenheimer admits the allegations set

13  forth within paragraph 20 of the statement of claim

14  to the extent that they allege that Mr. Ngo was

15  promoted to the title of executive director in

16  2011."

17  Do you see that?

18  A.   I see it.

19  Q.   And that's accurate?

20  A.   Yes.

21  Q.   Now, in 2012, I believe you testified

22  that Mr. Ngo received a competing offer; is that

23  right?

24  A.   Yes.

25

956

Lowenthal - Cross

1  Q.   CIBC was trying to hire him away;

2  correct?

3  A.   Yes.

4  Q.   And you decided to match that offer;

5  correct?

6  A.   I don't remember the particulars of

7  our economic response.

8  Q.   Take a look at page 111 of your

9  transcript.

10  (Pause.)

11  MR. GIBSON:  Here you go (handing).

12  BY MR. LICUL:

13  Q.   I'm going to refer your attention to

14  line 14:

15  "QUESTION:  Do you recall whether you

16  matched the offer?

17  "ANSWER:  That's very possible."

18  Did you give that testimony?

19  A.   I gave that testimony.

20  Q.   Okay.  And as part of that effort,

21  Mr. Ngo's base compensation was increased and it now

22  matched Ms. Burns' compensation; correct?

23  A.   Correct.

24  Q.   And prior to that time, Ms. Burns

25

957

Lowenthal - Cross

1  was -- had a higher base salary than Mr. Ngo;

2  correct?

3  A.   Yes.

4  Q.   And you made both of their salaries --

5  you increased both of their salaries to $150,000 a

6  year; correct?

7  A.   Yes.

8  Q.   And you paid discretionary bonuses to

9  Mr. Ngo and Ms. Burns for 2011 in early 2012;

10  correct?

11  A.   Correct.

12  Q.   And you gave Mr. Ngo a higher bonus

13  than Ms. Burns; correct?

14  A.   I'd have to look at the data.

15  Q.   Take a look at Exhibit 20.

16  (Pause.)

17  Q.   Now, Exhibit 20 is an e-mail from

18  Ms. Bridges to you; is that right?

19  A.   Yes.

20  Q.   And you asked a question about bonuses

21  for Mr. Ngo and Ms. Burns; correct?

22  A.   Yes.

23  Q.   And Ms. Bridges is in human resources;

24  correct?

25

958

Lowenthal - Cross

1  A.   Yes.

2  Q.   And she writes to you, "Ngo's bonus in

3  January 2013 was 278 -- $270,833 and Colleen's" --

4  A.   As written here, yes.

5  Q.   Yes.

6  -- "and Colleen's bonus in

7  January 2013 was $218,750"; correct?

8  A.   It says that here for the reasons that

9  we've discussed earlier.  It's very difficult.  And

10  HR tends to make mistakes when they share this

11  information about which year bonuses were depending

12  on when they were paid.  So they track an IRS year,

13  but we pay on a calendar year.  So there can be

14  mismatches at times.  So I'm not sure what the data

15  is behind this e-mail.

16  Q.   Do you think Ms. Bridges is competent

17  at her job?

18  A.   Yes, she is.

19  Q.   When she tells you what someone

20  earned, do you trust that that information is

21  accurate?

22  A.   There are different ways to interpret

23  when something is earned.  This could be accurate

24  for the IRS, but not accurate for performance years.

25

959

Lowenthal - Cross

1    Q.   Let me ask you a question.
2         Turn to the top e-mail, which she
3    writes to you.  And Ms. Burns -- excuse me --
4    Ms. Bridges writes to you, "Hoai's bonus in
5    January 2013 was $270,833."
6         What did you understand that to mean?
7    A.   I don't remember.
8    Q.   What do you understand it to mean now,
9    as you sit here?
10   A.   If I take a look at, you know, what
11   his payroll check says, that would be more evident
12   of this than just an e-mail with numbers on it.
13        THE ARBITRATOR:  If you question --
14        THE WITNESS:  The data is the data.
15        THE ARBITRATOR:  If you question the
16   accuracy of what you get from Ms. Bridges,
17   would you not have asked then for payroll
18   documentation if it was important to you?
19        THE WITNESS:  I may have.  And that
20   doesn't mean it's not in here too.  I haven't
21   reviewed all the documents, and I don't have
22   all the data.  And I don't want to be
23   misrepresented in terms of what I do or don't
24   understand.

960

Lowenthal - Cross

1         So if I look at payroll numbers,
2    that's empirical evidence.  If I look at
3    e-mail traffic, it may or may not be as
4    reliable, is what I'm trying to say.  I'm not
5    disputing it; I'm just saying I don't know
6    the answer.
7    BY MR. LICUL:
8    Q.   Let's clarify it.
9         Take a look at Exhibit 11E.
10   A.   Yes.
11   Q.   Do you recognize 11E to be a pay stub
12   for Mr. Ngo for the period ending January 31st,
13   2013?
14   A.   What page?
15   Q.   The first page it should be.
16        MR. GIBSON:  There's a subtab.  It
17   says, "E."
18        THE WITNESS:  That is a pay stub.
19   BY MR. LICUL:
20   Q.   And that is for Mr. Ngo for the period
21   January 31, 2013; correct?
22   A.   Yes.
23   Q.   And that shows that he received a
24   management bonus of $270,833; correct?

961

Lowenthal - Cross

1    A.   Yes.
2    Q.   And that management bonus would have
3    been paid for work done in 2012; correct?
4    A.   Yes.
5    Q.   Now take a look at 12B.
6         (Pause.)
7    Q.   Are you there?
8    A.   I am.  It's just unusual not to have
9    any year-to-date numbers on a payroll check.
10   Q.   Take a look at 12B at page -- at the
11   first page.  I'm sorry.
12        MR. GIBSON:  848?
13        MR. LICUL:  Yes.  Thank you.
14   BY MR. LICUL:
15   Q.   And that's an earnings statement --
16   that is an earnings statement for Ms. Burns dated
17   January 31st, 2013; correct?
18   A.   Which tab are you in?
19   Q.   12B, as in boy.
20   A.   I have -- I have one for Hoai.  I
21   don't have any --
22        MR. GIBSON:  I think you're still on
23   11.  If you go to --

962

Lowenthal - Cross

1    BY MR. LICUL:
2    Q.   It might be in a different book.
3         (Pause.)
4    A.   Okay.
5    Q.   Is that a pay stub for Ms. Burns dated
6    January 31st, 2013?
7    A.   Yes.
8    Q.   And it says that she received a
9    management bonus of $218,750; correct?
10   A.   Yes.
11   Q.   And that would have been for work done
12   in 2012; correct?
13   A.   Yes.
14   Q.   So do those documents refresh your
15   recollection that you paid Mr. Ngo more than
16   Ms. Burns for 2012?
17   A.   Yes.
18   Q.   Now, you promoted Mr. Ngo in 2013 to
19   cohead of the group; correct?
20   A.   Yes.
21   Q.   And that was your decision?
22   A.   Yes.
23   Q.   You considered it a promotion;
24   correct?

963

Lowenthal - Cross

1
2    A.    Yes.
3    Q.    Now, one of the areas that Mr. Ngo
4    covered was metals and mining; correct?
5    A.    Yes.
6    Q.    And he also covered chemicals;
7    correct?
8    A.    Yes.
9    Q.    And Oppenheimer did not have any
10   investment banking counterpart to metals and mining
11   or chemicals -- has not had any investment banking
12   counterpart since 2011 or '12; correct?
13   A.    Yes.
14   Q.    And you also made Ms. Burns cohead
15   with Mr. Ngo; correct?
16   A.    Yes.
17   Q.    And you made them coheads even though
18   Ms. Burns had more years of employment at
19   Oppenheimer; correct?
20   A.    Yes.
21   Q.    And she also had more years of
22   industry experience; correct?
23   A.    Yes.
24   Q.    And you gave them at that point a
25   salary of $150,000; correct?

964

Lowenthal - Cross

1
2    A.    Correct.
3    Q.    Prior to that time, you had increased
4    their salary to $150,000, but you paid it out in
5    quarterly bonuses; is that correct?
6    A.    That sounds right.
7    Q.    Because there was some sort of salary
8    freeze?
9    A.    That's correct.
10   Q.    And at the time that you gave Mr. Ngo
11   and Ms. Burns an official salary bump to $150,000,
12   you also gave -- promoted Mr. Sneeden to senior
13   director; correct?
14   A.    Yes.
15   Q.    And you paid him a bonus of $100,000;
16   correct?
17   A.    I don't remember exactly.
18   Q.    Take a look at 24.
19   A.    Yes.
20   Q.    Take a look at the last page of 24.
21         (Pause.)
22         MR. GIBSON:  The PCNs?
23         MR. LICUL:  Yes.  The very last page.
24         THE WITNESS:  Yes.
25

965

Lowenthal - Cross

1
2    BY MR. LICUL:
3    Q.    That is an October 18, 2013, PCN for
4    Mr. Sneeden; correct?
5    A.    Yes.
6    Q.    And it shows that he received a salary
7    increase to $100,000; correct?
8    A.    Yes.
9    Q.    And he's promoted to senior director;
10   correct?
11   A.    Yes.
12   Q.    Mr. Sneeden was junior to both Mr. Ngo
13   and Ms. Burns; correct?
14   A.    Yes.
15   Q.    You gave some testimony earlier about
16   Lynn Johnson.
17         Lynn Johnson was a salesperson in
18   high-yield --
19   A.    Yes.
20   Q.    -- correct?
21         And she reported to Ms. Ross; correct?
22   A.    Yes.
23   Q.    And Ms. Johnson took maternity leave
24   in 2015; correct?
25   A.    That sounds right.

966

Lowenthal - Cross

1
2    Q.    And you understood that to mean that
3    Ms. Johnson was going to have a baby and would not
4    be at work; correct?
5    A.    Yes.
6    Q.    And Ms. -- Oppenheimer paid
7    Ms. Johnson commissions for the period of time that
8    she was out of work; correct?
9    A.    We did.
10   Q.    And you approved the decision to pay
11   her commissions; correct?
12   A.    Subject to it being okay with our
13   legal and HR department.  I had Jane speak with them
14   first to make sure it was permissible, but I had no
15   issue with the business terms around it.
16         THE ARBITRATOR:  Is this 2015?
17         MR. LICUL:  Yes, 2015.
18         THE ARBITRATOR:  Okay.
19   BY MR. LICUL:
20   Q.    And Ms. Johnson took -- requested
21   three months of leave for the birth of her child;
22   correct?
23   A.    Yes.
24   Q.    And Ms. Johnson went on leave on
25   January 8, 2015; correct?

967

Lowenthal - Cross

1      A.    I don't know the dates.
2      Q.    That's fair.
3            Can you turn to Exhibit 79.  If you
4  can just flip through the 12 pages there.
5            (Pause.)
6      A.    What's the lower right-hand corner
7  number you're looking for?
8      Q.    I just want you to look at all 12
9  pages, and I just want to ask you a general
10 question, which is, are those Oppenheimer documents
11 relating to Ms. Johnson's maternity?
12           (Pause.)
13     A.    Yes.
14     Q.    Take a look at page -- the first page,
15 1612.
16           Are you there?
17     A.    I'm just finishing looking at it.
18     Q.    Sure.  Take your time.
19           (Pause.)
20     A.    Page 2?
21     Q.    The first page, 1612.
22           Do you see that?
23     A.    Yes.
24     Q.    That is the PCN for Ms. Johnson's

968

Lowenthal - Cross

1  maternity leave; is that right?
2      A.    Yes.
3      Q.    If you take a look at the -- on the
4  lower right-hand corner, there's a box that's
5  entitled, "Notes and Explanations."
6            Do you see that?
7      A.    I do.
8      Q.    And that states that Ms. Johnson went
9  on leave beginning January 8, 2015; correct?
10     A.    Yes.
11     Q.    And she was to be -- to return on
12 4/1/2015 -- actually, her last day of maternity
13 leave was supposed to be April 1, 2015; correct?
14     A.    That sounds correct.  That's what it
15 says here.
16     Q.    That's what it says.
17     A.    I don't think this was -- again, I see
18 the handwriting is different than the handwriting
19 that says, "Maternity leave."  And I don't know that
20 this was on there when I signed it, as I said
21 before.  The sheets are used by several people after
22 I sign them.
23     Q.    I will represent to you that this was
24 produced by your counsel.

969

Lowenthal - Cross

1            Do you have any reason to believe that
2  this document is not authentic?
3      A.    No, I believe it's authentic.  Some of
4  it's familiar and some of it's not, so...
5      Q.    And so that says that Ms. Johnson
6  would go on leave beginning January 8, 2015;
7  correct?
8      A.    Yes.
9      Q.    And that she would return on April 1,
10 2015; correct?
11     A.    Yes.
12     Q.    And that's 12 weeks; correct?
13     A.    Yes.
14     Q.    Okay.  Isn't it true that Ms. Johnson
15 had not filled out any FMLA paperwork when she began
16 her leave on January 8, 2015?
17     A.    I don't know.
18     Q.    Take a look at page 1615.  It says,
19 "Application for FMLA Leave."
20           Do you see that?
21     A.    Yes.
22     Q.    And that's Ms. Johnson's application
23 for FMLA leave?
24     A.    Yes.

970

Lowenthal - Cross

1      Q.    And if you turn to page 1616, where it
2  says, "Signature of employee or employee's
3  spokesperson," it's dated February 14, 2015.
4            Do you see that?
5      A.    Yes.
6      Q.    So Ms. Johnson submitted her FMLA
7  paperwork some four, five weeks after she started
8  her leave; correct?
9      A.    Yes, I believe the start date is still
10 1/9.
11     Q.    That would indicate that she actually
12 went on leave on 1/9; correct?
13     A.    She got her paperwork in, yes -- she
14 signs it on February 14, but she has it effective on
15 January 9.
16     Q.    Take a look at page 1619.
17     A.    Yes.
18     Q.    And that is Oppenheimer's approval for
19 Ms. Johnson's leave; correct?
20     A.    Yes.
21     Q.    And that approval is not granted until
22 February 25, 2015; correct?
23     A.    Yes.
24     Q.    And that is some -- not quite two

971

Lowenthal - Cross

1   months after she actually began her leave; correct?
2   A.   Yes.
3   Q.   And isn't it true that Ms. Johnson
4   took more than 12 weeks of leave for the birth of
5   her child?
6   A.   I don't recall when she came back.
7   Q.   Take a look at the very last page of
8   this exhibit.
9        (Pause.)
10   A.   Okay.  Yes.
11   Q.   And it's an e-mail chain.  And the
12   bottom e-mail is from Stephanie Rego to Ms. Johnson.
13        Do you see that?
14   A.   Yes.
15   Q.   Who is Ms. Rego?
16   A.   She's my assistant.
17   Q.   And Ms. Rego writes to Ms. Johnson,
18   "Hi, Lynn.  Kristi Decker has contacted me about
19   your return from FMLA.  She said that you were
20   supposed to return on April 3rd, but I am unsure if
21   you did get it."
22        Do you see that?
23   A.   Yes.
24   Q.   That states that Ms. Johnson was

972

Lowenthal - Cross

1   supposed to return on April 3rd at the end of her
2   leave; correct?
3   A.   Yes.
4   Q.   Then if you look at the middle e-mail
5   from Ms. Johnson, who replies, "Hi, Stephanie.  I
6   will now be back next Monday, April 13th."
7        Do you see that?
8   A.   I do.
9   Q.   So Ms. Johnson took more than 12 weeks
10   of leave; correct?
11   A.   Yes.
12   Q.   And you did not strip her of any of
13   her responsibilities; correct?
14   A.   Did not.
15   Q.   And she returned to the same job?
16   A.   She did.
17        THE ARBITRATOR:  By the way,
18   salespeople are paid on a commission basis?
19        THE WITNESS:  Yes.
20        THE ARBITRATOR:  Was that their
21   exclusive pay, or was there a base pay?
22        THE WITNESS:  There's a minimum wage
23   requirement in the State of New York that
24   every employee receives.  As salespeople who

973

Lowenthal - Cross

1   produce zero commissions or less than an
2   amount that with their payout would produce
3   less than minimum wage, would get a minimum
4   wage check.
5   BY MR. LICUL:
6   Q.   If they produce more than the minimum
7   wage, then is that minimum wage backed out of their
8   commissions?
9   A.   You're not allowed to do that.  It is
10   included -- you can't pay someone less than minimum
11   wage.
12   Q.   Understood.  It was a bad question.
13        What I'm asking, though, is, if their
14   commissions actually generate more than the minimum
15   wage, do you then pay them the difference between
16   the minimum wage and the commissions?
17   A.   They will earn an amount that is their
18   commissions multiplied by a payout percentage that
19   they're eligible to receive.  That would be -- that
20   net number will be inclusive of minimum wage.  If it
21   results in a number below minimum wage, they will
22   get a number above the payout number and that's
23   equal to minimum wage.
24   Q.   Oppenheimer will true them up, in

974

Lowenthal - Cross

1   other words.
2   A.   Yes.
3   Q.   Okay.
4   A.   In addition to benefits and other
5   contributions.
6   Q.   I want to draw your attention to
7   Mr. Ngo's discussions regarding having a baby.
8        I believe you testified earlier that
9   on May 12th, you had a discussion with Mr. Ngo where
10   he told you he was having a child; correct?
11   A.   Yes.
12   Q.   And I think you testified earlier that
13   he was adopting a baby; is that right?
14   A.   Yes.
15   Q.   Isn't it true that he was, in fact,
16   having a child by surrogacy?
17   A.   I think I said it both ways.  There's
18   a mixture of terminology.  I believe the letter to
19   Lenore that was opened earlier as one of the
20   exhibits I referenced that he had a child through
21   surrogacy.
22   Q.   Okay.  And it was your testimony that
23   he told you that he was going to go to California to
24   pick up the baby; correct?

975

Lowenthal - Cross

1     A.    Yes.
2     Q.    And was it your understanding that he
3  was going to go to California pick up the baby and
4  then come back while working throughout that entire
5  period?
6     A.    That was what he had -- that was what
7  he had told me.
8     Q.    You understood that he was not going
9  to take any time off for the birth of this child;
10  correct?
11    A.    That his -- what he had represented to
12  me was that he would continue working and fulfill
13  his responsibilities.  And I told him that if he
14  chose to take any other sort of approach towards the
15  birth of his child, that he should discuss it with
16  HR and fill out the proper paperwork that allows for
17  that.
18    Q.    Isn't it true that what Mr. Ngo told
19  you was that he and his partner were having a baby,
20  that he was going to California, and that he needed
21  to be there when the child was born?
22    Correct?
23    A.    Yes.
24    Q.    And then after this conversation with

976

Lowenthal - Cross

1  Mr. Ngo, you had a conversation with Ms. Ross;
2  correct?
3     A.    I don't recall.
4     Q.    Take a look at page 121 of your
5  transcript.
6          (Pause.)
7     A.    121?
8     Q.    Page 121, yes.
9     A.    Okay.
10    Q.    Beginning on line 19.
11    A.    Yes.
12    Q.    (Reading):
13         "Question:  Do you know if you
14    discussed Mr. Ngo's request with Ms. Ross?
15         "ANSWER:  When?
16         "QUESTION:  Between the time that he
17    told you he was going to have a child and the
18    first time he went to California.
19         "ANSWER:  I am quite certain that in
20    some point in that range of time, Jane Ross
21    and I had a conversation about the topic."
22    Did you give that testimony?
23    A.    I did.
24    Q.    And you wanted to know from Ms. Ross

977

Lowenthal - Cross

1  what the impact would be if Mr. Ngo was not
2  available for a period of time; correct?
3     A.    I don't see that.
4     Q.    Take a look at --
5     A.    I don't think I said that.
6     Q.    Take a look at page 122 again,
7  beginning on line 13:
8         "QUESTION:  What was your conversation
9    with Ms. Ross?
10        "ANSWER:  I wanted to know what the
11   impact of our client relationships would be
12   if Hoai were not available for a period of
13   time."
14   Did you give that testimony?
15   A.    Yes.
16   Q.    You also -- in addition to speaking to
17  Ms. Ross, you called -- you informed human resources
18  that Mr. Ngo would be calling; correct?
19   A.    Yes.
20   Q.    Because you told Mr. Ngo to speak to
21  human resources; correct?
22   A.    Yes.
23   Q.    And then you eventually learned that
24  he had done so; correct?

978

Lowenthal - Cross

1     A.    Yes.
2     Q.    And you learned that he had done so
3  because he sent you an e-mail about his conversation
4  with human resources; correct?
5     A.    Yes.  And I received an e-mail from
6  human resources saying that he spoke to them.
7     Q.    Earlier you testified that you had to
8  follow up to determine whether Mr. Ngo had gone to
9  human resources.
10        That's untrue; correct?
11   A.    I think there's some traffic where I
12  inquired as to whether or not there was
13  communication at some point, but the time period,
14  I'm not sure.
15   Q.    Take a look at Exhibit 113.  I believe
16  you testified about this earlier.
17   A.    Yes.
18   Q.    Are you there?
19   A.    Yes.
20   Q.    That's an e-mail exchange between --
21  or among you, Mr. Ngo and Lenore Denys; right?
22   A.    Yes.
23   Q.    And in the bottom e-mail, Mr. Ngo
24  writes to Ms. Denys about maternity/paternity

979

Lowenthal - Cross

1 policy; correct?
2 A. Yes.
3 Q. And he does that on May 12th; correct?
4 A. Yes.
5 Q. The same day that you had a
6 conversation with him and directed him to go to
7 human resources; correct?
8 A. Yes.
9 Q. And then Ms. Lenore -- Ms. Denys,
10 excuse me, writes -- writes back to Mr. Ngo to
11 explain what the policies are; correct?
12 A. Yes.
13 Q. And then Mr. Ngo forwards that e-mail
14 to you; correct?
15 A. Yes.
16 Q. And this entire exchange happens in
17 about two and a half hours; correct?
18 A. Yes.
19 Q. And in Mr. Ngo's e-mail to you, he
20 expressly references the FMLA, the Family and
21 Medical Leave Act; correct?
22 A. Yes.
23 Q. And in addition to speaking to
24 Ms. Ross and human resources, you also spoke to

980

Lowenthal - Cross

1 Ms. Burns about Mr. Ngo's leave; correct?
2 A. Yes.
3 Q. And, again, you wanted to discuss with
4 Ms. Burns the impact for clients and the burden for
5 her in responding to client requests; correct?
6 A. Where's that?
7 Q. I'm asking you.
8 Do you remember having that discussion
9 with Ms. Ross --
10 A. I don't.
11 Q. -- with Ms. Burns? Excuse me.
12 A. I don't remember specifically.
13 Q. Take a look at page 125 of your
14 deposition.
15 A. This was five years ago, so I
16 apologize for not really remembering everything.
17 (Pause.)
18 Q. Page 125, beginning on line 25:
19 "QUESTION: Did you speak to
20 Ms. Ross -- excuse me -- Ms. Burns during the
21 period of time regarding Mr. Ngo's request?
22 "ANSWER: Period of time between when
23 he informed me and when he --
24 "QUESTION: Went to California.

981

Lowenthal - Cross

1 "ANSWER: As I said earlier, I am sure
2 Colleen and I had conversations, yes.
3 "QUESTION: Do you recall what they
4 were?
5 "ANSWER: Asking her what the impact
6 for clients might be, what the burden for her
7 might be to be responsive to any client
8 requests and what the expectations were for
9 the business."
10 Did you give that testimony?
11 A. Yes.
12 Q. You understood that Mr. Ngo would be
13 on leave for two to four weeks; correct?
14 A. That's correct.
15 Q. And you understood he would be on
16 leave for two to four weeks provided there were no
17 complications with the birth or other issues;
18 correct?
19 A. I understood he would not be in
20 New York for two to four weeks and that he would be
21 working from the West Coast.
22 Q. Take a look at page 129, line 16.
23 There's an objection from your lawyer.
24 "ANSWER: I thought it would be around

982

Lowenthal - Cross

1 two or three weeks.
2 "QUESTION: And what was your basis
3 for that?
4 "ANSWER: That there were no
5 complications with the birth of the baby and
6 that it was going to take him not that much
7 time to bring the baby back. He did not have
8 any indications that there would be
9 complications with either the law or the
10 health of the baby to bring the baby from
11 California to New York, which is where he
12 told me he wanted to reside and had planned
13 to bring the baby back to his home."
14 Did you give that testimony?
15 A. Yes.
16 Q. At no point during the conversation
17 that you had with Mr. Ngo about leave did he say to
18 you that he did not want to take FMLA leave;
19 correct?
20 A. Well, I think that that's not true. I
21 think that he did tell me that he wanted to continue
22 working, he wanted to continue getting a salary, he
23 wanted a laptop, he wanted access to the LA office,
24 and he would continue to perform his duties.

983

Lowenthal - Cross

1  So to me that says, I'm not going to
2
3  take FMLA.
4      Q.  Earlier today --
5      A.  Those accommodations I gave him.  And
6  that was the status of the conversation we had
7  before he left for California.
8      Q.  Earlier today, did you testify that
9  Mr. Ngo told you that he did not want to take FMLA
10  leave?
11      A.  Yes.
12      Q.  He did not say that during your
13  conversation with him; correct?
14      A.  In May, I told him to speak to HR.  As
15  a follow-up, he did not sign any FMLA documentation,
16  he did not participate in any of the efforts that
17  were made available to him when he was preparing to
18  leave.  He asked for a laptop.  He told me he'd be
19  available, he'd be performing his duties, he'd be
20  back in a few weeks.
21      Q.  My question, though, is, did Mr. Ngo
22  say -- did these words come out of his mouth, "I do
23  not want to take FMLA leave"?
24      A.  I do not recall.
25      Q.  Now, at some point after you spoke to

984

Lowenthal - Cross

1
2  Mr. Ngo, human resources, Ms. Ross and Ms. Burns
3  about Mr. Ngo taking leave, Mr. Ngo told you that he
4  needed to extended his leave; correct?
5      A.  He didn't tell me that.
6      Q.  He told Oppenheimer that; correct?
7      A.  I think he told Colleen that and --
8  notified Colleen and Jane of his decision to do
9  that, but he didn't request any permission.
10      Q.  Did you learn that he wanted to extend
11  his leave?
12      A.  I learned that he unilaterally decided
13  to stay in California without telling his supervisor
14  or the HR department.  That's what I learned.
15      Q.  Take a look at page 131 of your
16  deposition transcript.
17      A.  Yes.
18      Q.  Are you there?
19          At line 5:
20          "QUESTION:  And so did there come a
21      time when you learned that Mr. Ngo wanted to
22      extend his leave?"
23          There's an objection.
24          "ANSWER:  So I don't remember the
25      date, but we had a conversation.

985

Lowenthal - Cross

1      "QUESTION:  You and Mr. Ngo did?
2
3      "ANSWER:  Yes."
4          Did you give that testimony?
5      A.  Yes.
6      Q.  And during that conversation, Mr. Ngo
7  told you that he needed more time in California;
8  correct?
9      A.  Yes.
10      Q.  And you found that conversation
11  frustrating; correct?
12      A.  Yes.
13      Q.  And so you wrote him the July 18th
14  e-mail with the letter; correct?
15      A.  Yes.
16      Q.  And at this time, you knew that
17  Mr. Ngo needed the additional time because his
18  daughter had not yet been cleared to fly; correct?
19      A.  Yes.
20      Q.  But when you were deposed and you were
21  asked that question, the first time you gave the
22  following answer, that -- you said that Mr. Ngo was
23  just electing to take time in California; correct?
24      A.  I don't recall the specifics of my
25  answer.

986

Lowenthal - Cross

1      Q.  Take a look at page 133 of your
2
3  deposition.
4      A.  Yes.
5      Q.  On line 25.
6      A.  Yes.
7      Q.  (Reading):
8          "QUESTION:  Did he tell you why he was
9      taking additional time?
10          "ANSWER:  I think he was just electing
11      to."
12          Did you give that testimony?
13      A.  Yes.
14      Q.  And then you were asked that question
15  a second time, and your second answer was that you
16  thought he was just electing to take more time as a
17  preference; correct?
18      A.  I don't see the word "preference."
19  Where are you looking?
20      Q.  Page 135, beginning on line 22:
21          "QUESTION:  Do you know today -- as
22      you sit here today why he needed to take more
23      time?
24          "ANSWER:  My recollection is that he
25      was electing to take more time as a

987

Lowenthal - Cross

1   preference."
2        Did you give that testimony?
3   A.   Yes.
4   Q.   In fact, you knew that he needed the
5   time because his daughter could not fly; correct?
6   A.   I knew that he needed to stay in
7   California, yes.
8   Q.   Take a look at page 140, beginning on
9   line 8.
10  A.   Yes.
11  Q.   (Reading):
12       "QUESTION:  My question is, were you
13  aware that Mr. Ngo needed to take time off --
14  additional time off because his daughter had
15  not been cleared to fly?
16       "ANSWER:  Yes."
17       Did you give that testimony?
18  A.   Yes.
19  Q.   Now, I want to talk to you a little
20  bit about the July 13th e-mail that Mr. Ngo sent.
21       Mr. Ngo sent that e-mail to Ms. Ross
22  and Ms. Burns; correct?
23  A.   What e-mail are you talking about?
24  Q.   Oh, I'm sorry.

988

Lowenthal - Cross

1        MR. GIBSON:  What is the exhibit?
2        MR. IADEVAIA:  51.
3        MR. LICUL:  Exhibit 51, yes.
4        THE WITNESS:  Okay.
5   BY MR. LICUL:
6   Q.   Do you recognize the bottom e-mail
7   from Mr. Ngo to Ms. Burns and Ms. Ross?
8        Do you see that?
9   A.   Yes.
10  Q.   That's the -- what I'll refer to as
11  the July 13th e-mail.  Okay?
12       And he sent that e-mail to Ms. Ross
13  and Ms. Burns; correct?
14  A.   Yes, Sunday night at 9:22 p.m.
15  Q.   And in that e-mail, he tells Ms. Ross
16  and Ms. Burns that he needs to take time off because
17  his daughter had not been cleared to fly by the
18  doctors; correct?
19  A.   Yes.  He says, "A doctor recommended
20  we do not fly."
21  Q.   And when you received that e-mail,
22  your concern was that Mr. Ngo was taking significant
23  time off for the birth of his child; correct?
24  A.   That's not true.

989

Lowenthal - Cross

1   Q.   Take a look at Exhibit 52.
2        (Pause.)
3   A.   I don't see the word "concern" here.
4   Q.   Okay.  Fair enough.
5   A.   I don't see -- you're putting words in
6   my mouth.  That's not what the document says.
7   Q.   That's an e-mail that you sent to
8   Ms. Denys --
9   A.   It doesn't reflect any concern.
10  Q.   Let me just ask a few questions.
11       Are you done with your --
12  A.   Yes.
13  Q.   On July 14th, the day after you
14  learned of the July 13th e-mail, you write to
15  Ms. Denys in HR; correct?
16  A.   Yes.
17  Q.   You say, "Lenore, Hoai may have called
18  you earlier this spring at my request.  He had a
19  baby through a surrogate last month and is taking
20  significant time off"; correct?
21  A.   Yes.
22  Q.   And the reason you used the words
23  "significant time off" is because you believed that
24  he was asking for significant time off; correct?

990

Lowenthal - Cross

1   A.   I believed that it was factually,
2   correct.
3   Q.   You thought --
4   A.   He had taken -- he had been gone for
5   longer than -- the length of time he communicated to
6   me when he left.  So it had become -- it was no
7   longer the same accommodation that I had given him
8   in May.
9   Q.   Now, he left for California on
10  June 20th; correct?
11  A.   Yes.
12  Q.   And his e-mail states he will return
13  on August 25th, correct, the July 13th e-mail?
14  A.   Yes.
15  Q.   And that's a period of ten weeks;
16  correct?
17  A.   From --
18  Q.   June 20th to August 25th.
19  A.   Yes.  June 20th to August 25th.  Okay.
20  Q.   That's less than the 12 weeks provided
21  for in the FMLA; correct?
22  A.   Yes.
23  Q.   And when you used the word "time
24  off" -- the phrase "time off," you meant not

991

Lowenthal - Cross

1  working; correct?
2  A.   I don't know what I meant by that.
3  Q.   Take a look at page 145 of your
4  deposition.
5  A.   Yes.
6  Q.   Beginning on line 15:
7  "QUESTION:  And your testimony was
8  that 'time off' meant not working; correct?
9  "ANSWER:  Yes."
10  Did you give that testimony?
11  A.   Yes.
12  Q.   You were checking with -- in this
13  July 14th e-mail, Exhibit 52, you were checking with
14  Ms. Denys about Oppenheimer's policy guidance;
15  correct?
16  A.   Yes.
17  Q.   And you learned from Ms. Denys that he
18  was entitled up to 12 weeks of leave; correct?
19  A.   Yes.
20  Q.   This is the second e-mail that you
21  received connecting Mr. Ngo's request for leave to
22  the FMLA; correct?
23  A.   Yes.  This is not a request for FMLA
24  allowance.  This is just informing me about the
25

992

Lowenthal - Cross

1  policies of the firm.  There's no request here.
2  Q.   This is the second e-mail you received
3  concerning Mr. Ngo's leave and the FMLA, associating
4  the two; correct?
5  A.   I think that you're interpolating
6  something.  I think these are both e-mails that
7  reflect clarification around the firm's policies.  I
8  don't think there's anything here specific about a
9  request being made or being granted.
10  Q.   Now I want to draw your attention to
11  the letter that you sent on July 18th to Mr. Ngo,
12  which is Exhibit 45.
13  A.   Yes.
14  Q.   Now, you used the word -- you used the
15  word "leave" there repeatedly in that letter;
16  correct?
17  A.   Yes.
18  Q.   And I believe it was your testimony
19  earlier that you weren't referring to any specific
20  kind of leave when you used the word "leave";
21  correct?
22  A.   Lower case L "leave."
23  Q.   And you weren't referring to any
24  specific kind of leave; correct?
25

993

Lowenthal - Cross

1  A.   No.
2  Q.   But you cleared the letter first with
3  human resources; right?
4  A.   Yes.
5  Q.   And human resources is familiar with
6  Oppenheimer's leave policies; correct?
7  A.   Yes.
8  Q.   And you also cleared it with legal;
9  correct?
10  A.   Yes.
11  Q.   And you would expect legal to know
12  what "leave" means in terms of the policies and the
13  law; correct?
14  A.   That's why I attached the document
15  that has capitalized FMLA language and permissions
16  and forms to be filed and filled out to clarify
17  the -- what "leave" means.
18  Q.   And the reason you attached the FMLA
19  forms is because you connected Mr. Ngo's request to
20  be out until the 25th with the FMLA; correct?
21  A.   That's entirely incorrect.  It's
22  because he hadn't done it and, if he wanted to, this
23  was the moment to do it.  Here are the forms.  Fill
24  them out, sign them and send them in.
25

994

Lowenthal - Cross

1  Q.   You didn't send him forms to fill out
2  for a bereavement leave, did you?
3  A.   No.
4  Q.   You didn't send him forms to fill out
5  for jury duty leave, did you?
6  A.   No.
7  Q.   You sent him FMLA forms; correct?
8  A.   Yes.
9  Q.   Because you knew he could be eligible
10  for the FMLA; correct?
11  A.   Yes.
12  THE ARBITRATOR:  When you had your
13  conversation with Mr. Ngo, I guess it was
14  July 16th or thereabouts, did either you or
15  he refer specifically to FMLA or FMLA leave?
16  THE WITNESS:  No.  No.  Other than my
17  continued request for him to speak with HR
18  and obtain any permissions or any forms and
19  fill them out and send them in, at which
20  point he said, send me the forms.  So HR and
21  the lawyers gave me the forms that were
22  pertinent to the conversation that I had.
23  BY MR. LICUL:
24  Q.   And it was around this time that you
25

995

Lowenthal - Cross

1  decided to strip Mr. Ngo of his supervisory
2  responsibilities; correct?
3       A.   Yes.
4       Q.   And you gave those supervisory
5  responsibilities -- or sole group supervisory
6  responsibilities to Ms. Burns; correct?
7       A.   Yes.
8       Q.   And you did so on an interim basis;
9  correct?
10      A.   No.
11      Q.   Take a look at Exhibit 55.
12           (Pause.)
13      A.   Yes.
14      Q.   And in Exhibit 55, Steve Krasner
15  writes an e-mail to you about -- Steve Krasner
16  writes an e-mail to you about Ms. Burns' becoming
17  the group head; correct?
18      A.   Yes.
19      Q.   And he refers to her as "the interim
20  sole head of fixed income research"; correct?
21      A.   He does.
22      Q.   I want to draw your attention again to
23  Exhibit 45, which is the letter --
24      A.   He doesn't make those decisions.  So

996

Lowenthal - Cross

1  this is -- his role is to document my decisions, not
2  for me to document his.
3       Q.   Did you write an e-mail back to him
4  saying, no, this is not interim, this is permanent?
5       A.   I think that the documentation that
6  was official that followed is all determinative.  It
7  was org charts.  They were the 3110 letters or, in
8  this case, the 342 letters.  All of the official
9  documentation was filled out in total and reflected
10 my decisions.  This is just correspondence back from
11 Mr. Steven Krasner, who doesn't make the decisions.
12      Q.   Steve Krasner is compliance?
13      A.   He's in the fixed income department,
14 but he's just an administrative worker.
15      Q.   Turn back to Exhibit 45, please, which
16 is the letter that you sent to Mr. Ngo.
17      A.   Yes.
18      Q.   Isn't Mr. Krasner an attorney?
19      A.   He is, but he doesn't act -- he is a
20 lawyer, but he works in the fixed income department.
21      Q.   But he's not just an administrator;
22 right?
23      A.   He's an administrator in the fixed
24 income department.  He happens to have a law degree.

997

Lowenthal - Cross

1  A lot of people happen to have law degrees.
2       Q.   If you turn back to Exhibit 45, which
3  is the letter you sent to Mr. Ngo.
4       I believe you testified earlier that
5  you decided to strip Mr. Ngo of supervisory
6  responsibilities because you were -- you were
7  disappointed -- I forget the word you used -- that
8  he had not told you about his request to extend
9  leave, but, rather, sent an e-mail to Ms. Burns and
10 Ms. Ross; correct?
11      A.   What's the question?
12      Q.   Was that your testimony, that you were
13 upset with him because he had sent that July 13th
14 e-mail to Ms. Burns and Ms. Ross rather than to you?
15      A.   That was a source of some of my
16 frustration, yes.
17      Q.   Where in this Exhibit 45, the letter,
18 do you say that to Mr. Ngo?
19      A.   I don't think I say that I'm
20 frustrated about that.  I think -- that's why I
21 asked Colleen to have him call me.  I was just
22 surprised.
23      Q.   Take a look at -- I'm sorry.  Did you
24 finish your --

998

Lowenthal - Cross

1       A.   I was surprised that I wasn't made
2  aware of his decision to extend his time in
3  California.
4            THE ARBITRATOR:  Is that something you
5  communicated to him during your telephone
6  conversation?
7            THE WITNESS:  I don't think that was
8  an issue to the point that involved a dis- --
9  a meaningful discussion.  It was the reason I
10 told Colleen to have him call me.  He
11 communicated to you, have him call me and
12 communicate to me what decisions he's
13 intending to make here.
14      So that was the source of that
15 conversation.  And the letter was a follow-up
16 to the conversation we had after we had a
17 chance to discuss what his decisions were.
18 BY MR. LICUL:
19      Q.   But am I correct that nowhere in
20 Exhibit 45, in this letter, do you say that you were
21 disappointed or upset with him because he had not
22 told you first?
23           Correct?
24      A.   That's not in here.

999

Lowenthal - Cross

1    Q.    And nowhere in this letter do you say
2    to Mr. Ngo that you were upset because of regulatory
3    pressures, as you testified earlier today; correct?
4    A.    Nope.
5    Q.    And nowhere in there do you say that
6    you were upset because Oppenheimer was going through
7    investigations; correct?
8    A.    Correct.
9    Q.    And then on --
10   A.    It wouldn't be common for me to put
11   that kind of language in a letter that's codifying a
12   conversation.  A lot of that is not something that
13   would be reflected here.
14   Q.    And then you write a letter to
15   Ms. Burns telling her that you're giving her
16   Mr. Ngo's supervisory responsibilities.
17         It's an e-mail, actually; is that
18   right?
19   A.    Yes.
20   Q.    And Exhibit 56, please take a look at
21   that.
22   A.    Yes.
23   Q.    Is there anywhere in this e-mail that
24   you state that the reason you are stripping Mr. Ngo

1000

Lowenthal - Cross

1    of his supervisory responsibilities is because he
2    had told Ms. Ross and Ms. Burns before telling you?
3    A.    No.
4         (Discussion off the record.)
5    Q.    At some point after your July 18th
6    letter, human resources learned -- or someone in
7    human resources learns that you sent that letter;
8    correct?
9    A.    About --
10   Q.    That was a bad question.  I apologize.
11        At some point, you receive an e-mail
12   from Ms. Bridges about your July 18th letter to
13   Mr. Ngo; correct?
14   A.    Can you remind me where it is.
15   Q.    Do you recall --
16   A.    I don't.
17   Q.    You don't.  Okay.  Fair enough.
18   A.    There's a lot of material in here.
19   It's like four binders.
20   Q.    Look at Exhibit 60, please.
21        MR. GIBSON:  6-0?
22        MR. LICUL:  Yes.
23   BY MR. LICUL:
24   Q.    Do you see that?

1001

Lowenthal - Cross

1    A.    Yes.
2    Q.    In the bottom e-mail, Ms. Bridges in
3    human resources writes to you that human resources
4    would consider his FMLA to have started on the 18th,
5    meaning the 18th of July when you sent the paperwork
6    to Mr. Ngo; correct?
7    A.    Yes.
8    Q.    And you understood that the FMLA
9    entitled Mr. Ngo to job protection; correct?
10   A.    Yes.
11   Q.    And job protection means that he's
12   entitled to get his job back; correct?
13   A.    Yes.
14   Q.    And human resources placed Mr. Ngo on
15   FMLA leave even though he had not yet filled out any
16   paperwork; correct?
17   A.    I'm not sure what the specifics of
18   that are, whether or not -- what the date was that
19   he was officially on FMLA leave.  I don't know.
20   Q.    Well, the e-mail from Ms. Bridges says
21   that he's on FMLA leave as July 18th; correct?
22   A.    That's what the e-mail says, yes.
23   Q.    Did you think that Ms. Bridges was
24   lying to you?

1002

Lowenthal - Cross

1    A.    I just don't know what date
2    effective -- his FMLA status became effective.
3    That's what this e-mail says.  You showed me 12
4    documents earlier with Lynn Johnson's paperwork
5    filled out, and I don't know if July 18th is the
6    official date or not, is all I'm telling you.  It's
7    just correspondence here.
8    Q.    Ms. Bridges writes to you, "We would
9    consider his," Mr. Ngo's, "FMLA to have started on
10   the 18th."
11        Do you see that?
12   A.    I do.
13   Q.    Is that a confusing phrase to you?
14   A.    No.
15   Q.    It means what it says; right?
16   A.    It does.
17   Q.    And you rely on human resources for
18   FMLA leave policies; correct?
19   A.    It says his job is protected until
20   October 10th.
21   Q.    And to your knowledge, as of -- on
22   July 18th, Mr. Ngo had not sent in any FMLA
23   paperwork; correct?
24   A.    No.

1003

Lowenthal - Cross

1    Q.   In fact, that was the date you sent
2 him FMLA paperwork.
3    A.   Yes.
4    Q.   And you had not sent him any FMLA
5 paperwork prior to that time; correct?
6    A.   I had asked him to get that paperwork
7 from -- whatever paperwork is regarding the policies
8 the firms has and anything he'd like to elect to
9 participate in, to get from our HR department.
10    Q.   You told him to go to human
11 resources --
12    A.   That was in May, yes.
13    Q.   You told him to go to human resources;
14 correct?
15    A.   Yes.
16    Q.   And he did that; correct?
17    A.   He did.  And they told him to check
18 the handbook, the documents are in there, fill them
19 out and send them in.
20    Q.   In fact, Ms. Denys told him to check
21 page 17 of the handbook; correct?
22    A.   That sounds correct.
23    Q.   You saw that e-mail exchange; correct?
24    A.   Yes.

1004

Lowenthal - Cross

1    Q.   She doesn't mention any forms in that
2 e-mail; correct?
3    A.   I'd have to go back and look at it
4 again, but I believe you.
5    Q.   Your testimony is that you decided to
6 strip Mr. Ngo of his responsibilities because you
7 realized that you no longer needed a cohead
8 arrangement with fixed income; correct?
9    A.   I think that that's one element that
10 you're choosing to focus on, but I think the reason
11 is that I had two supervisors, one of which was
12 active, the other one which I had learned was not
13 performing the job function.
14    My concern at the time was around
15 venue shopping for approvals or permissions within
16 the firm or someone to receive a permission when we
17 don't know their status or whether or not they're
18 aware, familiar with details.  And so that concern
19 of mine, within the context of a tremendous amount
20 of regulatory scrutiny around governance, was the
21 result of me deciding to have one supervisor that
22 was actively engaged in the business.
23    Q.   Prior to October of 2013, you had not
24 had a cohead structure; correct?

1005

Lowenthal - Cross

1    A.   That's correct.
2    Q.   Mr. Morgan was the sole head.
3    A.   That's right.
4    Q.   And then in October of 2013, you
5 decided to employ a cohead structure; correct?
6    A.   Yes.
7    Q.   It was your testimony earlier today
8 that you decided you did not need a cohead
9 structure; correct?
10    A.   Yes.
11    Q.   So the timing of events is, on
12 October 13 -- withdrawn.
13    The timing of events is that in
14 October of 2013, you decided to employ the cohead
15 structure; correct?
16    A.   Yes.
17    Q.   And on July -- in July of 2014, some
18 months later, you decided you no longer needed it;
19 correct?
20    A.   It was not working, yes.
21    Q.   It was not working.
22    And you decided that coincidentally
23 while Mr. Ngo was on leave; correct?
24    A.   It was at the same time.

1006

Lowenthal - Cross

1    Q.   It was at the same time.
2    A.   Yes.
3    THE ARBITRATOR:  And you say "it was
4 not working."  Was it, in your view, not
5 working because Mr. Ngo was out in California
6 and either not doing work or doing only a
7 little work or --
8    THE WITNESS:  Because my impression
9 was that he was actively working, but
10 speaking with him and seeing his level of
11 engagement in the business as it related to
12 keeping me aware of what was going on in the
13 conversation we had, it was clear that he was
14 not as actively involved as I would have
15 suspected someone to be in a supervisory
16 position.
17    So my concern was around whether or
18 not he was or was not attending to
19 supervisory functions.
20    So in order to protect the firm from,
21 like I said, ambiguity as to who's
22 responsibility for what, in the context of a
23 regulatory issue, I wanted to make sure that
24 we drew a line in the sand and that there was

1007

Lowenthal - Cross

1    someone who was on staff every day who could
2    speak to and respond to the day-to-day issues
3    that may arise.
4  BY MR. LICUL:
5        Q.    There was sometime in August of 2014
6    that you learned that Mr. Ngo could not return on
7    August 25th; correct?
8        A.    Yes.
9        Q.    And that's because he suffered a brain
10   aneurysm; right?
11       A.    Yes.
12       Q.    And it was then that Mr. Ngo went on
13   leave for his own health condition; correct?
14       A.    Yes.
15       Q.    And you don't dispute that that was
16   FMLA; correct?
17       A.    I do not.
18             What date did that start, by the way?
19       Q.    August 16th of 2014.
20             Does that sound right?
21       A.    Yes.
22       Q.    And while Mr. Ngo was on medical
23   leave, you gave Ms. Burns a raise from 150- to
24   $175,000 in salary; correct?

1008

Lowenthal - Cross

1        A.    Yes.
2        Q.    And you gave no one else in the group
3    a raise at that time; right?
4        A.    That's right.
5        Q.    And then you learned that Mr. Ngo --
6    when Mr. Ngo was going to return; correct?
7        A.    What was the question?
8        Q.    It was a bad question.  I'm sorry.
9             At some point while Mr. Ngo was an
10   medical leave, you learned that -- when he's going
11   to return?
12       A.    Yes.
13       Q.    And you learned that from him; right?
14       A.    Yes.
15       Q.    He wrote you an e-mail, which is
16   Exhibit 72; correct?
17       A.    Yes.
18       Q.    Now, at your deposition, you were
19   asked about how you learned that Mr. Ngo would
20   return.
21             Do you recall that?
22       A.    I don't recall.
23       Q.    Do you recall testifying that Mr. Ngo
24   just showed up and that you did not know he was

1009

Lowenthal - Cross

1    showing up until he showed up?
2        A.    I don't remember.
3        Q.    Take a look at page 182 of your
4    deposition.
5             (Pause.)
6        A.    Yes.
7        Q.    Beginning on line 15:
8             "QUESTION:  And how did you learn that
9    he was returning to work?
10            "ANSWER:  He showed up.  I don't
11   remember having a conversation.  I don't
12   remember being informed by him, ever getting
13   an e-mail from him or anyone related to him.
14   I didn't know he was showing up until he
15   showed up, is my recollection."
16            Did you give that testimony?
17       A.    I did.
18       Q.    That was not accurate; right?
19       A.    I think the fact that I said that how
20   did I know -- the question was how did I learn that
21   he had returned to work, that he was there, that is
22   how I learned that he was back at work, is when he
23   showed up.
24       Q.    Your testimony was not accurate at

1010

Lowenthal - Cross

1    your deposition; correct?
2        A.    I'm just saying that's what I said.
3    It doesn't reflect that I was made aware that he
4    would be returning prior to that, but that's how --
5    that was where it was evident to me that he was at
6    work.
7        Q.    Take a look at page 184 of your
8    deposition.
9        A.    Yes.
10       Q.    On line 9:
11            "QUESTION:  So it was inaccurate when
12   you said that he just showed up; correct?
13            "ANSWER:  Correct."
14            Did you give that testimony?
15       A.    Yes.
16       Q.    Okay.  Now take a look at Exhibit 72.
17            Mr. Ngo sends you an e-mail -- sorry.
18   I'll wait for you to get there.
19       A.    Yes.
20            THE ARBITRATOR:  I'm sorry.  Which is
21   the exhibit number?
22            MR. LICUL:  7-2.  The same one we had
23   just gone over.

1011

```
 1          Lowenthal - Cross
 2  BY MR. LICUL:
 3      Q.   That's an e-mail that Mr. Ngo sends to
 4  you on October 9, 2014; correct?
 5      A.   Yes.
 6      Q.   Approximately a month before he is set
 7  to return; correct?
 8      A.   Yes.
 9      Q.   In that e-mail, the second -- the
10  third sentence of that e-mail, Mr. Ngo writes to
11  you, "I've been checking in with Colleen
12  frequently."
13          Do you see that?
14      A.   Yes.
15      Q.   You didn't consider Mr. Ngo checking
16  in with Colleen to be work, did you?
17      A.   No.
18      Q.   And upon getting --
19      A.   Just to clarify the context of some
20  confusion that I think you and I have regarding that
21  November 3rd date.
22          The same way -- and this is not unique
23  to this situation -- someone says, I will be
24  somewhere at a certain time in the future doesn't
25  mean that that is certain.  So you're not -- the
```

1012

```
 1  certainty of it is when it happens.
 2          So if you're going to return back to
 3  New York July 12th and you don't return back to
 4  New York until mid August, then it's not evident
 5  that you returned back until you're there.
 6          So I think the specifics around when
 7  was I aware that he was back in the office, it was
 8  when he was back in the office.
 9          What he told me in advance of that as
10  to when he would be there, I may have been
11  knowledgeable to when he intended to come back, but
12  when I knew he was back was when he arrived.
13      Q.   But that wasn't your testimony at your
14  deposition; correct?
15      A.   I'm just clarifying my understanding.
16      Q.   But that was not your testimony at
17  your deposition; correct?
18      A.   Correct.
19      Q.   You testified that "he just showed up"
20  and basically that you did not -- you were not aware
21  that he was --
22      A.   I'm not debating with you.  I'm just
23  telling you what my understanding is to clarify it
24  for everyone.
```

1013

```
 1          Lowenthal - Cross
 2      Q.   But what I want to ask you is, when
 3  you said "he just showed up," you meant that you had
 4  no prior awareness that he was going to show up;
 5  correct?
 6      A.   I mean that when he showed up, he
 7  showed up, is what I meant.
 8      Q.   When you received the e-mail on
 9  October 9, 2014, from Mr. Ngo, you immediately sent
10  it to Ms. Ross; correct?
11      A.   Yes.
12      Q.   Because you wanted to make her aware
13  of the dates and so she can inform the sales staff
14  and Mr. Ngo's colleagues; correct?
15      A.   I sent it to her to make her aware.
16      Q.   Take a look at page 184 of your
17  deposition.
18      A.   Yes.
19      Q.   Beginning on this line 20:
20          "QUESTION:  And then you sent
21  Mr. Ngo's e-mail to Ms. Ross?
22          "Do you see that?
23          "ANSWER:  Yes.
24          "QUESTION:  Why did you do that?
25          "ANSWER:  To make her aware of the
```

1014

```
 1  dates that are outlined below and what his
 2  status is so that she can prepare her sales
 3  staff and inform Hoai's colleagues and the
 4  sales group he would be returning, what date
 5  he will be returning and what his medical
 6  status is."
 7          Did you give that testimony?
 8      A.   Yes.
 9      Q.   And Mr. Ngo did return on
10  November 3rd; correct?
11      A.   Yes.
12      Q.   Consistent with his e-mail to you;
13  correct?
14      A.   Yes.
15      Q.   And then you had a conversation with
16  him when he returned on that first day; correct?
17      A.   Yes.
18      Q.   And then it was at that point that you
19  advised Mr. Ngo that his supervisory
20  responsibilities had been reassigned to Ms. Burns;
21  correct?
22      A.   I reminded him.
23      Q.   Now, you had some testimony about this
24  earlier today.
```

1015

Lowenthal - Cross

1    If you can take a look at Exhibit 3.
2    Turning to page 4, please.
3
4    MR. GIBSON:  Give him a second.  He
5    has to get the book.
6    THE WITNESS:  Okay.
7  BY MR. LICUL:
8    Q.    And the paragraph at the very bottom,
9  let me know when you get there.
10    A.    Okay.
11    Q.    "Mr. Ngo returned from his medical
12  leave on November 3rd, 2014, approximately four and
13  a half months since he last appeared for work in the
14  office.  It was at this point that Mr. Ngo was
15  advised that his supervisory responsibilities had
16  been reassigned and that Ms. Burns, who had been
17  acting as the sole head of the high-yield research
18  group during the entire time of Mr. Ngo's absence,
19  would continue in that regard."
20    Do you see that?
21    A.    Yes.
22    Q.    It's your testimony that that is a
23  mistake; correct?
24    A.    Yes, I think it's incomplete.  I think
25  that he was advised, but not for the first time.

1016

Lowenthal - Cross

1
2    Q.    You reviewed this before it was filed;
3  correct?
4    A.    I did.
5    Q.    And you reviewed it to make sure it
6  was accurate and, at that point, you didn't see that
7  it was not accurate; correct?
8    A.    I didn't see that it was incomplete.
9    Q.    Then you had a chance to take a look
10  at it again during your deposition; correct?
11    A.    I did.
12    Q.    And you didn't correct it then;
13  correct?
14    A.    Correct.
15    Q.    And then you reviewed your deposition
16  transcript; correct?
17    A.    Yes.
18    Q.    And you didn't catch the mistake then
19  either; correct?
20    A.    Was this in the transcript?
21    Q.    Well, your deposition testimony was.
22    A.    You're asking me if I caught this in
23  the transcript, and I don't think that's possible.
24    Q.    You testified that the answer was
25  accurate; correct?

1017

Lowenthal - Cross

1
2    A.    My transcript is correct and this is
3  incomplete.
4    Q.    This is incomplete.
5    A.    I reviewed them both.
6    Q.    Got you.
7    During that conversation on
8  November 4th -- my apologies.
9    You then have a conversation with
10  Mr. Ngo on November 4th, the second day he's back;
11  correct?
12    A.    Yes.
13    Q.    That's the tape-recorded conversation?
14    A.    Yes.
15    Q.    Take a look at Exhibit 86B.
16    A.    Okay.
17    Q.    That is the transcript of that
18  recorded call; right?
19    A.    Yes.
20    Q.    And you and Mr. Ngo had a conversation
21  during that recorded call about whether or not he
22  knew that he had been stripped of his supervisory
23  responsibilities; correct?
24    A.    Yes.  I'm not as familiar with this.
25  I've only seen portions of it.

1018

Lowenthal - Cross

1
2    Q.    So --
3    A.    Asking me based on my recollection,
4  not based on my review of the transcript.
5    Q.    Do you want to take a look at the
6  transcript?
7    A.    I don't think we all want to sit here
8  and have me read the whole thing.  I'm just letting
9  you know.
10    Q.    You're free to do that.  I just want
11  to ask you about --
12    A.    I'm not as familiar with it, is all
13  I'm letting you know.
14    Q.    I just want to ask you about a portion
15  of it.
16    On page 6 of the transcript, line 21,
17  you tell Mr. Ngo, "Colleen should have discussed it
18  with you."
19    Do you see that?
20    A.    Yes.
21    Q.    And that's referring to your decision
22  to strip Mr. Ngo of his supervisory
23  responsibilities; correct?
24    A.    I've got to read what's leading up to
25  that because I'm not actually sure --

1019

Lowenthal - Cross

1     Q.   Of course.  Take your time.
2     A.   -- what the context of the discussion
3  was at that point.
4        (Pause.)
5     A.   Okay.  What's the question?
6     Q.   What you're referring to there when
7  you say -- let me read it correctly, "Colleen should
8  have discussed it with you too," you're referring to
9  your decision to strip Mr. Ngo of his supervisory
10 responsibilities; correct?
11    A.   Yes.
12    Q.   And then you also tell Mr. Ngo that
13 when you realized he was going to be out longer than
14 three to four weeks, you made changes "because we
15 simply couldn't have that"; correct?
16    A.   Where do you see that?
17    Q.   Take a look at page 5, line 6 to 7.
18    A.   Okay.
19    Q.   Is that what you said to Mr. Ngo?
20    A.   Yes.
21    Q.   And so when Mr. Ngo went to California
22 for the birth of his daughter on June 20th of 2014,
23 he was cohead of the group; correct?
24    A.   Yes.

1020

Lowenthal - Cross

1     Q.   And when he returned on November 3rd,
2  2014, he was no longer cohead of the group; correct?
3     A.   Correct.
4     Q.   And the demotion became permanent;
5  correct?
6     A.   The removal of his supervisory
7  responsibilities was permanent, yes, but he remained
8  a high-yield research analyst in the group, and he
9  remained a managing director.
10    Q.   I want to draw --
11       MR. LICUL:  I mean, I have only a
12    couple more pages, so do we want to just do
13    that and then we can --
14       MR. GIBSON:  I can tell you right now
15    my redirect is short, so if you want to
16    squeeze through it, then -- unless you need a
17    break --
18       MR. LICUL:  I don't need a break.  I
19    just want to make sure no one has a biology
20    issue.
21       THE ARBITRATOR:  Does anyone wish for
22    a short break?
23       MR. GIBSON:  We're good.
24       THE ARBITRATOR:  Okay.  Silence is a

1021

Lowenthal - Cross

1  sanctity.
2  BY MR. LICUL:
3     Q.   I want to draw your attention to
4  Mr. Ngo's bonus for calendar year 2014.
5        You set that bonus number; right?
6     A.   Yes.
7     Q.   And that amount was paid in early
8  2015; correct?
9     A.   Yes.
10    Q.   About four months after Mr. Ngo
11 returned from leave?
12    A.   It reflected the December 31st period.
13 So that would be seven weeks after he returned.
14 It's the period that it covered.
15    Q.   When do you typically start deciding
16 how much to give in bonus amounts?
17    A.   The process begins in November,
18 December, goes through first half of January.
19    Q.   So the process would have started in
20 November, when Mr. Ngo returned from leave?
21    A.   After that point, mid November.
22    Q.   And you initially set Mr. Ngo's annual
23 bonus to $50,000; correct?
24    A.   I don't remember the progression.

1022

Lowenthal - Cross

1     Q.   Do you recall initially setting it at
2  50- and then reducing it to 40-?
3     A.   I don't.
4     Q.   Take a look at page 199 of your
5  deposition.  Okay.  On page 16 -- I'm sorry,
6  line 16.
7        Are you there?
8        MR. GIBSON:  Yeah.
9  BY MR. LICUL:
10    Q.   (Reading):
11       "QUESTION:  And who is it that
12    originally came up with the figure of
13    $50,000?
14       "ANSWER:  It would have been me.
15       "QUESTION:  And then you reduce it to
16    40,000.
17       "Do you see that?
18       "ANSWER:  Yes."
19       Was that the testimony you gave?
20    A.   Yes.
21    Q.   And take a look at Exhibit 18.
22       MR. GIBSON:  18?
23       MR. LICUL:  1-8, yes.
24       THE WITNESS:  Yes.

1023

Lowenthal - Cross

1  BY MR. LICUL:
2
3      Q.    That's an e-mail that you sent to
4  Albert Lowenthal where you are changing Mr. Ngo's
5  bonus from 50,000 to 40,000; is that right?
6      A.    Yes.
7      Q.    And then you eventually decide to
8  raise it to 100,000; correct?
9      A.    Yes.
10     Q.    And that was because Ms. Burns
11  advocated on Mr. Ngo's behalf; correct?
12     A.    Yes.
13     Q.    Other than Ms. Burns' advocacy, you
14  don't recall any of the other factors that you
15  considered when deciding this bonus; correct?
16     A.    The factors were the size of the bonus
17  pool and the performance of the business.  And those
18  are the factors that create the bonus pool that is
19  allocated to individuals.  So before you get to the
20  particulars of a person, you're dealing with the
21  constraints of the business.
22     Q.    Take a look at page 195 of your
23  transcript.
24           (Pause.)
25     A.    1-9-5?

1024

Lowenthal - Cross

1
2      Q.    Yes.
3      A.    Yes.  Okay.
4      Q.    Beginning on line 9:
5           "QUESTION:  Do you recall what factors
6      you considered in determining the amount of
7      that bonus which was in early 2015?
8           "ANSWER:  I would have to go back and
9      look at some information to recall my frame
10      of mind and thoughts at the time.  But it was
11      a long time ago, almost four years ago.  I
12      don't remember at the moment my thoughts on
13      that particular employee's bonus."
14           Did you give that testimony?
15     A.    I did.
16     Q.    And the $100,000 bonus that you
17  awarded Mr. Ngo for 2014 was significantly less than
18  the $270,000 that you had awarded him for 2013;
19  correct?
20     A.    Yes.
21     Q.    And, in fact, you had paid him a
22  $270,000 bonus for 2012; correct?
23     A.    Yes.
24     Q.    And the $100,000 bonus that you
25  awarded him for 2014 was less than any other

1025

Lowenthal - Cross

1  employee in the high-yield group; correct?
2
3      A.    Correct.
4      Q.    And you gave Ms. Burns $235,000;
5  correct?
6      A.    I'd have to reflect on that exhibit --
7      Q.    Does that sound right?
8      A.    That sounds right, sure.
9      Q.    You gave Ms. Burns more than Mr. Ngo
10  because she was now the supervisor of the group;
11  correct?
12     A.    That's not true.  I didn't say that.
13     Q.    Take a look at page 200 of your
14  transcript.
15           (Pause.)
16     A.    My recollection was that the amount of
17  work she had to put in to generate ideas and support
18  the sales staff for that year had been significantly
19  greater than in prior years.  So it was not for
20  supervising; it was for the amount of work it took
21  to support the business itself.
22     Q.    Are you on page 200?
23     A.    Yes.
24     Q.    Beginning on line 17:
25           "QUESTION:  Do you know what -- how

1026

Lowenthal - Cross

1
2      much you awarded Ms. Burns for an annual
3      bonus for calendar year 2014?
4           "ANSWER:  No
5           "QUESTION:  Was it more than $40,000?
6           "ANSWER:  Probably.
7           "QUESTION:  Why do you say 'probably'?
8           "ANSWER:  I gave her a raise that year
9      and she was working full year quite
10      diligently, so she probably got paid
11      something similar to what she had been paid
12      in the past.
13           "QUESTION:  And she was also now the
14      supervisor of the group; correct?"
15           There's an objection.
16           "ANSWER:  Yes."
17           Was that your testimony?
18     A.    That's here, yes, that's my testimony.
19     Q.    And the --
20     A.    Two separate points.  She worked very
21  diligently and she was also still a supervisor.
22  They're two different questions.
23     Q.    And you gave her $235,000 that year,
24  correct, for 2014?
25     A.    Yes.

1027

Lowenthal - Cross

1    Q.    Which was the same amount that you
2    gave her approximately the year prior?
3    A.    Sounds about right.
4    Q.    And you gave Mr. Sneeden $135,000;
5    correct?
6    A.    That sounds about right.
7    Q.    You gave Mr. Bhandary $125,000;
8    correct?
9    A.    Sounds correct.
10   Q.    Now, turning to Mr. Ngo's 2015 bonus,
11   you would have started deciding that bonus in late
12   2015; correct?
13   A.    His 2015 bonus paid in 2016 --
14   Q.    Let me do it again.  It was confusing.
15   A.    Yes.
16   Q.    His 2015 bonus was paid in early 2016;
17   correct?
18   A.    Yes.
19   Q.    But you would have started making
20   decisions about that bonus in late 2015, November,
21   December; correct?
22   A.    And into January, yes.
23   Q.    But that process would have started in
24   November or --

1028

Lowenthal - Cross

1    A.    Yes.
2    Q.    And you originally wanted to pay
3    Mr. Ngo $150,000; correct?
4    A.    I'd have to look at the documents.
5    Q.    Okay.
6    A.    I don't remember off the top of my
7    head all the years and numbers.
8    Q.    Let me ask you a different question.
9    Mr. Ngo worked the entire year of
10   2015; correct?
11   A.    Yes.
12   Q.    He didn't take any leave; right?
13   A.    2015, no.
14   Q.    Yes, he didn't take any leave.
15   So take a look at -- let me ask you
16   this question:  You don't recall whether you wanted
17   to give him $150,000 originally?  You don't recall
18   that?
19   A.    I don't recall the specifics of my
20   thought and mind-set.  At the time, I was thinking
21   about these issues, four years ago.  And if you show
22   me some information, I might be able to recall it.
23   Q.    Earlier you testified that you gave
24   Mr. Ngo $25,000 from Mr. Albano's bonus.

1029

Lowenthal - Cross

1    Do you recall testifying to that?
2    A.    Yes.
3    Q.    And Mr. Ngo's bonus for 2015 was
4    $175,000.
5    Do you recall testifying to that?
6    A.    Yes.
7    Q.    And so that means you originally --
8    Mr. Ngo's original bonus was set at 150-; correct?
9    A.    Yes.
10   Q.    And the additional $25,000 was given
11   to him again because Ms. Burns advocated on his
12   behalf; correct?
13   A.    Correct.
14   Q.    Now, you decided to terminate
15   Mr. Ngo's employment; correct?
16   A.    Yes.
17   Q.    And you weren't suspending his
18   employment; right?
19   A.    No.
20   Q.    You were terminating him; right?
21   A.    Yes.
22   Q.    You know the difference between the
23   two phrases?
24   A.    Yes.

1030

Lowenthal - Cross

1    Q.    And you were the one that decided to
2    characterize it as a head count reduction; correct?
3    A.    Yes, in consultation with HR and
4    legal, that's it.  I don't make those decisions in
5    isolation.
6    Q.    And Mr. Ngo was the only -- was the
7    only research analyst that was fired; correct?
8    A.    I didn't -- I believe in equities we
9    fired a dozen or so people.
10   Q.    In fixed income?
11   A.    In fixed income, yes.
12   Q.    He was the only one; right?
13   A.    I believe so.
14   Q.    At that time, you were the head of
15   fixed income; correct?
16   A.    Yes.
17   Q.    Not equities; right?
18   A.    That's right.
19   Q.    And you have not let anyone else in
20   high-yield research go after Mr. Ngo's departure;
21   isn't that right?
22   A.    Since then have we?  I don't know.
23   Q.    Take a look at page 216 of your
24   deposition.

1031

Lowenthal - Cross

1    A.   I haven't run this department since
2    the end of 2016.
3    Q.   That's a fair point.
4    A.   Things may have changed.
5         MR. GIBSON:  What was that page
6    number?
7         MR. LICUL:  216.
8    BY MR. LICUL:
9    Q.   From the period up until the time you
10   stopped running the department, you were not -- you
11   did not let any other fixed income high-yield
12   research analyst go; correct?
13   A.   No.
14   Q.   Am I correct?
15   A.   Yes.
16   Q.   So then you don't have to look at it.
17   I'm sorry for the confusion.
18        Take a look at Exhibit 36.  It's a
19   long chart with small numbers.
20   A.   Yes.
21   Q.   Is that a list of everyone that
22   Oppenheimer has let go since January of 2014?
23   A.   I don't know if it's comprehensive of
24   the entire firm, but it is certainly a list that

1032

Lowenthal - Cross

1    reflects people let go at Oppenheimer.
2    Q.   Did you see it being as incomplete in
3    some way?
4    A.   I just don't know -- there's no way
5    for me to verify if it is or isn't.
6    Q.   Take a look at the very last page of
7    that chart --
8    A.   Okay.
9    Q.   -- page 1212.
10        Do you see there's one name that's not
11   blacked out there?  It's Hoai Ngo?
12   A.   Yes.
13   Q.   And Mr. Ngo -- it shows that Mr. Ngo
14   was let go on June 30, 2016; correct?
15        Do you see that?
16   A.   Yes.
17   Q.   And there were a bunch of other people
18   let go on that same day?
19   A.   Yes.
20   Q.   Now, where it says, "Reporting
21   location," Column E, do you see that?
22   A.   Yes.
23   Q.   RD is the reporting location for
24   Mr. Ngo; right?

1033

Lowenthal - Cross

1    A.   Yes.
2    Q.   And that is high-yield research?
3    A.   Yes.
4    Q.   And the other people who were let go
5    at the same time were Reporting Location 65.
6         Do you see that?
7    A.   Yes.
8    Q.   That was not high-yield research;
9    right?
10   A.   That was the mortgage group.
11   Q.   And the reason those folks were let go
12   was because Oppenheimer sold the business?
13   A.   That's a more complicated longer story
14   than that, but they were in the business of
15   mortgages.  We were disbanding, along with other
16   restructuring efforts, to get rid of that business.
17   It wasn't actually sold.  MSRs that were sold, which
18   isn't a legal entity.  I don't know how much you
19   want to go into.  So people were let go.
20   Q.   You were getting out of that business?
21   A.   Yes.
22   Q.   And some of those people -- you were
23   waiting for some of those people to find jobs at the
24   new location, whether it was some --

1034

Lowenthal - Cross

1    A.   It was the option of the employer.
2    Q.   Okay.  And everyone else let go at
3    that time was in this mortgage group; correct?  On
4    June 30, 2016; right?
5    A.   64 is a trader.  And that's a
6    department --
7    Q.   Where do you see 64?
8    A.   That's the last one.
9    Q.   I'm asking about the June 30th, 2016,
10   date.  If you look at the left-hand side --
11   A.   I don't know what "CF" is.
12   Q.   If you look at the -- you don't know
13   what "CF" is.  Okay.
14   A.   That's on June 30th as well.
15   Q.   Now, Mr. Ngo had no responsibilities
16   related to the mortgage group; correct?
17   A.   No.
18   Q.   And if you take a look at that chart,
19   there's no one else who was let go from January 2014
20   up through December 2016 who was also in high-yield,
21   correct, high-yield research group?
22   A.   Department TG, in April of 2015,
23   that's a high-yield group.
24   Q.   Is that high-yield research?

1035

Lowenthal - Redirect

2 A. That's the high-yield sales and
3 trading group. It's the same business.
4 There's one in the high-yield
5 business.
6 Q. And that's Mr. Ngo?
7 A. No. Mr. Ngo and there's one other in
8 the high-yield business.
9 Q. But that person is not a research
10 analyst; correct?
11 A. No.
12 MR. LICUL: I have -- I have no
13 further questions.
14 MR. GIBSON: Take about five minutes?
15 MR. LICUL: Yes.
16 MR. GIBSON: My redirect will be very
17 short, if at all.
18 (Recess from the record.)
19 REDIRECT EXAMINATION
20 BY MR. GIBSON:
21 Q. I just have a few additional
22 questions, Mr. Lowenthal.
23 I believe you testified on cross-exam
24 that if someone in human resources had told you that
25 an employee was entitled to an FMLA leave, that you

1036

Lowenthal - Redirect

2 would accept that representation?
3 A. Yes.
4 Q. And if that employee did, in fact,
5 come to you and say, I would like to take an FMLA
6 leave, what would you tell them to do?
7 A. Fill out the paperwork, send it in.
8 Q. And I'm happy to bring you the exhibit
9 again if you think you need it, but do you recall
10 giving some testimony about a performance evaluation
11 that Mr. Morgan did for both Ms. Burns and Mr. Ngo?
12 I believe in it was 2010.
13 A. Yes.
14 Q. Or early 2011. Does that sound about
15 right?
16 A. It was 2010, yes.
17 Q. We saw in there some positive feedback
18 from the sales force with regard to Mr. Ngo?
19 A. Yes.
20 Q. Is that consistent with the feedback
21 that you were receiving from the sales force in 2015
22 and 2016?
23 A. No.
24 Q. And, also, in that particular
25 performance evaluation, there was also a reference

1037

Lowenthal - Redirect

1 to Mr. Ngo's strengths with regard to --
2 particularly paper and packaging?
3
4 A. Uh-huh.
5 Q. Do you recall that?
6 A. Yes.
7 Q. Was paper and packaging a significant
8 business for Oppenheimer in 2015 and 2016?
9 A. No. We were getting out of that. We
10 were getting out of chemicals. We were getting out
11 of paper and packaging, metals. Those legacy
12 sectors related to the CIBC acquisition were no
13 longer relevant to the ongoing business of
14 Oppenheimer's high-yield department.
15 Q. Can you take a look at -- Mr. Licul
16 showed you Exhibit 24.
17 A. Yes.
18 Q. And if I understood correctly, these
19 were three -- I'm sorry. I'm going a little fast.
20 These are -- if I recall correctly,
21 these were three PCN forms for Ms. Burns, Mr. Ngo
22 and Mr. Sneeden following Mr. Morgan's resignation?
23 A. Yes.
24 Q. And if you look at the third one, for
25 Mr. Sneeden --

1038

Lowenthal - Redirect

1 A. Yes.
2 Q. -- do you see in the "Notes and
3 Explanation" section, it says, "Title changed to
4 senior director"?
5 A. Yes.
6 Q. And then it also provides for a salary
7 increase?
8 A. Yes.
9 Q. And then when you look for Ms. Burns
10 and Mr. Ngo's PCNs, do you see any reference to a
11 title change?
12 A. No.
13 Q. Does that surprise you?
14 A. No.
15 Q. Why not?
16 A. Because their titles did not change,
17 not their corporate titles. They were -- cohead of
18 a group isn't -- is a -- it's not a corporate title.
19 It's a distinction. It's a meaningless title.
20 You're either a managing director, an executive
21 director, a senior director, a director, an
22 associate or an analyst. Those are the official
23 titles. Head is not a title.
24 Q. Am I correct that from the time that
25

1039

Lowenthal - Redirect

1  he left the office for the birth of his child in
2  June of 2014 through his termination in July of
3  2016, Mr. Ngo's corporate title did not change?
4      A.   That's right.
5      Q.   Again, I'm happy to point you to the
6  exhibit if you need it, but do you recall giving
7  some testimony about Ms. Johnson's time out of the
8  office for the birth of her child?
9      A.   Yes.
10     Q.   And do you recall Mr. Licul asking you
11 some questions about the dates that were on an FMLA
12 application that Ms. Johnson filled out?
13     A.   Yes.
14     Q.   Did you ever see an FMLA application
15 that was filled out by Mr. Ngo in connection with
16 his time out of the office --
17     A.   No.
18     Q.   -- for the birth of his child?
19     A.   No.
20     Q.   In fact, you were also asked some
21 questions about the fact that Ms. Johnson was paid
22 her commission or a portion of her commission during
23 the time that she was out of the office for the
24 birth of her child?

1040

Lowenthal - Redirect

1      A.   Yes.
2      Q.   Was Mr. Ngo being paid for the time
3  that he was out of the office for the birth of his
4  child?
5      A.   Yes.
6      Q.   Do you feel that Mr. Ngo was being
7  treated any differently than Ms. Johnson in that
8  regard?
9      A.   No.
10     Q.   If you could take a look at
11 Exhibit 52, please.
12         THE ARBITRATOR:  Just to clarify that,
13     I think you testified that your understanding
14     of what Mr. Ngo was going to do was that he
15     was going to be working from California and
16     that you at some point indicated that it was
17     because of that that you kept him on payroll,
18     he was only going to be away for a limited --
19         (Reporter seeks clarification.)
20         THE ARBITRATOR:  As far as you know,
21     was Ms. Johnson expected to do any work while
22     she was on leave?
23         THE WITNESS:  No.

1041

Lowenthal - Redirect

1  BY MR. GIBSON:
2      Q.   If you could take a look at
3  Exhibit 52.
4      A.   Yes.
5      Q.   I think Mr. Licul asked you -- may
6  have asked you a question about this.
7          And this is a July 15th, 2014, e-mail
8  from Ms. Denys to you?
9      Q.   And I believe Ms. Licul -- pardon me,
10 Mr. Licul said that this was Ms. Denys telling you
11 for the second time that Mr. Ngo could take an FMLA
12 leave?
13     A.   Yes.
14     Q.   And do you see, in the first sentence
15 of Ms. Denys' sen- -- sorry -- e-mail, "Hoai can
16 apply for an unpaid leave under the FMLA"?
17     A.   Yes.
18     Q.   To your knowledge, did that
19 application ever take place?
20     A.   No.
21     Q.   Now, you were also shown an e-mail
22 from Ms. Bridges that suggested that Oppenheimer
23 could treat Mr. Ngo as being on FMLA leave as of

1042

Lowenthal - Redirect

1  July 18th.
2          Do you recall that?
3      A.   Yes.
4      Q.   I'd like you to take a look at
5  Exhibit 59, please.
6      A.   Yes.
7      Q.   And if you see, in the middle, there's
8  an e-mail from Ms. Denys to Ms. Bridges and Kristen
9  Decker?
10     A.   Yes.
11     Q.   And it's dated August 18th?
12     A.   Yes.
13     Q.   And if I represented to you that was
14 the same day as Ms. Bridges' e-mail that we looked
15 at earlier, would that make sense to you?
16     A.   Yes.
17     Q.   Here Ms. Denys says to Ms. Bridges,
18 "Did we know about this?  I know we advised that we
19 do not have a paid paternity leave, but I was not
20 aware that Rob allowed Ngo to do this.  Looks like
21 we will have to give him 12 weeks now for his
22 medical condition since we never had him take leave
23 as of yet."
24         And looking at this e-mail now,

1043

Lowenthal - Redirect

1 Mr. Lowenthal, do you have any understanding as to
2 whether, as of the date of this e-mail, Oppenheimer
3 had already been treating Mr. Ngo as if he was on an
4 FMLA leave?
5     A.    We were not treating him as though he
6 was on an FMLA leave.  He was continuing to get
7 paid.
8     Q.    And is it your testimony that the FMLA
9 provides for 12 weeks of job protection?
10     A.    Yes.
11     Q.    And we see here Ms. Denys says, "Looks
12 like we will have to give him 12 weeks from now" --
13 I'm sorry -- "12 weeks now for his medical
14 condition"?
15     A.    Yes.
16     Q.    You also testified -- by the way, am I
17 correct that Ms. Denys was Ms. Bridges' supervisor?
18     A.    Yes.
19     Q.    And the director of Oppenheimer's
20 human resources department?
21     A.    Yes.
22     Q.    You also gave a little bit of
23 testimony about a raise that Ms. Burns received, I
24 believe in October of 2014.

1044

Lowenthal - Redirect

1     A.    Yes.
2     Q.    How did that raise come about?
3     A.    Colleen approached me and requested
4 that I raise her salary.  We had some discussion
5 about it, and I went ahead and gave her a raise for
6 all of the additional work she was doing related to
7 supporting clients and the activities of supporting
8 the sales force.
9     Q.    And, finally, Mr. Licul asked you some
10 questions about a chart that reflected job
11 eliminations at Oppenheimer.
12         Do you recall that?
13     A.    Yes.
14     Q.    And do you recall Mr. Licul asked you
15 about a group of other job eliminations that took
16 place on June 30th of 2016?
17     A.    Yes.
18     Q.    And it related to a mortgage business
19 that Oppenheimer was involved in?
20     A.    Yes.
21     Q.    And I believe your testimony was that
22 Oppenheimer was getting out of that business?
23     A.    Yes.
24     Q.    How important was chemicals, and paper

1045

Lowenthal - Redirect

1 and packaging to Oppenheimer in June of 2016?
2     A.    Every other business division had
3 gotten out of it already, and it was no longer -- it
4 was a legacy effort from CIBC, and it was no longer
5 a part of our current strategy at the time or future
6 strategy.
7     Q.    And -- I'm sorry.
8     A.    We were returning to our core
9 competencies of technology, health care, consumer.
10 So we were aligning ourselves back with our
11 traditional sector coverage.
12     Q.    Am I correct that you testified
13 earlier that Oppenheimer has not hired any research
14 analyst to cover any of those industry, chemicals,
15 paper and paging, or mining, since Mr. Ngo's
16 termination?
17     A.    That's correct.
18         MR. GIBSON:  I have no further
19 questions.
20         THE ARBITRATOR:  Okay.  Then I guess
21 we're done.
22         You're free to go.
23         MR. GIBSON:  Scheduling for
24 tomorrow -- so the witnesses that we will be

1046

Lowenthal - Redirect

1 calling are -- Jane Ross will be here in
2 person.  Jaime Bridges, we've heard about
3 today, will be testifying by telephone from
4 Michigan.  And we are also trying to line up
5 Lenore Denys, also to testify from Michigan.
6 I'm trying to lock Ms. Denys into 9:30
7 tomorrow so we have some order of appearance.
8         THE ARBITRATOR:  Do you have any
9 contemplation about the likelihood of a
10 rebuttal case?
11         MR. LICUL:  If we -- I guess if we do,
12 it would be very short and will likely just
13 be Mr. Ngo.  But don't quote me.  But, yes, I
14 see no reason why we can't end it tomorrow.
15         THE ARBITRATOR:  Okay.  I promise not
16 to quote you.  The court reporter can't
17 promise that, but --
18         MR. LICUL:  I was going to say --
19         MR. GIBSON:  I can tell you my
20 examination of Ms. Denys is maybe a half hour
21 and Ms. Jaime Bridges maybe a little longer.
22         THE ARBITRATOR:  Okay.
23         MR. GIBSON:  Thank you very much.
24         THE ARBITRATOR:  We'll reconvene at

1047

1     Lowenthal - Redirect

2     9:30 tomorrow.

3          (The hearing adjourned.  The time is

4     5:04 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1048

1

2          C E R T I F I C A T E

3

4     STATE OF NEW YORK  )

5                  ss:

6     COUNTY OF NEW YORK )

7

8          I, Eileen Mulvenna, CSR/RMR/CRR, and

9     Notary Public within and for the State of New York,

10    do hereby certify that the foregoing proceedings

11    were taken before me on March 6, 2019;

12          That the within transcript is a true

13    record of said proceedings;

14          That I am not connected by blood or

15    marriage with any of the parties herein nor

16    interested directly or indirectly in the matter

17    in controversy, nor am I in the employ of any

18    of the counsel.

19          IN WITNESS WHEREOF, I have hereunto  set my

20    hand this 17th day of March, 2019.

21          _____

22          Eileen Mulvenna, CSR/RMR/CRR

23

24

25

1049

| $ | 1 |
|---|---|

**$100,000** [13] - 772:22, 773:15, 773:22, 775:9, 775:14, 779:14, 903:3, 903:5, 906:5, 964:15, 965:7, 1024:16, 1024:24
**$125,000** [3] - 778:19, 778:24, 1027:8
**$135,000** [3] - 918:19, 918:22, 1027:5
**$150,000** [11] - 805:13, 806:18, 919:11, 953:12, 953:24, 957:6, 963:25, 964:4, 964:11, 1028:4, 1028:18
**$165,000** [1] - 785:9
**$170,000** [1] - 953:25
**$175,000** [17] - 781:3, 781:5, 781:17, 781:22, 782:4, 805:14, 807:7, 908:18, 916:12, 916:19, 919:15, 919:20, 919:23, 920:2, 920:7, 1007:25, 1029:5
**$200,000** [2] - 783:18, 783:24
**$218,750** [2] - 958:8, 962:10
**$225,000** [1] - 954:4
**$235,000** [10] - 777:9, 777:16, 782:20, 782:25, 783:4, 812:24, 813:7, 917:8, 1025:4, 1026:23
**$25,000** [3] - 786:9, 1028:25, 1029:11
**$270,000** [2] - 1024:18, 1024:22
**$270,833** [3] - 958:4, 959:6, 960:25
**$28** [2] - 904:13, 918:3
**$30** [1] - 926:17
**$35,000** [1] - 784:3
**$40** [1] - 904:20
**$40,000** [1] - 1026:5
**$50,000** [2] - 1021:24, 1022:14
**$6,250** [1] - 806:9
**$60,000** [1] - 773:12
**$7,291.67** [1] - 807:3

**'**

**'12** [1] - 963:12
**'14** [2] - 869:23, 904:11
**'15** [2] - 904:11, 931:3
**'leave** [1] - 938:24
**'leave'** [1] - 939:6
**'probably'** [1] - 1026:7
**'time** [1] - 991:9

**1** [3] - 922:22, 968:14, 969:10
**1-8** [1] - 1022:24
**1-9-5** [1] - 1023:25
**1/9** [2] - 970:11, 970:13
**10** [1] - 894:14
**100** [1] - 860:4
**100,000** [1] - 1023:8
**10017** [1] - 728:7
**102** [3] - 740:18, 808:4, 808:5
**1035** [1] - 730:13
**108** [1] - 918:3
**10th** [1] - 1002:21
**11** [4] - 780:21, 887:15, 939:3, 961:24
**111** [1] - 956:9
**112** [2] - 880:12, 927:20
**113** [2] - 839:14, 978:16
**1130** [1] - 728:16
**114** [3] - 754:22, 848:5, 855:16
**116** [1] - 912:4
**11E** [2] - 960:10, 960:12
**11H** [3] - 772:3, 772:7, 772:12
**11I** [2] - 780:22
**12** [24] - 744:24, 805:17, 805:19, 839:21, 840:10, 840:21, 842:25, 865:8, 887:20, 893:10, 893:14, 918:15, 967:5, 967:9, 969:13, 971:5, 972:10, 990:21, 991:19, 1002:4, 1042:22, 1043:10, 1043:13, 1043:14
**121** [3] - 976:5, 976:8, 976:9
**1212** [1] - 1032:10
**1215** [2] - 779:6, 918:16
**1216** [1] - 778:13
**122** [1] - 977:7
**1229** [1] - 953:11
**125** [3] - 746:5, 980:14, 980:19
**1254** [2] - 948:17, 949:4
**1258** [3] - 948:23, 950:22, 951:19
**128** [1] - 751:12
**129** [1] - 981:23
**12B** [3] - 961:6, 961:11, 961:20
**12D** [1] - 777:4
**12F** [1] - 783:7
**12th** [3] - 974:10, 979:4, 1012:4
**13** [9] - 755:5, 756:13, 778:6, 899:20, 900:16,

918:6, 918:9, 977:8, 1005:13
**131** [1] - 984:15
**1310** [1] - 946:24
**133** [1] - 986:2
**135** [2] - 779:8, 986:20
**135,000** [2] - 779:8, 919:7
**136** [1] - 784:21
**137** [4] - 784:22, 784:23, 784:24, 785:3
**138** [2] - 810:17, 810:20
**13th** [15] - 769:6, 798:20, 799:9, 848:16, 848:18, 848:21, 848:22, 849:2, 877:22, 972:7, 987:21, 988:12, 989:15, 990:14, 997:14
**14** [5] - 826:3, 915:11, 956:15, 970:4, 970:15
**140** [1] - 987:9
**1425025377** [1] - 727:2
**145** [1] - 991:4
**14th** [3] - 863:20, 989:14, 991:14
**15** [9] - 738:14, 739:9, 749:2, 806:24, 865:13, 893:21, 895:15, 991:7, 1009:8
**150** [2] - 1007:24, 1029:9
**150,000** [1] - 853:17
**150-** [1] - 853:16
**15th** [1] - 1041:8
**16** [9] - 731:17, 731:19, 746:15, 802:19, 856:9, 895:20, 981:23, 1022:6, 1022:7
**1612** [1] - 967:16, 967:22
**1615** [1] - 969:19
**1616** [1] - 970:2
**1619** [1] - 970:17
**165-** [1] - 784:16
**16th** [4] - 856:24, 862:21, 994:15, 1007:20
**17** [4] - 776:14, 840:22, 1003:22, 1025:24
**170-** [1] - 784:11
**17th** [2] - 862:22, 1048:20
**18** [10] - 803:20, 860:18, 865:25, 878:21, 879:3, 881:6, 899:3, 965:3, 1022:22, 1022:23
**182** [1] - 1009:4
**184** [2] - 1010:8, 1013:16
**18th** [18] - 776:8, 802:13, 802:15, 803:16, 871:6, 887:14, 985:13, 992:12, 1000:6, 1000:13, 1001:5, 1001:6, 1001:22, 1002:6, 1002:11, 1002:23, 1042:2, 1042:12
**19** [3] - 825:13, 896:7, 976:11

**195** [1] - 1023:22
**199** [1] - 1022:5
**1998** [1] - 818:19
**1999** [1] - 818:16
**1:55** [1] - 892:3

| 2 |
|---|

**2** [3] - 892:20, 893:20, 967:21
**2.0** [1] - 922:23
**20** [13] - 776:13, 819:15, 869:23, 881:3, 888:2, 888:3, 955:7, 955:9, 955:12, 955:14, 957:16, 957:18, 1013:19
**20-week** [1] - 888:6
**200** [2] - 1025:13, 1025:22
**200,000** [1] - 783:21
**2000** [1] - 732:21
**2003** [1] - 732:23
**2007** [4] - 795:24, 818:5, 830:20, 935:18
**2008** [1] - 829:2
**2009** [3] - 827:21, 828:5, 926:19
**2010** [11] - 827:20, 926:19, 946:6, 947:7, 947:18, 951:6, 951:10, 952:14, 953:6, 1036:12, 1036:16
**2011** [5] - 954:13, 955:17, 957:10, 963:12, 1036:14
**2012** [8] - 831:24, 924:14, 955:22, 957:10, 961:4, 962:13, 962:17, 1024:22
**2013** [28] - 735:14, 736:7, 737:5, 797:13, 797:16, 797:20, 819:25, 822:5, 822:19, 824:12, 831:24, 832:2, 833:19, 833:24, 920:17, 958:4, 958:8, 959:6, 960:14, 960:22, 961:18, 962:7, 962:19, 965:3, 1004:24, 1005:5, 1005:15, 1024:18
**2014** [114] - 739:20, 740:9, 743:2, 743:7, 745:8, 746:15, 749:8, 756:13, 767:6, 767:23, 771:11, 772:17, 773:8, 773:22, 775:10, 775:15, 775:20, 775:23, 776:5, 776:9, 776:13, 776:14, 777:2, 777:7, 777:17, 778:4, 778:15, 778:24, 779:3, 779:10, 781:12, 782:22, 784:4, 786:6, 787:24, 788:7, 788:20, 788:24, 798:12, 806:6, 806:24, 807:11, 807:21, 811:11, 812:8, 812:25, 814:9, 814:20,

1050

829:24, 836:19, 839:21,
842:15, 846:7, 848:16,
853:15, 854:3, 854:7,
856:10, 859:18, 862:22,
863:13, 865:3, 865:13,
865:25, 870:7, 874:13,
879:3, 881:3, 881:6, 883:18,
885:10, 887:14, 888:2,
894:4, 896:4, 899:17,
901:18, 901:21, 901:25,
903:2, 903:5, 906:7, 906:18,
907:17, 915:11, 918:23,
920:4, 921:21, 921:24,
922:24, 923:22, 927:9,
927:13, 931:3, 1005:18,
1007:6, 1007:20, 1011:4,
1013:9, 1015:12, 1019:23,
1020:3, 1021:5, 1024:17,
1024:25, 1026:3, 1026:24,
1031:23, 1034:20, 1039:3,
1041:8, 1043:25

**2015** [63] - 740:24, 771:15,
778:24, 779:7, 779:22,
779:24, 780:9, 780:16,
781:2, 789:7, 813:3, 813:6,
853:21, 854:3, 902:6, 908:3,
908:10, 909:9, 909:10,
911:12, 916:13, 917:3,
917:12, 917:17, 918:16,
918:23, 918:24, 919:7,
919:16, 919:20, 920:3,
920:24, 921:11, 921:20,
921:24, 923:2, 923:6,
923:20, 923:25, 965:24,
966:16, 966:17, 966:25,
968:10, 968:14, 969:7,
969:11, 969:17, 970:4,
970:23, 1021:9, 1024:7,
1027:11, 1027:13, 1027:14,
1027:17, 1027:21, 1028:11,
1028:14, 1029:4, 1034:23,
1036:21, 1037:8

**2016** [46] - 734:4, 780:19,
783:25, 786:21, 789:8,
791:18, 791:24, 813:10,
819:25, 824:13, 825:21,
826:3, 833:20, 833:24,
853:24, 854:3, 883:6,
908:14, 912:8, 918:23,
919:11, 920:25, 923:18,
923:24, 924:6, 924:14,
925:11, 925:12, 927:23,
931:7, 931:10, 931:13,
935:18, 1027:14, 1027:17,
1031:3, 1032:15, 1034:5,
1034:10, 1034:21, 1036:22,
1037:8, 1039:4, 1044:17,
1045:2

**2017** [2] - 783:14, 784:8

**2018** [1] - 784:12, 785:11,
804:19

**2019** [3] - 727:16, 1048:11,

1048:20

**20th** [8] - 775:20, 843:20,
843:25, 846:19, 990:11,
990:19, 990:20, 1019:23

**21** [3] - 896:25, 941:10,
1018:16

**212.403.7311** [1] - 728:8

**212.404.8726** [1] - 728:18

**216** [2] - 1030:24, 1031:8

**21st** [4] - 767:6, 767:23,
803:6, 874:13

**22** [1] - 986:20

**230** [1] - 728:16

**235** [1] - 782:22

**235-** [1] - 777:3

**24** [11] - 731:17, 731:20,
806:14, 806:18, 807:7,
811:11, 818:9, 938:20,
964:18, 964:20, 1037:16

**25** [3] - 970:23, 980:19,
986:5

**25K** [1] - 912:16

**25th** [13] - 751:19, 756:10,
763:2, 769:8, 798:22,
804:21, 863:23, 877:25,
990:14, 990:19, 990:20,
993:21, 1007:8

**26** [1] - 806:14

**26th** [2] - 898:2, 900:19

**278** [1] - 958:4

**280** [1] - 811:4

**282** [1] - 811:4

**29** [1] - 912:8

**29th** [1] - 912:21

**2Q** [2] - 759:5, 759:7

---

**3** [15] - 727:14, 803:22,
818:9, 839:25, 859:4,
859:18, 892:25, 894:13,
942:6, 943:22, 943:23,
943:24, 944:2, 954:17,
1015:2

**30** [6] - 806:6, 822:4, 883:5,
907:7, 1032:15, 1034:5

**30th** [7] - 786:22, 902:16,
925:12, 927:23, 1034:10,
1034:15, 1044:17

**31** [7] - 938:17, 946:14,
946:20, 946:23, 952:22,
952:24, 960:22

**3110** [2] - 877:15, 996:8

**31st** [5] - 884:23, 960:13,
961:18, 962:7, 1021:13

**32** [5] - 939:2, 952:18,
952:23, 953:16, 953:18

**33** [4] - 914:25, 952:25,
953:2, 953:6

**331** [1] - 821:24

---

**34** [1] - 947:23

**342** [1] - 996:9

**36** [1] - 1031:19

**3rd** [14] - 775:23, 776:9,
807:21, 884:21, 887:11,
887:14, 888:2, 901:18,
971:21, 972:2, 1011:21,
1014:11, 1015:12, 1020:2

---

# 4

**4** [7] - 859:12, 897:4, 897:6,
897:11, 898:15, 899:19,
1015:3

**4/1/2015** [1] - 968:13

**40** [1] - 1022:3

**40,000** [4] - 772:24, 773:4,
1022:17, 1023:5

**45** [10] - 803:10, 803:13,
860:18, 865:19, 992:13,
995:24, 996:16, 997:3,
997:18, 998:21

**46** [1] - 942:2

**48** [2] - 878:15, 878:22

**491** [1] - 921:15

**4th** [3] - 887:11, 1017:8,
1017:10

---

# 5

**5** [6] - 739:9, 748:25,
897:11, 900:14, 984:19,
1019:18

**5-2** [1] - 863:10

**50** [1] - 1022:3

**50,000** [1] - 1023:5

**500** [1] - 836:25

**51** [2] - 988:3, 988:4

**52** [5] - 863:6, 989:2,
991:14, 1040:12, 1041:4

**53** [1] - 818:9

**54** [1] - 856:3

**55** [3] - 818:9, 995:12,
995:15

**56** [7] - 766:23, 767:10,
800:12, 800:15, 804:5,
874:8, 999:21

**565** [1] - 728:6

**58** [1] - 878:23

**59** [1] - 1042:6

**5:04** [1] - 1047:4

---

# 6

**6** [6] - 727:16, 783:14,
898:15, 1018:16, 1019:18,
1048:11

**6,250** [1] - 806:18

**6-0** [1] - 1000:22

---

**60** [1] - 1000:21

**60,000** [3] - 772:24, 773:6,
774:16

**60-** [1] - 775:6

**63** [1] - 731:17

**64** [2] - 1034:6, 1034:8

**65** [1] - 1033:6

**68** [3] - 944:12, 945:4,
945:5

---

# 7

**7** [6] - 731:17, 818:9,
944:16, 945:7, 945:22,
1019:18

**7,291.67** [1] - 807:7

**7-2** [1] - 1010:23

**7.6** [1] - 922:21

**71** [1] - 886:13

**72** [3] - 883:13, 1008:17,
1010:17

**73** [1] - 886:21

**731** [1] - 730:6

**75** [1] - 930:2

**77.8** [1] - 922:24

**79** [2] - 818:9, 967:4

**795** [1] - 730:7

---

# 8

**8** [6] - 805:23, 966:25,
968:10, 969:7, 969:17,
987:10

**8.8** [1] - 922:23

**80** [1] - 930:2

**81** [1] - 941:9

**814** [1] - 730:8

**817** [1] - 730:11

**83** [2] - 799:24, 815:9

**848** [1] - 961:13

**85** [3] - 811:25, 867:9,
873:7

**86B** [2] - 892:10, 1017:15

**893** [4] - 805:18, 805:24,
805:25, 806:5

**894** [1] - 806:21

---

# 9

**9** [9] - 821:7, 883:18,
885:10, 955:8, 970:16,
1010:11, 1011:4, 1013:9,
1024:4

**9-0** [1] - 921:7

**90** [1] - 921:6

**91** [1] - 923:13

**928.3** [1] - 922:21

**935** [1] - 730:12

**9:22** [1] - 988:15

**9:30** [2] - 1046:7, 1047:2
**9th** [2] - 728:6, 886:25

# A

**abiding** [2] - 852:4, 852:6
**ability** [2] - 951:16, 952:11
**able** [6] - 844:8, 868:16, 879:15, 884:20, 913:15, 1028:23
**absence** [37] - 743:8, 748:12, 757:9, 757:16, 757:21, 757:25, 760:7, 760:9, 761:17, 775:16, 788:23, 825:2, 838:3, 841:23, 842:2, 842:20, 843:5, 843:11, 845:6, 845:8, 845:12, 845:17, 849:23, 857:25, 859:25, 860:24, 861:7, 861:18, 866:21, 880:4, 890:25, 900:19, 900:21, 906:11, 927:13, 934:7, 1015:18
**absent** [1] - 862:13
**absorb** [1] - 861:2
**abused** [1] - 891:4
**AC** [1] - 747:5
**accept** [2] - 936:18, 1036:2
**access** [4] - 830:22, 858:25, 900:4, 982:24
**accommodate** [2] - 845:4, 870:2
**accommodating** [3] - 868:23, 885:15, 927:3
**accommodation** [6] - 844:18, 846:12, 870:6, 900:25, 901:7, 990:8
**accommodations** [4] - 864:20, 867:8, 868:13, 983:5
**According** [1] - 811:21
**according** [2] - 803:13, 924:12
**account** [4] - 803:15, 910:6, 913:6, 920:3
**accounts** [2] - 913:2, 934:4
**accumulate** [1] - 901:8
**accuracy** [1] - 959:17
**accurate** [16] - 810:11, 812:6, 860:5, 864:17, 887:15, 940:19, 941:8, 955:20, 958:22, 958:24, 958:25, 1009:19, 1009:25, 1016:6, 1016:7, 1016:25
**acknowledged** [1] - 773:25
**acknowledgment** [2] - 850:20, 871:17
**acquired** [3] - 733:2, 830:2, 943:6
**acquisition** [6] - 828:25, 829:7, 829:8, 830:3, 900:2, 1037:12

**act** [1] - 996:20
**Act** [2] - 871:16, 979:22
**Act)** [1] - 865:7
**acting** [3] - 857:14, 859:23, 1015:17
**active** [9] - 889:12, 904:9, 904:11, 904:12, 905:22, 907:9, 907:12, 917:20, 1004:13
**actively** [3] - 1004:23, 1006:10, 1006:15
**activities** [1] - 1044:8
**activity** [1] - 917:22
**actual** [1] - 749:4
**add** [2] - 738:13, 784:18
**addition** [4] - 828:17, 974:5, 977:17, 979:24
**additional** [13] - 775:6, 801:7, 844:2, 849:5, 850:2, 869:21, 913:15, 985:17, 986:9, 987:15, 1029:11, 1035:21, 1044:7
**address** [1] - 858:24
**addressed** [2] - 871:22
**adequately** [1] - 862:14
**adjourned** [1] - 1047:3
**adjusting** [1] - 931:16
**adjustments** [1] - 914:10
**administrative** [3] - 874:7, 877:13, 996:15
**administrator** [2] - 996:22, 996:24
**admission** [1] - 729:3
**admits** [1] - 955:13
**adopting** [2] - 837:11, 974:14
**advance** [1] - 1012:10
**advice** [1] - 905:15
**advise** [1] - 816:7
**advised** [6] - 859:21, 864:5, 1014:20, 1015:15, 1015:25, 1042:19
**advising** [1] - 891:8
**advocacy** [1] - 1023:13
**advocated** [2] - 1023:11, 1029:12
**affect** [1] - 838:23
**afternoon** [4] - 817:10, 857:4, 935:4, 935:5
**afterwards** [1] - 763:9
**agencies** [1] - 820:18
**aggregated** [1] - 809:3
**ago** [8] - 732:8, 789:5, 794:11, 865:21, 980:16, 1024:11, 1028:22
**agree** [10] - 775:25, 805:2, 806:17, 807:6, 807:19, 810:9, 895:5, 911:25, 924:11, 925:15
**agreed** [1] - 830:22
**agreement** [2] - 735:6,

829:23
**ahead** [5] - 793:4, 906:3, 913:5, 944:17, 1044:6
**aid** [1] - 833:6
**Albano** [3] - 911:9, 911:21, 912:17, 913:13, 926:7
**Albano's** [2] - 911:11, 1028:25
**Albert** [4] - 912:7, 912:9, 913:18, 1023:4
**aligning** [1] - 1045:11
**alignment** [3] - 830:25, 852:10, 931:18
**allegations** [1] - 955:13
**allege** [1] - 955:15
**alleged** [2] - 819:3, 819:7
**alleging** [1] - 797:8
**allocate** [2] - 825:10, 905:3
**allocated** [2] - 914:6, 1023:19
**allocation** [3] - 825:9, 915:15, 953:19
**allocations** [1] - 914:3
**allotted** [1] - 871:20
**allowance** [1] - 991:25
**allowed** [4] - 891:14, 973:10, 1042:21
**allows** [1] - 975:17
**alluded** [2] - 852:20, 902:10
**allusion** [1] - 791:16
**almost** [4] - 794:10, 861:12, 888:3, 1024:11
**alphabetical** [1] - 809:6
**ALSO** [1] - 729:2
**ambiguity** [1] - 1006:22
**amount** [15] - 771:16, 773:4, 774:22, 793:16, 907:4, 907:21, 907:24, 973:3, 973:18, 1004:20, 1021:8, 1024:6, 1025:16, 1025:20, 1027:2
**amounts** [4] - 826:5, 826:20, 912:24, 1021:17
**analysis** [3] - 902:20, 914:14, 948:11
**analyst** [60] - 731:19, 733:7, 733:10, 734:7, 737:20, 738:8, 738:25, 740:5, 741:23, 747:25, 759:24, 762:18, 765:5, 766:7, 766:21, 768:11, 776:16, 780:13, 790:24, 791:17, 792:7, 793:24, 794:19, 825:6, 826:15, 826:18, 828:15, 835:18, 854:12, 854:16, 854:17, 854:18, 857:21, 873:3, 875:6, 876:12, 882:25, 883:10, 888:25, 902:9, 902:13, 906:25, 910:2, 910:12, 910:14, 910:15, 910:22,

910:23, 930:20, 930:23, 932:4, 932:13, 932:16, 1020:9, 1030:8, 1031:13, 1035:10, 1038:23, 1045:15
**analysts** [33] - 735:3, 736:23, 737:6, 737:11, 741:15, 741:21, 742:5, 750:17, 790:20, 791:10, 794:16, 794:23, 795:2, 795:5, 824:6, 824:14, 824:18, 824:21, 824:23, 825:2, 827:4, 833:21, 834:6, 834:15, 834:16, 836:14, 862:9, 901:15, 910:24, 932:25, 933:5, 948:2, 948:10
**analyze** [1] - 908:24
**analyzing** [2] - 909:4, 931:15
**aneurysm** [19] - 769:14, 770:3, 775:17, 788:5, 804:24, 805:3, 807:18, 878:12, 879:6, 880:5, 881:10, 882:5, 882:14, 882:21, 882:23, 906:12, 925:20, 927:13, 1007:11
**angry** [1] - 858:9
**announcement** [1] - 947:4
**announcing** [1] - 811:17
**annual** [6] - 812:21, 921:11, 923:18, 923:20, 1021:23, 1026:2
**annually** [1] - 916:2
**answer** [16] - 802:3, 859:7, 859:13, 936:18, 941:11, 941:17, 942:7, 944:20, 947:15, 951:9, 954:21, 960:7, 985:22, 985:25, 986:15, 1016:24
**ANSWER** [34] - 938:25, 939:7, 939:14, 939:17, 941:15, 942:11, 944:25, 946:2, 956:18, 976:16, 976:20, 977:11, 980:23, 981:2, 981:6, 981:25, 982:5, 984:24, 985:3, 986:10, 986:24, 987:17, 991:10, 1009:11, 1010:14, 1013:23, 1013:25, 1022:15, 1022:19, 1024:8, 1026:4, 1026:6, 1026:8, 1026:16
**answered** [1] - 929:6
**answers** [2] - 938:22, 939:20
**anticipate** [1] - 914:18
**anticipated** [3] - 769:7, 855:8, 913:12
**anyplace** [1] - 849:25
**Apart** [1] - 749:13
**Apologies** [1] - 780:23
**apologies** [2] - 952:25, 1017:8

1052

**apologize** [9] - 786:4, 816:15, 848:22, 853:8, 878:23, 880:24, 953:3, 980:17, 1000:11
**apologized** [1] - 893:5
**apologizes** [1] - 893:2
**appear** [4] - 772:14, 821:12, 886:24, 897:2
**appearance** [1] - 1046:8
**appeared** [2] - 859:19, 1015:13
**Application** [1] - 969:20
**application** [4] - 969:23, 1039:13, 1039:15, 1041:21
**apply** [2] - 865:6, 1041:18
**appointment** [1] - 885:3
**approach** [1] - 975:15
**approached** [1] - 1044:4
**appropriate** [1] - 936:18
**approval** [9] - 739:2, 747:9, 747:10, 747:15, 748:2, 834:25, 913:18, 970:19, 970:22
**approvals** [1] - 1004:16
**approve** [7] - 747:5, 757:16, 757:20, 834:25, 845:16, 913:22, 913:25
**approved** [3] - 739:3, 942:22, 966:10
**April** [9] - 825:21, 826:3, 837:24, 968:14, 969:10, 971:21, 972:2, 972:7, 1034:23
**ARBITRATION** [1] - 727:2
**ARBITRATOR** [95] - 741:24, 749:13, 749:20, 750:5, 750:11, 750:15, 750:20, 750:25, 751:9, 752:17, 753:3, 754:6, 754:12, 754:17, 759:25, 765:10, 774:3, 774:9, 774:17, 774:20, 775:7, 784:23, 785:3, 790:19, 791:4, 791:8, 791:14, 791:20, 792:3, 792:12, 792:20, 792:24, 795:10, 795:12, 795:14, 802:12, 802:16, 803:11, 803:18, 803:24, 804:3, 810:20, 813:23, 814:5, 816:11, 816:13, 816:20, 817:3, 833:9, 852:14, 853:10, 860:14, 860:17, 860:22, 861:14, 862:10, 871:9, 872:18, 873:9, 873:16, 873:19, 875:15, 891:18, 902:7, 903:23, 905:4, 906:3, 909:24, 910:17, 910:20, 918:9, 925:4, 926:3, 928:16, 928:21, 934:21, 959:14, 959:16, 966:16, 966:18,

972:18, 972:21, 994:13, 998:5, 1006:4, 1010:21, 1020:22, 1020:25, 1040:13, 1040:21, 1045:21, 1046:9, 1046:16, 1046:23, 1046:25
**Arbitrator** [3] - 727:12, 731:3, 817:6
**areas** [1] - 963:3
**argument** [1] - 914:7
**arguments** [2] - 924:21, 924:24
**arise** [1] - 1007:4
**arrangement** [4] - 758:7, 765:12, 934:3, 1004:9
**arrival** [1] - 867:24
**arrived** [1] - 1012:13
**articles** [2] - 924:18, 925:2
**aside** [5] - 736:21, 737:10, 819:2, 819:6, 946:16
**aspect** [1] - 822:16
**aspects** [1] - 890:16
**assessing** [1] - 909:2
**assessment** [1] - 786:2
**asset** [2] - 820:6, 820:8
**assigned** [1] - 952:12
**assistant** [2] - 856:12, 971:17
**assistant's** [1] - 928:23
**assisting** [1] - 829:20
**associate** [1] - 1038:23
**associated** [1] - 861:3
**associating** [1] - 992:4
**assume** [1] - 740:3
**at-will** [1] - 936:6
**attached** [6] - 803:19, 866:5, 867:12, 948:13, 993:15, 993:19
**attaches** [1] - 811:13
**attaching** [1] - 803:12
**attachment** [3] - 872:2, 915:12, 916:5
**attachments** [1] - 870:9
**attempted** [1] - 955:5
**attempting** [1] - 842:24, 868:25
**attending** [1] - 1006:19
**attention** [14] - 798:11, 800:11, 804:18, 808:3, 812:18, 864:5, 869:11, 940:6, 942:20, 956:14, 974:7, 992:11, 995:23, 1021:4
**attorney** [2] - 867:16, 996:19
**audit** [1] - 825:25
**August** [33] - 756:10, 758:19, 763:2, 769:8, 776:8, 776:14, 798:22, 804:19, 804:21, 822:4, 848:20, 859:2, 863:23, 875:3, 877:25, 878:10, 878:21,

879:3, 881:3, 881:6, 887:14, 898:2, 899:2, 899:3, 899:6, 990:14, 990:19, 990:20, 1007:6, 1007:8, 1007:20, 1012:5, 1042:12
**authentic** [2] - 969:3, 969:4
**author** [1] - 848:10
**authorities** [1] - 877:17
**authority** [2] - 845:16, 845:19
**authorization** [1] - 773:11
**authorize** [1] - 855:17
**authorized** [6] - 773:6, 774:15, 775:5, 824:17, 824:20, 824:25
**Auto** [1] - 881:19
**auto** [1] - 929:4
**availability** [3] - 838:11, 842:11, 896:13
**available** [13] - 841:10, 864:18, 868:15, 889:4, 889:7, 895:10, 896:14, 896:17, 939:15, 977:3, 977:13, 983:17, 983:19
**Avenue** [2] - 728:6, 728:16
**average** [4] - 739:21, 749:10, 749:11, 833:20
**awarded** [6] - 916:12, 920:2, 1024:17, 1024:18, 1024:25, 1026:2
**aware** [36] - 749:15, 753:20, 791:20, 797:7, 798:13, 803:25, 837:18, 838:7, 839:10, 839:12, 842:13, 847:11, 849:12, 850:22, 874:6, 884:14, 886:18, 887:5, 888:5, 890:17, 891:11, 896:12, 899:3, 937:2, 987:14, 998:3, 1004:19, 1006:13, 1010:4, 1012:8, 1012:21, 1013:12, 1013:15, 1013:25, 1042:21
**awareness** [1] - 1013:4
**axes** [1] - 922:6

## B

**baby** [36] - 743:5, 743:22, 743:24, 744:7, 753:6, 754:4, 769:16, 775:20, 788:20, 798:14, 798:17, 837:12, 838:18, 839:25, 842:21, 847:21, 864:8, 867:25, 869:22, 898:23, 899:14, 925:17, 966:3, 974:8, 974:14, 974:25, 975:4, 975:20, 982:6, 982:8, 982:11, 982:14, 989:20
**backed** [1] - 973:8
**background** [2] - 817:24, 831:6

**bad** [3] - 973:13, 1000:11, 1008:9
**badly** [1] - 879:13
**balance** [2] - 829:14, 829:18
**bank** [6] - 829:14, 829:16, 829:18, 831:18, 913:2, 913:6
**bankers** [3] - 900:8, 926:22, 931:22
**banking** [6] - 732:22, 792:10, 817:15, 829:9, 963:10, 963:11
**Barney** [1] - 818:20
**bars** [1] - 922:3
**base** [11] - 786:6, 851:18, 851:20, 853:15, 853:21, 853:23, 854:2, 854:10, 956:22, 957:2, 972:22
**based** [19] - 743:9, 790:22, 793:13, 800:23, 868:15, 872:22, 875:2, 875:23, 885:16, 895:12, 934:16, 935:25, 936:4, 940:25, 941:2, 941:3, 941:4, 1018:3, 1018:4
**basic** [1] - 915:16
**basis** [8] - 743:11, 763:7, 827:2, 832:21, 838:25, 972:19, 982:3, 995:9
**Bates** [2] - 810:24, 811:3
**Bear** [2] - 732:4, 732:23
**became** [11] - 735:10, 736:10, 736:21, 765:22, 796:10, 797:12, 831:20, 834:20, 854:21, 1002:3, 1020:5
**become** [2] - 753:20, 990:7
**becomes** [1] - 904:14
**becoming** [3] - 800:18, 835:19, 995:17
**BEFORE** [1] - 727:12
**began** [3] - 869:24, 969:16, 971:2
**begin** [1] - 868:4
**Beginning** [10] - 768:10, 875:5, 941:10, 942:6, 976:11, 991:7, 1009:8, 1013:19, 1024:4, 1025:24
**beginning** [12] - 770:17, 797:20, 858:5, 892:25, 938:20, 939:2, 968:10, 969:7, 977:8, 980:19, 986:20, 987:9
**begins** [2] - 811:21, 1021:18
**begun** [1] - 850:17
**BEHALF** [2] - 728:4, 728:14
**behalf** [2] - 1023:11, 1029:13
**behavior** [1] - 869:10
**behind** [1] - 958:16

**belabor** [1] - 921:13
**belief** [1] - 761:13
**below** [5] - 820:24, 826:6, 826:11, 973:22, 1014:2
**benefits** [6] - 840:25, 871:23, 880:21, 928:25, 929:4, 974:5
**bereavement** [1] - 994:3
**best** [1] - 826:24
**better** [4] - 761:2, 886:10, 895:11, 947:11
**Between** [1] - 976:17
**between** [14] - 770:2, 825:20, 843:23, 854:15, 863:14, 887:14, 888:2, 896:8, 915:4, 932:14, 973:16, 978:21, 980:23, 1029:23
**beverage** [1] - 733:12
**Bhandary** [7] - 742:8, 794:2, 794:3, 794:8, 932:18, 932:20, 1027:8
**big** [2] - 819:15, 819:22
**bigger** [3] - 951:16, 951:24, 952:15
**Bill** [3] - 867:21, 868:7, 870:16
**billion** [3] - 900:4, 904:20, 922:22
**billion-dollar** [1] - 900:4
**binder** [1] - 808:6
**binders** [2] - 821:6, 1000:20
**biographies** [1] - 741:12
**biography** [1] - 742:11
**biology** [1] - 1020:20
**bios** [3] - 741:6, 741:9, 808:11
**birth** [32] - 744:7, 753:6, 775:12, 775:20, 787:24, 798:17, 812:13, 841:11, 842:20, 843:14, 845:9, 845:12, 846:7, 872:6, 882:9, 906:8, 925:17, 927:8, 933:21, 966:21, 971:5, 975:10, 975:16, 981:18, 982:6, 988:24, 1019:23, 1039:2, 1039:9, 1039:19, 1039:25, 1040:4
**bit** [9] - 738:23, 758:25, 786:5, 820:21, 829:4, 893:9, 948:16, 987:21, 1043:23
**blacked** [1] - 1032:12
**Blackstone** [1] - 911:5
**blanking** [1] - 794:20
**blast** [9] - 737:21, 737:24, 738:2, 738:7, 738:15, 836:6, 858:18, 858:20, 858:24
**blood** [1] - 1048:14
**board** [3] - 920:13, 920:16, 920:18

**bond** [2] - 904:5, 918:4
**bonds** [2] - 833:13, 904:18
**bonus** [18] - 735:5, 735:7, 771:10, 771:14, 771:16, 772:15, 772:16, 773:8, 773:21, 774:5, 774:13, 774:23, 775:10, 775:15, 777:2, 777:6, 777:16, 778:4, 778:20, 778:24, 779:3, 779:6, 779:14, 779:23, 780:15, 781:2, 781:5, 781:22, 782:4, 782:17, 782:19, 782:24, 783:5, 783:18, 783:24, 784:7, 784:12, 785:9, 809:20, 812:24, 813:7, 824:9, 824:10, 825:5, 825:7, 825:9, 826:15, 826:17, 826:19, 901:25, 903:2, 903:4, 906:5, 906:18, 906:21, 907:17, 907:19, 908:9, 908:15, 908:21, 908:25, 912:18, 912:22, 913:8, 913:10, 913:14, 913:22, 914:9, 914:14, 914:24, 915:14, 915:23, 916:13, 917:6, 918:19, 919:20, 919:24, 920:3, 920:7, 945:19, 952:15, 953:18, 953:24, 953:25, 954:4, 954:7, 957:13, 958:3, 958:7, 959:5, 960:25, 961:3, 962:10, 964:15, 1021:5, 1021:6, 1021:17, 1021:24, 1023:5, 1023:15, 1023:16, 1023:18, 1024:7, 1024:13, 1024:16, 1024:22, 1024:24, 1026:3, 1027:11, 1027:12, 1027:14, 1027:17, 1027:21, 1028:25, 1029:4, 1029:9
**Bonus** [2] - 912:12, 923:10
**bonuses** [22] - 785:13, 785:18, 785:24, 796:19, 812:19, 812:21, 813:12, 824:13, 824:17, 827:7, 913:7, 913:25, 914:3, 923:7, 942:14, 942:17, 953:7, 953:12, 957:9, 957:21, 958:12, 964:5
**book** [8] - 766:23, 825:13, 937:16, 937:18, 937:20, 945:11, 962:3, 1015:5
**booklet** [1] - 898:7
**books** [1] - 880:25
**boring** [1] - 884:25
**born** [2] - 847:21, 975:22
**boss** [3] - 757:4, 868:16, 869:6
**bottom** [18] - 755:3, 778:10, 805:21, 821:19, 822:23, 839:20, 848:15, 877:18, 881:12, 881:24, 883:16,

924:9, 929:15, 971:13, 978:24, 988:7, 1001:3, 1015:8
**box** [4] - 822:12, 928:2, 928:6, 968:5
**boxes** [1] - 822:24
**boy** [1] - 961:20
**bracket** [2] - 822:23, 823:8
**brain** [19] - 769:14, 770:3, 775:17, 788:5, 804:23, 805:3, 807:18, 878:12, 879:6, 880:5, 881:10, 882:5, 882:14, 882:21, 882:23, 906:12, 925:20, 927:13, 1007:10
**break** [5] - 795:9, 853:9, 1020:18, 1020:19, 1020:23
**breakdown** [1] - 790:22, 791:11
**Bridges** [17] - 789:14, 871:3, 957:19, 957:24, 958:17, 959:5, 959:17, 1000:13, 1001:3, 1001:21, 1001:24, 1002:9, 1041:24, 1042:9, 1042:18, 1046:3, 1046:22
**Bridges'** [2] - 1042:15, 1043:18
**briefly** [1] - 732:18
**bring** [5] - 898:23, 982:8, 982:11, 982:14, 1036:8
**bringing** [2] - 909:19, 909:25
**Broad** [3] - 811:25, 867:9, 873:7
**Broide** [4] - 741:23, 809:10, 809:16, 810:5
**Broide's** [2] - 809:23, 811:17
**broken** [2] - 772:23, 773:3
**brought** [1] - 864:4
**Bud** [7] - 797:4, 913:19, 913:22, 914:12, 914:23, 915:4, 915:10
**building** [1] - 819:20
**built** [2] - 829:14, 835:8
**bump** [1] - 964:11
**bunch** [2] - 785:25, 1032:18
**burden** [2] - 980:5, 981:7
**Burns** [184] - 729:10, 731:7, 732:1, 733:1, 734:1, 735:1, 736:1, 737:1, 738:1, 739:1, 740:1, 741:1, 742:1, 742:3, 743:1, 744:1, 745:1, 746:1, 747:1, 748:1, 749:1, 750:1, 750:7, 751:1, 751:11, 752:1, 753:1, 754:1, 755:1, 755:4, 756:1, 757:1, 758:1, 759:1, 760:1, 761:1, 762:1, 763:1, 764:1, 765:1, 766:1, 767:1, 768:1, 769:1, 770:1, 771:1,

772:1, 772:4, 773:1, 774:1, 775:1, 776:1, 777:1, 777:11, 778:1, 779:1, 780:1, 780:24, 781:1, 782:1, 783:1, 783:11, 784:1, 785:1, 785:6, 786:1, 787:1, 788:1, 789:1, 790:1, 791:1, 792:1, 793:1, 794:1, 795:1, 795:17, 795:23, 796:1, 797:1, 798:1, 799:1, 800:1, 801:1, 802:1, 803:1, 804:1, 805:1, 806:1, 807:1, 808:1, 809:1, 810:1, 811:1, 812:1, 812:2, 813:1, 814:1, 814:8, 815:1, 816:1, 823:20, 830:3, 832:6, 832:8, 834:3, 834:9, 834:13, 834:20, 835:23, 842:6, 845:16, 848:17, 849:9, 849:14, 850:11, 855:23, 859:23, 860:25, 862:13, 874:2, 874:13, 877:6, 877:23, 878:20, 879:2, 879:11, 906:17, 906:22, 907:11, 916:8, 916:25, 930:23, 946:9, 947:9, 947:12, 948:14, 948:21, 949:20, 949:24, 950:5, 950:12, 950:19, 952:15, 953:11, 953:24, 954:3, 956:25, 957:10, 957:14, 957:22, 959:4, 961:17, 962:6, 962:17, 963:14, 963:18, 964:11, 965:13, 980:2, 980:5, 980:12, 980:21, 984:2, 987:23, 988:8, 988:14, 988:17, 995:7, 997:10, 997:15, 999:16, 1000:3, 1007:24, 1014:21, 1015:16, 1023:10, 1025:4, 1025:9, 1026:2, 1029:12, 1036:11, 1037:21, 1038:10, 1043:24
**BURNS** [2] - 730:4, 731:2
**Burns'** [4] - 836:2, 956:23, 995:17, 1023:13
**business** [82] - 733:3, 798:3, 818:2, 820:4, 820:25, 821:2, 821:3, 821:15, 821:17, 822:15, 825:10, 826:7, 827:5, 828:25, 829:6, 829:8, 829:10, 829:13, 829:18, 829:20, 830:2, 830:19, 830:21, 831:5, 831:7, 831:14, 831:16, 831:17, 832:25, 833:5, 833:8, 833:10, 833:11, 845:6, 853:6, 853:7, 874:20, 874:24, 891:7, 891:12, 899:21, 900:2, 903:13, 905:6, 909:2, 909:5, 914:6, 916:16, 926:16, 926:18, 926:20, 926:24, 929:21,

930:10, 931:14, 931:16, 934:11, 934:12, 943:2, 943:4, 943:6, 948:3, 966:15, 981:10, 1004:23, 1006:12, 1023:17, 1023:21, 1025:21, 1033:13, 1033:15, 1033:17, 1033:21, 1035:3, 1035:5, 1035:8, 1037:8, 1037:13, 1044:19, 1044:23, 1045:3

**Business** [1] - 818:3

**businesses** [2] - 829:21, 852:25

**busy** [2] - 759:10, 760:16

**but..** [1] - 870:17

**BY** [61] - 730:3, 731:6, 742:2, 750:6, 751:10, 753:4, 754:18, 760:3, 765:19, 767:13, 775:8, 785:5, 793:3, 795:16, 800:14, 804:4, 811:7, 814:7, 817:9, 833:15, 853:13, 862:17, 863:12, 871:11, 873:24, 876:23, 892:8, 902:24, 906:4, 911:8, 918:11, 925:6, 926:9, 929:5, 935:3, 937:21, 944:18, 945:21, 946:19, 953:5, 956:13, 960:8, 960:20, 961:15, 962:2, 965:2, 966:19, 973:6, 988:6, 994:24, 998:19, 1000:24, 1007:5, 1011:2, 1015:7, 1021:3, 1022:10, 1023:2, 1031:9, 1035:20, 1041:2

## C

**calendar** [6] - 812:24, 813:6, 919:2, 958:14, 1021:5, 1026:3

**California** [44] - 742:22, 743:4, 743:5, 743:22, 744:3, 745:11, 746:20, 748:8, 748:10, 749:15, 752:15, 753:6, 753:10, 765:13, 769:16, 776:15, 837:3, 837:10, 838:19, 845:23, 873:5, 873:11, 894:12, 898:18, 898:21, 898:25, 899:15, 903:11, 974:24, 975:4, 975:21, 976:19, 980:25, 982:12, 983:7, 984:13, 985:7, 985:23, 987:8, 990:10, 998:4, 1006:6, 1019:22, 1040:16

**canceled** [1] - 881:19

**capabilities** [2] - 931:18, 932:7

**capable** [1] - 816:20

**capacity** [1] - 734:19

**capitalized** [1] - 993:16

**card** [1] - 798:3

**care** [6] - 819:14, 841:11, 900:13, 905:22, 931:21, 1045:10

**Cary** [7] - 767:6, 767:23, 768:4, 768:6, 874:16, 874:19, 926:7

**cascading** [1] - 853:4

**case** [11] - 731:24, 799:19, 819:3, 827:12, 887:6, 890:17, 902:20, 938:3, 992:23, 996:9, 1046:11

**cases** [2] - 854:24, 914:8

**cash** [1] - 920:10

**Castello** [2] - 789:18, 789:19

**catch** [1] - 1016:18

**categories** [7] - 949:10, 949:15, 949:21, 950:6, 950:25, 951:5, 951:13

**category** [3] - 950:8, 950:13, 951:2

**caught** [1] - 1016:22

**CEO** [5] - 797:4, 877:18, 912:10, 935:7, 935:9

**certain** [10] - 746:4, 829:15, 835:11, 854:7, 858:17, 936:10, 976:20, 1011:24, 1011:25

**certainly** [2] - 788:11, 1031:25

**certainty** [1] - 1012:2

**certify** [1] - 1048:10

**CF** [2] - 1034:12, 1034:14

**chain** [2] - 754:23, 971:12

**chair** [1] - 935:11

**chairman** [1] - 912:11

**challenges** [1] - 931:16

**chance** [12] - 746:7, 751:14, 766:24, 767:17, 825:16, 848:6, 856:6, 874:9, 891:16, 938:14, 998:18, 1016:9

**change** [19] - 737:14, 737:18, 834:22, 834:23, 835:5, 851:16, 851:20, 876:18, 877:20, 880:11, 880:15, 880:22, 895:14, 912:13, 914:13, 929:23, 1038:12, 1038:17, 1039:4

**changed** [8] - 850:16, 854:2, 858:23, 865:18, 877:15, 899:21, 1031:5, 1038:4

**changes** [5] - 835:15, 844:11, 851:12, 913:23, 1019:15

**changing** [1] - 1023:4

**characterize** [1] - 1030:3

**chart** [13] - 822:11, 822:22, 823:3, 823:5, 823:20, 824:2, 921:17, 924:9, 924:12,

1031:20, 1032:8, 1034:19, 1044:11

**charts** [4] - 749:3, 821:13, 877:15, 996:8

**cheap** [1] - 833:4

**cheaper** [1] - 941:24

**check** [6] - 909:13, 959:12, 961:10, 973:5, 1003:18, 1003:21

**checked** [2] - 928:3, 928:6

**checking** [7] - 770:11, 883:25, 884:7, 991:13, 991:14, 1011:11, 1011:15

**checklist** [1] - 929:3

**checks** [1] - 813:16

**chemical** [1] - 952:2

**chemicals** [14] - 787:19, 794:24, 828:16, 828:18, 900:7, 917:23, 917:25, 926:23, 933:2, 963:6, 963:11, 1037:10, 1044:25, 1045:15

**child** [32] - 775:12, 787:24, 837:11, 841:11, 843:14, 845:9, 845:13, 846:7, 851:3, 858:10, 858:14, 872:7, 882:10, 898:22, 906:8, 927:8, 933:21, 966:21, 971:6, 974:11, 974:17, 974:21, 975:10, 975:16, 975:22, 976:18, 988:24, 1039:2, 1039:9, 1039:19, 1039:25, 1040:5

**children** [1] - 817:20

**choosing** [1] - 1004:11

**chose** [3] - 831:13, 898:8, 975:15

**CIBC** [22] - 732:25, 733:24, 735:24, 736:4, 795:24, 828:25, 829:7, 829:23, 830:2, 830:3, 830:9, 830:19, 831:3, 831:18, 900:2, 900:5, 943:2, 943:8, 943:11, 956:2, 1037:12, 1045:5

**CIBC's** [1] - 733:3

**circle** [1] - 889:9

**circulate** [1] - 836:18

**circumstances** [6] - 735:16, 786:11, 877:19, 879:19, 885:16, 941:7

**Citigroup** [1] - 732:21

**claim** [3] - 859:8, 954:22, 955:14

**claimant** [2] - 731:24, 827:11

**Claimant** [1] - 727:5

**CLAIMANT** [1] - 728:4

**clarification** [1] - 803:17, 992:8, 1040:20

**clarified** [2] - 873:20, 873:22

**clarify** [10] - 765:14, 765:15, 801:12, 814:11, 899:7, 960:9, 993:17, 1011:19, 1012:24, 1040:13

**clarifying** [1] - 1012:16

**CLARK** [1] - 728:5

**classes** [2] - 820:6, 820:9

**clean** [1] - 862:3

**cleanup** [1] - 853:2

**clear** [6] - 867:14, 875:14, 889:14, 894:6, 894:8, 1006:14

**cleared** [5] - 985:18, 987:16, 988:18, 993:3, 993:9

**Client** [2] - 950:9, 951:11

**client** [8] - 826:23, 845:4, 905:20, 910:10, 910:23, 977:12, 980:6, 981:8

**clients** [23] - 741:9, 741:10, 742:18, 810:5, 826:24, 826:25, 827:3, 833:14, 835:8, 836:18, 836:20, 836:24, 836:25, 889:12, 900:6, 907:5, 909:15, 909:19, 910:2, 910:25, 980:5, 981:7, 1044:8

**closed** [3] - 829:2, 926:22, 945:16

**CO** [1] - 727:7

**Coast** [12] - 799:5, 844:19, 846:3, 846:12, 847:9, 847:25, 855:18, 857:8, 867:9, 896:23, 901:12, 981:22

**Code** [2] - 822:13, 823:12

**codify** [1] - 869:8

**codifying** [2] - 869:3, 999:12

**cohead** [35] - 734:19, 735:10, 735:20, 736:4, 736:10, 737:15, 740:14, 765:24, 766:3, 766:8, 776:19, 797:13, 797:17, 797:21, 798:5, 812:9, 831:20, 832:5, 833:6, 835:19, 854:12, 860:25, 877:2, 916:20, 927:17, 962:20, 963:14, 1004:8, 1004:25, 1005:6, 1005:9, 1005:15, 1019:24, 1020:3, 1038:18

**coheads** [13] - 734:14, 735:18, 736:21, 796:10, 812:3, 816:2, 832:8, 832:15, 832:18, 832:23, 834:14, 834:21, 963:17

**coincidentally** [1] - 1005:23

**colicky** [1] - 743:24

**collaboration** [1] - 925:24

**collaborative** [1] - 901:5

**colleagues** [8] - 816:4, 838:10, 842:13, 895:4, 925:25, 926:4, 1013:14, 1014:4

**collection** [1] - 927:21

**Colleen** [40] - 729:10, 760:22, 812:2, 823:20, 832:6, 832:23, 847:6, 847:11, 847:17, 849:11, 855:19, 857:13, 860:25, 874:5, 874:25, 878:14, 883:25, 884:12, 888:24, 889:10, 896:8, 896:20, 896:21, 900:17, 903:20, 906:25, 907:18, 914:15, 914:17, 926:5, 981:3, 984:7, 984:8, 997:22, 998:11, 1011:11, 1011:16, 1018:17, 1019:8, 1044:4

**COLLEEN** [2] - 730:4, 731:2

**Colleen's** [3] - 894:20, 958:4, 958:7

**college** [1] - 732:22

**color** [1] - 889:11

**Columbia** [1] - 818:3

**Column** [1] - 1032:22

**combination** [1] - 926:15

**Combination** [1] - 870:16

**coming** [7] - 857:17, 861:11, 869:5, 878:7, 899:5, 907:6, 907:14

**command** [1] - 797:2

**comments** [1] - 836:14

**Comments** [1] - 951:20

**commission** [6] - 827:10, 933:19, 934:2, 972:19, 1039:23

**commission -paid** [1] - 933:19

**commissioned** [1] - 934:6

**commissions** [9] - 934:8, 934:15, 966:7, 966:11, 973:2, 973:9, 973:15, 973:17, 973:19

**committee** [1] - 935:12

**common** [1] - 999:11

**communicate** [3] - 745:12, 940:15, 998:13

**communicated** [12] - 745:13, 768:15, 855:10, 856:20, 875:2, 875:11, 875:18, 899:10, 899:13, 990:6, 998:6, 998:12

**communicating** [12] - 747:24, 754:5, 758:4, 770:8, 770:10, 770:12, 835:9, 856:18, 882:14, 912:19, 913:7, 915:10

**communication** [5] - 762:14, 856:21, 913:3,

914:11, 978:14

**Communication** [2] - 950:9, 951:12

**communications** [1] - 896:19

**companies** [5] - 759:9, 791:5, 830:25, 836:16, 902:19

**company** [11] - 741:11, 789:7, 796:23, 840:24, 895:21, 904:22, 920:20, 920:24, 922:20, 923:3, 923:7

**compare** [3] - 921:21, 921:24, 923:24

**compared** [2] - 917:23, 922:23

**compensate** [1] - 913:10

**compensated** [4] - 735:4, 824:6, 824:8, 933:18

**compensation** [15] - 825:8, 825:11, 851:12, 851:15, 851:17, 908:24, 913:15, 916:2, 919:4, 920:10, 929:25, 930:9, 933:24, 956:22, 956:23

**competencies** [1] - 1045:10

**competent** [1] - 958:17

**competing** [1] - 955:23

**competitor** [5] - 830:6, 830:8, 830:13, 833:3, 833:17

**compilation** [1] - 738:8

**complete** [2] - 739:8, 852:10

**completely** [2] - 894:18, 898:16

**completing** [3] - 776:15, 776:18, 776:21

**completion** [1] - 818:21

**compliance** [4] - 747:10, 747:15, 835:14, 996:13

**compliance /risk** [1] - 768:7

**complicated** [1] - 1033:14

**complications** [3] - 981:18, 982:6, 982:10

**component** [4] - 822:15, 854:25, 931:15, 932:5

**components** [1] - 821:2

**comprehensive** [1] - 1031:24

**comps** [1] - 840:6

**computer** [1] - 845:22

**concern** [12] - 852:13, 852:21, 862:2, 885:7, 885:9, 891:12, 988:23, 989:4, 989:10, 1004:15, 1004:19, 1006:18

**concerning** [2] - 871:21, 992:4

**concerns** [1] - 875:7

**condition** [6] - 788:24,

805:5, 936:24, 1007:14, 1042:23, 1043:15

**conduct** [2] - 749:23, 952:11

**conducting** [1] - 740:10

**confidence** [1] - 833:3

**Confidential** [2] - 778:10, 821:21

**confirmed** [1] - 896:5

**confused** [1] - 894:5

**confusing** [5] - 801:13, 1002:14, 1027:15

**confusion** [8] - 862:5, 869:9, 893:22, 894:3, 894:10, 894:25, 1011:20, 1031:18

**congratulated** [1] - 837:18

**Congratulations** [1] - 867:24

**connected** [2] - 993:20, 1048:14

**connecting** [1] - 991:22

**connection** [1] - 1039:16

**Connor** [1] - 729:4

**conserve** [1] - 930:6

**consider** [9] - 732:14, 732:17, 734:23, 740:13, 777:12, 851:7, 1001:5, 1002:10, 1011:15

**considerably** [3] - 921:22, 921:25, 926:21

**considered** [8] - 766:3, 766:7, 825:5, 826:14, 916:14, 962:24, 1023:15, 1024:6

**considering** [2] - 815:6, 838:3

**Consistent** [1] - 1014:13

**consistent** [12] - 781:11, 840:15, 870:5, 896:2, 902:14, 909:25, 922:25, 928:12, 940:22, 941:14, 943:4, 1036:20

**Consistently** [1] - 909:17

**consistently** [1] - 909:21

**constraints** [1] - 1023:21

**constructed** [1] - 926:18

**consult** [2] - 867:17, 867:20

**consultants** [1] - 852:3

**consultation** [1] - 1030:4

**consumer** [4] - 733:11, 900:13, 931:20, 1045:10

**Cont'd** [1] - 892:7

**contact** [8] - 826:23, 826:25, 835:13, 845:5, 855:19, 872:9, 873:3, 907:4

**contacted** [2] - 872:5, 971:19

**contained** [1] - 741:13

**contemplation** [1] - 1046:10

**contents** [1] - 872:10

**context** [7] - 867:10, 897:19, 903:14, 1004:20, 1006:23, 1011:19, 1019:3

**continue** [15] - 736:9, 783:4, 835:23, 844:16, 844:17, 844:19, 847:8, 855:17, 857:20, 859:25, 975:13, 982:22, 982:23, 982:25, 1015:19

**continued** [4] - 782:24, 835:21, 903:12, 994:18

**continuing** [4] - 846:11, 872:25, 894:11, 1043:7

**contribution** [6] - 775:3, 777:20, 786:3, 827:4, 909:3, 909:4

**contributions** [1] - 974:6

**control** [1] - 852:17

**controversy** [1] - 1048:17

**convenient** [1] - 855:21

**conversation** [112] - 744:10, 744:15, 744:19, 753:25, 754:16, 754:20, 759:19, 760:4, 761:3, 761:7, 761:12, 763:19, 763:20, 764:12, 764:15, 764:19, 764:24, 765:2, 766:15, 768:17, 768:21, 773:18, 774:12, 774:18, 774:19, 774:21, 779:13, 779:23, 781:10, 781:11, 781:25, 787:21, 788:2, 788:3, 789:21, 790:2, 790:5, 814:25, 837:16, 837:21, 837:22, 837:25, 840:11, 844:13, 844:22, 855:13, 855:23, 857:6, 857:23, 858:7, 860:7, 860:8, 866:4, 867:7, 869:4, 869:14, 873:10, 873:13, 873:21, 877:8, 879:12, 888:9, 888:13, 888:16, 888:18, 888:21, 889:16, 889:17, 889:19, 889:22, 890:3, 890:9, 890:12, 890:19, 891:3, 892:15, 893:2, 893:8, 893:17, 896:21, 897:14, 897:19, 899:24, 903:16, 975:25, 976:2, 976:22, 977:9, 978:4, 979:7, 982:17, 983:6, 983:13, 984:25, 985:6, 985:10, 994:14, 994:23, 998:7, 998:16, 998:17, 999:13, 1006:14, 1009:12, 1014:16, 1017:7, 1017:9, 1017:13, 1017:20

**conversations** [22] - 744:5, 763:13, 763:16, 770:18, 770:22, 774:4, 774:10, 779:24, 780:4, 826:21,

844:2, 850:10, 867:15,
879:22, 886:6, 891:8,
891:13, 894:9, 909:8,
909:11, 914:15, 981:3

**convey** [1] - 868:25

**conveying** [2] - 894:22,
900:23

**coordinate** [1] - 838:9

**copied** [4] - 756:21, 758:11,
839:22, 874:15

**copy** [5] - 800:4, 815:20,
859:7, 859:9, 938:9

**copying** [2] - 767:5, 767:22

**core** [8] - 835:9, 835:21,
854:25, 857:21, 900:11,
900:12, 932:7, 1045:9

**corner** [6] - 778:10, 783:15,
805:21, 821:20, 967:7, 968:5

**corporate** [8] - 817:16,
820:15, 820:17, 820:23,
900:6, 1038:18, 1038:19,
1039:4

**Correct** [49] - 740:8,
740:25, 784:5, 796:2, 796:5,
796:14, 796:24, 797:6,
797:11, 797:19, 798:9,
798:15, 798:19, 799:7,
800:6, 800:10, 800:21,
801:11, 804:22, 804:25,
806:13, 807:8, 807:9,
807:25, 812:14, 813:2,
813:5, 813:8, 813:11,
815:25, 816:3, 816:5, 936:2,
936:5, 936:8, 940:13,
950:14, 956:24, 957:12,
964:2, 975:23, 998:24,
999:9, 1010:14, 1012:19,
1016:14, 1020:4, 1025:3,
1029:14

**correct** [373] - 734:10,
742:3, 758:12, 773:14,
775:19, 775:22, 776:7,
780:18, 782:20, 794:11,
795:25, 796:4, 796:13,
796:17, 796:19, 796:23,
797:5, 797:10, 797:14,
797:18, 797:21, 797:25,
798:10, 798:14, 798:18,
798:22, 799:2, 799:6,
799:11, 799:15, 799:17,
799:23, 800:5, 800:9,
800:20, 800:24, 801:2,
801:8, 801:18, 801:22,
802:7, 804:21, 804:24,
805:5, 805:9, 805:14, 806:6,
806:9, 806:12, 806:15,
806:21, 806:24, 807:14,
807:16, 807:21, 807:24,
808:9, 808:12, 808:18,
808:24, 809:11, 809:15,
809:24, 811:9, 811:11,
812:9, 812:13, 812:21,

812:25, 813:4, 813:7,
813:10, 815:24, 841:4,
842:16, 882:21, 883:6,
885:21, 886:14, 893:2,
895:19, 911:20, 916:25,
919:8, 919:12, 919:15,
923:22, 928:5, 935:7, 935:9,
935:15, 935:19, 935:22,
935:25, 936:4, 936:7,
936:11, 936:14, 936:19,
936:24, 937:3, 937:7,
937:13, 938:14, 938:15,
939:24, 940:4, 940:12,
940:16, 940:19, 940:23,
942:15, 942:18, 942:23,
943:2, 943:8, 943:11,
943:16, 943:20, 944:10,
946:7, 946:10, 946:11,
947:12, 947:14, 947:15,
947:18, 947:21, 948:24,
949:21, 949:24, 950:2,
950:3, 950:6, 950:13,
950:16, 950:20, 950:23,
951:5, 951:13, 951:17,
952:8, 952:12, 953:8,
953:19, 953:25, 954:14,
954:23, 955:2, 955:5, 956:3,
956:6, 956:23, 957:3, 957:7,
957:11, 957:14, 957:22,
957:25, 958:8, 960:22,
960:25, 961:4, 961:18,
962:10, 962:13, 962:20,
962:25, 963:4, 963:7,
963:12, 963:15, 963:19,
963:22, 963:25, 964:5,
964:9, 964:13, 964:16,
965:4, 965:7, 965:10,
965:13, 965:20, 965:21,
965:24, 966:4, 966:8,
966:11, 966:22, 966:25,
968:10, 968:14, 968:15,
969:8, 969:11, 969:13,
970:9, 970:13, 970:20,
970:23, 971:2, 972:3,
972:11, 972:14, 974:11,
974:25, 975:11, 976:3,
977:3, 977:19, 977:22,
977:25, 978:5, 978:11,
979:2, 979:4, 979:8, 979:12,
979:15, 979:18, 979:22,
980:2, 980:6, 981:14,
981:15, 981:19, 982:20,
983:13, 984:4, 984:6, 985:8,
985:11, 985:14, 985:18,
985:23, 986:17, 987:6,
987:23, 988:14, 988:19,
988:24, 989:16, 989:21,
989:25, 990:3, 990:11,
990:14, 990:17, 990:22,
991:2, 991:9, 991:16,
991:19, 991:23, 992:5,
992:17, 992:22, 992:25,

993:7, 993:10, 993:14,
993:21, 994:8, 994:11,
995:3, 995:7, 995:10,
995:18, 995:21, 997:11,
998:20, 999:4, 999:8,
1000:9, 1000:14, 1001:7,
1001:10, 1001:13, 1001:17,
1001:22, 1002:19, 1002:24,
1003:6, 1003:15, 1003:17,
1003:22, 1003:23, 1003:24,
1004:3, 1004:9, 1004:25,
1005:2, 1005:6, 1005:10,
1005:16, 1005:20, 1005:24,
1007:8, 1007:14, 1007:17,
1007:25, 1008:7, 1008:17,
1010:2, 1010:13, 1011:4,
1011:7, 1012:15, 1012:18,
1013:5, 1013:10, 1013:14,
1014:11, 1014:14, 1014:17,
1014:22, 1015:23, 1016:3,
1016:7, 1016:10, 1016:12,
1016:13, 1016:16, 1016:19,
1016:25, 1017:2, 1017:11,
1017:23, 1018:23, 1019:11,
1019:16, 1019:24, 1020:3,
1020:6, 1021:9, 1021:24,
1023:8, 1023:11, 1023:15,
1024:19, 1024:22, 1025:2,
1025:5, 1025:11, 1026:14,
1026:24, 1027:6, 1027:9,
1027:10, 1027:13, 1027:18,
1027:22, 1028:4, 1028:11,
1029:9, 1029:13, 1029:16,
1030:3, 1030:8, 1030:16,
1031:13, 1031:15, 1032:15,
1034:4, 1034:17, 1034:22,
1035:10, 1038:25, 1043:18,
1045:13, 1045:18

**correctly** [4] - 754:9,
1019:8, 1037:18, 1037:20

**correspondence** [3] -
868:8, 996:11, 1002:8

**cost** [6] - 787:15, 788:13,
788:15, 789:3, 790:12,
929:18

**cost-cutting** [6] - 787:15,
788:13, 788:15, 789:3,
790:12, 929:18

**COSTER** [1] - 728:21

**costs** [6] - 927:3, 929:20,
930:8, 930:13, 931:10,
931:15

**counsel** [3] - 939:13,
968:25, 1048:18

**count** [3] - 910:4, 930:8,
1030:3

**counterpart** [2] - 963:10,
963:12

**COUNTY** [1] - 1048:6

**Couple** [1] - 748:20

**couple** [24] - 732:8, 738:3,
746:23, 749:2, 753:13,

754:8, 754:11, 758:6,
768:17, 813:24, 840:5,
844:5, 844:9, 846:16,
846:24, 847:4, 873:5,
873:23, 884:9, 890:25,
898:24, 899:16, 929:9,
1020:13

**course** [5] - 774:17, 774:20,
853:10, 948:5, 1019:2

**court** [1] - 1046:17

**courtesy** [3] - 896:9,
896:17, 900:25

**cover** [15] - 733:15, 752:21,
761:10, 791:25, 794:23,
795:3, 795:6, 811:8, 835:21,
835:23, 917:15, 932:8,
933:2, 933:6, 1045:15

**coverage** [3] - 762:6,
836:16, 1045:12

**covered** [18] - 733:11,
733:13, 762:20, 787:19,
791:10, 792:9, 793:24,
793:25, 794:6, 828:19,
900:8, 900:9, 926:22,
932:11, 932:14, 963:4,
963:6, 1021:15

**covering** [7] - 740:7,
762:11, 776:23, 776:24,
828:15, 889:3, 934:4

**create** [3] - 868:16, 951:16,
1023:18

**created** [1] - 922:2

**creating** [2] - 915:14,
951:24

**credible** [2] - 951:16,
951:24

**credit** [7] - 820:13, 820:14,
820:15, 820:23, 904:8,
904:20, 911:13

**credits** [3] - 733:11, 889:2,
889:10

**crisis** [3] - 829:20, 831:2,
921:4

**criteria** [2] - 826:6, 826:10

**Cross** [119] - 795:14, 796:1,
797:1, 798:1, 799:1, 800:1,
801:1, 802:1, 803:1, 804:1,
805:1, 806:1, 807:1, 808:1,
809:1, 810:1, 811:1, 812:1,
813:1, 935:1, 936:1, 937:1,
938:1, 939:1, 940:1, 941:1,
942:1, 943:1, 944:1, 945:1,
946:1, 947:1, 948:1, 949:1,
950:1, 951:1, 952:1, 953:1,
954:1, 955:1, 956:1, 957:1,
958:1, 959:1, 960:1, 961:1,
962:1, 963:1, 964:1, 965:1,
966:1, 967:1, 968:1, 969:1,
970:1, 971:1, 972:1, 973:1,
974:1, 975:1, 976:1, 977:1,
978:1, 979:1, 980:1, 981:1,
982:1, 983:1, 984:1, 985:1,

986:1, 987:1, 988:1, 989:1,
990:1, 991:1, 992:1, 993:1,
994:1, 995:1, 996:1, 997:1,
998:1, 999:1, 1000:1,
1001:1, 1002:1, 1003:1,
1004:1, 1005:1, 1006:1,
1007:1, 1008:1, 1009:1,
1010:1, 1011:1, 1012:1,
1013:1, 1014:1, 1015:1,
1016:1, 1017:1, 1018:1,
1019:1, 1020:1, 1021:1,
1022:1, 1023:1, 1024:1,
1025:1, 1026:1, 1027:1,
1028:1, 1029:1, 1030:1,
1031:1, 1032:1, 1033:1,
1034:1

**CROSS** [4] - 730:7, 730:12,
795:15, 935:2

**cross** [1] - 1035:23

**cross-exam** [1] - 1035:23

**Cross-examination** [1] -
795:14

**CROSS-EXAMINATION** [2]
- 795:15, 935:2

**CSR/RMR/CRR** [3] -
727:23, 1048:8, 1048:22

**culture** [1] - 885:24

**current** [5] - 731:11, 758:6,
817:13, 930:22, 1045:6

**customers** [2] - 809:22,
810:5

**cut** [2] - 929:20, 930:12

**cuts** [1] - 929:20

**cutting** [11] - 787:15,
788:13, 788:15, 789:3,
790:12, 927:3, 929:18,
930:8, 931:10, 931:15

# D

**D9** [1] - 822:13

**Daniels** [7] - 759:25, 760:2,
762:2, 762:6, 762:11,
762:15, 776:24

**data** [12] - 904:2, 904:6,
905:4, 905:23, 915:21,
915:22, 952:17, 957:15,
958:15, 959:15, 959:23

**date** [26] - 765:22, 783:14,
822:4, 840:10, 840:19,
855:8, 856:25, 870:3,
876:22, 879:5, 881:5,
887:10, 898:2, 912:21,
961:10, 970:10, 984:25,
1001:19, 1002:2, 1002:7,
1003:2, 1007:19, 1011:21,
1014:5, 1034:11, 1043:3

**dated** [22] - 746:14, 751:19,
755:5, 767:6, 767:23, 826:3,
839:21, 848:16, 848:18,
856:9, 865:25, 874:12,

878:20, 879:2, 881:2,
883:17, 912:7, 927:23,
961:17, 962:6, 970:4,
1042:12

**dates** [5] - 858:5, 967:2,
1013:13, 1014:2, 1039:12

**daughter** [7] - 799:2,
812:13, 985:18, 987:6,
987:15, 988:18, 1019:23

**day-to-day** [5] - 809:18,
834:23, 835:5, 835:17,
1007:3

**days** [5] - 768:18, 802:20,
861:12, 891:2, 913:5

**dealing** [2] - 914:9, 1023:20

**Dear** [1] - 922:16

**debating** [1] - 1012:23

**Deborah** [2] - 856:9, 856:20

**Deborah's** [1] - 881:24

**debt** [3] - 830:22, 833:14,
931:25

**December** [5] - 902:10,
1021:13, 1021:19, 1027:22,
1034:21

**decentralized** [1] - 901:3

**decide** [3] - 926:13, 942:17,
1023:7

**decided** [19] - 788:18,
826:5, 833:2, 842:12, 847:8,
903:4, 916:18, 956:5,
984:12, 995:2, 997:6,
1004:6, 1005:6, 1005:9,
1005:15, 1005:19, 1005:23,
1029:15, 1030:2

**decides** [1] - 869:5

**deciding** [6] - 847:25,
944:9, 1004:22, 1021:16,
1023:15, 1027:12

**decision** [53] - 771:19,
774:22, 781:4, 787:2, 787:5,
787:13, 787:22, 788:10,
792:14, 814:20, 815:3,
815:6, 815:14, 828:2,
830:15, 830:18, 832:7,
832:9, 832:14, 832:22,
838:7, 850:23, 851:13,
854:4, 855:17, 855:21,
857:16, 857:19, 862:10,
862:20, 862:24, 863:3,
876:6, 900:10, 903:7, 909:2,
916:21, 924:22, 925:22,
926:11, 927:9, 927:14,
927:18, 931:17, 934:14,
945:2, 946:3, 962:22,
966:10, 984:8, 998:3,
1018:21, 1019:10

**decisions** [14] - 816:8,
838:11, 850:12, 864:7,
868:19, 905:2, 995:25,
996:2, 996:11, 996:12,
998:13, 998:18, 1027:21,

1030:5

**Decker** [2] - 971:19,
1042:10

**decrease** [2] - 922:21,
922:24

**decreased** [1] - 924:13

**deduct** [1] - 854:22

**deeply** [1] - 819:14

**definition** [1] - 867:2

**degree** [2] - 817:25, 996:25

**degrees** [1] - 997:2

**delay** [3] - 800:24, 875:2,
875:23

**delegation** [2] - 852:8,
877:17

**delivered** [1] - 937:22

**demoted** [2] - 770:25,
771:4

**demotion** [2] - 851:9,
1020:5

**Denys** [39] - 838:16, 839:4,
839:8, 839:20, 839:23,
840:14, 840:18, 841:4,
842:10, 843:25, 863:14,
863:16, 863:19, 864:13,
865:5, 867:22, 870:19,
870:22, 887:2, 894:16,
912:7, 912:20, 978:22,
978:25, 979:10, 989:9,
989:16, 991:15, 991:18,
1003:21, 1041:9, 1041:12,
1042:9, 1042:18, 1043:12,
1043:18, 1046:6, 1046:7,
1046:21

**Denys'** [3] - 865:12, 866:19,
1041:17

**departed** [1] - 833:17

**Department** [6] - 822:13,
823:8, 823:12, 928:10,
928:17, 1034:23

**department** [32] - 768:11,
825:25, 835:14, 836:23,
838:5, 845:2, 845:20, 861:4,
867:21, 871:23, 874:22,
875:6, 890:17, 894:7, 900:3,
908:8, 916:16, 916:23,
926:21, 929:2, 929:17,
966:13, 984:14, 996:14,
996:21, 996:25, 1003:10,
1031:2, 1031:11, 1034:7,
1037:14, 1043:21

**department's** [1] - 909:3

**departure** [4] - 832:10,
832:11, 843:25, 1030:21

**Depo** [1] - 943:23

**deposed** [2] - 938:2, 985:20

**deposition** [20] - 938:8,
938:10, 938:18, 942:3,
980:15, 984:16, 986:3,
991:5, 1008:19, 1009:5,
1010:2, 1010:9, 1012:15,

1012:18, 1013:17, 1016:10,
1016:15, 1016:21, 1022:6,
1030:25

**describe** [8] - 732:10,
732:18, 733:8, 774:6,
792:19, 796:25, 797:17,
812:15

**described** [4] - 733:16,
781:12, 798:7, 808:11

**describing** [2] - 744:18,
797:24

**description** [2] - 867:5,
867:6

**desk** [5] - 733:14, 761:10,
777:25, 901:2, 933:17

**detail** [1] - 869:12

**details** [2] - 840:23,
1004:19

**deteriorating** [1] - 927:4

**determination** [1] - 910:4

**determinative** [2] - 905:13,
996:7

**determine** [4] - 751:3,
790:23, 910:6, 978:9

**determined** [1] - 903:24

**determining** [6] - 826:14,
943:19, 944:23, 945:19,
945:24, 1024:6

**dialog** [1] - 896:8

**difference** [3] - 743:23,
973:16, 1029:23

**different** [18] - 766:23,
790:20, 791:9, 808:6, 810:3,
820:6, 825:13, 882:2,
885:16, 896:13, 896:23,
901:4, 945:8, 958:23, 962:3,
968:19, 1026:22, 1028:9

**differently** [2] - 745:5,
1040:8

**difficult** [3] - 789:21,
789:25, 958:10

**diligently** [2] - 1026:10,
1026:21

**dinner** [1] - 910:15

**DIRECT** [5] - 730:6, 730:11,
731:5, 817:8, 892:7

**Direct** [182] - 732:1, 733:1,
734:1, 735:1, 736:1, 737:1,
738:1, 739:1, 740:1, 741:1,
742:1, 743:1, 744:1, 745:1,
746:1, 747:1, 748:1, 749:1,
750:1, 751:1, 752:1, 753:1,
754:1, 755:1, 756:1, 757:1,
758:1, 759:1, 760:1, 761:1,
762:1, 763:1, 764:1, 765:1,
766:1, 767:1, 768:1, 769:1,
770:1, 771:1, 772:1, 773:1,
774:1, 775:1, 776:1, 777:1,
778:1, 779:1, 780:1, 781:1,
782:1, 783:1, 784:1, 785:1,
786:1, 787:1, 788:1, 789:1,

1058

790:1, 791:1, 792:1, 793:1, 794:1, 795:1, 817:1, 818:1, 819:1, 820:1, 821:1, 822:1, 823:1, 824:1, 825:1, 826:1, 827:1, 828:1, 829:1, 830:1, 831:1, 832:1, 833:1, 834:1, 835:1, 836:1, 837:1, 838:1, 839:1, 840:1, 841:1, 842:1, 843:1, 844:1, 845:1, 846:1, 847:1, 848:1, 849:1, 850:1, 851:1, 852:1, 853:1, 854:1, 855:1, 856:1, 857:1, 858:1, 859:1, 860:1, 861:1, 862:1, 863:1, 864:1, 865:1, 866:1, 867:1, 868:1, 869:1, 870:1, 871:1, 872:1, 873:1, 874:1, 875:1, 876:1, 877:1, 878:1, 879:1, 880:1, 881:1, 882:1, 883:1, 884:1, 885:1, 886:1, 887:1, 888:1, 889:1, 890:1, 891:1, 892:1, 893:1, 894:1, 895:1, 896:1, 897:1, 898:1, 899:1, 900:1, 901:1, 902:1, 903:1, 904:1, 905:1, 906:1, 907:1, 908:1, 909:1, 910:1, 911:1, 912:1, 913:1, 914:1, 915:1, 916:1, 917:1, 918:1, 919:1, 920:1, 921:1, 922:1, 923:1, 924:1, 925:1, 926:1, 927:1, 928:1, 929:1, 930:1, 931:1, 932:1, 933:1, 934:1

**direct** [4] - 814:9, 838:14, 842:15, 954:20

**directed** [4] - 838:15, 843:24, 844:25, 979:7

**direction** [3] - 894:16, 895:14, 935:15

**directly** [4] - 763:22, 857:9, 910:25, 1048:16

**director** [18] - 817:17, 820:2, 863:16, 882:24, 883:11, 908:7, 946:7, 954:14, 955:16, 964:13, 965:9, 1020:10, 1038:5, 1038:21, 1038:22, 1043:20

**directors** [3] - 920:13, 920:16, 920:19

**dis** [1] - 998:9

**disability** [4] - 867:2, 881:16, 884:22, 936:4

**disagree** [1] - 788:9

**disappointed** [3] - 886:3, 997:8, 998:22

**disappointing** [1] - 848:3

**disapprove** [3] - 757:16, 757:20, 845:17

**disapproved** [1] - 843:8

**disbanding** [1] - 1033:16

**discharge** [1] - 884:23

**discovery** [2] - 810:16, 890:16

**discretion** [2] - 894:20,

895:3

**discretionary** [28] - 735:5, 771:10, 771:13, 775:15, 776:25, 780:15, 780:25, 781:5, 781:22, 783:5, 784:7, 825:5, 826:14, 901:24, 903:2, 906:18, 906:21, 908:9, 913:14, 915:25, 916:2, 916:13, 917:5, 919:20, 919:23, 923:7, 952:15, 957:9

**discriminate** [2] - 935:25, 936:4

**discriminated** [1] - 819:4

**discriminating** [4] - 782:8, 785:17, 906:15, 919:19

**discrimination** [3] - 818:24, 935:21, 936:7

**discuss** [19] - 751:6, 759:13, 771:18, 771:21, 779:17, 779:20, 787:4, 826:18, 838:2, 858:18, 867:15, 903:7, 903:18, 905:12, 907:23, 920:7, 975:16, 980:4, 998:18

**discussed** [22] - 743:13, 743:17, 759:16, 762:6, 762:8, 773:5, 844:6, 848:2, 855:7, 858:16, 868:18, 869:18, 871:18, 875:16, 889:24, 892:15, 903:9, 908:21, 958:10, 976:15, 1018:17, 1019:9

**discussing** [2] - 850:18, 889:15

**Discussion** [2] - 800:13, 1000:5

**discussion** [15] - 781:15, 787:10, 787:13, 804:9, 860:11, 860:20, 875:5, 876:2, 890:6, 914:22, 974:10, 980:9, 998:10, 1019:3, 1044:5

**discussions** [5] - 771:24, 781:7, 846:15, 876:25, 974:8

**displeasure** [1] - 779:16

**disproportionally** [1] - 774:2

**dispute** [4] - 872:10, 895:16, 897:3, 1007:16

**disputed** [1] - 897:2

**disputing** [1] - 960:6

**disruptive** [1] - 831:15

**dissemination** [1] - 835:3

**dissuade** [2] - 842:19, 842:24

**distinction** [1] - 1038:20

**distribute** [2] - 738:10, 739:6

**distribution** [4] - 738:10, 813:13, 836:22, 912:25

**divided** [1] - 820:5

**division** [4] - 829:10, 917:19, 931:23, 1045:3

**doctor** [6] - 756:4, 884:3, 884:18, 885:3, 988:20

**doctors** [3] - 799:4, 884:22, 988:19

**document** [23] - 740:19, 768:22, 780:25, 785:7, 805:16, 808:9, 815:12, 815:18, 836:17, 861:11, 869:14, 874:7, 892:21, 910:9, 919:10, 921:9, 923:14, 954:20, 969:3, 989:7, 993:15, 996:2, 996:3

**documentation** [6] - 835:16, 880:10, 959:19, 983:15, 996:6, 996:10

**documented** [2] - 873:21, 880:9

**documenting** [1] - 873:14, 877:12

**documents** [12] - 772:12, 821:10, 852:12, 877:14, 880:15, 898:7, 959:22, 962:15, 967:11, 1002:5, 1003:19, 1028:5

**DOLINGER** [1] - 727:12

**Dolinger** [3] - 793:14, 814:19, 865:20

**Dolinger's** [1] - 862:18

**dollar** [3] - 826:20, 900:4, 912:24

**dollars** [1] - 913:12

**done** [19] - 749:21, 771:10, 776:22, 777:2, 795:9, 844:24, 845:25, 879:17, 890:24, 891:10, 951:23, 961:4, 962:12, 977:25, 978:3, 989:12, 993:23, 1045:22

**doubt** [5] - 862:19, 862:23, 866:7, 866:9, 875:10

**Down** [2] - 921:22, 921:25

**down** [18] - 746:11, 762:7, 772:23, 773:3, 773:24, 819:20, 862:7, 884:16, 890:5, 893:10, 896:24, 907:7, 922:4, 922:10, 923:21, 924:4, 926:22, 949:5

**downsizing** [2] - 789:4, 792:5

**dozen** [1] - 1030:10

**draft** [1] - 741:12

**drafting** [1] - 867:18

**drafts** [1] - 749:16

**draw** [10] - 798:11, 800:11, 804:18, 808:3, 869:7, 974:7, 992:11, 995:23, 1020:11, 1021:4

**drew** [1] - 1006:25

**driven** [1] - 826:5

**due** [1] - 839:25

**duly** [2] - 731:3, 817:6

**duplicitous** [1] - 861:22

**During** [16] - 732:9, 748:9, 752:16, 760:4, 761:12, 765:2, 776:13, 787:21, 788:2, 793:15, 824:12, 824:16, 827:16, 844:13, 857:23, 1017:7

**during** [40] - 745:10, 745:22, 750:16, 753:5, 770:9, 776:8, 776:11, 780:11, 805:12, 819:25, 833:19, 837:2, 837:21, 837:25, 844:21, 849:17, 858:7, 859:24, 861:7, 861:17, 862:12, 868:12, 882:4, 882:8, 882:12, 888:17, 890:25, 897:14, 930:11, 933:24, 934:15, 980:21, 982:17, 983:12, 985:6, 998:6, 1015:18, 1016:10, 1017:21, 1039:23

**duties** [2] - 982:25, 983:19

**duty** [1] - 994:6

## E

**e-mail** [198] - 740:23, 741:2, 741:5, 741:15, 742:4, 746:14, 746:25, 747:12, 747:24, 748:18, 750:12, 750:14, 751:18, 752:2, 752:5, 752:11, 752:18, 753:23, 754:20, 755:3, 755:5, 755:9, 755:12, 755:22, 756:4, 756:20, 756:22, 756:25, 757:3, 757:6, 757:9, 757:11, 757:23, 758:4, 758:8, 758:14, 759:3, 759:15, 759:17, 760:18, 763:14, 767:4, 767:8, 767:21, 768:2, 768:8, 768:14, 768:20, 769:7, 770:11, 770:12, 798:21, 798:24, 799:10, 799:13, 799:20, 800:3, 800:4, 800:7, 800:17, 800:25, 801:2, 801:4, 801:7, 801:14, 801:19, 802:13, 802:20, 803:2, 803:4, 803:5, 803:6, 803:12, 803:13, 803:18, 804:14, 808:10, 810:23, 811:8, 811:13, 815:20, 815:22, 825:19, 826:2, 826:11, 839:20, 839:22, 841:14, 841:21, 848:13, 848:15, 848:24, 849:8, 849:12, 849:19, 849:20, 849:23, 849:25,

850:8, 855:15, 856:8, 858:18, 863:14, 865:12, 865:24, 866:6, 866:14, 866:19, 866:24, 874:12, 874:15, 874:25, 875:12, 875:16, 875:22, 876:22, 876:25, 877:5, 877:11, 877:23, 878:18, 878:19, 878:20, 879:2, 879:10, 883:16, 883:17, 886:2, 886:15, 886:25, 897:25, 912:6, 912:20, 915:10, 947:25, 948:8, 957:18, 958:16, 959:3, 959:13, 960:4, 971:12, 971:13, 972:5, 978:4, 978:6, 978:21, 978:24, 979:14, 979:20, 985:14, 987:21, 987:22, 987:24, 988:7, 988:12, 988:13, 988:16, 988:22, 989:8, 989:15, 990:13, 990:14, 991:14, 991:21, 992:3, 995:16, 995:17, 996:4, 997:10, 997:15, 999:18, 999:24, 1000:12, 1001:3, 1001:21, 1001:23, 1002:4, 1003:24, 1004:3, 1008:16, 1009:14, 1010:18, 1011:3, 1011:9, 1011:10, 1013:8, 1013:21, 1014:13, 1023:3, 1041:8, 1041:17, 1041:23, 1042:9, 1042:15, 1042:25, 1043:3

**e-mailed** [1] - 849:11
**e-mailing** [1] - 769:19
**e-mails** [6] - 745:14, 745:16, 746:3, 746:10, 848:11, 992:7
**earliest** [1] - 902:21
**early** [8] - 816:18, 902:5, 908:13, 957:10, 1021:8, 1024:7, 1027:17, 1036:14
**earn** [2] - 792:16, 973:18
**earned** [3] - 833:12, 958:21, 958:24
**earnings** [14] - 759:5, 759:7, 759:14, 760:5, 760:13, 762:12, 762:17, 790:22, 791:2, 791:12, 902:14, 902:22, 961:16, 961:17
**easier** [1] - 948:16
**East** [1] - 799:5
**eating** [1] - 816:21
**economic** [1] - 956:8
**edges** [1] - 914:21
**educational** [1] - 817:24
**effect** [2] - 923:6, 923:9
**effective** [5] - 861:12, 881:5, 970:15, 1002:3
**effort** [2] - 835:8, 956:21, 1045:5

**efforts** [2] - 983:16, 1033:17
**eight** [2] - 879:9, 879:20
**Eileen** [3] - 727:23, 1048:8, 1048:22
**either** [14] - 793:17, 838:24, 846:3, 849:8, 850:11, 854:3, 878:13, 879:15, 886:2, 982:10, 994:15, 1006:7, 1016:19, 1038:21
**elapsed** [1] - 941:2
**elect** [3] - 895:12, 898:9, 1003:9
**elected** [1] - 865:16
**electing** [4] - 985:23, 986:10, 986:16, 986:25
**element** [1] - 1004:10
**elements** [2] - 855:2, 861:3
**elevating** [1] - 833:4
**elevators** [1] - 819:20
**eligible** [5] - 825:11, 941:22, 942:10, 973:20, 994:10
**eliminations** [2] - 1044:12, 1044:16
**EM** [2] - 741:23, 741:24
**emerging** [2] - 820:16, 911:17
**Emerging** [1] - 741:25
**Emily** [1] - 729:3
**empirical** [1] - 960:3
**empirically** [1] - 904:6
**employ** [5] - 736:23, 737:12, 1005:6, 1005:15, 1048:17
**employed** [4] - 731:9, 817:11, 833:22, 943:8
**employee** [18] - 819:4, 831:10, 840:23, 840:25, 880:23, 912:2, 933:19, 934:14, 934:16, 936:7, 936:17, 937:6, 943:11, 970:3, 972:25, 1025:2, 1035:25, 1036:4
**employee's** [3] - 913:2, 970:3, 1024:13
**employees** [9] - 819:22, 923:7, 924:9, 924:13, 936:11, 936:23, 940:16, 942:17, 947:5
**employees'** [1] - 819:8
**employer** [1] - 1034:2
**employing** [1] - 737:7
**employment** [14] - 787:2, 816:8, 819:16, 837:2, 850:13, 850:14, 883:3, 925:23, 926:14, 927:10, 927:18, 963:18, 1029:16, 1029:19
**employs** [1] - 834:7
**enclosed** [1] - 871:16

**end** [14] - 735:14, 825:7, 825:11, 847:14, 875:3, 902:15, 902:17, 909:10, 946:6, 947:4, 947:7, 972:2, 1031:3, 1046:15
**end-of-year** [1] - 947:4
**ending** [4] - 806:6, 806:23, 960:13
**Energy** [1] - 917:16
**energy** [6] - 904:10, 905:17, 909:20, 917:17, 917:22, 917:24
**enforcement** [1] - 852:2
**engaged** [1] - 1004:23
**engagement** [2] - 910:7, 1006:12
**Engagement** [1] - 826:23
**enjoy** [1] - 868:4
**enormous** [2] - 918:3, 931:24
**ensued** [1] - 908:23
**ensuing** [1] - 831:2
**entire** [11] - 755:13, 794:14, 859:24, 897:22, 904:21, 917:2, 975:5, 979:17, 1015:18, 1028:10, 1031:25
**entirely** [1] - 993:22
**entirety** [2] - 780:9, 908:3
**entitled** [11] - 735:7, 840:21, 845:8, 871:19, 936:17, 939:23, 968:6, 991:19, 1001:10, 1001:13, 1035:25
**entity** [1] - 1033:19
**environment** [7] - 819:21, 850:20, 901:5, 904:13, 904:25, 918:2, 930:6
**equal** [1] - 973:24
**equities** [3] - 829:9, 1030:9, 1030:18
**equity** [3] - 792:11, 900:9, 926:23
**error** [1] - 861:23
**errors** [1] - 955:4
**especially** [1] - 927:5
**ESQ** [4] - 728:9, 728:11, 728:19, 728:21
**Esq** [1] - 729:5
**essentially** [1] - 802:20
**ethical** [1] - 819:21
**evaluate** [1] - 940:15
**evaluation** [2] - 1036:10, 1036:25
**evaluations** [3] - 826:4, 941:4, 941:7
**evening** [1] - 836:13
**event** [2] - 867:25, 869:7
**events** [8] - 789:4, 836:12, 836:14, 838:23, 852:19, 911:3, 1005:12, 1005:14
**eventually** [5] - 734:11,

762:20, 786:16, 977:24, 1023:7
**evidence** [1] - 960:3
**evident** [3] - 959:12, 1010:6, 1012:5
**exact** [2] - 762:13, 805:15
**exactly** [2] - 869:8, 964:17
**exaggerated** [1] - 739:4
**exam** [1] - 1035:23
**EXAMINATION** [8] - 730:3, 731:5, 795:15, 814:6, 817:8, 892:7, 935:2, 1035:19
**examination** [3] - 793:2, 795:14, 1046:21
**examined** [2] - 731:4, 817:7
**example** [2] - 904:19, 909:14
**exceeds** [1] - 949:11
**exception** [2] - 732:6, 940:24
**Exceptional** [1] - 949:10
**exceptional** [4] - 949:24, 950:13, 951:5, 951:13
**exchange** [2] - 825:20, 841:3, 863:14, 915:4, 978:21, 979:17, 1003:24
**exchanged** [1] - 810:15
**excited** [1] - 839:2
**exclusive** [2] - 737:8, 972:22
**exclusively** [1] - 929:21
**Excuse** [2] - 945:7, 980:12
**excuse** [4] - 806:15, 959:4, 979:11, 980:21
**executive** [4] - 856:12, 954:14, 955:16, 1038:21
**executives** [1] - 796:23
**exempt** [1] - 820:11
**exhibit** [13] - 784:18, 803:7, 810:16, 821:6, 825:16, 886:12, 923:13, 971:9, 988:2, 1010:22, 1025:6, 1036:8, 1039:7
**Exhibit** [88] - 740:18, 746:5, 751:12, 754:22, 766:23, 772:3, 772:12, 777:4, 778:6, 780:21, 783:7, 785:3, 799:24, 800:12, 800:15, 803:10, 803:13, 805:17, 805:19, 808:4, 810:20, 815:9, 821:7, 825:13, 839:14, 848:5, 855:16, 856:3, 859:4, 860:18, 863:6, 865:19, 874:8, 878:15, 880:12, 883:13, 886:13, 886:21, 892:10, 912:4, 914:25, 918:6, 921:6, 923:13, 927:20, 943:22, 943:23, 943:24, 944:2, 946:14, 946:20, 946:23, 947:23, 952:18, 952:22,

1060

952:23, 952:24, 953:16,
953:18, 954:17, 957:16,
957:18, 960:10, 967:4,
978:16, 988:4, 989:2,
991:14, 992:13, 995:12,
995:15, 995:24, 996:16,
997:3, 997:18, 998:21,
999:21, 1000:21, 1008:17,
1010:17, 1015:2, 1017:15,
1022:22, 1031:19, 1037:16,
1040:12, 1041:4, 1042:6
  **exhibits** [2] - 815:9, 974:21
  **exists** [2] - 890:9, 890:15
  **exiting** [1] - 830:21
  **expanded** [1] - 950:19
  **expect** [7] - 850:7, 896:16,
902:8, 940:18, 940:21,
941:12, 993:12
  **expectation** [1] - 950:18
  **expectations** [7] - 914:17,
949:11, 949:12, 950:5,
950:16, 981:9
  **expected** [2] - 896:11,
1040:22
  **expecting** [2] - 753:11,
847:18
  **expense** [1] - 929:24
  **expenses** [1] - 930:3
  **experience** [6] - 862:12,
868:3, 868:20, 929:19,
934:5, 963:22
  **expired** [1] - 829:23
  **explain** [3] - 836:8, 915:3,
979:12
  **explaining** [1] - 830:20
  **explanation** [1] - 774:21
  **Explanation** [1] - 1038:4
  **explanations** [1] - 881:16
  **Explanations** [2] - 928:9,
968:6
  **expressed** [1] - 779:15
  **expressly** [2] - 800:3,
979:21
  **extend** [5] - 850:23, 984:10,
984:22, 997:9, 998:3
  **extended** [2] - 873:18,
984:4
  **extending** [1] - 869:21
  **extension** [2] - 758:6,
884:24
  **extent** [6] - 791:9, 858:21,
864:19, 876:10, 876:18,
955:15
  **extra** [1] - 773:11
  **extremely** [5] - 852:9,
904:11, 904:12, 904:14,
918:2

---

**F**

---

**facility** [2] - 829:19, 900:4

---

**fact** [23] - 769:10, 799:19,
839:4, 846:21, 847:23,
855:23, 878:3, 886:8,
916:19, 927:7, 927:12,
927:16, 931:13, 950:15,
974:16, 987:5, 1003:2,
1003:21, 1009:20, 1024:21,
1036:4, 1039:21, 1039:22
  **factors** [8] - 825:4, 826:13,
916:14, 926:15, 1023:14,
1023:16, 1023:18, 1024:5
  **factually** [1] - 990:2
  **failure** [1] - 831:6
  **fair** [6] - 740:3, 777:15,
781:17, 906:20, 967:3,
1031:4
  **Fair** [1] - 989:5, 1000:18
  **fairly** [1] - 853:5
  **fall** [3] - 864:21, 905:18,
919:5
  **familiar** [13] - 824:5,
827:14, 836:5, 864:14,
911:9, 920:19, 940:8,
940:11, 969:5, 993:6,
1004:19, 1017:24, 1018:12
  **family** [4] - 752:7, 868:10,
868:19, 871:19
  **Family** [4] - 840:22, 841:9,
865:7, 871:16, 887:20,
979:21
  **far** [4] - 750:15, 790:19,
793:4, 1040:21
  **fast** [1] - 1037:19
  **father** [4] - 912:10, 912:20,
913:18, 935:9
  **fault** [1] - 945:15
  **February** [15] - 740:24,
771:15, 779:22, 780:19,
783:14, 813:3, 813:9, 902:5,
902:6, 908:14, 919:5, 970:4,
970:15, 970:23
  **feedback** [8] - 827:2,
909:16, 909:17, 909:21,
940:23, 941:13, 1036:17,
1036:20
  **Fellow** [1] - 922:16
  **felt** [24] - 744:16, 745:4,
752:20, 761:16, 761:19,
761:22, 770:25, 771:3,
773:5, 774:2, 775:2, 779:25,
780:5, 782:8, 832:22, 833:4,
842:19, 843:3, 844:7,
844:17, 850:6, 869:7,
869:13, 877:12
  **few** [9] - 793:13, 795:21,
814:3, 865:21, 911:21,
949:2, 983:20, 989:11,
1035:21
  **Fifth** [1] - 728:6
  **figure** [2] - 840:2, 1022:13
  **figured** [1] - 833:7

---

**file** [2] - 810:23, 912:23
  **filed** [4] - 859:10, 954:25,
993:17, 1016:2
  **fill** [11] - 759:22, 761:10,
828:14, 845:2, 858:3,
865:16, 975:17, 994:2,
994:5, 994:20, 1003:19
  **Fill** [2] - 993:24, 1036:7
  **filled** [8] - 880:10, 969:16,
993:17, 996:10, 1001:16,
1002:6, 1039:13, 1039:16
  **final** [5] - 876:6, 885:19,
912:23, 953:8, 953:18
  **finalize** [1] - 914:16
  **finalized** [1] - 912:22
  **finally** [1] - 1044:10
  **finance** [1] - 820:12
  **financial** [1] - 921:3
  **Financial** [1] - 921:18
  **financing** [2] - 829:21,
830:23
  **fine** [2] - 858:3, 884:10,
893:9
  **finger** [1] - 861:24
  **finger-pointing** [1] - 861:24
  **finish** [3] - 764:4, 802:3,
997:25
  **finishing** [1] - 967:18
  **FINRA** [5] - 731:14, 731:21,
818:6, 818:11, 852:2
  **fired** [2] - 1030:8, 1030:10
  **firm** [30] - 786:2, 793:12,
794:8, 819:14, 819:16,
819:17, 819:18, 825:8,
825:9, 826:7, 833:7, 840:3,
841:8, 851:22, 855:3, 883:4,
890:23, 912:11, 921:2,
929:20, 930:2, 930:12,
931:19, 931:22, 932:5,
932:6, 992:2, 1004:17,
1006:21, 1031:25
  **firm's** [6] - 853:4, 916:15,
927:5, 935:12, 935:15, 992:8
  **firms** [3] - 910:9, 930:9,
1003:9
  **first** [59] - 733:5, 741:17,
753:20, 755:11, 763:19,
763:20, 768:14, 770:19,
770:24, 773:4, 796:8,
801:17, 816:24, 818:14,
823:9, 827:14, 831:8,
837:15, 837:21, 838:17,
840:7, 840:11, 843:23,
847:2, 847:24, 860:8, 864:4,
865:23, 867:13, 867:23,
876:11, 877:5, 883:22,
884:9, 887:8, 888:10,
889:16, 890:25, 891:2,
892:21, 899:12, 916:5,
922:19, 927:22, 951:2,
951:22, 960:16, 961:12,

---

966:14, 967:15, 967:22,
976:19, 985:21, 993:3,
998:23, 1014:17, 1015:25,
1021:19, 1041:16
  **five** [8] - 795:12, 829:19,
899:25, 907:14, 911:16,
970:8, 980:16, 1035:14
  **five-year** [1] - 829:19
  **fixed** [33] - 733:3, 736:15,
768:11, 808:12, 812:3,
820:3, 820:5, 820:11,
821:16, 821:17, 822:7,
824:5, 825:10, 860:25,
874:20, 874:22, 875:6,
903:20, 911:23, 917:18,
930:12, 935:18, 940:12,
995:21, 996:14, 996:21,
996:24, 1004:9, 1030:11,
1030:12, 1030:16, 1031:12
  **flag** [1] - 869:10
  **flexibility** [2] - 870:3, 898:8
  **flip** [1] - 967:5
  **Floor** [1] - 728:6
  **fly** [7] - 799:2, 799:5,
985:18, 987:6, 987:16,
988:18, 988:21
  **FMLA** [67] - 743:8, 757:6,
760:7, 761:14, 819:8,
841:10, 842:20, 844:14,
844:16, 844:22, 844:23,
849:20, 865:7, 865:8,
865:14, 866:20, 867:3,
872:6, 880:4, 898:6, 933:21,
940:3, 969:16, 969:20,
969:24, 970:7, 971:20,
979:21, 982:19, 983:3,
983:9, 983:15, 983:23,
990:22, 991:23, 991:24,
992:4, 993:16, 993:19,
993:21, 994:8, 994:11,
994:16, 1001:5, 1001:9,
1001:16, 1001:20, 1001:22,
1002:3, 1002:10, 1002:19,
1002:23, 1003:3, 1003:5,
1007:17, 1035:25, 1036:5,
1039:12, 1039:15, 1041:13,
1041:18, 1041:25, 1043:5,
1043:7, 1043:9
  **focus** [5] - 889:8, 900:10,
931:17, 932:7, 1004:14
  **focused** [2] - 931:22,
931:23
  **folks** [2] - 808:12, 1033:12
  **follow** [7] - 875:15, 884:3,
884:17, 910:11, 978:9,
983:15, 998:16
  **Follow** [1] - 866:2
  **follow-up** [4] - 884:3,
884:17, 983:15, 998:16
  **Follow-up** [1] - 866:2
  **followed** [2] - 839:8, 996:7

**following** [11] - 739:5, 850:10, 851:13, 857:4, 880:5, 902:6, 912:18, 919:4, 919:5, 985:22, 1037:22
**Following** [2] - 779:22, 794:22
**follows** [3] - 731:4, 817:7, 892:6
**food** [1] - 733:12
**Force** [2] - 950:9, 951:11
**force** [5] - 826:25, 907:10, 1036:18, 1036:21, 1044:9
**forced** [1] - 753:7
**forcing** [1] - 761:23
**foregoing** [1] - 1048:10
**forget** [1] - 997:8
**form** [3] - 821:9, 929:23, 933:24
**formal** [1] - 826:4
**former** [4] - 824:4, 911:22, 932:3, 943:11
**forms** [17] - 870:14, 880:17, 880:20, 918:13, 928:24, 929:10, 993:17, 993:20, 993:24, 994:2, 994:5, 994:8, 994:19, 994:21, 994:22, 1004:2, 1037:21
**forth** [2] - 915:20, 955:14
**forward** [14] - 764:22, 765:5, 765:17, 768:16, 768:25, 771:8, 801:25, 802:9, 804:17, 815:2, 862:9, 874:4, 887:4, 909:6
**forwarded** [3] - 841:3, 886:15, 886:25
**forwards** [1] - 979:14
**four** [26] - 732:25, 739:21, 742:4, 748:16, 749:12, 776:2, 776:4, 779:10, 823:20, 833:25, 846:22, 859:19, 879:20, 899:11, 902:15, 907:13, 970:8, 981:14, 981:17, 981:21, 1000:20, 1015:12, 1019:15, 1021:11, 1024:11, 1028:22
**Four** [1] - 879:9
**Four-to-eight-week** [1] - 879:9
**fourth** [3] - 756:7, 871:12, 902:18
**frame** [8] - 827:20, 831:24, 837:8, 837:24, 843:18, 843:19, 851:22, 1024:9
**franchise** [1] - 931:21
**frank** [1] - 884:25
**free** [2] - 1018:10, 1045:23
**freeze** [1] - 964:8
**frequently** [6] - 745:13, 745:21, 754:5, 884:2, 884:14, 1011:12
**Friday** [1] - 751:19

**friend** [5] - 732:15, 732:17, 777:12, 788:12, 790:3
**friends** [1] - 732:13
**front** [6] - 821:6, 865:24, 880:14, 911:7, 937:18, 954:15
**frustrated** [1] - 997:21
**frustrating** [1] - 985:11
**frustration** [1] - 997:17
**fulfill** [1] - 975:13
**full** [4] - 879:21, 892:21, 954:11, 1026:9
**function** [13] - 740:15, 766:17, 844:20, 846:5, 854:11, 854:15, 857:15, 857:21, 873:2, 901:3, 901:11, 903:15, 1004:14
**functions** [3] - 854:12, 862:7, 1006:20
**funds** [1] - 914:2
**future** [4] - 876:21, 931:16, 1011:24, 1045:6

## G

**game** [3] - 743:13, 743:17, 743:19
**gather** [1] - 790:20
**gay** [1] - 840:5
**general** [4] - 752:19, 905:5, 922:25, 967:10
**generally** [8] - 733:8, 789:6, 821:9, 836:8, 852:20, 880:20, 920:19, 920:23
**generate** [3] - 952:8, 973:15, 1025:17
**generated** [1] - 930:16
**generation** [3] - 907:3, 907:8, 909:20
**Gerard** [1] - 825:20
**Gerry** [1] - 826:4
**GIBSON** [89] - 728:19, 730:6, 730:8, 730:11, 730:13, 731:6, 742:2, 750:6, 751:10, 753:4, 754:18, 760:3, 765:19, 767:13, 775:8, 784:17, 784:24, 785:5, 792:25, 793:3, 795:8, 795:11, 803:7, 810:19, 810:22, 811:5, 813:24, 814:7, 816:10, 816:15, 816:24, 817:9, 833:15, 853:8, 853:12, 853:13, 862:17, 863:10, 863:12, 871:7, 871:10, 871:11, 873:24, 876:23, 891:15, 892:8, 902:24, 905:25, 906:4, 911:8, 918:10, 918:11, 924:16, 924:22, 924:25, 925:5, 925:6, 926:9, 929:5, 934:19, 937:20,

943:23, 944:15, 944:17, 945:12, 945:15, 946:16, 953:2, 956:12, 960:17, 961:13, 961:23, 964:22, 988:2, 1000:22, 1015:4, 1020:15, 1020:24, 1022:9, 1022:23, 1031:6, 1035:14, 1035:16, 1035:20, 1041:2, 1045:19, 1045:24, 1046:20, 1046:24
**given** [4] - 908:25, 938:9, 990:8, 1029:11
**Glad** [1] - 758:17
**global** [3] - 736:15, 820:3, 821:16
**governance** [2] - 852:23, 1004:21
**grade** [3] - 820:16, 820:24, 911:17
**graduated** [2] - 818:5, 818:19
**grant** [2] - 786:13, 824:25
**granted** [2] - 970:22, 992:10
**great** [3] - 852:13, 868:4, 951:23
**Great** [1] - 910:24
**greater** [1] - 1025:19
**greatly** [1] - 902:12
**gross** [3] - 921:21, 923:21, 923:24
**Gross** [2] - 924:3, 924:4
**group** [51] - 732:24, 737:16, 737:20, 740:14, 742:12, 742:17, 759:24, 764:22, 766:4, 766:8, 766:13, 771:7, 776:19, 786:2, 789:4, 792:6, 792:7, 808:18, 808:20, 834:14, 834:21, 836:11, 859:24, 882:25, 883:11, 884:13, 911:13, 914:18, 915:23, 916:8, 916:20, 962:20, 995:6, 995:18, 1008:3, 1014:5, 1015:18, 1019:24, 1020:3, 1020:9, 1025:2, 1025:10, 1026:14, 1033:11, 1034:4, 1034:17, 1034:22, 1034:24, 1035:3, 1038:19, 1044:16
**GSO** [1] - 911:5
**guaranteed** [6] - 735:7, 824:10, 851:12, 851:15, 851:16, 851:17
**guess** [6] - 791:6, 808:25, 809:8, 810:16, 836:24, 994:14, 1045:21, 1046:12
**guidance** [1] - 991:15
**guidelines** [1] - 864:11

## H

**half** [8] - 748:16, 822:24, 859:19, 910:16, 979:18, 1015:13, 1021:19, 1046:21
**halfway** [1] - 746:11, 951:20
**hall** [2] - 862:7, 896:24
**hand** [5] - 805:21, 967:7, 968:5, 1034:11, 1048:20
**handbook** [4] - 840:23, 840:24, 1003:19, 1003:22
**handing** ) [1] - 956:12
**handle** [10] - 752:9, 752:24, 753:2, 759:4, 759:21, 761:9, 762:16, 765:16, 777:25, 862:14
**handled** [2] - 760:13, 769:3
**handling** [5] - 764:21, 766:19, 769:4, 771:6, 807:25
**handwriting** [6] - 778:18, 881:23, 928:22, 928:23, 968:19
**handwritten** [1] - 918:18
**happy** [4] - 785:13, 788:11, 1036:8, 1039:6
**hard** [1] - 743:21
**hardest** [1] - 921:2
**Head** [4] - 731:13, 817:15, 828:10, 1038:24
**head** [57] - 733:20, 734:6, 734:15, 734:19, 735:2, 735:25, 736:15, 737:20, 739:11, 739:24, 740:14, 742:12, 742:17, 765:23, 768:16, 768:24, 794:6, 794:13, 797:17, 797:25, 798:2, 798:4, 798:7, 808:18, 815:2, 815:15, 820:3, 822:7, 822:18, 823:10, 824:4, 838:15, 859:23, 874:3, 874:19, 877:6, 903:19, 903:20, 903:21, 911:13, 911:16, 911:23, 916:23, 917:2, 926:6, 930:8, 930:12, 932:3, 935:18, 995:18, 995:21, 1005:3, 1015:17, 1028:8, 1030:3, 1030:15
**health** [11] - 805:4, 869:22, 878:6, 879:13, 898:16, 900:13, 905:21, 931:20, 982:11, 1007:14, 1045:10
**healthy** [2] - 758:18, 888:15
**hear** [5] - 812:15, 847:17, 857:8, 885:22, 886:9
**heard** [14] - 847:7, 847:20, 847:21, 847:22, 847:23, 847:24, 849:8, 849:13, 849:16, 857:19, 878:13, 884:9, 1046:3
**Hearing** [1] - 943:23

1062

**hearing** [6] - 763:21, 847:5, 855:9, 855:11, 855:16, 1047:3
**heavily** [1] - 850:21
**help** [8] - 755:19, 759:21, 759:22, 760:23, 761:10, 847:22, 895:10, 915:14
**helped** [1] - 762:22
**helpful** [7] - 756:2, 841:13, 841:16, 864:7, 868:11, 905:13, 915:19
**helps** [1] - 952:8
**hereby** [1] - 1048:10
**herein** [1] - 1048:15
**hereunto** [1] - 1048:19
**herself** [1] - 914:19
**Hi** [4] - 839:23, 841:6, 971:19, 972:6
**hide** [1] - 897:24
**High** [4] - 780:13, 820:22, 822:25, 823:8
**high** [114] - 731:13, 732:24, 733:2, 733:7, 733:9, 733:21, 734:6, 734:16, 734:20, 735:3, 735:10, 735:21, 735:25, 736:11, 736:21, 736:22, 737:6, 737:11, 737:16, 739:12, 739:24, 740:14, 741:21, 742:5, 742:12, 742:17, 765:23, 768:16, 768:24, 792:6, 794:6, 794:14, 797:13, 797:25, 798:3, 798:4, 798:8, 815:15, 820:16, 820:20, 820:25, 822:15, 822:18, 823:6, 823:11, 824:6, 824:13, 826:15, 826:18, 826:24, 827:6, 828:10, 829:6, 829:11, 829:22, 831:20, 832:8, 832:16, 832:19, 833:13, 833:14, 833:21, 834:6, 834:15, 835:20, 853:3, 859:24, 868:10, 874:3, 877:2, 877:7, 882:25, 883:11, 900:3, 904:18, 908:7, 910:7, 911:19, 915:23, 916:8, 916:20, 916:23, 917:2, 917:18, 917:21, 926:16, 926:24, 927:17, 930:19, 930:22, 931:25, 932:3, 932:4, 933:17, 948:3, 948:9, 951:25, 965:18, 1015:17, 1020:9, 1025:2, 1030:21, 1031:12, 1033:3, 1033:9, 1034:21, 1034:22, 1034:24, 1034:25, 1035:2, 1035:4, 1035:8, 1037:14
**high-grade** [1] - 820:16
**high-level** [1] - 853:3
**High-yield** [4] - 780:13, 820:22, 822:25, 823:8

**high-yield** [110] - 731:13, 732:24, 733:2, 733:7, 733:9, 733:21, 734:6, 734:16, 734:20, 735:3, 735:10, 735:21, 735:25, 736:11, 736:21, 736:22, 737:6, 737:11, 737:16, 739:12, 739:24, 740:14, 741:21, 742:5, 742:12, 742:17, 765:23, 768:16, 768:24, 792:6, 794:6, 794:14, 797:13, 797:25, 798:3, 798:4, 798:8, 815:15, 820:16, 820:20, 820:25, 822:15, 822:18, 823:6, 823:11, 824:6, 824:13, 826:15, 826:18, 826:24, 827:6, 828:10, 829:6, 829:11, 829:22, 831:20, 832:8, 832:16, 832:19, 833:13, 833:14, 833:21, 834:6, 834:15, 835:20, 859:24, 874:3, 877:2, 877:7, 882:25, 883:11, 900:3, 904:18, 908:7, 911:19, 915:23, 916:8, 916:20, 916:23, 917:2, 917:18, 917:21, 926:16, 926:24, 927:17, 930:19, 930:22, 931:25, 932:3, 932:4, 933:17, 948:3, 948:9, 951:25, 965:18, 1015:17, 1020:9, 1025:2, 1030:21, 1031:12, 1033:3, 1033:9, 1034:21, 1034:22, 1034:24, 1034:25, 1035:2, 1035:4, 1035:8, 1037:14
**higher** [5] - 774:15, 775:5, 907:2, 957:2, 957:13
**highest** [2] - 737:6, 929:24
**Highlights** [1] - 921:18
**highly** [3] - 819:21, 916:22
**himself** [1] - 855:17
**hire** [8] - 794:23, 795:3, 795:6, 811:18, 824:20, 828:3, 915:16, 956:2
**hired** [19] - 733:5, 733:19, 733:23, 791:22, 791:25, 793:23, 794:7, 828:5, 828:14, 854:16, 926:18, 930:25, 931:13, 933:2, 933:6, 942:25, 943:4, 943:13, 1045:14
**hiring** [7] - 732:19, 766:3, 791:17, 792:7, 827:16, 942:22, 943:15
**historic** [2] - 931:18, 931:21
**history** [3] - 732:19, 818:18, 921:3
**hit** [1] - 805:16
**hitting** [1] - 913:5

**HN** [1] - 747:21
**Hoai** [48] - 734:14, 735:18, 763:22, 763:23, 764:9, 764:16, 787:14, 793:18, 796:10, 812:2, 823:21, 831:17, 832:22, 847:5, 847:20, 849:13, 854:22, 855:10, 855:19, 856:14, 863:15, 863:25, 864:4, 864:19, 865:6, 866:3, 868:11, 875:2, 878:6, 879:14, 885:15, 886:7, 886:9, 886:19, 887:6, 890:24, 894:6, 898:20, 907:13, 909:14, 912:17, 913:16, 951:23, 961:21, 977:13, 989:18, 1032:12, 1041:17
**HOAI** [1] - 727:4
**Hoai's** [4] - 855:17, 903:10, 959:5, 1014:4
**Hoffman** [1] - 729:4
**Holcomb** [7] - 767:6, 767:15, 767:23, 768:5, 874:16, 874:18, 874:19
**Hold** [1] - 772:6
**hold** [1] - 731:14
**home** [1] - 982:14
**honest** [3] - 861:20, 893:12, 893:17
**Honor** [1] - 924:25
**hope** [1] - 883:23
**hoped** [1] - 889:4
**hopefully** [1] - 889:5
**hospital** [1] - 770:13
**hot** [1] - 790:24
**hour** [2] - 910:16, 1046:21
**hours** [5] - 739:25, 740:12, 896:14, 896:23, 979:18
**house** [1] - 729:5
**HR** [22] - 789:13, 789:15, 838:5, 838:14, 838:15, 845:2, 845:20, 857:18, 858:4, 894:7, 895:7, 929:2, 958:11, 966:13, 975:17, 983:14, 984:14, 989:16, 994:18, 994:21, 1003:10, 1030:4
**human** [31] - 839:5, 863:16, 865:3, 870:19, 870:23, 871:15, 872:5, 880:22, 936:13, 936:16, 957:24, 977:18, 977:22, 978:5, 978:7, 978:10, 979:8, 979:25, 984:2, 993:4, 993:6, 1000:7, 1000:8, 1001:4, 1001:15, 1002:18, 1003:11, 1003:14, 1035:24, 1043:21
**hundred** [1] - 772:18
**hurt** [1] - 879:14

**I**

**IADEVAIA** [5] - 728:9, 800:14, 803:9, 804:4, 988:3
**idea** [6] - 753:11, 869:4, 907:3, 907:8, 909:20, 910:15
**ideas** [5] - 835:9, 836:11, 836:17, 907:5, 1025:17
**identified** [1] - 831:4
**identify** [1] - 823:10
**imagine** [1] - 810:22
**immediate** [1] - 929:12
**immediately** [4] - 861:13, 872:16, 896:17, 1013:9
**impact** [8] - 927:9, 927:14, 927:18, 927:19, 977:2, 977:12, 980:5, 981:6
**impending** [1] - 867:25
**implies** [1] - 865:15
**important** [7] - 740:15, 742:17, 838:23, 910:4, 932:5, 959:19, 1044:25
**impression** [3] - 815:13, 861:20, 1006:9
**impressions** [1] - 827:2
**IN** [1] - 1048:19
**In-house** [1] - 729:5
**inaccurate** [1] - 1010:12
**inappropriate** [3] - 760:11, 799:14, 940:2
**INC** [1] - 727:7
**include** [6] - 742:14, 826:13, 834:2, 915:15, 915:22, 915:24
**included** [4] - 829:16, 900:3, 911:14, 973:11
**includes** [1] - 920:9
**including** [8] - 746:25, 750:21, 792:5, 828:16, 829:9, 829:11, 914:19, 921:3
**Including** [1] - 796:19
**inclusive** [1] - 973:21
**income** [33] - 733:3, 736:16, 768:11, 808:12, 812:3, 820:3, 820:5, 820:11, 821:16, 821:17, 822:8, 824:5, 825:10, 860:25, 874:20, 874:22, 875:6, 903:20, 911:23, 917:18, 930:12, 935:19, 940:12, 995:21, 996:14, 996:21, 996:25, 1004:9, 1030:11, 1030:12, 1030:16, 1031:12
**incomplete** [5] - 1015:24, 1016:8, 1017:3, 1017:4, 1032:3
**inconsistencies** [1] - 940:25
**inconsistent** [1] - 931:12
**incorrect** [1] - 993:22

1063

**increase** [4] - 807:11, 854:21, 965:7, 1038:8
**increased** [3] - 956:22, 957:6, 964:3
**indefinite** [1] - 847:9
**indicate** [11] - 744:20, 744:23, 745:3, 753:7, 761:13, 765:10, 765:20, 779:16, 782:7, 804:12, 970:12
**indicated** [9] - 754:7, 779:6, 815:18, 846:16, 875:20, 876:25, 877:23, 929:11, 1040:17
**indicating** [2] - 760:6, 922:10
**indication** [1] - 865:13
**indications** [1] - 982:9
**indirectly** [1] - 1048:16
**individual** [5] - 789:14, 852:25, 908:25, 912:24, 916:17
**individual 's** [1] - 909:4
**individuals** [4] - 741:18, 741:20, 823:23, 1023:19
**industries** [1] - 900:7
**industry** [6] - 732:19, 904:22, 929:19, 931:24, 963:22, 1045:15
**inflation** [1] - 941:4
**inform** [3] - 763:24, 1013:13, 1014:4
**information** [12] - 810:10, 812:6, 839:11, 841:22, 864:6, 865:2, 915:16, 915:18, 958:12, 958:21, 1024:9, 1028:23
**informed** [7] - 862:11, 865:17, 898:21, 907:18, 977:18, 980:24, 1009:13
**informing** [3] - 869:6, 891:5, 991:25
**inherit** [1] - 943:10
**inheritance** [1] - 829:5
**inherited** [1] - 828:25
**initial** [2] - 870:2, 889:18
**initiatives** [1] - 819:16
**injury** [1] - 879:16
**input** [3] - 944:25, 946:2, 947:21
**inquired** [1] - 978:13
**inquiries** [1] - 835:14
**insight** [1] - 911:6
**instance** [2] - 749:14, 749:22
**instances** [1] - 749:16
**institutional** [1] - 836:24
**instruction** [3] - 842:5, 842:8, 896:3
**instructive** [1] - 905:23
**intend** - 860:24, 862:8

**intended** [2] - 875:17, 1012:12
**intending** [2] - 876:3, 998:14
**intends** [1] - 759:4
**intense** [3] - 851:23, 852:13, 853:5
**intention** [5] - 861:7, 861:9, 861:15, 876:17, 876:20
**interactions** [1] - 910:10
**interested** [1] - 1048:16
**interesting** [1] - 889:12
**interfered** [1] - 819:8
**interim** [5] - 814:21, 913:6, 995:9, 995:20, 996:5
**intermittently** [1] - 909:12
**internal** [1] - 825:25
**internally** [1] - 835:13
**interpolating** [1] - 992:6
**interpret** [1] - 958:23
**interview** [1] - 827:24
**intranet** [1] - 840:24
**investigations** [2] - 852:19, 999:8
**investment** [8] - 732:22, 792:10, 817:15, 820:24, 829:9, 911:17, 963:10, 963:11
**investment-grade** [1] - 911:17
**invite** [1] - 890:5
**Involuntary** [1] - 928:3
**involved** [17] - 771:23, 781:14, 787:9, 796:16, 809:18, 830:15, 845:21, 853:3, 943:15, 943:18, 944:9, 944:23, 945:18, 945:23, 998:9, 1006:15, 1044:20
**involvement** [1] - 914:24
**IRS** [3] - 919:3, 958:13, 958:25
**isolated** [1] - 749:22
**isolation** [1] - 1030:6
**issuance** [2] - 829:22, 833:13
**issue** [12] - 759:13, 837:17, 876:4, 878:6, 879:13, 898:16, 899:4, 899:5, 966:15, 998:9, 1006:24, 1020:21
**issued** [1] - 845:22
**issuers** [5] - 820:23, 829:21, 830:23, 831:3, 900:5
**issues** [8] - 852:2, 852:7, 852:22, 898:17, 898:25, 981:18, 1007:3, 1028:22
**item** [2] - 922:8, 924:8
**items** [3] - 836:15, 889:14, 928:16
**itself** [1] - 1025:21

**J**

**Jack** [1] - 741:22
**Jaime** [4] - 871:2, 880:9, 1046:3, 1046:22
**JAMS** [1] - 727:2
**Jane** [26] - 733:25, 763:6, 763:8, 763:10, 822:20, 822:24, 823:2, 823:14, 823:17, 826:19, 842:19, 874:5, 878:14, 886:15, 886:18, 889:10, 894:20, 896:21, 909:14, 914:16, 926:6, 929:12, 966:13, 976:21, 984:8, 1046:2
**January** [23] - 902:5, 908:13, 912:8, 912:21, 915:11, 919:5, 958:4, 958:8, 959:6, 960:13, 960:22, 961:18, 962:7, 966:25, 968:10, 969:7, 969:17, 970:16, 1021:19, 1027:23, 1031:23, 1034:20
**Jefferies** [1] - 833:18
**JEREMIAH** [1] - 728:9
**jiadevaia@vladeck.com** [1] - 728:10
**Jiten** [4] - 791:24, 794:20, 834:12, 930:17
**job** [54] - 733:6, 733:9, 734:5, 737:14, 740:15, 740:16, 742:15, 766:17, 780:11, 798:7, 807:23, 817:13, 828:8, 834:21, 834:23, 844:20, 846:5, 852:12, 854:11, 854:13, 854:14, 854:15, 855:2, 857:22, 861:21, 865:8, 869:13, 873:2, 882:22, 883:8, 886:20, 887:18, 888:6, 888:24, 901:11, 903:14, 908:5, 937:5, 937:7, 937:13, 939:18, 939:23, 940:16, 951:23, 958:18, 972:16, 1001:10, 1001:12, 1001:13, 1002:20, 1004:14, 1043:10, 1044:11, 1044:16
**job-protected** [1] - 887:18
**job-protection** [1] - 888:6
**jobs** [2] - 835:5, 1033:24
**John** [10] - 759:21, 759:23, 760:2, 760:23, 761:9, 762:2, 762:15, 762:22, 776:23
**JOHN** [1] - 728:22
**john.coster@ssbb.com** [1] - 728:22
**Johnson** [26] - 933:13, 933:15, 933:18, 933:20, 933:23, 965:16, 965:17, 965:23, 966:3, 966:7, 966:20, 966:24, 968:9,

969:6, 969:15, 970:7, 971:4, 971:13, 971:18, 971:25, 972:6, 972:10, 1039:13, 1039:22, 1040:8, 1040:22
**Johnson 's** [6] - 967:12, 967:25, 969:23, 970:20, 1002:5, 1039:8
**joining** [1] - 732:5
**Joint** [1] - 943:25
**Joshi** [10] - 791:25, 793:23, 794:7, 794:21, 834:12, 930:17, 930:25, 931:13, 932:8, 932:14
**journey** [1] - 868:4
**Judge** [11] - 784:17, 793:14, 814:4, 814:18, 816:15, 853:8, 862:18, 865:20, 871:7, 905:25, 934:20
**JUDGE** [1] - 727:12
**judge** [1] - 899:8
**judgment** [1] - 850:19
**July** [69] - 746:15, 751:19, 751:22, 752:7, 755:5, 756:13, 767:6, 767:23, 769:6, 771:6, 786:21, 798:20, 799:9, 802:13, 802:15, 802:19, 803:16, 803:20, 814:20, 837:8, 839:25, 843:18, 847:15, 848:16, 848:18, 848:21, 848:22, 849:2, 854:6, 856:9, 856:24, 860:13, 860:18, 862:21, 862:22, 863:13, 863:20, 865:13, 865:25, 871:6, 874:13, 875:18, 877:22, 894:4, 898:14, 985:13, 987:21, 988:12, 989:14, 989:15, 990:14, 991:14, 992:12, 994:15, 997:14, 1000:6, 1000:13, 1001:6, 1001:22, 1002:6, 1002:23, 1005:18, 1012:4, 1039:3, 1041:8, 1042:2
**June** [33] - 743:2, 743:7, 762:4, 775:20, 776:13, 786:22, 811:11, 812:8, 837:8, 843:18, 843:20, 843:25, 846:7, 846:19, 869:23, 870:7, 883:5, 888:2, 894:4, 899:17, 925:12, 927:23, 990:11, 990:19, 990:20, 1019:23, 1032:15, 1034:5, 1034:10, 1034:15, 1039:3, 1044:17, 1045:2
**junior** [3] - 759:24, 762:18, 965:12
**jury** [1] - 994:6

1064

## K

**Kanno** [1] - 747:12
**keep** [3] - 814:2, 887:5, 945:13
**Keep** [2] - 758:25, 946:17
**keeping** [3] - 835:15, 884:11, 1006:13
**kept** [3] - 839:9, 870:3, 1040:18
**kind** [5] - 804:15, 937:14, 992:21, 992:25, 999:12
**Knowing** [1] - 893:16
**knowing** [1] - 879:13
**knowledge** [21] - 736:17, 744:4, 745:23, 762:5, 762:10, 762:23, 766:2, 766:6, 776:10, 778:22, 786:25, 819:2, 819:6, 823:22, 853:20, 882:17, 901:8, 930:22, 932:22, 1002:22, 1041:20
**knowledgeable** [3] - 842:10, 864:23, 1012:12
**known** [4] - 852:2, 935:21, 935:24, 936:3
**knows** [1] - 752:7
**Krasner** [13] - 767:5, 767:15, 767:22, 768:4, 768:6, 874:16, 874:18, 874:21, 995:15, 995:16, 996:12, 996:13, 996:19
**Kristen** [1] - 1042:9
**Kristi** [1] - 971:19

## L

**LA** [2] - 844:8, 982:24
**labeled** [1] - 949:6
**lack** [4] - 850:20, 867:4, 916:15, 927:6
**Laid** [1] - 928:6
**Lanci** [3] - 825:20, 825:22, 826:3
**Lanci's** [1] - 826:11
**land** [1] - 889:20
**language** [6] - 739:4, 802:22, 875:16, 928:20, 993:16, 999:12
**laptop** [6] - 743:15, 844:8, 845:22, 846:4, 982:24, 983:18
**large** [2] - 810:23, 836:22
**larger** [4] - 833:2, 833:16, 904:21, 917:24
**largest** [1] - 820:10
**last** [22] - 732:7, 755:17, 785:14, 811:24, 845:3, 859:14, 859:19, 864:9, 883:2, 884:23, 885:5,

910:12, 911:16, 946:24, 964:20, 964:23, 968:13, 971:8, 989:20, 1015:13, 1032:7, 1034:9
**late** [8] - 752:6, 849:11, 902:5, 908:13, 914:14, 914:22, 1027:12, 1027:21
**late-stage** [1] - 914:22
**latest** [1] - 887:6
**law** [4] - 982:10, 993:14, 996:25, 997:2
**lawyer** [3] - 874:21, 981:24, 996:21
**lawyers** [1] - 994:22
**lay** [2] - 889:19, 930:13
**lead** [2] - 904:25, 941:7
**leading** [4] - 732:19, 818:18, 868:21, 1018:24
**learn** [6] - 837:13, 847:10, 890:14, 984:10, 1009:9, 1009:21
**learned** [24] - 753:17, 762:24, 850:16, 873:17, 878:11, 879:18, 880:2, 890:16, 890:19, 977:24, 978:3, 984:12, 984:14, 984:21, 989:15, 991:18, 1000:7, 1004:13, 1007:7, 1008:6, 1008:11, 1008:14, 1008:20, 1009:23
**learning** [1] - 864:18
**learns** [1] - 1000:8
**least** [5] - 802:23, 861:17, 862:11, 866:19, 869:20
**Leave** [7] - 840:22, 841:9, 865:7, 871:16, 887:20, 969:20, 979:22
**leave** [159] - 743:8, 743:9, 744:17, 744:21, 744:25, 748:11, 756:6, 757:9, 757:16, 757:20, 757:25, 760:7, 760:9, 761:14, 761:17, 775:16, 788:23, 797:9, 801:7, 805:4, 805:9, 807:14, 807:16, 812:12, 812:16, 833:2, 838:3, 840:2, 840:4, 840:20, 840:21, 841:22, 842:2, 842:20, 842:25, 843:4, 843:10, 844:14, 844:16, 844:22, 844:23, 845:8, 845:12, 845:17, 849:23, 857:24, 858:6, 859:15, 859:18, 864:11, 864:19, 865:6, 865:9, 865:14, 866:4, 866:15, 866:21, 866:23, 866:25, 867:2, 867:3, 869:20, 869:21, 869:24, 869:25, 871:19, 871:20, 872:6, 880:4, 887:18, 888:7, 893:23, 894:18, 894:21, 895:9, 900:18, 900:21,

906:11, 927:13, 933:21, 934:6, 934:16, 936:10, 936:17, 936:23, 937:3, 937:6, 937:12, 937:14, 939:23, 940:3, 965:23, 966:21, 966:24, 968:2, 968:10, 968:14, 968:20, 969:7, 969:17, 969:24, 970:9, 970:13, 970:20, 971:2, 971:5, 972:3, 972:11, 980:2, 981:14, 981:17, 982:18, 982:19, 983:10, 983:18, 983:23, 984:3, 984:4, 984:11, 984:22, 991:19, 991:22, 992:4, 992:16, 992:21, 992:23, 992:25, 993:7, 993:13, 993:18, 994:3, 994:6, 994:16, 997:10, 1001:16, 1001:20, 1001:22, 1002:19, 1005:24, 1007:14, 1007:24, 1008:11, 1015:12, 1021:12, 1021:21, 1028:13, 1028:15, 1035:25, 1036:6, 1040:23, 1041:14, 1041:18, 1041:25, 1042:20, 1042:23, 1043:5, 1043:7
**leaves** [1] - 824:25
**leaving** [2] - 903:10, 912:17
**left** [21] - 735:17, 742:21, 743:6, 753:10, 754:15, 762:4, 775:19, 796:9, 822:12, 843:14, 846:6, 846:19, 873:12, 892:22, 922:11, 925:16, 983:7, 990:7, 990:10, 1034:11, 1039:2
**left-hand** [1] - 1034:11
**legacy** [2] - 1037:11, 1045:5
**legal** [9] - 768:6, 848:12, 867:21, 890:17, 966:13, 993:9, 993:12, 1030:5, 1033:19
**lend** [2] - 830:24, 831:3
**lending** [1] - 829:15
**length** [3] - 748:21, 748:25, 990:6
**Lenore** [27] - 838:16, 839:23, 841:6, 842:10, 863:25, 864:6, 864:15, 864:24, 867:22, 868:7, 870:16, 870:18, 870:19, 880:9, 886:25, 887:5, 894:16, 895:22, 895:24, 896:5, 912:7, 974:20, 978:22, 979:10, 989:18, 1046:6
**Less** [2] - 739:25, 740:12
**less** [11] - 739:25, 784:3, 914:10, 919:15, 926:21, 973:2, 973:4, 973:11,

990:21, 1024:17, 1024:25
**letter** [37] - 803:12, 803:19, 855:10, 855:14, 860:18, 865:20, 866:7, 867:11, 867:18, 867:24, 868:6, 869:2, 870:10, 871:5, 872:2, 872:10, 872:18, 873:14, 873:25, 876:22, 974:19, 985:14, 992:12, 992:16, 993:3, 995:24, 996:17, 997:4, 997:18, 998:16, 998:21, 999:2, 999:12, 999:15, 1000:7, 1000:8, 1000:13
**letters** [5] - 778:11, 877:15, 877:16, 996:8, 996:9
**Letting** [1] - 896:15
**letting** [5] - 787:14, 790:11, 914:17, 1018:8, 1018:13
**level** [5] - 796:23, 853:3, 907:2, 909:20, 1006:11
**levels** [1] - 910:7
**leveraged** [4] - 829:10, 829:17, 829:22, 926:17
**liberty** [1] - 816:13
**license** [1] - 731:20
**licensed** [1] - 876:11
**licenses** [8] - 731:14, 731:16, 731:18, 731:21, 818:6, 818:11, 834:24, 876:13
**LICUL** [58] - 728:11, 730:7, 730:12, 767:11, 784:22, 785:2, 795:16, 810:15, 810:25, 811:7, 813:21, 816:12, 863:8, 924:20, 924:23, 935:3, 937:21, 943:25, 944:16, 944:18, 945:13, 945:21, 946:19, 953:3, 953:5, 956:13, 960:8, 960:20, 961:14, 961:15, 962:2, 964:23, 965:2, 966:17, 966:19, 973:6, 988:4, 988:6, 994:24, 998:19, 1000:23, 1000:24, 1007:5, 1010:23, 1011:2, 1015:7, 1020:12, 1020:19, 1021:3, 1022:10, 1022:24, 1023:2, 1031:8, 1031:9, 1035:12, 1035:15, 1046:12, 1046:19
**Licul** [10] - 814:18, 815:9, 815:17, 1037:15, 1039:11, 1041:6, 1041:11, 1041:12, 1044:10, 1044:15
**life** [3] - 838:23, 868:12, 879:16
**light** [1] - 927:5
**likelihood** [1] - 1046:10
**likely** [7] - 792:15, 849:10, 849:16, 879:12, 914:14, 939:8, 1046:13

**Lily** [1] - 758:18
**limited** [1] - 1040:19
**line** [56] - 768:9, 853:7, 856:13, 863:15, 866:2, 869:7, 879:8, 883:18, 892:22, 892:25, 893:10, 893:13, 893:21, 894:14, 895:15, 895:20, 896:7, 896:25, 897:6, 897:10, 897:11, 898:15, 899:20, 900:16, 912:12, 922:4, 922:7, 924:8, 934:12, 938:20, 941:10, 942:6, 944:16, 945:7, 945:22, 951:22, 956:15, 976:11, 977:8, 980:19, 981:23, 984:19, 986:5, 986:20, 987:10, 991:7, 1006:25, 1009:8, 1010:11, 1013:19, 1018:16, 1019:18, 1022:7, 1024:4, 1025:24, 1046:5
**Line** [3] - 893:14, 897:11, 939:3
**lines** [3] - 755:21, 793:7, 831:5
**Lipton** [1] - 741:22
**list** [8] - 738:11, 750:21, 750:24, 818:9, 826:10, 836:22, 1031:22, 1031:25
**listed** [3] - 741:18, 826:6, 829:16
**listen** [1] - 892:18
**listing** [1] - 808:20
**lists** [1] - 809:3
**LLP** [1] - 728:15
**Loan** [1] - 822:25
**loan** [4] - 829:10, 829:11, 829:17, 926:21
**loans** [2] - 829:22, 926:17
**located** [2] - 746:18, 873:8
**Location** [1] - 1033:6
**location** [4] - 844:19, 1032:22, 1032:24, 1033:25
**lock** [1] - 1046:7
**log** [2] - 846:5, 847:22
**log-in** [1] - 847:22
**logistics** [3] - 759:20, 760:25, 761:9
**long-term** [1] - 833:7
**Look** [2] - 898:15, 1000:21
**look** [158] - 740:17, 740:19, 746:5, 751:11, 754:22, 755:17, 758:8, 760:18, 766:23, 767:18, 768:9, 772:2, 777:4, 778:6, 778:9, 783:7, 799:24, 805:17, 806:20, 811:14, 821:5, 821:7, 821:19, 822:2, 825:12, 825:16, 826:2, 839:13, 839:14, 848:4, 848:15, 856:2, 856:6, 859:3,

863:5, 865:23, 867:11, 869:16, 870:10, 871:12, 874:8, 878:15, 880:12, 880:24, 881:2, 883:12, 884:16, 885:18, 886:12, 887:22, 892:9, 893:10, 895:15, 895:20, 895:22, 896:25, 897:4, 897:21, 897:22, 904:6, 904:16, 912:4, 914:19, 914:25, 916:4, 918:5, 918:15, 919:10, 921:5, 922:5, 922:13, 922:18, 927:22, 937:15, 937:24, 938:17, 941:9, 942:2, 943:22, 944:12, 946:14, 946:23, 947:23, 948:17, 948:23, 949:4, 950:22, 951:19, 952:17, 952:18, 952:23, 953:15, 953:23, 954:17, 955:7, 955:9, 956:9, 957:15, 957:16, 959:11, 960:2, 960:3, 960:10, 961:6, 961:11, 964:18, 964:20, 967:9, 967:15, 968:4, 969:19, 970:17, 971:8, 972:5, 976:5, 977:5, 977:7, 978:16, 980:14, 981:23, 984:15, 986:2, 987:9, 989:2, 991:4, 995:12, 997:24, 999:21, 1004:4, 1009:4, 1010:8, 1010:17, 1013:16, 1015:2, 1016:9, 1017:15, 1018:5, 1019:18, 1022:5, 1022:22, 1023:22, 1024:9, 1025:13, 1028:5, 1028:16, 1030:24, 1031:17, 1031:19, 1032:7, 1034:11, 1034:13, 1034:19, 1037:15, 1037:24, 1038:10, 1040:11, 1041:3, 1042:5
**looked** [5] - 886:19, 904:2, 929:9, 952:22, 1042:15
**looking** [15] - 747:15, 748:14, 758:16, 780:24, 800:16, 852:4, 860:22, 904:23, 904:24, 909:3, 930:5, 967:8, 967:18, 986:19, 1042:25
**Looking** [2] - 849:19, 867:23
**Looks** [3] - 929:3, 1042:21, 1043:12
**looks** [1] - 881:25
**losing** [1] - 929:22
**loss** [2] - 924:2, 924:7
**Louis** [1] - 818:2
**low** [6] - 773:6, 774:2, 774:14, 775:4, 909:20
**Lowenthal** [327] - 729:11, 736:8, 736:10, 736:18, 740:24, 756:19, 756:21,

762:24, 763:4, 763:14, 764:3, 764:7, 764:8, 764:12, 764:19, 764:24, 765:3, 765:20, 766:16, 767:5, 767:14, 767:22, 768:2, 768:15, 768:20, 768:23, 771:2, 771:17, 771:18, 774:5, 779:18, 779:21, 781:6, 781:8, 781:11, 782:8, 782:13, 786:13, 787:3, 787:4, 787:13, 787:22, 788:17, 788:22, 796:7, 796:11, 796:12, 796:16, 796:18, 796:22, 797:5, 797:8, 799:10, 800:9, 800:18, 801:15, 802:13, 802:18, 804:7, 811:9, 814:13, 814:15, 814:24, 815:14, 815:20, 817:1, 817:10, 818:1, 818:23, 819:1, 820:1, 821:1, 822:1, 823:1, 824:1, 825:1, 826:1, 827:1, 828:1, 829:1, 830:1, 831:1, 832:1, 833:1, 834:1, 835:1, 836:1, 837:1, 838:1, 839:1, 839:16, 839:24, 840:1, 840:7, 840:8, 841:1, 841:2, 842:1, 843:1, 844:1, 845:1, 846:1, 847:1, 848:1, 848:9, 849:1, 850:1, 851:1, 852:1, 853:1, 853:14, 854:1, 855:1, 856:1, 857:1, 858:1, 859:1, 859:6, 860:1, 861:1, 862:1, 863:1, 864:1, 865:1, 866:1, 867:1, 867:13, 868:1, 869:1, 870:1, 871:1, 872:1, 873:1, 874:1, 875:1, 875:9, 876:1, 877:1, 878:1, 879:1, 880:1, 881:1, 882:1, 883:1, 884:1, 885:1, 885:6, 886:1, 886:14, 887:1, 888:1, 889:1, 890:1, 891:1, 892:1, 892:9, 893:1, 893:24, 894:1, 895:1, 896:1, 897:1, 898:1, 899:1, 900:1, 901:1, 902:1, 903:1, 904:1, 905:1, 906:1, 907:1, 908:1, 909:1, 910:1, 911:1, 912:1, 912:7, 912:9, 913:1, 913:22, 914:1, 914:12, 915:1, 915:4, 915:10, 916:1, 917:1, 918:1, 919:1, 920:1, 921:1, 921:10, 922:1, 923:1, 923:15, 924:1, 924:12, 925:1, 926:1, 927:1, 927:23, 928:1, 929:1, 930:1, 931:1, 932:1, 933:1, 933:12, 934:1, 935:1, 935:4, 936:1, 937:1, 938:1, 939:1, 940:1, 941:1, 942:1, 943:1, 944:1, 945:1, 946:1, 947:1, 948:1, 949:1, 950:1, 951:1, 952:1, 953:1, 954:1, 955:1, 956:1, 957:1,

958:1, 959:1, 960:1, 961:1, 962:1, 963:1, 964:1, 965:1, 966:1, 967:1, 968:1, 969:1, 970:1, 971:1, 972:1, 973:1, 974:1, 975:1, 976:1, 977:1, 978:1, 979:1, 980:1, 981:1, 982:1, 983:1, 984:1, 985:1, 986:1, 987:1, 988:1, 989:1, 990:1, 991:1, 992:1, 993:1, 994:1, 995:1, 996:1, 997:1, 998:1, 999:1, 1000:1, 1001:1, 1002:1, 1003:1, 1004:1, 1005:1, 1006:1, 1007:1, 1008:1, 1009:1, 1010:1, 1011:1, 1012:1, 1013:1, 1014:1, 1015:1, 1016:1, 1017:1, 1018:1, 1019:1, 1020:1, 1021:1, 1022:1, 1023:1, 1023:4, 1024:1, 1025:1, 1026:1, 1027:1, 1028:1, 1029:1, 1030:1, 1031:1, 1032:1, 1033:1, 1034:1, 1035:1, 1035:22, 1036:1, 1037:1, 1038:1, 1039:1, 1040:1, 1041:1, 1042:1, 1043:1, 1043:2, 1044:1, 1045:1, 1046:1, 1047:1
**LOWENTHAL** [3] - 730:10, 817:5, 892:4
**Lowenthal 's** [6] - 736:13, 768:8, 788:9, 814:20, 815:23, 914:23
**Lower** [1] - 992:23
**lower** [5] - 922:11, 923:10, 923:11, 967:7, 968:5
**Lucila** [4] - 741:23, 809:10, 809:16, 811:25
**lunch** [3] - 816:18, 816:21
**Luncheon** [1] - 891:19
**lying** [1] - 1001:25
**Lynn** [6] - 933:13, 933:15, 965:16, 965:17, 971:19, 1002:5

# M

**mail** [198] - 740:23, 741:2, 741:5, 741:15, 742:4, 746:14, 746:25, 747:12, 747:24, 748:18, 750:12, 750:14, 751:18, 752:2, 752:5, 752:11, 752:18, 753:23, 754:20, 755:3, 755:5, 755:9, 755:12, 755:22, 756:4, 756:20, 756:22, 756:25, 757:3, 757:6, 757:9, 757:11, 757:23, 758:4, 758:8, 758:14, 759:3, 759:15, 759:17, 760:18, 763:14,

1066

767:4, 767:8, 767:21, 768:2, 768:8, 768:14, 768:20, 769:7, 770:11, 770:12, 798:21, 798:24, 799:10, 799:13, 799:20, 800:3, 800:4, 800:7, 800:17, 800:25, 801:2, 801:4, 801:7, 801:14, 801:19, 802:13, 802:20, 803:2, 803:4, 803:5, 803:6, 803:12, 803:13, 803:18, 804:14, 808:10, 810:23, 811:8, 811:13, 815:20, 815:22, 825:19, 826:2, 826:11, 839:20, 839:22, 841:14, 841:21, 848:13, 848:15, 848:24, 849:8, 849:12, 849:19, 849:20, 849:23, 849:25, 850:8, 855:15, 856:8, 858:18, 863:14, 865:12, 865:24, 866:6, 866:14, 866:19, 866:24, 874:12, 874:15, 874:25, 875:12, 875:16, 875:22, 876:22, 876:25, 877:5, 877:11, 877:23, 878:18, 878:19, 878:20, 879:2, 879:10, 883:16, 883:17, 886:2, 886:15, 886:25, 897:25, 912:6, 912:20, 915:10, 947:25, 948:8, 957:18, 958:16, 959:3, 959:13, 960:4, 971:12, 971:13, 972:5, 978:4, 978:6, 978:21, 978:24, 979:14, 979:20, 985:14, 987:21, 987:22, 987:24, 988:7, 988:12, 988:13, 988:16, 988:22, 989:8, 989:15, 990:13, 990:14, 991:14, 991:21, 992:3, 995:16, 995:17, 996:4, 997:10, 997:15, 999:18, 999:24, 1000:12, 1001:3, 1001:21, 1001:23, 1002:4, 1003:24, 1004:3, 1008:16, 1009:14, 1010:18, 1011:3, 1011:9, 1011:10, 1013:8, 1013:21, 1014:13, 1023:3, 1041:8, 1041:17, 1041:23, 1042:9, 1042:15, 1042:25, 1043:3

**mailed** [1] - 849:11
**mailing** [1] - 769:19
**mails** [6] - 745:14, 745:16, 746:3, 746:10, 848:11, 992:7
**main** [3] - 740:16, 742:15, 901:2
**maintained** [1] - 836:23
**majority** [1] - 835:7
**man** [3] - 745:5, 906:15, 934:16
**Management** [1] - 783:17

**management** [5] - 768:7, 935:12, 960:25, 961:3, 962:10
**manager** [1] - 947:17
**managers** [3] - 854:25, 940:23, 941:19
**Managing** [2] - 882:24, 908:7
**managing** [5] - 817:17, 820:2, 883:11, 1020:10, 1038:21
**manual** [1] - 887:24
**March** [4] - 727:16, 791:24, 1048:11, 1048:20
**marked** [1] - 740:18
**market** [9] - 741:9, 820:17, 836:12, 889:11, 904:5, 905:5, 917:21, 931:25
**marketing** [1] - 741:7
**marketplace** [4] - 835:9, 889:11, 904:9, 904:24
**Markets** [1] - 829:8
**markets** [2] - 741:25, 911:17
**marriage** [1] - 1048:15
**married** [1] - 817:18
**marvelous** [1] - 868:3
**match** [1] - 956:5
**matched** [2] - 956:17, 956:23
**material** [1] - 1000:19
**materials** [2] - 871:22, 871:25
**maternity** [4] - 965:23, 967:12, 968:2, 968:13
**Maternity** [1] - 968:20
**maternity/paternity** [1] - 978:25
**matter** [2] - 839:9, 1048:16
**MBA** [2] - 818:3, 818:4
**McCabe** [1] - 867:21
**mean** [26] - 743:23, 751:5, 769:2, 774:25, 781:19, 805:10, 835:6, 849:16, 884:8, 888:23, 896:9, 897:16, 898:3, 898:19, 899:23, 900:22, 928:18, 938:24, 959:7, 959:9, 959:21, 966:2, 1011:25, 1013:6, 1020:12
**Meaning** [3] - 791:2, 939:16, 944:22
**meaning** [3] - 804:8, 911:5, 1001:6
**meaningful** [1] - 998:10
**meaningless** [1] - 1038:20
**means** [11] - 881:22, 930:8, 937:3, 937:5, 937:12, 993:13, 993:18, 1001:12, 1002:16, 1029:8
**meant** [6] - 830:24, 990:25,

991:3, 991:9, 1013:3, 1013:7
**measure** [1] - 910:9
**measured** [1] - 826:24
**media** [4] - 792:2, 792:20, 792:22, 793:17
**Medical** [6] - 840:22, 841:9, 865:7, 871:16, 887:20, 979:22
**medical** [17] - 788:24, 805:4, 805:9, 807:14, 807:16, 859:15, 859:18, 881:16, 899:4, 936:22, 936:24, 1007:23, 1008:11, 1014:6, 1015:11, 1042:23, 1043:14
**meet** [3] - 910:2, 910:22, 949:12
**meeting** [1] - 836:11
**meetings** [4] - 901:8, 910:5, 910:18, 910:20
**Melissa** [2] - 789:18, 789:19
**member** [1] - 920:18
**memo** [2] - 860:12, 866:5
**mention** [1] - 1004:2
**mentioned** [8] - 774:4, 792:20, 822:14, 911:21, 929:18, 930:18, 932:10, 954:19
**Message** [1] - 856:14
**messed** [1] - 944:8
**Met** [1] - 949:11
**met** [2] - 950:5, 950:16
**metal** [1] - 787:19
**metals** [5] - 795:6, 933:9, 963:4, 963:10, 1037:11
**Metals** [1] - 828:20
**metrics** [1] - 927:4
**mgibson@ssbb.com** [1] - 728:20
**MICHAEL** [2] - 727:12, 728:19
**Michigan** [2] - 1046:5, 1046:6
**mid** [8] - 804:19, 875:18, 878:10, 898:14, 902:23, 925:11, 1012:5, 1021:22
**midafternoon** [1] - 891:16
**middle** [6] - 778:19, 798:12, 847:14, 860:23, 972:5, 1042:8
**might** [18] - 749:17, 749:20, 818:10, 830:23, 839:11, 839:12, 875:8, 876:8, 879:23, 891:15, 904:21, 915:21, 941:8, 946:14, 962:3, 981:7, 981:8, 1028:23
**Mike** [2] - 810:18, 863:8
**MILLER** [3] - 784:21, 811:3, 945:10
**Miller** [1] - 729:3

**million** [4] - 922:21, 922:23, 926:17
**mind** [11] - 814:2, 850:16, 862:19, 866:7, 875:10, 876:7, 876:20, 944:5, 948:4, 1024:10, 1028:21
**mind-set** [1] - 1028:21
**mine** [4] - 788:12, 790:3, 945:9, 1004:20
**minimum** [11] - 972:23, 973:4, 973:7, 973:8, 973:11, 973:15, 973:17, 973:21, 973:22, 973:24
**mining** [7] - 787:20, 795:6, 828:20, 933:9, 963:4, 963:10, 1045:16
**minutes** [10] - 738:4, 738:14, 739:9, 748:20, 748:25, 749:2, 749:3, 795:12, 865:21, 1035:14
**mismatches** [1] - 958:15
**misrepresented** [1] - 959:24
**misspoke** [1] - 848:23
**mistake** [2] - 1015:23, 1016:18
**mistakes** [2] - 861:25, 958:11
**mixture** [1] - 974:19
**model** [1] - 899:21
**models** [1] - 762:8
**moment** [5] - 746:6, 904:15, 905:17, 993:24, 1024:12
**Monday** [3] - 873:15, 884:20, 972:7
**money** [5] - 914:4, 929:22, 930:5, 930:10, 941:25
**month** [7] - 806:11, 864:9, 884:23, 902:9, 910:12, 989:20, 1011:6
**monthly** [1] - 884:2
**months** [14] - 776:2, 776:5, 779:10, 859:19, 884:10, 894:17, 901:21, 907:13, 907:14, 966:21, 971:2, 1005:19, 1015:13, 1021:11
**Morgan** [31] - 733:20, 733:22, 734:10, 735:17, 735:20, 735:23, 794:5, 796:9, 796:12, 823:13, 823:14, 824:3, 828:4, 828:7, 830:2, 832:10, 832:12, 832:18, 832:21, 833:17, 905:9, 932:2, 932:11, 932:14, 947:17, 947:20, 947:25, 948:8, 1005:3, 1036:11
**Morgan's** [6] - 736:6, 823:19, 828:8, 832:11, 947:21, 1037:22

1067

**morning** [19] - 731:7, 731:8, 737:21, 737:23, 738:2, 738:7, 738:15, 795:17, 795:18, 798:7, 836:5, 836:13, 839:24, 840:9, 857:4, 858:18, 858:20, 858:24, 901:8

**mortgage** [4] - 1033:11, 1034:4, 1034:17, 1044:19

**mortgages** [2] - 820:19, 1033:16

**Most** [1] - 951:4

**most** [12] - 749:24, 750:8, 750:14, 796:22, 808:23, 833:5, 902:19, 905:23, 916:22, 950:4, 950:15, 951:12

**mouth** [2] - 983:22, 989:7

**move** [1] - 832:23

**moved** [2] - 732:23, 733:3

**movement** [1] - 913:9

**MR** [149] - 730:6, 730:7, 730:8, 730:11, 730:12, 730:13, 731:6, 742:2, 750:6, 751:10, 753:4, 754:18, 760:3, 765:19, 767:11, 767:13, 775:8, 784:17, 784:22, 784:24, 785:2, 785:5, 792:25, 793:3, 795:8, 795:11, 795:16, 800:14, 803:7, 803:9, 804:4, 810:15, 810:19, 810:22, 810:25, 811:5, 811:7, 813:21, 813:24, 814:7, 816:10, 816:12, 816:15, 816:24, 817:9, 833:15, 853:8, 853:12, 853:13, 862:17, 863:8, 863:10, 863:12, 871:7, 871:10, 871:11, 873:24, 876:23, 891:15, 892:8, 902:24, 905:25, 906:4, 911:8, 918:10, 918:11, 924:16, 924:20, 924:22, 924:23, 924:25, 925:5, 925:6, 926:9, 929:5, 934:19, 935:3, 937:20, 937:21, 943:23, 943:25, 944:15, 944:16, 944:17, 944:18, 945:12, 945:13, 945:15, 945:21, 946:16, 946:19, 953:2, 953:3, 953:5, 956:12, 956:13, 960:8, 960:17, 960:20, 961:13, 961:14, 961:15, 961:23, 962:2, 964:22, 964:23, 965:2, 966:17, 966:19, 973:6, 988:2, 988:3, 988:4, 988:6, 994:24, 998:19, 1000:22, 1000:23, 1000:24, 1007:5, 1010:23, 1011:2, 1015:4, 1015:7, 1020:12, 1020:15, 1020:19, 1020:24,

1021:3, 1022:9, 1022:10, 1022:23, 1022:24, 1023:2, 1031:6, 1031:8, 1031:9, 1035:12, 1035:14, 1035:15, 1035:16, 1035:20, 1041:2, 1045:19, 1045:24, 1046:12, 1046:19, 1046:20, 1046:24

**MS** [3] - 784:21, 811:3, 945:10

**MSRs** [1] - 1033:18

**multiplied** [1] - 973:19

**Mulvenna** [3] - 727:23, 1048:8, 1048:22

**municipal** [2] - 741:22, 820:12

**Murphy** [1] - 729:5

## N

**name** [14] - 794:20, 808:14, 808:17, 808:19, 808:21, 822:13, 822:25, 823:13, 823:19, 913:19, 916:9, 930:18, 932:16, 1032:11

**named** [2] - 832:4, 834:14

**names** [4] - 809:6, 823:20, 903:11, 915:20

**natural** [1] - 932:2

**nature** [2] - 762:9, 838:8

**near** [1] - 876:21

**necessary** [3] - 766:14, 832:15, 857:12

**necessity** [1] - 927:5

**need** [22] - 752:20, 837:20, 861:22, 869:7, 869:13, 869:20, 873:4, 877:10, 877:14, 884:24, 898:21, 907:10, 912:16, 913:17, 913:21, 914:5, 1005:9, 1020:17, 1020:19, 1036:9, 1039:7

**needed** [25] - 798:21, 798:25, 801:17, 841:21, 846:4, 847:22, 850:6, 872:13, 872:15, 873:23, 887:7, 898:8, 914:2, 932:7, 938:15, 975:21, 984:4, 985:7, 985:17, 986:22, 987:5, 987:7, 987:14, 1004:8, 1005:19

**needs** [4] - 858:20, 869:22, 909:5, 988:17

**net** [4] - 921:23, 923:21, 924:5, 973:21

**Net** [1] - 924:2

**Never** [1] - 944:5

**never** [3] - 891:10, 947:14, 1042:23

**NEW** [2] - 1048:4, 1048:6

**New** [16] - 727:15, 728:7, 728:17, 760:25, 861:18,

873:6, 898:24, 972:24, 981:21, 982:12, 1012:4, 1012:5, 1048:9

**new** [6] - 743:22, 792:7, 855:7, 867:25, 889:5, 1033:25

**newborn** [2] - 841:11, 851:3

**news** [7] - 836:14, 839:11, 847:24, 849:13, 868:17, 924:17, 925:2

**newsworthy** [1] - 836:12

**next** [16] - 775:22, 806:20, 806:21, 816:16, 822:12, 838:8, 849:10, 865:6, 885:18, 889:23, 895:13, 916:4, 922:13, 923:12, 949:9, 972:7

**Next** [1] - 823:12

**Ngo** [411] - 731:25, 732:3, 732:7, 732:10, 732:14, 736:20, 737:8, 742:7, 742:21, 743:3, 743:6, 743:18, 744:5, 744:12, 744:14, 744:18, 745:11, 745:22, 746:18, 747:2, 747:19, 747:21, 747:24, 748:3, 748:9, 748:19, 749:14, 750:16, 750:22, 751:2, 751:19, 751:21, 752:5, 752:10, 753:6, 753:10, 753:17, 755:4, 755:9, 755:12, 757:12, 757:17, 757:21, 757:24, 758:4, 759:4, 760:6, 760:12, 760:21, 761:4, 761:12, 762:4, 762:11, 762:24, 763:25, 764:7, 765:13, 768:25, 769:15, 769:25, 770:15, 770:19, 771:9, 773:7, 773:8, 773:14, 775:10, 775:15, 775:19, 776:9, 776:15, 777:13, 777:16, 779:13, 779:15, 779:23, 780:8, 780:14, 781:4, 781:21, 786:16, 787:23, 788:4, 788:18, 788:19, 788:23, 789:11, 789:22, 790:8, 793:6, 793:16, 794:10, 796:4, 797:8, 797:23, 798:13, 798:21, 799:15, 799:20, 800:4, 800:8, 801:6, 801:15, 801:16, 802:6, 802:14, 802:19, 803:14, 803:20, 804:20, 807:13, 807:19, 807:20, 812:2, 812:9, 812:12, 812:16, 813:18, 815:19, 816:7, 823:21, 827:12, 827:15, 827:24, 828:3, 828:5, 828:13, 828:19, 830:5, 830:11,

831:19, 832:7, 834:2, 834:13, 834:20, 835:21, 837:3, 837:9, 837:16, 837:22, 838:2, 838:13, 838:17, 839:3, 839:20, 839:23, 840:8, 840:11, 840:19, 841:3, 841:6, 841:12, 841:15, 841:21, 842:5, 842:18, 843:10, 843:14, 843:24, 844:13, 844:21, 845:7, 845:17, 845:22, 846:6, 846:15, 846:19, 846:21, 847:2, 847:17, 848:16, 849:4, 850:2, 850:6, 851:5, 853:20, 855:7, 855:14, 855:24, 856:14, 856:18, 856:25, 857:6, 857:23, 858:8, 858:17, 859:15, 859:17, 859:21, 860:9, 860:19, 861:6, 862:12, 863:15, 863:22, 865:2, 865:13, 865:25, 866:8, 866:10, 866:20, 868:23, 869:2, 870:6, 872:4, 872:9, 872:13, 872:19, 872:22, 874:2, 875:11, 875:18, 877:2, 879:6, 880:4, 881:9, 882:4, 882:9, 882:13, 883:17, 883:23, 884:6, 884:17, 885:8, 886:2, 887:8, 888:10, 888:17, 888:22, 889:15, 889:22, 890:5, 890:11, 893:2, 893:11, 893:16, 893:21, 894:22, 895:23, 896:3, 897:2, 897:7, 897:13, 897:20, 897:23, 898:13, 899:9, 899:12, 900:16, 901:17, 901:24, 903:4, 906:5, 906:21, 907:16, 907:20, 908:2, 908:22, 912:17, 916:12, 916:18, 919:16, 919:19, 919:23, 920:2, 920:6, 925:8, 925:16, 925:20, 927:7, 927:12, 927:16, 928:13, 929:10, 932:22, 933:2, 942:21, 942:23, 942:25, 943:16, 943:19, 944:10, 944:24, 945:24, 946:7, 947:8, 947:11, 948:14, 948:24, 951:4, 951:12, 952:7, 952:11, 952:14, 953:12, 953:25, 954:7, 954:13, 955:15, 955:23, 957:2, 957:10, 957:13, 957:22, 960:13, 960:21, 962:16, 962:19, 963:3, 963:15, 964:10, 965:12, 974:10, 975:19, 976:2, 977:2, 977:19, 977:21, 978:9, 978:22, 978:24, 979:11,

1068

979:14, 981:13, 982:18, 983:9, 983:21, 984:2, 984:3, 984:21, 985:2, 985:6, 985:17, 985:22, 987:14, 987:21, 987:22, 988:8, 988:23, 992:12, 994:14, 995:2, 996:17, 997:4, 997:6, 997:19, 999:3, 999:25, 1000:14, 1001:7, 1001:10, 1001:15, 1002:23, 1004:7, 1005:24, 1006:6, 1007:7, 1007:13, 1007:23, 1008:6, 1008:7, 1008:10, 1008:20, 1008:24, 1010:18, 1011:3, 1011:10, 1011:15, 1013:9, 1014:10, 1014:20, 1015:11, 1015:14, 1017:10, 1017:20, 1018:17, 1018:22, 1019:10, 1019:13, 1019:20, 1019:22, 1021:11, 1021:21, 1024:17, 1025:9, 1028:4, 1028:10, 1028:25, 1030:7, 1032:12, 1032:14, 1032:25, 1034:16, 1035:6, 1035:7, 1036:11, 1036:18, 1037:21, 1039:16, 1040:3, 1040:7, 1040:15, 1041:13, 1041:25, 1042:21, 1043:4, 1046:14

**NGO** [1] - 727:4

**Ngo's** [84] - 743:25, 745:7, 755:22, 756:12, 756:17, 758:8, 760:19, 762:16, 763:14, 766:17, 769:6, 772:16, 773:20, 780:25, 782:3, 787:2, 794:22, 800:19, 800:23, 800:24, 801:5, 804:8, 815:23, 840:13, 842:15, 849:9, 850:12, 850:25, 851:8, 851:12, 853:15, 854:2, 854:7, 859:25, 862:20, 877:22, 879:23, 882:22, 883:2, 883:8, 886:15, 886:25, 894:3, 895:15, 901:20, 903:2, 909:8, 916:9, 925:23, 926:14, 929:12, 933:7, 945:19, 950:23, 951:15, 954:22, 956:22, 958:3, 974:8, 976:15, 979:20, 980:2, 980:22, 991:22, 992:4, 993:20, 999:17, 1002:10, 1013:14, 1013:21, 1015:18, 1021:5, 1021:23, 1023:4, 1023:11, 1027:11, 1029:4, 1029:9, 1029:16, 1030:21, 1037:2, 1038:11, 1039:4, 1045:16

**nice** [2] - 758:23, 885:20
**Nicola** [1] - 729:5
**night** [2] - 849:11, 988:15
**nine** [1] - 946:13
**non** [1] - 953:8

**non-final** [1] - 953:8
**None** [6] - 794:25, 795:4, 795:7, 933:4, 933:8, 933:10
**none** [1] - 894:17
**nonstandard** [1] - 894:18
**noon** [1] - 816:17
**normal** [2] - 879:16, 885:2
**normally** [1] - 750:12
**Normally** [2] - 902:7, 909:24
**Notary** [1] - 1048:9
**note** [1] - 742:10
**notes** [1] - 881:15
**Notes** [3] - 928:8, 968:6, 1038:3
**Nothing** [1] - 816:12
**nothing** [1] - 934:18
**notice** [2] - 756:21, 881:17
**notices** [1] - 880:15
**notification** [1] - 877:20
**notified** [1] - 984:8
**notify** [1] - 855:20
**November** [25] - 770:17, 775:23, 776:9, 803:22, 807:21, 859:18, 884:21, 887:11, 887:14, 888:2, 901:18, 902:10, 902:21, 902:23, 1011:21, 1014:11, 1015:12, 1017:8, 1017:10, 1020:2, 1021:18, 1021:21, 1021:22, 1027:21, 1027:25
**nowhere** [5] - 800:7, 801:4, 998:20, 999:2, 999:6
**Nowhere** [1] - 801:14
**Number** [1] - 924:9
**number** [39] - 737:6, 746:25, 773:6, 774:13, 774:25, 775:3, 779:6, 779:16, 781:8, 781:18, 784:20, 803:8, 805:22, 807:7, 809:21, 810:24, 814:17, 821:20, 833:21, 856:15, 856:22, 871:24, 880:15, 893:13, 910:5, 910:10, 918:13, 922:3, 924:13, 945:8, 949:19, 967:8, 973:21, 973:22, 973:23, 1010:22, 1021:6, 1031:7
**numbers** [15] - 892:22, 903:9, 912:24, 914:16, 915:20, 919:14, 922:10, 949:16, 949:19, 955:9, 959:13, 960:2, 961:10, 1028:8, 1031:20

---

# O

**oath** [1] - 938:6
**obfuscate** [1] - 922:12
**objection** [9] - 784:19,

784:25, 785:2, 810:18, 811:6, 939:12, 981:24, 984:23, 1026:15
**Objection** [1] - 925:4
**obligation** [2] - 816:6, 936:22
**obligations** [3] - 762:21, 844:6, 936:10
**obtain** [1] - 994:19
**obtaining** [1] - 735:16
**obvious** [1] - 922:3
**obviously** [2] - 763:21, 773:23

**occurred** [2] - 873:14, 899:6
**October** [19] - 797:13, 797:20, 806:24, 807:11, 831:25, 883:18, 884:23, 885:10, 886:25, 902:18, 965:3, 1002:21, 1004:24, 1005:5, 1005:13, 1005:15, 1011:4, 1013:9, 1043:25
**odd** [2] - 752:10, 831:13
**OF** [4] - 728:4, 728:14, 1048:4, 1048:6
**off'** [1] - 991:9
**offer** [9] - 774:21, 830:6, 830:10, 831:9, 871:18, 896:18, 955:23, 956:5, 956:17
**offered** [1] - 900:5
**office** [88] - 742:21, 743:6, 744:6, 746:22, 753:12, 753:18, 756:10, 757:13, 760:24, 762:4, 762:25, 763:11, 763:12, 766:18, 769:8, 773:25, 775:11, 776:4, 777:23, 779:9, 787:24, 788:20, 798:17, 801:8, 802:7, 804:20, 807:15, 843:14, 844:8, 846:3, 846:4, 846:6, 846:13, 846:22, 847:3, 847:18, 849:5, 850:3, 850:7, 850:24, 851:3, 855:8, 857:18, 858:10, 858:13, 859:20, 861:18, 863:22, 869:6, 872:14, 872:15, 873:4, 877:24, 878:7, 882:9, 882:13, 885:17, 886:4, 888:19, 889:3, 889:23, 890:3, 894:4, 896:16, 899:11, 900:24, 901:2, 901:15, 906:7, 920:4, 925:17, 927:8, 933:25, 937:3, 937:13, 938:25, 939:7, 939:11, 939:24, 982:24, 1012:8, 1012:9, 1015:14, 1039:2, 1039:9, 1039:17, 1039:24, 1040:4
**official** [6] - 897:25, 964:11, 996:7, 996:9, 1002:7,

1038:23
**officially** [1] - 1001:20
**often** [4] - 745:11, 745:20, 770:8, 909:19
**oil** [2] - 904:13, 918:2
**OK** [2] - 747:5, 747:21
**Omar** [1] - 823:21
**ON** [2] - 728:4, 728:14
**Once** [1] - 745:21
**once** [4] - 796:9, 842:12, 850:16, 929:2
**One** [5] - 737:2, 737:13, 774:19, 794:18, 860:14
**one** [69] - 737:19, 738:9, 746:11, 749:13, 749:22, 760:18, 767:9, 767:12, 772:23, 772:24, 774:18, 783:20, 790:24, 791:14, 796:22, 813:12, 813:19, 813:20, 815:8, 821:23, 823:9, 834:9, 834:11, 834:17, 838:22, 839:11, 858:25, 861:24, 870:17, 876:4, 881:2, 882:8, 884:13, 904:8, 904:22, 910:13, 919:11, 926:10, 927:22, 927:24, 929:11, 929:14, 931:15, 937:11, 937:23, 944:15, 948:14, 949:23, 961:21, 963:3, 974:20, 1004:10, 1004:12, 1004:13, 1004:22, 1008:3, 1010:23, 1020:20, 1030:2, 1030:13, 1032:11, 1034:9, 1034:20, 1035:4, 1035:7, 1037:24
**one-on-ones** [1] - 910:13
**ones** [4] - 750:3, 818:8, 829:16, 910:13
**ongoing** [1] - 1037:13
**OPCO** [5] - 778:11, 821:21, 918:15, 921:15, 946:24
**open** [4] - 821:8, 821:25, 876:4, 946:17
**opened** [2] - 803:21, 974:20
**operating** [1] - 901:4
**operations** [2] - 818:21, 835:17
**opinion** [3] - 762:15, 787:7, 911:2
**opinions** [1] - 743:19
**Oppenheimer** [117] - 729:6, 731:10, 731:12, 732:5, 732:20, 733:2, 733:4, 733:5, 733:19, 733:22, 734:4, 734:7, 734:11, 734:23, 735:4, 735:7, 735:21, 736:23, 737:7, 737:11, 753:8, 757:25, 759:11, 766:2, 766:6, 779:25, 780:6, 780:8, 782:17, 785:16, 786:17, 788:14, 789:7,

790:21, 791:11, 791:12,
792:4, 792:15, 793:15,
793:24, 794:23, 795:3,
795:6, 795:24, 802:24,
809:22, 810:4, 810:8,
810:10, 815:12, 817:12,
817:14, 818:15, 818:18,
818:22, 819:4, 819:8,
819:24, 824:5, 829:7,
830:10, 831:9, 832:12,
833:22, 834:6, 850:13,
867:16, 869:24, 871:18,
885:20, 885:24, 887:18,
888:5, 891:11, 905:6, 908:2,
908:22, 911:12, 912:2,
917:11, 920:20, 920:24,
923:2, 924:13, 925:8, 931:2,
931:10, 932:13, 933:2,
933:6, 936:9, 936:22,
942:22, 943:10, 947:5,
951:25, 954:11, 955:12,
955:13, 963:9, 963:19,
966:6, 967:11, 973:25,
984:6, 999:7, 1031:23,
1032:2, 1033:13, 1037:8,
1041:24, 1043:3, 1044:12,
1044:20, 1044:23, 1045:2,
1045:14

**OPPENHEIMER** [1] - 727:7
**Oppenheimer 's** [18] -
812:3, 821:15, 841:22,
859:7, 870:4, 917:18,
920:12, 921:20, 921:23,
923:5, 924:5, 940:7, 954:21,
970:19, 991:15, 993:7,
1037:14, 1043:20
**Oppenheimer /CIBC** [1] -
796:4
**opportunities** [2] - 868:17,
900:12
**opportunity** [2] - 892:17,
918:4
**opposed** [2] - 749:23,
846:13
**optics** [1] - 831:17
**option** [2] - 876:16, 1034:2
**options** [3] - 868:14, 895:9,
895:11
**OPY** [1] - 920:11
**orally** [2] - 940:23, 941:14
**ordeal** [1] - 885:20
**order** [8] - 786:5, 808:20,
809:7, 837:20, 846:2,
936:23, 1006:21, 1046:8
**ordinary** [1] - 782:6
**Org** [1] - 821:13
**org** [2] - 877:15, 996:8
**organization** [1] - 877:18
**organizational** [2] - 823:3,
860:10
**organize** [1] - 915:14

**original** [1] - 1029:9
**originally** [4] - 1022:13,
1028:3, 1028:18, 1029:8
**others'** [1] - 947:22
**otherwise** [2] - 857:19,
865:16
**Otherwise** [1] - 810:23
**ourselves** [1] - 1045:11
**outlined** [1] - 1014:2
**outside** [2] - 929:16, 952:11
**overall** [7] - 785:25, 826:6,
904:18, 904:25, 916:15,
927:5, 930:3
**overdocument** [1] - 869:14
**oversaw** [1] - 940:12
**oversee** [1] - 759:22
**oversees** [1] - 874:23
**overwhelming** [1] - 868:2
**own** [7] - 762:19, 805:4,
852:6, 862:15, 867:2,
904:20, 1007:14
**owning** [1] - 905:17

## P

**P.C** [1] - 728:5
**p.m** [3] - 892:3, 988:15,
1047:4
**pace** [1] - 902:8
**packaging** [11] - 795:3,
828:23, 900:7, 904:21,
917:23, 917:25, 933:6,
1037:3, 1037:7, 1037:11,
1045:2
**PAGE** [1] - 730:3
**Page** [5] - 945:5, 967:21,
976:9, 980:19, 986:20
**page** [85] - 746:10, 746:11,
749:5, 755:4, 778:13,
778:19, 779:5, 805:18,
806:5, 806:20, 811:15,
811:20, 822:24, 840:22,
859:12, 892:20, 892:21,
892:23, 893:11, 893:20,
894:13, 897:4, 898:15,
899:19, 900:14, 916:4,
916:5, 921:14, 922:2, 922:9,
922:13, 937:17, 937:19,
938:17, 939:2, 941:9, 942:2,
944:12, 946:24, 948:18,
948:23, 949:4, 950:22,
951:19, 953:11, 953:23,
955:8, 956:9, 960:15,
960:16, 961:11, 961:12,
964:20, 964:23, 967:15,
967:22, 969:19, 970:2,
970:17, 971:8, 976:5, 977:7,
980:14, 981:23, 984:15,
986:2, 987:9, 991:4,
1003:22, 1009:4, 1010:8,
1013:16, 1015:3, 1018:16,

1019:18, 1022:5, 1022:6,
1023:22, 1025:13, 1025:22,
1030:24, 1031:6, 1032:7,
1032:10
**pages** [4] - 748:16, 967:5,
967:10, 1020:13
**paging** [1] - 1045:16
**paid** [50] - 771:14, 775:10,
777:6, 778:23, 780:19,
781:19, 783:24, 806:11,
813:3, 827:6, 827:9, 844:16,
854:17, 869:25, 871:18,
882:4, 894:11, 900:20,
900:24, 901:10, 902:4,
903:15, 908:9, 908:12,
916:22, 918:22, 918:23,
920:7, 933:19, 933:24,
937:8, 937:10, 957:9,
958:13, 961:4, 962:16,
964:4, 964:15, 966:6,
972:19, 1021:8, 1024:21,
1026:10, 1026:11, 1027:14,
1027:17, 1039:22, 1040:3,
1042:20, 1043:8
**Paper** [1] - 828:22
**paper** [13] - 787:19, 795:3,
828:20, 828:23, 848:19,
917:23, 917:25, 933:6,
1037:3, 1037:7, 1037:11,
1044:25, 1045:16
**paper/packaging** [1] -
952:2
**paperwork** [17] - 805:10,
845:2, 858:4, 865:16,
969:16, 970:8, 970:14,
975:17, 1001:6, 1001:17,
1002:5, 1002:24, 1003:3,
1003:6, 1003:7, 1003:8,
1036:7
**paragraph** [21] - 755:17,
756:3, 756:7, 760:21,
811:21, 811:25, 859:14,
860:23, 860:24, 867:23,
869:17, 871:13, 884:17,
885:5, 885:19, 955:7, 955:8,
955:9, 955:12, 955:14,
1015:8
**paragraphs** [1] - 883:22
**Paralegal** [1] - 729:4
**pardon** [1] - 1041:11
**parenthood** [1] - 868:3
**Park** [1] - 728:16
**part** [20] - 733:4, 740:15,
740:16, 741:6, 742:15,
798:12, 809:13, 809:17,
846:15, 850:22, 855:4,
862:11, 868:13, 881:23,
881:24, 942:25, 943:3,
943:5, 956:21, 1045:6
**participate** [2] - 983:16,
1003:10
**particular** [10] - 748:4,

752:18, 821:14, 823:20,
838:14, 852:15, 853:5,
903:24, 1024:13, 1036:24
**particularly** [2] - 821:17,
1037:3
**particulars** [3] - 852:25,
956:7, 1023:20
**parties** [1] - 1048:15
**partner** [4] - 839:25,
879:23, 898:22, 975:20
**partnership** [2] - 830:24,
831:5
**parts** [2] - 892:19, 931:19
**past** [3] - 864:16, 951:23,
1026:12
**paternity** [9] - 840:4,
840:20, 841:7, 864:11,
864:19, 865:9, 869:25,
895:9, 1042:20
**paternity/maternity** [1] -
867:4
**pattern** [1] - 749:23
**Paula** [1] - 747:12
**Pause** [48] - 740:21, 746:8,
751:16, 754:25, 767:2,
767:19, 777:5, 778:8, 783:9,
806:3, 825:17, 839:17,
848:7, 863:7, 870:12,
874:10, 878:16, 880:13,
883:14, 886:22, 892:12,
915:7, 918:7, 937:25, 942:4,
944:3, 947:24, 948:6,
951:21, 952:19, 955:10,
956:11, 957:17, 961:7,
962:4, 964:21, 967:6,
967:13, 967:20, 971:10,
976:7, 980:18, 989:3,
995:13, 1009:6, 1019:5,
1023:24, 1025:15
**Pay** [1] - 772:15
**pay** [31] - 772:15, 772:20,
781:4, 783:12, 783:13,
783:14, 796:16, 806:5,
806:8, 806:21, 807:2,
807:11, 854:21, 881:19,
903:4, 905:21, 906:21,
914:4, 914:5, 915:15, 929:4,
958:14, 960:12, 960:19,
962:6, 966:10, 972:22,
973:11, 973:16, 1028:3
**paychecks** [1] - 806:14,
806:15
**paying** [2] - 869:11, 906:5
**payments** [3] - 772:23,
773:3, 919:3
**payout** [1] - 973:3, 973:19,
973:23
**payroll** [6] - 846:8, 870:4,
880:21, 912:23, 928:25,
959:12, 959:18, 960:2,
961:10, 1040:18

**PCN** [5] - 882:8, 929:10, 965:3, 967:25, 1037:21
**PCNs** [4] - 927:21, 929:14, 964:22, 1038:11
**Pending** [1] - 729:3
**pending** [1] - 802:23
**people** [39] - 746:25, 750:21, 750:24, 808:20, 810:8, 811:2, 816:20, 819:17, 819:19, 833:5, 850:22, 854:15, 855:3, 856:22, 861:22, 873:3, 876:19, 885:24, 890:24, 894:25, 896:15, 896:18, 901:4, 905:14, 907:6, 909:13, 913:11, 914:4, 914:16, 916:22, 968:22, 997:2, 1030:10, 1032:2, 1032:18, 1033:5, 1033:20, 1033:23, 1033:24
**people's** [1] - 913:7
**percent** [8] - 739:22, 740:9, 860:4, 907:7, 922:21, 922:24, 930:2
**percentage** [3] - 929:24, 930:3, 973:19
**perfectly** [1] - 861:19
**perform** [9] - 791:5, 844:8, 844:20, 845:5, 846:5, 857:15, 873:2, 907:2, 982:25
**performance** [34] - 759:9, 785:25, 790:15, 790:18, 790:22, 791:3, 826:7, 903:10, 909:9, 909:11, 909:18, 920:20, 920:24, 923:6, 927:4, 932:6, 940:7, 940:14, 940:16, 940:18, 941:22, 942:9, 942:14, 947:21, 948:2, 948:9, 948:11, 948:13, 948:21, 948:24, 958:25, 1023:17, 1036:10, 1036:25
**performed** [7] - 780:16, 781:2, 783:24, 784:7, 789:7, 916:13, 923:2
**performer** [1] - 947:11
**performing** [6] - 857:20, 901:11, 926:25, 930:7, 983:19, 1004:14
**Period** [1] - 980:23
**period** [55] - 745:10, 745:23, 748:9, 752:16, 753:5, 753:18, 759:8, 770:9, 773:25, 776:2, 776:8, 776:13, 776:14, 777:24, 794:14, 798:25, 802:6, 802:10, 805:3, 805:12, 806:6, 806:8, 806:23, 807:13, 819:25, 824:12, 824:16, 833:19, 847:9, 852:13, 861:17, 862:12, 882:4, 882:8, 882:12, 886:4,

887:13, 887:25, 899:11, 902:9, 908:6, 911:16, 935:17, 960:13, 960:21, 966:7, 975:6, 977:3, 977:13, 978:14, 980:22, 990:16, 1021:13, 1021:15, 1031:10
**periodically** [1] - 877:19
**periods** [1] - 850:23
**permanent** [10] - 765:12, 801:22, 802:6, 814:21, 861:17, 875:20, 876:5, 996:5, 1020:5, 1020:8
**permanently** [1] - 855:18
**permissibilities** [1] - 857:17
**permissible** [2] - 826:6, 966:14
**permission** [4] - 850:5, 913:22, 984:9, 1004:17
**permissions** [4] - 894:18, 993:16, 994:19, 1004:16
**permitted** [1] - 870:2
**person** [18] - 791:21, 808:24, 838:14, 847:2, 858:25, 861:21, 861:24, 864:25, 882:2, 891:8, 894:5, 903:14, 913:13, 939:22, 942:9, 1023:20, 1035:9, 1046:3
**personal** [5] - 743:18, 838:25, 898:16, 899:4, 939:9
**personality** [1] - 868:9
**personally** [2] - 855:7, 879:17
**personnel** [3] - 831:14, 880:15, 880:22
**persons** [1] - 912:25
**perspective** [1] - 809:19
**pertinent** [2] - 852:21, 994:23
**Pete** [1] - 926:7
**Peter** [4] - 911:9, 912:17, 913:13, 913:16
**Phone** [2] - 728:8, 728:18
**phone** [6] - 856:15, 871:23, 897:7, 898:4, 910:5, 911:4
**photos** [1] - 758:19
**phrase** [2] - 990:25, 1002:14
**phrases** [1] - 1029:24
**physical** [2] - 844:18, 884:18
**Physically** [1] - 939:10
**physically** [1] - 746:18
**pick** [4] - 837:12, 898:23, 974:25, 975:4
**piece** [11] - 738:10, 739:2, 739:8, 739:10, 747:10, 748:4, 748:19, 748:22, 749:2, 848:18, 854:14
**pieces** [7] - 737:22, 746:4,

749:9, 749:19, 750:17, 821:4
**place** [10] - 829:19, 840:4, 840:6, 854:16, 860:7, 860:8, 890:3, 902:21, 1041:21, 1044:17
**placed** [2] - 816:22, 1001:15
**places** [1] - 901:4
**Plaintiff's** [1] - 811:4
**plan** [7] - 743:13, 743:17, 743:19, 756:6, 756:9, 838:10, 858:5
**plane** [1] - 896:14
**planned** [2] - 804:21, 982:13
**plans** [6] - 833:7, 842:14, 844:3, 849:9, 850:17, 864:5
**play** [1] - 916:20
**pleased** [3] - 884:11, 885:22, 888:14
**point** [34] - 735:10, 750:4, 750:7, 752:20, 754:7, 786:6, 849:17, 852:15, 858:22, 859:20, 860:9, 868:21, 899:7, 905:24, 924:16, 925:2, 963:24, 976:21, 978:14, 982:17, 983:25, 994:21, 998:9, 1000:6, 1000:12, 1008:10, 1014:19, 1015:14, 1016:6, 1019:4, 1021:22, 1031:4, 1039:6, 1040:17
**pointed** [1] - 895:22
**pointing** [1] - 861:24
**points** [2] - 889:24, 1026:20
**policies** [16] - 835:16, 838:6, 840:6, 842:11, 852:6, 864:15, 887:19, 891:12, 894:17, 979:12, 992:2, 992:8, 993:7, 993:13, 1002:19, 1003:8
**policy** [20] - 840:3, 840:4, 840:20, 841:7, 841:10, 841:23, 842:2, 864:11, 864:21, 864:22, 865:9, 868:14, 869:25, 887:23, 887:24, 888:6, 895:8, 895:21, 979:2, 991:15
**pool** [8] - 825:7, 825:9, 908:25, 913:10, 914:9, 923:10, 1023:17, 1023:18
**pools** [1] - 912:22
**poor** [4] - 850:19, 909:18, 941:21, 942:8
**portion** [3] - 854:13, 1018:14, 1039:23
**portions** [1] - 1017:25
**position** [9] - 735:16, 736:13, 742:11, 828:13, 850:15, 883:8, 911:11, 911:23, 1006:17

**positive** [1] - 1036:17
**possibility** [1] - 869:20
**possible** [7] - 761:11, 871:2, 889:5, 889:7, 914:21, 956:18, 1016:23
**possibly** [2] - 877:15, 926:7
**post** [1] - 884:23
**postcrisis** [1] - 853:2
**postdated** [1] - 860:19
**potential** [1] - 741:10
**potentially** [2] - 792:16, 903:19
**PR** [1] - 741:11
**practice** [2] - 877:14, 909:25
**praised** [3] - 951:15, 952:6, 952:10
**precedent** [1] - 840:5
**precrisis** [1] - 829:13
**predecessor** [1] - 877:16
**preference** [3] - 986:17, 986:18, 987:2
**preliminary** [1] - 915:13
**prepare** [2] - 896:22, 1014:3
**prepared** [4] - 762:11, 897:8, 897:14, 898:5
**preparing** [1] - 983:17
**presence** [2] - 951:17, 951:25
**present** [5] - 737:5, 764:23, 765:24, 773:17, 781:24
**PRESENT** [1] - 729:2
**presented** [2] - 809:22, 910:15
**press** [1] - 811:14
**pressure** [1] - 851:23
**pressures** [1] - 999:4
**pretty** [2] - 875:14, 912:2
**prevented** [2] - 878:7, 899:4
**previously** [3] - 892:5, 943:8, 952:22
**pricing** [1] - 904:4
**Primarily** [1] - 820:10
**principal** [1] - 731:20
**print** [1] - 821:20
**priority** [5] - 787:16, 787:17, 792:9, 792:13, 793:11
**procedure** [1] - 901:14
**procedures** [2] - 739:5, 835:17
**proceeding** [6] - 791:17, 797:8, 819:7, 848:13, 859:8, 954:22
**proceedings** [2] - 1048:10, 1048:13
**process** [14] - 755:14, 816:22, 827:17, 863:3, 908:23, 914:24, 940:7,

940:8, 940:12, 940:15, 940:19, 1021:18, 1021:20, 1027:24

**produce** [3] - 973:2, 973:3, 973:7

**produced** [2] - 811:6, 968:25

**producing** [1] - 854:25

**product** [3] - 901:21, 907:10, 910:19

**production** [1] - 855:2

**professional** [2] - 896:9, 896:17

**professionals** [1] - 896:11

**profit** [6] - 921:23, 922:22, 922:23, 923:21, 924:2, 924:5

**profitability** [2] - 923:11, 927:6

**program** [1] - 818:21

**progression** [1] - 1021:25

**prolific** [2] - 907:9, 907:12

**promise** [3] - 937:19, 1046:16, 1046:18

**promoted** [16] - 735:18, 911:15, 911:21, 943:19, 944:10, 944:24, 945:25, 946:6, 946:9, 947:5, 947:9, 954:13, 955:16, 962:19, 964:12, 965:9

**promoting** [1] - 766:7

**promotion** [3] - 941:23, 942:10, 962:24

**proper** [4] - 739:5, 845:2, 858:4, 975:17

**proponent** [2] - 819:15, 819:23

**proposals** [1] - 915:23

**protect** [1] - 1006:21

**protected** [3] - 887:18, 936:7, 1002:20

**protection** [4] - 888:6, 1001:10, 1001:12, 1043:10

**protects** [1] - 865:7

**proud** [1] - 819:17

**provide** [3] - 887:19, 936:10, 936:22

**provided** [2] - 981:17, 990:21

**provider** [1] - 830:22

**provides** [3] - 888:6, 1038:7, 1043:10

**provision** [1] - 841:10

**public** [1] - 820:12

**Public** [1] - 1048:9

**publicly** [1] - 852:2

**publish** [5] - 738:17, 738:18, 902:11, 902:22, 932:23

**published** [2] - 733:12, 901:22

**Published** [4] - 949:6,

949:9, 949:23, 951:3

**publishing** [3] - 738:19, 738:20, 793:16

**pulp** [2] - 828:21, 828:22

**punish** [2] - 851:5, 858:13

**punished** [1] - 797:9

**punishing** [7] - 780:2, 782:14, 788:19, 788:23, 906:6, 906:10, 919:22

**punishment** [2] - 775:11, 775:16

**purchase** [1] - 943:2

**purchasing** [1] - 943:4

**purpose** [2] - 880:20, 904:2, 940:14

**purposes** [1] - 928:25

**pursuant** [1] - 866:3

**put** [12] - 738:9, 741:15, 791:8, 809:2, 809:5, 897:19, 924:18, 925:2, 944:5, 999:11, 1025:17

**putting** [1] - 989:6

**Q**

**Q3** [1] - 889:6

**Q4** [1] - 889:6

**qualified** [2] - 762:16, 876:13

**quarter** [12] - 759:8, 759:9, 759:14, 760:5, 760:13, 762:12, 762:17, 762:21, 902:16, 902:17, 915:6, 949:5

**quarter's** [1] - 902:22

**quarterly** [1] - 964:5

**QUESTION** [32] - 938:23, 939:4, 939:10, 939:16, 941:12, 942:8, 944:21, 945:23, 956:16, 976:17, 977:9, 980:20, 980:25, 981:4, 982:3, 984:20, 985:2, 986:8, 986:21, 987:13, 991:8, 1009:9, 1010:12, 1013:20, 1013:24, 1022:12, 1022:16, 1024:5, 1025:25, 1026:5, 1026:7, 1026:13

**questions** [23] - 760:12, 793:13, 793:14, 795:22, 813:22, 813:25, 814:3, 814:18, 816:10, 875:7, 933:12, 938:21, 939:19, 941:2, 949:3, 989:11, 1026:22, 1035:13, 1035:22, 1039:12, 1039:22, 1044:11, 1045:20

**Questions** [1] - 871:21

**quick** [3] - 748:23, 754:23, 853:9

**quickly** [2] - 870:10, 888:25

**quite** [3] - 970:25, 976:20, 1026:9

**quote** [3] - 875:25, 1046:14, 1046:17

**R**

**raise** [16] - 786:5, 786:8, 805:13, 814:9, 814:12, 814:14, 814:16, 1007:24, 1008:4, 1023:8, 1026:8, 1043:24, 1044:3, 1044:5, 1044:6

**raised** [1] - 893:9

**range** [2] - 779:4, 976:21

**RASKIN** [1] - 728:5

**rate** [1] - 807:2

**rated** [7] - 949:20, 949:24, 950:4, 950:12, 950:15, 951:4, 951:12

**rates** [2] - 820:13, 820:14, 820:18

**rather** [3] - 905:5, 997:10, 997:15

**rating** [1] - 820:23

**RD** [2] - 823:12, 1032:24

**reach** [1] - 910:23

**reached** [1] - 896:15

**reaching** [1] - 870:6

**reaction** [5] - 756:23, 773:20, 782:3, 847:16, 890:18

**read** [13] - 751:7, 754:24, 755:21, 758:21, 859:9, 866:6, 874:9, 875:9, 928:18, 951:22, 1018:8, 1018:24, 1019:8

**reader** [1] - 748:24

**Reading** [5] - 861:5, 976:13, 986:7, 987:12, 1022:11

**ready** [3] - 740:20, 754:24, 839:15

**realized** [2] - 1004:8, 1019:14

**really** [6] - 766:13, 790:24, 869:12, 891:6, 894:16, 980:17

**reason** [17] - 765:4, 765:8, 790:9, 800:22, 851:4, 854:19, 854:20, 854:22, 928:13, 969:2, 989:23, 993:19, 998:10, 999:25, 1004:11, 1033:12, 1046:15

**reasoning** [1] - 831:16

**reasons** [3] - 790:12, 939:8, 958:9

**reassigned** [3] - 859:22, 1014:21, 1015:16

**rebuttal** [1] - 1046:11

**receive** [18] - 771:9, 777:16, 781:22, 783:4, 784:6, 786:5, 818:4, 901:24, 919:3, 934:7,

**quote** [3] - 875:25, 1046:14, 1046:17

934:15, 940:22, 940:23, 953:12, 973:20, 1000:12, 1004:17

**received** [47] - 737:15, 750:10, 756:20, 757:23, 773:11, 775:15, 777:17, 778:4, 780:15, 784:4, 784:12, 785:4, 785:10, 785:14, 798:20, 799:12, 803:15, 805:13, 807:11, 810:21, 812:24, 813:7, 813:12, 814:9, 814:12, 818:3, 830:6, 841:14, 871:15, 906:18, 906:22, 907:19, 908:16, 915:25, 919:16, 942:8, 954:4, 955:23, 960:24, 962:9, 965:6, 978:6, 988:22, 991:22, 992:3, 1013:8, 1043:24

**receives** [2] - 941:21, 972:25

**receiving** [8] - 752:2, 755:8, 767:7, 767:25, 773:15, 841:20, 885:25, 1036:21

**recent** [1] - 921:3

**Recess** [5] - 795:13, 817:4, 853:11, 934:22, 1035:18

**recess** [1] - 891:19

**recharacterize** [1] - 894:15

**recipient** [2] - 848:10, 941:5

**recognize** [7] - 783:10, 821:9, 881:24, 921:9, 923:14, 960:12, 988:7

**recollection** [16] - 750:24, 765:18, 773:2, 789:6, 807:10, 840:9, 840:15, 849:3, 893:7, 914:13, 921:25, 962:16, 986:24, 1009:16, 1018:3, 1025:16

**recommendation** [1] - 832:10

**recommended** [3] - 756:5, 799:4, 988:20

**reconsider** [1] - 862:24

**reconsidered** [1] - 815:3

**reconsidering** [3] - 815:6, 815:14, 863:3

**reconvene** [1] - 1046:25

**record** [14] - 795:13, 800:13, 802:17, 817:4, 853:11, 877:20, 890:12, 891:7, 891:19, 934:22, 946:12, 1000:5, 1035:18, 1048:13

**recorded** [5] - 890:19, 892:14, 1017:13, 1017:18, 1017:21

**recording** [7] - 890:8, 890:15, 891:3, 891:6,

891:12, 892:18, 893:16

**recover** [3] - 788:24, 906:11, 936:23

**recovering** [5] - 776:11, 788:4, 807:18, 882:5, 882:13

**recovery** [6] - 805:11, 879:9, 879:21, 879:23, 884:19, 884:25

**recruit** [1] - 831:14

**recruitment** [1] - 827:16

**red** [1] - 869:10

**REDIRECT** [4] - 730:8, 730:13, 814:6, 1035:19

**redirect** [3] - 813:23, 1020:16, 1035:16

**Redirect** [16] - 814:1, 815:1, 816:1, 1035:1, 1036:1, 1037:1, 1038:1, 1039:1, 1040:1, 1041:1, 1042:1, 1043:1, 1044:1, 1045:1, 1046:1, 1047:1

**reduce** [2] - 854:10, 1022:16

**reducing** [2] - 930:9, 1022:3

**reduction** [1] - 1030:3

**reentry** [1] - 886:20

**refer** [7] - 840:22, 852:14, 852:16, 936:13, 956:14, 988:11, 994:16

**reference** [13] - 742:11, 757:5, 757:8, 762:2, 787:23, 788:3, 820:22, 849:20, 849:22, 872:19, 916:7, 1036:25, 1038:11

**referenced** [3] - 738:21, 841:8, 974:21

**references** [1] - 979:21

**referencing** [1] - 915:13

**referred** [2] - 828:22, 865:2

**Referring** [1] - 860:17

**referring** [11] - 803:4, 833:11, 841:9, 864:3, 867:10, 871:25, 992:20, 992:24, 1018:21, 1019:7, 1019:9

**refers** [1] - 995:20

**reflect** [11] - 777:6, 785:9, 792:14, 868:8, 919:2, 923:10, 949:19, 989:10, 992:8, 1010:4, 1025:6

**reflected** [5] - 772:19, 996:10, 999:14, 1021:13, 1044:11

**reflecting** [1] - 868:17

**Reflecting** [1] - 914:17

**reflective** [4] - 775:2, 785:24, 790:14, 790:17

**reflects** [1] - 1032:2

**refresh** [4] - 807:10, 840:9, 849:2, 962:15

**regard** [14] - 738:7, 762:17, 782:17, 859:25, 860:13, 866:19, 868:10, 884:7, 894:3, 915:5, 1015:19, 1036:18, 1037:2, 1040:9

**regarding** [18] - 744:6, 841:22, 845:4, 850:12, 866:4, 867:7, 867:18, 887:6, 898:25, 899:9, 936:14, 947:21, 948:2, 948:9, 974:8, 980:22, 1003:8, 1011:20

**regards** [4] - 838:7, 842:12, 857:17, 864:19

**registration** [1] - 876:14

**Rego** [3] - 971:13, 971:16, 971:18

**regular** [1] - 827:2

**regularly** [1] - 769:20

**regulated** [1] - 850:21

**regulatory** [7] - 851:23, 852:5, 855:4, 874:23, 999:3, 1004:21, 1006:24

**rehashed** [1] - 889:24

**reinstate** [3] - 876:9, 876:15, 876:21

**reinstating** [2] - 876:17, 877:2

**reiterated** [1] - 860:11

**related** [6] - 1006:12, 1009:14, 1034:17, 1037:12, 1044:7, 1044:19

**relates** [1] - 835:16

**relating** [1] - 967:12

**relationship** [2] - 732:10, 732:12

**relationships** [1] - 977:12

**release** [1] - 811:14

**relevant** [4] - 889:10, 900:11, 903:12, 1037:13

**reliable** [1] - 960:5

**relied** [3] - 829:18, 864:15, 947:20

**rely** [2] - 819:19, 1002:18

**relying** [1] - 852:11

**remainder** [3] - 740:4, 776:21, 869:2

**remained** [2] - 1020:8, 1020:10

**remaining** [1] - 901:21

**remember** [32] - 737:3, 754:2, 779:2, 790:4, 805:15, 814:22, 827:25, 855:9, 855:11, 857:2, 870:17, 870:25, 879:18, 880:8, 883:4, 888:15, 897:16, 910:14, 917:7, 946:12, 956:7, 959:8, 964:17, 980:9, 980:13, 984:24, 1009:3, 1009:12, 1009:13, 1021:25, 1024:12, 1028:7

**remembering** [1] - 980:17

**remind** [2] - 860:9, 1000:15

**reminded** [1] - 1014:23

**reminding** [1] - 864:17

**remotely** [4] - 743:14, 744:2, 769:17, 901:15

**removal** [6] - 851:7, 858:16, 861:16, 875:19, 876:5, 1020:7

**remove** [6] - 850:25, 851:13, 854:9, 861:10, 862:20, 876:12

**removed** [2] - 854:7, 866:12

**removing** [2] - 861:6, 875:12

**repeatedly** [1] - 992:16

**replace** [1] - 932:15

**replaced** [1] - 734:13

**replies** [1] - 972:6

**reply** [1] - 751:8

**report** [25] - 733:18, 734:8, 734:18, 736:9, 736:18, 759:9, 809:12, 809:20, 812:2, 823:2, 823:14, 823:17, 823:23, 823:25, 828:11, 842:18, 842:23, 843:3, 901:23, 902:11, 916:2, 921:11, 923:18, 923:20, 935:7

**reported** [16] - 796:6, 796:8, 796:10, 796:12, 809:10, 809:14, 809:17, 809:25, 810:2, 810:5, 810:13, 823:4, 902:19, 919:3, 922:20, 922:22, 942:18, 965:21

**Reported** [1] - 727:22

**Reporter** [2] - 803:17, 1040:20

**reporter** [1] - 1046:17

**reporting** [5] - 736:7, 828:6, 888:23, 901:2, 1032:24

**Reporting** [2] - 1032:21, 1033:6

**reports** [2] - 889:4, 889:6, 905:8

**represent** [5] - 848:9, 859:6, 892:13, 918:12, 968:24

**representation** [2] - 840:13, 1036:2

**representative** [1] - 871:15

**represented** [3] - 822:10, 975:12, 1042:14

**represents** [1] - 778:23

**reputation** [2] - 788:14, 831:15

**request** [18] - 786:14, 800:8, 814:14, 850:5, 864:2, 864:12, 870:2, 976:15, 980:22, 984:9, 989:19,

991:22, 991:24, 992:2, 992:10, 993:20, 994:18, 997:9

**requested** [3] - 814:16, 966:20, 1044:4

**requesting** [5] - 747:8, 757:12, 757:24, 801:7, 850:2

**requests** [3] - 885:15, 980:6, 981:9

**require** [1] - 904:4

**required** [1] - 907:11

**requirement** [2] - 876:19, 904:4, 972:24

**requires** [1] - 850:21

**research** [155] - 731:13, 732:24, 733:2, 733:10, 733:13, 733:21, 734:7, 734:16, 734:20, 735:3, 735:10, 735:21, 735:25, 736:11, 736:21, 736:22, 737:6, 737:11, 737:16, 737:22, 738:9, 739:2, 739:8, 739:12, 739:24, 740:5, 740:14, 741:14, 741:21, 741:23, 742:5, 742:12, 742:17, 746:4, 748:4, 748:15, 748:22, 749:9, 765:23, 766:7, 766:21, 768:11, 768:16, 768:24, 776:16, 780:13, 792:11, 793:24, 794:6, 794:14, 794:16, 794:19, 794:23, 795:2, 795:5, 797:13, 797:25, 798:3, 798:4, 798:8, 808:12, 808:13, 809:17, 809:19, 812:3, 815:2, 815:15, 821:4, 823:6, 823:11, 824:6, 824:13, 824:17, 824:21, 824:23, 825:2, 825:6, 826:15, 826:18, 827:4, 828:10, 828:15, 829:12, 831:20, 832:8, 832:16, 832:19, 833:21, 834:6, 834:15, 834:16, 834:21, 834:25, 835:2, 835:18, 835:20, 836:13, 836:23, 854:11, 854:15, 854:17, 854:18, 857:21, 859:24, 861:2, 861:4, 873:2, 874:3, 877:3, 877:7, 882:24, 882:25, 883:10, 883:11, 888:25, 889:4, 889:6, 900:9, 901:14, 901:23, 902:8, 903:20, 906:25, 907:14, 908:8, 915:23, 916:8, 916:20, 917:2, 926:24, 927:17, 930:19, 930:22, 931:23, 932:3, 932:4, 932:16, 932:25, 933:5, 951:17, 951:25, 952:11, 995:21, 1015:17, 1020:9, 1030:8,

1073

1030:21, 1031:13, 1033:3,
1033:9, 1034:22, 1034:25,
1035:9, 1045:14
 **Research** [6] - 823:7,
823:8, 949:6, 949:9, 949:23,
951:3
 **reside** [1] - 982:13
 **resign** [1] - 832:12
 **resignation** [2] - 736:7,
1037:22
 **resigned** [1] - 734:11
 **resources** [33] - 839:5,
863:17, 865:3, 870:20,
870:23, 871:15, 872:5,
880:22, 905:3, 930:6,
936:13, 936:16, 957:24,
977:18, 977:22, 978:5,
978:7, 978:10, 979:8,
979:25, 984:2, 993:4, 993:6,
1000:7, 1000:8, 1001:4,
1001:15, 1002:18, 1003:12,
1003:14, 1035:24, 1043:21
 **respect** [1] - 907:3
 **respond** [1] - 1007:3
 **responded** [1] - 840:19
 **Respondent** [1] - 727:9
 **RESPONDENT** [1] - 728:14
 **responding** [3] - 745:16,
746:3, 980:6
 **responds** [2] - 865:5,
895:23
 **response** [19] - 741:13,
743:25, 747:11, 747:18,
758:9, 758:12, 758:16,
758:24, 760:19, 793:10,
801:3, 815:19, 858:2,
858:25, 872:11, 886:8,
895:16, 900:20, 956:8
 **responses** [1] - 858:21
 **responsibilities** [57] -
733:9, 737:14, 740:11,
762:16, 764:21, 765:17,
766:20, 769:5, 771:7,
797:24, 800:20, 800:23,
801:6, 801:16, 801:22,
801:25, 804:9, 804:16,
808:2, 834:22, 835:12,
844:9, 851:2, 851:8, 851:14,
852:8, 853:4, 854:8, 855:4,
857:11, 858:17, 859:22,
862:21, 866:11, 868:2,
869:13, 875:4, 875:8,
875:13, 875:25, 876:9,
972:14, 975:14, 995:3,
995:6, 995:7, 997:7, 999:17,
1000:2, 1004:7, 1014:21,
1015:15, 1017:23, 1018:23,
1019:11, 1020:8, 1034:16
 **responsibility** [1] - 1006:23
 **responsible** [1] - 911:18
 **responsive** [1] - 981:8

 **responsiveness** [1] - 952:7
 **rest** [2] - 809:23, 888:16
 **restroom** [1] - 853:9
 **restructuring** [3] - 928:10,
928:17, 1033:17
 **result** [2] - 885:25, 1004:22
 **results** [1] - 973:22
 **resume** [3] - 879:16, 885:2,
888:24
 **resumed** [1] - 892:5
 **retail** [2] - 733:12, 746:4
 **Retail/consumer** [1] -
836:4
 **retain** [4] - 819:18, 830:11,
831:9, 831:16
 **retaliate** [1] - 940:3
 **retaliated** [1] - 785:21
 **Retaliating** [1] - 782:11
 **retention** [1] - 833:6
 **return** [31] - 753:12, 800:24,
802:24, 803:22, 804:20,
807:20, 807:23, 846:21,
855:8, 856:21, 870:3,
872:15, 875:3, 875:23,
883:25, 884:20, 888:22,
968:12, 969:10, 971:20,
971:21, 972:2, 990:13,
1007:7, 1008:7, 1008:12,
1008:21, 1011:7, 1012:3,
1012:4, 1014:10
 **returned** [20] - 766:18,
770:3, 770:15, 770:19,
805:4, 807:21, 859:15,
859:17, 887:9, 888:10,
901:18, 972:16, 1009:22,
1012:6, 1014:17, 1015:11,
1020:2, 1021:12, 1021:14,
1021:21
 **returning** [13] - 762:25,
769:7, 847:3, 849:4, 863:22,
873:6, 873:7, 877:24,
1009:10, 1010:5, 1014:5,
1014:6, 1045:9
 **revenue** [1] - 833:12,
921:21, 923:21, 923:24,
924:3, 924:4, 926:17, 930:4,
930:16, 952:8
 **revenues** [1] - 922:20
 **review** [24] - 739:3, 746:6,
746:7, 747:4, 751:15,
766:24, 848:6, 853:3,
871:17, 902:20, 903:11,
914:2, 938:8, 938:10, 940:7,
940:15, 940:18, 941:5,
941:22, 948:4, 948:21,
948:24, 950:23, 1018:4
 **reviewed** [9] - 852:24,
859:11, 868:7, 954:25,
959:22, 1016:2, 1016:5,
1016:15, 1017:5
 **reviews** [4] - 940:22,

941:13, 942:9, 948:14
 **revise** [1] - 877:19
 **revoked** [2] - 731:22,
818:12
 **rid** [1] - 1033:17
 **right-hand** [3] - 805:21,
967:7, 968:5
 **rights** [2] - 819:9, 936:14
 **risk** [1] - 874:19
 **risks** [1] - 874:23
 **Rob** [29] - 736:8, 741:6,
745:9, 756:19, 756:25,
757:2, 763:9, 763:21,
764:10, 767:14, 769:2,
770:23, 770:25, 771:3,
771:5, 773:4, 779:17,
779:21, 781:6, 786:12,
787:3, 792:19, 796:10,
839:24, 840:2, 840:8, 841:6,
900:18, 1042:21
 **Rob's** [2] - 763:11, 763:12
 **Robert** [4] - 729:11, 736:17,
740:24, 771:17
 **ROBERT** [3] - 730:10,
817:5, 892:4
 **role** [7] - 861:6, 861:16,
862:14, 875:19, 916:21,
935:14, 996:2
 **room** [4] - 808:13, 861:23,
901:7, 914:20
 **Ross** [84] - 733:25, 734:8,
734:18, 734:23, 736:18,
744:5, 744:15, 744:19,
744:20, 744:24, 745:4,
756:15, 757:20, 758:9,
758:22, 759:14, 759:19,
760:5, 760:6, 760:12,
760:19, 761:22, 764:23,
771:23, 772:4, 773:17,
781:14, 781:24, 787:9,
799:17, 799:21, 800:4,
822:20, 823:2, 823:15,
823:17, 823:23, 824:17,
824:20, 826:19, 826:22,
842:6, 842:19, 842:24,
843:4, 843:7, 845:16,
847:17, 848:17, 849:8,
849:14, 850:11, 877:23,
886:15, 903:21, 909:8,
909:14, 929:12, 929:15,
943:15, 944:9, 944:22,
965:21, 976:2, 976:15,
976:21, 976:25, 977:10,
977:18, 979:25, 980:10,
980:21, 984:2, 987:22,
988:8, 988:13, 988:16,
997:11, 997:15, 1000:3,
1013:10, 1013:21, 1046:2
 **Ross'** [4] - 734:5, 758:16,
759:3, 822:25
 **rotational** [1] - 818:21
 **rule** [1] - 752:19

 **rules** [3] - 835:15, 852:5,
876:18
 **run** [2] - 905:9, 905:11,
1031:2
 **running** [2] - 884:13,
1031:11

 **S**

 **SA** [14] - 737:21, 737:22,
739:3, 739:8, 747:9, 747:21,
748:19, 748:22, 749:14,
749:25, 750:10, 751:6,
751:7, 751:22
 **SA'd** [2] - 748:3, 749:18
 **SA'ing** [11] - 738:21, 746:3,
749:9, 749:16, 749:24,
750:3, 750:8, 750:17, 751:4,
752:9, 752:19
 **salaries** [4] - 851:21,
915:16, 957:5, 957:6
 **salary** [17] - 786:6, 851:19,
853:15, 853:21, 853:23,
854:2, 854:10, 957:2,
963:25, 964:4, 964:7,
964:11, 965:6, 982:23,
1007:25, 1038:7, 1044:5
 **Salary** [2] - 735:5, 824:9
 **Sales** [3] - 822:25, 950:9,
951:11
 **sales** [30] - 733:14, 734:6,
735:2, 818:20, 821:4,
822:16, 822:18, 822:23,
826:25, 829:11, 829:17,
836:11, 903:19, 903:21,
907:9, 911:14, 911:17,
911:18, 911:19, 926:16,
926:24, 1013:13, 1014:3,
1014:5, 1025:18, 1035:2,
1036:18, 1036:21, 1044:9
 **salespeople** [18] - 827:6,
909:18, 909:25, 910:11,
911:2, 911:3, 930:13,
949:20, 950:4, 950:15,
951:4, 951:12, 951:15,
952:3, 952:6, 952:10,
972:19, 972:25
 **salesperson** [7] - 910:21,
933:16, 934:3, 934:6,
934:14, 950:12, 965:17
 **Salomon** [1] - 818:20
 **sanctity** [1] - 1021:2
 **sand** [2] - 869:8, 1006:25
 **SAs** [2] - 739:12, 739:19
 **sat** [1] - 762:7
 **satisfy** [1] - 907:9
 **SATTERLEE** [1] - 728:15
 **save** [2] - 930:5, 930:10
 **saw** [10] - 756:23, 763:8,
763:10, 769:6, 782:19,
877:22, 899:3, 923:20,

1003:24, 1036:17
**schedule** [2] - 838:24, 842:13
**schedules** [1] - 845:5
**Scheduling** [1] - 1045:24
**School** [1] - 818:3
**scrutiny** [1] - 1004:21
**Sean** [6] - 737:4, 737:19, 781:20, 823:21, 834:19, 918:13
**Sean's** [1] - 835:2
**SEC** [1] - 852:2
**Second** [1] - 945:12
**second** [37] - 740:18, 755:18, 759:5, 759:8, 759:9, 759:14, 760:5, 760:13, 760:21, 762:12, 762:17, 762:21, 764:12, 764:14, 764:19, 765:2, 768:9, 770:24, 779:12, 796:25, 811:15, 853:9, 869:16, 869:18, 890:6, 944:15, 945:11, 952:24, 953:23, 986:15, 991:21, 992:3, 1011:9, 1015:4, 1017:10, 1041:13
**second-quarter** [8] - 759:8, 759:9, 759:14, 760:5, 760:13, 762:12, 762:17, 762:21
**secondary** [2] - 900:11, 918:4
**seconds** [1] - 934:19
**section** [6] - 841:8, 897:22, 922:15, 949:5, 951:20, 1038:4
**sections** [1] - 950:19
**sector** [12] - 733:12, 791:12, 821:14, 903:24, 904:7, 905:7, 905:10, 905:15, 917:18, 917:20, 1045:12
**sectors** [34] - 733:15, 740:7, 787:16, 787:18, 790:21, 790:23, 790:24, 791:10, 792:2, 792:9, 792:13, 792:15, 792:17, 793:11, 828:16, 828:18, 828:24, 829:5, 829:15, 835:10, 835:21, 835:24, 836:2, 889:12, 900:12, 903:12, 907:15, 909:15, 917:14, 929:21, 931:21, 952:12, 1037:12
**see** [144] - 741:18, 746:9, 746:14, 746:24, 747:11, 747:18, 748:15, 751:5, 751:24, 754:17, 755:11, 755:15, 756:3, 756:5, 757:5, 757:8, 757:11, 758:9, 758:14, 758:19, 759:3,

760:22, 768:12, 772:12, 772:22, 778:15, 778:18, 783:13, 783:17, 783:21, 800:15, 802:13, 803:15, 803:16, 803:21, 804:10, 805:10, 805:22, 807:4, 808:14, 811:21, 812:4, 816:24, 822:4, 823:20, 826:8, 826:10, 840:18, 848:17, 848:24, 849:19, 849:22, 849:25, 852:4, 856:7, 859:14, 860:2, 865:10, 866:4, 866:14, 866:16, 868:14, 870:9, 880:14, 882:7, 883:16, 883:20, 884:11, 885:3, 886:8, 892:22, 893:11, 893:24, 895:20, 897:6, 897:9, 899:20, 904:10, 909:19, 911:2, 912:14, 915:6, 916:7, 918:18, 919:7, 921:17, 922:10, 922:15, 924:8, 927:24, 928:2, 928:9, 941:5, 946:20, 947:2, 948:20, 949:7, 949:13, 949:17, 950:10, 951:18, 953:11, 953:13, 953:24, 954:5, 955:8, 955:18, 955:19, 967:23, 968:7, 968:18, 969:21, 970:5, 971:14, 971:23, 972:8, 977:4, 986:18, 988:9, 989:4, 989:6, 1000:25, 1002:12, 1011:13, 1013:22, 1015:20, 1016:6, 1016:8, 1018:19, 1019:17, 1022:18, 1032:3, 1032:11, 1032:16, 1032:22, 1033:7, 1034:8, 1038:3, 1038:11, 1039:15, 1041:16, 1042:8, 1043:12, 1046:15
**seeing** [3] - 848:14, 904:8, 1006:11
**seek** [1] - 920:6
**seeks** [2] - 803:17, 1040:20
**seem** [1] - 868:2
**sen** [1] - 1041:17
**send** [18] - 737:25, 738:3, 747:10, 750:20, 751:7, 799:15, 799:20, 800:8, 858:4, 877:10, 879:10, 993:25, 994:2, 994:5, 994:20, 994:21, 1003:20, 1036:7
**Send** [1] - 758:18
**sending** [6] - 741:2, 745:14, 750:17, 860:12, 873:25, 875:11
**sends** [2] - 1010:18, 1011:3
**senior** [13] - 796:23, 808:24, 820:2, 833:5, 852:8, 909:13, 912:2, 913:13, 946:7, 964:12, 965:9,

1038:5, 1038:22
**Senior** [1] - 817:17
**senior-level** [1] - 796:23
**sense** [2] - 838:24, 1042:16
**sensitive** [1] - 852:9
**sensitivity** [3] - 852:7, 852:15, 852:16
**sent** [43] - 733:13, 737:21, 741:4, 742:4, 746:24, 750:23, 750:25, 752:11, 753:22, 768:20, 799:10, 801:6, 802:14, 802:19, 803:19, 815:22, 849:8, 858:20, 866:8, 897:25, 898:6, 898:10, 929:2, 978:4, 987:21, 987:22, 988:13, 989:8, 992:12, 994:8, 996:17, 997:4, 997:10, 997:14, 1000:8, 1001:6, 1002:23, 1003:2, 1003:5, 1013:9, 1013:15, 1013:20, 1023:3
**sentence** [11] - 755:11, 755:18, 756:5, 811:24, 869:17, 869:18, 885:18, 900:23, 922:19, 1011:10, 1041:16
**separate** [7] - 803:5, 813:16, 821:2, 840:20, 898:17, 899:5, 1026:20
**separated** [1] - 854:14
**separating** [1] - 820:12
**separation** [1] - 831:18
**September** [2] - 806:6, 902:16
**set** [17] - 771:16, 775:3, 796:18, 824:13, 824:17, 825:8, 884:22, 912:25, 935:14, 946:16, 955:13, 1011:6, 1021:6, 1021:23, 1028:21, 1029:9, 1048:19
**sets** [2] - 774:12, 774:25
**setting** [4] - 796:16, 825:5, 826:17, 1022:2
**settlements** [1] - 851:25
**seven** [1] - 1021:14
**Seven** [1] - 926:20
**several** [4] - 819:15, 911:15, 913:5, 968:22
**sex** [1] - 935:25
**share** [4] - 826:5, 905:11, 934:2, 958:11
**shared** [1] - 838:25
**Shareholders** [1] - 922:16
**shareholders** [1] - 923:19
**shares** [1] - 920:11
**sheet** [2] - 829:14, 829:18
**sheets** [1] - 968:22
**shocked** [2] - 890:20, 891:6
**shopping** [1] - 1004:16
**short** [5] - 795:8, 1020:16,

1020:23, 1035:17, 1046:13
**shortly** [5] - 849:7, 855:22, 857:3, 888:22, 889:22
**show** [5] - 810:14, 905:10, 947:8, 1013:4, 1028:22
**showed** [17] - 762:8, 815:9, 850:19, 855:15, 884:12, 1002:4, 1008:25, 1009:2, 1009:11, 1009:16, 1009:24, 1010:13, 1012:20, 1013:3, 1013:6, 1013:7, 1037:16
**showing** [2] - 1009:2, 1009:15
**shown** [1] - 1041:23
**shows** [3] - 960:24, 965:6, 1032:14
**sic** [2] - 771:3, 885:6
**side** [7] - 792:10, 792:11, 821:18, 892:22, 922:19, 928:9, 1034:11
**sign** [8] - 852:11, 882:7, 897:8, 897:15, 897:17, 898:5, 968:23, 983:15, 993:25
**signature** [1] - 881:12
**Signature** [1] - 970:3
**signed** [3] - 881:25, 929:15, 968:21
**significant** [9] - 793:16, 864:10, 916:21, 917:17, 988:23, 989:21, 989:24, 989:25, 1037:7
**Significantly** [1] - 949:10
**significantly** [2] - 1024:17, 1025:18
**signified** [2] - 808:21, 808:23
**signing** [1] - 835:15
**signs** [1] - 970:15
**Silence** [1] - 1020:25
**similar** [1] - 1026:11
**simpler** [1] - 937:11
**simply** [2] - 802:6, 1019:16
**single** [4] - 836:17, 853:6, 902:11
**sit** [3] - 959:10, 986:22, 1018:7
**situation** [3] - 769:3, 883:24, 1011:23
**six** [6] - 741:18, 741:20, 822:24, 896:14, 910:12, 911:16
**size** [2] - 748:22, 1023:16
**slated** [1] - 953:12
**small** [7] - 766:13, 778:11, 821:20, 822:2, 854:14, 855:3, 1031:20
**smaller** [1] - 822:3
**smarter** [1] - 811:2
**Smith** [1] - 818:20
**Sneeden** [25] - 737:4,

742:7, 746:12, 746:24, 747:4, 747:8, 747:15, 748:4, 778:3, 778:16, 778:23, 779:9, 781:20, 823:21, 834:19, 917:11, 917:14, 918:13, 918:22, 964:12, 965:4, 965:12, 1027:5, 1037:22, 1037:25

**Sneeden's** [3] - 748:15, 779:2, 779:7

**so..** [2] - 891:17, 969:5

**socializing** [1] - 895:13

**sold** [5] - 830:19, 831:15, 1033:13, 1033:18

**sole** [17] - 734:19, 765:4, 765:23, 768:10, 768:16, 768:24, 815:2, 815:15, 859:23, 874:3, 875:6, 877:6, 917:2, 995:6, 995:21, 1005:3, 1015:17

**solely** [1] - 750:18

**someone** [17] - 790:2, 852:8, 852:11, 868:10, 869:5, 936:16, 940:3, 941:21, 942:8, 958:20, 973:11, 1000:7, 1004:17, 1006:16, 1007:2, 1011:23, 1035:24

**sometime** [2] - 758:19, 1007:6

**Sometimes** [1] - 941:24

**sometimes** [1] - 928:24

**somewhere** [5] - 735:17, 802:18, 887:11, 913:12, 1011:24

**son** [1] - 797:4

**soon** [4] - 764:6, 764:9, 889:5, 889:7

**sorry** [31] - 749:6, 756:6, 760:24, 767:10, 770:6, 780:22, 790:16, 802:2, 815:23, 848:20, 863:8, 905:25, 937:9, 937:22, 943:25, 944:7, 945:10, 946:22, 952:24, 961:12, 987:25, 997:24, 1008:9, 1010:18, 1010:21, 1022:6, 1031:18, 1037:19, 1041:17, 1043:14, 1045:8

**Sorry** [3] - 759:2, 767:12, 871:7

**sort** [6] - 852:20, 864:25, 902:7, 903:25, 964:7, 975:15

**sorts** [2] - 826:21, 853:2

**sound** [14] - 786:23, 827:21, 832:2, 843:21, 853:18, 883:6, 887:15, 888:3, 908:19, 917:9, 925:13, 1007:21, 1025:7, 1036:14

**Sounds** [3] - 888:4, 1027:4,

1027:10

**sounds** [11] - 778:25, 779:4, 853:19, 883:7, 908:20, 964:6, 965:25, 968:15, 1003:23, 1025:8, 1027:7

**source** [2] - 997:16, 998:15

**sovereigns** [1] - 820:17

**space** [1] - 794:6

**spaces** [1] - 952:2

**speaking** [9] - 764:6, 769:22, 842:6, 861:10, 870:23, 880:20, 977:17, 979:24, 1006:11

**specific** [10] - 749:18, 750:4, 765:3, 828:16, 872:22, 894:24, 909:7, 992:9, 992:20, 992:25

**Specifically** [2] - 780:22, 903:25

**specifically** [6] - 805:18, 896:21, 936:21, 946:13, 980:13, 994:16

**specifics** [5] - 888:16, 985:24, 1001:18, 1012:7, 1028:20

**specifying** [1] - 869:3

**speed** [1] - 888:25

**spend** [3] - 739:23, 740:4, 889:13

**spending** [2] - 744:6, 906:7

**spent** [5] - 740:10, 788:4, 788:19, 809:4, 927:7

**spoken** [6] - 732:16, 770:23, 801:23, 842:9, 871:14, 896:6

**spokesperson** [1] - 970:4

**spreadsheet** [5] - 953:6, 953:7, 953:8, 953:10, 953:19

**spring** [4] - 864:2, 891:4, 931:6, 989:19

**squeeze** [1] - 1020:17

**SS** [1] - 747:5

**ss** [1] - 1048:5

**St** [1] - 818:2

**staff** [6] - 874:7, 877:13, 1007:2, 1013:13, 1014:4, 1025:18

**stage** [5] - 885:14, 913:9, 913:24, 914:14, 914:22

**stamped** [1] - 811:4

**stand** [1] - 892:6

**standard** [1] - 901:14

**Start** [1] - 944:16

**start** [11] - 737:23, 746:9, 746:10, 818:14, 836:10, 839:19, 892:20, 951:2, 970:10, 1007:19, 1021:16

**started** [12] - 732:21, 734:3, 795:23, 797:21, 797:24, 970:8, 1001:5, 1002:10,

1021:20, 1027:12, 1027:20, 1027:24

**starting** [2] - 755:3, 869:17

**Starting** [1] - 900:16

**starts** [2] - 756:4, 859:15

**State** [2] - 972:24, 1048:9

**STATE** [1] - 1048:4

**state** [10] - 800:8, 801:15, 826:3, 863:25, 871:14, 894:14, 895:21, 898:15, 912:16, 999:25

**statement** [10] - 859:8, 860:2, 860:4, 894:23, 895:16, 897:2, 954:22, 955:14, 961:16, 961:17

**states** [22] - 751:21, 755:12, 755:18, 756:5, 758:17, 760:22, 768:9, 859:17, 867:24, 869:17, 883:23, 884:17, 885:19, 893:21, 900:16, 921:17, 922:19, 951:22, 955:13, 968:9, 971:25, 990:13

**stating** [2] - 758:5, 840:19, 850:4

**status** [15] - 850:12, 850:14, 860:9, 865:17, 869:15, 880:11, 880:23, 884:7, 884:15, 896:12, 983:6, 1002:3, 1004:18, 1014:3, 1014:7

**stay** [6] - 798:22, 847:25, 873:4, 905:16, 984:13, 987:7

**staying** [2] - 857:8, 899:19

**Stearns** [2] - 732:4, 732:24

**Stephanie** [2] - 971:13, 972:6

**STEPHENS** [1] - 728:15

**stepped** [1] - 769:4

**stepping** [1] - 777:24

**steps** [1] - 838:8

**Steve** [8] - 767:5, 767:22, 768:4, 768:6, 874:15, 995:15, 995:16, 996:13

**Steven** [3] - 874:21, 926:6, 996:12

**sticking** [1] - 893:20

**still** [12] - 732:14, 733:15, 782:14, 794:8, 796:22, 844:6, 854:16, 868:19, 876:4, 961:23, 970:10, 1026:21

**stock** [1] - 920:9

**Stone** [3] - 856:9, 856:11, 856:18

**stood** [2] - 869:8, 894:7

**stop** [1] - 884:5

**stopped** [3] - 738:20, 854:22, 1031:11

**story** [1] - 1033:14

**strategic** [6] - 829:15,

830:25, 903:25, 904:14, 905:2, 909:5

**strategically** [1] - 903:13

**Strategy** [1] - 823:7

**strategy** [4] - 935:15, 943:5, 1045:6, 1045:7

**Street** [4] - 811:25, 867:9, 873:7, 929:25

**strengths** [1] - 1037:2

**strip** [6] - 972:13, 995:2, 997:6, 1004:7, 1018:22, 1019:10

**stripped** [2] - 797:23, 1017:22

**stripping** [3] - 801:15, 801:22, 999:25

**strongly** [1] - 819:18

**structure** [7] - 852:23, 855:5, 860:10, 1004:25, 1005:6, 1005:10, 1005:16

**stub** [7] - 783:12, 783:13, 806:5, 806:21, 960:12, 960:19, 962:6

**stubs** [3] - 772:15, 772:20

**stuff** [2] - 749:4, 777:25

**subject** [6] - 856:13, 863:15, 866:2, 879:8, 883:18, 912:12

**Subject** [1] - 966:12

**submitted** [1] - 970:7

**subordinates** [1] - 852:18

**subsector** [2] - 904:17, 910:16

**Subsequent** [1] - 899:2

**subsequent** [4] - 754:20, 788:3, 889:16, 897:18

**subsequently** [2] - 765:7, 877:11

**substance** [1] - 774:6

**subtab** [1] - 960:17

**success** [1] - 916:15

**successful** [1] - 926:21

**sued** [1] - 818:24

**suffered** [12] - 770:2, 770:3, 804:23, 805:3, 878:6, 878:12, 881:9, 882:20, 882:22, 925:20, 927:12, 1007:10

**suffering** [1] - 879:6

**suggest** [4] - 752:18, 843:7, 861:5, 876:3

**suggested** [3] - 802:23, 840:2, 1041:24

**suggestion** [1] - 899:13

**Suite** [1] - 728:16

**summarize** [2] - 817:23, 818:17

**summarized** [1] - 836:17

**summary** [1] - 871:16

**Sunday** [3] - 755:5, 849:11, 988:15

**supervise** [2] - 794:17, 855:5

**supervising** [2] - 737:19, 1025:20

**supervision** [2] - 809:19, 852:18

**supervisor** [22] - 734:23, 745:7, 756:12, 756:17, 771:22, 807:24, 809:15, 809:24, 815:24, 838:22, 842:16, 850:15, 854:20, 854:23, 857:14, 929:12, 984:13, 1004:22, 1025:10, 1026:14, 1026:21, 1043:18

**supervisors** [2] - 854:21, 1004:12

**supervisory** [60] - 731:18, 731:19, 738:25, 740:10, 747:25, 764:21, 765:5, 765:17, 766:20, 768:10, 769:5, 771:7, 800:19, 800:23, 801:5, 801:16, 801:24, 802:22, 804:8, 804:16, 808:2, 834:24, 835:12, 850:25, 851:8, 851:13, 852:23, 854:7, 854:12, 854:13, 857:10, 858:17, 859:21, 861:3, 861:6, 861:16, 862:9, 862:14, 862:21, 866:11, 875:4, 875:6, 875:12, 875:19, 875:24, 876:11, 995:2, 995:5, 995:6, 997:6, 999:17, 1000:2, 1006:16, 1006:20, 1014:20, 1015:15, 1017:22, 1018:22, 1019:10, 1020:7

**support** [10] - 755:19, 829:20, 833:8, 885:7, 885:9, 890:24, 907:4, 932:2, 1025:17, 1025:21

**supported** [2] - 733:13, 831:4

**supporting** [5] - 835:8, 843:4, 845:5, 1044:8

**supportive** [4] - 744:17, 756:2, 837:19, 868:19

**supposed** [3] - 968:14, 971:21, 972:2

**surprise** [8] - 758:21, 766:10, 819:11, 838:17, 885:8, 885:11, 931:7, 1038:14

**surprised** [10] - 748:3, 755:21, 771:2, 841:15, 847:19, 857:7, 884:6, 893:5, 997:23, 998:2

**surrogacy** [2] - 974:17, 974:22

**surrogate** [2] - 864:9, 989:20

**surrounding** [1] - 885:16

**survivability** [1] - 832:25

**suspect** [1] - 816:21

**suspected** [1] - 1006:16

**suspended** [2] - 731:22, 818:12

**suspending** [7] - 800:19, 800:22, 801:5, 804:8, 875:3, 875:24, 1029:18

**suspension** [1] - 804:13

**sustained** [1] - 925:4

**switched** [2] - 922:6, 922:11

**swore** [1] - 938:5

**sworn** [2] - 731:3, 817:6, 892:5

**systems** [1] - 910:8

## T

**tab** [3] - 945:11, 945:12, 961:19

**table** [1] - 816:23

**talent** [2] - 819:18, 819:19, 940:15

**tape** [1] - 1017:13

**tape-recorded** [1] - 1017:13

**target** [1] - 900:11

**targeting** [1] - 900:6

**task** [1] - 739:23

**tasks** [4] - 740:5, 776:16, 776:18, 861:2

**tax** [1] - 820:11

**tax-exempt** [1] - 820:11

**taxable** [5] - 820:11, 821:17, 822:7, 824:4, 930:12

**team** [1] - 901:9

**team's** [1] - 907:7

**teams** [1] - 896:12

**technically** [4] - 809:12, 809:16, 809:25, 810:12

**technology** [12] - 791:25, 792:23, 793:17, 900:13, 904:16, 931:20, 931:24, 932:4, 932:8, 932:16, 932:23, 1045:10

**Telecom** [1] - 792:22

**telecom** [2] - 792:2, 793:17

**telephone** [11] - 745:18, 753:25, 754:2, 769:23, 857:6, 860:20, 866:8, 886:3, 892:14, 998:6, 1046:4

**temper** [1] - 893:9

**temporary** [4] - 765:12, 801:21, 804:13, 814:21

**ten** [1] - 990:16

**tends** [1] - 958:11

**tenure** [1] - 796:3

**term** [3] - 793:21, 833:7, 866:15

**terminate** [9] - 787:2, 788:18, 824:23, 925:22, 926:13, 927:9, 927:14, 927:18, 1029:15

**terminated** [8] - 786:16, 789:12, 790:10, 793:8, 794:10, 925:8, 928:14, 933:3

**terminating** [1] - 1029:21

**termination** [4] - 794:22, 933:7, 1039:3, 1045:17

**Termination** [1] - 928:3

**terminology** [1] - 974:19

**terms** [7] - 869:11, 894:16, 904:19, 907:7, 959:24, 966:15, 993:13

**testified** [40] - 731:4, 735:9, 754:19, 755:6, 761:25, 764:11, 769:15, 776:7, 777:11, 785:10, 793:6, 797:12, 798:6, 803:20, 812:11, 812:23, 817:7, 842:4, 846:14, 854:6, 866:18, 892:6, 901:17, 916:11, 930:21, 931:9, 955:22, 974:9, 974:13, 978:8, 978:17, 997:5, 999:4, 1012:20, 1016:24, 1028:24, 1035:23, 1040:14, 1043:17, 1045:13

**testify** [2] - 983:8, 1046:6

**testifying** [4] - 1008:24, 1029:2, 1029:6, 1046:4

**testimony** [49] - 799:8, 802:17, 803:14, 808:8, 812:20, 814:8, 846:17, 921:12, 935:6, 938:5, 939:11, 942:12, 946:4, 956:19, 956:20, 965:15, 974:23, 976:23, 977:15, 981:11, 982:15, 985:4, 986:12, 987:3, 987:18, 991:8, 991:11, 992:19, 997:13, 1004:6, 1005:8, 1009:17, 1009:25, 1010:15, 1012:14, 1012:17, 1014:8, 1014:24, 1015:22, 1016:21, 1022:20, 1024:14, 1026:17, 1026:18, 1036:10, 1039:8, 1043:9, 1043:24, 1044:22

**text** [2] - 754:3, 892:21

**TG** [1] - 1034:23

**thanked** [2] - 841:15, 885:9

**THE** [163] - 741:24, 741:25, 749:13, 749:17, 749:20, 749:24, 750:5, 750:11, 750:13, 750:15, 750:19, 750:20, 750:23, 750:25, 751:5, 751:9, 752:17, 752:23, 753:3, 754:6, 754:10, 754:12, 754:14, 754:17, 759:25, 760:2, 765:10, 765:15, 767:12,

774:3, 774:8, 774:9, 774:11, 774:17, 774:19, 774:20, 774:24, 775:7, 784:23, 785:3, 790:19, 791:2, 791:4, 791:5, 791:8, 791:13, 791:14, 791:19, 791:20, 791:23, 792:3, 792:8, 792:12, 792:18, 792:20, 792:22, 792:24, 795:10, 795:12, 795:14, 802:12, 802:15, 802:16, 803:3, 803:11, 803:18, 803:23, 803:24, 804:2, 804:3, 810:20, 813:23, 814:5, 816:11, 816:13, 816:14, 816:20, 817:3, 833:9, 833:12, 852:14, 852:22, 853:10, 860:14, 860:16, 860:17, 860:21, 860:22, 861:9, 861:14, 861:19, 862:10, 862:16, 863:11, 871:9, 872:18, 872:25, 873:9, 873:13, 873:16, 873:17, 873:19, 873:20, 875:15, 876:6, 891:18, 902:7, 902:12, 903:23, 904:3, 905:4, 905:8, 906:3, 909:24, 910:3, 910:17, 910:19, 910:20, 910:24, 918:9, 925:4, 926:3, 926:5, 928:16, 928:19, 928:21, 928:22, 934:21, 945:18, 946:18, 953:4, 959:14, 959:15, 959:16, 959:20, 960:19, 964:24, 966:16, 966:18, 972:18, 972:20, 972:21, 972:23, 988:5, 994:13, 994:17, 998:5, 998:8, 1006:4, 1006:9, 1010:21, 1015:6, 1020:22, 1020:25, 1022:25, 1040:13, 1040:21, 1040:24, 1045:21, 1046:9, 1046:16, 1046:23, 1046:25

**therapist** [1] - 884:19

**thereabouts** [1] - 994:15

**thereafter** [3] - 857:3, 861:11, 889:22

**therefore** [1] - 752:20

**thereof** [1] - 916:16

**thinking** [4] - 809:4, 869:12, 903:13, 1028:21

**third** [9] - 756:3, 811:20, 860:23, 881:2, 884:17, 902:18, 948:18, 1011:10, 1037:24

**thorough** [1] - 884:4

**thoughts** [2] - 1024:10, 1024:12

**thousand** [1] - 772:18

**Three** [1] - 833:25

**three** [20] - 732:23, 737:9,

1077

739:21, 746:10, 746:23, 749:11, 794:11, 821:3, 821:6, 846:22, 894:17, 902:15, 907:6, 910:13, 933:11, 966:21, 982:2, 1019:15, 1037:19, 1037:21
**thriving** [1] - 758:18
**throughout** [3] - 909:12, 929:23, 975:5
**Thursday** [1] - 883:17
**tied** [1] - 942:14
**timing** [7] - 805:15, 838:8, 883:24, 886:19, 902:13, 1005:12, 1005:14
**Title** [1] - 1038:4
**title** [26] - 731:11, 733:6, 734:5, 735:24, 737:15, 740:13, 742:16, 780:11, 797:21, 817:13, 817:16, 819:24, 828:8, 878:19, 882:22, 908:5, 916:19, 916:24, 927:17, 941:25, 955:16, 1038:12, 1038:19, 1038:20, 1038:24, 1039:4
**titled** [1] - 922:16
**titles** [5] - 833:4, 833:6, 1038:17, 1038:18, 1038:24
**TMT** [4] - 793:21, 793:23, 932:11, 932:14
**Today** [1] - 739:14
**today** [12] - 739:22, 768:10, 841:13, 875:5, 983:4, 983:8, 986:21, 986:22, 999:4, 1005:8, 1014:25, 1046:4
**Todd** [18] - 733:20, 735:17, 794:5, 796:9, 823:13, 824:3, 828:4, 828:7, 832:10, 832:24, 905:8, 932:2, 932:11, 932:15, 947:17, 947:20
**together** [8] - 733:24, 736:3, 738:9, 738:13, 741:15, 762:22, 809:2, 901:10
**tomorrow** [4] - 1045:25, 1046:8, 1046:15, 1047:2
**took** [12] - 748:19, 752:23, 860:7, 860:8, 890:3, 927:13, 965:23, 966:20, 971:5, 972:10, 1025:20, 1044:16
**top** [9] - 808:14, 808:17, 808:19, 808:22, 811:22, 822:12, 920:10, 959:3, 1028:7
**topic** [3] - 914:23, 930:11, 976:22
**total** [1] - 996:10
**totally** [3] - 897:8, 897:14, 898:4
**totals** [1] - 912:18
**touch** [2] - 839:9, 857:13,

884:11
**touching** [1] - 862:18
**towards** [3] - 844:25, 894:16, 975:15
**TRACE** [1] - 904:3
**track** [2] - 884:19, 958:13
**traded** [1] - 904:23
**trader** [1] - 1034:6
**trading** [17] - 733:14, 818:20, 821:4, 829:11, 829:17, 833:13, 900:11, 901:2, 903:19, 904:7, 905:10, 911:14, 918:4, 926:6, 926:16, 926:25, 1035:3
**traditional** [1] - 1045:12
**traffic** [2] - 960:4, 978:12
**transact** [2] - 911:6, 918:4
**transacting** [1] - 905:21
**transaction** [4] - 829:3, 829:5, 943:3, 943:13
**transactions** [1] - 904:5
**transcript** [22] - 893:21, 894:14, 899:20, 937:15, 941:10, 944:13, 945:11, 945:14, 956:10, 976:6, 984:16, 1016:16, 1016:20, 1016:23, 1017:2, 1017:17, 1018:4, 1018:6, 1018:16, 1023:23, 1025:14, 1048:12
**transcription** [1] - 892:14
**travel** [2] - 742:21, 845:22
**traveled** [1] - 837:3
**treasuries** [1] - 820:18
**treat** [1] - 1041:25
**treated** [3] - 780:5, 782:16, 1040:8
**treating** [3] - 745:4, 1043:4, 1043:6
**tremendous** [1] - 1004:20
**trend** [2] - 922:4, 922:12
**tried** [1] - 932:15
**triggered** [1] - 910:21
**triggering** [1] - 911:3
**triple** [1] - 820:24
**triple-B** [1] - 820:24
**true** [11] - 860:6, 885:23, 969:15, 971:4, 973:25, 974:16, 975:19, 982:21, 988:25, 1025:12, 1048:12
**trust** [2] - 891:4, 946:11, 958:21
**try** [3] - 761:9, 831:13, 921:13
**trying** [10] - 755:25, 777:25, 840:2, 842:19, 897:24, 924:18, 956:2, 960:5, 1046:5, 1046:7
**Tuesday** [1] - 873:15
**tune** [1] - 852:10
**turn** [23] - 778:9, 778:13,

779:5, 804:5, 805:18, 811:20, 812:18, 815:8, 821:23, 859:12, 894:13, 900:14, 921:14, 922:9, 923:12, 932:6, 940:6, 942:20, 949:4, 953:10, 967:4, 970:2, 997:3
**Turn** [2] - 959:3, 996:16
**Turning** [1] - 1015:3
**turning** [1] - 1027:11
**turns** [1] - 914:9
**twice** [1] - 806:11
**two** [48] - 739:25, 740:12, 751:3, 764:17, 770:19, 772:12, 772:23, 773:3, 785:14, 789:4, 802:20, 813:15, 820:10, 830:25, 832:15, 833:5, 853:9, 854:15, 855:25, 861:21, 861:22, 862:8, 869:20, 869:21, 872:20, 872:21, 876:18, 876:19, 883:22, 885:3, 899:11, 901:21, 902:9, 925:16, 925:19, 933:11, 934:19, 948:13, 970:25, 979:18, 981:14, 981:17, 981:21, 982:2, 992:5, 1004:12, 1026:22, 1029:24
**Two** [5] - 763:17, 817:21, 817:22, 834:8, 1026:20
**two-month** [1] - 902:9
**two-person** [1] - 861:21
**two-second** [1] - 853:9
**type** [2] - 745:25, 941:2
**typical** [2] - 739:13, 739:20
**typically** [9] - 739:7, 891:7, 901:3, 913:17, 913:21, 915:19, 915:22, 930:13, 1021:16

## U

**ultimately** [2] - 831:3, 926:10
**Umesh** [3] - 793:25, 932:17, 932:20
**unable** [1] - 799:2
**uncertain** [1] - 749:21
**unclear** [1] - 842:2
**Under** [1] - 949:23
**under** [18] - 815:13, 822:25, 823:19, 836:16, 840:21, 840:24, 851:23, 865:6, 916:9, 925:19, 928:8, 928:17, 938:5, 949:20, 950:25, 951:11, 951:19, 1041:18
**undergraduate** [1] - 817:25
**underneath** [1] - 950:8
**Underneath** [3] - 823:7,

928:5, 949:15
**understand** [9] - 743:7, 754:8, 769:2, 856:17, 895:10, 938:24, 959:7, 959:9, 959:25
**Understood** [1] - 973:13
**understood** [15] - 788:12, 801:20, 805:8, 875:21, 884:12, 894:8, 894:9, 939:22, 966:2, 975:9, 981:13, 981:16, 981:20, 1001:9, 1037:18
**unethical** [1] - 890:23
**unfair** [2] - 768:25, 907:21
**unfairly** [2] - 780:5, 782:17
**Unfortunately** [1] - 871:17
**unilaterally** [7] - 847:8, 847:25, 850:17, 869:5, 876:10, 876:12, 984:12
**unique** [2] - 934:11, 1011:22
**unit** [6] - 826:7, 853:6, 853:7, 874:24, 914:6, 916:16
**universe** [3] - 836:16, 904:18, 917:24
**University** [1] - 818:2
**unknown** [1] - 930:6
**unlawful** [2] - 935:22, 935:24, 936:3
**unlawfully** [1] - 797:9
**unless** [1] - 1020:17
**unpaid** [4] - 840:21, 865:6, 871:20, 1041:18
**unsure** [1] - 971:21
**untrue** [1] - 978:11
**unusual** [6] - 748:21, 869:7, 934:5, 934:9, 934:10, 961:9
**up** [59] - 732:19, 749:2, 752:19, 758:25, 760:18, 769:4, 777:24, 784:20, 793:2, 811:22, 818:18, 819:20, 821:3, 835:15, 837:12, 839:8, 862:4, 865:8, 866:2, 868:21, 875:15, 884:3, 884:17, 888:25, 894:20, 898:23, 904:17, 907:5, 910:11, 912:25, 929:25, 942:18, 944:8, 951:20, 973:25, 974:25, 975:4, 978:9, 983:15, 991:19, 998:16, 1008:25, 1009:2, 1009:11, 1009:15, 1009:16, 1009:24, 1010:13, 1012:20, 1013:3, 1013:4, 1013:6, 1013:7, 1018:24, 1022:13, 1031:10, 1034:21, 1046:5
**update** [5] - 880:21, 883:24, 884:4, 885:25, 887:6
**Update** [1] - 883:18
**updates** [1] - 733:13

1078

**upper** [3] - 783:14, 881:23, 922:11
**upset** [9] - 763:21, 769:3, 773:23, 790:6, 888:18, 997:14, 998:22, 999:3, 999:7
**US** [3] - 830:20, 830:21, 830:23
**useful** [1] - 889:13
**utilized** [1] - 741:9
**utilizing** [1] - 797:21

## V

**vacation** [2] - 752:6, 871:21
**VALDI** [1] - 728:11
**valuable** [2] - 945:2, 946:3
**valued** [1] - 905:20
**values** [2] - 819:21, 868:10
**varies** [1] - 934:9
**variety** [1] - 851:25
**various** [5] - 791:10, 831:5, 852:19, 949:15, 949:21
**vast** [1] - 835:7
**venture** [1] - 836:24
**venue** [1] - 1004:16
**verify** [1] - 1032:6
**Verizon** [1] - 904:19
**versus** [2] - 894:17, 941:6
**vertical** [1] - 922:2
**view** [1] - 1006:5
**viewed** [1] - 939:8
**visit** [2] - 770:13, 884:18
**VLADECK** [1] - 728:5
**vlicul@vladeck.com** [1] - 728:12
**voice** [1] - 758:25
**volatile** [1] - 918:2
**volume** [3] - 904:15, 907:5, 907:8
**volumes** [3] - 904:7, 904:23, 905:10

## W

**W-2** [9] - 778:16, 779:7, 918:13, 918:16, 918:25, 919:2, 919:6, 919:8, 919:11
**wage** [11] - 972:23, 973:4, 973:5, 973:8, 973:12, 973:16, 973:17, 973:21, 973:22, 973:24
**wait** [5] - 764:4, 780:22, 884:2, 884:25, 1010:19
**waiting** [1] - 1033:24
**Wall** [1] - 929:25
**wants** [1] - 857:16
**warehouse** [2] - 829:19, 900:4
**was..** [1] - 804:17
**Washington** [1] - 818:2

**ways** [2] - 958:23, 974:18
**weaker** [1] - 789:10
**week** [5] - 745:21, 752:8, 879:9, 887:12, 902:18
**weeks** [49] - 744:24, 746:23, 753:13, 754:8, 754:11, 758:6, 840:21, 842:25, 844:5, 844:10, 846:17, 846:22, 846:24, 847:4, 865:8, 869:21, 872:20, 872:21, 873:5, 873:23, 879:21, 885:3, 887:15, 887:18, 887:21, 888:3, 898:24, 899:11, 899:16, 902:15, 969:13, 970:8, 971:5, 972:10, 981:14, 981:17, 981:21, 982:2, 983:20, 990:16, 990:21, 991:19, 1019:15, 1021:14, 1042:22, 1043:10, 1043:13, 1043:14
**weeks'** [1] - 869:20
**welcome** [1] - 889:19
**welcomed** [1] - 888:14
**West** [11] - 844:19, 846:3, 846:12, 847:9, 847:25, 855:18, 857:8, 867:9, 896:23, 901:12, 981:22
**whereabouts** [1] - 891:5
**whereby** [1] - 829:14
**WHEREOF** [1] - 1048:19
**whole** [3] - 750:21, 891:17, 1018:8
**willing** [1] - 869:25
**win** [1] - 827:4
**wish** [1] - 1020:22
**wishes** [1] - 755:13
**withdraw** [2] - 738:5, 944:6
**withdrawn** [3] - 772:10, 807:20, 1005:13
**WITNESS** [71] - 729:9, 730:3, 741:25, 749:17, 749:24, 750:13, 750:19, 750:23, 751:5, 752:23, 754:10, 754:14, 760:2, 765:15, 767:12, 774:8, 774:11, 774:19, 774:24, 791:2, 791:5, 791:13, 791:19, 791:23, 792:8, 792:18, 792:22, 802:15, 803:3, 803:23, 804:2, 816:14, 833:12, 852:22, 860:16, 860:21, 861:9, 861:19, 862:16, 863:11, 872:25, 873:13, 873:17, 873:20, 876:6, 902:12, 904:3, 905:8, 910:3, 910:19, 910:24, 926:5, 928:19, 928:22, 945:18, 946:18, 953:4, 959:15, 959:20, 960:19, 964:24, 972:20,

972:23, 988:5, 994:17, 998:8, 1006:9, 1015:6, 1022:25, 1040:24, 1048:19
**witness** [2] - 814:2, 816:16
**witnesses** [1] - 1045:25
**woman** [1] - 934:17
**wondering** [1] - 802:25
**word** [12] - 866:23, 866:25, 938:23, 939:5, 954:16, 986:18, 989:4, 990:24, 992:15, 992:16, 992:21, 997:8
**wording** [1] - 749:4
**words** [7] - 813:15, 928:17, 951:18, 974:2, 983:22, 989:6, 989:23
**workday** [1] - 739:22
**worker** [1] - 996:15
**works** [1] - 996:21
**worksheet** [2] - 915:13, 915:17
**worksheets** [1] - 915:21
**World** [1] - 829:7
**world** [3] - 809:23, 820:13
**worry** [1] - 752:25
**wrapped** [1] - 793:2
**write** [6] - 863:19, 868:5, 929:3, 989:15, 996:4, 999:15
**writes** [18] - 747:21, 800:18, 804:7, 841:6, 841:12, 885:6, 958:3, 959:4, 959:5, 971:18, 978:25, 979:11, 995:16, 995:17, 1001:4, 1002:9, 1011:10
**writing** [3] - 822:2, 822:3, 938:10
**written** [6] - 928:20, 940:21, 941:5, 941:13, 958:5
**wrote** [6] - 839:23, 868:6, 879:9, 952:3, 985:13, 1008:16

## Y

**year** [62] - 752:6, 762:5, 773:24, 777:21, 780:4, 780:12, 781:20, 782:20, 782:25, 783:5, 791:18, 794:4, 805:13, 805:14, 806:15, 807:7, 812:25, 813:6, 825:7, 825:11, 829:19, 855:12, 889:5, 899:6, 902:6, 902:13, 903:15, 907:2, 908:16, 909:3, 909:12, 909:22, 915:15, 915:16, 917:2, 919:2, 919:4, 920:20, 920:21, 922:11, 922:20, 922:22, 924:14, 947:4, 951:6, 951:24, 954:3, 954:8, 954:11, 957:7, 958:12,

958:13, 958:14, 961:10, 1021:5, 1025:18, 1026:3, 1026:8, 1026:9, 1026:23, 1027:3, 1028:10
**year's** [1] - 919:6
**year-end** [2] - 825:7, 825:11
**year-to-date** [1] - 961:10
**years** [29] - 732:8, 732:23, 732:25, 785:14, 789:5, 789:10, 794:11, 819:15, 831:3, 833:23, 876:8, 876:15, 899:25, 907:3, 911:16, 921:2, 925:16, 925:19, 926:20, 930:3, 946:13, 958:25, 963:18, 963:21, 980:16, 1024:11, 1025:19, 1028:8, 1028:22
**yesterday** [2] - 732:6, 884:3
**yield** [114] - 731:13, 732:24, 733:2, 733:7, 733:9, 733:21, 734:6, 734:16, 734:20, 735:3, 735:10, 735:21, 735:25, 736:11, 736:21, 736:22, 737:6, 737:11, 737:16, 739:12, 739:24, 740:14, 741:21, 742:5, 742:12, 742:17, 765:23, 768:16, 768:24, 780:13, 792:6, 794:6, 794:14, 798:4, 798:8, 815:15, 820:16, 820:20, 820:22, 820:25, 822:15, 822:18, 822:25, 823:6, 823:8, 823:11, 824:6, 824:13, 826:15, 826:18, 826:24, 827:6, 828:10, 829:6, 829:11, 829:22, 831:20, 832:8, 832:16, 832:19, 833:13, 833:14, 833:21, 834:6, 834:15, 835:20, 859:24, 874:3, 877:2, 877:7, 882:25, 883:11, 900:3, 904:18, 908:7, 911:19, 915:23, 916:8, 916:20, 916:23, 917:2, 917:18, 917:21, 926:16, 926:24, 927:17, 930:19, 930:22, 931:25, 932:3, 932:4, 933:17, 948:3, 948:9, 951:25, 965:18, 1015:17, 1020:9, 1025:2, 1030:21, 1031:12, 1033:3, 1033:9, 1034:21, 1034:22, 1034:24, 1034:25, 1035:2, 1035:4, 1035:8, 1037:14
**York** [16] - 727:15, 728:7, 728:17, 760:25, 861:18, 873:6, 898:24, 972:24, 981:21, 982:12, 1012:4, 1012:5, 1048:9

1079

**YORK** [2] - 1048:4, 1048:6
**Yourself** [1] - 742:7
**yourself** [21] - 737:8,
737:10, 740:24, 746:25,
751:19, 755:4, 767:5,
767:14, 767:22, 777:12,
797:17, 797:24, 825:20,
856:9, 863:14, 874:13,
878:20, 879:2, 883:17,
912:7, 915:4
  **yourselves** [1] - 736:22

## Z

**Zeolla** [1] - 823:21
**Zero** [2] - 739:16, 739:17
**zero** [1] - 973:2

1080

```
 1
 2              JAMS ARBITRATION
                  No. 1425025377
 3   _____
 4   HOAI NGO,
 5          Claimant,
 6      and
 7
     OPPENHEIMER & CO., INC.,
 8
 9          Respondent.
10
11   _____
12   BEFORE:   JUDGE MICHAEL DOLINGER, Arbitrator
13
14                  Day 4
15              New York, New York
16              March 7, 2019
17
18
19
20
21
22   Reported by:
23   Eileen Mulvenna, CSR/RMR/CRR
24
25
```

1082

```
 1
 2   ALSO PRESENT:
 3          Emily Miller (Pending admission)
 4          Connor Hoffman, Paralegal
 5          Diana Sur, Esq., In-house
 6          Oppenheimer
 7          Justin Garbaccio, Esq., In-house
 8          Oppenheimer
 9
10
11
12   WITNESS:
13          Leonore Denys
14          Jane Ross
15          Jamie Bridges
16
17
18
19
20
21
22
23
24
25
```

1081

```
 1
 2   A P P E A R A N C E S :
 3
 4   ON BEHALF OF CLAIMANT:
 5       VLADECK RASKIN & CLARK, P.C.
 6           565 Fifth Avenue, 9th Floor
 7           New York, New York  10017
 8       Phone:  212.403.7311
 9       By:     JEREMIAH IADEVAIA, ESQ.
10               jiadevaia@vladeck.com
11               VALDI LICUL, ESQ.
12               vlicul@vladeck.com
13
14   ON BEHALF OF RESPONDENT:
15       SATTERLEE & STEPHENS LLP
16           230 Park Avenue, Suite 1130
17           New York, New York
18       Phone:  212.404.8726
19       By:     MICHAEL H. GIBSON, ESQ.
20               mgibson@ssbb.com
21               JOHN COSTER, ESQ.
22               john.coster@ssbb.com
23
24
25
```

1083

```
 1
 2                I N D E X
 3   WITNESS        EXAMINATION BY        PAGE
 4
     LENORE DENYS
 5
 6       MR. GIBSON - DIRECT      1084
 7       MR. LICUL - CROSS        1091
 8       MR. GIBSON - REDIRECT    1102
 9   JANE ROSS
10       MR. GIBSON - DIRECT      1104
11       MR. IADEVAIA - CROSS     1155
12       MR. GIBSON - REDIRECT    1205
13   JAMIE BRIDGES
14       MR. GIBSON - DIRECT      1210
15       MR. LICUL - CROSS        1232
16       MR. GIBSON - REDIRECT    1242
17   HOAI NGO
18       MR. IADEVAIA - REBUTTAL     1244
19       MR. GIBSON - SURREBUTTAL    1256
20       MR. AIDEVAIA - SUR-SURREBUTTAL 1261
21
22
23
24
25
```

1084

1      MR. GIBSON:  Lenore, I'm here with my
2  colleagues from Oppenheimer.  And also we
3  have Mr. Ngo and his attorneys.  And, most
4  importantly, we have our arbitrator, Judge
5  Dolinger.  And there's also a court reporter
6  in the room, who's going to be taking down
7  your testimony today.
8      Before we get started, the judge is
9  going to swear you in, but I just want to
10  also ask, do you have the share file of
11  exhibits that my colleague John e-mailed you
12  this morning?
13      THE WITNESS:  Yes, I do.
14      MR. GIBSON:  Okay.  Great.
15  LENORE DENYS,
16    having been duly sworn by the Arbitrator,
17    was examined and testified as follows:
18  DIRECT EXAMINATION
19  BY MR. GIBSON:
20      Q.    Ms. Denys, where are you currently
21  located geographically?
22      A.    I'm in Sterling Heights, Michigan.
23      Q.    Are you the only one in the room that
24  you're currently in?  Is there anyone with you?

1085

1      A.    No.  I'm alone.
2      Q.    Were you employed by Oppenheimer in
3  the year 2014?
4      A.    Yes, I was.
5      Q.    And what was your job title during
6  that time?
7      A.    I was the managing director in charge
8  of human resources.
9      Q.    Are you familiar with the claimant,
10  Hoai Ngo, in this proceeding?
11      A.    Yes, I am.
12      Q.    Do you recall having an e-mail
13  exchange with Mr. Ngo at some point in 2014?
14      A.    A very brief one, but, yes.
15      Q.    In that exhibit file that was sent to
16  you, can you take a look at Exhibit 113, please.
17      A.    Okay.
18      Q.    Let's just -- give me one second for
19  everyone in here to get that exhibit.
20      And, Ms. Denys, I'm going to ask
21  you -- if you look at the bottom two e-mails in this
22  exhibit between yourself and Mr. Ngo, is that the
23  e-mail exchange that you testified you recall
24  having?

1086

1      A.    Yes, uh-huh.
2      Q.    And following that e-mail exchange,
3  did you ever recall communicating with Mr. Ngo
4  again, either electronically or telephonically?
5      A.    I believe we had telephonic
6  conversation.
7      Q.    Was that shortly after this e-mail?
8      A.    I believe it was the same day.
9      Q.    And other than that telephonic
10  conversation, do you ever recall speaking with
11  Mr. Ngo telephonically, in person or e-mailing with
12  him after May 12, 2014?
13      A.    No, I don't.
14      Q.    In 2014, what department at
15  Oppenheimer had the authority to approve or
16  disapprove an FMLA leave of absence?
17      A.    FMLA was administered by the human
18  resources department in all cases.
19      Q.    And following your May 12, 2014,
20  e-mail with Mr. Ngo, if he had ever called you or
21  e-mailed you or in any way told you that he wanted
22  to take an FMLA leave of absence, what would you
23  have done next?
24      A.    We would have generated the paperwork

1087

1  to apply for the Family and Medical Leave.
2      Q.    Was it standard practice at
3  Oppenheimer at that time to require employees
4  seeking an FMLA leave to fill out that paperwork you
5  were talking about?
6      A.    Yes, it is -- yes, it was.
7      Q.    And do you have any recollection of
8  Mr. Ngo suffering a medical emergency at some time
9  in 2014?
10      A.    I did become aware of it, yes.
11      Q.    Do you recall what the nature of that
12  medical emergency was?
13      A.    I don't know the details, but I
14  believe it was an aneurysm.
15      Q.    Do you have any recollection as to
16  whether Mr. Ngo went on an FMLA leave of absence at
17  that time?
18      A.    He did, and I believe it was in
19  August.
20      Q.    And do you ever recall seeing any
21  document in Mr. Ngo's human resources file that
22  indicated to you that he was on a leave of absence
23  prior to suffering that brain aneurysm?
24      A.    No, he was not on a formal leave with

1088

1    us.

2    Q.    Can you take a look at Exhibit 59,

3    please.

4    A.    Okay.

5    Q.    Give us one second.

6         In the middle of this e-mail chain,

7    there appears to be an e-mail from yourself to Jaime

8    Bridges and Ms. Decker dated August 18, 2014.

9         Do you see that, Ms. Denys?

10   A.    Yes, I do.

11   Q.    And am I correct that Ms. Bridges and

12   Ms. Decker were also in human resources or the

13   benefits department at Oppenheimer?

14   A.    That's correct.

15   Q.    Was Ms. Decker in benefits?

16   A.    Well, the human resources and benefits

17   departments are generally referred to as one

18   department, but, yes, she was more in benefits than

19   in human resources.

20   Q.    Thank you.

21        You state in your e-mail -- by the

22   way, was August 18, 2014, at or around the time that

23   you understood Mr. Ngo to have suffered his brain

24   aneurysm?

1089

1    A.    Yes.  Yes, it was.

2    Q.    You write in your e-mail, "Did we know

3    about this?  I know we advised that we do not have a

4    paid paternity leave, but I was not aware that Rob

5    allowed Ngo to do this.  It looks like we will have

6    to give him 12 weeks now for his medical condition

7    since we never had him take leave as of yet."

8         Do you see that, Ms. Denys?

9    A.    Yes, I do.

10   Q.    Ms. Denys, do you recall how many

11   weeks of job-protected leave Oppenheimer's FMLA

12   policy provided for in 2014?

13   A.    Provided 12 weeks.  It provided 12

14   weeks under Family and Medical Leave provided that

15   the employee has been employed at least 12 months.

16   Q.    Thank you.

17        And by the way, did you have an

18   understanding as to whether that FMLA policy

19   provided for either paid or unpaid leave?

20   A.    FMLA is unpaid.

21   Q.    Ms. Denys, if it was your

22   understanding that Mr. Ngo was already on an FMLA

23   leave of absence prior to August 18th, would you

24   have felt that Oppenheimer was obligated to give him

1090

1    12 weeks of FMLA leave going forward?

2    A.    No.  You're entitled to 12 weeks in a

3    rolling 12-month period of time.

4    Q.    Am I correct -- I think you testified

5    already, but at the time you wrote this e-mail, you

6    were the supervisor in the human resources

7    department?

8    A.    I was the managing director, yes.

9    Q.    And then finally we see Ms. Decker

10   responded to your e-mail that same day stating, "Rob

11   sent you a message back in July in regards to his

12   baby.  You replied about unpaid" -- I'm sorry --

13   "You replied back about unpaid FMLA leave.  Nothing

14   happened after that.  We never heard from Hoai.  We

15   should put him on FMLA and send him all of the std

16   FMLA paperwork."

17        My only question, Ms. Denys, is, do

18   you recall receiving that e-mail from Ms. Decker?

19   A.    Yes.  Uh-huh.

20   MR. GIBSON:  Thank you very much,

21   Ms. Denys.  I have no further questions.  I

22   think Mr. Licul, Mr. Ngo's attorney, will

23   have some questions for you.

24        THE WITNESS:  Okay.

1091

1    CROSS-EXAMINATION

2    BY MR. LICUL:

3    Q.    Good morning, Ms. Denys.

4    A.    Good morning.

5    Q.    Can you hear me okay?

6    A.    Yes, I can.

7    Q.    Now, how long have you been in HR?

8    A.    Almost all of my career, almost 30

9    years.

10   Q.    You've processed FMLA paperwork for

11   other people before; correct?

12   A.    I don't recall -- I don't recall when

13   I actually handled FMLA paperwork.  At some point,

14   my associates did the actual paperwork.

15   Q.    But you're familiar with the FMLA's

16   requirements; correct?

17   A.    Yes.  Yes, I am.

18   Q.    You're also familiar that FMLA could

19   be paid or unpaid; correct?

20   A.    You need to specify.  The FMLA is

21   unpaid leave.

22   Q.    But you can substitute paid leave for

23   unpaid leave; correct?

24   A.    Yes.  Correct.

1092

1      Q.   And you are also aware of the
2  employer's obligations to notify someone that he or
3  she is on FMLA leave; correct?
4      A.   If we designated it as FMLA leave,
5  yes, correct.
6      Q.   You also are aware that you, as the
7  employer, have an obligation to tell someone who is
8  on leave whether -- let me withdraw that question
9  and ask it again.
10      You're also aware that you have an
11  obligation to tell someone if their leave is not
12  FMLA-qualified; correct?
13      A.   It would depend on what we're aware
14  of, the circumstance.  I couldn't answer that
15  blankly.
16      Q.   Okay.  But are you aware of an
17  obligation to inform an employee that their leave is
18  not FMLA-protected?
19      A.   No.  No.
20      Q.   Okay.  Take a look at Exhibit 8,
21  please.
22      A.   It will take me a few minutes.
23      Q.   That's okay.  Take your time.
24      A.   I lost my connection so it could take

1093

1  me a couple of seconds.
2      Q.   No problem.
3      (Pause.)
4      A.   I'm getting an error coming up.  Let
5  me try one more time.
6      MR. GIBSON:  Lenore, while you're
7  trying to do that, I'm going to have John
8  send you an e-mail with Exhibit 8.  Maybe
9  that will be an easier way to get to it.
10      (Pause.)
11      THE WITNESS:  I'm getting a message
12  that an error has occurred.
13      MR. GIBSON:  John just sent you an
14  e-mail with a PDF.  See if you can open that
15  when you get it.
16      THE WITNESS:  I have not gotten it
17  yet.
18      There it comes.
19      MR. GIBSON:  Okay.
20      (Discussion off the record.)
21      THE WITNESS:  Okay.  I have the
22  employee handbook.
23  BY MR. LICUL:
24      Q.   Do you have it open?

1094

1      A.   Yes.
2      Q.   So I believe the question I asked you,
3  and I'll restate it because I've forgotten it, is,
4  you are aware that Oppenheimer had an obligation to
5  inform an employee that their leave is not
6  FMLA-protected; correct?
7      A.   I believe so, yes.
8      Q.   And that's what it says in the
9  handbook, doesn't it?
10      Let me do this because that's an
11  unfair question.
12      Take a look at page 27 of the
13  handbook.  Let me know when you get there.
14      A.   Okay.
15      (Pause.)
16      Q.   Are you there?
17      A.   Yes, I'm on page 27.
18      Q.   Take a look at the section labeled,
19  "Employer Responsibilities."
20      Do you see that on the right-hand side
21  of the page?
22      Do you see it?
23      A.   Yes.
24      Q.   Take a look at the last line, and I'll

1095

1  read it.
2      "If the employer determines that the
3  leave is not FMLA-protected, the employer must
4  notify the employee."
5      Do you see that?
6      A.   Yes.
7      Q.   And in May of 2012, when you
8  corresponded and talked to Mr. Ngo, you knew that
9  his -- that his time away from the office could be
10  FMLA leave; correct?
11      A.   If he had time away from the office,
12  it could be FMLA.
13      Q.   Because --
14      A.   As far as we were aware -- as far as
15  we were aware, we were not aware that he was away
16  from the office.
17      Q.   You did not know that he went to
18  California?
19      A.   Did not.
20      Q.   Did you know that he was in California
21  for the birth of his child?
22      A.   I did not.
23      Q.   And if you knew that he was away in
24  California for the birth of his child, would that

1096

1 
2 have been an FMLA-protected leave?
3     A.   If he had applied for the leave and
4 he's been with us more than a year, he would have
5 been FMLA-protected, yes.
6     Q.   Did you send Mr. Ngo an e-mail telling
7 him -- or pointing him to your handbook and its FMLA
8 policies?
9     A.   Yes.
10    Q.   So you knew that his time away from
11 the office could be FMLA-protected; right?
12    A.   If he opted to take the time off.  We
13 were not aware that he did opt to do that.
14    Q.   But the reason you directed him to the
15 handbook was so he could see the FMLA policies;
16 correct?
17    A.   No, I directed him to the handbook
18 because he asked if we had paternity leave.  I
19 replied that we don't have paternity leave, but you
20 can refer to FMLA for more information.
21    Q.   And it would be fair to assume that if
22 he's asking you about paternity leave, he's probably
23 having a child; correct?
24    A.   I would assume that would be true.
25    Q.   You did not send him any forms; is

1097

1 that right?
2    A.   No.  He did not request any forms.
3 Again, we were not aware that he decided to take any
4 type of leave.  He inquiry was a general inquiry as
5 to what our policies were.
6    Q.   Isn't it your obligation to send the
7 forms to an employee who you have reason to
8 understand may be taking FMLA leave?
9    A.   If he should request it.
10   Q.   Only --
11   A.   I --
12   Q.   I'm sorry.  Please finish your answer.
13   A.   No -- if he requested it.  Our answer
14 was, I'm sorry, we don't have paternity leave.  We
15 had no idea what his intentions were after that.
16   Q.   So it's your understanding that unless
17 an employee specifically requests FMLA forms, you
18 have no obligation to provide them?
19   A.   No.  Again, it depends on the
20 circumstance.
21   Q.   In what circumstance would you send
22 the person FMLA forms?
23   A.   If someone -- if, for example, someone
24 tells me that they're going into the hospital the

1098

1 
2 next day.  But, again, his question was, do we have
3 paternity leave?
4     The answer was, no, we don't have paid
5 paternity leave.
6    Q.   And so from that you understood that
7 you did not have to send him forms; correct?
8    A.   Correct.  He did not indicate that he
9 was going to take any kind of leave.
10   Q.   Isn't it the case, Ms. Denys, that an
11 employee could start FMLA leave and then submit the
12 forms afterwards?
13   A.   I believe they have a period of time
14 before they -- yes.
15   Q.   In fact, Oppenheimer placed Mr. Ngo on
16 FMLA leave without him having submitted any forms;
17 correct?
18   A.   Again, I believe they have -- I don't
19 know -- 15 to 20 days to return the paperwork.
20 There's a period of time they have to return the
21 paperwork.
22   Q.   I have a question.
23     My question I think is a little
24 different, which is that Oppenheimer placed Mr. Ngo
25 on FMLA leave without him having submitted any FMLA

1099

1 
2 forms; correct?
3     THE ARBITRATOR:  Do you have a time
4 frame that you're referring to about when --
5     MR. LICUL:  Yes.
6     Let me do this -- can we --
7 Exhibit 60.
8     MR. GIBSON:  Ms. Denys, John is going
9 to e-mail you another exhibit.
10    THE WITNESS:  Okay.
11    (Pause.)
12 BY MR. LICUL:
13   Q.   Let us know when you get it.
14   A.   I have it.
15   Q.   I'm going to draw your attention to
16 the bottom e-mail from Ms. Bridges to Mr. Lowenthal
17 and you, among others.  It also went to William
18 McCabe.
19     Who is William McCabe?
20   A.   He was an attorney in our legal
21 department.
22   Q.   I'm not going to read the whole
23 thing -- the whole e-mail that Ms. Bridges sends to
24 you, but in the first line, she says, "You sent him
25 a letter on July 18th with FMLA paperwork and,

1100

1  therefore, we would consider his FMLA leave to have
2  started on the 18th."
3       Do you see that?
4  A.  I do.
5  Q.  And Ms. Bridges there is referring to
6  the FMLA paperwork that Mr. Lowenthal sent to
7  Mr. Ngo; is that right?
8  A.  I believe so, yes.
9  Q.  So Oppenheimer considered Mr. Ngo to
10 be on FMLA leave as of July 18th; correct?
11 A.  I don't believe that ever happened.
12 According to our payroll records, he didn't go on
13 leave until August.  He continued -- and he
14 continued to be paid from July 18th until he went on
15 leave in August.
16 Q.  Is Ms. Bridges incorrect then that
17 Oppenheimer considered Mr. Ngo to be on FMLA leave
18 as of July 18th?
19 A.  I can't answer that question.  I don't
20 know.
21 Q.  Did you write back to her and say that
22 that's incorrect, he is not on FMLA leave?
23 A.  I don't recall.
24 Q.  Did you ever send anything to Mr. Ngo
25

1101

1  stating that if he did not fill out his paperwork
2  that was sent to him on July 18th, that he would not
3  be job-protected?
4  A.  Did I?  I did not.
5  Q.  Do you know if anyone from Oppenheimer
6  did?
7  A.  I'll have to go back and look to see
8  that exhibit.
9  Q.  Which exhibit?
10 A.  The letter that Rob attached to the
11 FMLA paperwork.  I don't know if there was dates in
12 there or not.  I think they were just general forms.
13 Q.  Right.
14      But what I'm asking is, after
15 Mr. Lowenthal sent the general forms, did
16 Oppenheimer send anything to Mr. Ngo stating that if
17 he did not fill out the paperwork, that he would not
18 be job-protected?
19 A.  I don't know the answer.
20 Q.  Would that document be in Mr. Ngo's
21 personnel file if it existed?
22 A.  It would -- not so much his personnel
23 file, but a benefit file.
24 Q.  Is that different than the personnel
25

1102

1  file?
2  A.  Yes.
3  MR. LICUL:  I have no further
4  questions.
5  MR. GIBSON:  Judge, unless you have a
6  question, I just have one or two.
7  THE ARBITRATOR:  By all means.
8  REDIRECT EXAMINATION
9  BY MR. GIBSON:
10 Q.  Ms. Denys, this is Mike Gibson again.
11 A.  Yes.
12 Q.  Do you still have that employee
13 handbook open to page 27 by any chance?  And if not,
14 if you could --
15 A.  No.  Hold on one second.
16 Q.  Thank you.
17      (Pause.)
18 A.  Okay.
19 Q.  And do you remember Mr. Licul asked
20 you about the section on the right side called
21 "Employer Responsibilities"?
22 A.  Yes.  Uh-huh.
23 Q.  And specifically he pointed you to
24 that last sentence where it says, "If the employer
25

1103

1  determines that the leave is not FMLA-protected, the
2  employer must notify the employee."
3  A.  Yes.
4  Q.  Would you agree with me, Ms. Denys,
5  that in order to have that obligation, the employee
6  must first indicate that they want to take a leave
7  of absence?
8  A.  Yes.  Correct.
9  Q.  And, in fact, if you look at the left
10 side of that page under "Employee Responsibilities,"
11 the first sentence --
12 A.  Yes.
13 Q.  -- states, "Employees must provide
14 30 days' advance notice of the need to take FMLA
15 leave when the need is foreseeable"?
16 A.  Correct.
17 Q.  Do you ever recall Mr. Ngo providing
18 any such notice to Oppenheimer?
19 A.  He did not, not to the human resources
20 department.
21 Q.  In fact, in the e-mail exchange -- and
22 let me know if you need to go back to see it.
23      But in the e-mail exchange that you
24 had with Mr. Ngo on May 12th, do you recall him
25

1104

1  
2  saying, "I am trying to figure out leave"?
3      A.   Yes, that's correct.
4          MR. GIBSON:  Thank you.  I have no
5      further questions.
6          MR. LICUL:  No questions.
7          THE ARBITRATOR:  Thank you, Ms. Denys.
8          MR. GIBSON:  Thank you very much,
9      Ms. Denys.  We really appreciate your time.
10         MR. LICUL:  Thank you.
11         THE WITNESS:  Thank you.  Good-bye.
12         (Pause.)
13  JANE ROSS,
14     having been duly sworn by the Arbitration,
15     was examined and testified as follows:
16  DIRECT EXAMINATION
17  BY MR. GIBSON:
18      Q.   Good morning, Ms. Ross.
19      A.   Good morning.
20         MR. GIBSON:  May I, sir?
21         THE ARBITRATOR:  Yes.
22  BY MR. GIBSON:
23      Q.   Who are you currently employed by?
24      A.   Oppenheimer & Company.
25      Q.   What is your current job title at

1105

1  
2  Oppenheimer?
3      A.   Managing director, debt capital
4  markets.
5      Q.   And what Oppenheimer office do you
6  currently work out of?
7      A.   Los Angeles.
8      Q.   Do you have any children?
9      A.   I do.
10      Q.   How many?
11      A.   I have two daughters.
12      Q.   And do you have any FINRA licenses?
13      A.   I do.
14      Q.   Which ones do you have?
15      A.   I have Series 79, Series 24, Series 7,
16  and 63.
17      Q.   Have any of your FINRA licenses ever
18  been suspended or revoked?
19      A.   No.
20      Q.   Can you briefly summarize for us your
21  work history in the industry leading up to being
22  hired at Oppenheimer.
23      A.   My whole work experience, it's a long
24  amount of time.  I graduated Columbia Business
25  School with an MBA, and I started working for a firm

1106

1  
2  called L.F. Rothschild Unterberg, Towbin.
3          And then in 1986, I received an offer
4  to have a similar position at Bear Stearns &
5  Company, which I took.  And at Bear Stearns, I made
6  a move to the high-yield department after the crash,
7  which was a terrific move.
8          And then I left Bear in 1993 to join a
9  high-yield start-up investment bank called Argosy.
10  I was one of the founding salespeople.  We built a
11  nice business.
12          We were sold to Canadian Imperial Bank
13  of Commerce.  I became managing director, head of
14  high-yield sales at CIBC.  We subsequently became --
15  that franchise subsequently became the backbone of
16  Oppenheimer's fixed income business.  And at
17  Oppenheimer, I was the head of high-yield sales.
18      Q.   And you may have just answered my
19  question, but were you the head of high-yield sales
20  at Oppenheimer during the period of 2009 through
21  2016?
22      A.   Yes.
23      Q.   And can you briefly describe your
24  responsibilities as the head of high-yield sales.
25      A.   Sure.

1107

1  
2          Well, we became -- the franchise at
3  Oppenheimer began in late 2007, when they took over
4  the business from CIBC.  So my job was to build out
5  a high-yield sales force for Oppenheimer & Company,
6  which was a little different than the structure that
7  we had at CIBC because Oppenheimer was a
8  commissioned-based business.
9          So having the benefit of lucky timing,
10  I started to put the group together in late 2007.
11  And we really built out the team as the financial
12  crisis became under way.  So my job was to hire
13  salespeople, manage the sales force, interface with
14  the other two areas of high-yield.
15      Q.   And have you ever worked as a research
16  analyst?
17      A.   No, I have not.
18      Q.   At any time during your employment at
19  Oppenheimer, have your responsibilities ever
20  included supervising research analysts?
21      A.   No.
22      Q.   At any time during your career
23  elsewhere, have your responsibilities ever included
24  supervising research analysts?
25      A.   No.

1108

1   
2       Q.    During the time period at Oppenheimer
3   while you were the head of high-yield sales, whom
4   did you report to?
5       A.    I reported to Rob Lowenthal.
6       Q.    And what was Mr. Lowenthal's title
7   during that time?
8       A.    At that time, he was, I believe, the
9   head of Oppenheimer taxable fixed income.
10      Q.    At any point in your career at
11  Oppenheimer, did Mr. Lowenthal report to you?
12      A.    No.
13      Q.    Do you know who Todd Morgan is?
14      A.    Yes, I do.
15      Q.    And what was Mr. Morgan's position at
16  Oppenheimer during the period of 2009 through 2013?
17      A.    He was the head of high-yield
18  research, and he was also a high-yield research
19  analyst.
20      Q.    And at any time while you were at
21  Oppenheimer, did Mr. Morgan report to you?
22      A.    No.
23      Q.    Did you ever work in the high-yield
24  research department at Oppenheimer?
25      A.    No.

1109

1   
2       Q.    Can you briefly describe for us the
3   relationship between the high-yield sales team and
4   the high-yield research team, how they interact
5   essentially.
6       A.    Sure.
7             Well, the high-yield department pretty
8   much consisted of three silos:  There was high-yield
9   sales, which I was the head of; there was high-yield
10  trading; and then high-yield research.  And each of
11  those areas worked together to provide service and
12  information for our clients.
13            So research really provided a lot of
14  the content of what we did.  The research analyst
15  would cover companies, opine on those companies,
16  earnings reports, and then we would, in turn, you
17  know, use that information in our calls and our
18  pitches and our trading axis with our institutional
19  clients.
20      Q.    Are you currently the head of
21  high-yield sales at Oppenheimer?
22      A.    I am not.
23      Q.    Did you undertake a new position at
24  Oppenheimer?
25      A.    I did.

1110

1   
2       Q.    When did that change take place?
3       A.    My last day on the high-yield desk was
4   the end of March 2018.
5       Q.    And was that a voluntary choice?
6       A.    Yes.
7       Q.    To your knowledge, did the change in
8   your position at Oppenheimer have anything to do
9   with the allegations of this proceeding?
10      A.    No.
11      Q.    Now, are you familiar with the
12  claimant in this proceeding, Mr. Ngo?
13      A.    Yes.
14      Q.    How and when do you first recall
15  becoming familiar with Mr. Ngo?
16      A.    I met Hoai in mid 2009.
17      Q.    And how did you come to meet him?
18      A.    I forget precisely how he came to us,
19  but he came to us as a candidate for a research
20  analyst position.
21      Q.    And at that time, what Oppenheimer
22  office were you working in?
23      A.    Midtown at -- on Madison Avenue.
24      Q.    And did you make the decision to hire
25  Mr. Ngo?

1111

1   
2       A.    No.
3       Q.    Do you know who did?
4       A.    I would presume that Rob Lowenthal and
5   Todd Morgan made the actual decision.
6       Q.    During the time that you were the head
7   of high-yield sales at Oppenheimer, did you have the
8   authority to hire research analysts?
9       A.    No.
10      Q.    To terminate research analysts?
11      A.    No.
12      Q.    Did you have the authority to set
13  compensation levels for research analysts?
14      A.    No.
15      Q.    Could you discipline research
16  analysts?
17      A.    No.
18      Q.    Did you have the authority to approve
19  or deny requests for leave of absence for research
20  analysts?
21      A.    No.
22      Q.    Did you interview Mr. Ngo when he was
23  hired?
24      A.    Yes, I did.
25      Q.    Do you typically interview research

1112

```
1
2    analysts?
3        A.    Yes.
4        Q.    Why?
5        A.    I think I probably interviewed every
6    candidate because, again, as the head of sales, we
7    were a consumer, we were a user of the research
8    product.  So my opinion was important as to whether
9    an analyst would be a valuable addition to the
10   group.
11       Q.    I'd like you to take a look at
12   Exhibit 110, please.
13       A.    Is --
14       Q.    If you look at the cover, it has the
15   span of the numbers.  So it would be in between one
16   of those.
17       A.    102?
18       Q.    10.
19       A.    110.
20       (Discussion off the record.)
21       (Pause.)
22       Q.    Ms. Ross, do you have Exhibit 110 in
23   front of you?
24       A.    Yes.
25       Q.    What do you recognize this document to
```

1113

```
1
2    be?
3        A.    An offer letter to Hoai.
4        Q.    And if you look at the last page of
5    the letter, is that your signature?
6        A.    It is.
7        Q.    As the head of high-yield sales, did
8    you typically execute offer letters for research
9    analysts?
10       A.    No.
11       Q.    How many other offer letters for
12   research analysts can you recall signing?
13       A.    I don't believe I signed any.
14       Q.    Do you have any idea why you may have
15   executed this one?
16       A.    I don't recall, but my guess is
17   that -- given that it was in August, that Todd
18   Morgan was perhaps out of the office, but I don't
19   know for sure.
20       Q.    Please keep your voice up a little
21   bit.
22       A.    Yes.
23       Q.    I heard that.
24             Now, was it your understanding, when
25   you executed this offer letter, that Mr. Ngo would
```

1114

```
1
2    be reporting to you?
3        A.    No.
4        Q.    In fact, if we go to the first page of
5    the exhibit, do you see, at the end of the first
6    paragraph, it says, "You will be located at
7    300 Madison Avenue and will be reporting to Todd
8    Morgan"?
9        A.    Yes.
10       Q.    I believe you already testified
11   Mr. Morgan never reported to you?
12       A.    That's correct.
13       Q.    Have you ever seen any offer letter
14   that states that a research analyst would be
15   reporting to you?
16       A.    No.
17       Q.    Now, from his hiring in 2009 through
18   the end of 2013, what capacity do you recall Mr. Ngo
19   being employed by Oppenheimer?
20       A.    As a --
21       Q.    In what capacity?  I'm sorry.
22       A.    As a high-yield research analyst.
23       Q.    And do you recall if Mr. Ngo covered
24   any specific sectors?
25       A.    Yes.
```

1115

```
1
2        Q.    What were those sectors?
3        A.    Primarily chemicals and papers.
4        Q.    During the time that Mr. Ngo was
5    employed at Oppenheimer, did you make any decisions
6    regarding his bonuses?
7        A.    No.
8        Q.    Did you make any decisions regarding
9    his base salary?
10       A.    No.
11       Q.    Did you ever make any decisions
12   regarding any research analyst's compensation?
13       A.    No.
14       Q.    Who would have made decisions, to your
15   knowledge, regarding Mr. Ngo's compensation levels?
16       A.    It would have been Todd Morgan and Rob
17   Lowenthal.
18       Q.    Did you ever have any conversations
19   with either Mr. Morgan or Mr. Lowenthal regarding
20   Mr. Ngo's performance?
21       A.    Yes.
22       Q.    And would you have those sorts of
23   conversations regarding other research analysts'
24   performance?
25       A.    Yes.
```

1116

```
1
2        Q.    Now, did there come a time that
3   Mr. Ngo became the cohead of the high-yield research
4   group?
5        A.    Yes.
6        Q.    Do you recall when that was,
7   approximately?
8        A.    In 2013.
9        Q.    And was that because Mr. Morgan
10  resigned?
11       A.    That's right.
12       Q.    And do you recall who Mr. Ngo's cohead
13  of high-yield research became?
14       A.    Yes, Colleen Burns.
15       Q.    And did you make the decision to make
16  Mr. Ngo and Ms. Burns coheads of the high-yield
17  research group?
18       A.    No.
19       Q.    Do you have any idea who did?
20       A.    Rob Lowenthal did.
21       Q.    Now, at the time that Mr. Ngo and
22  Ms. Burns became the coheads of the high-yield
23  research group, do you recall how many total
24  research analysts -- high-yield research analysts
25  Oppenheimer employed?
```

1117

```
1
2        A.    At that time, it was three analysts, I
3   believe.
4        Q.    Does that include Ms. Burns and
5   Mr. Ngo?
6        A.    Yes.
7        Q.    And do you recall who the third person
8   was?
9        A.    Sean Sneeden.
10       Q.    And do you recall what sectors
11  Mr. Sneeden covered?
12       A.    Energy.
13       Q.    Now, from 2013 through the last day
14  that you worked on the high-yield research -- I'm
15  sorry -- high-yield sales desk, aside from Mr. Ngo
16  and Ms. Burns, what was the highest number of
17  high-yield research analysts that you can recall
18  Oppenheimer employing at one time?
19       A.    It would have been four or five in
20  total.
21       Q.    Would that include Ms. Burns and
22  Mr. Ngo?
23       A.    Yes.
24       Q.    Do you ever recall Mr. Morgan having a
25  cohead of research?
```

1118

```
1
2        A.    No.
3        Q.    From the standpoint of a salesperson,
4   did the title of cohead or head of the research
5   group have any significance to you?
6        A.    Not particularly.
7        Q.    Now, did there come a time when
8   Mr. Ngo spent some time out of the office to travel
9   to California?
10       A.    Yes.
11       Q.    Do you recall approximately when that
12  was?
13       A.    Yes, that was mid 2014.
14       Q.    Do you recall why Mr. Ngo went to
15  California?
16       A.    Yes.
17       Q.    Why?
18       A.    He was having a baby with his partner.
19       Q.    And how did you come to know that he
20  and his partner were going to be traveling to
21  California for the delivery of their baby?
22       A.    Hoai told me.
23       Q.    And what do you recall about that
24  conversation, the first conversation you had with
25  Mr. Ngo about him having a baby?
```

1119

```
1
2        A.    The first conversation that I recall
3   is that Hoai asked to speak with me in a conference
4   room, and he told me that he and his partner were
5   having a baby.
6        Q.    And did Mr. Ngo reach out to you for
7   that conversation or did you --
8        A.    Yes.
9        Q.    -- seek him out?
10       A.    No, he reached out to me.
11       Q.    What do you recall saying to Mr. Ngo
12  during that conversation?
13       A.    That I was very happy for him and very
14  excited for him.
15       Q.    During that conversation, did you tell
16  Mr. Ngo that you had not taken 12 weeks of leave
17  when your children were born?
18       A.    Well, I recall that when he asked me
19  about my experience with my girls, I told him what
20  my experience was.
21       Q.    And was that in that same
22  conversation?
23       A.    I believe it was.
24       Q.    And in that conversation, did you tell
25  Mr. Ngo that women make a mistake when taking too
```

1120

1 
2  much time off after their children are born because
3  kids need their mothers more during their teenage
4  years?
5       A.   Well, I don't know about that exact
6  wording, but I believe that when Hoai asked me about
7  my experience, my experience was that we were very
8  fortunate in finding a fantastic caregiver before my
9  older daughter was born, she subsequently worked
10  with us for 20 years, and that, for me, the early
11  days when my girls were newborns were easier days
12  versus later when things got more complex when they
13  were in middle school and high school.
14       Q.   And during any portion of that
15  conversation, do you recall Mr. Ngo asking for
16  permission to go on a leave of absence?
17       A.   No.
18       Q.   Do you recall Mr. Ngo referencing the
19  FMLA?
20       A.   No.
21       Q.   At that time, was it your
22  understanding that you had the authority to grant or
23  deny any request for a leave of absence by Mr. Ngo?
24       A.   No, I didn't have that authority.
25       Q.   During that conversation, did Mr. Ngo

1121

1 
2  indicate to you that he believed he needed your
3  approval to take a leave of absence?
4       A.   No.
5       Q.   During that conversation, did Mr. Ngo
6  propose to you that Ms. Burns should run the entire
7  high-yield research group while he was out of the
8  office?
9       A.   No.
10       Q.   If he did, would you have the
11  authority to approve or reject any such proposal?
12       A.   No, I would not.
13       Q.   During that conversation or any
14  subsequent conversation with Mr. Ngo, did you ever
15  tell him that he could not take a leave of absence
16  for the birth of his baby?
17       A.   No.
18       Q.   Did you ever tell him that he should
19  not take a leave of absence for the birth of his
20  baby?
21       A.   No.
22       Q.   During that conversation, did you ever
23  tell Mr. Ngo that he should not take the entire 12
24  weeks of FMLA leave?
25       A.   No.

1122

1 
2       Q.   During that conversation, was it ever
3  your intent to dissuade Mr. Ngo for taking a leave
4  of absence for the birth of his child?
5       A.   No.
6       Q.   Was it your intent to dissuade him
7  from taking 12 weeks of leave?
8       A.   No.
9       Q.   Why did you feel the need to share
10  your personal experiences with Mr. Ngo in that
11  conversation?
12       A.   Because he asked me about my personal
13  experiences.
14       Q.   And during that conversation, did
15  Mr. Ngo indicate in any way that he wasn't
16  interested in hearing your personal experiences?
17       A.   No.
18       Q.   Did he tell you that he felt you were
19  trying to dissuade him from taking a leave of
20  absence?
21       A.   No.
22       Q.   Did he tell you or indicate to you in
23  any way that he felt that you were not being
24  supportive of him potentially taking a leave of
25  absence?

1123

1 
2       A.   No.
3       Q.   Did Mr. Ngo ever subsequently tell you
4  that he felt that you were not being supportive of
5  him?
6       A.   No.
7       Q.   Did anybody in Oppenheimer's human
8  resources department ever indicate to you that
9  Mr. Ngo had complained about that conversation that
10  you had?
11       A.   No.
12       Q.   Did Mr. Lowenthal ever report that to
13  you?
14       A.   No.
15       Q.   Now, did there come a time when
16  Mr. Ngo did, in fact, leave the office for the birth
17  of his child?
18       A.   Yes.
19       Q.   And, by the way, if I didn't ask
20  already, do you recall when that conversation you
21  had with Mr. Ngo was, approximately?
22       A.   I believe it was in the end of May.
23       Q.   2014?
24       A.   Yes.
25       Q.   And I think you testified that Mr. Ngo

1124

1    eventually left the office.
2            Do you recall when that was,
3    approximately?
4        A.    It was right before the expected birth
5    of his baby.
6        Q.    If I said on or about June 20th, 2014,
7    would that sound right?
8        A.    Yes.
9        Q.    Do you have any recollection of the
10   circumstances surrounding Mr. Ngo's departure as it
11   related to his work responsibilities?
12       A.    Yes.
13       Q.    What do you recall?
14       A.    I recall that Hoai told me that he was
15   going to be going out before the birth.  And he was
16   going to be setting himself up -- I think he was
17   staying with his mom -- at his mom's house.  And he
18   was going to set himself up and that he was going to
19   be working remotely and that he would be taking
20   around three weeks and he would be accessible and
21   checking in with e-mails and he would be in contact
22   with us.
23       Q.    And during the time that Mr. Ngo was
24   in California, did he ever tell you that he was on a

1125

1    leave of absence?
2        A.    No.
3        Q.    Did he ever tell you that he was on an
4    FMLA leave?
5        A.    No.
6        Q.    Did he ever tell you or indicate to
7    you that he shouldn't be working?
8        A.    No.
9        Q.    And I think you may have said this
10   already, but when Mr. Ngo departed on June 20th, did
11   you have an understanding as to when he was expected
12   to be back in the office?
13       A.    My understanding was that he intended
14   to work out there for about three weeks.
15       Q.    And what was that -- what was that
16   understanding based on?
17       A.    That's what he told me.
18       Q.    Now, did there come a time when you
19   learned that Mr. Ngo was not going to be returning
20   to the office within three weeks?
21       A.    Yes.
22       Q.    And how did you come to learn of that?
23       A.    Via e-mail.
24       Q.    And if I could ask you to take a look

1126

1    at Exhibit 114, please.  And we see here there's a
2    chain of e-mails, and I'd first like you to take a
3    look at the bottom one --
4        A.    Yes.
5        Q.    -- which appears to be an e-mail from
6    Mr. Ngo to yourself and Colleen Ross [sic] dated
7    Sunday, July 13, 2014, with the subject line,
8    "Hoai's schedule."
9        A.    Yes.
10       Q.    Is this the e-mail that you were just
11   referring to?
12       A.    Yes.
13       Q.    Is this the first time that you had
14   learned that Mr. Ngo would be out of the office for
15   a longer period of time?
16       A.    Yes.
17       Q.    And we see, in the third paragraph --
18   I should say the fourth paragraph that starts
19   "Logistically" --
20       A.    Yes.
21       Q.    -- do you see where it says, "My plan
22   is to come back to the office by August 25"?
23       A.    Yes.
24       Q.    What, if any, reaction did you have

1127

1    when you read that?
2        A.    I was a little frustrated and
3    concerned about that -- that timing.
4        Q.    Were you frustrated because Mr. Ngo
5    needed to spend more time out of the office with his
6    baby?
7        A.    No.
8        Q.    What were you frustrated about?
9        A.    I was frustrated because that time
10   frame encompassed second-quarter earnings reports,
11   which is typically a pretty busy time for the desk.
12   And so he was telling us there that he was going --
13   he was not going to be in the office.
14       Q.    And did you have any understanding as
15   to whether Mr. Ngo had prepared for second-quarter
16   earnings to be handled before he left the office in
17   June?
18       A.    No.
19       Q.    When you received this e-mail, did you
20   notice that Mr. Lowenthal wasn't copied on it?
21       A.    I did.
22       Q.    Did you have any reaction to that?
23       A.    Yes.
24       Q.    What was your reaction?

1128

1     A.    I thought that that was curious and
2     probably not a great idea to not include his boss in
3     that e-mail.
4         Q.    And would you agree with me that in
5     Mr. Ngo's e-mail of July 13, there's no reference to
6     the FMLA?
7         A.    No, there is no reference.
8         Q.    Did you see any reference to a leave
9     of absence?
10        A.    No.
11        Q.    Did you see anywhere in this e-mail,
12    when you read it, where Mr. Ngo was requesting time
13    out of the office?
14        A.    No.
15        Q.    When you received this e-mail, did you
16    understand it to be a request for an FMLA leave?
17        A.    No.
18        Q.    Why not?
19        A.    Because there was no -- there was
20    neither no request, nor any mention of FMLA.  This
21    was a reporting of news, in my opinion.
22        Q.    And would you --
23        MR. GIBSON:  Do you have a question,
24    Judge?

1129

2         THE ARBITRATOR:  Let me ask this:  I
3     think you testified that you understood that
4     Mr. Ngo, although he would be out in
5     California, would be working while he was out
6     there.  If, hypothetically speaking, he's
7     working and he stays out there into the
8     period for second-quarter earnings reports,
9     would there have been any problem with his
10    ability to do that which he would have had to
11    do, but doing it remotely with respect to the
12    second-quarter earnings reports?
13        THE WITNESS:  If he would have done
14    it, there would have been no problem with
15    that being done remotely.
16        THE ARBITRATOR:  In other words, his
17    physical presence in New York was not
18    necessary for that task.
19        THE WITNESS:  No.
20        THE ARBITRATOR:  Okay.
21        MR. GIBSON:  Can you read back the
22    last question.
23        (Record read.)
24        MR. GIBSON:  Let me start over.
25

1130

1     BY MR. GIBSON:
2         Q.    If you had understood Mr. Ngo's e-mail
3     to be a request for a leave of absence or an FMLA
4     leave, what would you have done?
5         A.    I would have directed him to HR.
6         Q.    What was your understanding as to what
7     Mr. Ngo was trying to communicate in this e-mail?
8         A.    That he was going to continue his
9     attempt to work remotely.
10        Q.    And also in Mr. Ngo's e-mail, we see
11    in the first sentence, he states, "Thanks for all
12    the good wishing -- wishes and understanding through
13    this entire process."
14        Do you see that?
15        A.    Yes.
16        Q.    And in the last paragraph, the second
17    sentence, he states, "Thanks again for all your help
18    and support"?
19        A.    Yes.
20        Q.    Were you surprised to read that in the
21    e-mail?
22        A.    No.
23        Q.    Why not?
24        A.    Because I think we were quite

1131

2     supportive.
3         Q.    Now, if you look up to the next e-mail
4     up, from yourself to Mr. Ngo.
5         And that is dated Monday, July 14; am
6     I correct?  That's the following --
7         A.    Yes.
8         Q.    -- business day?
9         And you state, "Glad everything is
10    going well and that little Lily is healthy and
11    thriving.  Send photos and we'll see you sometime in
12    August."
13        Why did you write that?
14        A.    Because I was glad that everything was
15    going well, and I was responding to his stating that
16    he'd be back in August.
17        Q.    Did you tell him in any subsequent
18    writing or conversation that he needed to return to
19    the office sooner than August?
20        A.    No.
21        Q.    And you then say in that e-mail, "Let
22    us know how you plan to handle 2Q earnings reports."
23        What do you mean by "2Q earnings"?
24        A.    That --
25        Q.    I think we've talked about it a little

1132

1  bit.
2       Is that second-quarter --
3       A.   Second-quarter earnings, right.
4       Q.   Are second-quarter earnings an
5  important time period for the sales desk?
6       A.   Yes.
7       Q.   If you had understood Mr. Ngo to be on
8  an FMLA leave of absence, would you have asked him
9  to cover second-quarter earnings reports?
10      A.   No.
11      Q.   Would you have ensured that
12 preparations were made for that work coverage before
13 the employee left?
14      A.   Yes.
15      Q.   After sending your e-mail on July 14th
16 to Mr. Ngo, did he ever tell you that he shouldn't
17 be working because he's on an FMLA leave?
18      A.   No.
19      Q.   We see above that Mr. Ngo eventually
20 responded to your e-mail, I believe that same day.
21      A.   Yes.
22      Q.   And Mr. Ngo writes, "Thanks.  I'll
23 send more pics later.  She's gained almost a pound.
24 I just spoke with Colleen and we can see what John

1133

1  can do while I'm away.  I can help out more when I'm
2  back in New York as the logistics will be better.
3  Thanks, Hoai."
4       What reaction do you recall having
5  when you read this?
6       A.   I didn't think that that was a great
7  answer.
8       Q.   Why not?
9       A.   Because, again, second-quarter
10 earnings are a critical thing.  And this, to me,
11 seemed somewhat dismissive in saying, "we can see
12 what John can do while I'm away" because John really
13 wasn't qualified to opine on his company's -- on
14 Hoai's company's second-quarter earnings.
15      Q.   Is the "John" referred to here John
16 Daniels?
17      A.   Yes.
18      Q.   Did this response create any
19 frustration in your mind?
20      A.   It did.
21      Q.   And, again, was that frustration based
22 on the fact that Mr. Ngo needed time to spend with
23 his child?
24      A.   No.

1134

1
2       THE ARBITRATOR:  If you had been aware
3  of Mr. Ngo intending not to work at a certain
4  point pre the second-quarter earnings period,
5  what would you have expected in terms of an
6  arrangement to cover his work for that period
7  of time?
8       THE WITNESS:  Well, I think then his
9  partner, Colleen, would have worked with him
10 to come up with a system to have someone
11 cover earnings announcements as they came
12 out.  You know, earnings come out over a
13 period of time.  We find out on -- you know,
14 by a news headline or a press release from a
15 company.
16      And for us, as the sales force, it was
17 important that we had realtime responses to
18 those earnings because securities trade on
19 earnings.  So from my vantage point, there
20 would have been a system in place to have
21 continuity of coverage ahead of time.
22      THE ARBITRATOR:  And "a system in
23 place," I take it that didn't involve
24 Mr. Daniels covering for Mr. Ngo?
25      THE WITNESS:  Well, again, my

1135

1
2  recollection of John was that he was quite
3  junior.  And so I don't -- I think he could
4  have potentially with the oversight of
5  someone, but he wasn't in a position to -- to
6  handle earnings reports.
7       THE ARBITRATOR:  And your assumption
8  at the time was that Ms. Burns was not going
9  to be -- or had not been -- had not been
10 instructed or requested to be the coverage
11 person assisting Mr. Daniels?  Is that a
12 source of concern?
13      THE WITNESS:  My source of concern was
14 that there was no system in place.  From my
15 vantage point, being kind of an organized
16 person, if I had known that the perfect
17 situation would have been to have earnings
18 estimates for the companies that are covered,
19 had those been given to either Colleen or
20 Colleen and John Daniels so that we knew what
21 expectations were, and then when earnings
22 came out, we could be in a position to hear
23 from the analysts what our thinking was about
24 that.
25      THE ARBITRATOR:  Did you ask Ms. Burns

1136

```
1
2       whether there was such an arrangement in
3       place?
4              THE WITNESS:  I believe on that
5       Monday, when -- because this came on a
6       Sunday -- I believe I spoke with both Colleen
7       and with Rob Lowenthal about, you know, what
8       the plan was.
9              THE ARBITRATOR:  And your discussions
10      with Ms. Burns, did that yield for you any
11      suggestion that there was, in fact, some
12      prior understanding that she would --
13             THE WITNESS:  No.
14             THE ARBITRATOR:  -- be helping out
15      Mr. Daniels?
16             THE WITNESS:  It was -- it was not my
17      understanding that there was a preexisting
18      system in place.  I don't know if she said,
19      I'll do what I can -- you know, I don't know.
20             THE ARBITRATOR:  Okay.
21      BY MR. GIBSON:
22      Q.      Now, we saw that Mr. Lowenthal was not
23      copied on Mr. Ngo's July 13th e-mail.
24             Did there come a time that
25      Mr. Lowenthal did come to learn that Mr. Ngo had
```

1137

```
1
2       not -- was anticipating not returning to the office
3       until August 25th?
4       A.      Yes.
5       Q.      And how did Mr. Lowenthal come to
6       learn of that?
7       A.      I think I told him.
8       Q.      And do you remember when you would
9       have told him?
10      A.      That would have been Monday morning.
11      Q.      And did you have any conversations
12      with Mr. Lowenthal that Monday morning?
13      A.      Yes.
14      Q.      What do you recall about that
15      conversation?
16      A.      I recall going into his office and
17      asking him if he had heard from Hoai, and he told me
18      no.  And then I told him that I received this
19      e-mail, and I probably showed him the e-mail.
20      Q.      Did you have any subsequent
21      conversation with Mr. Lowenthal regarding Mr. Ngo
22      being out of the office?
23      A.      Yes.
24      Q.      What do you recall about the
25      subsequent conversation?
```

1138

```
1
2       A.      Well, I remember telling him about
3       this.  And then I remember him coming back to me,
4       maybe the next day or a couple days after --
5       probably the next day telling me that Colleen was
6       going to be the sole head of research.
7       Q.      And when -- did Mr. Lowenthal ask you
8       to participate in any decision with regard to making
9       Colleen Burns the sole head of research?
10      A.      No.
11      Q.      When Mr. Lowenthal told you that, did
12      you feel that he was punishing Mr. Ngo for taking
13      time out of the office to be with his child?
14      A.      No.
15      Q.      Am I correct that you recall that
16      conversation taking place a day or two after this
17      e-mail exchange?
18      A.      I think it was the next day, but I'm
19      not entirely sure.
20      Q.      To your knowledge, was Mr. Ngo ever
21      restored to the position of cohead of high-yield
22      research?
23      A.      No.
24      Q.      Did Mr. Lowenthal ever tell you that
25      he was going to reconsider his decision?
```

1139

```
1
2       A.      No.
3       Q.      Did he ever tell you that he was going
4       to revisit that decision in any way?
5       A.      No.
6       Q.      After you learned that Ms. Burns was
7       going to be the sole head of high-yield research,
8       did you communicate that to anybody else?
9       A.      I would have likely told the sales
10      force.
11      Q.      And when and how would you have told
12      them that?
13      A.      I don't recall that conversation, but
14      it would have been in one of the morning meetings.
15      We had a daily morning meeting.
16      Q.      Do you recall whether Mr. Ngo returned
17      to work on August 25th?
18      A.      He did not.
19      Q.      Do you know why that was?
20      A.      Yes.  He had an aneurism in August.
21      Q.      Do you know what date Mr. Ngo returned
22      to work following his brain aneurysm?
23      A.      In November.  I don't know the exact
24      date.
25      Q.      During the time period that Mr. Ngo
```

1140

1   
2  was out of the office recovering from his brain
3  aneurysm, did you ever e-mail him about any research
4  work?
5       A.   No.
6       Q.   Did you call him about any research
7  issues?
8       A.   No.
9       Q.   How many times do you recall speaking
10 to Mr. Ngo for any reason during that time period?
11      A.   I don't recall speaking with him.
12      Q.   Now, when Mr. Ngo returned to the
13 office -- if I told you November 3rd, would that
14 sound about right?
15      A.   Yes.
16      Q.   When he returned to the office on
17 November 3rd, when was the last time that you had
18 seen Mr. Ngo?
19      A.   In June.
20      Q.   That would be a period of
21 approximately 20 weeks?
22      A.   Yes.
23      Q.   When Mr. Ngo returned to work in
24 November, did you have any communications with your
25 sales staff about his return?

1141

1   
2       A.   Yes.
3       Q.   And do you recall how you communicated
4  that to them?
5       A.   Well, it was a confusing time because
6  Hoai had been out of the office for some time. And
7  not only salespeople had asked me, is he coming
8  back, is he coming back full time, is he going to be
9  covering his credits. Anthony Santino, who traded
10 his credits, asked him [sic].
11          So I sent out an e-mail clarifying
12 that, yes, he would indeed be coming back and
13 working as a research analyst.
14      Q.   Can you take a look at Exhibit 85,
15 please. It might be in a different book.
16      A.   Okay.
17      Q.   And is this a Bloomberg e-mail?
18      A.   Yes.
19      Q.   And is this the e-mail message that
20 you were talking about?
21      A.   Yes.
22      Q.   The first thing I'd like to point out,
23 if you see in there, it says November 6, 2014?
24      A.   Yes.
25      Q.   Am I correct that Mr. Ngo had already

1142

1   
2  returned to the office by that time?
3       A.   I believe so.
4       Q.   And you state here -- and please
5  correct me if I miss something. It's not a great
6  copy.
7          By the way, who did you send this to?
8       A.   I assume I sent it to my universe of
9  salespeople for sure. I don't know if I included
10 trading, but I suspect I would have.
11      Q.   You state, "Hey, all. Meant to go
12 through this in the morning meeting" --
13          Was that the daily morning meeting --
14      A.   Yes.
15      Q.   -- you were testifying about before?
16      A.   Yes.
17      Q.   -- "but I was stuck on 95 for two
18 hours. As we welcome Hoai back, I wanted to remind
19 everybody that Colleen remains head of research,
20 which we put in place in July, and Hoai will
21 continue to cover chemicals, paper, mining,
22 et cetera. Any supervisory research issues should
23 continue to go through Colleen."
24          Did I read that correctly as far as
25 you can see?

1143

1   
2       A.   Yes.
3       Q.   Is that consistent with your
4  understanding that Ms. Burns was made the sole head
5  of high-yield research back July?
6       A.   Yes.
7       Q.   At any time after he returned to work
8  in November, did Mr. Ngo ever communicate to you
9  that he believed he was still the cohead of
10 high-yield research?
11      A.   No.
12      Q.   Did anyone else ever communicate that
13 to you?
14      A.   No.
15      Q.   For the remainder of the time that
16 you -- withdrawn.
17          For the balance of the time that you
18 remained the head of high-yield sales at
19 Oppenheimer, was there ever another cohead of
20 high-yield research?
21      A.   No.
22      Q.   Did Ms. Burns remain the head for that
23 entire period?
24      A.   Yes.
25      Q.   Now, during the period -- I want to

1144

1  
2  talk about the period of 2015 and 2016.  
3      I think you testified that you would  
4  from time to time speak with Mr. Lowenthal about the  
5  performance of high-yield research analysts?  
6      A.  Yes.  
7      Q.  Where would you get the data or your  
8  information regarding sale -- research analysts'  
9  performance?  What would that be based on?  
10      A.  It would be based on my own opinions.  
11  It would be based on commentary from other  
12  salespeople.  It would be based on commentary from  
13  traders.  
14      Q.  And what do you recall about the  
15  commentary that you were getting from traders or  
16  salespeople about Mr. Ngo in 2015 and 2016?  
17      A.  I think that there was frustration  
18  with the universe of credits that Hoai covered.  
19      THE ARBITRATOR:  When you say  
20  "Credits," what is that referring to?  
21      THE WITNESS:  Companies.  So it was a  
22  pretty small universe by then.  There were  
23  the TiO2 players, which was in chemicals.  
24  There were some chemical credits.  He really  
25  wasn't opining on paper anymore.  And we  

1145

1  
2  had -- there was a desire on the part of  
3  sales and trading to get more commentary on  
4  mining credits because those were a bit more  
5  controversial and volatile.  So gold -- gold  
6  miners.  
7      THE ARBITRATOR:  And the lack of  
8  reporting on chemicals and paper, was that,  
9  in your view, attributable to those sectors  
10  declining in importance or significance or  
11  activity, or a failure on the part of Mr. Ngo  
12  simply to do the sort of reporting that he  
13  should have done with the material he had?  
14      THE WITNESS:  Yes, that's a good  
15  question.  From -- from the sales point of  
16  view, which, again, is a user of the  
17  research, there's definitely an issue when a  
18  sector will decline in importance because  
19  it's priced more efficiently or there's not  
20  as -- news-making events.  
21      But that doesn't preclude the analyst  
22  from covering those credits.  That is still  
23  the universe of coverage.  So even though  
24  something isn't as quite as exciting and  
25  controversial, that sector is still being  

1146

1  
2  covered.  
3      THE ARBITRATOR:  Okay.  
4      THE WITNESS:  So I think the  
5  frustration was on the coverage.  
6  BY MR. GIBSON:  
7      Q.  Now, did there come a time when  
8  Mr. Ngo was terminated by Oppenheimer?  
9      A.  Yes.  
10      Q.  Do you recall when that was,  
11  approximately?  
12      A.  In mid 2016.  
13      Q.  Did you make the decision to terminate  
14  Mr. Ngo's employment?  
15      A.  No.  
16      Q.  Did you have the authority to  
17  terminate Mr. Ngo at that time?  
18      A.  No.  
19      Q.  Do you know who made the decision?  
20      A.  I believe that was Rob Lowenthal.  
21      Q.  And how did you learn that that  
22  decision had been made?  
23      A.  I think I first learned when Colleen  
24  Burns told me.  
25      Q.  So is it fair to say then that  

1147

1  
2  Mr. Lowenthal didn't come to you first for your  
3  opinion on whether or not to terminate Mr. Ngo?  
4      A.  That's right.  
5      Q.  When Ms. Burns first informed you of  
6  that decision, did she give you an explanation as to  
7  why Mr. Lowenthal had made that decision?  
8      A.  Yes.  
9      Q.  What do you recall her saying?  
10      A.  I recall her telling me -- you know,  
11  the trading desk that Hoai was being let go, that we  
12  were ceasing coverage of his sectors, and that we  
13  would not be covering those industries any longer.  
14      Q.  Were you surprised at that explanation  
15  by Ms. Burns?  
16      A.  No.  
17      Q.  During that discussion with Ms. Burns,  
18  did she mention at all that Mr. Ngo had spent time  
19  out of the office in June of 2014 for the birth of  
20  his child?  
21      A.  No.  
22      Q.  Did she mention that Mr. Ngo had  
23  suffered a brain aneurysm in August of 2014?  
24      A.  No.  
25      Q.  Now, if I told you that Mr. Ngo was

1148

1    terminated on June 30, 2016, would that sound about
2    right?
3         A.    Yes.
4         Q.    Did Oppenheimer -- excuse me.
5              Did Oppenheimer hire, to your
6    knowledge, any high-yield research analyst in or
7    around the time that Mr. Ngo was terminated?
8         A.    Yes.
9         Q.    Do you know who that analyst was?
10        A.    Jiten Joshi.
11        Q.    And what sectors did Mr. Joshi cover?
12        A.    TMT; technology, media and
13   telecommunications.
14        Q.    Do you ever recall reading any
15   research published by Mr. Ngo in those sectors?
16        A.    No.
17        Q.    Did Mr. Joshi cover chemicals?
18        A.    No.
19        Q.    Paper and packaging?
20        A.    No.
21        Q.    Any mining?
22        A.    No.
23        Q.    Now, as the head of high-yield sales
24   in 2016, did you have any opinion as to the

1149

1    importance of having research coverage in TMT?
2         A.    Yes, I did.
3         Q.    What was that opinion?
4         A.    That was always a sector that was
5    pretty primary to the department.  I gave you my
6    lengthy working track record, but coverage of TMT
7    goes back to Argosy where that was kind of a core
8    competency.  And that continued with Canadian
9    Imperial Bank of Commerce and then at Oppenheimer.
10        Q.    And in 2016, how -- in your opinion,
11   how did the importance of having research coverage
12   in TMT compare to paper and packaging or chemicals
13   or mining?
14        A.    TMT was a significant sector for us.
15        Q.    Now, am I correct that Mr. Joshi was
16   not the first Oppenheimer research analyst to cover
17   TMT?
18        A.    That's right.
19        Q.    Who covered it before Mr. Joshi was
20   hired?
21        A.    Umesh Bhandary.
22        Q.    Was Mr. Bhandary stilled employed at
23   Oppenheimer when Mr. Joshi was hired?
24        A.    No.

1150

1         Q.    From the date of Mr. Ngo's termination
2    through the last day that you worked in high-yield
3    sales, how many high-yield research analysts do you
4    recall being hired to cover chemicals?
5         A.    Zero.
6         Q.    How about paper and packaging?
7         A.    Zero.
8         Q.    How about mining?
9         A.    Zero.
10        Q.    Does that surprise you?
11        A.    No.
12        Q.    Why not?
13        A.    Well, Oppenheimer -- it didn't
14   surprise me for a couple of reasons.
15             The first reason is that Oppenheimer
16   was really focusing on having continuity or
17   consistency between the equity research area, fixed
18   income research and investment banking.  So TMT was
19   an important sector for the firm in all of those
20   areas.
21             We had no coverage on the equity side
22   in chemicals and papers, and there were no bankers
23   in that space.  So from the firm's perspective, I
24   understood that that was not a sector -- those

1151

1    sectors were not that important.
2             From my perspective in the high-yield
3    group, it was also not a sector that was as
4    important in the marketplace.
5         Q.    During your deposition in this matter,
6    do you recall being asked whether there had been
7    cost cuts at Oppenheimer during your time at the
8    firm?
9         A.    Yes.
10        Q.    And had there been?
11        A.    Yes.
12        Q.    And you were also asked whether any
13   salespeople on your staff had been affected by
14   cost-cutting.
15             Do you recall that?
16        A.    Yes.
17        Q.    I believe you testified that you were
18   not aware of any?
19        A.    Correct.
20        Q.    Does it surprise you that none of your
21   salespeople were ever cut for cost-cutting reasons?
22        A.    No.
23        Q.    Why doesn't that surprise you?
24        A.    Because the structure of the business

1152

1   at Oppenheimer is that salespeople were compensated
2   by their commissioned production.  So salespeople
3   were paid on a formula and a matrix based on their
4   production.  So the dollars generated by salespeople
5   was the primary top-line revenue generator for the
6   department.  Trading would generate some P&L, but
7   sales was the primary driver.
8       Q.   And are salespeople paid a base
9   salary?
10      A.   No.
11      Q.   Are they paid bonuses?
12      A.   No.
13      Q.   Are you familiar with a salesperson by
14   the name of Lynn Johnson?
15      A.   Yes.
16      Q.   Who was Ms. Johnson in or about 2014?
17      A.   Lynn Johnson was a salesperson who
18   worked with us.  I hired her I think in 2008.
19      Q.   And was she reporting to you --
20      A.   Yes.
21      Q.   -- at that time?
22          Do you recall whether Ms. Johnson ever
23   took a leave of absence from Oppenheimer?
24      A.   Yes.

1153

1       Q.   And do you recall why she did?
2       A.   She was having a baby.
3       Q.   I'm going to ask you to take a look at
4   Exhibit 79.
5       A.   Okay.
6       Q.   I'm going to represent to you that
7   these are some documents from Ms. Johnson's
8   personnel file that were produced by Oppenheimer --
9       A.   Uh-huh.
10      Q.   -- in this case.
11          You'll see the first two pages of this
12  exhibit are what are called personnel change notice.
13      A.   Yes.
14      Q.   Have you seen these types of forms
15  before?
16      A.   Yes.
17      Q.   And on this particular one, you see in
18  the upper right corner where it says, "Immediate
19  Supervisor"?
20      A.   Yes.
21      Q.   It says your name there?
22      A.   Correct.
23      Q.   Does it surprise you to see your name
24  there?

1154

1
2       A.   No.
3       Q.   Is that because you were Ms. Johnson's
4   immediate supervisor?
5       A.   Yes.
6       Q.   Have you ever seen any of these PCN
7   forms that identifies you as Mr. Ngo's immediate
8   supervisor?
9       A.   No.
10      Q.   Now, I think you testified that
11  salespeople are paid by commission?
12      A.   Correct.
13      Q.   Do you have any recollection as to --
14  when Ms. Johnson took her leave of absence for her
15  baby, whether she continued to recover -- receive
16  some or all of her commissions?
17      A.   Yes.
18      Q.   Do you recall how that came about?
19      A.   Yes.
20      Q.   Tell us about that.
21      A.   Well, Lynn came to me and said that
22  she was having a baby and that her intention was to
23  come back and work after the birth of the baby and
24  that -- so I helped put in place a structure with
25  her that would provide continuity for the business

1155

1   while she was out on her leave.
2       Q.   And did you have to approve that
3   arrangement?
4       A.   Yes.
5       Q.   Did you approve it?
6       A.   I did.
7       Q.   When you decided whether or not to
8   approve that arrangement, did the fact that
9   Ms. Johnson was a female play any role in your
10  decision?
11      A.   No.
12      Q.   If Ms. Johnson -- if a male
13  salesperson went out on a leave of absence and asked
14  to continue to recover or split portions of their
15  commissions, would you consider that equally?
16      A.   Absolutely.
17          MR. GIBSON:  I think I'm done.  Can we
18      just take two minutes, Judge?
19          THE ARBITRATOR:  Yes.
20          MR. GIBSON:  Thank you.
21          (Recess from the record.)
22  CROSS-EXAMINATION
23  BY MR. IADEVAIA:
24      Q.   Good morning, Ms. Ross.

1156

1     A.    Good morning.
2     Q.    You currently work for Oppenheimer;
3  correct?
4     A.    Yes.
5     Q.    And you've worked at Oppenheimer for
6  approximately 12 years?
7     A.    Yes.
8     Q.    Since 2007?
9     A.    Yes.
10    Q.    That's right?
11          And you joined Oppenheimer when
12 Oppenheimer acquired the high-yield business from
13 CIBC; is that right?
14    A.    Correct.
15    Q.    And you are currently a managing
16 director?
17    A.    Yes.
18    Q.    For most of your career at
19 Oppenheimer, you were in a senior management role;
20 is that right?
21    A.    Yes.
22    Q.    And for a large part of your
23 employment, you reported to Mr. Lowenthal; correct?
24    A.    Yes.
25

1157

1
2     Q.    And Mr. Lowenthal is Robert Lowenthal;
3  is that right?
4     A.    Yes.
5     Q.    Mr. Lowenthal is the son of Bud
6  Lowenthal, the CEO of the company; is that right?
7     A.    Yes.
8     Q.    And Mr. Lowenthal is a member of the
9  board of directors for Oppenheimer; is that right?
10    A.    I believe so.
11    Q.    And you know that, as part of this
12 case, Mr. Ngo has alleged that Mr. Lowenthal demoted
13 and fired him because Mr. Ngo took leave in the
14 middle of 2014?
15    A.    That's what his allegation is, yes.
16    Q.    You also know that Mr. Ngo has alleged
17 that you discouraged him from taking leave in 2014?
18    A.    That's the allegation, yes.
19    Q.    You were the head of high-yield sales
20 at Oppenheimer for 11 years; right?
21    A.    Yes.
22    Q.    And the change from being head of
23 high-yield sales to this capital markets position
24 took place in 2018; is that right?
25    A.    Yes.

1158

1
2     Q.    And during the time you were head of
3  high-yield sales at Oppenheimer, you were the sole
4  head of the group; is that right?
5     A.    That's correct.
6     Q.    As the sole head of the group, you
7  managed the team; that's right?  The sales team?
8     A.    Yes.
9     Q.    You hired salespeople for the
10 high-yield sales team?
11    A.    Yes.
12    Q.    You recommended promotions of sales
13 staff?
14    A.    Yes.
15    Q.    You conducted performance reviews of
16 your staff; is that right?
17    A.    Yes.
18    Q.    You gave them feedback throughout the
19 year?
20    A.    Yes.
21    Q.    And you allocated the accounts among
22 the salespeople; right?
23    A.    Yes.
24    Q.    And if there were problems with the
25 account, you helped resolve those problems; is that

1159

1
2  right?
3     A.    Yes.
4     Q.    You never had a cohead; is that
5  correct?
6     A.    That's correct.
7     Q.    You testified -- strike that.
8          You believe that being head of your
9  group was an important part of your job; is that
10 right?
11    A.    Yes.
12    Q.    Having that title of head was
13 important?
14    A.    Yes.
15    Q.    And you testified -- strike that,
16 actually.
17          You believed it was a step down to
18 take a cohead role; is that right?
19    A.    For whom?
20    Q.    For you personally, in your job as
21 head of the high-yield sales desk, you thought it
22 would be --
23    A.    That it would be a step down, yes.
24    Q.    -- a step down if you took a cohead
25 position?

1160

1    A.   That's right.
2
3    Q.   If you shared the responsibilities of
4    being head of this high-yield sales group; is that
5    right?
6    A.   That's correct.
7    Q.   And you didn't want to share the role
8    of head of high-yield sales; is that right?
9    A.   Are we talking about in 2018?
10   Q.   In 2018.
11   A.   Yes.
12   Q.   You were told around 2018 that
13   Oppenheimer intended to promote a salesperson to
14   share your role as head of the group; is that right?
15   A.   Well, not exactly.
16   Q.   Well -- so is it your understanding
17   that Oppenheimer came to you and said that
18   Mr. Rahman, who's a salesperson, wanted leadership
19   responsibilities and that Oppenheimer wanted to make
20   him cohead of the group with you?
21   A.   Well, that Rob came to my boss at the
22   time, Peter Albano, and said that he wanted more of
23   a leadership role in the high-yield business.
24   Q.   And --
25        THE ARBITRATOR:  "He" being whom?

1161

1
2        THE WITNESS:  Rob -- Robert Rahman,
3    who's a senior salesperson who I had hired in
4    2008.
5    BY MR. IADEVAIA:
6    Q.   And that leadership responsibility
7    would mean that he would be a cohead of the group;
8    is that right?
9    A.   That's what he wanted.
10   Q.   You were offered the opportunity to
11   share the head position with Mr. Rahman; is that
12   correct?
13   A.   Well, there was a conversation about
14   what to do with that -- with that response by him
15   because --
16   Q.   And what -- I'm sorry.  Go ahead.
17   A.   Because he wanted more of a leadership
18   role -- you know, we're not a big bureaucracy here.
19   We're not a big hierarchy.  So a leadership role.
20   So he wanted to have some role, but the management
21   above me didn't think that he was ready to assume a
22   leadership role.  So there were discussions about
23   the possibility of me working with him, cohead,
24   training, side by side.
25   Q.   And so you were offered an opportunity

1162

1    to be cohead with Mr. Rahman; is that right?
2
3    A.   That was one of the things discussed.
4    Q.   And you no longer work in high-yield
5    at Oppenheimer.
6    A.   That's right.
7    Q.   And you're currently in a totally
8    different job in California?
9    A.   That's correct.
10   Q.   And the reason you moved to that
11   position -- one of the reasons you moved to that
12   position was because you didn't want to share being
13   cohead and leadership responsibilities of the
14   high-yield sales desk?
15   A.   The reason I got the role was, in
16   discussing with the firm, Rob Lowenthal asked what I
17   would like to do.  And my husband and I had been
18   discussing for some time the possibility of moving
19   to Los Angeles because that's where I grew up, and
20   my daughters are in graduate school and undergrad in
21   California.  So I worked with the firm to create
22   that opportunity so that I can move to Los Angeles.
23   Q.   You testified earlier today that the
24   decision to move to the other job was voluntary.
25        Do you remember that testimony?

1163

1
2    A.   Yes.
3    Q.   I'm going to ask you -- actually.
4        Do you recall having been deposed in
5    this case?
6    A.   Yes.
7    Q.   And you swore to give testimony under
8    oath during your deposition; is that right?
9    A.   Yes.
10   Q.   And you were given a copy of your
11   deposition after the deposition to review; is that
12   right?
13        MR. IADEVAIA:  No, there was no errata
14   sheet.
15        MR. GIBSON:  I don't think you ever
16   sent us --
17        MR. IADEVAIA:  Okay.  That's fine.
18   BY MR. IADEVAIA:
19   Q.   But you --
20        MR. LICUL:  Just for the record, we
21   did, and we sent you the transcript.
22        MR. GIBSON:  Again, I never -- I have
23   to be honest --
24        MR. LICUL:  It's not a big point.  I
25   just want to make a record.

1164

1      MR. GIBSON:  Okay.
2
3  BY MR. IADEVAIA:
4      Q.   But you did have your deposition taken
5  in this case.
6      A.   I did, yes.
7      Q.   And you swore to give testimony under
8  oath during that deposition?
9      A.   Yes.
10     Q.   And I'm going to ask you to take a
11  look at your deposition transcript.  If you look at
12  page 13.  So turn to page 13 and you look at line 2,
13  please.
14          (Discussion off the record.)
15     Q.   So I'm going to read, starting with
16  line 2.
17          The question is:
18          "QUESTION:  The decision to move to
19     Los Angeles for work purposes, was that
20     voluntary?
21          "ANSWER:  Not entirely."
22          Were you asked that question and did
23  you give that answer?
24     A.   Yes.
25     Q.   Is that accurate?

1165

1
2      A.   Yes.
3      Q.   And below that, if you take a look at
4  line -- line 6, the question is:
5          "QUESTION:  When you say 'not
6     entirely,' what do you mean by that?"
7          And your answer is:
8          "ANSWER:  Well, there was a series of
9     events.  A salesperson that I hired in 2008
10     wanted more leadership responsibilities.  As
11     you know, Oppenheimer is not exactly a huge
12     hierarchal organization with a lot of layers
13     of management leadership.  C'est moi.  So he
14     wanted to share leadership responsibilities,
15     and I didn't want to share.  And so we
16     crafted a really nice business situation for
17     everyone that entailed me moving to Los
18     Angeles."
19          Were you asked that question, and did
20  you give that answer?
21     A.   Yes.
22     Q.   Before you moved to this job in Los
23  Angeles, you had been working in the high-yield
24  business since 1990; is that right?  Since the '90s?
25     A.   In the high-yield business since 1990,

1166

1
2  yes.
3      Q.   And you had been head of high-yield
4  sales at CIBC; isn't that right?
5      A.   Yes.
6      Q.   And in your role on the high-yield
7  sales desk, you managed the staff; is that right?
8      A.   Yes.
9      Q.   And in your current position, you
10  don't manage a team anymore; is that accurate?
11     A.   Correct.
12     Q.   In your job as head of sales, you had
13  managed the P&L; is that right?
14     A.   I oversaw P&L.
15     Q.   And you have --
16          THE ARBITRATOR:  "P&L" refers to what?
17          THE WITNESS:  Basically there wasn't
18     really "L" for my group.  It was basically
19     pure "P" because it was the commissions
20     generated, which was the revenue of the
21     department.
22  BY MR. IADEVAIA:
23     Q.   And in your position, you're not
24  managing or overseeing a P&L; is that right?
25     A.   That's correct.

1167

1
2      Q.   Rather than lose your job as the head
3  of high-yield sales, you made a decision to take a
4  completely different job in Los Angeles; is that
5  right?
6      A.   Yes.
7      Q.   You would have been upset if you had
8  been made salesperson with no head or cohead title;
9  right?
10     A.   Yes.
11     Q.   The high-yield sales desk was part of
12  the high-yield business; is that accurate?
13     A.   Yes.
14          THE ARBITRATOR:  Let me just ask
15     because it seemed implicit in one question
16     ago.
17          In the course of these discussions
18     about what would be done about this ambitious
19     sales fellow, were you told that if you
20     didn't move to LA or take some other
21     position, that you would lose your position
22     as head of sales?
23          THE WITNESS:  Not explicitly.  It was
24     a conversation that this fellow wanted
25     responsibility and leadership.  He was very

1168

1  
2  frequently our top producer.  And so the
3  firm, nor I, could categorically deny his
4  ambitions because he was an important
5  producer.  So the dilemma was what do you do.
6  And one of the -- one of the potential
7  remedies ventured by Peter Albano was that I
8  could be side by side with him, which was not
9  something that I wanted to do.  But it was --
10  these were very iterative conversations.
11  THE ARBITRATOR:  Okay.
12  BY MR. IADEVAIA:
13  Q.  If you could take a look at your
14  deposition transcript, please.  And turn to page 203
15  of the transcript.  If you could look at line 20,
16  please.
17  A.  On page 203?
18  Q.  Yes.
19  A.  Okay.
20  Q.  I'm going to read the question and
21  answer as reflected in the transcript.  Starting on
22  203 at line 20, the question is:
23  "QUESTION:  Was there ever a
24  discussion about you and Rob being coheads?"
25  Your answer:

1169

1  
2  "ANSWER:  Yes.  He didn't want to take
3  my job.  He would have been happy being
4  cohead, but I didn't want to do that.
5  "QUESTION:  How come you didn't want
6  to do that?
7  "ANSWER:  Because I had been doing
8  this for quite some time and I built the
9  sales desk, and that was not something that I
10  was looking to do.  And my husband's been
11  bugging me to move us to California for a
12  long time, so..."
13  Were you asked those questions, and
14  did you give those answers?
15  A.  Yes.
16  Q.  Let me go back.
17  The high-yield sales desk was part of
18  the high-yield business when you were head of the
19  sales desk; is that right?
20  A.  Yes.
21  Q.  And the high-yield business also
22  included high-yield trading and high-yield research;
23  is that right?
24  A.  Correct.
25  Q.  And the high-yield sales desk was the

1170

1  
2  largest group on the -- of the high-yield business;
3  is that right?
4  A.  Yes.
5  Q.  It was bigger -- the high-yield sales
6  team was bigger than the high-yield trading team; is
7  that right?
8  A.  Yes.
9  Q.  And it was bigger -- the sales team
10  was bigger than the high-yield research team?
11  A.  Yes.
12  Q.  And revenue for the high-yield sales
13  desk was primarily generated from the sales -- I'm
14  sorry.  Strike that.
15  Revenue for the high-yield business
16  was primarily generated from the sales desk; is that
17  right?
18  A.  Yes.
19  Q.  You know that discrimination based on
20  gender in employment is unlawful; right?
21  A.  Yes.
22  Q.  And you know that discrimination based
23  on disability is unlawful in employment?
24  A.  Yes.
25  Q.  And you're familiar generally with the

1171

1  
2  Family and Medical Leave Act?
3  A.  Yes.
4  Q.  And you know that when an employee
5  gives birth to a child, that the employee has a
6  right to a leave of absence?
7  A.  Yes.
8  Q.  And you know that an employee who goes
9  on FMLA leave, they have a right to be restored to
10  their job?
11  A.  Yes.
12  Q.  You were hired -- you were involved in
13  hiring high-yield research analysts; is that right?
14  A.  I did not hire research analysts, but
15  my opinion was utilized in hiring research analysts.
16  Q.  So you were involved in the process
17  of --
18  A.  Yes.
19  Q.  -- hiring high-yield research
20  analysts.
21  A.  Yes.
22  Q.  And your opinion in hiring analysts
23  was meaningful because sales was a consumer of
24  research?
25  A.  Correct.

1172

1    
2        Q.   You were specifically involved in the
3    hiring of Mr. Ngo; is that right?
4        A.   Yes.
5        Q.   And you interviewed Mr. Ngo?
6        A.   Correct.
7        Q.   And you made a recommendation that
8    Oppenheimer should hire Mr. Ngo after interviewing
9    him; is that right?
10       A.   I did.
11       Q.   You also signed the offer letter; is
12   that right?
13       A.   Yes.
14       Q.   And you signed -- strike that.
15            You signed his offer letter because
16   you're a senior person on the high-yield team; is
17   that right?
18       A.   Yes, I'm a senior person on the
19   high-yield business.  And, again, I'm not a hundred
20   percent sure why I signed that letter.  My guess is,
21   given that it was August, was that Todd Morgan was
22   on vacation.
23       Q.   If you could take a look at page 119
24   of your transcript, please.
25       A.   Yes.

1173

1    
2        Q.   And if you turn -- look at line 8.
3        A.   Uh-huh.
4        Q.   So I'm going to read the question and
5    answer starting with line 8 on page 119:
6            "QUESTION:  Do you know who signed the
7        offer letter sent to Mr. Ngo?
8            "ANSWER:  I do because I saw it.
9            "QUESTION:  Who was that person?
10           "ANSWER:  That was Jane Ross.
11           "QUESTION:  That's you?
12           "ANSWER:  Yes.
13           "QUESTION:  Why did you sign the offer
14       letter to Mr. Ngo?
15           "ANSWER:  I don't recall the
16       specifics.  I don't know if Todd was out on
17       vacation or if Rob was, but as a senior
18       person in the department, I signed it."
19           Do you recall being asked those
20   questions and giving that testimony?
21       A.   Yes.
22       Q.   You don't recall a situation where
23   Oppenheimer made a bid to retain a high-yield
24   salesperson who had received a competing offer from
25   another bank, do you?

1174

1    
2        A.   Say that again.
3        Q.   Yeah, sure.  It's a long question.
4            You don't recall a situation where
5    Oppenheimer made a bid to retain a high-yield
6    salesperson who had received a competing offer from
7    another bank?
8        A.   It was low turnover in sales.  I do
9    not recall the situation.
10       Q.   And you're not aware of a time where
11   Oppenheimer made a bid to retain a high-yield trader
12   who had received a competing offer from another
13   bank?
14       A.   I wouldn't know.
15       Q.   You're not aware of any time that
16   happened, though, for an Oppenheimer trader, are
17   you?
18       A.   I'm not aware of any time, but it
19   could have happened and I didn't know about it.
20       Q.   The only time you remember when an
21   analyst in high-yield had received an offer from
22   another financial institution and Oppenheimer
23   offered money to retain that analyst was Mr. Ngo; is
24   that right?
25       A.   The only time I -- say the full

1175

1    
2    question again.
3        Q.   The only time you remember that
4    Oppenheimer made a matching offer to retain a
5    high-yield analyst was Mr. Ngo; is that right?
6        A.   Well, I remember that that happened
7    with Hoai.  I believe there -- and, again, I
8    wouldn't know this, but I don't know if there were
9    conversations around that when Umesh left.  I don't
10   know.  There could have been.
11       Q.   But Mr. Ngo is the only person you're
12   aware of?
13       A.   Yes.
14       Q.   And Mr. Ngo had received an offer from
15   CIBC in 2012?
16       A.   Yes.
17       Q.   And you were involved in the effort to
18   retain Mr. Ngo after he received an offer from CIBC?
19       A.   Yes.
20       Q.   And Mr. Ngo came to you to tell you
21   that he had received the offer; is that right?
22       A.   Yes.
23       Q.   And you talked to Mr. Lowenthal after
24   this discussion with Mr. Ngo about what to do; is
25   that right?

1176

1      A.    Yes.

2      Q.    And in 2012, you had worked with Hoai

3   for some amount of time?

4      A.    Yes.

5      Q.    And you told Mr. Lowenthal that the

6   firm should try and keep Mr. Ngo; is that right?

7      A.    Yes.

8      Q.    And you thought that Mr. Ngo was doing

9   a fine job; is that right?

10     A.    Probably.  I think my main interest in

11  wanting to retain him was, as a consumer of research

12  product, losing an analyst was always a difficult

13  thing because you invest time and -- with an

14  analyst.  So losing an analyst, you have to start

15  from scratch in hiring.

16     Q.    And if you thought Mr. Ngo was doing a

17  bad job, you would not have recommended that the

18  firm not [sic] retain him; is that right?

19     A.    Right.

20     Q.    You know that Oppenheimer offered

21  Mr. Ngo more money so he would not leave; is that

22  accurate?

23     A.    Again, I'm not privy to all the

24  details, but I assume.

1177

1      Q.    Do you know if they actually offered

2   him money?

3      A.    I know they -- well, I know they made

4   him an offer.  I don't know the particulars of

5   there -- dollars, stock.  I don't know the

6   particulars.  I know they made an offer to retain

7   him.

8      Q.    Do you understand that the offer --

9   that the offer that they made him was for more

10  money --

11     A.    Yes.

12     Q.    -- even if you don't know the

13  specifics --

14     A.    More total comp., yes.

15     Q.    You were head of sales in high-yield

16  in 2013; right?

17     A.    Yes.

18     Q.    And you were head of sales in

19  high-yield when Mr. Morgan was the head of

20  high-yield research; correct?

21     A.    Yes.

22     Q.    And Mr. Morgan was -- he left the

23  group in 2013; is that right?

24     A.    Yes.

1178

1      Q.    And at the time he left the group -- I

2   think you just said this, but he was the head of

3   high-yield research group; correct?

4      A.    Correct.

5      Q.    You were involved in the discussions

6   as to who should assume Mr. Morgan's role as cohead

7   of the group; correct?

8      A.    Yes.

9      Q.    And before Mr. Lowenthal decided who

10  to promote to the head research position, you spoke

11  to Mr. Lowenthal about who should take that role?

12     A.    Yes.

13     Q.    And you were involved because

14  high-yield sales was the biggest consumer of the

15  high-yield research product; is that right?

16     A.    Yes.

17     Q.    And Oppenheimer could have hired an

18  outside candidate; is that accurate?

19     A.    They could have done.  It would have

20  been out of character, but, yes, they could have

21  done.

22     Q.    And you thought it was a fine decision

23  to appoint Ms. Burns and Mr. Ngo as coheads of

24  research?

1179

1      A.    Yes.

2      Q.    And you thought it was a good solution

3   to make Ms. Burns and Mr. Ngo coheads because you

4   believed they could get the work done?

5      A.    Well, I thought it was a good decision

6   because it was logical.

7      Q.    And -- but you also believed it was a

8   good decision because you believed they could get

9   the work done; right?

10     A.    Yes.  For me, it was mostly about -- I

11  didn't have a problem with that happening.  And they

12  had both been at the firm for similar amounts of

13  time and had sort of similar levels of seniority

14  versus Sean Sneeden, who was significantly more

15  junior.

16     Q.    If you could take a look at page 72 of

17  your deposition transcript, please.

18        (Discussion off the record.)

19     Q.    I'm going to ask you to take a look at

20  page 72, line 15.  I'm going to read you the

21  question and answer starting there:

22        "QUESTION:  Did you at the time think

23     that was a good decision?"

24        Objection.

1180

1      "ANSWER:  I thought that was a fine
2
3  decision.
4      "QUESTION:  Why did you say 'a fine
5  decision'?
6      "ANSWER:  Well, they had both -- again
7  excusing me on dates, but they had both been
8  at the firm for similar amounts of time.  And
9  to bring someone new in is somewhat
10  disruptive, so it seemed like a good -- just
11  keep it going forward.  Between the two of
12  them, they could get the work done and it
13  seemed like a good solution.  It seemed like
14  a practical solution."
15      Were you asked those questions, and
16  did you give those answers?
17      A.   Yes.
18      Q.   And you thought that the concept of
19  coheads was a good idea; is that right?
20      A.   I thought that it was a fair idea and
21  a practical idea so if that equals good...
22      Q.   Did you testify during deposition that
23  you thought it was a good idea?
24      THE ARBITRATOR:  I think we've beaten
25      this to the ground.  Let's move on.

1181

1
2  BY MR. IADEVAIA:
3      Q.   You never told Mr. Lowenthal that
4  Mr. Lowenthal should not make Mr. Ngo the cohead,
5  did you?
6      A.   No.
7      Q.   You would have told Mr. Lowenthal if
8  you had a concern about Mr. Ngo not [sic] being
9  cohead of the research group?
10      A.   Yes.
11      Q.   In 2014, Mr. Ngo told you that he was
12  having a baby in California; is that right?
13      A.   Yes.
14      Q.   And he told you that he had a plan for
15  going to California; is that right?
16      A.   Correct.
17      Q.   And Mr. Ngo discussed with you how
18  much time -- strike that.
19      During your testimony, you testified
20  that Mr. Ngo asked about your experience taking time
21  off; is that what your testimony was?
22      A.   Yes.
23      Q.   During your deposition, do you recall
24  that -- testifying that you told Mr. Ngo why you had
25  taken the time off?

1182

1
2      THE ARBITRATOR:  What page?
3      MR. IADEVAIA:  136/20.  Actually, you
4  know what, 132/6, please.
5      MR. GIBSON:  132/6?
6      MR. IADEVAIA:  Yes.
7      THE WITNESS:  132/6.
8      (Pause.)
9  BY MR. IADEVAIA:
10      Q.   So the question starting on the line 6
11  is:
12      "QUESTION:  Did you have a
13  conversation about -- with Mr. Ngo about
14  taking leave?
15      "ANSWER:  Yes.
16      "QUESTION:  How many discussions did
17  you have with him about taking leave?
18      "ANSWER:  I'm not sure.
19      "QUESTION:  What do you recall about
20  those discussions?
21      "ANSWER:  I remember a discussion
22  where I told him about my experience.  And he
23  was interested in hearing about that because
24  he was trying to figure out what things
25  looked like."

1183

1
2      Do you remember that question and
3  answer?
4      A.   I see that, yes.
5      Q.   And is it -- Mr. Ngo never discussed
6  with you whether he'd be getting paid while he was
7  out of the office in connection with the baby;
8  correct?
9      A.   I don't recall him ever -- ask the
10  question again.
11      Q.   Sure.
12      You don't recall any discussions with
13  Mr. Ngo about whether he would be getting paid while
14  he was out of the office after having the baby?
15      A.   No.  He told me he was working, so I
16  assumed that he was getting paid, but I don't think
17  he ever explicitly told me what the terms were.
18      Q.   And Mr. Ngo did travel to California
19  for the birth of his baby in June of 2014?
20      A.   Yes.
21      Q.   And you understood that the purpose of
22  Mr. Ngo traveling to California was for the birth of
23  his baby; is that right?
24      A.   Yes.
25      Q.   And while Mr. Ngo was in California,

1184

1  Mr. Ngo did not perform any work for Oppenheimer; is
2  that right?
3      A.   I don't know.
4      Q.   You're not aware of any work that
5  Mr. Ngo performed while he was in California; is
6  that right?
7      A.   I don't know.  I don't know if he was
8  signing off on the daily blast.  I don't know.
9      Q.   You didn't see him give any
10  supervisory -- SA any daily blast, did you?
11      A.   I wouldn't see that.  He was in
12  California.
13      Q.   And you didn't see him do any
14  publishing of research, did you?
15      A.   I don't know.
16      Q.   You're not aware of him doing any of
17  that work, are you?
18      A.   I'd have to look back.  I'm not aware,
19  but I don't know.  Again, it was in July.  So July
20  is a fallow period for companies -- most companies
21  are in a quiet period before their earnings are
22  reported, so that would be a quiet period for
23  producing research.
24      Q.   If you could take a look at

1185

1
2  Exhibit 51, please.
3      A.   Page 51?
4      Q.   Exhibit 51, please.
5      A.   Okay.
6      Q.   So Exhibit 51 is the e-mail -- the
7  July 13th e-mail that you testified earlier about
8  today; correct?
9      A.   Yes.
10      Q.   And you knew from this e-mail that
11  Mr. Ngo was saying that he would be out of the
12  office until April 25th because he could not
13  travel --
14      THE ARBITRATOR:  August 25th.
15      MR. IADEVAIA:  Did I say April?
16  Sorry.
17  BY MR. IADEVAIA:
18      Q.   -- August 25th because he could not
19  travel with the baby for several weeks; is that
20  right?
21      A.   Yes.
22      Q.   And he said he couldn't travel with
23  the baby for several weeks because she needed
24  immunization shots; is that right?
25      A.   Yes.

1186

2      Q.   And he told you specifically that the
3  doctor had told him not to travel because the baby
4  needed the immunization shots; is that right?
5      A.   Yes.
6      Q.   And so you understood that he needed
7  this time for health-related reasons for his baby;
8  is that correct?
9      A.   He told us that he needed that time
10  for the immunizations for his baby.
11      Q.   And after getting this e-mail, you
12  believed that Mr. Ngo was not going to be working
13  between July 13th and August 25th; is that right?
14      A.   Well, no.  No, that's not right.
15      Q.   Could you take a look at 165, line 23,
16  of your transcript, please.
17      (Pause.)
18      A.   Okay.
19      Q.   So the question starting at line 23:
20      "QUESTION:  Was it your understanding,
21  based on this e-mail, that Mr. Ngo would be
22  working for Oppenheimer from then through
23  August 25th" --
24      There's an objection.
25      Next question -- or continuation:

1187

2      "QUESTION: -- performing work during
3  that period?
4      "ANSWER:  Would I be expecting that he
5  would be performing work?  I think, again, my
6  concern was that he would not.  While he says
7  he'll be working and continuing, clearly my
8  concern was that he wouldn't because I asked
9  him, how are you going to handle
10  second-quarter earnings?  I don't get the
11  distinction."
12      Was that the question that was asked
13  and your answer?
14      A.   Yes.
15      Q.   And between July 14th and August 16th,
16  Mr. Ngo didn't provide any work for you; is that
17  right?
18      A.   He didn't provide any work for me?
19      Q.   Yes.
20      Is that right?
21      A.   Did he produce work for the group, you
22  mean?  He never would provide work for just me.
23      Q.   Does -- are you aware of Mr. Ngo
24  providing any work for the group during that period?
25      A.   No.

1188

1     Q.   And you had no direct communication
2  with Mr. Ngo while he was in California other than
3  this July 13th e-mail; is that right?
4     A.   Correct.
5     Q.   And you had no phone calls with
6  Mr. Ngo during that period; is that right?
7     A.   I can't say a hundred percent zero
8  phone calls, but I think that's correct.  But,
9  again, it's because, in July, it's pretty much a
10  fallow period.  There's not a ton of news that
11  happens in July.
12     Q.   Okay.  Did you have any e-mail
13  communications with Mr. Ngo in August?
14     A.   No.
15     Q.   Did you have any phone calls with
16  Mr. Ngo in August?
17     A.   I don't know if I ever had any phone
18  conversations, but I don't believe so.
19     Q.   Soon after -- soon after getting the
20  July 13th e-mail, Exhibit 51, you told Mr. Lowenthal
21  about Mr. Ngo's return date; is that right?
22     A.   Yes.
23     Q.   And the return date that Mr. Ngo says
24  in his July 13th e-mail is August 25th; is that

1189

1  right?
2     A.   Yes.
3     Q.   And you thought it was convenient and
4  nice that the baby was coming in July because that's
5  a quiet time in the market; is that right?
6     A.   Well, it's a quiet time in the market.
7     Q.   If you can take a look at page 147 of
8  your transcript and look at line 16.
9     (Pause.)
10     Q.   So the question on line 16 is:
11     "QUESTION:  When you say 'handle his
12  absence through August,' what do you mean by
13  that?
14     "ANSWER:  Well, being away, it was
15  convenient and nice that the baby was coming
16  in July because that's a pretty quiet time in
17  the market.  And August is when the
18  second-quarter reports hit and it's a busier
19  time for news.  So Hoai had said he would be
20  gone for a few weeks and he would be working
21  and covering his companies and fulfilling his
22  responsibilities and that's great.  And now
23  we're entering earnings season and that's a
24  bit where things heat up."

1190

1     Do you recall being asked those -- or
2  that question and giving that answer?
3     A.   Yes.
4     Q.   You testified earlier today that you
5  were a little frustrated after receiving Mr. Ngo's
6  July 13th e-mail; is that right?
7     A.   Yes.
8     Q.   And, in fact, you were actually
9  frustrated.  You weren't a little frustrated when
10  you received --
11     A.   I was frustrated, yes.
12     Q.   You were frustrated with Mr. Ngo's
13  request for time off through August because it's a
14  busy time of the year; right?
15     MR. GIBSON:  Object to the
16     characterization.
17     THE WITNESS:  Right.
18     MR. GIBSON:  Withdrawn.
19     THE WITNESS:  It wasn't precisely
20     that.  I was frustrated because Hoai had said
21     that he was working remotely and that when I
22     received that e-mail on a Sunday -- if it
23     were me sending that e-mail, I would have
24     said, I'm going to continue to work remotely,

1191

1  but I have this system in place where, you
2  know, all my companies -- the dates that
3  they're going to report and this is what's
4  going to happen.  And I was frustrated that
5  there was no -- none of that.
6  BY MR. IADEVAIA:
7     Q.   Mr. Lowenthal was also frustrated when
8  you told him about Mr. Ngo's July 13th e-mail; is
9  that right?
10     A.   Yes.
11     Q.   And you respond to Mr. Ngo's e-mail,
12  and that response is reflected in Exhibit 51; is
13  that right?
14     MR. GIBSON:  Did I take --
15     THE WITNESS:  Yes, I -- yes.
16     MR. GIBSON:  Sorry.  I took your book.
17     I apologize.
18     THE WITNESS:  Yes.
19  BY MR. IADEVAIA:
20     Q.   In your response, you don't say to
21  Mr. Ngo, you should let Mr. Lowenthal know about
22  your August 25th return date; is that right?
23     A.   No.
24     Q.   And you don't tell Mr. Ngo that you

1192

1    think Mr. Ngo's e-mail to you is inappropriate in
2    some way in that e-mail; is that right?
3        A.   No.
4        Q.   May I ask you to take a look at
5    Exhibit 3, please.
6             (Pause.)
7        A.   Yep.
8        Q.   If you turn to -- this is the answer
9    that your -- that Oppenheimer submitted in this
10   matter.  And you've seen this answer before today;
11   is that accurate?
12       A.   Yes.
13       Q.   And you reviewed it before it was
14   filed; is that accurate?
15       A.   Yes.
16       Q.   And if you turn to the third page,
17   please.  And if you look at the top paragraph, it
18   says, "As a result of the above, Oppenheimer and
19   Mr. Ngo jointly prepared for Mr. Ngo to be absent
20   from the office for three to four weeks.  This
21   preparation included accounting for work functions
22   that would need to be covered while Mr. Ngo was out
23   of the office, including some of his supervisory
24   obligations.  Many of these obligations were

1193

1    allocated to his cohead of the group, Mrs. Burns --
2    Ms. Burns."
3             Do you see the text I just read?
4        A.   Yes.
5        Q.   Did I read it accurately?
6        A.   Yes.
7        Q.   Is this text accurate?
8        A.   Well, again, I wasn't privy to the
9    specifics of what his deal was.  I'm privy to what
10   he told me, which is, yes, he would be out of the
11   office for three weeks and that he would be
12   continuing to work.
13       Q.   And in this statement -- this
14   paragraph, it says, "This preparation included
15   accounting for work functions that would need to be
16   covered while Mr. Ngo was out of the office,
17   including some of his supervisory obligations."
18            Do you see that text?
19       A.   I see that.
20       Q.   Was that accurate?  Is that accurate?
21            (Pause.)
22       A.   Yes.  I just can't say what his -- I
23   can't speak to -- I don't know what he structured
24   with Colleen and what specific tasks and what -- I

1194

1    wasn't privy to those details.  So, again, I can
2    testify to what I know, which is I was told that he
3    was going to be out for a certain amount of time and
4    that he was going to continue to be working and --
5    but the obligations allocated to Colleen, I don't
6    have -- that's not my purview.
7             THE ARBITRATOR:  With respect to this
8        time frame of three to four weeks, if that
9        was the time frame that had been projected
10       and he left around June 20, would it be
11       correct to say that his absence would end
12       somewhat before the second-quarter report
13       period?
14            THE WITNESS:  Yes.
15            THE ARBITRATOR:  Okay.
16   BY MR. IADEVAIA:
17       Q.   You testified earlier about a
18   Bloomberg announcement to your sales staff, and
19   potentially the trading team, that Mr. Ngo was no
20   longer cohead and that Ms. Burns was cohead.
21       A.   Yes.
22       Q.   And there was no -- you don't recall
23   any other written announcement about Ms. Burns'
24   being -- either Ms. Burns being the sole head or

1195

1    Mr. Ngo no longer being the cohead?
2        A.   I don't recall that.  Again, the
3    typical form of communication for those kinds of
4    things was in the morning meeting where we would
5    make announcements like that.  In that e-mail, I
6    referenced that I was stuck on my commute during the
7    morning meeting, so...
8        Q.   You testified earlier today that you
9    had certain concerns about Mr. Ngo's work and
10   specifically about his coverage efforts; is that
11   right?
12       A.   In general?
13       Q.   No, I think your -- well, tell me if
14   I'm wrong.
15            My recollection of your testimony was
16   that you had -- in 2014 and 2015, you had concerns
17   about Mr. Ngo's effort in terms of coverage of
18   sectors.
19       A.   Yes.
20            THE ARBITRATOR:  Just to clarify, was
21       that question posed 2014 and '15 or 2015 and
22       '16?
23            THE WITNESS:  Well, again, as a
24       consumer of research, I had concerns for much

1196

1    of the period.  So -- I mean, I remember
2    having concerns in 2012, which doesn't
3    contradict with keeping him, but I still had
4    concerns after Hurricane Sandy on certain
5    coverage issues.
6    BY MR. IADEVAIA:
7        Q.   Specifically Mr. Ngo's willingness to
8    cover mining and metals; is that right?
9        A.   Willing to cover mining and metals and
10   just to broaden the depth of what he was doing.
11       Q.   And you can recall being upset or
12   concerned about that going all the way back to 2012;
13   right?
14       A.   Yes.
15       Q.   And Mr. Lowenthal solicited your input
16   about performance of research analysts; is that
17   right?
18       A.   Yes.
19       Q.   And Mr. Morgan, when he was the head
20   of research, had solicited your input about
21   performance of research analysts?
22       A.   Yes.
23       Q.   And both Mr. Lowenthal and Mr. Morgan
24   solicited your opinion for purposes of determining

1197

1    bonuses of the analysts?
2        A.   Yes.
3        Q.   And the concerns you had about
4    Mr. Ngo's coverage of metal and mining that you said
5    went back to 2012, that predated Mr. Ngo's promotion
6    to managing director; is that right?
7        A.   Yes.
8        Q.   And his promotion to cohead of the
9    high-yield research group; right?
10       A.   Yes.
11       Q.   Both -- both his promotion to MD and
12   his promotion to cohead of high-yield research
13   happened in October of 2013; is that right?
14       A.   I assume that's correct, yes.
15       Q.   Do you know that Mr. Ngo's annual
16   bonus for 2012 was higher than Ms. Burns'?
17       A.   I didn't know -- I don't know that.
18       Q.   Do you know whether Mr. Ngo's bonus
19   for 2013 that was paid in 2014 was higher than
20   Ms. Burns'?
21       A.   I don't know that.
22       Q.   THE ARBITRATOR:  You were not privy to
23   the amount of bonuses paid to the analysts?
24       THE WITNESS:  Research, no.

1198

1
2        THE ARBITRATOR:  By the way, there has
3    been testimony earlier in this proceeding
4    including documentation of a set of written
5    performance evaluations, I believe dated from
6    about 2010, in which apparently sales folks
7    were interviewed about the analysts and how
8    they rated them on a scale of, I don't know,
9    one to five or something or one to three.
10       Do you know whether that procedure was
11   carried out on an annual basis, or was that
12   just a rare event?
13       THE WITNESS:  I think it was -- I
14   don't know for certain.  I think it was a bit
15   more of a rare event.
16       THE ARBITRATOR:  Okay.
17       MR. IADEVAIA:  Did you have any other
18   questions?
19       THE ARBITRATOR:  That's it.
20       MR. IADEVAIA:  Okay.
21   BY MR. IADEVAIA:
22       Q.   You know -- you testified about Lynn
23   Johnson earlier; is that right?
24       A.   Yes.
25       Q.   And she was a salesperson on the

1199

1    high-yield sales desk?
2        A.   Yes.
3        Q.   And she reported to you?
4        A.   Yes.
5        Q.   And she had a -- she took two
6    different leaves of absence due to the birth of
7    children during the period that she reported to you;
8    is that right?
9        A.   Yes.
10       Q.   And during her leaves, you did not
11   communicate -- strike that, actually.
12       During her leaves of absence, she got
13   paid; is that right?
14       A.   Yes.
15       Q.   And during both leaves, Oppenheimer
16   paid her 50 percent of her commissions; is that
17   accurate?
18       A.   Yes.
19       Q.   And she received those commissions
20   based on trades that were completed during her
21   leaves; is that right?
22       A.   Yes.
23       Q.   And following both leaves, Oppenheimer
24   returned Ms. Johnson to her same job that she had

1200

1    pre leave?

2        A.    Yes, this was the plan that we put in

3    place that I helped to construct so that there was

4    continuity in the business while she was out on

5    leave.  So she got a split of her commissions, and

6    it just ensured kind of that there would be

7    consistency the whole way through.  So that was put

8    in place before.

9        Q.    Okay.  And when she got restored to

10   her same job following the leaves, that included

11   getting her accounts back, the ones that she had pre

12   leave; is that right?

13       A.    Yes.  She never lost them.

14       Q.    You testified earlier about the

15   reasons you were told that Mr. Ngo was being let go.

16       Do you recall that testimony?

17       A.    Yes.

18       Q.    And were you -- you were told -- I

19   think your testimony was, and tell me if I'm wrong,

20   that one of the reasons was there was not either

21   equity research coverage or investment banking

22   coverage for Mr. Ngo's sectors?

23       A.    The firm was not covering those

24   sectors any longer.

1201

1        Q.    And they were not covering them from

2    an investment banking perspective?

3        A.    I assume that there was no coverage in

4    investment banking.

5        Q.    And from an equity research

6    perspective?

7        A.    Yes.

8        Q.    Okay.  And to your knowledge, there

9    was never equity and investment coverage --

10   investment banking coverage for the chemical sector

11   during Mr. Ngo's employment; is that right?

12       A.    To my knowledge, there was not.

13       Q.    And there was never, to your

14   knowledge, any equity or -- equity research coverage

15   or investment banking coverage during Mr. Ngo's

16   employment for paper and packaging; is that right?

17       A.    Yes.

18       Q.    And you're not aware of any equity

19   research coverage for mining and metals during

20   Mr. Ngo's employment; is that right?

21       A.    Correct.

22       Q.    After Mr. Ngo was let go, did sales

23   continue to trade on the high-yield desk in the

24   chemical sector?

1202

1        A.    Yes.

2        Q.    And after Mr. Ngo was let go, did

3    high-yield sales continue to trade in mining and

4    metals sector?

5        A.    Yes.

6        Q.    And after Mr. Ngo was let go, did

7    high-yield sales continue to trade in the paper and

8    packaging sector?

9        A.    Yes, I think.  But sales and

10   trading -- trading executes in many industries that

11   we don't cover from a research point of view.

12       Q.    Mr. -- strike that.

13       Oppenheimer never fired any high-yield

14   salespeople for cost-cutting reasons during your

15   time as head of high-yield sales; is that right?

16       A.    At Oppenheimer, correct.

17       Q.    And during your -- strike that.

18       Other than Mr. Ngo, who was allegedly

19   let go for cost-cutting reasons, you're not aware of

20   any high-yield analysts who Oppenheimer fired for

21   purposes of cutting costs?

22       A.    No.  It was a small group, so --

23       Q.    And you would have known if one of the

24   research analysts had been let go for cost-cutting

1203

1    reasons; correct?

2        A.    Correct.  I don't know if any

3    assistants had been let go for cost-cutting.  I'm

4    not sure.

5        Q.    When you say "assistants" -- so

6    anybody at a director level or above, you would have

7    been aware if they had been let go for cost-cutting

8    reasons?

9        A.    Again, we're not talking about a big

10   group, but if there had been an assistant that had

11   been let go because of cost, that could have

12   happened.  I just don't recall specifically.

13       Q.    And the high-yield sales team, you

14   testified they don't receive a salary; is that

15   right?

16       A.    Right.

17       Q.    They're entitled to employee benefits,

18   though; is that correct?

19       A.    Health care?

20       Q.    Yes.

21       A.    Yes.

22       Q.    The firm provided them benefits,

23   health benefits?

24       A.    Yes.

1204

```
1
2       Q.    And other types of employment
3   benefits; is that right?
4       A.    Scant, but, yes.
5            THE ARBITRATOR:  By the way, there's
6   been some testimony earlier about the
7   shrinkage of the number of analysts,
8   high-yield.
9            Other than the replacement of -- I
10  guess it was Mr. Bhandary by Mr. Joshi --
11           THE WITNESS:  Yes.
12           THE ARBITRATOR:  -- were any of these
13  other apparently voluntary departures
14  replaced?
15           THE WITNESS:  Well, we replaced -- we
16  continued to stay in TMT, which you noted.
17  So after Todd left, they hired Umesh, and
18  then Jiten Joshi was hired.
19           After Sean Sneeden left, he was not
20  replaced, but I don't know if that was
21  cost-given or what.  You know, Oppenheimer
22  research is an expense; sales is a
23  production.  So the managing of that expense
24  side of the ledger was Rob Lowenthal.
25           THE ARBITRATOR:  Thank you.
```

1205

```
1
2            MR. IADEVAIA:  I'm all done.
3            MR. GIBSON:  Thank you.  I just have a
4   few questions on redirect.
5            Is it okay if the witness stays here?
6            MR. IADEVAIA:  Sure.
7   REDIRECT EXAMINATION
8   BY MR. GIBSON:
9       Q.    Ms. Ross, you were asked a few
10  questions about Mr. Rahman's desire to take on some
11  supervisory responsibility.
12      A.    Yes.
13      Q.    If I recall, you were not particularly
14  thrilled --
15           MR. GIBSON:  I'm sorry, Judge.  Am I
16  going --
17           THE ARBITRATOR:  It's okay.
18  BY MR. GIBSON:
19      Q.    You were not particularly thrilled
20  with that proposal?
21      A.    That's correct.
22      Q.    And if I recall, you testified on
23  counsel's cross-examination that one of the reasons
24  you weren't thrilled about that proposal was because
25  you felt you had built the sales -- the high-yield
```

1206

```
1   sales desk?
2       A.    That's true.
3       Q.    To your knowledge, did Mr. Ngo build
4   the high-yield research business at Oppenheimer?
5       A.    No.
6       Q.    Do you recall when Mr. Ngo became the
7   cohead of the high-yield research group?
8       A.    Yes.
9       Q.    When was that, approximately?
10      A.    That was in 2013.
11      Q.    And that title was removed, I believe,
12  in June of 2014?
13      A.    Yes.
14      Q.    Would you agree he held that position
15  for less than a year?
16      A.    Yes.
17      Q.    How long were you the head of
18  high-yield sales at Oppenheimer when it was
19  suggested to you that you might share that role with
20  Mr. Rahman?
21      A.    Since its inception in the department
22  in 2007.
23      Q.    You were also asked some questions
24  about your experience with Oppenheimer bidding to
25  keep salespeople away from competitors.
```

1207

```
1
2   keep salespeople away from competitors.
3       A.    Yes.
4       Q.    I think you stated that there wasn't a
5   whole lot of turnover in the sales department?
6       A.    Correct.
7       Q.    Do salespeople at Oppenheimer have any
8   form of guaranteed compensation?
9       A.    No, except if I -- in 2008 and 2009,
10  there were a few instances where I would give a
11  draw, which was against production.  So that would
12  enable a new salesperson a few months to get, you
13  know, some traction under his feet, and then those
14  dollars would be netted against his production.  So
15  I never gave a guarantee.  There was some draw
16  arrangements.
17      Q.    Thank you.
18           And, finally, you were also asked by
19  counsel about your response to Mr. Ngo's July 13,
20  2014, e-mail.
21      A.    Yes.
22      Q.    Do you recall that?
23      A.    Yes.
24      Q.    And counsel asked you if you had
25  stated anywhere in there that Mr. Ngo should
```

1208

1
2    immediately e-mail or contact Mr. Lowenthal?
3         A.    Correct.
4         Q.    And there wasn't any such reference.
5         A.    No.
6         Q.    Did you think it was your job to tell
7    Mr. Ngo how to communicate with his boss?
8         A.    No.
9              MR. GIBSON:  No further questions.
10   Thank you, Ms. Ross.
11             THE ARBITRATOR:  Anything else?
12             MR. IADEVAIA:  No.
13             THE ARBITRATOR:  Thank you.
14        You're free to go.
15             (Luncheon recess from the record.)
16
17
18
19
20
21
22
23
24
25

1209

1
2         A F T E R N O O N   S E S S I O N
3              (1:15 p.m.)
4              MR. GIBSON:  It's Mike Gibson from
5    Satterlee.  How are you?
6              THE WITNESS:  I'm good.
7              MR. GIBSON:  We are -- let me let you
8    know who's in the conference room.  You're on
9    speakerphone.  We're waiting for Mr. Ngo.
10   I'm here with my colleagues.  Mr. Ngo's
11   attorneys are in here.
12             MR. NGO:  Sorry about the hold-up.
13             MR. GIBSON:  And we have Judge
14   Dolinger, who is the arbitrator.  And there's
15   also a court reporter, who will be taking
16   down your testimony.
17        Do you happen to have the share file
18   that John sent you with all the exhibits
19   available to you?
20             THE WITNESS:  I do.  I wasn't able to
21   print it off, but I do have it pulled up on
22   my screen.
23             MR. GIBSON:  Okay.  I am not going to
24   be going through a lot of them.  I think you
25   should be okay electronically.

1210

1
2              THE WITNESS:  Okay.
3              MR. GIBSON:  Are you the only person
4    in your office right now?
5              THE WITNESS:  I am.  But if you give
6    me one second, I just want to shut my office
7    door.  Hold on.
8              MR. GIBSON:  Thank you.
9              THE WITNESS:  Okay.  All good.
10             MR. GIBSON:  Great.
11   JAIME BRIDGES,
12        having been duly sworn by the Arbitrator,
13        was examined and testified as follows:
14   DIRECT EXAMINATION
15   BY MR. GIBSON:
16        Q.    Ms. Bridges, who are you currently
17   employed by?
18        A.    Oppenheimer & Co., Inc.
19        Q.    What is your current job title at
20   Oppenheimer?
21        A.    My current job title is senior
22   director of human resources.
23        Q.    And what Oppenheimer office do you
24   work out of?
25        A.    Troy, Michigan office.

1211

1
2         Q.    When were you first hired by
3    Oppenheimer?
4         A.    December -- sometime in December of
5    1997.
6         Q.    During the period -- I want to focus
7    in on the period of 2014 through 2016.
8         What was your position at Oppenheimer
9    at that time?
10        A.    I was in human resources, and I
11   reported to Lenore Denys.
12        Q.    And before your testimony in this
13   proceeding, did you have a chance to review
14   Mr. Ngo's personnel file with Oppenheimer?
15        A.    Yes, I did.
16        Q.    And in your capacity as an employee in
17   Oppenheimer's human resources department, are you
18   familiar with Oppenheimer's employee policies?
19        A.    Yes.
20        Q.    And where are those policies generally
21   found?
22        A.    Generally found in the employee
23   handbook.
24        Q.    I'd like to just ask you a few
25   questions about that employee handbook.  So if you

1212

1    
2    could open Exhibit 8.
3        A.    Okay.
4        Q.    In fact, I'd just like you to start on
5    page 16 of the employee handbook, which has a little
6    number on the bottom of OPCO 52.
7        A.    Okay.
8        Q.    And do you see the section in the
9    employee handbook titled, "Leaves of Absence"?
10       A.    Yes.
11       Q.    And it states, "In administering our
12   leave policy, Oppenheimer & Co., Inc., will adhere
13   to applicable state, federal and local laws.  Unless
14   required by law, approval of a request for leave of
15   absence is not guaranteed.  In all cases, a prior
16   written request is needed and must be submitted to
17   the human resources department."
18       A.    Uh-huh.  Yes.
19       Q.    Is it your understanding, Ms. Bridges,
20   that there are any Oppenheimer employees outside of
21   the human resources department that can authorize a
22   leave of absence?
23       A.    No.
24       Q.    I'd like you, if you could, to now
25   turn to page 17 of the manual, which says OPCO 53.

1213

1    
2        A.    Okay.
3        Q.    I'm just going to ask you if you
4    recognize that as Oppenheimer's FMLA policy.
5        A.    Yes, it is.
6        Q.    And can you now go forward two pages,
7    to page 19, which is OPCO 55.
8        A.    Yes.
9        Q.    And do you see the section titled,
10   "Request for FMLA Leave"?
11       A.    I do.
12       Q.    And it states that "An employee should
13   request FMLA leave by submitting a written request
14   for such leave to the human resources department."
15       A.    Uh-huh.  Yes.
16       Q.    In reviewing Mr. Ngo's human resources
17   records, did you come across any documents that
18   indicated that Mr. Ngo ever took a leave of absence
19   under the FMLA while he was at Oppenheimer?
20       A.    Yes.
21       Q.    And do you recall when that FMLA leave
22   of absence took place or when it commenced,
23   approximately?
24       A.    August -- August 18th, 2014.
25       Q.    Do you recall why it was that Mr. Ngo

1214

1    
2    took an FMLA leave of absence in August?
3        A.    Yes.  It was a medical condition.
4        Q.    And in reviewing Mr. Ngo's personnel
5    file or human resources file, did you see any
6    documents that suggested to you that Mr. Ngo had
7    taken an FMLA leave of absence before August of
8    2014?
9        A.    No.
10       Q.    And can I ask you to go to
11   Exhibit 112, please.
12       A.    112 -- 112.
13       Q.    It should be a collection of personnel
14   change forms.
15       A.    Yes.  Yes, I've got it.
16       Q.    I think I've already told you, but do
17   you recognize what these documents are?
18       A.    Yes, I am familiar with them.
19       Q.    And these PCN documents, are they
20   maintained by Oppenheimer's human resources
21   department?
22       A.    Yes, they are.
23       Q.    And what are they generally used for?
24       A.    They are used for a lot of different
25   reasons.  Any time an employee has any kind of

1215

1    
2    personnel notice that would need to be changed in
3    the payroll system, this is how the managers of the
4    departments notify us.
5        Q.    And would one of those changes include
6    taking a leave of absence from the firm?
7        A.    Yes.
8        Q.    And let's take a look at the third PCN
9    form, and it's got a number OPCO 04.
10       A.    OPCO 04.  Okay.
11       Q.    And does this appear to be a PCN form
12   for Mr. Ngo?
13       A.    Yes, it is.
14       Q.    And we see that it's got a date in the
15   bottom left corner of August 20, 2014, and then
16   above that an effective date of August 18, 2014?
17       A.    Yes.
18       Q.    What does the "effective date" mean to
19   you?
20       A.    The effective date is the date of the
21   action.  So that is the first day out.
22       Q.    And what does this particular PCN for
23   Mr. Ngo reflect to you?
24       A.    This is the PCN that put him out on a
25   leave of absence.

1216

1     Q.   If you look on the right side of the
2  form, under "Notes and Explanations," it states,
3  "Out on medical disability until further notice."
4     A.   Yes.
5     Q.   And you also see under that it says,
6  "Auto pay canceled."
7     A.   Uh-huh.  Yes.
8     Q.   Do you have an understanding of what
9  that means?
10    A.   Yes.  That's actually our note here in
11  our department, kind of like payroll -- it's just
12  payroll-related.  "Auto pay" just means that we
13  stopped his automatic salary payment.
14    Q.   And in looking at this particular PCN,
15  do you have any understanding as to why Mr. Ngo's
16  auto pay would be canceled effective August 18,
17  2014?
18    A.   Yes, because as of that date, that was
19  his first day out on a medical disability.
20    Q.   If you turn to the prior page of this
21  exhibit, which is OPCO 3.
22    A.   Yes.
23    Q.   And do we see that this one is dated
24  November 10th with an effective date of

1217

1  November 3rd?
2     A.   Yes, it is.
3     Q.   And what does this particular PCN
4  reflect to you?
5     A.   "Reinstate" -- oh, this is his first
6  day back after his medical leave of absence.
7     Q.   And I think you started reading, but
8  if you look at the right side in that same notes and
9  explanations, it states, "Reinstate after medical
10  leave with doctor letter."
11       Do you see that?
12    A.   Yes.
13    Q.   What was the need for a doctor letter?
14       Do you have an understanding as to why
15  that would be there?
16    A.   Well, yes.  That's -- I mean, that's
17  what we require.  If an employee is returning after
18  a medical leave of absence, we would require a
19  doctor's letter to say that they are able to return
20  to work with no restriction.
21    Q.   And with regard to the leave of
22  absence -- with the exception, I should say, of the
23  leave of absence that's reflected in these two PCNs,
24  did you see any other Oppenheimer document that

1218

1  indicated to you that Mr. Ngo had taken any other
2  leaves of absence while at Oppenheimer?
3     A.   No.
4     Q.   If you could go to Exhibit 11G, as in
5  George.
6     A.   What was that?  11 --
7     Q.   11G.
8     A.   Pay stub?
9     Q.   That's correct.  Just give us --
10    A.   Yes, I have that.
11    Q.   Does this appear to be a number of
12  earnings statements for Mr. Ngo?
13    A.   Yes.  Yes, it is.
14    Q.   If we see -- with the exception of the
15  very last one, do we see they all provide for zero
16  dollars in payment?
17    A.   Yes.
18    Q.   And looking at these stubs, would you
19  agree with me that this is the time period between
20  the date on which Mr. Ngo suffered his brain
21  aneurysm and when he returned to work?
22    A.   Yes, it is.
23    Q.   And with the exception of the very
24  last one, all of these appear to have some

1219

1  handwriting on it that state, "LOA."
2       Do you see that?
3     A.   Yes.
4     Q.   What is your understanding as to what
5  "LOA" stands for?
6     A.   Leave of absence.
7     Q.   And let's look at the very last
8  exhibit -- I'm sorry -- very last page of exhibit.
9     A.   Okay.
10    Q.   And on this one, we see that it
11  provides for the payment of compensation?
12    A.   Yes, it does.
13    Q.   And there's also some handwriting on
14  this one that says, "RTW, 11-03-14."
15       Do you have an understanding as to
16  what "RTW" stand for?
17    A.   "RTW" is return to work.
18    Q.   And if I told you Mr. Ngo returned to
19  work on November 3rd, 2014, would that sound about
20  right to you?
21    A.   Yes.
22    Q.   Have you ever spoken to Mr. Ngo in
23  person?
24    A.   No.

1220

1    Q.   Do you recall ever having any e-mail
2  communications directly with Mr. Ngo?
3    A.   No, not that I can recall.
4    Q.   Now, we saw, from the PCNs that we
5  just looked at, that Mr. Ngo was on a leave of
6  absence between August 18, 2014, and November 3,
7  2014.  And I'd like you to please take a look at
8  Exhibit 59.
9    A.   Okay.  E-mail.
10   Q.   Just give us one moment.  We're going
11  through -- you have it electronically.  We're going
12  through large, thick exhibit books.
13   A.   Okay.  Okay.
14   Q.   Do you have that in front of you,
15  Ms. Bridges?
16   A.   Yes.  Just trying to -- I do, yes.
17   Q.   Okay.  And does this -- just to make
18  sure we're on the right document, does this appear
19  to be an e-mail exchange, the top one is from
20  Ms. Decker to yourself and Lenore Denys?
21   A.   Yes.
22   Q.   I'd like to start with the middle
23  e-mail that's from Ms. Denys to yourself and
24  Ms. Decker.

1221

1    A.   Okay.
2    Q.   What department was Ms. Decker
3  employed in at this time?
4    A.   She was in the human resources -- she
5  is in the human resources department.
6    Q.   And this e-mail from Ms. Denys to
7  yourself and Ms. Decker is dated August 18, 2014?
8    A.   Yes.
9    Q.   And is this at or around the time that
10  Mr. Ngo suffered his brain aneurysm?
11   A.   Yes.
12   Q.   And was Ms. Denys your supervisor at
13  this time?
14   A.   Yes.
15   Q.   And in Ms. Denys' e-mail of that day,
16  she states, "Did we know about this?  I know we
17  advised that we do not have a paid paternity leave,
18  but I was not aware that Rob allowed Ngo to do this.
19  Looks like we will have to give him 12 weeks from
20  now" -- I'm sorry -- "12 weeks now for his medical
21  condition since we never had him take leave as of
22  yet."
23       Do you recall receiving that e-mail
24  from Ms. Denys?

1222

1    A.   Now that I'm looking at it, yes.
2    Q.   What did you understand Ms. Denys to
3  be saying in this e-mail?
4    A.   She is saying -- okay.  She's saying
5  that he didn't take the leave, and now that he has a
6  medical condition, we have to give him the 12 weeks
7  starting then.
8    Q.   If Mr. Ngo had been on an FMLA leave
9  for any period of time before August 18th, is it
10  your understanding that, under Oppenheimer's policy,
11  it would have to give him 12 more weeks of FMLA
12  leave?
13   A.   No.  No.
14   Q.   And looking above Ms. Denys' e-mail,
15  do you see a response from Ms. Decker?
16   A.   Yes.
17   Q.   And if you look at the -- it states,
18  "Rob sent you a message back in July in regards to
19  his baby.  You replied back about unpaid FMLA leave.
20  Nothing happened after that.  We never heard from
21  Hoai.  We should put him on FMLA and send him all
22  the std FMLA paperwork."
23       And looking at Ms. Decker's e-mail,
24  Ms. Bridges, I would ask you, is it your

1223

1  understanding that Mr. Ngo was on an FMLA leave
2  before August 18, 2014?
3    A.   No.
4    Q.   I'd like to ask you to turn to
5  Exhibit 70, please.
6    A.   Okay.  Did you say 70?
7    Q.   Yes, 7-0.
8    A.   Okay.
9    Q.   And this appears to be an e-mail
10  exchange between yourself and Ms. Denys.  And this
11  one is from a little later.  This is in October of
12  2014.
13       Do you see that?
14   A.   Yes, I do.
15   Q.   And is it your understanding that this
16  is during the time period that Mr. Ngo was on his
17  FMLA leave recovering from his brain aneurysm?
18   A.   Yes, it is.
19   Q.   And Ms. Denys says to you, "Can you
20  call Rob and let him know FMLA goes until
21  mid November?"
22       Do you see that?
23   A.   Yes.
24   Q.   Would you agree with me, Ms. Denys

1224

1  
2  [Sic], that if you walk back 12 weeks from
3  mid November, that would put you in mid August?
4       A.   Yes, it would.
5       Q.   I'd like you now to go to Exhibit 60,
6  please, 6-0.
7       A.   Okay.
8       Q.   Let me know when you have that ready,
9  Ms. Bridges.
10      A.   Okay.
11           (Pause.)
12      A.   Sorry.  It's not pulling up.  Hold on.
13      Q.   Sure.
14           (Pause.)
15      A.   Okay.  Got it.
16      Q.   And this is another August 18, 2014,
17  e-mail exchange.  I'd like to concentrate on the
18  bottom e-mail.  That is an e-mail from yourself to
19  Robert Lowenthal, William McCabe, Lenore Denys and
20  Kristen Decker.
21           And you state in this e-mail, "Rob,
22  I'm very" -- "I am very" -- I imagine you meant to
23  say, "very sorry to hear about Hoai.  You sent him a
24  letter on July 18th with the FMLA paperwork.
25  Therefore, we would consider his FMLA to have

1225

1  
2  started on the 18th.  His job protection is good
3  until October 10th."
4           Do you see that?
5       A.   Yes, I do.
6       Q.   And my question for you -- my first
7  question for you is, did Oppenheimer ultimately
8  consider Mr. Ngo to have commenced FMLA leave on
9  July 18th, as you suggest in this e-mail?
10      A.   No, we did not.
11      Q.   How do you know that?
12      A.   Because of e-mail from Lenore Denys --
13  it was just -- it was confusing.  I know that we
14  didn't because Lenore had kind of straightened
15  everything out stating that he never took the leave
16  and that we -- and that he was good until
17  mid November.
18      Q.   And, in fact, you say in this e-mail,
19  "His job protection is good until October 10th."
20      A.   Uh-huh.
21      Q.   Do you know when Mr. Ngo returned to
22  the office?
23      A.   November 3rd.
24      Q.   And if you look at the end of your
25  e-mail, it states, "Please send a PCN to put him on

1226

1  
2  leave as of the date of his accident."
3           Do you see that?
4       A.   I do.
5       Q.   And was that the August 18th or
6  August 20th, 2014, PCN that we looked at earlier?
7       A.   Yes.
8       Q.   Have you ever seen a PCN indicating
9  that Mr. Ngo took a leave of absence that was
10  effective as of July 18th?
11      A.   No.
12      Q.   I just want to ask you a couple of
13  questions about Oppenheimer as a company.
14           As an employee in human resources, do
15  you have general knowledge as to Oppenheimer -- how
16  Oppenheimer performs as a firm from year to year?
17      A.   Yes.  It's not my expertise, but we
18  get the annual reports every year.
19      Q.   And we're going to talk about one of
20  those.
21           But, generally speaking, do you recall
22  how Oppenheimer performed as a firm in 2015 and
23  2016?
24           MR. LICUL:  Your Honor, I'm going to
25  object.  I don't think this is her area of

1227

1  
2  expertise.  I think we've gone over this.
3  Probably four other reasons, that I can't
4  think of right now, why we shouldn't spend
5  time on this.
6           MR. GIBSON:  Your Honor, if I can
7  quickly respond to one reason Mr. Licul can
8  recall.
9           First of all, I will tell you this
10  will be very short, and I'm only going to be
11  concentrating on number of employees and
12  layoffs, which is --
13           THE ARBITRATOR:  Human resources.
14           MR. GIBSON:  Exactly.
15           THE ARBITRATOR:  Okay.  The objection
16  is overruled in anticipation of a limited
17  examination on this topic.
18  BY MR. GIBSON:
19      Q.   Okay.  And I think my question,
20  Ms. Bridges, was, do you recall generally how
21  Oppenheimer performed as a company in 2015 and 2016?
22      A.   Yes.  It wasn't all that great.
23      Q.   Do you recall whether that ultimately
24  resulted in some layoffs at Oppenheimer?
25      A.   It did, yes.

1228

1    Q.   I'm going to ask you about just -- one
2  or two questions about one particular annual report,
3  and that's at Exhibit 91.
4    A.   Okay.  I've got that.
5    Q.   Just give everyone here two seconds.
6    A.   Sure.
7        (Pause.)
8    Q.   And I'd like you to please turn to the
9  third page of this annual report, which on the
10 bottom says OPCO 511.
11   A.   Okay.
12   Q.   And do you see a chart at the top that
13 says, "Financial Highlights"?
14   A.   I do.
15   Q.   And if you look at the bottom line
16 item for that chart, do you see a number of
17 employees?
18   A.   Yes.
19   Q.   And do you see across the top it lists
20 years from 2016 to 2012?
21   A.   Yes.
22   Q.   Would you agree with me that from --
23 from 2015 to 2016, the number of Oppenheimer --
24 number of employees at Oppenheimer went down by

1229

1  approximately 200?
2    A.   Yes, it did.
3    Q.   Would you agree with me that from 2012
4  through 2016, the number of employees at Oppenheimer
5  went down by about 400?
6    A.   Yes, it did.
7    Q.   I'd like you to take a look at one
8  more exhibit, I think one more exhibit, which is
9  Exhibit 36, please.
10   A.   Okay.
11   Q.   I'm just going to ask you if you
12 recognize this document.
13   A.   Yes, I do.
14   Q.   And what is this document?
15   A.   This is an Excel document -- or an
16 Excel report that we can pull directly from our
17 payroll system.
18   Q.   What does this particular one reflect
19 to you?
20   A.   This is a termination report that
21 reflects -- looks like from 2014 until the end of
22 2016.  So it was all of the terms [sic] within that
23 time period that were terminated for elimination of
24 position.
25

1230

1
2    Q.   Did you yourself create this document?
3    A.   Yes, I did.
4    Q.   And how would just -- from
5  10,000 feet, how would you have gone about creating
6  this?
7    A.   I just put the criteria of the
8  termination date from -- from one date to another,
9  action, reason for termination, and then a reason
10 code of why they were terminated with -- and kind of
11 shortened it down by elimination of position.
12   Q.   And on that point -- I think you
13 already made this clear, but does this show all
14 employees who were terminated by Oppenheimer for any
15 reason during this time period?
16   A.   No.
17   Q.   What types of terminations does this
18 report address?
19   A.   This is only the people that were laid
20 off, the positions that were eliminated.
21   Q.   How can you tell that this chart deals
22 with position elimination?
23   A.   In Column B for "Reason Code," it's
24 ELI, and I know that that is elimination of
25 position.

1231

1
2    Q.   Okay.  I'm just going to do some math
3  for you, and tell me if you think I'm wrong.
4        Am I correct that this list appears to
5  be chronological?
6    A.   Yes.
7    Q.   And if I told you in 2014 I counted 15
8  position eliminations, by your view of this, does
9  that sound about right?
10   A.   Yes.
11   Q.   If I told you, in counting this, in
12 2015 I counted 32 position eliminations, does that
13 sound about right?
14   A.   Yes.
15   Q.   And if I told you, in counting in this
16 document, in 2016 I counted 71 position
17 eliminations, does that sound about right?
18   A.   Yes, it does.
19   Q.   Would you agree with me that from this
20 chart, position eliminations more or less doubled
21 from year to year from 2014 to 2016?
22   A.   Yes.
23   Q.   In addition to layoffs, did
24 Oppenheimer's financial status in 2015 and 2016 have
25 any effect on employee compensation?

1232

1    A.   It did, yes.
2    Q.   What do you recall about that,
3  generally?
4    A.   What I remember is that -- or there
5  was no raises going through, so there was no pay
6  increases, as well as our bonuses were down from
7  year to year.
8    MR. GIBSON:  Thank you very much,
9  Ms. Bridges.  I have no further questions.
10  CROSS-EXAMINATION
11  BY MR. LICUL:
12   Q.   Good afternoon, Ms. Bridges.  This is
13  Valdi Licul.  I represent Mr. Ngo.  I'm going to be
14  asking you a couple of questions.  Please let me
15  know if you can't hear me.
16     Take a look at Exhibit 60, which is an
17  exhibit you were just asked to take a look at.  And
18  I'm going to draw your attention to your e-mail at
19  the bottom.
20     MR. GIBSON:  Do you have -- she has to
21  open another one.
22     Do you have that open, Jaime?
23     THE WITNESS:  Hold on.  I'm getting it
24  right now.

1233

2     (Pause.)
3     THE WITNESS:  Okay.  I have that.
4  BY MR. LICUL:
5    Q.   So you wrote the first line -- or,
6  actually, the second line, you say, "You sent him a
7  letter on July 18th with the FMLA paperwork.
8  Therefore, we would consider his FMLA leave to have
9  started on the 18th"; correct?
10     That was your e-mail; right?
11   A.   Yes.
12   Q.   So as of that date, you considered
13  Mr. Ngo to be on FMLA leave as of that time?
14   A.   Well, without -- I mean, the first
15  e-mail, sure.
16   Q.   Yes.
17     Because you knew that Mr. Lowenthal
18  had sent Mr. Ngo FMLA paperwork; correct?
19   A.   I did know that, yeah.
20   Q.   And so you would have considered him
21  to be on leave even though Mr. Ngo had not yet
22  returned that paperwork; correct?
23   A.   Possibly, yes.
24   Q.   And it is the case often that an
25  employee will start their FMLA before actually

1234

1
2  submitting the paperwork; correct?
3    A.   They do have a time frame.  It's
4  possible, if they requested the leave like
5  unexpectedly or -- what am I trying to say -- under
6  like certain circumstances where they couldn't
7  request the leave earlier than actually going out.
8    Q.   And there are cases where employees
9  have gone on family medical leave for the birth of a
10  child where that employee has submitted the
11  paperwork after he or she has gone out on leave;
12  correct?
13   A.   Not offhand.  It's usually returned
14  ahead of time, but I can't speak of -- I don't know
15  because I don't know everybody who's returned
16  paperwork.
17   Q.   Do you recall any instance where you
18  told an employee that he or she was not entitled to
19  FMLA because they returned the paperwork too late?
20   A.   I believe we have.  I don't have a
21  specific example, but I know that we have sent
22  letters to deny their leave, sure.
23   Q.   Have you sent letters to deny the
24  leave or to remind them to submit the paperwork or
25  their leave will be denied?

1235

2    A.   I'm not sure.
3    Q.   Do you recall sending a letter to
4  Mr. Ngo in this case after July 18th telling him
5  that if he did not submit the paperwork, his leave
6  would be denied?
7    A.   I do not know if we sent a letter, no.
8    Q.   Would that be in his benefits file?
9  If that letter existed, would that be in his HR file
10  or his benefits file?
11   A.   No, it would not be in his HR file.
12   Q.   Would it be in his benefits file?
13   A.   Probably not.  We usually keep the
14  FMLA -- all that paperwork separate.
15   Q.   I see.
16     There's a separate FMLA file?
17   A.   Yes.
18   Q.   I want to refer your attention to the
19  July 18th letter that you referred to in that second
20  line.
21     That's the letter that Mr. Lowenthal
22  sent to Mr. Ngo; correct?
23   A.   Yes.  I'm looking at the
24  letter -- yes, Mr. Lowenthal sent that.
25   Q.   You've seen that letter; right?

1236

1    
2    A.    Yes.
3    Q.    Can you take a look at Exhibit 45,
4    please.
5          (Pause.)
6    Q.    Let me know when you get there.
7    A.    45.  Is that -- that's an e-mail?
8    Q.    It's an e-mail, yes, from
9    Mr. Lowenthal to Mr. Ngo.  And the second page of
10   that is a letter dated July 18th.
11   A.    Okay.
12   Q.    Are you there?
13   A.    Yes, I'm on the e-mail -- oh, there it
14   is.  Yes.
15   Q.    Are you at the letter?
16   A.    I am, yes.
17   Q.    Is that the letter you were referring
18   to in your -- in your e-mail that we just went over?
19   A.    Yes.
20   Q.    And do you see there where
21   Mr. Lowenthal repeatedly uses the word "leave" with
22   respect to Mr. Ngo being out of the office?
23   A.    No.  What are you referring to?
24   Q.    Let me try to do this.
25         So take a look -- the first page of

1237

1    
2    Exhibit 45 should have a Bates number at the bottom
3    of 1406, the last four digits.
4          Do you see that?
5    A.    Yes.
6    Q.    Now, flip the page.
7    A.    Yes.
8    Q.    Do you see a Bates No. 1407?
9          Do you see that?
10   A.    Yes, I do.
11   Q.    And it's dated July 18, 2014, and it
12   starts, "Dear Hoai."
13         Do you see that?
14   A.    Yes.  I have the letter.
15   Q.    And it says, "Congratulations on the
16   arrival of your new baby."
17         That's the first sentence; correct?
18   A.    Yes.
19   Q.    And then beginning of the second
20   paragraph is, "I need to take the opportunity now to
21   clarify the details regarding your leave from
22   Oppenheimer and your return."
23         Do you see that?
24   A.    I do.
25   Q.    So Mr. Lowenthal uses the word "leave"

1238

1    
2    there; correct?
3    A.    Uh-huh.
4    Q.    And is that a yes?
5    A.    Yes, it is.
6    Q.    I'm sorry.  We have a court reporter.
7    You just have to say yes or no.
8    A.    Sorry.
9    Q.    That's okay.
10         I'm not going to read the rest of the
11   letter, but he uses the word "leave" a number of
12   other times in that letter; correct?
13   A.    Yes.  I do see it a couple of times,
14   yes.
15   Q.    But more than a couple; right?
16   A.    Uh-huh.
17   Q.    Yes?  Is that a yes?
18   A.    I'm sorry.  I'm trying to read
19   through.  I see two.  Do you want me to --
20   Q.    Why don't you take your time, read the
21   letter, and then let me know when you're done.
22         (Pause.)
23   A.    It is referenced here, from what I
24   see, like four times.
25   Q.    There's also reference to "time off";

1239

1    
2    correct?
3    A.    Yes.
4    Q.    That letter makes it clear that the
5    leave and the time off is related to the arrival of
6    a new baby; is that right?
7    A.    Well, this letter is directly -- this
8    is not from the human resources department.  So I'm
9    not sure what Rob was considering a leave.
10   Q.    Okay.  I understand.
11         But he does use that phrase,
12   correct -- that term?
13   A.    He is using that phrase, yes.
14   Q.    On July -- you eventually saw that
15   letter, correct, on or about August 18th; is that
16   right?
17   A.    I'm not sure when I saw this letter.
18   Q.    You saw it before you wrote your
19   e-mail, which is Exhibit 60; correct?
20   A.    Yes.
21   Q.    Right.
22         Because you reference this
23   July 18th letter --
24   A.    Sure.  Yes.
25   Q.    I just want to make sure I get my

1240

1    question out.
2
3           You reference your July 18th -- this
4    July 18th letter in that e-mail; correct?
5       A.   That's correct.
6       Q.   Do you know -- did you or did anyone
7    else at Oppenheimer send Mr. Ngo a letter or an
8    e-mail telling him and making it clear to him that
9    the leave that Mr. Lowenthal referenced here was not
10   FMLA leave?
11      A.   Not that I'm aware of, no.
12      Q.   And if it existed, you would be aware
13   of it; correct?
14      A.   If it had come from my department,
15   yes.
16      Q.   And that's the human resources
17   department?
18      A.   Yes.
19      Q.   And would a letter like that come from
20   any other department?
21      A.   No, it wouldn't.
22      Q.   Okay.  Can you turn to Exhibit 11G.
23   Those are the pay stubs that you were asked about
24   earlier.
25      A.   Okay.

1241

1
2       Q.   Are you there?
3       A.   Yes, I'm there.
4       Q.   The handwriting "LOA" you said stands
5    for leave of absence; is that right?
6       A.   Yes.
7       Q.   Now, the handwriting was not on the
8    pay stubs given to Mr. Ngo; is that right?
9       A.   That's correct -- oh, I don't know.  I
10   don't know.
11      Q.   It would be unusual for him to get a
12   pay stub with handwriting on it; right?
13      A.   Probably, yes.
14      Q.   You don't hand out pay stubs with
15   handwriting on them, do you?
16      A.   We don't typically hand out pay stubs.
17      Q.   You deliver them by mail or some other
18   way?
19      A.   Well, they're -- the employees -- it's
20   their responsibility to pull them off of the ADP
21   system.
22      Q.   Okay.  And that would not have any
23   handwriting; correct?
24      A.   No, it would not.
25      Q.   You don't know when this LOA was added

1242

1    to the pay stubs; correct?
2       A.   No, I don't know when.
3       Q.   And you don't know who did it; right?
4       A.   Not by the handwriting, no.
5       Q.   If an employee at Oppenheimer is fired
6    or their job is terminated for performance, would
7    that be reflected in a PCN?
8       A.   Yes, it would.
9           MR. LICUL:  I have no other questions.
10   REDIRECT EXAMINATION
11   BY MR. GIBSON:
12      Q.   I just have one question on redirect,
13   Ms. Bridges.
14          Can you go back to Mr. Lowenthal's
15   letter, which was Exhibit 45.
16      A.   Yes, I have that.
17      Q.   And I think Mr. Licul asked you if
18   Oppenheimer --
19          MR. GIBSON:  I'm sorry, Judge.
20          THE ARBITRATOR:  It's okay.
21          MR. GIBSON:  You've seen it enough by
22   now.
23   BY MR. GIBSON:
24      Q.   I believe Mr. Licul asked you if you

1243

1
2    had seen any letters in Mr. Ngo's file indicating
3    that Oppenheimer had advised him that he did not
4    qualify for FMLA leave or was denied a request for
5    FMLA leave.
6           Do you remember that question or
7    questions?
8       A.   Yes.
9       Q.   And you said that you didn't see any?
10      A.   Correct.
11      Q.   I'd like you to look at the very next
12   page, the attachment to this letter.
13      A.   Okay.
14      Q.   And do you see there are a number of
15   check boxes?  I believe there's four of them.
16      A.   Yes.
17      Q.   And do you see underneath the last one
18   where it says, "FMLA provides up to 12 weeks of
19   unpaid job-protected leave.  You are required to
20   fill out FMLA material" and "are required" is
21   underlined?
22      A.   Yes.
23      Q.   And the "FMLA material" that's
24   referred to there, is that the rest of the documents
25   that's behind this particular form?

1244

1     A.   Yes.
2     Q.   Do you ever recall receiving that
3  material from Mr. Ngo in connection with his time
4  out of the office for the birth of this child?
5     A.   We never -- no, we did not.
6     MR. GIBSON:  Thank you very much.
7     MR. LICUL:  No questions.
8     THE ARBITRATOR:  Okay.
9     Thank you, Ms. Bridges.  You're free
10 to hang up.
11    MR. GIBSON:  Thank you, Jane.
12    THE WITNESS:  You're welcome.
13    MR. GIBSON:  Take two minutes before
14 you call Hoai?
15    MR. LICUL:  Sure.
16    MR. GIBSON:  We're requesting.
17    THE ARBITRATOR:  Okay.
18    (Recess from the record.)
19 HOAI NGO,
20    having been previously sworn, resumed the
21    stand and testified further as follows:
22 REBUTTAL EXAMINATION
23 BY MR. IADEVAIA:
24    Q.   Mr. Ngo, do you recall Mr. Lowenthal's

1245

1  testimony yesterday about the alleged declining
2  importance of your sectors while you worked at
3  Oppenheimer?
4     A.   Yes, I do.
5     Q.   And is that -- was that testimony that
6  your sectors were on the decline accurate?
7     A.   No, it was not.  On a trading
8  perspective, no.
9     Q.   What's that?
10    A.   No, it was not.
11    Q.   How do you know that?
12    A.   You can take -- you can take a
13 benchmark measure of the Barclays high-yield index
14 and calculate it.
15    Q.   What do you mean, "a benchmark measure
16 of the Barclays high-yield index"?
17    A.   When Rob is talking about -- the
18 Barclay -- US Barclays, there's a measurement that's
19 called the Bloomberg US Barclays high-yield index.
20 And it measures all the total outstanding bonds
21 outstanding in the high-yield sector, and it also
22 sorts it by sector.
23    Q.   So it reflects all of the high-yield
24 bonds in high-yield, right, all bonds in high-yield?

1246

1  And then you said it breaks it out -- it can break
2  it out by industry sector?
3     A.   Yes, I believe there were over 2200
4  companies in that index, and it's divided by 70
5  sectors.
6     Q.   All right.  And when did you look at
7  this data?
8     A.   Last night.
9     Q.   And what -- strike that.
10    Are you able to look up the data as of
11 a certain date?
12    A.   Yes.  You can go in your Bloomberg
13 terminal and you can sort it by date as well, sector
14 and date.
15    Q.   And which date did you look at when
16 you reviewed the data?
17    A.   I ran it as of -- the index as of
18 June 30th, 2016.
19    Q.   And that was the date that you were
20 notified and actually lost your job at Oppenheimer?
21    A.   That is correct.
22    Q.   Did you look at specific sectors in
23 reviewing this data?
24    A.   Yes, I did.

1247

1     Q.   And which sector or sectors?
2     A.   I sorted it by the 70 sectors.  And
3  you can see it in ranking order which sector had the
4  biggest weighting by market cap, based on market
5  cap.
6     Q.   And --
7     THE ARBITRATOR:  What does that mean?
8     THE WITNESS:  Sorry.  It's a technical
9  thing.  The way the index works is when they
10 do the sector weighting, they will take it --
11 they do the sector weighting by market cap of
12 the bond, meaning if a bond is trading at par
13 and you have -- and they say like the index
14 for, say, chemicals is 80 billion, right,
15 those trading at par, then that weight is
16 80 billion.
17    So there's no -- if it was trading at
18 a discount, like, say, 96 cents on the
19 dollar, it would discount it by about
20 4 percent.  So the weighting is based on a
21 market base weighting of what the bonds trade
22 at today.  So it's a current valuation of the
23 sector.
24    THE ARBITRATOR:  It's a measurement

1248

1 
2 then of what the bond -- current market price
3 of these bonds will be?
4     THE WITNESS:  Exactly.  So what it
5 measures is that -- you have 2200 companies,
6 all the companies.  And they'll sort it by
7 sectors and then say which sector has the
8 most significance.  It will just tell you
9 which is the highest sector by volume, and it
10 will give you an exact percent.
11     THE ARBITRATOR:  So it's a measure
12 then of volume or of comparative price versus
13 the par value?
14     THE WITNESS:  You can look -- both.
15 It's both.  But when it sorts out the market
16 percent, it will sort it by -- to give you
17 more accurate data representation, sorts it
18 by market value.  So it's very current as of
19 that date.
20 BY MR. IADEVAIA:
21     Q.   Were you able to -- and you said that
22 you looked at the data as of June 30th, 2016?
23     A.   That is correct.
24     Q.   And one of the -- one of your sectors,
25 at the time you were let go at Oppenheimer, was

1249

1 
2 mining and metals; is that right?
3     A.   Metals and mining, yes.
4     Q.   Metals and mining.
5         And what did the data you looked at
6 say about minings and metals?
7     A.   The data said, as of June 30th, 2016,
8 that metals and mining was one of the top five
9 sectors by market cap-based weighting.
10     THE ARBITRATOR:  Does that mean it's
11 measured by volume of the trade or as
12 measured by current price versus par value or
13 something else?
14     THE WITNESS:  It just tells you how
15 many -- so it tells you what percent of bonds
16 outstanding.  So -- and it bases it on a
17 market cap, but -- the current market cap.
18 So basically a simple way to look at it is
19 that it tells you that -- the index will say
20 there are a hundred -- 80 billion bonds from
21 this sector, a hundred billion bonds from
22 this sector, and then it adds all the sectors
23 together and then you get a percent by
24 sector.
25     THE ARBITRATOR:  I see.  So then it's

1250

1 
2 comparing percentages.
3     THE WITNESS:  No, it's just getting a
4 market weight, so --
5     THE ARBITRATOR:  If one sector, let's
6 say, has 3 percent of the market, is that
7 what it's telling you?
8     THE WITNESS:  That's what it tells
9 you.
10     THE ARBITRATOR:  Another sector has
11 5 percent, that means presumably the sector
12 with 5 percent is in some way -- has a higher
13 weight or significance?
14     THE WITNESS:  Relative to sales and
15 trading -- this is what Rob was referring to
16 yesterday.  He referred to TRACE data, and
17 that's basically a term for trading.  So he's
18 saying basically the importance of my sectors
19 was based upon trading, right.  Jane talked
20 about P&L.  It was based on trading.
21     So one way to measure what's important
22 to the sales force is to see how many bonds
23 are outstanding in a sector.  So like, say,
24 if you have a big sector, you want to cover
25 that sector because there's a lot of

1251

1 
2 possibilities for trading because there's X
3 amount of bonds available for sale and
4 trading.
5     THE ARBITRATOR:  If that's the
6 concern, though, would a measure not of the
7 total current market value of a particular
8 bond, but rather a measure of the volume of
9 trading be significant?
10     THE WITNESS:  But we don't have
11 that -- I don't have -- there's no way to see
12 the TRACE data for all these bonds.  It would
13 be very massive.  That's secondary thing.
14     This is saying -- this is what -- this
15 US Barclays high-yield index is what
16 salespeople use -- what Jane would use to
17 determine what sectors to focus on.  Because
18 you can see how many -- it's an easy way to
19 say, hey, let's focus on this second because
20 this accounts for X percent of the index,
21 right.
22     And you presumably want to get the
23 higher percentage sectors because there's
24 more optionality to trade bonds in that
25 sector.  So you want the higher bond sector.

1252

1       
2       Plus you also want to see what's more
3       volatile too because there may be more
4       trading.  But the volatility, you're not
5       going to get data that implies that.  It's
6       just a sense of when you see things trade,
7       right.
8  BY MR. IADEVAIA:
9       Q.   I'm sorry.  I think you testified to
10  this, but what did you see in terms of the data
11  from -- what is it, metals and mining?
12      A.   Sure.  Metals and mining is one of the
13  top five sectors by weighting in the high-yield
14  index.
15      Q.   And did you look at the data for any
16  other sectors?
17      A.   Yes.
18      Q.   And what other sectors did you look
19  at?
20      A.   Well, the weighting for metals and
21  mining I believe is about 5.2 percent; is that
22  correct?  Are you asking -- repeat the question.
23      Q.   I was asking -- you said it was the
24  fourth ranked.
25           What percentage was that?

1253

1
2           THE ARBITRATOR:  I think he said the
3       top five.
4           MR. IADEVAIA:  The top five.  I'm
5       sorry.
6           THE WITNESS:  Top five.  It's ranked
7       number 4 and accounts for about 5.2 percent
8       of the index.  And the highest -- I think the
9       highest is 6.5.  So I think -- just so you
10      know relative to what the highest is, is
11      metals and mining's number 4, and it ranks
12      5.2 percent of the index.
13  BY MR. IADEVAIA:
14      Q.   What other sector did you look at?
15      A.   I looked at retail and consumer.
16      Q.   And what did the data say about retail
17  and consumer?
18      A.   The data said that the retail and
19  consumer only accounts for about 2.5 percent of the
20  high-yield index.
21      Q.   And where did that rank, do you
22  recall, in terms of the number?
23      A.   It was not in the top ten.
24      Q.   And at the time that you left
25  Oppenheimer, who covered the retail sector?

1254

1
2       A.   Colleen Burns.
3       Q.   To your knowledge, does Ms. Burns
4  cover any other sectors other than the retail
5  sector?
6       A.   No.
7       Q.   You covered other sectors, at the time
8  you were let go, in addition to mining and metals;
9  right?
10      A.   Yes.
11      Q.   I keep getting them --
12      A.   It's okay.  It's very consistent.
13      Q.   And what were the other sectors you
14  covered?
15      A.   I also covered chemicals, and I also
16  covered paper and packaging.
17      Q.   So what did the data you looked at say
18  about chemicals?
19      A.   The data said that chemicals accounted
20  for 2.2 percent of the high-yield index.
21      Q.   And what did the data say about paper
22  and packaging?
23      A.   The data called paper and -- it didn't
24  call it paper and packaging.  I think it called it
25  containers and packaging, which is paper and

1255

1
2  packaging.
3           And I believe it weighted it at
4  2.7 percent of the high-yield index.
5       Q.   And those were your core sectors at
6  the time you were let go; is that right?
7       A.   That is correct.
8       Q.   So it was mining and metals,
9  chemicals, and paper and packaging; right?
10      A.   Three sectors, that is correct.
11      Q.   And what was the total percentage
12  according to the data you looked at?
13      A.   It would be 5.2 percent for metals and
14  mining, plus the 2.2 for the chemicals, and another
15  2.7.  So I think it's in excess of -- a little over
16  10 percent of the index.
17      Q.   Did anyone at Oppenheimer tell you
18  that they were getting out of the high-yield
19  chemical business?
20      A.   No.
21      Q.   That they were not going to -- no
22  longer trade high-yield chemicals?
23      A.   No.
24      Q.   And did anyone at Oppenheimer ever
25  tell you that Oppenheimer was no longer going to

1256

1
2  trade high-yield paper and packaging bonds?
3      A.   No.
4      Q.   Did anyone ever tell you that
5  Oppenheimer was no longer going to trade metals and
6  mining bonds?
7      A.   No.
8          MR. IADEVAIA:  I don't have anything
9      further.
10         MR. GIBSON:  I just have -- do you
11     want -- I don't need any exhibits.  Do you
12     want to have Mr. Ngo back on --
13         MR. LICUL:  No.
14  SURREBUTTAL EXAMINATION
15  BY MR. GIBSON:
16     Q.   A few questions, Mr. Ngo.
17          You heard Mr. Lowenthal testify
18  yesterday that in 2016, Oppenheimer, in words or
19  substance, was exiting the chemicals, and paper, and
20  metals and mining sectors?
21     A.   Yes, I heard him say that.
22     Q.   Did you think he was lying?
23     A.   Yes.  Well, let me clarify.
24     Q.   Please.
25     A.   No, I did think he was lying.

1257

1
2      Q.   Okay.  Did you hear Mr. Lowenthal,
3  Ms. Ross and Ms. Burns testify that Oppenheimer has
4  not hired one single research analyst to cover any
5  of those sectors since you were terminated nearly
6  three years ago?
7          Did you hear that testimony?
8      A.   That is correct.
9      Q.   Do you think all three of them are
10  lying?
11     A.   About the hiring?
12     Q.   That Oppenheimer hasn't hired any
13  research analyst --
14     A.   No, I don't think they're lying about
15  that.
16     Q.   Now, in your core sectors, the three
17  we've talked about several times, would you view
18  yourself an experienced research analyst in those
19  sectors?
20     A.   Yes.
21     Q.   And I think you referred to yourself
22  several times as the best athlete?
23     A.   I didn't -- I didn't say that about
24  myself.  I just -- well, I think they did consider
25  me a best athlete, yes.

1258

1
2      Q.   Isn't it true that since you were
3  terminated by Oppenheimer, you were not offered one
4  job position covering any of those sectors as a
5  high-yield research analyst?
6      A.   That's correct.  But I interviewed for
7  those sectors, yes.
8      Q.   You were not offered any jobs for
9  those; correct?
10     A.   That's correct.
11     Q.   Last thing I wanted to -- I just want
12  to nail down a timeline, if I can.
13          So if I recall correctly -- I'm going
14  back to your conversation with Ms. Ross in May of
15  2014.
16     A.   Okay.
17     Q.   If I recall, in that conversation,
18  that was the first time that you felt Ms. Ross was
19  attempting to dissuade you from taking an FMLA leave
20  or the full 12 weeks of FMLA leave?
21     A.   That's correct.
22     Q.   And then you left the office on
23  June 20th of 2014; correct?
24     A.   That is correct.
25     Q.   And you would agree with me, sir, that

1259

1
2  when you left the office on June 20th, 2014, that
3  you were not on an FMLA leave at that time?
4      A.   That is correct.
5      Q.   And when you left the office on
6  June 20th, 2014, wasn't it your expectation that you
7  were going to be working remotely for a month?
8      A.   No.
9      Q.   Are you sure about that?
10     A.   Yes.
11         MR. GIBSON:  I'd like to add an
12     exhibit, if I can.  Last one.  This is from
13     that last mass e-mail.
14         THE ARBITRATOR:  I think we're up to
15     138?
16         (Pause.)
17         THE ARBITRATOR:  No, 139.
18         MR. GIBSON:  Thank you.
19  BY MR. GIBSON:
20     Q.   Mr. Ngo, take your time and let me
21  know when you've had a chance to review this.
22         (Pause.)
23     A.   Okay.
24     Q.   Mr. Ngo, I'd just like to concentrate
25  on one particular e-mail.

1260

1    THE ARBITRATOR:  Before you do that,
2  is there any objection to receiving
3  Exhibit 139?
4    MR. IADEVAIA:  No objection.
5    THE ARBITRATOR:  Exhibit 139 is
6  received.
7    MR. GIBSON:  Thank you, Judge.
8  BY MR. GIBSON:
9    Q.   Mr. Ngo, I'd just like to ask you
10  about the bottom e-mail in this chain.
11    And we see that that is an e-mail from
12  your Oppenheimer e-mail address?
13    A.   That is correct.
14    Q.   And it's so an individual.
15    Am I correct it's Katia Ngo?  Katia?
16    A.   Yes.  Katia, yes.  It's very hard.
17    Q.   And this e-mail is dated Friday,
18  June 20th, 2014; correct, sir?
19    A.   That's correct.
20    Q.   And that's the day that you left for
21  the birth of your child?
22    A.   That is correct.
23    Q.   And if you would turn to the third
24  page of the document.

1261

1
2    A.   Yes.  I'm on that page.
3    Q.   And you see at the top it says, "Also,
4  I will be working from California for the next
5  month"?
6    A.   That is correct.
7    MR. GIBSON:  Thank you.
8  I have no further questions.
9    THE WITNESS:  Can I explain the
10  context of that e-mail?
11    MR. IADEVAIA:  We're going to ask you.
12    (Discussion off the record.)
13    THE WITNESS:  I don't know the
14  procedure.  I'm like this is a little taken
15  out of context.
16  SUR-SURREBUTTAL EXAMINATION
17  BY MR. IADEVAIA:
18    Q.   So June 20th was the time -- around
19  the time you left to go to California for the birth
20  of your baby; correct?
21    A.   That is correct.
22    Q.   And your plan was that you would work
23  remotely up until the time the baby was born; is
24  that right?
25    A.   That is correct.

1262

1
2    Q.   And June 20th was -- obviously it was
3  before your baby was born.
4    A.   That is correct.
5    Q.   Okay.  And you had a due date.
6    And when was that due date?
7    A.   Sometime in July.
8    Q.   You know that, with due dates,
9  sometimes babies come early and sometimes babies
10  come late?
11    A.   That is correct.
12    Q.   And, in fact, your baby did end up
13  coming early; is that right?
14    A.   That's correct.
15    Q.   And so at the time that you wrote
16  this, it is possible that your baby would not have
17  been born as of, you know, 30 days from June 20th;
18  is that right?
19    A.   That is correct.
20    Remember, this was a personal e-mail.
21  I was doing my sister-in-law a favor, so it was just
22  telling her attorney that you -- don't e-mail me at
23  this address and to e-mail to my other address.
24    Q.   So Katia is, I'm sorry, who?
25    A.   So this e-mail chain is a personal

1263

1
2  e-mail between my sister-in-law, who was going
3  through a divorce, and her attorney.  She asked me
4  to review some of her financial stuff, and so I
5  basically saying to her attorney, don't e-mail me at
6  work, e-mail me in the next month at my e-mail
7  address there.
8    Q.   Did you mean to say to her that you
9  would be working for the next month --
10    A.   I'm saying it wasn't -- I was not
11  working.  This was a personal thing.  I was just
12  basically telling her that I won't be in this office
13  in the next month, so e-mail me at my Gmail account.
14    MR. IADEVAIA:  Okay.  No further
15  questions.
16    THE ARBITRATOR:  Okay.
17    MR. GIBSON:  No further questions.
18    (Pause.)
19    THE ARBITRATOR:  The next order of
20  business.
21    MR. LICUL:  I understand that the
22  transcript will be ready in about ten days.
23  The question then is both the timing and the
24  order of post-hearing briefing.  I'm happy to
25  hear from the parties about their views on

1264

1 that.

2     MR. GIBSON:  The one thing I would

3 ask -- and I am certainly not looking to drag

4 this thing out any longer than it has.  I

5 know you both have a busy schedule coming up

6 also.  I have a hearing on the West Coast in

7 two weeks for three days.  Considering that

8 it's going to be ten days for the transcript,

9 does 30 days sounds like too much to do --

10     MR. LICUL:  For simultaneously

11 briefing?

12     MR. GIBSON:  For simultaneously

13 briefing.

14     MR. LICUL:  That's fine.

15     THE ARBITRATOR:  Thirty days from

16 today?

17     MR. GIBSON:  Does your Honor have --

18 I'm open to anything.  Do you want to set a

19 page limit or --

20     THE ARBITRATOR:  I would be the last

21 one, I think, to set a page limit based on my

22 prior habits in writing -- so I will not play

23 the hypocrite here.

24     MR. GIBSON:  Okay.

1265

1     THE ARBITRATOR:  We are today, what,

2 7th?

3     MR. LICUL:  Yes.  So April 4th is four

4 weeks, which is a Thursday.  Do we want to

5 just make it that Friday because it's a

6 Friday?

7     MR. GIBSON:  Good for me.

8     THE ARBITRATOR:  Sounds fine to me.

9 April 5.

10     MR. GIBSON:  Good reading for the

11 weekend.

12     THE ARBITRATOR:  Then I presume --

13 there generally is a desire to have an option

14 for reply briefs.

15     MR. LICUL:  Yes.

16     THE ARBITRATOR:  One week from then?

17     MR. LICUL:  That's fine.

18     THE ARBITRATOR:  April 12.

19     MR. GIBSON:  Sure.

20     THE ARBITRATOR:  And let's see, I have

21 your list of designations for the depositions

22 of Ms. Ross and Mr. Lowenthal.  Are there any

23 other items that we should address at this

24 point?

1266

1     MR. LICUL:  No.  I think everything

2 has been decided or will be briefed.

3     THE ARBITRATOR:  Okay.

4     MR. GIBSON:  As far as -- just to

5 clarify, all exhibits are entered with the

6 exception of the news articles; correct?

7     MR. LICUL:  Correct.

8     MR. GIBSON:  We stipulated to

9 everything.

10     MR. LICUL:  Correct.

11     MR. IADEVAIA:  There's actually one

12 issue, which is the damages charts that we

13 had submitted, 1A, 1B and 1C, they cite to

14 Bates number.  And we thought it would be

15 easier for you, Judge, if they cited to

16 exhibit numbers.

17     THE ARBITRATOR:  That seems sensible,

18 yes.

19     MR. IADEVAIA:  Do you have any

20 objection to that?

21     MR. GIBSON:  The numbers are the same;

22 right?

23     MR. IADEVAIA:  Nothing changed.  The

24 data stayed the same and the cites stayed the

1267

1 same.  It's just --

2     MR. GIBSON:  Because every analysis I

3 get gets higher and higher.  I just want to

4 make sure it's not happening again.

5     (Discussion off the record.)

6     MR. IADEVAIA:  So, look, if you're

7 looking at that, you see something, don't

8 hesitate to ask us.

9     MR. GIBSON:  As long as you don't

10 change the exhibits, I certainly have no

11 issue.

12     THE ARBITRATOR:  This is Exhibit 1

13 again.

14     MR. IADEVAIA:  Yes, 1A through 1C.

15     THE ARBITRATOR:  Okay.  Okay.

16 Thank you all very much.

17     MR. LICUL:  Thank you, Judge.  It's

18 been a pleasure.

19     MR. GIBSON:  Thank you so much, Judge.

20 We appreciate your time.

21     THE ARBITRATOR:  My pleasure.

22     (Whereupon the arbitration concluded.

23 The time is 2:22 p.m.)

1268

1
2              C E R T I F I C A T E
3
4    STATE OF NEW YORK  )
5                  ss:
6    COUNTY OF NEW YORK )
7
8         I, Eileen Mulvenna, CSR/RMR/CRR, and
9    Notary Public within and for the State of New York,
10   do hereby certify that the foregoing proceedings
11   were taken before me on March 7, 2019;
12        That the within transcript is a true
13   record of said proceedings;
14        That I am not connected by blood or
15   marriage with any of the parties herein nor
16   interested directly or indirectly in the matter
17   in controversy, nor am I in the employ of any
18   of the counsel.
19        IN WITNESS WHEREOF, I have hereunto  set my
20   hand this 19th day of March, 2019.
21        _____
22            Eileen Mulvenna, CSR/RMR/CRR
23
24
25

'

**'15** [1] - 1195:22
**'16** [1] - 1195:23
**'90s** [1] - 1165:24
**'handle** [1] - 1189:12
**'not** [1] - 1165:5

## 0

**04** [2] - 1215:9, 1215:10

## 1

**1** [1] - 1267:13
**10** [2] - 1112:18, 1255:16
**10,000** [1] - 1230:5
**10017** [1] - 1081:7
**102** [1] - 1112:17
**1084** [1] - 1083:6
**1091** [1] - 1083:7
**10th** [3] - 1216:25, 1225:3, 1225:19
**11** [2] - 1157:20, 1218:7
**11-03-14** [1] - 1219:15
**110** [3] - 1112:12, 1112:19, 1112:22
**1102** [1] - 1083:8
**1104** [1] - 1083:10
**112** [3] - 1214:11, 1214:12
**113** [1] - 1085:17
**1130** [1] - 1081:16
**114** [1] - 1126:2
**1155** [1] - 1083:11
**119** [2] - 1172:23, 1173:5
**11G** [3] - 1218:5, 1218:8, 1240:22
**12** [20] - 1086:13, 1086:20, 1089:7, 1089:14, 1089:16, 1090:2, 1090:3, 1119:16, 1121:23, 1122:7, 1156:7, 1221:20, 1221:21, 1222:7, 1222:12, 1224:2, 1243:18, 1258:20, 1265:19
**12-month** [1] - 1090:4
**1205** [1] - 1083:12
**1210** [1] - 1083:14
**1232** [1] - 1083:15
**1242** [1] - 1083:16
**1244** [1] - 1083:18
**1256** [1] - 1083:19
**1261** [1] - 1083:20
**12th** [1] - 1103:25
**13** [5] - 1126:8, 1128:6, 1164:12, 1207:19
**132/6** [3] - 1182:4, 1182:5, 1182:7
**136/20** [1] - 1182:3
**138** [1] - 1259:15

**139** [3] - 1259:17, 1260:4, 1260:6
**13th** [8] - 1136:23, 1185:7, 1186:13, 1188:4, 1188:21, 1188:25, 1190:7, 1191:9
**14** [1] - 1131:5
**1406** [1] - 1237:3
**1407** [1] - 1237:8
**1425025377** [1] - 1080:2
**147** [1] - 1189:8
**14th** [2] - 1132:16, 1187:15
**15** [1] - 1098:19, 1179:21, 1231:7
**16** [3] - 1189:9, 1189:11, 1212:5
**165** [1] - 1186:15
**16th** [1] - 1187:15
**17** [1] - 1212:25
**18** [9] - 1088:9, 1088:23, 1215:16, 1216:17, 1220:7, 1221:8, 1223:3, 1224:16, 1237:11
**18th** [23] - 1089:24, 1099:25, 1100:3, 1100:11, 1100:15, 1100:19, 1101:3, 1213:24, 1222:10, 1224:24, 1225:2, 1225:9, 1226:5, 1226:10, 1233:7, 1233:9, 1235:4, 1235:19, 1236:10, 1239:15, 1239:23, 1240:3, 1240:4
**19** [1] - 1213:7
**1986** [1] - 1106:3
**1990** [2] - 1165:24, 1165:25
**1993** [1] - 1106:8
**1997** [1] - 1211:5
**19th** [1] - 1268:20
**1:15** [1] - 1209:3
**1A** [2] - 1266:14, 1267:15
**1B** [1] - 1266:14
**1C** [2] - 1266:14, 1267:15

## 2

**2** [2] - 1164:12, 1164:16
**2.2** [2] - 1254:20, 1255:14
**2.5** [1] - 1253:19
**2.7** [2] - 1255:4, 1255:15
**20** [7] - 1098:19, 1120:10, 1140:21, 1168:15, 1168:22, 1194:11, 1215:15
**200** [1] - 1229:2
**2007** [4] - 1107:3, 1107:10, 1156:9, 1206:23
**2008** [4] - 1152:19, 1161:4, 1165:9, 1207:9
**2009** [5] - 1106:20, 1108:16, 1110:16, 1114:17, 1207:9
**2010** [1] - 1198:6

**2012** [9] - 1095:8, 1175:15, 1176:3, 1196:3, 1196:13, 1197:6, 1197:17, 1228:21, 1229:4
**2013** [9] - 1108:16, 1114:18, 1116:8, 1117:13, 1177:17, 1177:24, 1197:14, 1197:20, 1206:11
**2014** [49] - 1085:4, 1085:14, 1086:13, 1086:15, 1086:20, 1087:10, 1088:9, 1088:23, 1089:13, 1118:13, 1123:23, 1124:7, 1126:8, 1141:23, 1147:19, 1147:23, 1152:17, 1157:14, 1157:17, 1181:11, 1183:19, 1195:17, 1195:22, 1197:20, 1206:13, 1207:20, 1211:7, 1213:24, 1214:8, 1215:15, 1215:16, 1216:18, 1219:20, 1220:7, 1220:8, 1221:8, 1223:3, 1223:13, 1224:16, 1226:6, 1229:22, 1231:7, 1231:21, 1237:11, 1258:15, 1258:23, 1259:2, 1259:6, 1260:19
**2015** [9] - 1144:2, 1144:16, 1195:17, 1195:22, 1226:22, 1227:21, 1228:24, 1231:12, 1231:24
**2016** [21] - 1106:21, 1144:2, 1144:16, 1146:12, 1148:2, 1148:25, 1149:11, 1211:7, 1226:23, 1227:21, 1228:21, 1228:24, 1229:5, 1229:23, 1231:16, 1231:21, 1231:24, 1246:19, 1248:22, 1249:7, 1256:18
**2018** [5] - 1110:4, 1157:24, 1160:9, 1160:10, 1160:12
**2019** [3] - 1080:16, 1268:11, 1268:20
**203** [3] - 1168:14, 1168:17, 1168:22
**20th** [10] - 1124:7, 1125:11, 1226:6, 1258:23, 1259:2, 1259:6, 1260:19, 1261:18, 1262:2, 1262:17
**212.403.7311** [1] - 1081:8
**212.404.8726** [1] - 1081:18
**2200** [2] - 1246:4, 1248:5
**23** [2] - 1186:15, 1186:19
**230** [1] - 1081:16
**24** [1] - 1105:15
**25** [1] - 1126:23
**25th** [9] - 1137:3, 1139:17, 1185:12, 1185:14, 1185:18, 1186:13, 1186:23, 1188:25, 1191:23
**27** [1] - 1094:13, 1094:18, 1102:14
**2:22** [1] - 1267:24

**2Q** [1] - 1131:22, 1131:23

## 3

**3** [4] - 1192:6, 1216:22, 1220:7, 1250:6
**30** [5] - 1091:9, 1103:15, 1148:2, 1262:17, 1264:10
**300** [1] - 1114:7
**30th** [3] - 1246:19, 1248:22, 1249:7
**32** [1] - 1231:12
**36** [1] - 1229:10
**3rd** [5] - 1140:13, 1140:17, 1217:2, 1219:20, 1225:23

## 4

**4** [4] - 1080:14, 1247:21, 1253:7, 1253:11
**400** [1] - 1229:6
**45** [4] - 1236:3, 1236:7, 1237:2, 1242:16
**4th** [1] - 1265:4

## 5

**5** [3] - 1250:11, 1250:12, 1265:10
**5.2** [4] - 1252:21, 1253:7, 1253:12, 1255:13
**50** [1] - 1199:17
**51** [6] - 1185:2, 1185:3, 1185:4, 1185:6, 1188:21, 1191:13
**511** [1] - 1228:11
**52** [1] - 1212:6
**53** [1] - 1212:25
**55** [1] - 1213:7
**565** [1] - 1081:6
**59** [2] - 1088:3, 1220:9

## 6

**6** [3] - 1141:23, 1165:4, 1182:10
**6-0** [1] - 1224:6
**6.5** [1] - 1253:9
**60** [4] - 1099:7, 1224:5, 1232:17, 1239:19
**63** [1] - 1105:16

## 7

**7** [3] - 1080:16, 1105:15, 1268:11
**7-0** [1] - 1223:8
**70** [4] - 1223:6, 1223:7,

1246:5, 1247:3
**71** [1] - 1231:16
**72** [2] - 1179:17, 1179:21
**79** [2] - 1105:15, 1153:5
**7th** [1] - 1265:3

## 8

**8** [5] - 1092:21, 1093:9, 1173:2, 1173:5, 1212:2
**80** [3] - 1247:15, 1247:17, 1249:20
**85** [1] - 1141:14

## 9

**91** [1] - 1228:4
**95** [1] - 1142:17
**96** [1] - 1247:19
**9th** [1] - 1081:6

## A

**ability** [1] - 1129:10
**able** [4] - 1209:20, 1217:20, 1246:11, 1248:21
**absence** [44] - 1086:17, 1086:23, 1087:17, 1087:23, 1089:24, 1103:8, 1111:19, 1120:16, 1120:23, 1121:3, 1121:15, 1121:19, 1122:4, 1122:20, 1122:25, 1125:2, 1128:10, 1130:4, 1132:9, 1152:24, 1154:14, 1155:14, 1171:6, 1189:13, 1194:12, 1199:7, 1199:13, 1212:15, 1212:22, 1213:18, 1213:22, 1214:2, 1214:7, 1215:6, 1215:25, 1217:7, 1217:19, 1217:23, 1217:24, 1218:3, 1219:7, 1220:7, 1226:9, 1241:5
**Absence** [1] - 1212:9
**absent** [1] - 1192:20
**Absolutely** [1] - 1155:17
**accessible** [1] - 1124:21
**accident** [1] - 1226:2
**According** [1] - 1100:13
**according** [1] - 1255:12
**account** [2] - 1158:25, 1263:13
**accounted** [1] - 1254:19
**accounting** [2] - 1192:22, 1193:16
**accounts** [5] - 1158:21, 1200:12, 1251:20, 1253:7, 1253:19
**accurate** [13] - 1164:25, 1166:10, 1167:12, 1176:23,

1178:19, 1192:12, 1192:15, 1193:8, 1193:21, 1199:18, 1245:7, 1248:17
**accurately** [1] - 1193:6
**acquired** [1] - 1156:13
**Act** [1] - 1171:2
**action** [2] - 1215:21, 1230:9
**activity** [1] - 1145:11
**actual** [2] - 1091:15, 1111:5
**add** [1] - 1259:11
**added** [1] - 1241:25
**addition** [3] - 1112:9, 1231:23, 1254:8
**address** [6] - 1230:18, 1260:13, 1262:23, 1263:7, 1265:24
**adds** [1] - 1249:22
**adhere** [1] - 1212:12
**administered** [1] - 1086:18
**administering** [1] - 1211:11
**admission** [1] - 1082:3
**ADP** [1] - 1241:20
**advance** [1] - 1103:15
**advised** [3] - 1089:4, 1221:18, 1243:3
**affected** [1] - 1151:14
**afternoon** [1] - 1232:13
**afterwards** [1] - 1098:12
**ago** [2] - 1167:16, 1257:6
**agree** [9] - 1103:5, 1128:5, 1206:15, 1218:20, 1223:25, 1228:23, 1229:4, 1231:19, 1258:25
**ahead** [3] - 1134:21, 1161:16, 1234:14
**AIDEVAIA** [1] - 1083:20
**Albano** [2] - 1160:22, 1168:7
**allegation** [2] - 1157:15, 1157:18
**allegations** [1] - 1110:9
**alleged** [3] - 1157:12, 1157:16, 1245:2
**allegedly** [1] - 1202:19
**allocated** [3] - 1158:21, 1193:2, 1194:6
**allowed** [2] - 1089:6, 1221:19
**Almost** [1] - 1091:9
**almost** [2] - 1091:9, 1132:24
**alone** [1] - 1085:2
**ALSO** [1] - 1082:2
**ambitions** [1] - 1168:4
**ambitious** [1] - 1167:18
**amount** [2] - 1105:24, 1176:4, 1194:4, 1197:24, 1251:3
**amounts** [2] - 1179:13, 1180:8
**analysis** [1] - 1267:3

**analyst** [22] - 1107:16, 1108:19, 1109:14, 1110:20, 1112:9, 1114:14, 1114:22, 1141:13, 1145:21, 1148:7, 1148:10, 1149:17, 1174:21, 1174:23, 1175:5, 1176:13, 1176:15, 1257:4, 1257:13, 1257:18, 1258:5
**analyst's** [1] - 1115:12
**analysts** [30] - 1107:20, 1107:24, 1111:8, 1111:10, 1111:13, 1111:16, 1111:20, 1112:2, 1113:9, 1113:12, 1116:24, 1117:2, 1117:17, 1135:23, 1144:5, 1150:4, 1171:13, 1171:14, 1171:15, 1171:20, 1171:22, 1196:17, 1196:22, 1197:2, 1197:24, 1198:7, 1202:21, 1202:25, 1204:7
**analysts'** [2] - 1115:23, 1144:8
**aneurysm** [10] - 1087:15, 1087:24, 1088:25, 1139:20, 1139:22, 1140:3, 1147:23, 1218:22, 1221:11, 1223:18
**Angeles** [7] - 1105:7, 1162:19, 1162:22, 1164:19, 1165:18, 1165:23, 1167:4
**announcement** [2] - 1194:19, 1194:24
**announcements** [2] - 1134:11, 1195:6
**annual** [5] - 1197:16, 1198:11, 1226:18, 1228:3, 1228:10
**answer** [19] - 1092:15, 1097:13, 1097:14, 1098:4, 1100:20, 1101:20, 1133:8, 1164:23, 1165:7, 1165:20, 1168:21, 1168:25, 1173:5, 1179:22, 1183:3, 1187:13, 1190:3, 1192:9, 1192:11
**ANSWER** [15] - 1164:21, 1165:8, 1169:2, 1169:7, 1173:8, 1173:10, 1173:12, 1173:15, 1180:2, 1180:6, 1182:15, 1182:18, 1182:21, 1187:4, 1189:15
**answered** [1] - 1106:18
**answers** [2] - 1169:14, 1180:16
**Anthony** [1] - 1141:9
**anticipating** [1] - 1137:2
**anticipation** [1] - 1227:16
**apologize** [1] - 1191:18
**appear** [4] - 1215:11, 1218:12, 1218:25, 1220:19
**applicable** [1] - 1212:13
**applied** [1] - 1096:3
**apply** [1] - 1087:2

**appoint** [1] - 1178:24
**appreciate** [2] - 1104:9, 1267:21
**approval** [2] - 1121:3, 1212:14
**approve** [6] - 1086:16, 1111:18, 1121:11, 1155:3, 1155:6, 1155:9
**April** [5] - 1185:12, 1185:15, 1265:4, 1265:10, 1265:19
**ARBITRATION** [1] - 1080:2
**arbitration** [1] - 1267:23
**Arbitration** [1] - 1104:14
**ARBITRATOR** [71] - 1099:3, 1102:8, 1104:7, 1104:21, 1129:2, 1129:16, 1129:20, 1134:2, 1134:22, 1135:7, 1135:25, 1136:9, 1136:14, 1136:20, 1144:19, 1145:7, 1146:3, 1155:20, 1160:25, 1166:16, 1167:14, 1168:11, 1180:24, 1182:2, 1185:14, 1194:8, 1194:16, 1195:21, 1197:23, 1198:2, 1198:16, 1198:19, 1204:5, 1204:12, 1204:25, 1205:17, 1208:11, 1208:13, 1227:13, 1227:15, 1242:21, 1244:9, 1244:18, 1247:8, 1247:25, 1248:11, 1249:10, 1249:25, 1250:5, 1250:10, 1251:5, 1253:2, 1259:14, 1259:17, 1260:2, 1260:6, 1263:16, 1263:19, 1264:16, 1264:21, 1265:2, 1265:9, 1265:13, 1265:17, 1265:19, 1265:21, 1266:4, 1266:18, 1267:13, 1267:16, 1267:22
**Arbitrator** [3] - 1080:12, 1084:17, 1210:12
**arbitrator** [2] - 1084:5, 1209:14
**area** [2] - 1150:18, 1226:25
**areas** [3] - 1107:14, 1109:11, 1150:21
**Argosy** [1] - 1106:9, 1149:8
**arrangement** [4] - 1134:6, 1136:2, 1155:4, 1155:9
**arrangements** [1] - 1207:16
**arrival** [2] - 1237:16, 1239:5
**articles** [1] - 1266:7
**aside** [1] - 1117:15
**assistant** [1] - 1203:11
**assistants** [2] - 1203:4, 1203:6
**assisting** [1] - 1135:11
**associates** [1] - 1091:15
**assume** [8] - 1096:21, 1096:24, 1142:8, 1161:21, 1176:25, 1178:7, 1197:15,

1201:4
**assumed** [1] - 1183:16
**assumption** [1] - 1135:7
**athlete** [2] - 1257:22, 1257:25
**attached** [1] - 1101:11
**attachment** [1] - 1243:12
**attempt** [1] - 1130:10
**attempting** [1] - 1258:19
**attention** [3] - 1099:15, 1232:19, 1235:18
**attorney** [5] - 1090:23, 1099:20, 1262:22, 1263:3, 1263:5
**attorneys** [2] - 1084:4, 1209:11
**attributable** [1] - 1145:9
**August** [44] - 1087:20, 1088:9, 1088:23, 1089:24, 1100:14, 1100:16, 1113:17, 1126:23, 1131:12, 1131:16, 1131:19, 1137:3, 1139:17, 1139:20, 1147:23, 1172:21, 1185:14, 1185:18, 1186:13, 1186:23, 1187:15, 1188:14, 1188:17, 1188:25, 1189:13, 1189:18, 1190:14, 1191:23, 1213:24, 1214:2, 1214:7, 1215:15, 1215:16, 1216:17, 1220:7, 1221:8, 1222:10, 1223:3, 1224:3, 1224:16, 1226:5, 1226:6, 1239:15
**authority** [8] - 1086:16, 1111:8, 1111:12, 1111:18, 1120:22, 1120:24, 1121:11, 1146:16
**authorize** [1] - 1212:21
**Auto** [2] - 1216:7, 1216:13
**auto** [1] - 1216:17
**automatic** [1] - 1216:14
**available** [2] - 1209:19, 1251:3
**Avenue** [4] - 1081:6, 1081:16, 1110:23, 1114:7
**aware** [29] - 1087:11, 1089:5, 1092:2, 1092:7, 1092:11, 1092:14, 1092:17, 1094:5, 1095:15, 1095:16, 1096:13, 1097:4, 1134:2, 1151:19, 1174:10, 1174:15, 1174:18, 1175:12, 1184:5, 1184:17, 1184:19, 1187:23, 1201:19, 1202:20, 1203:8, 1221:19, 1240:11, 1240:12
**axis** [1] - 1109:18

## B

**babies** [2] - 1262:9
**baby** [33] - 1090:13, 1118:18, 1118:21, 1118:25,

1119:5, 1121:16, 1121:20, 1124:6, 1127:7, 1153:3, 1154:15, 1154:22, 1154:23, 1181:12, 1183:7, 1183:14, 1183:19, 1183:23, 1185:19, 1185:23, 1186:3, 1186:7, 1186:10, 1189:5, 1189:16, 1222:20, 1237:16, 1239:6, 1261:20, 1261:23, 1262:3, 1262:12, 1262:16
**backbone** [1] - 1106:15
**bad** [1] - 1176:18
**balance** [1] - 1143:17
**bank** [4] - 1106:9, 1173:25, 1174:7, 1174:13
**Bank** [2] - 1106:12, 1149:10
**bankers** [1] - 1150:23
**banking** [6] - 1150:19, 1200:22, 1201:3, 1201:5, 1201:11, 1201:16
**Barclay** [1] - 1245:19
**Barclays** [5] - 1245:14, 1245:17, 1245:19, 1245:20, 1251:15
**base** [3] - 1115:9, 1152:9, 1247:22
**based** [18] - 1107:8, 1125:17, 1133:22, 1144:9, 1144:10, 1144:11, 1144:12, 1152:4, 1170:19, 1170:22, 1186:21, 1199:21, 1247:5, 1247:21, 1249:9, 1250:19, 1250:20, 1264:22
**bases** [1] - 1249:16
**basis** [1] - 1198:11
**Bates** [3] - 1237:2, 1237:8, 1266:15
**Bear** [3] - 1106:4, 1106:5, 1106:8
**beaten** [1] - 1180:24
**became** [9] - 1106:13, 1106:14, 1106:15, 1107:2, 1107:12, 1116:3, 1116:13, 1116:22, 1206:7
**become** [1] - 1087:11
**becoming** [1] - 1110:15
**BEFORE** [1] - 1080:12
**began** [1] - 1107:3
**beginning** [1] - 1237:19
**BEHALF** [2] - 1081:4, 1081:14
**behind** [1] - 1243:25
**below** [1] - 1165:3
**benchmark** [2] - 1245:14, 1245:16
**benefit** [2] - 1101:24, 1107:9
**benefits** [11] - 1088:14, 1088:16, 1088:17, 1088:19, 1203:18, 1203:23, 1203:24, 1204:3, 1235:8, 1235:10,

1235:12
**best** [2] - 1257:22, 1257:25
**better** [1] - 1133:3
**Between** [1] - 1180:11
**between** [10] - 1085:23, 1109:3, 1112:15, 1150:18, 1186:13, 1187:15, 1218:20, 1220:7, 1223:11, 1263:2
**Bhandary** [3] - 1149:22, 1149:23, 1204:10
**bid** [3] - 1173:23, 1174:5, 1174:11
**bidding** [1] - 1206:25
**big** [5] - 1161:18, 1161:19, 1163:24, 1203:10, 1250:24
**bigger** [4] - 1170:5, 1170:6, 1170:9, 1170:10
**biggest** [2] - 1178:15, 1247:5
**billion** [4] - 1247:15, 1247:17, 1249:20, 1249:21
**birth** [18] - 1095:22, 1095:25, 1121:16, 1121:19, 1122:4, 1123:16, 1124:5, 1124:16, 1147:19, 1154:23, 1171:5, 1183:19, 1183:22, 1199:7, 1234:9, 1244:5, 1260:22, 1261:19
**bit** [5] - 1113:21, 1132:2, 1145:4, 1189:25, 1198:14
**blankly** [1] - 1092:16
**blast** [2] - 1184:9, 1184:11
**blood** [1] - 1268:14
**Bloomberg** [4] - 1141:17, 1194:19, 1245:20, 1246:13
**board** [1] - 1157:9
**bond** [5] - 1247:13, 1248:2, 1251:8, 1251:25
**bonds** [14] - 1245:21, 1245:25, 1247:22, 1248:3, 1249:15, 1249:20, 1249:21, 1250:22, 1251:3, 1251:12, 1251:24, 1256:2, 1256:6
**bonus** [2] - 1197:17, 1197:19
**bonuses** [5] - 1115:6, 1152:12, 1197:2, 1197:24, 1232:7
**book** [2] - 1141:15, 1191:17
**books** [1] - 1220:13
**born** [6] - 1119:17, 1120:2, 1120:9, 1261:23, 1262:3, 1262:17
**boss** [3] - 1128:3, 1160:21, 1208:7
**bottom** [11] - 1085:22, 1099:16, 1126:4, 1212:6, 1215:15, 1224:18, 1228:11, 1228:16, 1232:20, 1237:2, 1260:11
**boxes** [1] - 1243:15

**brain** [8] - 1087:24, 1088:24, 1139:22, 1140:2, 1147:23, 1218:21, 1221:11, 1223:18
**break** [1] - 1246:2
**breaks** [1] - 1246:2
**Bridges** [17] - 1082:15, 1088:9, 1088:12, 1099:16, 1099:23, 1100:6, 1100:17, 1210:16, 1212:19, 1220:16, 1222:25, 1224:9, 1227:20, 1232:10, 1232:13, 1242:14, 1244:10
**BRIDGES** [2] - 1083:13, 1210:11
**brief** [1] - 1085:15
**briefed** [1] - 1266:3
**briefing** [3] - 1263:24, 1264:12, 1264:14
**briefly** [3] - 1105:20, 1106:23, 1109:2
**briefs** [1] - 1265:15
**bring** [1] - 1180:9
**broaden** [1] - 1196:11
**Bud** [1] - 1157:5
**bugging** [1] - 1169:11
**build** [2] - 1107:4, 1206:4
**built** [4] - 1106:10, 1107:11, 1169:8, 1205:25
**bureaucracy** [1] - 1161:18
**Burns** [27] - 1116:14, 1116:16, 1116:22, 1117:4, 1117:16, 1117:21, 1121:6, 1135:8, 1135:25, 1136:10, 1138:9, 1139:6, 1143:4, 1143:22, 1146:24, 1147:5, 1147:15, 1147:17, 1178:24, 1179:4, 1193:2, 1193:3, 1194:21, 1194:25, 1254:2, 1254:3, 1257:3
**Burns'** [3] - 1194:24, 1197:17, 1197:21
**busier** [1] - 1189:19
**Business** [1] - 1105:24
**business** [22] - 1106:11, 1106:16, 1107:4, 1107:8, 1131:8, 1151:25, 1154:25, 1156:13, 1160:23, 1165:16, 1165:24, 1165:25, 1167:12, 1169:18, 1169:21, 1170:2, 1170:15, 1172:19, 1200:5, 1206:5, 1255:19, 1263:20
**busy** [2] - 1127:12, 1190:15, 1264:6
**BY** [41] - 1083:3, 1084:20, 1091:3, 1093:24, 1099:12, 1102:10, 1104:17, 1104:22, 1130:2, 1136:21, 1146:6, 1155:24, 1161:5, 1163:18, 1164:3, 1166:22, 1168:12, 1181:2, 1182:9, 1185:17,

1191:7, 1191:20, 1194:17,
1196:7, 1198:21, 1205:8,
1205:18, 1210:15, 1227:18,
1232:12, 1233:4, 1242:12,
1242:24, 1244:24, 1248:20,
1252:8, 1253:13, 1256:15,
1259:19, 1260:9, 1261:17
**bye** [1] - 1104:11

# C

**C'est** [1] - 1165:13
**calculate** [1] - 1245:15
**California** [21] - 1095:19,
1095:21, 1095:25, 1118:9,
1118:15, 1118:21, 1124:25,
1129:5, 1162:8, 1162:21,
1169:11, 1181:12, 1181:15,
1183:18, 1183:22, 1183:25,
1184:6, 1184:13, 1188:3,
1261:4, 1261:19
**Canadian** [2] - 1106:12,
1149:9
**canceled** [2] - 1216:7,
1216:17
**candidate** [3] - 1110:19,
1112:6, 1178:19
**cap** [6] - 1247:5, 1247:6,
1247:12, 1249:9, 1249:17
**cap-based** [1] - 1249:9
**capacity** [3] - 1114:18,
1114:21, 1211:16
**capital** [2] - 1105:3,
1157:23
**care** [1] - 1203:20
**career** [4] - 1091:9,
1107:22, 1108:10, 1156:19
**caregiver** [1] - 1120:8
**carried** [1] - 1198:11
**case** [7] - 1098:10,
1153:11, 1157:12, 1163:5,
1164:5, 1233:24, 1235:4
**cases** [3] - 1086:19,
1212:15, 1234:8
**categorically** [1] - 1168:3
**ceasing** [1] - 1147:12
**cents** [1] - 1247:19
**CEO** [1] - 1157:6
**certain** [7] - 1134:3, 1194:4,
1195:10, 1196:5, 1198:14,
1234:6, 1246:12
**certainly** [2] - 1264:4,
1267:11
**certify** [1] - 1268:10
**cetera** [1] - 1142:22
**chain** [4] - 1088:7, 1126:3,
1260:11, 1262:25
**chance** [3] - 1102:14,
1211:13, 1259:21
**change** [6] - 1110:2,
1110:7, 1153:13, 1157:22,

1214:14, 1267:11
**changed** [2] - 1215:2,
1266:24
**changes** [1] - 1215:5
**character** [1] - 1178:21
**characterization** [1] -
1190:17
**charge** [1] - 1085:8
**chart** [4] - 1228:13,
1228:17, 1230:21, 1231:20
**charts** [1] - 1266:13
**check** [1] - 1243:15
**checking** [1] - 1124:22
**chemical** [4] - 1144:24,
1201:11, 1201:25, 1255:19
**chemicals** [16] - 1115:3,
1142:21, 1144:23, 1145:8,
1148:18, 1149:13, 1150:5,
1150:23, 1247:15, 1254:15,
1254:18, 1254:19, 1255:9,
1255:14, 1255:22, 1256:19
**child** [12] - 1095:22,
1095:25, 1096:23, 1122:4,
1123:17, 1133:24, 1138:13,
1147:20, 1171:5, 1234:10,
1244:5, 1260:22
**children** [4] - 1105:8,
1119:17, 1120:2, 1199:8
**choice** [1] - 1110:5
**chronological** [1] - 1231:5
**CIBC** [7] - 1106:14, 1107:4,
1107:7, 1156:14, 1166:4,
1175:15, 1175:18
**circumstance** [3] -
1092:15, 1097:21, 1097:22
**circumstances** [2] -
1124:11, 1234:6
**cite** [1] - 1266:14
**cited** [1] - 1266:16
**cites** [1] - 1266:25
**Claimant** [1] - 1080:5
**claimant** [2] - 1085:10,
1110:12
**CLAIMANT** [1] - 1081:4
**clarify** [4] - 1195:21,
1237:21, 1256:23, 1266:6
**clarifying** [1] - 1141:11
**CLARK** [1] - 1081:5
**clear** [3] - 1230:13, 1239:4,
1240:8
**clearly** [1] - 1187:7
**clients** [2] - 1109:12,
1109:19
**CO** [1] - 1080:7
**Co** [2] - 1210:18, 1212:12
**Coast** [1] - 1264:7
**code** [1] - 1230:10
**Code** [1] - 1230:23
**cohead** [27] - 1116:3,
1116:12, 1117:25, 1118:4,
1138:21, 1143:9, 1143:19,

1159:4, 1159:18, 1159:24,
1160:20, 1161:7, 1161:23,
1162:2, 1162:13, 1167:8,
1169:4, 1178:7, 1181:4,
1181:9, 1193:2, 1194:21,
1195:2, 1197:9, 1197:13,
1206:8
**coheads** [6] - 1116:16,
1116:22, 1168:24, 1178:24,
1179:4, 1180:19
**colleague** [1] - 1084:12
**colleagues** [2] - 1084:3,
1209:10
**collection** [1] - 1214:13
**Colleen** [15] - 1116:14,
1126:7, 1132:25, 1134:9,
1135:19, 1135:20, 1136:6,
1138:5, 1138:9, 1142:19,
1142:23, 1146:23, 1193:25,
1194:6, 1254:2
**Columbia** [1] - 1105:24
**Column** [1] - 1230:23
**coming** [9] - 1093:5,
1138:3, 1141:7, 1141:8,
1141:12, 1189:5, 1189:16,
1262:13, 1264:6
**commenced** [2] - 1213:22,
1225:8
**commentary** [4] - 1144:11,
1144:12, 1144:15, 1145:3
**Commerce** [2] - 1106:13,
1149:10
**commission** [1] - 1154:11
**commissioned** [2] -
1107:8, 1152:3
**commissioned-based** [1] -
1107:8
**commissions** [6] -
1154:16, 1155:16, 1166:19,
1199:17, 1199:20, 1200:6
**communicate** [6] - 1130:8,
1139:8, 1143:8, 1143:12,
1199:12, 1208:7
**communicated** [1] - 1141:3
**communicating** [1] -
1086:4
**communication** [2] -
1188:2, 1195:4
**communications** [3] -
1140:24, 1188:14, 1220:3
**commute** [1] - 1195:7
**comp** [1] - 1177:15
**companies** [10] - 1109:15,
1135:18, 1184:21, 1189:22,
1191:3, 1246:5, 1248:5,
1248:6
**Companies** [1] - 1144:21
**company** [4] - 1134:15,
1157:6, 1226:13, 1227:21
**Company** [3] - 1104:24,
1106:5, 1107:5

**company's** [2] - 1133:14,
1133:15
**comparative** [1] - 1248:12
**compare** [1] - 1149:13
**comparing** [1] - 1250:2
**compensated** [1] - 1152:2
**compensation** [6] -
1111:13, 1115:12, 1115:15,
1207:8, 1219:12, 1231:25
**competency** [1] - 1149:9
**competing** [3] - 1173:24,
1174:6, 1174:12
**competitors** [1] - 1207:2
**complained** [1] - 1123:9
**completed** [1] - 1199:21
**completely** [1] - 1167:4
**complex** [1] - 1120:12
**concentrate** [2] - 1224:17,
1259:24
**concentrating** [1] - 1227:11
**concept** [1] - 1180:18
**concern** [6] - 1135:12,
1135:13, 1181:8, 1187:6,
1187:8, 1251:6
**concerned** [2] - 1127:4,
1196:13
**concerns** [6] - 1195:10,
1195:17, 1195:25, 1196:3,
1196:5, 1197:4
**concluded** [1] - 1267:23
**condition** [4] - 1089:7,
1214:3, 1221:22, 1222:7
**conducted** [1] - 1158:15
**conference** [2] - 1119:3,
1209:8
**confusing** [2] - 1141:5,
1225:13
**Congratulations** [1] -
1237:15
**connected** [1] - 1268:14
**connection** [3] - 1092:25,
1183:7, 1244:4
**Connor** [1] - 1082:4
**consider** [6] - 1100:2,
1155:16, 1224:25, 1225:8,
1233:8, 1257:24
**considered** [4] - 1100:10,
1100:18, 1233:12, 1233:20
**Considering** [1] - 1264:8
**considering** [1] - 1239:9
**consisted** [1] - 1109:8
**consistency** [2] - 1150:18,
1200:8
**consistent** [2] - 1143:3,
1254:12
**construct** [1] - 1200:4
**consumer** [8] - 1112:7,
1171:23, 1176:12, 1178:15,
1195:25, 1253:15, 1253:17,
1253:19
**contact** [2] - 1124:22,

1208:2
**containers** [1] - 1254:25
**content** [1] - 1109:14
**context** [2] - 1261:10, 1261:15
**continuation** [1] - 1186:25
**continue** [9] - 1130:9, 1142:21, 1142:23, 1155:15, 1190:25, 1194:5, 1201:24, 1202:4, 1202:8
**continued** [5] - 1100:14, 1100:15, 1149:9, 1154:15, 1204:16
**continuing** [2] - 1187:7, 1193:13
**continuity** [4] - 1134:21, 1150:17, 1154:25, 1200:5
**contradict** [1] - 1196:4
**controversial** [2] - 1145:5, 1145:25
**controversy** [1] - 1268:17
**convenient** [1] - 1189:4, 1189:16
**conversation** [32] - 1086:7, 1086:11, 1118:24, 1119:2, 1119:7, 1119:12, 1119:15, 1119:22, 1119:24, 1120:15, 1120:25, 1121:5, 1121:13, 1121:14, 1121:22, 1122:2, 1122:11, 1122:14, 1123:9, 1123:20, 1131:18, 1137:15, 1137:21, 1137:25, 1138:16, 1139:13, 1161:13, 1167:24, 1182:13, 1258:14, 1258:17
**conversations** [6] - 1115:18, 1115:23, 1137:11, 1168:10, 1175:9, 1188:19
**copied** [2] - 1127:21, 1136:23
**copy** [2] - 1142:6, 1163:10
**core** [3] - 1149:8, 1255:5, 1257:16
**corner** [2] - 1153:19, 1215:15
**Correct** [22] - 1091:25, 1098:8, 1103:9, 1103:17, 1151:20, 1153:23, 1154:12, 1156:15, 1166:11, 1169:24, 1171:25, 1172:6, 1178:5, 1181:16, 1188:5, 1201:22, 1203:3, 1207:6, 1208:3, 1243:10, 1266:8, 1266:11
**correct** [95] - 1088:12, 1088:15, 1090:5, 1091:12, 1091:17, 1091:20, 1091:24, 1092:4, 1092:6, 1092:13, 1094:7, 1095:11, 1096:16, 1096:23, 1098:7, 1098:17, 1099:2, 1100:11, 1104:3, 1114:12, 1131:6, 1138:15, 1141:25, 1142:5, 1149:16,

1156:4, 1156:24, 1158:5, 1159:5, 1159:6, 1160:6, 1161:12, 1162:9, 1166:25, 1177:21, 1178:4, 1178:8, 1183:8, 1185:8, 1186:8, 1188:9, 1194:12, 1197:15, 1202:17, 1203:2, 1203:19, 1205:21, 1218:10, 1231:4, 1233:9, 1233:18, 1233:22, 1234:2, 1234:12, 1235:22, 1237:17, 1238:2, 1238:12, 1239:2, 1239:12, 1239:15, 1239:19, 1240:4, 1240:5, 1240:13, 1241:9, 1241:23, 1242:2, 1246:22, 1248:23, 1252:22, 1255:7, 1255:10, 1257:8, 1258:6, 1258:9, 1258:10, 1258:21, 1258:23, 1258:24, 1259:4, 1260:14, 1260:16, 1260:19, 1260:20, 1260:23, 1261:6, 1261:20, 1261:21, 1261:25, 1262:4, 1262:11, 1262:14, 1262:19, 1266:7
**correctly** [2] - 1142:24, 1258:13
**corresponded** [1] - 1095:9
**cost** [10] - 1151:8, 1151:15, 1151:22, 1202:15, 1202:20, 1202:25, 1203:4, 1203:8, 1203:12, 1204:21
**cost-cutting** [7] - 1151:15, 1151:22, 1202:15, 1202:20, 1202:25, 1203:4, 1203:8
**cost-given** [1] - 1204:21
**COSTER** [1] - 1081:21
**costs** [1] - 1202:22
**counsel** [2] - 1207:19, 1207:24, 1268:18
**counsel's** [1] - 1205:23
**counted** [1] - 1231:7, 1231:12, 1231:16
**counting** [2] - 1231:11, 1231:15
**COUNTY** [1] - 1268:6
**couple** [7] - 1093:2, 1138:4, 1150:15, 1226:12, 1232:15, 1238:13, 1238:15
**course** [1] - 1167:17
**court** [3] - 1084:6, 1209:15, 1238:6
**cover** [16] - 1109:15, 1112:14, 1132:10, 1134:6, 1134:11, 1142:21, 1148:12, 1148:18, 1149:17, 1150:5, 1196:9, 1196:10, 1202:12, 1250:24, 1254:4, 1257:4
**coverage** [22] - 1132:13, 1134:21, 1135:10, 1145:23, 1146:5, 1147:12, 1149:2, 1149:7, 1149:12, 1150:22, 1195:11, 1195:18, 1196:6,

1197:5, 1200:22, 1200:23, 1201:4, 1201:10, 1201:11, 1201:15, 1201:16, 1201:20
**covered** [13] - 1114:23, 1117:11, 1135:18, 1144:18, 1146:2, 1149:20, 1192:23, 1193:17, 1253:25, 1254:7, 1254:14, 1254:15, 1254:16
**covering** [4] - 1134:24, 1141:9, 1145:22, 1147:13, 1189:22, 1200:24, 1201:2, 1258:4
**crafted** [1] - 1165:16
**crash** [1] - 1106:6
**create** [3] - 1133:19, 1162:21, 1230:2
**creating** [1] - 1230:5
**credits** [7] - 1141:9, 1141:10, 1144:18, 1144:20, 1144:24, 1145:4, 1145:22
**crisis** [1] - 1107:12
**criteria** [1] - 1230:7
**critical** [1] - 1133:11
**CROSS** [1] - 1083:7, 1083:11, 1083:15, 1091:2, 1155:23, 1232:11
**cross** [1] - 1205:23
**CROSS-EXAMINATION** [3] - 1091:2, 1155:23, 1232:11
**cross-examination** [1] - 1205:23
**CSR/RMR/CRR** [3] - 1080:23, 1268:8, 1268:22
**curious** [1] - 1128:2
**current** [10] - 1104:25, 1166:9, 1210:19, 1210:21, 1247:23, 1248:2, 1248:18, 1249:12, 1249:17, 1251:7
**cut** [1] - 1151:22
**cuts** [1] - 1151:8
**cutting** [8] - 1151:15, 1151:22, 1202:15, 1202:20, 1202:22, 1202:25, 1203:4, 1203:8

**D**

**daily** [4] - 1139:15, 1142:13, 1184:9, 1184:11
**damages** [1] - 1266:13
**Daniels** [5] - 1133:17, 1134:24, 1135:11, 1135:20, 1136:15
**data** [22] - 1144:7, 1246:8, 1246:11, 1246:17, 1246:24, 1248:17, 1248:22, 1249:5, 1249:7, 1250:16, 1251:12, 1252:5, 1252:10, 1252:15, 1253:16, 1253:18, 1254:17, 1254:19, 1254:21, 1254:23, 1255:12, 1266:25

**date** [26] - 1139:21, 1139:24, 1150:2, 1188:22, 1188:24, 1191:23, 1215:14, 1215:16, 1215:18, 1215:20, 1216:19, 1216:25, 1218:21, 1226:2, 1230:8, 1233:12, 1246:12, 1246:14, 1246:15, 1246:16, 1246:20, 1248:19, 1262:5, 1262:6
**dated** [9] - 1088:9, 1126:7, 1131:5, 1198:5, 1216:24, 1221:8, 1236:10, 1237:11, 1260:18
**dates** [4] - 1101:12, 1180:7, 1191:3, 1262:8
**daughter** [1] - 1120:9
**daughters** [2] - 1105:11, 1162:20
**days** [10] - 1098:19, 1120:11, 1138:4, 1262:17, 1263:22, 1264:8, 1264:9, 1264:10, 1264:16
**days'** [1] - 1103:15
**deal** [1] - 1193:10
**deals** [1] - 1230:21
**Dear** [1] - 1237:12
**debt** [1] - 1105:3
**December** [1] - 1211:4
**decided** [4] - 1097:4, 1155:8, 1178:10, 1266:3
**decision** [20] - 1110:24, 1111:5, 1116:15, 1138:8, 1138:25, 1139:4, 1146:13, 1146:19, 1146:22, 1147:6, 1147:7, 1155:11, 1162:24, 1164:18, 1167:3, 1178:23, 1179:6, 1179:9, 1179:24, 1180:3
**decision'** [1] - 1180:5
**decisions** [4] - 1115:5, 1115:8, 1115:11, 1115:14
**Decker** [11] - 1088:9, 1088:13, 1088:16, 1090:10, 1090:19, 1220:21, 1220:25, 1221:3, 1221:8, 1222:16, 1224:20
**Decker's** [1] - 1222:24
**decline** [2] - 1145:18, 1245:7
**declining** [2] - 1145:10, 1245:2
**definitely** [1] - 1145:17
**deliver** [1] - 1241:17
**delivery** [1] - 1118:21
**demoted** [1] - 1157:12
**denied** [3] - 1234:25, 1235:6, 1243:4
**deny** [5] - 1111:19, 1120:23, 1168:3, 1234:22, 1234:23
**Denys** [28] - 1082:13,

1274

1084:21, 1085:21, 1088:10, 1089:9, 1089:11, 1089:22, 1090:18, 1090:22, 1091:4, 1098:10, 1099:8, 1102:11, 1103:5, 1104:7, 1104:9, 1211:11, 1220:21, 1220:24, 1221:7, 1221:13, 1221:25, 1222:3, 1223:11, 1223:20, 1223:25, 1224:19, 1225:12

**DENYS** [2] - 1083:4, 1084:16

**Denys'** [2] - 1221:16, 1222:15

**departed** [1] - 1125:11

**department** [29] - 1086:15, 1086:19, 1088:14, 1088:19, 1090:8, 1099:21, 1103:21, 1106:6, 1108:24, 1109:7, 1123:8, 1149:6, 1152:7, 1166:21, 1173:18, 1206:22, 1207:5, 1211:17, 1212:17, 1212:21, 1213:14, 1214:21, 1216:12, 1221:3, 1221:6, 1239:8, 1240:14, 1240:17, 1240:20

**departments** [2] - 1088:18, 1215:4

**departure** [1] - 1124:11

**departures** [1] - 1204:13

**deposed** [1] - 1163:4

**deposition** [11] - 1151:6, 1163:8, 1163:11, 1164:4, 1164:8, 1164:11, 1168:14, 1179:18, 1180:22, 1181:23

**depositions** [1] - 1265:22

**depth** [1] - 1196:11

**describe** [2] - 1106:23, 1109:2

**designated** [1] - 1092:5

**designations** [1] - 1265:22

**desire** [3] - 1145:2, 1205:10, 1265:14

**desk** [18] - 1110:3, 1117:15, 1127:12, 1132:6, 1147:11, 1159:21, 1162:14, 1166:7, 1167:11, 1166:9, 1169:17, 1169:19, 1169:25, 1170:13, 1170:16, 1199:2, 1201:24, 1206:2

**details** [4] - 1087:14, 1176:25, 1194:2, 1237:21

**determine** [1] - 1251:17

**determines** [2] - 1095:3, 1103:2

**determining** [1] - 1196:25

**Diana** [1] - 1082:5

**different** [8] - 1098:24, 1101:25, 1107:6, 1141:15, 1162:8, 1167:4, 1199:7, 1214:24

**difficult** [1] - 1176:13

**digits** [1] - 1237:3

**dilemma** [1] - 1168:5

**direct** [1] - 1188:2

**DIRECT** [6] - 1083:6, 1083:10, 1083:14, 1084:19, 1104:16, 1210:14

**directed** [3] - 1096:14, 1096:17, 1130:6

**directly** [4] - 1220:3, 1229:17, 1239:7, 1268:16

**director** [8] - 1085:8, 1090:9, 1105:3, 1106:13, 1156:17, 1197:7, 1203:7, 1210:22

**directors** [1] - 1157:9

**disability** [3] - 1170:23, 1216:4, 1216:20

**disapprove** [1] - 1086:17

**discipline** [1] - 1111:15

**discount** [2] - 1247:19, 1247:20

**discouraged** [1] - 1157:17

**discrimination** [2] - 1170:19, 1170:22

**discussed** [3] - 1162:3, 1181:17, 1183:5

**discussing** [2] - 1162:16, 1162:18

**Discussion** [6] - 1093:21, 1112:20, 1164:14, 1179:19, 1261:12, 1267:6

**discussion** [4] - 1147:17, 1168:24, 1175:24, 1182:21

**discussions** [7] - 1136:9, 1161:22, 1167:17, 1178:6, 1182:16, 1182:20, 1183:12

**dismissive** [1] - 1133:12

**disruptive** [1] - 1180:10

**dissuade** [4] - 1122:3, 1122:6, 1122:19, 1258:19

**distinction** [1] - 1187:11

**divided** [1] - 1246:5

**divorce** [1] - 1263:3

**doctor** [3] - 1186:3, 1217:11, 1217:14

**doctor's** [1] - 1217:20

**document** [11] - 1087:22, 1101:21, 1112:25, 1217:25, 1220:19, 1229:13, 1229:15, 1229:16, 1230:2, 1231:16, 1260:25

**documentation** [1] - 1198:4

**documents** [6] - 1153:8, 1213:17, 1214:6, 1214:17, 1214:19, 1243:24

**DOLINGER** [1] - 1080:12

**Dolinger** [2] - 1084:6, 1209:14

**dollar** [1] - 1247:20

**dollars** [4] - 1152:5, 1177:6, 1207:14, 1218:17

**done** [14] - 1086:24, 1129:13, 1129:15, 1130:5, 1145:13, 1155:18, 1167:18, 1178:20, 1178:22, 1179:5, 1179:10, 1180:12, 1205:2, 1238:21

**door** [1] - 1210:7

**doubled** [1] - 1231:20

**down** [10] - 1084:7, 1159:17, 1159:23, 1159:24, 1209:16, 1228:25, 1229:6, 1230:11, 1232:7, 1258:12

**drag** [1] - 1264:4

**draw** [4] - 1099:15, 1207:11, 1207:15, 1232:19

**driver** [1] - 1152:8

**due** [4] - 1199:7, 1262:5, 1262:6, 1262:8

**duly** [3] - 1084:17, 1104:14, 1210:12

**During** [16] - 1108:2, 1111:6, 1115:4, 1119:15, 1120:25, 1121:5, 1121:13, 1121:22, 1122:2, 1139:25, 1147:17, 1151:6, 1181:19, 1181:23, 1199:13, 1211:6

**during** [33] - 1085:6, 1106:20, 1107:18, 1107:22, 1108:7, 1108:16, 1119:12, 1120:3, 1120:14, 1122:14, 1124:24, 1140:10, 1143:25, 1151:8, 1158:2, 1163:8, 1164:8, 1180:22, 1187:2, 1187:24, 1188:7, 1195:7, 1199:8, 1199:11, 1199:16, 1199:21, 1201:12, 1201:16, 1201:20, 1202:15, 1202:18, 1223:17, 1230:15

**E**

**E-mail** [1] - 1220:10

**e-mail** [107] - 1085:13, 1085:24, 1086:3, 1086:8, 1086:21, 1088:7, 1088:8, 1088:22, 1089:3, 1090:6, 1090:11, 1090:19, 1093:9, 1093:15, 1096:6, 1099:9, 1099:16, 1099:23, 1103:22, 1103:24, 1125:24, 1126:6, 1126:11, 1127:20, 1128:4, 1128:6, 1128:12, 1128:16, 1130:3, 1130:8, 1130:11, 1130:22, 1131:3, 1131:21, 1132:16, 1132:21, 1136:23, 1137:19, 1138:17, 1140:3, 1141:11, 1141:17, 1141:19, 1185:6, 1185:7, 1185:10, 1186:11, 1186:21, 1188:4, 1188:13, 1188:21, 1188:25, 1190:7, 1190:23, 1190:24,

1191:9, 1191:12, 1192:2, 1192:3, 1195:6, 1207:20, 1208:2, 1220:2, 1220:20, 1220:24, 1221:7, 1221:16, 1221:24, 1222:4, 1222:15, 1222:24, 1223:10, 1224:17, 1224:18, 1224:21, 1225:9, 1225:12, 1225:18, 1225:25, 1232:19, 1233:10, 1233:15, 1236:7, 1236:8, 1236:13, 1236:18, 1239:19, 1240:4, 1240:8, 1259:13, 1259:25, 1260:11, 1260:12, 1260:13, 1260:18, 1261:10, 1262:20, 1262:22, 1262:23, 1262:25, 1263:2, 1263:5, 1263:6, 1263:13

**e-mailed** [2] - 1084:12, 1086:22

**e-mailing** [1] - 1086:12

**e-mails** [3] - 1085:22, 1124:22, 1126:3

**early** [3] - 1120:10, 1262:9, 1262:13

**earnings** [24] - 1109:16, 1127:11, 1127:17, 1129:8, 1129:12, 1131:22, 1131:23, 1132:4, 1132:5, 1132:10, 1133:11, 1133:15, 1134:4, 1134:11, 1134:12, 1134:18, 1134:19, 1135:6, 1135:17, 1135:21, 1184:22, 1187:10, 1189:24, 1218:13

**easier** [3] - 1093:10, 1120:11, 1266:16

**easy** [1] - 1251:18

**effect** [1] - 1231:25

**effective** [6] - 1215:16, 1215:18, 1215:20, 1216:17, 1216:25, 1226:10

**efficiently** [1] - 1145:19

**effort** [2] - 1175:17, 1195:18

**efforts** [1] - 1195:11

**Eileen** [3] - 1080:23, 1268:8, 1268:22

**either** [6] - 1086:5, 1089:20, 1115:19, 1135:19, 1194:25, 1200:21

**electronically** [1] - 1086:5, 1209:25, 1220:12

**ELI** [1] - 1230:24

**eliminated** [1] - 1230:20

**elimination** [4] - 1229:24, 1230:11, 1230:22, 1230:24

**eliminations** [4] - 1231:8, 1231:12, 1231:17, 1231:20

**elsewhere** [1] - 1107:23

**emergency** [2] - 1087:9, 1087:13

**Emily** [1] - 1082:3

**employ** [1] - 1268:17
**employed** [9] - 1085:3, 1089:16, 1104:23, 1114:19, 1115:5, 1116:25, 1149:23, 1210:17, 1221:4
**Employee** [1] - 1103:11
**employee** [31] - 1089:16, 1092:18, 1093:23, 1094:6, 1095:5, 1097:8, 1097:18, 1098:11, 1102:13, 1103:3, 1103:6, 1132:14, 1171:4, 1171:5, 1171:8, 1203:18, 1211:16, 1211:18, 1211:22, 1211:25, 1212:5, 1212:9, 1213:12, 1214:25, 1217:18, 1226:14, 1231:25, 1233:25, 1234:10, 1234:18, 1242:6
**employees** [9] - 1087:4, 1212:20, 1227:11, 1228:18, 1228:25, 1229:5, 1230:14, 1234:8, 1241:19
**Employees** [1] - 1103:14
**employer** [5] - 1092:8, 1095:3, 1095:4, 1102:25, 1103:3
**Employer** [2] - 1094:20, 1102:22
**employer's** [1] - 1092:3
**employing** [1] - 1117:18
**employment** [9] - 1107:18, 1146:14, 1156:24, 1170:20, 1170:23, 1201:12, 1201:17, 1201:21, 1204:2
**enable** [1] - 1207:12
**encompassed** [1] - 1127:11
**end** [8] - 1110:4, 1114:5, 1114:18, 1123:22, 1194:12, 1225:24, 1229:22, 1262:12
**Energy** [1] - 1117:12
**ensured** [2] - 1132:12, 1200:7
**entailed** [1] - 1165:17
**entered** [1] - 1266:6
**entering** [1] - 1189:24
**entire** [4] - 1121:6, 1121:23, 1130:14, 1143:23
**entirely** [3] - 1138:19, 1164:21, 1165:6
**entitled** [3] - 1090:3, 1203:18, 1234:18
**equally** [1] - 1155:16
**equals** [1] - 1180:21
**equity** [8] - 1150:18, 1150:22, 1200:22, 1201:6, 1201:10, 1201:15, 1201:19
**errata** [1] - 1163:13
**error** [2] - 1093:5, 1093:13
**ESQ** [4] - 1081:9, 1081:11, 1081:19, 1081:21
**Esq** [2] - 1082:5, 1082:7

**essentially** [1] - 1109:5
**estimates** [1] - 1135:18
**et** [1] - 1142:22
**evaluations** [1] - 1198:5
**event** [2] - 1198:12, 1198:15
**events** [2] - 1145:20, 1165:9
**eventually** [3] - 1124:2, 1132:20, 1239:14
**exact** [3] - 1120:5, 1139:23, 1248:10
**exactly** [2] - 1160:15, 1165:11
**Exactly** [1] - 1227:14, 1248:4
**EXAMINATION** [13] - 1083:3, 1084:19, 1091:2, 1102:9, 1104:16, 1155:23, 1205:7, 1210:14, 1232:11, 1242:11, 1244:23, 1256:14, 1261:16
**examination** [2] - 1205:23, 1227:17
**examined** [3] - 1084:18, 1104:15, 1210:13
**example** [2] - 1097:24, 1234:21
**Excel** [2] - 1229:16, 1229:17
**except** [1] - 1207:9
**exception** [4] - 1217:23, 1218:15, 1218:24, 1266:7
**excess** [1] - 1255:15
**exchange** [9] - 1085:14, 1085:24, 1086:3, 1103:22, 1103:24, 1138:17, 1220:20, 1223:11, 1224:17
**excited** [1] - 1119:14
**exciting** [1] - 1145:24
**excuse** [1] - 1148:5
**excusing** [1] - 1180:7
**execute** [1] - 1113:8
**executed** [2] - 1113:15, 1113:25
**executes** [1] - 1202:11
**exhibit** [17] - 1085:16, 1085:20, 1085:23, 1099:9, 1101:9, 1101:10, 1114:5, 1153:13, 1216:22, 1219:9, 1220:13, 1229:9, 1232:18, 1259:12, 1266:17
**Exhibit** [33] - 1085:17, 1088:3, 1092:21, 1093:9, 1099:7, 1112:12, 1112:22, 1126:2, 1141:14, 1153:5, 1185:2, 1185:4, 1185:6, 1188:21, 1191:13, 1192:6, 1212:2, 1214:11, 1218:5, 1220:9, 1223:6, 1224:5, 1228:4, 1229:10, 1232:17,

1236:3, 1237:2, 1239:19, 1240:22, 1242:16, 1260:4, 1260:6, 1267:13
**exhibits** [5] - 1084:12, 1209:18, 1256:11, 1266:6, 1267:11
**existed** [3] - 1101:22, 1235:9, 1240:12
**exiting** [1] - 1256:19
**expectation** [1] - 1259:6
**expectations** [1] - 1135:21
**expected** [3] - 1124:5, 1125:12, 1134:5
**expecting** [1] - 1187:4
**expense** [2] - 1204:22, 1204:23
**experience** [8] - 1105:23, 1119:19, 1119:20, 1120:7, 1181:20, 1182:22, 1206:25
**experienced** [1] - 1257:18
**experiences** [3] - 1122:10, 1122:13, 1122:16
**expertise** [2] - 1226:17, 1227:2
**explain** [1] - 1261:9
**explanation** [2] - 1147:6, 1147:14
**Explanations** [1] - 1216:3
**explanations** [1] - 1217:10
**explicitly** [2] - 1167:23, 1183:17

# F

**fact** [12] - 1098:15, 1103:10, 1103:22, 1114:4, 1123:16, 1133:23, 1136:11, 1155:9, 1190:9, 1212:4, 1225:18, 1262:12
**failure** [1] - 1145:11
**fair** [3] - 1096:21, 1146:25, 1180:20
**fallow** [2] - 1184:21, 1188:11
**familiar** [9] - 1085:10, 1091:16, 1091:19, 1110:11, 1110:15, 1152:14, 1170:25, 1211:18, 1214:18
**family** [1] - 1234:9
**Family** [3] - 1087:2, 1089:15, 1171:2
**fantastic** [1] - 1120:8
**far** [4] - 1095:15, 1142:24, 1266:5
**favor** [1] - 1262:21
**federal** [1] - 1212:13
**feedback** [1] - 1158:18
**feet** [2] - 1207:13, 1230:5
**fellow** [1] - 1167:19, 1167:24

**felt** [6] - 1089:25, 1122:18, 1122:23, 1123:4, 1205:25, 1258:18
**female** [1] - 1155:10
**few** [8] - 1092:23, 1189:21, 1205:4, 1205:9, 1207:10, 1207:12, 1211:24, 1256:16
**Fifth** [1] - 1081:6
**figure** [2] - 1104:2, 1182:24
**file** [19] - 1084:11, 1085:16, 1087:22, 1101:22, 1101:24, 1102:2, 1153:9, 1209:17, 1211:14, 1214:5, 1235:8, 1235:9, 1235:10, 1235:11, 1235:12, 1235:16, 1243:2
**filed** [4] - 1192:15
**fill** [3] - 1087:5, 1101:2, 1101:18, 1243:20
**finally** [2] - 1090:10, 1207:18
**financial** [4] - 1107:11, 1174:22, 1231:24, 1263:4
**Financial** [1] - 1228:14
**fine** [8] - 1163:17, 1176:10, 1178:23, 1180:2, 1180:4, 1264:15, 1265:9, 1265:18
**finish** [1] - 1097:13
**FINRA** [2] - 1105:12, 1105:17
**fired** [4] - 1157:13, 1202:14, 1202:21, 1242:6
**firm** [15] - 1105:25, 1150:20, 1151:9, 1162:16, 1162:21, 1168:3, 1176:7, 1176:19, 1179:13, 1180:8, 1200:24, 1203:23, 1215:6, 1226:16, 1226:22
**firm's** [1] - 1150:24
**First** [1] - 1227:9
**first** [28] - 1099:24, 1103:7, 1103:12, 1110:14, 1114:4, 1114:5, 1118:24, 1119:2, 1126:3, 1126:14, 1130:12, 1141:22, 1146:23, 1147:2, 1147:5, 1149:17, 1150:16, 1153:12, 1211:2, 1215:21, 1216:20, 1217:6, 1225:6, 1233:5, 1233:14, 1236:25, 1237:17, 1258:18
**five** [7] - 1117:19, 1198:9, 1249:8, 1252:13, 1253:3, 1253:4, 1253:6
**fixed** [3] - 1106:16, 1108:9, 1150:18
**flip** [1] - 1237:6
**Floor** [1] - 1081:6
**FMLA** [92] - 1086:17, 1086:18, 1086:23, 1087:5, 1087:17, 1089:12, 1089:19, 1089:21, 1089:23, 1090:2, 1090:14, 1090:16, 1090:17,

1276

1091:11, 1091:14, 1091:19, 1091:21, 1092:4, 1092:5, 1092:13, 1092:19, 1094:7, 1095:4, 1095:11, 1095:13, 1096:2, 1096:5, 1096:7, 1096:11, 1096:15, 1096:20, 1097:9, 1097:18, 1097:23, 1098:11, 1098:16, 1098:25, 1099:25, 1100:2, 1100:7, 1100:11, 1100:18, 1100:23, 1101:12, 1103:2, 1103:15, 1120:19, 1121:24, 1125:5, 1128:7, 1128:17, 1128:21, 1130:4, 1132:9, 1132:18, 1171:9, 1213:4, 1213:10, 1213:13, 1213:19, 1213:21, 1214:2, 1214:7, 1222:9, 1222:12, 1222:20, 1222:22, 1222:23, 1223:2, 1223:18, 1223:21, 1224:24, 1224:25, 1225:8, 1233:7, 1233:8, 1233:13, 1233:18, 1233:25, 1234:19, 1235:14, 1235:16, 1240:10, 1243:4, 1243:5, 1243:18, 1243:20, 1243:23, 1258:19, 1258:20, 1259:3

**FMLA's** [1] - 1091:16
**FMLA-protected** [7] - 1092:19, 1094:7, 1095:4, 1096:2, 1096:5, 1096:11, 1103:2

**FMLA-qualified** [1] - 1092:13

**focus** [3] - 1211:6, 1251:17, 1251:19

**focusing** [1] - 1150:17

**folks** [1] - 1198:6

**following** [6] - 1086:3, 1086:20, 1131:6, 1139:22, 1199:24, 1200:11

**follows** [4] - 1084:18, 1104:15, 1210:13, 1244:22

**force** [5] - 1107:5, 1107:13, 1134:16, 1139:10, 1250:22

**foregoing** [1] - 1268:10

**foreseeable** [1] - 1103:16

**forget** [1] - 1110:18

**forgotten** [1] - 1094:4

**form** [6] - 1195:4, 1207:8, 1215:9, 1215:11, 1216:3, 1243:25

**formal** [1] - 1087:25

**forms** [14] - 1096:25, 1097:3, 1097:8, 1097:18, 1097:23, 1098:7, 1098:12, 1098:16, 1099:2, 1101:13, 1101:16, 1153:15, 1154:7, 1214:14

**formula** [1] - 1152:4

**fortunate** [1] - 1120:8

**forward** [3] - 1090:2,

1180:11, 1213:6
**founding** [1] - 1106:10
**four** [8] - 1117:19, 1192:21, 1194:9, 1227:3, 1237:3, 1238:24, 1243:15, 1265:4
**fourth** [2] - 1126:19, 1252:24
**frame** [5] - 1099:4, 1127:11, 1194:9, 1194:10, 1234:3
**franchise** [2] - 1106:15, 1107:2
**free** [1] - 1208:14, 1244:10
**frequently** [1] - 1168:2
**Friday** [3] - 1260:18, 1265:6, 1265:7
**front** [2] - 1112:23, 1220:15
**frustrated** [12] - 1127:3, 1127:5, 1127:9, 1127:10, 1190:6, 1190:10, 1190:12, 1190:13, 1190:21, 1191:5, 1191:8
**frustration** [4] - 1133:20, 1133:22, 1144:17, 1146:5
**fulfilling** [1] - 1189:22
**full** [3] - 1141:8, 1174:25, 1258:20
**functions** [2] - 1192:22, 1193:16

## G

**gained** [1] - 1132:24
**Garbaccio** [1] - 1082:7
**gender** [1] - 1170:20
**general** [5] - 1097:5, 1101:13, 1101:16, 1195:13, 1226:15
**generally** [8] - 1088:18, 1170:25, 1211:20, 1214:23, 1226:21, 1227:20, 1232:4, 1265:14
**Generally** [1] - 1211:22
**generate** [1] - 1152:7
**generated** [5] - 1086:25, 1152:5, 1166:20, 1170:13, 1170:16
**generator** [1] - 1152:6
**geographically** [1] - 1084:22
**George** [1] - 1218:6
**GIBSON** [87] - 1081:19, 1083:6, 1083:8, 1083:10, 1083:12, 1083:14, 1083:16, 1083:19, 1084:2, 1084:15, 1084:20, 1090:21, 1093:7, 1093:14, 1093:20, 1099:8, 1102:6, 1102:10, 1104:4, 1104:8, 1104:17, 1104:20, 1104:22, 1128:24, 1129:21, 1129:24, 1130:2, 1136:21, 1146:6, 1155:18, 1155:21,

1163:15, 1163:22, 1164:2, 1182:5, 1190:16, 1190:19, 1191:15, 1191:17, 1205:3, 1205:8, 1205:15, 1205:18, 1208:9, 1209:4, 1209:7, 1209:13, 1209:23, 1210:3, 1210:8, 1210:10, 1210:15, 1227:6, 1227:14, 1227:18, 1232:9, 1232:21, 1242:12, 1242:20, 1242:22, 1242:24, 1244:7, 1244:12, 1244:14, 1244:17, 1256:10, 1256:15, 1259:11, 1259:18, 1259:19, 1260:8, 1260:9, 1261:7, 1263:17, 1264:3, 1264:13, 1264:18, 1264:25, 1265:8, 1265:11, 1265:20, 1266:5, 1266:9, 1266:22, 1267:3, 1267:10, 1267:20
**Gibson** [2] - 1102:11, 1209:4
**girls** [2] - 1119:19, 1120:11
**given** [6] - 1113:17, 1135:19, 1163:10, 1172:21, 1204:21, 1241:8
**Glad** [1] - 1131:9
**glad** [1] - 1131:14
**Gmail** [1] - 1263:13
**gold** [2] - 1145:5
**Good-bye** [1] - 1104:11
**good..** [1] - 1180:21
**graduate** [1] - 1162:20
**graduated** [1] - 1105:24
**grant** [1] - 1120:22
**great** [5] - 1128:3, 1133:7, 1142:5, 1189:23, 1227:22
**Great** [2] - 1084:15, 1210:10
**grew** [1] - 1162:19
**ground** [1] - 1180:25
**group** [29] - 1107:10, 1112:10, 1116:4, 1116:17, 1116:23, 1118:5, 1121:7, 1151:4, 1158:4, 1158:6, 1159:9, 1160:4, 1160:14, 1160:20, 1161:7, 1166:18, 1170:2, 1177:24, 1178:2, 1178:4, 1178:8, 1181:9, 1187:21, 1187:24, 1193:2, 1197:10, 1202:23, 1203:11, 1206:8
**guarantee** [1] - 1207:15
**guaranteed** [2] - 1207:8, 1212:15
**guess** [3] - 1113:16, 1172:20, 1204:10

## H

**habits** [1] - 1264:23
**hand** [4] - 1094:21,

1241:14, 1241:16, 1268:20
**handbook** [11] - 1093:23, 1094:10, 1094:14, 1096:7, 1096:15, 1096:17, 1102:14, 1211:23, 1211:25, 1212:5, 1212:9
**handle** [3] - 1131:22, 1135:6, 1187:9
**handled** [2] - 1091:14, 1127:17
**handwriting** [8] - 1219:2, 1219:14, 1241:4, 1241:7, 1241:12, 1241:15, 1241:23, 1242:5
**hang** [1] - 1244:11
**happy** [3] - 1119:13, 1169:3, 1263:24
**hard** [1] - 1260:17
**head** [48] - 1106:13, 1106:17, 1106:19, 1106:24, 1108:3, 1108:9, 1108:17, 1109:9, 1109:20, 1111:6, 1112:6, 1113:7, 1118:4, 1138:6, 1138:9, 1139:7, 1142:19, 1143:4, 1143:18, 1143:22, 1148:24, 1157:19, 1157:22, 1158:2, 1158:4, 1158:6, 1159:8, 1159:12, 1159:21, 1160:4, 1160:8, 1160:14, 1161:11, 1166:3, 1166:12, 1167:2, 1167:8, 1167:22, 1169:18, 1177:16, 1177:19, 1177:20, 1178:3, 1178:11, 1194:25, 1196:20, 1202:16, 1206:18
**headline** [1] - 1134:14
**health** [2] - 1186:7, 1203:24
**Health** [1] - 1203:20
**health-related** [1] - 1186:7
**healthy** [1] - 1131:10
**hear** [7] - 1091:6, 1135:22, 1224:23, 1232:16, 1257:2, 1257:7, 1263:25
**heard** [6] - 1090:15, 1113:23, 1137:17, 1222:21, 1256:17, 1256:21
**hearing** [4] - 1122:16, 1182:23, 1263:24, 1264:7
**heat** [1] - 1189:25
**Heights** [1] - 1084:23
**held** [1] - 1206:15
**help** [2] - 1130:18, 1133:2
**helped** [3] - 1154:24, 1158:25, 1200:4
**helping** [1] - 1136:14
**hereby** [1] - 1268:10
**herein** [1] - 1268:15
**hereunto** [1] - 1268:19
**hesitate** [1] - 1267:9
**hierarchal** [1] - 1165:12
**hierarchy** [1] - 1161:19

**high** [121] - 1106:6, 1106:9, 1106:14, 1106:17, 1106:19, 1106:24, 1107:5, 1107:14, 1108:3, 1108:17, 1108:18, 1108:23, 1109:3, 1109:4, 1109:7, 1109:8, 1109:9, 1109:10, 1109:21, 1110:3, 1111:7, 1113:7, 1114:22, 1116:3, 1116:13, 1116:16, 1116:22, 1116:24, 1117:14, 1117:15, 1117:17, 1120:13, 1121:7, 1138:21, 1139:7, 1143:5, 1143:10, 1143:18, 1143:20, 1144:5, 1148:7, 1148:24, 1150:3, 1150:4, 1151:3, 1156:13, 1157:19, 1157:23, 1158:3, 1158:10, 1159:21, 1160:4, 1160:8, 1160:23, 1162:4, 1162:14, 1165:23, 1165:25, 1166:3, 1166:6, 1167:3, 1167:11, 1167:12, 1169:17, 1169:18, 1169:21, 1169:22, 1169:25, 1170:2, 1170:5, 1170:6, 1170:10, 1170:12, 1170:15, 1171:13, 1171:19, 1172:16, 1172:19, 1173:23, 1174:5, 1174:11, 1174:21, 1175:5, 1177:16, 1177:20, 1177:21, 1178:4, 1178:15, 1178:16, 1197:10, 1197:13, 1199:2, 1201:24, 1202:4, 1202:8, 1202:14, 1202:16, 1202:21, 1203:14, 1204:8, 1205:25, 1206:5, 1206:8, 1206:19, 1245:14, 1245:17, 1245:20, 1245:22, 1245:24, 1245:25, 1251:15, 1252:13, 1253:20, 1254:20, 1255:4, 1255:18, 1255:22, 1256:2, 1258:5

**high-yield** [120] - 1106:6, 1106:9, 1106:14, 1106:17, 1106:19, 1106:24, 1107:5, 1107:14, 1108:3, 1108:17, 1108:18, 1108:23, 1109:3, 1109:4, 1109:7, 1109:8, 1109:9, 1109:10, 1109:21, 1110:3, 1111:7, 1113:7, 1114:22, 1116:3, 1116:13, 1116:16, 1116:22, 1116:24, 1117:14, 1117:15, 1117:17, 1121:7, 1138:21, 1139:7, 1143:5, 1143:10, 1143:18, 1143:20, 1144:5, 1148:7, 1148:24, 1150:3, 1150:4, 1151:3, 1156:13, 1157:19, 1157:23, 1158:3, 1158:10, 1159:21, 1160:4, 1160:8, 1160:23, 1162:4, 1162:14, 1165:23, 1165:25, 1166:3, 1166:6, 1167:3, 1167:11, 1167:12, 1169:17, 1169:18,

1169:21, 1169:22, 1169:25, 1170:2, 1170:5, 1170:6, 1170:10, 1170:12, 1170:15, 1171:13, 1171:19, 1172:16, 1172:19, 1173:23, 1174:5, 1174:11, 1174:21, 1175:5, 1177:16, 1177:20, 1177:21, 1178:4, 1178:15, 1178:16, 1197:10, 1197:13, 1199:2, 1201:24, 1202:4, 1202:8, 1202:14, 1202:16, 1202:21, 1203:14, 1204:8, 1205:25, 1206:5, 1206:8, 1206:19, 1245:14, 1245:17, 1245:20, 1245:22, 1245:24, 1245:25, 1251:15, 1252:13, 1253:20, 1254:20, 1255:4, 1255:18, 1255:22, 1256:2, 1258:5

**higher** [7] - 1197:17, 1197:20, 1250:12, 1251:23, 1251:25, 1267:4

**highest** [5] - 1117:16, 1248:9, 1253:8, 1253:9, 1253:10

**Highlights** [1] - 1228:14

**himself** [2] - 1124:17, 1124:19

**hire** [6] - 1107:12, 1110:24, 1111:8, 1148:6, 1171:14, 1172:8

**hired** [16] - 1105:22, 1111:23, 1149:21, 1149:24, 1150:5, 1152:19, 1158:9, 1161:3, 1165:9, 1171:12, 1178:18, 1204:17, 1204:18, 1211:2, 1257:4, 1257:12

**hiring** [8] - 1114:17, 1171:13, 1171:15, 1171:19, 1171:22, 1172:3, 1176:16, 1257:11

**history** [1] - 1105:21

**hit** [1] - 1189:19

**HOAI** [3] - 1080:4, 1083:17, 1244:20

**Hoai** [23] - 1085:11, 1090:15, 1110:16, 1113:3, 1118:22, 1119:3, 1120:6, 1124:15, 1133:4, 1137:17, 1141:6, 1142:18, 1142:20, 1144:18, 1147:11, 1175:7, 1176:3, 1189:20, 1190:21, 1222:22, 1224:23, 1237:12, 1244:20

**Hoai's** [2] - 1126:9, 1133:15

**Hoffman** [1] - 1082:4

**Hold** [4] - 1102:16, 1210:7, 1224:12, 1232:24

**hold** [1] - 1209:12

**hold-up** [1] - 1209:12

**honest** [1] - 1163:23

**Honor** [3] - 1226:24,

1227:6, 1264:18

**hospital** [1] - 1097:25

**hours** [1] - 1142:18

**house** [3] - 1082:5, 1082:7, 1124:18

**HR** [4] - 1091:8, 1130:6, 1235:9, 1235:11

**huge** [1] - 1165:11

**Human** [1] - 1227:13

**human** [23] - 1085:9, 1086:18, 1087:22, 1088:13, 1088:17, 1088:20, 1090:7, 1103:20, 1123:7, 1210:22, 1211:10, 1211:17, 1212:17, 1212:21, 1213:14, 1213:16, 1214:5, 1214:20, 1221:5, 1221:6, 1226:14, 1239:8, 1240:16

**hundred** [4] - 1172:19, 1188:8, 1249:20, 1249:21

**Hurricane** [1] - 1196:5

**husband** [1] - 1162:17

**husband's** [1] - 1169:10

**hypocrite** [1] - 1264:24

**hypothetically** [1] - 1129:6

## I

**IADEVAIA** [42] - 1081:9, 1083:11, 1083:18, 1155:24, 1161:5, 1163:13, 1163:17, 1163:18, 1164:3, 1166:22, 1168:12, 1181:2, 1182:3, 1182:6, 1182:9, 1185:15, 1185:17, 1191:7, 1191:20, 1194:17, 1196:7, 1198:17, 1198:20, 1198:21, 1205:2, 1205:6, 1208:12, 1244:24, 1248:20, 1252:8, 1253:4, 1253:13, 1256:8, 1260:5, 1261:11, 1261:17, 1263:14, 1266:12, 1266:20, 1266:24, 1267:7, 1267:15

**idea** [8] - 1097:16, 1113:14, 1116:19, 1128:3, 1180:19, 1180:20, 1180:21, 1180:23

**identifies** [1] - 1154:7

**imagine** [1] - 1224:22

**Immediate** [1] - 1153:19

**immediate** [2] - 1154:4, 1154:7

**immediately** [1] - 1208:2

**immunization** [2] - 1185:24, 1186:4

**immunizations** [1] - 1186:10

**Imperial** [2] - 1106:12, 1149:10

**implicit** [1] - 1167:15

**implies** [1] - 1252:5

**importance** [6] - 1145:10,

1145:18, 1149:2, 1149:12, 1245:3, 1250:18

**important** [10] - 1112:8, 1132:6, 1134:17, 1150:20, 1151:2, 1151:5, 1159:9, 1159:13, 1168:4, 1250:21

**importantly** [1] - 1084:5

**IN** [1] - 1268:19

**In-house** [2] - 1082:5, 1082:7

**inappropriate** [1] - 1192:2

**Inc** [2] - 1210:18, 1212:12

**INC** [1] - 1080:7

**inception** [1] - 1206:22

**include** [4] - 1117:4, 1117:21, 1128:3, 1215:5

**included** [7] - 1107:20, 1107:23, 1142:9, 1169:22, 1192:22, 1193:15, 1200:11

**including** [3] - 1192:24, 1193:18, 1198:4

**income** [3] - 1106:16, 1108:9, 1150:19

**incorrect** [2] - 1100:17, 1100:23

**increases** [1] - 1232:7

**indeed** [1] - 1141:12

**index** [17] - 1245:14, 1245:17, 1245:20, 1246:5, 1246:18, 1247:10, 1247:14, 1249:19, 1251:15, 1251:20, 1252:14, 1253:8, 1253:12, 1253:20, 1254:20, 1255:4, 1255:16

**indicate** [7] - 1098:8, 1103:7, 1121:2, 1122:15, 1122:22, 1123:8, 1125:7

**indicated** [3] - 1087:23, 1213:18, 1218:2

**indicating** [2] - 1226:8, 1243:2

**indirectly** [1] - 1268:16

**individual** [1] - 1260:15

**industries** [2] - 1147:13, 1202:11

**industry** [2] - 1105:21, 1246:3

**inform** [2] - 1092:18, 1094:6

**information** [4] - 1096:20, 1109:12, 1109:17, 1144:8

**informed** [1] - 1147:5

**input** [2] - 1196:16, 1196:21

**inquiry** [1] - 1097:5

**instance** [1] - 1234:17

**instances** [1] - 1207:10

**institution** [1] - 1174:22

**institutional** [1] - 1109:18

**instructed** [1] - 1135:10

**intended** [2] - 1125:14, 1160:13

1278

**intending** [1] - 1134:3
**intent** [2] - 1122:3, 1122:6
**intention** [1] - 1154:22
**intentions** [1] - 1097:16
**interact** [1] - 1109:4
**interest** [1] - 1176:11
**interested** [3] - 1122:16, 1182:23, 1268:16
**interface** [1] - 1107:13
**interview** [2] - 1111:22, 1111:25
**interviewed** [4] - 1112:5, 1172:5, 1198:7, 1258:6
**interviewing** [1] - 1172:8
**invest** [1] - 1176:14
**investment** [8] - 1106:9, 1150:19, 1200:22, 1201:3, 1201:5, 1201:10, 1201:11, 1201:16
**involve** [1] - 1134:23
**involved** [6] - 1171:12, 1171:16, 1172:2, 1175:17, 1178:6, 1178:14
**issue** [3] - 1145:17, 1266:13, 1267:12
**issues** [3] - 1140:7, 1142:22, 1196:6
**item** [1] - 1228:17
**items** [1] - 1265:24
**iterative** [1] - 1168:10

## J

**Jaime** [2] - 1088:8, 1232:23
**JAIME** [1] - 1210:11
**Jamie** [1] - 1082:15
**JAMIE** [1] - 1083:13
**JAMS** [1] - 1080:2
**Jane** [5] - 1082:14, 1173:10, 1244:12, 1250:19, 1251:16
**JANE** [2] - 1083:9, 1104:13
**JEREMIAH** [1] - 1081:9
**jiadevaia@vladeck.com** [1] - 1081:10
**Jiten** [2] - 1148:11, 1204:18
**job** [30] - 1085:6, 1089:12, 1101:4, 1101:19, 1104:25, 1107:4, 1107:12, 1159:9, 1159:20, 1162:8, 1162:24, 1165:22, 1166:12, 1167:2, 1167:4, 1169:3, 1171:10, 1176:10, 1176:18, 1199:25, 1200:11, 1208:6, 1210:19, 1210:21, 1225:2, 1225:19, 1242:7, 1243:19, 1246:21, 1258:4
**job-protected** [4] - 1089:12, 1101:4, 1101:19, 1243:19

**jobs** [1] - 1258:8
**John** [12] - 1084:12, 1093:8, 1093:14, 1099:8, 1132:25, 1133:13, 1133:16, 1135:2, 1135:20, 1209:18
**JOHN** [1] - 1081:21
**john.coster@ssbb.com** [1] - 1081:22
**Johnson** [9] - 1152:15, 1152:17, 1152:18, 1152:23, 1154:14, 1155:10, 1155:13, 1198:23, 1199:25
**Johnson's** [2] - 1153:8, 1154:3
**join** [1] - 1106:8
**joined** [1] - 1156:12
**jointly** [1] - 1192:20
**Joshi** [8] - 1148:11, 1148:12, 1148:18, 1149:16, 1149:20, 1149:24, 1204:10, 1204:18
**Judge** [11] - 1084:5, 1102:6, 1128:25, 1155:19, 1205:15, 1209:13, 1242:20, 1260:8, 1266:16, 1267:18, 1267:20
**judge** [1] - 1084:9
**JUDGE** [1] - 1080:12
**July** [42] - 1090:12, 1099:25, 1100:11, 1100:15, 1100:19, 1101:3, 1126:8, 1128:6, 1131:5, 1132:16, 1136:23, 1142:20, 1143:5, 1184:20, 1185:7, 1186:13, 1187:15, 1188:4, 1188:10, 1188:12, 1188:21, 1188:25, 1189:5, 1189:17, 1190:7, 1191:9, 1207:19, 1222:19, 1224:24, 1225:9, 1226:10, 1233:7, 1235:4, 1235:19, 1236:10, 1237:11, 1239:14, 1239:23, 1240:3, 1240:4, 1262:7
**June** [19] - 1124:7, 1125:11, 1127:18, 1140:19, 1147:19, 1148:2, 1183:19, 1194:11, 1206:13, 1246:19, 1248:22, 1249:7, 1258:23, 1259:2, 1259:6, 1260:19, 1261:18, 1262:2, 1262:17
**junior** [1] - 1135:3, 1179:16
**Justin** [1] - 1082:7

## K

**Katia** [4] - 1260:16, 1260:17, 1262:24
**keep** [6] - 1113:20, 1176:7, 1180:11, 1207:2, 1235:13, 1254:11
**keeping** [1] - 1196:4

**kids** [1] - 1120:3
**kind** [8] - 1098:9, 1135:15, 1149:8, 1200:7, 1214:25, 1216:12, 1225:14, 1230:10
**kinds** [1] - 1195:4
**knowledge** [10] - 1110:7, 1115:15, 1138:20, 1148:7, 1201:9, 1201:13, 1201:15, 1206:4, 1226:15, 1254:3
**known** [2] - 1135:16, 1202:24
**Kristen** [1] - 1224:20

## L

**L.F** [1] - 1106:2
**LA** [1] - 1167:20
**labeled** [1] - 1094:19
**lack** [1] - 1145:7
**laid** [1] - 1230:19
**large** [2] - 1156:23, 1220:13
**largest** [1] - 1170:2
**Last** [3] - 1246:9, 1258:11, 1259:12
**last** [17] - 1094:25, 1102:25, 1110:3, 1113:4, 1117:13, 1129:22, 1130:17, 1140:17, 1150:3, 1218:16, 1218:25, 1219:8, 1219:9, 1237:3, 1243:17, 1259:13, 1264:21
**late** [4] - 1107:3, 1107:10, 1234:19, 1262:10
**law** [3] - 1212:14, 1262:21, 1263:2
**laws** [1] - 1212:13
**layers** [1] - 1165:12
**layoffs** [3] - 1227:12, 1227:24, 1231:23
**leadership** [11] - 1160:18, 1160:23, 1161:6, 1161:17, 1161:19, 1161:22, 1162:13, 1165:10, 1165:13, 1165:14, 1167:25
**leading** [1] - 1105:21
**learn** [4] - 1125:23, 1136:25, 1137:6, 1146:21
**learned** [4] - 1125:20, 1126:15, 1139:6, 1146:23
**least** [1] - 1089:16
**leave** [138] - 1086:17, 1086:23, 1087:5, 1087:17, 1087:23, 1087:25, 1089:5, 1089:8, 1089:12, 1089:20, 1089:24, 1090:2, 1090:14, 1091:22, 1091:23, 1091:24, 1092:4, 1092:5, 1092:9, 1092:12, 1092:18, 1094:6, 1095:4, 1095:11, 1096:2, 1096:3, 1096:18, 1096:19, 1096:22, 1097:5, 1097:9, 1097:15, 1098:3, 1098:5,

1098:9, 1098:11, 1098:16, 1098:25, 1100:2, 1100:11, 1100:14, 1100:16, 1100:18, 1100:23, 1103:2, 1103:7, 1103:16, 1104:2, 1111:19, 1119:16, 1120:16, 1120:23, 1121:3, 1121:15, 1121:19, 1121:24, 1122:3, 1122:7, 1122:19, 1122:24, 1123:16, 1125:2, 1125:5, 1128:9, 1128:17, 1130:4, 1130:5, 1132:9, 1132:18, 1152:24, 1154:14, 1155:2, 1155:14, 1157:13, 1157:17, 1171:6, 1171:9, 1176:22, 1182:14, 1182:17, 1200:2, 1200:6, 1200:13, 1212:12, 1212:14, 1212:22, 1213:13, 1213:14, 1213:18, 1213:21, 1214:2, 1214:7, 1215:6, 1215:25, 1217:7, 1217:11, 1217:19, 1217:22, 1217:24, 1220:6, 1221:18, 1221:22, 1222:6, 1222:9, 1222:13, 1222:20, 1223:2, 1223:18, 1225:8, 1225:15, 1226:2, 1226:9, 1233:8, 1233:13, 1233:21, 1234:4, 1234:7, 1234:9, 1234:11, 1234:22, 1234:24, 1234:25, 1235:5, 1236:21, 1237:21, 1237:25, 1238:11, 1239:5, 1239:9, 1240:9, 1240:10, 1241:5, 1243:4, 1243:5, 1243:19, 1258:19, 1258:20, 1259:3
**Leave** [5] - 1087:2, 1089:15, 1171:2, 1213:10, 1219:7
**leaves** [8] - 1199:7, 1199:11, 1199:13, 1199:16, 1199:22, 1199:24, 1200:11, 1218:3
**Leaves** [1] - 1212:9
**ledger** [1] - 1204:24
**left** [18] - 1103:10, 1106:8, 1124:2, 1127:17, 1132:14, 1175:9, 1177:23, 1178:2, 1194:11, 1204:17, 1204:19, 1215:15, 1253:24, 1258:22, 1259:2, 1259:5, 1260:21, 1261:19
**legal** [1] - 1099:20
**lengthy** [1] - 1149:7
**LENORE** [2] - 1083:4, 1084:16
**Lenore** [7] - 1084:2, 1093:7, 1211:11, 1220:21, 1224:19, 1225:12, 1225:14
**Leonore** [2] - 1082:13
**less** [2] - 1206:16, 1231:20
**letter** [40] - 1099:25, 1101:11, 1113:3, 1113:5,

1113:25, 1114:13, 1172:11, 1172:15, 1172:20, 1173:7, 1173:14, 1217:11, 1217:14, 1217:20, 1224:24, 1233:7, 1235:3, 1235:7, 1235:9, 1235:19, 1235:21, 1235:24, 1235:25, 1236:10, 1236:15, 1236:17, 1237:14, 1238:11, 1238:12, 1238:21, 1239:4, 1239:7, 1239:15, 1239:17, 1239:23, 1240:4, 1240:7, 1240:19, 1242:16, 1243:12

**letters** [5] - 1113:8, 1113:11, 1234:22, 1234:23, 1243:2

**level** [1] - 1203:7

**levels** [3] - 1111:13, 1115:15, 1179:14

**licenses** [2] - 1105:12, 1105:17

**LICUL** [29] - 1081:11, 1083:7, 1083:15, 1091:3, 1093:24, 1099:5, 1099:12, 1102:4, 1104:6, 1104:10, 1163:20, 1163:24, 1226:24, 1232:12, 1233:4, 1242:10, 1244:8, 1244:16, 1256:13, 1263:21, 1264:11, 1264:15, 1265:4, 1265:16, 1265:18, 1266:2, 1266:8, 1266:11, 1267:18

**Licul** [6] - 1090:23, 1102:20, 1227:7, 1232:14, 1242:18, 1242:25

**likely** [1] - 1139:9

**Lily** [1] - 1131:10

**limit** [2] - 1264:20, 1264:22

**limited** [1] - 1227:16

**line** [22] - 1094:25, 1099:24, 1126:8, 1152:6, 1164:12, 1164:16, 1165:4, 1168:15, 1168:22, 1173:2, 1173:5, 1179:21, 1182:10, 1186:15, 1186:19, 1189:9, 1189:11, 1228:16, 1233:5, 1233:6, 1235:20

**list** [2] - 1231:4, 1265:22

**lists** [1] - 1228:20

**LLP** [1] - 1081:15

**LOA** [4] - 1219:2, 1219:6, 1241:4, 1241:25

**local** [1] - 1212:13

**located** [2] - 1084:22, 1114:6

**logical** [1] - 1179:7

**Logistically** [1] - 1126:20

**logistics** [1] - 1133:3

**look** [58] - 1085:17, 1085:22, 1088:3, 1092:21, 1094:13, 1094:19, 1094:25, 1101:8, 1103:10, 1112:11,

---

1112:14, 1113:4, 1125:25, 1126:4, 1131:3, 1141:14, 1153:4, 1164:11, 1164:12, 1165:3, 1168:13, 1168:15, 1172:23, 1173:2, 1179:17, 1179:20, 1184:19, 1184:25, 1186:15, 1189:8, 1189:9, 1192:5, 1192:18, 1215:8, 1216:2, 1217:9, 1219:8, 1220:8, 1222:18, 1225:24, 1228:16, 1229:8, 1232:17, 1232:18, 1236:3, 1236:25, 1243:11, 1246:7, 1246:11, 1246:16, 1246:23, 1248:14, 1249:18, 1252:15, 1252:18, 1253:14, 1267:7

**looked** [8] - 1182:25, 1220:6, 1226:6, 1248:22, 1249:5, 1253:15, 1254:17, 1255:12

**looking** [9] - 1169:10, 1216:15, 1218:19, 1222:2, 1222:15, 1222:24, 1235:23, 1264:4, 1267:8

**looks** [2] - 1089:6, 1229:22

**Looks** [1] - 1221:20

**Los** [7] - 1105:7, 1162:19, 1162:22, 1164:19, 1165:17, 1165:22, 1167:4

**lose** [2] - 1167:2, 1167:21

**losing** [2] - 1176:13, 1176:15

**lost** [1] - 1092:25, 1200:14, 1246:21

**low** [1] - 1174:8

**Lowenthal** [57] - 1099:16, 1100:7, 1101:16, 1108:5, 1108:11, 1111:4, 1115:17, 1115:19, 1116:20, 1123:12, 1127:21, 1136:7, 1136:22, 1136:25, 1137:5, 1137:12, 1137:21, 1138:7, 1138:11, 1138:24, 1144:4, 1146:20, 1147:2, 1147:7, 1156:24, 1157:2, 1157:5, 1157:6, 1157:8, 1157:12, 1162:16, 1175:23, 1176:6, 1178:10, 1178:12, 1181:3, 1181:4, 1181:7, 1188:21, 1191:8, 1191:22, 1196:16, 1196:24, 1204:24, 1208:2, 1224:19, 1233:17, 1235:21, 1235:24, 1236:9, 1236:21, 1237:25, 1240:9, 1256:17, 1257:2, 1265:23

**Lowenthal's** [3] - 1108:6, 1242:15, 1244:25

**lucky** [1] - 1107:9

**Luncheon** [1] - 1208:15

**lying** [4] - 1256:22, 1256:25, 1257:10, 1257:14

**Lynn** [4] - 1152:15,

---

1152:18, 1154:21, 1198:22

## M

**Madison** [2] - 1110:23, 1114:7

**mail** [109] - 1085:13, 1085:24, 1086:3, 1086:8, 1086:21, 1088:7, 1088:8, 1088:22, 1089:3, 1090:6, 1090:11, 1090:19, 1093:9, 1093:15, 1096:6, 1099:9, 1099:16, 1099:23, 1103:22, 1103:24, 1125:24, 1126:6, 1126:11, 1127:20, 1128:4, 1128:6, 1128:12, 1128:16, 1130:3, 1130:8, 1130:11, 1130:22, 1131:3, 1131:21, 1132:16, 1132:21, 1136:23, 1137:19, 1138:17, 1140:3, 1141:11, 1141:17, 1141:19, 1185:6, 1185:7, 1185:10, 1186:11, 1186:21, 1188:4, 1188:13, 1188:21, 1188:25, 1190:7, 1190:23, 1190:24, 1191:9, 1191:12, 1192:2, 1192:3, 1195:6, 1207:20, 1208:2, 1220:2, 1220:10, 1220:20, 1220:24, 1221:7, 1221:16, 1221:24, 1222:4, 1222:15, 1222:24, 1223:10, 1224:17, 1224:18, 1224:21, 1225:9, 1225:12, 1225:18, 1225:25, 1232:19, 1233:10, 1233:15, 1236:7, 1236:8, 1236:13, 1236:18, 1239:19, 1240:4, 1240:8, 1241:17, 1259:13, 1259:25, 1260:11, 1260:12, 1260:13, 1260:18, 1261:10, 1262:20, 1262:22, 1262:23, 1262:25, 1263:2, 1263:5, 1263:6, 1263:13

**mailed** [2] - 1084:12, 1086:22

**mailing** [1] - 1086:12

**mails** [3] - 1085:22, 1124:22, 1126:3

**main** [1] - 1176:11

**maintained** [1] - 1214:20

**male** [1] - 1155:13

**manage** [2] - 1107:13, 1166:10

**managed** [3] - 1158:7, 1166:7, 1166:13

**management** [3] - 1156:20, 1161:20, 1165:13

**managers** [1] - 1215:3

**managing** [7] - 1085:8, 1090:9, 1106:13, 1156:16, 1166:24, 1197:7, 1204:23

**Managing** [1] - 1105:3

---

**manual** [1] - 1212:25

**March** [4] - 1080:16, 1110:4, 1268:11, 1268:20

**market** [16] - 1189:6, 1189:7, 1189:18, 1247:5, 1247:12, 1247:22, 1248:2, 1248:15, 1248:18, 1249:9, 1249:17, 1250:4, 1250:6, 1251:7

**marketplace** [1] - 1151:5

**markets** [2] - 1105:4, 1157:23

**marriage** [1] - 1268:15

**mass** [1] - 1259:13

**massive** [1] - 1251:13

**matching** [1] - 1175:4

**material** [4] - 1145:13, 1243:20, 1243:23, 1244:4

**math** [1] - 1231:2

**matrix** [1] - 1152:4

**matter** [3] - 1151:6, 1192:11, 1268:16

**MBA** [1] - 1105:25

**McCabe** [3] - 1099:18, 1099:19, 1224:19

**MD** [1] - 1197:12

**mean** [13] - 1131:23, 1161:7, 1165:6, 1187:22, 1189:13, 1196:2, 1215:18, 1217:17, 1233:14, 1245:16, 1247:8, 1249:10, 1263:8

**meaning** [1] - 1247:13

**meaningful** [1] - 1171:23

**means** [4] - 1102:8, 1216:10, 1216:13, 1250:11

**meant** [1] - 1224:22

**Meant** [1] - 1142:11

**measure** [6] - 1245:14, 1245:16, 1248:11, 1250:21, 1251:6, 1251:8

**measured** [2] - 1249:11, 1249:12

**measurement** [2] - 1245:19, 1247:25

**measures** [2] - 1245:21, 1248:5

**media** [1] - 1148:13

**Medical** [3] - 1087:2, 1089:15, 1171:2

**medical** [12] - 1087:9, 1087:13, 1089:7, 1214:3, 1216:4, 1216:20, 1217:7, 1217:10, 1217:19, 1221:21, 1222:7, 1234:9

**meet** [1] - 1110:17

**meeting** [5] - 1139:15, 1142:12, 1142:13, 1195:5, 1195:8

**meetings** [1] - 1139:14

**member** [1] - 1157:8

**mention** [3] - 1128:21,

1280

1147:18, 1147:22

**message** [4] - 1090:12, 1093:12, 1141:19, 1222:19

**met** [1] - 1110:16

**metal** [1] - 1197:5

**Metals** [3] - 1249:3, 1249:4, 1252:12

**metals** [15] - 1196:9, 1196:10, 1201:20, 1202:5, 1249:2, 1249:6, 1249:8, 1252:11, 1252:20, 1253:11, 1254:8, 1255:8, 1255:13, 1256:5, 1256:20

**mgibson @ssbb.com** [1] - 1081:20

**MICHAEL** [2] - 1080:12, 1081:19

**Michigan** [2] - 1084:23, 1210:25

**mid** [7] - 1110:16, 1118:13, 1146:12, 1223:22, 1224:3, 1225:17

**middle** [4] - 1088:7, 1120:13, 1157:14, 1220:23

**Midtown** [1] - 1110:23

**might** [2] - 1141:15, 1206:20

**Mike** [2] - 1102:11, 1209:4

**Miller** [1] - 1082:3

**mind** [1] - 1133:20

**miners** [1] - 1145:6

**mining** [22] - 1142:21, 1145:4, 1148:22, 1149:14, 1150:9, 1196:9, 1196:10, 1197:5, 1201:20, 1202:4, 1249:2, 1249:3, 1249:4, 1249:8, 1252:11, 1252:12, 1252:21, 1254:8, 1255:8, 1255:14, 1256:6, 1256:20

**mining's** [1] - 1253:11

**minings** [1] - 1249:6

**minutes** [3] - 1092:23, 1155:19, 1244:14

**miss** [1] - 1142:5

**mistake** [1] - 1119:25

**moi** [1] - 1165:13

**mom** [1] - 1124:18

**mom's** [1] - 1124:18

**moment** [1] - 1220:11

**Monday** [4] - 1131:5, 1136:5, 1137:10, 1137:12

**money** [4] - 1174:23, 1176:22, 1177:3, 1177:11

**month** [5] - 1259:7, 1261:5, 1263:6, 1263:9, 1263:13

**months** [2] - 1089:16, 1207:12

**Morgan** [15] - 1108:13, 1108:21, 1111:5, 1113:18, 1114:8, 1114:11, 1115:16, 1115:19, 1116:9, 1117:24,

1172:21, 1177:20, 1177:23, 1196:20, 1196:24

**Morgan's** [2] - 1108:15, 1178:7

**morning** [15] - 1084:13, 1091:4, 1091:5, 1104:18, 1104:19, 1137:10, 1137:12, 1139:14, 1139:15, 1142:12, 1142:13, 1155:25, 1156:2, 1195:5, 1195:8

**most** [4] - 1084:4, 1156:19, 1184:21, 1248:8

**mostly** [1] - 1179:11

**mothers** [1] - 1120:3

**move** [8] - 1106:6, 1106:7, 1162:22, 1162:24, 1164:18, 1167:20, 1169:11, 1180:25

**moved** [3] - 1162:10, 1162:11, 1165:22

**moving** [2] - 1162:18, 1165:17

**MR** [157] - 1083:6, 1083:7, 1083:8, 1083:10, 1083:11, 1083:12, 1083:14, 1083:15, 1083:16, 1083:18, 1083:19, 1083:20, 1084:2, 1084:15, 1084:20, 1090:21, 1091:3, 1093:7, 1093:14, 1093:20, 1093:24, 1099:5, 1099:8, 1099:12, 1102:4, 1102:6, 1102:10, 1104:4, 1104:6, 1104:8, 1104:10, 1104:17, 1104:20, 1104:22, 1128:24, 1129:21, 1129:24, 1130:2, 1136:21, 1146:6, 1155:18, 1155:21, 1155:24, 1161:5, 1163:13, 1163:15, 1163:17, 1163:18, 1163:20, 1163:22, 1163:24, 1164:2, 1164:3, 1166:22, 1168:12, 1181:2, 1182:3, 1182:5, 1182:6, 1182:9, 1185:15, 1185:17, 1190:16, 1190:19, 1191:7, 1191:15, 1191:17, 1191:20, 1194:17, 1196:7, 1198:17, 1198:20, 1198:21, 1205:2, 1205:3, 1205:6, 1205:8, 1205:15, 1205:18, 1208:9, 1208:12, 1209:4, 1209:7, 1209:12, 1209:13, 1209:23, 1210:3, 1210:8, 1210:10, 1210:15, 1226:24, 1227:6, 1227:14, 1227:18, 1232:9, 1232:12, 1232:21, 1233:4, 1242:10, 1242:12, 1242:20, 1242:22, 1242:24, 1244:7, 1244:8, 1244:12, 1244:14, 1244:16, 1244:17, 1244:24, 1248:20, 1252:8, 1253:4, 1253:13, 1256:8, 1256:10, 1256:13, 1256:15, 1259:11, 1259:18, 1259:19, 1260:5,

1260:8, 1260:9, 1261:7, 1261:11, 1261:17, 1263:14, 1263:17, 1263:21, 1264:3, 1264:11, 1264:13, 1264:15, 1264:18, 1264:25, 1265:4, 1265:8, 1265:11, 1265:16, 1265:18, 1265:20, 1266:2, 1266:5, 1266:8, 1266:9, 1266:11, 1266:12, 1266:20, 1266:22, 1266:24, 1267:3, 1267:7, 1267:10, 1267:15, 1267:18, 1267:20

**Mulvenna** [3] - 1080:23, 1268:8, 1268:22

**must** [5] - 1095:4, 1103:3, 1103:7, 1103:14, 1212:16

## N

**nail** [1] - 1258:12

**name** [3] - 1152:15, 1153:22, 1153:24

**nature** [1] - 1087:12

**nearly** [1] - 1257:5

**necessary** [1] - 1129:18

**need** [12] - 1091:21, 1103:15, 1103:16, 1103:23, 1120:3, 1122:9, 1192:23, 1193:16, 1215:2, 1217:14, 1237:20, 1256:11

**needed** [7] - 1121:2, 1127:6, 1131:18, 1133:23, 1185:23, 1186:4, 1186:6, 1186:9, 1212:16

**netted** [1] - 1207:14

**never** [17] - 1089:8, 1090:15, 1114:11, 1159:4, 1163:22, 1181:3, 1183:5, 1187:22, 1200:14, 1201:10, 1201:14, 1202:14, 1207:15, 1221:22, 1222:21, 1225:15, 1244:6

**new** [5] - 1109:23, 1180:9, 1207:12, 1237:16, 1239:6

**NEW** [2] - 1268:4, 1268:6

**New** [9] - 1080:15, 1081:7, 1081:17, 1129:17, 1133:3, 1268:9

**newborns** [1] - 1120:11

**news** [6] - 1128:22, 1134:14, 1145:20, 1188:11, 1189:20, 1266:7

**news-making** [1] - 1145:20

**next** [12] - 1086:24, 1098:2, 1131:3, 1138:4, 1138:5, 1138:18, 1243:11, 1261:4, 1263:6, 1263:9, 1263:13, 1263:19

**Next** [1] - 1186:25

**NGO** [4] - 1080:4, 1083:17, 1209:12, 1244:20

**Ngo** [201] - 1084:4, 1085:11, 1085:14, 1085:23, 1086:4, 1086:12, 1086:21, 1087:9, 1087:17, 1088:24, 1089:6, 1089:23, 1095:9, 1096:6, 1098:15, 1098:24, 1100:8, 1100:10, 1100:18, 1100:25, 1101:17, 1103:18, 1103:25, 1110:12, 1110:15, 1110:25, 1111:22, 1113:25, 1114:18, 1114:23, 1115:4, 1116:3, 1116:16, 1116:21, 1117:5, 1117:15, 1117:22, 1118:8, 1118:14, 1118:25, 1119:6, 1119:11, 1119:16, 1119:25, 1120:15, 1120:18, 1120:23, 1120:25, 1121:5, 1121:14, 1121:23, 1122:3, 1122:10, 1122:15, 1123:3, 1123:9, 1123:16, 1123:21, 1123:25, 1124:24, 1125:11, 1125:20, 1126:7, 1126:15, 1127:5, 1127:16, 1128:13, 1129:4, 1130:8, 1131:4, 1132:8, 1132:17, 1132:20, 1132:23, 1133:23, 1134:3, 1134:24, 1136:25, 1137:21, 1138:12, 1138:20, 1139:16, 1139:21, 1139:25, 1140:10, 1140:12, 1140:18, 1140:23, 1141:25, 1143:8, 1144:16, 1145:11, 1146:8, 1146:17, 1147:3, 1147:18, 1147:22, 1147:25, 1148:8, 1148:16, 1157:12, 1157:13, 1157:16, 1172:3, 1172:5, 1172:8, 1173:7, 1173:14, 1174:23, 1175:5, 1175:11, 1175:14, 1175:18, 1175:20, 1175:24, 1176:7, 1176:9, 1176:17, 1176:22, 1178:24, 1179:4, 1181:4, 1181:8, 1181:11, 1181:17, 1181:20, 1181:24, 1182:13, 1183:5, 1183:13, 1183:18, 1183:22, 1183:25, 1184:2, 1184:6, 1185:11, 1186:12, 1186:21, 1187:16, 1187:23, 1188:3, 1188:7, 1188:14, 1188:17, 1188:24, 1191:22, 1191:25, 1192:20, 1192:23, 1193:17, 1194:20, 1195:2, 1200:16, 1201:23, 1202:3, 1202:7, 1202:19, 1206:4, 1206:7, 1207:25, 1208:7, 1209:9, 1213:18, 1213:25, 1214:6, 1215:12, 1215:23, 1218:2, 1218:13, 1218:21, 1219:19, 1219:23, 1220:3, 1220:6, 1221:11, 1221:19, 1222:9, 1223:2, 1223:17, 1225:8, 1225:21, 1226:9, 1232:14, 1233:13,

1281

1233:18, 1233:21, 1235:4,
1235:22, 1236:9, 1236:22,
1240:7, 1241:8, 1244:4,
1244:25, 1256:12, 1256:16,
1259:20, 1259:24, 1260:10,
1260:16

**Ngo's** [38] - 1087:22,
1090:23, 1101:21, 1115:15,
1115:20, 1116:12, 1124:11,
1128:6, 1130:3, 1130:11,
1136:23, 1146:14, 1150:2,
1154:7, 1188:22, 1190:6,
1190:13, 1191:9, 1191:12,
1192:2, 1195:10, 1195:18,
1196:8, 1197:5, 1197:6,
1197:16, 1197:19, 1200:23,
1201:12, 1201:16, 1201:21,
1207:19, 1209:10, 1211:14,
1213:16, 1214:4, 1216:16,
1243:2

**nice** [4] - 1106:11, 1165:16,
1189:5, 1189:16

**night** [1] - 1246:9

**none** [2] - 1151:21, 1191:6

**Notary** [1] - 1268:9

**note** [1] - 1216:11

**noted** [1] - 1204:16

**Notes** [1] - 1216:3

**notes** [1] - 1217:9

**Nothing** [3] - 1090:14,
1222:21, 1266:24

**notice** [6] - 1103:15,
1103:19, 1127:21, 1153:13,
1215:2, 1216:4

**notified** [1] - 1246:21

**notify** [4] - 1092:3, 1095:5,
1103:3, 1215:4

**November** [14] - 1139:23,
1140:13, 1140:17, 1140:24,
1141:23, 1143:8, 1216:25,
1217:2, 1219:20, 1220:7,
1223:22, 1224:3, 1225:17,
1225:23

**number** [17] - 1117:16,
1204:7, 1212:6, 1215:9,
1218:12, 1227:11, 1228:17,
1228:24, 1228:25, 1229:5,
1237:2, 1238:11, 1243:14,
1253:7, 1253:11, 1253:22,
1266:15

**numbers** [3] - 1112:15,
1266:17, 1266:22

## O

**oath** [2] - 1163:8, 1164:8

**object** [2] - 1226:25

**Object** [1] - 1190:16

**Objection** [1] - 1179:25

**objection** [5] - 1186:24,
1227:15, 1260:3, 1260:5,

1266:21

**obligated** [1] - 1089:25

**obligation** [7] - 1092:8,
1092:12, 1092:18, 1094:5,
1097:7, 1097:19, 1103:6

**obligations** [5] - 1092:3,
1192:25, 1193:18, 1194:6

**obviously** [1] - 1262:2

**occurred** [1] - 1093:13

**October** [4] - 1197:14,
1223:12, 1225:3, 1225:19

**OF** [4] - 1081:4, 1081:14,
1268:4, 1268:6

**offer** [22] - 1106:3, 1113:3,
1113:8, 1113:11, 1113:25,
1114:13, 1172:11, 1172:15,
1173:7, 1173:13, 1173:24,
1174:6, 1174:12, 1174:21,
1175:4, 1175:14, 1175:18,
1175:21, 1177:5, 1177:7,
1177:9, 1177:10

**offered** [7] - 1161:10,
1161:25, 1174:23, 1176:21,
1177:2, 1258:3, 1258:8

**offhand** [1] - 1234:13

**office** [48] - 1095:10,
1095:12, 1095:17, 1096:11,
1105:5, 1110:22, 1113:18,
1118:8, 1121:8, 1123:16,
1124:2, 1125:13, 1125:21,
1126:15, 1126:23, 1127:6,
1127:14, 1127:17, 1128:14,
1131:19, 1137:2, 1137:16,
1137:22, 1138:13, 1140:2,
1140:13, 1140:16, 1141:6,
1142:2, 1147:19, 1183:7,
1183:14, 1185:12, 1192:21,
1192:24, 1193:12, 1193:17,
1210:4, 1210:6, 1210:23,
1210:25, 1225:22, 1236:22,
1244:5, 1258:22, 1259:2,
1259:5, 1263:12

**often** [1] - 1233:24

**older** [1] - 1120:9

**ON** [2] - 1081:4, 1081:14

**One** [1] - 1265:17

**one** [59] - 1084:24,
1085:15, 1085:19, 1088:6,
1088:18, 1093:6, 1102:7,
1102:16, 1106:10, 1112:15,
1113:15, 1117:18, 1126:4,
1139:14, 1153:18, 1162:3,
1162:11, 1167:15, 1168:6,
1198:9, 1200:21, 1202:24,
1205:23, 1210:6, 1215:5,
1216:24, 1218:16, 1218:25,
1219:11, 1219:15, 1220:11,
1220:20, 1223:12, 1226:19,
1227:7, 1228:2, 1228:3,
1229:8, 1229:9, 1229:19,
1230:8, 1232:22, 1242:13,
1243:17, 1248:24, 1249:8,

1250:5, 1250:21, 1252:12,
1257:4, 1258:3, 1259:12,
1259:25, 1264:3, 1264:22,
1266:12

**ones** [2] - 1105:14, 1200:12

**OPCO** [7] - 1212:6,
1212:25, 1213:7, 1215:9,
1215:10, 1216:22, 1228:11

**open** [7] - 1093:15,
1093:25, 1102:14, 1212:2,
1232:22, 1232:23, 1264:19

**opine** [2] - 1109:15,
1133:14

**opining** [1] - 1144:25

**opinion** [9] - 1112:8,
1128:22, 1147:3, 1148:25,
1149:4, 1149:11, 1171:15,
1171:22, 1196:25

**opinions** [1] - 1144:10

**OPPENHEIMER** [1] -
1080:7

**Oppenheimer** [130] -
1082:6, 1082:8, 1084:3,
1085:3, 1086:16, 1087:4,
1088:14, 1089:25, 1094:5,
1098:15, 1098:24, 1100:10,
1100:18, 1101:6, 1101:17,
1103:19, 1104:24, 1105:2,
1105:5, 1105:22, 1106:17,
1106:20, 1107:3, 1107:5,
1107:7, 1107:19, 1108:2,
1108:9, 1108:11, 1108:16,
1108:21, 1108:24, 1109:21,
1109:24, 1110:8, 1110:21,
1111:7, 1114:19, 1115:5,
1116:25, 1117:18, 1143:19,
1146:8, 1148:5, 1148:6,
1149:10, 1149:17, 1149:24,
1150:14, 1150:16, 1151:8,
1152:2, 1152:24, 1153:9,
1156:3, 1156:6, 1156:12,
1156:13, 1156:20, 1157:9,
1157:20, 1158:3, 1160:13,
1160:17, 1160:19, 1162:5,
1165:11, 1172:8, 1173:23,
1174:5, 1174:11, 1174:16,
1174:22, 1175:4, 1176:21,
1178:18, 1184:2, 1186:22,
1192:10, 1192:19, 1199:16,
1199:24, 1202:14, 1202:17,
1202:21, 1204:21, 1206:5,
1206:19, 1206:25, 1207:7,
1210:18, 1210:20, 1210:23,
1211:3, 1211:8, 1211:14,
1212:12, 1212:20, 1213:19,
1217:25, 1218:3, 1225:7,
1226:13, 1226:15, 1226:16,
1226:22, 1227:21, 1227:24,
1228:24, 1228:25, 1229:5,
1230:14, 1237:22, 1240:7,
1242:6, 1242:19, 1243:3,
1245:4, 1246:21, 1248:25,

1253:25, 1255:17, 1255:24,
1255:25, 1256:5, 1256:18,
1257:3, 1257:12, 1258:3,
1260:13

**Oppenheimer 's** [9] -
1089:12, 1106:16, 1123:7,
1211:17, 1211:18, 1213:4,
1214:20, 1222:11, 1231:24

**opportunity** [4] - 1161:10,
1161:25, 1162:22, 1237:20

**opt** [1] - 1096:13

**opted** [1] - 1096:12

**option** [1] - 1265:14

**optionality** [1] - 1251:24

**order** [4] - 1103:6, 1247:4,
1263:19, 1263:24

**organization** [1] - 1165:12

**organized** [1] - 1135:15

**outside** [2] - 1178:19,
1212:20

**outstanding** [4] - 1245:21,
1245:22, 1249:16, 1250:23

**overruled** [1] - 1227:16

**oversaw** [1] - 1166:14

**overseeing** [1] - 1166:24

**oversight** [1] - 1135:4

**own** [1] - 1144:10

## P

**P&L** [6] - 1152:7, 1166:13,
1166:14, 1166:16, 1166:24,
1250:20

**P.C** [1] - 1081:5

**p.m** [2] - 1209:3, 1267:24

**packaging** [12] - 1148:20,
1149:13, 1150:7, 1201:17,
1202:9, 1254:16, 1254:22,
1254:24, 1254:25, 1255:2,
1255:9, 1256:2

**Page** [1] - 1185:3

**PAGE** [1] - 1083:3

**page** [32] - 1094:13,
1094:18, 1094:22, 1102:14,
1103:11, 1113:4, 1114:4,
1164:12, 1168:14, 1168:17,
1172:23, 1173:5, 1179:17,
1179:21, 1182:2, 1189:8,
1192:17, 1212:5, 1212:25,
1213:7, 1216:21, 1219:9,
1228:10, 1236:9, 1236:25,
1237:6, 1243:12, 1260:25,
1261:2, 1264:20, 1264:22

**pages** [2] - 1153:12, 1213:6

**paid** [18] - 1089:5, 1089:20,
1091:20, 1091:23, 1098:4,
1100:15, 1152:4, 1152:9,
1152:12, 1154:11, 1183:6,
1183:13, 1183:16, 1197:20,
1197:24, 1199:14, 1199:17,
1221:18

**Paper** [1] - 1148:20
**paper** [15] - 1142:21,
1144:25, 1145:8, 1149:13,
1150:7, 1201:17, 1202:8,
1254:16, 1254:21, 1254:23,
1254:24, 1254:25, 1255:9,
1256:2, 1256:19
**papers** [2] - 1115:3,
1150:23
**paperwork** [25] - 1086:25,
1087:5, 1090:17, 1091:11,
1091:14, 1091:15, 1098:19,
1098:21, 1099:25, 1100:7,
1101:2, 1101:12, 1101:18,
1222:23, 1224:24, 1233:7,
1233:18, 1233:22, 1234:2,
1234:11, 1234:16, 1234:19,
1234:24, 1235:5, 1235:14
**par** [4] - 1247:13, 1247:16,
1248:13, 1249:12
**paragraph** [7] - 1114:6,
1126:18, 1126:19, 1130:17,
1192:18, 1193:15, 1237:20
**Paralegal** [1] - 1082:4
**Park** [1] - 1081:16
**part** [7] - 1145:2, 1145:11,
1156:23, 1157:11, 1159:9,
1167:11, 1169:17
**participate** [1] - 1138:8
**particular** [9] - 1153:18,
1215:22, 1216:15, 1217:4,
1228:3, 1229:19, 1243:25,
1251:7, 1259:25
**particularly** [3] - 1118:6,
1205:13, 1205:19
**particulars** [2] - 1177:5,
1177:7
**parties** [2] - 1263:25,
1268:15
**partner** [4] - 1118:18,
1118:20, 1119:4, 1134:9
**paternity** [8] - 1089:5,
1096:18, 1096:19, 1096:22,
1097:15, 1098:3, 1098:5,
1221:18
**Pause** [21] - 1093:4,
1093:11, 1094:16, 1099:11,
1102:18, 1104:12, 1112:21,
1182:8, 1186:17, 1189:10,
1192:7, 1193:22, 1224:11,
1224:14, 1228:8, 1233:2,
1236:5, 1238:22, 1259:16,
1259:22, 1263:18
**pay** [10] - 1216:7, 1216:13,
1216:17, 1232:6, 1240:23,
1241:8, 1241:12, 1241:14,
1241:16, 1242:2
**Pay** [1] - 1218:9
**payment** [3] - 1216:14,
1218:17, 1219:12
**payroll** [5] - 1100:13,

1215:3, 1216:12, 1216:13,
1229:18
**payroll-related** [1] -
1216:13
**PCN** [12] - 1154:6, 1214:19,
1215:8, 1215:11, 1215:22,
1215:24, 1216:15, 1217:4,
1225:25, 1226:6, 1226:8,
1242:8
**PCNs** [2] - 1217:24, 1220:5
**PDF** [1] - 1093:15
**Pending** [1] - 1082:3
**people** [2] - 1091:12,
1230:19
**percent** [20] - 1172:20,
1188:8, 1199:17, 1247:21,
1248:10, 1248:16, 1249:15,
1249:23, 1250:6, 1250:11,
1250:12, 1251:20, 1252:21,
1253:7, 1253:12, 1253:19,
1254:20, 1255:4, 1255:13,
1255:16
**percentage** [3] - 1251:23,
1252:25, 1255:11
**percentages** [1] - 1250:2
**perfect** [1] - 1135:16
**perform** [1] - 1184:2
**performance** [9] - 1115:20,
1115:24, 1144:5, 1144:9,
1158:15, 1196:17, 1196:22,
1198:5, 1242:7
**performed** [3] - 1184:6,
1226:22, 1227:21
**performing** [2] - 1187:2,
1187:5
**performs** [1] - 1226:16
**perhaps** [1] - 1113:18
**period** [35] - 1090:4,
1098:13, 1098:20, 1106:20,
1108:2, 1108:16, 1126:16,
1129:8, 1132:6, 1134:4,
1134:6, 1134:13, 1139:25,
1140:10, 1140:20, 1143:23,
1143:25, 1144:2, 1184:21,
1184:22, 1184:23, 1187:3,
1187:24, 1188:7, 1188:11,
1194:14, 1196:2, 1199:8,
1211:6, 1211:7, 1218:20,
1222:10, 1223:17, 1229:24,
1230:15
**permission** [1] - 1120:16
**person** [12] - 1086:12,
1097:23, 1117:7, 1135:11,
1135:16, 1172:16, 1172:18,
1173:9, 1173:18, 1175:11,
1210:3, 1219:24
**personal** [6] - 1122:10,
1122:12, 1122:16, 1262:20,
1262:25, 1263:11
**personally** [1] - 1159:20
**personnel** [9] - 1101:22,

1101:23, 1101:25, 1153:9,
1153:13, 1211:14, 1214:4,
1214:13, 1215:2
**perspective** [5] - 1150:24,
1151:3, 1201:3, 1201:7,
1245:9
**Peter** [2] - 1160:22, 1168:7
**Phone** [2] - 1081:8,
1081:18
**phone** [4] - 1188:6, 1188:9,
1188:16, 1188:18
**photos** [1] - 1131:11
**phrase** [2] - 1239:11,
1239:13
**physical** [1] - 1129:17
**pics** [1] - 1132:24
**pitches** [1] - 1109:18
**place** [14] - 1110:2,
1134:20, 1134:23, 1135:14,
1136:3, 1136:18, 1138:16,
1142:20, 1154:24, 1157:24,
1191:2, 1200:4, 1200:9,
1213:22
**placed** [2] - 1098:15,
1098:24
**plan** [6] - 1126:22, 1131:22,
1136:8, 1181:14, 1200:3,
1261:22
**play** [2] - 1155:10, 1264:23
**players** [1] - 1144:23
**pleasure** [2] - 1267:19,
1267:22
**Plus** [1] - 1252:2
**plus** [1] - 1255:14
**point** [12] - 1085:14,
1091:14, 1108:10, 1134:4,
1134:19, 1135:15, 1141:22,
1145:15, 1163:24, 1202:12,
1230:12, 1265:25
**pointed** [1] - 1102:24
**pointing** [1] - 1096:7
**policies** [5] - 1096:8,
1096:15, 1097:6, 1211:18,
1211:20
**policy** [5] - 1089:13,
1089:19, 1212:12, 1213:4,
1222:11
**portion** [1] - 1120:14
**portions** [1] - 1155:15
**posed** [1] - 1195:22
**position** [29] - 1106:4,
1108:15, 1109:23, 1110:8,
1110:20, 1135:5, 1135:22,
1138:21, 1157:23, 1159:25,
1161:11, 1162:11, 1162:12,
1166:9, 1166:23, 1167:21,
1178:11, 1206:15, 1211:8,
1229:25, 1230:11, 1230:22,
1230:25, 1231:8, 1231:12,
1231:16, 1231:20, 1258:4
**positions** [1] - 1230:20

**possibilities** [1] - 1251:2
**possibility** [2] - 1161:23,
1162:18
**possible** [2] - 1234:4,
1262:16
**Possibly** [1] - 1233:23
**post** [1] - 1263:24
**post-hearing** [1] - 1263:24
**potential** [1] - 1168:6
**potentially** [3] - 1122:24,
1135:4, 1194:20
**pound** [1] - 1132:24
**practical** [2] - 1180:14,
1180:21
**practice** [1] - 1087:3
**pre** [3] - 1134:4, 1200:2,
1200:12
**precisely** [2] - 1110:18,
1190:20
**preclude** [1] - 1145:21
**predated** [1] - 1197:6
**preexisting** [1] - 1136:17
**preparation** [2] - 1192:2,
1193:15
**preparations** [1] - 1132:13
**prepared** [2] - 1127:16,
1192:20
**presence** [1] - 1129:17
**PRESENT** [1] - 1082:2
**press** [1] - 1134:14
**presumably** [2] - 1250:11,
1251:22
**presume** [2] - 1111:4,
1265:13
**pretty** [6] - 1109:7,
1127:12, 1144:22, 1149:6,
1188:10, 1189:17
**previously** [1] - 1244:21
**price** [3] - 1248:2, 1248:12,
1249:12
**priced** [1] - 1145:19
**Primarily** [1] - 1115:3
**primarily** [2] - 1170:13,
1170:16
**primary** [3] - 1149:6,
1152:6, 1152:8
**print** [1] - 1209:21
**privy** [5] - 1176:24, 1193:9,
1193:10, 1194:2, 1197:23
**problem** [4] - 1093:3,
1129:9, 1129:14, 1179:12
**problems** [2] - 1158:24,
1158:25
**procedure** [2] - 1198:10,
1261:14
**proceeding** [5] - 1085:11,
1110:9, 1110:12, 1198:3,
1211:13
**proceedings** [2] - 1268:10,
1268:13
**process** [2] - 1130:14,

1171:16
  **processed** [1] - 1091:11
  **produce** [1] - 1187:21
  **produced** [1] - 1153:9
  **producer** [2] - 1168:2,
1168:5
  **producing** [1] - 1184:24
  **product** [3] - 1112:8,
1176:13, 1178:16
  **production** [5] - 1152:3,
1152:5, 1204:23, 1207:11,
1207:14
  **projected** [1] - 1194:10
  **promote** [2] - 1160:13,
1178:11
  **promotion** [4] - 1197:6,
1197:9, 1197:12, 1197:13
  **promotions** [1] - 1158:12
  **proposal** [3] - 1121:11,
1205:20, 1205:24
  **propose** [1] - 1121:6
  **protected** [11] - 1089:12,
1092:19, 1094:7, 1095:4,
1096:2, 1096:5, 1096:11,
1101:4, 1101:19, 1103:2,
1243:19
  **protection** [2] - 1225:2,
1225:19
  **provide** [8] - 1097:19,
1103:14, 1109:11, 1154:25,
1187:16, 1187:18, 1187:22,
1218:16
  **provided** [6] - 1089:13,
1089:14, 1089:15, 1089:20,
1109:13, 1203:23
  **Provided** [1] - 1089:14
  **provides** [2] - 1219:12,
1243:18
  **providing** [2] - 1103:18,
1187:24
  **Public** [1] - 1268:9
  **published** [1] - 1148:16
  **publishing** [1] - 1184:15
  **pull** [2] - 1229:17, 1241:20
  **pulled** [1] - 1209:21
  **pulling** [1] - 1224:12
  **punishing** [1] - 1138:12
  **pure** [1] - 1166:19
  **purpose** [1] - 1183:21
  **purposes** [3] - 1164:19,
1196:25, 1202:22
  **purview** [1] - 1194:7
  **put** [11] - 1090:16, 1107:10,
1142:20, 1154:24, 1200:3,
1200:8, 1215:24, 1222:22,
1224:3, 1225:25, 1230:7

## Q

  **qualified** [2] - 1092:13,

1133:14
  **qualify** [1] - 1243:4
  **quarter** [14] - 1127:11,
1127:16, 1129:8, 1129:12,
1132:3, 1132:4, 1132:5,
1132:10, 1133:10, 1133:15,
1134:4, 1187:10, 1189:19,
1194:13
  **QUESTION** [16] - 1164:18,
1165:5, 1168:23, 1169:5,
1173:6, 1173:9, 1173:11,
1173:13, 1179:23, 1180:4,
1182:12, 1182:16, 1182:19,
1186:20, 1187:2, 1189:12
  **questions** [25] - 1090:22,
1090:24, 1102:5, 1104:5,
1104:6, 1169:13, 1173:20,
1180:15, 1198:18, 1205:4,
1205:10, 1206:24, 1208:9,
1211:25, 1226:13, 1228:3,
1232:10, 1232:15, 1242:10,
1243:7, 1244:8, 1256:16,
1261:8, 1263:15, 1263:17
  **quickly** [1] - 1227:7
  **quiet** [5] - 1184:22,
1184:23, 1189:6, 1189:7,
1189:17
  **quite** [4] - 1130:25, 1135:2,
1145:24, 1169:8

## R

  **Rahman** [5] - 1160:18,
1161:2, 1161:11, 1162:2,
1206:21
  **Rahman's** [1] - 1205:10
  **raises** [1] - 1232:6
  **ran** [1] - 1246:18
  **rank** [1] - 1253:21
  **ranked** [2] - 1252:24,
1253:6
  **ranking** [1] - 1247:4
  **ranks** [1] - 1253:11
  **rare** [2] - 1198:12, 1198:15
  **RASKIN** [1] - 1081:5
  **rated** [1] - 1198:8
  **rather** [1] - 1251:8
  **Rather** [1] - 1167:2
  **reach** [1] - 1119:6
  **reached** [1] - 1119:10
  **reaction** [4] - 1126:25,
1127:23, 1127:25, 1133:5
  **read** [18] - 1095:2, 1099:22,
1127:2, 1128:13, 1129:21,
1129:23, 1130:21, 1133:6,
1142:24, 1164:15, 1168:20,
1173:4, 1179:21, 1193:4,
1193:6, 1238:10, 1238:18,
1238:20
  **reading** [3] - 1148:15,
1217:8, 1265:11

**ready** [3] - 1161:21, 1224:8,
1263:22
  **really** [8] - 1104:9, 1107:11,
1109:13, 1133:13, 1144:24,
1150:17, 1165:16, 1166:18
  **realtime** [1] - 1134:17
  **reason** [10] - 1096:14,
1097:8, 1140:10, 1150:16,
1162:10, 1162:15, 1227:7,
1230:9, 1230:15
  **Reason** [1] - 1230:23
  **reasons** [13] - 1150:15,
1151:22, 1162:11, 1186:7,
1200:16, 1200:21, 1202:15,
1202:20, 1203:2, 1203:9,
1205:23, 1214:25, 1227:3
  **REBUTTAL** [1] - 1083:18,
1244:23
  **receive** [2] - 1154:15,
1203:15
  **received** [15] - 1106:3,
1127:20, 1128:16, 1137:18,
1173:24, 1174:6, 1174:12,
1174:21, 1175:14, 1175:18,
1175:21, 1190:11, 1190:23,
1199:20, 1260:7
  **receiving** [5] - 1090:19,
1190:6, 1221:24, 1244:3,
1260:3
  **Recess** [2] - 1155:22,
1244:19
  **recess** [1] - 1208:15
  **recognize** [4] - 1112:25,
1213:4, 1214:17, 1229:13
  **recollection** [6] - 1087:8,
1087:16, 1124:10, 1135:2,
1154:13, 1195:16
  **recommendation** [1] -
1172:7
  **recommended** [2] -
1158:12, 1176:18
  **reconsider** [1] - 1138:25
  **record** [13] - 1093:21,
1112:20, 1149:7, 1155:22,
1163:20, 1163:25, 1164:14,
1179:19, 1208:15, 1244:19,
1261:12, 1267:6, 1268:13
  **Record** [1] - 1129:23
  **records** [2] - 1100:13,
1213:17
  **recover** [2] - 1154:15,
1155:15
  **recovering** [1] - 1140:2,
1223:18
  **REDIRECT** [6] - 1083:8,
1083:12, 1083:16, 1102:9,
1205:7, 1242:11
  **redirect** [2] - 1205:4,
1242:13
  **refer** [2] - 1096:20, 1235:18
  **reference** [7] - 1128:6,

1128:8, 1128:9, 1208:4,
1238:25, 1239:22, 1240:3
  **referenced** [1] - 1195:7,
1238:23, 1240:9
  **referencing** [1] - 1120:18
  **referred** [6] - 1088:18,
1133:16, 1235:19, 1243:24,
1250:16, 1257:21
  **referring** [7] - 1099:4,
1100:6, 1126:12, 1144:20,
1236:17, 1236:23, 1250:15
  **refers** [1] - 1166:16
  **reflect** [3] - 1215:23,
1217:5, 1229:19
  **reflected** [4] - 1168:21,
1191:13, 1217:24, 1242:8
  **reflects** [2] - 1229:22,
1245:24
  **regard** [2] - 1138:8,
1217:22
  **regarding** [9] - 1115:6,
1115:8, 1115:12, 1115:16,
1115:19, 1115:23, 1137:21,
1144:8, 1237:21
  **regards** [2] - 1090:12,
1222:19
  **Reinstate** [2] - 1217:6,
1217:10
  **reject** [1] - 1121:11
  **related** [4] - 1124:12,
1186:7, 1216:13, 1239:5
  **relationship** [1] - 1109:3
  **Relative** [1] - 1250:14
  **relative** [1] - 1253:10
  **release** [1] - 1134:14
  **remain** [1] - 1143:22
  **remainder** [1] - 1143:15
  **remained** [1] - 1143:18
  **remains** [1] - 1142:19
  **remedies** [1] - 1168:7
  **remember** [13] - 1102:20,
1137:8, 1138:2, 1138:3,
1162:25, 1174:20, 1175:3,
1175:6, 1182:21, 1183:2,
1196:2, 1232:5, 1243:6
  **Remember** [1] - 1262:20
  **remind** [2] - 1142:18,
1234:24
  **remotely** [8] - 1124:20,
1129:11, 1129:15, 1130:10,
1190:22, 1190:25, 1259:7,
1261:23
  **removed** [1] - 1206:12
  **repeat** [1] - 1252:22
  **repeatedly** [1] - 1236:21
  **replaced** [3] - 1204:14,
1204:15, 1204:20
  **replacement** [1] - 1204:9
  **replied** [4] - 1090:13,
1090:14, 1096:19, 1222:20
  **reply** [1] - 1265:15

1284

**report** [11] - 1108:4,
1108:11, 1108:21, 1123:12,
1191:4, 1194:13, 1228:3,
1228:10, 1229:17, 1229:21,
1230:18
**Reported** [1] - 1080:22
**reported** [7] - 1108:5,
1114:11, 1156:24, 1184:23,
1199:4, 1199:8, 1211:11
**reporter** [3] - 1084:6,
1209:15, 1238:6
**reporting** [7] - 1114:2,
1114:7, 1114:15, 1128:22,
1145:8, 1145:12, 1152:20
**reports** [9] - 1109:16,
1127:11, 1129:8, 1129:12,
1131:22, 1132:10, 1135:6,
1189:19, 1226:18
**represent** [2] - 1153:7,
1232:14
**representation** [1] -
1248:17
**request** [13] - 1097:3,
1097:10, 1120:23, 1128:17,
1128:21, 1130:4, 1190:14,
1212:14, 1212:16, 1213:13,
1234:7, 1243:4
**Request** [1] - 1213:10
**requested** [3] - 1097:14,
1135:10, 1234:4
**requesting** [2] - 1128:13,
1244:17
**requests** [2] - 1097:18,
1111:19
**require** [3] - 1087:4,
1217:18, 1217:19
**required** [3] - 1212:14,
1243:19, 1243:20
**requirements** [1] - 1091:17
**research** [93] - 1107:15,
1107:20, 1107:24, 1108:18,
1108:24, 1109:4, 1109:10,
1109:13, 1109:14, 1110:19,
1111:8, 1111:10, 1111:13,
1111:15, 1111:19, 1111:25,
1112:7, 1113:8, 1113:12,
1114:14, 1114:22, 1115:12,
1115:23, 1116:3, 1116:13,
1116:17, 1116:23, 1116:24,
1117:14, 1117:17, 1117:25,
1118:4, 1121:7, 1138:6,
1138:9, 1138:22, 1139:7,
1140:3, 1140:6, 1141:13,
1142:19, 1142:22, 1143:5,
1143:10, 1143:20, 1144:5,
1144:8, 1145:17, 1148:7,
1148:16, 1149:2, 1149:12,
1149:17, 1150:4, 1150:18,
1150:19, 1169:22, 1170:10,
1171:13, 1171:14, 1171:15,
1171:19, 1171:24, 1176:12,
1177:21, 1178:4, 1178:11,

1178:16, 1178:25, 1181:9,
1184:15, 1184:24, 1195:25,
1196:17, 1196:21, 1196:22,
1197:10, 1197:13, 1200:22,
1201:6, 1201:15, 1201:20,
1202:12, 1202:25, 1204:22,
1206:5, 1206:8, 1257:4,
1257:13, 1257:18, 1258:5
**Research** [1] - 1197:25
**resigned** [1] - 1116:10
**resolve** [1] - 1158:25
**resources** [24] - 1085:9,
1086:19, 1087:22, 1088:13,
1088:17, 1088:20, 1090:7,
1103:20, 1123:8, 1210:22,
1211:10, 1211:17, 1212:17,
1212:21, 1213:14, 1213:16,
1214:5, 1214:20, 1221:5,
1221:6, 1226:14, 1227:13,
1239:8, 1240:16
**respect** [3] - 1129:11,
1194:8, 1236:22
**respond** [2] - 1191:12,
1227:7
**responded** [2] - 1090:11,
1132:21
**Respondent** [1] - 1080:9
**RESPONDENT** [1] -
1081:14
**responding** [1] - 1131:15
**response** [6] - 1133:19,
1161:14, 1191:13, 1191:21,
1207:19, 1222:16
**responses** [1] - 1134:17
**responsibilities** [10] -
1106:24, 1107:19, 1107:23,
1124:12, 1160:3, 1160:19,
1162:13, 1165:10, 1165:14,
1189:23
**Responsibilities** [3] -
1094:20, 1102:22, 1103:11
**responsibility** [4] - 1161:6,
1167:25, 1205:11, 1241:20
**rest** [2] - 1238:10, 1243:24
**restate** [1] - 1094:4
**restored** [1] - 1138:21,
1171:9, 1200:10
**restriction** [1] - 1217:21
**result** [1] - 1192:19
**resulted** [1] - 1227:24
**resumed** [1] - 1244:21
**retail** [5] - 1253:15,
1253:16, 1253:18, 1253:25,
1254:4
**retain** [9] - 1173:23, 1174:5,
1174:11, 1174:23, 1175:4,
1175:18, 1176:12, 1176:19,
1177:7
**return** [10] - 1098:19,
1098:20, 1131:18, 1140:25,
1188:22, 1188:24, 1191:23,

1217:20, 1219:18, 1237:22
**returned** [15] - 1139:16,
1139:21, 1140:12, 1140:16,
1140:23, 1142:2, 1143:7,
1199:25, 1218:22, 1219:19,
1225:21, 1233:22, 1234:13,
1234:15, 1234:19
**returning** [3] - 1125:20,
1137:2, 1217:18
**revenue** [3] - 1152:6,
1166:20, 1170:12
**Revenue** [1] - 1170:15
**review** [4] - 1163:11,
1211:13, 1259:21, 1263:4
**reviewed** [2] - 1192:14,
1246:17
**reviewing** [3] - 1213:16,
1214:4, 1246:24
**reviews** [1] - 1158:15
**revisit** [1] - 1139:4
**revoked** [1] - 1105:18
**right-hand** [1] - 1094:21
**Rob** [22] - 1089:5, 1090:11,
1101:11, 1108:5, 1111:4,
1115:16, 1116:20, 1136:7,
1146:20, 1160:21, 1161:2,
1162:16, 1168:24, 1173:17,
1204:24, 1221:19, 1222:19,
1223:21, 1224:21, 1239:9,
1245:18, 1250:15
**Robert** [3] - 1157:2, 1161:2,
1224:19
**role** [15] - 1155:10,
1156:20, 1159:18, 1160:7,
1160:14, 1160:23, 1161:18,
1161:19, 1161:20, 1161:22,
1162:15, 1166:6, 1178:7,
1178:12, 1206:20
**rolling** [1] - 1090:4
**room** [4] - 1084:7, 1084:24,
1119:4, 1209:8
**Ross** [12] - 1082:14,
1104:18, 1112:22, 1126:7,
1155:25, 1173:10, 1205:9,
1208:10, 1257:3, 1258:14,
1258:18, 1265:23
**ROSS** [2] - 1083:9, 1104:13
**Rothschild** [1] - 1106:2
**RTW** [3] - 1219:15,
1219:17, 1219:18
**run** [1] - 1121:6

---

**S**

**SA** [1] - 1184:11
**salary** [4] - 1115:9,
1152:10, 1203:15, 1216:14
**sale** [2] - 1144:8, 1251:3
**sales** [71] - 1106:14,
1106:17, 1106:19, 1106:24,
1107:5, 1107:13, 1108:3,

1109:3, 1109:9, 1109:21,
1111:7, 1112:6, 1113:7,
1117:15, 1132:6, 1134:16,
1139:9, 1140:25, 1143:18,
1145:3, 1145:15, 1148:24,
1150:4, 1152:8, 1157:19,
1157:23, 1158:3, 1158:7,
1158:10, 1158:12, 1159:21,
1160:4, 1160:8, 1162:14,
1166:4, 1166:7, 1166:12,
1167:3, 1167:11, 1167:19,
1167:22, 1169:9, 1169:17,
1169:19, 1169:25, 1170:5,
1170:9, 1170:12, 1170:13,
1170:16, 1171:23, 1174:8,
1177:16, 1177:19, 1178:15,
1194:19, 1198:6, 1199:2,
1201:23, 1202:4, 1202:8,
1202:10, 1202:16, 1203:14,
1204:22, 1205:25, 1206:2,
1206:19, 1207:5, 1250:14,
1250:22
**salespeople** [19] - 1106:10,
1107:13, 1141:7, 1142:9,
1144:12, 1144:16, 1151:14,
1151:22, 1152:2, 1152:3,
1152:5, 1152:9, 1154:11,
1158:9, 1158:22, 1202:15,
1207:2, 1207:7, 1251:16
**salesperson** [13] - 1118:3,
1152:14, 1152:18, 1155:14,
1160:13, 1160:18, 1161:3,
1165:9, 1167:8, 1173:24,
1174:6, 1198:25, 1207:12
**Sandy** [1] - 1196:5
**Santino** [1] - 1141:9
**SATTERLEE** [1] - 1081:15
**Satterlee** [1] - 1209:5
**saw** [6] - 1136:22, 1173:8,
1220:5, 1239:14, 1239:17,
1239:18
**scale** [1] - 1198:8
**Scant** [1] - 1204:4
**schedule** [2] - 1126:9,
1264:6
**school** [3] - 1120:13,
1162:20
**School** [1] - 1105:25
**scratch** [1] - 1176:16
**screen** [1] - 1209:22
**Sean** [3] - 1117:9, 1179:15,
1204:19
**season** [1] - 1189:24
**Second** [1] - 1132:4
**second** [23] - 1085:19,
1088:6, 1102:16, 1127:11,
1127:16, 1129:8, 1129:12,
1130:17, 1132:3, 1132:5,
1132:10, 1133:10, 1133:15,
1134:4, 1187:10, 1189:19,
1194:13, 1210:6, 1233:6,

1235:19, 1236:9, 1237:19, 1251:19

**second-quarter** [13] - 1127:11, 1127:16, 1129:8, 1129:12, 1132:3, 1132:5, 1132:10, 1133:10, 1133:15, 1134:4, 1187:10, 1189:19, 1194:13

**Second-quarter** [1] - 1132:4

**secondary** [1] - 1251:13

**seconds** [2] - 1093:2, 1228:6

**section** [4] - 1094:19, 1102:21, 1212:8, 1213:9

**sector** [36] - 1145:18, 1145:25, 1149:5, 1149:15, 1150:20, 1150:25, 1151:4, 1201:11, 1201:25, 1202:5, 1202:9, 1245:22, 1245:23, 1246:3, 1246:14, 1247:2, 1247:4, 1247:11, 1247:12, 1247:24, 1248:7, 1248:9, 1249:21, 1249:22, 1249:24, 1250:5, 1250:10, 1250:11, 1250:23, 1250:24, 1250:25, 1251:25, 1253:14, 1253:25, 1254:5

**sectors** [38] - 1114:24, 1115:2, 1117:10, 1145:9, 1147:12, 1148:12, 1148:16, 1151:2, 1195:19, 1200:23, 1200:25, 1245:3, 1245:7, 1246:6, 1246:23, 1247:2, 1247:3, 1248:7, 1248:24, 1249:9, 1249:22, 1250:18, 1251:17, 1251:23, 1252:13, 1252:16, 1252:18, 1254:4, 1254:7, 1254:13, 1255:5, 1255:10, 1256:20, 1257:5, 1257:16, 1257:19, 1258:4, 1258:7

**securities** [1] - 1134:18

**See** [1] - 1093:15

**see** [79] - 1088:10, 1089:9, 1090:10, 1094:21, 1094:23, 1095:6, 1096:15, 1100:4, 1101:8, 1103:23, 1114:5, 1126:2, 1126:18, 1126:22, 1128:9, 1128:12, 1130:11, 1130:15, 1131:11, 1132:20, 1132:25, 1133:12, 1141:23, 1142:25, 1153:12, 1153:18, 1153:24, 1183:4, 1184:10, 1184:12, 1184:14, 1193:4, 1193:19, 1193:20, 1212:8, 1213:9, 1214:5, 1215:14, 1216:6, 1216:24, 1217:12, 1217:25, 1218:15, 1218:16, 1219:3, 1219:11, 1222:16, 1223:14, 1223:23, 1225:4, 1226:3, 1228:13, 1228:17,

1228:20, 1235:15, 1236:20, 1237:4, 1237:8, 1237:9, 1237:13, 1237:23, 1238:13, 1238:19, 1238:24, 1243:9, 1243:14, 1243:17, 1247:4, 1249:25, 1250:22, 1251:11, 1251:18, 1252:2, 1252:6, 1252:10, 1260:12, 1261:3, 1265:21, 1267:8

**seeing** [1] - 1087:21

**seek** [1] - 1119:9

**seeking** [1] - 1087:5

**send** [14] - 1090:16, 1093:9, 1096:6, 1096:25, 1097:7, 1097:22, 1098:7, 1100:25, 1101:17, 1132:24, 1142:7, 1222:22, 1225:25, 1240:7

**Send** [1] - 1131:11

**sending** [3] - 1132:16, 1190:24, 1235:3

**sends** [1] - 1099:23

**senior** [6] - 1156:20, 1161:3, 1172:16, 1172:18, 1173:17, 1210:21

**seniority** [1] - 1179:14

**sense** [1] - 1252:6

**sensible** [1] - 1266:18

**sent** [22] - 1085:16, 1090:12, 1093:14, 1099:24, 1100:7, 1101:3, 1101:16, 1141:11, 1142:8, 1163:16, 1163:21, 1173:7, 1209:18, 1222:19, 1224:23, 1233:6, 1233:18, 1234:21, 1234:23, 1235:7, 1235:22, 1235:24

**sentence** [5] - 1102:25, 1103:12, 1130:12, 1130:18, 1237:17

**separate** [2] - 1235:14, 1235:16

**series** [1] - 1165:8

**Series** [3] - 1105:15

**service** [1] - 1109:11

**set** [6] - 1111:12, 1124:19, 1198:4, 1264:19, 1264:22, 1268:19

**setting** [1] - 1124:17

**several** [4] - 1185:19, 1185:23, 1257:17, 1257:22

**share** [10] - 1084:11, 1122:9, 1160:7, 1160:14, 1161:11, 1162:12, 1165:14, 1165:15, 1206:20, 1209:17

**shared** [1] - 1160:3

**sheet** [1] - 1163:14

**short** [1] - 1227:10

**shortened** [1] - 1230:11

**shortly** [1] - 1086:8

**shots** [2] - 1185:24, 1186:4

**show** [1] - 1230:13

**showed** [1] - 1137:19

**shrinkage** [1] - 1204:7

**shut** [1] - 1210:6

**sic** [5] - 1126:7, 1176:19, 1181:8, 1224:2, 1229:23

**sic]** [1] - 1141:10

**side** [11] - 1094:21, 1102:21, 1103:11, 1150:22, 1161:24, 1168:8, 1204:24, 1216:2, 1217:9

**sign** [1] - 1173:13

**signature** [1] - 1113:5

**signed** [7] - 1113:13, 1172:11, 1172:14, 1172:15, 1172:20, 1173:6, 1173:18

**significance** [4] - 1118:5, 1145:10, 1248:8, 1250:13

**significant** [2] - 1149:15, 1251:9

**significantly** [1] - 1179:15

**signing** [2] - 1113:12, 1184:9

**silos** [1] - 1109:8

**similar** [4] - 1106:4, 1179:13, 1179:14, 1180:8

**simple** [1] - 1249:18

**simply** [1] - 1145:12

**simultaneously** [2] - 1264:11, 1264:13

**single** [1] - 1257:4

**sister** [2] - 1262:21, 1263:2

**sister-in-law** [2] - 1262:21, 1263:2

**situation** [5] - 1135:17, 1165:16, 1173:22, 1174:4, 1174:9

**small** [2] - 1144:22, 1202:23

**Sneeden** [4] - 1117:9, 1117:11, 1119:15, 1204:19

**so..** [2] - 1169:12, 1195:8

**sold** [1] - 1106:12

**sole** [7] - 1138:6, 1138:9, 1139:7, 1143:4, 1158:3, 1158:6, 1194:25

**solicited** [3] - 1196:16, 1196:21, 1196:25

**solution** [3] - 1179:3, 1180:13, 1180:14

**someone** [8] - 1092:3, 1092:8, 1092:12, 1097:24, 1134:10, 1135:5, 1180:9

**sometime** [2] - 1131:11, 1211:4

**Sometime** [1] - 1262:7

**sometimes** [2] - 1262:9

**somewhat** [3] - 1133:12, 1180:9, 1194:13

**son** [1] - 1157:5

**Soon** [1] - 1188:20

**soon** [1] - 1188:20

**sooner** [1] - 1131:19

**sorry** [17] - 1090:13, 1097:13, 1097:15, 1114:21, 1117:15, 1161:16, 1170:14, 1205:15, 1219:9, 1221:21, 1224:23, 1238:6, 1238:18, 1242:20, 1252:9, 1253:5, 1262:24

**Sorry** [6] - 1185:16, 1191:17, 1209:12, 1224:12, 1238:8, 1247:9

**sort** [5] - 1145:12, 1179:14, 1246:14, 1248:6, 1248:16

**sorted** [1] - 1247:3

**sorts** [4] - 1115:22, 1245:23, 1248:15, 1248:17

**sound** [7] - 1124:8, 1140:14, 1148:2, 1219:20, 1231:9, 1231:13, 1231:17

**sounds** [1] - 1264:10

**Sounds** [1] - 1265:9

**source** [2] - 1135:12, 1135:13

**space** [1] - 1150:24

**span** [1] - 1112:15

**speakerphone** [1] - 1209:9

**speaking** [5] - 1086:11, 1129:6, 1140:9, 1140:11, 1226:21

**specific** [4] - 1114:24, 1193:25, 1234:21, 1246:23

**specifically** [6] - 1097:18, 1102:24, 1172:2, 1186:2, 1195:11, 1203:13

**Specifically** [1] - 1196:8

**specifics** [3] - 1173:16, 1177:14, 1193:10

**specify** [1] - 1091:21

**spend** [3] - 1127:6, 1133:23, 1227:4

**spent** [2] - 1118:8, 1147:18

**split** [2] - 1155:15, 1200:6

**spoken** [1] - 1219:23

**ss** [1] - 1268:5

**staff** [6] - 1140:25, 1151:14, 1158:13, 1158:16, 1166:7, 1194:19

**stand** [2] - 1219:17, 1244:22

**standard** [1] - 1087:3

**standpoint** [1] - 1118:3

**stands** [2] - 1219:6, 1241:4

**start** [7] - 1098:11, 1106:9, 1129:24, 1176:15, 1212:4, 1220:23, 1233:25

**start-up** [1] - 1106:9

**started** [7] - 1084:9, 1100:3, 1105:25, 1107:10, 1217:8, 1225:2, 1233:9

**starting** [6] - 1164:15, 1173:5, 1179:22, 1182:10,

1186:19, 1222:8

**Starting** [1] - 1168:21

**starts** [2] - 1126:19, 1237:12

**STATE** [1] - 1268:4

**state** [7] - 1088:22, 1131:9, 1142:4, 1142:11, 1212:13, 1219:2, 1224:21

**State** [1] - 1268:9

**statement** [1] - 1193:14

**statements** [1] - 1218:13

**states** [11] - 1103:14, 1114:14, 1130:12, 1130:18, 1212:11, 1213:12, 1216:3, 1217:10, 1221:17, 1222:18, 1225:25

**stating** [5] - 1090:11, 1101:2, 1101:17, 1131:15, 1225:15

**status** [1] - 1231:24

**stay** [1] - 1204:16

**stayed** [1] - 1266:25

**staying** [1] - 1124:18

**stays** [2] - 1129:7, 1205:5

**std** [2] - 1090:16, 1222:23

**Stearns** [2] - 1106:4, 1106:5

**step** [3] - 1159:17, 1159:23, 1159:24

**STEPHENS** [1] - 1081:15

**Sterling** [1] - 1084:23

**still** [5] - 1102:13, 1143:9, 1145:22, 1145:25, 1196:4

**stilled** [1] - 1149:23

**stipulated** [1] - 1266:9

**stock** [1] - 1177:6

**stopped** [1] - 1216:14

**straightened** [1] - 1225:14

**strike** [8] - 1159:7, 1159:15, 1172:14, 1181:18, 1199:12, 1202:13, 1202:18, 1246:10

**Strike** [1] - 1170:14

**structure** [3] - 1107:6, 1151:25, 1154:24

**structured** [1] - 1193:24

**stub** [2] - 1218:9, 1241:12

**stubs** [6] - 1218:19, 1240:23, 1241:8, 1241:14, 1241:16, 1242:2

**stuck** [2] - 1142:17, 1195:7

**stuff** [1] - 1263:4

**subject** [1] - 1126:8

**submit** [3] - 1098:11, 1234:24, 1235:5

**submitted** [6] - 1098:16, 1098:25, 1192:10, 1212:16, 1234:10, 1266:14

**submitting** [2] - 1213:13, 1234:2

**subsequent** [4] - 1121:14, 1131:17, 1137:20, 1137:25

**subsequently** [4] - 1106:14, 1106:15, 1120:9, 1123:3

**substance** [1] - 1256:19

**substitute** [1] - 1091:23

**suffered** [4] - 1088:24, 1147:23, 1218:21, 1221:11

**suffering** [2] - 1087:9, 1087:24

**suggest** [1] - 1225:9

**suggested** [2] - 1206:20, 1214:6

**suggestion** [1] - 1136:11

**Suite** [1] - 1081:16

**summarize** [1] - 1105:20

**Sunday** [3] - 1126:8, 1136:6, 1190:23

**supervising** [2] - 1107:20, 1107:24

**supervisor** [4] - 1090:7, 1154:4, 1154:8, 1221:13

**Supervisor** [1] - 1153:20

**supervisory** [5] - 1142:22, 1184:11, 1192:24, 1193:18, 1205:11

**support** [1] - 1130:19

**supportive** [3] - 1122:24, 1123:4, 1131:2

**Sur** [1] - 1082:5

**SUR** [2] - 1083:20, 1261:16

**SUR-SURREBUTTAL** [2] - 1083:20, 1261:16

**surprise** [5] - 1150:11, 1150:15, 1151:21, 1151:24, 1153:24

**surprised** [2] - 1130:21, 1147:14

**SURREBUTTAL** [4] - 1083:19, 1083:20, 1256:14, 1261:16

**surrounding** [1] - 1124:11

**suspect** [1] - 1142:10

**suspended** [1] - 1105:18

**swear** [1] - 1084:10

**swore** [2] - 1163:7, 1164:7

**sworn** [4] - 1084:17, 1104:14, 1210:12, 1244:21

**system** [9] - 1134:10, 1134:20, 1134:22, 1135:14, 1136:18, 1191:2, 1215:3, 1229:18, 1241:21

## T

**task** [1] - 1129:18

**tasks** [1] - 1193:25

**taxable** [1] - 1108:9

**team** [14] - 1107:11, 1109:3, 1109:4, 1158:7, 1158:10, 1166:10, 1170:6, 1170:9,

1170:10, 1172:16, 1194:20, 1203:14

**technical** [1] - 1247:9

**technology** [1] - 1148:13

**teenage** [1] - 1120:3

**telecommunications** [1] - 1148:14

**telephonic** [2] - 1086:6, 1086:10

**telephonically** [2] - 1086:5, 1086:12

**ten** [3] - 1253:23, 1263:22, 1264:9

**term** [2] - 1239:12, 1250:17

**terminal** [1] - 1246:14

**terminate** [4] - 1111:10, 1146:13, 1146:17, 1147:3

**terminated** [9] - 1146:8, 1148:2, 1148:8, 1229:24, 1230:10, 1230:14, 1242:7, 1257:5, 1258:3

**termination** [4] - 1150:2, 1229:21, 1230:8, 1230:9

**terminations** [1] - 1230:17

**terms** [6] - 1134:5, 1183:17, 1195:18, 1229:23, 1252:10, 1253:22

**terrific** [1] - 1106:7

**testified** [25] - 1084:18, 1085:24, 1090:5, 1104:15, 1114:10, 1123:25, 1129:3, 1144:3, 1151:18, 1154:10, 1159:7, 1159:15, 1162:23, 1181:19, 1185:7, 1190:5, 1194:18, 1195:9, 1198:22, 1200:15, 1203:15, 1205:22, 1210:13, 1244:22, 1252:9

**testify** [4] - 1180:22, 1194:3, 1256:17, 1257:3

**testifying** [2] - 1142:15, 1181:24

**testimony** [17] - 1084:8, 1162:25, 1163:7, 1164:7, 1173:20, 1181:19, 1181:21, 1195:16, 1198:3, 1200:17, 1200:20, 1204:6, 1209:16, 1211:12, 1245:2, 1245:6, 1257:7

**text** [3] - 1193:4, 1193:8, 1193:19

**THE** [122] - 1084:14, 1090:25, 1093:12, 1093:17, 1093:22, 1099:3, 1099:10, 1102:8, 1104:7, 1104:11, 1104:21, 1129:2, 1129:13, 1129:16, 1129:19, 1129:20, 1134:2, 1134:8, 1134:22, 1134:25, 1135:7, 1135:13, 1135:25, 1136:4, 1136:9, 1136:13, 1136:14, 1136:16, 1136:20, 1144:19, 1144:21,

1145:7, 1145:14, 1146:3, 1146:4, 1155:20, 1160:25, 1161:2, 1166:16, 1166:17, 1167:14, 1167:23, 1168:11, 1180:24, 1182:2, 1182:7, 1185:14, 1190:18, 1190:20, 1191:16, 1191:19, 1194:8, 1194:15, 1194:16, 1195:21, 1195:24, 1197:23, 1197:25, 1198:2, 1198:13, 1198:16, 1198:19, 1204:5, 1204:11, 1204:12, 1204:15, 1204:25, 1205:17, 1208:11, 1208:13, 1209:6, 1209:20, 1210:2, 1210:5, 1210:9, 1227:13, 1227:15, 1232:24, 1233:3, 1242:21, 1244:9, 1244:13, 1244:18, 1247:8, 1247:9, 1247:25, 1248:4, 1248:11, 1248:14, 1249:10, 1249:14, 1249:25, 1250:3, 1250:5, 1250:8, 1250:10, 1250:14, 1251:5, 1251:10, 1253:2, 1253:6, 1259:14, 1259:17, 1260:2, 1260:6, 1261:9, 1261:13, 1263:16, 1263:19, 1264:16, 1264:21, 1265:2, 1265:9, 1265:13, 1265:17, 1265:19, 1265:21, 1266:4, 1266:18, 1267:13, 1267:16, 1267:22

**Therefore** [2] - 1224:25, 1233:8

**therefore** [1] - 1100:2

**thick** [1] - 1220:13

**thinking** [1] - 1135:23

**third** [6] - 1117:7, 1126:18, 1192:17, 1215:8, 1228:10, 1260:24

**Thirty** [1] - 1264:16

**three** [13] - 1109:8, 1117:2, 1124:21, 1125:15, 1125:21, 1192:21, 1193:12, 1194:9, 1198:9, 1257:6, 1257:9, 1257:16, 1264:8

**Three** [1] - 1255:10

**thrilled** [3] - 1205:14, 1205:19, 1205:24

**thriving** [1] - 1131:11

**throughout** [1] - 1158:18

**Thursday** [1] - 1265:5

**timeline** [1] - 1258:12

**timing** [3] - 1107:9, 1127:4, 1263:23

**TiO2** [1] - 1144:23

**title** [9] - 1085:6, 1104:25, 1108:6, 1118:4, 1159:12, 1167:8, 1206:12, 1210:19, 1210:21

**titled** [2] - 1212:9, 1213:9

**TMT** [8] - 1148:13, 1149:2,

1287

1149:7, 1149:13, 1149:15, 1149:18, 1150:19, 1204:16
**today** [9] - 1084:8, 1162:23, 1185:8, 1190:5, 1192:11, 1195:9, 1247:23, 1264:17, 1265:2
**Todd** [8] - 1108:13, 1111:5, 1113:17, 1114:7, 1115:16, 1172:21, 1173:16, 1204:17
**together** [3] - 1107:10, 1109:11, 1249:23
**ton** [1] - 1188:11
**took** [14] - 1106:5, 1107:3, 1152:24, 1154:14, 1157:13, 1157:24, 1159:24, 1191:17, 1199:6, 1213:18, 1213:22, 1214:2, 1225:15, 1226:9
**top** [12] - 1152:6, 1168:2, 1192:18, 1220:20, 1228:13, 1228:20, 1249:8, 1252:13, 1253:3, 1253:4, 1253:23, 1261:3
**Top** [1] - 1253:6
**top-line** [1] - 1152:6
**topic** [1] - 1227:17
**total** [6] - 1116:23, 1117:20, 1177:15, 1245:21, 1251:7, 1255:11
**totally** [1] - 1162:7
**Towbin** [1] - 1106:2
**TRACE** [2] - 1250:16, 1251:12
**track** [1] - 1149:7
**traction** [1] - 1207:13
**trade** [11] - 1134:18, 1201:24, 1202:4, 1202:8, 1247:22, 1249:11, 1251:24, 1252:6, 1255:22, 1256:2, 1256:5
**traded** [1] - 1141:9
**trader** [2] - 1174:11, 1174:16
**traders** [2] - 1144:13, 1144:15
**trades** [1] - 1199:21
**trading** [23] - 1109:10, 1109:18, 1142:10, 1145:3, 1147:11, 1169:22, 1170:6, 1194:20, 1202:11, 1245:8, 1247:13, 1247:16, 1247:18, 1250:15, 1250:17, 1250:19, 1250:20, 1251:2, 1251:4, 1251:9, 1251:13, 1252:4
**Trading** [1] - 1152:7
**training** [1] - 1161:24
**transcript** [12] - 1163:21, 1164:11, 1168:14, 1168:15, 1168:21, 1172:24, 1179:18, 1186:16, 1189:9, 1263:22, 1264:9, 1268:12
**travel** [6] - 1118:8, 1183:18,

1185:13, 1185:19, 1185:22, 1186:3
**traveling** [2] - 1118:20, 1183:22
**Troy** [1] - 1210:25
**true** [4] - 1096:24, 1206:3, 1258:2, 1268:12
**try** [3] - 1093:6, 1176:7, 1236:24
**trying** [8] - 1093:8, 1104:2, 1122:19, 1130:8, 1182:24, 1220:17, 1234:5, 1238:18
**turn** [12] - 1109:16, 1164:12, 1168:14, 1173:2, 1192:9, 1192:17, 1212:25, 1216:21, 1223:5, 1228:9, 1240:22, 1260:24
**turnover** [2] - 1174:8, 1207:5
**two** [17] - 1085:22, 1102:7, 1105:11, 1107:14, 1138:16, 1142:17, 1153:12, 1155:19, 1180:11, 1199:6, 1213:6, 1217:24, 1228:3, 1228:6, 1238:19, 1244:14, 1264:8
**type** [1] - 1097:5
**types** [3] - 1153:15, 1204:2, 1230:17
**typical** [1] - 1195:4
**typically** [4] - 1111:25, 1113:8, 1127:12, 1241:16

## U

**ultimately** [2] - 1225:7, 1227:23
**Umesh** [3] - 1149:22, 1175:9, 1204:17
**under** [11] - 1089:15, 1103:11, 1107:12, 1163:7, 1164:7, 1207:13, 1213:19, 1216:3, 1216:6, 1222:11, 1234:5
**undergrad** [1] - 1162:20
**underlined** [1] - 1243:21
**underneath** [1] - 1243:17
**understand** [6] - 1097:9, 1128:17, 1177:9, 1222:3, 1239:10, 1263:21
**understood** [8] - 1088:24, 1098:6, 1129:3, 1130:3, 1132:8, 1150:25, 1183:21, 1186:6
**undertake** [1] - 1109:23
**unexpectedly** [1] - 1234:5
**unfair** [1] - 1094:12
**universe** [4] - 1142:8, 1144:18, 1144:22, 1145:23
**unlawful** [2] - 1170:20, 1170:23
**Unless** [1] - 1212:13

**unless** [2] - 1097:17, 1102:6
**unpaid** [9] - 1089:20, 1089:21, 1090:13, 1090:14, 1091:20, 1091:22, 1091:24, 1222:20, 1243:19
**Unterberg** [1] - 1106:2
**unusual** [1] - 1241:11
**up** [21] - 1093:5, 1105:21, 1106:9, 1113:20, 1124:17, 1124:19, 1131:3, 1131:4, 1134:10, 1162:19, 1189:25, 1209:12, 1209:21, 1224:12, 1243:18, 1244:11, 1246:11, 1259:14, 1261:23, 1262:12, 1264:6
**upper** [1] - 1153:19
**upset** [2] - 1167:7, 1196:12
**US** [3] - 1245:19, 1245:20, 1251:15
**user** [2] - 1112:7, 1145:16
**uses** [3] - 1236:21, 1237:25, 1238:11
**utilized** [1] - 1171:15

## V

**vacation** [2] - 1172:22, 1173:17
**VALDI** [1] - 1081:11
**Valdi** [1] - 1232:14
**valuable** [1] - 1112:9
**valuation** [1] - 1247:23
**value** [4] - 1248:13, 1248:18, 1249:12, 1251:7
**vantage** [2] - 1134:19, 1135:15
**ventured** [1] - 1168:7
**versus** [4] - 1120:12, 1179:15, 1248:12, 1249:12
**Via** [1] - 1125:24
**view** [5] - 1145:9, 1145:16, 1202:12, 1231:8, 1257:17
**views** [1] - 1263:25
**VLADECK** [1] - 1081:5
**vlicul@vladeck.com** [1] - 1081:12
**voice** [1] - 1113:20
**volatile** [2] - 1145:5, 1252:3
**volatility** [1] - 1252:4
**volume** [4] - 1248:9, 1248:12, 1249:11, 1251:8
**voluntary** [4] - 1110:5, 1162:24, 1164:20, 1204:13

## W

**waiting** [1] - 1209:9
**walk** [1] - 1224:2
**week** [1] - 1265:17

**weekend** [1] - 1265:12
**weeks** [28] - 1089:7, 1089:12, 1089:14, 1089:15, 1090:2, 1090:3, 1119:16, 1121:24, 1122:7, 1124:21, 1125:15, 1125:21, 1140:21, 1185:19, 1185:23, 1189:21, 1192:21, 1193:12, 1194:9, 1221:20, 1221:21, 1222:7, 1222:12, 1224:2, 1243:18, 1258:20, 1264:8, 1265:5
**weight** [3] - 1247:16, 1250:4, 1250:13
**weighted** [1] - 1255:3
**weighting** [8] - 1247:5, 1247:11, 1247:12, 1247:21, 1247:22, 1249:9, 1252:13, 1252:20
**welcome** [2] - 1142:18, 1244:13
**West** [1] - 1264:7
**WHEREOF** [1] - 1268:19
**whole** [5] - 1099:22, 1099:23, 1105:23, 1200:8, 1207:5
**William** [3] - 1099:17, 1099:19, 1224:19
**Willing** [1] - 1196:10
**willingness** [1] - 1196:8
**wishes** [1] - 1130:13
**wishing** [1] - 1130:13
**withdraw** [1] - 1092:9
**withdrawn** [1] - 1143:16
**Withdrawn** [1] - 1190:19
**witness** [1] - 1205:5
**WITNESS** [54] - 1082:12, 1083:3, 1084:14, 1090:25, 1093:12, 1093:17, 1093:22, 1099:10, 1104:11, 1129:13, 1129:19, 1134:8, 1134:25, 1135:13, 1136:4, 1136:13, 1136:16, 1144:21, 1145:14, 1146:4, 1161:2, 1166:17, 1167:23, 1182:7, 1190:18, 1190:20, 1191:16, 1191:19, 1194:15, 1195:24, 1197:25, 1198:13, 1204:11, 1204:15, 1209:6, 1209:20, 1210:2, 1210:5, 1210:9, 1232:24, 1233:3, 1244:13, 1247:9, 1248:4, 1248:14, 1249:14, 1250:3, 1250:8, 1250:14, 1251:10, 1253:6, 1261:9, 1261:23, 1268:19
**women** [1] - 1119:25
**word** [3] - 1236:21, 1237:25, 1238:11
**wording** [1] - 1120:6
**words** [2] - 1129:16, 1256:18
**works** [1] - 1247:10

1288

| | |
|---|---|
| **write** [3] - 1089:3, 1100:22, 1131:13<br>**writes** [1] - 1132:23<br>**writing** [2] - 1131:18, 1264:23<br>**written** [4] - 1194:24, 1198:4, 1212:16, 1213:13<br>**wrote** [4] - 1090:6, 1233:5, 1239:18, 1262:15 | **YORK** [2] - 1268:4, 1268:6<br>**York** [9] - 1080:15, 1081:7, 1081:17, 1129:17, 1133:3, 1268:9<br>**yourself** [12] - 1085:23, 1088:8, 1126:7, 1131:4, 1220:21, 1220:24, 1221:8, 1223:11, 1224:18, 1230:2, 1257:18, 1257:21 |

| Y | Z |
|---|---|
| **year** [12] - 1085:4, 1096:4, 1158:19, 1190:15, 1206:16, 1226:16, 1226:18, 1231:21, 1232:8<br>**years** [7] - 1091:10, 1120:4, 1120:10, 1156:7, 1157:20, 1228:21, 1257:6<br>**yesterday** [3] - 1245:2, 1250:16, 1256:18<br>**yield** [121] - 1106:6, 1106:9, 1106:14, 1106:17, 1106:19, 1106:24, 1107:5, 1107:14, 1108:3, 1108:17, 1108:18, 1108:23, 1109:3, 1109:4, 1109:7, 1109:8, 1109:9, 1109:10, 1109:21, 1110:3, 1111:7, 1113:7, 1114:22, 1116:3, 1116:13, 1116:16, 1116:22, 1116:24, 1117:14, 1117:15, 1117:17, 1121:7, 1136:10, 1138:21, 1139:7, 1143:5, 1143:10, 1143:18, 1143:20, 1144:5, 1148:7, 1148:24, 1150:3, 1150:4, 1151:3, 1156:13, 1157:19, 1157:23, 1158:3, 1158:10, 1159:21, 1160:4, 1160:8, 1160:23, 1162:4, 1162:14, 1165:23, 1165:25, 1166:3, 1166:6, 1167:3, 1167:11, 1167:12, 1169:17, 1169:18, 1169:21, 1169:22, 1169:25, 1170:2, 1170:5, 1170:6, 1170:10, 1170:12, 1170:15, 1171:13, 1171:19, 1172:16, 1172:19, 1173:23, 1174:5, 1174:11, 1174:21, 1175:5, 1177:16, 1177:20, 1177:21, 1178:4, 1178:15, 1178:16, 1197:10, 1197:13, 1199:2, 1201:24, 1202:4, 1202:8, 1202:14, 1202:16, 1202:21, 1203:14, 1204:8, 1205:25, 1206:5, 1206:8, 1206:19, 1245:14, 1245:17, 1245:20, 1245:22, 1245:24, 1245:25, 1251:15, 1252:13, 1253:20, 1254:20, 1255:4, 1255:18, 1255:22, 1256:2, 1258:5 | **Zero** [3] - 1150:6, 1150:8, 1150:10<br>**zero** [2] - 1188:8, 1218:16 |